# EXHIBIT A

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ALFRED ALOISI, et al., )
)
Plaintiffs, )
)
vs. ) No. 95-650L
)
UNITED STATES OF AMERICA, )
)
Defendants. )
)

DEPOSITION OF ALFRED ALOISI

Wednesday, October 31, 2007
9:20 a.m.

Reported By: CRAIG W. WOOD, RPR, CSR No. 9789

APPEARANCES

For the Plaintiffs:
FOLEY & LARDNER
Washington Harbour
3000 K Street, N.W., Suite 500
Washington, DC 20007-5101
(202) 295-4017
BY: LAWRENCE G. McBRIDE

For the Defendant:
DEPARTMENT OF JUSTICE
Environmental & Natural Resources Division
601 D Street, N.W.
Washington, DC 20004
(202) 305-0238
BY: BRUCE K. Trauben

Also Present: Thomas Ferrero
Hilton Cass

---oOo---

INDEX

EXAMINATION BY: Page

Mr. Trauben 4

EXHIBITS

FOR THE DEFENDANT'S:
1 Quitclaim Deed 29
2 Tax Assessor Cards 47
3 Document 129
4 Letter 131

---oOo---

BE IT REMEMBERED that on Wednesday, October 31, 2007, commencing at the hour of 9:20 a.m., of said day, at the offices of Klamath National Forest, 1312 Fairlane Road, Yreka, California, before me, Craig W. Wood, a Certified Shorthand Reporter in and for the State of California, there personally appeared

ALFRED L. ALOISI,

who, being first duly sworn by me to tell the truth, was examined and testified as follows:

---oOo---

EXAMINATION

BY MR. TRAUBEN:

Q. Will you please state your name for the record.
A. Alfred L. Aloisi.
Q. And you go by Fred?
A. Yes, I do.
Q. As you know, my name is Bruce Trauben. I represent the United States, the defendant in this action.
A. Yes, Bruce, I've made your acquaintance.
Q. I'll have some questions for you today. And just as an overview of what we're going to do today, I'm going to ask you some general questions about the -- who the plaintiffs are and the status of the plaintiffs.

We'll go into the property interest of the plaintiffs. The knowledge of the owl. We'll talk about the various components that go into a takings case. So just to give you an overview of what we'll be discussing.

A. Thank you.

Q. And, also, we'll get into your prior deposition. I have some follow-up questions and some discovery responses.

A. Very well.

Q. I understand from discussions with your attorney, Mr. McBride, that Mr. Goodman has passed away.

A. Yes, he has.

Q. And do you know when?

A. Approximately three, four years ago. And I'm not certain of the exact date.

Q. When did you learn of his passing?

A. I would say three years ago.

Q. Do you know, was it sudden, his death?

A. No. It was -- I believe his health deteriorated over a considerable period of time. Don was diabetic and he had other problems, as well.

Q. Do you know whether his estate is still in probate?

A. I do not know.

Q. Do you know who is representing his estate?

A. I do not.
Q. Do you know where Mr. Kendle is located?
A. I don't know for certain. Although, I had someone tell me that they thought he might be in Portland.
Q. What was the last time you spoke to Mr. Kendle.
A. 1991. May the 5th.
Q. Does Mr. Kendle know that he's a plaintiff in this action?
A. I'm not certain.
Q. Did you send him a copy of the complaint?
A. No, I did not.
Q. Do you know whether anyone else sent him a copy of the complaint?
A. I have no knowledge of that.
Q. Just to clarify my last question. Do you know whether he saw a draft of the complaint before it was filed?
A. I don't believe so. I last saw him in '91 and the complaint was filed in '95.
Q. Do you know the status of Dynatech today?
A. Dynatech and Capricorn are both in bankruptcy.
Q. Is Capricorn a plaintiff?
A. I don't know if Capricorn is listed. I don't believe so. Perhaps it was. Dynatech, Capricorn, yes.

the claims once they went open for location upon Mr. Patterson's untimely demise.

Q. I don't understand how Mega Gold had an interest in the mining claims. Do you understand it?

A. By virtue of -- of Mega Gold? By virtue of a lease.

Q. A lease with whom?

A. Mega Gold had a lease with myself and Jim Kendle.

MR. McBRIDE: To try to keep the record clear, is this the lease -- or this is what you testified as a predecessor to the lease under which that occurred?

THE WITNESS: This was the Mara Venture's -- yes. This is the predecessor lease to that.

MR. McBRIDE: Okay. Tying them together, Mr. Trauben.

BY MR. TRAUBEN:

Q. So this, then, was after you had staked your claims in Eddy Gulch?

A. Correct.

Q. Okay. So can you explain Mara Ventures to me? Who formed Mara Ventures?

A. Mara Ventures was a Washington corporation that was, I guess, a U.S. company that Mr. Robert Pincomb and one other person that was involved with them there --

from Canada, that had an agreement with Mr. Patterson for many years.

And they had carried out some exploration with a company by the name of New Cinch Uranium, which was the 1977, '76 drilling program that was done there on the properties.

Q. At some point did you quitclaim your interest in the mining claims to Mara Ventures?

A. Yes. I think we did.

Q. Did you --

A. I'm going to say -- I say that with some uncertainty. I'm not certain we quitclaimed it to Mara Ventures. It's been a long time. I'm not quite certain.

Q. That's fair enough.

Mr. TRAUBEN: May we have this marked, please, as Exhibit 1 to today's deposition.

(Defendants' Exhibit 1 was marked.)

