IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ALFRED ALOISI, et al., | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | No. 95-650L |
| | ) | |
| UNITED STATES OF AMERICA, | ) | Hon. Lawrence S. Margolis |
| | ) | |
| Defendant. | ) | |
| | ) | |

**JOINT STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

The parties, through counsel, hereby submit their Joint Statement of Material Facts Not in Dispute, for the purpose of forthcoming dispositive motions only, as follows:

1. Eddy Gulch is on the north side of a ridge of the Klamath Mountains in Siskiyou County, California. Eddy Gulch drains into the North Fork of the Salmon River at the town of Sawyers Bar, California. Placer gold mining began at Sawyers Bar in about 1851, and moved into Eddy Gulch thereafter. Placer mining refers to the mining of locatable minerals, such as gold, silver or other minerals, from deposits of material that are not rock in place. Development of the lode deposits (gold-bearing ore deposits) that were the source of the downstream placer gold in Eddy Gulch began in about 1862. Between 1863 and 1932, reportedly 230,000 ounces of gold was produced from placer and lode mining operations in Eddy Gulch. See JA 75 at 711 (map); JA 100 at 945-46, 958-59; JA 6 at 140, 145-47 (derived from California State Mineralogist's Reports).[1] The property involved in this case is located in Eddy Gulch within the area formerly known as the Liberty Mining District. JA 75 at 710-14.

[1] "JA [No.]" refers to the tab-numbered documents found in the Joint Appendix to the Joint Statement of Facts, a paper copy of which is being filed contemporaneously with this Joint

2. Evidence of underground mine workings, including tunnels and portals (i.e., tunnel entrances), surface cave-ins containing exposed underground mine timbers, mine waste and tailings dumps near the mouths of tunnels, and tailings dumps near remnants of stamp mills (which generally use weighted cylinders, similar to pistons, to crush rock) and other ore processing structures are found throughout Eddy Gulch. See JA 6 at 11; JA 100; and JA 105.

3. The area of Eddy Gulch involved in this case, except for two private, patented parcels, lies within the boundaries of Klamath National Forest ("KNF"), which is within the Pacific Southwest Region (also known as Region 5, or "R5"). The KNF is a unit of the national forest system under the jurisdiction of the U. S. Department of Agriculture, Forest Service ("Forest Service" or "USFS"), with the Forest Supervisor's office in Yreka, California and, during the relevant time period, with the Regional Forester's office in San Francisco, California (now in Vallejo, California). The two patented parcels are surrounded by the KNF. The Eddy Gulch area within KNF is under the supervision of the Salmon River Ranger District, with the District Ranger's office in Etna, California, during the relevant time period, and now is in Fort Jones, California ("the District Ranger").

4. The KNF lands in Eddy Gulch, including the land embraced by the unpatented mining claims involved in this case, have not been withdrawn and at all relevant times have been, and remain, open for location of mining claims under the General Mining Laws of the United States, 30 U.S.C. § 22 et seq. ("the Mining Law"). The Forest Service regulates the use of the surface of national forest system lands in connection with mining operations authorized by the United States mining laws through regulations found in 36 CFR Part 228, Subpart A. (Other

---

Statement of Facts; the cited page numbers refer to the Bates numbers found on each page with the prefix, "JA."

government agencies regulate other aspects of mining operations, for example the Department of Labor regulates underground mine safety under the Federal Mine Safety and Health Act of 1977, PL 91-173, as amended.)

5. The two patented parcels noted in paragraph 3 were patented into private ownership by the United States under the Mining Law. The patented parcels are: (a) a patented lode claim formally surveyed and conveyed by the United States as Mineral Lot 45A of Mineral Survey No. 3161, and known variously as the Mountain Laurel Mine; and (b) a patented mill site claim formally surveyed and conveyed by the United States as Mineral Lot 45B (Mill Site) of the same Mineral Survey No. 3161, and variously known as Rollin Townsite, Rollin Mill Site, or the Mountain Laurel Mill Site. See JA 35; JA 188 (map).

6. In 1984, the Forest Service issued the Regional Guide for the Pacific Southwest Region ("Regional Guide"), which identified the northern spotted owl (Strix occidentalis) as a sensitive species. According to the Regional Guide, spotted owl territories within the KNF "require a 300-acre core area of old-growth timber stands surrounding a nest site, with an additional 700 acres of these stands in one to four parcels within a 1.5 mile radius of the core area[,]" known as a spotted owl habitat area or "SOHA." JA 3 at 81; see also JA 4 at 97, 110-113; JA 5 at 117; JA 71 at 639.

7. By recognizing the northern spotted owl as a sensitive species, the Forest Service's objectives and policies for sensitive species set out in the Forest Service Manual (Title 2600 – Wildlife, Fish and Sensitive Plant Habitat Management) applied to the spotted owl, including the objectives to: "1. Develop and implement management practices to ensure that [sensitive] species do not become threatened or endangered because of Forest Service actions[;] 2. Maintain viable populations . . . in habitats distributed throughout their geographic range on

National Forest System lands[;] [and] 3. Develop and implement management objectives for populations and/or habitat of sensitive species." JA 2 at 12 (Forest Service Manual, Title 2600 – Wildlife, Fish and Sensitive Plant Habitat Management, July 1984). The Forest Service Manual, which applies agency-wide, assigns responsibilities to each level of management within the Forest Service, including the Regional Forester, Forest Supervisor, and District Ranger, to ensure the viability of sensitive species. See JA 2 at 16-19.

8. In 1985 and 1986, Plaintiff Alfred Aloisi ("Aloisi"), with the assistance of Thomas P. Ferrero ("Ferrero"), staked and recorded a series of lode and placer mining claims, including the: Raindrop (Lode); Dariel (Lode); Sunset (Placer); Sunrise (Lode); Union Addition (Lode); Banner (Lode); Buster (Lode); Specimen (Lode); Blue Bell (Lode); Ohio 84 (Lode); Union Extension (Lode); Union (Lode); Big Fish (Lode); Six O'clock (Lode); Buckeye (Associated Placer); Yankee (Associated Placer); East Fork (Associated Placer); Compressor (Associated Placer); and Stevens (Associated Placer). See JA 27. These unpatented mining claims, along with the two patented parcels within this same area of Eddy Gulch, are the primary mining claims and parcels at issue in this case.

9. On September 11, 1987, the Fish and Wildlife Service of the U.S. Department of the Interior ("Fish and Wildlife Service") published its determination that listing the northern spotted owl as an endangered species may be warranted pursuant to the Endangered Species Act of 1973, as amended (16 U.S.C. 1531, et seq.) ("ESA"). See 52 Fed. Reg. 34396 (Sept. 11, 1987). The Fish and Wildlife Service initiated a formal review and solicited comments from all interested parties. Id.

