No. 95-650L
(Judge Margolis)

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

ALFRED ALOISI, et al.,

Plaintiffs,

v.

UNITED STATES OF AMERICA,

Defendant.

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT**

Lawrence G. McBride
FOLEY & LARDNER LLP
3000 K St., N. W., Suite 500
Washington, D.C. 20007-5143
Telephone: (202) 672-5300
Facsimile: (202) 672-5399

Dated: February 6, 2008

*Attorney for Plaintiffs*

# TABLE OF CONTENTS

**Page**

I. PLAINTIFFS' MOTION. ....1

II. STATEMENT OF THE CASE....3

A. Approaching the record in the Case. ....3

B. Source of the Dispute and the Taking. ....3

III. JURISDICTION AND SUMMARY JUDGMENT IN THE COURT OF FEDERAL CLAIMS. ....11

A. Jurisdiction. ....11

B. Summary Judgment. ....12

IV. TEMPORARY TAKINGS – THE CASE LAW AND STANDARDS. ....13

V. ANALYSIS OF THE FACTS UNDER THE LEGAL STANDARDS. ....16

A. Plaintiffs have property rights recognized under the Fifth Amendment. ....16

B. The first *Penn Central* factor – the character of the government action. ....29

C. The second *Penn Central* factor – the economic impact of the governmental action. ....35

D. The third *Penn Central* factor – interference with reasonable, investment-backed expectations. ....36

VI. CONCLUSION ....39

EXHIBIT INDEX:

| Plaintiffs' Exhibit Number | Discovery Production Number | Document Identification or Description |
|---|---|---|
| PE-1 | none | Affidavit of Alfred L. Aloisi |
| PE-2 | none | Affidavit of Thomas P. Ferrero |
| PE-3 | A-1 | C. Colcock Jones Report |
| PE-4 | A-2 | William Elmendorf, Report to A. R. Patterson, of Gold Standard, Inc. (maps omitted) (1932) |
| PE-5 | A-95 | General Land Office serial register page for Klamath Mine patent application (1930s) |
| PE-6 | A-81-g | Sannes Report on Eddy Gulch for New Cinch |
| PE-7 | A-141 | Maps with October 1989 supplemental plan |
| PE-8 | A-149 | (Excerpt from A-149), Moore to Liberty letter (Jan. 26, 1990) |
| PE-9 | A-49 | Forest Supervisor to Aloisi re forest planning (July 10, 1990) |
| PE-10 | none | Forest Service Manual §§ 2817.2-2819.3 |
| PE-11 | A-190 | Letter from Winthrop to Forest Service and SHPO re standards for Arch Study (June 7, 1991) |
| PE-12 | A-58 | Envelope "Received 2/11/92 at U.S.F.S." (contained August 5, 1991, letter) |
| PE-13 | A-146 | Maps with April 1, 1992 plan of operations |
| PE-14 | FS-114 | Letter from Fred Aloisi to District Ranger (Oct. 5, 1992) |
| PE-15 | A-80 | Ferrero to Gutierrez (Forest Service), summary of Eddy Gulch mines mineral values data (Feb. 12, 1999) |
| PE-16 | A-189 | USFS letter approving Liberty Consolidated Mines, Inc., plan of operations (Aug. 5, 1996) |
| PE-17 | A-81-s | Ferrero, "Reserve Calculations, Eddy Gulch" (August 1998) |
| PE-18 | A-114 | Ferrero, "Analysis of Metallurgical Data …" (March 2007) |
| PE-19 | none | Interior Department Administrative Law Judge's Order Denying Government Motions (May 2, 2007) |
| PE-20 | none | Mine Equipment and Costs -- Response to Defendant's Interrogatory No. 10 (Sept. 24, 2007) |

# TABLE OF AUTHORITIES

**Page**

FEDERAL CASES

*Anderson v. Liberty Lobby*,
477 U.S. 242 (1986).....13

*Bass Enterprises Production Co. v. United States*,
54 Fed. Cl. 400 (2002), aff'd, 381 F.3d 1360 (Fed. Cir. 2004) .....*Passim*

*Belk v. Meagher*,
104 U.S. 279 (1881).....12

*Best v. Humboldt Placer Mining Co.*,
371 U.S. 334 (1963).....20, 25

*Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*,
249 F.3d 1341 (Fed. Cir. 2001).....13

*Boise Cascade Corp. v. United States*,
296 F.3d 1339 (Fed. Cir. 2002).....13, 15

*CCA Associates v. United States*,
75 Fed. Cl. 170 (2007) .....35

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986).....13

*Chrisman v. Miller*,
197 U.S. 313 (1905).....19, 24

*Clipper Mining Co. v. Eli Mining & Land Co.*,
194 U.S. 220 (1904).....12

*Clouser v. Espy*,
42 F.3d 1522 (9th Cir. 1994) .....25

*Ferring B.V. v. Barr Labs., Inc.*,
437 F.3d 1181 (Fed. Cir. 2006).....13

*First English Evangelical Lutheran Church v. Los Angeles County*,
482 U.S. 304 (1987).....15

*Florida Rock Indus. v. United States*,
45 Fed. Cl. 21 (1999) .....14, 35, 37

*Holden v. United States*,
38 Fed. Cl. 732 (1997) ........................................ 20, 24-25

*Keystone Bituminous Coal Ass'n v. DeBenedictus*,
480 U.S. 470 (1987) ........................................ 14

*Loretto v. Teleprompter Manhattan CATV Corp.*,
458 U.S. 419 (1982) ........................................ 14

*Loveladies Harbor, Inc. v. United States*,
28 F.3d 1171 (Fed. Cir. 1994) ........................................ 35

*Lucas v. South Carolina Coastal Council*,
505 U.S. 1003 (1992) ........................................ 14

*Maritrans Inc. v. United States*,
342 F.3d 1344 (Fed. Cir. 2003) ........................................ 13

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ........................................ 13

*Payne v. United States*,
31 Fed. Cl. 709 (1994) ........................................ 24

*Penn Central Transp. Co. v. City of New York*,
438 U.S. 104 (1978) ........................................ 14-15, 35, 39

*Pennsylvania Coal Co. v. Mahon*,
260 U.S. 393 (1922) ........................................ 14

*Seiber v. United States*,
364 F.3d 1356 (Fed. Cir. 2004) ........................................ 15

*Skaw v. United States*,
740 F.2d 922 (Fed. Cir. 1984) ........................................ 20

*Tabb Lakes, Ltd. v. United States*,
10 F.3d 796 (Fed. Cir. 1993) ........................................ 15-16, 34

*Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*,
535 U.S. 302 (2002) ........................................ 14-15, 30

*Union Oil Co. v. Smith*,
249 U.S. 337 (1919) ........................................ 20

*United States v. Coleman*,
390 U.S. 599 (1968) ........................................ 19, 24-25

*United States v. Etcheverry*,
230 F.2d 193 (10th Cir. 1956) ....................12, 24

*United States v. Noguiera*,
403 F.2d 816 (9th Cir. 1968) ....................36

*United States v. Rizinelli*
182 Fed. 675 (D. Idaho 1910)....................36

*Wyatt v. United States*,
271 F.3d 1090 (Fed. Cir. 2001)....................*Passim*

**FEDERAL STATUTES**

16 U.S.C. § 1536....................5

28 U.S.C. § 1491(a)(1)....................12

30 U.S.C. § 22 et seq....................12, 25

30 U.S.C. §§ 23 and 28 ....................12

30 U.S.C. § 26....................24

30 U.S.C. §§ 35 and 36 ....................16

42 U.S.C. § 4321 et seq....................27

**REGULATIONS**

36 C.F.R. Part 228....................26

36 C.F.R. Part 252....................26

36 C.F.R. § 228.3(a)....................28, 36

36 C.F.R. § 228.4(d) ....................27

36 C.F.R. § 228.5 ....................26

36 C.F.R. § 228.5(a)(5)....................27

36 C.F.R. § 228.5(a)(1)....................26

36 C.F.R. § 228.5(a)(4)....................26

50 C.F.R. 402.14(b)(1)....................32

50 C.F.R. § 402.02 ....................33

50 C.F.R § 402.14(a)....................................................................................................32

50 C.F.R § 402.14(b)(1)...............................................................................................32

50 C.F.R. § 402.14(e)...........................................................................................5, 30, 33

39 Fed. Reg. 31317, col. 1 (Aug. 28, 1974)....................................................................26, 28

57 Fed. Reg. 1796 (Jan. 15, 1992) ..........................................................................................8

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ALFRED ALOISI, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 95-650L |
| | ) | |
| UNITED STATES OF AMERICA, | ) | Hon. Lawrence S. Margolis |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT**

## I. Plaintiffs' Motion.

Plaintiffs respectfully move for summary judgment under Rule 56 of the Rules of the Court of Federal Claims ("RCFC"). Plaintiffs seek an order that defendant United States, acting chiefly through the agency of the Forest Service of the U. S. Department of Agriculture ("Forest Service"), be found liable to plaintiffs for an inverse condemnation of their property, and be obligated to pay just compensation for this taking.

The taking at issue was temporary, but lasted through a period of roughly four years in which defendant for an extraordinary period, unreasonably, and through actions accomplishing only delay and suggesting lack of good faith, denied plaintiffs the use of their property for its intended purpose, mine development.

