IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ALFRED ALOISI, et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 95-650L |
| UNITED STATES OF AMERICA, | ) | Hon. Lawrence S. Margolis |
| Defendant. | ) | |

**Affidavit of Alfred L. Aloisi**

I, Alfred L. Aloisi, being duly sworn, do declare:

1. I first became involved in mining in Eddy Gulch, in Sawyers Bar California, in 1980. The main group of mining claims in Eddy Gulch were held by Mr. A. R. Patterson. Patterson was the secretary for Gold Standard Inc in 1932 (A-2), and held the properties in Eddy Gulch from then to the 1980s. JA-100 at 954-960.

2. Another group of claims in the eastern section of Eddy Gulch, known as the Anna Johnson group, were held by Mrs. Ruth Markon. JA-100 at 953 and JA-6, at 172 and JA-168 at 43. Ruth Markon's father, William Wike, located the Anna Johnson group of claims in the mid 1890's. The properties passed on to Ruth who married Alex Markon. During the late 1940s Alex Markon ran the underground workings, while Ruth Markon operated the mill. She later became a judge for the town of Sawyers Bar and kept the mint receipts for local miners. Ruth Markon lived to be 100, while A. R. Patterson lived into his late 80's. Both of them had worked in Eddy Gulch for decades, and I learned a great deal from them as they provided written (A-1 and A-2) as well as

verbal histories of the mines of that locale.

3. I tried to learn as much as I could about Eddy Gulch and the Liberty Mining District from the "old-timers" who had worked in the area. Two others who contributed to my mining education were Mr. Ezra Erich, of French Gulch California, and Mr. Ben Baker, of Fort Jones California. Mr. Erich was a 1918 Stanford graduate who studied under Herbert Hoover. He was a practicing geologist for over 70 years and died at the age of 100. Ben Baker was born in 1900 in Cripple Creek Colorado to a family of miners. He spent his life mining and milling. I traveled with him to many mining districts in the Klamath Mountains, and he shared his knowledge of them with me. Both Ben Baker and Ezra Erich were mentors for me as well as others.

4. Gold mining had ceased in 1941 at the beginning of World War II, with the enactment of Public Law 208, the War Powers Act, which declared gold mining to be non-essential to the war effort. Miners were needed for the production of base metals for the war effort, and they responded. Gold mills and machinery were scrapped and moved for the war effort. After the War the fixed price of gold and other economic conditions made gold mining uneconomic, or viable only for small operations like that run by the Markons at the Anna Johnson Mine. That changed in the late 1970's and early 1980's, when gold prices soared.

5. One consistent theme that was communicated to me by all of these people who had worked in the mines of the Liberty Mining District before the War, and even after (as with Patterson and Markon) was that the mines of the Liberty District were not worked out. Conflicts over claim ownership and extralateral rights had led to challenges and litigations that halted several of the mining operations (A-1, A-95).

6. I conducted placer gold operations over the years 1982-1985 (JA-12) in lower Eddy Gulch at the site of the confluence of several of the drainages making up the Eddy Gulch headwaters. These operations were conducted at what we initially called the Double Eagle and later the E T Placer pit. Gravity separation and other mining equipment was brought there and used in these operations. These operations were on mining claims at first held by myself, Ron Long and Glenn Wadstein. Ron and Glenn later sold out to Steve Bennett and Dick Watts (JA-12). The operations were approved and bonded by the Forest Service. After we "broke our pick" in the E T Placer, I turned to the lode deposits and associated dumps, tailings, etc. above the E T Placer.

7. Mr. Patterson had leased his properties to a Mr. Robert Pincombe, who operated through an entity named Mara Ventures. Patterson also had leased the Anna Johnson claim group from Ruth Markon, and in turn leased them to Pincombe. With my colleagues at the time, we entered into a lease purchase agreement on the Eddy Gulch properties, which was accomplished through a sublease with Pincombe (JA-18). Mr. Pincombe was from British Columbia, a former Royal Canadian Mounted Policeman, and he sought investors through the Vancouver stock exchange. He brought in a company named New Cinch Uranium, which conducted a drilling program and evaluated the Klamath dumps (JA-12 at 283 and 284) to provide data for a stock offering to re-start underground operations in Eddy Gulch. During its work on the Eddy Gulch project New Cinch was de-listed from the Vancouver exchange over improprieties at a venture in New Mexico wholly unrelated to Eddy Gulch.

8. Thereafter I bought out Mr. Pincombe and Mara Ventures, after some unsettling developments. I had been making lease payments for 2 or 3 years on the

properties to Mr. Patterson through the lease purchase agreement. It was Mr. Patterson's custom to travel down from Seattle to Sawyers Bar each year in the fall to file with the County and the Bureau of Land Management forms documenting the performance of the annual assessment work, which I had performed, both for his claims and for Ruth Markon's Anna Johnson group. After his filing with the county in 1983 his health failed and he died. Unbeknownst to me, Patterson had not made the annual filing of the proof of labor with the Bureau of Land Management, and under federal law the claims I was leasing lapsed, and the ground came open to location. Rival claimants (chiefly USMX out of Golden Colorado) became active in the Gulch, and upon learning of Patterson's failure to record, I prevailed in locating claims covering the same ground under the name of the Lost Dutch Boy group ahead of my rivals.

9. At the time I made these new locations of the leased claims, I had paid Mr. Patterson approximately $70,000 under the lease-purchase agreement. I contacted Mr. Pincombe and Ruth Markon and proposed a new business arrangement with each. We agreed with Ruth Markon to pay $50,000 dollars for the Anna Johnson group of claims (this was a new deal – she was to have received $20,000 from Patterson, which she never got). We made a similar arrangement with Mr. Pincombe ($50,000) for all of his interests in the Eddy Gulch properties. Finally, we also made a similar arrangement with the Patterson estate (JA-18), that we would pay $50,000 for the two patented parcels – Mineral Lot 45A (the Mountain Laurel Mine) and Mineral Lot 45B (the Mountain Laurel or Gold Ball Millsite, or Rollin site). Although the ground had come open due to Patterson's failure to file with BLM, and I had on my own preserved the property position by locating the Lost Dutch Boys claim group, I felt that it was a matter of honor

that I completed the purchases under the terms previously contracted with Mr. Patterson, through Pincombe and Mara Ventures.

