IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ALFRED ALOISI, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 95-650L |
| | ) | |
| UNITED STATES OF AMERICA, | ) | Hon. Lawrence S. Margolis |
| | ) | |
| Defendant. | ) | |
| | ) | |

**Affidavit of Thomas P. Ferrero**

I, Thomas P. Ferrero, being duly sworn, do declare:

1. I am a certified Engineering Geologist in the States of Oregon and California. I have been self-employed in the fields of engineering and mining geology and geohydrology for over 24 years, working on projects and properties primarily in Oregon and Northern California. Prior to opening my own geological consulting business, I was directly employed by the U.S. Forest Service as a trainee geologist for two years under the supervision of a senior Engineering Geologist who had 30 combined years of experience with the U.S. Army Corp of Engineers and U.S. Forest Service. After that, over a three year period, I supervised geologic mapping, assay and geochemical sampling, geophysical and drilling programs, as well as supervising the geologic activities at operating mines, for three mining companies and for two of those years under a senior mining engineer/geologist with 30 years of exploration/mining/teaching experience. Deposits I evaluated included coal and surface mineable and underground gold deposits.

**Part I. – The History of the Eddy Gulch Mines/My work for Mega and Liberty in Eddy Gulch, and dealing with the Forest Service.**

2. Prior to the 1930s, the properties in Eddy Gulch were owned and operated as separate mines, at times in litigation against each other, due to the fact that the continuous

vein hosting structure (the apex corridor) crosses numerous claim boundaries. The broken and adverse property positions prevented systematic exploration. Nonetheless, incomplete production records from the Klamath, Union and Mountain Laurel Mines cite production of about 75,000 ounces of gold from 1863 to 1886, and about 25,000 ounces from 1886 to 1932, from ore averaging 0.382 to 0.890 ounce of gold per ton. There is no doubt that there was substantially greater production than that based on the incompleteness of the records. JA-6, quoting California State Mineralogist's Reports. The claims have historically produced during times when the economics were advantageous to mining, as is the case for all mines. It is common for very successful, long time producing mines to go through periods of inactivity due to changing market and economic conditions.

3. In the 1930s, the properties were consolidated and explored by geologists who, as the 1999 Forest Service mineral report re the Liberty claims states, "praise[d] the development potential of the surface apex lodes, mine dumps, the multiple vein fissure systems and the high potential for underground down-dip lodes." FS-190. These geologists concluded that the mineral hosting structure is a regional scale fissure with continuity across the entire district, and to great depth, and that there was no evidence suggesting that the pattern of substantial ore bodies at 500 to 1000 foot spacing exposed along the apex by mining operations would not continue with depth and on strike across the entire property. A-1, A-2 and A-81-g.

4. It was clear then to the owners and exploration geologists that development of the property would have to evolve from mining ore bodies exposed along the surface apex ("glorified pocket hunting" according to one geologist, Mr. Elmendorf (A-2)) to

systematic down dip development via long cross-cuts and drifts. This would involve substantial development costs. The ability to raise the substantial capital necessary to develop the property was hampered by the depression, World War II, and the post war continuation of the $35 gold price.

5. After the gold price was freed in the 1970s, the property became economically viable again. In 1975, New Cinch Uranium leased the property from the owner (Patterson) who had consolidated the property back in the 1930s. Their geologist, David Sannes, completed some geologic mapping, surveying and sampling of dumps, geochemical sampling and drilling, in an attempt to test the viability of the dumps and apex reserves, and find the underground vein target(s) closest to surface. A-81-g. They realized that the best way to raise capital to develop the property was to begin initial production on the easiest and cheapest reserves to mine, thereby seeding the process of generating interest and investment. The dumps and apexes, and even the first underground target under the Six O'clock Claim – which is actually an extension of the Mountain Laurel workings kept from production by claim boundary litigation – were not the ultimate development goals. They were to be the "seed" production leading to capitalization of the big target – the unexposed, down dip underground reserves.

6. The Patterson lease was picked up by Fred Aloisi, et al., shortly after New Cinch had to give up its lease due to corporate problems elsewhere. From 1984 to 1986, working for Mega Gold, Inc., who leased the property from Aloisi, et al., I picked up where Sannes left off, and continued as a consultant for Liberty after that, as described above. It took me about fours years of absorbing the geology of the Eddy Gulch Mines and the broader Liberty District before I really understood the scale of what was there. I

doubted the 1930s reports at first, as have the Forest Service personnel, but I learned through sustained investigation that Jones, Elmendorf, et al. had it right.

7. I first went to the Sawyers Bar area in 1984 for my client Mega Gold Corp., to do geologic mapping, and to sample and evaluate their claims in Whites Gulch, the drainage immediately east of the Eddy Gulch drainage. Before beginning field work, I was given a stack of old reports describing the Eddy Gulch properties, dated from 1932 to the 1977, mostly by geologists (Jones, Elmendorf, Daggett, etc.). I meticulously outlined all of the reports, and from that, eliminating duplicated information, made one compilation report that contained all of the 1932 to 1977 data, titled *THE EDDY GULCH GROUP OF GOLD MINING PROPERTIES, A Geologic Report, Tom Ferrero, April 5, 1985*. JA-6.

8. While I was field mapping, I discovered that there was an overlap and potential conflict between the westernmost Mega-Whites Gulch claims and the senior easternmost claims of the Eddy Gulch claim group belonging to Fred Aloisi and others. Mega's directors agreed that I should approach Mr. Aloisi to explain that the overlap was unintended, and Mega would remedy it by restaking, quitclaiming or otherwise resolving the conflict. This meeting led to Mega's leasing of the Eddy Gulch claim group from Mr. Aloisi and his associates. The claims were then named Lost Dutchboy numbers 1 through 14, AJ 104, AJ105, S95 and S96.

9. After studying the extensive historical data describing the Eddy Gulch properties, I spent the next two years working for Mega on the Eddy Gulch claim group, conducting geologic mapping, sampling, reverse circulation drilling, surveying and restaking of claims. JA-6, JA-7, JA-8, and JA-9. I also spent a great deal of time visiting

and evaluating other properties across the full length of the Liberty Mining District and the nearby Knownothing Creek, or Gilta, District, and a few properties in between.

10. From the 1930s to the 1980s the Eddy Gulch claim group names were unchanged. The claim survey map (JA-189) shows these claim names, with the exception of the Ohio 84 and the Union Addition, which were first located in 1985. The break in the continuity of the claim title occurred in 1983 when the claim owner, A.R. Patterson died and so did not submit the required annual forms to the BLM. To remedy this, Aloisi restaked the claims with new names, Lost Dutchboy and Lost Dutchboy 1 - 13. The Eddy Gulch properties were well known in the mining world as a prime property, and when their names showed up on the BLM records as lapsed, outside mining company geologists began exploring the ground and staking claims. To stop this, we (Mega's Directors, Fred Aloisi and I) decided to relocate the claims under the old names. The relocations were completed in 1985 after I completed a control survey of the properties in 1984.

11. It was during this period that I came to the conclusion that the Eddy Gulch properties offered unlimited potential and a phased approach to development. In Eddy Gulch, a junior company like Mega (or later Liberty) could set up pilot production from the surface deposits (dumps and apexes) that would establish production and ore values, and lead to further investment (perhaps from a larger company or investor), allowing development of the underground ore bodies that would be the long-term target of production and value. JA-7, JA-8 and JA-9.

12. I came to these conclusions about the Eddy Gulch property early, while working for Mega, not for Aloisi or Liberty. I have evaluated many mining properties,

and regularly reached a negative assessment of nearly ever mine I evaluated during those years. Eddy Gulch was a significant departure, although I applied the same standards and methods that led me to recommend to clients not to invest further in other prospective mines. In Eddy Gulch, the ore grade, ore tonnage and mining cost economic calculations have varied to some extent as data has been generated over the years, or been included or excluded in making calculations, but the overall bottom line has not significantly changed from 1986 to this date. Back in 1986 I certainly had no reason to bias my conclusions.

