**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| ALFRED ALOISI, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 95-650L |
| | ) | Hon. Lawrence S. Margolis |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFFS' PROPOSED FINDINGS OF**
**UNCONTROVERTED FACT**

In support of their Motion for Summary Judgment in the captioned case Plaintiffs hereby submit the following proposed findings of uncontroverted fact:

1. Alfred L. Aloisi ("Aloisi") first became involved in mining in Eddy Gulch, in Sawyers Bar California, in 1980. Aloisi Affidavit, Plaintiffs' Exhibit ("PE") 1, at ¶ 1 ("Aloisi PE-1:1").

2. Aloisi spent time learning about Eddy Gulch and the history of its mines from those who had worked there and who owned mining claims there, including A.R. Patterson, Ruth Markon and others. Aloisi PE-1:1-3, 5.

3. Aloisi and others conducted placer mining operations in Eddy Gulch in the 1982-1985 period at a site immediately downstream from the property involved in this case, known as the Double Eagle or E T Placer Pit. Aloisi PE-1:6; JAs-12, 35 (map location).[1]

4. Aloisi and his associates acquired interests in the property involved in this case through lease and purchase agreements with A.R. Patterson, Ruth Markon and other owners of

[1] "JA-[No.]" refers to the tab-numbered documents found in the Joint Appendix to the Joint Statement of Facts.

the unpatented mining claims and two private parcels in Eddy Gulch that are the subject of this case. Aloisi PE-1:7-9; JA-18.

5. Aloisi and his associates paid the pre-existing owners of the unpatented mining claims and two private parcels in Eddy Gulch that are the subject of this case in excess of $220,000 to acquire title to, and to control, the unpatented mining claims and two private parcels in Eddy Gulch that are the subject of this case. Aloisi PE-1:9; JA-18.

6. When A.R. Patterson's underlying claims were lost upon his death by a failure to make required annual federal claim filings, Aloisi protected the property position against rival locators by locating new claims on the same ground; after restaking and locating new claims using the former claim names in 1985, he honored the pre-existing lease-purchase arrangements for the earlier Patterson claims with Patterson's estate and intervening interest owners, including Robert Pincombe and Pincombe's Mara Ventures. Aloisi PE-1:9, 11; Thomas P. Ferrero ("Ferrero") Affidavit, Plaintiffs' Exhibit ("PE") 2, at ¶ 13 ("Ferrero PE-2:13"); JA-18.

7. Aloisi and his associates acquired significant geological, sampling, assay, metallurgical and other data from prior owners and lessees of the properties, from historic production records and reports from before World War II, from New Cinch in the 1970s (which did sampling and volume computations of both the mine dumps and the apex outcrops, and did core drilling), from Mega Gold in the mid-1980s (which did more sampling of dumps and apex deposits, and core drilling), and from others. Aloisi PE-1:3-5, 7, 10, 12; Ferrero PE-2:9; e.g., JA-6 through 9, JA-12 through 14, PE-3/A-1,[2] PE-4/A-2, PE-15/A-80, PE-17/A-81-s.

[2] "A-#" references are to the plaintiffs' document production index. These references are provided for certain exhibits to Plaintiffs' Motion for Summary Judgment, along with their "PE-" numbers. These exhibits may be referred to by their "A-" numbers (rather than their "PE" numbers) in the Aloisi and Ferrero Affidavits submitted as PE-1 and PE-2, respectively.

8. As their initial development work, Aloisi and his associates rehabilitated and extended the historic road network in Eddy Gulch facilitate movement of crews, equipment and ore in and around Eddy Gulch. See JA-35, "Reconstructed Existing Roads."

9. In 1989, Aloisi and the late plaintiff Donald W. Goodman organized Liberty Mining, Inc. ("Liberty"), to continue and conduct these operations, with the understanding that Aloisi would contribute the mining properties and be on-site, managing operations, while Goodman would contribute equipment and capital as they developed the property together. JA-19; Aloisi PE-1:13-15.

10. Goodman and Aloisi agreed that another company Goodman had previously formed, Energel, Inc., would be the holding company for their mining properties, including the two private parcels in Eddy Gulch when the lease-purchase of Patterson's and other interests in those parcels was completed. Aloisi PE-1:14.

11. Aloisi had moved claim ownership into Jefferson State Exploration and Development Company for a development financing plan that did not go through, and then moved claim ownership out of Jefferson State so that he could contribute it later to Liberty and his business relationship with Don Goodman. Aloisi PE-1:13-15.

