**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| ALFRED ALOISI, et al. | ) | |
| Plaintiffs, | ) | No. 95-650L |
| v. | ) | Judge Lawrence S. Margolis |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION TO DISMISS OR, ALTERNATIVELY, FOR SUMMARY JUDGMENT**

Pursuant to Rule 12(h)(3) or, alternatively, Rule 56(b) of the Rules of the Court of Federal Claims (RCFC), Defendant, the United States, moves for dismissal or, alternatively, for summary judgment on the takings claim raised in Plaintiffs' Complaint, filed September 27, 1995 (Dkt. No. 1).

According to Plaintiffs, the United States temporarily took their unpatented mining claims, as well as two patented parcels known as the Mountain Laurel Mine and the Rollin Mill Site (also known as the Rollin Townsite), by failing to timely inform Plaintiffs of a Biological Opinion, which the Fish and Wildlife Service ("FWS") issued on July 23, 1990 (the "Biological Opinion"). See Compl., ¶¶ 65, 66. Pursuant to § 7 of the Endangered Species Act ("ESA") (16 U.S.C. § 1536), the Forest Service initiated consultation proceedings with FWS regarding whether the continued existence of the northern spotted owl would be jeopardized by various proposed projects in the Klamath National Forest ("KNF"), including certain activities planned by plaintiff Liberty Mining, Inc. ("Liberty Mining," or "Liberty"). See Compl., ¶ 30. The Biological Opinion concluded that the proposed projects would not jeopardize the continued existence of the northern spotted owl, provided certain reasonable and prudent measures, among

other mandatory terms and conditions, were implemented. Plaintiffs allege that the United States failed to inform them of the Biological Opinion until March 1992, preventing them from mining and producing "free-milled gold doré for sale . . . in or before January 1991." Compl., ¶ 44; see also Compl., ¶ 45.

Plaintiffs also complain that after the United States informed them of the Biological Opinion, the Forest Service wrongfully initiated a consultation proceeding with FWS (even though such process is required by ESA §7). See Compl., ¶¶ 48, 49. Plaintiffs allege that this second consultation with FWS violated federal regulations and perpetuated the temporary taking until February 1994, when the consultation ended. See Compl., ¶¶ 69-72.

Plaintiffs' takings claim should be dismissed for several reasons. First, the Court lacks jurisdiction to hear claims that are not ripe. It is well-settled that a takings claim is ripe only when the claimant has sought agency approval of a proposed course of action, the agency is given a meaningful opportunity to review the proposal, and the agency prevents the claimant from undertaking the proposed action. Plaintiffs, however, never submitted a complete plan of proposed operations for the Forest Service's review – despite repeated attempts by the Forest Service to obtain such a plan from Plaintiffs. Plaintiffs' claim alleging an interference with production activities, therefore, is not ripe. Moreover, Plaintiffs cannot show the requisite extraordinary delay to establish a temporary regulatory taking.

Second, Plaintiffs' takings claim is ground on allegations of omissions and unlawful actions by the United States, which are torts over which this Court lacks jurisdiction. Moreover, Plaintiffs' failure to identify any affirmative governmental act giving rise to a taking, by itself, is grounds to grant Defendant summary judgment.

Third, Plaintiffs did not acquire an interest in the Mountain Laurel mine (Mineral Lot 45-A) and the Rollin Mill Site (Mineral Lot 45-B) until May 1991, well after the alleged date of taking of July 23, 1990. Consequently, these private lots should be dismissed from this action.

Alternatively, summary judgment should be granted, because Plaintiffs cannot show the requisite Penn Central factors to establish a regulatory taking. See Penn Central Transp. Co. v. New York City, 438 U.S. 104, 124 (1978). Specifically, Plaintiffs cannot show that they suffered any economic harm from the alleged governmental action or inaction, because the only economic harm they allege is speculative lost profits (especially since the gold remains in the ground). Plaintiffs also were not deprived "of all or substantially all economically viable use of their property," Walcek v. United States, 44 Fed. Cl. 462, 467 (1999), because Plaintiffs leased the mining claims to third parties during the alleged takings period. In addition, Plaintiffs cannot show that any governmental action interfered with any reasonable investment-backed expectations, because an extensive regulatory regime protecting archaeological resources and the northern spotted owl was in place long before Plaintiffs acquired any interest in the subject property. An analysis of the character of the governmental action (or inaction) also shows that no taking occurred. Accordingly, application of the Penn Central factors shows that no taking has occurred, entitling Defendant to summary judgment.

For the reasons stated herein and in its accompanying Memorandum, Defendant respectfully requests that the Court grant its motion to dismiss or, alternatively, grant Defendant summary judgment.

//
//
//

Respectfully submitted,

RONALD J. TENPAS
Assistant Attorney General
Environment & Natural Resources Division

/s/ Bruce K. Trauben
BRUCE K. TRAUBEN
Trial Attorney
Natural Resources Section
Environment & Natural Resources Division
U.S. Department of Justice
601 D Street, NW
Washington, D.C. 20004
(202) 305-0238 (phone)
(202) 305-0506 (fax)

WILLIAM J. SHAPIRO
Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Div.
501 I Street, Suite 9-700
Sacramento, CA 95814-2322

OF COUNSEL:
ROSE MIKSOVSKY
U.S. Department of Agriculture
Office of General Counsel
33 New Montgomery St., 17th Fl.
San Francisco, CA 94105-3170

Dated: February 6, 2008

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| ALFRED ALOISI, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | No. 95-650L |
| | ) | |
| v. | ) | Judge Lawrence S. Margolis |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS**
**MOTION TO DISMISS OR, ALTERNATIVELY, FOR SUMMARY JUDGMENT**

RONALD J. TENPAS
Assistant Attorney General
Environment & Natural Resources Division

BRUCE K. TRAUBEN
Trial Attorney
Natural Resources Section
Environment & Natural Resources Division
U.S. Department of Justice
601 D Street, NW
Washington, D.C. 20004
(202) 305-0238 (phone)/(202) 305-0506 (fax)

WILLIAM J. SHAPIRO
Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Div.
501 I Street, Suite 9-700
Sacramento, CA 95814-2322

OF COUNSEL:
ROSE MIKSOVSKY
U.S. Department of Agriculture
Office of General Counsel
33 New Montgomery St., 17th Fl.
San Francisco, CA 94105-3170

Dated: February 6, 2008

## TABLE OF CONTENTS


I. STATEMENT OF THE CASE . . . . . 1

A. INTRODUCTION . . . . . 1

B. FACTUAL BACKGROUND . . . . . 4

1. Liberty Mining, Inc.'s Plans of Operations . . . . . 4

a. Liberty Mining's June 1989 Plan of Operations . . . . . 4

b. September 28, 1989 Proposed Plan of Operations . . . . . 6

c. October 25, 1989 Proposed Plan of Operations and November 27, 1989 Approval Letter . . . . . 7

2. The January 1990 Stop Work Order . . . . . 9

3. Liberty's Ever-Changing Plans and Failure to Provide Repeatedly Requested Information Cause Delay . . . . . 10

4. The Northern Spotted Owl Is Listed as a Threatened Species Under the Endangered Species Act, Spurring the Forest Service to Seek a Programmatic Biological Opinion from the Fish and Wildlife Service . . . . . 15

5. The Forest Service Tries to Implement the Biological Opinion . . . . . 16

6. The Forest Service Initiated an ESA Consultation with the FWS in 1992 Regarding Liberty Mining's April 1992 Plan . . . . . 17

C. PROCEDURAL BACKGROUND . . . . . 19

II. ARGUMENT . . . . . 20

A. Standard of Review . . . . . 20

B. Plaintiffs' Takings Claim is Not Ripe . . . . . 22

1. Plaintiffs' Plans of Operations Were Limited to Preliminary Exploration and Development Activities, and Did Not Include Production of Gold . . . . . 23

2. Plaintiffs' Claim of a Taking of Its Right to Mine Is Not Ripe . . . . . . . . . 25

3. There Also Was No Extraordinary Delay Giving Rise to a Taking . . . . . 27

C. Plaintiffs' Takings Claim Sounds in Tort and, Therefore, is Beyond This Court's Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

D. Plaintiffs' Takings Claim Does Not Arise From an Alleged Affirmative Governmental Act, Warranting Dismissal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

E. Plaintiffs Did Not Have a Cognizable Property Interest in Mineral Lots 45-A and 45-B at the Time of the Alleged Taking, Entitling Defendant to Partial Summary Judgment with Respect to Those Lots . . . . . . . . . . . . . . . . . . 32

F. Alternatively, Defendant is Entitled to Summary Judgment Because Plaintiffs Cannot Show a Temporary, Regulatory Taking Given the Undisputed Facts of This Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

1. Plaintiffs Cannot Show Economic Harm Resulting from the Government's Alleged Failure to Timely Inform Them of the Biological Opinion, Warranting Summary Judgment for Defendant . . . . . . . . . . . . . . . . . . . . . 33

2. Plaintiffs Cannot Show that the Government Interfered With Any Reasonable Investment-Backed Expectations . . . . . . . . . . . . . . . . . . . . . . 36

3. Defendant Is Entitled To Summary Judgment Because Plaintiffs Cannot Satisfy the "Character" Prong of the Penn Central Test . . . . . . . . 39

III. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

# TABLE OF AUTHORITIES

## CASES

1902 Atlantic Ltd. v. United States
26 Cl. Ct. 575 (1992) . . . . . . . . . . 34

Acadia Tech., Inc. v. United States
458 F.3d 1327 (Fed. Cir. 2006) . . . . . . . . . . 31

Agins v. City of Tiburon
447 U.S. 255 (1980) . . . . . . . . . . 34

Almota Farmers Elevator & Warehouse Co. v. United States
409 U.S. 470 (1973) . . . . . . . . . . 32

Alves v. United States
133 F.3d 1454 (Fed. Cir. 1998) . . . . . . . . . . 31

Anaheim Gardens v. United States
33 Fed. Cl. 24 (1995) . . . . . . . . . . 34

Anderson v. Liberty Lobby, Inc.
477 U.S. 242 (1986) . . . . . . . . . . 21

Appolo Fuels, Inc. v. United States
381 F.3d 1338 (Fed. Cir. 2004) . . . . . . . . . . 27, 39, 40

B&G Enter., Ltd. v. United States
43 Fed. Cl. 523 (1999) . . . . . . . . . . 31

Bass Enters. Prod. Co. v. United States
381 F.3d 1360 (Fed. Cir. 2004) . . . . . . . . . . 28, 33

Boise Cascade Corp. v. United States
296 F.3d 1339 (Fed. Cir. 2002) . . . . . . . . . . 22, 27

Bradshaw v. United States
47 Fed. Cl. 549 (2000) . . . . . . . . . . 32

Brown v. Legal Foundation of Washington
538 U.S. 216 (2003) . . . . . . . . . . 33, 36

Brown v. United States
105 F.3d 621 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

California Coastal Comm'n v. Granite Rock
480 U.S. 572 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Cavin v. United States
956 F.2d 1131 (Fed. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Celotex Corp. v. Catrett
477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Clouser v. Espy
42 F.3d 1522 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Conti v. United States
291 F.3d 1334 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Cottrell v. United States
42 Fed. Cl. 144 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Danforth v. United States
308 U.S. 271 (1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Deltona Corp. v. United States
657 F.2d 1184 (Fed. Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Hendler v. United States
175 F.3d 1374 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Florida Rock Indus. v. United States
791 F.2d 893 (Fed. Cir. 1986), cert. denied, 479 U.S. 1053 (1987) . . . . . . . . . . . . . . . . 30

Freese v. United States
6 Cl. Ct. 1 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 37

Fry v. United States
72 Fed. Cl. 500 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Gahagan v. United States
72 Fed. Cl. 157 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Good v. United States
189 F.3d 1355 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Holden v. United States
38 Fed. Cl. 732 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

John v. United States
77 Fed. Cl. 788 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Kawaoka v. City of Arroyo Grande
17 F.3d 1227 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Keystone Bituminous Coal Ass'n v. DeBenedictis
480 U.S. 470 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Last Chance Mining Co. v. United States
12 Cl. Ct. 551 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Lowe v. United States
76 Fed. Cl. 262 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

MacDonald, Sommer & Frates v. Yolo County
477 U.S. 340 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Maher v. United States
314 F.3d 600 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Maritrans v. United States
342 F.3d 1344 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Marks v. United States
34 Fed. Cl. 387 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Mugler v. Kansas
123 U.S. 623 (1887) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Newby v. United States
57 Fed. Cl. 283 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Nicholson v. United States
77 Fed. Cl. 605 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31

United States v. Vogler
859 F.2d 638 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Palazzolo v. Rhode Island
533 U.S. 606 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 22, 26, 27

Patton v. United States
64 Fed. Cl. 768 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Pax Christi Mem. Gardens v. United States
52 Fed. Cl. 318 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Pendleton v. United States
47 Fed. Cl. 480 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Penn Central Transp. Co. v. New York City
438 U.S. 104 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 33, 39

Pennsylvania Coal Co. v. Mahon
260 U.S. 393 (1922) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Pettro v. United States
47 Fed. Cl. 136 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Pro-Eco, Inc. v. Bd. of Comm'rs of Jay County, Indiana
57 F.3d 505 (7th Cir.1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Reynolds v. Army & Air Force Exch. Serv.
846 F.2d 746 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Rith Energy, Inc. v. United States
270 F.3d 1347 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Seiber v. United States
364 F.3d 1356 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 36

Tabb Lakes, Ltd. v. United States
10 F.3d 796 (Fed. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 30

Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency
535 U.S. 302 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 34

Tennessee Valley Auth. v. Hill
437 U.S. 153 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 40

Toxgon Corp. v. BNFL, Inc.
312 F.3d 1379 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Truckee-Carson Irrigation Dist. v. United States
14 Cl. Ct. 361, aff'd, 864 F.2d 149 (Fed, Cur, 1988) . . . . . . . . . . . . . . . . . . . . . . . . . 20

Walcek v. United States
44 Fed. Cl. 462 (1999) . . . . . . . . . . 3, 34, 35

Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City,
473 U.S. 172 (1985) . . . . . . . . . . 27

Wyatt v. United States
271 F.3d 1090 (Fed. Cir. 2001) . . . . . . . . . . 27, 28, 32

Yuba Natural Resources, Inc. v. United States
904 F.2d 1577 (Fed. Cir. 1990) . . . . . . . . . . 35

**STATUTES**

16 U.S.C. §§ 470a-t . . . . . . . . . . 8, 36

16 U.S.C. §§ 470a(b) . . . . . . . . . . 38

16 U.S.C. § 470f . . . . . . . . . . 9, 38

16 U.S.C. § 1536 . . . . . . . . . . 1

28 U.S.C. 1346(b)(1) . . . . . . . . . . 29

28 U.S.C. §1491(a)(1) . . . . . . . . . . 30

30 U.S.C. § 612 . . . . . . . . . . 37

33 U.S.C. § 1251 . . . . . . . . . . 38

42 U.S.C. § 4321 . . . . . . . . . . 5

42 U.S.C. § 4332(C) . . . . . . . . . . 12

42 U.S.C. § 7401 . . . . . . . . . . 39

**RULES**

RCFC 12 . . . . . . . . . . 19

RCFC 12(h)(3) . . . . . . . . . . 20

RCFC 56(c) . . . . . . . . . . 21

**REGULATIONS**

36 C.F.R. § 228.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

36 C.F.R. § 228.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 22

36 C.F.R. § 228.4(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

36 C.F.R. §§ 228.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

36 C.F.R. § 228.8(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 38

36 C.F.R.§ 251 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

36 C.F.R. § 252.4(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

**MISCELLANEOUS**

Black's Law Dictionary (5th ed. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

# LIST OF EXHIBITS

| Exhibit No. | Exhibit Description |
|---|---|
| A | Excerpts from Deposition Transcript of Thomas Ferrero dated November 1, 2007 |
| B | Excerpts from Deposition Transcript of Albert Buchter dated October 29, 2007 |
| C | Excerpts from Deposition Transcript of Alfred Aloisi dated October 31, 2007 |
| D | Excerpts from Deposition Transcript of Kathleen Granillo dated October 2, 1997 |
| E | Excerpts from Plaintiffs' Answers to Defendant's Second Set of Interrogatories and Requests for Production of Documents dated September 24, 2007 |
| F | Exhibit 2 to the Deposition of Alfred Aloisi dated October 31, 2007 (Siskiyou County Assessor Records, Mineral Lots 45A and 45B) |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS OR, ALTERNATIVELY, FOR SUMMARY JUDGMENT**

## I. STATEMENT OF THE CASE

### A. INTRODUCTION

In this temporary regulatory takings action, Plaintiffs seek in excess of $22 million as "just compensation," even though they still have possession of the mining claims and the gold still is in the ground. For the reasons stated herein, Plaintiffs' takings claim should be dismissed.

According to Plaintiffs, the United States temporarily took their unpatented mining claims, as well as the patented Mountain Laurel Mine and the patented Rollin Mill Site, by failing to timely inform Plaintiffs of a Biological Opinion, which the Fish and Wildlife Service ("FWS") issued on July 23, 1990 (the "Biological Opinion").[1/] See Compl., ¶¶ 65, 66. Pursuant to § 7 of the Endangered Species Act ("ESA") (16 U.S.C. § 1536), the Forest Service initiated consultation proceedings with FWS regarding whether the continued existence of the northern spotted owl would be jeopardized by various proposed projects in the Klamath National Forest ("KNF"), including certain activities planned by plaintiff Liberty Mining, Inc. ("Liberty Mining," or "Liberty"). See Compl., ¶ 30. The Biological Opinion concluded that the proposed projects would not jeopardize the continued existence of the northern spotted owl, provided certain reasonable and prudent measures, among other mandatory terms and conditions, were implemented. See JA 80 at 761, 770.[2/] Plaintiffs allege that

---

[1/] The Rollin Mill Site also is referred to as the Rollin Townsite, and is Mineral Lot 45-B. See Compl., ¶ 13; see also Joint Statement of Facts, ¶ 5 ("JSOF") (Dkt. No. 112) (citations to the JSOF throughout this brief are intended to include the documents referenced therein). "Patented" land in this context refers to land that formerly was in the public domain, and for which the Secretary of the Interior issued a land patent to the former mining claimant(s) under the Mining Laws. Once a patent issues, the land becomes the private property of the owner.

[2/] References to "JA [No.]" refer to the document tab number in the Parties' December 21, 2007, Joint Appendix to Joint Statement of Facts, and the cited page numbers refer to the Bates numbers found on each page therein with the prefix "JA."

the United States failed to inform them of the Biological Opinion until March 1992, preventing them from mining and producing "free-milled gold doré for sale . . . in or before January 1991."[3] Compl., ¶ 44; see also Compl., ¶ 45.

Plaintiffs also complain that after the United States informed them of the Biological Opinion, the Forest Service wrongfully initiated a consultation proceeding with FWS (even though such process is required by ESA §7). See Compl., ¶¶ 48, 49. Plaintiffs allege that this second consultation with FWS violated federal regulations and perpetuated the temporary taking until February 1994, when the consultation ended. See Compl., ¶¶ 69-72.

Plaintiffs' claim should be rejected for several reasons. First, the Court lacks jurisdiction to hear claims that are not ripe. It is well-settled that a takings claim is ripe only when the claimant has sought agency approval of a proposed course of action, the agency is given a meaningful opportunity to review the proposal, and the agency prevents the claimant from undertaking the proposed action. See Palazzolo v. Rhode Island, 533 U.S. 606, 620-21 (2001). Plaintiffs, however, never submitted a complete plan of proposed operations for the Forest Service's review – despite repeated attempts by the Forest Service to obtain such a plan from Plaintiffs. Plaintiffs' claim alleging an interference with production activities, therefore, is not ripe. Moreover, even if this court were to conclude that Plaintiffs' preliminary plan should somehow be treated as a complete plan of operations, Plaintiffs cannot show the requisite extraordinary delay to establish a temporary regulatory taking.

Second, Plaintiffs' Complaint is replete with allegations of omissions and unlawful actions

---

[3] For the purposes of this motion only, the United States will assume as true Plaintiffs' allegation that they did not learn about the Biological Opinion until March 1990. Defendant, however, believes that there is evidence to the contrary and may dispute this factual issue in response to any dispositive motion Plaintiffs may file, or in any subsequent proceeding in this action. Plaintiffs' allegation that they were prevented from mining and producing gold doré for sale, however, is based upon rank speculation as discussed herein, below.

by the United States, which are torts over which this Court lacks jurisdiction. Moreover, Plaintiffs' failure to identify any affirmative governmental act giving rise to a taking, by itself, is grounds to grant Defendant summary judgment.

Third, Plaintiffs did not acquire an interest in the Mountain Laurel mine (Mineral Lot 45-A) and the Rollin Mill Site (Mineral Lot 45-B) until May 1991, well after the alleged date of taking of July 23, 1990. Consequently, as discussed further below, these private lots should be dismissed from this action.

Alternatively, summary judgment should be granted, because Plaintiffs cannot show the requisite Penn Central factors to establish a regulatory taking. See Penn Central Transp. Co. v. New York City, 438 U.S. 104, 124 (1978). Specifically, Plaintiffs cannot show that they suffered any economic harm from the alleged governmental action or inaction, because the only economic harm they allege is speculative lost profits (especially since the gold remains in the ground). Plaintiffs also were not deprived "of all or substantially all economically viable use of their property," Walcek v. United States, 44 Fed. Cl. 462, 467 (1999), because Plaintiffs leased the mining claims to third parties during the alleged takings period. In addition, Plaintiffs cannot show that any governmental action interfered with any reasonable investment-backed expectations, because an extensive regulatory regime protecting archaeological resources and the northern spotted owl was in place long before Plaintiffs acquired any interest in the subject property. An analysis of the character of the governmental action (or inaction) also shows that no taking occurred. Accordingly, application of the Penn Central factors shows that no taking has occurred, entitling Defendant to summary judgment.

**B. FACTUAL BACKGROUND**

Many of the pertinent facts are set out essentially in chronological order in the JSOF. Defendant summarizes the facts briefly, below, by categories of events.

**1. Liberty Mining, Inc.'s Plans of Operations**

Forest Service regulations require prospective miners to obtain an approved plan of operations prior to undertaking any mining activity in a national forest that is likely to cause a significant disturbance of surface resources. See § II.B., infra. Liberty Mining submitted several proposed plans of operation, all of which focused on preliminary activities such as road construction, exploration, sampling and testing, rather than upon actual production. Only those portions of Liberty Mining's proposed plans that dealt with these preliminary activities were approved, as discussed in more detail below. Liberty Mining's outline plans for production always were contingent upon the outcome of its proposed preliminary activities, and Liberty Mining never submitted sufficient information to the Forest Service so it could complete its review of Liberty Mining's conceptual plans.

**a. Liberty Mining's June 1989 Plan of Operations**

The first preliminary plan of operations for the relevant mining claims was initiated on April 3, 1989, when Michael P. Lee, then District Ranger of the Klamath National Forest, transmitted a draft Plan of Operations (the "April 1989 Plan") to Plaintiffs.[4/] See JSOF, ¶ 17; see also JA 20. Through the April 1989 proposed plan, Plaintiffs sought approval for "mineral sampling, road construction, site clearance and related operations on The Liberty Claims preparatory to mining." Compl., ¶ 18; see also JSOF, ¶ 17.

