**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| ALFRED ALOISI, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | No. 95-650L |
| | ) | |
| v. | ) | Judge Lawrence S. Margolis |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS**
**MOTION TO DISMISS OR, ALTERNATIVELY, FOR SUMMARY JUDGMENT**

RONALD J. TENPAS
Assistant Attorney General
Environment & Natural Resources Division

BRUCE K. TRAUBEN
Trial Attorney
Natural Resources Section
Environment & Natural Resources Division
U.S. Department of Justice
601 D Street, NW
Washington, D.C. 20004
(202) 305-0238 (phone)/(202) 305-0506 (fax)

WILLIAM J. SHAPIRO
Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Div.
501 I Street, Suite 9-700
Sacramento, CA 95814-2322

OF COUNSEL:
ROSE MIKSOVSKY
U.S. Department of Agriculture
Office of General Counsel
33 New Montgomery St., 17th Fl.
San Francisco, CA 94105-3170

Dated: February 6, 2008

**TABLE OF CONTENTS**


I. STATEMENT OF THE CASE . . . . . 1

A. INTRODUCTION . . . . . 1

B. FACTUAL BACKGROUND . . . . . 4

1. Liberty Mining, Inc.'s Plans of Operations . . . . . 4

a. Liberty Mining's June 1989 Plan of Operations . . . . . 4

b. September 28, 1989 Proposed Plan of Operations . . . . . 6

c. October 25, 1989 Proposed Plan of Operations and November 27, 1989 Approval Letter . . . . . 7

2. The January 1990 Stop Work Order . . . . . 9

3. Liberty's Ever-Changing Plans and Failure to Provide Repeatedly Requested Information Cause Delay . . . . . 10

4. The Northern Spotted Owl Is Listed as a Threatened Species Under the Endangered Species Act, Spurring the Forest Service to Seek a Programmatic Biological Opinion from the Fish and Wildlife Service . . . . . 15

5. The Forest Service Tries to Implement the Biological Opinion . . . . . 16

6. The Forest Service Initiated an ESA Consultation with the FWS in 1992 Regarding Liberty Mining's April 1992 Plan . . . . . 17

C. PROCEDURAL BACKGROUND . . . . . 19

II. ARGUMENT . . . . . 20

A. Standard of Review . . . . . 20

B. Plaintiffs' Takings Claim is Not Ripe . . . . . 22

1. Plaintiffs' Plans of Operations Were Limited to Preliminary Exploration and Development Activities, and Did Not Include Production of Gold . . . . . 23

2. Plaintiffs' Claim of a Taking of Its Right to Mine Is Not Ripe . . . . . . . . . 25

3. There Also Was No Extraordinary Delay Giving Rise to a Taking . . . . . 27

C. Plaintiffs' Takings Claim Sounds in Tort and, Therefore, is Beyond This Court's Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

D. Plaintiffs' Takings Claim Does Not Arise From an Alleged Affirmative Governmental Act, Warranting Dismissal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

E. Plaintiffs Did Not Have a Cognizable Property Interest in Mineral Lots 45-A and 45-B at the Time of the Alleged Taking, Entitling Defendant to Partial Summary Judgment with Respect to Those Lots . . . . . . . . . . . . . . . . . . 32

F. Alternatively, Defendant is Entitled to Summary Judgment Because Plaintiffs Cannot Show a Temporary, Regulatory Taking Given the Undisputed Facts of This Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

1. Plaintiffs Cannot Show Economic Harm Resulting from the Government's Alleged Failure to Timely Inform Them of the Biological Opinion, Warranting Summary Judgment for Defendant . . . . . . . . . . . . . . . . . . . . . 33

2. Plaintiffs Cannot Show that the Government Interfered With Any Reasonable Investment-Backed Expectations . . . . . . . . . . . . . . . . . . . . . . 36

3. Defendant Is Entitled To Summary Judgment Because Plaintiffs Cannot Satisfy the "Character" Prong of the Penn Central Test . . . . . . . . 39

III. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

## TABLE OF AUTHORITIES

### CASES

1902 Atlantic Ltd. v. United States
26 Cl. Ct. 575 (1992) . . . . . 34

Acadia Tech., Inc. v. United States
458 F.3d 1327 (Fed. Cir. 2006) . . . . . 31

Agins v. City of Tiburon
447 U.S. 255 (1980) . . . . . 34

Almota Farmers Elevator & Warehouse Co. v. United States
409 U.S. 470 (1973) . . . . . 32

Alves v. United States
133 F.3d 1454 (Fed. Cir. 1998) . . . . . 31

Anaheim Gardens v. United States
33 Fed. Cl. 24 (1995) . . . . . 34

Anderson v. Liberty Lobby, Inc.
477 U.S. 242 (1986) . . . . . 21

Appolo Fuels, Inc. v. United States
381 F.3d 1338 (Fed. Cir. 2004) . . . . . 27, 39, 40

B&G Enter., Ltd. v. United States
43 Fed. Cl. 523 (1999) . . . . . 31

Bass Enters. Prod. Co. v. United States
381 F.3d 1360 (Fed. Cir. 2004) . . . . . 28, 33

Boise Cascade Corp. v. United States
296 F.3d 1339 (Fed. Cir. 2002) . . . . . 22, 27

Bradshaw v. United States
47 Fed. Cl. 549 (2000) . . . . . 32

Brown v. Legal Foundation of Washington
538 U.S. 216 (2003) . . . . . 33, 36

Brown v. United States
105 F.3d 621 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

California Coastal Comm'n v. Granite Rock
480 U.S. 572 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Cavin v. United States
956 F.2d 1131 (Fed. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Celotex Corp. v. Catrett
477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Clouser v. Espy
42 F.3d 1522 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Conti v. United States
291 F.3d 1334 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Cottrell v. United States
42 Fed. Cl. 144 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Danforth v. United States
308 U.S. 271 (1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Deltona Corp. v. United States
657 F.2d 1184 (Fed. Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Hendler v. United States
175 F.3d 1374 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Florida Rock Indus. v. United States
791 F.2d 893 (Fed. Cir. 1986), cert. denied, 479 U.S. 1053 (1987) . . . . . . . . . . . . . . . . 30

Freese v. United States
6 Cl. Ct. 1 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 37

Fry v. United States
72 Fed. Cl. 500 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Gahagan v. United States
72 Fed. Cl. 157 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Good v. United States
189 F.3d 1355 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Holden v. United States
38 Fed. Cl. 732 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

John v. United States
77 Fed. Cl. 788 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Kawaoka v. City of Arroyo Grande
17 F.3d 1227 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Keystone Bituminous Coal Ass'n v. DeBenedictis
480 U.S. 470 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Last Chance Mining Co. v. United States
12 Cl. Ct. 551 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Lowe v. United States
76 Fed. Cl. 262 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

MacDonald, Sommer & Frates v. Yolo County
477 U.S. 340 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Maher v. United States
314 F.3d 600 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Maritrans v. United States
342 F.3d 1344 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Marks v. United States
34 Fed. Cl. 387 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Mugler v. Kansas
123 U.S. 623 (1887) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Newby v. United States
57 Fed. Cl. 283 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Nicholson v. United States
77 Fed. Cl. 605 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31

United States v. Vogler
859 F.2d 638 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Palazzolo v. Rhode Island
533 U.S. 606 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 22, 26, 27

Patton v. United States
64 Fed. Cl. 768 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Pax Christi Mem. Gardens v. United States
52 Fed. Cl. 318 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Pendleton v. United States
47 Fed. Cl. 480 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Penn Central Transp. Co. v. New York City
438 U.S. 104 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 33, 39

Pennsylvania Coal Co. v. Mahon
260 U.S. 393 (1922) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Pettro v. United States
47 Fed. Cl. 136 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Pro-Eco, Inc. v. Bd. of Comm'rs of Jay County, Indiana
57 F.3d 505 (7th Cir.1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Reynolds v. Army & Air Force Exch. Serv.
846 F.2d 746 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Rith Energy, Inc. v. United States
270 F.3d 1347 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Seiber v. United States
364 F.3d 1356 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 36

Tabb Lakes, Ltd. v. United States
10 F.3d 796 (Fed. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 30

Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg’l Planning Agency
535 U.S. 302 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 34

Tennessee Valley Auth. v. Hill
437 U.S. 153 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 40

Toxgon Corp. v. BNFL, Inc.
312 F.3d 1379 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Truckee-Carson Irrigation Dist. v. United States
14 Cl. Ct. 361, aff’d, 864 F.2d 149 (Fed, Cur, 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Walcek v. United States
44 Fed. Cl. 462 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 34, 35

Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City,
473 U.S. 172 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Wyatt v. United States
271 F.3d 1090 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28, 32

Yuba Natural Resources, Inc. v. United States
904 F.2d 1577 (Fed. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

**STATUTES**

16 U.S.C. §§ 470a-t . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 36

16 U.S.C. §§ 470a(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

16 U.S.C. § 470f . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 38

16 U.S.C. § 1536 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. 1346(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

28 U.S.C. §1491(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

30 U.S.C. § 612 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

33 U.S.C. § 1251 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

42 U.S.C. § 4321 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

42 U.S.C. § 4332(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

42 U.S.C. § 7401 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

**RULES**

RCFC 12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

RCFC 12(h)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

RCFC 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**REGULATIONS**

36 C.F.R. § 228.3 . . . . . . . . . . 18

36 C.F.R. § 228.4 . . . . . . . . . . 18, 22

36 C.F.R. § 228.4(a) . . . . . . . . . . 36, 37

36 C.F.R. §§ 228.5 . . . . . . . . . . 22

36 C.F.R. § 228.8(e) . . . . . . . . . . 37, 38

36 C.F.R.§ 251 . . . . . . . . . . 8

36 C.F.R. § 252.4(a) . . . . . . . . . . 37

**MISCELLANEOUS**

Black's Law Dictionary (5th ed. 1979) . . . . . . . . . . 29

## LIST OF EXHIBITS

| Exhibit No. | Exhibit Description |
|---|---|
| A | Excerpts from Deposition Transcript of Thomas Ferrero dated November 1, 2007 |
| B | Excerpts from Deposition Transcript of Albert Buchter dated October 29, 2007 |
| C | Excerpts from Deposition Transcript of Alfred Aloisi dated October 31, 2007 |
| D | Excerpts from Deposition Transcript of Kathleen Granillo dated October 2, 1997 |
| E | Excerpts from Plaintiffs' Answers to Defendant's Second Set of Interrogatories and Requests for Production of Documents dated September 24, 2007 |
| F | Exhibit 2 to the Deposition of Alfred Aloisi dated October 31, 2007 (Siskiyou County Assessor Records, Mineral Lots 45A and 45B) |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS OR, ALTERNATIVELY, FOR SUMMARY JUDGMENT**

## I. STATEMENT OF THE CASE

### A. INTRODUCTION

In this temporary regulatory takings action, Plaintiffs seek in excess of $22 million as "just compensation," even though they still have possession of the mining claims and the gold still is in the ground. For the reasons stated herein, Plaintiffs' takings claim should be dismissed.

