# EXHIBIT A

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ALFRED ALOISI, et al., )
)
Plaintiffs, )
)
vs. ) No. 95-650L
)
UNITED STATES OF AMERICA, )
)
Defendants. )
)

DEPOSITION OF THOMAS FERRERO

Thursday, November 1, 2007
9:18 a.m.

Reported By: CRAIG W. WOOD, RPR, CSR No. 9789

APPEARANCES

For the Plaintiffs:
FOLEY & LARDNER
Washington Harbour
3000 K Street, N.W., Suite 500
Washington, DC 20007-5101
(202) 295-4017
BY: LAWRENCE G. McBRIDE

For the Defendant:
DEPARTMENT OF JUSTICE
Environmental & Natural Resources Division
601 D Street, N.W.
Washington, DC 20004
(202) 305-0238
BY: BRUCE K. TRAUBEN

Also Present:

Fred Aloisi

—oOo—



INDEX


| EXAMINATION BY: | Page |
| --- | --- |
| Mr. Trauben | 4 |


EXHIBITS

NO DOCUMENTS WERE MARKED AS EXHIBITS

---oOo---



BE IT REMEMBERED that on Thursday, November 1, 2007, commencing at the hour of 9:18 a.m., of said day, at the offices of Klamath National Forest, 1312 Fairlane Road, Yreka, California, before me, Craig W. Wood, a Certified Shorthand Reporter in and for the State of California, there personally appeared

THOMAS FERRERO,

who, being first duly sworn by me to tell the truth, was examined and testified as follows:

—oOo—

EXAMINATION

BY MR. TRAUBEN:

Q. Please state your full name for the record.
A. Thomas Paul Ferrero.
Q. Mr. Ferrero, my name is Bruce Trauben, I represent the United States, the defendant in this action of Aloisi, et al, versus the United States.
And I understand you've been deposed in this action previously?
A. Yes.
Q. So I'm going to forego the normal preliminaries of explaining the rules of a deposition. I will remind you, though, that if you need to take a break for any reason, just say so and we'll take a break.



A. Okay.
Q. Can we start off by having you take a look at Plaintiff's Exhibit A-171.
A. (Reviewing document.) Okay.
Q. What is Exhibit A-171?
A. It's the cert field notes of a survey of the Klamath Blacksmith Tunnel by H. Behrens, done in 1936.
Q. And what is this -- what do these notes show?
A. They show the bearings and distances from point to point, mapping the course of the Blacksmith Tunnel and some of the side workings off of it.
Q. And based on these notes, is it possible to locate the tunnel in the field? On the ground?
A. Based on these notes?
Q. Yes.
A. No.
Q. And the last page, is that a summary of the notes that you created?
A. This is my plotting of the data in the notes.
Q. And the different -- I'll describe it for the record, there appear to be five depictions surrounding a line that was like three parallel lines which are running northeast to southwest.
A. Uh-huh.
Q. Does this -- your graphical representation show

Page 58

Q. At what point?
A. October, the October '89 plan was approved for phase one and parts of phase two.
Q. Okay. So you're assuming that a decision had been made by that time regarding the Spotted Owl?
A. I honestly don't remember how that played in that approval; whether they had said to us the owl had been resolved or not at that point, I don't recall.
Q. Okay.
A. It wasn't -- I don't recall it being an issue at that point, but it did become an issue -- no. Wait a minute, I'm sorry. My memory is wrong. Let me back up.
When I submitted this long-range plan, it was after that that we were told we needed to mitigate what I described earlier, the ponds and the roads and the apex corridor. And we mitigated those things and that resolved the owl issue as far as we were concerned, as far as what we were told. And that's why we were approved in October.
Q. Okay. And that was when the owl was still a sensitive species, not yet listed as a threatened or endangered species?
A. Yeah. I believe it wasn't actually listed until 1990.
Q. So in August '89 that's reflected in FS-289, the plan on the table was the June plan that had been --

