# EXHIBIT B

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ALFRED ALOISI, et al., )
)
Plaintiffs, )
)
vs. ) No. 95-650L
)
UNITED STATES OF AMERICA, )
)
Defendants. )
)

DEPOSITION OF ALBERT BUCHTER

Monday, October 29, 2007
9:30 a.m.

Reported By: CRAIG W. WOOD, RPR, CSR No. 9789

APPEARANCES

For the Plaintiffs:
FOLEY & LARDNER
Washington Harbour
3000 K Street, N.W., Suite 500
Washington, DC 20007-5101
(202) 295-4017
BY: LAWRENCE G. McBRIDE

For the Defendant:
DEPARTMENT OF JUSTICE
Environmental & Natural Resources Division
601 D Street, N.W.
Washington, DC 20004
(202) 305-0238
BY: BRUCE K. TRAUBEN

Also Present:

Fred Aloisi

—oOo—



INDEX


| EXAMINATION BY: | Page |
|---|---|
| Mr. McBride | 5 |
| Mr. Trauben | 75 |
| Mr. McBride | 92 |
| Mr. Trauben | 99 |


EXHIBITS

NO DOCUMENTS WERE MARKED AS EXHIBITS

—oOo—



BE IT REMEMBERED that on Monday, October 29, 2007, commencing at the hour of 9:30 a.m., of said day, at the offices of Klamath National Forest, 1312 Fairlane Road, Yreka, California, before me, Craig W. Wood, a Certified Shorthand Reporter in and for the State of California, there personally appeared

ALBERT BUCHTER,

who, being first duly sworn by me to tell the truth, was examined and testified as follows:

---oOo---

MR. McBRIDE: Lawrence G. McBride, Foley & Lardner, for plaintiffs. This is a deposition in -- the caption of the case is Aloisi, A-l-o-i-s-i, et al., versus United States, No. 95-560, in the Court of Federal Claims.
MR. ALOISI: It's 650.
MR. McBRIDE: All right. Yes?
MR. Aloisi: It's 650 not 560.
MR. McBRIDE: Did I say 95-650?
MR. ALOISI: You said 560, it's 650. Excuse me.
MR. McBRIDE: And today is the deposition of Al Buchter. Before we actually start with questions for Mr. Buchter, do you want to put yourself on the record?
MR. TRAUBEN: Yes. Bruce Trauben representing defendant United States. And, also, I am -- I'll be



objecting today. I'm not Mr. Buchter's personal attorney, but I'm here representing the defendant.
Also, I wanted to state on the record, as we discussed before going on the record, that all objections as to admissibility will be preserved and we will be objecting as to the forms of questions which can be corrected during the course of the deposition.
BY MR. McBRIDE: Thank you, Mr. Trauben.

EXAMINATION

BY MR. McBRIDE:
Q. I'd like to go back over a few ground rules here, Mr. Buchter. Do you recall that I deposed you ten or 11 years ago?
A. Yes.
Q. You do recall that deposition.
In that deposition I think you were my first deponent in the case, so we spent a long time where I was learning the Forest Service, if you will, and learning who was in what position and all that kind of stuff. So I'm going to be going back into some of those things.
And Mr. Trauben could have an objection that some of these questions might have been asked and answered, but I'm going back into these things sort of to take us to the points where I need to get to supplemental questions. And

Page 74

Q. You don't remember?
A. Again, I'd have to speculate.
Q. And how far did that environmental assessment get, if you recall?
A. We did review on the ground. Whether it was complete, I would think that there was – there would have been questions that were generated. And probably some correspondence back to Fred on clarification of processes or whatever.
Q. Are you speculating now or are you remembering?
A. I am speculating. I know that there was meetings on the ground.
Q. Fine. And any other recollection as opposed to speculation about how far it got or what was done?
A. No.
MR. McBRIDE: Mr. Trauben, I don't think we've ever seen any file related to that. So I'll follow up with you in that regard that would constitute an environmental assessment or the initiation of the environmental assessment either in 1992 or in 1989.
Thank you. I'm done. Do you have clarification or --
MR. TRAUBEN: Yes. I'll have some questions.
Bruce Trauben for the United States, just for the record.

Page 75

EXAMINATION
BY MR. TRAUBEN:
Q. Mr. Buchter, can you take a look at Forest Service 110. Take a minute and take a look at that document.
A. (Reviewing document.)
Q. You don't have to read it all in detail, just familiarize yourself with what it is.
A. Okay.
Q. For the record, that is a September 25, 1992, memorandum. Addressed to Jay West, Fish and Earth Science Staff Officer. And it's signed by Polly Haessig, Cal Conklin and Juan de la Fuente. Is that what you're looking at?
A. Uh-huh.
Q. Is that FS-110? Did you say "yes"?
A. Yes.
Q. Okay. And the subject is "Eddy Gulch Mines Field Visit September 17, 1992." Do you see the subject line?
A. Uh-huh.
Q. That's correct? "Yes"?
A. Yes.
Q. And did you participate in that field visit?
A. Yes.

