# EXHIBIT C

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ALFRED ALOISI, et al., )
)
Plaintiffs, )
)
vs. ) No. 95-650L
)
UNITED STATES OF AMERICA, )
)
Defendants. )
)

DEPOSITION OF ALFRED ALOISI

Wednesday, October 31, 2007
9:20 a.m.

Reported By: CRAIG W. WOOD, RPR, CSR No. 9789

Page 2

APPEARANCES

For the Plaintiffs:
FOLEY & LARDNER
Washington Harbour
3000 K Street, N.W., Suite 500
Washington, DC 20007-5101
(202) 295-4017
BY: LAWRENCE G. McBRIDE

For the Defendant:
DEPARTMENT OF JUSTICE
Environmental & Natural Resources Division
601 D Street, N.W.
Washington, DC 20004
(202) 305-0238
BY: BRUCE K. Trauben

Also Present: Thomas Ferrero
Hilton Cass

—oOo—

Page 3

INDEX


| EXAMINATION BY: | Page |
|---|---|
| Mr. Trauben | 4 |


EXHIBITS
FOR THE DEFENDANT'S:


| | | |
|---|---|---|
| 1 | Quitclaim Deed | 29 |
| 2 | Tax Assessor Cards | 47 |
| 3 | Document | 129 |
| 4 | Letter | 131 |


---oOo---

Page 4

BE IT REMEMBERED that on Wednesday, October 31, 2007, commencing at the hour of 9:20 a.m., of said day, at the offices of Klamath National Forest, 1312 Fairlane Road, Yreka, California, before me, Craig W. Wood, a Certified Shorthand Reporter in and for the State of California, there personally appeared

ALFRED L. ALOISI,

who, being first duly sworn by me to tell the truth, was examined and testified as follows:

---oOo---

EXAMINATION

BY MR. TRAUBEN:

Q. Will you please state your name for the record.
A. Alfred L. Aloisi.
Q. And you go by Fred?
A. Yes, I do.
Q. As you know, my name is Bruce Trauben. I represent the United States, the defendant in this action.
A. Yes, Bruce, I've made your acquaintance.
Q. I'll have some questions for you today. And just as an overview of what we're going to do today, I'm going to ask you some general questions about the -- who the plaintiffs are and the status of the plaintiffs.

Page 5

We'll go into the property interest of the plaintiffs. The knowledge of the owl. We'll talk about the various components that go into a takings case. So just to give you an overview of what we'll be discussing.
A. Thank you.
Q. And, also, we'll get into your prior deposition. I have some follow-up questions and some discovery responses.
A. Very well.
Q. I understand from discussions with your attorney, Mr. McBride, that Mr. Goodman has passed away.
A. Yes, he has.
Q. And do you know when?
A. Approximately three, four years ago. And I'm not certain of the exact date.
Q. When did you learn of his passing?
A. I would say three years ago.
Q. Do you know, was it sudden, his death?
A. No. It was -- I believe his health deteriorated over a considerable period of time. Don was diabetic and he had other problems, as well.
Q. Do you know whether his estate is still in probate?
A. I do not know.
Q. Do you know who is representing his estate?

Page 46

A. We still held the lease.
Q. You held the lease. And was the Usher property then -- or how did you refer to it -- the security group part of your operating plan?
A. Yes.
Q. Okay. In this memo Mr. Wernicke attributes to you a statement that you did not want to be involved with occupancy issues?
A. That's not correct.
Q. Okay. You recall that discussion?
A. Yes.
Q. And what did you mean or what had you said?
A. Well, that's a --
MR. McBRIDE: Can we back up and establish any foundation about occupancy issues?
MR. TRAUBEN: Very good. Thank you.
Q. What occupancy issues did you and Mr. Wernicke discuss?
A. We posted a $600 reclamation bond to be able to use the two Usher cabins for storage of equipment and core and also for housing for our crew. And I -- that bond, I don't believe I redeemed that bond until just late '90s.
Q. So the occupancy issue you're referring to is occupancy of cabins that were located at Usher Flat. Is

