# EXHIBIT D

**In The Matter Of:**

*Alfred Aloisi, et al., v.*
*The United States*

---

*Kathleen Granillo*
*Vol. 1, October 2, 1997*

COPY

---

*Bean & Associates, Inc.*
*Professional Court Reporting Service*
*500 Marquette, N.W., Suite 280, Albuquerque, NM 87102*
*119 East Marcy, Suite 110, Santa Fe, New Mexico 87501*

*(800) 669-9492 or (505) 843-9494*

*Original File gr100297.v1, 90 Pages*
*Min-U-Script® File ID: 0792355618*

**Word Index included with this Min-U-Script®**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
No. 95-650L
(Filed: July 31, 1997)

ALFRED ALOISI, et al.,
Plaintiffs,
vs.
THE UNITED STATES,
Defendant.

DEPOSITION OF KATHLEEN GRANILLO
October 2, 1997
9:30 a.m.
500 Gold Avenue, Southwest
Albuquerque, New Mexico 87102

PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE, this deposition was:

TAKEN BY: MR. LAWRENCE G. MCBRIDE
ATTORNEY FOR THE PLAINTIFFS

REPORTED BY: Melissa Correa, RPR, NM CCR #279
Bean & Associates, Inc.
Professional Court Reporting Service
500 Marquette, Northwest, Suite 280
Albuquerque, New Mexico 87102

5392-11 MEL



APPEARANCES

For the Plaintiffs:
FREEDMAN, LEVY, KROLL & SIMONDS
Attorneys at Law
1050 Connecticut Avenue, Northwest
Washington, D.C. 20036
BY: MR. LAWRENCE G. MCBRIDE

For the Defendant:
MS. SUSAN V. COOK
Attorney at Law
United States Department of Justice
Environment & Natural Resources Division
601 Pennsylvania Avenue, Northwest, Room 837
Washington, D.C. 20004

Also Present: Mr. Alfred Aloisi

INDEX PAGE

KATHLEEN GRANILLO
Examination by Mr. McBride 3
REPORTER'S CERTIFICATE 85
WITNESS SIGNATURE/CORRECTION PAGE 87



KATHLEEN GRANILLO,
after having been first duly sworn under oath, was questioned and testified as follows:

EXAMINATION
BY MR. MCBRIDE:

Q: Ms. Granillo, could you state and spell your name for the record, please?
A: Kathleen, K-A-T-H-L-E-E-N; Granillo, G-R-A-N-I-L-L-O.
Q: And during much of the period we're going to be talking about, which is 1989 through '94, your last name was Milne?
A: Uh-huh.
Q: Could you spell that, please, for the record?
A: M-I-L-N-E.
Q: By way of opening, I'm going to ask you a series of questions that have to do with the procedures and policies of the Fish and Wildlife Service and the Forest Service. And when I ask you these questions, I'm asking for your understanding, what you thought your responsibilities were or what you thought the duties or responsibilities of other officials of the agencies were. I'm not asking you for legal conclusions or to bind the Forest Service to a position on a matter, but what you thought rules meant or what you thought you were supposed to do or who you thought was responsible for a type of action, that

had individual documents on each project.

Q: I'm asking if in July of 1990 you read through this and learned what the various projects were, including exposing yourself to the fact that there was a Liberty Mine project described here.

A: Yes.

Q: Okay. Did you discuss with the Salmon Ranger District what plan of operations was involved in the Liberty Mine consultation, whether it was an all-phase plan, a plan as previously approved? Did you discuss that in any way?

A: At some point, I don't remember when, but yes, we talked about this project.

Q: And was it your understanding that what had been put in the consultation request, the project, was the so-called all-phase plan, which is a phrase that was used then, all-phase plan of operations?

MS. COOK: Why don't we first establish that she's even heard the term all-phase plan, because –

MR. MCBRIDE: Sure.

Q: Is that a phrase that you recall with the Liberty Mine proposal?

A: No. Just in reading through the documents, you know, this last week. But I don't recall using that phrase.

Q: Okay. Did you ever speak to – well, let's just start from the beginning here. You've met Mr. Aloisi before



today?

A: Yes, I have.

Q: Okay. And do you recall when you may first have met him?

A: We met – we had a meeting in the forest supervisor's office. I don't recall exactly when, but probably a few months after this came out. I don't recall when.

Q: Okay. And have you ever been up Eddie Gulch?

A: Yes, I went up there once.

Q: You've been up there once? Okay. Do you remember when that was?

A: I really don't. Sometime, you know, when I was there, so from that two-year-or-so time period. I think it was, like, summer of '91.

Q: Okay. Do you recall with whom you went on that trip?

A: I was with Harry Frey, and we came by and saw – you were at the cabins.

MR. ALOISI: Uh-huh. Kurt Marsick perhaps?

THE WITNESS: I don't remember that name.

MS. COOK: For the record, when you say "you," you will have to indicate you're talking to Mr. Aloisi. And unfortunately, we can't let you two have conversations because you're under oath. He's not. It's your deposition, so –

MR. ALOISI: I never lie.



MS. COOK: I know, but we just have to. That's the rules. We can't have you two having conversations, so you just need to confine your answers to Mr. McBride.

Q: (By Mr. McBride) Do you remember Jim Rock?

A: Yes.

Q: Would he have been with you that day?

A: I really don't remember.

Q: And do you remember someone in the forest supervisor's office named Kurt Marsick? And I'll guess at spelling, M-A-R-S-I-C-K.

