# EXHIBIT E

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| ALFRED ALOISI, et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 95-650L |
| THE UNITED STATES, | ) | Judge Lawrence S. Margolis |
| Defendant. | ) | |

**PLAINTIFFS' ANSWERS TO DEFENDANT'S SECOND SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS**

Pursuant to Rules 26, 33, 34 and 36 of the Rules of the United States Court of Federal Claims, Plaintiffs hereby respond to Defendant's Second Set of Interrogatories and Requests for Production of Documents (Defendant's "Second Set of Discovery") as follows:

**GENERAL OBJECTIONS AND OBJECTIONS TO DEFINITIONS**

1. Plaintiffs object to Defendant's Second Set of Discovery to the extent that it seeks irrelevant information and/or documents.

2. Plaintiffs object to Defendant's Second Set of Discovery to the extent it seeks information and/or documents that are protected by attorney-client privilege, work product doctrine, or any other applicable protection against disclosure.

3. Plaintiffs object to Defendant's Second Set of Discovery to the extent that it is overly broad, vague and ambiguous, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

4. Plaintiffs object to overly broad and unduly burdensome definitions of terms, including pronouns, plural/singular, and entities/persons.

5. Plaintiffs object to the instructions relating to the identification of documents on the basis that, as to produced documents, it is unduly burdensome, as the information is as readily available to defendant as to plaintiffs.

6. Plaintiffs object to the instructions and questions asking for descriptions of oral communications, as documented oral communications may be gleaned from any record of oral communications as readily by defendant as by plaintiffs.

7. Plaintiffs object to Defendant's requests to state all facts about contacts, communications and events pertaining to a response to an interrogatory because it is overly broad and burdensome; Plaintiffs identify and describe sufficient facts to support their substantive responses to Defendant's interrogatories as is practicable.

8. Plaintiffs' general objections and objections to definitions and instructions are incorporated into each and every response herein, regardless of whether specific objections are asserted in response to a particular discovery request.

**ANSWERS TO INTERROGATORIES**

INTERROGATORY NO. 1: For each and every mining claim that Plaintiffs contend was temporarily taken please identify:

a. the date upon which Defendant allegedly first temporarily took each mining claim (the "date of taking")

b. the date upon which the alleged temporary taking ceased;

c. any interim or intervening time period within the range of dates identified in response to l.a. and l.b. during which Plaintiffs contend there was no taking;

d. each and every mineral deposit or resource site within each mining claim that Plaintiffs contend was temporarily taken; and

e. those mining claims and mineral deposits or resources with respect to which Plaintiffs intend to offer proof of a temporary taking at trial.

**ANSWER No. 1**: Plaintiffs respond that Defendant's (Second) Interrogatory No. 1(a)

appears to seek a legal conclusion rather than factual information. To the extent this Interrogatory constitutes a contention interrogatory seeking explication of Plaintiffs' claims in the action, plaintiffs respond as follows.

First, with respect to each lettered paragraph answer to this (Second) Interrogatory No. 1, Plaintiffs do not contend solely that unpatented mining claims were temporarily taken, but also contend that specific property constituting patented, fully private land was also temporarily taken, chiefly the Mt. Laurel parcel (U. S. Mineral Survey No. 3161, Lot 45A), by virtue of Defendant's letter order of January 4, 1990 (FS # 50) ("the Stop Work Order"), which stated, "I must inform you that all activities, including activities on private land accessed through National Forest must stop immediately."

Second, as a legal proposition, defendant has to acknowledge what its obligations to plaintiffs were on July 23, 1990. On that date, the Forest Service no longer had any basis under the Endangered Species Act: (i) not to rescind the Stop Work Order (as to the previously-approved elements of plaintiffs' mining plan of operations); and (ii) not to immediately process the balance of the All Phase Plan of mining operations, as required by its mining plan rules, 36 CFR 228.5(a), and as it formally represented to plaintiffs in its November 1989 plan approval letter, "The [balance of your proposed activities not approved here] will be included in a master Plan of Operation Two with an Environmental Analysis completed in the Spring of 1990 as we agreed at our meeting." (FS # 46.). Until this legal obligation is acknowledged or resolved, there is uncertainty as to the exact dates of the temporary taking, thus:

a. Plaintiffs claim that Defendant temporarily took plaintiffs' rights on each mining claim, and on the private parcel identified herein (and in the Complaint), and the period of the compensable temporary taking commenced, either: (1) on July 23, 1990 (when the U. S. Fish

and Wildlife Service tendered its biological opinion to the U. S. Forest Service that the 38-acre projected area of surface disturbance for the plaintiffs' All Phase Plan of operations for the Liberty Mine would not jeopardize the northern spotted owl); or (2) on the date shortly after July 23, 1990, when in the normal course of business the U. S. Forest Service would have notified plaintiffs of its receipt of that biological opinion and taken the necessary administrative action to authorize plaintiffs to return to work under the approved portions of their All Phase Plan of mining operations. (The "All Phase Plan" is described more specifically in Answer No. 3 below.) Plaintiffs wrote defendant on September 24, 1998, regarding this dating of the temporary taking period (the USFS used other pages of this letter as an exhibit to its March 1, 2007, Motions in the administrative contest). We asked in 1998 that defendant provide plaintiffs with information so that the parties could consider stipulating to these dates:

