**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

ALFRED ALOISI, et al., )
Plaintiffs, ) No. 95-650L
v. ) Judge Lawrence S. Margolis
THE UNITED STATES, )
Defendant. )

**DEFENDANT'S PROPOSED FINDINGS**
**OF UNCONTROVERTED FACT**

Pursuant to Rule 56, Defendant hereby submits its Proposed Findings of Uncontroverted Fact ("Proposed Findings of Fact"). As Defendant notes in its Memorandum in Support of Its Motion to Dismiss Or, Alternatively, for Summary Judgment, many of the pertinent, uncontroverted facts are set out in the Joint Statement of Material Facts Not in Dispute, filed January 7, 2008 (Dkt. No. 112)("JSOF"). Defendant therefore cites to the JSOF in support of its Proposed Findings of Fact, as appropriate.[1/]

**A. Liberty Mining's June 1989 Plan of Operations**

1. On May 2, 1989, Liberty Mining submitted a two-phased proposed plan of operations. See JSOF, ¶ 19; see also JA 23 at 401-402.[2/] Liberty proposed in Phase I to repair roads, sample the "Klamath Dumps" (i.e., waste material from historic mining operations (see JSOF, ¶ 12)), haul samples to centrifugal concentrators for test runs and, depending upon the Environmental Assessment ("EA") "on the spotted owl situation[,] . . . log and dozer cut apex corridors . . . ."

---

[1/] Citations to the JSOF are intended to include the documents cited therein.

[2/] Citations to "JA[ ]" refer to the Joint Appendix to Joint Statement of Facts, filed December 21, 2007, and the page cite refers to the pages Bates stamped with the prefix, "JA."

JA23 at 401-02; see also JSOF, ¶ 19.

2. Liberty's proposal for Phase II depended upon the test results in Phase I and the EA. In response, on May 25, 1989, the Forest Service submitted a proposed plan for Liberty's consideration that encompassed only the proposed "Phase I" activities. See JSOF, ¶ 20; see also JA24 at 412. Thus, Phase II activities would depend upon the outcome of the "test results from Phase I and NEPA," referring to the National Environmental Policy Act of 1969 (42 U.S.C. § 4321 et seq.). JA24 at 412; see also JSOF, ¶¶ 19, 20.

3. The May 25, 1989 proposed plan was approved with minor modifications on June 6, 1989. See JSOF, ¶ 22; see also JA26.

4. Plaintiffs' plans for future mining activities in Phase II expressly could not be approved until Plaintiffs submitted an "environmental document and operating plan." See JA24 at 408; see also JA26 at 421, 425 (noting that the approved plan authorized only those "activities expressly stated" in the plan).

5. By its own terms, the June 6, 1989 Plan was scheduled to expire on July 31, 1989. See JA26 at 424-25.

6. On about July 27, 1989 Plaintiffs proposed minor additions to the June 6, 1989 approved plan (see JA31), which were approved on August 11, 1989. See JA32. While Liberty proposed to haul material for milling, those plans depended upon the outcome of the proposed sampling and testing. See JA31 at 440.

**B. September 28, 1989 Proposed Plan of Operations**

7. On September 28, 1989, Plaintiffs submitted their "all phase" proposed plan of operations (the "September 1989 Plan"). See JSOF, ¶ 26; see also JA36 at 446. Plaintiffs' "all

phase" plan, however, lacked the necessary information to allow the Forest Service to evaluate all of the activities proposed. See JSOF, ¶¶ 26, 29-33.

8. The September 1989 Plan described four phases of activity, consisting of:

> Phase 1) Klamath Road improvement, Shoo Fly Road Improvement, Schoolhouse Flat Road construction, clearing of work areas, excavation and bulk sampling of apexes at existing cleared areas, setting up screening, crushing and centrifugal concentrating equipment, test processing of sampled material . . . screening, crushing and centrifugal concentrating of Klamath dump material (if justified by test results) . . . .
>
> Phase 2) Contingent on positive results from Phase 1. Remaining road work . . . bulk sampling and test milling of material form [sic] apex road excavation to determine extent of ore distribution, underground exploration . . . .
>
> Phase 3) Contingent on positive results from Phase 2. Production: Underground mining, surface mining of ore zones along apexes, milling . . . Length of production period depends on amount of ore discovered.
>
> Phase 4) Reclamation: Filling, grading, seeding, etc.

