No. 95-650L
(Judge Margolis)

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

ALFRED ALOISI, et al.,

Plaintiffs,

v.

UNITED STATES OF AMERICA,

Defendant.

---

# PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS, OR ALTERNATIVELY, FOR SUMMARY JUDGMENT

---

Lawrence G. McBride
FOLEY & LARDNER LLP
3000 K St., N. W., Suite 500
Washington, D.C. 20007-5143
Telephone: (202) 672-5300
Facsimile: (202) 672-5399

Dated: March 5, 2008

*Attorney for Plaintiffs*

# TABLE OF CONTENTS

**Page**

I. SUMMARY OF DEFENDANT'S ARGUMENTS AND PLAINTIFFS' RESPONSE.....1

A. Ripeness. .....1

B. Whether this is a tort case. .....2

C. Plaintiffs' property interest in the private parcels at the time of the taking.....3

D. *Penn Central* factors – the economic impact of the agency conduct.....3

E. *Penn Central* factors – reasonable investment-backed expectations.....4

F. *Penn Central* factors – the character of the government's action.....4

II. ARGUMENT.....5

A. The claim here is ripe, and not subject to dismissal on "lack of ripeness" grounds.....5

1. The two relevant facets of takings "ripeness" doctrine support Plaintiffs' claim here.....5

2. The issue was the owl clearance, not approval of an all-phase plan of operations.....6

3. The claim is ripe as to the approved but stopped work.....7

4. The agency's rules contradict their plan-approval based ripeness argument .....8

5. The owl clearance is the relevant inquiry, and that issue is fully ripe.....10

B. Defendant's conduct was actionable as a temporary taking; plaintiffs do not have and did not bring tort claims. .....11

C. Plaintiffs had control of, and the right to mine, the private lands during the relevant period. .....12

D. Application of *Penn Central* factors – the economic impact of the agency conduct.....14

1. "Speculative" economic impact.....14

2. Lease revenue and diminution of value ....................16

3. Permanent taking valuation versus temporary taking valuation....................19

E. Application of *Penn Central* factors – Plaintiffs' reasonable investment-backed expectations. ....................20

1. Plaintiffs understood and managed the regulatory risks of operating here....................20

2. Ready to abide by conditions in the biological opinion....................21

3. Trying to Implement, But Getting Nowhere....................23

4. Applying the July 1990 Opinion's Standards....................25

F. Penn Central factors – the character of the government's action. ....................28

III. CONCLUSION....................30

EXHIBIT INDEX:

| Plaintiffs' Exhibit Number | Discovery Production Number | Document Identification or Description |
|---|---|---|
| PE-21 | none | Second Affidavit of Alfred L. Aloisi |
| PE-22 | A-163 | Memorandum of Agreement between Robert Pincombe and Fred Aloisi (1988) |
| PE-23 | A-168 | Excerpts from Liberty Mining, Inc., 1989 accounting records |
| PE-24 | none | Kathy Milne Granillo deposition transcript, October 2, 1997 |
| PE-25 | none | Mark Williams deposition transcript, October 11, 1996 |
| PE-26 | FS-69 | Forest Service internal faxed version of FS-69 / JA-80 |

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Bailey v. United States*,
78 Fed. Cl. 239 (2007) ........ 24

*Bass Enterprises Prod. Co. v. United States*,
54 Fed. Cl. 400 (Fed. Cl. 2002) ........ 20-21

*Bass Enterprises Production Co. v. United States*,
381 F.3d 1360 (Fed. Cir. 2004) ........ 5, 20-21

*Belk v. Meagher*,
104 U.S. 279 (1881) ........ 29

*Boise Cascade Corp. v. United States*,
296 F.3d 1339 (Fed. Cir. 2002) ........ 5

*Clipper Mining Co. v. Eli Mining & Land Co.*,
194 U.S. 220 (1904) ........ 29

*Conti v. United States*,
291 F.3d 1334 (Fed. Cir. 2002) ........ 18

*Cottrell v. United States*,
42 Fed. Cl. 144 (1998) ........ 13

*Del-Rio Drilling Programs, Inc. v. United States*,
146 F.3d 1358 (Fed. Cir. 1998) ........ 24

*First English Evangelical Lutheran Church v. Los Angeles County*,
482 U.S. 304 (1987) ........ 23

*Florida Rock Ind., Inc. v. United States*,
49 Fed. Cl. 21 (1999) ........ 19

*Hansen v. United States*,
65 Fed. Cl. 76 (2005) ........ 13

*Lowe v. United States*,
76 Fed. Cl. 262 (2007) ........ 13

*Marks v. United States*,
34 Fed. Cl. 387 (1995) ........ 18

*Nicholson v. United States*,
77 Fed. Cl. 605 (2007) ........ 23

*Palazzolo v. Rhode Island*,
533 U.S. 606 (2001)....................5

*Tabb Lakes, Ltd v. United States*,
10 F.3d 796 (Fed. Cir. 1993)....................5

*Thune v. United States*,
41 Fed. Cl. 49 (1998) ....................13

*United States v. Etcheverry*,
230 F.2d 193 (10th Cir. 1956) ....................29

*Walcek v. United States*,
44 Fed. Cl. 462 (1999) ....................18, 24

*Whitney Benefits, Inc. v. United States*,
18 Cl. Ct. 294 (Ct. Cl. 1989)....................20

*Whitney Benefits, Inc. v. United States*,
18 Cl. Ct. 394 (1989), aff'd, 926 F.2d 1169 (Fed. Cir. 1991) ....................17

*Wyatt v. United States*,
271 F.3d 1090 (Fed Cir. 2001).................... *Passim*

*Yancey v. United States*,
915 F.2d 1534 (Fed. Cir. 1991)....................19

**FEDERAL STATUTES**

16 U.S.C. § 1536(o)(2) ....................22

16 U.S.C. § 1538....................22

16 U.S.C. § 1539(a) ....................22

30 U.S.C. § 22 et seq....................29

**REGULATIONS**

36 C.F.R. § 226.4(d) ....................11

36 C.F.R. § 228.1 and § 228.8 ....................16

36 C.F.R. § 228.4....................7, 26

36 C.F.R. § 228.4(d) .................... 10-11

50 C.F.R. § 402.14(e)....................7

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ALFRED ALOISI, et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 95-650L |
| UNITED STATES OF AMERICA, | ) | Hon. Lawrence S. Margolis |
| Defendant. | ) | |

**PLAINTIFFS' RESPONSE TO**
**DEFENDANT'S MOTION TO DISMISS**
**OR FOR SUMMARY JUDGMENT**

## I. SUMMARY OF DEFENDANT'S ARGUMENTS AND PLAINTIFFS' RESPONSE.

Plaintiffs break Defendant's motion and opening memorandum, for purposes of response, into six subjects, three of them the Penn Central factors for takings liability. We summarize Defendant's arguments and Plaintiffs' response here:

### A. Ripeness.

Defendant argues that Plaintiffs do not have a ripe taking claim because Plaintiffs never submitted a complete all-phase mining plan of operations that the Forest Service could approve under its plan regulations, 36 C.F.R. Subpart 228, and kept changing its proposals.

Plaintiffs' response is threefold. First, this case is not focused on the Forest Service's failure to approve an all-phase mining plan of operations. It is focused on the Forest Service's actions and inactions in mishandling the most important clearance and review for mining in northern spotted owl country. The critical predicate for any mining plan of operations is the operator knowing, from the agency, whether plan elements will be cleared and allowed, modified or constrained, or rejected in the interaction of the plan and owl protection requirements. This is

what the Forest Service failed to do here – unnecessarily, without basis and for an extraordinary period. Owl clearance is the regulatory hurdle, the permit, at issue here. Liberty went through the process to final clearance twice, so this case is ripe both under finality and unreasonable, bad faith delay analysis.

Second, Defendant's lack of finality arguments based on Liberty's supposed non-cooperation in supplying information on the mining details of its plans of operations is inconsistent with the Forest Service's own regulations. District Rangers must allow sequential operations, and operators on mining claims are not obligated to invent detailed plans for all phases of their operations when later phases are uncertain or dependent on the outcome of the earlier phases for which approval is being sought.

Third, the Forest Service had already approved mining, the installation of a mill, and the generation of revenue from the property until this initial production and all mine development operations were shut down. Unreasonable interference with approved operations cannot be "unripe" for examination under takings standards.

**B. <u>Whether this is a tort case.</u>**

Defendant argues that plaintiffs' grievances here sound in tort, and are thus not actionable in the Court of Federal Claims under the Tucker Act.

This case is about uncompensated interference with the right to use property. Temporary taking jurisprudence advises that the clearest way to show ripe, actionable, extraordinary delay, as well as to show reasonable investment-backed expectations, is to demonstrate bad faith on the part of the agency. Thus temporary taking proof regularly involves claims of improper agency conduct. That legal fact does not turn temporary takings claims, such as this, into tort actions.

**C. <u>Plaintiffs' property interest in the private parcels at the time of the taking.</u>**

Defendant insists that plaintiffs had no cognizable property interest in the Mountain Laurel and Rollin parcels, conveyed by the United States years ago into private ownership, at the time of the taking in 1990.

Defendant has misinterpreted the document production in the case, which admittedly is not complete due to the simple loss and unavailability of material that would complete earlier steps in the land transaction history. To clarify the meaning of the documentary record on this issue, Plaintiffs submit the Second Affidavit of plaintiff Alfred Aloisi to confirm that he and thus Liberty Mining held these two private parcels from 1984 forward under a mining lease-purchase agreement. He then exercised rights under the lease-purchase to acquire full fee title in 1991 in connection with a closing on a mortgage transaction that provided funds to run Liberty Mining.

**D. <u>*Penn Central* factors – the economic impact of the agency conduct.</u>**

Defendant argues that plaintiffs were not deprived of substantially all economic use of the property for two reasons: because Defendant thinks the property only has "speculative" value; and because Plaintiffs were able to realize rental income from the unpatented claims during part of the unreasonable delay period.

Defendant has, however, provided nothing demonstrating whether the property's value is great or small, certain or speculative. Defendant has presented no factual basis on which it can make economic arguments about the value or lack of value of the potential mine.

As to Defendant's claim that Plaintiffs still had value as demonstrated by lease revenue, the possibility of rental income is almost always there in a temporary taking. Plaintiffs present a comparison of the rental (holding) value of the property against the mining (use) value, showing that there was no "mere diminution" in value during the delay period caused by the agency's failure to deal with the owl and Liberty's mining plan.

**E. *Penn Central* factors – reasonable investment-backed expectations.**

Defendant argues that Plaintiffs were unreasonable to think they could ever mine in owl country, and could not have reasonable investment-backed expectations they could succeed.

Plaintiffs have never sought to avoid any proper, lawful and properly administered environmental protection requirement with respect to their operations in Eddy Gulch. What Defendant does not do in its presentation, however, is explain what if any prohibitive regulatory constraint exists regarding this plan. Each time the Forest Service has acted regarding the owl (rather than stalled, failed to decide, or said it was still "working on it" without showing how or when any progress would occur), it said the Liberty 1989/1992 all-phase plan of operations was "approved" (JA-163, at 1342, three committees), or "could proceed as submitted" (JA-111, at 1084). Liberty has never received a letter, decision or other action from the Forest Service that required any modification or adjustment to the 1989/1992 all-phase plan of operations in order to accommodate restrictions that protect the owl.

Liberty Mining reasonably addressed all real permitting issues affecting its mine to the crucial point of owl clearance, where the saga began. What neither plaintiffs nor any permit applicants are obligated to accept is unreasonable and extraordinary delaying action by the agency, without appropriate basis, delay that interferes with their use and nullifies the value of their property, and to have this delivered in ways that ignore agency rules, that are not called for by any resource protection standard, and complete with hidden facts and evaded procedures.

**F. *Penn Central* factors – the character of the government's action.**

Defendant argues that Liberty's operations are legally a "nuisance," subject to prohibition without compensation.

This position is inconsistent with the Mining Law and the agency's own policies implementing the Mining Law, it is inconsistent with the Forest Service's handling of timber

sales in owl country and its regulatory treatment of Liberty's mining plan as a proposed timber sale, and it is otherwise inapplicable to the facts here.

## II. ARGUMENT.

### A. The claim here is ripe, and not subject to dismissal on "lack of ripeness" grounds.

1. The two relevant facets of takings "ripeness" doctrine support Plaintiffs' claim here. First, whether there has been final permitting action or not, an "extraordinary delay in permit processing or bad faith on the part of the agency can give rise to a ripe takings claim notwithstanding the failure to deny the permit." Boise Cascade Corp. v. United States, 296 F.3d 1339, 1347 n.6 (Fed. Cir. 2002), citing Wyatt v. United States, 271 F.3d 1090, 1097-98 (Fed Cir. 2001). In evaluating extraordinary delay, the simple length of the delay is not determinative (see Wyatt, 271 F.3d at 1098). Rather, one examines whether the delay is disproportionate in light of the permit process in which it arises (see Bass Enterprises Production Co. v. United States, 381 F.3d 1360, 1366-67 (Fed. Cir. 2004)), or liability is established with a showing of bad faith on the part of the government. Tabb Lakes, Ltd v. United States, 10 F.3d 796, 799 (Fed. Cir. 1993).

Second, "finality" in permitting does not require a final decision on all aspects of property development before governmental liability may be found. Palazzolo v. Rhode Island, 533 U.S. 606, 619-22 (2001). "Ripeness doctrine does not require a landowner to submit [permit] applications for their own sake." Palazzolo, 533 U.S. at 622. Defendant here insists the matter is not ripe because Liberty never submitted a full-detail life of mine plan of operations complete enough for the Forest Service to approve. But Palazzolo does not require that later permit. The permit here was clearance of mining the Eddy Gulch property with respect to its impacts on the owl. With respect to this permit we have both finality, and extraordinary delay and bad faith.

2. The issue was the owl clearance, not approval of an all-phase plan of operations. In all their "unripe claim" arguments that Liberty's full-scale mining plan of operations was never completed, Defendant never acknowledges the plain reason the plan of operations for full-scale mining operations was never completed to the level of detail that might have satisfied the Forest Service – because the Forest Service behavior aborted the operation before it got there. Both the Forest Service and Liberty recognized that the big issue was the owl during this 1989-90 period, and clarity about the owl's potential impact on any operations had to be acquired before completion of a detailed plans of operations was appropriate.

In other words, the Forest Service was not going to approve any mining plan of operations without first knowing and establishing what if any conditions or limitations on the proposed operation were lawfully imposed in order to protect the owl. Nor did Liberty invest in the next suite of milling equipment it intended to use, before knowing whether and how owl protection requirements would alter or stymy the planned mine development.

Liberty's failure to submit detailed mining plans for the Forest Service to approve those operations – was a direct response to the earlier, baseless, project-killer delay of the Forest Service. The bad faith conduct included the failure to notify Liberty that the Fish and Wildlife Service concluded in July 1990 that the Liberty Mining all-phase plan would not jeopardize the owl for over a year and three quarters, in the face of a regulatory notice obligation. 50 C.F.R. § 402.14(e).

The ripeness "defense" asserted here is impeached by the agencies' own conduct. The FWS had in July 1990 wholly sufficient information about Liberty Mining's plan of operations to render its biological opinion. What was relevant to both agencies for all purposes of protection of the owl was acreage of timber harvest, the board feet of timber cutting and the

proximity of those activities to active owl nests and activity centers. See JA-76, at 750-51 (biological evaluation displaying board feet and acres of harvest); JA-80, throughout, including at 771-72. However incomplete the later phases of Liberty's all-phase mining plan may have been for purposes of final approval under 36 C.F.R. § 228.4, the Forest Service and the FWS never questioned the adequacy of that same plan information for purposes of the 1990 Section 7 consultation. The Forest Service provided the FWS exactly the same level of information for Liberty's mining plan of operations that it provided the FWS for all of the timber sales.

3. The claim is ripe as to the approved but stopped work. In arguing that Plaintiffs' suit is "unripe," Defendant asserts that on July 23, 1990, when Plaintiffs assert the temporary taking arose, Liberty was only approved to do road work and sampling. Def. Br. 23. Defendant cites for this erroneous proposition JSOF recitals pertaining to the June 1989 plan of operations. That plan was simply irrelevant from early 1990 on. Under the District Ranger's unique and unhelpful plan "expiration" practice, that plan expired July 31, 1989. JA-26, at 425. Further, any work allowed under the June 1989 plan and not completed was carried forward in August 1989 (JA-32) and November 1989 (JA-45) approvals that became the approved elements of the October 1989 all-phase plan. The Forest Service authorized much more than road work (JA-45, at 472), including moving the existing gravity separation mill at the E T Placer Pit to Usher Flat, mining and milling of 10,000 tons of apex deposit (JA-40, at 464 Item 3), as well as dump material (JA-88, at 822), with the gravity separation equipment at Usher Flat.

The approved operations the agency indefinitely aborted show that the operation was not preliminary, and the claim is ripe. An evaluation of the initial approved mining and milling operations is straightforward. Spreadsheet 9 of the Ferrero evaluation (JA-191, at 1577) displays the economics of the initial gravity separation operation here. This initial operation involved

moving the existing Liberty gravity separation equipment from the E T Placer site up Eddy Gulch to Usher Flat, with no acquisition costs. The Forest Service approved Liberty to mine and mill 10,000 tons of Klamath and Mountain Laurel apex deposits, a specific work item in the approved sections of the October 1989 all-phase plan (JA-40, at 464, description; JA-45, at 472, approval). Spreadsheet 9 (JA-191, at 1577) provides the data for this simple calculation: processing ore with a cutoff grade of 0.10 and an average grade of 0.152 opt (Line 1, 1st column) in gravity concentration equipment with a recovery rate of 37 % (Line 1, column 4),[1] would yield $21.66 per ton of gold at the $380/oz gold price then prevailing (Line 1, column 6). Given mining costs of $12.85/ton (columns 1-3, at bottom, under "Klamath Apex Operating Costs (All tons)") and the 500 ton per day operating capacity of the existing gravity separation equipment, Liberty would have grossed $216,600 and netted $88,100 in the 20 days of test milling operation (10,000 tons ˙/. 500 tons/day).

The 10,000 tons of ore were already being mined and hauled to Usher Flat when the approved operations were shut down in January 1990. The agency's baseless actions that prevented the resumption of this previously-approved work, and the logical continuation of bulk sampling at this level with comparable results, cannot constitute an unripe claim.

4. The agency's rules contradict their plan-approval based ripeness argument. In its unripeness arguments, Defendant relies heavily on Liberty's claimed non-cooperation in providing the Forest Service the detailed and complete all-phase information it

[1] The 37% recovery rate for straight gravity separation in this calculation is less than the "relatively poor gold recovery" of 40-50% from a gravity – flotation mill circuit, a recovery rate Defendant uses when introducing its arguments about Liberty's interest in a vat cyanide circuit that would double recovery from 40% to 80%. Def. Br. 10. The point is that even without installing the third-level milling suite, in 1989 with existing equipment, these operations made economic sense, and would immediate generate income to fund the next stages of the development program.

demanded in order to approve all phases of these plans. Liberty regarded the details of out-year operations as unimportant for two reasons: first, it was so important to establish initial production and revenue with a working mill; and second, the Forest Service had been giving only seasonal or half-year approvals anyhow. See JA-38, at 458 ("the next six month and twelve month periods").

