IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ALFRED ALOISI, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 95-650L |
| | ) | |
| UNITED STATES OF AMERICA, | ) | Hon. Lawrence S. Margolis |
| | ) | |
| Defendant. | ) | |
| | ) | |

**Second Affidavit of Alfred L. Aloisi**

I, Alfred L. Aloisi, being duly sworn, do declare:

1. I am the same Alfred L. Aloisi who executed an Affidavit on January 28, 2008, under the same case caption, and am the same Alfred Aloisi listed as a plaintiff in the captioned case. I am aware that my January 28, 2008, Affidavit was lodged with the Court in the captioned case as Exhibit 1 to Plaintiffs' Motion for Summary Judgment and Memorandum in Support on February 6, 2008.

2. In paragraphs 8 and 9 of my January 28, 2008, Affidavit, I described the history of my acquisition of interests in the mining property in Eddy Gulch, both the two patented, private parcels known as Mineral Lot 45A (the Mountain Laurel Mine) and Mineral Lot 45B (the Mountain Laurel or Gold Ball Millsite, or Rollin site), and the unpatented mining claims in Eddy Gulch, both the claims held by Mr. Alexander Patterson directly, and those he had leased from others such as Ruth Markon with respect to the Anna Johnson group of claims. As I described some of these events in those paragraphs 8 and 9, I acquired these interests in association with others, including my

business associate in the early 1980s Mr. Robert Pincombe, who did business in the name of Mara Ventures, Inc.

3. Specifically, I described in those paragraphs there: how Mr. Patterson's death led to a failure to make annual filings required to maintain the unpatented mining claims that we were acquiring under lease – purchase agreements; how I located new claims on my own in order to reestablish and preserve the property position in unpatented mining claims that we had been acquiring from Patterson and others under these agreements; and how my relocations prevented the loss of all of the rights of Patterson (now his estate) in the unpatented claims in Eddy Gulch.

4. In paragraph 9 of my January 28, 2008, Affidavit, I declared the following:

"9. At the time I made these new locations of the leased claims, I had paid Mr. Patterson approximately $70,000 under the lease-purchase agreement. I contacted Mr. Pincombe and Ruth Markon and proposed a new business arrangement with each. We agreed with Ruth Markon to pay $50,000 dollars for the Anna Johnson group of claims (this was a new deal – she was to have received $20,000 from Patterson, which she never got). We made a similar arrangement with Mr. Pincombe ($50,000) for all of his interests in the Eddy Gulch properties. Finally, we also made a similar arrangement with the Patterson estate (JA-18), that we would pay $50,000 for the two patented parcels – Mineral Lot 45A (the Mountain Laurel Mine) and Mineral Lot 45B (the Mountain Laurel or Gold Ball Millsite, or Rollin site). Although the ground had come open due to Patterson's failure to file with BLM, and I had on my own preserved the property position by locating the Lost Dutch Boys claim group, I felt that it was a matter of honor that I completed the purchases under the terms previously contracted with Mr. Patterson,

through Pincombe and Mara Ventures."

5. The Memorandum of Agreement dated March 18, 1988 (produced as A-163) memorializes the agreement described in the preceding "Paragraph 9" to pay Mr. Pincombe (Mara Ventures) $50,000 to acquire all of his remaining interest in the rights Mr. Patterson (and then his Estate) held in Eddy Gulch.

6. The "Agreement dated 1 June 1984 with George M. Patterson," listed as number "1" in the Memorandum of Agreement that is A-163, and refers to the lease purchase agreement I entered into with Patterson's Estate in 1984 (after relocating the claims lost by Patterson) for $50,000. Any copy of the 1 June 1984 Agreement with George M. Patterson (Alexander Patterson's brother) has been lost to me. This $50,000 lease-purchase agreement, however, significantly reduced the purchase price on the original pre-1983 lease-purchase agreement between Patterson and Mara Ventures and my associates, that was in effect before Patterson lost the unpatented claims. The purchase price reduction was in consideration for my efforts to relocate the claims and avoid everyone's (Patterson's, Pincombe's and my) losing the unpatented ground to competing locators.

7. During this time I, through Jefferson State and then Liberty Mining, continued to make the $500 per month lease-purchase payments. Several of these monthly lease-purchase payments are reflected on the Liberty expense ledgers produced in this case as A-168, as on pages 6 and 17 of the produced ledger, in payments of $500 each month to Ruth Patterson, widow of Alexander Patterson.

8. In my January 28, 2008, Affidavit, I also described events that occurred in the Spring of 1991, during the period when District Mineral Officer then, Harry Frey,

authorized Liberty to undertake certain limited activities under an oral authorization he gave in March 1991.

9. In paragraph 39 of my January 28, 2008, Affidavit, I declared:

"39. Another activity Mr. Frey authorized in the Spring of 1991 was the burning of slash piles and cleanup work, and the brushing of the road from Rollin to the Anna Johnson Mine for the purpose of moving the core drill up to the proposed drill sites. Liberty paid Salmon Mountain Forestry $40,000 to do this work. The funds to pay Salmon Mountain Forestry, and Winthrop and Associates to nearly complete the Arch Study ($12,000), came from bartering Liberty's timber milling equipment for the milled lumber that resulted and mortgaging its patented properties for operating capital ($250,000) (JA-115). Liberty operated under the Frey authorization from March to July 1991."

