**In The Matter Of:**

*Alfred Aloisi, et al., v.*
*The United States*

---

*Kathleen Granillo*
*Vol. 1, October 2, 1997*

---

*Bean & Associates, Inc.*
*Professional Court Reporting Service*
*500 Marquette, N.W., Suite 280, Albuquerque, NM 87102*
*119 East Marcy, Suite 110, Santa Fe, New Mexico 87501*

*(800) 669-9492 or (505) 843-9494*

*Original File gr100297.v1, 90 Pages*
*Min-U-Script® File ID: 0792355618*

**Word Index included with this Min-U-Script®**

I went to work for the Pacific Southwest Forest and Range Experiment Station, which is the research branch of the Forest Service out of Arcata, the Redwood Sciences Lab.
**Q:** That's in California?
**A:** In California, northern California. And I worked on the old growth Douglas fir wildlife study, which took place all over Six Rivers, mostly Six Rivers National Forest, a little bit on the Klamath, K-L-A-M-A-T-H. And then there were equivalent studies going on in Oregon and Washington, and they were looking at old growth fir and wildlife species.
**MS. COOK:** Slow down a little.
**A:** The Douglas fir, I worked on that project for about ten months, and then I went back and finished my - passed my orals for my master's. And then I went to work for a professor at UC Berkeley, Dr. Michael Morrison. I worked for him in the Sierra Nevada at Blodgett Experimental Forest, B-L-O-D-G-E-T-T, which is a UC Berkeley Experimental Forest. I worked on studying wintering foraging habits of birds and mixed conifer.
**Q:** Okay.
**A:** And then I went to work for - back to Pacific Southwest Forest and Range Experiment Station, but out at Fresno.
**MS. COOK:** We're going to spend hours correcting this deposition. You're going to have to concentrate on going very slow because a lot of this is going to be new to her.



**A:** PSW.
**MS. COOK:** Can you start at the beginning of the last sentence? Do you remember where you were?
**A:** I went back to Pacific Southwest Forest and Range Experiment Station, or PSW, for authority out of Fresno, California, for Dr. Jerry Verner, V-E-R-N-E-R.
**Q:** What years are we in now?
**A:** I started there in '85.
**Q:** Okay.
**A:** 1985, and I worked for Jerry. I got a permanent position there in 1986 or 1987. I can't remember which.
**Q:** This is part of the Agriculture Department and part of the Forest Service?
**A:** It's a research branch of the Forest Service. And I worked for him for four years on monitoring bird populations in the Sierra Nevada. And then in 1988, I transferred to the management side of the Forest Service. I went to the Coronado National Forest in southeast Arizona to the Safford Ranger District as the district wildlife biologist.
**Q:** Did you deal with owls there in Safford?
**A:** Yes, somewhat. We had Mexican Spotted Owls in the forest. My main job was working with the Mountain Graham Red Squirrel.
**Q:** Mountain -
**A:** Graham, G-R-A-H-A-M. It's an endangered subspecies



of red squirrel.
**Q:** Thank you. And when did you leave Safford and move to your next position?
**A:** I left Safford in July of 1990 and went to the Klamath. I got to the Klamath like the day or two after the Northern Spotted Owl was listed.
**Q:** In Safford, you were in a forest supervisor's office for Coronado National Forest, or were you in a ranger district?
**A:** A ranger district. And then at Klamath, I was the forest - I came as the forest wildlife biologist.
**Q:** There was only one of you?
**A:** There was an assistant wildlife biologist already there, Karen Raftery, R-A-F-T-E-R-Y, and then my job, the wildlife biologist.
**Q:** You said you arrived in the Klamath National Forest. That means in Yreka, California?
**A:** Yes.
**Q:** When? In June or July?
**A:** July. I got there right when the owl was listed.
**Q:** That would be June.
**A:** Well, it was when the opinion came out, whenever that was, before the - you're right.
**Q:** Were you hired specifically because of your familiarity with owls, or did you apply for the job knowing that there was a listing that was going to occur and that you



would be working with Northern Spotted Owls?
**A:** I applied for the job because the forest supervisor called me up and asked me to apply for it.
**Q:** Who was that?
**A:** Barbara Holder. And I knew that owls would be a big part of the job.
**Q:** When you got there, what percentage of the job were they?
**A:** Owls? Well, they ended up being probably 95 percent of the job.
**Q:** For most of the time that you were in the forest supervisor's office?
**A:** Yes.
**Q:** And how long was that?
**A:** I left there at the end of November of '92.
**MS. COOK:** Now, even though you know what he's going to say toward the end of the sentence, let him get all the way through because it makes it so much easier for her.
**THE WITNESS:** Okay.
**Q:** Were you the wildlife biologist for Klamath National Forest for that entire period, July 1990 to November 1992?
**A:** Yes. And I also - there was a change in our organizational structure after - I can't remember how long - a few months, a year, and I became the forest wildlife staff officer.



