FS69

Rec'd 10/10/96 from SVC

# United States Department of the Interior
## FISH AND WILDLIFE SERVICE

1002 N.E. HOLLADAY STREET
PORTLAND, OREGON 97232-4181

In Reply Refer To:
1-1-90-I-37

July 23, 1990

Mr. Paul Barker
Regional Forester
Pacific Southwest Region
630 Sansome Street
San Francisco, California 94111

Subject: Formal Section 7 Biological Opinion for Klamath National Forest Planned Fiscal Year 1990 Timber Sales (Federal Action)

Dear Mr. Barker:

This letter responds to your June 27, 1990, request for formal consultation on the effects of timber harvest and associated activities on the threatened northern spotted owl (*Strix occidentalis caurina*). This Biological Opinion analyzes the anticipated effects on northern spotted owls resulting from implementation of planned fiscal year (FY) 1990 timber sales on the Klamath National Forest (KNF). This Biological Opinion is prepared pursuant to 50 CFR 402 of our interagency regulations governing Section 7 of the Endangered Species Act of 1973, as amended (Act).

The Biological Assessment (BA) for these timber sales was received in our office on June 18, 1990, and was submitted in anticipation that the proposed threatened northern spotted owl would be declared threatened under the Act. The Fish and Wildlife Service (Service) announced the decision to list the northern spotted owl as threatened on June 22, 1990. The effective date of this final rule is July 23, 1990. The BA provided a description of the project (timber sales) that is the subject of this consultation, and assessed impacts to the listed subspecies. Various augmenting documents and updates to the BA were received and considered during the consultation period, and are on file with the Service.

The project BA addresses the effects resulting from 45 planned FY 1990 timber sales. However, three of the proposed projects (Bullion Mountain, Lobo, and Fish Meadows) are in such early stages of design that units have not been finalized and no information is given as to the amount of habitat to be harvested. Thus, these sales are not included in this Biological Opinion.

Eleven of the actions considered in this Biological Opinion underwent informal Section 7 conference pursuant to 50 CFR 402.10. Since that time, several documents have been produced that entail the most comprehensive and up-to-date information available on the status, biology, and management strategies of the northern spotted owl. These documents include: <u>A Conservation Strategy for the Northern Spotted Owl</u> (Conservation Strategy) (Thomas et. al., 1990); <u>1990 Status Review (for the) Northern Spotted Owl</u> (1990 Status Review) (USDI Fish and Wildlife Service, 1990a); and <u>Final Rule</u> (USDI Fish and Wildlife Service, 1990b). Pursuant to 50 CFR 402.10(c), projects previously conferenced on must be reviewed to determine whether formal consultation is necessary. The Forest Service decided that formal consultation was appropriate for the previously

printed on unbleached, recycled paper

conferenced sales that have not been harvested. Thus, this Biological Opinion superoedes determinations made by the Service during prior deliberations.

## Biological Opinion

It is our biological opinion that the proposed timber sale action discussed herein, including anticipated incidental take, is not likely to jeopardize the continued existence of the northern spotted owl for the following reasons: (1) a minor amount of take is anticipated, (2) the isolation of the Klamath physiographic province (from the other provinces) will not occur, and further separation of the northern spotted owl from the California spotted owl (*S. o. occidentalis*) is not expected to occur, and (3) options remain for long-term conservation planning after harvest of the subject action. Critical habitat has not been proposed or designated for this subspecies; therefore, none will be destroyed or adversely modified.

## Description of the Proposed Action

KNF proposes implementation of 42 planned FY 1990 timber sales. The following timber sales are addressed in this formal consultation:

Sales that have not undergone informal Section 7 conference (N = 31):

| | | | |
|---|---|---|---|
| Limestone | Limestone Helf | Shanty | Shanty Heli |
| Bar SST | Cotton | LonJon | Pine Marten #3 |
| Mercury | Whiteway | Buckshot | Thomas |
| Rattlesnake | Resalvage | Cleghorn | Decker |
| YJ Blowdown | McKinney | Baldy EIS | Highview |
| Bug Salvage | Crawford Heli | Olsen Add-On | Liberty Mine |
| Cove 66 percent | Grizz San/Sal | Mt. Hebron | Crackle |
| Typhoon | Temple Rock RS | Shingle Springs | |

Sales that have undergone informal Section 7 conference (N = 11):

| | | | |
|---|---|---|---|
| Second Salvage | Mini | Bare Rummage | King Titus |
| Cecil | High Winds Blowdown | Hoot Salvage | Jessup/Grasslake |
| Honda East | Black Panther | Border | |

The actions listed above propose harvest of approximately 154 million board-feet (MMBF) of timber from approximately 12,768 acres of forested land. (The average annual harvest on the KNF over the last five years has been approximately 211 MMBF).