BY MR. TRAUBEN:

Q. Okay. Mr. Aloisi, I'm going to hand you what's been marked as Exhibit 1 to your deposition today. Is that a quitclaim deed from you and Jim Kendle to Mara Ventures?

A. Yes, it is.

Q. In that transaction, are you quitclaiming all

your interest in the listed mining claims?
A. Yes, we are.
Q. What's the date of that?
A. July 23rd. And the year is obscured. Let's see if I can find it someplace else.
I'm sorry, dated April 12, 1988.
Q. Did you and Mr. Kendle at some point reacquire an interest in the mining claims?
A. Yes, we did.
Q. And when was that?
A. Well, I'm not certain of the exact year, but Mara Ventures received $50,000 through the law firm of Jacobson, Jewett & Turoff of Medford and deeded back all interest in the properties. The Patterson estate also received $50,000, as did Ruth Markon as per my prior agreements. Even though the claims had come up open.
Q. Do you know whether plaintiffs have produced the deed from Mara Ventures back to the plaintiffs?
A. It's here. I believe we've just given you those documents.
Q. Do you know what tab number that was produced as?
A. Pardon?
Q. Do you know under what tab number?
A. Let's see here. Well, I'm looking at A-180,

A. Yes, it does.
Q. And your recollection is that you did intend to lease the placer claims?
A. It appears I did lease the placers.
Q. And that was your intent to lease all the placer claims to WAZCO?
A. I don't know if it was my intent. I'm just saying that we did lease all of them to them.
Q. Okay. And all the lode claims, as well?
A. That was my intent.
Q. And that's what this document effectuated?
A. Yes, sir.
Q. We are done with that for the time being.
Can you take a look at A-181 that was recently produced by plaintiffs.
A. Yes.
Q. Take a moment and look that over.
A. Yes, I have. I'm familiar with this document.
Q. And what is this document?
A. This is a Notice of Delinquency to a Co-Owner on Proof of Labor. It's advertising someone out of a claim.
Q. And that person is Mr. Kendle?
A. Kendle Trucking, John Kendle and James Kendle.
Q. James Kendle, one of the plaintiffs?

A. Yes.
Q. That's with respect to the lode and placer claims listed on the front page of that exhibit?
A. Yes, sir.
Q. And in this document are you and Candis asserting that the entities you just mentioned, the individuals on Kendle Trucking, failed to contribute their share of assessment work?
A. Correct.
Q. What is "assessment work"?
A. Assessment work is work that has to be performed on a mining claim in the form of labor, $100 labor, in order to meet your annual requirements in order to hold those claims.
MR. McBRIDE: If I may, Bruce, I think these questions are subject to the same understanding or a flip side understanding as our questions to Forest Service people. This is not a legal conclusion, but is understanding of what the requirements of the law may be or how the law works.
MR. TRAUBEN: Exactly.
MR. McBRIDE: Thank you.
BY MR. TRAUBEN:
Q. That's your understanding of what assessment work is?

my best to answer.
Q. No. That's fine.
Do you know whether Mr. Kendle's interests actually were extinguished in the mining claims?
A. Certainly hope so. We recorded the documents.
Q. And it's just a matter of course as your understanding that once you submit the documents and the notice is posted, that his interest then extinguishes after the response?
A. Yes. Within a certain period of time. That's my understanding.
Q. And it is your understanding that he did not respond?
A. That's my understanding.
MR. TRAUBEN: Go off the record a second.
(Off the record.)
BY MR. TRAUBEN: Back on the record.
Q. Do you still have the notebook, if you could take a look at Forest Service Document 147.
A. Yes, sir.
Q. And that should be a lease and option agreement between you and Don Goodman, the lessor and Liberty Consolidated Mines as the lessee?
A. Yes.
Q. And if you flip back to the second to the last

Liberty Mining, Inc. has?
A. It's the only one I have at this time. I provided.
Q. There were others?
A. No. This is the only one that I have.
Q. Currently. Were there others generated?
A. I would believe so. Yes. I think this is all that we have left of those documents, though.
Q. When was Liberty Mining formed?
A. I believe it was -- about 1990. '89, '90, somewhere in there. We have Articles of Incorporation here. If I could look at them, I could let you know.
Q. Okay. But just because this begins with April '89, it was sometime before April '89?
A. I would think so. Yes.
Q. And this is the company's register?
A. Yes, sir.
Q. Okay. Do you recognize any of the handwriting in the register?
A. I do. I certainly do.
Q. And is that -- any of that your handwriting?
A. It is not.
Q. Whose handwriting is that?
A. Jim Kendle's. Oh, there is one piece here. On

line -- check number 1006, Economy Plywood, that kind of looks like my handwriting. Maybe not. Guess not.

Q. Between the two of you --

A. Oh, and the top one here to Alfred Aloisi for $20 is my handwriting.

Q. -- between the two of you, you and Mr. Kendle, was Mr. Kendle more responsible for keeping the books?

A. Correct.

Q. Do you know whether these --

A. Excuse me one second.

Q. Sure.

A. I'm not sure if it was exactly at this same time, but approximately at this same time, we hired an accountant here in Medford by the name of Clay Vanderbrick, I think it was, that was doing our books and issuing checks to our crew. And I believe that would supplement this. It might have been shortly after these, might have been the next --

Q. That's what I was going to get to. Can you take a look at A-164. You can leave the handwritten one available.

A. Okay.

Q. Was the document plaintiffs produced at A-164 prepared by the accounting firm that you hired?

A. I believe so.