10. In December 1987, the Forest Service and the Fish and Wildlife Service entered into an interagency agreement to ensure "population viability for the spotted owl," by managing

"habitats on the National Forest System to provide for a number and distribution of spotted owls that insures continued existence," among other agreements. See JA 10 at 216.

11. On December 17, 1987, the Fish and Wildlife Service found it unwarranted to list the spotted owl as an endangered or threatened species at that time, noting the need for further studies. See 52 Fed. Reg. 48552 (Dec. 23, 1987). On May 5, 1988, the Sierra Club Legal Defense Fund filed suit on behalf of a number of environmental organizations in the U.S. District Court for the Western District of Washington, challenging the Fish and Wildlife Service's finding. See Northern Spotted Owl v. Hodel, 716 F.Supp. 479 (W.D. Wash. 1988); see also 54 Fed Reg. 4049 (Jan. 27, 1989) (Fish and Wildlife Service reinitiating the status review of the northern spotted owl upon remand).

12. In July 1988, Aloisi and his associates, operating under the name Jefferson State Exploration and Development Co., proposed to improve a road leading to the Klamath Dump, which is comprised of waste material from historic mining operations, so that a truck could access the dump to take a 20 ton sample; construct a road spur to an area referred to as the vein apex; and drill shallow exploration holes along the vein apex, under a plan of operations submitted to the District Ranger under 36 CFR 228. See JA 15 at 315. This proposed plan "was never finalized due to fire activity." See JA 31 at 439.

13. In August 1988, the Fish and Wildlife Service, the Forest Service, and the Department of the Interior's Bureau of Land Management and National Park Service entered into an Interagency Agreement to ensure population viability for the northern spotted owl. As under the 1987 Interagency Agreement with the Fish and Wildlife Service, under this 1988 Interagency Agreement, the Forest Service agreed to "[m]anage habitats on the National Forest System to provide for a number and distribution of spotted owls that insures continued existence of a well

distributed population of spotted owls on those lands so they may interact with spotted owls throughout the geographic range of the species." See JA 16 at 325. The Forest Service also agreed to "[s]pecify standards and guidelines in Regional Guides and Forest Plans for the conditions and management of habitats designated to maintain reproductive pairs of spotted owls. . . [and to] [c]arry out habitat population inventories and monitoring sufficient to indicate long-term trends in habitats and populations throughout the National Forest System[,]" among other responsibilities. Id. This Interagency Agreement later served as the umbrella authority for the creation of the Interagency Scientific Committee to Address the Conservation of the Northern Spotted Owl in October 1989. See JA 71 at 629.

14. In an order issued on November 17, 1988, the U.S. District Court for the Western District of Washington concluded that the Fish and Wildlife Service's finding (see paragraph 11, supra) was arbitrary and capricious or contrary to law, and remanded the matter back to the Fish and Wildlife Service for further review. See Northern Spotted Owl, 716 F.Supp. at 480; see also 54 Fed. Reg. 4049 (Jan. 27, 1989).

15. On January 19, 1989, the Fish and Wildlife Service reopened its review of the status of the spotted owl as an endangered or threatened species. See 54 Fed. Reg. 4049 (Jan. 27, 1989).

16. In March 1989, Aloisi and plaintiff Donald W. Goodman ("Goodman") (now deceased) and plaintiff James Kendle ("Kendle") organized plaintiff Liberty Mining, Inc., an Oregon corporation ("Liberty"). Aloisi and Goodman were the shareholders and Directors of Liberty, with Kendle serving as the Assistant Secretary. JA 19.

17. In about April 1989, Liberty submitted a plan of operations to the District Ranger. (At that time, it was common practice for the applicant-operator to meet with representatives of

the Forest Service to present a proposed plan of operations orally, or to submit an informal document, perhaps handwritten, describing the proposed activities. Based on the information provided, the Forest Service would prepare a type-written proposed plan of operations for the operator's review and acceptance.) In response, the District Ranger wrote to Liberty forwarding a proposed plan of operations to develop the access road system to the Klamath Dump; remove a 20 ton sample from the Klamath Dump; construct "approximately 2000' of new low standard road twelve (12) feet in width along the apex of the vein for subsurface drilling" (an "apex" is where an ore vein reaches the surface); and drill exploration holes along the vein apex. JA 20 at 389. The proposed plan anticipated using an "assay lab building and wooden storage shed at Schoolhouse Flat," and a "core storage building on the Anna Johnson Claim." JA 20 at 390; see also JA 31 at 441 (June 1989, map showing the location of Schoolhouse Flat and Anna Johnson claim). The proposed plan also contemplated "possibly" constructing approximately 300 feet of road "from the Dariel Lode Claim to the new Black Bear Road if the location is acceptable to the Forest Service." See JA20 at 389-390.

18. On April 19, 1989, in an internal memorandum, the Forest Service's District Wildlife Biologist, Marc Williams, analyzed the potential affects of the proposed plan of operations on the spotted owl, as the "proposed project lies within the Eddy Gulch spotted owl SOHA (#24)." See JA 22 at 399. Mr. Williams concluded that the proposal "will have a negative effect on owl habitat," and suggested mitigation measures to the District Ranger that would help reduce the negative effects, including that "the clearing of the millsite be done in stages," that the "[m]illsite and road work should occur outside of the nesting season," and that noise levels should be reduced. Id. at 400.

19. On May 2, 1989, Liberty submitted a two-phase proposed plan of operations to the Forest Service. See JA 23 at 401. Phase I of the proposed plan included repairing existing roads, taking a 20 ton bulk sample from the Klamath Dump, and, if permitted in light of the "spotted owl situation," logging and cutting with a dozer the apex corridor or, if prevented by the "spotted owl situation," bulk sampling with a dozer at the Klamath, Anna Johnson and Incline Ridge pits. Id. at 401. Phase I also contemplated hauling the 20-ton bulk samples "from apex cuts or existing pits to centrifugal concentrators at ET placer," a nearby mining claim. Id. at 402; see also JA 35 (map showing, among other things, the location of the ET Placer). Phase II of that plan proposed building a road, logging and cutting apex corridors, and other work, depending upon whether the proposed centrifuges were found adequate or not. Id. at 402-403.