The actions of defendant's agencies prohibited plaintiffs from exercising their property rights by denying plaintiffs any revenue from the production of gold deposits and the sale of minerals (here gold), during the period of the extraordinary delay and agency neglect of their obligations. This period began with the first biological opinion from the U. S. Fish and Wildlife Service ("FWS") in July 1990 (JA-80) – had plaintiffs been timely and properly informed of it,

they could have shortly gone back to work. It lasted at least until the second biological opinion from the FWS in February 1994 (JA-163) – as it was only upon timely and proper notice of the second opinion in the second half of March 1994 (JA-167) that defendant restored what legally speaking might be characterized as the status quo as of July 1990. In the intervening period, the agencies' unreasonable, unwarranted and extraordinary delays in maladministration barred any mining on the property, and barred full beneficial use of the property rights they held.

The actions of defendant's agencies flew in the face of the reasonable investment-backed expectations of the plaintiffs. The actions of defendant's agencies were purportedly in the service of public use of the property for environmental protection to the exclusion of plaintiffs' rights, even though other agencies of defendant advised the Forest Service that plaintiffs' use could proceed, and did not need to be prohibited or even curtailed in the service of the purported public use the Forest Service sought to the exclusion of plaintiffs' rights.

Plaintiffs rely in support of this motion on: (1) the briefing below; (2) the Joint Statement of Facts ("JSOF") filed in this case on January 7, 2008; (3) the Joint Appendix ("JA") filed in this case December 21, 2007; (4) Plaintiffs' Proposed Findings of Uncontroverted Fact submitted with this Motion ("PPFUF"); (5) Plaintiffs' Exhibits ("PEs") attached to this Motion, which include the affidavit of plaintiff Alfred L. Aloisi, attached as Plaintiffs' Exhibit No. 1 to this Motion (cited as "Aloisi PE-1") and the affidavit of Thomas P. Ferrero, attached as Plaintiffs' Exhibit No. 2 to this Motion (cited as "Ferrero PE-2"), who was plaintiff Liberty Mining, Inc.'s consultant with respect to geology and mine permitting;[1] and (6) such other materials as may be

[1] In this filing, Plaintiffs cite the Aloisi and Ferrero affidavits by paragraph number ("Aloisi PE-1:7" being paragraph 7 of the Aloisi Affidavit), and cite their other exhibits by the serial "PE" pagination they bear (e.g., "PE-19-266").

filed in completing the briefing on this Motion and in response to any dispositive motion defendant may file.

Together these materials establish, as a matter of law and based on a combination of jointly agreed facts and plaintiffs' uncontroverted facts, that plaintiffs are entitled to summary judgment in their favor on defendant's liability for a temporary taking.

## II. Statement of the Case.

### A. Approaching the record in the Case.

The factual puzzle pieces of this case are lodged in several places, some in the Joint Statement of Facts, some in Plaintiffs' Exhibits and Proposed Findings of Uncontroverted Fact, and some in the Joint Appendix. These sources, by the nature of the filings that support a summary judgment motion, contain some duplication and overlap. Plaintiffs submit the case may be directly approached and understood by starting with the Aloisi Affidavit, proceeding to the Plaintiffs' Proposed Findings of Uncontroverted Fact, then to the Ferrero Affidavit and the distillation of those narratives below. However it is approached, may it please the Court:

### B. Source of the Dispute and the Taking.

(1.) The lost or hidden biological opinion. In November 1989, the Forest Service approved the first phases of an "all-phase" plan of mining operations submitted by plaintiff Liberty Mining, Inc. ("Liberty") for gold extraction in Eddy Gulch, an area of the Klamath Mountains where earlier claimants and mine operators had once organized the Liberty Mining District and productively mined gold for decades. Liberty continued road and site improvement work authorized by prior Forest Service approvals, and began under the November 1989 approval the extraction of gold-bearing apex and dump deposits, the exposure of additional gold-bearing vein along the apex corridor, the hauling of these ores to its mill locations, and the

acquisition of additional milling equipment (beyond gravity separation mill equipment already in Eddy Gulch).

After barely a month of mining operations under the plan approval, Liberty was ordered to stop these mining and mill installation operations (JA-45; PPFUF-23), by a Forest Service January 4, 1990 “Stop Work Order.” JA-51. The California State Historic Preservation Office (“SHPO”) had advised the Forest Service that the Forest Service’s own pre-approval cultural resources study (paid for by Liberty) was inadequate. Instead of questioning or challenging the SHPO’s position on this Forest Service land management matter, the Forest Service promptly shut down Liberty’s operation.

Whether this shutdown was appropriate, Liberty did not fight it, as it was clear the FWS would soon put the Northern Spotted Owl (“the owl”) on the endangered species list, and the owl’s potential impact on Liberty’s plans for Eddy Gulch was more important. Liberty declined to fund a second cultural and archeological resources study (“Arch Study”) until the owl situation was clarified. Liberty did not want a completed second Arch Study to be thrown out because Liberty’s operations moved or changed to accommodate the owl. Liberty communicated this position to the Forest Service, and the Forest Service understood this was Liberty’s position. Aloisi PE-1:27; e.g., JA-82, at 777; JA-88, at 823; PPFUF-45.

The FWS had already proposed to list the owl, and the Forest Service told Liberty that the owl situation should be clarified soon. The Forest Service prepared for the listing in advance, as the Forest Service’s main event, its timber sales program for 1990, would be at risk if there were no biological opinion establishing what logging could proceed after the listing of the owl.

Liberty understood that the Forest Service would consult with FWS under the Endangered Species Act, 16 U.S.C. § 1536, once the owl was formally listed. Liberty did not

know how or when, or the details of the process, nor did the Forest Service provide it any information in that regard.

Unknown to Liberty, the Forest Service initiated its consultation in June 1990, preparing a biological evaluation and transmitting that to initiate formal consultation with the FWS even before the FWS formally listed the owl as threatened. This put Liberty in among all of the 40-plus proposed 1990 timber sales for Klamath National Forest. JA-76, at 747. The Forest Service and FWS had tightly cooperated to save as much of the Forest Service's 1990 timber program as could be saved in light of the owl's listing. A little over a month after the consultation request, on July 23, 1990, the FWS delivered back its biological opinions. As the Forest Service acknowledged over a year and half later, this biological opinion "determined that the [Liberty Mine] project could proceed as submitted." JA-111, at 1084.

FWS consultation rules require that the agency provide an "applicant," precisely what Liberty was here, with the biological opinion on its project within 45 days. 50 C.F.R. § 402.14(e). Neither the Forest Service nor the FWS complied with that rule. Neither agency even notified Liberty there was a biological opinion. Aloisi PE-1:36. This failure is made uglier by the fact that the Forest Service authorized timber harvesting during the summer of 1990 in Eddy Gulch in a sale area surrounding the same nesting owl pair that the Liberty project supposedly affected, and Aloisi and Ferrero could hear the chainsaws in Eddy Gulch while Liberty was not operating and in the dark about the biological opinion clearing their mining operation. Aloisi PE-1:32; JA-157, at 1298.

Over the next year and a half the exchange between Liberty and the Forest Service was this – "Have you gotten word on the owl?" "No, we're still awaiting word on the owl." The situation was perfect for anyone in the Forest Service not wanting Liberty to re-start its mining

operation in Eddy Gulch. Liberty had said it would not pay for the Arch Study needed to go back to work until it got word on the owl and knew what if any operating restrictions might pertain. As long as Liberty did not get word on the owl, Liberty would not do the Arch Study and would never be able to go back to work.

The Forest Service's November 1989 approval of Liberty's plan had a "termination" date in it – July 31, 1990. JSOF-48. This is a bizarre and counter-productive requirement (Ferrero PE-2:19), unless of course the approval can routinely be extended if the work approved in the plan is not completed; for instance, if for some reason it has not been allowed to proceed at all. Liberty applied in July 1990 to renew its approval; the Forest Service granted the extension in August 1990, through December 31, 1990. Liberty applied in September 1990 to renew the approval again; in November the Forest Service granted the extension through March 31, 1991. Liberty applied in March 1991 to renew the approval a third time; the Forest Service never acted on this renewal request. PPFUFs-72, 73.

In March 1991, Liberty received an oral authorization to do some limited work. PPFUF-55; Aloisi PE-1:37. At this time, Liberty raised additional money by mortgaging the two private parcels in its property position, and used some of it to pay for the bulk of the needed Arch Study. Aloisi PE-1:39. Within days of the Forest Service's learning that Liberty had funded an "interim" Arch Study (JA-105) and might be resolving the basis for its being stopped, the Forest Service visited the site on July 11 and orally directed Liberty to shut down even the limited work Liberty had been authorized to undertake. PPFUF-61; Aloisi PE-1:40.

When Liberty got shut down on July 11, it demanded this new shut-down order be in writing. Months after having stopped work, but still not having received anything in writing, and getting more and more suspicious about how they were being treated, Liberty arranged a meeting

with the Forest Service. The meeting was, Mr. Aloisi recounts, “bizarre.” Aloisi PE-1:43 (meeting content Aloisi PE-1:43-45). Liberty hired a lawyer who called the District Ranger, specifically requesting that the District Ranger check on the status of the biological opinion. Aloisi PE-1:46. Next Liberty got the March 10, 1992 letter from the Forest Service, finally acknowledging there was “word on the owl,” namely, the FWS “determined that the [Liberty Mine] project could proceed as submitted.” JA-111, at 1084.

(2.) Making it worse. Remarkably, the March 1992 letter does not disclose when the biological opinion was rendered. It continues the violation of federal regulation by not tendering that opinion to Liberty, but it also covers up the fact, still then unknown to Liberty, that the agencies failed for well over a year and a half to comply with their obligations.