10. It was during 1984 that Tom Ferrero and I first became acquainted. Mr. Ferrero was working as a geologist for a company named Mega Gold. He was mapping and staking claims in the Whites Gulch, the next drainage east of Eddy Gulch. He contacted me about some of his locations, which either abutted or overlapped the Anna Johnson claims at the east edge of the Eddy Gulch claim group. After discussions with Mr. Ferrero and the officials of Mega Gold, we (Fred Aloisi/Jim Kendle and Mega Gold, Inc.) entered into a leasing arrangement. My connection with Mr. Ferrero through Mega Gold's interest in the area began a valued 25-year relationship between the two of us.

11. Because the restaking of the Eddy Gulch claims as the "Lost Dutchboy" group resulted in the well known old claim names appearing in the county and BLM records as lapsed, anyone interested in that area doing claim research was lead to believe that the ground had come open. As a result, others began trying to stake new claims. To remedy this, in 1985, we restaked the claims and filed amended claim notices that renamed the claims back to the old familiar names (Sunrise, Union, Six O'clock, etc.). From 1985 to present, these are the unpatented mining claims involved in our operations and this case. JA-18 at 338-339.

12. Mega Gold was unsuccessful in its other mining ventures, and terminated its lease in Eddy Gulch. I formed a company called Jefferson State Exploration and Development, and with Tom as consultant, we spent much time examining mining prospects in the Klamath Mountains. During the 1986-87 period I approached another Vancouver stock exchange company called Valley View Gold. We were going to do a

public offering called Jefferson Valley Gold, who retained Watts, Griffis and McOuat to do an evaluation of the Eddy Gulch claim group for that purpose. Their geologist, Hugh Clayton, prepared a report for this purpose. JA-12, JA-13, JA-14. Regrettably, Black Monday and the October 1987 stock market crash ended those efforts.

13. As we renewed our efforts to develop in 1988 (JA-15), we were stopped by an extremely bad drought season, and Forest Service restrictions on nearly every use of engines or motors in the forest that season. It was 1987 that I first met Don Goodman. Mr. Goodman was a professional blaster by trade. At 27 years of age he accomplished some extremely technical underwater blasting connected to work on the St. Lawrence Seaway project, and over the years had earned the nickname "the Master Blaster." He was 59 years old when we met. His business then, conducted through companies he controlled, including Dynatech, was blasting trap rock in a New Jersey rock quarry, producing 5 million tons per year, netting 10 cents per ton.

14. After he visited Eddy Gulch, he and I formed a business relationship based on a handshake. Don was very favorably impressed with what he saw there. Together we formed Liberty Mining, Inc. ("Liberty") (JA-19), to be our operating company. We also agreed that another company Goodman had previously formed, Energel, Inc., would be the holding company for our mining properties. I moved claim ownership out of Jefferson State so that I could contribute it later to Liberty. JA-18. In concept, I would contribute the mining properties and be on-site managing operations, and Mr. Goodman would contribute equipment and capital as we developed the property together.

15. The Liberty plan was to start operations without seeking outside capital or attempting any stock offering. We made plans to develop the Eddy Gulch mines by

putting them into production. Our intention was to run mine dumps and apex ore, which had only to be loaded, or excavated and loaded, and so involved minimal mining cost. This ore would be processed through the gravity separation system already in place at the E T Placer Pit, and the "tails" from gravity separation would be saved for later ball mill feed. This initial operation was to be a stepping stone to generate revenue to begin re-conditioning the underground workings to reach and mine the ore at the locations where mining ceased decades before due to litigation (A-1, A-95) over ownership or the then-controlled low gold price.

16. My and Don Goodman's assessment of the property, with Ferrero's advice, was that the dumps and apexes were $40/ton material, and that based on the volumes of sampling and other data, we were confident that we could mine them for a substantial profit.

17. Liberty filed a mining plan of operations that was approved June 5, 1989, by the Forest Service District Ranger Mike Lee. JA-26. Liberty acquired several large pieces of equipment which included one caterpillar loader (950B). We also acquired a long year wire line 44 diamond core drill, two Terex 24 scrapers (35 ton capacity each) and several trucks and all ancillary power tools. A D8H 46A bulldozer and a 977L Cat Loader were shipped from Don Goodman's operations in New Jersey. All of the above entailed the expenditure of hundreds of thousands of dollars. JA-98. In our work at this time we employed a crew of 9 men.

18. It was during this period of time that the spotted owl was becoming an issue. We were aware that a portion of our claim group was in a Forest Service designated spotted owl habitat area (SOHA). The SOHA was one of the building blocks for the

habitat conservation areas (HCA), as well as critical habitat areas (CHA) and then late succession reserves (LSR).

19. We presented an all-phase plan of operations in September of 1989 (JA-36), which was supplemented on October 25, 1989. JA 40. The October supplemental plan contained many owl mitigation measures, discussed below. At the same time that the owl was becoming an issue, the Forest Service expressed its inability to perform cultural resources or archeological studies (what we called an "Arch Study") due to budgetary restraints. Liberty and the Forest Service discussed this problem. We agreed that the Forest Service would perform the Arch Study for phase 1 and part of phase 2 of the all-phase plan (the approved October supplemental plan) under a "cooperative agreement," with Liberty paying off-duty Forest Service personnel to do the work. JA 37, JA-41. Previously the Forest Service had been performing archeological studies as part of their environmental assessment obligations.

20. The mitigation measures were included in our October 25, 1989 supplement to the all-phase plan. These mitigation measures had major effects on the mine development design Liberty had conceived, with the assistance of Mr. Ferrero. We had previously moved the flotation milling facilities from the old Klamath Mill Site (JA-35) down to the Usher Flat in the July additions to the June plan. Moving the mill facilities downhill necessitated the reconstruction and widening of the existing Klamath, Shoo-Fly and other haulage roads, rather than the pipeline previously proposed for slurrying ore from the Klamath apex to the mill location. In the October supplemental plan we eliminated the holding pond which was to be located on Live Yankee flat. We also removed from the plan the previously-proposed road connection from the existing

Evening Star Road (a spur off the main Black Bear Road) to the Klamath Mine area. JA-35. In addition we removed the proposed continuous apex road cut from west of the Klamath Mine to the Anna Johnson at the east end of our claim group, and replaced it with isolated pits on the Klamath, Union and Six O'clock ridge tops, and a small pit on the Mt. Laurel. In all, we eliminated nearly 2 miles of apex cuts. All of these mitigation steps were taken to remove the operations from the existing SOHA and to eliminate apex road-creek crossings, both at the request of the Forest Service. This was not only an extensive mitigation, but also in direct opposition to what Tom Ferrero was proposing and urging us to adhere to. JA-35 pre-mitigation; A-141 post-mitigation.