13. Despite the Mega directors' recognition of the potential of the Eddy Gulch properties, they dropped their lease in 1987 due to their inability to raise capital in the waning of the Vancouver, Canada penny mining stocks boom of the late 1970s and early 1980s. In 1988 I was retained by Mr. Aloisi and his associates to evaluate the E T Placer and other placer properties downstream in Eddy Gulch from the claims Mega had leased, and also on Humbug Creek (a tributary of the Klamath River), and a group of lode mines in Trinity and Shasta Counties to the south, as well as to do further evaluation work on the Eddy Gulch properties. From 1988 to 1992, my work for Aloisi and his associates, and then Liberty, primarily involved preparation of plan of operations documents for submittal to the U. S. Forest Service ("Forest Service").

14. Although I provided substantial technical (geologic) input, I had only a small part in preparation of the 1988 Jefferson State plan of operations. The first plan of operations that I played a major hand in was the one submitted in May of 1989 and approved in June of 1989. JA-26 (the approval), and see JA-23 (handwritten) through JA-27. We submitted the plan for development of the mines based on the evaluation of historical data and on the wide, continuous vein exposure at the large Klamath Cut on the

north side of the Klamath Mine area, as well as recent sampling, geologic mapping and drilling completed mostly during my time with Mega, and working directly with Aloisi and his new associate Don Goodman, who together founded Liberty Mining, Inc. ("Liberty") at that time. We concluded that the low cost and ease of mining the dumps and apex ore zone deposits, which averaged a gross value of about $40/ton, warranted going ahead with pilot production. Mr. Goodman was at that time in the business of excavating and moving rock (aggregate quarrying) and knew the costs involved. It was his conclusion as well as mine that we could mine the dumps and apexes at a substantial profit. In Part II below, I describe in greater detail the underlying sampling results, metallurgical testing and ore volume calculations that informed this decision.

15. The June 1989 plan of operations (JA-23 through JA-27) was the first plan that described to the Forest Service our plan to initiate pilot production from the dumps and apexes, processed initially through the existing centrifugal concentrators then in Eddy Gulch at the E T Placer site, and later through what at the time we thought would be a gravity separation-flotation mill. The June 1989 approval included the first year operations including initial milling of dump and apex material through the centrifugal concentrators. JA-26 at 422 (items 4 and 5). In July of 1989 we submitted some additions to the May-June plan, including road improvements from the E T Placer to the Klamath dumps and hauling the Klamath dumps down the improved roads to the E T Placer for gravity separation milling there. JA-31. The Forest Service approved these additions in August of 1989. JA-32.

16. In September of 1989 I submitted on Liberty's behalf an all-phase plan (JA-36), not for immediate approval of the later phases of the plan, which were a year away

or more best case, but so the Forest Service could evaluate the early plan segments for which immediate approval was sought, in the context of our long range plans for development of the property. Included with the all-phase plan was a discussion of projected ore grade and tonnage, excerpted from a report I had prepared in 1986 and a map with proposed all-phase developments marked by color coded symbols. Apparently in reference to the numerous road lines switching back across the map, and Mr. Aloisi's and my Italian heritage, the Forest Service referred to it then and throughout this saga as the "spaghetti map." Aloisi and I always though this was odd, considering the clearly stated no-tolerance policy of the Forest Service toward ethnic references of any kind, made clear during the training I received in the Forest Service, for whom I worked as a geologist in 1975-76.

17. Our goal with the September 1989 all-phase plan was to find out from the Forest Service if any elements or phases of the full plan were conceptually beyond the possibility of approval. To that point, the Forest Service had limited Liberty's operations to one-year plan approvals. There was no reason to invest in early phases of the operation that were simply to set up later phases of the operation, if the latter might not be approved. We expressed to District Ranger Lee that we were not seeking full approval of the all-phase plan. We were only seeking his opinion as to whether it was generally approvable in concept or not, evaluated at that time with the data available to him.

18. We never received any formal response to the September 1989 all-phase plan, so we submitted a supplemental plan dated October 25, 1989, that described the activities for that fall and through the next year for which we did seek immediate approval. JA-40 (missing map) and A-141 (includes map). The District Ranger approved the "Fall, 1989"

and "Winter, 1989-90" portions of the plan in November 1989. JA-45. Approval of the "Spring/Summer/Fall, 1990" portions of the plan was withheld pending an environmental assessment ("EA") to be completed by the USFS in the Spring of 1990. The Forest Service had completed its archeological and cultural resources field survey at that time, concluding that no avoidance or protection measures were necessary with regard to Liberty's approved operations (what we called the "Arch Study"), and that Forest Service report had been submitted to the California State Historic Preservation Officer ("SHPO"). No response had yet been received from SHPO. JA-45. Although Liberty had contacted a consultant, Winthrop and Associates, and received a proposal from them to provide an "archeological survey of the Eddy Gulch Mines" (JA-37), Liberty relied instead on the Forest Service that its Liberty-paid, Forest Service-performed Arch Study would satisfy those obligations.

19. The District Ranger's approval letter of November 1989 had one major item that made no sense to Liberty at all. It stated that our plan termination date was adjusted to July 31, 1990, and that "Reclamation of the area will be performed upon completion of the operations covered by this supplemental plan or by the termination date of the Plan of Operation, which ever comes first." JA-45, at page 1. The letter goes on to describe re-contouring and re-vegetation of the Klamath apex pit and the settling ponds at the E T Placer site, removal of milling equipment from Usher Flat and the pipeline from there to the E T Placer settling ponds, and other reclamation, all during the period from July 15 to 31, 1990. This completely ignored the fact, which the District Ranger was well aware of, that our long range plan involved additional phases that would require continued use of the milling equipment, pipeline and ponds, and that the mining of the Klamath Ridge pit

was a longer-term operation that would continue well past the July 31 termination date. We disagreed with but understood his position that he wanted to grant us approval of only a year of operations at a time, but it was illogical to require complete reclamation at the end of these arbitrary one year time blocks.

20. Liberty's October 1989 supplemental plan included major mitigation actions that significantly reduced the area impacted by the mining operation, specifically to address issues identified by the Forest Service to Liberty in review of the earlier June plan of operations. This is evident when one compares the all-phase plan of operations text and map from September 1989 (JA-36), and the text and map from the partially approved supplemental plan of October 1989 JA-40 (missing map) and A-141 (includes map). We had previously moved the flotation milling facilities from the old Klamath mill site down to the Usher flat in the July additions to the June plan. Moving the mill facilities downhill necessitated the reconstruction and widening of the existing Klamath, Shoo-Fly and other haulage roads, replacing the pipeline previously proposed for slurrying ore from the Klamath apex to the mill location. In the October supplemental plan we eliminated the holding pond which was to be located on Live Yankee flat and was designed to capture run-off water to be used for milling at Usher Flat and for slurrying tailings from Usher Flat to the E T Placer ponds for settling and disposal. We also removed from the plan the road connection from the existing Evening Star Road to the Klamath Mine area. The most significant mitigation was the removal of the proposed continuous apex road cut from the Ohio 84 claim (west of the Klamath Mine area and at the west end of the claim group) east to the Surprise claim (at the east end of the claim group). We replaced the continuous apex corridor cut with isolated pits on the Klamath,

Union and Six O'clock ridge tops, and a smaller pit on the Mt. Laurel.

21. These changes were made at the request of Mark Williams, District Ranger Lee's staff biologist. Williams told us that the road link, pond and the west end of the apex corridor cut were within the habitat area of a spotted owl pair, and if we removed those operations our plan of operations, as mitigated, would be in compliance with new regulations that would apply to the operation when, as expected, the owl would get listed as a threatened or endangered species. Removal of the continuous apex cut east of there was in response to the USFS expressing concern about the apex cut crossing steep stream-adjacent sides-slopes and stream channels.

22. At the time, during discussions with the Liberty principals, I argued against removing the exposure and mining of the continuous apex corridor, except for the westernmost portion in the spotted owl area designated by Mr. Williams. I felt that the benefit of the continuous exposure of the apex of the vein across the property outweighed any potential adverse environmental impacts. After all, the vein exposure was simply a road cut at a very gentle grade following the vein as it contoured across the property. Compared to the myriad of steep side-hill roads the Forest Service authorized its timber contractors to build throughout the national forests for logging access, our continuous apex cut was just a drop in the bucket. In 1975-1976, working as an engineering geologist for the Forest Service, I worked on timber sale road route location and road design. My opinion regarding the insignificant impact of Liberty's proposed continuous apex cut is in part based on that experience.