12. In 1988, after years of study of the mineral deposits on the property in question, and years of work acquiring the rights, Aloisi and his colleagues and business associates initiated mine development work in Eddy Gulch. Aloisi PE-1:13-16; JA-6, and JAs-7-9, 12-14.

13. With the road network largely re-established, and with years of exploration, sampling and identification of the initial apex vein deposits and adjacent historic mine dump in hand, Liberty submitted plans of operations to the Forest Service to begin mining operations. JAs-20-28, 31-33, 35-36, 40, 43.

14. Liberty's plan and intention was to start operations without seeking outside capital or attempting any stock offering, starting production by running mine dump ore and apex ore (which had only to be loaded, or excavated and loaded, and so involved minimal mining cost), processed initially through the gravity separation system already in place at the E T Placer Pit, with the "tails" from gravity separation to be saved for later ball mill feed. Aloisi PE-1:15; Ferrero PE-2:14, 63 and 67; JAs-31-32, 36, 40.

15. Liberty also made plans to acquire and erect a gravity separation, flotation mill as the development progressed. JAs-52, 53, 60; Ferrero PE-2:63.

16. It was the judgment in 1989 of Liberty and Ferrero that the mine dump and apex ore was $40/ton material, that is, material that would yield that value of recovered gold using gravity separation milling, with a return substantially in excess of the cost of loading and hauling the dump deposits, and of excavating, loading and hauling the apex deposits. Aloisi PE-1:15-16; Ferrero PE-2:14, 63 and 67.

17. It was Liberty's longer-term plan in 1989 that the proceeds from mining and gravity milling the dump and apex ore would fund the next stages (or attract outside capital to fund the next stages) of development, which would involve accessing and mining specific, identified underground ore bodies connected to the underground workings of several of the historic mines in Eddy Gulch on the claim group under Liberty's control, including certain ore bodies identified in underground locations where mining ceased decades before due to litigation over ownership, or the then-controlled low gold price. Aloisi PE-1:15; Ferrero PE-2:5, 11, 14, 16; PE-3/A-1 and PE-5/A-95 (as to litigation over underground reserves); JA-187; PE-15/A-80; JA-9 (drill holes analyzed).

18. Ferrero assembled, compiled and analyzed the sampling, assay, ore volume and quality, metallurgical and mill testing and related data available to Liberty in 1989-90, and certain data acquired later but pertaining to the same dump, apex and underground gold deposits identified as development targets in Liberty's 1989-90 plans of operations, and calculated Liberty's gold recovery rates from mining and milling those deposits against the costs of that mining and milling, under several alternative combinations of mining scenarios (which dump, apex and underground deposits are mined) and milling scenarios (solely gravity separation, or gravity and flotation milling, or gravity/flotation/vat cyanidation milling). Ferrero PE-2:9, 11, 12, 48-50, 55, 57-62, 66-75; PE-15/A-80; PE-17/A-81-s, PE-18/A-114; JAs-188-193.

19. Per Ferrero's several alternative calculations and their supporting data and explanations, Liberty would have realized a profit from operations delineated in its 1989 plans of operations, ranging from $1.3 million, applying the most conservative calculations to the smallest subset of identified and targeted mineral deposits, to $24.1 million, applying reasonable but less conservative calculations to a larger set of identified and targeted mineral deposits, in larger-scale operations contemplated by and within the capacity of Liberty in 1989. Ferrero PE-2:49, 73; JA-191: 1573-77, Spreadsheets 5-9.

20. Ferrero's Spreadsheets set out the mineral deposit, grade and quantity, metallurgy and milling recovery, and cost bases for the operation planned and intended by Liberty in its 1989 all-phase plan of operations filed with the Forest Service and partially approved in November 1989, and calculate a profit of $21.9 million from that operation. Ferrero PE-2:49, which is based on PE-15/A-80, PE-17/A-81-s, and PE-18/A-114; and JAs-188-193, which are based in part on other assay, volume, cost and other relevant sources of record, including JAs-6-

8, 52, PE-3/A-1, PE-4/A-2 as well as other referenced assays, metallurgical, volumetric and other data described in Ferrero's sources. Ferrero PE-2:50-77.