[4/] In July 1988, before Liberty Mining, Inc. was formed, Plaintiffs Aloisi et al. submitted a preliminary plan of operations under the name Jefferson State Exploration and Development Co., but that plan was never finalized due to fires in the area. See JSOF, ¶¶ 12, 16.

In an internal memorandum dated April 19, 1989, the Forest Service's District Wildlife Biologist, Marc Williams, analyzed the potential effects of Liberty Mining's proposed plan of operations on the spotted owl, noting that the "proposed project lies within the Eddy Gulch [Spotted Owl Habitat Area ("SOHA")] (#24)." JA22 at 399; see also JSOF, ¶ 18. Mr. Williams concluded that the proposal "will have a negative effect on owl habitat," and suggested mitigation measures to the District Ranger, including "the clearing of the millsite . . . in stages," and that "road work should occur outside of the nesting season." JA22 at 400; see also JSOF, ¶ 18.

Soon thereafter, on May 2, 1989, Liberty Mining proposed a two-phased approach. See JSOF, ¶ 19; see also JA 23 at 401-402. Liberty proposed in Phase I to repair roads, sample the "Klamath Dumps" (i.e., waste material from historic mining operations (see JSOF, ¶ 12)), haul samples to centrifugal concentrators for test runs and, depending upon the Environmental Assessment ("EA") "on the spotted owl situation[,] . . . log and dozer cut apex corridors . . . ." JA23 at 401-02; see also JSOF, ¶ 19. Liberty's proposal for Phase II depended upon the test results in Phase I and the EA required by the National Environmental Policy Act of 1969 (42 U.S.C. § 4321 et seq.) ("NEPA"). In response, on May 25, 1989, the Forest Service submitted a proposed plan for Liberty's consideration for the proposed "Phase I" activities, and agreeing with Plaintiffs that Phase II activities would depend upon the outcome of the "test results from Phase I and NEPA." See JSOF, ¶¶ 19, 20; see also JA24 at 412. The May 25, 1989 proposed plan was approved with minor modifications on June 6, 1989. See JSOF, ¶ 22; see also JA26.

The approved plan thus contemplated limited, preliminary Phase I activities that were designed to determine whether gold could be recovered from existing mine dumps and to explore and sample the vein apexes. See JA26 at 421-22. By its own terms, the June 6, 1989 Plan was scheduled to

expire on July 31, 1989. See JA26 at 424-25.[5]

**b. September 28, 1989 Proposed Plan of Operations**

On September 28, 1989, Plaintiffs submitted their "all phase" plan of operations (the "September 1989 Plan"). See JSOF, ¶ 26; see also JA36 at 446. The "all phase" plan never was approved as proposed. See JSOF, ¶¶ 26, 29-33. The September 1989 Plan generally described four phases of activity, consisting of:

> Phase 1) Klamath Road improvement, Shoo Fly Road Improvement, Schoolhouse Flat Road construction, clearing of work areas, excavation and bulk sampling of apexes at existing cleared areas, setting up screening, crushing and centrifugal concentrating equipment, test processing of sampled material . . . screening, crushing and centrifugal concentrating of Klamath dump material (if justified by test results) . . . .
>
> Phase 2) Contingent on positive results from Phase 1. Remaining road work . . . bulk sampling and test milling of material form [sic] apex road excavation to determine extent of ore distribution, underground exploration . . . .
>
> Phase 3) Contingent on positive results from Phase 2. Production: Underground mining, surface mining of ore zones along apexes, milling ... Length of production period depends on amount of ore discovered.
>
> Phase 4) Reclamation: Filling, grading, seeding, etc.

JA36 at 449.

The "all phase" plan provided few details, and anticipated future work "depend[ing] upon the results of bulk sampling and test milling during Phase I." JA36 at 448. Plaintiffs did not provide any details for the actual production of any gold (Phase 3). As the September 28, 1989 letter admitted:

> The description of the overall exploration and mining plan presented in this letter is incomplete due to the fact that preliminary feasibility studies have not been completed.

---

[5] On about July 27, 1989 Plaintiffs proposed minor additions to the June 6, 1989 approved plan (see JA31), which were approved on August 11, 1989. See JA32. In this supplemental plan, Liberty also proposed hauling dump material for processing, but that work depended upon the outcome of the "dump material testing." JA31 at 440. Also, Liberty could not identify its milling operation, which would "depend on test results." Id.

> Details of ore reserve availability, mining feasibility and milling methods have not yet been determined.

JA36 at 449. At his November 1, 2007 deposition, the plan's author, Tom Ferrero, explained that the September 28, 1989 proposed "all phase" plan, notwithstanding its moniker, was an "outline plan . . . the general concept of what we were planning to do down the road . . . we weren't asking for every detail of it to be approved . . . ." Nov. 1, 2007 Ferrero Tr. at 75:1-18 (Ex. A, hereto).[6]

**c. October 25, 1989 Proposed Plan of Operations and November 27, 1989 Approval Letter**

On October 24, 1989, the District Ranger requested "a firm plan . . . by Liberty Mining depicting what areas are going to be developed and how the areas are going to be developed during the next six month and twelve month periods." JA38 at 458; see also JSOF, ¶ 29. That requested plan, the District Ranger wrote, would "be the foundation for Operating Plan Number Two." JA38 at 458.

On October 25, 1989, Plaintiffs submitted a Supplemental Plan of Operations, providing additional details on the activities proposed for Phase 1 and Phase 2, but no further information about Phases 3 or 4. Cf. JA36 at 449 with JA40 at 464-65. Similar to Liberty Mining's September 1989 proposed plan, the activities proposed in the October 25, 1989 supplemental plan were unformed and dependent on then-unknown results from the proposed preliminary work:

> The amount of material excavated, hauled and milled during the Spring/Summer/Fall of 1990 will depend on many factors, and cannot be accurately projected at this time. Only selected portions of the apexes will be mined in 1990. Much more apex area will remain to be developed on the following year(s) as justified by 1989-90 results.

JA40 at 465 (emphasis added).

On November, 27, 1989, the Forest Service submitted a "Liberty Mine Proposed Mill Site

[6] All cited excerpts to the Nov. 1, 2007 Ferrero Tr. are attached hereto at Ex. A.

Archaeological Reconnaissance Report" to the California State Historical Preservation Officer (SHPO), seeking the SHPO's review pursuant to Section 106 of the National Historic Preservation Act of 1966 (16 U.S.C. § 470a-t, as amended) ("NHPA"). See JSOF, ¶ 34, see also JA46 at 475. Noting that the Forest Service was seeking the SHPO's review of the archaeological report, on November 27, 1989, the District Ranger approved Liberty's proposed Fall 1989 and Winter 1989-90 activities, as set forth in the October 25, 1989 proposed supplemental plan. See JA45 at 472. In his November 27, 1989 letter, The District Ranger made clear:

> The [October 25, 1989] supplemental plan included activities labeled Spring/Summer/Fall, 1990 which would be part of Phase Two of the development of your mine. These activities are not approved at this time because they will be included in a master Plan of Operation Number Two with an Environmental Analysis to be completed in the spring of 1990 as we agreed at our meeting on November 1, 1989.

JA45 at 472 (emphasis added).[7] Plaintiffs concede that "[t]he activities authorized in the November 1989 approval did not include any activities that could generate income from sale of production from the Liberty Property." Compl., ¶ 23.

The termination date for the approved Plan of Operations was adjusted to July 31, 1990. See JA45 at 472; see also JSOF, ¶ 33. The July 31, 1990 termination date established by the District Ranger in his November 27, 1989 approval letter subsequently was extended twice, first to September 30, 1990 (see JSOF, ¶ 51), and then to March 31, 1991 (see JSOF, ¶ 55). Although Liberty requested a third extension on March 11, 1991 (see JSOF, ¶ 59), it was not granted and Liberty's approved plan of operations expired on March 31, 1991. See JSOF, ¶ 72, see also JA111 at 1083.

---

[7] As the letter noted, Plaintiffs had the ability to challenge the decision pursuant to 36 C.F.R. 251 (see JA45 at 474), but Plaintiffs did not do so.

**2. The January 1990 Stop Work Order**

As noted above, the Forest Service's November 27, 1989 approval letter indicated that an archaeological field survey had been completed by the Forest Service, and had been transmitted to the SHPO, as is required by NHPA § 106 (16 U.S.C. § 470f). See JA45 at 472; see also JA46. The SHPO responded to the Forest Service on December 15, 1989, expressing "fundamental concerns regarding the approach you are taking to Section 106 compliance for this project." JA47 at 498. Specifically, SHPO Gualtieri found that the potential effects of the proposed project could not be adequately evaluated, "without a comprehensive understanding of the scope of both the entire project (and its land disturbing potential) and the historic context and full extent of the historic resource." Id. (emphasis as in original). Based on her concerns with the archaeological field survey, the SHPO concluded that a "finding of no effect for the portions of the project you have considered . . . is premature," and urged the Forest Service to "complete your Section 106 responsibilities for the entire project [Area of Potential Effect] prior to permitting the project to procede [sic]." Id. at 498-99.

On January 4, 1990, the Forest Service informed Plaintiffs Aloisi and Liberty Mining, Inc., of the SHPO's decision that "the archeology work that has been completed is not comprehensive for the scope of the area and your project." JA51; see also JSOF, ¶ 36. The District Ranger continued, "SHPO indicates that the entire area must be analyzed before a determination can be made." JA51. He explained that "[w]ithout this complete analysis we would be out of compliance with Section 106 of [NHPA]." Id. The District Ranger concluded that he had "no choice but to inform [Liberty] that all activities including activities on private land accessed through National Forest must stop immediately. No activities should proceed until we receive a favorable determination from SHPO and we notify [Liberty] in writing." Id.

In a letter dated February 22, 1990, the Forest Service explained that Plaintiffs' "mining-

related activities on your private land are interrelated and interdependent with your activities associated with your current and proposed operating plans." JA55 at 513. But the Forest Service also made clear that while Liberty Mining's "surface disturbing activities are still restricted, any non-mining related activities are permissible on your adjoining private lands. These activities could include occupancy of the existing facilities, travel to and from your residence and normal equipment maintenance and upkeep." Id. The Forest Service's letter to Plaintiffs informed them of their ability to administratively challenge the Forest Service's decision. See JA55 at 514.

Plaintiffs, however, did not challenge the District Ranger's decision to stop work pending archaeological clearance from the California SHPO. Instead, Liberty Mining began to receive bids for a cultural resources study. See JSOF, ¶ 41; see also JA57. By August 1990, however, Liberty decided to forego having the archaeological study completed until the effect of the northern spotted owl on Liberty's operations was resolved. See JA82 at 777.

**3. Liberty's Ever-Changing Plans and Failure to Provide Repeatedly Requested Information Cause Delay**

In late February and early March 1990, Liberty received the results of metallurgical tests that showed relatively poor gold recovery using a gravity/floatation circuit alone (40-50%), compared to the 80% recovery obtained when cyanide leaching was added to the process.[8] See JA60 at 548. Consequently, at a March 16, 1990 meeting held at the District Ranger's office, Liberty proposed using "a cyanide vat type [gold] recovery process." JA65 at 594; see also JSOF, ¶ 40. Mr. Aloisi then "admitted that this was a new issue that would need to be addressed in its entirety." JA65 at 594. Liberty was told at the meeting that "significantly more information and coordination would be

[8] The gravity/flotation process uses a combination of gravity and chemicals to extract gold in a sulfide concentrate. The cyanide step, if added, then extracts any residual gold by dissolving it. See Nov. 1, 2007 Ferrero Tr. at 63:6-23.

required and thereby setting back the [Environmental Assessment required under NEPA] until the summer of 1990." Id.; see also Oct. 29, 2007 Buchter Tr. at 76:20-21 (testifying that an EA is part of the NEPA process) (Ex. B, hereto).[9]

In March 1990, representatives of Liberty Mining contacted regional and County regulatory agencies to inquire about the applicable requirements if a cyanide process were used. See JA62; see also JA 64. Liberty learned that, to operate a cyanide processing system, it would need to file, among other documents, a reclamation plan with Siskiyou County for its approval. JA62; JA64; Oct. 31, 2007 Aloisi Tr. at 71:10-72:1 (Ex. C, hereto).[10] But Liberty never obtained an approved reclamation plan from the County. See Nov. 1, 2007 Ferrero Tr. at 61:5-14 (discussing JA64). Indeed, Liberty Mining was several years away from obtaining the necessary permits to use a cyanide recovery process. See JA190 at 1567.

In an April 12, 1990 letter, the District Ranger reminded Mr. Aloisi that he agreed to provide "a written proposal describing the specific plans that you have for your new recovery process . . . ." JA69. The District Ranger reiterated that "due to the change of your proposal complexity and lack of available information, it was agreed that the [Environmental Assessment] scheduled for completion in April, will not be completed until mid-summer." Id.

The District Ranger again wrote to Liberty Mining on August 27, 1990, stating, "it is apparent that there is a high likelihood that preparation of an Environmental Impact Statement (EIS) will be required for your proposed cyanide leaching process . . . [requiring] probably two years, for the

[9] All cited excerpts to the Oct. 29, 2007 Buchter Tr. are attached hereto at Ex. B.

[10] All cited excerpts to the Oct. 31, 2007 Aloisi Tr. are attached hereto at Ex. C.

process to be completed."[11] JA82 at 777; see also JSOF, ¶ 51. The District Ranger asked that Liberty inform him of its decision about using a milling process which would require an EIS (i.e., a cyanide process) as soon as Liberty finalized its decision, to minimize any delay. See JA82 at 778.

When applying to renew its then-existing preliminary plan on September 18, 1990, Liberty informed the Forest Service that the "milling process will be determined in the next two years as exploring progresses. No cyanide milling is included in the current plan." JA84 (emphasis added); see also JSOF, ¶ 53. In November 1990, the District Ranger again informed Liberty that the Forest Service could not process Liberty's proposals without additional information:

> In order to formulate your proposals into a Plan of Operations we need a specific schedule for completion of phases of development of your operation from exploration to full operation, and we need your specific measures that you plan to use to reclaim the disturbed areas of your operation and a time table for the completion of the reclamation.

JA88 at 823. As the District Ranger further observed:

> It is our understanding that at this time there can be no further activity that would constitute a taking of spotted owl habitat within [a Habitat Conservation Area].
>
> * * *
>
> Until you can provide us with a detailed Plan of Operations, as described previously, we will not be able to answer to what extent your planned activities would be constrained, nor will [we] be able to complete an environmental analysis.

Id. at 824 (emphasis added).

District Ranger Lee wrote to Mr. Aloisi on December 7, 1990, regarding Liberty Mining's alternative proposal to mine in some existing underground tunnels, further away from "the known owl activity center." JA90 at 828. While District Ranger Lee predicted that Mr. Aloisi's alternative

---

[11] Pursuant to NEPA, an EIS is required when the environmental consequences of a federally authorized undertaking are significant. See 42 U.S.C. § 4332(C).

proposal "could probably occur," he stated that the Forest Service "would need to know more about [Liberty Mining's] proposal in detail before an accurate response could be made." Id.

On or about March 11, 1991, Plaintiffs submitted a document titled an "Application for Renewal of Existing Plan of Operations with Modifications." See JA94; see also JSOF, ¶ 59. Liberty again informed the Forest Service in its March 1991 proposal that it intended to "[c]onstruct jig and flotation circuit mill at Usher Flat (no cyanide)." JA94 at 906 (emphasis added). However, Liberty describes the March 11, 1991 document as an "outline plan." JA94 at 906. Indeed, the March 1991 document is replete with promises of future details to be forthcoming. See, e.g., JA94 at 905-06, ¶ 5 ("Details of exact hole locations and methods forthcoming . . ."), ¶ 6 ("Details of which portals to be reopened and methods forthcoming . . ."), ¶ 8 ("Detailed site plans will be forthcoming . . .") & ¶ 10 ("Exact mill plans will be forthcoming . . ."). Those details never were provided by Liberty Mining, and Liberty Mining's Phase I plan terminated on March 31, 1991, according to the terms of the November 27, 1990 extension. See JA88 at 822; see also § I.B.1.c., supra.

Two months later, on May 9, 1991, Tom Ferrero, the author of Liberty's preliminary plans (see, e.g., JA36, JA40, JA94), met with District Ranger Lee to discuss Liberty's potential operations. See JA99; see also Nov. 1, 2007 Ferrero Tr. at 62:11-13. During that meeting Mr. Ferrero again raised the possibility of using a cyanide system to recover gold. Nov. 1, 2007 Ferrero Tr. at 66:3-7 (discussing JA99). As Mr. Ferrero explained at his deposition, "[s]ometimes we think we're going to use cyanide, sometimes we don't. But that was because we were in the process of testing the efficiency of it and weighing the regulatory problems." Nov. 1, 2007 Ferrero Tr. at 67:22-68:16.

In a March 10, 1992 letter summarizing the outcome of a February 11, 1992 meeting with Mr. Aloisi and others, the District Ranger reiterated his November 1990 request for information:

> In order to formulate your proposals into a plan of operations, you have agreed to provide a specific schedule for completion of phases of development of your operation from exploration to full operation. We will also need for you to include your specific measures that you plan to use to reclaim the disturbed areas of your operation and a time table for the completion of the reclamation.

JA111 at 1084. Again, despite the repeated promises of forthcoming details, Liberty Mining did not submit a detailed plan of operations. Id. at 1083.

On April 1, 1992, Liberty Mining submitted a new proposed Plan of Operations (the "April 1992 Plan"). See JA114 at 1106. As with Plaintiffs' prior submissions, however, the scope of Liberty's April 1992 Plan was contingent upon the outcome of its explorations. See, e.g., JA114 at 1106 ("The objectives of the proposed developments are to determine whether there are reserves of gold bearing [sic] rock of sufficient quality and quantity to warrant mine development . . .").

Because Liberty's April 1992 Plan once again lacked sufficient detail, in a letter dated November 10, 1992, the District Ranger requested additional, detailed information before he could approve Liberty's "overall plan as submitted." JA137 at 1223-24; see also JSOF, ¶ 85. In a letter to Mr. Aloisi dated December 21, 1992, the Forest Service repeated its request for information identified in the November 10, 1992 letter, listing the "very minimum . . . information . . . required to restart the preparation of the [Environmental Assessment]." JA142; see also JSOF, ¶ 92. Liberty Mining, however, never submitted the information necessary to complete the Environmental Assessment. See Oct. 29, 2007 Buchter Tr. at 75:4-78:21.[12]

[12] Rather than provide the information sought by the Forest Service to complete an Environmental Assessment, Liberty Mining began to negotiate leasing its mining claims to a company called WAZCO, during the Fall 1992. See Oct. 31, 2007 Aloisi Tr. at 133:12-23. The lease was executed by April 25, 1993, with an effective date of April 1, 1993. See JSOF, ¶ 97.

**4. The Northern Spotted Owl Is Listed as a Threatened Species Under the Endangered Species Act, Spurring the Forest Service to Seek a Programmatic Biological Opinion from the Fish and Wildlife Service**

Meanwhile, on June 18, 1990, anticipating that the spotted owl soon would be listed as an endangered or threatened species under the ESA, the Forest Service transmitted a Programmatic Biological Evaluation to the Fish and Wildlife Service as part of the required ESA consultation process.[13/] See JA76. Although the Forest Service's Programmatic Biological Evaluation focused almost entirely on proposed timber sales in Klamath National Forest, it also included a paragraph addressing Plaintiffs' proposed mining activities. See JA76 at 747. The Forest Service submitted the Programmatic Biological Evaluation to FWS "to expedite the formal consultation process." JA76 at 719.

In response, FWS issued a Biological Opinion on July 23, 1990, addressing the "effects of timber harvest and associated activities on the threatened northern spotted owl (Strix occidentalis caurina)." JA80 at 760. While the focus of the Biological Opinion letter was on timber sales, Liberty Mine was included in the opinion. See id. at 761; see also JSOF, ¶ 50. Significantly, the Biological Opinion contains mandatory requirements for the incidental take of spotted owls pursuant to the Endangered Species Act.[14/] See JA80 at 769-71.

---

[13/] On June 26, 1990, the Fish and Wildlife Service published the formal listing of the northern spotted owl as a threatened species under the ESA. See JSOF, ¶45. Years before it was listed, however, the northern spotted owl was considered a sensitive species by the Forest Service, triggering efforts by the Forest Service to protect the owl and preserve its habitat. See JSOF, ¶¶ 6, 7, 10, & 13. The history of the listing of the northern spotted owl under the Endangered Species Act is set out in the JSOF, ¶¶ 9, 11, 14, 15, & 23.

[14/] Incidental take is defined in the Biological Opinion as a "taking that results from, but is not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or applicant." JA80 at 769. Under the terms of the Biological Opinion, any incidental taking "must be in compliance with the terms and conditions of [its] written Incidental Take Statement as

FWS authorized "incidental take" of spotted owls "in the form of harassment . . . in compliance with the provisions of the reasonable and prudent measures and terms and conditions of this Incidental Take Statement." JA80 at 770. The reasonable and prudent measures instructed the Forest Service to "[m]aintain essential habitat within close proximity of spotted owl nest sites and activity centers . . . in proposed [Habitat Conservation Areas (HCAs)]." Id. Mandatory terms and conditions were established by FWS to implement the reasonable and prudent measures. Id. at 770-71. To minimize impacts in HCAs where the project cannot be moved (such as a mining claim), FWS recommended "avoid[ing] road construction in HCAs." JA 80 at 772. Liberty Mining's claims are located in a category 1 HCA, and it proposed activities within 0.5 mile of a known pair of spotted owls. See JSOF ¶¶ 43, 44; see also JA80 at 765-66.

**5. The Forest Service Tries To Implement the Biological Opinion**

Within a few months after the Biological Opinion issued, on October 24, 1990, the Regional Forester followed the Fish and Wildlife Service's recommendation and adopted the Interagency Scientific Committee's (ISC) Conservation Strategy for the spotted owl. See JSOF, ¶ 54; see also JA71; JA86. The Conservation Strategy called for the cessation of logging in HCAs. See JSOF, ¶ 43; see also JA71 at 652. The Regional Forester directed the Forest Supervisors, including the Supervisor of the Klamath National Forest, to comply with the mandatory terms and conditions of the Biological Opinion, and to "document steps taken to implement the Conservation Recommendations." See JSOF, ¶ 54; see also JA86.

In April 1991, the Regional Forester released spotted owl survey protocol for FY1991 to the Forest Supervisors. See JSOF, ¶ 61. In May 1991, the Regional Office circulated additional guidance

---

directed by [ESA] Section 7(o)(2)." Id.

on interpreting and implementing the Conservation Strategy. See JSOF, ¶ 63. Additional guidance was issued in July 1991 describing the responsibilities of a Regional Technical Review Team established to review proposed actions for compliance with the Conservation Strategy. See JSOF, ¶ 65. The July 1991 guidance also set out procedures for evaluating a project area with respect to northern spotted owl populations and habitat. See JSOF, ¶ 65, see also JA 107 at 1038-43. Even though Liberty's plan of operations expired on March 31, 1991 (see § I.B.1.c., supra), KNF Wildlife Biologist Kathleen Milne Granillo visited Liberty Mining's claims in July 1991, to try to implement the Biological Opinion and explore ways to lessen the effect of Liberty's proposed activities on suitable spotted owl habitat. See Granillo Tr. at 25:8-27:17 (Ex. D, hereto).