According to Plaintiffs, the United States temporarily took their unpatented mining claims, as well as the patented Mountain Laurel Mine and the patented Rollin Mill Site, by failing to timely inform Plaintiffs of a Biological Opinion, which the Fish and Wildlife Service ("FWS") issued on July 23, 1990 (the "Biological Opinion").[1/] See Compl., ¶¶ 65, 66. Pursuant to § 7 of the Endangered Species Act ("ESA") (16 U.S.C. § 1536), the Forest Service initiated consultation proceedings with FWS regarding whether the continued existence of the northern spotted owl would be jeopardized by various proposed projects in the Klamath National Forest ("KNF"), including certain activities planned by plaintiff Liberty Mining, Inc. ("Liberty Mining," or "Liberty"). See Compl., ¶ 30. The Biological Opinion concluded that the proposed projects would not jeopardize the continued existence of the northern spotted owl, provided certain reasonable and prudent measures, among other mandatory terms and conditions, were implemented. See JA 80 at 761, 770.[2/] Plaintiffs allege that

---

[1/] The Rollin Mill Site also is referred to as the Rollin Townsite, and is Mineral Lot 45-B. See Compl., ¶ 13; see also Joint Statement of Facts, ¶ 5 ("JSOF") (Dkt. No. 112) (citations to the JSOF throughout this brief are intended to include the documents referenced therein). "Patented" land in this context refers to land that formerly was in the public domain, and for which the Secretary of the Interior issued a land patent to the former mining claimant(s) under the Mining Laws. Once a patent issues, the land becomes the private property of the owner.

[2/] References to "JA [No.]" refer to the document tab number in the Parties' December 21, 2007, Joint Appendix to Joint Statement of Facts, and the cited page numbers refer to the Bates numbers found on each page therein with the prefix "JA."

the United States failed to inform them of the Biological Opinion until March 1992, preventing them from mining and producing "free-milled gold doré for sale . . . in or before January 1991."[3] Compl., ¶ 44; see also Compl., ¶ 45.

Plaintiffs also complain that after the United States informed them of the Biological Opinion, the Forest Service wrongfully initiated a consultation proceeding with FWS (even though such process is required by ESA §7). See Compl., ¶¶ 48, 49. Plaintiffs allege that this second consultation with FWS violated federal regulations and perpetuated the temporary taking until February 1994, when the consultation ended. See Compl., ¶¶ 69-72.

Plaintiffs' claim should be rejected for several reasons. First, the Court lacks jurisdiction to hear claims that are not ripe. It is well-settled that a takings claim is ripe only when the claimant has sought agency approval of a proposed course of action, the agency is given a meaningful opportunity to review the proposal, and the agency prevents the claimant from undertaking the proposed action. See Palazzolo v. Rhode Island, 533 U.S. 606, 620-21 (2001). Plaintiffs, however, never submitted a complete plan of proposed operations for the Forest Service's review – despite repeated attempts by the Forest Service to obtain such a plan from Plaintiffs. Plaintiffs' claim alleging an interference with production activities, therefore, is not ripe. Moreover, even if this court were to conclude that Plaintiffs' preliminary plan should somehow be treated as a complete plan of operations, Plaintiffs cannot show the requisite extraordinary delay to establish a temporary regulatory taking.

Second, Plaintiffs' Complaint is replete with allegations of omissions and unlawful actions

---

[3] For the purposes of this motion only, the United States will assume as true Plaintiffs' allegation that they did not learn about the Biological Opinion until March 1990. Defendant, however, believes that there is evidence to the contrary and may dispute this factual issue in response to any dispositive motion Plaintiffs may file, or in any subsequent proceeding in this action. Plaintiffs' allegation that they were prevented from mining and producing gold doré for sale, however, is based upon rank speculation as discussed herein, below.

by the United States, which are torts over which this Court lacks jurisdiction. Moreover, Plaintiffs' failure to identify any affirmative governmental act giving rise to a taking, by itself, is grounds to grant Defendant summary judgment.

Third, Plaintiffs did not acquire an interest in the Mountain Laurel mine (Mineral Lot 45-A) and the Rollin Mill Site (Mineral Lot 45-B) until May 1991, well after the alleged date of taking of July 23, 1990. Consequently, as discussed further below, these private lots should be dismissed from this action.

Alternatively, summary judgment should be granted, because Plaintiffs cannot show the requisite Penn Central factors to establish a regulatory taking. See Penn Central Transp. Co. v. New York City, 438 U.S. 104, 124 (1978). Specifically, Plaintiffs cannot show that they suffered any economic harm from the alleged governmental action or inaction, because the only economic harm they allege is speculative lost profits (especially since the gold remains in the ground). Plaintiffs also were not deprived "of all or substantially all economically viable use of their property," Walcek v. United States, 44 Fed. Cl. 462, 467 (1999), because Plaintiffs leased the mining claims to third parties during the alleged takings period. In addition, Plaintiffs cannot show that any governmental action interfered with any reasonable investment-backed expectations, because an extensive regulatory regime protecting archaeological resources and the northern spotted owl was in place long before Plaintiffs acquired any interest in the subject property. An analysis of the character of the governmental action (or inaction) also shows that no taking occurred. Accordingly, application of the Penn Central factors shows that no taking has occurred, entitling Defendant to summary judgment.

## B. FACTUAL BACKGROUND

Many of the pertinent facts are set out essentially in chronological order in the JSOF. Defendant summarizes the facts briefly, below, by categories of events.

### 1. Liberty Mining, Inc.'s Plans of Operations

Forest Service regulations require prospective miners to obtain an approved plan of operations prior to undertaking any mining activity in a national forest that is likely to cause a significant disturbance of surface resources. See § II.B., infra. Liberty Mining submitted several proposed plans of operation, all of which focused on preliminary activities such as road construction, exploration, sampling and testing, rather than upon actual production. Only those portions of Liberty Mining's proposed plans that dealt with these preliminary activities were approved, as discussed in more detail below. Liberty Mining's outline plans for production always were contingent upon the outcome of its proposed preliminary activities, and Liberty Mining never submitted sufficient information to the Forest Service so it could complete its review of Liberty Mining's conceptual plans.

#### a. Liberty Mining's June 1989 Plan of Operations

The first preliminary plan of operations for the relevant mining claims was initiated on April 3, 1989, when Michael P. Lee, then District Ranger of the Klamath National Forest, transmitted a draft Plan of Operations (the "April 1989 Plan") to Plaintiffs.[4/] See JSOF, ¶ 17; see also JA 20. Through the April 1989 proposed plan, Plaintiffs sought approval for "mineral sampling, road construction, site clearance and related operations on The Liberty Claims preparatory to mining." Compl., ¶ 18; see also JSOF, ¶ 17.

---

[4/] In July 1988, before Liberty Mining, Inc. was formed, Plaintiffs Aloisi et al. submitted a preliminary plan of operations under the name Jefferson State Exploration and Development Co., but that plan was never finalized due to fires in the area. See JSOF, ¶¶ 12, 16.

In an internal memorandum dated April 19, 1989, the Forest Service's District Wildlife Biologist, Marc Williams, analyzed the potential effects of Liberty Mining's proposed plan of operations on the spotted owl, noting that the "proposed project lies within the Eddy Gulch [Spotted Owl Habitat Area ("SOHA")] (#24)." JA22 at 399; see also JSOF, ¶ 18. Mr. Williams concluded that the proposal "will have a negative effect on owl habitat," and suggested mitigation measures to the District Ranger, including "the clearing of the millsite . . . in stages," and that "road work should occur outside of the nesting season." JA22 at 400; see also JSOF, ¶ 18.

Soon thereafter, on May 2, 1989, Liberty Mining proposed a two-phased approach. See JSOF, ¶ 19; see also JA 23 at 401-402. Liberty proposed in Phase I to repair roads, sample the "Klamath Dumps" (i.e., waste material from historic mining operations (see JSOF, ¶ 12)), haul samples to centrifugal concentrators for test runs and, depending upon the Environmental Assessment ("EA") "on the spotted owl situation[,] . . . log and dozer cut apex corridors . . . ." JA23 at 401-02; see also JSOF, ¶ 19. Liberty's proposal for Phase II depended upon the test results in Phase I and the EA required by the National Environmental Policy Act of 1969 (42 U.S.C. § 4321 et seq.) ("NEPA"). In response, on May 25, 1989, the Forest Service submitted a proposed plan for Liberty's consideration for the proposed "Phase I" activities, and agreeing with Plaintiffs that Phase II activities would depend upon the outcome of the "test results from Phase I and NEPA." See JSOF, ¶¶ 19, 20; see also JA24 at 412. The May 25, 1989 proposed plan was approved with minor modifications on June 6, 1989. See JSOF, ¶ 22; see also JA26.

The approved plan thus contemplated limited, preliminary Phase I activities that were designed to determine whether gold could be recovered from existing mine dumps and to explore and sample the vein apexes. See JA26 at 421-22. By its own terms, the June 6, 1989 Plan was scheduled to

expire on July 31, 1989. See JA26 at 424-25.[5]

**b. September 28, 1989 Proposed Plan of Operations**

On September 28, 1989, Plaintiffs submitted their "all phase" plan of operations (the "September 1989 Plan"). See JSOF, ¶ 26; see also JA36 at 446. The "all phase" plan never was approved as proposed. See JSOF, ¶¶ 26, 29-33. The September 1989 Plan generally described four phases of activity, consisting of:

> Phase 1) Klamath Road improvement, Shoo Fly Road Improvement, Schoolhouse Flat Road construction, clearing of work areas, excavation and bulk sampling of apexes at existing cleared areas, setting up screening, crushing and centrifugal concentrating equipment, test processing of sampled material . . . screening, crushing and centrifugal concentrating of Klamath dump material (if justified by test results) . . . .
>
> Phase 2) Contingent on positive results from Phase 1. Remaining road work . . . bulk sampling and test milling of material form [sic] apex road excavation to determine extent of ore distribution, underground exploration . . . .
>
> Phase 3) Contingent on positive results from Phase 2. Production: Underground mining, surface mining of ore zones along apexes, milling ... Length of production period depends on amount of ore discovered.
>
> Phase 4) Reclamation: Filling, grading, seeding, etc.

JA36 at 449.