Page 59

the plan that had been approved in June?
A. Yes. That was what we were -- what we had at this point. Yes.
Q. Well, sorry to go back and forth, but can you go now to plaintiff's document A-44.
Can you describe for the record what A-44 is?.
A. It's a letter to me in response to a meeting between myself and I believe it's Wayne Vera -- no. The letter is from Martin Taylor. Vera was the planning director, I believe. No, Robert Simmon was.
Anyway, it's a letter following up on a meeting with the planning department between myself and them regarding Eddy Gulch.
Q. And why were you meeting with the planning department in March 1990?
A. To discuss what we needed to do in terms of county permitting for the operations on private lands within the claim.
Q. Was your understanding that some county permitting was required for operations even on private lands?
A. Actually, it was just the private lands, is what we were told. The county wasn't involved in the government land, that the Forest Service was the lead agency with the state. SMARA and the historical

Page 60

preservation organization and all that. This was specifically regarding the Mountain Laurel and Rollin.
Q. If you look at the -- I guess it would be the third paragraph, bottom of the first page, says, "I would encourage you to provide to this department a project description outlining the activities to take place on both private and public lands."
Do you recall whether that was done?
A. I don't believe it was. Now, we may have supplied them with a copy of our Plan of Operation to the Forest Service to cover that, but I don't know that for sure. If I was doing it today, that's what I would do. But I don't recall if I did that or not.
Q. Okay. Then the paragraph above, second paragraph, it states, "As we discussed, a use permit must be approved and issued, reclamation plan approved and reclamation agreement executed prior to commencing mining operations on private lands."
A. Yes.
Q. And, to your knowledge, was a use permit approved and issued with respect to any operations in Eddy Gulch?
A. No. Not from the planning department.
Q. And had a reclamation plan been approved and a reclamation agreement executed with respect to any

Page 61

operations on private lands in Eddy Gulch?
A. No. At that time we weren't operating on private land, so we hadn't gone forward with that. We were operating on the government land at that point.
Q. Okay. And then it says, "Further, pursuant to Assembly Bill 747, a reclamation plan must also be approved and reviewed by Siskiyou County for that portion of your project occurring on public lands."
Do you see that?
A. Yes.
Q. Was a reclamation plan approved by the Siskiyou County for any operations by Liberty Mining in Eddy Gulch that were planned to occur on public lands?
A. I don't recall anything like that.
Q. Had a -- strike that.
Can you look at the last page of that letter for me, please. You see in the -- the "cc" at the bottom -- or "pc" identified in this case, you see it says, "Fred Aloisi" --
A. Yes.
Q. -- "as pres," I guess meaning president, "Diamond Core Drilling."
A. Uh-huh.
Q. Do you know what "Diamond Core Drilling" is?
A. Yes. It was an entity created having to do

with the operations of the core drill that was bought by -- I believe it was Fred and Don Goodman.
Q. Did you have any interest in it?
A. No.
Q. Okay. Can you go to the plaintiff's document A-55, please.
A. I apologize. 45 or 55? Okay.
Q. Is this your handwriting in the -- up to the map? First seven pages?
A. Yes.
Q. Do you recall having a meeting with Mike Lee and Al Buchter in Etna on May 9, 1991?
A. Oh, yes.
Q. If you look at the what's identified as page 2/2. Under item five, "Metallurgical Testing," and there are a couple headings. One is "Amalgamation/Flotation."
A. Uh-huh.
Q. And then below that underlined, it says, "Cyanide Leach and Amalgamation -- or a-m-a-l-g/f-l-o-t," see where I'm looking?
A. Yes.
Q. I guess "a-m-a-l-g" was the abbreviation for amalgamation?
A. Yes.