Page 76

Q. In fact, it says in the first paragraph that "Forest Service personnel included Al Buchter"?
A. Yes.
Q. That's you.
And what was the purpose of that field visit?
A. In 1992, the forest was reviewing mines for possible water contamination.
Q. Is this part of the EA process?
A. This was not.
Q. If you look on the third page, under "Recommendations." See recommendations one through five where I'm looking?
A. Okay.
Q. And it says, "Those are our highest priority and are of prime importance for assessment of a Plan of Operation and the NEPA process"?
A. Yes.
Q. Do you see where I'm reading?
A. Yes.
Q. Is the EA part of the of the NEPA process?
A. Yes.
Q. So then was this site visit related to the NEPA process?
A. This was separate from the NEPA process.
Q. Did it identify some information needs for the NEPA process?

Page 77

A. Yes.
MR. McBRIDE: I'm going to object to form. You're asking him all "yes" or "no" questions. He's your witness. Can you induce testimony instead of asking him "yes" or "no" questions, please? Objection to form.
BY MR. TRAUBEN:
Q. And there's a list of items that were identified that Liberty mining needed to provide. Do you see that list?
A. Yes, I do.
Q. And, for an example, if you look at the item number three on the third page, says, "Liberty mining, Incorporated needs to provide engineering designs and map locations for roads, pits, ponds, mill sites and other planned earth work and structures for review." I read that correctly?
A. Yes.
Q. To your knowledge, were those engineering plans submitted?
A. My best correct recollection is no.
Q. Then on the last page, item nine --
MR. McBRIDE: Is there a question out?
MR. TRAUBEN: Yeah. I'm still thinking.
Q. Says that, "The Plan of Operations must estimate

Page 78

the volumes of fine sediment and tailings that will be trapped by the ponds and establish reclamation sites for the sediment." Do you know whether those estimates were submitted?
A. To the best of my recollection, no. They were not submitted.
Q. Was there a need for an estimate of volume of water that would be used from the Eddy Gulch? Was that one of the information needs that were identified to complete the NEPA process?
A. It would be required because the east fork of Eddy Gulch for a considerable portion of the year produces little water. So if you're going to be using that water for milling and power generation, you'd have a complete depletion of the creek itself.
Q. To your knowledge, was an analysis of the volume of water usage for the Liberty mine submitted?
A. Best of my recollection, no.
Q. And you would have needed that information to complete the NEPA process?
A. Yes.
Q. Do you still have Liberty Consolidated Mine tab five? Let me put in front of you Liberty Consolidated Mine tab five document, which is dated February 4, 1994.
There's a list of itemized activities on that

Page 79

document. I believe you testified earlier that to haul waste rock, which is item one, and the second half of that page would have required digging. My question is, would this not depend upon the location and situation of the waste rock?
MR. McBRIDE: Objection to form.
MR. TRAUBEN: What's your objection?
MR. McBRIDE: You're leading him to a "yes" or "no" question. Can you induce testimony rather than to ask a "yes" or "no" question?
MR. TRAUBEN: I'll rephrase.
Q. Whether or not the -- what would that depend upon, whether to haul waste rock would require digging?
A. Well, if you're just hauling material, that's what they're authorized to do. It infers that it's going to be dug and loaded on the truck. But they're authorized to haul.
Q. So if the waste rock is sitting on the surface of the ground, would that require digging?
A. No.
Q. Also, earlier you referred to SHPO. Do you know SHPO refers to?
A. State Historic Preservation Officer.
Q. Is that a state act?
A. It's --

Page 80

Q. State law?
A. It's a state law for California. And that is a specific person.
Q. I believe earlier you testified that the April 1, 1992 plan had a number of acres that were different from acres that were proposed to be disturbed in earlier plans. Do you recall that testimony?
A. Yes.
Q. And I think that Mr. McBride elicited testimony that the number of acres was actually less than the areas of proposed disturbance from the earlier plans. Do you recall that testimony?
A. Yes.
Q. Is it a factor -- you can tell me, does it matter where those acres are located within the project area?
A. It would matter where they were located because of the type of clearances that would be required. An area that would be cleared in a brush field doesn't have anywhere near the concern of an area that'd be cleared in a -- an old growth forest.
Q. And that's because of what?
A. The disturbance to habitat for the Spotted Owl.
Q. Were there Spotted Owls near the proposed project?
A. There were some near the project.

Page 81

Q. And you're not an expert on the Spotted Owl?
A. No.
Q. So in connection with this project, if -- what would you do, if you had specific recollection, to inform yourself of what could be done, what could not be done with respect to the presence of the Spotted Owl?
A. What I would require from a proponent would be where the project was located, what was going to be done as far as clearances, new road construction, excavation pits, the specifics on what kind of clearing would be done. And then I would take that information and go to the wildlife biologist, give him the information, and then he would conduct a underground survey and a paper survey and initiate consultation service for potential for impacts to the Spotted Owl or other related species. It's not just the Spotted Owl that is of concern.
Q. There are other species?
A. There are other species.
Q. What other species?
A. Specifics, I'm not sure, but it would be both aquatic species that may be impacted and terrestrial species like Mollusks or plant species.
Q. And would that be done in-house informally between you and the wildlife biologist, the consultation?
A. The initial talking about it would be informal,