Page 47

that correct?
A. On the Usher claims, not on the flat.
Q. Okay. Did Liberty Mining intend to mine any of the security group in the time period leading up to July 23, 1990?
A. It was something that we had considered adding on as a supplement to our Plan of Operations.
Q. You considered it, but had not done so?
A. Not at that point. No. We were using it primarily for housing and milling, future mill site.
MR. TRAUBEN: Can you have this marked as Exhibit 2, please.
(Defendants' Exhibit 2 was marked.)
BY MR. TRAUBEN:
Q. Mr. Aloisi, I'm going to hand you what's been marked Exhibit 2 to your deposition today. And I will represent to you that these are records that were obtained locally in the county records.
A. Uh-huh.
Q. And it concerns lots 45-A and 45-B.
A. Uh-huh.
Q. I believe they are tax assessor cards.
A. Yes.
Q. And they reflect change in title to the lot 45-B and 45-A.

Page 48

A. Correct.
Q. And take a look -- I'm afraid I have to come around. I hope you don't mind.
A. It's all right.
Q. I gave you my only copy.
A. I don't mind.
MR. McBRIDE: That's fine.
BY MR. TRAUBEN:
Q. Okay. I'd like to direct your attention first to the second page of Exhibit 2.
A. Yes, sir.
Q. And this document reflects a quiet title action occurring about 1985?
A. Yes, sir.
Q. Is that the quiet title action -- do you believe that's the quiet title action you referred to earlier in your testimony?
A. Yes, it is. I do believe so.
Q. And in whom did that title -- that quiet title action quiet title?
A. The Patterson estate.
Q. And then when did the Patterson Estate transfer its interest in 45-B?
A. It appears to be 1991.
Q. And is that your understanding?

Page 49

A. That's what it says.
Q. That's what it says, but is that your independent understanding, as well?
MR. McBRIDE: Can I ask for clarification. Do we know whether those are recordation dates or transaction indicates?
MR. TRAUBEN: Well, it has document date and recording date in the two columns.
MR. McBRIDE: Fine.
BY MR. TRAUBEN: In the first column is the document date.
A. Yes.
Q. You're answering my question "yes"?
MR. McBRIDE: I'm sorry. Are you talking to me or --
THE WITNESS: It is my understanding.
MR. McBRIDE: Let the record show there was a little conversation with counsel. So we need to clarify the record. Can we actually have the question over again and then we'll -- because I'm lost now.
MR. TRAUBEN: If you could read it back, please, and make sure we got the correct response.
(Record read.)
BY MR. TRAUBEN:
Q. And that's your understanding?

A. That's my understanding.
Q. And then just to follow up, it appears from this document that you acquired an ownership interest in lot 45-B in May 1991?
A. Yes.
Q. And then you transferred your interest to Energel in that same month?
A. It was a back-to-back transaction. That's correct.
Q. If you could take a look at the last page of Exhibit 2.
And this is with respect to mineral lot 45-A. Correct?
A. Yes.
Q. And if you could take a look and state for the record whether this reflects similar transaction we had just discussed with respect to the lot 45-B?
A. It appears to. Yes.
Q. Okay. And so what was happening with respect to lot 45-B is also happening with lot 45-A?
A. Yes.
Q. Okay. So we don't need to run through all the transactions, they are occurring at the same time. Correct?
A. It appears so.