A: Yes. And I don't know if he was there either.

Q: Okay. Do you know why you came? Do you remember the purpose of your visit? Presumably it was not your vacation or an off day.

A: It was related to this project and trying to implement this opinion and trying to figure out what habitat was going to be taken, just to look at the site and see where the project was and look at the – because we had been talking about this project, trying to figure out what habitat was being taken and what the effects were.

Q: Who is "we" that you've been talking about? Who are the "we"?

A: Well, the district and myself and Harry and –

Q: So implementing this project was one of the – was a matter that you specifically got involved with.



A: Yes.

Q: Okay. And how often or how regularly?

A: I don't think that I can characterize that, unless you ask me a different way.

Q: Okay. Was there a specific finding or determination you wanted to make with your visit, then, in July 1991? Did you come to make a finding or to make a determination of some kind?

A: Not that I recall. We were – it was mainly for me just to come see the site, since I had not seen it before, and to look at – since it's in an HCA and it was a suitable habitat and it was consulted on as a planned sale, we were told to get out of planned sales in HCAs, to, you know – not to offer that timber for sale. So even though this is a mining claim, you know, it's a suitable habitat question. So we were looking to see if there was any way to lessen the effect on suitable habitat.

Q: And were you able to make that determination?

A: I don't remember.

Q: Okay. Did you, while you were there, develop your own view as to whether this area in Eddie Gulch fit the HCA criteria and was, you know, properly designated?

A: Well, the HCA is, as I said, a large area that covers 20 or more pairs of spotted owls. And so in that area, there are, you know, 20 pairs of spotted owls, and so there was

Page 36

(The witness complies.)
Q: From your understanding of the July 1990 –
A: I'm still reading.
Q: All right. I'll step back and you can finish.
A: Okay.
Q: In light of the July 1990 opinion that we discussed before, what would the forest have been waiting for from the Fish and Wildlife Service at this point? A report not scheduled to be issued until September? What might that have been?
A: I'm not sure.
Q: Were you aware during that period that there was any further consultation or issue with the Fish and Wildlife Service?
A: Well, we – I'm not sure. We had dealings with the HCAs. The Forest Service initially adopted the strategy, and we had to implement the ISC strategy, which sets up the HCAs. And I don't recall having to go to Fish and Wildlife Service. I don't remember. But we did have to try to meet those requirements of getting out of planned sales that I mentioned before.
Q: Could you look at the second paragraph as well, please?
A: Okay.
Q: And the last sentence there, what might that be

Page 37

talking about, "In light of your wildlife biologist," just from the forest and knowing about the July 1990 opinion?
MS. COOK: Excuse me. Could you make your question more precise? Because if you're asking her to speculate on what that letter means on a letter that she's never seen before and she didn't write, I don't know if that's proper. But if you have a specific inquiry –
Q: What findings would anybody have been waiting for at that time?
A: I'm not sure what they're referencing there.
Q: Okay. Was it your understanding, during this period of time or when you came to your site visit, when you came to Eddie Gulch, that Mr. Aloisi was waiting for word on how the owl affected his operation before he completed the archaeological work?
A: I don't remember.
Q: Okay. You don't ever recall discussing that state of affairs, waiting to do the archaeological work until one knows what the owls' impacts on the operation are? You don't ever recall discussing that with anybody from the district?
A: No.
Q: Could you look at document 75, please?
(The witness complies.)
Q: Again, is this a document that you reviewed?
A: No.

Page 38

Q: The first paragraph is my focus.
A: Okay.
Q: This is the same problem here. The Forest Service was following the Interagency Scientific Committee report; isn't that what you've said?
A: Right.
Q: What, then, are they waiting for, or what information do they need before they can apply the Interagency Scientific Committee report to a plan of operations?
A: Well, again, I think this relates to our direction to get out of planned timber sales in HCAs. And, you know, yes, Mr. Aloisi's project is a mining claim, but it involved, you know, removal of timber, and we consulted on it as that part of the project. But since it is a mining claim, we can't have him – I mean, the mine is there. That's where the mine is, so how do we tell him to go ahead with his project and not be in conflict getting out of planned sales in an HCA? And I believe we had asked the regional office who, I believe, asked the Washington office what we're supposed to do to reconcile mining claims with the HCAs and the strategy.
Q: The forest supervisor's office was involved in that referral or request for information?
A: I believe so.
Q: And you were going to wait for that before approving or reauthorizing Mr. Aloisi to undertake operations?

Page 39

A: Yeah, because in order to implement the strategy, we would have to say, "No, you can't do your project."
Q: Didn't you get a no-jeopardy opinion from the Fish and Wildlife Service in July of 1990 on the project?
A: Yes.
Q: What, then, did you additionally need in order to allow it to go forward without jeopardy?
A: Well, the opinion on the effects on the owl is different than implementing the ISC strategy. The opinion is, you know, what is the effect of this project on the spotted owl, and here's how we think you can mitigate effects through those reasonable and prudent measures. The conservation strategy is a policy that we adopted, and it says in there, get out of planned sales.
Q: Okay.
A: You know, they're related, but they're not the same thing. So we, you know, have a conflict there.
Q: Were you involved in 1991 in the proposed designation of critical habitat for the spotted owl?
A: Could you be more specific in what you mean by "involved"?
Q: Well, were you participating in the rule making? Were you contributing –
A: Well, let me tell you what I did –
Q: Please.