> Assume the Forest Service had notified plaintiffs of the July 23, 1990, biological opinion on July 23, or on the same date it began taking action on the timber sales "cleared" by the same opinion. Without rereading Marc Williams's deposition, I believe that was actually July 23. How long would it have taken the Forest Service to rescind or undo its "stop order" of January 4, 1990 (Doc. FS #50), as to all previously approved activities (Phase I and those parts of Phase II approved in 1989)? In other words, how long would it have been before plaintiffs could have gone back to work both on the five claims the agency representatives have been sampling, and on the approved Mt. Laurel property apex cut?
>
> ..................
>
> The same exercise pertains to February 1994 when the second Fish and Wildlife Service clearance was rendered. It was only with the February 1994 second clearance that beneficial use of the property for mining was restored to the status quo as of July 23, 1990, that is, with no Endangered Species Act objection to the resumption of operations previously ordered to a halt ....

Plaintiffs submit that the dates the parties might establish using this principle would shortly follow the dates of the Fish and Wildlife Service letters, but the dates cannot be set without fixing the Forest Service's obligations and process (see 36 CFR 228.5(a)) in light of the complete clearance of the entire all-phases plan of operations under the Endangered Species Act

in both letters.

b. Plaintiffs claim that Defendant's temporary taking of plaintiffs' rights on each mining claim, and on the private parcel identified herein (and in the Complaint), and the period of the compensable temporary ended, either: (1) on February 8, 1994 (this is when the U. S. Fish and Wildlife Service tendered its second biological opinion (FS # 184) to the U. S. Forest Service that the 38-acre projected area of surface disturbance for the all-phase plan of operations of the Liberty Mine would not jeopardize the northern spotted owl, in a consultation treated by the U. S. Fish and Wildlife Service as an "informal consultation" not required by section 7 of the Endangered Species Act, in light of the fact that the projected area of surface disturbance and the operations described in mining plan of operations undergoing informal consultation were the for all purposes the same as those evaluated in the July 23, 1990, no-jeopardy opinion); or (2) on the date shortly after February 8, 1994, when in the normal course of business the U. S. Forest Service would have taken the related administrative actions: (i) of authorizing plaintiffs to return to work under the previously-approved portions of their all-phases mining plan of operations; and (ii) of recommencing processing the balance of the All Phases Plan of mining operations under 36 CFR 226.5(a), consistent with the Forest Service's representation to plaintiffs in FS # 46 (plaintiffs refer here to the unanswered 1998 correspondence regarding temporary taking dates set out in Answer 1.a. above); or (3) based on the Forest Service's failure ever to take further action with respect to plaintiffs' mining plan of operations after its receipt of the February 8, 1994, second biological opinion, some much later date.

c. There was no period of time between the earliest date provided in Answer 1.a. (July 23, 1990), and the latest date provided in Answer 1.b. above (in 1994 or thereafter) when defendant, by virtue of its failure to implement its obligations consistent with the 1990 no-

jeopardy opinion, did not wholly prevent plaintiffs from engaging in beneficial use of the property for mining purposes, and did not wholly prevent plaintiffs from working and mining under the previously-approved mining plan of operations.

d. Every "mineral deposit or resource site within each mining claim," and on the private Mt. Laurel parcel, was wholly subject to the temporary taking, and plaintiffs were denied beneficial use for mining purposes of any and all of them. More specifically, the mineral deposits of economic value and present interest to plaintiffs in 1989 through 1995 were those treated as ore blocks in "The Liberty – Eddy Gulch Gold Mines, A Discussion of Grade, Tonnage, Recovery, Economic Calculations and Other Topics and Issues Related to the Liberty vs. USFS Litigation," September 2007 (A-150), and on the nine Spreadsheets that are described in the September 2007 Ferrero Analysis (A-151), and the three sets of maps showing the location and values of these ore blocks (A-152, A-153 and A-154), all of which A-150 through A-154 taken together constitute plaintiffs' working analysis of the design and profitability of their Eddy Gulch mining operation (together, "the September 2007 Ferrero Analysis").