JA36 at 449.

9. Plaintiffs did not provide any details for the actual production of any gold (Phase 3). As the September 28, 1989 letter admitted:

> The description of the overall exploration and mining plan presented in this letter is incomplete due to the fact that preliminary feasibility studies have not been completed. Details of ore reserve availability, mining feasibility and milling methods have not yet been determined.

JA36 at 449 (emphasis added).

**C. October 25, 1989 Proposed Plan of Operations**

10. On October 24, 1989, the District Ranger sought "a firm plan . . . by Liberty Mining depicting what areas are going to be developed and how the areas are going to be developed during the next six month and twelve month periods." JA38 at 458; see also JSOF, ¶ 29. That

requested plan, the District Ranger wrote, would "be the foundation for Operating Plan Number Two." JA38 at 458.

11. On October 25, 1989, Plaintiffs submitted a Supplemental Plan of Operations, providing additional details on the activities proposed for Phase 1 and Phase 2, but no further information about Phases 3 or 4. See JA40. The activities proposed in the October 25, 1989 supplemental plan were unformed and dependent on then-unknown results from the proposed preliminary work:

> The amount of material excavated, hauled and milled during the Spring/Summer/Fall of 1990 will depend on many factors, and cannot be accurately projected at this time. Only selected portions of the apexes will be mined in 1990. Much more apex area will remain to be developed on the following year(s) as justified by 1989-90 results.

JA40 at 465 (emphasis added).

12. On November, 27, 1989, the Forest Service submitted a "Liberty Mine Proposed Mill Site Archaeological Reconnaissance Report" to the California State Historical Preservation Officer (SHPO), seeking the SHPO's review pursuant to Section 106 of the National Historic Preservation Act of 1966 (16 U.S.C. § 470a-t, as amended) ("NHPA"). See JSOF, ¶ 34, see also JA46 at 475.

13. Noting that the Forest Service was seeking the SHPO's review of the archaeological report, on November 27, 1989, the District Ranger approved Liberty's proposed Fall 1989 and Winter 1989-90 activities, as set forth in the October 25, 1989 proposed supplemental plan. See JA45 at 472. In his November 27, 1989 letter, The District Ranger made clear:

> The [October 25, 1989] supplemental plan included activities labeled Spring/Summer/Fall, 1990 which would be part of Phase Two of the development of your mine. These activities are not approved at this time because they will be included in a master Plan of Operation Number Two with an Environmental

> Analysis to be completed in the spring of 1990 as we agreed at our meeting on November 1, 1989.

JA45 at 472 (emphasis added).[3]

14. Like Liberty Mining's prior plans, the "activities authorized in the November 1989 approval did not include any activities that could generate income from sale of production from the Liberty Property." Compl., ¶ 23.

15. The termination date for the approved Plan of Operations was adjusted to July 31, 1990. See JA45 at 472; see also JSOF, ¶ 33.

16. The July 31, 1990 termination date subsequently was extended twice, first to September 30, 1990 (see JSOF, ¶ 51), and then to March 31, 1991 (see JSOF, ¶ 55).

17. Although Liberty requested a third extension on March 11, 1991 (see JSOF, ¶ 59), it was not granted.

18. Liberty's approved plan of operations expired on March 31, 1991. See JSOF, ¶ 72, see also JA111 at 1083.

**D. The January 1990 Stop Work Order**

19. The SHPO responded to the Forest Service on December 15, 1989, expressing "fundamental concerns regarding the approach you are taking to Section 106 compliance for this project." JA47 at 498. Specifically, SHPO Gualtieri found that the potential effects of the proposed project could not be adequately evaluated, "without a comprehensive understanding of the scope of both the entire project (and its land disturbing potential) and the historic context and full extent of the historic resource." Id. (emphasis as in original). Based on her concerns with the

---

[3] As the letter noted, Plaintiffs had the ability to challenge the decision pursuant to 36 C.F.R. 251 (see JA45 at 474), but Plaintiffs did not do so.

archaeological field survey, the SHPO concluded that a "finding of no effect for the portions of the project you have considered . . . is premature," and urged the Forest Service to "complete your Section 106 responsibilities for the entire project [Area of Potential Effect] prior to permitting the project to procede [sic]." Id. at 498-99.