Beyond Liberty's focus, the agency's own rules governing hardrock mining plans directly address the issue of permitting when the course of later operations are uncertain or contingent. 36 C.F.R. § 228.4(d) provides,

> The plan of operations shall cover the requirements set forth in paragraph (c) of this section, as foreseen for the entire operation for the full estimated period of activity: *Provided*, *however*, that if the development of a plan for an entire operation is not possible at the time of preparation of a plan, the operator shall file an initial plan setting forth his proposed operation to the degree reasonably foreseeable at that time, and shall thereafter file a supplemental plan or plans whenever it is proposed to undertake any significant surface disturbance not covered by the initial plan.

(a) Defendant relies in its ripeness argument on Mr. Ferrero's advice to the Forest Service that Liberty cannot provide the specifics of Phases 3 and 4 of its all-phase plan of operations, because they are in their details dependent on Liberty's analysis and operational adjustments derived from its completion of Phase 1 and Phase 2 of the mining plan, already partly approved. E.g., Def. Br. 7, citing Defs.' Ex. A, and JA-40 and JA-84. Mr. Ferrero's position is wholly consistent with this Forest Service plan approval regulation – the Forest Service must process the plan that the operator seeks approval to conduct, not demand plans the operator may or may not seek to conduct, depending on circumstances not yet established.

Here, the initial development and production that would inform later work was approved, and then aborted, and their ordered cessation was unreasonably and baselessly extended by an extraordinary sequence of agency mistakes, hidden from Liberty, and then by further agency

efforts to cover-up the mistakes and prevent the operation from restarting. Defendant's ripeness claim demands that Plaintiffs meet agency demands inconsistent with the agency's own rules.

(b) Defendant tries to make much of Liberty's examination of the possibility of a vat cyanide circuit as a third element of its mill setup in Eddy Gulch (Def. Br. at 10-12, and 28). This is a red herring unripeness argument. Liberty discussed this possibility with the Forest Service. JA-65. Plaintiffs never submitted a plan of operations that proposed installation of a vat cyanide milling circuit in Eddy Gulch. E.g., JA-84 and JA-94, at 906. The Forest Service never had any obligation to process such a plan, because there never was one. With the cyanide possibility as with demands for all-phase plan detail, the Forest Service argues against its own rules, which required the Forest Service to address the plans the operator knows it will conduct. 36 C.F.R. § 228.4(d).

5. The owl clearance is the relevant inquiry, and that issue is fully ripe. This case is not about the Forest Service's failure to approve an "all-phase" plan of operations. It is about the Forest Service's actions and inactions on the central issue that prohibited all movement toward a complete all-phase mining plan – applying the owl protection standards to the Liberty all-phase plan so that it could either: (a) go forward as is; (b) be modified to avoid prohibited impacts on the owl; or (c) be abandoned as impossible consistent with owl protection requirements. It was in this central element of the permit decision that the agency stalled, delayed and behaved actionably. This claim is fully ripe.

On this record, had Plaintiffs been provided the July 1990 Opinion: Liberty would have funded the Arch Study; moved the gravity separation equipment already on-site at the E T Placer Pit to Usher Flat and operated, first on the 10,000 tons approved in November 1989, and then with additional bulk samples such as those the Forest Service approved in its November 1990

plan extension and modification.[2] Instead, even though the FWS has twice rendered biological opinions concluding that Liberty's all-phase plan of operations would not cause jeopardy to the owl (and the second time around, would not adversely modify its critical habitat), the Forest Service has never taken the basic action of saying what if any conditions or limitations owl protection would require on Liberty's long-pending all-phase plans of operations.

This case was ripe after the decision of the Forest Service in March 1992. It gave with one hand – "the FWS determined that the project could proceed as submitted" (JA-111, at 1084) – and took away with the other, by reinitiating consultation afresh after the first two year delay and refusing to lift a plan processing finger until the second consultation was completed. Adding to that treatment Defendant's argument that the claim is not ripe here because Liberty never got to the end of the permit line with an approvable all-phase plan of operations, the defense here is, "if we act unreasonably, delay and stall you, and hide from you the owl clearance that we both know is critical to designing your mine and committing to develop it, and if we do that early enough in the process a 'ripeness' rule will let us get away with it." This is not the law.

**B. Defendant's conduct was actionable as a temporary taking; plaintiffs do not have and did not bring tort claims.**

Defendant inaccurately tries to characterize Plaintiffs' cause of action as grounded in tort rather than on an uncompensated regulatory prohibition of the use of property. Plaintiffs' demonstration that Defendant's failure to notify them of the existence of the July 1990 Biological Opinion and succeeding acts of delay were extraordinary, unwarranted and had a bad faith strain, is an appropriate or even necessary component of winning a temporary taking case.

[2] JA-88, at 822: "Under your present Plan of Operations with modifications you are approved to do the following: Bulk sample the Klamath Mill dumps. Bulk sample pits at Klamath, Anna Johnson and Incline Ridge."

This Court does not lack jurisdiction over a valid takings claim merely because an element of the Plaintiffs' claim may be characterized as tortious in nature. See, e.g., Hansen v. United States, 65 Fed. Cl. 76, 80-81 (2005) ("it is not fatal to a plaintiff's claim or this court's jurisdiction if the government alleges that the facts might give rise to a tort"). Nor does the allegation and proof of bad faith in government actions remove a takings claim from the jurisdictional purview of this Court. See Thune v. United States, 41 Fed. Cl. 49, 52 (1998) (plaintiff's allegation that a taking resulted from the unconstitutional and unauthorized action of the Forest Service was "not fatal to his taking claim because the complaint as a whole plainly assert[ed] that his property loss is traceable to authorized government action"). A takings claim will survive a jurisdictional attack if there is "some material evidence in the record that establishes the predicates for a traditional takings claim." Id.

The case law Defendant cites contains no elements of the regulatory prohibition of the use of property; this case law is inapposite. The "essence" of the claims in the cases Defendant relies on here was grounded in tort, and some involve common law tort claims. The complaint in Cottrell v. United States, 42 Fed. Cl. 144 (1998), asserted among other grounds intentional and negligent infliction of emotional distress. In Lowe v. United States, 76 Fed. Cl. 262 (2007), the plaintiff alleged that specific government employees engaged in tortious and criminal conduct including negligence per se, wanton negligence, and suppression of evidence. This court has subject matter jurisdiction over Plaintiffs' temporary takings claims.

**C. Plaintiffs had control of, and the right to mine, the private lands during the relevant period.**

Defendant asserts that Plaintiffs only acquired an interest in the Mountain Laurel Mine parcel, Mineral Lot 45A, or the Rollin (or Mountain Laurel millsite) parcel in 1991, and therefore did not have a valid property interest at the time of the taking.

Plaintiffs' Exhibit No. 1 ("PE-1"), the Aloisi Affidavit, at ¶s 7 and 9, explains how Aloisi and his associates in the early 1980s acquired interests in both the unpatented mining claims and the two private parcels from Robert Pincombe (operating as Mara Ventures) and Alexander Patterson. The PE-1 Aloisi Affidavit is perhaps not fully clear on its face that the "Eddy Gulch properties" to which Aloisi refers in its paragraph 7 include not only the unpatented mining claims held by Patterson and leased by Patterson to Pincombe / Mara Ventures, but also the two private parcels (Mineral Lots 45A and 45B), also owned by Patterson and leased by Patterson to Pincombe / Mara Ventures.

To clarify this issue, plaintiffs submit the Second Affidavit of Alfred Aloisi. PE-21 (continuing Plaintiffs' exhibit numbering from their opening brief), "Second Aloisi Affidavit"). The Second Aloisi Affidavit (PE-21, at ¶s 4-7) further explains that his lease-purchase agreements with Patterson operative during the period at issue here were made in mid-1984, and the lease purchase agreement for the two private parcels in the "Agreement dated 1 June 1984" numbered "1." (PE-22-292, plaintiffs' production A-163, attached hereto). As the Second Aloisi Affidavit declares (at ¶ 7), as of 1990 Aloisi was making monthly lease payments under these lease purchase agreements. The monthly lease payments he made to Ruth Patterson, Alexander Patterson's widow, applied to the 1984 lease-purchase agreement for Mineral Lots 45A and 45B. These payments can be identified in the financial records of Liberty Mining shown in PE-23 (plaintiffs' production A-168, excerpt).

Finally, the Second Aloisi Affidavit explains that in 1991, to raise funds for Liberty, Aloisi completed the purchase payment under the lease – purchase agreement with Patterson, and held full legal title to both parcels during that financing transaction, then transferring title to Energel, Inc. who mortgaged the title for the loans, the proceeds of which were used by Liberty.

Aloisi / Liberty had the lease right to mine and use for mining purposes both Lot 45A and Lot 45B at the time of the temporary taking in the case.

**D. Application of *Penn Central* factors – the economic impact of the agency conduct.**

1. "Speculative" economic impact. Defendant argues that plaintiffs cannot show economic harm from what the agency did. Defendant asserts that the only harm plaintiffs claim is "speculative profits." Def. Br. 33. Defendant does not explain the basis on which it insists that Liberty's calculations from years of sampling, assaying, ore volume calculations and metallurgical test are "speculative."[3] Defendant has submitted no evidence regarding the mineral value of the property or its lack of mineral value of the property – none of any kind, so it has established no factual predicate to make any assertion on summary judgment regarding what could or could not be mined from the property (the unpatented claims and the private Mountain Laurel parcel), what the value of the property may be, or whether any value is speculative or not.

Further, Defendant has not made any argument why mining operations could or would not be approved in Eddy Gulch on the property involved in this case. Defendant provides a litany of statutes and standards considered in approving a mining plan of operations and applicable to mining operations (Def. Br. 38-39). However, the only mining plans of operations involving this property on which the Forest Service has taken action in the last two decades – the several 1989 plans, including the first phases of Liberty's October supplemental 1989 all-phase plan, and Liberty Consolidated Mines' in 1996 (PE-16) – the Forest Service has approved. The northern spotted owl did not prevent either of those mining plan approvals, and plaintiffs finally

[3] The government can call anything that it did not allow to happen speculative simply because it did not happen. All mine revenue projections are "speculative" in the meaningless sense of Defendant's pejorative here. Here the government prevents the use of the property in an actionable fashion, and submits there can be no liability because the property use is speculative because it did not happen.

learned in February 1994 (JA-163), that the owl would not have prevented approval of Liberty's 1989/1992 all-phase plan of operations either.

On that basis, is it not "speculation" for plaintiffs to expect that their operations, once presented in the detail required by the Forest Service, would be approved. The Forest Service's rules authorize the agency to "minimize adverse environmental impact" (36 C.F.R. § 228.1 and § 228.8), but they do not authorize the agency to say "no" to a plan of operations which otherwise meets the requirements of its rules.

With their opening brief, Plaintiffs presented their calculation of the economics of the operation they had designed and would have proceeded to work to implement, once allowed to do what the Forest Service first approved in November 1989 and then aborted, and once the government might figure out, or reveal (we may not know which yet) how the agency's requirements for owl protection would prohibit or restrict mining or mine support operations within the property. See PE-2, Ferrero Affidavit. This evidence was presented for the purpose of supporting and demonstrating the validity of plaintiffs' mining claims as a predicate to this motion for summary judgment on the government's liability for a temporary taking. It was also submitted, at minimum, to demonstrate Plaintiffs' motives and understanding – the basis and premises on which they initiated mining operations in 1989, and submitted their all-phase mining plan of operations – that is, in support of their obligation to show that their investment-backed expectations were and are reasonable.

Absent their making this showing, Plaintiffs would have expected Defendant to respond in their contemporaneous filing that Plaintiffs failed to making any showing on an essential element in a motion for summary judgment regarding government liability, namely, the

demonstration they had the predicate real property interests in the unpatented mining claims to support any takings claim.[4]

Even as compared with the revenues plaintiffs would have derived from bulk sampling using the then-existing gravity separation equipment (as described above), it is clear that the period of the claimed temporary taking here was one in which plaintiffs were deprived of substantially all economic use of their property. Defendant does not dispute that no mining was authorized on any of the property during the entire period from January 4, 1990 through August 5, 1996, when the LCM plan was approved (see PE-16). Likewise, no surface use except for certain road work (not involving heavy or motorized equipment, see JA-108) was authorized during this entire period. See, e.g., Whitney Benefits, Inc. v. United States, 18 Cl. Ct. 394, 404-05 (1989), aff'd, 926 F.2d 1169 (Fed. Cir. 1991) (rejecting Defendant's assertion that alternate economically viable uses remained for plaintiffs' coal property, such as the right to ranch and farm).

Defendant has not argued there is any other lawful use of unpatented mining claims than mining purposes, nor as a matter of fact that there is any other commercial use of the patented Mountain Laurel property (Mineral Lot 45A) other than in connection with mining – using the portals there to access the underground deposits.

2. Lease revenue and diminution of value. The case law cited by Defendant is inapposite and does not provide support for the conclusion that the deprivation of substantially all economic value of a property can be remedied through the incremental monetary gain

[4] Plaintiffs have agreed with Defendant that this showing, and the economic evidence involved, is solely for the purposes of proceeding with briefing and decision on the government's liability, or lack of liability, on summary judgment, and that the parties' rights and opportunity to expert discovery are deferred and reserved in connection with all subsequent proceedings in the case, including on the issue of damages.

received from lease rental income.[5] Defendant argues that Plaintiffs' lease rental income disproves the deprivation of substantially all economic value in the property during the mining prohibition period. The WAZCO lease provided for a rental (called in its Article 5 a "Minimum Production Payment," as it is credited against actual Production Payments when those begin) beginning at $500 per month for the first two years of the Lease, and increasing in its third and succeeding years to $1000 per month. JA-158, at 1307. $6000 per year in income from these claims would barely keep a lessor in beans and rice; $12,000 is well below poverty level. The point of a mineral lease is production, and the revenues from it.

WAZCO, the property's lessee, had a different plan of development for the property than Liberty Mining. It involved solely the mining of underground deposits. Whether WAZCO did so for the purpose of moving directly to the high-grade long-term target deposits for development of the Gulch, or for the purpose of avoiding the problems Liberty Mining had had with its plan initiating property development with surface operations using the old mine dumps and the exposed apex cuts, is not critical.

The mining plan of operations of WAZCO (rather, of Liberty Consolidated Mines, Inc. ("LCM") after WAZCO) described their project, which the Forest Service approved in 1996 (PE-16), as mining an underground ore body accessed from the May Tunnel or the Union No. 8 Adit[6]

---

[5] Defendant cites to a number of cases finding that substantially all economically valuable use of the plaintiff's property has not been deprived, and all of which are not applicable to this case. *See* Walcek v. United States, 44 Fed. Cl. 462, 467 (1999) (the cease and desist order provided plaintiffs an alternate use of their property); Conti v. United States, 291 F.3d 1334, 1344 (Fed. Cir. 2002) (sale of banned fishing equipment was possible after use of equipment was banned from use); Marks v. United States, 34 Fed. Cl. 387, 410 (1995) (plaintiff sold the majority of one of the two parcels at issue for "millions of dollars").

[6] JA-35 (map) shows the May Tunnel, with its entry on the Mountain Laurel private parcel. JA-189 (map), at 1542 shows the proximity of the Mountain Laurel and Union claim groups, the May Tunnel and the Litigation Stope. In sum, the Mountain Laurel parcel provided significant value to the lessee of the unpatented mining claims, as it contained the existing access to the underground ore body which was a target of Liberty's, and the focus of the WAZCO/LCM plan

of in excess of 200,000 tons "contain[ing] gold values in excess of 0.5 Troy ounces of gold per ton", processing it through a 150 ton per day mill (at Usher Flat), and milling it with a "combination of gravity and flotation extraction" based on "tests … achieving a 93.4% recovery of contained gold." JA-181, at 1481 and 1483. Mining half ounce ore and milling 150 tons per day at 93.4% recovery would yield 70.05 ounces of gold per day. Operating a full 30-day month and using $380/ounce as the gold price, the operation would produce $798,570 of gold per month. The WAZCO lease (JA-158, at 1307-08) provided for a 10% net smelter return to Aloisi / Liberty as lessor, in other words, $79,857 less 10% of the smelting charge per month.

Comparing $500 per month while production was prohibited to something in the neighborhood of $75,000 per month contemplated by LCM's operation shows the difference between a "rental" value (merely holding the property) on the one hand and production revenues to the lessor (actually using the property for its intended purpose) on the other hand. This is no "mere diminution" in value caused by the prohibition against mining. The "residual value" of holding a property that might or might not ever be mineable due to the Forest Service's unwarranted delays in figuring out whether it could allow mining to be permitted again was less than a hundredth of the value the lessee was prepared to pay the lessor when the prohibition would be removed and the property put to its intended (and only) lawful use, mining activity. See Florida Rock Ind., Inc. v. United States, 49 Fed. Cl. 21 (1999), where a 73% diminution in value was found substantial for purposes of federal liability ($10,500 before to $2,822 after per acre appraised values). Similarly, in Yancey v. United States, 915 F.2d 1534 (Fed. Cir. 1991), the Court of Appeals upheld the trial court's decision, rendered applying the Penn Central

---

of operations. See PE-21, Second Aloisi Affidavit, ¶ 15, with respect to the Mountain Laurel property's value.

factors, that compensation was owed a turkey farmer who suffered a 77% diminution in the value of his turkey flock under a quarantine slaughter order.

3. Permanent taking valuation versus temporary taking valuation. Defendant asserts that Plaintiffs have shown no economic loss, as the "gold remains in the ground." Yes it is still in the ground. But the damages here are the time value of money based on the delay in its realization by the property owner, due to the actionable and unwarranted delay Defendant caused in Plaintiffs' being allowed to realize the income from the property. As this Court held in Whitney Benefits, Inc. v. United States, 18 Cl. Ct. 294 (Ct. Cl. 1989), in appropriate cases, especially in valuing mining properties, the comparable sales or rental income approaches used in residential and commercial real estate sales may be inappropriate and a discounted cash flow or income approach may be appropriate. The cash flow method of property valuation was used in connection with a mineral property in Bass Enterprises Prod. Co. v. United States, 54 Fed. Cl. 400, 404 (Fed. Cl. 2002), where a temporary taking was valued adjusting the cash flow valuation by the period of the actionable delay and "appl[ying] an interest factor to the lost cash flow."[7] Defendant's suggestion that because the property here continues to have economic use after the temporary taking no damages are due is inconsistent with Bass Enterprises, with all economic theory regarding the time value of money, and with the Fifth Amendment grounding of

[7] Defendant uses plaintiffs' allegation of the damages amount in their 1995 complaint. Def. Br. 34. First, for purposes of the arguments in support of Defendant's Motion to Dismiss, Defendant must take the allegation of the complaint to be true. Second, for purposes of the Defendant's arguments in support of their Motion for Summary Judgment, Defendant has submitted not one bit of data or evidence that refutes either Plaintiffs' 1995 allegation or Plaintiffs' 2008 showing of the estimated value of the mining operation intended by Plaintiffs at the time they were stopped (see JA-191, and PE-2, Ferrero Affidavit). Third, plaintiffs filed this complaint so long ago that it pre-dates the Federal Circuit's decisions in Bass Enterprises clarifying the method of valuing property damages in temporary takings cases, as opposed to the methods of valuing fair market value of title in permanent taking cases.

temporary taking jurisprudence – the provision of just compensation for public use of private property, even if the public use is temporary.