10. When Liberty (and Energel) sought to raise additional operating capital by mortgaging the two private parcels, both Lots 45A and 45B (Rollin), we paid the remaining balance owed on the Memorandum of Agreement between Pincombe (Mara Ventures) and me (A-163), and between Patterson's Estate and me under the "Agreement dated 1 June 1984" referred to in paragraph 1 of the 1988 Memorandum with Pincombe. This is the mortgaging referred to in the preceding Paragraph 39 of my first Affidavit. It was in connection with this mortgage that Mr. Charles Schultz provided David Davies his assessment (JA-101) appraising the Mountain Laurel property for purposes of the mortgage and describing that the "mine tailings dump contains at least 35,000 tons at 0.097 oz/ton which would yield 3,395 ounces of gold." This was one of Liberty's target dump deposit for its operation aborted in 1990.

11. Thus I held the right to use and mine Mountain Laurel Lot 45A and Rollin Lot 45B from 1984 under the agreement with George Patterson, and then held full legal title briefly in 1991 during the closing in which we completed the purchase of the rights previously held under lease. I then conveyed to Energel who mortgaged the Mountain Laurel property to David Davies, and with Lot 45B mortgaged to the life insurance company with which David Davies was affiliated. I with my various associates (from Mara Ventures through Jefferson State to Liberty) held and controlled the Mountain Laurel property from the early 1980s under lease-purchase agreement, and conveyed full title to Energel in 1991.

12. I have read "Defendant's Motion to Dismiss, or Alternatively, for Summary Judgment" also filed February 6, 2008, in the captioned case. On page 18 of that filing it is stated, "… Liberty leased its mining claims (including Mountain Laurel Mine) to WAZCO on April 25, 1993, effective April 1, 1993." This is not true. In 1992, prior to this lease, the holder of the note on the Mountain Laurel property (David Davies) who had loaned Energel capital security by the mortgage of Mineral Lot 45A, the Mountain Laurel Mine, foreclosed on the loan. The papers in JA-115 reflect this transaction. Although Exhibit A to the WAZCO Lease (JA-158, at 1323) mentions a "letter of understanding" with respect to Mineral Lot 45A, WAZCO acquired the Mountain Laurel Mine property directly from David Davies, Energel's successor through foreclosure. Mineral Lot 45B (Rollin) was not involved in either the WAZCO lease (JA-158), or the successor lease between Don Goodman and me and Liberty Consolidated Mines, Inc. (LCM).

13. The Mountain Laurel Mine, Mineral Lot 45A, was and is the key to restarting

underground mining operations in Eddy Gulch. This is clear from the plan of operations submitted by WAZCO's successor, LCM, which the Forest Service ultimately approved in 1996. It called for mining an underground orebody accessed from the May Tunnel or the Union No. 8 Adit of in excess of 200,000 tons "contain[ing] gold values in excess of 0.5 Troy ounces of gold per ton", processing it through a 150 ton per day mill (at Usher Flat), and milling it with a "combination of gravity and flotation extraction" based on "tests ... achieving a 93.4% recovery of contained gold." JA-181, at 1481 and 1483. The May Tunnel is on the Mountain Laurel property, even though the underground ore underlies unpatented lode claims in the Liberty property position.

14. After the foreclosure on the Mountain Laurel property in 1992, Liberty was faced with two overwhelming obstacles: the Forest Service continued to delay any chance at initiating the development of Eddy Gulch starting with surface apex and dump mining operations, given the reinitiation of consultation on the effects of the 1989/1992 Liberty all-phase plan on the owl; and the best approach to developing the underground deposits in the property, through the accessible existing workings of the Mountain Laurel Mine, had been was lost through the 1992 foreclosure. WAZCO and LCM, however, even if they acquired the Mountain Laurel Mine from Davies, could not develop underground ore through the May Tunnel on the Mountain Laurel property without generating the same ownership dispute and trespass claims regarding those underground deposits that led to the naming of the "Litigation Stope" when the Union claims and Mountain Laurel Mine were under different ownership and litigated which property position owned the ore body both claimed to own.

15. Under these circumstances, Liberty determined to lease the unpatented

mining claims it controlled to WAZCO as the best way to advance the development of the property. WAZCO (and then its successor LCM) would fully control these underground deposits: holding the legal right to mine ore that is controlled by the unpatented mining claims as the down-dip extension of the vein which has its apex in the unpatented claims; and controlling the easiest and least expensive physical access to these deposits through the tunnel opening on the Mountain Laurel private parcel. This course, at the time in 1993, also appeared to be the most promising way for Liberty to earn mining revenue (although through a production royalty on underground production).

Subscribed and sworn before me by [signature] on this 3rd day of March, 2008.

[signature] Notary Public, State of California

My commission expires June 7, 2012



PE-21-290

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California
County of ______

On ______ (Date) before me, ______ (Here Insert Name and Title of the Officer),

personally appeared ______ (Name(s) of Signer(s)) ______,

RONALD O. ROBISON
Commission # 1666654
Notary Public - California
Siskiyou County
My Comm. Expires Jun 7, 2010

Place Notary Seal Above

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature ______ (Signature of Notary Public)

### OPTIONAL

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Description of Attached Document**

Title or Type of Document: ______

Document Date: ______ Number of Pages: ______

Signer(s) Other Than Named Above: ______

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: ______
- ☑ Individual
- ☐ Corporate Officer — Title(s): ______
- ☐ Partner — ☐ Limited ☐ General
- ☐ Attorney in Fact
- ☐ Trustee
- ☐ Guardian or Conservator
- ☐ Other: ______

Signer Is Representing: ______

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

Signer's Name: ______
- ☐ Individual
- ☐ Corporate Officer — Title(s): ______
- ☐ Partner — ☐ Limited ☐ General
- ☐ Attorney in Fact
- ☐ Trustee
- ☐ Guardian or Conservator
- ☐ Other: ______

Signer Is Representing: ______

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

©2007 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org Item #5907 Reorder: Call Toll-Free 1-800-876-6827