**Q:** What's the difference between being a staff officer and a wildlife biologist?
**A:** Well, the staff officers - and there are several. There's a timber staff officer, recreational staff officer, that sort of thing. Those positions are on the forest management team.
**Q:** So that's a promotion?
**A:** Well, I did not receive a promotion, but workwise, it was.
**Q:** In November of 1992, then, where did you go?
**A:** I came here to Albuquerque to the U.S. Fish and Wildlife Service.
**Q:** And are you in the same job now that you came to in Albuquerque?
**A:** No.
**Q:** Okay. What job did you come here to take in November of '92?
**A:** November of '92, I came here to be the regional nongame migratory bird coordinator. And I had that job for about a year, and then I became the regional biologist.
**Q:** Is that the job you have now?
**A:** Yes.
**Q:** In your current job, are you involved in section 7 consultations? Is that part of your responsibilities?
**A:** No. I am in refuges.



**Q:** So you don't deal with the listing of species as threatened or endangered, the listing process?
**A:** No.
**Q:** Nor the designation of critical habitat?
**A:** No.
**Q:** Not even as it applies to a refuge?
**A:** We have not had that happen, that I know of, while I've been here.
**Q:** And while you were in the Klamath National Forest supervisor's office, did you receive any special training in endangered species procedures or practice?
**A:** Well, when I was at Safford, I had a training session on the Endangered Species Act and consultation.
**Q:** Where was that held? Is that like a national thing for people in the Forest Service, or do you recall?
**A:** U.S. Fish and Wildlife Service, Phoenix office, put it on, and I mean, I've had other training that dealt with consultation.
**Q:** While you were in the supervisor's office in Yreka?
**A:** Yeah. We had some - not any real formal training, but we would have get-togethers with other biologists in the Forest Service and go over how we were supposed to do consultation packages and whatnot.
**Q:** If I could ask you to start in with some documents here. I'm going to be referring to the tab numbers, so for the

PE-24-298

Page 12

record, I'm asking you to look at tab 66. This is in the Forest Service index numbering system.
You made reference to arriving on the forest shortly after either a listing or an opinion. Can you be specific about how your arrival was timed with document 66, which is dated June 18, 1990?
A: Well, document 66 is the request for – is the biological evaluation. This was done before I arrived on the forest and sent to the Fish and Wildlife Service.
Q: So you had no role in preparing this?
A: I had absolutely no role in preparing this. When I got there, they had just received the opinion back on this package.
Q: Okay. And what responsibilities did – well, I guess let me ask you, then, if you would turn to document 69. You've said, I think, they had just gotten the opinion back. Is this the opinion back that you were referring to or perhaps one of several?
A: Yes, this one. And we have – this is for planned sales, and we had one for sold sales.
Q: Could you explain the difference between planned sales and sold sales? S-O-L-D sales?
A: Uh-huh, S-O-L-D.
Q: Go ahead.
A: Planned sales are sales that the Forest Service had

Page 13

planned but not yet sold to an operator at, you know, timber operation. Sold sales were sales that we had sold to –
Q: There was already a contract?
A: On the contract, already something in place, that that person was actually going to go out and cut timber.
Q: And was there a difference on how the biological opinion was going to treat those?
A: Yes.
Q: And do you know what that was or how you handled that, how the Forest Service handled that?
A: Well, you know, it's been several years. I would have to look, but I believe the main difference was, planned sales we have more flexibility on. We can alter them. They're not sold. We don't have a contract, so we can change them a lot easier. Sold sales, since we have committed to a contract and there's money involved and all, are harder to change. So the way the Fish and Wildlife Service dealt with those, they wanted us to do more with our planned sales, more modifications than with the sold sales.
Q: Okay. So there was a lot of follow-up to be done after the biological opinion came back on planned sales to complete modifications and do those things?
A: Yeah, there was work to be done to change some of those sales.
Q: And what role did your office, the wildlife