A variety of harvest prescriptions are proposed within many different habitat types. Approximately 4,082 acres are proposed for regeneration (clearcut) harvest, and approximately 8,686 acres are proposed for Individual Tree Mark (ITM) prescriptions, a generic term encompassing a variety of treatments. The ITM treatments are of differing intensities, ranging from removal of only a few trees per acre to removal of all but a few trees per acre. Of the 12,768 acres to be treated, the amount of suitable habitat that will be rendered unsuitable is approximately 1,315 acres.

Interrelated and interdependent activities associated with these projects include road building, site preparation, planting, and post-planting treatments such as release projects and thinnings. Again, a great deal of variation can be expected in these activities as dictated by harvest prescription, site quality, and other variables.

Case 1:95-cv-00650-LSM Document 127-7 Filed 03/05/2008 Page 3 of 15



Species Account/Environmental Baseline

For descriptions of the biology, population status and trends, and past management of the northern spotted owl, consult the 1989 Status Review Supplement (USDI Fish and Wildlife Service, 1989), the 1990 Status Review, and the Conservation Strategy.

The environmental baseline used in this analysis includes past and present impacts of all Federal, State, or private actions and other human activities on the KNF that have impacted or are impacting spotted owls. This description of the current spotted owl status on the KNF is derived mainly from USFS and California Department of Fish and Game records.

The Service has determined, as supported by the Conservation Strategy and the 1990 Status Review, that the Goosenest Ranger District and eastern areas of the Scott River and Salmon River Ranger Districts on the KNF are within the Shasta-McCloud Area of Special Concern. Little suitable habitat and, therefore, few spotted owls are known or expected to occur in the area of concern relative to estimated pre-1900 levels, and relative to densities in similar vegetational associations in other parts of the subspecies' range. The primary reason for the decline in both habitat and spotted owls in this area is an extensive logging history. In addition, Federal efforts at reserving contiguous areas for spotted owl management have been hampered by a checkerboard pattern of private and Federal land ownership.

The remainder of the KNF is less fragmented and currently supports higher densities of spotted owls, due in part to different natural factors, logging history and land ownership patterns. Nonetheless, it is reasonable to assume that owl numbers are below historic levels.

Effects of the Proposed Projects on Northern Spotted Owls

The focus of this Biological Opinion will be on harvest prescriptions that are proposed for suitable spotted owl habitat (as determined by Forest Service biologists and silviculturists) and that will reduce the quality of that habitat to a point where it is no longer considered suitable for nesting, roosting or foraging by spotted owls. Both the Forest Service and the Service have determined that any suitable habitat that is harvested "may affect" the northern spotted owl. The Service further determines that, in certain situations, suitable habitat reduced to an unsuitable condition may harm or harass ("take") northern spotted owls.

The Habitat Conservation Area (HCA) concept, described in the Conservation Strategy, involves designation of relatively large areas, mainly reserved from timber harvest, that are expected to support multiple spotted owl pairs in the future. This concept is consistent with current theories of conservation biology that large areas supporting multiple reproductive pairs are less likely to undergo localized extinction than are single-pair management areas, thus increasing the likelihood of persistence of the species. The Service, as stated in the 1990 Status Review, supports this position. Thus, the effects analysis, as enumerated in points 1-7 below, discusses each of the ways that spotted owls may be affected by the proposed actions, and relates these effects to the Conservation Strategy recommendations, where applicable. The

Conservation Strategy allows certain deviations from the general recommendations in cases of timber harvests currently under contract. See Appendix Q of that document for suggested management guidelines.

1. **Habitat loss:**

According to KNF data, approximately 193,935 acres currently support suitable spotted owl habitat. This is approximately 14 percent of the forested acres on KNF land. Harvests considered previously by the Service will reduce the amount of suitable habitat to approximately 191,746 acres, which is approximately 13.8 percent of KNF forested acres. Approximately 1,315 acres of suitable habitat is proposed for removal in planned FY 1990 sales, which constitutes a reduction of approximately 0.7 percent.

**Effects Within Category 1 and 2 HCAs.** Table 1 shows, by sale, the Category 1 and 2 HCAs described in the Conservation Strategy that will be adversely affected by the subject actions. A total of 625 acres of suitable habitat will be reduced to unsuitability and, therefore, lost from these HCAs. Another 5,670 acres will be treated at varying intensities, but none of those harvests will result in currently suitable habitat becoming unsuitable. The Conservation Strategy considered all harvest within HCAs to be an adverse effect, so a total of 6,295 acres will be adversely affected by the proposed actions. These acres are within 1.5 miles of 39 known spotted owls (14 known pairs plus 11 other known owls).

Harvest of suitable spotted owl habitat in Category 1 and 2 HCAs within the home ranges of spotted owls can be expected to adversely affect those individuals. Thus, assuming the owls are still in the area, at least 39 spotted owls, plus an unquantifiable number of undiscovered spotted owls may be harmed or harassed. Harvest of any habitat within these HCAs, whether or not spotted owls are present, can be expected to have a longer term adverse affect with respect to management of these areas for spotted owls under the Conservation Strategy guidelines. Such harvest, however, may not foreclose all future options possible for the management of spotted owl populations within the principles of conservation biology.