20. In response to the May 2, 1989 proposed plan, on May 25, 1989, the Forest Service submitted to Liberty Mining for its consideration a proposed plan of operations that encompassed only Phase I. See JA 24 at 412. Phase I in the Forest Service's proposal included repairing existing access roads, grading access to a staging area for fuel and equipment storage, bulk sampling 20 tons from the Klamath Dump for a test run, and bulk sampling at Klamath, Anna Johnson, and Incline Ridge Pits, and sampling the apex vein from "existing cleared areas." Id. at 413. The proposed plan stated, "[l]ogging of the apex corridors will not occur at this time." Id. This proposed plan also would authorize use of cabins to house a crew and store equipment. Id.

21. Also on May 25, 1989, the Forest Service issued a Decision Notice & Finding of No Significant Impact for Phase I of the proposed plan of operations. See JA 25 at 417.

22. On June 6, 1989, the May 25, 1989 proposed plan of operations for Phase I was fully executed by Liberty Mining and the District Ranger, with a few handwritten modifications (to

allow blasting one rock point, clearing noncommercial timber as a component of road repairs, and allowing additional sampling from road cut slopes); and Liberty posted the required bond. See JA 26; JA 28. By its own terms, the plan was due to expire on July 31, 1989. See JA 26 at 425.

23. On June 23, 1989, the Fish and Wildlife Service published its proposed rule to list the northern spotted owl as a threatened species under the ESA. See 54 Fed. Reg. 26666 (June 23, 1989).

24. In July 1989, Liberty and the Forest Service began discussing, orally during on-site visits by District Ranger staff and in correspondence, Liberty's long-term mining plans and the issues pertaining to approval of those plans. See, e.g., JA 30. These exchanges focused on the potential effects of a long-range operation on the northern spotted owl, and on cultural and historic resources under the National Historic Preservation Act, 16 U.S.C. 460f ("NHPA"). See JA 30; JA 33. The NHPA required the Forest Service to assess the potential effects of Liberty's mining operations on artifacts chiefly from historical mining in Eddy Gulch, such as cabins, mill structures, remnants of stanchions of tramways that delivered ore from mine sites to mill sites, and other artifacts. See JA 35 (map); JA 37 (proposal for archaeological survey); JA 38 (discussing a potential cooperative account for conducting archaeological surveys).

25. Also during July 1989, Liberty Mining proposed additions to the Phase I work (see ¶¶ 20-22, supra). See JA 31. The additional proposed work included building "approximately 1000 feet of road on an old road route . . . to the Mt. Laurel Millsite (Rollin)," improving "the entire road route from Schoolhouse Flat to the Klamath dumps," and "[i]f the dump material testing. . . yields positive results, haul[ing] the dump material down the improved roads. . . for screening and milling." JA 31 at 439-40. "The exact nature of the milling process will depend

on test results," wrote Tom Ferrero for Liberty Mining. Id. at 440. The District Ranger approved the additions to the Phase I plan on August 11, 1989, with additional terms and conditions. See JA 32. An additional performance bond for the screening and milling equipment was not required because the use of such equipment would "depend on the dump testing results." Id. The District Ranger requested that Liberty Mining submit "a description of the equipment to be used for the screening and milling process," before it "is brought onto National Forest lands." Id.

26. On September 28, 1989, Liberty submitted to the Forest Service its long-range plan for operations on certain mining claims in Eddy Gulch, which Liberty refers to as its "all phase" plan. See JA 36; see also JA 35 (map). "The description of the overall exploration and mining plan" in the September 1989 letter was incomplete, however, "due to the fact that preliminary feasibility studies [had] not been completed." JA 36 at 449.

27. Depending upon "the results of the Summer, 1989 exploration program," in its September 28, 1989 letter, Liberty sought the Forest Service's approval to mine the apex (outcrop) of the lode deposit by surface excavation (open pit excavations). JA 36 at 446. Grading and excavation equipment would proceed along the apex. Id. Liberty estimated that the activities identified in the proposed plan would disturb approximately 38.3 acres of the surface. See JA 36 at 447; JA 76,at 747.

28. In October 1989, in support of the "all-phase plan," Liberty explored having a consultant, Winthrop and Associates ("Winthrop"), conduct a "cultural resource survey" for NHPA purposes. JA 37. Rather than contracting with Winthrop, however, Liberty agreed to pay Forest Service employees, on their off-time, to conduct an "Archeological survey to cover the proposed activity at the apex near Klamath mine and at Usher Flat," for purposes of NHPA

compliance. JA 38 at 458; JA 43 at 468. Liberty intended "to have an outside consultant do the Archaeological survey to cover [Liberty's] entire project area before June of 1990." JA 43 at 468; see also JA 42.

29. On October 24, 1989, The District Ranger sought "a firm plan . . .by Liberty Mining depicting what areas are going to be developed and how the areas are going to be developed during the next six month and next twelve month time periods." That plan would "be the foundation for Operating Plan Number Two." JA 38 at 458.

30. On October 25, 1989, Liberty submitted a "Supplemental Plan of Operations, Eddy Gulch Mines, 10/89 to 10/90." JA 40. This plan identified proposed activities through Fall 1990. Id. at 465.

31. On October 26, 1989, in an internal memorandum, Forest Service Archaeologist James T. Rock expressed concern to the District Ranger about mitigating potential impacts of the proposed project on archaeological resources. JA 41.

32. At a November 1, 1989 meeting with Fred Aloisi and representatives of the Forest Service, including the District Ranger, the Forest Service stated that it "still needs [Liberty's] complete Plan of Operations to meet the mining laws, which includes reclamation." See JA 42 (emphasis as in original); see also JA 43.

33. On November 27, 1989, the District Ranger approved, with terms and conditions, the supplemental Phase I work identified in the October 25, 1989 Supplemental Plan (JA 40) under the headings, "Fall, 1989," and Winter, 1989-90." JA 45 at 472. The District Ranger did not approve the work identified under the heading, "Spring/Summer/Fall, 1990 . . . because [these activities] will be included in a master Plan of Operation Number Two with an Environmental Analysis to be completed in the spring of 1990." Id. The conditions included an

"archaeological field survey. . . [,] [r]eclamation of the area . . .[,] [and] an increase in the performance bond...." JA 45 at 472-73. "The termination date for the Plan of Operations [was]...adjusted to July 31, 1990." Id. at 472.

34. On November 27, 1989, "to comply with Section 106 of the National Historic Preservation Act and 36 CFR 800," the Forest Supervisor submitted an Archaeological Reconnaissance Report for the Klamath Ridge Apex Area, Usher Flat, and 14.1 additional acres to the State Historic Preservation Officer, seeking comments on the report, noting that "Mr. Aloisi has assured us that he will contract a larger survey for this phased project and that this will be done prior to activities taking place outside of the areas surveyed within this report." See JA 46 at 475, 480.