Another noteworthy feature of the March 1992 letter is that it tells Liberty that the November 1989 approval of the initial mining and milling operations expired March 31, 1991, a year before. Apparently (and retroactively) the work Liberty did under oral authorization between March 31 and getting stopped again July 11, 1991, was under an expired plan.

In addition, the March 1992 letter demands what it said was agreed to at the February meeting – for Liberty to proceed it must resolve the Forest Service’s “confusion” about what Liberty had been approved to do and proposed to do by submitting a new plan of operations. Did Liberty have a choice? Liberty submitted on April 1, 1992 what it regarded as a restatement of its October 1989 all-phase plan of operations (Aloisi PE-1:51; Ferrero PE-2:43, 44). This was the same plan partially approved in November 1989; the same plan where the approved phases of the plan were never completed (since only 1 of the 7 months of work was done before the Arch Study Stop Work Order).

The Forest Service, however, treated this restatement of the partially-approved 1989 plan as a new plan. How convenient. Critical habitat for the northern spotted owl had been formally designated in January 1992, and the FWS's rule stated, "All presently existing projects and all proposed projects where all Federal, State, and local permitting processes had been completed" would be exempt from the effects of critical habitat designation. JSOF-70, quoting 57 Fed. Reg. 1796 (Jan. 15, 1992). If Liberty were an existing 1989 project it would be exempt, as a new project, critical habitat requirements would apply. If Liberty's March 1991 renewal request extended the approval it sought to renew, then Liberty was still approved in January 1992 (and exempt from critical habitat), as the Forest Service had never acted on Liberty's third renewal request. (Plaintiffs recognize the March 1992 District Ranger's letter pronounces the plan approval to have expired March 31, 1991, but that letter, too, fails even to acknowledge that there was a renewal request pending.)

Given that the Forest Service got Liberty to submit a "new" plan, and took the position that the prior approval had expired a year before (without action on the renewal request), the Forest Service set about to undertake a new consultation with the FWS on this new April 1, 1992 plan of operations.

(3.) <u>Adding insult to injury</u>. Of course the local Forest Service office did not tell Liberty that it was reinitiating consultation until after the reinitiation was well launched. PPFUF-73; Aloisi PE-1:52. Liberty still did not know that the biological opinion was over a year and a half old, but it could see another giant stall coming that would prevent action on its plan of operations. So Liberty filed an administrative appeal of the Forest Service decision to reinitiate consultation. PPFUF-76; JA-121. In the course of answering Liberty's appeal filing in the summer of 1992, the Forest Service disclosed to Liberty for the first time that the biological

opinion was dated July 23, 1990. JA-121, at 1168. Still the Forest Service did not provide the opinion to Liberty.

As the appeal was being prepared for the "oral presentation" scheduled for October 1992, and unknown to Liberty, the FWS could not understand why the Forest Service was reinitiating consultation. FWS wrote internally, "reinitiation of consultation not necessary." JA-129. Over a month later, the FWS shared with the Forest Service its draft inter-agency letter replying the Forest Service's request, stating that reinitiation of consultation was not necessary on the Liberty plan. JA-133, at 1216. Even though this was the position of the FWS, the agency whose rules were involved, the Forest Service was not going to take no for an answer from the FWS.

Ultimately, the Forest Service prevailed on the FWS to "accept the reinitiation" of consultation, arguing the April 1, 1992 plan was a new plan because the prior approval had terminated, among other grounds. The FWS's point, however, was that the April 1992 plan affected fewer acres than the 1989 plan they had already cleared, so what new or different effects on the owl could be at issue?

The Forest Service succeeded in getting the FWS to "accept" the reinitiation of consultation only a few weeks before Liberty's oral presentation on its appeal was scheduled. The Forest Supervisor promptly canceled the "oral" appeal meeting with Liberty and dismissed the appeal as moot, saying the FWS's action accepting reinitiation deprived the agency of authority to undo the prior reinitiation request. From any perspective, the agency worked very hard to make sure it could not provide Liberty any relief from its own actions.

Finally, Liberty filed a second level appeal to the Regional Forester. That appeal was dismissed, with the Regional Forester satisfied that no injustice was done because, "Based on the not likely to jeopardize finding, the project was allowed to proceed as submitted." JA-145, at

1263. This is what the FWS July 1990 biological opinion said should have happened, but this is exactly what did not happen because of the indefensible and extraordinary conduct and delays of the Forest Service in this case.[2]

(4.) The bitter irony. The extraordinary lengths to which the Forest Service went to assure that Liberty could not go back to work, and was stalled on its new plan, might make sense if some legitimate purpose had been served by all these machinations. However, no legitimate purpose can be found in these years of delay. One step after another seemed only to continue the cover-up of the original failure in July 1990 to act properly upon receipt of the FWS's July 1990 biological opinion. Proper action, of course, was to provide Liberty the opinion, and let Liberty implement the opinion's "determin[ation] that the project could proceed as submitted" (JA-111, at 1084), just as the District Office implemented the Evening Star and other cleared projects. None of the stall helped the owl, and none of the operation would have hurt the owl.

The Forest Service has never imposed any stipulations or conditions specifically for the purpose of owl protection and preservation in any approval of mining operations in Eddy Gulch. It did not do so in either of the approvals it gave Liberty in 1989. JA-25, 46. Likewise, the plan of operations approval documents for Liberty's lessee Liberty Consolidated Mines, Inc. ("LCM"), contained no such conditions. JA-182 (decision memo); PE-16/A-189 (approval letter and conditions). In 1989, Liberty voluntarily mitigated – removed from its plan of operations – all work that the Forest Service biologist indicated might affect the owl pair living in SOHA

[2] The District Ranger's May 1992 memorandum asking his superiors to reinitiate consultation is highly misleading, and it successfully misled the Regional Forester. It states, "This mine was previously covered in the Biological Opinion rendered on July 23, 1990, and given approval to begin operations." JA-118, at 1145. The second clause suggests Liberty's plan was approved and Liberty operated after the biological opinion. These suggestions are falsehoods. The District Office is hiding the fact the agencies never notified Liberty of the July 1990 opinion (until March 1992), and making it worse with the false suggestion Liberty ever was allowed to "proceed as submitted" after the biological opinion. This is bad faith.

1024. This area northwest of the Liberty operations was in 1989 and remains the area that might be subject to constraints on Mining Law operations in order to protect the owl under applicable regulations, although 189 acres were harvested in the Evening Star timber sale without apparent ill effects on the same owl pair. Compare the "reinitiation" map (JA-118, at 1146) with the Evening Star sale map (JA-66, at 598).

It is not just Liberty's view of the relationship between the owl and Liberty's mine, this is the view of the agency ultimately responsible for protection of the owl, the Fish and Wildlife Service. The July 23, 1990 and February 4, 1994, biological opinions reached the same conclusion, and so did three agency clearances during the second consultation. The April 1, 1992 plan of operations received a June 1992 "Review Team" approval, an August 1992 "Oversight Committee" approval, and a January 1993 "Conservation Group" approval, all without conditions. JA-163, at 1343. Even the Forest Service, in its wrongly timed April 1993 "information letter," determined that Liberty's all-phase plan was "not likely to adversely affect the northern spotted owl and its critical habitat." Id.

The stark fact in this case is that the only mitigation needed to assure that the owl would not be adversely affected by Liberty's Eddy Gulch gold mining operation was accomplished informally, without delay, and voluntarily by Liberty in mid-1989 when it mitigated its proposed operations as requested by the Forest Service biologist.

## III. Jurisdiction and summary judgment in the Court of Federal Claims.

### A. Jurisdiction.

The Tucker Act grants this Court jurisdiction to adjudicate "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department …." 28 U.S.C. § 1491(a)(1). The Fifth Amendment to the Constitution

prohibits the government from taking private property for public use without just compensation. U. S. Const., Amendment V.

The private parcels in Eddy Gulch are fully and wholly private property, fully and wholly covered by Fifth Amendment jurisprudence.

With respect to the unpatented mining claims, the Act of May 10, 1872, as supplemented and amended, 30 U.S.C. § 22 et seq. ("the Mining Law") declares that "all valuable mineral deposits in lands belonging to the United States, … shall be free and open to exploration and purchase, and the lands in which they are found to occupation and purchase, … under regulations prescribed by law." 30 U.S.C. § 22. Once mining claims are located –their boundaries staked, and notices recorded as provided in 30 U.S.C. §§ 23 (lode claims), 28(staking and maintenance), 35 (placer claims), the case law is settled that the holder of an unpatented mining claim holds property "in the highest sense of the term." Clipper Mining Co. v. Eli Mining & Land Co., 194 U.S. 220, 226 (1904), quoting Belk v. Meagher, 104 U.S. 279, 283 (1881). As a typical case explains the holdings of Belk v. Meagher and Clipper v. Eli:

> The law is well settled by innumerable decisions that when a mining claim has been perfected under the law, it is in effect a grant from the United States of the exclusive right of possession to the same. It constitutes property to its fullest extent, and is real property subject to be sold, transferred, mortgaged, taxed, and inherited without infringing any right of the United States.

United States v. Etcheverry, 230 F.2d 193, 195 (10th Cir. 1956). A mining claimant holds property rights in public domain lands owned by the United States by accepting the statutory invitation and staking and maintaining a mining claim, and exploring for and discovering mineral deposits subject to the operation of the statute, such as gold.