21. Under the June and November approvals, Liberty operated the mine from June of 1989 until January of 1990. A-73 - video. Liberty hauled several scraper and dump truck loads of ore from the Klamath dumps and three apex cuts (the Dariel, the main Klamath and the Klamath Ridge) all at the Klamath Mine area to Usher Flat. A few dump truck loads came from Union Dump and the Mt. Laurel Apex Cut.

22. Because of the need to mitigate the Klamath Mine area plan elements, we had to move our milling site from the Klamath Mine area, we relocated it to the centrally located Usher Flat on the previously leased Usher properties (Ida May, Bootjack and Security claims).

23. On or shortly after January 4, 1990, I received a letter from Mike Lee commanding Liberty to stop its approved operations, "including activities on private land" which I felt was outside of their jurisdiction. JA 51 ("the Stop Work Order"). The basis for the Stop Work Order was the Forest Service's receipt of a letter from the California State Historic Preservation Office (SHPO) stating that the Arch Study done by

the Forest Service was inadequate. It seemed strange to us that SHPO could tell the Forest Service that its cultural resources work was inadequate. First, neither the Forest Service nor SHPO made any valid reference to any adverse impact that approved work was having on any cultural resource. Second, SHPO was complaining about cultural resources study that pertained to elements of Liberty's all-phase plan which had not yet been approved. Nonetheless, Liberty honored the Stop Work Order and did cease work.

24. I say "valid" reference above because there are documents in the Forest Service files describing destruction of cultural resources. In the Forest Service Arch Study (later deemed inadequate) (JA-46, page 21) there is an entry dated October 10, 1989 describing cultural resource destruction at Cookhouse Flat as follows. "Building remains bulldozed off of original location on flat to east side of flat, garbage strewn around area on hill above flat." A letter to file by Paul Uncapher dated August 31, 1989, cited building destruction at the Klamath Mill Site. JA-34. He states that Earl McBroom (a Liberty employee) cleared ½ acre and destroyed buildings under the authority of the current operation plan. Almost a year later, in the Cascade Research Arch Study field records dated May 1991 Dennis Gray described a similar disturbance on Cookhouse Flat. JA-100, at 992 and 993. These reports completely misrepresent what actually occurred. There were no standing buildings on either Cookhouse Flat or the Old Klamath Millsite during any of the time that we held the properties. JA-35. It appears that Uncapher did not even know which site he was on, since he is the only one to call Cookhouse Flat the Klamath Mill Site. JA-35. The Forest Service people and Gray saw a few old boards and an old can dump (all still there today) and jumped to the conclusion that buildings had been recently demolished. The buildings had been demolished and pushed out over the

can dump long before we acquired the property. All that actually occurred in 1989 was that Earl McBroom brushed a long-ago cleared flat in accordance with the approved June plan to develop a "work area" at that location. At the time, no letter of non-compliance was issued and we were allowed to continue operations.

25. I met with the Forest Service regarding its inadequate cultural resources study, and we agreed that I would retain Winthrop Associates from Ashland, Oregon to complete an archeological study with an "area of potential effects" (APE) of 800 acres, to comply with requirements of the State Historic Preservation Office ("SHPO"). This APE was strongly recommended by Bill Bailey, Forest Service Archeologist, notwithstanding Liberty's all-phase plan of operations would disturb, according to the Forest Service (JA-46), only 38 acres.

26. One of the bitter parts of Liberty's getting stopped because of the Forest Service's inadequate Arch Study is the background of "cultural resources protection" on the part of the Forest Service. During the 1970's and 1980's there were many people in the Klamath Mountains living on mining claims. The Forest Service labeled them "illegal occupants," because it said their residences on mining claims were not necessary to the conduct of the mining operations. They especially went after residences on claims where no mining operations were occurring. However, this turned into something more organized and more aggressive with the Forest Service's "Klamath Initiative," in which the Forest Service undertook to get rid of all cabins on mining claims (unless approved as part of a mining plan of operations). I have often asked for, and never been shown, any cultural resources inventories or SHPO reviews on any of the cabins and other structures destroyed by the Forest Service during the Klamath Initiative.

27. It was at one of the Liberty-Forest Service meetings during this period that Mike Lee stated that due to owl considerations I might ***never*** get to mine. I asked him when Liberty would have an answer regarding the owl, and he assured me the owl would be addressed in the near future. I advised him that before Liberty paid $17,500 dollars for the Winthrop Associates cultural resources study on the all-phase plan I would await the owl decision. If the owl would prevent mining, or prevent mining activity in certain locations, then it was a waste of money to study impacts on cultural resources throughout the plan area.

28. During this idle time, while awaiting the decision, Tom and I spent time at the supervisors office in Yreka working as industry representatives for mining on the Klamath National Forest Land Management Plan. A-49. I also spent time working with the Siskiyou County planning department regarding permitting. We were told by the county that the Forest Service is the lead agency for operations on Forest Service lands and the county planning department is the lead agency for operations on private lands. Also at this time, Don Moore visited the mine and took two 140 pound samples for metallurgical tests. His 1990 report and mill circuit proposal were based on this field work. JA-53, JA-60 and JA-68.

29. I became aware that the spotted owl was listed as a threatened and endangered species in June of 1990, having obtained a copy of the Conservation Strategy for the Northern Spotted Owl, by J. W. Thomas et al, dated May 1990 (see JA-71 JSOF-45).

30. Unknown to us, Liberty's September 1989 all-phase plan of operations was included by Klamath National Forest in a "programmatic biological evaluation" (JA-76)

that it submitted to the U. S. Fish and Wildlife Service ("FWS") in June of 1990 for purposes of formal consultation and "no jeopardy" clearance along with 42 timber sales. We did not know until later that the extensive mitigation measures included in the October 1989 supplemental plan were not included in the Liberty information submitted for consultation.