23. The mining plan that I designed with Liberty was partially about production from the ridge-top apex sites, where substantial ore volume could be easily and

inexpensively extracted within stripping ratio limits. The apex corridor cuts between the ridge sites were an integral part of long-term development of underground reserves. The continuous exposure of the vein would allow for detailed structural mapping and geochemical sampling in and around the productive ore bodies mined at the four major mine sections in Eddy Gulch, from west to east the Klamath Mine, the Union Mine, the Mountain Laurel Mine (accessed from the private parcel), and the Anna Johnson Mine. This would greatly facilitate the geologic projections to deeper ore bodies. There was no doubt in my mind, given the distribution of the surface breaking ore bodies mined in the past along the apex, given the structural and geochemical characteristics of the vein that clearly indicated continuity with depth, and armed with the detailed mapping data from the exposed apex corridor, I would be able to project the location of additional ore bodies close to, but not breaking the surface.

24. My conclusions were based on my extensive experience similarly evaluating other mines in detail. It is standard mining industry procedure for geologists to create structural models of a property's vein systems from all available exposures, both surface and underground, to provide the basis for projections to additional ore. Gold is localized by structural elements (faults, fractures, folds, etc). Mapping the structural elements of a vein system in detail provides the structural keys to understanding ore distribution. Although the mitigations within the spotted owl area at the west end of the properties were significant changes, they would not seriously affect the design of this development plan. Giving up the continuous apex corridor was a major impediment to securing the best data and opportunity for long-term mine development in Eddy Gulch.

25. However, Aloisi and Goodman wanted to avoid conflicts and retain what they

felt were relatively good relations with the Forest Service. They decided to mitigate out the continuous apex corridor as the Forest Service requested. I resigned myself to the fact that I could still collect substantial data from the remaining apex pits, even if it was far less than one would want to facilitate long-term development of the property, and for minimal environmental advantage.

26. In January 1990, Liberty received a letter from the District Ranger ordering stoppage of all work on the property due to issues regarding the Arch Study the Forest Service had completed ("the Stop Work Order"). JA-51. Attached to Ranger Lee's letter was a letter from SHPO citing major deficiencies in the Forest Service's archeological report (JA-46). Liberty was completely caught off guard by the total shut-down of operations. We had been under the impression that the Forest Service's Arch Study would address the archeological issues adequately. We would not have agreed to pay for the Forest Service to do the Arch Study had we contemplated it would be rejected by SHPO, and lead to any delay in operations under the plan approval.

27. At the time I advised Aloisi and Goodman to challenge or ignore the Stop Work Order. I was concerned that if we stopped they would probably never let us get back to work again. SHPO's letter did not cite any specific cultural resource issues related to the Liberty plan of operations, and their focus was entirely on the all-phase plan which was not going to be approved for months at the earliest, and only after an environmental assessment the Forest Service had not yet begun. I suggested that Liberty start legal proceedings to deflect the probable enforcement actions by the USFS, to at least delay the stoppage long enough for us to complete some significant elements of our plan. Over my objections Aloisi and Goodman abided by the Forest Service's Stop Work

Order, not to be allowed to make progress toward development of the claims again for many years. One of the reasons Liberty did not immediately fight the Stop Work Order was that the Forest Service had indicated the owl might be formally listed under the Endangered Species Act, and the Forest Service would have to consult with the Fish and Wildlife Service to make sure Liberty's operations would not cause "jeopardy" to the owl.

28. A series of correspondence and meetings between Liberty, Winthrop, Jim Rock (the Forest Service archeologist), and SHPO into April of 1991 resulted in Liberty contracting with Winthrop for a $17,500 Arch Study for the all-phase plan of operations. JA-57, JA-70, JA-100, and JA-105. The initial background study titled *One Hundred Thirty Years of Hard-Rock Mining: Eddy Gulch 1860 to 1990*, which cost $3,300, was completed in May of 1991. JA-100, at 927. In June of 1991 Winthrop sought both Forest Service and SHPO approval of guidelines for the field survey portion of Winthrop's Arch Study, given SHPO's demand that the whole Gulch be studied rather than just the areas where Liberty was approved to operate. A-190. Upon that approval, and further payment(s) by Liberty to Winthrop (adding up to about $12,500 as I recall), the field survey was complete in June of 1991. See JA-168, at 1363. The final report was not completed until April of 1994, for Aloisi and Goodman's lessee Liberty Consolidated Mines, Inc. ("LCM"). JA-168. The nearly 3-year hiatus began as the result of Liberty deciding to delay finalizing the report. It would have been a waste of effort and money to complete the Arch Study, if Liberty was never to be allowed to go back to work or if the Arch Study had to be redone later should the Fish and Wildlife Service's ("FWS") owl requirements change the area or type of operations allowed in the all-phase plan of

operations.

29. In March of 1990, Liberty received a letter from Ranger Lee regarding the environmental analysis of the proposed Evening Star timber sale area which partially encompassed our mining claims. JA-66. As far as we were concerned, we had already mitigated the owl issues, at the request of the USFS, and so the letter was not thought of by us as particularly important at the time.

30. At a meeting in March and in a follow-up letter in April to Fred Aloisi (JA-69), Mike Lee requested additional detail regarding the gravity milling circuit and E T Placer pit reclamation. During this period of the Stop Work Order, the Forest Service's exchanges with Liberty (May 17 and July 10, 1990) mostly involved the brush, slash and timber generated by the road work and apex exposures that occurred under the approved plan. The Forest Service must have concluded without further consultation with SHPO that this work would not affect cultural resources, since it was pressing for this work to be done notwithstanding the Stop Work Order. JA-74 and JA-78. In the July 10 letter Ranger Lee restated that the plan termination date was July 31 and that reclamation must start on July 15. Once again, Ranger Lee ignored the rest of the all-phase plan awaiting his action, and seemed much more interested in starting reclamation than working to facilitate any resumption of work under the approved plan. Aloisi immediately submitted a hand-written request for an extension of the termination date on July 10, 1990 (JA-79), in response to Ranger Lee's expiration threat letter.

31. The spotted owl was listed as threatened in June of 1990. Unknown to Liberty and me, the Klamath National Forest immediately sought consultation with the FWS on all of its proposed timber sales, and included the Liberty all-phase plan of

operations. Years later when we got the Forest Service's biological assessment we saw that they described the Liberty plan of operations as including a 38-acre disturbance and 375,000 board feet of timber removal, which is a description of the September 1989 all-phase plan before we mitigated the elements within the owl habitat area, and deleted the continuous apex exposure along the areas near the creek channels and side-slopes. JA-76. The "timber sales" included in the consultation, which included the Liberty Mine operation, added up to "42 planned FY 1990 timber sales" which "propose harvest of approximately 154 million board-feet (MMBF) of timber from approximately 12,768 acres of forested land" (JA-80). The average "sale" accounted for 3.7 million board feet and 304 acres (harvest and acreage totals divided by the 42 sales). The Liberty 0.375 million board-feet and 38 acres represented about one-tenth of the impact of one average timber sale!

32. The Forest Service received the FWS's "no jeopardy" determination on Liberty's all-phase plan on July 22, 1990. JA-80. Liberty was not notified. In my dealings with the Forest Service from this date through the end of 1991, I too was never told of the July 1990 biological opinion, and after Liberty learned of the opinion in March 1992, I too did not learn that the Forest Service had received the opinion in July 1990 until the FWS disclosed this to Aloisi after he demanded a copy of it from both agencies in the summer of 1992.

33. The District Ranger's letter granting Aloisi's July 10, 1990 renewal request was loaded with mixed messages. JA-82. On the one hand, the granting of the renewal request in August, after the originally stated expiration date of July 31, told Liberty that the approval had not actually expired July 31 even if the Forest Service did not act on it

until after that. On the other hand, the letter seems oblivious to the fact that Liberty requested extension of the period to complete the previously-approved work. Liberty was not seeking to "extend" any of the rest of the all-phase plan that the Forest Service had taken no further action on. The new expiration date both shortened the period in which the work was to be completed and ignored the fact that Liberty was under a Stop Work Order. "Expiration periods" made no sense while work was not occurring, unless the Forest Service had other reasons, not stated in the letters, for imposing them. And any reasonable extension period would have been for the same length of time Liberty previously had to complete its work, starting when the Stop Work Order was lifted. This confirmed to me that the Forest Service was working not to facilitate Liberty's return to operations, but working to prevent Liberty from operating again, even though the Forest Service had identified no environmental risks or prohibitions caused by the all-phase plan (since we previously mitigated out the area requested by the agency's owl biologist). It had certainly not identified any environmental risk or prohibition caused by the previously-approved early-phase operations subject to the Stop Work Order.