21. Liberty's property position was a series of unpatented lode and placer mining claims, and two private parcels, stretching across the ground that contained the dumps and old workings of the primary historic gold production in Eddy Gulch. JAs-35, 188; *see also* Joint Statement of Facts ("JSOF") ¶s 1-2, 5, 8.

22. In the Nineteenth Century this property position was a central part of what was organized by the miners of that time as the Liberty Mining District. JSOF-1.

23. The two private parcels in Liberty's property position were a patented lode claim known as the Mountain Laurel Mine (or Mt. Laurel parcel), which contains the entrance tunnels accessing the underground workings of one of the chief mines of the Liberty Mining District, and the patented associated mill site known as the Mountain Laurel Millsite or Rollin. JSOF-5.

24. The unpatented mining claims in Liberty's property position were located under the General Mining Laws of the United States, 30 U.S.C. § 22 et seq. ("the Mining Law"), on federal public lands open to the operation of the Mining Law (JSOF-4, 8), that are part of Klamath National Forest, administered by the Forest Service of the U. S. Department of Agriculture ("Forest Service") (JSOF-4).

25. In 1989 Liberty submitted to the Forest Service, and the Forest Service approved, mining plans of operations consistent with the Forest Service's regulations governing operations under the Mining Law, 36 C.F.R. Part 228, Subpart A.

26. Liberty's approved plans of operations included Liberty's development work for the next full year: a June 1989 approval of certain work through the summer and fall of 1989; and a

November approval of the first phases of Liberty's "all-phase" plan of operations, into the next summer. JA-26 (June plan approval); JA-45 (November plan approval).

27. After receiving approval of its mining plan of operations in June 1989, Liberty operated under that plan, and under the November 1989 approval of phases of its October 1989 supplemental plan (JAs-40, 45), using equipment acquired by Liberty for the operation (Aloisi PE-1:17) that cost in excess of $800,000 to acquire or equip for use in Eddy Gulch (PE-20).

28. Liberty largely completed road rehabilitation and construction, bringing in equipment, exposing additional lengths of the apex ore and excavating and hauling both apex and dump ore to Liberty's approved mill location. Aloisi PE-1:15, 17.

29. In 1989, after on-site consultations with Forest Service staff, Liberty, cooperating with the Forest Service's biologist, had removed from its all-phase plan (both the approved and the pending phases of it) those operations at the west end of its property position closest to the location the Forest Service had mapped as the site of the nest of a Northern Spotted Owl ("owl") pair. Aloisi PE-1:19, 20; Ferrero PE-2:20-22; JA-35 (pre-mitigation September 1989 all-phase plan map); PE-7/A-141 (mitigated October 1989 all-phase plan maps, omitted from JA-40).

30. At this same time in 1989, Liberty also deleted other components of its earlier planned operations as impact mitigation, to avoid issues with the Forest Service in approval of the all-phase plan of operations, chiefly by removing a substantial portion of the apex corridor cut previously proposed to obviate Forest Service concerns about mining on steep slopes and near or above stream crossings. Aloisi PE-1:20; Ferrero PE-2:20; JA-35; PE-7/A-141.

31. Per this informal cooperation under the Forest Service's Spotted Owl Habitat Area ("SOHA") management program, Liberty had removed from its plan those aspects of its

proposed mining operation that would might have required any mitigation under the Forest Service's 1989 owl protection standards.

32. This mitigation, both pertaining to the operations and sites that might affect the nesting owls and pertaining to other plan elements apart from owl concerns, was in Liberty's October 1989 all-phase plan of operations, the first parts of which the Forest Service approved in November 1989. Aloisi PE-1:19, 20; Ferrero PE-2:20-22; JA-35 (pre-mitigation September 1989 all-phase plan map); PE-7/A-141 (mitigated October 1989 all-phase plan maps, omitted from JA-40).

33. Liberty worked under these 1989 approvals continuously until early January 1990, when the Forest Service ordered work to stop (JA-51, "the Stop Work Order"), on the basis that the State of California's State Historic Preservation Officer ("SHPO") found the Forest Service's own pre-approval cultural resources work (the Forest Service's "the Arch Study") to be inadequate. JA-47.

34. At the time of the Forest Service's Stop Work Order, Liberty had only completed one month of the approved work that the Forest Service expected it would take seven months for Liberty to complete, based on the "termination" date the Forest Service provided in the November 1989 approval for the completion of the approved phases of Liberty's plan. JA-46.