**6. The Forest Service Initiated an ESA Consultation with the FWS in 1992 Regarding Liberty Mining's April 1992 Plan**

About nine months after the Biological Opinion issued, FWS proposed designating certain areas as critical habitat for the northern spotted owl. See JSOF, ¶ 61. The list of proposed critical habitat areas was revised on August 13, 1991 to, among other things, include the Eddy Gulch area encompassing Liberty Mining's operations. See JSOF, ¶ 68; see also 56 Fed. Reg. 40002, 40042 (Aug. 13, 1991) (proposing as critical habitat for the northern spotted owl Sections 3, 4, 8, 9 and 10 of Township 39 N., Range 11 W., Mt. Diablo Meridian, among others); JA 6 at 142-44 (identifying the Sections, Township and Range of Liberty Mining's claims in Eddy Gulch). On January 15, 1992, FWS published its final rule designating as critical habitat the areas identified in its August 13, 1991 revised notice. See JSOF, ¶ 70; see also Final Rule, 57 Fed. Reg. 1796 (Jan. 15, 1992); JA 145 at 1264 (Deputy Regional Forester Bosworth noting that the critical habitat areas were based on the HCAs).

The designation of critical habitat for the northern spotted owl was to provide "additional

protection requirements under section 7 of the [ESA] with regard to activities that are funded, authorized, or carried out by a Federal agency." JA138 at 1226 (quoting Final Rule, 57 Fed. Reg. at 1796) (internal quotation marks omitted). The January 1992 designation of critical habitat, therefore, required the Forest Service to re-initiate the ESA consultation process to determine whether Liberty Mining's April 1992 Plan would adversely affect critical habitat of the northern spotted owl. See JA124 at 1177. After some discussion between FWS and the Forest Service about whether it was necessary to consult on Liberty Mining's April 1992 Plan, FWS agreed "to determine the project's effects on the spotted owl critical habitat." See JSOF, ¶¶ 86, 87.

FWS, however, had to suspend the consultation pending receipt of additional information from Liberty Mining. See JSOF, ¶¶ 89, 91; see also JA138 at 1225 (FWS letter providing notice to the Forest Service of suspension of consultation and requesting additional information); JA140 (Dec. 4, 1992 Forest Service letter to Mr. Aloisi providing notice of the suspension and forwarding FWS's letter requesting additional information). After meeting in January 1993 and March 1993, Liberty Mining provided the information sought by FWS for the consultation. See JSOF, ¶ 95. That information was forwarded to FWS by District Ranger Lee on April 2, 1993. See JSOF, ¶ 96.

Before FWS could complete the consultation on Liberty Mining's April 1992 Plan, however, Liberty Mining leased its mining claims (including Mountain Laurel mine) to WAZCO on April 25, 1993, effective April 1, 1993. See JSOF, ¶ 97; see also n.12, supra. WAZCO (subsequently operating under the name, Liberty Consolidated Mines, Inc. (LCM)), therefore, became the operator with which the Forest Service dealt. See JSOF, ¶¶ 98-100, 103-105, 108-111; see also 36 C.F.R. §§ 228.3 & 228.4 (defining "operations" and "operator," and specifying the requirements for the submission of a proposed plan of operations by an operator).

FWS completed its consultation on February 8, 1994, concluding that the proposed project was not likely to adversely affect the northern spotted owl. See JSOF, ¶ 101. Although LCM ultimately was approved to operate provided it posted a reclamation bond (JSOF, ¶ 111), it never did so (JSOF, ¶ 112), and allowed its lease on the mining claims to lapse in 1999 (JSOF, ¶ 113).

**C. PROCEDURAL BACKGROUND**

Plaintiffs filed this action on September 27, 1995, and Defendant answered the Complaint on January 31, 1996. On November 18, 1998, Defendant filed a motion to dismiss pursuant to Rule 12(b)(1) or 12(b)(4),[15] arguing that Plaintiffs do not have a compensable property interest, because their mining claims are unpatented and no determination of validity had been made. See Defendant's Motion to Dismiss, or in the Alternative, for a Stay of Proceedings at 2 (hereinafter, "Defendant's Motion to Dismiss"). In the alternative, the government sought a stay of the action to permit the Department of the Interior to determine whether the mining claims at issue are valid.[16] Id.

The Court decided to stay the proceedings so that the Department of the Interior could determine whether the mining claims at issue are valid. See Order dated Oct. 6, 1999. Ultimately, the Department of the Interior decided that it did not have jurisdiction to determine whether the mining claims were valid as of the date of the alleged taking, because no regulatory action occurred

---

[15] Pursuant to the 2002 Revision, Rule 12(b)(4) was renumbered as 12(b)(6) to conform with the Federal Rules of Civil Procedure. See Rules Committee Note, RCFC 12.

[16] At that time, Plaintiffs agreed that only six (6) of the mining claims underlie their proposed plan of operation upon which their taking claim is based, namely: (1) Sunrise (BLM Serial #167529); (2) Sunset (#167530); (3) Six O' Clock (#167538); (4) Yankee (#167544); (5) East Fork (#167545); and (6) Compressor (#167546). See Defendant's Motion to Dismiss at 1 n.1. Plaintiffs, however, now are asserting that all of the mining claims listed in their Complaint, as well as the Mountain Laurel mine and the Rollin Millsite (see Compl., ¶ 13), were temporarily taken. See Pls.' Answers to Def.'s Second Set of Interrogatories at 3 (Ex. E, hereto).

at that time. See U.S. DOI, Office of Hearings and Appeals, May 2, 2007 Order at 4 (Dkt. No. 93-2), attached to May 14, 2007 Joint Interim Status Report (Dkt. No. 93). Soon thereafter this Court lifted the stay. See Order dated May 24, 2007 (Dkt. No. 95).

The Court then held scheduling conferences on June 19, 2007 and September 6, 2007, and issued a Scheduling Order dated September 6, 2007 (Dkt. No. 99). On January 10, 2008, the Court adopted the proposed scheduling order submitted by Plaintiffs on January 4, 2008 (Dkt. No. 111), setting February 1, 2008 as the due date for dispositive motions.[17/] (See Dkt. No. 113.)

## II. ARGUMENT

### A. STANDARD OF REVIEW

Under RCFC 12(h)(3), "[w]henever is appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Thus, "under Rule 12(h)(3) this court is mandated to . . . dismiss the action '[w]henever it appears . . . that the court lacks jurisdiction of the subject matter . . . .'" Truckee-Carson Irrigation Dist. v. United States, 14 Cl. Ct. 361, 368, aff'd, 864 F.2d 149 (Fed. Cir. 1988) (quoting RCFC 12(h)(3)) (emphasis as in original). Whether this Court has jurisdiction to hear a plaintiff's claim is a question of law. See Toxgon Corp. v. BNFL, Inc., 312 F.3d 1379, 1381 (Fed. Cir. 2002) ("the existence of subject matter jurisdiction is a question of law"); Maher v. United States, 314 F.3d 600, 603 (Fed. Cir. 2002) (noting that the Federal Circuit reviews de novo whether the Court of Federal Claims possesses jurisdiction because this is a question of law).

When deciding a motion to dismiss based on a lack of subject matter jurisdiction, the court

---

[17/] On February 1, 2008, the government filed an unopposed motion for an extension of time, requesting that the due date be extended to February 6, 2008 (Dkt. No. 116), which the Court granted on February 5, 2008 (Dkt. No. 117).

must assume that all undisputed facts alleged in the Complaint are true and must draw all reasonable inferences in the non-movant's favor. Newby v. United States, 57 Fed. Cl. 283, 290 (2003). If the government's motion challenges the truth of the jurisdictional facts alleged in the complaint, the court may consider relevant evidence beyond the Complaint in order to resolve the factual dispute. Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 747 (Fed. Cir. 1988) (citing Land v. Dollar, 330 U.S. 731, 735 (1947)). "Once the court's subject matter jurisdiction is put into question, it is 'incumbent upon [the plaintiff] to come forward with evidence establishing the court's jurisdiction. [The plaintiff] bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence.'" Patton v. United States, 64 Fed. Cl. 768, 773 (2005) (quoting Reynolds, 846 F.2d at 748) (alterations as in original).

Summary judgment is appropriate when there are no general issues of material fact and the moving party is entitled to judgment as a matter of law. See RCFC 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is genuine if it "may reasonably be resolved in favor of either party." Id. at 250.

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. See Celotex Corp., 477 U.S. at 323. The burden then shifts to the nonmoving party, who then must show that there are genuine issues of material fact for trial. Celotex Corp., 477 U.S. at 324. The nonmoving party must go beyond the pleadings and support its opposition with affidavits or with depositions, answer to interrogatories, and admissions. Id. at 324. Entry of summary judgment is mandated, "after adequate time for discovery," against a party who fails to establish "an element essential to that party's case, and on which that party will bear the burden of proof at trial."

Id. at 322.

## B. PLAINTIFFS' TAKINGS CLAIM IS NOT RIPE

Despite their numerous filings, Plaintiffs never submitted anything more than proposals for preliminary activities (such as road-building and sampling activities) and conceptual outlines of production activities. See § I.B.1.b., supra. Despite repeated requests by the Forest Service, Plaintiffs never submitted a sufficiently-detailed plan addressing actual mining activities for Forest Service review. See § I.B.3., supra. Plaintiffs' contention that some government action interfered with Plaintiffs' right to mine within KNF, therefore, is not ripe for review.

A regulatory takings claim does not ripen until the government entity charged with implementing the regulation has reached a final decision to restrict some aspect of ownership. See Palazzolo, 533 U.S. at 620; MacDonald, Sommer & Frates v. Yolo County, 477 U.S. 340, 349-51 (1986). To ripen a regulatory takings claim, a claimant must have first "followed reasonable and necessary steps to allow regulatory agencies to exercise their full discretion" so that the full extent of the restriction on the property can be ascertained. See Palazzolo, 533 U.S. at 620-21. Stated another way, a regulatory takings claim does not ripen until a claimant has submitted a meaningful permit application and the agency has reached a final decision on that application. See Boise Cascade Corp. v. United States, 296 F.3d 1339, 1351-52 (Fed. Cir. 2002). "If the government denies a permit, then the aggrieved party can seek compensation." Id. at 1347.

The Forest Service regulates ground-disturbing activities on National Forest System lands by requiring operators to obtain an approved plan of operations prior to initiation. See 36 C.F.R. §§ 228.4 & 228.5. Any claim related to activities that were not presented to the Forest Service for review in a meaningful plan is not ripe for review and must be dismissed. See United States v. Vogler, 859

F.2d 638, 642 (9th Cir. 1988) (finding Fifth Amendment claim not ripe because plaintiff "never attempted to apply for a permit and he never submitted a mining plan"); Freese v. United States, 6 Cl. Ct. 1, 15 (1984) (denying takings claim where plaintiff failed to furnish information needed to evaluate proposed plan of operation). Accordingly, as discussed below, Plaintiffs' takings claim must be dismissed.

Moreover, even if this Court treats Plaintiffs' preliminary plan as a full operational plan, Plaintiffs cannot show that there was extraordinary delay, which has been recognized by the Federal Circuit as an essential element of a temporary regulatory takings claim. First, the alleged delay resulted from Plaintiffs' own dilatory actions. And, even if the government caused the alleged delay, that delay was not extraordinary because it arose from the government's good faith attempts to implement the Biological Opinion and protect the northern spotted owl, a species listed as threatened under the ESA. Because Plaintiffs cannot show extraordinary delay, their temporary regulatory takings claim must be dismissed.

**1. Plaintiffs' Plans of Operations Were Limited to Preliminary Exploration and Development Activities, And Did Not Include Production of Gold**

Plaintiffs contend that their temporary takings claim arose on July 23, 1990, when the FWS issued the Biological Opinion. See Compl., ¶ 74. At that time, Plaintiffs' operating plan included only "Phase I" activities, such as repairing existing access roads, grading access to a staging area, and sampling. See JSOF, ¶¶ 20, 22. Plaintiffs' proposed Phase II activities would depend upon the outcome of the "test results from Phase I and NEPA." JA24 at 412; see also JSOF, ¶¶ 19, 20. On November 27, 1989, the District Ranger approved a supplemental plan, making clear that Phase II activities were not approved at that time, and "will be included in a master Plan of Operation Number Two with an Environmental Analysis to be completed . . . ." JA45 at 472. Plaintiffs concede that

"[t]he activities authorized in the November 1989 approval did not include any activities that could generate income from sale of production from the Liberty Property." Compl., ¶ 23. Phase III – the phase that would include production – was admittedly unformed and expressly contingent on then-unknown results from Phases I and II. See JA36 at 449.

On numerous occasions, the Forest Service informed Liberty Mining that its plans lacked the requisite information to progress to the production phase. The Forest Service requested additional information from Plaintiffs to enable agency review on several occasions, but Plaintiffs consistently were unable or unwilling to provide the requested information.[18] By March 1991 – eight months after Plaintiffs allege their takings claim arose – Plaintiffs admitted that its operating plans were still unformed, but stated that the necessary details would be "forthcoming." JA94 at 905-06. Plaintiffs failed to submit the details by March 1992, despite the Forest Service's repeated written requests for the information.[19] In short, Plaintiffs failed to provide the necessary information sought by the Forest Service, thereby preventing the Forest Service from evaluating a proposal and reaching a final decision on Liberty Mining's proposed plan of operations.

Even Plaintiffs' April 1992 Plan – submitted almost two years after Plaintiffs argue their takings claim accrued – lacked any specific details about any production activities, stating that the details would depend on the results of future exploratory work. See JA114 at 1108; see also § I.B.3.,

---

[18] See JA69 (April 1990 letter from Forest Service repeating verbal request for a "written proposal describing the specific plans"); JA88 (November 1990 letter from Forest Service stating "[a]t this time we do not have a complete proposed Plan of Operation to encompass these [operational phase] activities"); JA90 (December 1990 letter from Forest Service stating "we would need to know more about your proposal in detail before an accurate response could be made").

[19] See JA108 (August 1991 letter from Forest Service requesting information); JA111 (March 1992 letter from Forest Service requesting information).

supra. The Forest Service notified Plaintiffs that the April 1992 Plan failed to include sufficient detail regarding proposed mining operations, and repeatedly requested the needed information.[20] Despite these repeated requests, Plaintiffs' operating plans were consistently limited to preliminary activities, and never encompassed the production phase of mining.

**2. Plaintiffs' Claim of a Taking of Its Right to Mine Is Not Ripe**

Since Plaintiffs always cast their proposed production activities as dependent upon the results of future exploration and development, the planned scope of any actual mining activities (and, hence, the scope of Plaintiffs' takings claim) are unknown. The details of any future mining activities depended on numerous unknown factors, including (1) the nature of Plaintiffs' proposal; (2) whether state and local regulatory agencies would have approved Plaintiffs' proposals;[21] and (3) whether

[20] See, e.g., JA137 (November 1992 letter from Forest Service requesting additional information about the details of the proposed plan for an Environmental Assessment); see also JA142 (December 1992 letter from Forest Service repeating request for information needed for the Environmental Assessment on the proposed plan); Oct. 29, 2007 Buchter Tr. at 75:4-78:21 (testifying that Liberty Mining never submitted information needed to perform an environmental analysis).

[21] It is clear that State and County regulations also would have been required for certain mining activities. According to a March 1990 letter from the County of Siskiyou Planning Department to Plaintiffs' Registered Geologist, for example, the County would have required an approved use permit as well as an approved reclamation plan and a "reclamation agreement executed prior to commencing mining operations on private lands." JA62. The County would have also undertaken a "complete environmental review . . . prior to project approval" that could have necessitated "preparation of an Environmental Impact Report and/or an Environmental Impact Statement due to the scope of [Plaintiffs'] project, hazardous materials involved and potentially unavoidable significant environmental impacts associated with [the planned] project." JA64. It is, of course, impossible to know how these County studies ultimately would have been resolved.

Plaintiffs would have been able to obtain necessary federal environmental approvals.[22/] As a result, it is impossible to evaluate Plaintiffs' contention of economic harm allegedly suffered as a result of any governmental restriction because any proposed production activities – and, hence, any alleged monetary harms – are purely speculative. See Palazzolo, 533 U.S. at 621 (until an agency has had an opportunity to consider, reject or restrict an application, "the extent of the restriction on property is not known and a regulatory taking has not been established").

A December 1990 letter from the Forest Service to Plaintiffs underscores this point. See JA90; JSOF, ¶ 57. In that letter, the Forest Service requested information about a proposed underground mining proposal, noting that the described project "could probably occur, providing the above project description was followed. Of course we would need to know more about your proposal in detail before an accurate response could be made." JA90 at 828 (emphasis added).[23/] Accordingly, had Plaintiffs submitted a meaningful proposed plan of operation (or at least provided the requested information to the Forest Service), it is probable that the Forest Service would have approved activities. Due to Plaintiffs' failure to submit such a proposal, however, it is impossible to know

---

[22/] Although it is clear that NEPA would have applied to certain proposed activities, see JA26 at 421, it is impossible to know how a hypothetical mining plan would have been evaluated under that statute. Similarly, the Court would have no way of knowing the outcome of any review under the CWA or CAA, or any other applicable federal statute.

[23/] Similarly, a November 27, 1990 letter from the Forest Service to Mr. Aloisi stated that

> In order to formulate your proposals into a Plan of Operations we need a specific schedule for completion of phases of development of your operation from exploration to full operation, and we need your specific measures that you plan to use to reclaim the disturbed areas of your operation and a time table for the completion of the reclamation.

JA88 at 823; see also JSOF, ¶ 55.

whether the agency's regulations extended "too far," so as to constitute a violation of the Fifth Amendment. See Pennsylvania Coal Co. v. Mahon, 260 U.S. 393 (1922); Palazzolo, 533 U.S. at 621 ("the extent of the restriction on property is not known and a regulatory taking has not been established"); see also Pax Christi Mem. Gardens v. United States, 52 Fed. Cl. 318, 323-24 (2002) (Corps of Engineers' withdrawal of plaintiff's permit application for lack of necessary information is not a taking).

The ripeness doctrine intends to avoid these unknowns by requiring a takings litigant to submit at least one meaningful application to allow the agency to decide how far the regulation extends before the litigant is permitted to institute a Tucker Act claim. Plaintiffs failed to do so here. Thus, Plaintiffs' takings claim is unripe for adjudication and must be dismissed.

**3. There Also Was No Extraordinary Delay Giving Rise to a Taking**

Even if this Court were to consider Plaintiffs' preliminary plans to be sufficient for a full plan of operations, Plaintiffs' takings claim also fails because there was no extraordinary delay by the United States in the regulatory process. "Delay in the regulatory process cannot give rise to takings liability unless the delay is extraordinary." Appolo Fuels, Inc. v. United States, 381 F.3d 1338, 1351 (Fed. Cir. 2004) (citing Boise Cascade, 296 F.3d at 1352 ("[A]bsent denial of a permit, only extraordinary delays in the permitting process ripen into a comparable taking.") (internal quotation marks omitted)). If the delay were extraordinary, then "the question of temporary regulatory takings liability is to be determined using the Penn Central factors. Id. (citing Boise Cascade, 296 F.3d at 1352). The "extraordinary delay must be 'substantial' and . . . the Supreme Court has condoned delays up to 'approximately eight years.'" Wyatt v. United States, 271 F.3d 1090, 1098 (Fed. Cir. 2001) (quoting Kawaoka v. City of Arroyo Grande, 17 F.3d 1227, 1233 (9th Cir. 1994) (citing

Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172 (1985))). Along with the length of the delay, courts also consider

> the nature of the permitting process as well as the reasons for the delay. Moreover, it is the rare circumstance that [courts] will find a taking based on extraordinary delay without a showing of bad faith.

Id. (citing Tabb Lakes, Ltd. v. United States, 10 F.3d 796, 799 (Fed. Cir. 1993)).

First, Plaintiffs' own actions caused much of the delay that they complain of by failing to timely provide information repeatedly sought by the government. Simply stated, their proposed plans were constantly changing, as their plans to use cyanide demonstrate. Plaintiffs also repeatedly failed to provide information sought by the government that was necessary to evaluate their proposed plan of operations. There was no extraordinary delay by the United States, therefore, resulting in a taking. See Wyatt, 271 F.3d at 1099-1100 (delay of about six years was not extraordinary where caused in large part by plaintiff corporation's failure to respond to requests for information).

Even if the delay were attributable to the federal government, it was not extraordinary because it resulted from the Forest Service's good faith attempts to implement the Biological Opinion and protect the northern spotted owl. See § I.B.5., supra. Indeed, the Forest Service actively was seeking ways to allow Liberty's proposed activities to go forward while mitigating its effects within a designated spotted owl habitat conservation area. See id. Where delay has resulted from the government's efforts to minimize the potentially adverse effects of a proposed project, no taking should be found. See Bass Enters. Prod. Co. v. United States, 381 F.3d 1360, 1366-69 (Fed. Cir. 2004) (45 months delay was not extraordinary where government was seeking to protect an underground nuclear waste facility from proposed drilling). Here, the government was attempting to mitigate the potentially adverse effects of Liberty Mining's proposed project on the northern

spotted owl, a protected species under the ESA whose value is "incalculable." See Tennessee Valley Auth. v. Hill, 437 U.S. 153, 187 (1978) (internal quotation marks omitted). Accordingly, assuming the government caused delay, any such delay arose from the government's attempts to protect an invaluable wildlife resource - the northern spotted owl. There is no evidence to suggest that the United States acted in bad faith at any time. The alleged delay, therefore, cannot be found to be extraordinary under the circumstances, and no temporary regulatory taking has occurred.

**C. PLAINTIFFS' TAKINGS CLAIM SOUNDS IN TORT AND, THEREFORE, IS BEYOND THIS COURT'S JURISDICTION**

Plaintiffs' temporary takings claim is based on their allegation that the government failed to notify them of the existence of the Biological Opinion "until March 1992 . . . in violation of federal regulations governing defendant's conduct." Compl., ¶ 65. Plaintiffs allege that the "failure to notify caused unwarranted delay and inaction on plaintiffs' September 1989 plan of operations . . . depriv[ing] plaintiffs of beneficial use and enjoyment of the Liberty Property." Compl., ¶ 66 (emphasis added). In other words, Plaintiffs allege that the government had a duty to inform them about the Biological Opinion, breached that duty and, therefore, they suffered damages – the basic elements of a tort. See Black's Law Dictionary 1335 (5th ed. 1979). Plaintiffs assert one taking that began on July 23, 1990, and continued to at least February 8, 1994. See Compl., ¶ 74; see also Pls.' Answers to Def.'s Second Set of Interrogatories at 5-6 (responding to Interrogatory No. 1.c.) (Ex. E).

Claims based upon a failure to act fall squarely within the law of torts, and the Federal Tort Claims Act ("FTCA"), which specifically waives sovereign immunity for "act[s] or omission[s]" by government employees. See 28 U.S.C. 1346(b)(1); see also Lowe v. United States, 76 Fed. Cl. 262, 267 (2007) ("Unauthorized actions by federal officials . . . are torts"). The jurisdiction of this Court does not extend to cases sounding in tort. See Fry v. United States, 72 Fed. Cl. 500, 505 (2006); see

also 28 U.S.C. §1491(a)(1) (limiting the Court's jurisdiction "to render judgment upon any claim . . . for liquidated or unliquidated damages in cases not sounding in tort") (emphasis added); Brown v. United States, 105 F.3d 621, 623 (Fed. Cir. 1997) (the United States Court of Federal Claims does not have jurisdiction over claims sounding in tort). Consequently, this Court

> does not have jurisdiction over claims that [the United States] engaged in negligent, fraudulent, or other wrongful conduct when discharging its official duties. . . . Even where the claim is framed under non-tort law, the court lacks jurisdiction if the essence of the claim lies in tort.