The "all phase" plan provided few details, and anticipated future work "depend[ing] upon the results of bulk sampling and test milling during Phase I." JA36 at 448. Plaintiffs did not provide any details for the actual production of any gold (Phase 3). As the September 28, 1989 letter admitted:

> The description of the overall exploration and mining plan presented in this letter is incomplete due to the fact that preliminary feasibility studies have not been completed.

---

[5] On about July 27, 1989 Plaintiffs proposed minor additions to the June 6, 1989 approved plan (see JA31), which were approved on August 11, 1989. See JA32. In this supplemental plan, Liberty also proposed hauling dump material for processing, but that work depended upon the outcome of the "dump material testing." JA31 at 440. Also, Liberty could not identify its milling operation, which would "depend on test results." Id.

> Details of ore reserve availability, mining feasibility and milling methods have not yet been determined.

JA36 at 449. At his November 1, 2007 deposition, the plan's author, Tom Ferrero, explained that the September 28, 1989 proposed "all phase" plan, notwithstanding its moniker, was an "outline plan . . . the general concept of what we were planning to do down the road . . . we weren't asking for every detail of it to be approved . . . ." Nov. 1, 2007 Ferrero Tr. at 75:1-18 (Ex. A, hereto).[6]

**c. October 25, 1989 Proposed Plan of Operations and November 27, 1989 Approval Letter**

On October 24, 1989, the District Ranger requested "a firm plan . . . by Liberty Mining depicting what areas are going to be developed and how the areas are going to be developed during the next six month and twelve month periods." JA38 at 458; see also JSOF, ¶ 29. That requested plan, the District Ranger wrote, would "be the foundation for Operating Plan Number Two." JA38 at 458.

On October 25, 1989, Plaintiffs submitted a Supplemental Plan of Operations, providing additional details on the activities proposed for Phase 1 and Phase 2, but no further information about Phases 3 or 4. Cf. JA36 at 449 with JA40 at 464-65. Similar to Liberty Mining's September 1989 proposed plan, the activities proposed in the October 25, 1989 supplemental plan were unformed and dependent on then-unknown results from the proposed preliminary work:

> The amount of material excavated, hauled and milled during the Spring/Summer/Fall of 1990 will depend on many factors, and cannot be accurately projected at this time. Only selected portions of the apexes will be mined in 1990. Much more apex area will remain to be developed on the following year(s) as justified by 1989-90 results.

JA40 at 465 (emphasis added).

On November, 27, 1989, the Forest Service submitted a "Liberty Mine Proposed Mill Site

---

[6] All cited excerpts to the Nov. 1, 2007 Ferrero Tr. are attached hereto at Ex. A.

Archaeological Reconnaissance Report" to the California State Historical Preservation Officer (SHPO), seeking the SHPO's review pursuant to Section 106 of the National Historic Preservation Act of 1966 (16 U.S.C. § 470a-t, as amended) ("NHPA"). See JSOF, ¶ 34, see also JA46 at 475. Noting that the Forest Service was seeking the SHPO's review of the archaeological report, on November 27, 1989, the District Ranger approved Liberty's proposed Fall 1989 and Winter 1989-90 activities, as set forth in the October 25, 1989 proposed supplemental plan. See JA45 at 472. In his November 27, 1989 letter, The District Ranger made clear:

> The [October 25, 1989] supplemental plan included activities labeled Spring/Summer/Fall, 1990 which would be part of Phase Two of the development of your mine. These activities are not approved at this time because they will be included in a master Plan of Operation Number Two with an Environmental Analysis to be completed in the spring of 1990 as we agreed at our meeting on November 1, 1989.

JA45 at 472 (emphasis added).[7] Plaintiffs concede that "[t]he activities authorized in the November 1989 approval did not include any activities that could generate income from sale of production from the Liberty Property." Compl., ¶ 23.

The termination date for the approved Plan of Operations was adjusted to July 31, 1990. See JA45 at 472; see also JSOF, ¶ 33. The July 31, 1990 termination date established by the District Ranger in his November 27, 1989 approval letter subsequently was extended twice, first to September 30, 1990 (see JSOF, ¶ 51), and then to March 31, 1991 (see JSOF, ¶ 55). Although Liberty requested a third extension on March 11, 1991 (see JSOF, ¶ 59), it was not granted and Liberty's approved plan of operations expired on March 31, 1991. See JSOF, ¶ 72, see also JA111 at 1083.

[7] As the letter noted, Plaintiffs had the ability to challenge the decision pursuant to 36 C.F.R. 251 (see JA45 at 474), but Plaintiffs did not do so.

**2. The January 1990 Stop Work Order**

As noted above, the Forest Service's November 27, 1989 approval letter indicated that an archaeological field survey had been completed by the Forest Service, and had been transmitted to the SHPO, as is required by NHPA § 106 (16 U.S.C. § 470f). See JA45 at 472; see also JA46. The SHPO responded to the Forest Service on December 15, 1989, expressing "fundamental concerns regarding the approach you are taking to Section 106 compliance for this project." JA47 at 498. Specifically, SHPO Gualtieri found that the potential effects of the proposed project could not be adequately evaluated, "without a comprehensive understanding of the scope of both the entire project (and its land disturbing potential) and the historic context and full extent of the historic resource." Id. (emphasis as in original). Based on her concerns with the archaeological field survey, the SHPO concluded that a "finding of no effect for the portions of the project you have considered . . . is premature," and urged the Forest Service to "complete your Section 106 responsibilities for the entire project [Area of Potential Effect] prior to permitting the project to procede [sic]." Id. at 498-99.

On January 4, 1990, the Forest Service informed Plaintiffs Aloisi and Liberty Mining, Inc., of the SHPO's decision that "the archeology work that has been completed is not comprehensive for the scope of the area and your project." JA51; see also JSOF, ¶ 36. The District Ranger continued, "SHPO indicates that the entire area must be analyzed before a determination can be made." JA51. He explained that "[w]ithout this complete analysis we would be out of compliance with Section 106 of [NHPA]." Id. The District Ranger concluded that he had "no choice but to inform [Liberty] that all activities including activities on private land accessed through National Forest must stop immediately. No activities should proceed until we receive a favorable determination from SHPO and we notify [Liberty] in writing." Id.

In a letter dated February 22, 1990, the Forest Service explained that Plaintiffs' "mining-

related activities on your private land are interrelated and interdependent with your activities associated with your current and proposed operating plans." JA55 at 513. But the Forest Service also made clear that while Liberty Mining's "surface disturbing activities are still restricted, any non-mining related activities are permissible on your adjoining private lands. These activities could include occupancy of the existing facilities, travel to and from your residence and normal equipment maintenance and upkeep." Id. The Forest Service's letter to Plaintiffs informed them of their ability to administratively challenge the Forest Service's decision. See JA55 at 514.

Plaintiffs, however, did not challenge the District Ranger's decision to stop work pending archaeological clearance from the California SHPO. Instead, Liberty Mining began to receive bids for a cultural resources study. See JSOF, ¶ 41; see also JA57. By August 1990, however, Liberty decided to forego having the archaeological study completed until the effect of the northern spotted owl on Liberty's operations was resolved. See JA82 at 777.

**3. Liberty's Ever-Changing Plans and Failure to Provide Repeatedly Requested Information Cause Delay**

In late February and early March 1990, Liberty received the results of metallurgical tests that showed relatively poor gold recovery using a gravity/floatation circuit alone (40-50%), compared to the 80% recovery obtained when cyanide leaching was added to the process.[8] See JA60 at 548. Consequently, at a March 16, 1990 meeting held at the District Ranger's office, Liberty proposed using "a cyanide vat type [gold] recovery process." JA65 at 594; see also JSOF, ¶ 40. Mr. Aloisi then "admitted that this was a new issue that would need to be addressed in its entirety." JA65 at 594. Liberty was told at the meeting that "significantly more information and coordination would be

[8] The gravity/flotation process uses a combination of gravity and chemicals to extract gold in a sulfide concentrate. The cyanide step, if added, then extracts any residual gold by dissolving it. See Nov. 1, 2007 Ferrero Tr. at 63:6-23.

required and thereby setting back the [Environmental Assessment required under NEPA] until the summer of 1990." Id.; see also Oct. 29, 2007 Buchter Tr. at 76:20-21 (testifying that an EA is part of the NEPA process) (Ex. B, hereto).[9]

In March 1990, representatives of Liberty Mining contacted regional and County regulatory agencies to inquire about the applicable requirements if a cyanide process were used. See JA62; see also JA 64. Liberty learned that, to operate a cyanide processing system, it would need to file, among other documents, a reclamation plan with Siskiyou County for its approval. JA62; JA64; Oct. 31, 2007 Aloisi Tr. at 71:10-72:1 (Ex. C, hereto).[10] But Liberty never obtained an approved reclamation plan from the County. See Nov. 1, 2007 Ferrero Tr. at 61:5-14 (discussing JA64). Indeed, Liberty Mining was several years away from obtaining the necessary permits to use a cyanide recovery process. See JA190 at 1567.

In an April 12, 1990 letter, the District Ranger reminded Mr. Aloisi that he agreed to provide "a written proposal describing the specific plans that you have for your new recovery process . . . ." JA69. The District Ranger reiterated that "due to the change of your proposal complexity and lack of available information, it was agreed that the [Environmental Assessment] scheduled for completion in April, will not be completed until mid-summer." Id.

The District Ranger again wrote to Liberty Mining on August 27, 1990, stating, "it is apparent that there is a high likelihood that preparation of an Environmental Impact Statement (EIS) will be required for your proposed cyanide leaching process . . . [requiring] probably two years, for the

---

[9] All cited excerpts to the Oct. 29, 2007 Buchter Tr. are attached hereto at Ex. B.

[10] All cited excerpts to the Oct. 31, 2007 Aloisi Tr. are attached hereto at Ex. C.

process to be completed."[11/] JA82 at 777; see also JSOF, ¶ 51. The District Ranger asked that Liberty inform him of its decision about using a milling process which would require an EIS (i.e., a cyanide process) as soon as Liberty finalized its decision, to minimize any delay. See JA82 at 778.

When applying to renew its then-existing preliminary plan on September 18, 1990, Liberty informed the Forest Service that the "milling process will be determined in the next two years as exploring progresses. No cyanide milling is included in the current plan." JA84 (emphasis added); see also JSOF, ¶ 53. In November 1990, the District Ranger again informed Liberty that the Forest Service could not process Liberty's proposals without additional information:

> In order to formulate your proposals into a Plan of Operations we need a specific schedule for completion of phases of development of your operation from exploration to full operation, and we need your specific measures that you plan to use to reclaim the disturbed areas of your operation and a time table for the completion of the reclamation.

JA88 at 823. As the District Ranger further observed:

> It is our understanding that at this time there can be no further activity that would constitute a taking of spotted owl habitat within [a Habitat Conservation Area].
>
> * * *
>
> Until you can provide us with a detailed Plan of Operations, as described previously, we will not be able to answer to what extent your planned activities would be constrained, nor will [we] be able to complete an environmental analysis.