Q. And "f-l-o-t" is abbreviation for flotation?
A. Yes.
Q. And then "/cyan," which I assume means cyanide leach combination?
A. Yes.
Q. Can you explain what these options are, if they are options. What is "amalgamation/flotation"?
A. It's a series of milling methods where the material is subjected to one and then another and then another. The tails from the first one go through the second one. The tails from the second one go through the third one.
Basically what you're doing is -- with amalgamation, you're extracting the free gold, the coarse and liberated gold that's not encapsulated in silica or coated with carbonation slimes or whatever. And the flotation is a combination gravity and chemical process that extracts, makes a concentrate, usually a sulfide. Mostly sulfides come out in that process.
And what you don't get with the amalgamation and the flotation cyanide is designed to take a high percentage of whatever is left because it dissolves the gold.
Q. At this meeting in May '91, did -- were you representing the interest of Liberty Mining at this



meeting? Let me rephrase it.
Were you there on behalf of Liberty Mine?
A. No.
Q. For whom were you there attending this meeting?
A. For me.
Q. For you personally?
A. Yes.
Q. Okay. This was for your own edification or does this relate to your work for Liberty Mining?
A. I asked for a meeting with Mike Lee and Al Buchter because I thought that they were making a mistake by making such an issue about such a small operation. And that -- I told them that we were going down a road where it was going to go on and on and on and it was going to be a big disaster.
And I was trying to explain to them the scale of the thing and that it really had merit and that under the mining law we had a right to proceed as long as we did it clean. And I was going to make sure it was done clean.
And that why didn't they just ease off and if it didn't have merit, we'd find out. We'd start running and wouldn't get anything and we'd go away. But if we had it, we had a right to mine it.
That was basically the reason I held the



meeting, it was on my own to try to get through to them as a professional to another professional.
Q. But you were espousing the position of Liberty Mining at that meeting?
A. I don't think Fred knew I even had the meeting. I know he didn't. I did it on my own.
So, yes, I was presenting the position of that operation, but I was invested in the operation in the sense that, you know, I had thought it up and I thought it was a good plan. And it was phased so that it didn't get out of hand. If it turned out that there were a problem or something didn't live up to the expectation, that it would stop at that point.
And that I was going to make sure that it was done clean. I'm an engineering geologist, an environmental geologist. That's my job. That's what I do out in the rest of the world.
And I just wanted them to know that, that it wasn't just some crazed miners out there that were going to tear up the hill. And it was very small and it didn't really merit the disaster that appeared to be occurring.
Q. And just to make clear, you had no stake in the operation at this point?
A. No.

Q. Or at any point?
A. No.
Q. So, to your knowledge, then, did you discuss with Mr. Lee and Mr. Buchter the potential use of the cyanide leaching operation in the Eddy Gulch mines?
A. I must have. It's listed here in my list of topics.
Q. Was this -- to your knowledge, is this the first time use of cyanide came up in discussions regarding --
A. No. I think it was in plans that led up to this, in the plans of operations.
Q. To use cyanide?
A. Yes.
Q. In what?
A. I'd have to dig. You want me to look?
Q. Well, actually, let's take a look.
A. I have them all in sequence right here.
Q. Yeah. Give me just one second.
A. We may not have included it in the plans. I know we were working on the testing for it long before that. Let me look.
Q. Let's go back a couple months in time and look at Plaintiff's A-144.
MR. McBRIDE: Show marked as the same as Forest



Service 76. But, yes, he has it now.
BY MR. TRAUBEN: Okay. Thank you.
Q. Is document A-144 a memorandum that you wrote to the Forest Service dated March 11th, 1991?
A. Yes.
Q. And that's your signature on the second page?
A. Yes.
Q. And this was -- this memo that you sent to the Forest Service was just a couple months before the meeting in May '91, obviously?
A. Yes.
Q. Okay. Can you take a look at the second page, item ten.
A. Yes.
Q. Number ten. It says there in parentheses "no cyanide"?
A. Correct.
Q. Were you informing the Forest Service that there were no plans to use cyanide in Liberty Mines' operations at that point?
A. At that time.
Q. And between March '91 and May '91, was there a decision made at some time during that period to use cyanide in the Liberty Mine operations?
A. No. This was something that I did on my own to