MR. McBRIDE: Excuse me. To clarify my own notes and the like, that was deposition Exhibit 2?
MR. TRAUBEN: Correct.
MR. McBRIDE: Thank you.
BY MR. TRAUBEN:
Q. In April, 1993, I believe you entered into a lease agreement with a company called WAZCO, Inc.?
A. WAZCO.
Q. WAZCO, W-A-Z-C-O.
A. Yes.
Q. In that lease were all the mining claims in Eddy Gulch leased to WAZCO?
A. I know the lode properties were. I'm not sure of the associated placers.
Q. Do you know whether that was -- your intent was to lease all the claims, including the associated placers to WAZCO?
A. I don't know if that was our intent because they had no interest in mining the dumps.
Q. Do you have tab Forest Service 142 in front of you? Should be in this book here.
A. Yes. Lease agreement.
Q. That's the lease agreement?
A. Uh-huh.
Q. And between you and WAZCO in 1993 that we were



just speaking of?
A. Yes, sir.
Q. And if you could --
A. They are included here, sir. I'm on -- towards the back. The pages aren't numbered, but it says, "The claims listed below were being" -- "for payment of fees" -- wait a minute. WAZCO paid it. Let's see here.
Q. Well, maybe it would help if I asked a question first.
A. All right. Please.
Q. If you take a look at the page numbered 1, which is actually the second page of this document.
A. Yes, sir.
Q. And Article II, Grant of Lease, paragraph 2.1.
A. Uh-huh.
Q. It states that, "Lessor hereby grants, leases and let's, et cetera, all underground workings, dips, burrs, angles, dumps, tailings and stockpiles, et cetera"?
A. Yes.
Q. So now having seen that, does that refresh your recollection as to whether or not you intended to lease all the mining claims, including placers?
A. Yes.
Q. It does refresh your recollection?



A. Yes, it does.
Q. And your recollection is that you did intend to lease the placer claims?
A. It appears I did lease the placers.
Q. And that was your intent to lease all the placer claims to WAZCO?
A. I don't know if it was my intent. I'm just saying that we did lease all of them to them.
Q. Okay. And all the lode claims, as well?
A. That was my intent.
Q. And that's what this document effectuated?
A. Yes, sir.
Q. We are done with that for the time being.
Can you take a look at A-181 that was recently produced by plaintiffs.
A. Yes.
Q. Take a moment and look that over.
A. Yes, I have. I'm familiar with this document.
Q. And what is this document?
A. This is a Notice of Delinquency to a Co-Owner on Proof of Labor. It's advertising someone out of a claim.
Q. And that person is Mr. Kendle?
A. Kendle Trucking, John Kendle and James Kendle.
Q. James Kendle, one of the plaintiffs?

Page 70

believe, their water specialist, came up on the arsenic. And I did provide her with some documentation.

I don't know about this letter you asked about, but we gave her cross-sections of our core drill holes that showed the arsenic percentages, ascending and descending, what percentage was there in the background. Once again, we're establishing background values. And that was provided to the Forest Service.

Q. So had Liberty Mining conducted any studies, to your knowledge, that analyzed whether any arsenopyrites remained in the tailings --

A. No.

Q. -- after the process?

A. No.

Q. And --

A. That was something that Don Moore was, as I said, responsible for, was to remove any sort of metals that might cause acidification or oxidation.

Q. But he hadn't -- but to your knowledge, he has not yet done that?

A. Not to my knowledge.

MR. TRAUBEN: Is Don Moore an expert in this action? Will he be identified as an expert in this action?

MR. McBRIDE: That's a future determination.

Page 71

BY MR. TRAUBEN:

Q. But he has provided data relating to the costs and so forth that plaintiffs are relying on?

A. For our milling circuit. Yes.

Q. Who is Dan McClain?

A. Dan McClain is a employee of the State of California, divisions of mines and geology. He specializes in permitting. He's got quite an extensive resume in that regard.

Q. Is there a Dan McClain that was contracted by Liberty Mining to do any consulting work?

A. Assisting us in our permitting process.

Q. Assisting. Okay.

And did he meet with California Regional Water Qualities Control Board?

A. He was in touch with them telephonically, I believe.

Q. At the direction of Liberty Mine?

A. Yes.

Q. Was a determination made that a reclamation plan with the Siskiyou County would need to be filed?

A. Yes. We spoke with Siskiyou County Planning Department.

Q. And they requested that a reclamation plan be filed?

Page 72

A. Yes.

Q. Was a reclamation plan filed?

A. I don't know. The Forest Service has its own way of dealing with reclamation plans. They like to set the bonds rather than SMARA, at least at that time. It was a lead agency.