Plaintiffs are not familiar with defendant's phrase "resource sites," but answer that it was not just the mineral deposits on the mining claims (and on and accessed through the private Mt. Laurel parcel) that were temporarily taken for this entire period. It was also the use and enjoyment of all of the same ground for related mine development purposes, transportation of employees, equipment and ore, construction and operation of mining support facilities including stockpiles, mill and related facilities, and as locations for disposal of mine and mill wastes. These lawful mining uses of the mining claims and the private Mt. Laurel parcel render these lands "resource sites" – and beneficial use for mining purposes of the entirety of this ground, including as "resource sites" as so understood, was prohibited to plaintiffs through the entire

INTERROGATORY NO. 7: With respect to each and every lease or license relating to any of the mining claims at issue, please provide the following the information:

a. the circumstances surrounding initiation of any negotiations leading to the execution of each lease or license, including the identity of the individuals who participated in any communication regarding leasing or licensing any mining claim at issue;

b. the date upon which the initial contact between any party, or representative of a party, to the leases or licenses was made;

c. the time period during which each lease was in effect (if the effective period of any lease or license is disputed by the parties to the lease, provide the dates each party to the lease or license contends that the lease was in effect);

d. the amount and date of each payment received pursuant to each lease or license, including in your response the identity of the lease under which the payment was received, from whom it was received, the date of receipt, and the amount received;

e. the total amount in rent or consideration received under each lease or license;

f. whether any lessee developed to production a mine on any leased or licensed mining claim;

g. the amount of gold, or gold-bearing ore, produced from each leased or licensed mining claim; and

h. the quantum of any and all payments received as a production or royalty payment (such as was contemplated in Article 6 found in both FS Document Nos. 142 and 147) under each lease or license.

**ANSWER No. 7**: This Answer employs the same numbering as Answer No. 6, to identify the agreement or offer with respect to which the Answer pertains.

a. (1) By 1991, plaintiffs had been allowed to do no more of the work the Forest Service approved in November 1989 than they had completed by January 4, 1990. Per the sequence of events in the approved phases of the All Phase Plan, the test mill could have been erected, and operating under Forest Service approval, in 1990. Per the plan, income from gold production would have begun to be available to fund succeeding stages in mine development.

As it was, not only had plaintiffs not been allowed back to work, but the Forest Service had lifted not a finger to process the rest of the All Phase Plan of Mining Operations, notwithstanding their representation in November 1989 (FS # 46) to complete environmental analysis on the balance of the All Phase Plan in the Spring of 1990. Plaintiffs mortgaged the Rollin and Mt. Laurel private parcels, and used the loan proceeds to pay expenses, including servicing the equipment payment expenses. The lender - mortgagee on the Mt. Laurel parcel was one David Davies, a business associate of Aloisi's father, who learned of this property and became interested in that loan opportunity at that time.

The Forest Service in early 1992 finally acknowledged its receipt of the July 1990 biological opinion, but then the Forest Service's insisted that plaintiffs' April 1, 1992, version of its All Phase Plan was a new plan, not simply a demanded re-statement of the several submissions that constituted the 1989 All Phase Plan. Plaintiffs, unable to pay on the Mt. Laurel loan note, defaulted, and Davies foreclosed (A-162).

Davies had a business associate in Northern California, in mining, named Mark Gavard, also known to Mr. Aloisi. From Aloisi's perspective Gavard had coveted the Eddy Gulch property for years. When Davies advised Gavard that he was foreclosing on the Mt. Laurel loan (A-162 pertains to this foreclosure sale), Gavard and Davies made some arrangement for Gavard (through WAZCO) to lease, buy or otherwise control the Mt. Laurel property, which they saw as the crucial property for purposes of controlling long-term underground development of the Eddy Gulch property. WAZCO/Gavard approached Aloisi to lease or purchase all the mining claims. From this position, forced on plaintiffs by the Forest Service on the one side and Davies and WAZCO (Gavard) on the other, plaintiffs worked out the 1993 WAZCO Lease Agreement.

(2) The principals of WAZCO were also the principals of LCM, although LCM had new,

additional principals in addition. Plaintiffs understood LCM's motivation to negotiate a successor lease, when lessor notified WAZCO of its default under the WAZCO lease (A-161), to be as follows – LCM had taken an assignment of the WAZCO lease, without notifying lessor or securing lessor's approval, and was either then selling, or intending to sell, stock in LCM, whose primary asset was the assigned WAZCO lease of the Eddy Gulch property. This, plaintiffs understood, was the reason why LCM wanted the LCM LOA, though executed in December 1994, to be effective a year prior, November 1, 1993, and supersede the WAZCO Lease Agreement for that period – a period from in which LCM may have been selling stock on a company whose primary asset was a Lease at risk of termination for breach.

b. (1) Plaintiffs cannot re-create when WAZCO contacted plaintiffs, although it was shortly after Davies initiated foreclosure action on plaintiffs' default on the mortgage of the Mt. Laurel private parcel. (2) Contact between the principals of LCM and plaintiffs was periodic and continual from and through the execution of the WAZCO lease. After the six-month time period provided in Exhibit B of the WAZCO lease for WAZCO to "initiate a mining plan" had passed without WAZCO doing so, plaintiffs were in regular contact with WAZCO about WAZCO's breach of this material contract obligation.

c (1) The WAZCO Lease Agreement was in effect from on or about April 1, 1993, and was superseded on November 1, 1993, per the terms of the LCM LOA. (2) The LCM LOA was executed by the parties in December 1994, and declared that it was effective November 1, 1993. It was terminated on or about September 9, 1999 (A-156).