20. On January 4, 1990, the Forest Service informed Plaintiffs Aloisi and Liberty Mining, Inc., of the SHPO's decision that "the archeology work that has been completed is not comprehensive for the scope of the area and your project." JA51; see also JSOF, ¶ 36. The District Ranger continued, "SHPO indicates that the entire area must be analyzed before a determination can be made." JA51. He explained that "[w]ithout this complete analysis we would be out of compliance with Section 106 of [NHPA]." Id. The District Ranger concluded that he had "no choice but to inform [Liberty] that all activities including activities on private land accessed through National Forest must stop immediately. No activities should proceed until we receive a favorable determination from SHPO and we notify [Liberty] in writing." Id.

21. In a letter dated February 22, 1990, the Forest Service made clear its authority for stopping work on private lands, explaining that Plaintiffs' "mining-related activities on your private land are interrelated and interdependent with your activities associated with your current and proposed operating plans." JA55 at 513. But the Forest Service also made clear that while Liberty Mining's "surface disturbing activities are still restricted, any non-mining related activities are permissible on your adjoining private lands. These activities could include occupancy of the existing facilities, travel to and from your residence and normal equipment maintenance and upkeep." Id.

22. The Forest Service's letter to Plaintiffs informed them of their ability to

administratively challenge the Forest Service's decision. See JA55 at 514.

23. Plaintiffs did not challenge the District Ranger's decision to stop work pending archaeological clearance from the California SHPO. Instead, Liberty Mining began to receive bids for a cultural resources study. See JSOF, ¶ 41; see also JA57.

24. Liberty decided to forego having the archaeological study completed until the effect of the northern spotted owl on Liberty's operations was resolved. See JA82 at 777.

**E. Liberty Mining's Plans Changed Frequently and Liberty Failed to Provide Necessary Information to the Forest Service Causing Delay**

25. At a March 16, 1990 meeting held at the District Ranger's office, Liberty proposed using "a cyanide vat type [gold] recovery process." JA65 at 594; see also JSOF, ¶ 40. Mr. Aloisi then "admitted that this was a new issue that would need to be addressed in its entirety." JA65 at 594. Liberty was told at the meeting that "significantly more information and coordination would be required and thereby setting back the [Environmental Assessment required under NEPA] until the summer of 1990." Id.

26. In March 1990, Liberty Mining learned from regional and County regulatory agencies that, to operate a cyanide processing system, it would need to file, among other documents, a reclamation plan with Siskiyou County for its approval. JA62; JA64. But Liberty never obtained an approved reclamation plan from the County. See Nov. 1, 2007 Ferrero Tr. at 61:5-14 (discussing JA64) (Ex. A).[4]

27. In 1990, Liberty Mining still was several years away from obtaining the necessary

---

[4] References to exhibits, other than to the JA, refer to exhibits submitted with Defendant's Memorandum in Support of Its Motion to Dismiss or, Alternatively, for Summary Judgment (Defendant's "Memorandum").

permits to use a cyanide recovery process. See JA190 at 1567.

28. In an April 12, 1990 letter, the District Ranger reminded Mr. Aloisi that he agreed to provide "a written proposal describing the specific plans that you have for your new recovery process . . . ." JA69. The District Ranger reiterated that "due to the change of your proposal complexity and lack of available information, it was agreed that the [Environmental Assessment] scheduled for completion in April, will not be completed until mid-summer." Id.

29. The District Ranger again wrote to Liberty Mining on August 27, 1990, stating, "it is apparent that there is a high likelihood that preparation of an Environmental Impact Statement (EIS) will be required for your proposed cyanide leaching process . . . [requiring] probably two years, for the process to be completed." JA82 at 777; see also JSOF, ¶ 51. The District Ranger asked that Liberty inform him of its decision about using a milling process which would require an EIS (i.e., a cyanide process) as soon as Liberty finalized its decision, to minimize any delay. See JA82 at 778.

30. On September 18, 1990, Liberty informed the Forest Service that the "milling process will be determined in the next two years as exploring progresses. No cyanide milling is included in the current plan." JA84 (emphasis added); see also JSOF, ¶ 53.

31. In November 1990, the District Ranger informed Liberty that the Forest Service could not process Liberty's proposals without additional information:

> In order to formulate your proposals into a Plan of Operations we need a specific schedule for completion of phases of development of your operation from exploration to full operation, and we need your specific measures that you plan to use to reclaim the disturbed areas of your operation and a time table for the completion of the reclamation.