Defendant ventures no calculation of the time-value of the deferral for four years of income of the kind analyzed and calculated in JA-191 and explained in the Ferrero Affidavit (PE-2), adjusted by applying "an interest factor to the lost cash flow." It is a substantial amount, perhaps not to the government, but to plaintiffs. Nor does Defendant cite any case that holds that there is a de minimis dollar amount below which regulatory takings are not compensable under the Tucker Act.

**E. Application of *Penn Central* factors – Plaintiffs' reasonable investment-backed expectations.**

1. Plaintiffs understood and managed the regulatory risks of operating here. A property owner may have reasonable investment-backed expectations that allow for the timely use of its property, despite a complex regulatory regime. See Bass Enterprises, 54 Fed. Cl. at 403. A delay that is "disproportionate to the regulatory permitting scheme from which it arises" is not foreseeable, regardless of the complexity of the regulatory regime. See Bass Enterprises, 381 F.3d at 1366, citing Wyatt, 271 F.3d at 1098.

Defendant attacks plaintiffs thus, "Plaintiffs' expectation that they could stake out a mining claim within the KNF and immediately begin extensive mining activities is clearly unreasonable." Def. Br. 39. What is clearly unreasonable is Defendant's characterization of plaintiffs' conduct and expectations. The record is undisputed that Liberty voluntarily agreed with the District wildlife biologist in 1989 to significantly alter and limit its operating plans to accommodate the Forest Service's concerns about owl protection, before the owl was listed as threatened. PE-1, Aloisi Affidavit, ¶ 20; PE-2, Ferrero Affidavit, ¶s 20-22. The record is also undisputed that even before the owl was designated as threatened, plaintiffs did not rush to

resume operations in early 1990, and they waited to complete the Arch Study, with work stopped, to learn what restrictions might lawfully constrain Liberty's operation based on the listing of the owl as threatened, in light of its then-fresh listing as threatened and the understanding some kind of Section 7 consultation with the FWS was going to be required on Liberty's all-phase plan of operations. Defendant's attack characterization carries no citation or reference to the record of this case; there is none available to support that view of Plaintiffs.

2. Ready to abide by conditions in the biological opinion. (a) In arguing that Plaintiffs assumed the regulatory risk they might not be able to operate in owl country, Defendant relies on the "conditions" in the FWS's July 1990 Biological Opinion (JA-80). Def. Br. 16. Defendant insists that the projects cleared by that biological opinion were only cleared subject to conditions, "reasonable and prudent measures" (in the phrasing of Section 7 of the ESA governing biological opinions), and the terms and conditions of the biological opinion authorizing the "incidental take"[8] of owls.

On this record, the Forest Service never applied these reasonable and prudent measures, and conditions for authorized incidental takings of owls (JA-80, at 770-71) to Liberty, period. Clearly, these mandatory conditions have never been applied by the Forest Service to require any change or limitation in Liberty's all-phase plan of operations. When the District Ranger in early 1992 finally admitted the existence of the 1990 biological opinion, he informed Liberty that the "Fish and Wildlife Service determined that your project could proceed as submitted." JA-111, at 1084. No conditions, no restrictions, no areas out of bounds. The District Ranger then

[8] Section 9 of the Endangered Species Act prohibits agencies or individuals from "taking" a threatened or endangered species – harassing, interfering with breeding behavior, or killing an individual of the species – unless that taking occurs under a "take" permit issued consistent with Section 10(a) of the Act, or as provided in Section 7(o)(2) of the Act, consistent with a "written statement" that is part of a biological opinion. 16 U.S.C. § 1538, 16 U.S.C. § 1539(a), and 16 U.S.C. § 1536(o)(2), respectively.

demanded a new mining plan of operations, and upon its receipt, reinitiated consultation with the FWS on that "new" plan, but that is the extraordinary delay saga set out in Plaintiffs' Opening Brief. The point here is that, although the District Ranger never allowed Liberty the benefit of it, he did characterize it as giving Liberty's operations clearance regarding the owl – "proceed as submitted."

(b) Defendant argues that the delays here were not "extraordinary" within the meaning of the temporary takings case law. Def. Br. at 27-29. Defendants cite cases ruling that delays of "approximately eight years" have been condoned as not actionable, quoting Wyatt v. United States, 271 F.3d 1090, 1098 (Fed. Cir. 2001), and cases cited there. However, Defendant acknowledges that "the nature of the permitting process as well as the reasons for the delay" are central to the analysis whether an agency's delays are actionable as temporary takings or not. Def. Br. at 28, citing Wyatt, 271 F.3d at 1098.

In clear contradiction of the preceding argument, in Part II.D of its brief Defendant asserts that "failure to act" cannot be actionable at all under the Tucker Act. Def. Br. 30-31. The two arguments cannot occupy the same space. Defendant does not explain how this argument is consistent with First English Evangelical Lutheran Church v. Los Angeles County, 482 U.S. 304 (1987), and the cases such as Wyatt delineating when agency delay and inaction is actionable under the Tucker Act. This argument is inconsistent with their other delay arguments, and the cases cited are not applicable.[9] None of the cases cited in Part II.D of Defendant's brief deal

[9] Nicholson v. United States, 77 Fed. Cl. 605 (2007), involves the distinct jurisprudence of the flooding cases. More to the point, its holding regarding the need for some government action pertains to a situation where there is no permitting relationship between the agency and the plaintiff. The realm of temporary takings law is wholly in the context of the relationship between the permitting agency and the property owner dependent on the permit for his lawful use of his property. And in the realm of temporary takings law, excessive and extraordinary delay is actionable, Nicholson notwithstanding.

with temporary taking claims, and none of them casts any doubt that the relevant case law here is Seiber, Wyatt, Bass Enterprises, and the other cases analyzing delay (failure to act, indecision, bumbling) under First English and the Tucker Act.

3. Trying to Implement, But Getting Nowhere. Plaintiffs' Opening Brief details how extraordinary the delays in dealing with the owl were here, and how tinged with bad faith the Forest Service's course was. In Defendant's Opening Brief (at 16), a topic heading is, "The Forest Service Tries To Implement the Biological Opinion." The "we tried" content here helps Plaintiffs; it highlights the strange course of hidden action, inaction, bad faith and inexplicable failure of the Forest Service ever to deal squarely with the applicant on the applicant's project.[10] To start, the Forest Service tried to implement the opinion while keeping Liberty in the dark. The regulations prohibit "trying to implement" that way. 50 CFR 402.14(e) directs that the applicant be provided the biological opinion.[11] It is simply clear that this all would have turned out quite differently if the agencies: had not ignored the notification requirement in the first place; and had not thereafter acted to hide the opinion in an unwarranted and unreasonable delay that was hidden from Liberty as it occurred.

[10] This case is thus the opposite of Walcek, 44 Fed. Cl. at 468, and Wyatt, 271 F.3d 1090, 1098-99 (Fed Cir. 2001), where the permit applicants' avoidance of the agency or failure to provide requested information undermined their taking claims. Here Liberty kept asking to engage on the outcome of the owl consultation, and was met with unspecific evasions that there was no word on the owl.

[11] In its note 24, Defendant asserts that Plaintiffs must concede the legality of the government's conduct in order to bring a jurisdictional takings claim. This Court recently ruled in Bailey v. United States, 78 Fed. Cl. 239 (2007), citing and relying on the Federal Circuit's decision in Del-Rio Drilling Programs, Inc. v. United States, 146 F.3d 1358, 1363 (Fed. Cir. 1998), that a takings claim cannot be defeated merely on grounds that the property owner asserts that the government's action was invalid or unlawful – "A claim in our court for just compensation due to a taking is not defeated merely because a property owner believes that the government action that allegedly took his property was for other reasons invalid – or even because he goes so far as to challenge its validity. ... A property owner is free to attempt to invalidate a government decision and also to seek compensation if he alleges that decision resulted in a taking." Bailey, 78 Fed. Cl. at 253-56 (citations omitted).

Defendant introduces excerpts from the deposition of Kathleen Milne Granillo (Def. Ex. D), who described that she arrived in the Klamath National Forest Supervisor's Office as the July 1990 biological opinion was issued. PE-24, at p. 8. She agreed that the July 1990 Opinion was "a big deal in the forest supervisor's office", and it was "the task of the week or weeks to see it implemented." PE-24, at pp. 14-15. Likewise, Mark Williams, the Ranger District biologist with whom Liberty worked out the 1989 owl mitigation of its earlier all-phase plans, testified that the arrival of the July 1990 biological opinion in the District Office "was a watershed. When this came back, it was general knowledge. Everyone was anticipating this." PE-25, at p. 21. One version of the July 1990 biological opinion Defendant produced (PE-26, a version of JA-80), contains the fax transmission print line at its top, showing transmission by fax from the Forest Service's Region 5 ("R5 FS RO") to the Klamath National Forest July 26, 1990.

The Regional Office made sure that the District Office got right on the "big deal," "watershed" task of implementing the opinion. The District Office got right on it, except as to Liberty's all-phase plan of operations. Defendant's best argument that the Forest Service was trying hard to evaluate the Liberty plan against the owl's requirements is deposition testimony of Ms. Milne Granillo that she visited Eddy Gulch nearly a year after the July 1990 Biological Opinion. Def. Br. 17, and Def. Ex. D. So the Forest Service gets around to considering Liberty a year later? Equally telling is that Ms. Milne Granillo's visit to the site led to nothing, resolved nothing, and provided no information or advice to Liberty. There is no document of any kind tied to Ms. Milne Granillo before or after her visit supporting Defendant's assertion that she did <u>anything</u> regarding the Liberty plan of operations in 1990 or 1991, much less anything that moved the project forward in any way.

The most specific reference to any active anything regarding Liberty is in the District Ranger's August 27, 1990, letter, "The determination of how your operation will affect and how it will be affected by the Habitat Conservation Area (HCA) has not been completed by the [FWS]. The report is not scheduled to be issued by the [FWS] until September first of this year." JA-82, at 777. However, no such determination was ever provided to Liberty, and on the record of this case none was prepared, even though the "report" was expected only five days after the letter announcing there would be a "report."

4. Applying the July 1990 Opinion's Standards. The "we tried" is hollow in another respect; there is no document from 1990 through to early 1992 (when critical habitat was designated) showing anyone applying the July 1990 Opinion's mandatory conditions for incidental take (harming, disturbing nesting, etc.) of owls in projects cleared by the biological opinion. Assume the Forest Service was implementing the ISC Conservation Strategy on July 23, 1990, and thereafter. The ISC Report, dated May 1990 (JA-71, at 679), directs that "mining activities should be reviewed case by case for approval by the interagency body organized to review implementation of this conservation strategy."

There is no evidence in this record that the Forest Service ever submitted this mining activity to any interagency body in 1990, 1991 or 1992. They did so sometime in early 1993 (see JA-163, at 1342), two and a half years after the biological opinion, but only in connection with the reinitiated consultation. And when that review of Liberty's 1989/1992 all-phase plan of operations finally occurred, the FWS reported that "the [Interagency Technical Review Team/Interagency Northern Spotted Owl Conservation Group and two other] groups have

determined that the proposed Liberty Mine complies with current direction, court mandates, and regulations." Id. [12]

By including the Liberty Mining project in its June 1990 Biological Evaluation and Section 7 consultation for proposed timber sales, the Forest Service determined that the Liberty Mining plan of operations was appropriately treated under the Forest Service's silviculture standards – "The purpose of this biological evaluation is to determine the potential effects of the Klamath National Forest (KNF) planned timber sale program on the Northern Spotted Owl …." JA-76, at 721. If silviculture handling was appropriate, two points follow. First, the previously approved portion of Liberty's all-phase plan should have been treated as a sold timber sale rather than a proposed timber sale. As the ISC Report stated (JA-71 at 653),

> Undoubtedly, other timber sales have been awarded within HCA boundaries, but not yet cut. Cancellation of these sales would result in significant costs to taxpayers and considerable economic and social disruption. These awarded sales may proceed on the condition that [no owls are found there]. If a pair exists, all sale units within ½ mile of the center of owl activity should be excluded from the timber sale through standard [contract] modification procedures. The result may entail buyback of the [timber harvest] units.[13]

---

[12] These committees were reviewing Liberty's April 1992 plan of operations, which, just like the October 1989 plan of which it was a restatement: (a) contained no proposal for any cyanide mill circuit; and (b) was still indefinite as to the operations that would be undertaken during the full-scale operations phase (the third phase of its all-phase descriptions), because the second phase of completed multiple bulk tests to perfect the milling circuit had never been allowed to occur. The point here is that plaintiffs' description of the mine development activities in the plan of operations necessary to clear owl-related review was a different level of detail than might be required for Forest Service's approval of the all-phase plan. Plan incompleteness for 36 CFR § 228.4 Forest Service plan approval meant something quite different than the plan detail necessary for any owl clearance standing as a precondition to the Forest Service action approving the plan of operations.

[13] "Buyback" of sold timber sales means providing the timber contractor a refund of contract payments or equivalent timber elsewhere. Defendant's closing argument (Def. Br. 39-40) asserts that any activity that might cause jeopardy to the owl would constitute a nuisance the prohibition of which would require no compensation. The ISC policy that the Forest Service adopted repudiates that argument of Defendant; if it is a public nuisance to harvest timber in proximity to an owl nest the Forest Service would not have to acknowledge the existence of, and buy back, timber contracts.

Then assume, as to the balance of Liberty's all-phase plan, that the standards for proposed 1990 timber sales applied (since that's the consultation in which Liberty was put). In noting that the July 1990 Biological Opinion conditioned its "no jeopardy" conclusion (Def. Br. 16), Defendant never identifies these conditions, or how they work. Likewise, in 1990 and thereafter no such information was provided Liberty, on this record. The Forest Service never applied the Opinion's "mandatory conditions" to any Liberty all-phase plan of operations. If anyone in the Forest Service did so, that person never documented that fact, or provided that documentation to Liberty.

The FWS provided two "mandatory terms and conditions" for timber "sales that were planned as of July 23, 1990" (JA-80, at 770-71):

> (1) "Eliminate or relocate planned timber harvests … within a 0.5-mile radius of spotted owl nest sites or pair activity centers within category 1, 2, or 3 HCAs, [with an exception for timber harvest where certain habitat conditions would remain after harvest]."
>
> (2) "Between February 1 and July 31, for all pairs outside of HCAs prohibit timber harvest activities within a 0.5-mile radius of spotted owl nest sites or pair activity centers [with the same exception as (1) regarding the remaining post-harvest habitat]."

Outside of these protected areas, the biological opinion authorized the incidental take of owls. Was any or all of Liberty's all-phase plan of operations with the type of HCA in condition (1)? If so, was any activity within the 0.5-mile radius? If so, does the remaining habitat exception apply? There is no evidence in this record that the Forest Service ever applied these mandatory conditions to Liberty's all-phase plan of operations. If these standards were ever applied by anyone, there is no evidence that anyone ever communicated the results of this exercise to Liberty, or to anyone else.

The application of the mandatory conditions to Liberty yields on this record a straightforward "inapplicable" answer. The owl map showing the 1.3 mile radius circle around the relevant owl pair, and within that a dotted line circle showing the 0.7-mile radius, shows even at this small scale that none of the Liberty Mining project area is within the 0.7-mile radius. JA-118, at 1146.[14] The owl data form included there confirms, "[Timber] Removed within 0.7 miles: 0." JA-118, at 1147. Liberty has never sought approval to operate within the 0.7 mile radius since the mitigation Liberty did in October 1989 removed from Liberty's plans the very minor fractions of the operations that were at or inside the 0.7 mile circles.

Defendant's presentation that it "tried to implement," fails to describe the only two things that are relevant: after it received the "big deal," "watershed" biological opinion, what did the Forest Service do to apply it to Liberty's plan of operations and let everyone move forward; and any explanation why it was that nothing happened.

**F. *Penn Central* factors – the character of the government's action.**

To close its brief, Defendant asserts that Plaintiffs cannot meet "the 'character' prong" of Penn Central. Def. Br. 39-40. Defendant's assertion that the exercise of property rights created and maintained under the Mining Law, 30 U.S.C. § 22 et seq., constitutes or should be held by this Court to constitute a "nuisance" such that its prohibition could never be actionable is flatly inconsistent with federal land management policy the Forest Service is charged with implementing.

---

[14] JA-118 is the District Ranger's May 1992 reinitiation request, which is still using silviculture forms and standards to describe Liberty's plan of operations – "Total Sale Acres: 38." JA-118, at 1147. For reasons not explained on this record, however, the Forest Service could not implement the silviculture standards in 1990 and did nothing rather than implement the July 1990 biological opinion.

The lands in the unpatented mining claims in this case are open to the operation of the Mining Law. JSOF-4. Congressionally declared policy is that these lands "shall be free and open to exploration and purchase, and the lands in which [valuable mineral deposits] are found to occupation and purchase." 30 U.S.C. § 22. (See Plaintiffs' Opening Brief on Summary Judgment, at 12, describing the rights of a mining claimant.) The Forest Service's permitting regime for open federal lands acknowledges the property rights created by location, exploration and discovery of the "valuable mineral deposits" referred to in the Mining Law, and authorizes the mitigation but not the prevention of adverse environmental effects reasonably incident to the conduct of Mining Law operations. See 36 CFR § 228.8 – "All operations shall be conducted so as, where feasible, to minimize adverse environmental impacts on National Forest surface resources …." See also 36 CFR § 228.1. This public land use expressly sanctioned by Congress and supported by the Forest Service's plan approval rules cannot constitute a nuisance that can be prohibited without the possibility of takings liability.