Page 14

biologist for the forest, have in that responsibility implementation?
A: Well, the way that we operate is, the sales are planned by the districts, and they do all the documentation. The forest level, like for this consultation package, we compiled the information for the districts, you know, sent it off. And then when we get it back, we disseminate it back out to the districts, and then it's up to them to implement whatever is called for for any particular project.
And we would, you know, try to alert them to what we thought needed to be done, but they don't work for us, you know. So we would give advice on what they should be doing, and then it's up to the district to do it.
Q: Were you responsible – was there a sequence ordered where you would deal with one ranger district for a week and then the next ranger district, or was this catch-as-catch-can, who phoned who when?
A: There wasn't any real, you know, straightforward do this district then that district. It was just pretty erratic.
Q: Did you have to read this document start to finish when you got on to your job?
A: Yes, I did.
Q: Okay. So when this July 23 biological opinion came back, this was a big deal in the forest supervisor's office? Was this the task of the week or weeks to see it implemented?

Page 15

A: That's a fair characterization.
Q: And did you have assistance in working on that from the supervisor's office? Was there a team of you, or by and large it was for you to deal with the various ranger districts if they had questions about this?
A: Well, myself and Karen, the assistant biologist, dealt with this extensively, and also the timber staff, since mostly it was timber sales that were involved. So Ken Slater, S-L-A-T-E-R, the head of the timber shop and his people were also involved in, you know, trying to make sure the districts knew what was in here and what they had to do.
Q: Okay. You said mostly timber sales. What other kinds of projects were covered?
A: Well, like, the Liberty Mine was in there.
Q: Were there other types of nontimber projects that were covered?
A: I'd have to look. I don't remember.
Q: Okay. And do you remember, was there more than one mining plan of operations involved?
A: I don't remember. I'd have to look.
Q: Okay. Who, then, would have had – was there another program official in the supervisor's office who would have had responsibility, then, for a plan of operations, as opposed to timber sales, as Mr. Slater had timber sales? Someone else?

Page 16

A: Well, yeah, I mean, it's up to the district to deal with each individual project. We did have a minerals staff officer. Dick Ober was there, and Harry Frey, and they were dealing with minerals operations, so they knew about this document. But mainly it was up to the district.
Q: Okay. Was there any difference in priority given to projects where there was an applicant as opposed to projects where there was not an applicant under the Fish and Wildlife Service rules?
A: What do you mean by "applicant"?
Q: Well, if an outside proponent of the project, someone who is seeking approval from the Forest Service to go ahead with something, as opposed to a timber sale, which if it's unsold – correct me if I'm wrong – there is no contractor, and it is just a Forest Service proposal, there is no one coming to the Forest Service with an application that needs to be acted on.
A: Well, I don't think we considered any of these projects to have an applicant.
Q: Okay. Even the mining plan of operations case?
A: Right, because we were consulting on the effects on habitat, the removal of trees, the removal of suitable spotted-owl habitat, which was like that phase-one part of the mining plan and not the entire plan of operations, which we didn't have.

Page 17

**MR. MCBRIDE:** Off the record for a minute.
(A discussion was held off the record.)
**MR. MCBRIDE:** Okay. Back on the record.
Q: You were examining or looking at or dealing with the impact on trees and cutting and clearing; is that what you were saying? What were the standards, then, that were being used to determine whether a project was in need of modification or not in need of modification? What sort of impact standards were there on trees or canopy closure or whatever? Do you remember them?
A: Well, are you talking about when the biological assessment was written or after the ISC, the Interagency Scientific Committee strategy came out?
Q: Well, I guess I'm asking about as of the time of the July 23, 1990, opinion, and I don't know the answer. I'll ask you, had the Interagency Scientific Committee come out with its standards?
A: I don't remember when they did that. I know in the opinion they told us some stuff. I'll take a look here. We have to go with what the Fish and Wildlife Service tells us we can do, you know, to avoid taking of a species. And in their incidental take statement, they're talking about –
Q: Could you give me the page of the –
A: Page 111.
Q: Thank you. Go ahead.