**Effects on Category 3 HCAs.** The Service and the Conservation Strategy consider the Goosenest and parts of the Scott River and Salmon River Ranger Districts to be within the Shasta-McCloud Area of Special Concern, and the Conservation Strategy recommends strategies for managing areas where establishment of multiple-pair HCAs is precluded by man-caused and/or natural habitat conditions. For lands that are south and/or west of designated HCAs, but not included within them, the recommendation is to establish single-pair (Category 3) HCAs around all known pair locations, as well as pairs discovered in future inventories. For areas north and/or east of designated HCAs, establishment of Category 3 HCAs is recommended around all repeated locations of single owls as well as verified pairs. Consult Appendix Q of the Conservation Strategy for detailed management guidelines.

According to the Conservation Strategy, Category 3 HCAs are to be established as follows: Around the owl or owl pair location (as appropriate), a circle 1.2 miles in radius, roughly centered on the owl(s) location, shall be plotted. The area circumscribed becomes the HCA, and suggested guidelines for managing HCAs are applied. The circle need not be centered exactly on the owl location if adjustments can be made so that as much suitable habitat as possible is included in the HCA. However, activity centers of the owl(s) should be no closer than 0.25 mile from the edges of the circles.

One of the proposed timber sales will impact one Category 3 HCA associated with a single spotted owl on the Goosenest Ranger District. Approximately 148 acres of suitable spotted owl habitat is proposed for removal from this HCA. These acres are within 1.5 miles of at least one spotted owl, assuming that an owl is still present. Harvest of suitable spotted owl habitat in Category 3 HCAs can be expected to affect associated individual spotted owls. Thus, at least one spotted owl, plus an unknown number of undiscovered spotted owls will be adversely impacted in this HCA. Harvest of any habitat within this HCA, whether or not spotted owls are present, can be expected to have a longer term adverse affect with respect to management of this area for spotted owls according to Conservation Strategy guidelines.

**Effects on Category 4 HCAs.** The Conservation Strategy recommends retention of a minimum of 80 acres of suitable spotted owl habitat around known pair activity centers outside of Category 1, 2, and 3 HCAs. None of the subject projects are proposed within a Category 4 HCA.

In total, approximately 773 acres of suitable habitat will be lost within HCAs and 5,670 acres will be otherwise negatively impacted, for a total of 6,443 acres adversely affected in HCAs. Appendix Q in the Conservation Strategy provides recommended standards and guidelines for managing HCAs. That document recommends that no timber, regardless of age class, be harvested in HCAs. For planned FY 1990 timber sales, relocation of units outside HCAs is encouraged. If that is not possible, harvests greater than 0.5 mile from pair activity centers may proceed. As proposed, implementation of these timber sales will result in harvest within 0.5 mile of 14 HCA pairs. Thus, the recommendations of the Conservation Strategy will not be met if the projects proceed as proposed.

**Effects on the Forest Matrix.** The Conservation Strategy defines the forest matrix as "all forest lands outside of designated HCAs". For the purposes of this opinion, our definition will be those acres outside any HCAs.

A total of 6,325 acres of habitat will be negatively impacted outside HCAs. Of those, 542 acres of suitable spotted owl habitat (as defined by the KNF) will be lost. These acres are within 1.5 miles of 25 known spotted owls not previously counted in this opinion.

The following is a summary of the effects of the subject timber sales on spotted owl habitat loss:

Total acres negatively impacted = 12,768
Total suitable acres lost = 1,315
Total known owls adversely affected = 111

**2. Direct Effects to Spotted Owls**

**Disturbance/Disruption of Breeding Activity.** The project BA states that contract clause C 6.313, which limits contractor operations during the nesting season, will be required in some of the planned FY 1990 contracts for the subject actions. The BA further states that, in those contracts where contract clause C 6.313 (limited operating period) is not present, clause C 6.25 will be implemented. Clause C 6.25 generally authorizes project modifications when federally-listed species are involved. The narratives for most of these sales, however, do not mention what the inclusive dates of these closures are, what circumstances will trigger invocation of these clauses, nor

Table 1. Timber sales and their effects on HCAs, known spotted owls, and the Shasta/McCloud Area of Special Concern. These figures were taken from the project BA and associated documents.