35. The State Historic Preservation Officer responded by a letter dated December 15, 1989, stating that "[s]egmentation of the project is clearly inappropriate for several reasons . . . [because] such segmentation will effectively preclude consideration of the widest feasible range of design alternatives – consideration explicitly required for projects subject to compliance with Section 106 and its implementing regulations (36 CFR 800)." JA 47 at 498.

36. On January 4, 1990, the District Ranger ordered Liberty to cease all work in Eddy Gulch ("the Stop Work Order"), in light of the December 15, 1989, response from the State Historic Preservation Officer . JA 51. The Stop Work Order included a prohibition on any "activities on private land accessed through the National Forest." Id. At that time, Liberty stopped all work approved by the Forest Service.

37. On February 15, 1990, the Forest Service's District Wildlife Biologist, Marc Williams, spoke with Aloisi by telephone and told Aloisi that "the owl situation is in a state of flux and changes in management/policy were likely to change [*sic*]. . . [and that] the U.S. Fish

and Wildlife Service was the final word on owl management and the Forest Service conferred with them on all situations having a potential effect on owl habitat." JA 50.

38. By a letter dated February 22, 1990, the District Ranger made clear that "non-mining related activities are permissible on your adjoining private lands . . . includ[ing] occupancy of the existing facilities, travel to and from your residence and normal equipment maintenance and upkeep." JA 55 at 513.

39. In early 1990, Liberty: (a) worked through a consultant named Dan McLean with the State of California on water quality issues relevant to potential full-scale ore milling operations (see JA 62); (b) secured from Mr. Donald Moore (who operates a mining equipment supply business in Arizona) an offer sheet with quoted prices to supply the suite of milling equipment (see JA 91 at 849, 875-76, 889) that Mr. Moore recommended to Liberty after conducting various metallurgical tests of Liberty ore (see JA 63; JA 68; and JA 183); and (c) corresponded with Siskiyou County regarding County permitting and its relationship to the Forest Service plan approval. See JA 64 at 592.

40. As a result of the preliminary metallurgical testing, Aloisi informed the Forest Service on March 16, 1990, that Liberty intended to "use a cyanide vat type recovery process...[,] [which] was a new issue that would need to be addressed in its entirety." JA 65 at 594.

41. Liberty, meanwhile, obtained bids from a cultural resource/NHPA consultant for a cultural resources inventory that would satisfy the State of California's position on NHPA compliance with respect to the project. See JA 57; JA 70.

42. The District Ranger initiated an environmental assessment in March 1990, on Liberty's plan of operations, including "road construction, excavation and transportation of

material, processing of extracted material and reclamation methods," with a public notice of intent. JA 48.

43. In May 1990, the Interagency Scientific Committee to Address the Conservation of the Northern Spotted Owl ("Interagency Scientific Committee," or "ISC"), which was created pursuant to the Interagency Agreement (see paragraph 13, above), issued its Conservation Strategy for the Northern Spotted Owl (the "Conservation Strategy"). See JA 71. The Conservation Strategy identified Habitat Conservation Areas ("HCA") of varying categories based upon the number of owl pairs could be supported. Id. at 668. The Eddy Gulch area falls within HCA C-10, a Category 1 HCA that supports, or could support, up to 20 pairs of owls. Id. at 684-685; see also JA 76 at 747. The Conservation Strategy also stated that "logging (including salvage operations) and other silvicultural activities . . . should cease within HCAs." Id. at 652. The Conservation Strategy made clear that "[r]oad construction in HCAs should be discouraged because it detracts from the quality and amount of owl habitat[,] [and] [r]oads should be located in HCAs only when no feasible alternative is possible." Id.

44. Owl surveys conducted during May and June 1990, confirmed the presence of at least one pair of northern spotted owls in Eddy Gulch, within 0.5 miles of Liberty's proposed activities. See JA 72; see also JA 76 at 747, 750-752.

45. On June 26, 1990, the Fish and Wildlife Service published the formal listing of the northern spotted owl as a threatened species under the ESA. 55 Fed. Reg. 26114 (signed by the Director of the Fish and Wildlife Service on June 22, 1990).

46. Before the Director of the Fish and Wildlife Service signed the rule listing the northern spotted owl as a threatened species, on June 18, 1990, the Klamath National Forest completed a Programmatic Biological Evaluation ("June 1990, Evaluation") on all of its projects

potentially affected by the listing of the owl as a threatened species. JA 76. The "Liberty Mine" project was one of approximately 45 projects (all timber sales except Liberty Mine) included in the Evaluation. The Forest Service transmitted the Evaluation, and request for consultation under 50 CFR Part 402, to the Fish and Wildlife Service on June 27, 1990. JA 77.

47. The Forest Service's June 1990, Evaluation states that the Liberty Mine project will disturb 38 acres, "of which 13 acres can be considered as suitable habitat," and further describes the project as removing "habitat and soil overburden along a narrow 'apex' of mineral deposit cutting across the slope for 2.5 miles, . . . existing roads would be upgraded, new roads constructed, pits excavated, and milling sites developed." JA 76 at 747.

48. The District Ranger's November 1989 approval of portions of Liberty's October Supplemental Plan, as described in paragraph 33 above, contained an "expiration date" of July 31, 1990, for Liberty to conduct the approved operations, on the assumption that the approved work would be completed within that period. See JA 45 at 472. On July 10, 1990, Liberty requested that the approval of the plan be extended. JA 79.

49. Also on July 10, 1990, in response to Liberty's intention to use "timber for tunnel work in the development of [its] mine," the Forest Service noted that this proposal was not covered by Liberty's current plan of operation, and required Liberty to submit an amendment of the plan, which would describe "how, where, and when" Liberty intended to use the timber cut from the road right-of-ways. JA 78 at 757.

50. On July 23, 1990, the Fish and Wildlife Service issued its Biological Opinion in response to the Forest Service's June 18, 1990 formal consultation letter. Along with its treatment of 42 projects included in this biological opinion (JA 80, at 2), the Fish and Wildlife Service concluded that the proposed activities, including the Liberty Mining proposal as

described in the Forest Service's Evaluation, were "not likely to jeopardize the continued existence of the northern spotted owl." JA 80 at 761. The Biological Opinion also contains an "Incidental Take Statement," specifying "reasonable and prudent measures" and "mandatory terms and conditions for incidental take," including the elimination or relocation of "planned timber harvest activities (e.g., sale units, road right-of-way clearing) that are within 0.5 mile radius of spotted owl nest sites or pair activity centers within category 1, 2, or 3 HCAs, unless further analysis demonstrates that a 70-acre core area of the best available, most contiguous habitat around the nest site or activity center and 500 acres of suitable habitat within a 0.7-mile radius would remain after harvest." JA 80 at 770.