**B. Summary Judgment.**

Under Rule 56 of the RCFC, the Court will grant summary judgment when "there is no genuine issue as to any material fact and … the moving party is entitled to judgment as a matter

of law." RCFC 56(c). The moving party bears the initial burden of showing the absence of genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once that burden is met, the non-moving party, to prevail, "must submit conflicting evidence in the form of an affidavit or other admissible evidence." Ferring B.V. v. Barr Labs., Inc., 437 F.3d 1181, 1193 (Fed. Cir. 2006), citing Anderson v. Liberty Lobby, 477 U.S. 242, 247 (1986); Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc., 249 F.3d 1341, 1353 (Fed. Cir. 2001).

The Court considers all factual questions in the light most favorable to the non-moving party, but if the trier of fact cannot find for the non-moving party, the motion for summary judgment may appropriately be granted. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## IV. Temporary takings – the case law and standards.

In evaluating inverse condemnation claims, where just compensation is sought under the Fifth Amendment through the Tucker Act, the Federal Circuit follows a two-part test to determine whether the government actions at issue constitute a compensable taking. Maritrans Inc. v. United States, 342 F.3d 1344, 1351 (Fed. Cir. 2003); Boise Cascade Corp. v. United States, 296 F.3d 1339, 1343 (Fed. Cir. 2002). First, the plaintiff must first demonstrate that it possesses an interest in real property establishing the right to beneficial use of the land that has been affected by the governmental action at issue.

With the necessary interest in or right to use real property established, the plaintiff must demonstrate that a compensable taking occurred, either through the government's physical occupation of the property or by regulation that "goes too far" in prohibiting or interfering with the property owner's rights to use his or her property. See Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 430 (1982); and Florida Rock Indus. v. United States, 45 Fed. Cl.

21, 26 (1999), citing Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415 (1922), which established the "when regulation goes too far" principle in takings jurisprudence.

While the courts recognize two forms of regulatory takings, one form, the per se categorical taking where the landowner is denied all use of his or her land, as in Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1015 (1992), does not apply in the temporary taking context. Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency, 535 U.S. 302, 330 (2002).

The second form of regulatory taking is where some residual right in or use of the property remains notwithstanding the challenged governmental regulatory action (or inaction), and this is the kind of regulatory taking involved in a temporary taking case. See Tahoe-Sierra, 535 U.S. at 330-31. In this class of regulatory takings, there is a three part, case-specific factual inquiry to analyze whether a regulatory taking has occurred. See Penn Central Transp. Co. v. City of New York, 438 U.S. 104 (1978). To determine if the regulation amounts to a compensable taking, the Penn Central inquiry examines three factors: (1) the character of the government action; (2) the economic impact of the governmental action on the property; and (3) the interference with the reasonable, investment-backed expectations of the property owner. Penn Central, 438 U.S. at 124; Keystone Bituminous Coal Ass'n v. DeBenedictus, 480 U.S. 470, 495 (1987).

Temporary deprivation of a property interest, like permanent deprivation of a property interest, is actionable as a regulatory taking of private property for public use under the Fifth Amendment and the Tucker Act. First English Evangelical Lutheran Church v. Los Angeles County, 482 U.S. 304 (1987); see Seiber v. United States, 364 F.3d 1356, 1364 (Fed. Cir. 2004). "Temporary takings are not different in kind from permanent takings." Wyatt v. United States,

271 F.3d 1090, 1097 n.6 (Fed. Cir. 2001), citing First English, 482 U.S. at 321. A temporary taking may arise when what appears to be a permanent taking is ended or reversed by the government, resulting in a finite start and end to the taking. See Seiber, 364 F.3d at 1364; and Wyatt, 271 F.3d at 1097 n.6. The initial denial of a permit to use property (or the rescission of an issued permit), even when the taking is not permanent and the permit is ultimately granted (or the rescinded permit is eventually reinstated), can constitute an actionable temporary taking claim. See Boise Cascade, 296 F.3d at 1347.

Alternatively, a temporary "taking may occur by reason of 'extraordinary delay in [the] governmental decisionmaking' process." Seiber, 364 F.3d at 1364, citing Wyatt, 271 F.3d at 1098 and quoting Tabb Lakes, Ltd. v. United States, 10 F.3d 796, 803 (Fed. Cir. 1993). The Penn Central three-factor analysis is applied to determine whether a government action constitutes a compensable regulatory temporary taking, whether the temporary taking claim is based on extraordinary delay or denial of a permit. See Tahoe-Sierra, 535 U.S. at 330-31; Boise Cascade, 286 F.3d at 1347; Bass Enterprises Production Co. v. United States, 54 Fed. Cl. 400, 402-03 (2002), aff'd, 381 F.3d 1360, 1366 (Fed. Cir. 2004).

"[E]xtraordinary delay in permit processing or bad faith on the part of the agency can give rise to a ripe takings claim notwithstanding the failure to deny the permit." Boise Cascade, 296 F.3d at 1347 n.6, citing Wyatt, 271 F.3d at 1097-98. While agency delays need to be unreasonable or "extraordinary," the length of the delay in and of itself is not determinative. See Wyatt, 271 F.3d at 1098. One clear way to establish that agency permitting delay is unreasonable or extraordinary is to show bad faith on the part of the government. Id., citing Tabb Lakes, 10 F.3d at 799; see also Bass Enterprises, 381 F.3d at 1366. The nature of the regulatory permitting process as well as the reasons for the delays are the material inquiries in

determining extraordinary delay, that is, how disproportionate the delay is to the permitting process from which it arises. See Bass Enterprises, 381 F.3d at 1366-67.

We turn to applying these legal standards to the facts of this case.

## V. Analysis of the facts under the legal standards.

### A. Plaintiffs have property rights recognized under the Fifth Amendment.

(1.) Plaintiffs' unpatented mining claims. The map at JA-188 shows in green the boundaries of Plaintiffs' property position in Eddy Gulch, including both the unpatented mining claims and the patented private parcels. The claims were staked and these boundaries created by Messrs. Aloisi and Ferrero in 1985. Aloisi PE-1:11; Ferrero PE-2:10.

There are four claim groups that Plaintiffs collectively refer to as "the property position." Liberty's predecessor Mr. Patterson, and thereafter Liberty and Aloisi, have recognized that the four property groups should be in unified ownership to facilitate development and gold production from Eddy Gulch.

The westernmost claim group holds the ground operated in the past at different times and under different ownerships as the Klamath Mine. It includes the Ohio 84, Dariel, Sunrise and Raindrop lode claims as well as the Sunset placer claim, a 20-acre placer claim largely overlapping the Sunrise lode, and the Buckeye and Yankee association placer claims (160 acres as provided in 30 U.S.C. §§ 35 and 36), that surround the lode claims and the Klamath Mine area. These claims include the Klamath cut, an apex exposure on the west half of the Sunrise claim pre-dating Plaintiffs' involvement in the Gulch, which Liberty expanded in length and defined in width during their 1989 operations, along with further apex exposures along the continuous vein here.

East of the Klamath Mine group, across the East Fork of Eddy Gulch (see the map JA-188), is the "Union Group" of lode claims: the Union, the Union Extension, the Union Addition

uphill of the other two, and the Big Fish. In addition, the East Fork and Compressor association placer claims hold any mine dumps in the Union Mine area not within the four lode claims.

Next to the east is the Mountain Laurel Mine group. At its center is the Mountain Laurel patented parcel (Lot 45A of Mineral Survey No. 3161), mostly east of Compressor Gulch, but with a "tail" or "prong" off its southwest corner. The Mountain Laurel (or "Mt. Laurel" as it is sometimes written) parcel covers the portals and underground workings of the May and MJ Tunnels, access to the extensive historic workings shown on maps Mr. Aloisi acquired from "old-timers" in Eddy Gulch. JA-187. These workings reached the so-called "Litigation Stope," which was the subject of litigation between the operators of the Mountain Laurel Mine and the owners of the Union Group of claims that stopped operations then. The Mountain Laurel private parcel was held under lease-purchase agreement by Aloisi and his associates from the estate of Patterson, and later acquired by Aloisi (JA-115, at 1117), transferred by Aloisi to Energel, Inc. during Liberty's operating period in 1991, mortgaged in 1991 to raise cash to run Liberty, and lost through foreclosure on that note in 1992. JAs-101, 115. The principals of WAZCO acquired the Mountain Laurel parcel from Liberty's mortgage lienholder, and later as LCM (at the same time they defaulted on the Aloisi/Goodman-LCM lease) they ceased paying county taxes on it. It was sold at a Siskiyou County tax lien foreclosure sale after termination of LCM's lease (JA-185), and purchased by a third party. Surrounding the Mountain Laurel parcel are the Banner, Buster, Blue Bell, Specimen and Six O'clock lode claims and the Compressor and Stevens association placer claims.

The easternmost group includes the Anna Johnson and Surprise lode claims, site of the Anna Johnson Mine operated by Alex and Ruth Markon (Aloisi PE-1:2, 10), the latter of whom

leased those and other lode claims to Patterson and Pincombe, and from whom Aloisi and Liberty acquired the lease and later the claims. Aloisi PE-1:2, 7.

The focus of the first phases of Liberty's operations approved in 1989 and of some of the subsequent phases of its all-phase plan was the largely exposed and easily accessible apex corridor and the substantial volume of mine dumps at the Klamath Mine site. JA-189, at 1543. The apex corridor – running from the east side of the Dariel claim along the length of the Sunrise claim and around the nose of the ridge and then south on to the Raindrop claim (JA-189, at 1543, and JA-188) – is the surface outcrop of the vein, varying in width from 6 feet to 35 feet, averaging about 20 feet where fully exposed along that corridor. JA-6. This nearly flat-lying vein dips gradually down to the east and somewhat to the south into the mountain. It was mined behind and below this apex through several tunnels, including the Blacksmith Tunnel, which is plotted on Ferrero's map (JA-189, at 1543) consistent with its 1936 field survey (JA-1). The records display significant assay results from samples from this tunnel (the 1932 Elmendorf Report, PE-4/A-2), consistent with the production reports in the State Mineralogist's Reports for the Klamath Mine. The extent of the underground workings of the Klamath Mine are evident in surface cave-ins and protruding mine timbers near the apex, and in the extensive mine dumps near the Blacksmith Tunnel, and at eight mapped other locations. JA-189, at 1543.