31. The FWS responded to the Forest Service in a month, on July 23, 1990 (JA80), providing its "no jeopardy" biological opinion on the Liberty all-phase (full impact, pre-mitigation) plan of operations. However, Liberty did not learn from the Forest Service that there was such a biological opinion on the Liberty all-phase plan of operations until March of 1992. The Forest Service ignored its obligation under the FWS's endangered species section 7 rules that a consulting agency provide the FWS's biological opinion to an "applicant" whose project has been put through consultation within 45 days after the FWS provides its opinion. This was a wrong with no remedy for Liberty. Liberty did not know an FWS opinion had been sought and did not know the Forest Service had received the no-jeopardy opinion.

32. We inquired regularly on the status of the owl over the months immediately after the Forest Service received the FWS's no-jeopardy opinion, and received letters from the District Ranger stating that the Forest Service had not yet received a decision from FWS (JA 82, 88, 90, 108). One of the reasons I kept inquiring was that I was well aware, living at Rollin in Eddy Gulch, that Forest Service contractors had begun timber harvesting under sales that affected the same SOHA (the same owl nest location of concern to the Forest Service in 1989) to the northwest of the Klamath Mine area. I could hear the chain saws through the woods, and saw the trucks hauling logs out of that

area, where the so-called "Evening Star" timber sale was located (JA-66). At that time, I asked Al Buchter how come the timber sales were allowed to proceed and we were not. Al's reply was, "Life's not fair." We only learned later that the Evening Star timber sale cut 194 acres of suitable habitat for the same owl pair to the northwest of our operation, more than five times the area of our pre-mitigation all-phase plan. JA 157, at 1298.

33. The HCA determination was on August 22, 1990 (see JA-83).

34. As the November 1989 plan approval had an expiration date of July 31, 1990, on behalf of Liberty I wrote the Forest Service July 10, 1990, seeking renewal of the approval of the operations. Liberty had not been able to conduct any work since the January 4 Stop Work Order, and I was still awaiting the decision whether, and if so how, the owl would affect our plan of operations. JA79. By letter dated August 27, 1990, the District Ranger stated that our plan expired on July 31, 1990, despite the pre-expiration date July 10th renewal request. He goes on to "adjust" the expiration date to December 31, 1990 (JA-82). Also in the August 27, 1990 letter, the Forest Service said, "the determination of how your operation will effect and how it will be affected by the HCA has not been completed by Fish and Wildlife. The Environmental analysis is also delayed." The Forest Service waited until after the August 22, 1990, determinations setting up Habitat Conservation Areas ("HCAs") to implement the June 1990 designation of the owl as a threatened species before extending the Liberty plan approval (JA-83). He also required a new operating schedule by September 15, 1990. I find this rather ironic, since until we received the answer on the owl we did not know what plan elements would be allowed, and so could not provide a schedule - another Catch-22.

35. On September 19, 1990, we hand delivered a second "renewal request and

second supplement" to our plan. The schedule (item 4) was dependent "on HCA decisions by the government. As plan in letters of 9/28/89 and 10/25/89, same relative time periods, different years." JA-84. On November 27, 1990, in a letter that also documents a meeting that took place at the Etna ranger station, the Forest Service states that the termination date for the Liberty plan of operations is adjusted through March 31, 1991. JA88. In that letter, the Forest Service acknowledges that Liberty Mining is awaiting the determination on the owl before it pays for completion of the Arch Study. JA88, at 823. The Forest Service states (JA-88, at 822) that the approved operations include:

> Bulk sample the Klamath Mill dumps.
> Bulk sample pits at Klamath, Anna Johnson, and Incline Ridge.
> Set up screening, crushing and centrifugal concentrating equipment at Usher Flat.
> Install a pipeline from Usher Flat to settling ponds at the ET Placer Mine.

But (curiously) that the only authorized activities were the following,

> "Removal of the merchantable timber and slash disposal from the road alignment and widening are the only remaining operations authorized."

until "you have a new plan of operations in place".

36. All the while the Forest Service is saying it does not know whether or how the owl will affect our plan of operations (JA88, at 823, November 27, 1990; and JA90, at 828, December 7, 1990). No one ever advised Liberty that the July 1990 biological opinion of the FWS found "no-jeopardy" for the all-phase plan of operations. By necessity, a no-jeopardy biological opinion on Liberty's all-phase plan of operations includes a no-jeopardy opinion on the previously-approved phases of the supplemental plan of operations. The Forest Service kept Liberty entirely in the dark. Due to this,

Liberty was never able to demand that the Forest Service allow us to go back to work and complete the previously-approved operations. We were working on a phased plan of operations where some of the specific details of each phase were dependent on the results of the previous phase. The Forest Service never considered informing us that we could go back to work on approved phases. They only talked about the all-phase plan, for which we were only seeking outline approval.

37. On March 11, 1991, Liberty, through Mr. Ferrero, submitted its third renewal request, covering the previously approved phases of the all-phase plan of operations, with modifications. JA-94. Liberty met on-site with Harry Frey on March 21, 1991 (FS-77). Mr. Frey informed us that he was now the Mineral Officer for the District (that appointment also documented in a letter to Liberty from Mike Lee dated November 27, 1990 – JA-88), and told us that he would "stick his neck out" and allow us to proceed with the modifications while awaiting the owl decision. After that meeting we did not see Mr. Frey again for about a year; we understood he was transferred or given an assignment to Alaska.

38. One of the modifications to Liberty's operations contained in the March 1991 renewal request (JA-94, at 905 "First Year, Spring 1991 …" point 2) included milling the logs lying on the ground next to the roads that had been built and widened during the approved Liberty operations up through January 1990, so that they would not rot in place while the Forest Service allowed no mining to occur. Frey authorized the timber milling.

39. Another activity Mr. Frey authorized in the Spring of 1991 was the burning of slash piles and cleanup work, and the brushing of the road from Rollin to the Anna Johnson Mine for the purpose of moving the core drill up to the proposed drill sites.