34. The Ranger's Office (Mr. Griffith here) goes on to say, "The determination of how your operation will affect and how it will be affected by the Habitat Conservation Area (HCA) has not been completed by the Fish and Wildlife Service." JA-80. The agency stall was laid on Liberty again, as the Ranger's Office either did not know or else was deliberately deceiving Liberty about its July 1990 receipt of the "no jeopardy" opinion from FWS in stating this! The Ranger's Office also states, "To your credit, in order to reduce impacts, you have deleted proposed plans to construct the mill site at Yankee Flat and to construct the road from the Klamath Apex to the Evening Star road

system." JA-80. The Ranger's Office (Griffith) was in error here. As described above, Liberty's October 1989 supplemental plan removed a *pond* at Yankee Flat. The July "additions" plan moved the mill site, which was originally proposed to be located about 1/3 mile east on the Old Klamath Mill Site, down to Usher Flat. As we later found out, the plan that was determined to be "no jeopardy" to the spotted owl included the pond, the connector road to the Evening Star area, and the full apex corridor cut across the properties. The "credit" Liberty was being given completely ignored the several miles of apex corridor cut that we mitigated out, as the 375,000 board feet of timber in the biological assessment was perhaps 10 times more than the timber involved once the continuous apex corridor exposure was deleted, not to mention the great reduction of land disturbance. At this same time, as we sat there, idle, due to the stop order, we could hear the chain saws running on the Evening Start timber sale just across Eddy Gulch from us (and closer than our operation to the owl nest our mitigation was designed to protect).

35. The District Ranger's (Griffith's) August letter also discussed the need to complete the Arch Study, the need for an EIS prepared by an outside consultant if a cyanide leach system were included in the mill circuit, and delay of the Forest Service environmental assessment on the all-phase plan until the finalization of the decision regarding the mill circuit. JA-82. Liberty was waiting for word whether its all-phase plan would jeopardize the owl, and how its operations, location and type, might or might not be restricted, before committing to new plans. The letter also demanded a new operating schedule for "phases of the project that were interrupted" by the Forest Service's inadequate 1989 Arch Study. This demand of course ignored the complete uncertainty as to any schedule or whether we would ever be able to get back to work

while awaiting word on the owl, word that was being hidden from Liberty by the Forest Service at that time, since its receipt by the Forest Service the previous month. The letter was unreasonable to Liberty when received, based on what Liberty knew then. In hindsight it appears even worse. How could the District Mineral Officer and acting Ranger (Griffith) write this letter while the District Biologist (Williams) was implementing timber sales like the Evening Star (but not the Liberty operations) cleared by the July 1990 biological opinion? District Ranger Lee was detailed out of the District Office at the time of that letter, so it is not clear to Liberty whether Griffith was ignorant of the facts pertaining to Liberty's plan in the District Ranger's absence, or what.

36. During this first approval extension, of course, the Forest Service never disclosed the existence of the July biological opinion, so Liberty's contracting for work to cover for the Forest Service's inadequate Arch Study was awaiting word on the owl. Knowing the extension period would expire without mining operations, in September 1990 I submitted a second renewal request, which included our response to Ranger Griffith's August demands, with a note that our schedule of activities "depends on HCA decisions by the government." JA-84. After a meeting at the Ranger's Office, the 1990 renewal request was approved in a letter from Mike Lee in November of 1990, extending the termination date to March 31, 1991. JA-88. This letter continues to hide from Liberty the existence of the July 1990 "no jeopardy" determination. It also curiously calls for a complete plan of operations covering all phases, like the one we submitted in September of 1989 and supplemented in October of 1989 (JA-36 and JA-40), after refusing to respond to the September plan, and refusing to consider more than a one-year approval of the early phases of the October supplement, and ignoring the disruption of

our plans by the arch-study and owl issues.

37. From early 1990 on through the end of 1991, Liberty was caught in a Catch-22, held up by both the Arch Study and the owl, with the former deferred until the Forest Service had an answer from FWS on the latter, so the Arch Study could be completed consistent with any constraints on the operations the FWS would require for the owl. And there was no movement on the owl, because the Forest Service never told Liberty they had received the "no jeopardy" biological opinion in July 1990. Rather, the Forest Service repeatedly told Liberty and me they were awaiting word on the owl from FWS, despite their having received that word in July 1990. As the Forest Service had shrunk the period in which Liberty was supposed to complete six months worth of work (when stopped in January 1990) to three months (in the second extension grant), we submitted the third renewal request for the approved operations in March of 1991, prior to the termination date. JA-94. Later that same month I answered in writing a series USFS of questions regarding the plan elements in the renewal request. JA-96.

38. The Forest Service did not formally respond to the March third renewal request. This inaction was not ominous to us at the time, for two reasons. First, the Forest Service had granted Liberty's first renewal request after the approval expiration date we sought to extend, so we expected into April and beyond that would occur again. Second, in March Liberty was allowed to proceed with our lower road brush clearing and other maintenance work by a verbal authorization from Harry Frey, the District Mineral Officer at that time, so Liberty was in fact operating over the date when the second extension ended, with a third extension request pending.

39. In May 1991, unknown to Aloisi and Goodman, I met with Mike Lee and Al

Buchter (the replacement mineral officer for Harry Frey) at the District Ranger's Office in Etna, professional to professional, in order to show them that their handling of the Liberty plans of operation was heading for serious problems for all concerned, and all without any environmental justification. I explained that the approved operations were for the first phase of work, with minimal land impact and under my supervision. I assured them that I would never let any environmental damage occur. My credibility and liability would be on the line. I reminded them that in 1989 we had mitigated out the areas within the owl habitat as requested by their District biologist. I produced a rough, hand written work up of the technical data behind our planned operations and a projection of potential profits, to show that we had ample justification to operate. JA-99. I pointed out that the approved small operation would either not play out, so Liberty would clean up and leave, or it would play out, and then Liberty would proceed to the next phases of its development, exercising its right under the mining laws to operate within the constraints of Forest Service management policies. Stopping approved operations, despite the fact that they had been modified to avoid all identified environmental issues, with no restart in sight, could only lead to a prolonged legal battle. My words proved prophetic. I got no specific response, and ultimately they made no gesture of any kind toward resolving these issues. Worst, in hindsight, they disclosed nothing about the July 1990 biological opinion or what they were or were not doing regarding the owl.

40. In July of 1991, as I was surveying and contract crews were brushing the road widening corridors, Al Buchter showed up at the mine to order us to stop working again. Aloisi and Goodman again complied with this demand, even though they received no written confirmation of Buchter's demand or its basis throughout the rest of that wasted

field season.

41. FWS designated critical habitat for the northern spotted owl on January 15, 1992. I believe that it is very likely that the delay in telling Liberty about the no jeopardy determination was part of a larger conspiracy. The goal was to stop us until we would be permanently blocked from going back to work by the more stringent controls that the Forest Service anticipated would come with the designation of critical habitat. Since the designation came with the provision that "projects that were under permit at the time of designation were exempted" (JA-138, at 1226), they needed to break our chain of approvals, and so never acted on the third renewal request and declared our plan approval expired. Perhaps the Forest Service thought that the designation would come much sooner than it did, and so did not anticipate the long delay and all the evasions they would need to perpetuate in order to achieve their goal.

42. By a letter in March 1992 we were informed by Mike Lee of the FWS no jeopardy opinion. JA-111. However, we were not told that the opinion had been reached more than a year and a half earlier. That only came out later after some effort by Fred and the lawyer he hired to help him dig into the Forest Service documents and what had happened. It was only at this point that Ranger Lee communicated his position that our plan approval had expired due to failure to comply with archeological survey requirements. This was especially galling since the Forest Service knew that the Arch Study field work was all but completed in mid-1991 and found no adverse affects from the all-phase plan on cultural resources, so no mitigation was going to be recommended in the final report, and that Liberty had only held up completing the formal final report waiting on the owl decision that they had hidden from us for nearly two years.