35. Liberty did not challenge the Stop Work Order, however, and it cooperated with the Forest Service in determining the next steps to get operations re-started. Ferrero PE-2:27.

36. Given the Forest Service's projection that the approved work would take seven months to do (in light of the "termination date" of July 31, 1990 in its November approval letter, JA-45:472), Liberty had six months of approved work (a half year's development operations) approved but not undertaken at the time of the Stop Work Order.

37. The listing of the owl as a threatened species had already been formally proposed at the time Liberty submitted its all-phase plan of operations. JSOFs-19-23.

38. Upon listing, Section 7 of the Endangered Species Act, 16 U.S.C. § 1536 would require the Forest Service to consult with the U. S. Fish and Wildlife Service ("FWS") and get a "biological opinion" from FWS whether various Forest Service actions in Klamath National Forest (and other northwestern national forests) would jeopardize the listed species, and this requirement was likely to apply to the approval of the un-approved balance of Liberty's all-phase plan of operations.

39. In March 1990, the Forest Service published a notice of its intent to prepare an environmental assessment on Liberty's all-phase plan of operations (JA-48), a key step in the Forest Service process for approving Liberty's all-phase plan of operations.

40. The Forest Service, including Klamath National Forest, prepared the necessary biological assessments for its Section 7 consultation with the FWS even before the owl was listed. JSOFs-23 (proposed listing), 37, 45 (listing). Each national forest in owl country, including Klamath National Forest, prepared programmatic biological evaluations covering both sold and planned timber sales, and all other projects and permits in owl habitat. JA-76. Absent such coordination and completion of consultation, the Forest Service's 1990 timber harvests and sales in all forests in the owl's range were at risk of having to stop.

41. With close inter-agency planning and cooperation, the Forest Service initiated Section 7 consultation for Klamath National Forest before the owl was even listed (JA-76), and the FWS issued its biological opinions for Klamath National Forest to the Forest Service less than a month after the owl's listing was published. JA-80.

42. In June 1990, Klamath National Forest included the Liberty Mine all-phase plan of operations in its programmatic biological assessment, and in its forest-wide consultations with the FWS after the listing of the owl as threatened. JA-76.

43. In its biological assessment and for purposes of its consultation with the FWS, the Forest Service tendered Liberty's pre-mitigation September 1989 all-phase plan, or a description of it, rather than Liberty's mitigated October 1989 all-phase plan of operations. Aloisi PE-1:30; Ferrero PE-2:31; JAs-76, 111:1084.

44. Liberty did not know when or in what form the Liberty plan of operations was submitted for FWS consultation under Section 7 of the Endangered Species Act; the Forest Service did not supply either the programmatic biological assessment or consultation letter involving Liberty to Liberty during the consultation. Aloisi PE-1:30; Ferrero PE-2:31.

45. After the Forest Service Stop Work Order (JA-51) based on the Forest Service's cultural resources clearance that the Forest Service itself treated as inadequate, Liberty informed the Forest Service, and the Forest Service was aware, that Liberty did not intend to pay for a second "Arch Study" before it knew the results of the Forest Service's consultation with the FWS on the owl, as any change in the location or type of mining operations necessary to abide by the FWS's jeopardy opinion on the owl might require a third Arch Study. Aloisi PE-1:27; e.g., JA-88: 823.

46. Between July 23, 1990 and Liberty's receipt of the District Ranger's March 10, 1992 letter (JA-111), no federal official wrote or told Liberty that the FWS had rendered a biological opinion to the Forest Service regarding the owl and Liberty's mining plan of operations. Aloisi PE-1:31. Neither the FWS nor the Forest Service provided Liberty the opinion. Aloisi PE-1:31. Liberty was not operating, awaiting word on the owl.

47. Notwithstanding recurring requests and inquiries by Liberty of the Forest Service regarding the owl situation, for over a year and a half no agency official advised Liberty, even though it was an "applicant" under the FWS consultation rules, that there was a biological opinion.

48. During the period from Spring 1990 through February 1992, Aloisi routinely asked the Forest Service District Ranger's Office personnel he encountered whether the Forest Service had heard from the FWS regarding the owl and Liberty's plan, but was never told of the existence of the biological opinion of July 23, 1990, covering Liberty, and was instead informed that the Forest Service did not know from the FWS how the owl might affect Liberty. Aloisi PE-1:32, 36; JA-88: 823; JA-90:828.