Cottrell v. United States, 42 Fed. Cl. 144, 149 (1998) (citations omitted).

Plaintiffs' allegation that the government failed to notify them of the Biological Opinion in violation of federal regulations plainly alleges tortious conduct outside of the realm of a taking.[24] Accordingly, this Court does not have jurisdiction over Plaintiffs' takings claim, and this action must be dismissed.

### D. PLAINTIFFS' TAKINGS CLAIM DOES NOT ARISE FROM AN ALLEGED AFFIRMATIVE GOVERNMENTAL ACT, WARRANTING DISMISSAL

Plaintiffs' takings claim allegedly arises not from an affirmative governmental act, but from an alleged failure to act – specifically, the alleged failure of the government to apprise Plaintiffs of the Biological Opinion. See Compl., ¶ 65. Because Plaintiffs' takings claim is not based upon an

---

[24] Indeed, a takings claimant must concede the propriety of the governmental action that allegedly interferes with their alleged property interests. See Tabb Lakes, Ltd. v. United States, 10 F.3d 796, 802-03 (Fed. Cir. 1993) (citing Florida Rock Indus. v. United States, 791 F.2d 893, 899 (Fed. Cir. 1986), cert. denied, 479 U.S. 1053 (1987)); see also Nicholson v. United States, 77 Fed. Cl. 605, 614 (2007) ("[a]mong the hallmarks of a Fifth Amendment taking is that the governmental conduct forming the basis of the taking is authorized and legitimate . . . [and] takings claimants must concede the propriety of the governmental interference with their property interests."); Gahagan v. United States, 72 Fed. Cl. 157, 161-62 (2006) (plaintiff's assertions "that the continued seizure was 'unlawful' and defendant was without authority to refuse plaintiff's requests to develop [the property's] oil and gas reserves . . . places the claim outside a takings context.").

affirmative governmental act, it is fatally flawed and must be dismissed.

In Nicholson, the Plaintiffs alleged a taking by the United States based "on the Government's failure to adequately design, build, or maintain certain levees in New Orleans before and after Hurricane Katrina, resulting in a permanent loss of value to their properties." Nicholson, 77 Fed. Cl. at 606. "[A]s the basis for the taking, [the plaintiffs] allege that 'the decision not to rebuild and/or replace the levee system to withstand a Category 5 hurricane' gives rise to their Constitutional entitlement." Id. at 619 (emphasis as in original). But, as Judge Baskir observed, this allegation "does not allege an action on [the] part of the Government capable of taking property . . . [i]n no case that we know of has a governmental agency's failure to act or to perform its duties correctly been ruled a taking." Id. at 620 (citing Acadia Tech., Inc. v. United States, 458 F.3d 1327 (Fed. Cir. 2006) (Customs Service's delay in subjecting property to forfeiture proceedings resulting in depreciated value is not grounds for a takings claim). "The Court has consistently required that an affirmative action on the part of the Government form the basis of the alleged taking." Nicholson, 77 Fed. Cl. at 620 (citing Last Chance Mining Co. v. United States, 12 Cl. Ct. 551, 556-57 (1987); B&G Enter., Ltd. v. United States, 43 Fed. Cl. 523, 526-27 (1999); Pendleton v. United States, 47 Fed. Cl. 480, 485 (2000)); see also Bradshaw v. United States, 47 Fed. Cl. 549, 544 (2000) (government's failure to prevent feral horses from trespassing upon plaintiffs' land did not give rise to a taking); Alves v. United States, 133 F.3d 1454, 1458 (Fed. Cir. 1998) ("there was no governmental action" that could result in a taking); cf. John v. United States, 77 Fed. Cl. 788, 816 (2007) (in a takings action, the plaintiffs must allege an affirmative, federal governmental act within the statute of limitations period).

Because the Plaintiffs here do not allege that their takings claim arose from an affirmative governmental act, it must be dismissed.

### E. PLAINTIFFS DID NOT HAVE A COGNIZABLE PROPERTY INTEREST IN MINERAL LOTS 45-A AND 45-B AT THE TIME OF THE ALLEGED TAKING, ENTITLING DEFENDANT TO PARTIAL SUMMARY JUDGMENT WITH RESPECT TO THOSE LOTS

Plaintiffs did not acquire a property interest in the patented Mountain Laurel mine (Mineral Lot 45-A) and the Rollin Mill Site (Mineral Lot 45-B) until 1991, after Plaintiffs allege the taking accrued. See Oct. 31, 2007 Aloisi Tr. at 47:15-50:25 (discussing Dep. Ex. 2, attached hereto as Ex. F). "It is axiomatic that only persons with a valid property interest at the time of the taking are entitled to compensation." Wyatt, 271 F.3d at 1096 (citing Almota Farmers Elevator & Warehouse Co. v. United States, 409 U.S. 470, 473-74 (1973); Pro-Eco, Inc. v. Bd. of Comm'rs of Jay County, Indiana, 57 F.3d 505, 509 (7th Cir.1995); Cavin v. United States, 956 F.2d 1131, 1134 (Fed. Cir. 1992)). Consequently, Plaintiffs did not have a property interest in either Mineral Lot 45-A or 45-B at the time of taking, warranting dismissal as to those lots.[25]

### F. ALTERNATIVELY DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT BECAUSE PLAINTIFFS CANNOT SHOW A TEMPORARY, REGULATORY TAKING GIVEN THE UNDISPUTED FACTS OF THIS CASE

Because Plaintiffs in the instant case have alleged only a temporary regulatory taking, the Court must evaluate the three-part Penn Central factors to determine whether the governmental action constituted a compensable taking. See Bass Enters., 381 F.3d at 1365 (per se categorical takings

---

[25] Normally, as a threshold matter in a Fifth Amendment takings action, the Court should determine whether the claimant has established a compensable property interest. See Maritrans v. United States, 342 F.3d 1344, 1351 (Fed. Cir. 2003). Whether Plaintiffs have a property interest in the unpatented mining claims depends upon the validity of those claims, which has not been judicially determined. See Holden v. United States, 38 Fed. Cl. 732, 735 (1997) (to bring a takings action on unpatented mining claims, "there must have been a determination as to the validity of those mining claims"). Irrespective of the Plaintiffs' property interest in the unpatented mining claims, the Court may dismiss or grant Defendant summary judgment on the grounds raised in its motion papers.

jurisprudence does not apply to temporary regulatory takings claims, but are limited "to permanent, rather than temporary, regulatory takings. . . ."); see also Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 318 (2002); Penn Central Transp. Co., 438 U.S. at 124. The Penn Central factors are (1) the character of the governmental action; (2) the economic impact of the action on the claimant; and (3) the extent to which the action interfered with the claimant's reasonable investment-backed expectations. Penn Central, 438 U.S. at 124.

While a finding of no economic impact dispenses with the need to consider the other Penn Central factors, see Brown v. Legal Foundation of Washington, 538 U.S. 216, 235 (2003), as a matter of law, all three factors support granting Defendant's motion for summary judgment, as discussed below.

**1. Plaintiffs Cannot Show Economic Harm Resulting from the Government's Alleged Failure to Timely Inform Them of the Biological Opinion, Warranting Summary Judgment for Defendant**

To show a temporary regulatory taking, Plaintiffs must show substantial economic harm resulting from the government's action. The only harm Plaintiffs allege, however, is the loss of speculative profits. As a matter of law, therefore, Defendant is entitled to summary judgment because Plaintiffs fail to allege and cannot show substantial economic harm resulting from the alleged taking.

"The existence of economic injury is indispensable to demonstrating a regulatory taking." Seiber v. United States, 364 F.3d 1356, 1370 (Fed. Cir. 2004); id. at 1371 ("Our court has repeatedly made clear that the failure to provide evidence to support the existence of economic injury is fatal to a takings claim."); see also Hendler v. United States, 175 F.3d 1374, 1385 (Fed. Cir. 1999) ("if the regulatory action is not shown to have had a negative economic impact on the property, there is no regulatory taking"). Additionally, to show a temporary regulatory taking, plaintiffs must prove that

they were "deprived . . . of all or substantially all economically viable use of their property." Walcek v. United States, 44 Fed. Cl. 462, 467 (1999) (citing Anaheim Gardens v. United States, 33 Fed. Cl. 24, 36 (1995); 1902 Atlantic Ltd. v. United States, 26 Cl. Ct. 575, 579 (1992)).

Since Walcek was decided, the United States Supreme has made clear that when considering this prong in the context of an alleged temporary taking, careful attention must be given to the "parcel as a whole," which includes both physical and temporal components: "An interest in real property is defined by the metes and bounds that describe its geographic dimensions and the term of years that describes the temporal aspect of the owner's interest." Tahoe-Sierra Pres. Council, Inc., 535 U.S. at 331-32. "Mere fluctuations in value during the process of governmental decisionmaking, absent extraordinary delay, are incidents of ownership [and] . . . cannot be considered as a taking in the constitutional sense." Id. at 332 (quoting Agins v. City of Tiburon, 447 U.S. 255, 263 n.9 (1980) (quoting Danforth v. United States, 308 U.S. 271, 285 (1939))) (internal quotation marks omitted). Thus, to prove a temporary regulatory taking, Plaintiffs must show that they sustained substantial economic harm resulting from the government's extraordinary delay.

Here, the only economic harm averred by Plaintiffs is the approximate $22 million they seek as "just compensation," which represents their estimate of lost profits had they been in production during the period of the alleged temporary taking. See Oct. 31, 2007 Aloisi Tr. at 76:13-77:16. Plaintiffs' contention, however, that they would have been producing a gold product at any time during the alleged takings period is wholly speculative. See § II.B., supra (explaining why Plaintiffs' takings claim is not ripe). As discussed above, Plaintiffs never submitted a full mining plan that would have allowed such mining operations to go forward. Such an estimate of economic harm, therefore, cannot support liability under Penn Central, because it is based upon the very type of

speculation that courts routinely reject. See Yuba Natural Resources, Inc. v. United States, 904 F.2d 1577, 1583 (Fed. Cir. 1990) ("any attempt to determine how much gold would have been extracted during the taking period, and what its net sales price would have been, would involve the very kind of conjectural and speculative analysis the courts consistently reject . . .").

Moreover, Plaintiffs still possess the unpatented mining claims, and the gold remains in the ground (because the lessees never entered the production phase, although approved). See JSOF, ¶¶ 112, 113; see also Nov. 1, 2007 Ferrero Tr. at 113:19-115:15 (testifying that, based on today's price of gold and mining costs, the profits from mining today "would be in the ballpark" of estimated profits based upon 1990 prices). Plaintiffs' alleged economic injury, therefore, posits a potential double recovery rather than any economic harm. See Pettro v. United States, 47 Fed. Cl. 136, 151-52 (2000) ("were the court to grant plaintiff recovery for his lost profits, the possibility of double recovery would be created," because "the plaintiff retains the sand and gravel").

Additionally, that Plaintiffs were able to lease their mining claims to WAZCO during the alleged takings period (see JSOF, ¶ 97), also shows that Plaintiffs were not deprived "of all or substantially all economically viable use of their property," negating their takings claim. Walcek, 44 Fed. Cl. at 467; see also Conti v. United States, 291 F.3d 1334, 1344 (Fed. Cir. 2002) (no taking where, among other factors, plaintiff "can offer for sale, and can sell, his property"); Marks v. United States, 34 Fed. Cl. 387, 410 (1995) (that plaintiffs were able to sell a portion of their property shows that their land was not left "devoid of all economic viability"); Pls.' Answers to Def.'s Second Set of Interrogatories at 21 (stating income earned from leases) (Ex. E); Oct. 31, 2007 Aloisi Tr. at 149:2-21 (confirming total income of about $120,000 from the WAZCO and LCM leases).

Plaintiffs thus cannot show any economic harm resulting from the alleged temporary taking,

and the Court should dismiss this action. See Brown, 538 U.S. at 235; see also Seiber, 364 F.3d at 1371-72 (plaintiffs' failure to show economic harm warranted dismissal of their temporary takings claim).

**2. Plaintiffs Cannot Show that the Government Interfered with Any Reasonable Investment-Backed Expectations**

Reasonable investment-backed expectations usually will be found to be lacking where the industry at issue has been highly regulated for some time. See, e.g., Rith Energy, Inc. v. United States, 270 F.3d 1347, 1351 (Fed. Cir. 2001) ("A party in Rith's position necessarily understands that it can expect the regulatory regime to impose some restraints on its right to mine coal under a coal lease."); Deltona Corp. v. United States, 657 F.2d 1184, 1193 (Fed. Cir. 1981) (claimant "must have been aware that the standards and conditions governing the issuance of permits could change"); Good v. United States, 189 F.3d 1355, 1363 (Fed. Cir. 1999) (claimant lacked reasonable investment-backed expectation to be free from development restrictions under post-acquisition statutory regime where such restrictions were foreseeable based on the pre-acquisition regulatory regime).

Mining within national forests (and in KNF in particular) had been regulated for years before Plaintiffs acquired an interest in these mining claims. Among those preexisting regulations are comprehensive procedural regimes regulating (1) any proposed ground-disturbing activities (see, e.g., 36 C.F.R. § 228.4(a)); (2) the protection of archaeological and historical resources (see NHPA (16 U.S.C. § 470a-t)); and (3) the protection of wildlife, including spotted owl habitats (see JSOF, ¶¶ 6, 7; see also 36 C.F.R. § 228.8(e)).[26] See California Coastal Comm'n v. Granite Rock, 480 U.S. 572,

[26] 36 C.F.R. §§ 228.4(a) and 228.8(e) were promulgated as 36 C.F.R §§ 252.4(a) and 252.8(e), respectively (see 39 Fed. Reg. 31317, 31318-19 (Aug. 28, 1974)), and redesignated at 46 Fed. Reg. 36142 (July 14, 1981).

599 (1987) ("Congress has entrusted the task of balancing mineral development and environmental protection in the national forests to the Department of Agriculture, and its delegate the Forest Service").

First, the Forest Service regulates ground-disturbing activities within KNF by requiring potential miners to submit for approval operating plans for their proposed operations. See Clouser v. Espy, 42 F.3d 1522, 1530 (9th Cir. 1994) ("[T]his court has upheld Forest Service authority to regulate mining operations in national forests by requiring miners to submit for approval operating plans for their proposed operations.") (citations omitted); Freese, 6 Cl. Ct. at 10 ("With regard to unpatented claims, therefore, the Government retains the right to regulate disturbance of surface resources, as well as the right to permit uses of the surface area of the claim for purposes other than mining."). Forest Service regulations specify that "a notice of intent to operate is required from any person proposing to conduct operations which might cause disturbance of surface resources." 36 C.F.R. § 228.4(a). "If the District Ranger determines that the proposed operations are likely to cause a 'significant disturbance of surface resources,' the operator must file a proposed plan of operations." Clouser, 42 F.3d at 1532 (citing 36 C.F.R. § 228.4(a)). In approving a proposed mining plan, the Forest Service may impose terms and conditions on an operator's mining activities. Id. at 1531; see also 30 U.S.C. § 612.

Second, the Forest Service may impose terms and conditions in a plan of operations to mitigate adverse effects on cultural resources under NHPA. Section 106 of NHPA requires federal agencies to take into account the "effect of the undertaking on any district, site, building, structure or object that is included or eligible for inclusion in the National Register [of Historic Places] . . . [and] shall afford the Advisory Council on Historic Preservation . . . a reasonable opportunity to comment with

regard to such undertaking." 16 U.S.C. § 470f. NHPA contemplates a coordinated effort among the relevant federal agency (in this case, the Forest Service) the Advisory Council on Historic Preservation, the State Historic Preservation Officer ("SHPO"), and the public. See 16 U.S.C. §§ 470a(b), 470f.[27]

Third, in 1984, before Plaintiffs staked out any mining claims in KNF (see JSOF, ¶ 8), the Forest Service had identified the northern spotted owl as a sensitive species requiring, within KNF, a "core area of old-growth timber stands surrounding a nest site, with an additional 700 acres of these stands in one to four parcels within a 1.5 mile radius of the core area," known as a Spotted Owl Habitat Area ("SOHA"). JSOF, ¶ 6. Morever, Forest Service regulations had long required mining operators to "take all practicable measures to maintain and protect fisheries and wildlife habitat which may be affected by the operations." 36 C.F.R. § 228.8(e) (emphasis added). When Plaintiffs staked out a mining claim within KNF, they knew, or should have known, that any mining proposal would be closely examined under existing environmental statutes. Plaintiffs were certainly aware of the regulatory regimes when they submitted their first plan of operation in 1989. See JSOF, ¶ 19, JA23 at 401, 402 (proposing certain Phase I activities depending upon the Environmental Assessment (EA) on the spotted owl).

Other federal, state and local regulatory regimes may apply to a mining operation, including, other preexisting restrictions such as NEPA, Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), and the Clean Air Act (42 U.S.C. § 7401, et seq.), and additional state and local approval.

---

[27] Indeed, the Forest Service notified Plaintiff Aloisi in July 1988 – before Liberty Mining was formed and before any operating plan was submitted – that archaeological resources may be present in Eddy Gulch, requiring cessation of operations. See JA15 at 313, 318 (draft operating plan citing both NHPA, NEPA, and applicable regulations, among other authorities, protecting archaeological resources).

See § I.B.3., supra. Plaintiffs' expectation that they could stake out a mining claim within the KNF and immediately begin extensive mining activities is clearly unreasonable. Well before Plaintiffs staked out a mining claim within the KNF and began to propose operations, extensive regulatory restrictions were already in place. Plaintiffs, therefore, cannot show interference with any reasonable investment-backed expectations, and this prong of the Penn Central test supports granting summary judgment in favor of the United States.

**3. Defendant Is Entitled to Summary Judgment Because Plaintiffs Cannot Satisfy the "Character" Prong of the Penn Central Test**

Under Penn Central, the Court must consider the "character of the governmental action" allegedly giving rise to the regulatory taking. See Penn Central Transp. Co., 438 U.S. at 124. "[A] prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking or appropriation of property. . . ." Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 489 (1987) (quoting Mugler v. Kansas, 123 U.S. 623, 668-69 (1887)). So, for example, government actions that are "directed at protecting the safety, health, and welfare of the communities surrounding the [subject property] by preventing harmful runoff [into local water supplies]" have been characterized as a type of action that does not require compensation. See Appolo Fuels, 381 F.3d at 1351.

Here, the Biological Opinion contained mandatory terms and conditions to protect owl habitat. The Forest Service was actively seeking ways to implement the Biological Opinion, so that Liberty Mining's operations could go forward without jeopardizing the continued existence of the northern spotted owl. As the Supreme Court recognized decades ago, "the plain language of the [Endangered Species] Act, buttressed by its legislative history, shows clearly that Congress viewed the value of

endangered species as 'incalculable.'" Tennessee Valley Auth., 437 U.S. at 187. Accordingly, the Forest Service's efforts to allow Plaintiffs' project to go forward without jeopardizing the northern spotted owl, should be "characterized as a type of action that does not require compensation." Appolo Fuels, 381 F.3d at 1351.

The "character" prong of the Penn Central test, therefore, shows that there was no temporary taking in this case, and summary judgment should be granted to Defendant.

## III. CONCLUSION

For the foregoing reasons, Defendant, the United States, respectfully requests that the Court grant this motion and dismiss this action. Alternatively, Defendant requests that the Court grant its motion for summary judgment.

Respectfully submitted,

RONALD J. TENPAS
Assistant Attorney General
Environment & Natural Resources Division

/s/ Bruce K. Trauben
BRUCE K. TRAUBEN
Trial Attorney
Natural Resources Section
Environment & Natural Resources Division
U.S. Department of Justice
601 D Street, NW
Washington, D.C. 20004
(202) 305-0238 (phone)
(202) 305-0506 (fax)

WILLIAM J. SHAPIRO
Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Div.
501 I Street, Suite 9-700
Sacramento, CA 95814-2322

OF COUNSEL:
ROSE MIKSOVSKY
U.S. Department of Agriculture
Office of General Counsel
33 New Montgomery St., 17th Fl.
San Francisco, CA 94105-3170

Dated: February 6, 2008

# EXHIBIT A

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ALFRED ALOISI, et al., )
)
Plaintiffs, )
)
vs. ) No. 95-650L
)
UNITED STATES OF AMERICA, )
)
Defendants. )
)

DEPOSITION OF THOMAS FERRERO

Thursday, November 1, 2007
9:18 a.m.

Reported By: CRAIG W. WOOD, RPR, CSR No. 9789

APPEARANCES

For the Plaintiffs:
FOLEY & LARDNER
Washington Harbour
3000 K Street, N.W., Suite 500
Washington, DC 20007-5101
(202) 295-4017
BY: LAWRENCE G. McBRIDE

For the Defendant:
DEPARTMENT OF JUSTICE
Environmental & Natural Resources Division
601 D Street, N.W.
Washington, DC 20004
(202) 305-0238
BY: BRUCE K. TRAUBEN

Also Present:

Fred Aloisi

—oOo—



INDEX


| EXAMINATION BY: | Page |
| --- | --- |
| Mr. Trauben | 4 |


EXHIBITS

NO DOCUMENTS WERE MARKED AS EXHIBITS

---oOo---



BE IT REMEMBERED that on Thursday, November 1, 2007, commencing at the hour of 9:18 a.m., of said day, at the offices of Klamath National Forest, 1312 Fairlane Road, Yreka, California, before me, Craig W. Wood, a Certified Shorthand Reporter in and for the State of California, there personally appeared

THOMAS FERRERO,

who, being first duly sworn by me to tell the truth, was examined and testified as follows:

—oOo—

EXAMINATION

BY MR. TRAUBEN:

Q. Please state your full name for the record.
A. Thomas Paul Ferrero.
Q. Mr. Ferrero, my name is Bruce Trauben, I represent the United States, the defendant in this action of Aloisi, et al, versus the United States.
And I understand you've been deposed in this action previously?
A. Yes.
Q. So I'm going to forego the normal preliminaries of explaining the rules of a deposition. I will remind you, though, that if you need to take a break for any reason, just say so and we'll take a break.