Id. at 824 (emphasis added).

District Ranger Lee wrote to Mr. Aloisi on December 7, 1990, regarding Liberty Mining's alternative proposal to mine in some existing underground tunnels, further away from "the known owl activity center." JA90 at 828. While District Ranger Lee predicted that Mr. Aloisi's alternative

---

[11/] Pursuant to NEPA, an EIS is required when the environmental consequences of a federally authorized undertaking are significant. See 42 U.S.C. § 4332(C).

proposal "could probably occur," he stated that the Forest Service "would need to know more about [Liberty Mining's] proposal in detail before an accurate response could be made." Id.

On or about March 11, 1991, Plaintiffs submitted a document titled an "Application for Renewal of Existing Plan of Operations with Modifications." See JA94; see also JSOF, ¶ 59. Liberty again informed the Forest Service in its March 1991 proposal that it intended to "[c]onstruct jig and flotation circuit mill at Usher Flat (no cyanide)." JA94 at 906 (emphasis added). However, Liberty describes the March 11, 1991 document as an "outline plan." JA94 at 906. Indeed, the March 1991 document is replete with promises of future details to be forthcoming. See, e.g., JA94 at 905-06, ¶ 5 ("Details of exact hole locations and methods forthcoming . . ."), ¶ 6 ("Details of which portals to be reopened and methods forthcoming . . ."), ¶ 8 ("Detailed site plans will be forthcoming . . .") & ¶ 10 ("Exact mill plans will be forthcoming . . ."). Those details never were provided by Liberty Mining, and Liberty Mining's Phase I plan terminated on March 31, 1991, according to the terms of the November 27, 1990 extension. See JA88 at 822; see also § I.B.1.c., supra.

Two months later, on May 9, 1991, Tom Ferrero, the author of Liberty's preliminary plans (see, e.g., JA36, JA40, JA94), met with District Ranger Lee to discuss Liberty's potential operations. See JA99; see also Nov. 1, 2007 Ferrero Tr. at 62:11-13. During that meeting Mr. Ferrero again raised the possibility of using a cyanide system to recover gold. Nov. 1, 2007 Ferrero Tr. at 66:3-7 (discussing JA99). As Mr. Ferrero explained at his deposition, "[s]ometimes we think we're going to use cyanide, sometimes we don't. But that was because we were in the process of testing the efficiency of it and weighing the regulatory problems." Nov. 1, 2007 Ferrero Tr. at 67:22-68:16.

In a March 10, 1992 letter summarizing the outcome of a February 11, 1992 meeting with Mr. Aloisi and others, the District Ranger reiterated his November 1990 request for information:

> In order to formulate your proposals into a plan of operations, you have agreed to provide a specific schedule for completion of phases of development of your operation from exploration to full operation. We will also need for you to include your specific measures that you plan to use to reclaim the disturbed areas of your operation and a time table for the completion of the reclamation.

JA111 at 1084. Again, despite the repeated promises of forthcoming details, Liberty Mining did not submit a detailed plan of operations. Id. at 1083.

On April 1, 1992, Liberty Mining submitted a new proposed Plan of Operations (the "April 1992 Plan"). See JA114 at 1106. As with Plaintiffs' prior submissions, however, the scope of Liberty's April 1992 Plan was contingent upon the outcome of its explorations. See, e.g., JA114 at 1106 ("The objectives of the proposed developments are to determine whether there are reserves of gold bearing [sic] rock of sufficient quality and quantity to warrant mine development . . .").

Because Liberty's April 1992 Plan once again lacked sufficient detail, in a letter dated November 10, 1992, the District Ranger requested additional, detailed information before he could approve Liberty's "overall plan as submitted." JA137 at 1223-24; see also JSOF, ¶ 85. In a letter to Mr. Aloisi dated December 21, 1992, the Forest Service repeated its request for information identified in the November 10, 1992 letter, listing the "very minimum . . . information . . . required to restart the preparation of the [Environmental Assessment]." JA142; see also JSOF, ¶ 92. Liberty Mining, however, never submitted the information necessary to complete the Environmental Assessment. See Oct. 29, 2007 Buchter Tr. at 75:4-78:21.[12/]

---

[12/] Rather than provide the information sought by the Forest Service to complete an Environmental Assessment, Liberty Mining began to negotiate leasing its mining claims to a company called WAZCO, during the Fall 1992. See Oct. 31, 2007 Aloisi Tr. at 133:12-23. The lease was executed by April 25, 1993, with an effective date of April 1, 1993. See JSOF, ¶ 97.

**4. The Northern Spotted Owl Is Listed as a Threatened Species Under the Endangered Species Act, Spurring the Forest Service to Seek a Programmatic Biological Opinion from the Fish and Wildlife Service**

Meanwhile, on June 18, 1990, anticipating that the spotted owl soon would be listed as an endangered or threatened species under the ESA, the Forest Service transmitted a Programmatic Biological Evaluation to the Fish and Wildlife Service as part of the required ESA consultation process.[13] See JA76. Although the Forest Service's Programmatic Biological Evaluation focused almost entirely on proposed timber sales in Klamath National Forest, it also included a paragraph addressing Plaintiffs' proposed mining activities. See JA76 at 747. The Forest Service submitted the Programmatic Biological Evaluation to FWS "to expedite the formal consultation process." JA76 at 719.

In response, FWS issued a Biological Opinion on July 23, 1990, addressing the "effects of timber harvest and associated activities on the threatened northern spotted owl (Strix occidentalis caurina)." JA80 at 760. While the focus of the Biological Opinion letter was on timber sales, Liberty Mine was included in the opinion. See id. at 761; see also JSOF, ¶ 50. Significantly, the Biological Opinion contains mandatory requirements for the incidental take of spotted owls pursuant to the Endangered Species Act.[14] See JA80 at 769-71.

---

[13] On June 26, 1990, the Fish and Wildlife Service published the formal listing of the northern spotted owl as a threatened species under the ESA. See JSOF, ¶45. Years before it was listed, however, the northern spotted owl was considered a sensitive species by the Forest Service, triggering efforts by the Forest Service to protect the owl and preserve its habitat. See JSOF, ¶¶ 6, 7, 10, & 13. The history of the listing of the northern spotted owl under the Endangered Species Act is set out in the JSOF, ¶¶ 9, 11, 14, 15, & 23.

[14] Incidental take is defined in the Biological Opinion as a "taking that results from, but is not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or applicant." JA80 at 769. Under the terms of the Biological Opinion, any incidental taking "must be in compliance with the terms and conditions of [its] written Incidental Take Statement as

FWS authorized "incidental take" of spotted owls "in the form of harassment . . . in compliance with the provisions of the reasonable and prudent measures and terms and conditions of this Incidental Take Statement." JA80 at 770. The reasonable and prudent measures instructed the Forest Service to "[m]aintain essential habitat within close proximity of spotted owl nest sites and activity centers . . . in proposed [Habitat Conservation Areas (HCAs)]." Id. Mandatory terms and conditions were established by FWS to implement the reasonable and prudent measures. Id. at 770-71. To minimize impacts in HCAs where the project cannot be moved (such as a mining claim), FWS recommended "avoid[ing] road construction in HCAs." JA 80 at 772. Liberty Mining's claims are located in a category 1 HCA, and it proposed activities within 0.5 mile of a known pair of spotted owls. See JSOF ¶¶ 43, 44; see also JA80 at 765-66.

**5. The Forest Service Tries To Implement the Biological Opinion**

Within a few months after the Biological Opinion issued, on October 24, 1990, the Regional Forester followed the Fish and Wildlife Service's recommendation and adopted the Interagency Scientific Committee's (ISC) Conservation Strategy for the spotted owl. See JSOF, ¶ 54; see also JA71; JA86. The Conservation Strategy called for the cessation of logging in HCAs. See JSOF, ¶ 43; see also JA71 at 652. The Regional Forester directed the Forest Supervisors, including the Supervisor of the Klamath National Forest, to comply with the mandatory terms and conditions of the Biological Opinion, and to "document steps taken to implement the Conservation Recommendations." See JSOF, ¶ 54; see also JA86.

In April 1991, the Regional Forester released spotted owl survey protocol for FY1991 to the Forest Supervisors. See JSOF, ¶ 61. In May 1991, the Regional Office circulated additional guidance

---

directed by [ESA] Section 7(o)(2)." Id.

on interpreting and implementing the Conservation Strategy. See JSOF, ¶ 63. Additional guidance was issued in July 1991 describing the responsibilities of a Regional Technical Review Team established to review proposed actions for compliance with the Conservation Strategy. See JSOF, ¶ 65. The July 1991 guidance also set out procedures for evaluating a project area with respect to northern spotted owl populations and habitat. See JSOF, ¶ 65, see also JA 107 at 1038-43. Even though Liberty's plan of operations expired on March 31, 1991 (see § I.B.1.c., supra), KNF Wildlife Biologist Kathleen Milne Granillo visited Liberty Mining's claims in July 1991, to try to implement the Biological Opinion and explore ways to lessen the effect of Liberty's proposed activities on suitable spotted owl habitat. See Granillo Tr. at 25:8-27:17 (Ex. D, hereto).

**6. The Forest Service Initiated an ESA Consultation with the FWS in 1992 Regarding Liberty Mining's April 1992 Plan**

About nine months after the Biological Opinion issued, FWS proposed designating certain areas as critical habitat for the northern spotted owl. See JSOF, ¶ 61. The list of proposed critical habitat areas was revised on August 13, 1991 to, among other things, include the Eddy Gulch area encompassing Liberty Mining's operations. See JSOF, ¶ 68; see also 56 Fed. Reg. 40002, 40042 (Aug. 13, 1991) (proposing as critical habitat for the northern spotted owl Sections 3, 4, 8, 9 and 10 of Township 39 N., Range 11 W., Mt. Diablo Meridian, among others); JA 6 at 142-44 (identifying the Sections, Township and Range of Liberty Mining's claims in Eddy Gulch). On January 15, 1992, FWS published its final rule designating as critical habitat the areas identified in its August 13, 1991 revised notice. See JSOF, ¶ 70; see also Final Rule, 57 Fed. Reg. 1796 (Jan. 15, 1992); JA 145 at 1264 (Deputy Regional Forester Bosworth noting that the critical habitat areas were based on the HCAs).