show the possibilities of where it might go. We hadn't decided at that point exactly what we were going -- whether we were going to include a cyanide circuit.
We had been advised that it was going to be difficult to get a cyanide circuit. But I also knew from my own experience that I had worked at operating cyanide mines and that it certainly wasn't impossible. But I was sort of waiting for the process that was going on within the company to fall out.
Each time we made these plans, they were basically yearly intervals because we were on this one year renewal process. And they vary. Sometimes we think we're going to use cyanide, sometimes we don't. But that was because we were in the process of testing the efficiency of it and weighing the regulatory problems.
Q. Okay. Just so everybody is clear on the record and everything, the cyanide circuit that you're referring to is not the heap leach method?
A. Absolutely not. No.
Q. Okay.
A. No. It's a carbon and pulp vat leach, which takes place in a big tank and you build big concrete containments that hold more material than the tank holds. So even if the tank dissolves or it all empties



out, it's all contained. And the tailings are washed and the cyanide is recirculated into the system. So it's a closed system.
Q. A closed system.
And a heap leach system is an open system where cyanide solution is leached through a pile of ore to extract gold out in the environment?
A. Well, a properly designed heap leach system is also a closed system. They haven't all worked that way.
But because the piles are set on a liner, a heavy liner, and the pregnant solution, which is the cyanide solution, after it circulates through the pile and collects under the pile and then is transported to the pipes at the low end, it never makes contact with the actual earth, it's separated by a liner. The problems that have occurred in some heap leach operations is where the liners have failed. Generally.
Q. So some containment systems that you -- I think you said, the system that you were contemplating, that would have required some containment system?
A. Absolutely.
Q. Had there been engineering designs for a containment system?
A. We never got to that point.
Q. Take a look at the next page. Looks like the

A. Yes.
Q. Is that also based on the amalgamation and flotation?
A. No. Underground ore at Eddy Gulch has yielded actually over a half ounce from gravity separation throughout its history. So that's a very conservative number. And that's probably gravity separation.
Q. Gravity --
MR. McBRIDE: Concern about what number is actually on the record as opposed to on the page, 0.3?
THE WITNESS: O.3.
MR. McBRIDE: Yes.
BY MR. TRAUBEN:
Q. 0.3.
Okay. If you look to the right where the assumption line for the underground workings.
A. Yes.
Q. The cost per ton it appears to be at $100 per ton?
A. Yes.
Q. Is that because of the increased costs in the processing or in the extraction?
A. The mining.
Q. The mining.
A. The actual physical mining. Yes.



Q. Let's go back a couple pages into the document. There's -- at the top of the page it says, "Want 'outline plan,' approval asterisk." Do you see that page?
A. Yes.
Q. What does that mean? What did you mean here when you wrote this, that you want -- or who wants an outline plan approval?
A. It's basically -- the plan we submitted as the all phase plan, that's an outline plan. That is a -- what we were really after was to know that -- the general concept of what we were planning to do down the road. Even though we were working in phases in terms of the phases in terms of the details, we didn't want to get halfway down through the process and find out that the concept of where we were going was impossible. So we wanted to know that the broader plan -- we weren't asking for every detail of it to be approved, we were asking whether they could swallow the whole plan conceptually. And that's what the outline plan is.
Q. I appreciate your answer. My question actually was a little more simple than that. I was asking who wanted the outline?
A. Oh, I'm sorry. I did. Because this was something I did on my own. I mean, I was -- at that



point I was talking about the operation, but because I was there on my own, I was speaking for myself.
Q. But isn't it also fair to say that Liberty Mining at that time wanted its outline plan approved?
A. Absolutely.
Q. Okay. Then there's a list of eight items. What are those items? What do they reflect?
A. Say that again.
Q. The list of items underneath that heading.
A. They're items that needed to be satisfied. What I was saying was, yes, we know we need to do these things to get there, but we just want to know that if we do all those things, that the general plan is not an impossibility conceptually.
Q. Okay. Can you please take a look at A-62.
A. Okay.
Q. And what is A-62?
A. It looks like a letter from me to Harry Frey and the subject is "Response to questions in the letter of Wayne S. White, U.S. Wildlife Service."
Q. And it's dated March 4, 1993?
A. Yeah. This is dated March 4, 1993.
Q. And if I understand correctly, this was a -- this is a response to the Forest Service to questions posed by the Fish and Wildlife Service?