So basically prior to your getting your plan approved, the Forest Service requires that a reclamation bond be posted and they set the bond. And we had paid and had a reclamation bond in place. Whether they provided that to SMARA or the County, I don't recall.

Q. Okay. Are a reclamation bond and a reclamation plan the same thing?

A. A reclamation bond is put up in case the miner doesn't perform the reclamation work, the Forest Service has the bond to perform that work. And I might add, they really do so.

MR. McBRIDE: Can I clarify, was your question specific –

MR. TRAUBEN: No. Let me follow up first, please.

MR. McBRIDE: Thank you.

BY MR. TRAUBEN:

Q. Okay. What I'm asking is whether a reclamation plan was filed by Liberty Mining with the Siskiyou

Page 73

County.

A. Same answer. I don't know. I know we filed it with the Forest Service. I know Harry Frey had been in touch with the planning department. They had our reclamation plan and our bond to make sure that that reclamation was carried out.

Q. Was it your understanding that the Forest Service would have filed the plan with the county?

A. They would have been the lead agency. Just like they would be the ones that would file it with SMARA or do your archae study or file your biological opinion, they took the lead role in that.

Q. So it was not Liberty Mining's responsibility to file the plan with the county?

A. We probably had a responsibility to have the plan. I don't know if it was our responsibility to file it with the county or if the Forest Service was taking care of that.

But I know that there is documentation in here where we were going to file a reclamation, all phase reclamation plan with them, but that never eventuated because we were stopped before that could happen.

Q. Okay. And when you say you were stopped, you're referring to the January 4, 1990, stop work order?

Page 74

A. That's correct.
Q. This is sort of a backtrack, you might say, but what is the Bonanza King claim?
A. What is it?
Q. Yes.
A. The Bonanza King was a very rich, high grade lode deposit in the Trinities. And it's one of the properties that we took a pretty good look at.
Q. Did you perform any mining at --
A. Yes, we did.
Q. You did?
A. Uh-huh.
Q. Operations?
A. We --
Q. Or production, excuse me. I mean production.
A. Production, no. We did not have production there. It was an exploration and development program that we were carrying on in the Trinities at the time.
Q. That's in a forest south of the Klamath National Forest?
A. Yes. Trinity National Forest.
Q. Were Spotted Owls in the Trinities?
A. More than likely. They have a Northern Spotted Owl through most of the California, so I would assume so.

Page 75

Q. Was that an issue when you were operating down there?
A. No. The owl wasn't listed until 1990. And I believe we were operating down there prior to that time.
Q. If you could take a quick look at A-55.
A. Yes, sir.
Q. If you want to flip through that and tell me whether or not that is your handwriting?
A. It's not.
Q. You recognize that as the handwriting of Mr. Ferrero?
A. I do.
Q. Will you do me a favor and, please, take a look at A-63?
MR. McBRIDE: This is a book that's gotten bound and rebound. I'm not sure if I have exactly the same A-63.
MR. TRAUBEN: I probably only have a few pages. Something dated November 9, 1995. And it says, "Gentlemen, we are pleased to present our report."
MR. McBRIDE: Thank you.
THE WITNESS: Uh-huh.
BY MR. TRAUBEN:
Q. This is a report from Egan and Redmond dated November 9, 1995. Correct?

Page 76

A. Yes, sir.
Q. And my question is, why was this work done?
A. As part of establishing the damages for our lawsuit.
Q. And not in conjunction with any operations at the mine site?
A. No, sir.
Q. And Egan and Redmond will be experts in this matter?
A. You'll have to ask Mr. McBride that question.
Q. What are your damages in this lawsuit?
A. Emotional? Monetary? What type of damages?
Q. Plaintiffs allege a taking in this case. They, I assume, want compensation?
A. Just compensation. Yes.
Q. Just compensation for the alleged taking?
A. Yes, sir.
Q. Then my question is, what is the amount of that just compensation?
A. At this time or then? The price of gold has raised dramatically since this took place.
Q. Well, there is some mixture of law and fact here. And based on my understanding of the law, the question is what was the amount of compensation due plaintiffs at the time of the taking?