Plaintiffs are aware of no disputes over these dates. (1) To the extent WAZCO disputed whether its lease was in default due to its breach of the lease terms, that dispute was mooted by the execution of the LCM lease. (2) The termination of the LCM LOA has, to plaintiffs'

knowledge, never been disputed in any way or in any forum.

d. (1) Aloisi believes that he received monthly "minimum production payments" of $500 for 20 months under the WAZCO lease, for April 1993 through November 1994. (2) Under the LCM LOA, LCM made the monthly "minimum production payments" through June 1999. LCM's failure to make the July 1999 monthly payment was one of the breaches on the basis of which the LCM LOA was terminated.

e. Under the WAZCO lease, per lease provisions described in paragraph 7.d., $10,000. Under the LCM LOA, $500 of each monthly payment went not to Aloisi and Goodman, but directly to Melvin Usher to service his lease to Aloisi of three claims Lessor subleased to LCM in the LCM LOA. With the LCM LOA effective November 1, 1993, the 10 months at the $2,500 monthly payment rate had already passed when the LCM LOA was executed. In each of those 10 months, LCM owed an additional net to plaintiffs of $1,500, and LCM owed an additional net sum of $1,715 for the months from September through November 1994. In connection with executing the LCM LOA, LCM made a payment, with other adjustments, of about $17,000 to plaintiffs. After the execution of the LCM LOA through June 1999 when it stopped paying, LCM paid about $93,000 under the LCM LOA.

f. This question was answered in Answer 6, paragraphs (1) and (2) above.

g. Plaintiffs have reason to believe that WAZCO or LCM, or both, removed stockpiled ore from various locations on the property during the period of their Lease Agreement or LOA and had the ore milled at the Bowerman Mill, located outside of Eddy Gulch. Plaintiffs' belief is grounded in the fact that ore mined by plaintiffs from the Klamath Cut, and hauled to Usher Flat in 1989 before the Forest Service shut down the mining operation, was no longer there at some point during these leases, and likewise, ore stockpiled by prior owners of the Mt.

Laurel private parcel near the mouth of the M J Tunnel on that parcel was also removed from the property during this period.

Plaintiffs are aware of no other motive for any lessee to remove this volume of ore from the property other than to have it milled and sell the gold. However, neither lessee ever reported any production of gold to plaintiffs under either lease, and neither lessee ever paid any royalty, as required under either lease, on the production and sale of any gold from those ore piles.

h. Plaintiffs received no "production or royalty payment" under either the WAZCO Lease or the LCM LOA.

---

INTERROGATORY NO. 8: Please describe in detail all investment amounts or costs incurred and/or paid by Plaintiffs with respect to each mining claim at issue that Plaintiffs contend were lost or diminished in value by the alleged temporary taking, including:

a. the amount incurred;

b. whether the incurred amount was paid;

c. the purpose of the cost incurred;

d. the date the cost was incurred; and

e. an explanation as to how, and in what amount, each investment or cost incurred was lost or diminished in value as a result of the alleged temporary taking.

**ANSWER No. 8**:

(1) Plaintiffs detail their investment in equipment to conduct the mining and milling operations in their Answer to Interrogatory No. 10, and as reflected in the expenditures itemized in ledgers and accounting information in A-164 through A-168.

(2) Plaintiffs invested in labor in their 1988 and 1989 operations, as detailed in the produced ledgers and accounting information A-164 through A-168.

(3) Plaintiffs paid Robert Pincombe and his Mara Ventures entity, and through him the

REQUEST NO. 23: Please produce all documents that Plaintiffs may rely upon at trial

**ANSWER No. 23**: Plaintiffs have done so, subject to the objections and qualifications: (1) that expert reports may be completed and discovered when completed at whatever later date is set in pre-trial schedule; (2) that neither party is obligated to have created or shared any demonstrative exhibits they may create and stipulate to use; and (3) that plaintiffs recognize their ongoing obligation to supplement their production should they identify additional responsive documents as they proceed.

Dated: September 24, 2007

Respectfully submitted,

Lawrence G McBride

Lawrence G. McBride
FOLEY & LARDNER LLP
3000 K Street, N.W. – Suite 500
Washington, D.C. 20007
Telephone: (202) 672-5300
Facsimile: (202) 672-5399
E-mail: lmcbride@foley.com