JA88 at 823. As the District Ranger further observed:

> It is our understanding that at this time there can be no further activity that would constitute a taking of spotted owl habitat within [a Habitat Conservation Area].
>
> * * *
>
> Until you can provide us with a detailed Plan of Operations, as described previously, we will not be able to answer to what extent your planned activities would be constrained, nor will [we] be able to complete an environmental analysis.

Id. at 824.

32. District Ranger Lee wrote to Mr. Aloisi on December 7, 1990, regarding Liberty Mining's alternative proposal to mine in some existing underground tunnels, further away from "the known owl activity center." JA90 at 828. While District Ranger Lee predicted that Mr. Aloisi's alternative proposal "could probably occur," he stated that the Forest Service "would need to know more about [Liberty Mining's] proposal in detail before an accurate response could be made." Id.

33. On or about March 11, 1991, Plaintiffs submitted a document titled an "Application for Renewal of Existing Plan of Operations with Modifications." See JA94; see also JSOF, ¶ 59. Liberty again informed the Forest Service in its March 1991 proposal that it intended to "[c]onstruct jig and flotation circuit mill at Usher Flat (no cyanide)." JA94 at 906 (emphasis added). However, Liberty describes the March 11, 1991 document as an "outline plan." JA94 at 906. The March 1991 document contains promises of future details to be forthcoming. See, e.g., JA94 at 905-06, ¶¶ 5, 6, 8 & 10. The Forest Service took no action on Liberty's March 11, 1991 submission.

34. Liberty Mining's June 1989 plan of operations, as supplemented, terminated on March 31, 1991, according to the terms of the November 27, 1990 extension. See JA88 at 822.

35. On May 9, 1991, Tom Ferrero, the author of Liberty's operating plans (see, e.g., JA36, JA40, JA94), met with District Ranger Lee to discuss Liberty's potential operations. See JA99; see also Nov. 1, 2007 Ferrero Tr. at 62:11-13 (Ex. A). During that meeting Mr. Ferrero again raised the

possibility of using a cyanide system to recover gold. Nov. 1, 2007 Ferrero Tr. at 66:3-7 (discussing JA99) (Ex. A). As Mr. Ferrero explained at his deposition, "[s]ometimes we think we're going to use cyanide, sometimes we don't. But that was because we were in the process of testing the efficiency of it and weighing the regulatory problems." Nov. 1, 2007 Ferrero Tr. at 67:22-68:16 (Ex. A).

36. In a March 10, 1992 letter summarizing the outcome of a February 11, 1992 meeting with Mr. Aloisi and others, the District Ranger reiterated his November 1990 request for information:

> In order to formulate your proposals into a plan of operations, you have agreed to provide a specific schedule for completion of phases of development of your operation from exploration to full operation. We will also need for you to include your specific measures that you plan to use to reclaim the disturbed areas of your operation and a time table for the completion of the reclamation.

JA111 at 1084. Liberty Mining had failed to submit a detailed plan of operations by March 10, 1992. Id. at 1083.

37. On April 1, 1992, Liberty Mining submitted a new Plan of Operations (the "April 1992 Plan"). See JA114 at 1106.

38. Like its predecessors, the scope of Liberty's April 1992 Plan was contingent upon the outcome of its explorations. See, e.g., JA114 at 1106 ("The objectives of the proposed developments are to determine whether there are reserves of gold bearing [sic] rock of sufficient quality and quantity to warrant mine development . . .").

39. In a letter dated November 10, 1992, the District Ranger requested additional, detailed information before he could approve Liberty's "overall plan as submitted." JA137 at 1223-24; see also JSOF, ¶ 85.

40. In a letter to Mr. Aloisi dated December 21, 1992, the Forest Service repeated its request for information identified in the November 10, 1992 letter, listing the "very minimum . . . information . . . required to restart the preparation of the [Environmental Assessment]." JA142; see also JSOF, ¶ 92.

41. Liberty Mining never submitted the information necessary to complete the requisite Environmental Assessment. See Oct. 29, 2007 Buchter Tr. at 75:4-77:21 (Ex. B).

42. Liberty Mining began to negotiate leasing its mining claims to a company called WAZCO, during the Fall 1992. See Oct. 31, 2007 Aloisi Tr. at 133:12-23 (Ex. C).