The "nuisance" objection is especially irrelevant here on this record, where no federal official has ever advised Liberty that its all-phase plan of operations could <u>not</u> go forward, either for reasons of the owl or any other reason. Over the entire length of the temporary taking period at issue in this case, no federal official ever advised Liberty in any respect how its 1989/1992 all-phase plan of operations had to be modified or revised in any respect in order to be allowed to go forward.[15] To the contrary, every federal official that has gone on record has notified Liberty that its 1989/1992 all-phase plan of mining operations could proceed, without any modification or restriction due to the owl. JA-111, at 1084 – "The Fish and Wildlife Service determined that

[15] As developed in detail in the exhibits to Plaintiffs' Opening Brief (Aloisi Affidavit Ex. 1, ¶ 20; Ferrero Affidavit Ex. 2, ¶s 20-22), in 1989 Plaintiffs modified their project plans to accommodate fully the specific owl mitigation measures sought by the District wildlife biologist.

the project could proceed as submitted …"; JA-163, at 1343 – "The Service … concurs with your determination that the proposed projects [sic] are not likely to adversely affect the [owl] or adversely modify its critical habitat …"; and JA-163, at 1342 – the Forest Service Regional Technical Review Team (6/25/92), the Interagency Technical Review Team/Interagency [Owl] Conservation Group (1/22/93), and the Forest Service Regional Oversight Committee (8/12/92) … have determined that the proposed Liberty Mine complies with current direction, court mandates, and regulations."

## III. CONCLUSION

On this record, Defendant has shown no basis for the granting either of its motion to dismiss, or its alternative motion for summary judgment. This claim is ripe; the showing of economic harm to plaintiffs is clear; plaintiffs had full mining lease rights to the Mountain Laurel private parcel and has valid subsisting unpatented mining claims; this case does not sound in tort; and the proper evaluation of the Penn Central factors establishes an extraordinary administrative delay, colored with bad faith action and inaction, without permitting justification, that prohibited economic use of plaintiffs' property. Plaintiffs' motion for summary judgment on governmental liability should be granted.

Dated: March 5, 2008

Respectfully submitted,

s/ Lawrence G. McBride

Lawrence G. McBride
FOLEY & LARDNER LLP
3000 K St., N. W., Suite 500
Washington, D.C. 20007-5143
Telephone: (202) 672-5300
Facsimile: (202) 672-5399

Attorney for Plaintiffs

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ALFRED ALOISI, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 95-650L |
| | ) | |
| UNITED STATES OF AMERICA, | ) | Hon. Lawrence S. Margolis |
| | ) | |
| Defendant. | ) | |
| | ) | |

**Second Affidavit of Alfred L. Aloisi**

I, Alfred L. Aloisi, being duly sworn, do declare:

1. I am the same Alfred L. Aloisi who executed an Affidavit on January 28, 2008, under the same case caption, and am the same Alfred Aloisi listed as a plaintiff in the captioned case. I am aware that my January 28, 2008, Affidavit was lodged with the Court in the captioned case as Exhibit 1 to Plaintiffs' Motion for Summary Judgment and Memorandum in Support on February 6, 2008.

2. In paragraphs 8 and 9 of my January 28, 2008, Affidavit, I described the history of my acquisition of interests in the mining property in Eddy Gulch, both the two patented, private parcels known as Mineral Lot 45A (the Mountain Laurel Mine) and Mineral Lot 45B (the Mountain Laurel or Gold Ball Millsite, or Rollin site), and the unpatented mining claims in Eddy Gulch, both the claims held by Mr. Alexander Patterson directly, and those he had leased from others such as Ruth Markon with respect to the Anna Johnson group of claims. As I described some of these events in those paragraphs 8 and 9, I acquired these interests in association with others, including my

business associate in the early 1980s Mr. Robert Pincombe, who did business in the name of Mara Ventures, Inc.

3. Specifically, I described in those paragraphs there: how Mr. Patterson's death led to a failure to make annual filings required to maintain the unpatented mining claims that we were acquiring under lease – purchase agreements; how I located new claims on my own in order to reestablish and preserve the property position in unpatented mining claims that we had been acquiring from Patterson and others under these agreements; and how my relocations prevented the loss of all of the rights of Patterson (now his estate) in the unpatented claims in Eddy Gulch.

4. In paragraph 9 of my January 28, 2008, Affidavit, I declared the following:

"9. At the time I made these new locations of the leased claims, I had paid Mr. Patterson approximately $70,000 under the lease-purchase agreement. I contacted Mr. Pincombe and Ruth Markon and proposed a new business arrangement with each. We agreed with Ruth Markon to pay $50,000 dollars for the Anna Johnson group of claims (this was a new deal – she was to have received $20,000 from Patterson, which she never got). We made a similar arrangement with Mr. Pincombe ($50,000) for all of his interests in the Eddy Gulch properties. Finally, we also made a similar arrangement with the Patterson estate (JA-18), that we would pay $50,000 for the two patented parcels – Mineral Lot 45A (the Mountain Laurel Mine) and Mineral Lot 45B (the Mountain Laurel or Gold Ball Millsite, or Rollin site). Although the ground had come open due to Patterson's failure to file with BLM, and I had on my own preserved the property position by locating the Lost Dutch Boys claim group, I felt that it was a matter of honor that I completed the purchases under the terms previously contracted with Mr. Patterson,

through Pincombe and Mara Ventures."

5. The Memorandum of Agreement dated March 18, 1988 (produced as A-163) memorializes the agreement described in the preceding "Paragraph 9" to pay Mr. Pincombe (Mara Ventures) $50,000 to acquire all of his remaining interest in the rights Mr. Patterson (and then his Estate) held in Eddy Gulch.

6. The "Agreement dated 1 June 1984 with George M. Patterson," listed as number "1" in the Memorandum of Agreement that is A-163, and refers to the lease purchase agreement I entered into with Patterson's Estate in 1984 (after relocating the claims lost by Patterson) for $50,000. Any copy of the 1 June 1984 Agreement with George M. Patterson (Alexander Patterson's brother) has been lost to me. This $50,000 lease-purchase agreement, however, significantly reduced the purchase price on the original pre-1983 lease-purchase agreement between Patterson and Mara Ventures and my associates, that was in effect before Patterson lost the unpatented claims. The purchase price reduction was in consideration for my efforts to relocate the claims and avoid everyone's (Patterson's, Pincombe's and my) losing the unpatented ground to competing locators.

7. During this time I, through Jefferson State and then Liberty Mining, continued to make the $500 per month lease-purchase payments. Several of these monthly lease-purchase payments are reflected on the Liberty expense ledgers produced in this case as A-168, as on pages 6 and 17 of the produced ledger, in payments of $500 each month to Ruth Patterson, widow of Alexander Patterson.

8. In my January 28, 2008, Affidavit, I also described events that occurred in the Spring of 1991, during the period when District Mineral Officer then, Harry Frey,

authorized Liberty to undertake certain limited activities under an oral authorization he gave in March 1991.

9. In paragraph 39 of my January 28, 2008, Affidavit, I declared:

"39. Another activity Mr. Frey authorized in the Spring of 1991 was the burning of slash piles and cleanup work, and the brushing of the road from Rollin to the Anna Johnson Mine for the purpose of moving the core drill up to the proposed drill sites. Liberty paid Salmon Mountain Forestry $40,000 to do this work. The funds to pay Salmon Mountain Forestry, and Winthrop and Associates to nearly complete the Arch Study ($12,000), came from bartering Liberty's timber milling equipment for the milled lumber that resulted and mortgaging its patented properties for operating capital ($250,000) (JA-115). Liberty operated under the Frey authorization from March to July 1991."

10. When Liberty (and Energel) sought to raise additional operating capital by mortgaging the two private parcels, both Lots 45A and 45B (Rollin), we paid the remaining balance owed on the Memorandum of Agreement between Pincombe (Mara Ventures) and me (A-163), and between Patterson's Estate and me under the "Agreement dated 1 June 1984" referred to in paragraph 1 of the 1988 Memorandum with Pincombe. This is the mortgaging referred to in the preceding Paragraph 39 of my first Affidavit. It was in connection with this mortgage that Mr. Charles Schultz provided David Davies his assessment (JA-101) appraising the Mountain Laurel property for purposes of the mortgage and describing that the "mine tailings dump contains at least 35,000 tons at 0.097 oz/ton which would yield 3,395 ounces of gold." This was one of Liberty's target dump deposit for its operation aborted in 1990.

11. Thus I held the right to use and mine Mountain Laurel Lot 45A and Rollin Lot 45B from 1984 under the agreement with George Patterson, and then held full legal title briefly in 1991 during the closing in which we completed the purchase of the rights previously held under lease. I then conveyed to Energel who mortgaged the Mountain Laurel property to David Davies, and with Lot 45B mortgaged to the life insurance company with which David Davies was affiliated. I with my various associates (from Mara Ventures through Jefferson State to Liberty) held and controlled the Mountain Laurel property from the early 1980s under lease-purchase agreement, and conveyed full title to Energel in 1991.

12. I have read "Defendant's Motion to Dismiss, or Alternatively, for Summary Judgment" also filed February 6, 2008, in the captioned case. On page 18 of that filing it is stated, "… Liberty leased its mining claims (including Mountain Laurel Mine) to WAZCO on April 25, 1993, effective April 1, 1993." This is not true. In 1992, prior to this lease, the holder of the note on the Mountain Laurel property (David Davies) who had loaned Energel capital security by the mortgage of Mineral Lot 45A, the Mountain Laurel Mine, foreclosed on the loan. The papers in JA-115 reflect this transaction. Although Exhibit A to the WAZCO Lease (JA-158, at 1323) mentions a "letter of understanding" with respect to Mineral Lot 45A, WAZCO acquired the Mountain Laurel Mine property directly from David Davies, Energel's successor through foreclosure. Mineral Lot 45B (Rollin) was not involved in either the WAZCO lease (JA-158), or the successor lease between Don Goodman and me and Liberty Consolidated Mines, Inc. (LCM).

13. The Mountain Laurel Mine, Mineral Lot 45A, was and is the key to restarting

underground mining operations in Eddy Gulch. This is clear from the plan of operations submitted by WAZCO's successor, LCM, which the Forest Service ultimately approved in 1996. It called for mining an underground orebody accessed from the May Tunnel or the Union No. 8 Adit of in excess of 200,000 tons "contain[ing] gold values in excess of 0.5 Troy ounces of gold per ton", processing it through a 150 ton per day mill (at Usher Flat), and milling it with a "combination of gravity and flotation extraction" based on "tests ... achieving a 93.4% recovery of contained gold." JA-181, at 1481 and 1483. The May Tunnel is on the Mountain Laurel property, even though the underground ore underlies unpatented lode claims in the Liberty property position.

14. After the foreclosure on the Mountain Laurel property in 1992, Liberty was faced with two overwhelming obstacles: the Forest Service continued to delay any chance at initiating the development of Eddy Gulch starting with surface apex and dump mining operations, given the reinitiation of consultation on the effects of the 1989/1992 Liberty all-phase plan on the owl; and the best approach to developing the underground deposits in the property, through the accessible existing workings of the Mountain Laurel Mine, had been was lost through the 1992 foreclosure. WAZCO and LCM, however, even if they acquired the Mountain Laurel Mine from Davies, could not develop underground ore through the May Tunnel on the Mountain Laurel property without generating the same ownership dispute and trespass claims regarding those underground deposits that led to the naming of the "Litigation Stope" when the Union claims and Mountain Laurel Mine were under different ownership and litigated which property position owned the ore body both claimed to own.

15. Under these circumstances, Liberty determined to lease the unpatented

mining claims it controlled to WAZCO as the best way to advance the development of the property. WAZCO (and then its successor LCM) would fully control these underground deposits: holding the legal right to mine ore that is controlled by the unpatented mining claims as the down-dip extension of the vein which has its apex in the unpatented claims; and controlling the easiest and least expensive physical access to these deposits through the tunnel opening on the Mountain Laurel private parcel. This course, at the time in 1993, also appeared to be the most promising way for Liberty to earn mining revenue (although through a production royalty on underground production).

Subscribed and sworn before me by ____ on this 3rd day of March, 2008.

____ Notary Public, State of California

My commission expires June 7, 2010

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California
County of [illegible] }

On [illegible] (Date) before me, [illegible] (Here Insert Name and Title of the Officer),

personally appeared [illegible] (Name(s) of Signer(s)),

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

RONALD O. ROBISON
Commission # 1666654
Notary Public - California
Siskiyou County
My Comm. Expires Jun 7, 2010

Place Notary Seal Above

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature [illegible] (Signature of Notary Public)

## OPTIONAL

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Description of Attached Document**

Title or Type of Document: [illegible]

Document Date: 3/3/08 Number of Pages: [illegible]

Signer(s) Other Than Named Above: ______

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: ______
- ☑ Individual
- ☐ Corporate Officer — Title(s): ______
- ☐ Partner — ☐ Limited ☐ General
- ☐ Attorney in Fact
- ☐ Trustee
- ☐ Guardian or Conservator
- ☐ Other: ______

Signer Is Representing: ______

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

Signer's Name: ______
- ☐ Individual
- ☐ Corporate Officer — Title(s): ______
- ☐ Partner — ☐ Limited ☐ General
- ☐ Attorney in Fact
- ☐ Trustee
- ☐ Guardian or Conservator
- ☐ Other: ______

Signer Is Representing: ______

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

©2007 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org Item #5907 Reorder: Call Toll-Free 1-800-876-6827

A.163

MEMORANDUM OF AGREEMENT

Jefferson State Exploration and Development Co.
P.O. Box 1214
Ashland, Oregon 97520

Sirs:

RE: Mineral claims held by Mara Ventures, Inc.
in Eddy Gulch, Siskiyou County, California

This to confirm our understanding and agreement that Jefferson State Exploration and Development Co. will acquire all the interests of Mara Ventures, Inc. in the following Lease/Option agreements:

1. Agreement dated 1 June 1984 with George M. Patterson, Executor of the A. R. Patterson Estate covering Mineral Lot 45A and Mineral Lot 45B. (Recorded in Volume 8 of Patent, page 219)

2. Agreement dated 12 July 1984 with Ruth Markon covering the Anna Johnson, Surprise No. 2, S95, S96, AJ104 and AJ105 located mineral claims.

The purchase price for the above mineral interests is:

$50,000.00 U.S. in cash and a 1 percent gross royalty on any sales of minerals from all hard rock claims held now or in the future by Jefferson State or any other affiliated or subsidiary companies in Eddy Gulch. This royalty to be paid quarterly from any production from the area. Mara Ventures, Inc. will be provided access to any production records, and the royalty may be paid in cash or kind at Mara Ventures, Inc.'s option.

The initial cash payment must be paid by April 30, 1988 or this agreement will terminate. In the event a more formal agreement is required it will contain the above terms and conditions and such others as our respective solicitors deem necessary for an agreement of this kind.

Mara Ventures, Inc.

[signature]
Robert B. Pincombe, President

Agreed to and accepted this 18th day of March, 1988.

Jefferson State Exploration and Development Co.

[signature]
Fred Aloisi, Secretary

PE-22-292

STATE OF ....Oregon..........)
COUNTY OF...Jackson.................) ss.:

On this ..18th..day of ......March....... 19 ..88., before me personally came ......Robert B. Pincombe and Fred Aloisi.......................................................

to me known and known to me to be the individual described in and who executed the foregoing instrument and acknowledged that he executed the same.

Susan C Deomuke
Notary Public
My Commission Expires: 9/6/90

STATE OF ....Oregon..........)
COUNTY OF...Jackson.................) ss.:

On this ..18th.day of ....March.......... 19 .88.., before me personally came ..............Robert B. Pincombe and Fred Aloisi.............................................

to me known and known to me to be the individual described in and who executed the foregoing instrument and acknowledged that he executed the same.

Susan C Deomuke
Notary Public
My Commission Expires: 9/6/90

A-168 (1)

# PROFESSIONAL REGISTER SYSTEM

Liberty

PAYMENT RECORD

DATES: FROM April 1989 TO Aug 1989

NUMBERS: FROM 1001 TO 1299

PE-23-294

A-168(6)

REMINDER: RECORD AUTOMATIC PAYMENTS OR DEPOSITS ON DATE OF TRANSACTION THAT AFFECT YOUR ACCOUNT.

| NUMBER | DATE | DESCRIPTION OF PAYMENTS – DEBITS – FEES OR DEPOSITS – CREDITS | AMOUNT OF PAYMENT-DEBIT OR FEE (–) | T ✓ | DATE OF DEP. | DESCRIPTION OF DEPOSIT | AMOUNT OF DEPOSIT OR CREDIT (✓) | | BALANCE FORWARD |
|---|---|---|---|---|---|---|---|---|---|
| | | BALANCES BROUGHT FORWARD | | | | | | | |
| 1097 | 5/16 | To Precision Weld inc<br>For | 141 – | | | | | Pay't or Dep.<br>Bal. | 141 00 |
| 1096 | 5/17 | To Crater Auto Supply<br>For Paint + | 22 75 | | | | | Pay't or Dep.<br>Bal. | 22 75 |
| 1098 | 5/17 | To Southern Oregon R.V.<br>For Trailer Brake | 92 24 | | | | | Pay't or Dep.<br>Bal. | 92 24 |
| 1099 | 5/17 | To Cash<br>For petty cash | 100 – | | | | | Pay't or Dep.<br>Bal. | 100 – |
| 1100 | 5/17 | To Peter Smith<br>For Reimburse fees shop rent | 200 – | | | | | Pay't or Dep.<br>Bal. | 200 – |
| 1101 | 5/17 | To Bill Barton<br>For Misc. Shesh | 400 – | | | | | Pay't or Dep.<br>Bal. | 400 – |
| 1102 | 5/17 | To Marty Brown<br>For Work on Brown Bear | 225 – | | | | | Pay't or Dep.<br>Bal. | 225 – |
| 1103 | 5/ | To Crater Auto Supply<br>For Parts- | 182 58 | | | | | Pay't or Dep.<br>Bal. | 182 58 |
| 1104 | 5/22 | To Daniel C. McLean, P.E.<br>For Retainer | 1000 – | | | | | Pay't or Dep.<br>Bal. | 1000 – |
| 1105 | 5/22 | To Ruth Patterson<br>For Mineral Lots 45 A + 45 B | 500 – | | | | | Pay't or Dep.<br>Bal. | 500 – |
| 1106 | 5/22 | To James Kendle<br>For Draw | 500 – | | | | | Pay't or Dep.<br>Bal. | 500 – |
| 1107 | 5/22 | To Radio Shack<br>For Batteries for CD's | 9 18 | | | | | Pay't or Dep.<br>Bal. | 9 18 |
| 1108 | 5/22 | To William Barton<br>For Food + Supplies - To Sawyers | 200 – | | | | | Pay't or Dep.<br>Bal. | 200 – |
| 1109 | 5/25 | To Madlyn Pietila<br>For Recover Seat, D-c | | | | | | Pay't or Dep.<br>Bal. | 170 –<br>2182 71 |
| 1110 | 5/25 | To Peter Smith<br>For P/n | 351 97 | | | | | Pay't or Dep.<br>Bal. | 351 97 |
| | 5/25 | To Deposit<br>For | | | | Tombstone - 7500<br>Steve Wilson 6000 | 13500 – | Pay't or Dep.<br>Bal. | 13500 –<br>8113 26 |
| 1111 | 5/25 | To William Barton<br>For P/R | 688 59 | | | | | Pay't or Dep.<br>Bal. | 688 59 |
| 1112 | 5/25 | To Simon Kindle<br>For P/R | 500 82 | | | | | Pay't or Dep.<br>Bal. | 500 82 |
| 1113 | 5/25 | To Fred Aloisi<br>For P/R | 1000 82 | | | | | Pay't or Dep.<br>Bal. | 1000 82 |
| 1114 | 5/25 | To Blake Short<br>For P/R | 1296 46 | | | | | Pay't or Dep.<br>Bal. | 1296 46 |
| | | AMOUNTS FORWARDED | | | | | | | 4626 57 |