PE-24-299

Page 18

A: Talks about preventing disturbance to owl pairs and maintaining essential habitats. And then it goes on, "Having reasonable and prudent measures in order to meet those." Those are the reasonable and prudent measures, and then there are steps to meet those. In there, they spell out about eliminating or relocating planned timber harvest activities within a half mile radius that are in category one, two, or three HCAs.
Q: What are HCAs?
A: HCAs are habitat conservation areas.
Q: And what was your understanding of the origin of that designation or usage?
A: The HCAs come from the ISC strategy. And the ISC strategy was written to provide for the continued existence of the Northern Spotted Owl, and so the HCAs are habitat conservation areas from that plan.
Q: Okay. And what were the key concepts? You mentioned a radius. What's the point of the radius rule, and what was the rule, if you recall?
A: That deals with the size of a spotted owl pair's home range. And on the average, in the Klamath province, their home ranges were about – I can't remember exact acreages, but the half-mile radius is an area around the nest site that is felt to be, like, 60 percent of owl use. And the 1.2-mile radius is believed to take in the average home range of a pair

Page 19

of owls.
Q: Okay. And is that the same thing as a habitat conservation area, or is that just a little radius circle drawn in as part of the strategy?
A: Yeah. Those are two different things.
Q: What was a habitat conservation area there at that time?
A: The habitat conservation area – well, it depends on the categories, because there's three different categories. The category ones were to protect 20 pairs or more of spotted owls, so they were very large. Category twos were – I can't remember the exact numbers – I believe, like, five to ten or something, or less than ten. I don't remember. And the category threes, I think those were the areas of special concern, but I'd have to look to be sure.
Q: Okay. Could I ask you to turn to page 6 of this same Exhibit 69? It's a chart, table.
A: Table 1?
Q: Yes. Thank you. Does this chart reflect anywhere the different types of categories you've just been describing?
A: Well, it has the HCA number on it, and by the number, you can reference which type. It doesn't say exactly which type it is on here.
Q: Okay. These are the numbers of specific geographical areas that the Forest Service had established?

Page 20

A: Each HCA – these are all set up by the ISC, and the numbering system is also. It's not a Forest Service numbering system. That was part of the strategy. They gave us a map and said, "Here's the HCAs and here's their number."
Q: So looking at table 1 on page 6, where it says Liberty Mine about two-thirds of the way down, going across C10, there is a specific designated area.
A: Right. That's the number of that particular HCA.
Q: Designated by the interagency committee?
A: Right.
Q: And when was that done?
A: Well, I don't know. I guess it was before we got the opinion. I'm not sure of the exact date.
Q: Okay. Right about the same time?
A: Probably right in there, because – yeah. I'm not sure of the date.
Q: Did the creation of habitat conservation areas have a canopy closure constituent criteria?
A: Well, the HCAs – that's an oversimplification. There is a habitat component to HCAs, but HCAs also have a larger meaning in the realm of conservation of the owl.
Q: What is that larger meaning beyond?
A: Well, I don't know how detailed you want to get here, but –
Q: A paragraph perhaps?

Page 21

MS. COOK: Give detail.
A: We have the SOHA system, spotted-owl habitat areas. The SOHA areas were what the Forest Service had been operating under.
Q: Is that a system that the Forest Service designed, not the Interagency Scientific Committee?
A: Right. It's a Forest Service process. And what we did there was set up a SOHA around known owl pairs. So it was oriented around the pair, and it was set up to protect as much suitable habitat for that pair.
Q: Now, did you actually create any of those SOHAs as part of you duties or –
A: No.
Q: You came to an existing set of maps of them?
A: Right. They were existing. They've been around for several years before this.
Q: Okay.
MS. COOK: For the record, "this" being Exhibit 69?
A: Yeah, the opinion. The SOHA system was believed to be inadequate to protect the owls, which was partly how the ISC strategy came out. And the HCAs, what they wanted to do was set aside large areas of habitat so that the habitat would not get very fragmented. Fragmentation is believed to adversely affect the owl. So the idea of having these large HCAs was to

Page 22

protect as much habitat as possible in a contiguous manner. So they tried to set them up based on what habitat was there, but I don't know exactly what criteria, but it's not strictly on some canopy coverage amount.
Q: Is there a criterion for maintaining a canopy closure within such areas, if possible, you know, avoiding disturbance that would result in a reduction of canopy closure?
A: Well, there were restrictions on what we could do in habitat conservation areas.
Q: As stated in the –
A: I don't remember the exact canopy criteria.
MS. COOK: If you have questions, I can cite you the cases that set out the whole process.
MR. MCBRIDE: Okay. Eventually we will get there.
Q: So you knew shortly after you got to your job there in Yreka that Liberty Mine was one of the projects that was included in the July 23rd opinion?
A: Yes, because it's listed in the tables.
Q: Okay. Did you go through any educational exercise of your own to learn more about given projects that were covered by the biological opinion?
A: Yeah. When I got there, I read through the biological assessment that we had submitted and information we had received on all the projects, you know, and talked with