| Sale Name | RD | Acres Lost Total | Acres Lost HCAs | Owls Known 1.5 | Owls Known 0.5 | HCA | ASC |
|---|---|---|---|---|---|---|---|
| Limestone | OK | 192 | 192 | 3 (1p) | 3 (1p) | C-6 | N |
| Limestone Heli | OK | 66 | 66 | 0 | 0 | C-6 | N |
| Shanty | OK | 67 | 67 | 0 | 0 | C-6 | N |
| Shanty Heli | OK | 55 | 55 | 9 (4p) | 8 (4p) | C-6 | N |
| Second Salvage | OK | 0 | 0 | 2 (1p) | 2 (1p) | C-5 | N |
| Bar SST | OK | 0 | 0 | 0 | 0 | x | N |
| Cotton | OK | 0 | 0 | 2 | 2 | 0-20 | N |
| LonJon | OK | 0 | 0 | 1 | 1 | 0-20 | N |
| Mini | OK | 0 | 0 | 0 | 0 | 0-20 | N |
| Pine Marten #3 | OK | 10 | 10 | 4 (1p) | 4 (1p) | 0-20 | N |
| Mercury | OK | 0 | 0 | 3 (1p) | 1 | x | N |
| Whiteway | OK | 10 | 10 | 2 (1p) | 0 | C-5 | N |
| Buckshot | OK | 84 | 0 | 1 | 1 | x | N |
| Resalvage | OK | 0 | 0 | 2 (1p) | 2 (1p) | C-5 | N |
| Cleghorn | OK | 25 | 0 | --- | --- | x | N |
| YJ Blowdown | OK | 0 | 0 | --- | --- | x | N |
| McKinney | OK | 0 | 0 | --- | --- | x | N |
| Baldy EIS | HC | 0 | 0 | 3 | 0 | x | N |
| Bare Rummage | HC | 0 | 0 | 3 (1p) | 0 | x | N |
| King Titus | HC | 40 | 25 | 23(11p) | 4 (2p) | C-8 | N |
| Cecil | SA | 91 | 0 | 2 (1p) | 0 | x | N |
| High Winds Blowdown | SA | 0 | 0 | 2 (1p) | 2 (1p) | C-10 | N |
| Highview | SA | 0 | 0 | 3 (1p) | 0 | C-10 | N |
| Moot Salvage | SA | 0 | 0 | 8 (4p) | 0 | x | N |
| Bug Salvage | SA | 0 | 0 | 6 (3p) | 2 (1p) | C-23 | N |
| Jessup/Grasslake | SA | 0 | 0 | 1 | 0 | x | N |
| Crawford Heli | SA | 0 | 0 | 6 (3p) | 0 | C-10 | N |
| Olsen Add-On | SA | 0 | 0 | 0 | 0 | x | N |
| Liberty Mine | SA | 13 | 13 | 2 (1p) | 2 (1p) | C-10 | N |
| Cove 66 percent | SC | 110 | 0 | 2 (1p) | 0 | x | N |
| Grizz San/Sal | SC | 20 | 0 | 2 (1p) | 0 | x | N |
| Mt. Hebron | GN | 173 | 0 | 0 | 0 | x | Y |
| Crackle | GN | 92 | 0 | 0 | 0 | x | Y |
| Typhoon | GN | 148 | 148 | 1 | 1 | 3 | Y |
| Honda East | GN | 0 | 0 | 0 | 0 | x | Y |
| Temple Rock RS | GN | 80 | 0 | 0 | 0 | x | Y |
| Shingle Springs | GN | 0 | 0 | 0 | 0 | x | Y |
| Black Panther | UK | 33 | 33 | 11 (5p) | 3 (1p) | C-8 | N |
| Decker | UK | 6 | 6 | 2 (1p) | 0 | C-8 | N |
| Rattlesnake | UK | 0 | 0 | 0 | 0 | C-8 | N |
| Thomas | UK | 0 | 0 | 2 (1p) | 0 | C-8 | N |
| Border | UK | 0 | 0 | 3 (1p) | 1 | C-8 | N |
| Totals: | | 1315 | 625 | 111 (46p) | 39 (14p) | | |

*Table 1 (continued). Definitions:*

*RD = Ranger District: OK = Oak Knoll; HC = Happy Camp; SA = Salmon River; SC = Scott River; GN = Goosenest; UK = Ukonom*

*Acres Lost: Total = Total suitable spotted owl habitat that will be unsuitable after harvest. HCAs = suitable spotted owl habitat to be lost in HCAs.*

*Owls Known: Owls that have been recorded within 1.5 and 0.5 miles of sale units, 1986-June, 1990. (Xp) = Number of known pairs --- = not surveyed.*

*HCA = Habitat Conservation Area. C-XX = Category 1 or 2 HCA from Conservation Strategy; 4 = Category 4 HCA; x = not in HCA.*

*ASC = Shasta-McCloud Area of Special Concern identified in the Conservation Strategy. Y = sale in ASC; N = sale not in ASC.*

what surveillance will be conducted so that the need to implement these measures can be assessed. Therefore, this opinion will revisit and clarify the issue of seasonal protection for spotted owl breeding pairs.