51. On August 27, 1990, the District Ranger approved Liberty's July 10, 1990, extension request, setting a revised termination date for the plan of operations of September 30, 1990. JA 82. At this time, no "ground disturbing activities" could take place, "other than the agreed[-]to removal of merchantable logs from the construction/reconstruction of the roads and the disposal of the slash from the construction activities." JA 82 at 777. The District Ranger also informed Liberty that "there is a high likelihood that preparation of an Environmental Impact Statement (EIS) will be required for [Liberty's] proposed cyanide leaching process." Id. The District Ranger estimated that it would take "probably two years" for the EIS process to be completed. Id. The District Ranger also stated that the Environmental Assessment on the proposed mining operations would be delayed until the Forest Service receives Liberty's decision on its milling process. JA 82 at 777-78.

52. During August, 1990, the Regional Office (R5) began to collect information for the Forest Service's Washington Office on mineral activities within HCAs, and their potential effect on spotted owls. See JA 83 at 784. KNF reported that there were "over 4500 mining claims on

the forest" and that one of these projects (referring to Liberty Mining) "was included in the programmatic BE for FY '90 planned projects because of impacts to suitable habitat within an HCA." Id. at 792.

53. On September 18, 1990, Liberty requested a further extension of the October 1989 Supplemental Plan approval, which was due to expire September 30, 1990. See JA 84. Liberty (through Ferrero) characterized this letter both as a renewal request and as a "second supplement" to the plan, as it sought approval of certain activities not specifically listed in the October 25, 1989, Supplemental Plan. In this "second supplement," Liberty stated that "[t]he milling process will be determined in the next two years as exploration progresses[, and] [n]o cyanide milling is included in the current plan." JA 84.

54. On October 24, 1990, the Regional Forester informed the Forest Supervisors, including the Forest Supervisor for KNF, that "[f]orests in the Klamath Province are directed to conduct timber management activities 'in a manner not inconsistent with the Interagency Scientific Committee recommendations' for the northern spotted owl." See JA 86. Additionally, this communiqué stated that the "SOHAs established by the Regional Guide are also vacated...." Id.; see also 55 Fed. Reg. 40412 (Oct. 3, 1990) (announcing the Department of Agriculture's September 28, 1990, decision to vacate the prior northern spotted owl guidance, and announcing that all future actions involving the northern spotted owl would be carried out in compliance with the requirement of the ESA). "Of particular importance," the Regional Forester told the Forest Supervisors, are "the July 23, 1990 Biological Opinions from the Fish and Wildlife Service[;] Forests should document compliance with the mandatory terms and conditions of the Opinions... [and] document steps taken to implement the Conservation Recommendations." JA 86 at 819 (referring to JA 80 at 771-73).

55. On November 27, 1990, the District Ranger approved Liberty's extension request, moving the plan approval expiration date to March 31, 1991, and also approved modifications to the operations originally contained in the 1989 (June and November) plan approvals. JA 88. The District Ranger noted that Liberty's "letters of September 28 and October 25, 1989 included proposals for the operational phase of [Liberty's] mine[,]" but the Forest Service does "not have a complete proposed Plan of Operations to encompass these activities." Id. at 823. The District Ranger also informed Liberty of his understanding "that at this time there can be no further activity that would constitute the taking of spotted owl habitat within an HCA," and that the Washington Office is reviewing the issue of mining within HCAs. Id. at 823-24. The District Ranger further stated that "[u]ntil [Liberty] can provide [the Forest Service] with a detailed Plan of Operations, as described previously, we will not be able to answer to what extent your planned activities would be constrained, nor will [the Forest Service] be able to complete an environmental analysis." Id. at 824.

56. On December 4, 1990, KNF Wildlife Biologist Karen Raftery wrote to the Regional Office seeking guidance on how to implement the July 23, 1990 Biological Opinion with respect to Liberty Mine. See JA 89 at 826.

57. In November 1990, Liberty (Aloisi) contacted the Ranger District Wildlife Biologist, Marc Williams, about the spotted owl situation. See JA 90 at 828 In response, the District Ranger wrote Liberty explaining that "the Forest Service was now to follow the recommendations in the Interagency Scientific Committee Report, 'A Conservation Strategy for the Northern Spotted Owl[,]'" but the Forest Service was "still unclear how these recommendations might apply to [Liberty's] situation." JA 90 at 828. The District Ranger also suggested that, to minimize misinformation, Liberty should deal with as few "players" as

possible and direct its technical questions to either the District Ranger or the Minerals Officer for the Ranger District. JA 90 at 829.

58. In January 1991, the Forest Supervisors received guidance from the Interagency Scientific Committee on implementing the Conservation Strategy. See JA 92. With respect to permissible activities within an HCA, the Committee stated that when "determining what types of activities should or should not occur in HCAs, [one] need[s] to assess whether the activity would degrade current owl habitat or negatively affect future potential owl habitats." JA 92 at 893. "The ISC report (Pages 30 and 31; 325 and 326) provides a description of prohibited activities. Activities not described in the ISC report should be reviewed by the district biologist and the appropriate recommendations made through the biological evaluation process." Id. at 893; see also JA 71 at 652-53, 326 (identifying road construction as among the prohibited activities within ¼ mile of an activity center of any owl pair).

59. On or about March 11, 1991, Liberty submitted a document bearing the Subject, "Application for renewal of existing Plan of Operations with modifications." JA 94 at 905.

60. In late March 1991 (see JA 97; JA 108 at 1064), the Ranger District's Harry Frey orally authorized Liberty to conduct operations that included "mov[ing] and deck[ing] logs, pil[ing] road construction slash[,] . . . repair[ing] the damage from the road reconstruction to the Klamath mine site[,] [and] . . . hand clear[ing] a 14 by 14 foot swath to the Anna Johnson mine." JA 108 at 1063-64. This oral authorization is referred to as the "letter of authorization" in JA 108 at 1063.

61. In April 1991, the Fish and Wildlife Service proposed the designation of critical habitat for the northern spotted owl. See 56 Fed. Reg. 20816 (May 6, 1991) (signed April 25,

1991). Also in April 1991, the Regional Forester released owl survey protocol for FY 1991. See JA 107 at 1049-51.