While the focus of the approved 1989 mining was on the Klamath Mine area, dump and apex ore had been sampled, valued and targeted on the Union Group, the Mountain Laurel parcel, and the Anna Johnson Mine area, all with comparable gold content and recoveries to the Klamath Mine area deposits.

Liberty also had high-grade vein intersections from core drilling under the Six O'clock claim (immediately uphill from the Mountain Laurel parcel) and under the Union group of lode

claims (near the May tunnel). These vein intersections tied to the underground mine maps (*e.g.* JA-187), and established high-grade underground mining targets to be developed using the profits from the initial dump and apex operations.

(2.) The Core Liberty mining claims were (and are) validated by discovery under the Mining Law. The mining claims containing within their boundaries the mineral deposits identified to be mined in Liberty's all-phase plan of operations were in 1989-90 "valid" claims,[3] as that phrase is used to mean claims supported by the "discovery" of a "valuable mineral deposit" within the meaning of those words and phrases under the Mining Law. As stated by Department of the Interior in Castle v. Womble, 19 Land Dec. 455, 457 (1895), and endorsed by the Supreme Court in Chrisman v. Miller, 197 U.S. 313, 322 (1905), a claimant has made a discovery of "valuable mineral deposits" when he or she has identified minerals in quantity and quality such that "a person of ordinary prudence would be justified in the further expenditure of his labor and means, with a reasonable prospect of success, in developing a valuable mine." A valuable mine, as the Supreme Court later established in United States v. Coleman, 390 U.S. 599, 600 (1968), is one where the "mineral can be 'extracted, removed and marketed at a profit' – [meeting] the so-called 'marketability test.'"

There is no question that an unpatented mining claim supported by a "discovery" under this set of standards constitutes a real property interest – property in the fullest sense – that may not be taken for public use without the provision by the government of just compensation under the Fifth Amendment. See Skaw v. United States, 740 F.2d 922, 935-36 (Fed. Cir. 1984),

[3] To be clear, Liberty does not just mean those claims on which mining operations were being conducted at the time of the January 1990 Stop Work Order. First, the Forest Service approval identifies areas in the property position, not specific claims. E.g., JA-26, at 434 (June 1989 plan approval, list of claims involved). Second, the Ferrero economic analysis discussed below includes gold deposits on 15 claims in the property position. Third, whether the claimant has an approved plan of operations is irrelevant to the law of discovery.

quoting Union Oil Co. v. Smith, 249 U.S. 337, 349 (1919); Holden v. United States, 38 Fed. Cl. 732, 735-36 (1997), citing among other cases Best v. Humboldt Placer Mining Co., 371 U.S. 334, 339 (1963).

By early 1989, the Liberty principals, Aloisi and Goodman, and their associates, in consultation with their geologist Ferrero, determined that the dump and apex deposits they had identified on the property contained "$40/ton material," that is, dump and apex ore that would yield a gross return of $40 per ton. Aloisi PE-1:16; Ferrero PE-2:24. A fragment of the geology, sampling, and metallurgy regarding the continuous apex corridor across the property position, and the dumps around the historic mine tunnels, is found in JAs 6-9 and 12-14; PE-15/A-80; and JA-192, at 1579-81.

They knew they could process these dump and apex deposits by gravity separation, and start that operation immediately using the centrifugal concentration equipment already owned and on site in Eddy Gulch. They also knew that employing a gravity-flotation circuit would increase their recovery of gold from the lower-grade dump deposits left by the earlier operators. Plaintiffs knew there was an underlying fine gold component in the dumps, ignored by the historic operations which milled only high-grade ore containing significant fractions of coarse, free-milling gold. Ferrero PE-2:66. Liberty knew that the flotation milling sequence for these ores, after gravity separation, would best be determined by bulk test runs of the deposits, allowing them to optimize recovery of the fine gold fraction through improvement of the flotation circuit, and Liberty also knew that the optimal milling sequence might involve final carbon-in-pulp vat cyanidation circuit for greatest recovery of the fine gold. Ferrero PE-2:67.

The fact that the dump and apex deposits were lower grade than the underground targets was more than offset by the advantage of their minimal mining cost. Recovery of dump and

apex deposit gold would fund the next stage, the identified underground mining targets identified by high-grade core sample intersections tied to the old underground workings.

Ferrero had by then spent the better part of five years mapping and learning the structural geology, recreating the production history, assembling and interpreting the pre-existing sampling and drilling data, and supervising sampling, drilling and feasibility studies for such an operation on the Eddy Gulch property (see Ferrero PE-2:9, 11) (Moore letters at JAs-52, 53, PE-8/A-149 excerpt, JAs-183 (out of chronological order), 60, 63, 68, and 91, and Ferrero PE-2:64.

The Forest Service approved bulk test runs through the mill equipment suite they would purchase from Moore in November 1989 (JA-45). This was confirmed in the Forest Service's November 1990 approval extension letter (JA-88, at 822):

> [Y]ou are approved to do the following:
>
> Bulk sample the Klamath Mill dumps.
> Bulk sample pits at Klamath, Anna Johnson and Incline Ridge [Six O'clock claim above the Mountain Laurel underground workings].
> Set up screening, crushing and centrifugal concentrating equipment at Usher Flat.
> Install a pipeline from Usher Flat to settling ponds at the ET Placer Mine.

These tests would yield gold production, and would also yield refinements to their milling system and circuits, and Liberty was ready to erect that mill and run those bulk samples, beginning with the ore it was moving to Usher Flat at the time of the Stop Work Order.

In his affidavit and in several narratives, including both JA-190 and PE-15/A-80, and as well on Spreadsheets 1 through 4 of JA-191, at 1569-72, Mr. Ferrero recreates in detail the background sampling and metallurgical data available to Liberty when it determined to begin mining operations. In spreadsheets 5 through 9 of JA-191, at 1573-77, Mr. Ferrero sets out the mining and capital costs reasonably estimated for operating – mining with equipment on hand (PE-20, listing equipment on-site and in use, and JA-180, at 1430), and milling with the

processes described and equipment priced by Liberty's mill equipment supplier and metallurgist. See JA-52 (Mr. Moore's mill equipment quotations / offer to sell). For conservative (if slanted at all, slanted against Liberty) mining and milling costs, Ferrero employed the costs used by Mr. Stebbins, the Forest Service's contractor, in his analysis for the contest case (references to "Stebbins" as throughout JA-191, at 1573-77).

The Ferrero Affidavit (PE-2:51) and Narrative (JA-190) and its supporting Spreadsheets then identify the quantity and grade of ore in the several different deposits at the different sites in the claim group that were Liberty's initial targets for the operations Liberty intended during the four-five year period of the temporary taking here,[4] and the recovery rates expected from the various mill equipment and process steps, both those Liberty was approved to undertake in November 1989, and would have moved to in the next phases of its operation.

As the Ferrero Affidavit (PE-2:49) and the underlying JA-190 narrative describe, these JA-191 Spreadsheets assess the data available in 1990 to Liberty, and which would have been available to Liberty in 1990 had they been able to complete their initial operations approved in 1989. The data include what was available to Liberty in 1989-90, and what was generated later in the 1990s and during the "mineral examination" and administrative contest sampling from 1998 to 2006. The data are analyzed and expressed through several mine development and milling scenarios, ranging in approach and assumptions from very conservative and negative to reasonable and wholly warranted. Notably, even the most conservative and negative scenario in its resource assumptions on Spreadsheets 5-9 yields a profit at its bottom line.

---

[4] The Ferrero analysis includes deposits on the Dariel, Sunrise, Raindrop, Union, Union Extension, Big Fish, Banner, Six O'clock, Buster and Anna Johnson lode claims, and all five placer claims (Sunset, Yankee, East Fork, Compressor and Stevens).

The Ferrero Affidavit (PE-2:49) also sets out Liberty's bottom line form the operations Liberty began with the 1989 Forest Service approval and expected to undertake – Liberty would have netted $21.9 million had it been allowed to proceed with the operation described in the approved phases, and the next operating phase of the all-phase plan of operations, over the first four-five year period of mining described in Liberty's 1989 mining plan of operations, and analyzed in these economic calculation scenarios.

The $21.9 million profit calculation, and the parallel calculations of alternative scenarios yielding different but still profitable outcomes, were documented in these Spreadsheets in the course of discovery in preparing for the hearing in the administrative proceeding and for this case. However, these recent written calculations simply recreate the less formal process undertaken by plaintiffs in 1989-90, with the assistance and advice of Mr. Ferrero, when Liberty decided to begin mining. Liberty had determined to haul the ore to the centrifugal concentrator equipment already on-site, or else to the initial gravity separation/flotation mill location, depending on how quickly it could be erected, for processing. This decision to go mining employed all sampling, metallurgical, geologic and mining cost data available and known to plaintiffs in 1989-90, when they began mining. E.g., JAs-61, 99 and PE-15/A-80. This decision constituted Liberty's determination that it had "a reasonable prospect of success in developing a paying mine" consistent with the "discovery" standard under the Mining Law. Plaintiffs' conclusions then are demonstrated now in the maps, narrative and spreadsheet calculations presented as JA-189-193 (supported by resource data analysis such as PE-15/A-80, as explained further in Ferrero PE-2:50-61, and by metallurgical analysis such as PE-18/A-114, explained further in Ferrero PE-2:62-69). With these reasonable projections that revenues from mining these deposits would exceed the costs of doing so, Liberty and its property position met the

"marketability test" engrafted by United States v. Coleman, supra, on to the original "prudent person standard" of Castle v. Womble, supra, and Chrisman v. Miller, supra.