Liberty paid Salmon Mountain Forestry $40,000 to do this work. The funds to pay Salmon Mountain Forestry, and Winthrop and Associates to nearly complete the Arch Study ($12,000), came from bartering Liberty's timber milling equipment for the milled lumber that resulted and mortgaging its patented properties for operating capital ($250,000) (JA-115). Liberty operated under the Frey authorization from March to July 1991.

40. On July 12, 1991, Al Buchter, who had replaced Mr. Frey as the Mineral Officer for the District, arrived at the mine while we were in the process of hauling apex ore and dump material to the Usher mill site, and said, "Cease all activity." Once again the reason given was FWS and the spotted owl. Critical habitat for the owl had been proposed in April, and was re-proposed July 31. JSOF-68. In response to this oral stop work demand, I asked Mr. Buchter to put this order in writing. I then suspended work on the final version (the last $5,000 worth) of the Arch Study, once again awaiting the Forest Service's word on the owl. Winthrop and Associates had already concluded no mitigation measures regarding cultural resources would be needed for the all-phase plan of operations. JA-105.

41. After the July 12 stop order, we did not hear from the Forest Service again through the end of 1991.

42. The record shows that on August 5, 1991, the Forest Service signed and dated a letter to me. JA-108. It also shows that because it was addressed incorrectly, it was returned to sender several times. JA-109.

43. We initiated contact in February 1992 by calling for a meeting regarding what had developed regarding the owl and going back to work. This meeting occurred

February 11, 1992, at the Etna Ranger Station. I attended with my wife then, Candis Blanchard Aloisi. Present at the meeting were Mike Lee, Al Buchter, and Earl Griffith for the Forest Service. Earl Griffith, sitting directly across the table from me, began the meeting by stating, "you never had an approved plan of operations." I was incredulous. I said, "Earl, what are you talking about? Are you trying to say I've been operating illegally?" Mr. Griffith turned beet red, balled up his fists and repeated, "you've never had an approved plan of operations." Candis was trained as a paralegal and very organized. I asked her to show Earl a copy of our signed June 5, 1989 plan, which she had with her. I asked Earl if that wasn't Mike Lee's signature on that approved plan. I thought he was going to jump across the table at me. Mike Lee, who had signed the approved plan, sat mute.

44. At this same meeting of February 11, 1992, with the District Ranger in his office, Al Buchter said, "I guess I can give this to you now," and gave us an envelope that contained the mis-addressed, August 5, 1991 suspension letter. Candis wrote the date on the outside of the envelope; that is her handwriting in the lower left corner of it. A-58.

45. This meeting, just coincidentally, was one month after the FWS designated critical habitat for the spotted owl, with the final rule that stated that projects that were under permit at the time of designation were exempted. JA-138, JSOF-70. The August 5, 1991, letter that we received February 11, 1992, states that, "you are working under a letter of authorization from Harry Frey, and it is hereby suspended" (my emphasis added). Many times I have requested the Frey "letter of authorization." None has ever been produced and Liberty never received one. The authorization to go back to work was oral, given to me by Harry Frey on March 21, 1991 on-site.

46. As a result of this bizarre meeting Candice and I traveled to Reno, Nevada and retained Charles Weller, for the purpose of helping us sort out what had and had not occurred in the Forest Service's relationship with the FWS, and with Liberty. Mr. Weller called Mike Lee and convinced him to agree to check on the status of the owl.

47. On March 10, 1992, Ranger Lee sent me a letter that says it documents decisions made at the February 11 meeting. However, the most significant thing in the letter was news not communicated at the February 11 meeting. Responding to Mr. Weller's inquiry regarding the owl, in this letter, Ranger Lee answered that the Forest Service had gotten word on the owl -- "The Fish and Wildlife Service determined that the project could proceed as submitted because it did not threaten the existence of the Northern Spotted Owl." JA-111, at 1084. This was the first time this news was given to Liberty. Ranger Lee did not say WHEN the FWS made that determination, but we were elated to finally hear that the all-phase plan could proceed as submitted to the Forest Service. This was especially good news, because Lee said the FWS had cleared the "9/28/89" plan shown on the "spaghetti map." The plan the FWS cleared involved impacts and areas of operation that we had mitigated out in our October 1989 supplemental plan (JA-40), so there should not have been any more issues with the owl.

48. This letter and subsequent events document what to Liberty was a trap executed by the Forest Service. First, at the February meeting (and as described in the March letter) Ranger Lee used the Forest Service's "confusion" about what the Forest Service had approved and what Liberty had sought approval to do, but that had not been approved, to insist that Liberty had to submit a new plan that would supersede all previous plans. Liberty was not confused over what had been approved and what not.

Activities in the first phases of the June plan and in the October supplement were all approved. However, each Liberty plan approval renewal request had to revise the dates of the operations, since the intervening time had passed without any work occurring. Liberty's second (September 1990 – JA 84) renewal request had contained modifications, and the Forest Service's November 1990 extension grant (JA-88) listed the operations the Forest Service understood were approved at that point. Liberty's third (March 1991 – JA-94) renewal request had not been acted upon. Any confusion in these regards was the Forest Service's.

49. Also in the March 1992 letter, Ranger Lee stakes out his position that the previously-approved plan of operations had terminated on March 31, 1991. He does this without even mentioning Liberty's March 11, 1991, third renewal request. He also does not acknowledge the logical impossibility that in July 1991 orally and in the August 1991 letter his office had "suspended" our authorization to operate <u>under a supposedly expired plan</u>.

50. In the March 10 letter, the District Ranger also answered a request Liberty made in a letter to the District Ranger dated February 18, 1992 (JA-93), that the Forest Service do a validity examination on the claims. The District Ranger said he had no reason to do a validity examination unless we applied to patent the claims under the Mining Law. We sought the validity exam because some of the Forest Service representatives had questioned our claims, and we were convinced of their validity, and would welcome a chance to patent them. However, whether claim validity has been proven or not, it is the responsibility of the Forest Service to deal with all mining plans of operations in accordance with laws and regulations.