43. Again Liberty complied with the Forest Service's demands. I prepared and Liberty submitted its restatement of its October 1989 all-phase plan of operations on April 1, 1992. JA-114. Although the Forest Service later insisted that the filing of the April 1992 plan was Liberty's admission that the prior plan had expired, to us it was simply another restatement of the 1989 plan, and a renewed request to extend or reinstate the approval of the elements of the existing plan approved in 1989. After hiding the no jeopardy opinion for which we waited before we met the conditions to restart work, then admitting there was such an opinion but not telling us it was nearly two years old, they demanded a new plan on the basis they were confused about our plan and said the prior approval had expired without their ever having taken action on the pending request to extend that approval. The Forest Service's positions in these regards struck me as something out of a Kafka novel. No matter what they had done, and no matter how we cooperated, they were not going to allow Liberty to go back to work.

44. The April 1992 plan involved less surface disturbance and potential impact on the owl (or cultural resources) than the September 1989 plan submitted by the Forest Service with its 1990 biological evaluation to the FWS, and determined not to jeopardize the spotted owl, due to the mitigations that we included in the October 1989 plan, and further modifications we had adopted in the intervening two and a half years. The continuous apex cut had been replaced by ridge-top apex pits, two of which had been eliminated from the mitigated supplemental plan of October 1989. The road system improvements were all along existing road corridors or rerouted corridors included in the September 1989 all-phase plan, with the only exception being a short switchback extension to the road up to the Anna Johnson Mine. Despite our deliberate design that

the April 1992 resubmitted all-phase plan propose less surface disturbance, in May and June 1992, the Forest Service determined that it had to undertake a fresh consultation with FWS regarding the impacts of this plan on the owl. We were told that the consultation would be completed in June 1993, another year of delay. JA-124.

45. I had no direct role in Liberty's appeal of the re-initiation of consultation to the Klamath National Forest Supervisor, Barbara Holder, but learned that she "mooted the appeal" in October 1992 (JA-134) without every addressing any of Liberty's complaints about how it had been treated, and without ever saying why a new consultation was required if, as the District Ranger wrote Liberty six months before, the FWS "determined that the project could proceed as submitted." JA-111. I was also aware that the Regional Supervisor Office, through Dale Bosworth, dismissed Liberty's second-level appeal in January 1993 without addressing the merits of what the District Ranger had done to Liberty, and did so based on total misinformation that erroneously claimed that Liberty was allowed to proceed with its approved operations. JA-145.

46. During this second consultation, I answered questions in writing in response to a letter to the Forest Service from Wayne White of the FWS dated November 24, 1992, forwarded to me by Harry Frey in March of 1993. JA-138. As Liberty was getting ready to lease the claims and the lessees were pursuing a plan of development different than the one in my April 1992 all-phase plan, I was not at that time actively involved in any work on the ground in Eddy Gulch. I did learn that in February 1994, the FWS rendered a no-jeopardy opinion on my April 1992 restatement of the 1989 all-phase plan, and that there really had been no apparent need for a second consultation. JA-163. As it turned out, the delay lasted over a year and a half and yielded no environmental benefit of any kind, and

no condition or restriction on any plan of operations, either Liberty's or LCM's, that was ever identified to Liberty then or since.

**Part II. Geology, Metallurgy and Data/Economic Calculations Supporting Validity of the Claims**

47. The claims cover the apex of the second most productive structure in the entire Klamath Mountains Geologic Province, which geologically is the northern extension of the famed Mother Lode Gold belt. These claims encompass the second and third greatest producing gold mines in that district. The geologic structure that hosts the mineralized veins is a major thrust fault that is shown on every geologic map of the vicinity, including the Sawyer's Bar Quadrangle, Klamath Mountains and State of California geologic maps. The document "Liberty District Geology Elder and Ernst," (A-92) provides an overview of the immensity of the mineralized structure that apexes on the Liberty claims. Mr. Elder, a geologist who has provided consulting services for the USFS (as have I), concluded that the down dip extension of the hosting Soap Creek Ridge Thrust reaches under Mount Shasta!

48. Only from an understanding of the scale of the Eddy Gulch mineralization can an appreciation be gained of the continuity and the significance of the dump and apex reserves. Those reserves constituted the first phases of our plans of operations, which also included the underground developments as later phases. They formed a logical continuum of development in the real world of financing a mining operation.

**Ore Deposit Quality and Quantity Data and Economic Calculations Establishing the Validity of Liberty's Claims**

49. The bottom line profit totals summarized from the spreadsheets and

discussion ahead are tabulated below. Two scenarios that are unlikely, but provide numbers for deriving likely scenario numbers are…

If we ran all of the ore through the screens and centrifuges with 0.10 opt cut-off grade:

| | |
|---|---|
| Apex and Dumps | $1.3 million |

or

If we ran all of the ore through the gravity-flotation-cyanide mill with 0.05 opt cut-off grade:

| | |
|---|---|
| Apex and Dumps | $5.8 million |
| Apex, Dumps and Six O'clock Underground | $17.9 million |
| Apex, Dumps and Six O'clock and May Underground | $24.1 million |

Two likely scenarios are…

If we ran all of the apex and dump material through the screens and centrifuges, and all of those tails and the underground ore through the gravity-flotation mill:

| | |
|---|---|
| Apex and Dumps | $1.3 million |
| Apex, Dumps and Six O'clock Underground | $12.2 million |
| Apex, Dumps and Six O'clock and May Underground | $19.6 million |

or, more likely…

If we ran half of the apex and dump material through the screens and centrifuges, and all of those tails and the other half of the apex and dump material and the underground ore through the gravity-flotation mill:

| | |
|---|---|
| Dumps and Apexes | $3.6 million |
| Apex, Dumps and Six O'clock Underground | $14.5 million |
| Apex, Dumps and Six O'clock and May Underground | **$21.9 million** |

The **bold** font number above ($21.9 million) is the single most likely, conservative, minimum bottom line profit number.

50. My most recent detailed analysis of all testing results and economic calculations re ore deposit quality and quantity data establishing the validity of Liberty's claims is document JA-190, "The Liberty – Eddy Gulch Gold Mines, A Discussion of Grade, Tonnage, Recovery, Economic Calculations …" (September, 2007), along with associated spreadsheets and maps, including JA-189, JA-191, JA-192, JA-193. The following explanation of the conclusions on those spreadsheets (which are summarized in paragraph 49 above, is excerpted and revised from the "Discussion" text (JA-190).

51. The color coded maps (JA-189, f through l) are variations of the All-Sample Map submitted to the Government in July of 2007 as Map EG-CC-08-1, part of A-153. The All-Sample map presents all of the samples from 1932 to 2007. It shows the breadth and close spacing of the sample data, as well as the complete set of recovery data points. Documents A-118 through A-138, submitted in July 2007, provide the backup documentation for the map data, including laboratory reports for nearly every sample. The second color coded map (Map EG-CC-08-2, JA-192) shows only the samples that Liberty had in 1990 when shut down by the USFS. This map shows the basis for Liberty's decision in 1989 that the property was economically mineable. The third color coded map (Map EG-CC-08-3; JA-193) shows only those sample points included in the

grade weighted-average calculations applied in the economic calculation spreadsheets at JA-191. These samples also range in date from 1932 to 2007, as do the Map EG-CC-08-1 samples. JA-190 contains a detailed discussion of how the color coded maps were derived from the All Sample map.

52. Some individual samples and sample groups were not included in the grade and economic calculations. All of the metallurgical data was included in the recovery calculations except for the 2006 Liberty gravity mill testing results. I eliminated some samples from these grade and economic calculations, for two primary reasons. Either the method of sampling was unrepresentative or the results were so anomalous that they had to be considered compromised due to analytical methodology or chemistry. These rejected samples included some of the Forest Service's as well as some of Liberty's samples. Full text explanation in JA-190, at 1547-54.

53. Ore tonnages of the Klamath apex and the Klamath east dump and all but one of the Klamath west dumps are based on plan and cross-section surveys. Underground tonnages are based on projections from surface, underground and drill hole survey data. Tonnages of one of the Klamath west dumps, the Union dump, the Mt. Laurel dump and the Anna Johnson dump are estimated from field sketches, aerial photos and comparison in scale to other similar surveyed dumps (described in Liberty's documents produced as A-85, A-86 and A-88 and A-148). The tonnage applied to the May Tunnel-Union underground deposit is a conservative estimate based on ore body spacing and scale in the vicinity (A-92).