49. During the summer of 1990 and thereafter, the Forest Service implemented the timber sales cleared by the FWS in its July 1990 biological opinions that included "Liberty Mine" in the consultation, including allowing the harvesting of 194 acres of timber in the "Evening Star" timber sale within SOHA 1024, the area of concern for the same owl pair affecting Liberty's plan of operations. Aloisi PE-1:32; Ferrero PE-2:34; JA-66 (Evening Star sale environmental assessment), JA-77:754; JA-157:1298 (description of harvest and location).

50. Forest Service's January 1990 Stop Work Order effectively prevented Liberty from completing the approved mine development work before the July 31, 1990, "termination date" set in the November 1989 approval. JA-45.

51. Liberty timely sought an extension of that termination date in July 1990 (JA-79), and the Forest Service approved that renewal or extension request in late August 1990 (JA-82), resetting the "termination date" of the November 1989 approval to December 31, 1990.

52. Still awaiting word on the owl, Liberty had not funded the Arch Study, and no more of the approved mine development work was being done in the second half of 1990, so Liberty filed a second plan approval renewal or extension request in September 1990 (JA-84), and the Forest Service granted that extension in November 1990 (JA-88) through March 31, 1991.

53. Still without having been able to do any of a half-year's approved development work on the mine, as the next "termination" date approached, on March 11, 1991, Liberty filed a third extension request. JA-94.

54. The Forest Service never acted on this extension request.

55. While Liberty's third extension request (covering the approved phases of its all-phase plan of operations) was pending in March 1991, the District Ranger's Mineral Officer visited Liberty on-site and orally authorized Liberty to proceed with milling the logs lying on the ground next to the roads that had been widened and built during the approved Liberty operations up through January 1990, so that they would not rot where they were when the Stop Work Order was issued, and authorized the burning of slash piles and cleanup work, and the brushing of the road from Rollin to the Anna Johnson Mine for the purpose of moving the core drill up to the proposed drill sites while awaiting the owl decision. Aloisi PE-1:37-39.

56. The Forest Service did not authorize any work that could constitute mining or generate any income from the property in this March 1991 oral authorization.

57. Under this oral authorization, Liberty was operating, conducting the limited cleanup, road work and timber salvage operations from March 21, 1991, and across March 31 and April 1, and after what the Forest Service later (see paragraph 69 below) labeled the supposed termination date of its plan approval.

58. Liberty continued operating in this limited fashion into July 1991.

59. Liberty paid Salmon Mountain Forestry $40,000 to do the timber salvage work. Aloisi PE-1:39.

60. The funds to pay Salmon Mountain Forestry came from bartering Liberty's timber milling equipment for the milled lumber that resulted (PE-20, Item 22), and the funds to pay Winthrop and Associates to nearly complete the Arch Study ($12,000) (JAs-100, 105) and pay the crew doing the authorized road work came from mortgaging Liberty's patented properties for operating capital ($250,000) (JA-115). Aloisi PE-1:39.

61. Liberty operated under the Frey authorization from March 1991 until July 11, 1991, when the District Ranger's new Mineral Officer visited Liberty on-site and orally ordered that all work immediately stop. Aloisi PE-1:40.

62. Liberty stopped work, and demanded that the Mineral Officer put the oral order in writing. Aloisi PE-1:40.

63. Months passed after the Mineral Officer orally halted work in July 1991, although Liberty received no written confirmation of the oral stop work order or any word on the owl.

64. The Forest Service record shows that it sent a letter dated August 1991 to Liberty (JA-108), but the record also shows that it was returned to the Forest Service undeliverable as addressed. JA-109:1066.

65. Liberty did not receive this letter until it was hand-delivered to Aloisi or his wife then, plaintiff Candis Blanchard Aloisi, at a meeting February 11, 1992. Aloisi PE-1:42-44; JA-109 and PE-12/A-58.

66. Two full years had passed, from January 1990 to January 1992, since Liberty was barred from mining, and the Forest Service had still provided Liberty no information on what if anything the Forest Service might have heard from the FWS on how the designation of the owl

might affect Liberty's plan of operations, both the approved and later phases of the all-phase plan of operations.

67. Before it ever acknowledged that there was a FWS opinion on the owl and Liberty's plan, at a meeting in February 1992 requested by Liberty to discuss what the situation was and when Liberty could go back to work (see JA-91), the Forest Service demanded that Liberty submit a new plan of operations to clear up the Forest Service's "confusion" (JA-111) about what had and had not been approved, and what Liberty did and did not currently propose to do.