A. Okay.
Q. Can we start off by having you take a look at Plaintiff's Exhibit A-171.
A. (Reviewing document.) Okay.
Q. What is Exhibit A-171?
A. It's the cert field notes of a survey of the Klamath Blacksmith Tunnel by H. Behrens, done in 1936.
Q. And what is this -- what do these notes show?
A. They show the bearings and distances from point to point, mapping the course of the Blacksmith Tunnel and some of the side workings off of it.
Q. And based on these notes, is it possible to locate the tunnel in the field? On the ground?
A. Based on these notes?
Q. Yes.
A. No.
Q. And the last page, is that a summary of the notes that you created?
A. This is my plotting of the data in the notes.
Q. And the different -- I'll describe it for the record, there appear to be five depictions surrounding a line that was like three parallel lines which are running northeast to southwest.
A. Uh-huh.
Q. Does this -- your graphical representation show

Q. At what point?
A. October, the October '89 plan was approved for phase one and parts of phase two.
Q. Okay. So you're assuming that a decision had been made by that time regarding the Spotted Owl?
A. I honestly don't remember how that played in that approval; whether they had said to us the owl had been resolved or not at that point, I don't recall.
Q. Okay.
A. It wasn't -- I don't recall it being an issue at that point, but it did become an issue -- no. Wait a minute, I'm sorry. My memory is wrong. Let me back up.
When I submitted this long-range plan, it was after that that we were told we needed to mitigate what I described earlier, the ponds and the roads and the apex corridor. And we mitigated those things and that resolved the owl issue as far as we were concerned, as far as what we were told. And that's why we were approved in October.
Q. Okay. And that was when the owl was still a sensitive species, not yet listed as a threatened or endangered species?
A. Yeah. I believe it wasn't actually listed until 1990.
Q. So in August '89 that's reflected in FS-289, the plan on the table was the June plan that had been --



the plan that had been approved in June?
A. Yes. That was what we were -- what we had at this point. Yes.
Q. Well, sorry to go back and forth, but can you go now to plaintiff's document A-44.
Can you describe for the record what A-44 is?.
A. It's a letter to me in response to a meeting between myself and I believe it's Wayne Vera -- no. The letter is from Martin Taylor. Vera was the planning director, I believe. No, Robert Simmon was.
Anyway, it's a letter following up on a meeting with the planning department between myself and them regarding Eddy Gulch.
Q. And why were you meeting with the planning department in March 1990?
A. To discuss what we needed to do in terms of county permitting for the operations on private lands within the claim.
Q. Was your understanding that some county permitting was required for operations even on private lands?
A. Actually, it was just the private lands, is what we were told. The county wasn't involved in the government land, that the Forest Service was the lead agency with the state. SMARA and the historical



preservation organization and all that. This was specifically regarding the Mountain Laurel and Rollin.
Q. If you look at the -- I guess it would be the third paragraph, bottom of the first page, says, "I would encourage you to provide to this department a project description outlining the activities to take place on both private and public lands."
Do you recall whether that was done?
A. I don't believe it was. Now, we may have supplied them with a copy of our Plan of Operation to the Forest Service to cover that, but I don't know that for sure. If I was doing it today, that's what I would do. But I don't recall if I did that or not.
Q. Okay. Then the paragraph above, second paragraph, it states, "As we discussed, a use permit must be approved and issued, reclamation plan approved and reclamation agreement executed prior to commencing mining operations on private lands."
A. Yes.
Q. And, to your knowledge, was a use permit approved and issued with respect to any operations in Eddy Gulch?
A. No. Not from the planning department.
Q. And had a reclamation plan been approved and a reclamation agreement executed with respect to any



operations on private lands in Eddy Gulch?
A. No. At that time we weren't operating on private land, so we hadn't gone forward with that. We were operating on the government land at that point.
Q. Okay. And then it says, "Further, pursuant to Assembly Bill 747, a reclamation plan must also be approved and reviewed by Siskiyou County for that portion of your project occurring on public lands."
Do you see that?
A. Yes.
Q. Was a reclamation plan approved by the Siskiyou County for any operations by Liberty Mining in Eddy Gulch that were planned to occur on public lands?
A. I don't recall anything like that.
Q. Had a -- strike that.
Can you look at the last page of that letter for me, please. You see in the -- the "cc" at the bottom -- or "pc" identified in this case, you see it says, "Fred Aloisi" --
A. Yes.
Q. -- "as pres," I guess meaning president, "Diamond Core Drilling."
A. Uh-huh.
Q. Do you know what "Diamond Core Drilling" is?
A. Yes. It was an entity created having to do

Page 62

with the operations of the core drill that was bought by -- I believe it was Fred and Don Goodman.
Q. Did you have any interest in it?
A. No.
Q. Okay. Can you go to the plaintiff's document A-55, please.
A. I apologize. 45 or 55? Okay.
Q. Is this your handwriting in the -- up to the map? First seven pages?
A. Yes.
Q. Do you recall having a meeting with Mike Lee and Al Buchter in Etna on May 9, 1991?
A. Oh, yes.
Q. If you look at the what's identified as page 2/2. Under item five, "Metallurgical Testing," and there are a couple headings. One is "Amalgamation/Flotation."
A. Uh-huh.
Q. And then below that underlined, it says, "Cyanide Leach and Amalgamation -- or a-m-a-l-g/f-l-o-t," see where I'm looking?
A. Yes.
Q. I guess "a-m-a-l-g" was the abbreviation for amalgamation?
A. Yes.

Page 63

Q. And "f-l-o-t" is abbreviation for flotation?
A. Yes.
Q. And then "/cyan," which I assume means cyanide leach combination?
A. Yes.
Q. Can you explain what these options are, if they are options. What is "amalgamation/flotation"?
A. It's a series of milling methods where the material is subjected to one and then another and then another. The tails from the first one go through the second one. The tails from the second one go through the third one.
Basically what you're doing is -- with amalgamation, you're extracting the free gold, the coarse and liberated gold that's not encapsulated in silica or coated with carbonation slimes or whatever. And the flotation is a combination gravity and chemical process that extracts, makes a concentrate, usually a sulfide. Mostly sulfides come out in that process.
And what you don't get with the amalgamation and the flotation cyanide is designed to take a high percentage of whatever is left because it dissolves the gold.
Q. At this meeting in May '91, did -- were you representing the interest of Liberty Mining at this

Page 64

meeting? Let me rephrase it.
Were you there on behalf of Liberty Mine?
A. No.
Q. For whom were you there attending this meeting?
A. For me.
Q. For you personally?
A. Yes.
Q. Okay. This was for your own edification or does this relate to your work for Liberty Mining?
A. I asked for a meeting with Mike Lee and Al Buchter because I thought that they were making a mistake by making such an issue about such a small operation. And that -- I told them that we were going down a road where it was going to go on and on and on and it was going to be a big disaster.
And I was trying to explain to them the scale of the thing and that it really had merit and that under the mining law we had a right to proceed as long as we did it clean. And I was going to make sure it was done clean.
And that why didn't they just ease off and if it didn't have merit, we'd find out. We'd start running and wouldn't get anything and we'd go away. But if we had it, we had a right to mine it.
That was basically the reason I held the

Page 65

meeting, it was on my own to try to get through to them as a professional to another professional.
Q. But you were espousing the position of Liberty Mining at that meeting?
A. I don't think Fred knew I even had the meeting. I know he didn't. I did it on my own.
So, yes, I was presenting the position of that operation, but I was invested in the operation in the sense that, you know, I had thought it up and I thought it was a good plan. And it was phased so that it didn't get out of hand. If it turned out that there were a problem or something didn't live up to the expectation, that it would stop at that point.
And that I was going to make sure that it was done clean. I'm an engineering geologist, an environmental geologist. That's my job. That's what I do out in the rest of the world.
And I just wanted them to know that, that it wasn't just some crazed miners out there that were going to tear up the hill. And it was very small and it didn't really merit the disaster that appeared to be occurring.
Q. And just to make clear, you had no stake in the operation at this point?
A. No.

Page 66

Q. Or at any point?
A. No.
Q. So, to your knowledge, then, did you discuss with Mr. Lee and Mr. Buchter the potential use of the cyanide leaching operation in the Eddy Gulch mines?
A. I must have. It's listed here in my list of topics.
Q. Was this -- to your knowledge, is this the first time use of cyanide came up in discussions regarding --
A. No. I think it was in plans that led up to this, in the plans of operations.
Q. To use cyanide?
A. Yes.
Q. In what?
A. I'd have to dig. You want me to look?
Q. Well, actually, let's take a look.
A. I have them all in sequence right here.
Q. Yeah. Give me just one second.
A. We may not have included it in the plans. I know we were working on the testing for it long before that. Let me look.
Q. Let's go back a couple months in time and look at Plaintiff's A-144.
MR. McBRIDE: Show marked as the same as Forest

Page 67

Service 76. But, yes, he has it now.
BY MR. TRAUBEN: Okay. Thank you.
Q. Is document A-144 a memorandum that you wrote to the Forest Service dated March 11th, 1991?
A. Yes.
Q. And that's your signature on the second page?
A. Yes.
Q. And this was -- this memo that you sent to the Forest Service was just a couple months before the meeting in May '91, obviously?
A. Yes.
Q. Okay. Can you take a look at the second page, item ten.
A. Yes.
Q. Number ten. It says there in parentheses "no cyanide"?
A. Correct.
Q. Were you informing the Forest Service that there were no plans to use cyanide in Liberty Mines' operations at that point?
A. At that time.
Q. And between March '91 and May '91, was there a decision made at some time during that period to use cyanide in the Liberty Mine operations?
A. No. This was something that I did on my own to

Page 68

show the possibilities of where it might go. We hadn't decided at that point exactly what we were going -- whether we were going to include a cyanide circuit.
We had been advised that it was going to be difficult to get a cyanide circuit. But I also knew from my own experience that I had worked at operating cyanide mines and that it certainly wasn't impossible. But I was sort of waiting for the process that was going on within the company to fall out.
Each time we made these plans, they were basically yearly intervals because we were on this one year renewal process. And they vary. Sometimes we think we're going to use cyanide, sometimes we don't. But that was because we were in the process of testing the efficiency of it and weighing the regulatory problems.
Q. Okay. Just so everybody is clear on the record and everything, the cyanide circuit that you're referring to is not the heap leach method?
A. Absolutely not. No.
Q. Okay.
A. No. It's a carbon and pulp vat leach, which takes place in a big tank and you build big concrete containments that hold more material than the tank holds. So even if the tank dissolves or it all empties

Page 69

out, it's all contained. And the tailings are washed and the cyanide is recirculated into the system. So it's a closed system.
Q. A closed system.
And a heap leach system is an open system where cyanide solution is leached through a pile of ore to extract gold out in the environment?
A. Well, a properly designed heap leach system is also a closed system. They haven't all worked that way.
But because the piles are set on a liner, a heavy liner, and the pregnant solution, which is the cyanide solution, after it circulates through the pile and collects under the pile and then is transported to the pipes at the low end, it never makes contact with the actual earth, it's separated by a liner. The problems that have occurred in some heap leach operations is where the liners have failed. Generally.
Q. So some containment systems that you -- I think you said, the system that you were contemplating, that would have required some containment system?
A. Absolutely.
Q. Had there been engineering designs for a containment system?
A. We never got to that point.
Q. Take a look at the next page. Looks like the

A. Yes.
Q. Is that also based on the amalgamation and flotation?
A. No. Underground ore at Eddy Gulch has yielded actually over a half ounce from gravity separation throughout its history. So that's a very conservative number. And that's probably gravity separation.
Q. Gravity --
MR. McBRIDE: Concern about what number is actually on the record as opposed to on the page, 0.3?
THE WITNESS: O.3.
MR. McBRIDE: Yes.
BY MR. TRAUBEN:
Q. 0.3.
Okay. If you look to the right where the assumption line for the underground workings.
A. Yes.
Q. The cost per ton it appears to be at $100 per ton?
A. Yes.
Q. Is that because of the increased costs in the processing or in the extraction?
A. The mining.
Q. The mining.
A. The actual physical mining. Yes.



Q. Let's go back a couple pages into the document. There's -- at the top of the page it says, "Want 'outline plan,' approval asterisk." Do you see that page?
A. Yes.
Q. What does that mean? What did you mean here when you wrote this, that you want -- or who wants an outline plan approval?
A. It's basically -- the plan we submitted as the all phase plan, that's an outline plan. That is a -- what we were really after was to know that -- the general concept of what we were planning to do down the road. Even though we were working in phases in terms of the phases in terms of the details, we didn't want to get halfway down through the process and find out that the concept of where we were going was impossible. So we wanted to know that the broader plan -- we weren't asking for every detail of it to be approved, we were asking whether they could swallow the whole plan conceptually. And that's what the outline plan is.
Q. I appreciate your answer. My question actually was a little more simple than that. I was asking who wanted the outline?
A. Oh, I'm sorry. I did. Because this was something I did on my own. I mean, I was -- at that



point I was talking about the operation, but because I was there on my own, I was speaking for myself.
Q. But isn't it also fair to say that Liberty Mining at that time wanted its outline plan approved?
A. Absolutely.
Q. Okay. Then there's a list of eight items. What are those items? What do they reflect?
A. Say that again.
Q. The list of items underneath that heading.
A. They're items that needed to be satisfied. What I was saying was, yes, we know we need to do these things to get there, but we just want to know that if we do all those things, that the general plan is not an impossibility conceptually.
Q. Okay. Can you please take a look at A-62.
A. Okay.
Q. And what is A-62?
A. It looks like a letter from me to Harry Frey and the subject is "Response to questions in the letter of Wayne S. White, U.S. Wildlife Service."
Q. And it's dated March 4, 1993?
A. Yeah. This is dated March 4, 1993.
Q. And if I understand correctly, this was a -- this is a response to the Forest Service to questions posed by the Fish and Wildlife Service?



A. Yeah. Harry was asking me to help him respond to the questions that were being asked by Fish and Wildlife, if I could fill in some blanks for him.
Q. And put it all in context, this is during what we refer to as the second consultation on the Spotted Owl?
A. I would guess so from the date. Yes.
Q. Can you turn to the second page, please.
That's your signature?
A. Yes.
Q. Okay. Item nine. If you could take a look at that. Okay. And you make a statement -- well, why don't you go ahead and take a look at item nine.
A. (Reviewing document.) Okay.
Q. There's a statement there that, "Silica waste will be deposited in the ET pit layered with natural material stockpiled around the pit during its operation."
A. Yes.
Q. And then the next statement says, "This will safely bury mill waste and reclaim the ET pit area"?
A. Yes.
Q. How do you know that in this at this time?
A. How do I know that?
Q. Yes.

this. I'm just thinking in terms of deposit. The deposits are on -- what claim they're on.

The complaint involves the entire property, if I'm not mistaken. Whereas, the contest action was narrowed to the claims that we were permitted to operate on, I believe. But because I'm not including all the properties doesn't mean that we didn't project that we were going to work those properties.

I'm still trying to function within the range of what we had -- what we knew and what we were permitted to do at that time for the period of time we're talking about, the 1990 to 1994 period. We knew we had a good target under the Union. We knew we had a good target under the Six O'clock. And we knew we had the Dumps and Apexes.

Now, I haven't included the Union in these totals because we never got permitted specifically to do that, but -- and that's this -- but that was definitely one of our primary targets.

Q. When you said "the Union," you mean the May Tunnel Underground?

A. May Tunnel Underground. You discussed that earlier with Fred about we didn't really have to be permitted to go in through the Union Tunnel.

So my -- if you asked me to generate a bottom



line number that would be my recommendation for the evaluation of the property, I would add in that Union -- that Union deposit.

Q. It shows here for the Union deposit on spreadsheet eight, looking at that first, the .05 cut-off, profit before capital cost at 7.4 million roughly. And I believe yesterday Mr. Aloisi estimated that it was more along the lines of $30 million.

Do you disagree with that?

A. No. I don't disagree with that. I'm trying to be conservative and say, okay. We have this large area of backs, in mining terminology it means area of vein available. And I just picked an arbitrary 50,000 ton deposit, but the potential is much greater.

Q. And -- I'm sorry. Go ahead.

A. We haven't completely blocked it out. We have assays above it. We have some drill holes. We have production on two sides of it. We have really strong indicators and good geologic data that we believe there's going to be substantial production from that area. But we don't have enough information to know exactly what that tonnage is.

So Fred's $30 million is well within the range of what I believe we're going to find in -- $30 million is well within the range. But for the sake of



conservatism in this calculation, I assume a smaller deposit because we have less hard data on that area than we do on other places.

Q. You used it as a guidance, you said, "We haven't completely blocked that out." Did you mean by that that it hasn't been totally or completely delineated?

A. Right. The boundaries or the exact boundaries within the ore bodies within the section of veining haven't been -- I can't draw a line and say this is the outer boundaries of that ore body.

Q. Have you been asked by counsel or anyone to --

MR. McBRIDE: Object to what asked by counsel will be. Attorney-client.

MR. TRAUBEN: Well, he's not your client, though, is he? Mr. Ferrero is one of your retained experts in this matter?

MR. McBRIDE: Yes.

MR. TRAUBEN: And your client is Mr. Aloisi and Liberty Mining?

MR. McBRIDE: Uh-huh. All right. You can pursue the question. All right.

BY MR. TRAUBEN:

Q. Have you been asked by counsel or anyone to revise your charts to include other deposits that are



reflected in these charts that we have in front of us?

A. No. I made all the decisions that I made on the spreadsheets.

Q. But do you understand my question? In other words, are you going to add in additional deposits?

A. Am I going to?

Q. Have you been asked to do that?

A. No. The thing about this is that the potential of the property from a geologic standpoint is much larger production. I mean, if I went into a statistical analysis of what I believe is there, it would far exceed any of this. But I'm trying to stay within the balance of what -- you know, we have some descent hard data on. So that's what this is.

Q. Then considering the price of gold today, which I think you -- during a break you were surmising it's around $800 per ounce. Is that correct?

A. Yes.

Q. Based on your knowledge of the deposits that are in the ground in the mining claims at issue in this case in Eddy Gulch, do you think that the mining claims today are worth more than the $17.8 million reflected on sheet eight?

A. If I calculated it in today's numbers for price and costs with the same parameters that I'm using here,

I'm not sure that it would be more because costs have inflated as the gold price has. So it may be in the same ballpark for these deposits.
I believe that the property ultimately if put in production will yield way more than any of these numbers, but if you use these assumptions, it's probably pretty close. Because of the incredible rise in price, the price of mining, along with the incredible rise in the gold price.
Q. So, in other words, the prices that are reflected here, these are based on 1990 costs?
A. Yes.
Q. And 1990 price of gold?
A. Yes.
Q. And if you updated that to reflect the cost today and the price of gold today, you think it would be about the same?
A. I'm saying it would be in the ballpark. I did do a calculation similar to that on earlier spread sheets that weren't as advanced as these for the contest. And I used a factor, which we have discussed before, for inflation, but -- and that inflation was industrial -- was applied to industrial uses.
But mining costs have a life of their own. They're not necessarily equal to every other industry.



So if I was asked to generate an accurate estimate of today's cost, I would probably talk to some people that are working in operating a mine right now and find out what their actual day-to-day costs are to get that.
At the time I did those spreadsheets, I didn't have access to that information and I used a round number that is the result of statistics over the last ten years. So I think it's close, but I wouldn't say that it's definitive.
And so that 50 percent increase is -- in costs, if that was true, is a little less than how much the gold price has risen. So that would suggest that maybe we'd make a little more on it now, but I don't know that that is really true because the mining costs have gone up so much.
Q. Now, these sheets eight and nine rely on information from other work sheets. Is that correct?
A. Yes.
Q. And so let's work backwards to see how you get to sheet eight. Because sheet eight has the greater value, we'll stay with that and let's figure out on the record how do you get to the 17.8 million from working off the prior sheets. Can you explain that?
A. Okay. I think the best way to explain it is to go back to sheet one and work our way forward toward



sheet eight.
Q. Okay.
A. Because that's the way I did it.
First of all, behind sheet one there are a number of sampling episodes which include the Forest Service contest action samples. They include samples by New Cinch Uranium in the 1970s. Include Elmendorf in the 1930s. This goes back to 1932. The complete set of base assay and metallurgical data.
Okay. I'm talking about sheet one here.
MR. McBRIDE: Still in A-151.
THE WITNESS: Yes.
BY MR. TRAUBEN:
Q. Okay.
A. So what I did was I made charts of all of the different assays and put them under the heading of which deposit, where they came from, whether it was Klamath Dumps, Klamath Apex, Klamath Ore Stockpiles, Klamath Underground, Union Dump, Union Underground, Mountain Laurel, Six O'clock Apex, Six O'clock Underground, Anna Johnson.
Now, I am -- what I'm doing is I'm giving each sample value of one within its group and I'm basically creating weighted averages. So that for each little -- like, for instance, under Klamath Dumps, I have it



broken into the different sampling events on this list. And then at the bottom I have the weighted average of all of those under that topic, so that I get an average grade for that deposit.
So basically what you're looking at is a chart that shows the individual sampling event at weighted average grades from the assays and the metallurgical tests. So that would be head grades from metallurgical tests and assays from just the assays. From each one of the different sampling events, but they're grouped by deposit. Okay.
And at the bottom of each one of those groupings is the weighted average of all of those. So you get a deposit wide weighted average of grade.
Q. Okay. What is the column that's headed "#SA x OPT"?
A. Number of samples.
Q. And is that the weighting?
A. Yeah. That's how you weight -- that's a created weighted average.
Q. Okay. So you're weighting the number of samples eight times 0 -- for an example, you're taking in the first line of data on sheet one, number of samples eight, times average assay ounce per ton 0.129 and that gives the result of 1.032. Correct?

# EXHIBIT B

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ALFRED ALOISI, et al., )
)
Plaintiffs, )
)
vs. ) No. 95-650L
)
UNITED STATES OF AMERICA, )
)
Defendants. )
)

DEPOSITION OF ALBERT BUCHTER

Monday, October 29, 2007
9:30 a.m.

Reported By: CRAIG W. WOOD, RPR, CSR No. 9789

APPEARANCES

For the Plaintiffs:
FOLEY & LARDNER
Washington Harbour
3000 K Street, N.W., Suite 500
Washington, DC 20007-5101
(202) 295-4017
BY: LAWRENCE G. McBRIDE

For the Defendant:
DEPARTMENT OF JUSTICE
Environmental & Natural Resources Division
601 D Street, N.W.
Washington, DC 20004
(202) 305-0238
BY: BRUCE K. TRAUBEN

Also Present:

Fred Aloisi

—oOo—



INDEX


| EXAMINATION BY: | Page |
|---|---|
| Mr. McBride | 5 |
| Mr. Trauben | 75 |
| Mr. McBride | 92 |
| Mr. Trauben | 99 |


EXHIBITS

NO DOCUMENTS WERE MARKED AS EXHIBITS

—oOo—



BE IT REMEMBERED that on Monday, October 29, 2007, commencing at the hour of 9:30 a.m., of said day, at the offices of Klamath National Forest, 1312 Fairlane Road, Yreka, California, before me, Craig W. Wood, a Certified Shorthand Reporter in and for the State of California, there personally appeared

ALBERT BUCHTER,

who, being first duly sworn by me to tell the truth, was examined and testified as follows:

---oOo---

MR. McBRIDE: Lawrence G. McBride, Foley & Lardner, for plaintiffs. This is a deposition in -- the caption of the case is Aloisi, A-l-o-i-s-i, et al., versus United States, No. 95-560, in the Court of Federal Claims.

MR. ALOISI: It's 650.

MR. McBRIDE: All right. Yes?

MR. Aloisi: It's 650 not 560.

MR. McBRIDE: Did I say 95-650?

MR. ALOISI: You said 560, it's 650. Excuse me.

MR. McBRIDE: And today is the deposition of Al Buchter. Before we actually start with questions for Mr. Buchter, do you want to put yourself on the record?

MR. TRAUBEN: Yes. Bruce Trauben representing defendant United States. And, also, I am -- I'll be



objecting today. I'm not Mr. Buchter's personal attorney, but I'm here representing the defendant.