The designation of critical habitat for the northern spotted owl was to provide "additional

protection requirements under section 7 of the [ESA] with regard to activities that are funded, authorized, or carried out by a Federal agency." JA138 at 1226 (quoting Final Rule, 57 Fed. Reg. at 1796) (internal quotation marks omitted). The January 1992 designation of critical habitat, therefore, required the Forest Service to re-initiate the ESA consultation process to determine whether Liberty Mining's April 1992 Plan would adversely affect critical habitat of the northern spotted owl. See JA124 at 1177. After some discussion between FWS and the Forest Service about whether it was necessary to consult on Liberty Mining's April 1992 Plan, FWS agreed "to determine the project's effects on the spotted owl critical habitat." See JSOF, ¶¶ 86, 87.

FWS, however, had to suspend the consultation pending receipt of additional information from Liberty Mining. See JSOF, ¶¶ 89, 91; see also JA138 at 1225 (FWS letter providing notice to the Forest Service of suspension of consultation and requesting additional information); JA140 (Dec. 4, 1992 Forest Service letter to Mr. Aloisi providing notice of the suspension and forwarding FWS's letter requesting additional information). After meeting in January 1993 and March 1993, Liberty Mining provided the information sought by FWS for the consultation. See JSOF, ¶ 95. That information was forwarded to FWS by District Ranger Lee on April 2, 1993. See JSOF, ¶ 96.

Before FWS could complete the consultation on Liberty Mining's April 1992 Plan, however, Liberty Mining leased its mining claims (including Mountain Laurel mine) to WAZCO on April 25, 1993, effective April 1, 1993. See JSOF, ¶ 97; see also n.12, supra. WAZCO (subsequently operating under the name, Liberty Consolidated Mines, Inc. (LCM)), therefore, became the operator with which the Forest Service dealt. See JSOF, ¶¶ 98-100, 103-105, 108-111; see also 36 C.F.R. §§ 228.3 & 228.4 (defining "operations" and "operator," and specifying the requirements for the submission of a proposed plan of operations by an operator).

FWS completed its consultation on February 8, 1994, concluding that the proposed project was not likely to adversely affect the northern spotted owl. See JSOF, ¶ 101. Although LCM ultimately was approved to operate provided it posted a reclamation bond (JSOF, ¶ 111), it never did so (JSOF, ¶ 112), and allowed its lease on the mining claims to lapse in 1999 (JSOF, ¶ 113).

### C. PROCEDURAL BACKGROUND

Plaintiffs filed this action on September 27, 1995, and Defendant answered the Complaint on January 31, 1996. On November 18, 1998, Defendant filed a motion to dismiss pursuant to Rule 12(b)(1) or 12(b)(4),[15] arguing that Plaintiffs do not have a compensable property interest, because their mining claims are unpatented and no determination of validity had been made. See Defendant's Motion to Dismiss, or in the Alternative, for a Stay of Proceedings at 2 (hereinafter, "Defendant's Motion to Dismiss"). In the alternative, the government sought a stay of the action to permit the Department of the Interior to determine whether the mining claims at issue are valid.[16] Id.

The Court decided to stay the proceedings so that the Department of the Interior could determine whether the mining claims at issue are valid. See Order dated Oct. 6, 1999. Ultimately, the Department of the Interior decided that it did not have jurisdiction to determine whether the mining claims were valid as of the date of the alleged taking, because no regulatory action occurred

---

[15] Pursuant to the 2002 Revision, Rule 12(b)(4) was renumbered as 12(b)(6) to conform with the Federal Rules of Civil Procedure. See Rules Committee Note, RCFC 12.

[16] At that time, Plaintiffs agreed that only six (6) of the mining claims underlie their proposed plan of operation upon which their taking claim is based, namely: (1) Sunrise (BLM Serial #167529); (2) Sunset (#167530); (3) Six O' Clock (#167538); (4) Yankee (#167544); (5) East Fork (#167545); and (6) Compressor (#167546). See Defendant's Motion to Dismiss at 1 n.1. Plaintiffs, however, now are asserting that all of the mining claims listed in their Complaint, as well as the Mountain Laurel mine and the Rollin Millsite (see Compl., ¶ 13), were temporarily taken. See Pls.' Answers to Def.'s Second Set of Interrogatories at 3 (Ex. E, hereto).

at that time. See U.S. DOI, Office of Hearings and Appeals, May 2, 2007 Order at 4 (Dkt. No. 93-2), attached to May 14, 2007 Joint Interim Status Report (Dkt. No. 93). Soon thereafter this Court lifted the stay. See Order dated May 24, 2007 (Dkt. No. 95).

The Court then held scheduling conferences on June 19, 2007 and September 6, 2007, and issued a Scheduling Order dated September 6, 2007 (Dkt. No. 99). On January 10, 2008, the Court adopted the proposed scheduling order submitted by Plaintiffs on January 4, 2008 (Dkt. No. 111), setting February 1, 2008 as the due date for dispositive motions.[17/] (See Dkt. No. 113.)

## II. ARGUMENT

### A. STANDARD OF REVIEW

Under RCFC 12(h)(3), "[w]henever is appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Thus, "under Rule 12(h)(3) this court is mandated to . . . dismiss the action '[w]henever it appears . . . that the court lacks jurisdiction of the subject matter . . . .'" Truckee-Carson Irrigation Dist. v. United States, 14 Cl. Ct. 361, 368, aff'd, 864 F.2d 149 (Fed. Cir. 1988) (quoting RCFC 12(h)(3)) (emphasis as in original). Whether this Court has jurisdiction to hear a plaintiff's claim is a question of law. See Toxgon Corp. v. BNFL, Inc., 312 F.3d 1379, 1381 (Fed. Cir. 2002) ("the existence of subject matter jurisdiction is a question of law"); Maher v. United States, 314 F.3d 600, 603 (Fed. Cir. 2002) (noting that the Federal Circuit reviews de novo whether the Court of Federal Claims possesses jurisdiction because this is a question of law).

When deciding a motion to dismiss based on a lack of subject matter jurisdiction, the court

---

[17/] On February 1, 2008, the government filed an unopposed motion for an extension of time, requesting that the due date be extended to February 6, 2008 (Dkt. No. 116), which the Court granted on February 5, 2008 (Dkt. No. 117).

must assume that all undisputed facts alleged in the Complaint are true and must draw all reasonable inferences in the non-movant's favor. Newby v. United States, 57 Fed. Cl. 283, 290 (2003). If the government's motion challenges the truth of the jurisdictional facts alleged in the complaint, the court may consider relevant evidence beyond the Complaint in order to resolve the factual dispute. Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 747 (Fed. Cir. 1988) (citing Land v. Dollar, 330 U.S. 731, 735 (1947)). "Once the court's subject matter jurisdiction is put into question, it is 'incumbent upon [the plaintiff] to come forward with evidence establishing the court's jurisdiction. [The plaintiff] bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence.'" Patton v. United States, 64 Fed. Cl. 768, 773 (2005) (quoting Reynolds, 846 F.2d at 748) (alterations as in original).

Summary judgment is appropriate when there are no general issues of material fact and the moving party is entitled to judgment as a matter of law. See RCFC 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is genuine if it "may reasonably be resolved in favor of either party." Id. at 250.

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. See Celotex Corp., 477 U.S. at 323. The burden then shifts to the nonmoving party, who then must show that there are genuine issues of material fact for trial. Celotex Corp., 477 U.S. at 324. The nonmoving party must go beyond the pleadings and support its opposition with affidavits or with depositions, answer to interrogatories, and admissions. Id. at 324. Entry of summary judgment is mandated, "after adequate time for discovery," against a party who fails to establish "an element essential to that party's case, and on which that party will bear the burden of proof at trial."

Id. at 322.

**B. PLAINTIFFS' TAKINGS CLAIM IS NOT RIPE**

Despite their numerous filings, Plaintiffs never submitted anything more than proposals for preliminary activities (such as road-building and sampling activities) and conceptual outlines of production activities. See § I.B.1.b., supra. Despite repeated requests by the Forest Service, Plaintiffs never submitted a sufficiently-detailed plan addressing actual mining activities for Forest Service review. See § I.B.3., supra. Plaintiffs' contention that some government action interfered with Plaintiffs' right to mine within KNF, therefore, is not ripe for review.

A regulatory takings claim does not ripen until the government entity charged with implementing the regulation has reached a final decision to restrict some aspect of ownership. See Palazzolo, 533 U.S. at 620; MacDonald, Sommer & Frates v. Yolo County, 477 U.S. 340, 349-51 (1986). To ripen a regulatory takings claim, a claimant must have first "followed reasonable and necessary steps to allow regulatory agencies to exercise their full discretion" so that the full extent of the restriction on the property can be ascertained. See Palazzolo, 533 U.S. at 620-21. Stated another way, a regulatory takings claim does not ripen until a claimant has submitted a meaningful permit application and the agency has reached a final decision on that application. See Boise Cascade Corp. v. United States, 296 F.3d 1339, 1351-52 (Fed. Cir. 2002). "If the government denies a permit, then the aggrieved party can seek compensation." Id. at 1347.

The Forest Service regulates ground-disturbing activities on National Forest System lands by requiring operators to obtain an approved plan of operations prior to initiation. See 36 C.F.R. §§ 228.4 & 228.5. Any claim related to activities that were not presented to the Forest Service for review in a meaningful plan is not ripe for review and must be dismissed. See United States v. Vogler, 859

F.2d 638, 642 (9th Cir. 1988) (finding Fifth Amendment claim not ripe because plaintiff "never attempted to apply for a permit and he never submitted a mining plan"); Freese v. United States, 6 Cl. Ct. 1, 15 (1984) (denying takings claim where plaintiff failed to furnish information needed to evaluate proposed plan of operation). Accordingly, as discussed below, Plaintiffs' takings claim must be dismissed.

Moreover, even if this Court treats Plaintiffs' preliminary plan as a full operational plan, Plaintiffs cannot show that there was extraordinary delay, which has been recognized by the Federal Circuit as an essential element of a temporary regulatory takings claim. First, the alleged delay resulted from Plaintiffs' own dilatory actions. And, even if the government caused the alleged delay, that delay was not extraordinary because it arose from the government's good faith attempts to implement the Biological Opinion and protect the northern spotted owl, a species listed as threatened under the ESA. Because Plaintiffs cannot show extraordinary delay, their temporary regulatory takings claim must be dismissed.

**1. Plaintiffs' Plans of Operations Were Limited to Preliminary Exploration and Development Activities, And Did Not Include Production of Gold**

Plaintiffs contend that their temporary takings claim arose on July 23, 1990, when the FWS issued the Biological Opinion. See Compl., ¶ 74. At that time, Plaintiffs' operating plan included only "Phase I" activities, such as repairing existing access roads, grading access to a staging area, and sampling. See JSOF, ¶¶ 20, 22. Plaintiffs' proposed Phase II activities would depend upon the outcome of the "test results from Phase I and NEPA." JA24 at 412; see also JSOF, ¶¶ 19, 20. On November 27, 1989, the District Ranger approved a supplemental plan, making clear that Phase II activities were not approved at that time, and "will be included in a master Plan of Operation Number Two with an Environmental Analysis to be completed . . . ." JA45 at 472. Plaintiffs concede that

"[t]he activities authorized in the November 1989 approval did not include any activities that could generate income from sale of production from the Liberty Property." Compl., ¶ 23. Phase III – the phase that would include production – was admittedly unformed and expressly contingent on then-unknown results from Phases I and II. See JA36 at 449.