A. Yeah. Harry was asking me to help him respond to the questions that were being asked by Fish and Wildlife, if I could fill in some blanks for him.
Q. And put it all in context, this is during what we refer to as the second consultation on the Spotted Owl?
A. I would guess so from the date. Yes.
Q. Can you turn to the second page, please.
That's your signature?
A. Yes.
Q. Okay. Item nine. If you could take a look at that. Okay. And you make a statement -- well, why don't you go ahead and take a look at item nine.
A. (Reviewing document.) Okay.
Q. There's a statement there that, "Silica waste will be deposited in the ET pit layered with natural material stockpiled around the pit during its operation."
A. Yes.
Q. And then the next statement says, "This will safely bury mill waste and reclaim the ET pit area"?
A. Yes.
Q. How do you know that in this at this time?
A. How do I know that?
Q. Yes.

this. I'm just thinking in terms of deposit. The deposits are on -- what claim they're on.
The complaint involves the entire property, if I'm not mistaken. Whereas, the contest action was narrowed to the claims that we were permitted to operate on, I believe. But because I'm not including all the properties doesn't mean that we didn't project that we were going to work those properties.
I'm still trying to function within the range of what we had -- what we knew and what we were permitted to do at that time for the period of time we're talking about, the 1990 to 1994 period. We knew we had a good target under the Union. We knew we had a good target under the Six O'clock. And we knew we had the Dumps and Apexes.
Now, I haven't included the Union in these totals because we never got permitted specifically to do that, but -- and that's this -- but that was definitely one of our primary targets.
Q. When you said "the Union," you mean the May Tunnel Underground?
A. May Tunnel Underground. You discussed that earlier with Fred about we didn't really have to be permitted to go in through the Union Tunnel.
So my -- if you asked me to generate a bottom



line number that would be my recommendation for the evaluation of the property, I would add in that Union -- that Union deposit.
Q. It shows here for the Union deposit on spreadsheet eight, looking at that first, the .05 cut-off, profit before capital cost at 7.4 million roughly. And I believe yesterday Mr. Aloisi estimated that it was more along the lines of $30 million.
Do you disagree with that?
A. No. I don't disagree with that. I'm trying to be conservative and say, okay. We have this large area of backs, in mining terminology it means area of vein available. And I just picked an arbitrary 50,000 ton deposit, but the potential is much greater.
Q. And -- I'm sorry. Go ahead.
A. We haven't completely blocked it out. We have assays above it. We have some drill holes. We have production on two sides of it. We have really strong indicators and good geologic data that we believe there's going to be substantial production from that area. But we don't have enough information to know exactly what that tonnage is.
So Fred's $30 million is well within the range of what I believe we're going to find in -- $30 million is well within the range. But for the sake of



conservatism in this calculation, I assume a smaller deposit because we have less hard data on that area than we do on other places.
Q. You used it as a guidance, you said, "We haven't completely blocked that out." Did you mean by that that it hasn't been totally or completely delineated?
A. Right. The boundaries or the exact boundaries within the ore bodies within the section of veining haven't been -- I can't draw a line and say this is the outer boundaries of that ore body.
Q. Have you been asked by counsel or anyone to --
MR. McBRIDE: Object to what asked by counsel will be. Attorney-client.
MR. TRAUBEN: Well, he's not your client, though, is he? Mr. Ferrero is one of your retained experts in this matter?
MR. McBRIDE: Yes.
MR. TRAUBEN: And your client is Mr. Aloisi and Liberty Mining?
MR. McBRIDE: Uh-huh. All right. You can pursue the question. All right.
BY MR. TRAUBEN:
Q. Have you been asked by counsel or anyone to revise your charts to include other deposits that are



reflected in these charts that we have in front of us?
A. No. I made all the decisions that I made on the spreadsheets.
Q. But do you understand my question? In other words, are you going to add in additional deposits?
A. Am I going to?
Q. Have you been asked to do that?
A. No. The thing about this is that the potential of the property from a geologic standpoint is much larger production. I mean, if I went into a statistical analysis of what I believe is there, it would far exceed any of this. But I'm trying to stay within the balance of what -- you know, we have some descent hard data on. So that's what this is.
Q. Then considering the price of gold today, which I think you -- during a break you were surmising it's around $800 per ounce. Is that correct?
A. Yes.
Q. Based on your knowledge of the deposits that are in the ground in the mining claims at issue in this case in Eddy Gulch, do you think that the mining claims today are worth more than the $17.8 million reflected on sheet eight?
A. If I calculated it in today's numbers for price and costs with the same parameters that I'm using here,