Page 77

A. Well, my experts say $22 million.
Q. And what does that amount represent?
A. That represents what we would have earned had we been allowed to proceed in a timely fashion. During a period of time over an approximate four-year period.
And we'd also like to see compound interest added to it.
Q. And would that $22 million have been generated in 1990 or that period, 1990-1994, would that have been the profits earned that you estimate by Liberty Mining?
A. Yes. That's what was estimated.
Q. Estimated from the entire mining operation in Eddy Gulch?
A. That's correct. Well, not the entire mining operation. It would have been generated from the dumps and the apex. Doesn't include the underground.
Q. Why is that? Why does it not include the underground?
A. Because we weren't permitted at that time to do the underground. We're only suing for what was permitted. At least in our minds it was permitted.
Q. When you say "underground," you're referring to tunnelling?
A. Underground lode deposits. Yes, sir.
Q. Do plaintiffs allege that the government took

Page 130

I have segments of it, though. I mean -- wait a minute here. Okay.
Q. Does this document reflect any tests done that were also done by Cal Nickel?
A. Yes. Cal Nickel. Yes.
Q. Do you know -- do you have an understanding what the relationship is between Inter-American and Cal Nickel?
A. I don't.
Q. Were there separate samples sent to Inter-American and Cal Nickel?
A. I don't recall. Mr. Lowenhaupt was on site and took these samples. That's all -- that's about my recollection of it. This was quite good.
Q. Do you know whether these results have been used by plaintiffs in any of their subsequent analyses?
A. I believe that Mr. Ferrero references them in his workup.
Q. We'll get into that more tomorrow, I suppose.
A. All right.
Q. If you could hand that to the reporter.
A. Yes, sir.
Q. I'll give this back to your counsel.
(Defendants' Exhibit 4 was marked.)
BY MR. TRAUBEN:

Page 131

Q. Mr. Aloisi, I'm handing you what's been marked as Exhibit 4 to your deposition.
A. Oh, Yes.
Q. Do you recognize that document?
A. Yes.
Q. What is it?
A. It is a letter to me from Ben Licari from the Western Mining Corp, which is Alcoa Aluminum of Australia. They came up and made a site visit and this is a follow-up letter.
Q. In the upper right-hand corner, is that your handwriting, number ten?
A. No.
Q. Do you know whose handwriting it is?
A. I do not.
Q. Do you know -- says there's going to be some follow-up or refers to some follow-up there that they're "trying to interest the big boys," I think is what he says. Do you know what he's talking about?
A. Yes.
Q. What is that?
A. They were interested in the property.
Q. Who is "they"?
A. Ben Licari. And I believe Western Mining Corp. He came up and visited and had some people along with

Page 132

him. Their names escape me at the moment.
Q. Did they do some sampling?
A. I don't think so. I think they took some reports and that type of thing.
Q. And what was the result --
A. I'm sorry. We have sent chem's samples out, it says. So I would have to change that statement based on what I've just read.
Q. Based on what's in the document now, not in your own recollection?
A. Yes. Yeah. This is the geology field trip that we sponsored.
Q. Was the company participating in the field trip?
A. Not the company. No. Various individuals.
Q. Was that a field trip, then, that this doesn't belong with the letter?
A. I don't think so.
Q. Okay. Sometimes that happens, documents are stapled together inadvertently.
Then we can pull the second page off if it's not related and the exhibit will just be the one page.
A. Very well.
Q. Did Licari visit in 1989?
A. I think it was about that time. Yes.