43. A lease with WAZCO was executed on or about April 25, 1993, with an effective date of April 1, 1993. See JSOF, ¶ 97.

**F. The Northern Spotted Owl Is Listed as a Threatened Species Under the Endangered Species Act, Spurring the Forest Service to Seek a Programmatic Biologic Opinion from the Fish and Wildlife Service**

44. By 1984, the northern spotted owl was considered a sensitive species by the Forest Service, triggering efforts by the Forest Service to protect the owl and preserve its habitat. See JSOF, ¶¶ 6, 7, 10, & 13. The listing of the northern spotted owl under the Endangered Species Act began in 1987, and was the subject of legal action. See JSOF, ¶¶ 9, 11, 14, 15, & 23.

45. On June 18, 1990, anticipating that the spotted owl soon would be listed as an endangered or threatened species under the ESA, the Forest Service transmitted a Programmatic Biological Evaluation to the Fish and Wildlife Service as part of the required ESA consultation process. See JA76. Although the Forest Service's Programmatic Biological Evaluation focused almost entirely on proposed timber sales in Klamath National Forest, it also included a paragraph addressing Plaintiffs' proposed mining activities. See JA76 at 747. The Forest Service submitted

the Programmatic Biological Evaluation to FWS "to expedite the formal consultation process." JA76 at 719.

46. On June 26, 1990, the Fish and Wildlife Service published the formal listing of the northern spotted owl as a threatened species under the ESA. See JSOF, ¶45.

47. FWS issued a Biological Opinion on July 23, 1990, addressing the "effects of timber harvest and associated activities on the threatened northern spotted owl (Strix occidentalis caurina)." JA80 at 760. While the focus of the Biological Opinion letter was on timber sales, Liberty Mine was included in the opinion. See id. at 761; see also JSOF, ¶ 50. The Biological Opinion contains mandatory requirements for the incidental take of spotted owls pursuant to the Endangered Species Act.[5/] See JA80 at 769-771.

48. FWS authorized "incidental take" of spotted owls "in the form of harassment . . . in compliance with the provisions of the reasonable and prudent measures and terms and conditions of this Incidental Take Statement." JA80 at 770. The reasonable and prudent measures instructed the Forest Service to "[m]aintain essential habitat within close proximity of spotted owl nest sites and activity centers . . . in proposed [Habitat Conservation Areas (HCAs)]." Id. Mandatory terms and conditions were established by FWS to implement the reasonable and prudent measures. Id. at 770-71. To minimize impacts in HCAs where the project cannot be moved (such as a mining claim), FWS recommended "avoid[ing] road construction in HCAs." JA 80 at 772.

49. Liberty Mining's claims are located in a category 1 HCA, and it proposed activities

---

[5/] "'Incidental take' is . . . taking that results from, but is not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or applicant." JA80 at 769. Under the terms of the Biological Opinion any incidental taking "must be in compliance with the terms and conditions of [its] written Incidental Take Statement as directed by [ESA] Section 7(o)(2)." Id.

within 0.5 mile of a known pair of spotted owls. See JSOF ¶¶ 43, 44; see also JA80 at 765-766.

**G. The Forest Service Tries To Implement the Biological Opinion**

50. Within a few months after the Biological Opinion issued, on October 24, 1990, the Regional Forester followed the Fish and Wildlife Service's recommendation and adopted the ISC's Conservation Strategy for the spotted owl. See JSOF, ¶ 54; see also JA86. The Conservation Strategy called for the cessation of logging in HCAs. See JSOF, ¶ 43; see also JA71 at 652. The Regional Forester directed the Forest Supervisors, including the Supervisor of the Klamath National Forest, to comply with the mandatory terms and conditions of the Biological Opinion, and to "document steps taken to implement the Conservation Recommendations." See JSOF, ¶ 54; see also JA86.

51. In April 1991, the Regional Forester released spotted owl survey protocol for FY1991 to the Forest Supervisors. See JSOF, ¶ 61.

52. In May 1991, the Regional Office circulated additional guidance on interpreting and implementing the Conservation Strategy. See JSOF, ¶ 63.

53. Additional guidance was issued in July 1991 describing the responsibilities of a Regional Technical Review Team established to review proposed actions for compliance with the Conservation Strategy. See JSOF, ¶ 65. The July 1991 guidance also set out procedures for evaluating a project area with respect to northern spotted owl populations and habitat. See JSOF, ¶ 65, see also JA 107 at 1038-43.