PE-23-295

A 168 (17)

REMINDER: RECORD AUTOMATIC PAYMENTS OR DEPOSITS ON DATE OF TRANSACTION THAT AFFECT YOUR ACCOUNT.

| NUMBER | DATE | DESCRIPTION OF PAYMENTS – DEBITS – FEES OR DEPOSITS – CREDITS | AMOUNT OF PAYMENT-DEBIT OR FEE (–) | T ✓ | DATE OF DEP. | DESCRIPTION OF DEPOSIT | AMOUNT OF DEPOSIT OR CREDIT (✓) | | BALANCE FORWARD |
|---|---|---|---|---|---|---|---|---|---|
| | | BALANCES BROUGHT FORWARD | | | | | | | 3709 73 |
| 1019 | 4/14 | To Honda of Medford<br>For Deposit for generators | 100 — | ✓ | 834 | | | Pay't or Dep.<br>Bal. | 100 —<br>3609 73 |
| 1020 | 4/14 | To Northwest Link 4X4<br>For Bed caps (LINK) | 91 — | ✓ | 834 | x | | Pay't or Dep.<br>Bal. | 91 —<br>3518 73 |
| 1021 | 4/15 | To Ruth Patterson<br>For Mineral Lots 45A + 45B | 500 — | ✓ | 820 | BUYING | | Pay't or Dep.<br>Bal. | 500 —<br>3018 73 |
| 1022 | 4/15 | To Dick's Towing -<br>For Tow Int'l from Exit 119 | 295 — | ✓ | 714 | | | Pay't or Dep.<br>Bal. | 295 —<br>2723 73 |
| 1023 | 4/15 | To U.S. Air -<br>For Tickets to Tuscon | 456 | ✓ | 836 | | | Pay't or Dep.<br>Bal. | 456 —<br>2267 73 |
| 1024 | 4/15 | To Blackbird<br>For Parts | 50 — | ✓ | 834 | | | Pay't or Dep.<br>Bal. | 50 —<br>2217 73 |
| 1025 | 4/15 | To Charles Spencer<br>For Big Cliff - Finder's fee | 210 — | ✓ | 714 | | | Pay't or Dep.<br>Bal. | 210 —<br>2007 73 |
| 1026 | 4/17 | To Work on Brown Bear<br>For Paul Contoni | 375 — | | 714 | O/S | | Pay't or Dep.<br>Bal. | 375 —<br>1632 73 |
| 1027 | 4/17 | To<br>For Work on Brown Bear | ~~225~~ | | VOID | | | Pay't or Dep.<br>Bal. | 225 —<br>1407 73 |
| 1028 | 4/17 | To Fred Alesi - week of 4-17-89<br>For Trip to Sawyers + Sacto | 257 — | ✓ | 836 | | | Pay't or Dep.<br>Bal. | 257 —<br>1150 73 |
| 1029 | 4/17 | To Contractors Quarry Supply<br>For Underground Lights | 250 75 | ✓ | 714 | | | Pay't or Dep.<br>Bal. | 250 75<br>899 98 |
| 1030 | 4/18 | To Lazy Acres Motel<br>For Rent - Week of 4-17-89 | 191 — | ✓ | 836 | | | Pay't or Dep.<br>Bal. | 191 —<br>708 98 |
| 1031 | 4/18 | To Federal Express<br>For Bob Elsman | 12 — | ✓ | 827 | | | Pay't or Dep.<br>Bal. | 12 —<br>696 98 |
| 1032 | 4/19 | To Bill's Glass Service<br>For Rear window - Nissan | 69 95 | ✓ | 813 | | | Pay't or Dep.<br>Bal. | 69 95<br>627 03 |
| 1033 | 4/20 | To Bill Barton<br>For Food for week of 4-17-89 | 100 — | ✓ | 836 | | | Pay't or Dep.<br>Bal. | 100 —<br>527 03 |
| 1034 | 4/20 | To Pete Smith<br>For Pickup Gas - Exp Reimbursement | 50 — | ✓ | 836 | | | Pay't or Dep.<br>Bal. | 50 —<br>477 03 |
| 1035 | 4/20 | To Blake Short<br>For Planks - wood for drill pad | 50 — | ✓ | 834 | | | Pay't or Dep.<br>Bal. | 50 —<br>427 03 |
| 1036 | 4/20 | To Elmer's -<br>For Crew Breakfast | 28 Void | | X | | | Pay't or Dep.<br>Bal. | 28 —<br>399 03 |
| 1037 | 4/20 | To Elmer's -<br>For Crew Breakfast | 35 | ✓ | 819 | | | Pay't or Dep.<br>Bal. | 35 —<br>364 03 |
| | | To Void Check # 1036<br>For | | | X | | 28 — | Pay't or Dep.<br>Bal. | 28 00<br>392 03 |
| | | AMOUNTS FORWARDED | | | | | | | |

 FLKS 10/16/97

**In The Matter Of:**

*Alfred Aloisi, et al., v.*
*The United States*

---

*Kathleen Granillo*
*Vol. 1, October 2, 1997*

---

*Bean & Associates, Inc.*
*Professional Court Reporting Service*
*500 Marquette, N.W., Suite 280, Albuquerque, NM 87102*
*119 East Marcy, Suite 110, Santa Fe, New Mexico 87501*

*(800) 669-9492 or (505) 843-9494*

*Original File gr100297.v1, 90 Pages*
*Min-U-Script® File ID: 0792355618*

**Word Index included with this Min-U-Script®**

Page 6

I went to work for the Pacific Southwest Forest and Range Experiment Station, which is the research branch of the Forest Service out of Arcata, the Redwood Sciences Lab.
Q: That's in California?
A: In California, northern California. And I worked on the old growth Douglas fir wildlife study, which took place all over Six Rivers, mostly Six Rivers National Forest, a little bit on the Klamath, K-L-A-M-A-T-H. And then there were equivalent studies going on in Oregon and Washington, and they were looking at old growth fir and wildlife species.
MS. COOK: Slow down a little.
A: The Douglas fir, I worked on that project for about ten months, and then I went back and finished my – passed my orals for my master's. And then I went to work for a professor at UC Berkeley, Dr. Michael Morrison. I worked for him in the Sierra Nevada at Blodgett Experimental Forest, B-L-O-D-G-E-T-T, which is a UC Berkeley Experimental Forest. I worked on studying wintering foraging habits of birds and mixed conifer.
Q: Okay.
A: And then I went to work for – back to Pacific Southwest Forest and Range Experiment Station, but out at Fresno.
MS. COOK: We're going to spend hours correcting this deposition. You're going to have to concentrate on going very slow because a lot of this is going to be new to her.

Page 7

A: PSW.
MS. COOK: Can you start at the beginning of the last sentence? Do you remember where you were?
A: I went back to Pacific Southwest Forest and Range Experiment Station, or PSW, for authority out of Fresno, California, for Dr. Jerry Verner, V-E-R-N-E-R.
Q: What years are we in now?
A: I started there in '85.
Q: Okay.
A: 1985, and I worked for Jerry. I got a permanent position there in 1986 or 1987. I can't remember which.
Q: This is part of the Agriculture Department and part of the Forest Service?
A: It's a research branch of the Forest Service. And I worked for him for four years on monitoring bird populations in the Sierra Nevada. And then in 1988, I transferred to the management side of the Forest Service. I went to the Coronado National Forest in southeast Arizona to the Safford Ranger District as the district wildlife biologist.
Q: Did you deal with owls there in Safford?
A: Yes, somewhat. We had Mexican Spotted Owls in the forest. My main job was working with the Mountain Graham Red Squirrel.
Q: Mountain –
A: Graham, G-R-A-H-A-M. It's an endangered subspecies

Page 8

of red squirrel.
Q: Thank you. And when did you leave Safford and move to your next position?
A: I left Safford in July of 1990 and went to the Klamath. I got to the Klamath like the day or two after the Northern Spotted Owl was listed.
Q: In Safford, you were in a forest supervisor's office for Coronado National Forest, or were you in a ranger district?
A: A ranger district. And then at Klamath, I was the forest – I came as the forest wildlife biologist.
Q: There was only one of you?
A: There was an assistant wildlife biologist already there, Karen Raftery, R-A-F-T-E-R-Y, and then my job, the wildlife biologist.
Q: You said you arrived in the Klamath National Forest. That means in Yreka, California?
A: Yes.
Q: When? In June or July?
A: July. I got there right when the owl was listed.
Q: That would be June.
A: Well, it was when the opinion came out, whenever that was, before the – you're right.
Q: Were you hired specifically because of your familiarity with owls, or did you apply for the job knowing that there was a listing that was going to occur and that you

Page 9

would be working with Northern Spotted Owls?
A: I applied for the job because the forest supervisor called me up and asked me to apply for it.
Q: Who was that?
A: Barbara Holder. And I knew that owls would be a big part of the job.
Q: When you got there, what percentage of the job were they?
A: Owls? Well, they ended up being probably 95 percent of the job.
Q: For most of the time that you were in the forest supervisor's office?
A: Yes.
Q: And how long was that?
A: I left there at the end of November of '92.
MS. COOK: Now, even though you know what he's going to say toward the end of the sentence, let him get all the way through because it makes it so much easier for her.
THE WITNESS: Okay.
Q: Were you the wildlife biologist for Klamath National Forest for that entire period, July 1990 to November 1992?
A: Yes. And I also – there was a change in our organizational structure after – I can't remember how long – a few months, a year, and I became the forest wildlife staff officer.

Page 10

Q: What's the difference between being a staff officer and a wildlife biologist?
A: Well, the staff officers – and there are several. There's a timber staff officer, recreational staff officer, that sort of thing. Those positions are on the forest management team.
Q: So that's a promotion?
A: Well, I did not receive a promotion, but workwise, it was.
Q: In November of 1992, then, where did you go?
A: I came here to Albuquerque to the U.S. Fish and Wildlife Service.
Q: And are you in the same job now that you came to in Albuquerque?
A: No.
Q: Okay. What job did you come here to take in November of '92?
A: November of '92, I came here to be the regional nongame migratory bird coordinator. And I had that job for about a year, and then I became the regional biologist.
Q: Is that the job you have now?
A: Yes.
Q: In your current job, are you involved in section 7 consultations? Is that part of your responsibilities?
A: No. I am in refuges.

Page 11

Q: So you don't deal with the listing of species as threatened or endangered, the listing process?
A: No.
Q: Nor the designation of critical habitat?
A: No.
Q: Not even as it applies to a refuge?
A: We have not had that happen, that I know of, while I've been here.
Q: And while you were in the Klamath National Forest supervisor's office, did you receive any special training in endangered species procedures or practice?
A: Well, when I was at Safford, I had a training session on the Endangered Species Act and consultation.
Q: Where was that held? Is that like a national thing for people in the Forest Service, or do you recall?
A: U.S. Fish and Wildlife Service, Phoenix office, put it on, and I mean, I've had other training that dealt with consultation.
Q: While you were in the supervisor's office in Yreka?
A: Yeah. We had some – not any real formal training, but we would have get-togethers with other biologists in the Forest Service and go over how we were supposed to do consultation packages and whatnot.
Q: If I could ask you to start in with some documents here. I'm going to be referring to the tab numbers, so for the

PE-24-298

Page 12

record, I'm asking you to look at tab 66. This is in the Forest Service index numbering system.

You made reference to arriving on the forest shortly after either a listing or an opinion. Can you be specific about how your arrival was timed with document 66, which is dated June 18, 1990?

A: Well, document 66 is the request for – is the biological evaluation. This was done before I arrived on the forest and sent to the Fish and Wildlife Service.

Q: So you had no role in preparing this?

A: I had absolutely no role in preparing this. When I got there, they had just received the opinion back on this package.

Q: Okay. And what responsibilities did – well, I guess let me ask you, then, if you would turn to document 69. You've said, I think, they had just gotten the opinion back. Is this the opinion back that you were referring to or perhaps one of several?

A: Yes, this one. And we have – this is for planned sales, and we had one for sold sales.

Q: Could you explain the difference between planned sales and sold sales? S-O-L-D sales?

A: Uh-huh, S-O-L-D.

Q: Go ahead.

A: Planned sales are sales that the Forest Service had

Page 13

planned but not yet sold to an operator at, you know, timber operation. Sold sales were sales that we had sold to –

Q: There was already a contract?

A: On the contract, already something in place, that that person was actually going to go out and cut timber.

Q: And was there a difference on how the biological opinion was going to treat those?

A: Yes.

Q: And do you know what that was or how you handled that, how the Forest Service handled that?

A: Well, you know, it's been several years. I would have to look, but I believe the main difference was, planned sales we have more flexibility on. We can alter them. They're not sold. We don't have a contract, so we can change them a lot easier. Sold sales, since we have committed to a contract and there's money involved and all, are harder to change. So the way the Fish and Wildlife Service dealt with those, they wanted us to do more with our planned sales, more modifications than with the sold sales.

Q: Okay. So there was a lot of follow-up to be done after the biological opinion came back on planned sales to complete modifications and do those things?

A: Yeah, there was work to be done to change some of those sales.

Q: And what role did your office, the wildlife

Page 14

biologist for the forest, have in that responsibility implementation?

A: Well, the way that we operate is, the sales are planned by the districts, and they do all the documentation. The forest level, like for this consultation package, we compiled the information for the districts, you know, sent it off. And then when we get it back, we disseminate it back out to the districts, and then it's up to them to implement whatever is called for for any particular project.

And we would, you know, try to alert them to what we thought needed to be done, but they don't work for us, you know. So we would give advice on what they should be doing, and then it's up to the district to do it.

Q: Were you responsible – was there a sequence ordered where you would deal with one ranger district for a week and then the next ranger district, or was this catch-as-catch-can, who phoned who when?

A: There wasn't any real, you know, straightforward do this district then that district. It was just pretty erratic.

Q: Did you have to read this document start to finish when you got on to your job?

A: Yes, I did.

Q: Okay. So when this July 23 biological opinion came back, this was a big deal in the forest supervisor's office? Was this the task of the week or weeks to see it implemented?

Page 15

A: That's a fair characterization.

Q: And did you have assistance in working on that from the supervisor's office? Was there a team of you, or by and large it was for you to deal with the various ranger districts if they had questions about this?

A: Well, myself and Karen, the assistant biologist, dealt with this extensively, and also the timber staff, since mostly it was timber sales that were involved. So Ken Slater, S-L-A-T-E-R, the head of the timber shop and his people were also involved in, you know, trying to make sure the districts knew what was in here and what they had to do.

Q: Okay. You said mostly timber sales. What other kinds of projects were covered?

A: Well, like, the Liberty Mine was in there.

Q: Were there other types of nontimber projects that were covered?

A: I'd have to look. I don't remember.

Q: Okay. And do you remember, was there more than one mining plan of operations involved?

A: I don't remember. I'd have to look.

Q: Okay. Who, then, would have had – was there another program official in the supervisor's office who would have had responsibility, then, for a plan of operations, as opposed to timber sales, as Mr. Slater had timber sales? Someone else?

Page 16

A: Well, yeah, I mean, it's up to the district to deal with each individual project. We did have a minerals staff officer. Dick Ober was there, and Harry Frey, and they were dealing with minerals operations, so they knew about this document. But mainly it was up to the district.

Q: Okay. Was there any difference in priority given to projects where there was an applicant as opposed to projects where there was not an applicant under the Fish and Wildlife Service rules?

A: What do you mean by "applicant"?

Q: Well, if an outside proponent of the project, someone who is seeking approval from the Forest Service to go ahead with something, as opposed to a timber sale, which if it's unsold – correct me if I'm wrong – there is no contractor, and it is just a Forest Service proposal, there is no one coming to the Forest Service with an application that needs to be acted on.

A: Well, I don't think we considered any of these projects to have an applicant.

Q: Okay. Even the mining plan of operations case?

A: Right, because we were consulting on the effects on habitat, the removal of trees, the removal of suitable spotted-owl habitat, which was like that phase-one part of the mining plan and not the entire plan of operations, which we didn't have.

Page 17

MR. MCBRIDE: Off the record for a minute.

(A discussion was held off the record.)

MR. MCBRIDE: Okay. Back on the record.

Q: You were examining or looking at or dealing with the impact on trees and cutting and clearing; is that what you were saying? What were the standards, then, that were being used to determine whether a project was in need of modification or not in need of modification? What sort of impact standards were there on trees or canopy closure or whatever? Do you remember them?

A: Well, are you talking about when the biological assessment was written or after the ISC, the Interagency Scientific Committee strategy came out?

Q: Well, I guess I'm asking about as of the time of the July 23, 1990, opinion, and I don't know the answer. I'll ask you, had the Interagency Scientific Committee come out with its standards?

A: I don't remember when they did that. I know in the opinion they told us some stuff. I'll take a look here. We have to go with what the Fish and Wildlife Service tells us we can do, you know, to avoid taking of a species. And in their incidental take statement, they're talking about –

Q: Could you give me the page of the –

A: Page 111.

Q: Thank you. Go ahead.

PE-24-299

Page 18

A: Talks about preventing disturbance to owl pairs and maintaining essential habitats. And then it goes on, "Having reasonable and prudent measures in order to meet those." Those are the reasonable and prudent measures, and then there are steps to meet those. In there, they spell out about eliminating or relocating planned timber harvest activities within a half mile radius that are in category one, two, or three HCAs.
Q: What are HCAs?
A: HCAs are habitat conservation areas.
Q: And what was your understanding of the origin of that designation or usage?
A: The HCAs come from the ISC strategy. And the ISC strategy was written to provide for the continued existence of the Northern Spotted Owl, and so the HCAs are habitat conservation areas from that plan.
Q: Okay. And what were the key concepts? You mentioned a radius. What's the point of the radius rule, and what was the rule, if you recall?
A: That deals with the size of a spotted owl pair's home range. And on the average, in the Klamath province, their home ranges were about – I can't remember exact acreages, but the half-mile radius is an area around the nest site that is felt to be, like, 60 percent of owl use. And the 1.2-mile radius is believed to take in the average home range of a pair

Page 19

of owls.
Q: Okay. And is that the same thing as a habitat conservation area, or is that just a little radius circle drawn in as part of the strategy?
A: Yeah. Those are two different things.
Q: What was a habitat conservation area there at that time?
A: The habitat conservation area – well, it depends on the categories, because there's three different categories. The category ones were to protect 20 pairs or more of spotted owls, so they were very large. Category twos were – I can't remember the exact numbers – I believe, like, five to ten or something, or less than ten. I don't remember. And the category threes, I think those were the areas of special concern, but I'd have to look to be sure.
Q: Okay. Could I ask you to turn to page 6 of this same Exhibit 69? It's a chart, table.
A: Table 1?
Q: Yes. Thank you. Does this chart reflect anywhere the different types of categories you've just been describing?
A: Well, it has the HCA number on it, and by the number, you can reference which type. It doesn't say exactly which type it is on here.
Q: Okay. These are the numbers of specific geographical areas that the Forest Service had established?