Page 23

people and tried to get up to speed on all these projects.
Q: Okay. And in that connection, if I could ask you to go back to document 66, please. Does it not have pages?
A: My copy does, handwritten.
Q: Well, nearly to the back.
A: Where do you want to be?
Q: Where the Liberty Mine activity is described, fairly close to the end.
A: Page 29 on my copy.
Q: Okay.
MS. COOK: I just numbered the documents starting from the first page, so that's my handwriting. There's no secret system. It just needed numbers.
THE WITNESS: Yeah. You started from the cover letter.
MS. COOK: Yeah. Started from the cover letter.
Q: As part of that education process, whatever, of just having arrived there with this biological opinion in hand, did you go back and look at the biological assessment or assessments that the Forest Service had sent to the Fish and Wildlife Service?
A: Well, this is the assessment that we sent.
Q: Yes.
A: Are you talking about the individual – I'm not sure how they put this together, and I frankly don't remember if we

PE-24-300

had individual documents on each project.
Q: I'm asking if in July of 1990 you read through this and learned what the various projects were, including exposing yourself to the fact that there was a Liberty Mine project described here.
A: Yes.
Q: Okay. Did you discuss with the Salmon Ranger District what plan of operations was involved in the Liberty Mine consultation, whether it was an all-phase plan, a plan as previously approved? Did you discuss that in any way?
A: At some point, I don't remember when, but yes, we talked about this project.
Q: And was it your understanding that what had been put in the consultation request, the project, was the so-called all-phase plan, which is a phrase that was used then, all-phase plan of operations?
**MS. COOK:** Why don't we first establish that she's even heard the term all-phase plan, because –
**MR. MCBRIDE:** Sure.
Q: Is that a phrase that you recall with the Liberty Mine proposal?
A: No. Just in reading through the documents, you know, this last week. But I don't recall using that phrase.
Q: Okay. Did you ever speak to – well, let's just start from the beginning here. You've met Mr. Aloisi before



today?
A: Yes, I have.
Q: Okay. And do you recall when you may first have met him?
A: We met – we had a meeting in the forest supervisor's office. I don't recall exactly when, but probably a few months after this came out. I don't recall when.
Q: Okay. And have you ever been up Eddie Gulch?
A: Yes, I went up there once.
Q: You've been up there once? Okay. Do you remember when that was?
A: I really don't. Sometime, you know, when I was there, so from that two-year-or-so time period. I think it was, like, summer of '91.
Q: Okay. Do you recall with whom you went on that trip?
A: I was with Harry Frey, and we came by and saw – you were at the cabins.
**MR. ALOISI:** Uh-huh. Kurt Marsick perhaps?
**THE WITNESS:** I don't remember that name.
**MS. COOK:** For the record, when you say "you," you will have to indicate you're talking to Mr. Aloisi. And unfortunately, we can't let you two have conversations because you're under oath. He's not. It's your deposition, so –
**MR. ALOISI:** I never lie.



**MS. COOK:** I know, but we just have to. That's the rules. We can't have you two having conversations, so you just need to confine your answers to Mr. McBride.
Q: (By Mr. McBride) Do you remember Jim Rock?
A: Yes.
Q: Would he have been with you that day?
A: I really don't remember.
Q: And do you remember someone in the forest supervisor's office named Kurt Marsick? And I'll guess at spelling, M-A-R-S-I-C-K.
A: Yes. And I don't know if he was there either.
Q: Okay. Do you know why you came? Do you remember the purpose of your visit? Presumably it was not your vacation or an off day.
A: It was related to this project and trying to implement this opinion and trying to figure out what habitat was going to be taken, just to look at the site and see where the project was and look at the – because we had been talking about this project, trying to figure out what habitat was being taken and what the effects were.
Q: Who is "we" that you've been talking about? Who are the "we"?
A: Well, the district and myself and Harry and –
Q: So implementing this project was one of the – was a matter that you specifically got involved with.