Logging activity within a nest grove during the breeding season can cause abandonment of the breeding effort and affect both juvenile and adult spotted owls. Sales with either an inadequate or no seasonal closure are planned within 0.5 mile of 14 known owl pair activity centers and, therefore, could potentially adversely impact 28 breeding adults and 28 young-of-the-year. (For the purpose of this analysis, production of two young by each of these 14 nests is assumed). In addition, an unknown quantity of undiscovered spotted owls and their progeny might be so affected.

**Direct Harm of Spotted Owls.** The act of falling trees could result in death and/or injury to spotted owls. As disturbance occurs, spotted owls can reasonably be expected to move from the disturbance area, thus avoiding death or injury. However, adult spotted owls tenaciously tending to reproductive activities such as incubation or brooding may be reluctant to leave the area, thus remaining vulnerable to potential injury or death. Young-of-the-year, whether in or out of the nest, may also be vulnerable to the effects of tree falling. The potential for such occurrences exists in areas where no seasonal restrictions are proposed. Since 14 known pair activity centers are within 0.5 mile of proposed sale areas with either an inadequate or no seasonal closure in the contracts, at least 28 adult spotted owls, plus 28 young-of-the-year, could be directly injured or killed by logging activity. In addition, an unknown number of undiscovered owls and their progeny might be impacted in this manner.

## 3. Reduction of Special Habitat Components

In addition to the loss of suitable habitat, a reduction in snags, dead and down woody material, and suitable nest sites is expected. The project BA states that contract clause C 6.25 can be used to modify sales for protection of federally-listed species. However, no mention is made as to the numbers of snags, snag replacement trees, or amounts of dead and down material that will be retained. Thus, for the purposes of this opinion, it is being assumed that

normal KNF retention guidelines (1.5 snags/acre and 5-10 logs/acres 16 inches in diameter or greater) (Wilbanks pers. comm.) will be implemented. The number of snag replacement trees is not specified.

A reduction in nest sites is expected as both snags and live trees are removed. Since owls do not build nests but depend upon cavities, broken-topped trees, naturally occurring platforms, and nests built by other species, it is reasonable to assume that few or no suitable nest sites will remain after harvest on treated acres. Snags, besides providing nest sites, are also important in the life histories of several known spotted owl prey species. Thus, the effect of snag reduction will be a reduction in nest sites and a reduction in populations of some spotted owl prey species. The amount of dead and down material present on the forest floor is positively correlated to densities of some spotted owl prey species. Thus, reduction of these materials will result in a reduction in spotted owl prey, at least on a localized basis and in the short-term.

## 4. Habitat Fragmentation

Fragmentation of contiguous blocks of suitable habitat into smaller blocks results in a higher ratio of habitat edge to habitat area. This increased edge effect can increase the vulnerability of spotted owls to predators, such as great horned owls (*Bubo virginianus*), and encourage encroachment of competitors like barred owls (*Strix varia*). Thus, an undetermined number of spotted owls may be lost to predation, and an undetermined number may also suffer a competitive disadvantage to barred owls should the recently documented extension of the species range into California continue.

Another ramification of habitat fragmentation can be increased vulnerability of the remaining trees to wind-throw and wind-shear. Severe windstorms, such as those that destroyed large amounts of spotted owl habitat in the Coast Range of California in 1988, pose a clear threat to habitat adjacent to clearcut units.

## 5. Impedance of Spotted Owl Movement

Avoidance of clearcut areas by spotted owls has been documented in various radio-telemetry studies. Thus, an adverse effect could result from disruption of natural movement patterns. A second effect could result from spotted owls that do attempt crossing clearcut areas. Birds moving across areas devoid of protective vegetation may be of increased vulnerability to predation by great horned owls or other avian predators. Thus, an undetermined number of spotted owls may be adversely affected in this manner.

The Conservation Strategy recommends that, to provide for successful movement of spotted owls between HCAs, 50 percent of the forest matrix (calculated on a quarter-township basis) be maintained in forested cover with at least 40 percent canopy closure and a mean conifer diameter-at-breast-height (DBH) of 11 inches or greater. The KNF, due to the limited time available, calculated the percentage of the landscape meeting the above criteria at the ranger district level. That analysis showed that all but the Oak Knoll and Goosenest Ranger Districts have over 50 percent of the Forest matrix meeting the 40 percent or greater crown closure and 11 inches or greater DBH standard. However, no data were provided as to the condition of the forest matrix in the particular quarter-townships to be affected by the proposed actions. Therefore, for the purposes of this opinion, the Service assumes that harvests in the Forest matrix will contribute to reduced connectivity between HCAs.

Should these actions result in inadequate connectivity between HCAs, an unquantifiable number of spotted owls may be adversely affected until sufficient habitat recovery occurs. In addition, inhibited recruitment lessens the chance of long-term persistence of spotted owls in HCAs.