62. By May 1991, Liberty's cultural resources contractor had essentially completed its review of the local history. See JA100. An interim archaeological survey report was prepared by July 3, 1991 (JA 100 at 987-96), but would not be completed until Liberty paid its contractor's invoice. JA 106.

63. In May 1991, the Interagency Northern Spotted Owl Conservation Group responded to questions about implementing the Conservation Strategy, stating specifically with respect to mining operations that "it was concluded that specific guidelines were inappropriate. These issues are management decisions and should be handled through the biological evaluation process on a case-by-case basis." JA 102 at 1013.

64. In June 1991, the Forest Service confirmed the presence in Eddy Gulch of a nesting, reproducing pair of northern spotted owls. See JA 104 at 1016.

65. Regional Forester, Ronald Stewart, released a Regional Guidance for Spotted Owl Habitat Management on July 10, 1991. See JA 107. This guidance document presented a series of steps to evaluate a project area with respect to the northern spotted owl populations and habitat. Id. at 1038-43. It also outlined the responsibility of the Regional Technical Review Team ("RTRT") formed by the Regional Forester to review proposed actions for compliance with the Conservation Strategy. Id. at 1045. Actions beyond the purview of the RTRT were to be taken to the Interagency Technical Review Team ("ITRT"). Id.

66. On or about July 12, 1991, the Ranger District's Mineral Officer, Al Buchter, visited Liberty on-site and ordered a halt to the activities previously authorized by mineral officer Harry Frey. See JA 108 (August 5, 1991 letter from District Ranger Michael Lee to Fred Aloisi).

67. In his August 5, 1991, letter to Liberty Mining, the District Ranger stated that he did not authorize "any further clearing within the HCA until [he] receive[s] guidelines concerning the development of mineral resources within HCAs." JA 108 at 1064. "The authorization that Harry Frey provided last Spring to clear trees along the road to the Anna Johnson Mine is suspended until we receive a final determination regarding potential impacts upon Northern Spotted Owl habitat," wrote the District Ranger. Id. The District Ranger also indicated in his August 5, 1991, letter that he expected to receive a proposed Plan of Operation within ten days. Id. at 1064. This letter was not delivered to Liberty upon the first and second attempts in August 1991, and was returned to sender on September 13, 1991. See JA 109 at 1066. Liberty would submit its next proposed Plan of Operations on April 1, 1992. See JA 114.

68. At the end of July 1991, the Fish and Wildlife Service issued a revised Notice of Proposed Rulemaking, proposing to designate critical habitat for the northern spotted owl See 56 Fed. Reg. 40001 (Aug. 13, 1991) (signed July 31, 1991).

69. In December 1991, the Forest Service created the Forest Service Northern Spotted Owl Oversight Team "to provide a mechanism to assist management in the implementation of the Interagency Scientific Committee (ISC) Conservation Strategy for the Northern Spotted Owl on National Forest lands." JA 110 at 1068.

70. On January 8, 1992, the Fish and Wildlife Service issued the final rule identifying specific areas, including an area encompassing Liberty Mine, as critical habitat for the northern spotted owl. See 57 Fed. Reg. 1796 (Jan. 15, 1992). The preamble to the final rule made clear that the designation of critical habitat would not apply to "[a]ll presently existing projects and all proposed projects where all Federal, State, and local permitting processes had been completed and final approvals and permits issued as of the date of the final rule." Id. at 1808.

71. By a letter dated February 18,1992, Liberty informed the District Ranger that Liberty would "be submitting basically the same plan as before with a few minor modifications and voluntary mitigation measures regarding the spotted owl." JA 93 at 902 (Note: the letter is erroneously dated February 18, 1991). Liberty also stated that "[i]t is important to us that a decision as to whether or not are [*sic*] over all plan is accepted and approved." Id.

72. In his letter dated March 10, 1992, documenting decisions made at the February 11, 1992 meeting, among other things, the District Ranger stated that there was no "Plan of Operations in effect at this time. The Plan of Operations that was in effect terminated on March 31, 1991." JA 111 at 1083. The District Ranger also stated that Liberty's "proposal of 9/28/89 with the multi-colored road map was submitted to the US Fish and Wildlife Service for their determination if your proposal would be adverse to the continued existence of the Northern Spotted Owl. They analyzed your proposal which had a maximum of 38 acres of clearing in the locations as shown on that 'spaghetti map.' The Fish and Wildlife Service determined that the project could proceed as submitted because it did not threaten the existence of the Northern Spotted Owl." Id. at 1084. The District Ranger also noted a "lack of common understanding on what activities have been proposed and what has been approved in the past plan along with supplements," and Liberty and the Forest Service agreed that "the best solution would be for [Liberty] to put together [its] final proposal." JA 111 at 1084.

73. On March 17, 1992, the Forest Service issued its revised "Protocol for Surveying Proposed Management Activities that May Impact Northern Spotted Owls," with instructions to conduct a 2-year owl survey for a management activity or planning area "to determine the presence or absence of spotted owls." JA 113 at 1089.

74. On April 1, 1992, Liberty submitted a proposed "Plan of Operations, Eddy Gulch Mines," to the District Ranger ("the April 1992 Plan of Operations"). See JA 114. This proposed Plan was prepared pursuant to the February 11, 1992 meeting, as noted in District Ranger Lee's March 10, 1992, letter described in paragraph 72, above. See JA 111, at 1084.

75. On May 12, 1992, the Forest Service's Regional Office issued "procedures for the Northern Spotted Owl Steering Committee and Oversight Team review process[,] [which] . . . is essential for assuring consistent implementation of the conservation strategy for the northern spotted owl." See JA 117 at 1133. This document instructed that projects "within HCAs with the potential to modify any existing or potential owl habitat, or create disturbance for owls (generally within ¼ mile of owl activity center)," among others, should be submitted to the RTRT. See JA 117 at 1133, 1139. But "Forests should consult with the U.S. Fish and Wildlife Service prior to submittal of projects for review by the RTRT." Id. at 1133.

76. On May 15, 1992, the District Ranger requested of his superiors that the Forest Service reinitiate consultation with the Fish and Wildlife Service regarding the potential effects on the northern spotted owl posed by Liberty's April 1992 Plan of Operations. See JA 118.

77. The Klamath National Forest Supervisor requested that the Regional Forest Supervisor reinitiate consultation by letter dated May 27, 1992. See JA 119.

78. On May 28, 1992, the District Ranger wrote Liberty notifying it that the Forest Service intended to reinitiate consultation with the Fish and Wildlife Service, and that "[r]egional standards" require field surveys of owls that would not be completed until June 1993. See JA 120 at 1159.