By the standards of the Mining Law, plaintiffs' mining claims were validated by discovery, and constituted "property to the fullest extent." Etcheverry, 230 F.2d at 195.

(3.) Whether the claims were valid or not, plaintiffs had the property right to operate under the Mining Law and agency standards on "open," non-withdrawn land. Plaintiffs have set out above and in the Ferrero Affidavit, and the exhibits it cites, in abbreviated form for purposes of this summary judgment motion, their case that plaintiffs' property position and the claims supporting it were validated by discovery within the meaning of the Mining Law.

(a) This case, however, involves a temporary taking of plaintiffs' property rights in these unpatented mining claims, which are on "open" public domain land. JSOF-4. On open ground, the Mining Law declares, "[t]he locators of all mining locations made on any mineral vein, lode, or ledge, situated on the public domain, … shall have the exclusive right of possession and enjoyment of all the surface included within the lines of their locations," among other rights. 30 U.S.C. § 26.

In its 1998 motion to stay this case until claim validity was established through the agency contest procedure, defendant relied on Holden v. United States, 38 Fed. Cl. 732, 733-34 (1997), and Payne v. United States, 31 Fed. Cl. 709 (1994), among other cases. Those cases all involved plaintiffs permanent taking causes of action, and land that the United States had closed, or withdrawn, from the operation of the Mining Law. In Holden, a formal land withdrawal order transferred the land to the Navy for use as a weapons training area. In Best v. Humboldt Placer Mining Co., 371 U.S. 334, 336 (1963), the United States filed a declaration of taking to use the land in a dam construction project. In Clouser v. Espy, 42 F.3d 1522 (9th Cir. 1994), Congress

withdrew the national forest land from the operation of the Mining Law for public use as a wilderness area. In each of these cases, the public lands were no longer subject to section 1 of the Act of May 10, 1872, 30 U.S.C. § 22 – they were no longer "free and open … to occupation" for mining purposes under the Mining Law. In those cases the claimant, to have rights that survived the Government's withdrawal of the statutory authorization to occupy them for mining purposes, had to establish property rights against the United States that survived the legal change in the land's status under the prudent person and marketability standards of Castle v. Womble, Chrisman v. Miller, and United States v. Coleman.

The lands in this case, however, have not been withdrawn from or closed to the operation of the Mining Law. "Open" lands are the legal opposite of withdrawn lands, and the right to operate on claims on open lands is not, by statute or regulation, limited or conditioned only to those who can demonstrate the "validity" of their locations by proving a discovery.

(b) The Forest Service's own rules and directive implement this principle. In issuing the Mining Law plan of operations rules in 1974, the Agriculture Department stated:

> The Forest Service recognizes that prospectors and miners have a statutory right, not mere privilege, under the 1872 mining law and the Act of June 4, 1897, to go upon and use the open public domain lands of the National Forest system for the purposes of mineral exploration, development and production. Exercise of that right may not be unreasonably restricted. (Emphasis added.)

39 Fed. Reg. 31317, col. 1 (Aug. 28, 1974) (emphasis added), explaining what was 36 C.F.R. Part 252 then, and has since been re-designated as 36 C.F.R. Part 228, Subpart A. The instant case involves defendant's denial of this statutory right by unreasonable and improper actions that wholly prevented plaintiffs from exercising these statutory rights at all over a multi-year period.

The Forest Service in the quoted basis for its own rules interprets the Mining Law and the Organic Act of the Forest Service ("the Act of June 4, 1897," in the quotation) to establish that a

mining claimant's statutory right is available to "prospectors" engaged in exploration as well as "miners" engaged in profitable production, and to the holders of claims everywhere in between. This confirms this statutory right is held by every mining claimant on "open" public domain land, whether or not the claimant has "validated" his or her claims by the discovery of a valuable mineral deposit. The statutory right to occupy and use "open" lands for mining and all related purpose reasonably incident to mining is implemented in the Forest Service's rules, and is not dependent on claim validity.

The Forest Service rules call for timely action on plans of operations irrespective of claim validity, and irrespective of the stage of the claimant's mining activities in the spectrum from initial exploration to development to production through to reclamation. 36 C.F.R. § 228.5 requires the Forest Service to respond to any plan of operations within 30 days of its filing, either approving it (36 C.F.R. § 228.5(a)(1)) or notifying the applicant "that more time, not to exceed an additional sixty (60) days, is necessary to complete such review, setting forth the reasons why additional time is needed." 36 C.F.R. § 228.5(a)(4).

The only circumstance under which the Forest Service's mining rules authorize district rangers to take longer than 60 days to act on a mining plan of operations is when the agency determines that it must prepare a formal environmental impact statement (EIS) to comply with the National Environmental Policy Act, 42 U.S.C. § 4321 et seq., before it can approve the plan. 36 C.F.R. § 228.5(a)(5). The District Ranger indicated that if Liberty sought to install and use a vat cyanide carbon-in-pulp milling circuit that it might require the Forest Service to prepare a formal environmental impact statement before such a plan could be approved. JA-82. However, Liberty never supplemented or revised its all-phase plan to seek Forest Service approval of vat cyanide carbon-in-pulp milling operations.

The Forest Service's own rules also prevent its officials from stalling a plan of operations to force an operator to make decisions on future phases of a plan, when the operator cannot or does not know them yet, or they reasonably depend on intervening events, whether those intervening events are on the part of the operator (when future plans depend on steps in the development process not yet undertaken, such as a milling circuit test run) or on the part of the regulator (uncertainty over future regulatory requirements). 36 C.F.R. § 228.4(d) provides:

> The plan of operations shall cover the requirements set forth in paragraph (c) of this section, as foreseen for the entire operation for the full estimated period of activity: *Provided, however*, That if the development of a plan for an entire operation is not possible at the time of preparation of a plan, the operator shall file an initial plan setting forth his proposed operation to the degree reasonably foreseeable at that time, and shall thereafter file a supplemental plan or plans whenever it is proposed to undertake any significant surface disturbance not covered by the initial plan.

The Forest Service could not properly demand that Liberty commit to eventual plan elements that were unknown or uncertain, and then stall action on what was know and certain, hiding behind the operator's failure to submit the details of hypothetical operations. In their professed "confusion" (JA-111) over what Liberty proposed in its supplemental all-phase plan of October 1989, the Forest Service was confessing its inability to implement its own regulations.

Likewise, in trying to force Liberty to commit to whether it was going to use vat cyanide leaching in its milling circuit, the Forest Service was ignoring its own rules not to compel any operator to supply plan elements beyond those "reasonably foreseeable at that time," "that time" being the time when the earlier operations in mine development require approval of a plan of operations, due to their threshold of surface disturbance, before they can be conducted. As Mr. Ferrero establishes, in 1989 "we were not seeking full approval of the all-phase plan. We were only seeking his opinion as to whether it was generally approvable in concept or not, evaluated at that time with the data available to him." Ferrero PE-2:17.

In addition to these regulatory deadlines, the Forest Service Manual ("FSM") § 2817.23 states that Forest Service approval of a plan of operations "does not constitute … recognition or certification of the validity of any mining claim to which it may relate …." PE-10-178. The Forest Service regulations define the "operations" subject to the rules and this Manual to include all activities from "prospecting" through "processing" ores, without distinguishing those that precede, accompany or follow "discovery" of a valuable mineral deposit. 36 C.F.R. § 228.3(a).

Another confirmation that the Forest Service acknowledges the statutory property right of the claimant to be able to operate, irrespective of a "discovery" on the claim, is found in FSM § 2818.3, which states, "in fact, a claimant with a valid discovery does not have more surface rights than one without a valid discovery … ." PE-10-185. The surface rights are to use claims for all purposes incident to mining operations, under the "statutory right" "the Forest Service recognizes" claimants have on "open public domain land." 39 Fed. Reg. 31317 (Aug. 28, 1974).

In the May 2007 Order leading to the parties' motions to dismiss the administrative contest proceeding, the Interior Department Administrative Law Judge stated that a validity determination was likely "ancillary to the Aloisi Group's takings claim" because the fact situation involved neither a patent application nor a withdrawal or closure of the public land from the operations of the Mining Law. PE-19-266. There was no finding that a validity determination was a necessary component of establishing a cognizable property interest. Rather, the Administrative Law Judge suggested that the Court could determine the plaintiffs' "compensable property rights" by means other than the validity of their mining claims. PE-19-266. Plaintiffs submit that their statutory right to operate on unpatented mining claims on open public lands constitutes a compensable property right when it is temporarily taken through actionable conduct of federal officials, actionable under the same standards applicable to analysis

of any regulatory takings claim regarding prohibition of or interference with rights to use real property for specific lawful purposes.

Plaintiffs have a cognizable property interest in their unpatented mining claims that the Forest Service's own rules observe and protect. While plaintiffs have demonstrated the validity of the claims on which they sought to operate on this record and filing, plaintiffs also submit they have property rights that give rise to liability for a temporary taking when the government actionably interferes with and prohibits the exercise of the right to mine on open public lands under the Mining Law, irrespective of claim "validity" under the prudent person/marketability tests employed in other contexts and for other purposes.