51. Liberty did agree in February 1992 to submit a restated plan of operations – it had no choice. We submitted our restated plan of operations, however, not to start all over again, but to document what had previously been approved and, as to later phases of the all-phase plan, to restate what the Forest Service had before it since 1989 without preparing an environmental assessment or taking any other action toward approving it. On April 1, 1992 Liberty submitted its restatement of the the 1989 plan that had been partially approved but aborted because of the Stop Work Order and the subsequent hiding of the biological opinion. JA-114 and A-146 (maps attached to JA-114). Central to Liberty's agreement to resubmit its plan was Ranger Lee's representation in the March 1992 letter (JA-111, at 1084) that "the Fish and Wildlife Service determined that the project could proceed as submitted." The "project" was the 1989 all-phase plan of operations, so with FWS clearance in the Forest Service's hands, Liberty foolishly assumed the Forest Service could take prompt action on the plan.

52. The Forest Service, however, promptly decided the April 1, 1992, Liberty plan of operations would require yet another biological opinion (JA-118 ad JA-119). A May 15, 1991 memorandum from Mike Lee seriously misled the Forest Supervisor and Kathy Milne. It strongly suggests that approved operations were allowed to proceed after the July 1990 biological opinion – "The mine was previously covered in the [July 1990] Biological Opinion ..., and given approval to begin operations." This mislead the District Ranger's supervisors two ways. It hid the fact the operations were stopped months before the Biological Opinion and never allowed to resume in 1990 after receipt of the opinion, and it hid the fact that we were never informed the Biological Opinion existed! It is also wrong in stating the "the operation was inactive during 1991." This ignores the

fact that District Mineral Officer Harry Frey authorized operations in March 1991 and replacement Mineral Officer Al Buchter ordered them stopped in July – how is that "inactive"? Without sharing these internal, misleading documents pushing for re-initiation of consultation with Liberty, the District Ranger waited until he had his supervisor's blessing to stall the plan for a new consultation, and then wrote Liberty May 28, 1992, informing it of the decision to delay action on that basis (JA-120).

53. Our April 1 resubmitted plan was the same plan as before, minus four acres of surface disturbance; the FWS understood the April 1 plan affected fewer acres (e.g., JA-129). As the Forest Service stalled this plan on the grounds it was a "new plan, and a new agency action" we came to call it our "April Fool's Plan." We were the fools for having agreed to submit a new document.

54. Even as the Forest Service insisted it had to start all over again with the FWS, it did not disclose to Liberty when the FWS had "determined that the project could proceed as submitted." The decision to reinitiate consultation with the FWS on the April Fool's Plan made no sense in light of Ranger Lee's March 1992 representation that the FWS had cleared the project, so Liberty filed an administrative appeal with the District Ranger, seeking Forest Supervisor's review. JA-121. At the same time, in order to understand why the Forest Service was behaving as it was (and still in the dark that the FWS determination was almost two years old), Liberty demanded a copy of the FWS determination. JA-127 and JA-128.

55. I did not learn the July 1990 date of the FWS's determination that the project could proceed as submitted until late August of 1992 (JA-127). This unjustifiable hiding of that opinion by the District Ranger made it important, to me, to be able to present these

facts to the Forest Supervisor in the appeal. The Forest Supervisor scheduled October 8, 1992, for the "oral presentation" provided in Forest Service appeal rules.

56. Liberty did not know it at the time, but as we were preparing for our oral presentation on our appeal, the FWS was advising the Forest Service that there was in fact no need to reinitiate consultation on the owl – "New data did not reveal new owl activity centers, and new operations plan is for less acres than in original consultation. Reinitiation of consultation not necessary." JA-129 (FWS biologist's notes of conversation with Forest Service). In Mr. White's response to my inquiry about the chronology of the Forest Service's hiding the first biological opinion, the FWS recites that it provided the Forest Service its draft letter stating that reinitiation of consultation was not necessary. JA-136, at 1221-22.

57. In a set of notes describing a meeting between Fred Aloisi and Al Buchter, dated September 29, 1992 (JA-132), the District Ranger's office documents that "Phase I and Phase II of the operating plan have been approved, (Fall of 1989 and 1990), but the sequence of events has been changed since 1989. Aloisi can go ahead and do the things that have been approved already." This is further documented in FS-114 which is the letter that I wrote to the Forest Service documenting the meeting.

58. A short while before the scheduled oral presentation to Forest Supervisor Barbara Holder, she canceled it. The timing of events suggests that she had learned of the FWS's draft letter to the Forest Service, stating that reinitiation of consultation was not required on the April 1 plan of operations. JA-136, at 1222 ("October 6, 1992" entry). Her subordinates had already arranged for a meeting with the FWS on October 8, the same date as the oral presentation on Liberty's appeal, to try to reverse the FWS's

conclusion, and force FWS to accept the new consultation. That would stall action on the plan of operations, and change the nature of the appeal. Liberty did not learn this until after the fact, at the end of the month in Mr. White's letter (JA-136).

59. Later in October, with the oral presentation having been canceled and no dialogue between the Forest Supervisor and Liberty, the Forest Supervisor dismissed the appeal on the basis that the FWS had "affirmed" the "procedural action" of "Ranger Lee to reinitiate consultation." This mooted the appeal, she wrote. While the decision letter does not explain this, she presumably acted on the basis that she could not second-guess the action of the FWS, even though the whole point of the appeal was for her to review whether the District Ranger should have initiated the exercise in the first place.

60. At the end of October 1992, Liberty received the FWS's response to our request for a chronology regarding the consultations between the FWS and the Forest Service. JA-136. Only then did we learn that the FWS understood that the April 1992 plan was no different than the 1989 plan it had cleared before in 1990 and felt a second consultation was unnecessary. From that, we could see how we had been "boxed." It was now clear how the District Ranger's and Supervisor's office had mooted the appeal and avoided meeting with us as they worked out stalling the plan for a new consultation with the FWS.

61. In a letter from Wayne White, FWS, to the Forest Service, dated November 24, 1992 (JA-138), the following is stated.

> At the time of your reinitiation of the consultation in August, 1992 … [y]our letter … did not elaborate on reasons why reinitiation was appropriate. During a

> September 15, 1992 telephone conversation between Alison Willy of [FWS] and Al Buchter of the Salmon River Ranger District of KNF, the Service learned that the Liberty Mining, Inc. had originally been issued a permit from the Forest Service that authorized operations until March 31, 1991. The liberty Mine operation proceeded under this permit until December, 1990, when operations were stopped due to disturbance of archeological sites.