54. The Klamath apex is represented on the spreadsheets in two configurations, one with the tonnage derived from the surveys and cross-sections only in the sample

cluster areas where the vein is exposed in the road cut, and the other a projection of the apex reserve continuous from the westernmost Dariel sample to the east end of the Sunrise claim. The latter is the more logical configuration. The only reason the gaps were not sampled was because they were above or below the existing Klamath road, but the sampled areas cover a large enough percentage of the entire Klamath apex length to more than justify including the unsampled sections. The Klamath Mine was productive under the entire apex, not just where the road crossed the vein. Note the high grade assays in the Blacksmith tunnel just below the apex east of the ridge sample cluster, derived from A-2, which is tied to the survey at JA-1, and represented on the map JA-189, at 1543 (as the black, southwest to northeast line under the words "Klamath Mine"). We are being quite conservative with this description of the Klamath apex here. We know from spot sampling and panning that there are continuous values to the west across the Dariel and Ohio 84 claims similar to those found on the Sunrise claim, but we have not included that tonnage, which would about double the total Klamath apex ore.

55. Although we do not claim that every foot of apex strike is ore, we do maintain that there is general continuity of gold values across the length of known productive zones. The apex targets in the approved mining operation were located above the old stopes in these productive zones. Even within those designated targets, we assumed that there would be some segments of below grade material. That is why we included volume reduction factors in our reserve calculations to account for selective mining of apex material.

56. Underground reserve grades are based on the Sannes 1977 (A-81g) and Liberty 1986 drill hole data (A-14), and Elmendorf 1932 (A-2), Sannes 1977 (A-81g) and

other underground sample data. Also, there is one very powerful set of underground sampling data – the production records from the mines, which add up to an average recovered value of 0.565 opt (JA-6). This principle of applying past production records as the best indication of projected production grades and recoveries is perfectly logical when there is ample geologic and structural data showing that more of the same type of production can be projected, as is the case in Eddy Gulch. This principle is a standard practice in economic geology and was applied by Elmendorf and Jones in 1932 (A-2 and A-1), and I have applied it here since 1986 (as set out in A-80 and A-81s, provided to the Forest Service in 1999 and January 1998, respectively). I have applied a 90 percent average recovery to underground ore, which is conservative given our gravity-flotation-cyanide flow sheet and the high recoveries from gravity systems in Eddy Gulch reported in numerous documents (see "Metallurgy" section of document A-80 and numerous other documents cited there).

57. The economic calculations on the JA-191 spreadsheets are very conservative due to my inclusion of some clearly unrepresentatively low assay and recovery results. When groups of samples and metallurgical tests from the same deposit yield very different average results, the right answer is not to average them together, but to figure out what went wrong with the lower ones. Assays and metallurgical tests can miss gold, but they cannot detect gold that is not present. A few anomalously low results are normal, but when a whole block of results is anomalously low there is a problem. With Eddy Gulch ore it has been demonstrated time and again by Forest Service and Liberty testing (including in the Report provided by the Forest Service's contract laboratory cited in the 1999 Forest Service Mineral Report) that the problem is related to carbonaceous

and arsenopyrite content, and the nugget effect (A-114, produced to the Forest Service in the Contest). Because I have included many anomalously low assay results in my averages, they are lower than what actual production grade averages should be.

58. Similarly, when a number of mill tests are performed on ore from a mining property, the projected recovery is not based on an average of all testing. The purpose of running a series of mill tests is to apply what is learned from previous tests in the next test to optimize recovery. Some mill tests along the way yield lower recovery results, and those recovery methods are rejected. Results from tests using rejected recovery methods should not be averaged in with the better tests to derive an average. That is not logical. The recovery from the flow sheet that has produced the best results, as long as it has been replicated a few times, establishes the projected recovery number. However, for this exercise I have included all metallurgical tests in deriving the projected recoveries on the attached spreadsheets. This is another way in which these economic calculations err on the side of conservatism.

59. The bottom line numbers from the Ferrero economic calculations in 1998 document A-81-s, created prior to the Forest Service's completion of its Mineral Report, and based on essentially the same data that Liberty had in 1989 when it decided to begin mining, are close to the bottom line numbers in the attached 2007 spreadsheets. Both numbers are different from and much higher than the economic spreadsheet created in January of 2007 for purposes of the contest proceeding (A-87, not attached), which was intentionally limited to showing claim validity solely with the set of sampling and recovery test data generated by the Forest Service's sampling for its 1999 Mineral Report and Liberty's 2004 contest rebuttal sampling. The differences between my 1998 and

2007 figures can be primarily attributed to better volume survey data generated during the mineral exam sampling, and to the more detailed grade, tonnage and recovery data compilation backing the latter.

60. Spreadsheets 07 and 08 ("TF-Interp", JA-191) provide adjusted economic calculations with no cut-off grade (mining all ore) and mining only ore above a cut-off grade of 0.05 ounces per ton (opt). These two spreadsheets are revised to be a little more interpretive, first by adjusting for the depressed apex and dump grade and recovery averages, and second by applying the grade of past underground production to the Six O'clock underground average grade. This is closer in my view to an accurate portrayal of the value of the Eddy Gulch deposits in question in this case. The orange colored figures on spreadsheets 07 and 08 indicate numbers altered in the interpretive spreadsheets. The average grades have been raised slightly, as a result of removing some of the lower recoveries from tests using less effective and less appropriate assaying and recovery circuits. The ¼ gr-fl-CN overlap is applied for recovery, and the Six O'clock claim's underground ore grade is adjusted lower to 0.628 opt (as per the May Tunnel-Union underground), which at 90 percent recovery yields the 0.565 opt from the production records.

61. The interpretive spreadsheets show a profit from mining the continuous Klamath apex plus the 6 O'clock underground plus the other surface apex and dump deposits, processed through the proposed Moore gravity-flotation-cyanide mill (JA-52), of about $16 million without application of the 0.05 opt cut-off grade, or about $18 million with application of the 0.05 opt cut-off grade.

62. However, this does not tell the whole story. The fact is that Liberty's original

plan was to start production using the existing Pitmaster crusher and Tri-R triple-deck screen/centrifugal concentrator system then at the E T Placer pit to process the ore. The May 1989 Liberty plan of operations and the July 1989 additions to the plan proposing this were approved by the USFS in June and July of 1989 (see documents JA-23, JA-31, and JA-32). The plan describes running material through the centrifuges at the E T Placer property, using the E T Placer settling ponds, and then a gravity-flotation mill as necessary, depending on early results. At that time Liberty had enough data from both small and large samples to know that there were substantial gold values in the dump, apex and underground reserves, but Liberty also knew that due to the uneven distribution of values ("nuggety" gold) in the ore, the only truly representative sample was to mine and mill a large volume. The "bulk sampling" described in the May 1989 plan of operations (JA-23) was designed to refine the metallurgical system by the only reliable method available for nuggety deposits – milling large volumes of ore. In 1989 Mr. Moore had not finished the small sample testing that led to adding the cyanide circuit to the proposed mill to increase recovery from the lower grade dump and apex ore. JA-52 and JA 53.

63. The evolving milling circuit proposed in plans of operations from 1989-1992 is summarized as follows.

a. May-June, 1989 – Test and ongoing milling at E T Placer (centrifuges) and possible flotation milling at Old Klamath Mill Site (tailings via slurry pipeline to E T ponds) or at Rollin. JA-23.

b. July-August, 1989 additions to June 1989 plan - Improve haul road from Klamath to E T Placer. Screening at Usher or E T and centrifuge or flotation milling at E

T Placer. JA-31, JA-32.

c. September, 1989 all-phase plan – Screening, gravity centrifuge and flotation milling at Usher Flat and E T Placer. Cyanide leaching of tailings off-site. JA-36.

d. October-November, 1989 supplemental plan – Initial gravity centrifuge milling at Usher Flat. Flotation mill test off-site. Upgrade E T Placer tailings ponds and gravity or flotation production milling system at Usher Flat as per testing results. JA-40 (missing map) and A-141 (map submitted with JA-40), JA-45.

e. July 1990 renewal request – as above. JA-79.

f. September-November, 1990 renewal request – as above. JA-84.

g. March, 1991 renewal request – Jig-flotation milling at Usher Flat (tailings to ponds at E T Placer). JA-94.

h. April, 1992 – Flotation milling at Usher Flat, ponds at E T Placer. JA-114.