68. With Liberty's agreement to submit a new plan of operations document in hand, the Forest Service provided Liberty its August letter documenting the oral on-site order countermanding the March 1991 authorization to conduct limited maintenance operations. Aloisi PE-1:44; PE-12/A-58.

69. After Liberty hired counsel to look into the stall, and counsel inquired of the Forest Service in February or early March 1992, and the Forest Service agreed to look into the status of the owl. Aloisi PE-1:46, 47; Ferrero PE-2:42.

70. In its letter of March 10, 1992, the Forest Service for the first time advised Liberty that the FWS "determined that the [September 1989 pre-mitigation plan of operations] project could proceed as submitted," but at that time the Forest Service did not tell Liberty when the FWS had made that determination nor did it provide Liberty a copy of the biological opinion. JA-111:1084.

71. Between March 1990 when it gave notice it was preparing an environmental assessment on Liberty's all-phase plan of operations (paragraph 39 above) through its March 1992 acknowledgement of the existence of a biological opinion, the Forest Service never

prepared any further work product toward preparation of an environmental assessment on approval of Liberty's all-phase plan of operations.

72. In the March 1992 letter, the Forest Service notified Liberty of its position that Liberty's prior plan approval had expired almost a year before, at the end of March 1991. JA-111:1083.

73. The Forest Service took the position that the plan approval expired March 31, 1991, without acting on, or acknowledging the pendency of, Liberty's approval renewal and extension request that had been timely filed during March 1991, a year before.

74. After Liberty complied with the Forest Service's demand that it file a restated all-phase plan of operations (JA-111:1084 – the requirement; JA-114, Liberty's restated 1989 plan, dated April 1, 1992), the Forest Service acted in May 1992 to reinitiate Section 7 consultation with the FWS without advising Liberty it intended to do so, or consulting with Liberty about the need to do so. JA-118 (District to Forest recommendation); JA-119 (Forest to Region recommendation); JA-120 (letter notifying Liberty, which still, JA-120:1159, covers up the fact the earlier biological opinion was now almost two full years old).

75. The Forest Service determined that the April 1, 1992, plan had to be put through formal consultation with the FWS all over again before taking any other action toward approving this plan. JA-118.

76. In connection with its 1992 reinitiation of consultation with the FWS, the Forest Service did not prepare any biological assessment before initiating consultation (JA-163:1342, recounting the history of the consultation); the equivalent of a biological assessment was not done until April 1993 and it concluded that the April 1992 Liberty plan of operations was "not

likely to adversely affect the northern spotted owl or adversely modify its critical habitat." JA-163:1343.

77. Liberty appealed the District Ranger's decision to reinitiate consultation in July 1992. JA-121; Aloisi PE-1:55.

78. Throughout the appeal, Liberty did not know that the Forest Service official deciding the appeal had taken action to reinitiate consultation. JAs-118-119.

79. In August 1992 Liberty learned that the FWS biological opinion on the Liberty all-phase plan of operations had been signed in July 1990 (JA-121:1168); however, the Forest Service still did not provide Liberty a copy of the opinion, which Liberty had to request in writing. JA-128.

80. The FWS later expressed surprise and concern about what had transpired, and disclosed the chronology of its involvement with the Liberty consultation promptly upon inquiry. JA-136.

81. Also unknown to Liberty while its appeal was pending, the FWS was proposing to reject the Forest Service's request to reinitiate consultation on Liberty's April 1, 1992, plan because it proposed no operations or impacts different from those operations and impacts that the FWS had cleared in the July 1990 "no jeopardy" biological opinion. JAs-122, 133, 136 (entries for August 31, 1992 and October 6, 1992).

82. The Forest Service scheduled meetings with the FWS to insist that the Liberty plan was a new plan, different from the 1989 plan among other things, and successfully pressured the FWS into "accepting" the reinitiation of consultation. JA-136.

83. Once the FWS had "acted," accepting the new consultation, the Klamath National Forest Supervisor canceled the "oral presentation" that had been scheduled between the

Supervisor and Liberty, and dismissed Liberty's appeal as moot without addressing any of the merits (or lack of merits) of what the agency had done from July 1990 through October 1992. JA-134.