Also, I wanted to state on the record, as we discussed before going on the record, that all objections as to admissibility will be preserved and we will be objecting as to the forms of questions which can be corrected during the course of the deposition.

BY MR. McBRIDE: Thank you, Mr. Trauben.

EXAMINATION

BY MR. McBRIDE:

Q. I'd like to go back over a few ground rules here, Mr. Buchter. Do you recall that I deposed you ten or 11 years ago?

A. Yes.

Q. You do recall that deposition.

In that deposition I think you were my first deponent in the case, so we spent a long time where I was learning the Forest Service, if you will, and learning who was in what position and all that kind of stuff. So I'm going to be going back into some of those things.

And Mr. Trauben could have an objection that some of these questions might have been asked and answered, but I'm going back into these things sort of to take us to the points where I need to get to supplemental questions. And

Page 74

Q. You don't remember?
A. Again, I'd have to speculate.
Q. And how far did that environmental assessment get, if you recall?
A. We did review on the ground. Whether it was complete, I would think that there was -- there would have been questions that were generated. And probably some correspondence back to Fred on clarification of processes or whatever.
Q. Are you speculating now or are you remembering?
A. I am speculating. I know that there was meetings on the ground.
Q. Fine. And any other recollection as opposed to speculation about how far it got or what was done?
A. No.
MR. McBRIDE: Mr. Trauben, I don't think we've ever seen any file related to that. So I'll follow up with you in that regard that would constitute an environmental assessment or the initiation of the environmental assessment either in 1992 or in 1989.
Thank you. I'm done. Do you have clarification or --
MR. TRAUBEN: Yes. I'll have some questions.
Bruce Trauben for the United States, just for the record.

Page 75

EXAMINATION
BY MR. TRAUBEN:
Q. Mr. Buchter, can you take a look at Forest Service 110. Take a minute and take a look at that document.
A. (Reviewing document.)
Q. You don't have to read it all in detail, just familiarize yourself with what it is.
A. Okay.
Q. For the record, that is a September 25, 1992, memorandum. Addressed to Jay West, Fish and Earth Science Staff Officer. And it's signed by Polly Haessig, Cal Conklin and Juan de la Fuente. Is that what you're looking at?
A. Uh-huh.
Q. Is that FS-110? Did you say "yes"?
A. Yes.
Q. Okay. And the subject is "Eddy Gulch Mines Field Visit September 17, 1992." Do you see the subject line?
A. Uh-huh.
Q. That's correct? "Yes"?
A. Yes.
Q. And did you participate in that field visit?
A. Yes.

Page 76

Q. In fact, it says in the first paragraph that "Forest Service personnel included Al Buchter"?
A. Yes.
Q. That's you.
And what was the purpose of that field visit?
A. In 1992, the forest was reviewing mines for possible water contamination.
Q. Is this part of the EA process?
A. This was not.
Q. If you look on the third page, under "Recommendations." See recommendations one through five where I'm looking?
A. Okay.
Q. And it says, "Those are our highest priority and are of prime importance for assessment of a Plan of Operation and the NEPA process"?
A. Yes.
Q. Do you see where I'm reading?
A. Yes.
Q. Is the EA part of the of the NEPA process?
A. Yes.
Q. So then was this site visit related to the NEPA process?
A. This was separate from the NEPA process.
Q. Did it identify some information needs for the

Page 77

NEPA process?
A. Yes.
MR. McBRIDE: I'm going to object to form. You're asking him all "yes" or "no" questions. He's your witness. Can you induce testimony instead of asking him "yes" or "no" questions, please? Objection to form.
BY MR. TRAUBEN:
Q. And there's a list of items that were identified that Liberty mining needed to provide. Do you see that list?
A. Yes, I do.
Q. And, for an example, if you look at the item number three on the third page, says, "Liberty mining, Incorporated needs to provide engineering designs and map locations for roads, pits, ponds, mill sites and other planned earth work and structures for review." I read that correctly?
A. Yes.
Q. To your knowledge, were those engineering plans submitted?
A. My best correct recollection is no.
Q. Then on the last page, item nine --
MR. McBRIDE: Is there a question out?
MR. TRAUBEN: Yeah. I'm still thinking.
Q. Says that, "The Plan of Operations must estimate

the volumes of fine sediment and tailings that will be trapped by the ponds and establish reclamation sites for the sediment." Do you know whether those estimates were submitted?
A. To the best of my recollection, no. They were not submitted.
Q. Was there a need for an estimate of volume of water that would be used from the Eddy Gulch? Was that one of the information needs that were identified to complete the NEPA process?
A. It would be required because the east fork of Eddy Gulch for a considerable portion of the year produces little water. So if you're going to be using that water for milling and power generation, you'd have a complete depletion of the creek itself.
Q. To your knowledge, was an analysis of the volume of water usage for the Liberty mine submitted?
A. Best of my recollection, no.
Q. And you would have needed that information to complete the NEPA process?
A. Yes.
Q. Do you still have Liberty Consolidated Mine tab five? Let me put in front of you Liberty Consolidated Mine tab five document, which is dated February 4, 1994.
There's a list of itemized activities on that



document. I believe you testified earlier that to haul waste rock, which is item one, and the second half of that page would have required digging. My question is, would this not depend upon the location and situation of the waste rock?
MR. McBRIDE: Objection to form.
MR. TRAUBEN: What's your objection?
MR. McBRIDE: You're leading him to a "yes" or "no" question. Can you induce testimony rather than to ask a "yes" or "no" question?
MR. TRAUBEN: I'll rephrase.
Q. Whether or not the -- what would that depend upon, whether to haul waste rock would require digging?
A. Well, if you're just hauling material, that's what they're authorized to do. It infers that it's going to be dug and loaded on the truck. But they're authorized to haul.
Q. So if the waste rock is sitting on the surface of the ground, would that require digging?
A. No.
Q. Also, earlier you referred to SHPO. Do you know SHPO refers to?
A. State Historic Preservation Officer.
Q. Is that a state act?
A. It's --



Q. State law?
A. It's a state law for California. And that is a specific person.
Q. I believe earlier you testified that the April 1, 1992 plan had a number of acres that were different from acres that were proposed to be disturbed in earlier plans. Do you recall that testimony?
A. Yes.
Q. And I think that Mr. McBride elicited testimony that the number of acres was actually less than the areas of proposed disturbance from the earlier plans. Do you recall that testimony?
A. Yes.
Q. Is it a factor -- you can tell me, does it matter where those acres are located within the project area?
A. It would matter where they were located because of the type of clearances that would be required. An area that would be cleared in a brush field doesn't have anywhere near the concern of an area that'd be cleared in a -- an old growth forest.
Q. And that's because of what?
A. The disturbance to habitat for the Spotted Owl.
Q. Were there Spotted Owls near the proposed project?
A. There were some near the project.



Q. And you're not an expert on the Spotted Owl?
A. No.
Q. So in connection with this project, if -- what would you do, if you had specific recollection, to inform yourself of what could be done, what could not be done with respect to the presence of the Spotted Owl?
A. What I would require from a proponent would be where the project was located, what was going to be done as far as clearances, new road construction, excavation pits, the specifics on what kind of clearing would be done. And then I would take that information and go to the wildlife biologist, give him the information, and then he would conduct a underground survey and a paper survey and initiate consultation service for potential for impacts to the Spotted Owl or other related species. It's not just the Spotted Owl that is of concern.
Q. There are other species?
A. There are other species.
Q. What other species?
A. Specifics, I'm not sure, but it would be both aquatic species that may be impacted and terrestrial species like Mollusks or plant species.
Q. And would that be done in-house informally between you and the wildlife biologist, the consultation?
A. The initial talking about it would be informal,

# EXHIBIT C

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ALFRED ALOISI, et al., )
)
Plaintiffs, )
)
vs. ) No. 95-650L
)
UNITED STATES OF AMERICA, )
)
Defendants. )
)

DEPOSITION OF ALFRED ALOISI

Wednesday, October 31, 2007
9:20 a.m.

Reported By: CRAIG W. WOOD, RPR, CSR No. 9789

APPEARANCES

For the Plaintiffs:
FOLEY & LARDNER
Washington Harbour
3000 K Street, N.W., Suite 500
Washington, DC 20007-5101
(202) 295-4017
BY: LAWRENCE G. McBRIDE

For the Defendant:
DEPARTMENT OF JUSTICE
Environmental & Natural Resources Division
601 D Street, N.W.
Washington, DC 20004
(202) 305-0238
BY: BRUCE K. Trauben

Also Present: Thomas Ferrero
Hilton Cass

—oOo—



INDEX


| EXAMINATION BY: | Page |
|---|---|
| Mr. Trauben | 4 |


EXHIBITS


| FOR THE DEFENDANT'S: | | |
|---|---|---|
| 1 | Quitclaim Deed | 29 |
| 2 | Tax Assessor Cards | 47 |
| 3 | Document | 129 |
| 4 | Letter | 131 |


---oOo---



BE IT REMEMBERED that on Wednesday, October 31, 2007, commencing at the hour of 9:20 a.m., of said day, at the offices of Klamath National Forest, 1312 Fairlane Road, Yreka, California, before me, Craig W. Wood, a Certified Shorthand Reporter in and for the State of California, there personally appeared

ALFRED L. ALOISI,

who, being first duly sworn by me to tell the truth, was examined and testified as follows:

---oOo---

EXAMINATION

BY MR. TRAUBEN:

Q. Will you please state your name for the record.
A. Alfred L. Aloisi.
Q. And you go by Fred?
A. Yes, I do.
Q. As you know, my name is Bruce Trauben. I represent the United States, the defendant in this action.
A. Yes, Bruce, I've made your acquaintance.
Q. I'll have some questions for you today. And just as an overview of what we're going to do today, I'm going to ask you some general questions about the -- who the plaintiffs are and the status of the plaintiffs.



We'll go into the property interest of the plaintiffs. The knowledge of the owl. We'll talk about the various components that go into a takings case. So just to give you an overview of what we'll be discussing.
A. Thank you.
Q. And, also, we'll get into your prior deposition. I have some follow-up questions and some discovery responses.
A. Very well.
Q. I understand from discussions with your attorney, Mr. McBride, that Mr. Goodman has passed away.
A. Yes, he has.
Q. And do you know when?
A. Approximately three, four years ago. And I'm not certain of the exact date.
Q. When did you learn of his passing?
A. I would say three years ago.
Q. Do you know, was it sudden, his death?
A. No. It was -- I believe his health deteriorated over a considerable period of time. Don was diabetic and he had other problems, as well.
Q. Do you know whether his estate is still in probate?
A. I do not know.
Q. Do you know who is representing his estate?

Page 46

A. We still held the lease.
Q. You held the lease. And was the Usher property then -- or how did you refer to it -- the security group part of your operating plan?
A. Yes.
Q. Okay. In this memo Mr. Wernicke attributes to you a statement that you did not want to be involved with occupancy issues?
A. That's not correct.
Q. Okay. You recall that discussion?
A. Yes.
Q. And what did you mean or what had you said?
A. Well, that's a --
MR. McBRIDE: Can we back up and establish any foundation about occupancy issues?
MR. TRAUBEN: Very good. Thank you.
Q. What occupancy issues did you and Mr. Wernicke discuss?
A. We posted a $600 reclamation bond to be able to use the two Usher cabins for storage of equipment and core and also for housing for our crew. And I -- that bond, I don't believe I redeemed that bond until just late '90s.
Q. So the occupancy issue you're referring to is occupancy of cabins that were located at Usher Flat. Is

Page 47

that correct?
A. On the Usher claims, not on the flat.
Q. Okay. Did Liberty Mining intend to mine any of the security group in the time period leading up to July 23, 1990?
A. It was something that we had considered adding on as a supplement to our Plan of Operations.
Q. You considered it, but had not done so?
A. Not at that point. No. We were using it primarily for housing and milling, future mill site.
MR. TRAUBEN: Can you have this marked as Exhibit 2, please.
(Defendants' Exhibit 2 was marked.)
BY MR. TRAUBEN:
Q. Mr. Aloisi, I'm going to hand you what's been marked Exhibit 2 to your deposition today. And I will represent to you that these are records that were obtained locally in the county records.
A. Uh-huh.
Q. And it concerns lots 45-A and 45-B.
A. Uh-huh.
Q. I believe they are tax assessor cards.
A. Yes.
Q. And they reflect change in title to the lot 45-B and 45-A.

Page 48

A. Correct.
Q. And take a look -- I'm afraid I have to come around. I hope you don't mind.
A. It's all right.
Q. I gave you my only copy.
A. I don't mind.
MR. McBRIDE: That's fine.
BY MR. TRAUBEN:
Q. Okay. I'd like to direct your attention first to the second page of Exhibit 2.
A. Yes, sir.
Q. And this document reflects a quiet title action occurring about 1985?
A. Yes, sir.
Q. Is that the quiet title action -- do you believe that's the quiet title action you referred to earlier in your testimony?
A. Yes, it is. I do believe so.
Q. And in whom did that title -- that quiet title action quiet title?
A. The Patterson estate.
Q. And then when did the Patterson Estate transfer its interest in 45-B?
A. It appears to be 1991.
Q. And is that your understanding?

Page 49

A. That's what it says.
Q. That's what it says, but is that your independent understanding, as well?
MR. McBRIDE: Can I ask for clarification. Do we know whether those are recordation dates or transaction indicates?
MR. TRAUBEN: Well, it has document date and recording date in the two columns.
MR. McBRIDE: Fine.
BY MR. TRAUBEN: In the first column is the document date.
A. Yes.
Q. You're answering my question "yes"?
MR. McBRIDE: I'm sorry. Are you talking to me or --
THE WITNESS: It is my understanding.
MR. McBRIDE: Let the record show there was a little conversation with counsel. So we need to clarify the record. Can we actually have the question over again and then we'll -- because I'm lost now.
MR. TRAUBEN: If you could read it back, please, and make sure we got the correct response.
(Record read.)
BY MR. TRAUBEN:
Q. And that's your understanding?

Page 50

A. That's my understanding.
Q. And then just to follow up, it appears from this document that you acquired an ownership interest in lot 45-B in May 1991?
A. Yes.
Q. And then you transferred your interest to Energel in that same month?
A. It was a back-to-back transaction. That's correct.
Q. If you could take a look at the last page of Exhibit 2.
And this is with respect to mineral lot 45-A. Correct?
A. Yes.
Q. And if you could take a look and state for the record whether this reflects similar transaction we had just discussed with respect to the lot 45-B?
A. It appears to. Yes.
Q. Okay. And so what was happening with respect to lot 45-B is also happening with lot 45-A?
A. Yes.
Q. Okay. So we don't need to run through all the transactions, they are occurring at the same time. Correct?
A. It appears so.

Page 51

MR. McBRIDE: Excuse me. To clarify my own notes and the like, that was deposition Exhibit 2?
MR. TRAUBEN: Correct.
MR. McBRIDE: Thank you.
BY MR. TRAUBEN:
Q. In April, 1993, I believe you entered into a lease agreement with a company called WAZCO, Inc.?
A. WAZCO.
Q. WAZCO, W-A-Z-C-O.
A. Yes.
Q. In that lease were all the mining claims in Eddy Gulch leased to WAZCO?
A. I know the lode properties were. I'm not sure of the associated placers.
Q. Do you know whether that was -- your intent was to lease all the claims, including the associated placers to WAZCO?
A. I don't know if that was our intent because they had no interest in mining the dumps.
Q. Do you have tab Forest Service 142 in front of you? Should be in this book here.
A. Yes. Lease agreement.
Q. That's the lease agreement?
A. Uh-huh.
Q. And between you and WAZCO in 1993 that we were

Page 52

just speaking of?
A. Yes, sir.
Q. And if you could --
A. They are included here, sir. I'm on -- towards the back. The pages aren't numbered, but it says, "The claims listed below were being" -- "for payment of fees" -- wait a minute. WAZCO paid it. Let's see here.
Q. Well, maybe it would help if I asked a question first.
A. All right. Please.
Q. If you take a look at the page numbered 1, which is actually the second page of this document.
A. Yes, sir.
Q. And Article II, Grant of Lease, paragraph 2.1.
A. Uh-huh.
Q. It states that, "Lessor hereby grants, leases and let's, et cetera, all underground workings, dips, burrs, angles, dumps, tailings and stockpiles, et cetera"?
A. Yes.
Q. So now having seen that, does that refresh your recollection as to whether or not you intended to lease all the mining claims, including placers?
A. Yes.
Q. It does refresh your recollection?

Page 53

A. Yes, it does.
Q. And your recollection is that you did intend to lease the placer claims?
A. It appears I did lease the placers.
Q. And that was your intent to lease all the placer claims to WAZCO?
A. I don't know if it was my intent. I'm just saying that we did lease all of them to them.
Q. Okay. And all the lode claims, as well?
A. That was my intent.
Q. And that's what this document effectuated?
A. Yes, sir.
Q. We are done with that for the time being.
Can you take a look at A-181 that was recently produced by plaintiffs.
A. Yes.
Q. Take a moment and look that over.
A. Yes, I have. I'm familiar with this document.
Q. And what is this document?
A. This is a Notice of Delinquency to a Co-Owner on Proof of Labor. It's advertising someone out of a claim.
Q. And that person is Mr. Kendle?
A. Kendle Trucking, John Kendle and James Kendle.
Q. James Kendle, one of the plaintiffs?

Page 70

believe, their water specialist, came up on the arsenic. And I did provide her with some documentation.
I don't know about this letter you asked about, but we gave her cross-sections of our core drill holes that showed the arsenic percentages, ascending and descending, what percentage was there in the background. Once again, we're establishing background values. And that was provided to the Forest Service.
Q. So had Liberty Mining conducted any studies, to your knowledge, that analyzed whether any arsenopyrites remained in the tailings --
A. No.
Q. -- after the process?
A. No.
Q. And --
A. That was something that Don Moore was, as I said, responsible for, was to remove any sort of metals that might cause acidification or oxidation.
Q. But he hadn't -- but to your knowledge, he has not yet done that?
A. Not to my knowledge.
MR. TRAUBEN: Is Don Moore an expert in this action? Will he be identified as an expert in this action?
MR. McBRIDE: That's a future determination.

Page 71

BY MR. TRAUBEN:
Q. But he has provided data relating to the costs and so forth that plaintiffs are relying on?
A. For our milling circuit. Yes.
Q. Who is Dan McClain?
A. Dan McClain is a employee of the State of California, divisions of mines and geology. He specializes in permitting. He's got quite an extensive resume in that regard.
Q. Is there a Dan McClain that was contracted by Liberty Mining to do any consulting work?
A. Assisting us in our permitting process.
Q. Assisting. Okay.
And did he meet with California Regional Water Qualities Control Board?
A. He was in touch with them telephonically, I believe.
Q. At the direction of Liberty Mine?
A. Yes.
Q. Was a determination made that a reclamation plan with the Siskiyou County would need to be filed?
A. Yes. We spoke with Siskiyou County Planning Department.
Q. And they requested that a reclamation plan be filed?

Page 72

A. Yes.
Q. Was a reclamation plan filed?
A. I don't know. The Forest Service has its own way of dealing with reclamation plans. They like to set the bonds rather than SMARA, at least at that time. It was a lead agency.
So basically prior to your getting your plan approved, the Forest Service requires that a reclamation bond be posted and they set the bond. And we had paid and had a reclamation bond in place. Whether they provided that to SMARA or the County, I don't recall.
Q. Okay. Are a reclamation bond and a reclamation plan the same thing?
A. A reclamation bond is put up in case the miner doesn't perform the reclamation work, the Forest Service has the bond to perform that work. And I might add, they really do so.
MR. McBRIDE: Can I clarify, was your question specific –
MR. TRAUBEN: No. Let me follow up first, please.
MR. McBRIDE: Thank you.
BY MR. TRAUBEN:
Q. Okay. What I'm asking is whether a reclamation plan was filed by Liberty Mining with the Siskiyou

Page 73

County.
A. Same answer. I don't know. I know we filed it with the Forest Service. I know Harry Frey had been in touch with the planning department. They had our reclamation plan and our bond to make sure that that reclamation was carried out.
Q. Was it your understanding that the Forest Service would have filed the plan with the county?
A. They would have been the lead agency. Just like they would be the ones that would file it with SMARA or do your archae study or file your biological opinion, they took the lead role in that.
Q. So it was not Liberty Mining's responsibility to file the plan with the county?
A. We probably had a responsibility to have the plan. I don't know if it was our responsibility to file it with the county or if the Forest Service was taking care of that.
But I know that there is documentation in here where we were going to file a reclamation, all phase reclamation plan with them, but that never eventuated because we were stopped before that could happen.
Q. Okay. And when you say you were stopped, you're referring to the January 4, 1990, stop work order?

Page 74

A. That's correct.
Q. This is sort of a backtrack, you might say, but what is the Bonanza King claim?
A. What is it?
Q. Yes.
A. The Bonanza King was a very rich, high grade lode deposit in the Trinities. And it's one of the properties that we took a pretty good look at.
Q. Did you perform any mining at --
A. Yes, we did.
Q. You did?
A. Uh-huh.
Q. Operations?
A. We --
Q. Or production, excuse me. I mean production.
A. Production, no. We did not have production there. It was an exploration and development program that we were carrying on in the Trinities at the time.
Q. That's in a forest south of the Klamath National Forest?
A. Yes. Trinity National Forest.
Q. Were Spotted Owls in the Trinities?
A. More than likely. They have a Northern Spotted Owl through most of the California, so I would assume so.

Page 75

Q. Was that an issue when you were operating down there?
A. No. The owl wasn't listed until 1990. And I believe we were operating down there prior to that time.
Q. If you could take a quick look at A-55.
A. Yes, sir.
Q. If you want to flip through that and tell me whether or not that is your handwriting?
A. It's not.
Q. You recognize that as the handwriting of Mr. Ferrero?
A. I do.
Q. Will you do me a favor and, please, take a look at A-63?
MR. McBRIDE: This is a book that's gotten bound and rebound. I'm not sure if I have exactly the same A-63.
MR. TRAUBEN: I probably only have a few pages. Something dated November 9, 1995. And it says, "Gentlemen, we are pleased to present our report."
MR. McBRIDE: Thank you.
THE WITNESS: Uh-huh.
BY MR. TRAUBEN:
Q. This is a report from Egan and Redmond dated November 9, 1995. Correct?

Page 76

A. Yes, sir.
Q. And my question is, why was this work done?
A. As part of establishing the damages for our lawsuit.
Q. And not in conjunction with any operations at the mine site?
A. No, sir.
Q. And Egan and Redmond will be experts in this matter?
A. You'll have to ask Mr. McBride that question.
Q. What are your damages in this lawsuit?
A. Emotional? Monetary? What type of damages?
Q. Plaintiffs allege a taking in this case. They, I assume, want compensation?
A. Just compensation. Yes.
Q. Just compensation for the alleged taking?
A. Yes, sir.
Q. Then my question is, what is the amount of that just compensation?
A. At this time or then? The price of gold has raised dramatically since this took place.
Q. Well, there is some mixture of law and fact here. And based on my understanding of the law, the question is what was the amount of compensation due plaintiffs at the time of the taking?