On numerous occasions, the Forest Service informed Liberty Mining that its plans lacked the requisite information to progress to the production phase. The Forest Service requested additional information from Plaintiffs to enable agency review on several occasions, but Plaintiffs consistently were unable or unwilling to provide the requested information.[18] By March 1991 – eight months after Plaintiffs allege their takings claim arose – Plaintiffs admitted that its operating plans were still unformed, but stated that the necessary details would be "forthcoming." JA94 at 905-06. Plaintiffs failed to submit the details by March 1992, despite the Forest Service's repeated written requests for the information.[19] In short, Plaintiffs failed to provide the necessary information sought by the Forest Service, thereby preventing the Forest Service from evaluating a proposal and reaching a final decision on Liberty Mining's proposed plan of operations.

Even Plaintiffs' April 1992 Plan – submitted almost two years after Plaintiffs argue their takings claim accrued – lacked any specific details about any production activities, stating that the details would depend on the results of future exploratory work. See JA114 at 1108; see also § I.B.3.,

---

[18] See JA69 (April 1990 letter from Forest Service repeating verbal request for a "written proposal describing the specific plans"); JA88 (November 1990 letter from Forest Service stating "[a]t this time we do not have a complete proposed Plan of Operation to encompass these [operational phase] activities"); JA90 (December 1990 letter from Forest Service stating "we would need to know more about your proposal in detail before an accurate response could be made").

[19] See JA108 (August 1991 letter from Forest Service requesting information); JA111 (March 1992 letter from Forest Service requesting information).

supra. The Forest Service notified Plaintiffs that the April 1992 Plan failed to include sufficient detail regarding proposed mining operations, and repeatedly requested the needed information.[20] Despite these repeated requests, Plaintiffs' operating plans were consistently limited to preliminary activities, and never encompassed the production phase of mining.

**2. Plaintiffs' Claim of a Taking of Its Right to Mine Is Not Ripe**

Since Plaintiffs always cast their proposed production activities as dependent upon the results of future exploration and development, the planned scope of any actual mining activities (and, hence, the scope of Plaintiffs' takings claim) are unknown. The details of any future mining activities depended on numerous unknown factors, including (1) the nature of Plaintiffs' proposal; (2) whether state and local regulatory agencies would have approved Plaintiffs' proposals;[21] and (3) whether

---

[20] See, e.g., JA137 (November 1992 letter from Forest Service requesting additional information about the details of the proposed plan for an Environmental Assessment); see also JA142 (December 1992 letter from Forest Service repeating request for information needed for the Environmental Assessment on the proposed plan); Oct. 29, 2007 Buchter Tr. at 75:4-78:21 (testifying that Liberty Mining never submitted information needed to perform an environmental analysis).

[21] It is clear that State and County regulations also would have been required for certain mining activities. According to a March 1990 letter from the County of Siskiyou Planning Department to Plaintiffs' Registered Geologist, for example, the County would have required an approved use permit as well as an approved reclamation plan and a "reclamation agreement executed prior to commencing mining operations on private lands." JA62. The County would have also undertaken a "complete environmental review . . . prior to project approval" that could have necessitated "preparation of an Environmental Impact Report and/or an Environmental Impact Statement due to the scope of [Plaintiffs'] project, hazardous materials involved and potentially unavoidable significant environmental impacts associated with [the planned] project." JA64. It is, of course, impossible to know how these County studies ultimately would have been resolved.

Plaintiffs would have been able to obtain necessary federal environmental approvals.[22] As a result, it is impossible to evaluate Plaintiffs' contention of economic harm allegedly suffered as a result of any governmental restriction because any proposed production activities – and, hence, any alleged monetary harms – are purely speculative. See Palazzolo, 533 U.S. at 621 (until an agency has had an opportunity to consider, reject or restrict an application, "the extent of the restriction on property is not known and a regulatory taking has not been established").

A December 1990 letter from the Forest Service to Plaintiffs underscores this point. See JA90; JSOF, ¶ 57. In that letter, the Forest Service requested information about a proposed underground mining proposal, noting that the described project "could probably occur, providing the above project description was followed. Of course we would need to know more about your proposal in detail before an accurate response could be made." JA90 at 828 (emphasis added).[23] Accordingly, had Plaintiffs submitted a meaningful proposed plan of operation (or at least provided the requested information to the Forest Service), it is probable that the Forest Service would have approved activities. Due to Plaintiffs' failure to submit such a proposal, however, it is impossible to know

---

[22] Although it is clear that NEPA would have applied to certain proposed activities, see JA26 at 421, it is impossible to know how a hypothetical mining plan would have been evaluated under that statute. Similarly, the Court would have no way of knowing the outcome of any review under the CWA or CAA, or any other applicable federal statute.

[23] Similarly, a November 27, 1990 letter from the Forest Service to Mr. Aloisi stated that

> In order to formulate your proposals into a Plan of Operations we need a specific schedule for completion of phases of development of your operation from exploration to full operation, and we need your specific measures that you plan to use to reclaim the disturbed areas of your operation and a time table for the completion of the reclamation.

JA88 at 823; see also JSOF, ¶ 55.

whether the agency's regulations extended "too far," so as to constitute a violation of the Fifth Amendment. See Pennsylvania Coal Co. v. Mahon, 260 U.S. 393 (1922); Palazzolo, 533 U.S. at 621 ("the extent of the restriction on property is not known and a regulatory taking has not been established"); see also Pax Christi Mem. Gardens v. United States, 52 Fed. Cl. 318, 323-24 (2002) (Corps of Engineers' withdrawal of plaintiff's permit application for lack of necessary information is not a taking).

The ripeness doctrine intends to avoid these unknowns by requiring a takings litigant to submit at least one meaningful application to allow the agency to decide how far the regulation extends before the litigant is permitted to institute a Tucker Act claim. Plaintiffs failed to do so here. Thus, Plaintiffs' takings claim is unripe for adjudication and must be dismissed.

**3. There Also Was No Extraordinary Delay Giving Rise to a Taking**

Even if this Court were to consider Plaintiffs' preliminary plans to be sufficient for a full plan of operations, Plaintiffs' takings claim also fails because there was no extraordinary delay by the United States in the regulatory process. "Delay in the regulatory process cannot give rise to takings liability unless the delay is extraordinary." Appolo Fuels, Inc. v. United States, 381 F.3d 1338, 1351 (Fed. Cir. 2004) (citing Boise Cascade, 296 F.3d at 1352 ("[A]bsent denial of a permit, only extraordinary delays in the permitting process ripen into a comparable taking.") (internal quotation marks omitted)). If the delay were extraordinary, then "the question of temporary regulatory takings liability is to be determined using the Penn Central factors. Id. (citing Boise Cascade, 296 F.3d at 1352). The "extraordinary delay must be 'substantial' and . . . the Supreme Court has condoned delays up to 'approximately eight years.'" Wyatt v. United States, 271 F.3d 1090, 1098 (Fed. Cir. 2001) (quoting Kawaoka v. City of Arroyo Grande, 17 F.3d 1227, 1233 (9th Cir. 1994) (citing

Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172 (1985))). Along with the length of the delay, courts also consider

> the nature of the permitting process as well as the reasons for the delay. Moreover, it is the rare circumstance that [courts] will find a taking based on extraordinary delay without a showing of bad faith.

Id. (citing Tabb Lakes, Ltd. v. United States, 10 F.3d 796, 799 (Fed. Cir. 1993)).

First, Plaintiffs' own actions caused much of the delay that they complain of by failing to timely provide information repeatedly sought by the government. Simply stated, their proposed plans were constantly changing, as their plans to use cyanide demonstrate. Plaintiffs also repeatedly failed to provide information sought by the government that was necessary to evaluate their proposed plan of operations. There was no extraordinary delay by the United States, therefore, resulting in a taking. See Wyatt, 271 F.3d at 1099-1100 (delay of about six years was not extraordinary where caused in large part by plaintiff corporation's failure to respond to requests for information).

Even if the delay were attributable to the federal government, it was not extraordinary because it resulted from the Forest Service's good faith attempts to implement the Biological Opinion and protect the northern spotted owl. See § I.B.5., supra. Indeed, the Forest Service actively was seeking ways to allow Liberty's proposed activities to go forward while mitigating its effects within a designated spotted owl habitat conservation area. See id. Where delay has resulted from the government's efforts to minimize the potentially adverse effects of a proposed project, no taking should be found. See Bass Enters. Prod. Co. v. United States, 381 F.3d 1360, 1366-69 (Fed. Cir. 2004) (45 months delay was not extraordinary where government was seeking to protect an underground nuclear waste facility from proposed drilling). Here, the government was attempting to mitigate the potentially adverse effects of Liberty Mining's proposed project on the northern

spotted owl, a protected species under the ESA whose value is "incalculable." See Tennessee Valley Auth. v. Hill, 437 U.S. 153, 187 (1978) (internal quotation marks omitted). Accordingly, assuming the government caused delay, any such delay arose from the government's attempts to protect an invaluable wildlife resource - the northern spotted owl. There is no evidence to suggest that the United States acted in bad faith at any time. The alleged delay, therefore, cannot be found to be extraordinary under the circumstances, and no temporary regulatory taking has occurred.

### C. PLAINTIFFS' TAKINGS CLAIM SOUNDS IN TORT AND, THEREFORE, IS BEYOND THIS COURT'S JURISDICTION

Plaintiffs' temporary takings claim is based on their allegation that the government failed to notify them of the existence of the Biological Opinion "until March 1992 . . . in violation of federal regulations governing defendant's conduct." Compl., ¶ 65. Plaintiffs allege that the "failure to notify caused unwarranted delay and inaction on plaintiffs' September 1989 plan of operations . . . depriv[ing] plaintiffs of beneficial use and enjoyment of the Liberty Property." Compl., ¶ 66 (emphasis added). In other words, Plaintiffs allege that the government had a duty to inform them about the Biological Opinion, breached that duty and, therefore, they suffered damages – the basic elements of a tort. See Black's Law Dictionary 1335 (5th ed. 1979). Plaintiffs assert one taking that began on July 23, 1990, and continued to at least February 8, 1994. See Compl., ¶ 74; see also Pls.' Answers to Def.'s Second Set of Interrogatories at 5-6 (responding to Interrogatory No. 1.c.) (Ex. E).