Page 114

I'm not sure that it would be more because costs have inflated as the gold price has. So it may be in the same ballpark for these deposits.
I believe that the property ultimately if put in production will yield way more than any of these numbers, but if you use these assumptions, it's probably pretty close. Because of the incredible rise in price, the price of mining, along with the incredible rise in the gold price.
Q. So, in other words, the prices that are reflected here, these are based on 1990 costs?
A. Yes.
Q. And 1990 price of gold?
A. Yes.
Q. And if you updated that to reflect the cost today and the price of gold today, you think it would be about the same?
A. I'm saying it would be in the ballpark. I did do a calculation similar to that on earlier spread sheets that weren't as advanced as these for the contest. And I used a factor, which we have discussed before, for inflation, but -- and that inflation was industrial -- was applied to industrial uses.
But mining costs have a life of their own. They're not necessarily equal to every other industry.

Page 115

So if I was asked to generate an accurate estimate of today's cost, I would probably talk to some people that are working in operating a mine right now and find out what their actual day-to-day costs are to get that.
At the time I did those spreadsheets, I didn't have access to that information and I used a round number that is the result of statistics over the last ten years. So I think it's close, but I wouldn't say that it's definitive.
And so that 50 percent increase is -- in costs, if that was true, is a little less than how much the gold price has risen. So that would suggest that maybe we'd make a little more on it now, but I don't know that that is really true because the mining costs have gone up so much.
Q. Now, these sheets eight and nine rely on information from other work sheets. Is that correct?
A. Yes.
Q. And so let's work backwards to see how you get to sheet eight. Because sheet eight has the greater value, we'll stay with that and let's figure out on the record how do you get to the 17.8 million from working off the prior sheets. Can you explain that?
A. Okay. I think the best way to explain it is to go back to sheet one and work our way forward toward

Page 116

sheet eight.
Q. Okay.
A. Because that's the way I did it.
First of all, behind sheet one there are a number of sampling episodes which include the Forest Service contest action samples. They include samples by New Cinch Uranium in the 1970s. Include Elmendorf in the 1930s. This goes back to 1932. The complete set of base assay and metallurgical data.
Okay. I'm talking about sheet one here.
MR. McBRIDE: Still in A-151.
THE WITNESS: Yes.
BY MR. TRAUBEN:
Q. Okay.
A. So what I did was I made charts of all of the different assays and put them under the heading of which deposit, where they came from, whether it was Klamath Dumps, Klamath Apex, Klamath Ore Stockpiles, Klamath Underground, Union Dump, Union Underground, Mountain Laurel, Six O'clock Apex, Six O'clock Underground, Anna Johnson.
Now, I am -- what I'm doing is I'm giving each sample value of one within its group and I'm basically creating weighted averages. So that for each little -- like, for instance, under Klamath Dumps, I have it

Page 117

broken into the different sampling events on this list. And then at the bottom I have the weighted average of all of those under that topic, so that I get an average grade for that deposit.
So basically what you're looking at is a chart that shows the individual sampling event at weighted average grades from the assays and the metallurgical tests. So that would be head grades from metallurgical tests and assays from just the assays. From each one of the different sampling events, but they're grouped by deposit. Okay.
And at the bottom of each one of those groupings is the weighted average of all of those. So you get a deposit wide weighted average of grade.
Q. Okay. What is the column that's headed "#SA x OPT"?
A. Number of samples.
Q. And is that the weighting?
A. Yeah. That's how you weight -- that's a created weighted average.
Q. Okay. So you're weighting the number of samples eight times 0 -- for an example, you're taking in the first line of data on sheet one, number of samples eight, times average assay ounce per ton 0.129 and that gives the result of 1.032. Correct?