Page 133

Q. And what was the result of the visit?
A. Alcoa -- or rather Western Mining Corp, they were having some problems at Carson Hill and they decided they didn't want to get involved with California. There's too many bureaucrats.
Q. So they did not invest?
A. No.
Q. Were they looking to -- to your knowledge, were they considering purchasing Liberty Mining's claims or were they interested in leasing?
A. I don't know. I don't recall.
Q. That just reminded me of a question I wanted to ask. Previously you were referring to the WAZCO lease in April 1993.
You know what I'm referring to?
A. Yes, I do.
Q. When did the negotiations leading to that lease begin?
A. 1992.
Q. When in 1992?
A. Fall.
Q. September, October?
A. Somewhere around there. Yes.
Q. Who approached whom?
A. Andy McBroom approached me on behalf of WAZCO.

Page 146

(Off the record.)
BY MR. TRAUBEN:
Q. You have the response to interrogatories in front of you?
A. Yes.
Q. And did you assist in the preparation of those responses?
A. No.
MR. McBRIDE: What?
THE WITNESS: On this?
MR. McBRIDE: Excuse me, if I may.
THE WITNESS: Maybe I'm misunderstanding here. Yes. Excuse me.
BY MR. TRAUBEN:
Q. You assisted in the preparation of some of the responses?
A. Yes.
Q. But not all of the responses?
A. Not all of them.
Q. Okay. But you're familiar with the responses?
A. Somewhat. Yes.
Q. Okay. And you did sign a certification?
A. Yes, sir.
Q. Okay. Can you take a look at page 5, subparagraph B, in response to Interrogatory No. 1.

Page 147

A. Yes.
Q. And at the bottom of subparagraph B there's a clause three in parentheses towards the bottom.
A. Yes.
Q. And that states, "Based on the Forest Service's failure ever to take further action with respect to Plaintiff's mining Plan of Operations, after its receipt of this February 8, 1994, second biological opinion some much later date." You see that response?
A. Yes, I see that.
Q. This is in response to defendant's request that plaintiffs identify the takings period, when the taking began, when it ended. And this suggests that it would end at some much later date.
Do plaintiffs today, as we're sitting here, have a -- can respond with more definitely to this -- or do they still intend to leave it open-ended on the closing period of date taking?
A. That is something that based on legal counsel will be determined. If I had my druthers, I'd have it go from the beginning until the present time, but I don't know if that's possible.
Q. Is the Rollins site part of the takings claim?
A. No.
Q. If you can look at page 13. This is in

Page 148

response to Interrogatory No. 3.
A. Yes.
Q. Relating to permitting hauling for the Liberty Mines. In the page 13 at the last clause it says, "Plaintiffs did not spend their limited resources to acquire any other permits."
A. That's correct.
Q. Was that a business decision?
A. It was a strategic decision.
Q. Strategic.
A. Tactical.
Q. To conserving financial resources?
A. Correct. And I also might add, that until we receive the biological opinion, which we had once, we were reluctant to spend anymore funds until we knew whether or not we were going to get clearance, given the sincere efforts we had made to get it permitted fully the first time.
Q. Did Liberty Mining have limited resources?
A. Yes, it did.
Q. And that was the situation throughout its existence.
A. Yes.
Q. Is that a fair characterization?
A. Yes. We were hoping to realize a profit on our

Page 149

investment backed expectations.
Q. To whom did WAZCO and Liberty Consolidated Mine make payments on their leases?
A. To me.
Q. Personally?
A. Yes.
Q. Was any of that income shared with any of the other plaintiffs?
A. Yes.
Q. With whom?
A. My wife.
Q. Anyone else?
A. I may have sent some payments to Don. I'm not quite certain. I know I sent him monies, but I'm not certain if it was originated from -- from where it originated.
Q. By my rough calculations, I'm estimating that approximately $120,000 was received from WAZCO and LCM, Liberty Consolidated combined. Is that approximately correct?
A. I think so.
Q. You think it was more?
A. No. I also might point out to you, though, Mr. Trauben, there were other terms and conditions as far as monies that were to have been generated insofar