54. KNF Wildlife Biologist Kathleen Milne Granillo visited Liberty Mining's claims in July 1991, to try to implement the Biological Opinion and explore ways to lessen the effect of Liberty's proposed activities on suitable spotted owl habitat. See Granillo Tr. at 25:8-27:17 (Ex. D).

### H. The Forest Service Initiated an ESA Consultation with the FWS in 1992 Regarding Liberty Mining's April 1992 Plan

55. In April 1991, FWS proposed designating certain areas as critical habitat for the northern spotted owl. See JSOF, ¶ 61. The list of proposed critical habitat areas was revised on August 13, 1991 to, among other things, include the Eddy Gulch area encompassing Liberty Mining's operations. See JSOF, ¶ 68; see also 56 Fed. Reg. 40002, 40042 (Aug. 13, 1991) (proposing as critical habitat for the northern spotted owl Sections 3, 4, 8, 9 and 10 of Township 39 N., Range 11 W., Mt. Diablo Meridian, among others); JA 6 at 142-44 (identifying the Sections, Township and Range of Liberty Mining's claims in Eddy Gulch).

56. On January 15, 1992, FWS published its final rule designating as critical habitat the areas identified in its August 13, 1991 revised notice. See JSOF, ¶ 70; see also Final Rule, 57 Fed. Reg. 1796 (Jan. 15, 1992); JA 145 at 1264 (Deputy Regional Forester Bosworth noting that the critical habitat areas were based on the HCAs).

57. The designation of critical habitat for the northern spotted owl was to provide "additional protection requirements under section 7 of the [ESA] with regard to activities that are funded, authorized, or carried out by a Federal agency." JA138 at 1226 (quoting Final Rule, 57 Fed. Reg. at 1796) (internal quotation marks omitted).

58. Because the area where Liberty Mining's claims were located was designated as critical habitat in January 1992, the Forest Service initiated the ESA consultation process to determine whether Liberty Mining's April 1992 Plan would adversely affect critical habitat of the northern spotted owl. See JA124 at 1177.

59. FWS suspended the consultation pending receipt of additional information from Liberty Mining. See JSOF, ¶¶ 89, 91; see also JA138 at 1225 (FWS letter providing notice to the Forest

Service of suspension of consultation and requesting additional information); JA140 (Dec. 4, 1992 Forest Service letter to Mr. Aloisi providing notice of the suspension and forwarding FWS's letter requesting additional information).

60. Liberty Mining provided the information sought by FWS for the consultation in about March 1993. See JSOF, ¶ 95. That information was forwarded to FWS by District Ranger Lee on April 2, 1993. See JSOF, ¶ 96.

61. Before FWS could complete the consultation on Liberty Mining's April 1992 Plan, Liberty Mining leased its mining claims (including Mountain Laurel mine) to WAZCO on April 25, 1993, effective April 1, 1993. See JSOF, ¶ 97.

62. WAZCO (subsequently operating under the name, Liberty Consolidated Mines, Inc. (LCM)), took over operations relating to the mining claims at issue, and sought Forest Service approval of its proposed plan of operations. See JSOF, ¶¶ 98-100, 103-105, 108-111.

63. FWS completed its consultation on February 8, 1994, concluding that the proposed project was not likely to adversely affect the northern spotted owl. See JSOF, ¶ 101.

64. Although LCM ultimately was approved to operate on August 5, 1996 (three years after taking possession of Liberty Mining's claims), on condition that it post a reclamation bond (JSOF, ¶ 111), LCM never did so (JSOF, ¶ 112), and allowed its lease on the mining claims to lapse in 1999 (JSOF, ¶ 113).

//
//
//
//
//
//
//
//

Respectfully submitted,

RONALD J. TENPAS
Assistant Attorney General
Environment & Natural Resources Division

/s/ Bruce K. Trauben
BRUCE K. TRAUBEN
Trial Attorney
Natural Resources Section
Environment & Natural Resources Division
U.S. Department of Justice
601 D Street, NW
Washington, D.C. 20004
(202) 305-0238 (phone)
(202) 305-0506 (fax)

WILLIAM SHAPIRO
Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Div.
501 I Street, Suite 9-700
Sacramento, CA 95814-2322

OF COUNSEL:
ROSE MIKSOVSKY
U.S. Department of Agriculture
Office of General Counsel
33 New Montgomery St., 17th Fl.
San Francisco, CA 94105-3170

Dated: February 6, 2008