Page 20

A: Each HCA – these are all set up by the ISC, and the numbering system is also. It's not a Forest Service numbering system. That was part of the strategy. They gave us a map and said, "Here's the HCAs and here's their number."
Q: So looking at table 1 on page 6, where it says Liberty Mine about two-thirds of the way down, going across C10, there is a specific designated area.
A: Right. That's the number of that particular HCA.
Q: Designated by the interagency committee?
A: Right.
Q: And when was that done?
A: Well, I don't know. I guess it was before we got the opinion. I'm not sure of the exact date.
Q: Okay. Right about the same time?
A: Probably right in there, because – yeah. I'm not sure of the date.
Q: Did the creation of habitat conservation areas have a canopy closure constituent criteria?
A: Well, the HCAs – that's an oversimplification. There is a habitat component to HCAs, but HCAs also have a larger meaning in the realm of conservation of the owl.
Q: What is that larger meaning beyond?
A: Well, I don't know how detailed you want to get here, but –
Q: A paragraph perhaps?

Page 21

MS. COOK: Give detail.
A: We have the SOHA system, spotted-owl habitat areas. The SOHA areas were what the Forest Service had been operating under.
Q: Is that a system that the Forest Service designed, not the Interagency Scientific Committee?
A: Right. It's a Forest Service process. And what we did there was set up a SOHA around known owl pairs. So it was oriented around the pair, and it was set up to protect as much suitable habitat for that pair.
Q: Now, did you actually create any of those SOHAs as part of you duties or –
A: No.
Q: You came to an existing set of maps of them?
A: Right. They were existing. They've been around for several years before this.
Q: Okay.
MS. COOK: For the record, "this" being Exhibit 69?
A: Yeah, the opinion. The SOHA system was believed to be inadequate to protect the owls, which was partly how the ISC strategy came out. And the HCAs, what they wanted to do was set aside large areas of habitat so that the habitat would not get very fragmented. Fragmentation is believed to adversely affect the owl. So the idea of having these large HCAs was to

Page 22

protect as much habitat as possible in a contiguous manner. So they tried to set them up based on what habitat was there, but I don't know exactly what criteria, but it's not strictly on some canopy coverage amount.
Q: Is there a criterion for maintaining a canopy closure within such areas, if possible, you know, avoiding disturbance that would result in a reduction of canopy closure?
A: Well, there were restrictions on what we could do in habitat conservation areas.
Q: As stated in the –
A: I don't remember the exact canopy criteria.
MS. COOK: If you have questions, I can cite you the cases that set out the whole process.
MR. MCBRIDE: Okay. Eventually we will get there.
Q: So you knew shortly after you got to your job there in Yreka that Liberty Mine was one of the projects that was included in the July 23rd opinion?
A: Yes, because it's listed in the tables.
Q: Okay. Did you go through any educational exercise of your own to learn more about given projects that were covered by the biological opinion?
A: Yeah. When I got there, I read through the biological assessment that we had submitted and information we had received on all the projects, you know, and talked with

Page 23

people and tried to get up to speed on all these projects.
Q: Okay. And in that connection, if I could ask you to go back to document 66, please. Does it not have pages?
A: My copy does, handwritten.
Q: Well, nearly to the back.
A: Where do you want to be?
Q: Where the Liberty Mine activity is described, fairly close to the end.
A: Page 29 on my copy.
Q: Okay.
MS. COOK: I just numbered the documents starting from the first page, so that's my handwriting. There's no secret system. It just needed numbers.
THE WITNESS: Yeah. You started from the cover letter.
MS. COOK: Yeah. Started from the cover letter.
Q: As part of that education process, whatever, of just having arrived there with this biological opinion in hand, did you go back and look at the biological assessment or assessments that the Forest Service had sent to the Fish and Wildlife Service?
A: Well, this is the assessment that we sent.
Q: Yes.
A: Are you talking about the individual – I'm not sure how they put this together, and I frankly don't remember if we

PE-24-300

had individual documents on each project.
Q: I'm asking if in July of 1990 you read through this and learned what the various projects were, including exposing yourself to the fact that there was a Liberty Mine project described here.
A: Yes.
Q: Okay. Did you discuss with the Salmon Ranger District what plan of operations was involved in the Liberty Mine consultation, whether it was an all-phase plan, a plan as previously approved? Did you discuss that in any way?
A: At some point, I don't remember when, but yes, we talked about this project.
Q: And was it your understanding that what had been put in the consultation request, the project, was the so-called all-phase plan, which is a phrase that was used then, all-phase plan of operations?
**MS. COOK:** Why don't we first establish that she's even heard the term all-phase plan, because –
**MR. MCBRIDE:** Sure.
Q: Is that a phrase that you recall with the Liberty Mine proposal?
A: No. Just in reading through the documents, you know, this last week. But I don't recall using that phrase.
Q: Okay. Did you ever speak to – well, let's just start from the beginning here. You've met Mr. Aloisi before



today?
A: Yes, I have.
Q: Okay. And do you recall when you may first have met him?
A: We met – we had a meeting in the forest supervisor's office. I don't recall exactly when, but probably a few months after this came out. I don't recall when.
Q: Okay. And have you ever been up Eddie Gulch?
A: Yes, I went up there once.
Q: You've been up there once? Okay. Do you remember when that was?
A: I really don't. Sometime, you know, when I was there, so from that two-year-or-so time period. I think it was, like, summer of '91.
Q: Okay. Do you recall with whom you went on that trip?
A: I was with Harry Frey, and we came by and saw – you were at the cabins.
**MR. ALOISI:** Uh-huh. Kurt Marsick perhaps?
**THE WITNESS:** I don't remember that name.
**MS. COOK:** For the record, when you say "you," you will have to indicate you're talking to Mr. Aloisi. And unfortunately, we can't let you two have conversations because you're under oath. He's not. It's your deposition, so –
**MR. ALOISI:** I never lie.



**MS. COOK:** I know, but we just have to. That's the rules. We can't have you two having conversations, so you just need to confine your answers to Mr. McBride.
Q: (By Mr. McBride) Do you remember Jim Rock?
A: Yes.
Q: Would he have been with you that day?
A: I really don't remember.
Q: And do you remember someone in the forest supervisor's office named Kurt Marsick? And I'll guess at spelling, M-A-R-S-I-C-K.
A: Yes. And I don't know if he was there either.
Q: Okay. Do you know why you came? Do you remember the purpose of your visit? Presumably it was not your vacation or an off day.
A: It was related to this project and trying to implement this opinion and trying to figure out what habitat was going to be taken, just to look at the site and see where the project was and look at the – because we had been talking about this project, trying to figure out what habitat was being taken and what the effects were.
Q: Who is "we" that you've been talking about? Who are the "we"?
A: Well, the district and myself and Harry and –
Q: So implementing this project was one of the – was a matter that you specifically got involved with.



A: Yes.
Q: Okay. And how often or how regularly?
A: I don't think that I can characterize that, unless you ask me a different way.
Q: Okay. Was there a specific finding or determination you wanted to make with your visit, then, in July 1991? Did you come to make a finding or to make a determination of some kind?
A: Not that I recall. We were – it was mainly for me just to come see the site, since I had not seen it before, and to look at – since it's in an HCA and it was a suitable habitat and it was consulted on as a planned sale, we were told to get out of planned sales in HCAs, to, you know – not to offer that timber for sale. So even though this is a mining claim, you know, it's a suitable habitat question. So we were looking to see if there was any way to lessen the effect on suitable habitat.
Q: And were you able to make that determination?
A: I don't remember.
Q: Okay. Did you,.while you were there, develop your own view as to whether this area in Eddie Gulch fit the HCA criteria and was, you know, properly designated?
A: Well, the HCA is, as I said, a large area that covers 20 or more pairs of spotted owls. And so in that area, there are, you know, 20 pairs of spotted owls, and so there was



obviously a lot of suitable spotted-owl habitat there.
Q: Okay. Did the forest that you saw there or the timber that you saw there appear to you to be old growth?
A: Now, tell me what you mean by "there," to be more specific.
Q: Well, let's go back and say, do you recall what parts of Eddie Gulch you toured? Do you remember particular areas you went? Usher Flat, for instance. Do you recall Usher Flat?
A: Yeah.
Q: Klamath dumps or the Klamath mine portal?
A: I think we went there.
Q: Go ahead.
A: I don't really know the names of all those places. I remember what we looked at and what it looked like.
Q: Was it a full-day trip?
A: I believe it was.
Q: So you were up onto the dirt road and into the gulch for four or five hours?
A: I don't recall.
Q: Okay. Do you recall any conversation you had with Mr. Aloisi while you were there that day?
A: Not any specifics.
Q: Okay. Did you discuss with him the condition of the area, its suitability in terms of old growth or canopy closure?



A: I don't remember.
Q: Okay.
**MS. COOK:** Do you recall anything about what was discussed, whether specific or general?
**THE WITNESS:** Well, I'm sure we talked about what the opinion called for in terms of what we had to do with planned sales and trying to get out of suitable habitat. And we looked at the proposed site, which most of it is not considered suitable owl habitat. There is like 13 acres, or whatever, that we consulted on as being suitable habitat. The rest of it is surrounded by suitable habitat.
Q: So were you able to determine when you were driven – I assume that you didn't walk around the gulch area, but that you went in a four-wheel drive of some kind.
A: We did both.
Q: Okay. Were you told or were you able to figure out when you were within the 13 acres that was in the suitable habitat and when you weren't?
A: Yeah.
Q: Okay. And who helped you with that, or did you know that just by observation?
A: You can tell by observation.
Q: And what makes that area different from the rest of the area?
A: Well, suitable habitat has got dense canopy cover.

PE-24-301

Page 30

It's got large trees. It has snags. It has pretty good understory. And a lot of the habitat in the particular project area is more open and kind of shrubby and Ponderosa pine habitat. It's pretty different between the old growth and the Ponderosa pine shrubby habitat.
**Q:** Do you remember having an argument with Harry Frey before your arrival there or while you were there?
**A:** Me personally had one with Harry?
**Q:** Yes, yes.
**A:** I don't remember that.
**Q:** Do you remember telling Mr. Aloisi it's ruined? With respect to what, I would ask, if you remember.
**A:** Well, it was – the only thing I can think of is, there's a road that Mr. Aloisi had built into the suitable habitat.
**Q:** Okay.
**A:** So therefore, that habitat would be gone.
**Q:** And how many acres or how big a road or how long a stretch of road would that have been?
**A:** I don't – I couldn't tell you exact numbers. Maybe a quarter mile.
**Q:** Okay.
**A:** But it was in towards the pair, also.
**Q:** Towards the pair?
**A:** Of owls.

Page 31

**Q:** Did you examine a map of the SOHA or the HCA before you went in order to know where those – the pair of owls nested or was?
**A:** Yeah, we looked at maps.
(A discussion was held off the record.)
**Q:** You said you looked at maps to know where the owl pair may have been.
**A:** Right.
**Q:** So when you left from that visit, what was the follow-up that needed to occur? Who was going to go do what? What had been learned? What had been accomplished?
**A:** Well, it was mainly an informational visit for me. I'm not sure what Harry was going to do with it. I think he was just mainly showing me the project so that I could talk fairly knowledgeably about it with the district. It's up to the district to do things.
**Q:** Did you, at any time after that visit, request Harry Frey to stop the operation or close down the operation or have the operation cease, if possible?
**A:** I don't remember.
**Q:** Do you recall anyone on that trip or in preparation for that trip discussing the question of what Mr. Aloisi knew about the July 1990 opinion?
**A:** I know that we had to have talked about it because that was the whole point of being there.

Page 32

**Q:** Say it again. The whole point of being there was –
**A:** To look at how we could meet the requirements of the opinion for that project.
**Q:** Okay. But did anyone say anything like, "Mr. Aloisi does not know that the Liberty Mine wasn't cleared and given no jeopardy opinion in the July 1990 biological opinion"? Did anyone say anything like that?
**A:** I don't recall.
**Q:** Whose duty in the Forest Service structure would you understand it to be to notify Mr. Aloisi of the existence of the biological opinion?
**A:** The district.
**Q:** Did you assume that had been done, or did you not even think about that?
**A:** I assumed it had been done.
**MS. COOK:** I believe Mr. Aloisi was present during some of her visit at the time. You might want to explore that before you leave the area.
**A:** And I believe in the forest supervisor's office meeting we talked about the opinion.
**Q:** And when do you believe that was? Earlier or before or after the site visit?
**A:** I believe before.
**MR. MCBRIDE:** Let's go off the record for just a second. If you want to take a break, you're welcome to take a

Page 33

break.
**MS. COOK:** You want a few minutes?
**MR. MCBRIDE:** Yes, a couple of minutes.
(A short recess was taken.)
**MR. MCBRIDE:** Back on the record.
**Q:** (By Mr. McBride) Ms. Granillo, before we broke, I asked you if you – well, I'm not sure what my question was. You indicated that you may have met with Mr. Aloisi at some time other than up at Eddie Gulch in July of '91.
**A:** Right. As I said before, we had a meeting in the forest supervisor's office.
**Q:** And do you recall when that was?
**A:** No. I believe – I know it was before I went out in the field to the site.
**Q:** And do you recall who else was there?
**A:** Well, I think the point of the meeting was, Mr. Aloisi was wondering what was going on with approval of his project and wanted to talk to the forest supervisor about it, so it was in the forest supervisor's office.
**Q:** We're talking about Yreka, not about the ranger district.
**A:** Right, Yreka. And I don't recall everyone that was there, but the forest supervisor –
**Q:** Is that Barbara Holder?
**A:** Barbara Holder, Harry Frey. I believe Mike Lee was

Page 34

there.
**Q:** Would Mr. Lee have come from the ranger district, or would he have been on detail at that time to the –
**A:** No. He had come from the ranger district.
**Q:** And you say Mr. Aloisi was there?
**A:** Yes. And he had someone with him. I don't remember who.
**Q:** Male? Female?
**A:** Male.
**Q:** Is Tom Ferrero a name that sounds right?
**A:** I really don't remember who it was.
**Q:** And was any written record made of this meeting?
**A:** I don't know.
**Q:** Is it policy for the forest supervisor to have a memo to the file or a written record of meetings with permitees and applicants and the like when they meet with her?
**A:** I don't know.
**Q:** You did not make a written record of this meeting?
**A:** No.
**Q:** And you don't recall if anyone else did?
**A:** I don't remember.
**Q:** And what do you recall the topic of discussion being?
**A:** Well, we were trying to explain to Mr. Aloisi what was going on with the project, why he couldn't start on the –

Page 35

and we talked about the archaeological surveys that were still needed.
**Q:** Was Mr. Rock there?
**A:** I don't remember. We talked about – I know we talked about what was going on with the opinion.
**Q:** What was going on with the opinion at that point?
**A:** Well, we had – actually, we had the opinion back since that July or whenever it came out. And what we were waiting on, as I recall, was Mr. Aloisi still did not have an approved plan of operations.
**Q:** So this was not about the opinion, but about what? Environmental assessments or about – I mean, what, then, needed to be done?
**A:** Well, there was a question of the archaeological survey work and providing more details on the – a real plan of operations that laid out the whole project, as I recall.
**Q:** Could you turn to document 71, please? Have you reviewed this document in preparation for the deposition?
**A:** I don't think I've seen this one. No, I have not.
**Q:** You want to take a look at it? And my question is whether you saw it back in 1990 or recall ever having seen it before.
**A:** I don't recall having seen it before.
**Q:** Could you read the first paragraph or familiarize yourself at least with what it's about?

PE-24-302

COPY

UNITED STATES COURT OF FEDERAL CASES

-oOo-

ALFRED ALOISI, et al.,

Plaintiffs,

vs. Case No. 95-650L

THE UNITED STATES,

Defendant.

________________________________/

-oOo-

DEPOSITION OF MARC ROSS WILLIAMS

Friday, October 11, 1996

-oOo-

Computer-Aided Transcription

Reported by
JOYCE A. FINK
CSR 1225
RPR 4605

Joyce A. Fink
Court Reporter
300 North Main Street, Yreka, California 96097
(916) 842-6633

Q. Could you look at document 69, please? Are you familiar with the document?
A. Yes, I am.
Q. Is this the Fish & Wildlife Service's biological opinion in response to your June 18th, consultation letter?
A. Yes, it is.
Q. Could I direct your attention to the second paragraph of the cover letter?
A. Okay.
Q. Near the -- well, it's the last sentence of the paragraph. Refers to augmenting documents and updates.
A. Uh-huh.
Q. Do you know if -- did you -- were you involved in providing any augmenting documents or updates to the Fish & Wildlife Service during this consultation?
A. I honestly don't remember.
Q. Do you recall having telephone conversations with the Fish & Wildlife Service during the consultation?
A. No.
Q. I could be even more specific and say: Were there any conversations about the consultation as pertained to the Liberty Mine proposal?

A. In the time frame immediately after or during this period, between June and July, I don't remember of any, no.

Q. When did you learn of the existence of this biological opinion; immediately, shortly thereafter, not for a long time?

A. Shortly thereafter.

Q. Would it have been your responsibility, then, to notify timber contractors or other staff that they could go forward with processing or issuing authorizations, now that this was back?

A. It would have been my responsibility to talk to other staff officers, yes.

Q. Okay.

A. This was -- I want to add that this was a watermark -- what's the word I want?

Q. Watershed?

A. Water -- thank you. This was a watershed. When this came back, it was general knowledge. Everyone was anticipating this.

Q. How would a document like this be distributed in the ranger district office. Would everyone have gotten a copy?

A. I don't know in this particular case, but usually the staff that is particularly involved would get a copy, the district ranger would probably

get a copy. And then I would have distributed it to timber staff, et cetera.
Q. The copy that's been put in the record indicates a fax slug line to Klamath National Forest. I assume it would have been faxed shortly thereafter to the Salmon River Ranger District. Do you recall getting it on the 26th or as soon as the forest had it?
A. Probably a day or two later,.
Q. Did you take any action with respect to the Liberty project after you received this and read it?
A. I did not personally contact Mr. Aloisi, no.
Q. Did you ask anyone else to do so?
A. I don't remember if I did. I don't remember at this particular time if I did.
Q. But you were aware when you received this -- I'll ask it differently. Excuse me.
When you received this, did you look to see if all of the project's proposed actions that you'd done a biological evaluation for were covered by this opinion?
A. Yes.
Q. So you knew, at the time you received this, that Liberty Mine was covered by this opinion?
A. Yes.