A: Yes.
Q: Okay. And how often or how regularly?
A: I don't think that I can characterize that, unless you ask me a different way.
Q: Okay. Was there a specific finding or determination you wanted to make with your visit, then, in July 1991? Did you come to make a finding or to make a determination of some kind?
A: Not that I recall. We were – it was mainly for me just to come see the site, since I had not seen it before, and to look at – since it's in an HCA and it was a suitable habitat and it was consulted on as a planned sale, we were told to get out of planned sales in HCAs, to, you know – not to offer that timber for sale. So even though this is a mining claim, you know, it's a suitable habitat question. So we were looking to see if there was any way to lessen the effect on suitable habitat.
Q: And were you able to make that determination?
A: I don't remember.
Q: Okay. Did you, while you were there, develop your own view as to whether this area in Eddie Gulch fit the HCA criteria and was, you know, properly designated?
A: Well, the HCA is, as I said, a large area that covers 20 or more pairs of spotted owls. And so in that area, there are, you know, 20 pairs of spotted owls, and so there was



obviously a lot of suitable spotted-owl habitat there.
Q: Okay. Did the forest that you saw there or the timber that you saw there appear to you to be old growth?
A: Now, tell me what you mean by "there," to be more specific.
Q: Well, let's go back and say, do you recall what parts of Eddie Gulch you toured? Do you remember particular areas you went? Usher Flat, for instance. Do you recall Usher Flat?
A: Yeah.
Q: Klamath dumps or the Klamath mine portal?
A: I think we went there.
Q: Go ahead.
A: I don't really know the names of all those places. I remember what we looked at and what it looked like.
Q: Was it a full-day trip?
A: I believe it was.
Q: So you were up onto the dirt road and into the gulch for four or five hours?
A: I don't recall.
Q: Okay. Do you recall any conversation you had with Mr. Aloisi while you were there that day?
A: Not any specifics.
Q: Okay. Did you discuss with him the condition of the area, its suitability in terms of old growth or canopy closure?



A: I don't remember.
Q: Okay.
**MS. COOK:** Do you recall anything about what was discussed, whether specific or general?
**THE WITNESS:** Well, I'm sure we talked about what the opinion called for in terms of what we had to do with planned sales and trying to get out of suitable habitat. And we looked at the proposed site, which most of it is not considered suitable owl habitat. There is like 13 acres, or whatever, that we consulted on as being suitable habitat. The rest of it is surrounded by suitable habitat.
Q: So were you able to determine when you were driven – I assume that you didn't walk around the gulch area, but that you went in a four-wheel drive of some kind.
A: We did both.
Q: Okay. Were you told or were you able to figure out when you were within the 13 acres that was in the suitable habitat and when you weren't?
A: Yeah.
Q: Okay. And who helped you with that, or did you know that just by observation?
A: You can tell by observation.
Q: And what makes that area different from the rest of the area?
A: Well, suitable habitat has got dense canopy cover.

PE-24-301

Page 30

It's got large trees. It has snags. It has pretty good understory. And a lot of the habitat in the particular project area is more open and kind of shrubby and Ponderosa pine habitat. It's pretty different between the old growth and the Ponderosa pine shrubby habitat.
Q: Do you remember having an argument with Harry Frey before your arrival there or while you were there?
A: Me personally had one with Harry?
Q: Yes, yes.
A: I don't remember that.
Q: Do you remember telling Mr. Aloisi it's ruined? With respect to what, I would ask, if you remember.
A: Well, it was – the only thing I can think of is, there's a road that Mr. Aloisi had built into the suitable habitat.
Q: Okay.
A: So therefore, that habitat would be gone.
Q: And how many acres or how big a road or how long a stretch of road would that have been?
A: I don't – I couldn't tell you exact numbers. Maybe a quarter mile.
Q: Okay.
A: But it was in towards the pair, also.
Q: Towards the pair?
A: Of owls.