6. **Risk of Wildfire**

Use of chain saws, heavy machinery, and other fuel-driven equipment increases the risk of wildfire. In addition, slash burning for site preparation poses a risk of escape and could result in damage to adjacent habitat. However, monitoring of fuel and weather conditions by the USFS is a routine measure during timber harvests and associated post-harvest activities. When such conditions indicate a high fire potential, restriction of activity by the KNF can be expected to minimize the potential for wildfire.

7. **Road Construction**

KNF proposes 27.1 miles of road construction and 47.1 miles of road reconstruction. Construction of roads in suitable habitat contributes to habitat loss and fragmentation. Road construction during the nesting season can result in disturbance to nesting owls and can disrupt the breeding effort. Further, disturbance can result in later years where roads facilitate human access to nest groves. The Conservation Strategy recommends that no roads be constructed in HCAs. None of the proposed roadwork is within HCAs.

**Summary of Effects**

Given the above analysis, it is likely that some northern spotted owls will be adversely impacted. Further, the Conservation Strategy recommendations will not be completely implemented if the timber sales proceed as proposed. However, given the long-term nature of the Conservation Strategy, and possibilities for other options which adhere to the principles of conservation biology, as well as the allowance for planned 1990 timber sales provided in the Conservation Strategy document, the timber sales evaluated in this Biological Opinion will not likely jeopardize the continued existance of the northern spotted owl.

**Cumulative Effects**

Cumulative effects are those impacts of future state and private actions that are reasonably certain to occur within the action area of the Federal action subject to consultation. Future Federal actions will be subject to the consultation requirements established in Section 7 of the Act and, therefore, are not considered cumulative to the proposed action.

As mentioned previously, considerable amounts of private timberland are interspersed among USFS land in some of the project areas. Most of this land is managed for timber production, so logging is ongoing. Further, a number of Timber Harvest Plans have been filed with the California Department of Forestry and Fire Protection, indicating that continued timber harvest is reasonably certain to occur. Continued logging of interspersed private parcels can exacerbate the adverse effects described previously. However, the subject actions, in conjunction with the cumulative effects described herein, are not likely to jeopardize the continued existence of the subspecies. The private timber lands within HCAs were not considered an integral part of a functioning HCA system; only Federal lands were invisioned by the Interagency Scientific Committee as areas of restricted cutting.

## Incidental Take

Section 9 of the Act and regulations issued thereunder prohibit the taking of a listed species without special authorization. The term "take" is defined in the Act as "to harass, harm, pursue, hunt, shoot, wound, kill, capture, or collect, or attempt to engage in any such conduct." Under the terms of Sections 7(b)(4) and 7(o)(2) of the Act, taking that is incidental to, and not the purpose of, the agency action is not considered prohibited taking within the bounds of the Act, provided that such taking is in compliance with the terms of this Incidental Take Statement. Furthermore, the Service must conclude that such taking could occur without violating Section 7 (a) (2).

"Harass", as defined in regulations implementing the Act, means an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering (50 CFR 17.3).

"Harm", as defined in regulations implementing the Act, means an act which actually kills or injures wildlife. Such an act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering (50 CFR 17.3).

"Incidental take" is defined in 50 CFR 402.02 as taking that results from, but is not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or applicant. Exemption of Federal actions to allow incidental take of spotted owls under Section 7 must pass two tests: (1) The anticipated level of take must not violate Section 7(a)(2) by being likely to jeopardize the continued existence of the owl, and (2) Taking that occurs must be in compliance with the terms and conditions of this written Incidental Take Statement as directed by Section 7(o)(2).

The Service is required to use the best scientific and commercial data available when reviewing actions under Section 7 of the Act. Incidental take guidelines for the northern spotted owl were established on July 11, 1990, using the most current home range and habitat use data available. Those data are found in the Conservation Strategy and the 1990 Status Review, and are presented in the Service's Procedures Manual (USDI 1990c).

The Service anticipates that incidental take attributable to the proposed actions will result from two situations associated with timber harvest and habitat reduction:

1. Removal of spotted owl habitat within 0.7 mile of a pair activity center or nest site when such removal leaves less than 500 acres of suitable habitat, and harvest within a 70 acre core area surrounding the nest or activity center; and

2. Loss of suitable habitat within the estimated home range of an owl pair (a 1.2 mile radius from the pair activity center in California, or approximately 2,500 acres) to an amount that is less than 40 percent of that home range (approximately 1,000 acres).

The first situation involves harvest of habitat within 0.7 mile of a nest site or pair activity center. This loss of habitat will increase fragmentation of the stand and impair the owls' ability to forage. An increase in predation

and/or competition for a shared but diminishing resource may also occur. The Forest Service provided information on known spotted owls within 0.5 mile of proposed harvest units. For the purposes of this opinion, the Service is assuming that harvest within 0.5 mile of a pair activity center will result in take of that pair.