79. Owl surveys conducted by the Forest Service in April through June 1992, confirmed the presence of a reproducing pair of northern spotted owls in Eddy Gulch. See JA 116 at 1124.

80. By "Notice of Appeal" dated July 9, 1992, Liberty submitted to the Forest Supervisor an appeal from the District Ranger's decision to re-initiate consultation. See JA 121.

81. On August 7, 1992, the Regional Forester formally requested consultation with the Fish and Wildlife Service pursuant to the ESA regarding Liberty's proposed plan, noting that "Liberty Mine lies wholly within HCA-10, which has now been designated as Critical Habitat for the northern spotted owl." See JA 124 at 1177.

82. On August 7, 1992, the Klamath National Forest Supervisor acknowledged the appeal as timely. JA 125. On the same day the Regional Forester formally reinitiated consultation by writing the Fish and Wildlife Service regarding the April 1992 Plan of Operations. JA 124.

83. On August 10, 1992, per Forest Service administrative appeal rules, the District Ranger responded to Liberty's arguments on appeal based upon the administrative record. JA 126.

84. On August 31, 1992, Steven Spangle, a Fish and Wildlife Service staff member working on the consultation, recorded his opinion that "Reinitiation of consultation [was] not necessary." JA 129.

85. On September 17, 1992, a team comprised of a Minerals Forester, Forest Hydrologist, and a Forest Geologist visited the Liberty Mining District to inspect "old, abandoned mine tunnels, associated mine wastes, and mill sites for environmental hazards, evidence of contamination, and acid mine drainage." JA 131 at 1203. Fred Aloisi met the team in the field. Id. at 1205. The team recommended as "of highest priority" that, among others, "Liberty Mining Incorporated needs to provide engineering designs and map locations for roads, pits, ponds, mill sites, and all other planned earthworks and structures for review." Id. at 1205.

Also, "[a] biological evaluation (B.E.) must be prepared for summer steelhead and spring chinook salmon[,] [and] [t]he proposal must go through the NEPA Process, Documentation and Review." Id. On September 29, 1992, representatives from the Forest Service met with Mr. Aloisi and conveyed "a list of items that the Forest Service needs from Aloisi," including, among others, "a site plan and building plan for the mill building[;] . . . a blue print of [the] mill[;] . . . profile of pits (2 sections), and pits need to be flagged on the ground[;] . . . stability report (mass movement)[;] [and] [w]ater quality report." See JA 132 at 1207. This list of needed information was set out more fully in the District Ranger's letter to Aloisi dated November 10, 1992. See JA 137.

86. For over a month, the Fish and Wildlife Service staff and Forest Service staff discussed whether this second consultation was necessary. On October 5, 1992, the Fish and Wildlife Service provided to the Forest Service a draft letter stating that "reinitiation of formal consultation is not required at this time." JA 133, at 1216.

87. On October 8, 1992, the Forest Service met with the Fish and Wildlife Service and as a result of that meeting the Fish and Wildlife Service agreed to proceed with the reinitiated consultation "to determine the project's effects on the spotted owl critical habitat." The October 5, 1992 draft letter became moot. See JA 136, at 1222.

88. On October 23, 1992, the Forest Supervisor noted that the "procedural action made by the District Ranger Mike Lee to reinitiate consultation with Fish and Wildlife Service has just been affirmed by [the Fish and Wildlife Service]." JA 134. She continued, "since the decision has been delayed to approve or deny Mr. Fred Aloisi's proposed plan of operation [Liberty's] appeal is moot and . . . [its] requested relief cannot be granted. . . ." Id. She "dismissed [Liberty's] appeal and closed the record without a decision on the merits." JA 134. After

receiving the October 23, 1992, Forest Supervisor's decision dismissing Liberty's appeal from the District Ranger's decision to reinitiate consultation, Liberty filed an appeal with the Regional Forester.

89. On November 24, 1992, the Fish and Wildlife Service notified the Regional Forester that the Fish and Wildlife Service needed additional information about Liberty Mining's proposed plan of operations in order to complete formal consultation. See JA 138.

90. On December 1, 1992, the Regional Forester requested "that the Interagency Northern Spotted Owl Conservation Group's (INSOCG) Management Application Group review and concur with the enclosed Oversight Team recommendations regarding mining claims within Habitat Conservation Areas (HCAs)," with respect to Liberty Mine. See JA 139 at 1230, 1232. The Oversight Team noted that "HCAs are not withdrawn from mineral entry[,]" [and] "[s]potted owls must be considered when developing the plan of operations, just as all other resources are, but nothing in the [Conservation] strategy precludes operation of otherwise legitimate and sensitively planned mining activities." Id. at 1233; see also JA 141 (transmitting Northern Spotted Owl Oversight Team and Steering Committee responses to questions posed by Region 5 on July 31, 1992).

91. On December 4, 1992, the District Ranger wrote Liberty to obtain information to respond to the Fish and Wildlife Service's November 24, 1992 request for additional information. See JA 140.

92. On December 21, 1992, the District Ranger again wrote to Liberty and reiterated the Forest Service's information needs "to restart the preparation of the [Environmental Assessment]." See JA 142; see also JA 137.

93. On December 22, 1992, the Deputy Regional Forester acknowledged receipt of Liberty's appeal and notified Liberty that he had "decided to exercise my discretion to review" the October 23, 1992 dismissal. See JA 143.

94. On January 22, 1993, the Deputy Regional Forester affirmed the KNF Forest Supervisor's dismissal of the appeal, on the alternative grounds that the District Ranger's decision to reinitiate consultation is not an appealable decision, because the District Ranger's letter "did not make any decision with respect to the issuance of authorization for Mr. Aloisi's proposed plan of operations; it merely notified Mr. Aloisi of the necessary processes involved in evaluating his proposed plan." JA 145 at 1264. "As such, the notification of appeal rights should not have been given because only decisions documented in a decision memo, decision notice or record of decision . . . are subject to appeal and no decision on your plan of operations has been made." Id. The January 22, 1993 decision letter recited erroneously that, "Based on the [July 23, 1990] not likely to jeopardize finding, the project was allowed to proceed as submitted." Id. at 1263.

95. Representatives of the Forest Service met with Liberty representatives in January and March 1993, and corresponded by letter, to respond to the Fish and Wildlife Service's information request. See JA 146; JA 147; JA 148; JA 150; and JA 151.

96. On April 2, 1993, the Forest Service wrote the Fish and Wildlife Service providing the information for the FWS to end its suspension of the consultation, and proceed with the reinitiated formal consultation. JA 157. This letter provided to the FWS the Forest Service's "determination . . . that the Liberty Mine proposal may affect, but is not likely to adversely affect the northern spotted owl or it's [*sic*] critical habitat." JA 157, at 1302.