**B. The first *Penn Central* factor – the character of the government action.**

The relevant analysis of the character of the government's action focuses on the purpose and effect of the Forest Service's handling of Liberty's approved and planned mining operations, including the extraordinary delay caused by the Forest Service's losing or hiding the July 1990 biological opinion. See Tahoe-Sierra, 535 U.S. at 323.

(1.) Unreasonable and unwarranted interference with, and extraordinary delay, in allowing beneficial use of property. The first way to measure the character of agency action is against the regulations that govern that conduct. Here both the Forest Service and the FWS clearly ignored the requirements of their own regulations, and their doing so directly resulted in the extraordinary delay that followed. Moreover, the Forest Service's conduct was in bad faith and extraordinary by any measure, and unreasonable and unwarranted.

(a) On July 23, 1990, the FWS "determined that the project [Liberty's September 28, 1989 all-phase plan of operations] could proceed as submitted." JA-111, at 1084. The FWS regulations governing consultations prescribe, "Within 45 days after concluding formal consultation, the Service shall deliver a biological opinion to the Federal agency and any

applicant." 50 C.F.R. § 402.14(e). Neither the FWS nor the Forest Service provided the biological opinion to Liberty within that deadline. Liberty only learned of the biological opinion when the District Ranger was forced to acknowledge it by Liberty's counsel's direct inquiry, in the March 1992 letter admitting there was a biological opinion that "determined that the project could proceed as submitted" (JA-111, at 1084). Even then, the Forest Service hid the date when the opinion was rendered. See JAs-127-128; Aloisi PE-1:42; Ferrero PE-2:42. This hide-the-ball behavior is unreasonable and unwarranted per se.

There are a number of ways in which the Forest Service's handling of that consultation were improperly hostile to Liberty.[5] All the others pale against this – the Forest Service never acknowledged to Liberty that the 1990 no jeopardy opinion existed, until it was forced to do so by demand from Liberty's counsel 20 or so months after the fact. And once its existence was acknowledged, the agencies still did not provide it to Liberty (what the rule requires) until 25

---

[5] First, the Forest Service distinguished in 1990 between "sold sales" and "proposed sales" in its handling of consultations. See JA-76, tendering sold and proposed sales under separate programmatic biological evaluations. If "sold sales" were "grandfathered" or immune from any adverse biological opinion, Liberty should have been treated as a "sold sale," at least with respect to those operations already approved by the Forest Service in November 1989 and under approval when the owl was designated. As to those operations, Liberty's was not a "proposal" but a permitted mining operation. The approved operations involved a large share of all the timber cutting involved in the all-phase plan: all of the road widening and new construction except to certain later-phase mining sites; the clearing of Usher Flat as the mill site; and "clearing and excavation of Mountain Laurel and Klamath Ridge apex areas." JA-40, at 464 (listing operations approved in November 1989 in JA-45).

Second, had the Forest Service simply extended the plan approval until it acknowledged the existence of the 1990 biological opinion, the approved operations as of January 1992 would have been exempt from the designation of critical habitat. JSOF-70.

Third, the Forest Service consulted in 1990 with the FWS by providing Liberty's September 1989 all-phase plan of operations, on which the Forest Service never acted. This plan was "pre-mitigation." It was the October 1989 supplemental "mitigated" plan (as explained in Aloisi PE-1:20 and Ferrero PE-2:20 to 23) that was partially approved, and the balance of which was pending Forest Service action at the time of the consultation.

months after the fact, over 16 times the period prescribed by the governing rules. JA-127-128. This is demonstrably bad faith conduct.

Had Liberty learned in July 1990 that its all-phase plan of operations could proceed as submitted, its own condition to paying for the necessary Arch Study would have been met, and within the period of time it would have taken to complete the Arch Study the Stop Work Order would have been lifted. The rest of this would never have transpired.

(b) The Forest Service's mishandling of its reinitiation of consultation included two new and different violations of governing procedures not committed in the first consultation round.

First, the Forest Service requested reinitiation of formal consultation without preparing a biological assessment, the regulatory prerequisite.[6] Agencies are required to "review [their] actions at the earliest possible time to determine whether any action may affect listed species or critical habitat." 50 C.F.R § 402.14(a). Only if an "affect" determination is made by the action agency is Section 7 consultation required under this rule. 50 C.F.R § 402.14(b)(1) creates an explicit exception – a "Federal agency need not initiate formal consultation if, as a result of the preparation of a biological assessment under § 402.12 ... the Federal agency determines, with the written concurrence of the Director, that the proposed action is not likely to adversely affect any listed species or critical habitat." Only when the FWS asked the Forest Service to provide the information that a biological assessment is supposed to provide did the Forest Service prepare

[6] The Forest Service labeled its documents providing information and analysis to the FWS as a "biological evaluation" both in June 1990 (JA-76) and in March 1993 (JA-153, at 1284) and April 1993 (JA-157, at 1297). The agencies also called the Forest Service's April 1993 letter an "information letter." JA-163, at 1343. Whatever they called it, the FWS rules provide only for the consulting agency to provide a "biological assessment," which is what the April 1993 Forest Service letter was per the FWS consultation rules.

and provide its "information letter," which it admitted "serve[d] as a biological evaluation." JA-157, at 1297.

When in April 1993 the Forest Service finally did what the rules called for a year earlier, the agency's own conclusion was that the project was not likely to adversely affect the owl or adversely modify critical habitat. Even then the Forest Service elected to continue the delay, rather than exercising its authority under 50 C.F.R. 402.14(b)(1) not to proceed with a consultation when the action was "not likely to affect." Most of a year later the FWS reached the same conclusion; its February 1994 second opinion was labeled an "informal consultation" as both agencies concluded the project was not likely to adversely affect the owl. Both agencies, in the end, concluded the second consultation was unnecessary, even though the Forest Service insisted it occur before making the preliminary determination prescribed by the FWS's consultation rules.

Second, the FWS Section 7 consultation rules prescribe the permitted length of a consultation, "A consultation involving an applicant cannot be extended for more than 60 days without the consent of the applicant." 50 C.F.R. § 402.14(e). Liberty was an "applicant" within the meaning of these rules (50 C.F.R. § 402.02, defining "applicant" and "action"), yet its consent was never sought nor given, and the consultation lingered for over a year and a half.

On top of the regulatory violations, the Forest Service reinitiated the consultation under bad faith circumstances, keeping both Liberty and agency superiors in the dark. The District Ranger pressed the FWS to undertake a new consultation on Liberty's restatement of its 1989 all-phase plan (see JAs 129, 133), all the while hiding from Liberty the fact that the first opinion had been rendered two years before, and not providing the opinion to Liberty, the applicant under the rules. The District Ranger also misled superior officials about what happened with the

first biological opinion, falsely suggesting that Liberty had been allowed to operate after the July 1990 biological opinion and under its clearance. See JA-118, and footnote 1 above.

(c) Finally, the Forest Service's behavior here was discriminatory in fact. The Forest Service and the FWS tightly coordinated the 1990 consultation, in order to save the Forest Service's timber program for the 1990 season. The Forest Service's biological evaluations were completed before the owl was listed (see JSOF-45-46), and the FWS's biological opinions were back in a month.

Both Aloisi and Ferrero describe that, while they were being told during 1990 that "there was no word on the owl" with respect to Liberty, they heard the logging activity at the Evening Star Timber Sale, in the same spotted owl habitat area (owl nest circles shown in JA-118; sale area shown in JA-66) in Eddy Gulch as the Liberty plan of operations. Aloisi PE-1:32; Ferrero PE-2:34. The Evening Star Timber Sale was also included in the Klamath National Forest biological assessments tendered for consultation by the Forest Service to FWS on June 18, 1990. JA-77, at 754. Klamath National Forest did implement the biological opinions received from the FWS on July 23, 1990, with respect to their timber sales, at least the timber sale directly affecting the same owl pair that affects the Liberty operation. They just did not do so for the Liberty plan of operations, without explanation to Liberty and on this record without basis. This again shows the agency's conduct toward Liberty to have been unwarranted and unreasonable.

(2.) Bad faith. The facts set out in Part I above force the conclusion that the actions of the Forest Service were conducted in bad faith within the meaning of temporary taking case law. Whether the Forest Service's actions are characterized as a mistake, followed by a cover-up, as motivated by some desire to protect the owl beyond the protections the law provided, or by some animus against Liberty or its principals that no one has yet admitted, need not be determined –

the facts set out here demand the finding, as a matter of law, that the Forest Service's conduct was extraordinary and unwarranted, and laced with bad faith, in the delay it created and enforced.

An entire District Ranger's Office had neither the courtesy, curiosity or competence to know that Liberty's plan was in the June 1990 consultation and had come back clean to be implemented "as submitted." This is worse than willful ignorance while timber harvesting is occurring in the same owl nesting area; this is worse than willful ignorance when the acknowledgement there is a biological opinion comes with continued hiding of the date of the opinion and compliance with the regulatory obligation to provide it to the applicant.

Plaintiffs submit that the recounting of the facts in Part I above, and in the preceding paragraphs, supplies undisputed evidence of bad faith that clears any hurdle set in the case law. See Wyatt, 271 F.3d at 1098 (plaintiffs were principally responsible for the delay), Tabb Lakes, 10 F.3d at 799, and Bass Enterprises, 381 F.3d at 1366 (serious public health and safety issues and additional mandated consultations justified the delay).