The so-called "disturbance" described in paragraph 24 was used here by the Forest Service as a pretext as they pressured FWS to accept the second reinitiation. In fact, neither the January 1990 Stop Work Order nor the SHPO's letter mentioned any disturbance of any cultural resources site. Ultimately, the final Arch Study recommended no mitigation or changes in any Liberty or LCM plan.

62. On November 5, 1992 (FS 118), Liberty filed a "second level" appeal to the Regional Forester. See JA-143. This appeal, in the end, was handled the same way as the first level appeal. The merits of the appeal were never addressed. Instead, the Forest Service used erroneous statements of fact to make it sound as though Liberty had been fairly treated – "Based on the not likely to jeopardize finding, the project was allowed to proceed as submitted." JA-145, at 1263. This could not be farther from the truth. This fiction began in the District Ranger's May memorandum pressing for a second consultation. JA-118. Then, relying on that fiction, the Regional Forester ruled that the decision to reinitiate was not appealable.

63. With this outcome, the Regional Forester did not have to review any of the stalls and evasions in the way Liberty was handled:

(a) how the District Ranger's office could suspend operations under an approved plan of operations occurring in March through July 1991—the limited road and maintenance work we had been allowed to go back to spending money on – if the plan had terminated earlier in 1991;

(b) the failure of the District Ranger and Forest Supervisor ever to act on the third renewal request until, at the February 1992 meeting after critical habitat had been designated for the owl, on January 15, 1992 (JSOF-70), they announced the plan had expired 11 months earlier;

(c) how convenient it was that the approved plan expired before critical habitat was designated, since approved plans were exempt from critical habitat;

(d) how Liberty did not know that the FWS had determined a year and one-half before that the Liberty all-phase plan could proceed as submitted, and Liberty learned that fact only after Liberty had agreed to resubmit that plan so the District Ranger's office could treat it as a "new" plan; and

(e) how the Forest Service never took any action after receiving the July 1990 biological opinion (when the FWS advised it the Liberty all-phase plan could proceed as submitted) to work with Liberty so that the operations approved in 1989 could be re-started.

64. Had we known in July 1990 that the September 1989 all-phase plan could proceed as submitted, we would immediately have completed the Arch Study. We would then have been able to go back to work. The Forest Service would have had no basis to continue the Stop Work Order, and there would have been no requirement to modify the approved operations. The second level appeal avoided dealing with any of this, and

based its findings on the fiction that Liberty had completed all of the approved operations.

65. The Forest Service had approved, and then aborted, our critical operations to set up a test milling plant to run bulk samples of apex ore we had already mined and stockpiled, and begun moving to the Usher Flat mill location, as well as bulk samples of the mine dump material from various locations on the claims. These bulk tests would allow us to optimize the gravity separation and related milling circuit that would best handle the dump and apex ores, while we had the equipment, crew and approvals to do so, and generate the initial revenues to expand the milling of dump and apex ore, and begin mining the underground, long-term targets of the all-phase operation.

66. At the same time, in 1992 it became obvious to me that the Forest Service was going to take its sweet time with processing the April Fool's Plan. Liberty was going into default on the notes that were part of the mortgage of the two private parcels in Liberty's property position – the Mountain Laurel Mine and the Rollin millsite. The mortgagee initiated foreclosure action on the notes. JA-115. I was contacted by one Mark Gavard, who planned to purchase the Mountain Laurel Mine from the mortgagee, regarding leasing the Eddy Gulch claims to his outfit, called WAZCO (named for Williams and Zane, two principals Gavard was fronting for).

67. As Liberty and I were broke and the loan notes on the private parcels were in default, I had little choice but to lease the claims. Certainly WAZCO could not be treated worse by the Forest Service than Liberty had been, and perhaps it would be treated better, for two reasons. First, WAZCO was interested in developing the underground deposits, and hoped that the Forest Service would find fewer reasons to stall or obstruct approval

of such an operation, and second, Mark Gavard was a friend of Al Buchter's.

68. The Liberty-WAZCO lease was executed in April 1993. JA-158, JSOF-97. Shortly thereafter, Candice and I moved to her original home, Truth or Consequences, New Mexico, since WAZCO was now responsible for maintaining the claims and dealing with the Forest Service with respect to its operating plans. My frustration over the way the 1990 opinion was hidden from Liberty, and the Forest Service's insistence that the 1989 approval of our operations had expired, without their ever acting on our renewal request, consumed me, and I worked to find out what had been done to Liberty and how. Eventually this caused the break-up of my marriage to Candis (JA-184).

69. Both before and after the leasing of the property to WAZCO we had meetings and conversations with the Forest Service regarding the April Fool's Plan of operations. Unknown to us, by April 1993 (a year after we filed the April Fool's Plan and as we decided to lease the property to WAZCO), the owl "Oversight Team" had approved the April Fool's Plan and so had the Interagency Northern Spotted Owl Conservation Group. JA-153. We only knew the second consultation was dragging along with no end in sight.

70. Our continued dealings with the Forest Service after we leased to WAZCO included exchanges with the Forest Service in which it insisted that we provide detailed information in support of the April Fool's Plan – such as number of workers, where they would live, kinds of equipment and areas of operation – that the Forest Service insisted were necessary in order for the FWS to analyze the impact of the April Fool's Plan on the owl and its January 1992 critical habitat. JA-150, JA-152, and JA-157. In fact, the Forest Service even got the FWS to "suspend" the consultation because it could not proceed without information Liberty needed to supply. JA-140. None of this

information involved a difference in the scale and type of operations, and areas of impact, that were in the June 1990 Biological Evaluation of Liberty's 1989 all-phase plan. The July 1990 biological opinion determined that the all-phase plan could proceed as submitted. Nonetheless, this process took all of 1993.

70. In early 1994, the Forest Service authorized WAZCO's successor, Liberty Consolidated Mines, Inc. ("LCM") to conduct certain operations on the claims, including grading and improvements at Usher Flat, where LCM also intended to erect its mill to process Eddy Gulch ores. JA-162. When we learned of this, we were surprised, since so far as we knew LCM had neither completed the Arch Study that had been the basis for stopping Liberty's work in January 1990, nor had the FWS rendered its biological opinion on the reinitiated consultation regarding Liberty's April Fool's all-phase plan of operations. (The Arch Study was not completed until April 1994. See JA-168, excerpts.)