64. Note that the March, 1991 (JA-94) and April, 1992 (JA-114) circuits do not remove gravity milling. These are gravity-flotation milling circuits. In addition, we had plans for a gravity-flotation-vat leach cyanide mill circuit in hand from Don Moore in 1990. Milling equipment was being purchased and readied for shipment (this process was delayed by the stoppage). We were still deciding whether to seek approval for the vat leach cyanide part of the circuit in 1992 when the last plan was submitted. We knew that we had plenty of ore to run gravity and flotation until the cyanide circuit was approved, if we decided to go that way.

65. So basically in the series of plans we consistently proposed initial gravity milling followed by flotation, with the cyanide part of the circuit still being considered. In the earlier plans, the initial gravity circuit location moved from the E T Placer to the

old Klamath Mill Site to Usher Flat. The gravity-flotation circuit was located at Usher Flat in all of the plans. The E T Placer ponds were in use for all circuits. Note that because we had all of the elements present in the gravity-flotation-vat leach cyanide mill circuit, the lessons that we eventually learned about milling Eddy Gulch ore by ongoing testing up to 1990 and then later in 1998-2006 (e.g. coarse crush for gravity and grind gravity tails for flotation-cyanide, etc.) would have been applied to the mill circuit.

66. Ore from the Liberty Eddy Gulch Mines from the 1860s to 1940s was predominantly milled by gravity separation methods (mostly stamp mills) yielding 85% recovery. In the later years of that period, ball mills replaced stamps and flotation cells were added, increasing recoveries to 90% to 94%. JA-6. Data supporting these figures are included in the 1925 California State Mineralogist's Report, quoted in Jones (A-1), Elmendorf in 1932 (A-2), and others. Metallurgical testing since the 1940s was concentrated on dump material and more recently on apex material. Gold bearing rock in the Liberty District with less than about 0.08 opt gold is composed of fine gold that is largely not recoverable by standard gravity separation methods. This is what I call the "background fine gold" component of the dump and apex material. At about 0.08 opt and above, the percentage of relatively coarse, gravity separable gold increases as grade increases. Consequently, when running ore in the 0.08 to 0.20 opt range, like the dump and apex material, recovery is lower than that reported from the high grade ore mined from the underground workings during the 1860s through 1930s. Test recoveries were above, although not far above, the margins of economic viability in the early 1990s when the gold price averaged about $380/ounce. The following table shows the relationship of grade, milling method and recovery.

| | Recovery | | |
|---|---|---|---|
| Ore Grade (opt) | Gravity | Gravity/Flotation | Gravity/Flotation/Leach |
| Low Grade | 27% | 43% | 70% |
| High Grade | 80% | 90%+ | 95%+? |

A much more detailed presentation of metallurgical data is found in my "Analysis of Metallurgical Data, USFS and Liberty Mining Testing, 1998, 2004, 2005 and 2006," document A-114.

67. Given all test results, the sequential plan for milling of the dump, apex and underground ore defined in Liberty's 1989 plans of operations would have included the following in 1990 (designated here "Mining and Milling Sequence A"). The testing since 1990 has refined some details of the process in terms of grinding, etc., but has not significantly changed what we had proposed as our mill circuit back then.

a. Gravity separation milling of selected higher grade dump and apex material (Yankee dump, Mountain Laurel-MJ Dump, Klamath Cut, etc.) through Liberty's Pitmaster crusher and Triple Deck Screen-Centrifugal Concentrator system on site in 1989 at the E T Placer property, using the existing settling ponds for recirculation of milling water, with no discharge to creeks; cut-off grade about 0.10 opt; tailings stored on E T claims temporarily, or hauled up to the mill site at Rollin or Usher Flat, to be run through gravity-flotation-cyanide mill when completed.

b. Concurrently with "a" above, complete the permitting process for the proposed 300-ton per day gravity-flotation-cyanide mill at Usher Flat or the Rollin patented mill site (with site selection depending on how onerous the Forest Service's permitting issues on the Usher Flat claims would be relative to those on the private Rollin property).

c. Also concurrently with “a” above, after completing item “b” construct the mill as per the 1989-90 plans and cost quote/contract by and with Don Moore, Argonaut Mine and Mill Supply. JA-52. Construction would include ponds for tailings settling and recirculation of water, with no discharge to creeks.

d. After completion of item “c”, process the remaining dump and apex material through the 300-ton per day mill (cut-off grade about 0.05 opt), with drained tailings stored at Rollin or Usher Flat and used in reclamation of the pit at the E T Placer, as proposed by the Forest Service. A-149 (excerpt – letter from Don Moore dated Jan. 26, 1990).

e. Concurrently with items “a” through “d”, drive crosscuts and drifts to develop targeted underground reserves under the Six O’clock and Union Group claims.

f. Process the developed underground ore through the 300-ton per day mill (the vat leach cyanide portion of the mill circuit would not be used for higher grade, free milling underground ore, and probably the same for the flotation circuit as well).

g. I estimate that these operations would take a minimum of four years, with continuous extraction of gold from Eddy Gulch ore during that entire period, and probably for much longer, as ongoing development work funded by revenues from the initial production delineated more underground reserves.

68. The alternative to this development sequence would be that Liberty may have decided that the cyanide circuit was unnecessary, and chosen to install the 300-ton per day gravity/flotation mill, only using the flotation circuit where necessary (designated here “Mining and Milling Sequence B”). This course was contemplated in document JA-

60 in which Liberty's consultants discussed issues regarding the cyanide circuit, and JA-91, at 886-889, Don Moore's letter number 10, which provides an alternative 300-ton per day gravity/flotation mill without the cyanide circuit.

69. Spreadsheet 09 (JA-191, at 1577) presents the recoveries and costs associated with centrifuge milling of dump, apex and crushing and centrifuge milling of underground ores. Major factors differentiating this spreadsheet from the gravity/flotation/cyanide mill spreadsheets (Sheets 05-08) are: the 0.10 cut-off grade; the reduced capital costs due to milling equipment already in possession and paid; the reduced per ton milling cost derived from the 1997 Egan and Redmond estimate of gravity processing costs (A-74); and the application of the formula for centrifuge recovery. The latter formula subtracts the background, fine, "pickled" or complexed gold value of 0.08 (the part that requires flotation and yields additional recovery upon cyanide processing) but includes 90% of the remaining (free) gold. This formula is based on volumes of testing data over the years. The background 0.08 was well know to us back in 1989, and has been continually affirmed by testing since then, and is reflected in the grade versus recovery numbers on spreadsheets 05-08. As the grade of the ore increases above the "pickled" or complexed gold that constitutes the 0.08 background concentration, the recovery increases accordingly because all or most of that greater than 0.08 gold is free milling. The 90% recovery of free milling gold is a conservative factor considering the excellent recovery of free gold from the enhanced gravity process of centrifugal concentrators.

70. Spreadsheet 09 shows that about 186,000 tons of the available 326,000 tons of dump and apex material would have gold content at or above the cut-off grade of 0.10



PE-2-71

opt. All of the targeted underground ore would be above the 0.10 cut-off grade. The Six O'clock target of 82,200 tons would be included. That means that while Liberty was finishing the tuning up of the milling circuit, getting permitted and constructing the 300-ton per day mill, Liberty had about 268,000 tons of ore to run at a substantial profit through the centrifuges. As spreadsheet 09 shows, if Liberty only ran that material in that way, they would have made over $11 million, about $1.3 million from the 186,000 tons of dumps and apex material alone. By Mining and Milling Sequence A, Liberty would run the stockpiled centrifuge tails through the gravity/flotation/cyanide mill permitted and built at Usher Flat or possibly at Rollin.