84. Liberty filed a second-level appeal on November 5, 1992, seeking an objective review. JA-143.

85. In the second-level appeal, the Regional Forester also failed to address any aspect of the merits of the agency's handling of Liberty's plan, like the first-level appeal.

86. The Regional Forester's decision erroneously stated that "the project was allowed to proceed as submitted." JSOF-94; JA-145.

87. The Regional Supervisor's action wholly avoided both issues it might have righted: dealing with the approved phases of Liberty's plan that were never allowed to proceed; and dealing with the agency's years of inaction on the rest of Liberty's 1989 all-phase plan of operations, both of which were even then being further stalled by the reinitiation of consultation that was the direct subject of the appeal.

88. At this stage Liberty was broke, it had lost the Mountain Laurel property to foreclosure (JA-115), and continued to face a hostile agency, so Liberty leased the property to the parties who had in the meantime acquired the Mountain Laurel parcel from the foreclosing lender. Aloisi PE-1:66-68.

89. Even as the second-level appeal was pending, agency officials continued the reinitiated consultation.

90. The Forest Service knew that Liberty had leased the property, and that the lessee had different plans for where and how it would initiate operations on the Liberty property. JA-159 (Forest Service meeting with WAZCO on-site to evaluate "May adit" proposal).

91. Nonetheless, the reinitiated consultation on the effects of the April 1, 1992 plan of operations on the owl proceeded. JAs-150, 157.

92. In February 1994, more than 4 years after Liberty had been ordered to stop work, the FWS concluded: (a) that reinitiation had not been required, restating its conclusion of July 1990 that Liberty's all-phase plan of operations could proceed as submitted (JA-163:1343); and (b) that the April 1992 plan did not propose operations or impacts greater than, or in any different locations from, the 1989 all-phase plan. JA-163.

93. In approving the mining plan of operations of Liberty's lessee Liberty Consolidated Mines, Inc. in critical habitat for the Northern Spotted Owl in August 1996 (PE-16/A-189, and *see* JA-182), the Forest Service relied solely and entirely on the February 1994 biological opinion (JA-163) that the FWS rendered in response to consultation on Liberty's April 1992 plan of operations; the Forest Service prepared no biological assessment and engaged in no consultation with the FWS regarding the Liberty Consolidated Mines, Inc., plan of operations.

94. The Forest Service has never imposed, in any mining plan of operations permitting decision in Eddy Gulch, any stipulations or conditions required for owl protection and preservation: (a) Liberty's two plan of operations approval documents contain no such conditions, JAs-26, 46; and (b) the plan of operations documents for Liberty's lessee "LCM," when its plan of operations was finally approved, contained no such conditions. JA-182; Aloisi PE-1:70; PE-16/A-189.

95. In 1989, Liberty had voluntarily mitigated – removed from its plan of operations – all work in the area originally identified as SOHA 1024, later the Habitat Conservation Area ("HCA") of the "Eddy Gulch owl pair" of concern throughout this whole affair. This area northwest of the Liberty operations was in 1989 and remains the area in which operations were

and are likely to be constrained, if not prohibited, in order to protect the owl consistent with interagency standards.

96. No one among the various FWS and Forest Service committees, task forces and reviewers ever found any reason for any revision to the mining plan – in 1990 the FWS "determined that the project could proceed as submitted" (JA-111), and the same conclusion came out of a June 1992 "Review Team" approval, an August 1992 "Oversight Committee" Approval, a January 1993 "Conservation Group" Approval, and the April 1993 Forest Service biological assessment, all done during the course of the reinitiated 1992-1994 consultation and finally in the February 1994 FWS biological opinion. See JA-163:1343-44.

97. Neither the FWS nor the Forest Service in 1989 or 1994 ever identified any reason to modify Liberty's all-phase plan of operations in any respect in order to protect the owl, and the entirety of what was required under the Endangered Species Act to protect the owl from Liberty's operations was accomplished in cooperative discussions in mid-1989 resulting in voluntary mitigation by Liberty in the all-phase plan in submitted in the fall of 1989.

Dated: February 6, 2008

Respectfully submitted,

s/ Lawrence G. McBride
Lawrence G. McBride
FOLEY & LARDNER LLP
3000 K St., N. W., Suite 500
Washington, D.C. 20007-5143
Telephone: (202) 672-5300
Facsimile: (202) 672-5399

*Attorney for Plaintiffs*