Page 77

A. Well, my experts say $22 million.
Q. And what does that amount represent?
A. That represents what we would have earned had we been allowed to proceed in a timely fashion. During a period of time over an approximate four-year period.
And we'd also like to see compound interest added to it.
Q. And would that $22 million have been generated in 1990 or that period, 1990-1994, would that have been the profits earned that you estimate by Liberty Mining?
A. Yes. That's what was estimated.
Q. Estimated from the entire mining operation in Eddy Gulch?
A. That's correct. Well, not the entire mining operation. It would have been generated from the dumps and the apex. Doesn't include the underground.
Q. Why is that? Why does it not include the underground?
A. Because we weren't permitted at that time to do the underground. We're only suing for what was permitted. At least in our minds it was permitted.
Q. When you say "underground," you're referring to tunnelling?
A. Underground lode deposits. Yes, sir.
Q. Do plaintiffs allege that the government took

Page 130

I have segments of it, though. I mean -- wait a minute here. Okay.
Q. Does this document reflect any tests done that were also done by Cal Nickel?
A. Yes. Cal Nickel. Yes.
Q. Do you know -- do you have an understanding what the relationship is between Inter-American and Cal Nickel?
A. I don't.
Q. Were there separate samples sent to Inter-American and Cal Nickel?
A. I don't recall. Mr. Lowenhaupt was on site and took these samples. That's all -- that's about my recollection of it. This was quite good.
Q. Do you know whether these results have been used by plaintiffs in any of their subsequent analyses?
A. I believe that Mr. Ferrero references them in his workup.
Q. We'll get into that more tomorrow, I suppose.
A. All right.
Q. If you could hand that to the reporter.
A. Yes, sir.
Q. I'll give this back to your counsel.
(Defendants' Exhibit 4 was marked.)
BY MR. TRAUBEN:

Page 131

Q. Mr. Aloisi, I'm handing you what's been marked as Exhibit 4 to your deposition.
A. Oh, Yes.
Q. Do you recognize that document?
A. Yes.
Q. What is it?
A. It is a letter to me from Ben Licari from the Western Mining Corp, which is Alcoa Aluminum of Australia. They came up and made a site visit and this is a follow-up letter.
Q. In the upper right-hand corner, is that your handwriting, number ten?
A. No.
Q. Do you know whose handwriting it is?
A. I do not.
Q. Do you know -- says there's going to be some follow-up or refers to some follow-up there that they're "trying to interest the big boys," I think is what he says. Do you know what he's talking about?
A. Yes.
Q. What is that?
A. They were interested in the property.
Q. Who is "they"?
A. Ben Licari. And I believe Western Mining Corp. He came up and visited and had some people along with

Page 132

him. Their names escape me at the moment.
Q. Did they do some sampling?
A. I don't think so. I think they took some reports and that type of thing.
Q. And what was the result --
A. I'm sorry. We have sent chem's samples out, it says. So I would have to change that statement based on what I've just read.
Q. Based on what's in the document now, not in your own recollection?
A. Yes. Yeah. This is the geology field trip that we sponsored.
Q. Was the company participating in the field trip?
A. Not the company. No. Various individuals.
Q. Was that a field trip, then, that this doesn't belong with the letter?
A. I don't think so.
Q. Okay. Sometimes that happens, documents are stapled together inadvertently.
Then we can pull the second page off if it's not related and the exhibit will just be the one page.
A. Very well.
Q. Did Licari visit in 1989?
A. I think it was about that time. Yes.

Page 133

Q. And what was the result of the visit?
A. Alcoa -- or rather Western Mining Corp, they were having some problems at Carson Hill and they decided they didn't want to get involved with California. There's too many bureaucrats.
Q. So they did not invest?
A. No.
Q. Were they looking to -- to your knowledge, were they considering purchasing Liberty Mining's claims or were they interested in leasing?
A. I don't know. I don't recall.
Q. That just reminded me of a question I wanted to ask. Previously you were referring to the WAZCO lease in April 1993.
You know what I'm referring to?
A. Yes, I do.
Q. When did the negotiations leading to that lease begin?
A. 1992.
Q. When in 1992?
A. Fall.
Q. September, October?
A. Somewhere around there. Yes.
Q. Who approached whom?
A. Andy McBroom approached me on behalf of WAZCO.

Page 146

(Off the record.)
BY MR. TRAUBEN:
Q. You have the response to interrogatories in front of you?
A. Yes.
Q. And did you assist in the preparation of those responses?
A. No.
MR. McBRIDE: What?
THE WITNESS: On this?
MR. McBRIDE: Excuse me, if I may.
THE WITNESS: Maybe I'm misunderstanding here. Yes. Excuse me.
BY MR. TRAUBEN:
Q. You assisted in the preparation of some of the responses?
A. Yes.
Q. But not all of the responses?
A. Not all of them.
Q. Okay. But you're familiar with the responses?
A. Somewhat. Yes.
Q. Okay. And you did sign a certification?
A. Yes, sir.
Q. Okay. Can you take a look at page 5, subparagraph B, in response to Interrogatory No. 1.

Page 147

A. Yes.
Q. And at the bottom of subparagraph B there's a clause three in parentheses towards the bottom.
A. Yes.
Q. And that states, "Based on the Forest Service's failure ever to take further action with respect to Plaintiff's mining Plan of Operations, after its receipt of this February 8, 1994, second biological opinion some much later date." You see that response?
A. Yes, I see that.
Q. This is in response to defendant's request that plaintiffs identify the takings period, when the taking began, when it ended. And this suggests that it would end at some much later date.
Do plaintiffs today, as we're sitting here, have a -- can respond with more definitely to this -- or do they still intend to leave it open-ended on the closing period of date taking?
A. That is something that based on legal counsel will be determined. If I had my druthers, I'd have it go from the beginning until the present time, but I don't know if that's possible.
Q. Is the Rollins site part of the takings claim?
A. No.
Q. If you can look at page 13. This is in

Page 148

response to Interrogatory No. 3.
A. Yes.
Q. Relating to permitting hauling for the Liberty Mines. In the page 13 at the last clause it says, "Plaintiffs did not spend their limited resources to acquire any other permits."
A. That's correct.
Q. Was that a business decision?
A. It was a strategic decision.
Q. Strategic.
A. Tactical.
Q. To conserving financial resources?
A. Correct. And I also might add, that until we receive the biological opinion, which we had once, we were reluctant to spend anymore funds until we knew whether or not we were going to get clearance, given the sincere efforts we had made to get it permitted fully the first time.
Q. Did Liberty Mining have limited resources?
A. Yes, it did.
Q. And that was the situation throughout its existence.
A. Yes.
Q. Is that a fair characterization?
A. Yes. We were hoping to realize a profit on our

Page 149

investment backed expectations.
Q. To whom did WAZCO and Liberty Consolidated Mine make payments on their leases?
A. To me.
Q. Personally?
A. Yes.
Q. Was any of that income shared with any of the other plaintiffs?
A. Yes.
Q. With whom?
A. My wife.
Q. Anyone else?
A. I may have sent some payments to Don. I'm not quite certain. I know I sent him monies, but I'm not certain if it was originated from -- from where it originated.
Q. By my rough calculations, I'm estimating that approximately $120,000 was received from WAZCO and LCM, Liberty Consolidated combined. Is that approximately correct?
A. I think so.
Q. You think it was more?
A. No. I also might point out to you, though, Mr. Trauben, there were other terms and conditions as far as monies that were to have been generated insofar

# EXHIBIT D

**In The Matter Of:**

*Alfred Aloisi, et al., v.*
*The United States*

---

*Kathleen Granillo*
*Vol. 1, October 2, 1997*

COPY

---

*Bean & Associates, Inc.*
*Professional Court Reporting Service*
*500 Marquette, N.W., Suite 280, Albuquerque, NM 87102*
*119 East Marcy, Suite 110, Santa Fe, New Mexico 87501*

*(800) 669-9492 or (505) 843-9494*

*Original File gr100297.v1, 90 Pages*
*Min-U-Script® File ID: 0792355618*

**Word Index included with this Min-U-Script®**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
No. 95-650L
(Filed: July 31, 1997)

ALFRED ALOISI, et al.,
Plaintiffs,
vs.
THE UNITED STATES,
Defendant.

DEPOSITION OF KATHLEEN GRANILLO
October 2, 1997
9:30 a.m.
500 Gold Avenue, Southwest
Albuquerque, New Mexico 87102

PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE, this deposition was:

TAKEN BY: MR. LAWRENCE G. MCBRIDE
ATTORNEY FOR THE PLAINTIFFS

REPORTED BY: Melissa Correa, RPR, NM CCR #279
Bean & Associates, Inc.
Professional Court Reporting Service
500 Marquette, Northwest, Suite 280
Albuquerque, New Mexico 87102

5392-11 MEL



APPEARANCES

For the Plaintiffs:
FREEDMAN, LEVY, KROLL & SIMONDS
Attorneys at Law
1050 Connecticut Avenue, Northwest
Washington, D.C. 20036
BY: MR. LAWRENCE G. MCBRIDE

For the Defendant:
MS. SUSAN V. COOK
Attorney at Law
United States Department of Justice
Environment & Natural Resources Division
601 Pennsylvania Avenue, Northwest, Room 837
Washington, D.C. 20004

Also Present: Mr. Alfred Aloisi

INDEX PAGE

KATHLEEN GRANILLO
Examination by Mr. McBride 3
REPORTER'S CERTIFICATE 85
WITNESS SIGNATURE/CORRECTION PAGE 87



KATHLEEN GRANILLO,
after having been first duly sworn under oath, was questioned and testified as follows:

EXAMINATION
BY MR. MCBRIDE:

Q: Ms. Granillo, could you state and spell your name for the record, please?
A: Kathleen, K-A-T-H-L-E-E-N; Granillo, G-R-A-N-I-L-L-O.
Q: And during much of the period we're going to be talking about, which is 1989 through '94, your last name was Milne?
A: Uh-huh.
Q: Could you spell that, please, for the record?
A: M-I-L-N-E.
Q: By way of opening, I'm going to ask you a series of questions that have to do with the procedures and policies of the Fish and Wildlife Service and the Forest Service. And when I ask you these questions, I'm asking for your understanding, what you thought your responsibilities were or what you thought the duties or responsibilities of other officials of the agencies were. I'm not asking you for legal conclusions or to bind the Forest Service to a position on a matter, but what you thought rules meant or what you thought you were supposed to do or who you thought was responsible for a type of action, that

Page 24

had individual documents on each project.

Q: I'm asking if in July of 1990 you read through this and learned what the various projects were, including exposing yourself to the fact that there was a Liberty Mine project described here.

A: Yes.

Q: Okay. Did you discuss with the Salmon Ranger District what plan of operations was involved in the Liberty Mine consultation, whether it was an all-phase plan, a plan as previously approved? Did you discuss that in any way?

A: At some point, I don't remember when, but yes, we talked about this project.

Q: And was it your understanding that what had been put in the consultation request, the project, was the so-called all-phase plan, which is a phrase that was used then, all-phase plan of operations?

MS. COOK: Why don't we first establish that she's even heard the term all-phase plan, because –

MR. MCBRIDE: Sure.

Q: Is that a phrase that you recall with the Liberty Mine proposal?

A: No. Just in reading through the documents, you know, this last week. But I don't recall using that phrase.

Q: Okay. Did you ever speak to – well, let's just start from the beginning here. You've met Mr. Aloisi before

Page 25

today?

A: Yes, I have.

Q: Okay. And do you recall when you may first have met him?

A: We met – we had a meeting in the forest supervisor's office. I don't recall exactly when, but probably a few months after this came out. I don't recall when.

Q: Okay. And have you ever been up Eddie Gulch?

A: Yes, I went up there once.

Q: You've been up there once? Okay. Do you remember when that was?

A: I really don't. Sometime, you know, when I was there, so from that two-year-or-so time period. I think it was, like, summer of '91.

Q: Okay. Do you recall with whom you went on that trip?

A: I was with Harry Frey, and we came by and saw – you were at the cabins.

MR. ALOISI: Uh-huh. Kurt Marsick perhaps?

THE WITNESS: I don't remember that name.

MS. COOK: For the record, when you say "you," you will have to indicate you're talking to Mr. Aloisi. And unfortunately, we can't let you two have conversations because you're under oath. He's not. It's your deposition, so –

MR. ALOISI: I never lie.

Page 26

MS. COOK: I know, but we just have to. That's the rules. We can't have you two having conversations, so you just need to confine your answers to Mr. McBride.

Q: (By Mr. McBride) Do you remember Jim Rock?

A: Yes.

Q: Would he have been with you that day?

A: I really don't remember.

Q: And do you remember someone in the forest supervisor's office named Kurt Marsick? And I'll guess at spelling, M-A-R-S-I-C-K.

A: Yes. And I don't know if he was there either.

Q: Okay. Do you know why you came? Do you remember the purpose of your visit? Presumably it was not your vacation or an off day.

A: It was related to this project and trying to implement this opinion and trying to figure out what habitat was going to be taken, just to look at the site and see where the project was and look at the – because we had been talking about this project, trying to figure out what habitat was being taken and what the effects were.

Q: Who is "we" that you've been talking about? Who are the "we"?

A: Well, the district and myself and Harry and –

Q: So implementing this project was one of the – was a matter that you specifically got involved with.

Page 27

A: Yes.

Q: Okay. And how often or how regularly?

A: I don't think that I can characterize that, unless you ask me a different way.

Q: Okay. Was there a specific finding or determination you wanted to make with your visit, then, in July 1991? Did you come to make a finding or to make a determination of some kind?

A: Not that I recall. We were – it was mainly for me just to come see the site, since I had not seen it before, and to look at – since it's in an HCA and it was a suitable habitat and it was consulted on as a planned sale, we were told to get out of planned sales in HCAs, to, you know – not to offer that timber for sale. So even though this is a mining claim, you know, it's a suitable habitat question. So we were looking to see if there was any way to lessen the effect on suitable habitat.

Q: And were you able to make that determination?

A: I don't remember.

Q: Okay. Did you, while you were there, develop your own view as to whether this area in Eddie Gulch fit the HCA criteria and was, you know, properly designated?

A: Well, the HCA is, as I said, a large area that covers 20 or more pairs of spotted owls. And so in that area, there are, you know, 20 pairs of spotted owls, and so there was

Page 36

(The witness complies.)
Q: From your understanding of the July 1990 –
A: I'm still reading.
Q: All right. I'll step back and you can finish.
A: Okay.
Q: In light of the July 1990 opinion that we discussed before, what would the forest have been waiting for from the Fish and Wildlife Service at this point? A report not scheduled to be issued until September? What might that have been?
A: I'm not sure.
Q: Were you aware during that period that there was any further consultation or issue with the Fish and Wildlife Service?
A: Well, we – I'm not sure. We had dealings with the HCAs. The Forest Service initially adopted the strategy, and we had to implement the ISC strategy, which sets up the HCAs. And I don't recall having to go to Fish and Wildlife Service. I don't remember. But we did have to try to meet those requirements of getting out of planned sales that I mentioned before.
Q: Could you look at the second paragraph as well, please?
A: Okay.
Q: And the last sentence there, what might that be

Page 37

talking about, "In light of your wildlife biologist," just from the forest and knowing about the July 1990 opinion?
MS. COOK: Excuse me. Could you make your question more precise? Because if you're asking her to speculate on what that letter means on a letter that she's never seen before and she didn't write, I don't know if that's proper. But if you have a specific inquiry –
Q: What findings would anybody have been waiting for at that time?
A: I'm not sure what they're referencing there.
Q: Okay. Was it your understanding, during this period of time or when you came to your site visit, when you came to Eddie Gulch, that Mr. Aloisi was waiting for word on how the owl affected his operation before he completed the archaeological work?
A: I don't remember.
Q: Okay. You don't ever recall discussing that state of affairs, waiting to do the archaeological work until one knows what the owls' impacts on the operation are? You don't ever recall discussing that with anybody from the district?
A: No.
Q: Could you look at document 75, please?
(The witness complies.)
Q: Again, is this a document that you reviewed?
A: No.

Page 38

Q: The first paragraph is my focus.
A: Okay.
Q: This is the same problem here. The Forest Service was following the Interagency Scientific Committee report; isn't that what you've said?
A: Right.
Q: What, then, are they waiting for, or what information do they need before they can apply the Interagency Scientific Committee report to a plan of operations?
A: Well, again, I think this relates to our direction to get out of planned timber sales in HCAs. And, you know, yes, Mr. Aloisi's project is a mining claim, but it involved, you know, removal of timber, and we consulted on it as that part of the project. But since it is a mining claim, we can't have him – I mean, the mine is there. That's where the mine is, so how do we tell him to go ahead with his project and not be in conflict getting out of planned sales in an HCA? And I believe we had asked the regional office who, I believe, asked the Washington office what we're supposed to do to reconcile mining claims with the HCAs and the strategy.
Q: The forest supervisor's office was involved in that referral or request for information?
A: I believe so.
Q: And you were going to wait for that before approving or reauthorizing Mr. Aloisi to undertake operations?

Page 39

A: Yeah, because in order to implement the strategy, we would have to say, "No, you can't do your project."
Q: Didn't you get a no-jeopardy opinion from the Fish and Wildlife Service in July of 1990 on the project?
A: Yes.
Q: What, then, did you additionally need in order to allow it to go forward without jeopardy?
A: Well, the opinion on the effects on the owl is different than implementing the ISC strategy. The opinion is, you know, what is the effect of this project on the spotted owl, and here's how we think you can mitigate effects through those reasonable and prudent measures. The conservation strategy is a policy that we adopted, and it says in there, get out of planned sales.
Q: Okay.
A: You know, they're related, but they're not the same thing. So we, you know, have a conflict there.
Q: Were you involved in 1991 in the proposed designation of critical habitat for the spotted owl?
A: Could you be more specific in what you mean by "involved"?
Q: Well, were you participating in the rule making? Were you contributing –
A: Well, let me tell you what I did –
Q: Please.

# EXHIBIT E

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ALFRED ALOISI, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 95-650L |
| THE UNITED STATES, | ) | Judge Lawrence S. Margolis |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFFS' ANSWERS TO DEFENDANT'S SECOND SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS**

Pursuant to Rules 26, 33, 34 and 36 of the Rules of the United States Court of Federal Claims, Plaintiffs hereby respond to Defendant's Second Set of Interrogatories and Requests for Production of Documents (Defendant's "Second Set of Discovery") as follows:

**GENERAL OBJECTIONS AND OBJECTIONS TO DEFINITIONS**

1. Plaintiffs object to Defendant's Second Set of Discovery to the extent that it seeks irrelevant information and/or documents.

2. Plaintiffs object to Defendant's Second Set of Discovery to the extent it seeks information and/or documents that are protected by attorney-client privilege, work product doctrine, or any other applicable protection against disclosure.

3. Plaintiffs object to Defendant's Second Set of Discovery to the extent that it is overly broad, vague and ambiguous, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

4. Plaintiffs object to overly broad and unduly burdensome definitions of terms, including pronouns, plural/singular, and entities/persons.

5. Plaintiffs object to the instructions relating to the identification of documents on the basis that, as to produced documents, it is unduly burdensome, as the information is as readily available to defendant as to plaintiffs.

6. Plaintiffs object to the instructions and questions asking for descriptions of oral communications, as documented oral communications may be gleaned from any record of oral communications as readily by defendant as by plaintiffs.

7. Plaintiffs object to Defendant's requests to state all facts about contacts, communications and events pertaining to a response to an interrogatory because it is overly broad and burdensome; Plaintiffs identify and describe sufficient facts to support their substantive responses to Defendant's interrogatories as is practicable.

8. Plaintiffs' general objections and objections to definitions and instructions are incorporated into each and every response herein, regardless of whether specific objections are asserted in response to a particular discovery request.

**ANSWERS TO INTERROGATORIES**

INTERROGATORY NO. 1: For each and every mining claim that Plaintiffs contend was temporarily taken please identify:

a. the date upon which Defendant allegedly first temporarily took each mining claim (the "date of taking")

b. the date upon which the alleged temporary taking ceased;

c. any interim or intervening time period within the range of dates identified in response to l.a. and l.b. during which Plaintiffs contend there was no taking;

d. each and every mineral deposit or resource site within each mining claim that Plaintiffs contend was temporarily taken; and

e. those mining claims and mineral deposits or resources with respect to which Plaintiffs intend to offer proof of a temporary taking at trial.

**ANSWER No. 1**: Plaintiffs respond that Defendant's (Second) Interrogatory No. 1(a)

appears to seek a legal conclusion rather than factual information. To the extent this Interrogatory constitutes a contention interrogatory seeking explication of Plaintiffs' claims in the action, plaintiffs respond as follows.

First, with respect to each lettered paragraph answer to this (Second) Interrogatory No. 1, Plaintiffs do not contend solely that unpatented mining claims were temporarily taken, but also contend that specific property constituting patented, fully private land was also temporarily taken, chiefly the Mt. Laurel parcel (U. S. Mineral Survey No. 3161, Lot 45A), by virtue of Defendant's letter order of January 4, 1990 (FS # 50) ("the Stop Work Order"), which stated, "I must inform you that all activities, including activities on private land accessed through National Forest must stop immediately."

Second, as a legal proposition, defendant has to acknowledge what its obligations to plaintiffs were on July 23, 1990. On that date, the Forest Service no longer had any basis under the Endangered Species Act: (i) not to rescind the Stop Work Order (as to the previously-approved elements of plaintiffs' mining plan of operations); and (ii) not to immediately process the balance of the All Phase Plan of mining operations, as required by its mining plan rules, 36 CFR 228.5(a), and as it formally represented to plaintiffs in its November 1989 plan approval letter, "The [balance of your proposed activities not approved here] will be included in a master Plan of Operation Two with an Environmental Analysis completed in the Spring of 1990 as we agreed at our meeting." (FS # 46.). Until this legal obligation is acknowledged or resolved, there is uncertainty as to the exact dates of the temporary taking, thus:

a. Plaintiffs claim that Defendant temporarily took plaintiffs' rights on each mining claim, and on the private parcel identified herein (and in the Complaint), and the period of the compensable temporary taking commenced, either: (1) on July 23, 1990 (when the U. S. Fish

and Wildlife Service tendered its biological opinion to the U. S. Forest Service that the 38-acre projected area of surface disturbance for the plaintiffs' All Phase Plan of operations for the Liberty Mine would not jeopardize the northern spotted owl); or (2) on the date shortly after July 23, 1990, when in the normal course of business the U. S. Forest Service would have notified plaintiffs of its receipt of that biological opinion and taken the necessary administrative action to authorize plaintiffs to return to work under the approved portions of their All Phase Plan of mining operations. (The "All Phase Plan" is described more specifically in Answer No. 3 below.) Plaintiffs wrote defendant on September 24, 1998, regarding this dating of the temporary taking period (the USFS used other pages of this letter as an exhibit to its March 1, 2007, Motions in the administrative contest). We asked in 1998 that defendant provide plaintiffs with information so that the parties could consider stipulating to these dates:

> Assume the Forest Service had notified plaintiffs of the July 23, 1990, biological opinion on July 23, or on the same date it began taking action on the timber sales "cleared" by the same opinion. Without rereading Marc Williams's deposition, I believe that was actually July 23. How long would it have taken the Forest Service to rescind or undo its "stop order" of January 4, 1990 (Doc. FS #50), as to all previously approved activities (Phase I and those parts of Phase II approved in 1989)? In other words, how long would it have been before plaintiffs could have gone back to work both on the five claims the agency representatives have been sampling, and on the approved Mt. Laurel property apex cut?
>
> ..................
>
> The same exercise pertains to February 1994 when the second Fish and Wildlife Service clearance was rendered. It was only with the February 1994 second clearance that beneficial use of the property for mining was restored to the status quo as of July 23, 1990, that is, with no Endangered Species Act objection to the resumption of operations previously ordered to a halt ....