Claims based upon a failure to act fall squarely within the law of torts, and the Federal Tort Claims Act ("FTCA"), which specifically waives sovereign immunity for "act[s] or omission[s]" by government employees. See 28 U.S.C. 1346(b)(1); see also Lowe v. United States, 76 Fed. Cl. 262, 267 (2007) ("Unauthorized actions by federal officials . . . are torts"). The jurisdiction of this Court does not extend to cases sounding in tort. See Fry v. United States, 72 Fed. Cl. 500, 505 (2006); see

also 28 U.S.C. §1491(a)(1) (limiting the Court's jurisdiction "to render judgment upon any claim . . . for liquidated or unliquidated damages in cases not sounding in tort") (emphasis added); Brown v. United States, 105 F.3d 621, 623 (Fed. Cir. 1997) (the United States Court of Federal Claims does not have jurisdiction over claims sounding in tort). Consequently, this Court

> does not have jurisdiction over claims that [the United States] engaged in negligent, fraudulent, or other wrongful conduct when discharging its official duties. . . . Even where the claim is framed under non-tort law, the court lacks jurisdiction if the essence of the claim lies in tort.

Cottrell v. United States, 42 Fed. Cl. 144, 149 (1998) (citations omitted).

Plaintiffs' allegation that the government failed to notify them of the Biological Opinion in violation of federal regulations plainly alleges tortious conduct outside of the realm of a taking.[24/] Accordingly, this Court does not have jurisdiction over Plaintiffs' takings claim, and this action must be dismissed.

### D. PLAINTIFFS' TAKINGS CLAIM DOES NOT ARISE FROM AN ALLEGED AFFIRMATIVE GOVERNMENTAL ACT, WARRANTING DISMISSAL

Plaintiffs' takings claim allegedly arises not from an affirmative governmental act, but from an alleged failure to act – specifically, the alleged failure of the government to apprise Plaintiffs of the Biological Opinion. See Compl., ¶ 65. Because Plaintiffs' takings claim is not based upon an

[24/] Indeed, a takings claimant must concede the propriety of the governmental action that allegedly interferes with their alleged property interests. See Tabb Lakes, Ltd. v. United States, 10 F.3d 796, 802-03 (Fed. Cir. 1993) (citing Florida Rock Indus. v. United States, 791 F.2d 893, 899 (Fed. Cir. 1986), cert. denied, 479 U.S. 1053 (1987)); see also Nicholson v. United States, 77 Fed. Cl. 605, 614 (2007) ("[a]mong the hallmarks of a Fifth Amendment taking is that the governmental conduct forming the basis of the taking is authorized and legitimate . . . [and] takings claimants must concede the propriety of the governmental interference with their property interests."); Gahagan v. United States, 72 Fed. Cl. 157, 161-62 (2006) (plaintiff's assertions "that the continued seizure was 'unlawful' and defendant was without authority to refuse plaintiff's requests to develop [the property's] oil and gas reserves . . . places the claim outside a takings context.").

affirmative governmental act, it is fatally flawed and must be dismissed.

In Nicholson, the Plaintiffs alleged a taking by the United States based "on the Government's failure to adequately design, build, or maintain certain levees in New Orleans before and after Hurricane Katrina, resulting in a permanent loss of value to their properties." Nicholson, 77 Fed. Cl. at 606. "[A]s the basis for the taking, [the plaintiffs] allege that 'the decision not to rebuild and/or replace the levee system to withstand a Category 5 hurricane' gives rise to their Constitutional entitlement." Id. at 619 (emphasis as in original). But, as Judge Baskir observed, this allegation "does not allege an action on [the] part of the Government capable of taking property . . . [i]n no case that we know of has a governmental agency's failure to act or to perform its duties correctly been ruled a taking." Id. at 620 (citing Acadia Tech., Inc. v. United States, 458 F.3d 1327 (Fed. Cir. 2006) (Customs Service's delay in subjecting property to forfeiture proceedings resulting in depreciated value is not grounds for a takings claim). "The Court has consistently required that an affirmative action on the part of the Government form the basis of the alleged taking." Nicholson, 77 Fed. Cl. at 620 (citing Last Chance Mining Co. v. United States, 12 Cl. Ct. 551, 556-57 (1987); B&G Enter., Ltd. v. United States, 43 Fed. Cl. 523, 526-27 (1999); Pendleton v. United States, 47 Fed. Cl. 480, 485 (2000)); see also Bradshaw v. United States, 47 Fed. Cl. 549, 544 (2000) (government's failure to prevent feral horses from trespassing upon plaintiffs' land did not give rise to a taking); Alves v. United States, 133 F.3d 1454, 1458 (Fed. Cir. 1998) ("there was no governmental action" that could result in a taking); cf. John v. United States, 77 Fed. Cl. 788, 816 (2007) (in a takings action, the plaintiffs must allege an affirmative, federal governmental act within the statute of limitations period).

Because the Plaintiffs here do not allege that their takings claim arose from an affirmative governmental act, it must be dismissed.

**E. PLAINTIFFS DID NOT HAVE A COGNIZABLE PROPERTY INTEREST IN MINERAL LOTS 45-A AND 45-B AT THE TIME OF THE ALLEGED TAKING, ENTITLING DEFENDANT TO PARTIAL SUMMARY JUDGMENT WITH RESPECT TO THOSE LOTS**

Plaintiffs did not acquire a property interest in the patented Mountain Laurel mine (Mineral Lot 45-A) and the Rollin Mill Site (Mineral Lot 45-B) until 1991, after Plaintiffs allege the taking accrued. See Oct. 31, 2007 Aloisi Tr. at 47:15-50:25 (discussing Dep. Ex. 2, attached hereto as Ex. F). "It is axiomatic that only persons with a valid property interest at the time of the taking are entitled to compensation." Wyatt, 271 F.3d at 1096 (citing Almota Farmers Elevator & Warehouse Co. v. United States, 409 U.S. 470, 473-74 (1973); Pro-Eco, Inc. v. Bd. of Comm'rs of Jay County, Indiana, 57 F.3d 505, 509 (7th Cir.1995); Cavin v. United States, 956 F.2d 1131, 1134 (Fed. Cir. 1992)). Consequently, Plaintiffs did not have a property interest in either Mineral Lot 45-A or 45-B at the time of taking, warranting dismissal as to those lots.[25]

**F. ALTERNATIVELY DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT BECAUSE PLAINTIFFS CANNOT SHOW A TEMPORARY, REGULATORY TAKING GIVEN THE UNDISPUTED FACTS OF THIS CASE**

Because Plaintiffs in the instant case have alleged only a temporary regulatory taking, the Court must evaluate the three-part Penn Central factors to determine whether the governmental action constituted a compensable taking. See Bass Enters., 381 F.3d at 1365 (per se categorical takings

---

[25] Normally, as a threshold matter in a Fifth Amendment takings action, the Court should determine whether the claimant has established a compensable property interest. See Maritrans v. United States, 342 F.3d 1344, 1351 (Fed. Cir. 2003). Whether Plaintiffs have a property interest in the unpatented mining claims depends upon the validity of those claims, which has not been judicially determined. See Holden v. United States, 38 Fed. Cl. 732, 735 (1997) (to bring a takings action on unpatented mining claims, "there must have been a determination as to the validity of those mining claims"). Irrespective of the Plaintiffs' property interest in the unpatented mining claims, the Court may dismiss or grant Defendant summary judgment on the grounds raised in its motion papers.

jurisprudence does not apply to temporary regulatory takings claims, but are limited "to permanent, rather than temporary, regulatory takings. . . ."); see also Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 318 (2002); Penn Central Transp. Co., 438 U.S. at 124. The Penn Central factors are (1) the character of the governmental action; (2) the economic impact of the action on the claimant; and (3) the extent to which the action interfered with the claimant's reasonable investment-backed expectations. Penn Central, 438 U.S. at 124.

While a finding of no economic impact dispenses with the need to consider the other Penn Central factors, see Brown v. Legal Foundation of Washington, 538 U.S. 216, 235 (2003), as a matter of law, all three factors support granting Defendant's motion for summary judgment, as discussed below.

**1. Plaintiffs Cannot Show Economic Harm Resulting from the Government's Alleged Failure to Timely Inform Them of the Biological Opinion, Warranting Summary Judgment for Defendant**

To show a temporary regulatory taking, Plaintiffs must show substantial economic harm resulting from the government's action. The only harm Plaintiffs allege, however, is the loss of speculative profits. As a matter of law, therefore, Defendant is entitled to summary judgment because Plaintiffs fail to allege and cannot show substantial economic harm resulting from the alleged taking.

"The existence of economic injury is indispensable to demonstrating a regulatory taking." Seiber v. United States, 364 F.3d 1356, 1370 (Fed. Cir. 2004); id. at 1371 ("Our court has repeatedly made clear that the failure to provide evidence to support the existence of economic injury is fatal to a takings claim."); see also Hendler v. United States, 175 F.3d 1374, 1385 (Fed. Cir. 1999) ("if the regulatory action is not shown to have had a negative economic impact on the property, there is no regulatory taking"). Additionally, to show a temporary regulatory taking, plaintiffs must prove that

they were "deprived . . . of all or substantially all economically viable use of their property." Walcek v. United States, 44 Fed. Cl. 462, 467 (1999) (citing Anaheim Gardens v. United States, 33 Fed. Cl. 24, 36 (1995); 1902 Atlantic Ltd. v. United States, 26 Cl. Ct. 575, 579 (1992)).

Since Walcek was decided, the United States Supreme has made clear that when considering this prong in the context of an alleged temporary taking, careful attention must be given to the "parcel as a whole," which includes both physical and temporal components: "An interest in real property is defined by the metes and bounds that describe its geographic dimensions and the term of years that describes the temporal aspect of the owner's interest." Tahoe-Sierra Pres. Council, Inc., 535 U.S. at 331-32. "Mere fluctuations in value during the process of governmental decisionmaking, absent extraordinary delay, are incidents of ownership [and] . . . cannot be considered as a taking in the constitutional sense." Id. at 332 (quoting Agins v. City of Tiburon, 447 U.S. 255, 263 n.9 (1980) (quoting Danforth v. United States, 308 U.S. 271, 285 (1939))) (internal quotation marks omitted). Thus, to prove a temporary regulatory taking, Plaintiffs must show that they sustained substantial economic harm resulting from the government's extraordinary delay.