FS69

Rec'd 10/10/96 from SVC

# United States Department of the Interior

## FISH AND WILDLIFE SERVICE

1002 N.E. HOLLADAY STREET
PORTLAND, OREGON 97232-4181

In Reply Refer To:
1-1-90-I-37

July 23, 1990

Mr. Paul Barker
Regional Forester
Pacific Southwest Region
630 Sansome Street
San Francisco, California 94111

Subject: Formal Section 7 Biological Opinion for Klamath National Forest Planned Fiscal Year 1990 Timber Sales (Federal Action)

Dear Mr. Barker:

This letter responds to your June 27, 1990, request for formal consultation on the effects of timber harvest and associated activities on the threatened northern spotted owl (*Strix occidentalis caurina*). This Biological Opinion analyzes the anticipated effects on northern spotted owls resulting from implementation of planned fiscal year (FY) 1990 timber sales on the Klamath National Forest (KNF). This Biological Opinion is prepared pursuant to 50 CFR 402 of our interagency regulations governing Section 7 of the Endangered Species Act of 1973, as amended (Act).

The Biological Assessment (BA) for these timber sales was received in our office on June 18, 1990, and was submitted in anticipation that the proposed threatened northern spotted owl would be declared threatened under the Act. The Fish and Wildlife Service (Service) announced the decision to list the northern spotted owl as threatened on June 22, 1990. The effective date of this final rule is July 23, 1990. The BA provided a description of the project (timber sales) that is the subject of this consultation, and assessed impacts to the listed subspecies. Various augmenting documents and updates to the BA were received and considered during the consultation period, and are on file with the Service.

The project BA addresses the effects resulting from 45 planned FY 1990 timber sales. However, three of the proposed projects (Bullion Mountain, Lobo, and Fish Meadows) are in such early stages of design that units have not been finalized and no information is given as to the amount of habitat to be harvested. Thus, these sales are not included in this Biological Opinion.

Eleven of the actions considered in this Biological Opinion underwent informal Section 7 conference pursuant to 50 CFR 402.10. Since that time, several documents have been produced that entail the most comprehensive and up-to-date information available on the status, biology, and management strategies of the northern spotted owl. These documents include: A Conservation Strategy for the Northern Spotted Owl (Conservation Strategy) (Thomas et. al., 1990); 1990 Status Review (for the) Northern Spotted Owl (1990 Status Review) (USDI Fish and Wildlife Service, 1990a); and Final Rule (USDI Fish and Wildlife Service, 1990b). Pursuant to 50 CFR 402.10(c), projects previously conferenced on must be reviewed to determine whether formal consultation is necessary. The Forest Service decided that formal consultation was appropriate for the previously

printed on unbleached, recycled paper

conferenced sales that have not been harvested. Thus, this Biological Opinion superoedes determinations made by the Service during prior deliberations.

## Biological Opinion

It is our biological opinion that the proposed timber sale action discussed herein, including anticipated incidental take, is not likely to jeopardize the continued existence of the northern spotted owl for the following reasons: (1) a minor amount of take is anticipated, (2) the isolation of the Klamath physiographic province (from the other provinces) will not occur, and further separation of the northern spotted owl from the California spotted owl (*S. o. occidentalis*) is not expected to occur, and (3) options remain for long-term conservation planning after harvest of the subject action. Critical habitat has not been proposed or designated for this subspecies; therefore, none will be destroyed or adversely modified.

## Description of the Proposed Action

KNF proposes implementation of 42 planned FY 1990 timber sales. The following timber sales are addressed in this formal consultation:

Sales that have not undergone informal Section 7 conference (N = 31):

| | | | |
|---|---|---|---|
| Limestone | Limestone Heli | Shanty | Shanty Heli |
| Bar SST | Cotton | LonJon | Pine Marten #3 |
| Mercury | Whiteway | Buckshot | Thomas |
| Rattlesnake | Resalvage | Cleghorn | Decker |
| YJ Blowdown | McKinney | Baldy EIS | Highview |
| Bug Salvage | Crawford Heli | Olsen Add-On | Liberty Mine |
| Cove 65 percent | Grizz San/Sal | Mt. Hebron | Crackle |
| Typhoon | Temple Rock RS | Shingle Springs | |

Sales that have undergone informal Section 7 conference (N = 11):

| | | | |
|---|---|---|---|
| Second Salvage | Mini | Bare Rummage | King Titus |
| Cecil | High Winds Blowdown | Hoot Salvage | Jessup/Grasslake |
| Honda East | Black Panther | Border | |

The actions listed above propose harvest of approximately 154 million board-feet (MMBF) of timber from approximately 12,768 acres of forested land. (The average annual harvest on the KNF over the last five years has been approximately 211 MMBF).

A variety of harvest prescriptions are proposed within many different habitat types. Approximately 4,082 acres are proposed for regeneration (clearcut) harvest, and approximately 8,686 acres are proposed for Individual Tree Mark (ITM) prescriptions, a generic term encompassing a variety of treatments. The ITM treatments are of differing intensities, ranging from removal of only a few trees per acre to removal of all but a few trees per acre. Of the 12,768 acres to be treated, the amount of suitable habitat that will be rendered unsuitable is approximately 1,315 acres.

Interrelated and interdependent activities associated with these projects include road building, site preparation, planting, and post-planting treatments such as release projects and thinnings. Again, a great deal of variation can be expected in these activities as dictated by harvest prescription, site quality, and other variables.

Species Account/Environmental Baseline

For descriptions of the biology, population status and trends, and past management of the northern spotted owl, consult the 1989 Status Review Supplement (USDI Fish and Wildlife Service, 1989), the 1990 Status Review, and the Conservation Strategy.

The environmental baseline used in this analysis includes past and present impacts of all Federal, State, or private actions and other human activities on the KNF that have impacted or are impacting spotted owls. This description of the current spotted owl status on the KNF is derived mainly from USFS and California Department of Fish and Game records.

The Service has determined, as supported by the Conservation Strategy and the 1990 Status Review, that the Goosenest Ranger District and eastern areas of the Scott River and Salmon River Ranger Districts on the KNF are within the Shasta-McCloud Area of Special Concern. Little suitable habitat and, therefore, few spotted owls are known or expected to occur in the area of concern relative to estimated pre-1900 levels, and relative to densities in similar vegetational associations in other parts of the subspecies' range. The primary reason for the decline in both habitat and spotted owls in this area is an extensive logging history. In addition, Federal efforts at reserving contiguous areas for spotted owl management have been hampered by a checkerboard pattern of private and Federal land ownership.

The remainder of the KNF is less fragmented and currently supports higher densities of spotted owls, due in part to different natural factors, logging history and land ownership patterns. Nonetheless, it is reasonable to assume that owl numbers are below historic levels.

Effects of the Proposed Projects on Northern Spotted Owls

The focus of this Biological Opinion will be on harvest prescriptions that are proposed for suitable spotted owl habitat (as determined by Forest Service biologists and silviculturists) and that will reduce the quality of that habitat to a point where it is no longer considered suitable for nesting, roosting or foraging by spotted owls. Both the Forest Service and the Service have determined that any suitable habitat that is harvested "may affect" the northern spotted owl. The Service further determines that, in certain situations, suitable habitat reduced to an unsuitable condition may harm or harass ("take") northern spotted owls.

The Habitat Conservation Area (HCA) concept, described in the Conservation Strategy, involves designation of relatively large areas, mainly reserved from timber harvest, that are expected to support multiple spotted owl pairs in the future. This concept is consistent with current theories of conservation biology that large areas supporting multiple reproductive pairs are less likely to undergo localized extinction than are single-pair management areas, thus increasing the likelihood of persistence of the species. The Service, as stated in the 1990 Status Review, supports this position. Thus, the effects analysis, as enumerated in points 1-7 below, discusses each of the ways that spotted owls may be affected by the proposed actions, and relates these effects to the Conservation Strategy recommendations, where applicable. The

Conservation Strategy allows certain deviations from the general recommendations in cases of timber harvests currently under contract. See Appendix Q of that document for suggested management guidelines.

1. **Habitat loss:**

According to KNF data, approximately 193,935 acres currently support suitable spotted owl habitat. This is approximately 14 percent of the forested acres on KNF land. Harvests considered previously by the Service will reduce the amount of suitable habitat to approximately 191,746 acres, which is approximately 13.8 percent of KNF forested acres. Approximately 1,315 acres of suitable habitat is proposed for removal in planned FY 1990 sales, which constitutes a reduction of approximately 0.7 percent.

**Effects Within Category 1 and 2 HCAs.** Table 1 shows, by sale, the Category 1 and 2 HCAs described in the Conservation Strategy that will be adversely affected by the subject actions. A total of 625 acres of suitable habitat will be reduced to unsuitability and, therefore, lost from these HCAs. Another 5,670 acres will be treated at varying intensities, but none of those harvests will result in currently suitable habitat becoming unsuitable. The Conservation Strategy considered all harvest within HCAs to be an adverse effect, so a total of 6,295 acres will be adversely affected by the proposed actions. These acres are within 1.5 miles of 39 known spotted owls (14 known pairs plus 11 other known owls).

Harvest of suitable spotted owl habitat in Category 1 and 2 HCAs within the home ranges of spotted owls can be expected to adversely affect those individuals. Thus, assuming the owls are still in the area, at least 39 spotted owls, plus an unquantifiable number of undiscovered spotted owls may be harmed or harassed. Harvest of any habitat within these HCAs, whether or not spotted owls are present, can be expected to have a longer term adverse affect with respect to management of these areas for spotted owls under the Conservation Strategy guidelines. Such harvest, however, may not foreclose all future options possible for the management of spotted owl populations within the principles of conservation biology.

**Effects on Category 3 HCAs.** The Service and the Conservation Strategy consider the Goosenest and parts of the Scott River and Salmon River Ranger Districts to be within the Shasta-McCloud Area of Special Concern, and the Conservation Strategy recommends strategies for managing areas where establishment of multiple-pair HCAs is precluded by man-caused and/or natural habitat conditions. For lands that are south and/or west of designated HCAs, but not included within them, the recommendation is to establish single-pair (Category 3) HCAs around all known pair locations, as well as pairs discovered in future inventories. For areas north and/or east of designated HCAs, establishment of Category 3 HCAs is recommended around all repeated locations of single owls as well as verified pairs. Consult Appendix Q of the Conservation Strategy for detailed management guidelines.

According to the Conservation Strategy, Category 3 HCAs are to be established as follows: Around the owl or owl pair location (as appropriate), a circle 1.2 miles in radius, roughly centered on the owl(s) location, shall be plotted. The area circumscribed becomes the HCA, and suggested guidelines for managing HCAs are applied. The circle need not be centered exactly on the owl location if adjustments can be made so that as much suitable habitat as possible is included in the HCA. However, activity centers of the owl(s) should be no closer than 0.25 mile from the edges of the circles.

One of the proposed timber sales will impact one Category 3 HCA associated with a single spotted owl on the Goosenest Ranger District. Approximately 148 acres of suitable spotted owl habitat is proposed for removal from this HCA. These acres are within 1.5 miles of at least one spotted owl, assuming that an owl is still present. Harvest of suitable spotted owl habitat in Category 3 HCAs can be expected to affect associated individual spotted owls. Thus, at least one spotted owl, plus an unknown number of undiscovered spotted owls will be adversely impacted in this HCA. Harvest of any habitat within this HCA, whether or not spotted owls are present, can be expected to have a longer term adverse affect with respect to management of this area for spotted owls according to Conservation Strategy guidelines.

**Effects on Category 4 HCAs.** The Conservation Strategy recommends retention of a minimum of 80 acres of suitable spotted owl habitat around known pair activity centers outside of Category 1, 2, and 3 HCAs. None of the subject projects are proposed within a Category 4 HCA.

In total, approximately 773 acres of suitable habitat will be lost within HCAs and 5,670 acres will be otherwise negatively impacted, for a total of 6,443 acres adversely affected in HCAs. Appendix Q in the Conservation Strategy provides recommended standards and guidelines for managing HCAs. That document recommends that no timber, regardless of age class, be harvested in HCAs. For planned FY 1990 timber sales, relocation of units outside HCAs is encouraged. If that is not possible, harvests greater than 0.5 mile from pair activity centers may proceed. As proposed, implementation of these timber sales will result in harvest within 0.5 mile of 14 HCA pairs. Thus, the recommendations of the Conservation Strategy will not be met if the projects proceed as proposed.

**Effects on the Forest Matrix.** The Conservation Strategy defines the forest matrix as "all forest lands outside of designated HCAs". For the purposes of this opinion, our definition will be those acres outside any HCAs.

A total of 6,325 acres of habitat will be negatively impacted outside HCAs. Of those, 542 acres of suitable spotted owl habitat (as defined by the KNF) will be lost. These acres are within 1.5 miles of 25 known spotted owls not previously counted in this opinion.

The following is a summary of the effects of the subject timber sales on spotted owl habitat loss:

Total acres negatively impacted = 12,768
Total suitable acres lost = 1,315
Total known owls adversely affected = 111

**2. Direct Effects to Spotted Owls**

**Disturbance/Disruption of Breeding Activity.** The project BA states that contract clause C 6.313, which limits contractor operations during the nesting season, will be required in some of the planned FY 1990 contracts for the subject actions. The BA further states that, in those contracts where contract clause C 6.313 (limited operating period) is not present, clause C 6.25 will be implemented. Clause C 6.25 generally authorizes project modifications when federally-listed species are involved. The narratives for most of these sales, however, do not mention what the inclusive dates of these closures are, what circumstances will trigger invocation of these clauses, nor

Table 1. Timber sales and their effects on HCAs, known spotted owls, and the Shasta/McCloud Area of Special Concern. These figures were taken from the project BA and associated documents.

| Sale Name | RD | Acres Lost Total | Acres Lost HCAs | Owls Known 1.5 | Owls Known 0.5 | HCA | ASC |
|---|---|---|---|---|---|---|---|
| Limestone | OK | 192 | 192 | 3 (1p) | 3 (1p) | C-6 | N |
| Limestone Heli | OK | 66 | 66 | 0 | 0 | C-6 | N |
| Shanty | OK | 67 | 67 | 0 | 0 | C-6 | N |
| Shanty Heli | OK | 55 | 55 | 9 (4p) | 8 (4p) | C-6 | N |
| Second Salvage | OK | 0 | 0 | 2 (1p) | 2 (1p) | C-5 | N |
| Bar SST | OK | 0 | 0 | 0 | 0 | x | N |
| Cotton | OK | 0 | 0 | 2 | 2 | 0-20 | N |
| LonJon | OK | 0 | 0 | 1 | 1 | 0-20 | N |
| Mini | OK | 0 | 0 | 0 | 0 | 0-20 | N |
| Pine Marten #3 | OK | 10 | 10 | 4 (1p) | 4 (1p) | 0-20 | N |
| Mercury | OK | 0 | 0 | 3 (1p) | 1 | x | N |
| Whiteway | OK | 10 | 10 | 2 (1p) | 0 | C-5 | N |
| Buckshot | OK | 84 | 0 | 1 | 1 | x | N |
| Resalvage | OK | 0 | 0 | 2 (1p) | 2 (1p) | C-5 | N |
| Cleghorn | OK | 25 | 0 | --- | --- | x | N |
| YJ Blowdown | OK | 0 | 0 | --- | --- | x | N |
| McKinney | OK | 0 | 0 | --- | --- | x | N |
| Baldy EIS | HC | 0 | 0 | 3 | 0 | x | N |
| Bare Rummage | HC | 0 | 0 | 3 (1p) | 0 | x | N |
| King Titus | HC | 40 | 25 | 23(11p) | 4 (2p) | C-8 | N |
| Cecil | SA | 91 | 0 | 2 (1p) | 0 | x | N |
| High Winds Blowdown | SA | 0 | 0 | 2 (1p) | 2 (1p) | C-10 | N |
| Highview | SA | 0 | 0 | 3 (1p) | 0 | C-10 | N |
| Moot Salvage | SA | 0 | 0 | 8 (4p) | 0 | x | N |
| Bug Salvage | SA | 0 | 0 | 6 (3p) | 2 (1p) | C-23 | N |
| Jessup/Grasslake | SA | 0 | 0 | 1 | 0 | x | N |
| Crawford Heli | SA | 0 | 0 | 6 (3p) | 0 | C-10 | N |
| Olsen Add-On | SA | 0 | 0 | 0 | 0 | x | N |
| Liberty Mine | SA | 13 | 13 | 2 (1p) | 2 (1p) | C-10 | N |
| Cove 66 percent | SC | 110 | 0 | 2 (1p) | 0 | x | N |
| Grizz San/Sal | SC | 20 | 0 | 2 (1p) | 0 | x | N |
| Mt. Hebron | GN | 173 | 0 | 0 | 0 | x | Y |
| Crackle | GN | 92 | 0 | 0 | 0 | x | Y |
| Typhoon | GN | 148 | 148 | 1 | 1 | 3 | Y |
| Honda East | GN | 0 | 0 | 0 | 0 | x | Y |
| Temple Rock RS | GN | 80 | 0 | 0 | 0 | x | Y |
| Shingle Springs | GN | 0 | 0 | 0 | 0 | x | Y |
| Black Panther | UK | 33 | 33 | 11 (5p) | 3 (1p) | C-8 | N |
| Decker | UK | 6 | 6 | 2 (1p) | 0 | C-8 | N |
| Rattlesnake | UK | 0 | 0 | 0 | 0 | C-8 | N |
| Thomas | UK | 0 | 0 | 2 (1p) | 0 | C-8 | N |
| Border | UK | 0 | 0 | 3 (1p) | 1 | C-8 | N |
| Totals: | | 1315 | 625 | 111 (46p) | 39 (14p) | | |

*Table 1 (continued). Definitions:*

*RD = Ranger District: OK = Oak Knoll; HC = Happy Camp; SR = Salmon River; SC = Scott River; GN = Goosenest; UK = Ukonom*

*Acres Lost: Total = Total suitable spotted owl habitat that will be unsuitable after harvest. HCAs = suitable spotted owl habitat to be lost in HCAs.*

*Owls Known: Owls that have been recorded within 1.5 and 0.5 miles of sale units, 1986-June, 1990. (Xp) = Number of known pairs --- = not surveyed.*

*HCA = Habitat Conservation Area. C-XX = Category 1 or 2 HCA from Conservation Strategy; 4 = Category 4 HCA; x = not in HCA.*

*ASC = Shasta-McCloud Area of Special Concern identified in the Conservation Strategy. Y = sale in ASC; N = sale not in ASC.*

what surveillance will be conducted so that the need to implement these measures can be assessed. Therefore, this opinion will revisit and clarify the issue of seasonal protection for spotted owl breeding pairs.