Page 31

Q: Did you examine a map of the SOHA or the HCA before you went in order to know where those – the pair of owls nested or was?
A: Yeah, we looked at maps.
(A discussion was held off the record.)
Q: You said you looked at maps to know where the owl pair may have been.
A: Right.
Q: So when you left from that visit, what was the follow-up that needed to occur? Who was going to go do what? What had been learned? What had been accomplished?
A: Well, it was mainly an informational visit for me. I'm not sure what Harry was going to do with it. I think he was just mainly showing me the project so that I could talk fairly knowledgeably about it with the district. It's up to the district to do things.
Q: Did you, at any time after that visit, request Harry Frey to stop the operation or close down the operation or have the operation cease, if possible?
A: I don't remember.
Q: Do you recall anyone on that trip or in preparation for that trip discussing the question of what Mr. Aloisi knew about the July 1990 opinion?
A: I know that we had to have talked about it because that was the whole point of being there.

Page 32

Q: Say it again. The whole point of being there was –
A: To look at how we could meet the requirements of the opinion for that project.
Q: Okay. But did anyone say anything like, "Mr. Aloisi does not know that the Liberty Mine wasn't cleared and given no jeopardy opinion in the July 1990 biological opinion"? Did anyone say anything like that?
A: I don't recall.
Q: Whose duty in the Forest Service structure would you understand it to be to notify Mr. Aloisi of the existence of the biological opinion?
A: The district.
Q: Did you assume that had been done, or did you not even think about that?
A: I assumed it had been done.
MS. COOK: I believe Mr. Aloisi was present during some of her visit at the time. You might want to explore that before you leave the area.
A: And I believe in the forest supervisor's office meeting we talked about the opinion.
Q: And when do you believe that was? Earlier or before or after the site visit?
A: I believe before.
MR. MCBRIDE: Let's go off the record for just a second. If you want to take a break, you're welcome to take a

Page 33

break.
MS. COOK: You want a few minutes?
MR. MCBRIDE: Yes, a couple of minutes.
(A short recess was taken.)
MR. MCBRIDE: Back on the record.
Q: (By Mr. McBride) Ms. Granillo, before we broke, I asked you if you – well, I'm not sure what my question was. You indicated that you may have met with Mr. Aloisi at some time other than up at Eddie Gulch in July of '91.
A: Right. As I said before, we had a meeting in the forest supervisor's office.
Q: And do you recall when that was?
A: No. I believe – I know it was before I went out in the field to the site.
Q: And do you recall who else was there?
A: Well, I think the point of the meeting was, Mr. Aloisi was wondering what was going on with approval of his project and wanted to talk to the forest supervisor about it, so it was in the forest supervisor's office.
Q: We're talking about Yreka, not about the ranger district.
A: Right, Yreka. And I don't recall everyone that was there, but the forest supervisor –
Q: Is that Barbara Holder?
A: Barbara Holder, Harry Frey. I believe Mike Lee was

Page 34

there.
Q: Would Mr. Lee have come from the ranger district, or would he have been on detail at that time to the –
A: No. He had come from the ranger district.
Q: And you say Mr. Aloisi was there?
A: Yes. And he had someone with him. I don't remember who.
Q: Male? Female?
A: Male.
Q: Is Tom Ferrero a name that sounds right?
A: I really don't remember who it was.
Q: And was any written record made of this meeting?
A: I don't know.
Q: Is it policy for the forest supervisor to have a memo to the file or a written record of meetings with permitees and applicants and the like when they meet with her?
A: I don't know.
Q: You did not make a written record of this meeting?
A: No.
Q: And you don't recall if anyone else did?
A: I don't remember.
Q: And what do you recall the topic of discussion being?
A: Well, we were trying to explain to Mr. Aloisi what was going on with the project, why he couldn't start on the –

Page 35

and we talked about the archaeological surveys that were still needed.
Q: Was Mr. Rock there?
A: I don't remember. We talked about – I know we talked about what was going on with the opinion.
Q: What was going on with the opinion at that point?
A: Well, we had – actually, we had the opinion back since that July or whenever it came out. And what we were waiting on, as I recall, was Mr. Aloisi still did not have an approved plan of operations.
Q: So this was not about the opinion, but about what? Environmental assessments or about – I mean, what, then, needed to be done?
A: Well, there was a question of the archaeological survey work and providing more details on the – a real plan of operations that laid out the whole project, as I recall.
Q: Could you turn to document 71, please? Have you reviewed this document in preparation for the deposition?
A: I don't think I've seen this one. No, I have not.
Q: You want to take a look at it? And my question is whether you saw it back in 1990 or recall ever having seen it before.
A: I don't recall having seen it before.
Q: Could you read the first paragraph or familiarize yourself at least with what it's about?

PE-24-302