The second situation would result in take if harvest reduces the amount of suitable habitat to less than 40 percent of the area within a 1.2-mile radius of a nest or pair activity center. This loss of habitat would reduce the productivity of the pair and could increase predation and competition through increased fragmentation. Consequently, the Service determines that this type of action may create a likelihood of injury to the owl by harassing it to an extent as to significantly disrupt normal behavioral patterns such as breeding, feeding, or sheltering.

Incidental Take Statement

The KNF proposes removal of 1,315 acres of suitable spotted owl habitat. Take of at least 14 spotted owl pairs may result due to harvest within 0.5 mile of known pair activity centers. Data as to the amount of habitat remaining within the home ranges of pairs affected by the subject actions are not available, so the Service is unable to predict the number of owls that may be taken in this manner. Further, other owls, as yet undiscovered, may be incidentally taken by the proposed actions. Thus, for the purpose of this opinion, the Service assumes take of all owls within removed suitable habitat that results in a variance from the incidental take guidelines detailed in the July, 1990, Procedures Manual. The Forest has developed this proposed action with the intent of avoidance of adverse impacts to spotted owls in known areas of concern.

The Service authorizes incidental take, in the form of harassment, of all owls associated with a portion of those suitable acres, in compliance with the provisions of the reasonable and prudent measures and terms and conditions of this Incidental Take Statement.

To minimize incidental take the following reasonable and prudent measures are established:

1. Prevent disturbances to owl pairs and their progeny during the nesting season.

2. Maintain essential habitat within close proximity of spotted owl nest sites and activity centers and maintain adequate breeding, foraging, and sheltering habitat within the home range of owls in proposed HCAs.

To implement these reasonable and prudent measures, we hereby establish the following mandatory terms and conditions for incidental take:

For sales that were planned as of July 23, 1990:

1. Eliminate or relocate planned timber harvest activities (e.g., sale units, road right-of-way clearing) that are within a 0.5-mile radius of spotted owl nest sites or pair activity centers within category 1, 2, or 3 HCAs, unless further analysis demonstrates that a 70-acre core area of the best available, most contiguous habitat around the nest site or activity center and 500 acres of suitable habitat within a 0.7-mile radius would remain after harvest.

2. Between February 1 and July 31, for all pairs outside of HCAs, prohibit timber harvest activities within a 0.5-mile radius of spotted owl nest sites and activity centers unless further analysis demonstrates that a 70-acre core area containing the best available, most contiguous habitat around the nest sites or activity centers and 500 acres of suitable habitat within a 0.7-mile radius would remain after harvest or it can be shown that the site is unoccupied at the time of harvest.

These terms and conditions were developed to minimize the level of incidental take to the species. As expressed throughout this document, the Service is most concerned about minimizing the loss of owls in proposed category 1, 2, and 3 HCAs. The maintenance of owl pairs and their habitat within these areas will promote their continued occupancy by owls and contribute to the successful movement of owls between and within provinces. In addition, these terms and conditions will help to maintain options for the successful implementation of a conservation strategy and recovery plan.

If more than the above-mentioned level of anticipated take occurs, the U.S. Forest Service shall require within its authorities that the causative action of such take cease immediately, and shall reinitiate formal consultation to reevaluate the incidental take impacts.

Conservation Recommendations

Section 7(a)(1) of the Act directs Federal agencies to utilize their authorities to further the purposes of the Act by carrying out conservation programs for the benefit of endangered and threatened species. The term "conservation recommendations" has been defined as suggestions by the Service regarding discretionary measures to minimize or avoid adverse effects of a proposed action on listed species or critical habitat. The Service offers the following conservation recommendations:

1. The only scientifically credible conservation strategy existing for the spotted owl is the one that was prepared by the ISC. We strongly recommend adoption of this plan as soon as possible. In the future, if other strategies based on the principles of conservation biology are accepted by the scientific community and the Service through the recovery planning process or another manner, they may be considered for adoption in place of, or as modifications to, the ISC strategy.

2. If a biologically sound conservation strategy is not adopted as soon as possible by the Forest Service and other land management agencies, it will be necessary to provide increased protection for all remaining pairs of spotted owls to preserve options for long-term recovery. Therefore, until an effective conservation strategy is adopted a avoid harvest in proposed HCAs; b avoid harvest within a 70-acre area adjacent to, and that reduces suitable habitat below 500 acres within 0.7 mile of nest sites and activity centers; c provide and maintain through time at least 60 percent suitable habitat within the home range of each spotted owl pair that is located outside HCAs; d plan sales in compliance with the 50-11-40 rule; e and maintain all existing large contiguous blocks of spotted owl habitat.