97. On April 25, 1993, Liberty leased its mining claims in Eddy Gulch to an entity called WAZCO, Inc. ("WAZCO"), effective April 1, 1993. See JA 158.

98. WAZCO, now functioning as the operator, met with the Forest Service to discuss a proposed plan of operations for the mining claims on May 6, 1993 and again on November 17, 1993. See JA 159; see also JA 160. WAZCO proposed operations that were different from the operations proposed in Liberty's April 1, 1992, Plan of Operations. WAZCO proposed using and improving different roads, re-conditioning and working adits (i.e., tunnel openings) and tunnels remaining from historical mining in Eddy Gulch, but also considering milling operations at Usher Flat, a mill location described in Liberty's April 1992 Plan of Operations. See JA 159; JA 160.

99. On January 11, 1994, WAZCO (under the name "Liberty Consolidated Mines, Inc.") submitted a notice of intent to operate, identifying activities planned for the ensuing 90 days as Phase 1 of its intended operations. See JA 161.

100. On February 4, 1994, the District Ranger approved Liberty Consolidated Mines, Inc.'s ("LCM") 90-day, Phase 1, operations. See JA 162. The authorization to operate states that the District Ranger did not have, and WAZCO/Liberty Consolidated Mines had not submitted, any plan of operations to cover any operations beyond the first 90 days of operations covered by Phase 1. Id. at 1341. That February 4, 1994 approval letter also states that "[n]o trees are to be removed with the reopening operation," and "[n]o clearing of any vegetation is authorized with any of the activity [*sic*] approved above." Id. at 1340-41.

101. On February 8, 1994, the Fish and Wildlife Service responded to the formal consultation that the Forest Service reinitiated in August 1992. See JA 163. The Fish and Wildlife Service deemed the process an "informal consultation" under its inter-agency

consultation rules, and "concur[red] with [the Forest Service's] determination that the proposed projects are not likely to adversely affect the northern spotted owl or adversely modify its critical habitat, provided the mitigation measures identified in your documentation are followed." JA 163, at 1343; see also JA 157 ("documentation" referenced in JA 163).

102. On March 11, 1994, Plaintiffs Fred and Candis Aloisi issued a Notice of Labor to Delinquent Co-Owner to Plaintiff James Kendle and others. That notice stated that the delinquent co-owners had 90 days to contribute their proportion of the expenditures made in 1991, 1992 and 1993 on the mining claims, or risk forfeiture of their interest in the mining claims identified in the notice. See JA 166 at 1352-53.

103. On or about June 5, 1994, Liberty Consolidated Mines submitted a plan of operations to the District Ranger to build its mill on Usher Flat on its leased mining claims in Eddy Gulch. JA 172.

104. On June 22, 1994, the District Ranger requested additional information about LCM's plan and notified LCM that he could not complete a review of the plan and make a decision on the Environmental Analysis until he received the additional information enumerated in the letter. See JA 173.

105. On or about December 6, 1994, Liberty Consolidated Mines submitted a proposed plan of operations describing its proposed mining operations and ore milling operations. See JA 176.

106. Later in December 1994, Aloisi and Goodman executed a Lease Agreement with Purchase Option with Liberty Consolidated Mines, Inc., effective retroactively to November 1, 1993, leasing the mining claims to LCM. See JA 177. This Lease Agreement superseded the April 1993 lease between Liberty and WAZCO (JA 158).

107. By letter dated May 9, 1995, the State Historic Preservation Officer concurred that LCM's proposed plan of operations would not affect historic properties. See JA 179 at 1423; see also JA 168 (April 1994, Cultural Resources Inventory (excerpts)); JA 169 (transmitting Inventory to State Historic Preservation Officer); JA 171 (State Historic Preservation Officer's comments on the Inventory, requiring more information); JA 178 (letter to State Archaeologist stating that the Forest Service will closely monitor Liberty Mining's operation).

108. On or about February 20, 1996, Liberty Consolidated Mines submitted a revised, more detailed plan of operations describing its proposed mining operations and ore milling operations on Usher Flat. See JA 181 (excerpts of LCM's Plan of Operations).

109. On or about May 24, 1996, the District Ranger issued a Decision Notice and Finding of No Significant Impact, adopting a mitigation measure to "negate adverse impacts to the environment by [LCM's] mining and milling operations." JA 182 at 1504.

110. The Forest Service did not reinitiate consultation with the Fish and Wildlife Service regarding Liberty Consolidated Mines' proposed plans of operations, but relied upon the Fish and Wildlife Service's February 8, 1994 opinion that evaluated Liberty's April 1, 1992 proposed plan of operations. See JA 165.

111. On August 5, 1996, the Forest Service approved LCM's plan of operations subject to terms and conditions, including the posting of a reclamation bond.

112. Liberty Consolidated Mines never posted the required reclamation bond, however, and did not proceed further with its proposed plan of operations.

113. LCM's lease of the mining claims was terminated through a default letter dated July 28, 1999 (see JA 185), and the lessors, Aloisi and Goodman (until his death on June 4, 2005), regained possession, and continue to maintain possession, of the unpatented mining claims.

Although this Joint Statement of Material Facts Not in Dispute is being filed electronically by counsel for the United States, it was reviewed and approved by, and is being filed on behalf of, counsel for all parties to the case.

Dated: January 7, 2008

Respectfully submitted,

*Attorneys for Plaintiffs*:

s/ Lawrence G. McBride
LAWRENCE G. McBRIDE
Foley & Lardner LLP
Washington Harbour
3000 K St., N.W., Suite 500
Washington, D.C. 20007
(202) 295-4017 (ph)
(202) 672-5399 (fax)

*Attorneys for Defendant*:

RONALD J. TENPAS
Assistant Attorney General
Environment and Natural Resources Division

s/ Bruce K. Trauben
BRUCE K. TRAUBEN
Natural Resources Section
Environment and Natural Resources Division
U. S. Department of Justice
P. O. Box 663
Washington, D.C. 20044-0663
(202) 305-0238 (ph)
(202) 305-0267 (fax)

WILLIAM SHAPIRO
Natural Resources Section
Environment and Natural Resources Division
U.S. Department of Justice
501 I Street, Suit 9-700
Sacramento, CA 95814-2322
(916) 930-2207 (ph)

OF COUNSEL:
ROSE MIKSOVKSY
Office of the General Counsel
U.S. Department of Agriculture
33 New Montgomery St., 17th Fl.
San Francisco, CA 94105-3170