Here the delays were all set in motion by the agencies' violation of their obligation to provide in a time certain the biological opinion to the applicant at all, much less within the prescribed time period. The delays were then drawn out another two full years by the Forest Service's insistence on a second consultation that they initiated without observing the governing starting procedure (failing to prepare a biological assessment up front), and a second consultation that in the end was found not to have been required at all. JA-163, at 1343. This record shows an agency abusing its processes repeatedly in order to stall action on Liberty's plan of operations – the essence of unreasonable, unwarranted, extraordinary and bad faith delay.

**C. The second *Penn Central* factor – the economic impact of the governmental action.**

The second Penn Central factor is whether the government action causes a significant economic impact on the property, and the property owner's beneficial use of it. See Loveladies Harbor, Inc. v. United States, 28 F.3d 1171, 1177 (Fed. Cir. 1994); Florida Rock, 45 Fed. Cl. at 32-33. The owner's loss, the damages caused by the temporary taking, are found in the lost profit and income from the property. CCA Associates v. United States, 75 Fed. Cl. 170, 197 (2007).

(1.) No income from mining could be realized the entire period. In 1989, the Forest Service authorized Liberty to begin mining the property, and Liberty did so. Ore was extracted and moved to the approved mill location, and milling was authorized. The milling of bulk samples authorized in the November 1989 approval (JA-40, at 464 and JA-88, at 822) would have initiated production and generated some gold to sell. However, the Stop Work Order of January 1990 (JA-51) prevented that bulk milling, and from then on, no mining and thus no sale of any minerals and thus no mineral revenue could be realized from the property, and none was. The Forest Service's refusal to allow any mining anywhere on any of the claims (including the private parcels, using Forest Service road access), and thus the prohibition against earning any income from Liberty's intended land use, continued with respect to the entire claims position (and the private parcels) until the Forest Service approved the LCM operation in August of 1996.

(2.) Unpatented mining claims may not be used for non-mining purposes. As has been clear under the Mining Law at least since United States v. Rizinelli, 182 Fed. 675 (D. Idaho 1910) (saloon may not be operated on unpatented mining claim), the only rights of use the locator acquires with an unpatented mining claim are uses for mining and mining-related

purposes. See also United States v. Noguiera, 403 F.2d 816, 825 (9th Cir. 1968) (claim may not be occupied for other than mining-related purposes).

As the Aloisi Affidavit notes (Aloisi PE-1:26), the Forest Service only allows residential occupancy of an unpatented mining claim in connection with operations under an approved mining plan of operations, and then only if the Forest Service determines that such residence is reasonably incident to the approved mining operations. See 36 C.F.R. § 228.3(a) defining "operations" on mining claims as, "All … exploration, development, mining or processing of mineral resources and all uses [of mining claims] reasonably incident thereto …." The mining claims cannot be used for other than mining purposes, and thus have no value for any other use.

**D. The third *Penn Central* factor – interference with reasonable, investment-backed expectations.**

Reasonable investment-backed expectations exist where the plaintiffs' proposed use of the property was feasible and appropriate, and they could reasonably anticipate the mines would be productive. See Bass Enterprises, 54 Fed. Cl. at 403. The nature of the permitting process and the length of and reasons for any delay, including bad faith on the part of the government are relevant considerations in evaluating the reasonableness of the property owner's expectations in the use with which the government action interferes. See Wyatt, 271 F.3d at 1098. A delay that is "disproportionate to the regulatory permitting scheme from which it arises" is not foreseeable, regardless of the complexity of the regulatory regime. See Bass Enterprises, 381 F.3d at 1366, citing Wyatt, 271 F.3d at 1098; see also Florida Rock, 45 Fed. Cl. at 39.

(1.) Reasonable expectations. The Liberty team had the combination of experience and expertise to design and execute a mining plan appropriate in scale and equipment for the mineral deposits to be mined and processed in their 1988-89 decision to start mining operations. Liberty had, among other employees and participants, the combined experience of: Goodman,

from the quarrying, blasting and rock-moving business (Aloisi PE-1:13 through 17); Aloisi, who had learned the properties over years (Aloisi PE-1:1-12) and had supervised the placer mining operations at the E T Placer using equipment (chiefly the Tri-R centrifugal concentrators, and the screen and other mill support equipment) that would be employed in this operation (Aloisi PE-1:6; Ferrero PE-2:15 and 19); and Ferrero, with his certification as an engineering geologist for permitting work, and experience as geologist evaluating and working at gold prospects and both surface and underground producing mines (Ferrero PE-2:1, 7-13, and 46 et seq.). Liberty had the appropriate supervisory and management team to conduct this mining enterprise.

Aloisi had operated for a number of years in Eddy Gulch under Forest Service approvals – the E T Placer site is a set of unpatented lode claims. See JA-12, at 249-74. Ferrero had worked for the Forest Service and knew their permitting and plan approval requirements. Ferrero PE-2:1, 16. In this case, the Forest Service had provided in its November 1989 approval of the first phases of the Liberty all-phase plan that the next "Phase Two" would be included in an environmental analysis to be completed in the spring of 1990 "as we agreed." JA-45. This permitting completion date fit with the July 31, 1990 termination date the Forest Service put in the plan for the approved work, on the expectation that the next phase of mine development would be approved timely before the operation reached that point, and the operation could seamlessly move to the next phase of development. Plaintiffs' acquisition of the equipment appropriate to conduct the first and second phases of their operations was reasonable and consistent with prudent business expectations under those circumstances.

Further, as described in PPFUFs 29-32, and Aloisi PE-1:19-20 and Ferrero PE-2:20-22, before submitting the October all-phase plan of operations that the Forest Service partially approved in November 1989, Liberty had cooperated in establishing the necessary mitigation to

deal with owl management prescriptions then in effect. Liberty had addressed the Forest Service's concerns with regard to the owl. This is demonstrated by the November 1989 approval, which contains no conditions or restrictions related to owl protection or conservation, and the 1990 biological opinion that evaluated the pre-mitigation September version of the all-phase plan of operations and "determined that the project could proceed as submitted." JA-111.

(2.) Investment-backed expectations. Aloisi spent in excess of $200,000 paying mining lease rents, credited toward claim purchase price, under agreements with Patterson, Pincombe (Mara Ventures), and Ruth Markon, and then to acquire outright the three separate sets of rights then existing after he relocated the claims lost for lack of annual filings. By this effort and expenditure Aloisi and Liberty acquired operating control of the property position in Eddy Gulch. This includes the amounts he paid to complete the purchase of the Patterson Estate and Pincombe interests in order to be able to convey clear title to the Mountain Laurel and Rollin private parcels in 1991 to Energel, Inc., so that Energel in turn could mortgage the properties in 1991 for the purpose of raising additional capital to operate (including paying for the Arch Study nearly completed in 1991).

As Plaintiffs set out in PE-20, their September 2007 Response to Defendant's Interrogatory No. 10, they acquired, and equipped for use at the Liberty operation, in excess of $800,000 worth of equipment, including excavators, a D-8 Caterpillar tractor, a truck-mounted diamond-bit drill for core hole drilling, and the two Tri-R concentrators, triple-deck screen and 60 KW generator employed as the gravity concentration mill suite ready for use since its operation at the E T Placer Pit earlier in the decade. Plaintiffs' Answer to Defendant's Interrogatory No. 10 (PE-20) makes it clear that this sum includes a great deal of equipment

priced used as it was acquired. This number is not inflated by new equipment pricing; the equipment was for mine use, and was used in 1989 right up until the Stop Work Order.

These two parts of the operation constituted an investment in excess of a million dollars in the long-term future of Liberty's operation at Eddy Gulch, and a reasonable investment in light of the gold deposits available on the claims and on the Mountain Laurel private parcel.

In sum, all three Penn Central factors support Liberty's case here.

## VI. Conclusion

Plaintiffs have set out the course of agency conduct that prevented Liberty from going back to work – the biological opinion that would have allowed them to return to work, but was hidden from them; the way in which the Forest Service extended the stall when the agencies' original misconduct was about to be found out; the ways in which the Forest Service played their system to delay any action toward allowing Liberty back to work, pressing the FWS to accept a new consultation on the same plan of operations, mooting appeals with misinformation about what had transpired; and all for no benefit to the supposed cause of it all, the northern spotted owl.

Plaintiffs have shown that they were starting to mine, and were justified in starting to mine, having a "discovery" on the claims and private parcel they were starting to mine within the meaning of the Mining Law. For purposes of summary judgment on federal liability for a temporary taking, plaintiffs have shown the profit they reasonably expected would result from the mining operation the agency misconduct aborted. Further, plaintiffs have demonstrated that they have compensable statutory property rights in their unpatented mining claims (and the private parcel), and that the agency misconduct is actionable under standard temporary taking case law even if they could not show that the mining claims were "validated" by "discovery."

Analyzing the facts established here under the three Penn Central factors, all three factors argue for federal liability: the government's actions constituted unreasonable, unwarranted and bad faith delay, violating agency rules and common decency; the government's actions prevented any mining on, and the realization of any mining income from, the property for the entire period of the unwarranted and bad faith delay; and plaintiffs had invested in property acquisition, appropriate equipment and crew, both anticipating and relying on the approval of their initial mining and mill construction and operation approvals by the Forest Service.

On this record, plaintiffs submit the Court should grant plaintiffs' motion and find defendant liable to plaintiffs for a temporary taking of their property.

Dated: February 6, 2008

Respectfully submitted,

s/ Lawrence G. McBride
Lawrence G. McBride
FOLEY & LARDNER LLP
3000 K St., N. W., Suite 500
Washington, D.C. 20007-5143
Telephone: (202) 672-5300
Facsimile: (202) 672-5399

*Attorney for Plaintiffs*