71. Later in February 1994, FWS responded to the Forest Service's reinitiation of consultation on Liberty's April Fool's all-phase plan of operations. JA-163 ("the Second Biological Opinion"). This letter was designated an "informal consultation" by the FWS, because both the Forest Service and FWS determined that the Liberty April Fool's Plan was "not likely to adversely affect the northern spotted owl or its critical habitat." JA-163, at 1343. In essence, FWS was confirming its mid-1992 advice to the Forest Service that no reinitiated consultation was required.

72. Further, the February 1994 Second Biological Opinion recited that the Forest Service had completed three internal reviews more than a year before, all of which had concluded that the Liberty April Fool's Plan could proceed without violating any agency directive with respect to owl habitat management: (a) "Forest Service Regional

Technical Review Team" approval June 25, 1992; (b) "Forest Service Regional Oversight Committee" approval August 12, 1992; and (c) "Interagency Technical Review Team/Interagency Northern Spotted owl Conservation Group" approval January 22, 1993. JA-163, at 1342. Moreover, on April 2, 1993, the Forest Service's own biological assessment of the Liberty April Fool's Plan concluded that it was "not likely to adversely affect the northern spotted owl and its critical habitat."

73. Two things are striking about these four agency actions. First, none of these approvals or decisions were ever communicated to Liberty; Liberty learned about in March 1994 them entirely through the FWS's candor in its Second Biological Opinion where it actually recited the facts for the public to know. JA-167. Second, all of these approvals or decisions occurred before Liberty leased the claims to WAZCO, but Liberty in leasing the property acted without knowledge of any of these approvals or decisions.

74. One additional fact is remarkable to Liberty about the Second Biological Opinion and the agency owl approvals and decisions. The Second Biological Opinion was the FWS's response to Forest Service consultation on Liberty's April Fool's Plan, yet the Forest Service immediately used it, without modification or further consultation with FWS, as its section 7 Endangered Species Act compliance for the LCM plan of operations. JA-165. Further, the Forest Service has produced no documentation that any LCM plan of operations was ever reviewed or approved by: the "Forest Service Regional Technical Review Team;" the "Forest Service Regional Oversight Committee;" or the "Interagency Technical Review Team/Interagency Northern Spotted owl Conservation Group;" and the Forest Service prepared no biological assessment on it either. This is noteworthy whether one evaluates the LCM plan of operations that is JA-161, or the

much changed LCM plan of operations an excerpt of which is JA-181. Both propose surface disturbances, including road construction and use, mine waste dumps and tailings disposal, in areas not included in Liberty's April Fool's Plan.

75. The minimum time when I believe the Forest Service improperly prohibited the beneficial use of the claims and private parcels in Eddy Gulch for mining purposes was July 23, 1990, through February 8, 1994, the entire period during which the agency lost or hid the First Biological Opinion and then unnecessarily engaged in the stall of getting a Second Biological Opinion.

76. The longer period when the Forest Service effectively prohibited beneficial use of the claims and private parcels in Eddy Gulch for mining purposes was January 4, 1990, through August 5, 1996. This period begins when the Stop Work Order was issued because the Forest Service's own work product in supposed compliance with its cultural resources obligations was deemed incompetent or incomplete by the State of California. In Liberty's view, there was no reason to have stopped Liberty then, from doing what was approved then, unless the Forest Service or the State identified some adverse affect the approved operations were having on any cultural resource that would have required protection in some fashion. No Arch Study, State requirement or Forest Service condition has ever been imposed requiring any change in proposed or approved mining operations in Eddy Gulch due to cultural resources (left from historic mining). The prohibition against mining began then, and did not end until the Forest Service approved LCM's plan of operations in August, 1996. The Forest Service allowed no <u>mining</u> operations on the claims that entire time.

77. Had Liberty been told promptly of the July 1990 First Biological Opinion,

and its "determination that the project could proceed as submitted," none of the consequences set out here that occurred after that date need have occurred. We would have completed the Arch Study expeditiously, knowing no change in and would have proceeded, with test milling of bulk apex and dump samples yielding the optimal milling circuit for these ores. The mid-1990 environmental assessment on the all-phase plan of operations should have resulted in an approval of the all-phase plan of operations long before the 1992 designation of critical habitat. None of this is certain, but if it did not come to pass it would have been because of Liberty's difficulties or failures in the exercise of its property rights to mine and operate on this national forest land under the Mining Law and on the two related private parcels. Instead, Liberty was unable to exercise its property rights under the Mining Law to operate because of the Forest Service's unreasonable and baseless losing or hiding of the First Biological Opinion, and its subsequent manipulations of the administrative process in order to delay rectifying and accounting for that first unreasonable and baseless course of conduct.

Subscribed and sworn before me by Alfred L. [signature] on this 28 day of January, 2008.

_______________________ Notary Public, State of California

My commission expires _______________________

## CALIFORNIA JURAT WITH AFFIANT STATEMENT

☐ See Attached Document (Notary to cross out lines 1–6 below)
☐ See Statement Below (Lines 1–5 to be completed only by document signer[s], *not* Notary)

1
2
3
4
5
6

Signature of Document Signer No. 1 — Signature of Document Signer No. 2 (if any)

State of California

County of Siskiyou

Subscribed and sworn to (or affirmed) before me on this 31 day of January, 20 08, by
Date Month Year

(1) Richard Lewis Hills III,
Name of Signer

proved to me on the basis of satisfactory evidence to be the person who appeared before me (.) (,)

(and

(2) ________________________,
Name of Signer

proved to me on the basis of satisfactory evidence to be the person who appeared before me.)

Signature ________________________
Signature of Notary Public

RONALD O. ROBISON
Commission # 1665654
Notary Public - California
Siskiyou County
My Comm. Expires Jun 7, 2010

Place Notary Seal Above

### OPTIONAL

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Further Description of Any Attached Document**

Title or Type of Document: Affidavit of Richard Hills

Document Date: 1/31/08 Number of Pages: 32

Signer(s) Other Than Named Above: —

| RIGHT THUMBPRINT OF SIGNER #1 | RIGHT THUMBPRINT OF SIGNER #2 |
|---|---|
| Top of thumb here | Top of thumb here |

©2007 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org Item #5910 Reorder: Call Toll-Free 1-800-876-6827