71. Included on the spreadsheets, but not in the bottom line numbers on those spreadsheets is the vein area under the Union apex accessed via the May Tunnel ("May" deposit). This vein area yielded significant drilling intersections in 1986 and the outcrop along the east-west trending, north facing exposure between the Union and Mt. Laurel mines yields visible gold at a structural intersection typical of high grade ore bodies at other locations on the property. It crops out on the surface along a road cut and projects to depth into the mountain to the south. In my opinion (as well as in the opinion of C.C. Jones, A-1) there is a high probability of finding a much larger volume of ore in this area of the vein system. In September of 2007, on the JA-191 spreadsheets, I projected a very conservative 50,000 ton ore body because we had not yet delineated the boundaries of this discovery, and did not include it in the "bottom line" totals. The reason for not including this ore body in the JA-191 totals is a carry-over from the earlier limitations related to the 1998 mineral examination, which only included at the east Klamath, Yankee and Union dumps, the Klamath and Six O'clock apexes, and the Six O'clock

underground. The bottom line numbers in paragraph 63 above and paragraph 73 below include the May deposit as evaluated in the JA-191 spreadsheets.

72. The inclusion of the May deposit allows an additional variation on the mining and milling sequence, that also addresses permitting issues - accessing the Six O'clock and Union ("May") underground targets via the May and MJ tunnels located on the patented Mt. Laurel property. The cost of rehabilitating the workings necessary to access these targets is about equivalent to the cost of the proposed 300-foot cross-cut to the Six O'clock target included in the spreadsheets 05-08. For about the same cost, some permitting issues would be eliminated by rehabilitating existing underground workings, and developing underground reserves from private property instead of Forest Service land. Liberty began applying for permitting of the Six O'clock underground mining phase of the operating plan in March 1991. JA-94. However, because of the Forest Service's shutdown of the Liberty operation and refusal to act on the rest of the All-Phase plan for years, and the resulting financial bind that was created for Liberty, the Mt. Laurel property and its valuable access to the deep underground were lost.

73. If Liberty decided to forgo the cyanide circuit, as per Mining and Milling Sequence B, they would go directly to gravity/flotation (the latter only as necessary) milling of underground ore. Sheet 08 (of JA-191) shows a total profit from mining and gravity/flotation/cyanide milling of apex, dump and Six O'clock underground ore of $17.9 million. Elimination of the flotation/cyanide process from the dump and apex milling circuit and the cyanide process from the underground material milling circuit would reduce Liberty's profits from those selected deposits by about $4.5 million, leaving $13.5 million. This does not include the May deposit (highly probable based on

geologic conditions and drilling data), which adds $7.4 million, bringing the total up to $19.6 million. It also does not include whatever additional underground reserves would have been proven elsewhere on the property, while milling the above reserves (also highly probable given the geologic conditions and distribution of existing ore bodies described in numerous documents by myself and other geologists since 1932). If, however, Liberty milled half of the dump and apex ore through the centrifuges and the other half along with the Six O'clock and May underground ore through the gravity/flotation mill, a more likely scenario, the total profit would be $21.9 million. These two options are the "two likely scenarios" tabulated in paragraph 49 above. Note that the profit calculations for these scenarios do not include an adjustment for lower capital and operating costs resulting from eliminating the cyanide circuit from the mill. I did not factor that in because I believe that the added gold extracted by running the underground ore through a cyanide circuit would probably be offset by the additional cost. The higher grade underground ore yielded recoveries of 90 to 94 percent to gravity and flotation mills in the past, as noted in the above discussion. Therefore, it would most likely be a waste of time and expense to permit and build a cyanide circuit into the mill. The cyanide circuit is strongly indicated by the metallurgy only in the scenario where the dumps and apexes are the only deposits that are mined and milled. In that case, where the percentage of gold not recoverable by gravity separation is much higher, the profit increases from $1.3 million with the centrifuges to $5.8 million with the vat cyanide circuit.

74. In 1989, the decision had not yet been made whether the cyanide circuit was going to be added to the mill. I believe that if we were allowed to proceed as per

Liberty's October 1989 no-jeopardy-to-the-owl, All-Phase plan, Liberty would have applied the centrifuges and gravity/flotation circuit as described above in paragraphs 49 and 73. However, had Liberty chosen to install a vat cyanide circuit to maximize gold recovery from the dump and apex deposits, in my opinion there was no reason to believe that Liberty could not get the zero-discharge cyanide circuit permitted. I worked at a California gold mining operation on federal lands that included a fully permitted cyanide vat leach mill in 1987. Certainly the permitting process would take time. But because Liberty would be producing gold with the centrifuge operation, permitting time was not a problem. I estimate that it would have taken Liberty more than two years just to run the 186,000 tons of dump and apex material through the centrifuges, during which time the 300-ton per day mill would be permitted and built (with or without the cyanide circuit). Add to that the time to centrifuge mill the 132,200 tons of Six O'clock and May underground ore (if necessary for production continuity) and whatever other underground ore or other dump or apex ore blocks Liberty would have developed from already-identified secondary targets during those two years, it probably would have taken more than three years to mine and centrifuge mill all of it, during which time the 300-ton per day mill would be permitted and built.

75. In 2002, during the same period during which the Forest Service was refusing to allow rebuttal sampling of the Klamath Mine area for the contest, the Forest Service approved Liberty's driving of a 300-foot crosscut to the Six O'clock underground (Reverse Dip vein) target. JA-104, JA-105. It approved this plan in May 2003 employing a categorical exclusion from further environmental documentation, allowing the construction of a large waste dump/staging pad adjacent to the adit, located close to



PE-2-75

the Stevens Gulch channel. But in the process, the Forest Service raised issues regarding short road construction for access, a creek crossing and slope issues, despite the fact that I had stamped the plan and the stability of the grading elements as a California Certified Engineering Geologist. Their forcing Liberty to move the adit site downslope resulted in increasing the crosscut length from about 100 feet to about 300 feet (Liberty never proceeded with the project because the approval did not include mining and milling of the ore once we got to the vein.) Accessing the Six O'clock deposit underground from the private Mt. Laurel parcel would not have been so problematic. However, the 2003 approval confirms that permitting the work to access the Six O'clock underground target would not have posed insurmountable problems in 1990-91, had the Forest Service not simply stopped everything for those years.

76. None of these variations in the type of contemplated milling operations, and none of the various ore reserves and targets discussed here, were outside of the area of potential surface disturbance (38 acres) of the "unmitigated," mid-1989 Liberty mining plan of operations that was the subject of the FWS July 1990 biological opinion. JA-35 and JA-111 (Ranger Lee's 1992 confirmation that FWS had cleared that 38-acre disturbance plan).

77. Under each of the scenarios developed and documented on the JA-191 spreadsheets and above revised discussion, Liberty had the reasonable expectation of profitable operations when its initial mining and mill construction plans were submitted to and approved by the Forest Service in 1989, when Liberty assembled its equipment and crew and began operations, and thereafter during the years when the operations were stopped by the Forest Service.

Subscribed and sworn before me by ____________________ on this 29 day

of January, 2008.

____________________ Notary Public, ~~State of California~~

My commission expires ____________________ T.L.

See Attached Notarial Certificate

# CALIFORNIA JURAT WITH AFFIANT STATEMENT

☑ See Attached Document (Notary to cross out lines 1–6 below)
☐ See Statement Below (Lines 1–5 to be completed only by document signer[s], *not* Notary)

1
2
3 T.L.
4
5
6

Signature of Document Signer No. 1

Signature of Document Signer No. 2 (if any)

State of California

County of Placer

Subscribed and sworn to (or affirmed) before me on this

29th day of January, 2008, by
Date Month Year

(1) Thomas P. Ferrero,
Name of Signer

proved to me on the basis of satisfactory evidence be the person who appeared before me (.) (,)

(and

(2) ,
Name of Signer

proved to me on the basis of satisfactory evidence be the person who appeared before me.)

Signature
Signature of Notary Public

TYLER A. LEHRER
COMM. # 1710472
NOTARY PUBLIC-CALIFORNIA
PLACER COUNTY
My Comm. Expires DEC. 12, 2010

Place Notary Seal Above

## OPTIONAL

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Further Description of Any Attached Document**

Title or Type of Document: Affidavit of Thomas P. Ferrero

Document Date: 01/29/2008 Number of Pages: 44

Signer(s) Other Than Named Above: -none

RIGHT THUMBPRINT OF SIGNER #1
Top of thumb here

RIGHT THUMBPRINT OF SIGNER #2
Top of thumb here

©2007 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org Item #5910 Reorder: Call Toll-Free 1-800-876-6827