Plaintiffs submit that the dates the parties might establish using this principle would shortly follow the dates of the Fish and Wildlife Service letters, but the dates cannot be set without fixing the Forest Service's obligations and process (see 36 CFR 228.5(a)) in light of the complete clearance of the entire all-phases plan of operations under the Endangered Species Act

in both letters.

b. Plaintiffs claim that Defendant's temporary taking of plaintiffs' rights on each mining claim, and on the private parcel identified herein (and in the Complaint), and the period of the compensable temporary ended, either: (1) on February 8, 1994 (this is when the U. S. Fish and Wildlife Service tendered its second biological opinion (FS # 184) to the U. S. Forest Service that the 38-acre projected area of surface disturbance for the all-phase plan of operations of the Liberty Mine would not jeopardize the northern spotted owl, in a consultation treated by the U. S. Fish and Wildlife Service as an "informal consultation" not required by section 7 of the Endangered Species Act, in light of the fact that the projected area of surface disturbance and the operations described in mining plan of operations undergoing informal consultation were the for all purposes the same as those evaluated in the July 23, 1990, no-jeopardy opinion); or (2) on the date shortly after February 8, 1994, when in the normal course of business the U. S. Forest Service would have taken the related administrative actions: (i) of authorizing plaintiffs to return to work under the previously-approved portions of their all-phases mining plan of operations; and (ii) of recommencing processing the balance of the All Phases Plan of mining operations under 36 CFR 226.5(a), consistent with the Forest Service's representation to plaintiffs in FS # 46 (plaintiffs refer here to the unanswered 1998 correspondence regarding temporary taking dates set out in Answer 1.a. above); or (3) based on the Forest Service's failure ever to take further action with respect to plaintiffs' mining plan of operations after its receipt of the February 8, 1994, second biological opinion, some much later date.

c. There was no period of time between the earliest date provided in Answer 1.a. (July 23, 1990), and the latest date provided in Answer 1.b. above (in 1994 or thereafter) when defendant, by virtue of its failure to implement its obligations consistent with the 1990 no-

jeopardy opinion, did not wholly prevent plaintiffs from engaging in beneficial use of the property for mining purposes, and did not wholly prevent plaintiffs from working and mining under the previously-approved mining plan of operations.

d. Every "mineral deposit or resource site within each mining claim," and on the private Mt. Laurel parcel, was wholly subject to the temporary taking, and plaintiffs were denied beneficial use for mining purposes of any and all of them. More specifically, the mineral deposits of economic value and present interest to plaintiffs in 1989 through 1995 were those treated as ore blocks in "The Liberty – Eddy Gulch Gold Mines, A Discussion of Grade, Tonnage, Recovery, Economic Calculations and Other Topics and Issues Related to the Liberty vs. USFS Litigation," September 2007 (A-150), and on the nine Spreadsheets that are described in the September 2007 Ferrero Analysis (A-151), and the three sets of maps showing the location and values of these ore blocks (A-152, A-153 and A-154), all of which A-150 through A-154 taken together constitute plaintiffs' working analysis of the design and profitability of their Eddy Gulch mining operation (together, "the September 2007 Ferrero Analysis").

Plaintiffs are not familiar with defendant's phrase "resource sites," but answer that it was not just the mineral deposits on the mining claims (and on and accessed through the private Mt. Laurel parcel) that were temporarily taken for this entire period. It was also the use and enjoyment of all of the same ground for related mine development purposes, transportation of employees, equipment and ore, construction and operation of mining support facilities including stockpiles, mill and related facilities, and as locations for disposal of mine and mill wastes. These lawful mining uses of the mining claims and the private Mt. Laurel parcel render these lands "resource sites" – and beneficial use for mining purposes of the entirety of this ground, including as "resource sites" as so understood, was prohibited to plaintiffs through the entire

---

INTERROGATORY NO. 7: With respect to each and every lease or license relating to any of the mining claims at issue, please provide the following the information:

a. the circumstances surrounding initiation of any negotiations leading to the execution of each lease or license, including the identity of the individuals who participated in any communication regarding leasing or licensing any mining claim at issue;

b. the date upon which the initial contact between any party, or representative of a party, to the leases or licenses was made;

c. the time period during which each lease was in effect (if the effective period of any lease or license is disputed by the parties to the lease, provide the dates each party to the lease or license contends that the lease was in effect);

d. the amount and date of each payment received pursuant to each lease or license, including in your response the identity of the lease under which the payment was received, from whom it was received, the date of receipt, and the amount received;

e. the total amount in rent or consideration received under each lease or license;

f. whether any lessee developed to production a mine on any leased or licensed mining claim;

g. the amount of gold, or gold-bearing ore, produced from each leased or licensed mining claim; and

h. the quantum of any and all payments received as a production or royalty payment (such as was contemplated in Article 6 found in both FS Document Nos. 142 and 147) under each lease or license.

**ANSWER No. 7**: This Answer employs the same numbering as Answer No. 6, to identify the agreement or offer with respect to which the Answer pertains.

a. (1) By 1991, plaintiffs had been allowed to do no more of the work the Forest Service approved in November 1989 than they had completed by January 4, 1990. Per the sequence of events in the approved phases of the All Phase Plan, the test mill could have been erected, and operating under Forest Service approval, in 1990. Per the plan, income from gold production would have begun to be available to fund succeeding stages in mine development.

As it was, not only had plaintiffs not been allowed back to work, but the Forest Service had lifted not a finger to process the rest of the All Phase Plan of Mining Operations, notwithstanding their representation in November 1989 (FS # 46) to complete environmental analysis on the balance of the All Phase Plan in the Spring of 1990. Plaintiffs mortgaged the Rollin and Mt. Laurel private parcels, and used the loan proceeds to pay expenses, including servicing the equipment payment expenses. The lender - mortgagee on the Mt. Laurel parcel was one David Davies, a business associate of Aloisi's father, who learned of this property and became interested in that loan opportunity at that time.

The Forest Service in early 1992 finally acknowledged its receipt of the July 1990 biological opinion, but then the Forest Service's insisted that plaintiffs' April 1, 1992, version of its All Phase Plan was a new plan, not simply a demanded re-statement of the several submissions that constituted the 1989 All Phase Plan. Plaintiffs, unable to pay on the Mt. Laurel loan note, defaulted, and Davies foreclosed (A-162).

Davies had a business associate in Northern California, in mining, named Mark Gavard, also known to Mr. Aloisi. From Aloisi's perspective Gavard had coveted the Eddy Gulch property for years. When Davies advised Gavard that he was foreclosing on the Mt. Laurel loan (A-162 pertains to this foreclosure sale), Gavard and Davies made some arrangement for Gavard (through WAZCO) to lease, buy or otherwise control the Mt. Laurel property, which they saw as the crucial property for purposes of controlling long-term underground development of the Eddy Gulch property. WAZCO/Gavard approached Aloisi to lease or purchase all the mining claims. From this position, forced on plaintiffs by the Forest Service on the one side and Davies and WAZCO (Gavard) on the other, plaintiffs worked out the 1993 WAZCO Lease Agreement.

(2) The principals of WAZCO were also the principals of LCM, although LCM had new,

additional principals in addition. Plaintiffs understood LCM's motivation to negotiate a successor lease, when lessor notified WAZCO of its default under the WAZCO lease (A-161), to be as follows – LCM had taken an assignment of the WAZCO lease, without notifying lessor or securing lessor's approval, and was either then selling, or intending to sell, stock in LCM, whose primary asset was the assigned WAZCO lease of the Eddy Gulch property. This, plaintiffs understood, was the reason why LCM wanted the LCM LOA, though executed in December 1994, to be effective a year prior, November 1, 1993, and supersede the WAZCO Lease Agreement for that period – a period from in which LCM may have been selling stock on a company whose primary asset was a Lease at risk of termination for breach.

b. (1) Plaintiffs cannot re-create when WAZCO contacted plaintiffs, although it was shortly after Davies initiated foreclosure action on plaintiffs' default on the mortgage of the Mt. Laurel private parcel. (2) Contact between the principals of LCM and plaintiffs was periodic and continual from and through the execution of the WAZCO lease. After the six-month time period provided in Exhibit B of the WAZCO lease for WAZCO to "initiate a mining plan" had passed without WAZCO doing so, plaintiffs were in regular contact with WAZCO about WAZCO's breach of this material contract obligation.

c (1) The WAZCO Lease Agreement was in effect from on or about April 1, 1993, and was superseded on November 1, 1993, per the terms of the LCM LOA. (2) The LCM LOA was executed by the parties in December 1994, and declared that it was effective November 1, 1993. It was terminated on or about September 9, 1999 (A-156).

Plaintiffs are aware of no disputes over these dates. (1) To the extent WAZCO disputed whether its lease was in default due to its breach of the lease terms, that dispute was mooted by the execution of the LCM lease. (2) The termination of the LCM LOA has, to plaintiffs'

knowledge, never been disputed in any way or in any forum.

d. (1) Aloisi believes that he received monthly "minimum production payments" of $500 for 20 months under the WAZCO lease, for April 1993 through November 1994. (2) Under the LCM LOA, LCM made the monthly "minimum production payments" through June 1999. LCM's failure to make the July 1999 monthly payment was one of the breaches on the basis of which the LCM LOA was terminated.

e. Under the WAZCO lease, per lease provisions described in paragraph 7.d., $10,000. Under the LCM LOA, $500 of each monthly payment went not to Aloisi and Goodman, but directly to Melvin Usher to service his lease to Aloisi of three claims Lessor subleased to LCM in the LCM LOA. With the LCM LOA effective November 1, 1993, the 10 months at the $2,500 monthly payment rate had already passed when the LCM LOA was executed. In each of those 10 months, LCM owed an additional net to plaintiffs of $1,500, and LCM owed an additional net sum of $1,715 for the months from September through November 1994. In connection with executing the LCM LOA, LCM made a payment, with other adjustments, of about $17,000 to plaintiffs. After the execution of the LCM LOA through June 1999 when it stopped paying, LCM paid about $93,000 under the LCM LOA.

f. This question was answered in Answer 6, paragraphs (1) and (2) above.

g. Plaintiffs have reason to believe that WAZCO or LCM, or both, removed stockpiled ore from various locations on the property during the period of their Lease Agreement or LOA and had the ore milled at the Bowerman Mill, located outside of Eddy Gulch. Plaintiffs' belief is grounded in the fact that ore mined by plaintiffs from the Klamath Cut, and hauled to Usher Flat in 1989 before the Forest Service shut down the mining operation, was no longer there at some point during these leases, and likewise, ore stockpiled by prior owners of the Mt.

Laurel private parcel near the mouth of the M J Tunnel on that parcel was also removed from the property during this period.

Plaintiffs are aware of no other motive for any lessee to remove this volume of ore from the property other than to have it milled and sell the gold. However, neither lessee ever reported any production of gold to plaintiffs under either lease, and neither lessee ever paid any royalty, as required under either lease, on the production and sale of any gold from those ore piles.

h. Plaintiffs received no "production or royalty payment" under either the WAZCO Lease or the LCM LOA.

---

INTERROGATORY NO. 8: Please describe in detail all investment amounts or costs incurred and/or paid by Plaintiffs with respect to each mining claim at issue that Plaintiffs contend were lost or diminished in value by the alleged temporary taking, including:

a. the amount incurred;

b. whether the incurred amount was paid;

c. the purpose of the cost incurred;

d. the date the cost was incurred; and

e. an explanation as to how, and in what amount, each investment or cost incurred was lost or diminished in value as a result of the alleged temporary taking.

**ANSWER No. 8**:

(1) Plaintiffs detail their investment in equipment to conduct the mining and milling operations in their Answer to Interrogatory No. 10, and as reflected in the expenditures itemized in ledgers and accounting information in A-164 through A-168.

(2) Plaintiffs invested in labor in their 1988 and 1989 operations, as detailed in the produced ledgers and accounting information A-164 through A-168.

(3) Plaintiffs paid Robert Pincombe and his Mara Ventures entity, and through him the

---

REQUEST NO. 23: Please produce all documents that Plaintiffs may rely upon at trial

**ANSWER No. 23**: Plaintiffs have done so, subject to the objections and qualifications: (1) that expert reports may be completed and discovered when completed at whatever later date is set in pre-trial schedule; (2) that neither party is obligated to have created or shared any demonstrative exhibits they may create and stipulate to use; and (3) that plaintiffs recognize their ongoing obligation to supplement their production should they identify additional responsive documents as they proceed.

---

Dated: September 24, 2007

Respectfully submitted,

Lawrence G. McBride

Lawrence G. McBride
FOLEY & LARDNER LLP
3000 K Street, N.W. – Suite 500
Washington, D.C. 20007
Telephone: (202) 672-5300
Facsimile: (202) 672-5399
E-mail: lmcbride@foley.com

# EXHIBIT F

**Assessor Inquiry - Main**
**Asmt: 032-370-010-000 Feeparcel: 032-370-010-000**
**Owner: WISNISKI MARK**

| | | | |
|---|---|---|---|
| Situs Address | | | |
| NameAddress | | WISNISKI MARK<br>3298 RT 147<br>MILLERSBURG PA 17061 | |
| Status | Date | ACTIVE | 11/27/1998 |
| Taxability Code | Descr | 000 | NORMAL OWNERSHIP |
| TRA | Base Date | 115-000 | 06/25/2002 |
| Creating Doc# | Date | | |
| Current Doc# | Date | 002062509284 | 06/25/2002 |
| Terminating Doc# | Date | | |
| Neighborhood C... | Supl Cnt | 032 | |
| Asmt Description | | | |
| Land Use 1 | Land Use 2 | | |
| Zoning 1 | Dwell 1 | | |
| Acres | SqFt | 13 | 0 |
| SWUnits | | | |
| SSN1 | SSN2 | | |

**Parcel Desc:**

| | | | |
|---|---|---|---|
| Section | TownShip | Range | |
| Description | | | |
| TPZ | Ag Pres | Efal | Roads |

**Values**

| | TAXROLL | CURRENT | APR DATE |
|---|---|---|---|
| Land | 22,603 | | |
| Structure | | | |
| Fixtures | | | |
| Growing | | | |
| Total L&I | 22,603 | | |
| Fixture RP | | | |
| MH PP | | | |
| PP | | | |
| Exemption | | | |
| Net | 22,603 | | |
| R/C # | | | |
| TR/Date | | | |
| Status | | | |
| Descriptio | ENROLLED is BASE YEAR | | |

Main | Notes | Ownership Detail | Ownership History | Exemptions | Mfg Homes | Attributes | Value History | Situs | Sales

Ready | lheinan 5/9/2003 3:51:39 PM

EXHIBIT
Depo 2
10-31-07
Alosi

| PARCEL NO. | TAX AREA CODE | ACRES |
|---|---|---|
| 32-370-010 | 115-00 | 13.0 |

| OWNER | | DOC. DATE | REC. DATE | TYPE OF DOC. | VOL. - PG. |
|---|---|---|---|---|---|
| ~~DAVIES, DAVID L.~~ | OA as of 5/5/92 | 5/5/92 | 5/6/92 | Tr's Dd | 9200-6173 |
| ~~LIBERTY CONSOLIDATED MINE~~ | as of OA | 8/15/94 | 3/8/95 | GD | 9500-9958 |
| David Davies to Diana Davies | A | 2/16/98 | 3/3/98 | QC | 98-02519 |
| ~~Per Diana Davies - a foreclosure is coming thru on this parcel that will put it~~ back to David's name so we can put it in Diana's name. 5/24/00 ss. | | | | | |
| WISNISKI, MARK | OA | 6/6/02 | 6/25/02 | Tax Dd | 02-09284 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

SCA-1

SISKIYOU COUNTY ASSESSORS HISTORICAL PROPERTY RECORD

| LEGAL DESCRIPTION | LOT OR SEC. | BLK. OR TWP. | RANGE | REMARKS |
|---|---|---|---|---|
| Min. Lot 45A | 10 | 39N | 11W | |

Transferred from old card 8/11/95 ss.

ET AL INTEREST:

FORMERLY (ALL) (POR): ________

DIVIDED INTO: ________

COMBINED WITH: ________ INTO ________

| PARCEL NO. | TAX AREA CODE | ACRES |
|---|---|---|
| ~~032-370-010~~ | 115-00 | 0013.0 |

| OWNER | DOC. DATE | REC. DATE | TYPE OF DOC. | VOL. - PG. |
|---|---|---|---|---|
| ~~SMITH, GEORGE ELDON JR.~~ | | 6-24-54 | | 0332-485 |
| ~~PATTERSON, A R ETAL~~ (OA) | | 11/14/73 | QC | 698-840 |
| ETAL dt of dth Alexander 6/12/83 | 3/25/85 | 3/25/85 | Order | 8500-3125 |
| ~~PATTERSON, GEORGE M Sr EST.~~ dt of dth George Jr. 10/8/84 (OA) Decree quieting title | 10/28/85 | 10/28/85 | dec | 8501 3228 |
| ~~PATTERSON, ALEXANDER R.~~ (Quieting Title) from Escott & Mosler (A) | 10/28/85 | 11/8/85 | Dec. | 8501-3835 |
| ~~Patterson, George M Sr EST~~ Title Corr 8/20/91 PK already coded. | 3/25/85 | 3/25/85 | Dec of Dist | 85-3125 |
| (OA) BETTY JEAN PATTERSON TO RUTH PATTERSON | 3/22/91 | 4/26/91 | QC | 91-4848 |
| (A) BETTY EDGE TO RUTH PATTERSON | 3/22/91 | 4/26/91 | QC | 91-4849 |
| ~~PATTERSON, RUTH E~~ (A) | 5/13/91 | 5/13/91 | spousal order | 91-6540 |
| ~~ALOISI, ALFRED~~ (OA) | 3/22/91 | 5/15/91 | GD | 91-5652 |
| ~~ENERGEL, INC.~~ OA | 5/29/91 | 6/4/91 | GD | 9100-6498 |
| DAVIES, DAVID L. OA AS OF 5/5/92 | 5/5/92 | 5/6/92 | Tr's D | 9200-6173 |

SISKIYOU COUNTY ASSESSORS HISTORICAL PROPERTY RECORD

| LEGAL DESCRIPTION | LOT OR SEC. | BLK. OR TWP. | RANGE | REMARKS |
|---|---|---|---|---|
| MIN LOT 45A | 10- | 39- | 11W | 13 |

TRANSFERRED TO NEW CARD 8/11/95 SS.

ET AL INTEREST: ~~Escott, R M Etal~~ out 85-13835
~~Mosler, George R (Trustee for A R Patterson)~~

FORMERLY (ALL) (POR): ____

DIVIDED INTO: ____

COMBINED WITH: ____ INTO ____

# Assessor Inquiry - Main

**Asmt: 032-410-030-000 Feeparcel: 032-410-030-000**

**Owner: ENERGEL INC**

| | | | |
|---|---|---|---|
| **Situs Address** | | | |
| **NameAddress** | | ENERGEL INC<br>C/O FRED ALDISI<br>BOX 1003<br>SAWYERS BAR CA 96027-1003 | |
| **Status** | **Date** | ACTIVE | 11/27/1998 |
| **Taxability Code** | **Descr** | 000 | NORMAL OWNERSHIP |
| **TRA** | **Base Date** | 115-000 | |
| **Creating Doc#** | **Date** | | |
| **Current Doc#** | **Date** | 1991R0006498 | 06/04/1991 |
| **Terminating Doc#** | **Date** | | |
| **Neighborhood C...** | **Supl Cnt** | 032 | |
| **Asmt Description** | | | |
| **Land Use 1** | **Land Use 2** | | |
| **Zoning 1** | **Dwell 1** | | |
| **Acres** | **SqFt** | 5 | 0 |
| **SWUnits** | | | |
| **SSN1** | **SSN2** | | |

**Parcel Desc:**

| | | | | |
|---|---|---|---|---|
| **Section** | **TownShip** | **Range** | | |
| **Description** | | | | |
| **TPZ** | **Ag Pres** | **Etal** | **Roads** | |

**Values**

| | TAXROLL | CURRENT | APR DATE |
|---|---|---|---|
| **Land** | 24,899 | | |
| **Structure** | | | |
| **Fixtures** | | | |
| **Growing** | | | |
| **Total L&I** | 24,899 | | |
| **Fixture RP** | | | |
| **MH PP** | | | |
| **PP** | | | |
| **Exemption** | | | |
| **Net** | 24,899 | | |
| **R/C #** | | | |
| **TR/Date** | | | |
| **Status** | | | |
| **Description** | ENROLLED is BASE YEAR | | |

Main | Notes | Ownership Detail | Ownership History | Exemptions | Mfg Homes | Attributes | Value History | Situs | Sales

Ready. myork 9/25/2006 8:50:20 AM

| PARCEL NO. | TAX AREA CODE | ACRES |
|---|---|---|
| 032-410-030 | 115-00 | 0005.0 |

| OWNER | DOC. DATE | REC. DATE | TYPE OF DOC. | VOL. - PG. |
|---|---|---|---|---|
| ~~SMITH, GEORGE ELDON JR.~~ | | 6-24-54 | | 0332-485 |
| ~~PATTERSON, A R ETAL~~ (OA) | | 11/14/73 | QC | 698-840 |
| PATTERSON, GEORGE ~~SR. EST. ETAL~~ dt of dth alexander 6/12/83 (OA) | 3/25/85 | 3/25/85 | decr | 8500-3125 |
| dt of dth George Sr. 10/18/84 (OA) A | " | " | | " |
| decree quieting title (A) | 10/28/85 | 11/8/85 | dec | 85013228 |
| ~~PATTERSON, ALEXANDER R.~~ (Quieting Title) Ann Escott & Mosler (A) | 10/28/85 | 11/8/85 | Dec. | 8501-3835 |
| ~~PATTERSON, GEORGE M Sr Est~~ Title Corr 5/20/91 EK Already coded | 3/25/85 | 3/25/85 | Dec of Dist | 85-3125 |
| (A) BETTY ~~ERW~~ PATTERSON TO RUTH | 3/22/91 | 4/26/91 | QC | 91-4848 |
| (A) BETTY EDGE TO RUTH PATTERSON | 3/22/91 | 4/26/91 | QC | 91-4849 |
| ~~PATTERSON, RUTH E~~ (A) | 5/13/91 | 5/13/91 | Spousal order | 91-5540 |
| ~~ALOISI, ALFRED~~ (OA) | 5/13/91 | 5/15/91 | GD | 91-5652 |
| ENERGEL, INC. OA | 5/29/91 | 6/4/91 | GD | 9100-6498 |
| | | | | |

SISKIYOU COUNTY ASSESSORS HISTORICAL PROPERTY RECORD

| LEGAL DESCRIPTION | LOT OR SEC | BLK. OR TWP. | RANGE | REMARKS |
|---|---|---|---|---|
| MIN LOT 45B | 4 | 39 | 11W | 5 |

ET AL INTEREST: ~~Escott, R M Etal~~
~~Mosler, George R (Trustee for A R Patterson)~~

FORMERLY (ALL) (POR): ______

DIVIDED INTO: ______

COMBINED WITH: ______ INTO ______