Here, the only economic harm averred by Plaintiffs is the approximate $22 million they seek as "just compensation," which represents their estimate of lost profits had they been in production during the period of the alleged temporary taking. See Oct. 31, 2007 Aloisi Tr. at 76:13-77:16. Plaintiffs' contention, however, that they would have been producing a gold product at any time during the alleged takings period is wholly speculative. See § II.B., supra (explaining why Plaintiffs' takings claim is not ripe). As discussed above, Plaintiffs never submitted a full mining plan that would have allowed such mining operations to go forward. Such an estimate of economic harm, therefore, cannot support liability under Penn Central, because it is based upon the very type of

speculation that courts routinely reject. See Yuba Natural Resources, Inc. v. United States, 904 F.2d 1577, 1583 (Fed. Cir. 1990) ("any attempt to determine how much gold would have been extracted during the taking period, and what its net sales price would have been, would involve the very kind of conjectural and speculative analysis the courts consistently reject . . .").

Moreover, Plaintiffs still possess the unpatented mining claims, and the gold remains in the ground (because the lessees never entered the production phase, although approved). See JSOF, ¶¶ 112, 113; see also Nov. 1, 2007 Ferrero Tr. at 113:19-115:15 (testifying that, based on today's price of gold and mining costs, the profits from mining today "would be in the ballpark" of estimated profits based upon 1990 prices). Plaintiffs' alleged economic injury, therefore, posits a potential double recovery rather than any economic harm. See Pettro v. United States, 47 Fed. Cl. 136, 151-52 (2000) ("were the court to grant plaintiff recovery for his lost profits, the possibility of double recovery would be created," because "the plaintiff retains the sand and gravel").

Additionally, that Plaintiffs were able to lease their mining claims to WAZCO during the alleged takings period (see JSOF, ¶ 97), also shows that Plaintiffs were not deprived "of all or substantially all economically viable use of their property," negating their takings claim. Walcek, 44 Fed. Cl. at 467; see also Conti v. United States, 291 F.3d 1334, 1344 (Fed. Cir. 2002) (no taking where, among other factors, plaintiff "can offer for sale, and can sell, his property"); Marks v. United States, 34 Fed. Cl. 387, 410 (1995) (that plaintiffs were able to sell a portion of their property shows that their land was not left "devoid of all economic viability"); Pls.' Answers to Def.'s Second Set of Interrogatories at 21 (stating income earned from leases) (Ex. E); Oct. 31, 2007 Aloisi Tr. at 149:2-21 (confirming total income of about $120,000 from the WAZCO and LCM leases).

Plaintiffs thus cannot show any economic harm resulting from the alleged temporary taking,

and the Court should dismiss this action. See Brown, 538 U.S. at 235; see also Seiber, 364 F.3d at 1371-72 (plaintiffs' failure to show economic harm warranted dismissal of their temporary takings claim).

**2. Plaintiffs Cannot Show that the Government Interfered with Any Reasonable Investment-Backed Expectations**

Reasonable investment-backed expectations usually will be found to be lacking where the industry at issue has been highly regulated for some time. See, e.g., Rith Energy, Inc. v. United States, 270 F.3d 1347, 1351 (Fed. Cir. 2001) ("A party in Rith's position necessarily understands that it can expect the regulatory regime to impose some restraints on its right to mine coal under a coal lease."); Deltona Corp. v. United States, 657 F.2d 1184, 1193 (Fed. Cir. 1981) (claimant "must have been aware that the standards and conditions governing the issuance of permits could change"); Good v. United States, 189 F.3d 1355, 1363 (Fed. Cir. 1999) (claimant lacked reasonable investment-backed expectation to be free from development restrictions under post-acquisition statutory regime where such restrictions were foreseeable based on the pre-acquisition regulatory regime).

Mining within national forests (and in KNF in particular) had been regulated for years before Plaintiffs acquired an interest in these mining claims. Among those preexisting regulations are comprehensive procedural regimes regulating (1) any proposed ground-disturbing activities (see, e.g., 36 C.F.R. § 228.4(a)); (2) the protection of archaeological and historical resources (see NHPA (16 U.S.C. § 470a-t)); and (3) the protection of wildlife, including spotted owl habitats (see JSOF, ¶¶ 6, 7; see also 36 C.F.R. § 228.8(e)).[26] See California Coastal Comm'n v. Granite Rock, 480 U.S. 572,

[26] 36 C.F.R. §§ 228.4(a) and 228.8(e) were promulgated as 36 C.F.R §§ 252.4(a) and 252.8(e), respectively (see 39 Fed. Reg. 31317, 31318-19 (Aug. 28, 1974)), and redesignated at 46 Fed. Reg. 36142 (July 14, 1981).

599 (1987) ("Congress has entrusted the task of balancing mineral development and environmental protection in the national forests to the Department of Agriculture, and its delegate the Forest Service").

First, the Forest Service regulates ground-disturbing activities within KNF by requiring potential miners to submit for approval operating plans for their proposed operations. See Clouser v. Espy, 42 F.3d 1522, 1530 (9th Cir. 1994) ("[T]his court has upheld Forest Service authority to regulate mining operations in national forests by requiring miners to submit for approval operating plans for their proposed operations.") (citations omitted); Freese, 6 Cl. Ct. at 10 ("With regard to unpatented claims, therefore, the Government retains the right to regulate disturbance of surface resources, as well as the right to permit uses of the surface area of the claim for purposes other than mining."). Forest Service regulations specify that "a notice of intent to operate is required from any person proposing to conduct operations which might cause disturbance of surface resources." 36 C.F.R. § 228.4(a). "If the District Ranger determines that the proposed operations are likely to cause a 'significant disturbance of surface resources,' the operator must file a proposed plan of operations." Clouser, 42 F.3d at 1532 (citing 36 C.F.R. § 228.4(a)). In approving a proposed mining plan, the Forest Service may impose terms and conditions on an operator's mining activities. Id. at 1531; see also 30 U.S.C. § 612.

Second, the Forest Service may impose terms and conditions in a plan of operations to mitigate adverse effects on cultural resources under NHPA. Section 106 of NHPA requires federal agencies to take into account the "effect of the undertaking on any district, site, building, structure or object that is included or eligible for inclusion in the National Register [of Historic Places] . . . [and] shall afford the Advisory Council on Historic Preservation . . . a reasonable opportunity to comment with

regard to such undertaking." 16 U.S.C. § 470f. NHPA contemplates a coordinated effort among the relevant federal agency (in this case, the Forest Service) the Advisory Council on Historic Preservation, the State Historic Preservation Officer ("SHPO"), and the public. See 16 U.S.C. §§ 470a(b), 470f.[27]

Third, in 1984, before Plaintiffs staked out any mining claims in KNF (see JSOF, ¶ 8), the Forest Service had identified the northern spotted owl as a sensitive species requiring, within KNF, a "core area of old-growth timber stands surrounding a nest site, with an additional 700 acres of these stands in one to four parcels within a 1.5 mile radius of the core area," known as a Spotted Owl Habitat Area ("SOHA"). JSOF, ¶ 6. Morever, Forest Service regulations had long required mining operators to "take all practicable measures to maintain and protect fisheries and wildlife habitat which may be affected by the operations." 36 C.F.R. § 228.8(e) (emphasis added). When Plaintiffs staked out a mining claim within KNF, they knew, or should have known, that any mining proposal would be closely examined under existing environmental statutes. Plaintiffs were certainly aware of the regulatory regimes when they submitted their first plan of operation in 1989. See JSOF, ¶ 19, JA23 at 401, 402 (proposing certain Phase I activities depending upon the Environmental Assessment (EA) on the spotted owl).

Other federal, state and local regulatory regimes may apply to a mining operation, including, other preexisting restrictions such as NEPA, Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), and the Clean Air Act (42 U.S.C. § 7401, et seq.), and additional state and local approval.

---

[27] Indeed, the Forest Service notified Plaintiff Aloisi in July 1988 – before Liberty Mining was formed and before any operating plan was submitted – that archaeological resources may be present in Eddy Gulch, requiring cessation of operations. See JA15 at 313, 318 (draft operating plan citing both NHPA, NEPA, and applicable regulations, among other authorities, protecting archaeological resources).

See § I.B.3., supra. Plaintiffs' expectation that they could stake out a mining claim within the KNF and immediately begin extensive mining activities is clearly unreasonable. Well before Plaintiffs staked out a mining claim within the KNF and began to propose operations, extensive regulatory restrictions were already in place. Plaintiffs, therefore, cannot show interference with any reasonable investment-backed expectations, and this prong of the Penn Central test supports granting summary judgment in favor of the United States.

**3. Defendant Is Entitled to Summary Judgment Because Plaintiffs Cannot Satisfy the "Character" Prong of the Penn Central Test**

Under Penn Central, the Court must consider the "character of the governmental action" allegedly giving rise to the regulatory taking. See Penn Central Transp. Co., 438 U.S. at 124. "[A] prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking or appropriation of property. . . ." Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 489 (1987) (quoting Mugler v. Kansas, 123 U.S. 623, 668-69 (1887)). So, for example, government actions that are "directed at protecting the safety, health, and welfare of the communities surrounding the [subject property] by preventing harmful runoff [into local water supplies]" have been characterized as a type of action that does not require compensation. See Appolo Fuels, 381 F.3d at 1351.

Here, the Biological Opinion contained mandatory terms and conditions to protect owl habitat. The Forest Service was actively seeking ways to implement the Biological Opinion, so that Liberty Mining's operations could go forward without jeopardizing the continued existence of the northern spotted owl. As the Supreme Court recognized decades ago, "the plain language of the [Endangered Species] Act, buttressed by its legislative history, shows clearly that Congress viewed the value of

endangered species as 'incalculable.'" Tennessee Valley Auth., 437 U.S. at 187. Accordingly, the Forest Service's efforts to allow Plaintiffs' project to go forward without jeopardizing the northern spotted owl, should be "characterized as a type of action that does not require compensation." Appolo Fuels, 381 F.3d at 1351.

The "character" prong of the Penn Central test, therefore, shows that there was no temporary taking in this case, and summary judgment should be granted to Defendant.

## III. CONCLUSION

For the foregoing reasons, Defendant, the United States, respectfully requests that the Court grant this motion and dismiss this action. Alternatively, Defendant requests that the Court grant its motion for summary judgment.

Respectfully submitted,

RONALD J. TENPAS
Assistant Attorney General
Environment & Natural Resources Division

/s/ Bruce K. Trauben
BRUCE K. TRAUBEN
Trial Attorney
Natural Resources Section
Environment & Natural Resources Division
U.S. Department of Justice
601 D Street, NW
Washington, D.C. 20004
(202) 305-0238 (phone)
(202) 305-0506 (fax)

WILLIAM J. SHAPIRO
Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Div.
501 I Street, Suite 9-700
Sacramento, CA 95814-2322

OF COUNSEL:
ROSE MIKSOVSKY
U.S. Department of Agriculture
Office of General Counsel
33 New Montgomery St., 17th Fl.
San Francisco, CA 94105-3170

Dated: February 6, 2008