Logging activity within a nest grove during the breeding season can cause abandonment of the breeding effort and affect both juvenile and adult spotted owls. Sales with either an inadequate or no seasonal closure are planned within 0.5 mile of 14 known owl pair activity centers and, therefore, could potentially adversely impact 28 breeding adults and 28 young-of-the-year. (For the purpose of this analysis, production of two young by each of these 14 nests is assumed). In addition, an unknown quantity of undiscovered spotted owls and their progeny might be so affected.

**Direct Harm of Spotted Owls.** The act of falling trees could result in death and/or injury to spotted owls. As disturbance occurs, spotted owls can reasonably be expected to move from the disturbance area, thus avoiding death or injury. However, adult spotted owls tenaciously tending to reproductive activities such as incubation or brooding may be reluctant to leave the area, thus remaining vulnerable to potential injury or death. Young-of-the-year, whether in or out of the nest, may also be vulnerable to the effects of tree falling. The potential for such occurrences exists in areas where no seasonal restrictions are proposed. Since 14 known pair activity centers are within 0.5 mile of proposed sale areas with either an inadequate or no seasonal closure in the contracts, at least 28 adult spotted owls, plus 28 young-of-the-year, could be directly injured or killed by logging activity. In addition, an unknown number of undiscovered owls and their progeny might be impacted in this manner.

## 3. Reduction of Special Habitat Components

In addition to the loss of suitable habitat, a reduction in snags, dead and down woody material, and suitable nest sites is expected. The project BA states that contract clause C 6.25 can be used to modify sales for protection of federally-listed species. However, no mention is made as to the numbers of snags, snag replacement trees, or amounts of dead and down material that will be retained. Thus, for the purposes of this opinion, it is being assumed that

normal KNF retention guidelines (1.5 snags/acre and 5-10 logs/acres 16 inches in diameter or greater) (Wilbanks pers. comm.) will be implemented. The number of snag replacement trees is not specified.

A reduction in nest sites is expected as both snags and live trees are removed. Since owls do not build nests but depend upon cavities, broken-topped trees, naturally occurring platforms, and nests built by other species, it is reasonable to assume that few or no suitable nest sites will remain after harvest on treated acres. Snags, besides providing nest sites, are also important in the life histories of several known spotted owl prey species. Thus, the effect of snag reduction will be a reduction in nest sites and a reduction in populations of some spotted owl prey species. The amount of dead and down material present on the forest floor is positively correlated to densities of some spotted owl prey species. Thus, reduction of these materials will result in a reduction in spotted owl prey, at least on a localized basis and in the short-term.

## 4. Habitat Fragmentation

Fragmentation of contiguous blocks of suitable habitat into smaller blocks results in a higher ratio of habitat edge to habitat area. This increased edge effect can increase the vulnerability of spotted owls to predators, such as great horned owls (*Bubo virginianus*), and encourage encroachment of competitors like barred owls (*Strix varia*). Thus, an undetermined number of spotted owls may be lost to predation, and an undetermined number may also suffer a competitive disadvantage to barred owls should the recently documented extension of the species range into California continue.

Another ramification of habitat fragmentation can be increased vulnerability of the remaining trees to wind-throw and wind-shear. Severe windstorms, such as those that destroyed large amounts of spotted owl habitat in the Coast Range of California in 1988, pose a clear threat to habitat adjacent to clearcut units.

## 5. Impedance of Spotted Owl Movement

Avoidance of clearcut areas by spotted owls has been documented in various radio-telemetry studies. Thus, an adverse effect could result from disruption of natural movement patterns. A second effect could result from spotted owls that do attempt crossing clearcut areas. Birds moving across areas devoid of protective vegetation may be of increased vulnerability to predation by great horned owls or other avian predators. Thus, an undetermined number of spotted owls may be adversely affected in this manner.

The Conservation Strategy recommends that, to provide for successful movement of spotted owls between HCAs, 50 percent of the forest matrix (calculated on a quarter-township basis) be maintained in forested cover with at least 40 percent canopy closure and a mean conifer diameter-at-breast-height (DBH) of 11 inches or greater. The KNF, due to the limited time available, calculated the percentage of the landscape meeting the above criteria at the ranger district level. That analysis showed that all but the Oak Knoll and Goosenest Ranger Districts have over 50 percent of the Forest matrix meeting the 40 percent or greater crown closure and 11 inches or greater DBH standard. However, no data were provided as to the condition of the forest matrix in the particular quarter-townships to be affected by the proposed actions. Therefore, for the purposes of this opinion, the Service assumes that harvests in the Forest matrix will contribute to reduced connectivity between HCAs.

Should these actions result in inadequate connectivity between HCAs, an unquantifiable number of spotted owls may be adversely affected until sufficient habitat recovery occurs. In addition, inhibited recruitment lessens the chance of long-term persistence of spotted owls in HCAs.

6. Risk of Wildfire

Use of chain saws, heavy machinery, and other fuel-driven equipment increases the risk of wildfire. In addition, slash burning for site preparation poses a risk of escape and could result in damage to adjacent habitat. However, monitoring of fuel and weather conditions by the USFS is a routine measure during timber harvests and associated post-harvest activities. When such conditions indicate a high fire potential, restriction of activity by the KNF can be expected to minimize the potential for wildfire.

7. Road Construction

KNF proposes 27.1 miles of road construction and 47.1 miles of road reconstruction. Construction of roads in suitable habitat contributes to habitat loss and fragmentation. Road construction during the nesting season can result in disturbance to nesting owls and can disrupt the breeding effort. Further, disturbance can result in later years where roads facilitate human access to nest groves. The Conservation Strategy recommends that no roads be constructed in HCAs. None of the proposed roadwork is within HCAs.

Summary of Effects

Given the above analysis, it is likely that some northern spotted owls will be adversely impacted. Further, the Conservation Strategy recommendations will not be completely implemented if the timber sales proceed as proposed. However, given the long-term nature of the Conservation Strategy, and possibilities for other options which adhere to the principles of conservation biology, as well as the allowance for planned 1990 timber sales provided in the Conservation Strategy document, the timber sales evaluated in this Biological Opinion will not likely jeopardize the continued existance of the northern spotted owl.

Cumulative Effects

Cumulative effects are those impacts of future state and private actions that are reasonably certain to occur within the action area of the Federal action subject to consultation. Future Federal actions will be subject to the consultation requirements established in Section 7 of the Act and, therefore, are not considered cumulative to the proposed action.

As mentioned previously, considerable amounts of private timberland are interspersed among USFS land in some of the project areas. Most of this land is managed for timber production, so logging is ongoing. Further, a number of Timber Harvest Plans have been filed with the California Department of Forestry and Fire Protection, indicating that continued timber harvest is reasonably certain to occur. Continued logging of interspersed private parcels can exacerbate the adverse effects described previously. However, the subject actions, in conjunction with the cumulative effects described herein, are not likely to jeopardize the continued existence of the subspecies. The private timber lands within HCAs were not considered an integral part of a functioning HCA system; only Federal lands were invisioned by the Interagency Scientific Committee as areas of restricted cutting.

## Incidental Take

Section 9 of the Act and regulations issued thereunder prohibit the taking of a listed species without special authorization. The term "take" is defined in the Act as "to harass, harm, pursue, hunt, shoot, wound, kill, capture, or collect, or attempt to engage in any such conduct." Under the terms of Sections 7(b)(4) and 7(o)(2) of the Act, taking that is incidental to, and not the purpose of, the agency action is not considered prohibited taking within the bounds of the Act, provided that such taking is in compliance with the terms of this Incidental Take Statement. Furthermore, the Service must conclude that such taking could occur without violating Section 7 (a) (2).

"Harass", as defined in regulations implementing the Act, means an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering (50 CFR 17.3).

"Harm", as defined in regulations implementing the Act, means an act which actually kills or injures wildlife. Such an act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering (50 CFR 17.3).

"Incidental take" is defined in 50 CFR 402.02 as taking that results from, but is not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or applicant. Exemption of Federal actions to allow incidental take of spotted owls under Section 7 must pass two tests: (1) The anticipated level of take must not violate Section 7(a)(2) by being likely to jeopardize the continued existence of the owl, and (2) Taking that occurs must be in compliance with the terms and conditions of this written Incidental Take Statement as directed by Section 7(o)(2).

The Service is required to use the best scientific and commercial data available when reviewing actions under Section 7 of the Act. Incidental take guidelines for the northern spotted owl were established on July 11, 1990, using the most current home range and habitat use data available. Those data are found in the Conservation Strategy and the 1990 Status Review, and are presented in the Service's Procedures Manual (USDI 1990c).

The Service anticipates that incidental take attributable to the proposed actions will result from two situations associated with timber harvest and habitat reduction:

1. Removal of spotted owl habitat within 0.7 mile of a pair activity center or nest site when such removal leaves less than 500 acres of suitable habitat, and harvest within a 70 acre core area surrounding the nest or activity center; and

2. Loss of suitable habitat within the estimated home range of an owl pair (a 1.2 mile radius from the pair activity center in California, or approximately 2,500 acres) to an amount that is less than 40 percent of that home range (approximately 1,000 acres).

The first situation involves harvest of habitat within 0.7 mile of a nest site or pair activity center. This loss of habitat will increase fragmentation of the stand and impair the owls' ability to forage. An increase in predation

and/or competition for a shared but diminishing resource may also occur. The Forest Service provided information on known spotted owls within 0.5 mile of proposed harvest units. For the purposes of this opinion, the Service is assuming that harvest within 0.5 mile of a pair activity center will result in take of that pair.

The second situation would result in take if harvest reduces the amount of suitable habitat to less than 40 percent of the area within a 1.2-mile radius of a nest or pair activity center. This loss of habitat would reduce the productivity of the pair and could increase predation and competition through increased fragmentation. Consequently, the Service determines that this type of action may create a likelihood of injury to the owl by harassing it to an extent as to significantly disrupt normal behavioral patterns such as breeding, feeding, or sheltering.

Incidental Take Statement

The KNF proposes removal of 1,315 acres of suitable spotted owl habitat. Take of at least 14 spotted owl pairs may result due to harvest within 0.5 mile of known pair activity centers. Data as to the amount of habitat remaining within the home ranges of pairs affected by the subject actions are not available, so the Service is unable to predict the number of owls that may be taken in this manner. Further, other owls, as yet undiscovered, may be incidentally taken by the proposed actions. Thus, for the purpose of this opinion, the Service assumes take of all owls within removed suitable habitat that results in a variance from the incidental take guidelines detailed in the July, 1990, Procedures Manual. The Forest has developed this proposed action with the intent of avoidance of adverse impacts to spotted owls in known areas of concern.

The Service authorizes incidental take, in the form of harassment, of all owls associated with a portion of those suitable acres, in compliance with the provisions of the reasonable and prudent measures and terms and conditions of this Incidental Take Statement.

To minimize incidental take the following reasonable and prudent measures are established:

1. Prevent disturbances to owl pairs and their progeny during the nesting season.

2. Maintain essential habitat within close proximity of spotted owl nest sites and activity centers and maintain adequate breeding, foraging, and sheltering habitat within the home range of owls in proposed HCAs.

To implement these reasonable and prudent measures, we hereby establish the following mandatory terms and conditions for incidental take:

For sales that were planned as of July 23, 1990:

1. Eliminate or relocate planned timber harvest activities (e.g., sale units, road right-of-way clearing) that are within a 0.5-mile radius of spotted owl nest sites or pair activity centers within category 1, 2, or 3 HCAs, unless further analysis demonstrates that a 70-acre core area of the best available, most contiguous habitat around the nest site or activity center and 500 acres of suitable habitat within a 0.7-mile radius would remain after harvest.

2. Between February 1 and July 31, for all pairs outside of HCAs, prohibit timber harvest activities within a 0.5-mile radius of spotted owl nest sites and activity centers unless further analysis demonstrates that a 70-acre core area containing the best available, most contiguous habitat around the nest sites or activity centers and 500 acres of suitable habitat within a 0.7-mile radius would remain after harvest or it can be shown that the site is unoccupied at the time of harvest.

These terms and conditions were developed to minimize the level of incidental take to the species. As expressed throughout this document, the Service is most concerned about minimizing the loss of owls in proposed category 1, 2, and 3 HCAs. The maintenance of owl pairs and their habitat within these areas will promote their continued occupancy by owls and contribute to the successful movement of owls between and within provinces. In addition, these terms and conditions will help to maintain options for the successful implementation of a conservation strategy and recovery plan.

If more than the above-mentioned level of anticipated take occurs, the U.S. Forest Service shall require within its authorities that the causative action of such take cease immediately, and shall reinitiate formal consultation to reevaluate the incidental take impacts.

Conservation Recommendations

Section 7(a)(1) of the Act directs Federal agencies to utilize their authorities to further the purposes of the Act by carrying out conservation programs for the benefit of endangered and threatened species. The term "conservation recommendations" has been defined as suggestions by the Service regarding discretionary measures to minimize or avoid adverse effects of a proposed action on listed species or critical habitat. The Service offers the following conservation recommendations:

1. The only scientifically credible conservation strategy existing for the spotted owl is the one that was prepared by the ISC. We strongly recommend adoption of this plan as soon as possible. In the future, if other strategies based on the principles of conservation biology are accepted by the scientific community and the Service through the recovery planning process or another manner, they may be considered for adoption in place of, or as modifications to, the ISC strategy.

2. If a biologically sound conservation strategy is not adopted as soon as possible by the Forest Service and other land management agencies, it will be necessary to provide increased protection for all remaining pairs of spotted owls to preserve options for long-term recovery. Therefore, until an effective conservation strategy is adopted,a avoid harvest in proposed HCAs;b avoid harvest within a 70-acre area adjacent to, and that reduces suitable habitat below 500 acres within 0.7 mile of nest sites and activity centers;c provide and maintain through time at least 60 percent suitable habitat within the home range of each spotted owl pair that is located outside HCAs;d plan sales in compliance with the 50-11-40 rule;e and maintain all existing large contiguous blocks of spotted owl habitat.

3. Design, implement, and monitor timber harvest prescriptions to minimize impacts to the spotted owl and, in the long term, create or restore the necessary components of owl habitat. The Service recognizes management

options exist to facilitate this need. Consider testing as many of the following prescriptions as possible on individual sites, as appropriate:

a. Leave sufficient snags and down woody material to provide for spotted owl habitat components.

b. Burn post-harvest fuels only as necessary for fuel reduction and insect control. Retain large down logs where possible.

c. Treat stands of young trees to facilitate more rapid production of large trees and well-developed multi-stories stands.

d. Create or improve the decadent tree component by topping or girdling large trees.

e. Selectively harvest to encourage understory development while retaining overstory canopy closure of 40 percent or more.

f. Leave sufficient green trees (at least 12 per acre, individually and in clusters of mixed species and ages) to serve as the upper canopy layer as habitat recovers its value for nesting, roosting, and/or foraging activities of spotted owls; and

g. Within shelterwood harvests, leave 8-15 mature trees per acre to provide the residual components of spotted owl nesting, roosting, and foraging habitat. Eliminate the final overstory removal phase.

4. In order to minimize impacts in HCAs in projects where the option to move projects out of HCAs does not exist, consider the following measures:

a. Attempt to locate substitute volume within the HCA but out of suitable spotted owl habitat.

b. If unable to accomplish the recommendation in (a), and in areas where clearcutting is proposed, change the harvest prescription to a partial cut, then seek substitute volume through thinnings or other prescriptions more compatible with creation and maintenance of spotted owl habitat.

c. Avoid road construction in HCAs.

5. Analyze the forest matrix to determine its condition in regard to providing connectivity between HCAs. Develop a strategy to manage for such connectivity. One method (the 50-11-40 rule) is described in the Conservation Strategy. The 50-11-40 rule, or some method that is reviewed and found acceptable by an interagency body of scientists similar to the Interagency Scientific Committee, should be considered in planning future timber sales.

6. The Forest Service should coordinate with the Service to develop a tracking procedure that will monitor implementation of the sale program and document the following: the total number of owls impacted and at what levels; the total amount of owl habitat removed from the environmental baseline; and the amount of habitat removed from each HCA. Habitat and owls lost to fires and other natural disasters should be similarly tracked.

7. Proposed sale areas should be surveyed a minimum of 6 times within a given season to provide a reasonably accurate data base from which to make sound management decisions.

8. The Forest Service should coordinate with the Service and State resource agencies to design and conduct spotted owl research and monitoring efforts, including banding and telemetry programs and studies of habitat utilization.

9. Work closely with adjacent Federal, State, and private landowners to properly manage spotted owl habitat on a landscape level, monitor owls and the effects of timber sale-related activities, and design sales to avoid adverse impacts to spotted owls.

10. Coordinate the funding, development, and maintenance of a geographic information system that is compatible between Federal and State land management and fish and wildlife resource agencies for the long-term tracking of spotted owls and their habitat.

In order for the Service to be kept informed of actions that either minimize or avoid adverse effects or benefit listed species or their habitat, the Service requests notification, in writing, of the implementation of any conservation recommendations.

The Service is to be notified in writing within three working days of the accidental death of, or injury to, a northern spotted owl, or of the finding of any dead or injured northern spotted owl(s) during harvest or post-harvest activity. Notification must include the date, time, and location of the incident or discovery of a dead or injured northern spotted owl, as well as any pertinent information on circumstances surrounding the incident or discovery. The Service contact for this information is either the nearest Service Law Enforcement Office/Agent or Mr. Wayne S. White (916/978-4866). Any dead or injured northern spotted owls must be reported to the Service's Law Enforcement Division and may subsequently be turned over as soon as possible to a game warden or biologist of the California Department of Fish and Game for care or analysis.

This concludes formal consultation on this action. Reinitiation of formal consultation is required if the amount or extent of incidental take is exceeded, if new information reveals effects of the action that may impact listed species or critical habitat in a manner or to an extent not considered in this opinion, if the action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in this opinion, or if a new species is listed or critical habitat designated that may be affected by this action. If you have any questions regarding this Biological Opinion, please contact me, Mr. Gail Kobetich or Mr. Steve Spangle of my staff at the above phone number.

Sincerely,

Marvin L Plenert

Regional Director

**References**

Thomas, Jack Ward, Eric D. Forsman, Joseph B. Lint, E. Charles Meslow, Barry R. Noon, and Jared Verner. 1990. A Conservation Strategy for the Northern Spotted Owl. Unpublished interagency document. 458 pp.

USDI Fish and Wildlife Service. 1989. The Northern Spotted Owl: A Status Review Supplement. Unpublished agency document.

__________ 1990a. 1990 Status Review (for the) Northern Spotted Owl. Unpublished agency document. 95 pp.

__________ 1990b. Final Rule (for the determination of threatened status for the) Northern Spotted Owl. United States Federal Register, June 26, 1990.

__________ 1990c. Procedures Leading To Endangered Species Act Compliance for the Northern Spotted Owl. Unpublished Agency Document. July, 1990.

Wilbanks, Sam. Personal Communication. Klamath National Forest Logging