3. Design, implement, and monitor timber harvest prescriptions to minimize impacts to the spotted owl and, in the long term, create or restore the necessary components of owl habitat. The Service recognizes management

options exist to facilitate this need. Consider testing as many of the following prescriptions as possible on individual sites, as appropriate:

a. Leave sufficient snags and down woody material to provide for spotted owl habitat components.

b. Burn post-harvest fuels only as necessary for fuel reduction and insect control. Retain large down logs where possible.

c. Treat stands of young trees to facilitate more rapid production of large trees and well-developed multi-stories stands.

d. Create or improve the decadent tree component by topping or girdling large trees.

e. Selectively harvest to encourage understory development while retaining overstory canopy closure of 40 percent or more.

f. Leave sufficient green trees (at least 12 per acre, individually and in clusters of mixed species and ages) to serve as the upper canopy layer as habitat recovers its value for nesting, roosting, and/or foraging activities of spotted owls; and

g. Within shelterwood harvests, leave 8-15 mature trees per acre to provide the residual components of spotted owl nesting, roosting, and foraging habitat. Eliminate the final overstory removal phase.

4. In order to minimize impacts in HCAs in projects where the option to move projects out of HCAs does not exist, consider the following measures:

a. Attempt to locate substitute volume within the HCA but out of suitable spotted owl habitat.

b. If unable to accomplish the recommendation in (a), and in areas where clearcutting is proposed, change the harvest prescription to a partial cut, then seek substitute volume through thinnings or other prescriptions more compatible with creation and maintenance of spotted owl habitat.

c. Avoid road construction in HCAs.

5. Analyze the forest matrix to determine its condition in regard to providing connectivity between HCAs. Develop a strategy to manage for such connectivity. One method (the 50-11-40 rule) is described in the Conservation Strategy. The 50-11-40 rule, or some method that is reviewed and found acceptable by an interagency body of scientists similar to the Interagency Scientific Committee, should be considered in planning future timber sales.

6. The Forest Service should coordinate with the Service to develop a tracking procedure that will monitor implementation of the sale program and document the following: the total number of owls impacted and at what levels; the total amount of owl habitat removed from the environmental baseline; and the amount of habitat removed from each HCA. Habitat and owls lost to fires and other natural disasters should be similarly tracked.

7. Proposed sale areas should be surveyed a minimum of 6 times within a given season to provide a reasonably accurate data base from which to make sound management decisions.

8. The Forest Service should coordinate with the Service and State resource agencies to design and conduct spotted owl research and monitoring efforts, including banding and telemetry programs and studies of habitat utilization.

9. Work closely with adjacent Federal, State, and private landowners to properly manage spotted owl habitat on a landscape level, monitor owls and the effects of timber sale-related activities, and design sales to avoid adverse impacts to spotted owls.

10. Coordinate the funding, development, and maintenance of a geographic information system that is compatible between Federal and State land management and fish and wildlife resource agencies for the long-term tracking of spotted owls and their habitat.

In order for the Service to be kept informed of actions that either minimize or avoid adverse effects or benefit listed species or their habitat, the Service requests notification, in writing, of the implementation of any conservation recommendations.

The Service is to be notified in writing within three working days of the accidental death of, or injury to, a northern spotted owl, or of the finding of any dead or injured northern spotted owl(s) during harvest or post-harvest activity. Notification must include the date, time, and location of the incident or discovery of a dead or injured northern spotted owl, as well as any pertinent information on circumstances surrounding the incident or discovery. The Service contact for this information is either the nearest Service Law Enforcement Office/Agent or Mr. Wayne S. White (916/978-4866). Any dead or injured northern spotted owls must be reported to the Service's Law Enforcement Division and may subsequently be turned over as soon as possible to a game warden or biologist of the California Department of Fish and Game for care or analysis.

This concludes formal consultation on this action. Reinitiation of formal consultation is required if the amount or extent of incidental take is exceeded, if new information reveals effects of the action that may impact listed species or critical habitat in a manner or to an extent not considered in this opinion, if the action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in this opinion, or if a new species is listed or critical habitat designated that may be affected by this action. If you have any questions regarding this Biological Opinion, please contact me, Mr. Gail Kobetich or Mr. Steve Spangle of my staff at the above phone number.

Sincerely,

Marvin L Plenert

Regional Director

**References**

Thomas, Jack Ward, Eric D. Forsman, Joseph B. Lint, E. Charles Meslow, Barry R. Noon, and Jared Verner. 1990. A Conservation Strategy for the Northern Spotted Owl. Unpublished interagency document. 458 pp.

USDI Fish and Wildlife Service. 1989. The Northern Spotted Owl: A Status Review Supplement. Unpublished agency document.

________ 1990a. 1990 Status Review (for the) Northern Spotted Owl. Unpublished agency document. 95 pp.

________ 1990b. Final Rule (for the determination of threatened status for the) Northern Spotted Owl. United States Federal Register, June 26, 1990.

________ 1990c. Procedures Leading To Endangered Species Act Compliance for the Northern Spotted Owl. Unpublished Agency Document. July, 1990.

Wilbanks, Sam. Personal Communication. Klamath National Forest Logging