**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| ALFRED ALOISI, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 95-650L |
| v. | ) | Judge Lawrence S. Margolis |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S**
**PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Under the provisions of Rule 56(h)(2) of the Rules of the Court of Federal Claims, Plaintiffs in the captioned case hereby respond to the Defendant's Proposed Findings of Uncontroverted Fact (Dkt. No. 121, filed February 6, 2008). The single-spaced text of Defendant's Proposed Findings and bold-font lettered subject captions are followed in double-spaced text by Plaintiffs' Response as follows:

**A. Liberty Mining's June 1989 Plan of Operations**

1. On May 2, 1989, Liberty Mining submitted a two-phased proposed plan of operations. See JSOF, ¶ 19; see also, JA23 at 401-402. Liberty proposed in Phase I to repair roads, sample the "Klamath Dumps" (i.e., waste material from historic mining operations (see JSOF, ¶ 12)), haul samples to centrifugal concentrators for test runs and, depending upon the Environmental Assessment ("EA") "on the spotted owl situation[,] . . . log and dozer cut apex corridors . . . ." JA23 at 401-02; see also JSOF, ¶ 19.

**Response No. 1:** Defendant's Proposed Finding of Uncontroverted Fact ("DPF") No. 1 largely restates Joint Statement of Facts ("JSOF") No. 19 (Dkt. No. 112, filed January 7, 2008), although it adds material to and omits material from JSOF-19. Plaintiffs note the "dozer cut apex corridors" were approved by the Forest Service in November 1989 in JA45.

2. Liberty's proposal for Phase II depended upon the test results in Phase I and the EA. In response, on May 25, 1989, the Forest Service submitted a proposed plan for Liberty's consideration that encompassed only the proposed "Phase I" activities. See JSOF, ¶ 20; see also JA24 at 412. Thus, Phase II activities would depend upon the outcome of the "test

results from Phase I and NEPA," referring to the National Environmental Policy Act of 1969 (42 U.S.C. § 4321 et seq.). JA24 at 412; see also JSOF, ¶¶ 19, 20.

**Response No. 2:** DPF No. 2 largely repeats the content of JSOF-19 and JSOF-20, with some additions and subtractions. DPF No. 2 omits a number of important mine development activities proposed by Liberty in JA23.

3. The May 25, 1989 proposed plan was approved with minor modifications on June 6, 1989. See JSOF, ¶ 22; see also JA26.

**Response No. 3:** Plaintiffs concur, and add that the Forest Service specifically found, in connection with approving these operations, "interdisciplinary review of these activities indicated there would be no adverse effects on the SOHA [Spotted Owl Habitat Area]. … Activities will occur on previously disturbed sites." JA25 at 417.

4. Plaintiffs' plans for future mining activities in Phase II expressly could not be approved until Plaintiffs submitted an "environmental document and operating plan." See JA24 at 408; see also JA26 at 421, 425 (noting that the approved plan authorized only those "activities expressly stated" in the plan).

**Response No. 4:** (a) Plaintiffs concur that the so-called Phase II activities (listed in JA23) were not approved.

(b) Plaintiffs disagree with the phrasing of the "until" clause – JA24 does not require that "Plaintiffs submit[] an 'environmental document …'" before any Phase II activities can be approved. It says, "Phase II of your operations will be addressed in a separate environmental document …." This does not suggest any alteration of the practice already employed in approval of Phase I (see "environmental document" JA25) that the Forest Service would prepare it.

5. By its own terms, the June 6, 1989 Plan was scheduled to expire on July 31, 1989. See JA26 at 424-25.

**Response No. 5:** Plaintiffs concur.

6. On about July 27, 1989 Plaintiffs proposed minor additions to the June 6, 1989 approved plan (see JA31), which were approved on August 11, 1989. See JA32. While Liberty

proposed to haul material for milling, those plans depended upon the outcome of the proposed sampling and testing. See JA31 at 440.

**Response No. 6:** (a) Plaintiffs concur that they proposed additions to the approved plan (JA31) that were approved.

(b) Plaintiffs deny the adjective "minor." Unlike the work in the June 6, 1989 approved plan, this work included cutting, removal and clearing of trees and future work sites. The additional approved work included: "[b]uild approximately 1,000 feet of road" near Rollin to reduce the grade and allow access into Eddy Gulch for much larger equipment; "[i]mprove the entire road route from Schoolhouse Flat to the Klamath dumps," about 3 miles of road with an 880 foot elevation gain; and the removal of merchantable timber incidental to this and further approved road and site clearing work, with trees marked to be cut by the Forest Service.

(c) In addition, Plaintiffs submit that the August approval meant that the July 31, 1989 termination date in the June 1989 plan approval was moot and irrelevant, and Plaintiffs state that the August approval contained no expiration date, so the work was authorized until completed, without time limit.

**B. September 28, 1989 Proposed Plan of Operations**

7. On September 28, 1989, Plaintiffs submitted their "all phase" proposed plan of operations (the "September 1989 Plan"). See JSOF, ¶ 26; see also JA36 at 446. Plaintiffs' "all phase" plan, however, lacked the necessary information to allow the Forest Service to evaluate all of the activities proposed. See JSOF, ¶¶ 26, 29-33.

**Response No. 7:** Plaintiffs concur with the first sentence. Plaintiffs concur with the second sentence insofar as it states the plan lacked necessary information for the Forest Service to be able to approve all phases of the plan. Plaintiffs dispute the generalization that the Forest Service could not "evaluate" all of the activities proposed – whether the information in the plan was sufficient for anyone to "evaluate" an activity depends on the activity, and the purpose of the evaluation.

Plaintiffs further respond that they had no expectation that the Forest Service could approve the entire plan of operations based on the September 28 submission, and did not design or intend those later portions of the plan to be processed to approval.

8. The September 1989 Plan described four phases of activity, consisting of:

> Phase 1) Klamath Road improvement, Shoo Fly Road Improvement, Schoolhouse Flat Road construction, clearing of work areas, excavation and bulk sampling of apexes at existing cleared areas, setting up screening, crushing and centrifugal concentrating equipment, test processing of sampled material . . . screening, crushing and centrifugal concentrating of Klamath dump material (if justified by test results) . . . .
>
> Phase 2) Contingent on positive results from Phase 1. Remaining road work . . . bulk sampling and test milling of material form [sic] apex road excavation to determine extent of ore distribution, underground exploration . . . .
>
> Phase 3) Contingent on positive results from Phase 2. Production: Underground mining, surface mining of ore zones along apexes, milling . . . Length of production period depends on amount of ore discovered.
>
> Phase 4) Reclamation: Filling, grading, seeding, etc.

JA36 at 449.

<u>**Response No. 8**</u>**:** Plaintiffs concur that Defendant has correctly quoted the bulk of the "phases" description of JA36, which is part of one page of a seven page narrative plan. Plaintiffs also note the quotation omits the dates during which Plaintiffs proposed to undertake these activities, including that Phase 1) quoted above was "[i]n progress" under the August 1989 Forest Service approval (JA32).

9. Plaintiffs did not provide any details for the actual production of any gold (Phase 3). As the September 28, 1989 letter admitted:

> The description of the overall exploration and mining plan presented in this letter is incomplete due to the fact that <u>preliminary feasibility studies have not been completed</u>. Details of ore reserve availability, mining feasibility and milling methods have not yet been determined.

JA36 at 449 (emphasis added).

**<u>Response No. 9</u>:** Plaintiffs concur this is an accurate quotation. Plaintiffs concur they did not provide "any details" for the actual production of any gold, but respond this is meaningless, as Plaintiffs expected they would in fact produce gold in operating the gravity separation equipment then at the E T Placer pit in processing the bulk samples they were approved to mine and process. Plaintiffs submit that the District Mineral Officer(s) involved knew and understood there would be gold production in gravity separation and required no "details" of that production in order to understand and approve any plan of operations involving bulk sampling and the operation of gravity separation equipment.

**C. October 25, 1989 Proposed Plan of Operations**

10. On October 24, 1989, the District Ranger sought "a firm plan . . . by Liberty Mining depicting what areas are going to be developed and how the areas are going to be developed during the next six month and twelve month periods." JA38 at 458; <u>see also</u> JSOF, ¶ 29. That requested plan, the District Ranger wrote, would "be the foundation for Operating Plan Number Two." JA38 at 458.

**<u>Response No. 10</u>:** Plaintiffs concur this accurately describes and quotes these sections of JA38. Plaintiffs acknowledge that this request for development information for the next year was acceptable to Liberty at the time. Plaintiffs also acknowledge that the District Ranger appropriately did not request development information beyond the end of the next year, as plaintiffs would have been entitled not to comply with such a request under 36 C.F.R. § 228.4(d).

11. On October 25, 1989, Plaintiffs submitted a Supplemental Plan of Operations, providing additional details on the activities proposed for Phase 1 and Phase 2, but no further information about Phases 3 or 4. See JA40. The activities proposed in the October 25, 1989 supplemental plan were unformed and dependent on then-unknown results from the proposed preliminary work:

> The amount of material excavated, hauled and milled during the Spring/Summer/Fall of 1990 <u>will depend on many factors, and cannot be accurately projected at this time</u>. Only selected portions of the apexes will be mined in 1990. Much more apex area will remain to be developed on the following year(s) as justified by 1989-90 results.

JA40 at 465 (emphasis added).

**Response No. 11:** (a) Plaintiffs concur the quotation is accurate; Plaintiffs concur that they provided additional details regarding Phase 1 and Phase 2.

(b) Plaintiffs deny that they failed to provide anything – Defendant's phrasing suggests Plaintiffs failed to provide any further information regarding Phase 3 and Phase 4. The District Ranger did not ask for further information regarding Phase 3 and Phase 4, so none was provided.

(c) Plaintiffs reject the word "unformed" in Defendant's statement as ambiguous at best and false at worst. The description in the October supplemental plan for all "activities described for Fall, 1989 and Winter, 1989-90" were obviously fully "formed," as the Forest Service approved them all in November 1989 (by JA45).

(d) Further, Plaintiffs had many well-formed alternatives and proposals for mine development; what was not definite, and what was not required by the Forest Service, was any more definite description of them for any purpose relevant to Liberty or the Forest Service in 1989.

(e) Plaintiffs also affirmatively explain that the phrase in the block quotation emphasized by Defendant does not refer in any respect to uncertainty about volumes of ore deposits worth bulk testing – it was clear there was more ore available on the property to run through the gravity separation equipment for years. The uncertainties pertained to assuring the equipment was in working order, training labor, uncertainty about Forest Service supervision and permitting intentions, weather, etc., not the easy available of deposits worth running in bulk.

12. On November, 27, 1989, the Forest Service submitted a "Liberty Mine Proposed Mill Site Archaeological Reconnaissance Report" to the California State Historical Preservation Officer (SHPO), seeking the SHPO's review pursuant to Section 106 of the National Historic Preservation Act of 1966 (16 U.S.C. § 470a-t, as amended) ("NHPA"). See JSOF, ¶ 34, see also JA46 at 475.

**Response No. 12:** Plaintiffs concur in the statement of fact. Plaintiffs add that this Report was funded by Liberty, in reliance on Forest Service representations that it would satisfy

the requirements of the NHPA with respect to all operations approved by the Forest Service in November 1989 (in JA45).

13. Noting that the Forest Service was seeking the SHPO's review of the archaeological report, on November 27, 1989, the District Ranger approved Liberty's proposed Fall 1989 and Winter 1989-90 activities, as set forth in the October 25, 1989 proposed supplemental plan. <u>See</u> JA45 at 472. In his November 27, 1989 letter, The District Ranger made clear:

> The [October 25, 1989] supplemental plan included activities labeled Spring/Summer/Fall, 1990 which would be part of Phase Two of the development of your mine. <u>These activities are not approved at this time</u> because they will be included in a master Plan of Operation Number Two with an Environmental Analysis to be completed in the spring of 1990 as we agreed at our meeting on November 1, 1989.

JA45 at 472 (emphasis added).

**<u>Response No. 13</u>:** Plaintiffs concur.

14. Like Liberty Mining's prior plans, the "activities authorized in the November 1989 approval did not include any activities that could generate income from sale of production from the Liberty Property." Compl., 1123.

**<u>Response No. 14</u>:** To conform the Complaint filed in September 1995 to the available evidence, Plaintiffs if they filed an amended complaint now would plead and do here state in response to DPF No. 14:

> The Forest Service's approval of the removal and test milling of "about 10,000 tons" of "Mountain Laurel and Klamath Ridge apex" mineral deposits would have grossed Liberty $216,600 and netted Liberty $88,100 in the 20 days of test milling operation.

This return is calculated as follows: (a) 10,000 tons ˙/. 500 tons/day (JA40, at 464, description; JA45, at 472, approval) through the existing gravity separation mill equipment approved for relocation and use at Usher Flat; (b) processing ore with a cutoff grade of 0.10 and an average grade of 0.152 opt (JA191, at 1577, Line 1, 1st column) in gravity concentration equipment with a recovery rate of 37 % (Line 1, column 4); (c) this processing would yield $21.66 per ton of gold at the $380/oz gold price then prevailing (Line 1, column 6); and (d) given mining costs of

$12.85/ton (columns 1-3, at bottom, under "Klamath Apex Operating Costs (All tons)") and the operating capacity of the existing gravity separation equipment in excess of 500 tons per day.

15. The termination date for the approved Plan of Operations was adjusted to July 31, 1990. See JA45 at 472; see also JSOF, ¶ 33.

**Response No. 15:** Plaintiffs concur.

16. The July 31, 1990 termination date subsequently was extended twice, first to September 30, 1990 (see JSOF, ¶ 51), and then to March 31, 1991 (see JSOF, ¶ 55).

**Response No. 16:** Plaintiffs concur. These extensions were timely requested by JA79 and JA84, respectively, and were approved by JA82 and JA88, respectively.

17. Although Liberty requested a third extension on March 11, 1991 (see JSOF, ¶ 59), it was not granted.

**Response No. 17:** (a) Plaintiffs never received any written response to their third extension request.

(b) Plaintiffs' extension request was granted in part, orally by District Mineral Officer Harry Frey, on or about March 21, 1991. District Mineral Officer Frey authorized Liberty to conduct certain road maintenance and improvement and other work, which Liberty conducted from some time after March 21, 1991 until on or about July 12, 1991, when District Mineral Office Al Buchter orally ordered Liberty to stop all work. Aloisi Affidavit, ¶¶ 37-40; Ferrero Affidavit, ¶ 40.

18. Liberty's approved plan of operations expired on March 31, 1991. See JSOF, ¶ 72, see also J A M at 1083.

**Response No. 18:** **(a)** Plaintiffs submit DPF No. 18 is not a statement of fact but a conclusion of law. By operation of law, namely, 5 U.S.C. § 558(c), which provides that a timely renewal request with respect to a license for an activity of a continuing nature extends the license past the date the agency otherwise may have prescribed for it to expire until such time as the

agency duly acts on the timely request to extend the license, and Liberty filed a timely renewal request with respect to its approved plan of operations on March 11, 1991 (JA94).

(b) As a matter of fact, District Mineral Officer Frey's authorization to Liberty to conduct limited operations after March 31, 1991 contradicts DPF No. 18.

(c) Plaintiffs note that JSOF-72 does not directly support DPF No. 18; JSOF-72 describes the contents of a letter from District Ranger Lee to Liberty in which Ranger Lee takes the position stated in DPF No. 18; likewise, "J A M at 1083" is a reference to the March 1992 letter from Ranger Lee containing this statement of his position.

**D. The January 1990 Stop Work Order**

19. The SHPO responded to the Forest Service on December 15, 1989, expressing "fundamental concerns regarding the approach you are taking to Section 106 compliance for this project." JA47 at 498. Specifically, SHPO Gualtieri found that the potential effects of the proposed project could not be adequately evaluated, "without a comprehensive understanding of the scope of both the entire project (and its land disturbing potential) and the historic context and full extent of the historic resource." Id. (emphasis as in original). Based on her concerns with the archaeological field survey, the SHPO concluded that a "finding of no effect for the portions of the project you have considered . . . is premature," and urged the Forest Service to "complete your Section 106 responsibilities for the entire project [Area of Potential Effect] prior to permitting the project to procede [sic]." Id. at 498-99.

**Response No. 19:** Plaintiffs concur this is an accurate, partial description of JA47. Plaintiffs also assert that the scope of work for the Forest Service's "Section 106 compliance" was determined entirely by the Forest Service without influence of Liberty. See JA43, at 468.

20. On January 4, 1990, the Forest Service informed Plaintiffs Aloisi and Liberty Mining, Inc., of the SHPO's decision that "the archeology work that has been completed is not comprehensive for the scope of the area and your project." JA51; see also JSOF, ¶ 36. The District Ranger continued, "SHPO indicates that the entire area must be analyzed before a determination can be made." JA51. He explained that "[w]ithout this complete analysis we would be out of compliance with Section 106 of [NHPA]." Id. The District Ranger concluded that he had "no choice but to inform [Liberty] that all activities including activities on private land accessed through National Forest must stop immediately. No activities should proceed until we receive a favorable determination from SHPO and we notify [Liberty] in writing." Id.

**<u>Response No. 20</u>:** Plaintiffs concur this is an accurate, partial description of JA51. With this concurrence, Plaintiffs do not agree that the Forest Service was "out of compliance" with Section 106 of the National Historic Preservation Act by having conducted the archeological resource surveys it did conduct, and having determined to approve the mine development operations it did approve.

21. In a letter dated February 22, 1990, the Forest Service made clear its authority for stopping work on private lands, explaining that Plaintiffs' "mining-related activities on your private land are interrelated and interdependent with your activities associated with your current and proposed operating plans." JA55 at 513. But the Forest Service also made clear that while Liberty Mining's "surface disturbing activities are still restricted, any non-mining related activities are permissible on your adjoining private lands. These activities could include occupancy of the existing facilities, travel to and from your residence and normal equipment maintenance and upkeep." <u>Id</u>.

**<u>Response No. 21</u>:** Plaintiffs concur this is an accurate, partial description of JA55. With this concurrence, Plaintiffs do not concur that the position "made clear" by the Forest Service with respect to its authority to stop mine development work on private land is correct as a matter of law.

22. The Forest Service's letter to Plaintiffs informed them of their ability to administratively challenge the Forest Service's decision. <u>See</u> JA55 at 514.

**<u>Response No. 22</u>:** Plaintiffs concur that the referenced letter (JA55) contains the standard form Forest Service administrative appeal information paragraph.

23. Plaintiffs did not challenge the District Ranger's decision to stop work pending archaeological clearance from the California SHPO. Instead, Liberty Mining began to receive bids for a cultural resources study. <u>See</u> JSOF, ¶ 41; <u>see also</u> JA57.

**<u>Response No. 23</u>:** Plaintiffs concur that they did not exercise the appeal right noticed in the decision. Plaintiffs concur that "receiving bids for a cultural resources study" was one of the things they did instead of appealing. <u>See</u>, <u>e.g.</u>, JA57 and JA70.

24. Liberty decided to forego having the archaeological study completed until the effect of the northern spotted owl on Liberty's operations was resolved. <u>See</u> JA82 at 777.

**<u>Response No. 24</u>:** (a) Plaintiffs clarify this DPF No. 24 with the date, August 1990 – at the time of JA82 this was Liberty's position. To provide more accurate context for DPF No. 24, Plaintiffs incorporate by reference Plaintiffs' Proposed Findings of Undisputed Fact ("PPF") ¶¶ 42-49 (Dkt. No. 119, pp. 10-11) in this Response No. 24.

(b) The District Ranger's August 27, 1990 letter referenced as a basis for DPF No. 24, the District Ranger informed Liberty of a "report … to be issued by the [FWS] September first of this year" … "of how your operation will affect and how it will be affected by the [HCA]." JA82 at 777. At this time, Plaintiffs have never seen such a "report" and understand none exists.

**E. Liberty Mining's Plans Changed Frequently and Liberty Failed to Provide Necessary Information to the Forest Service Causing Delay**

**<u>Response to Caption E</u>:** These are Plaintiffs' responses to Caption E, and they are incorporated by reference into Plaintiffs' responses to DPF Nos. 25-33 below.

(a) Plaintiffs dispute that they caused any delay relevant to Plaintiffs' taking claim, as the agencies had all the data they needed in July 1990 to ask for and render the no jeopardy opinion hidden from Plaintiffs.

(b) Plaintiffs periodically considered changing their plans, as with the December 1990 conceptual plan discussed in JA90 that would have focused mine development at the east end of the property so as to be as far from the owl nest as possible, to try to see if any reconfiguration of their surface activities might break the impasse of no known owl guidance what could and could not be done on the ground.

(c) Plaintiffs note and assert, however, that they were then prohibited from operations under the Stop Work Order of January 1990 (JA51), and were waiting for the Forest Service to address how the owl would affect any resumed operations in Eddy Gulch before paying for the necessary Arch Study (JA82, at 777). Thus, from Plaintiffs' perspective, agreeing to a Forest

Service delay in work on an environmental assessment on the next phases of their all-phase plan of operations was due to the potential impacts of the owl on any operation in Eddy Gulch, and settling on mill circuit particulars was a minor detail in comparison.

(d) Plaintiffs submit that the agencies' failure to provide the July 1990 biological opinion to Liberty, with its conclusion that the 38 acres of timber clearing and surface disturbance described in Liberty's September all-phase plan of operations (JA36) would not cause jeopardy to the owl, was the primary cause of all delay here.

25. At a March 16, 1990 meeting held at the District Ranger's office, Liberty proposed using "a cyanide vat type [gold] recovery process." JA65 at 594; see also JSOF, ¶ 40. Mr. Aloisi then "admitted that this was a new issue that would need to be addressed in its entirety." JA65 at 594. Liberty was told at the meeting that "significantly more information and coordination would be required and thereby setting back the [Environmental Assessment required under NEPA] until the summer of 1990." Id.

**Response No. 25:** Plaintiffs' object to the use of the word "proposed" as ambiguous and subject to misinterpretation, as explained here, but otherwise concur with the description in DPF No. 25 of the meetings and documents referred to. Any suggestion or implication that Plaintiffs ever submitted a plan of operations to the Forest Service seeking agency approval to install a vat cyanide milling circuit is false. The Forest Service was never under an obligation to process or approve any Liberty plan of operations calling for a cyanide milling circuit. Fairly stated, DPF 25 would read, "At a March 16, 1990 meeting … Liberty discussed with the District Ranger's Office what issues and considerations would be involved if Liberty were to seek approval of a plan of operations to install and use a cyanide milling circuit in Eddy Gulch."

26. In March 1990, Liberty Mining learned from regional and County regulatory agencies that, to operate a cyanide processing system, it would need to file, among other documents, a reclamation plan with Siskiyou County for its approval. JA62; JA64. But Liberty never obtained an approved reclamation plan from the County. See Nov. 1, 2007 Ferrero Tr. at 61:5-14 (discussing JA64) (Ex. A)."

**<u>Response No. 26</u>:** (a) Plaintiffs submit that the County letter is confusingly phrased, and has been misinterpreted by Defendant to require something that state law and county ordinance did not require. The County advised Mr. Ferrero then, and advised Mr. Aloisi in October 2007, that no county reclamation plan approval is required for operations solely on national forest lands. On such lands, the Forest Service is the lead agency. The County further advised that a County permit is required for operations on private lands (such as the Mountain Laurel parcel). If an operation involves both kinds of lands, the County requires a copy of the plan that applies to the federal lands as well, so that it can understand the whole operation and properly permit the private land portion of the operation. However the County's "approval" as to operations on public lands is pro forma, with the Forest Service remaining the lead permitting authority and the County not taking any action on federal lands inconsistent with the Forest Service lead. This is Liberty's understanding of JA-64 and the County's "reclamation agreement" requirement referred to in JA-64.

(b) Plaintiffs add that Liberty never sought the approval of Siskiyou County to operate a cyanide processing system, and would not have done so had its cyanide mill been on federal lands, with no private lands included in the operation.

27. In 1990, Liberty Mining still was several years away from obtaining the necessary permits to use a cyanide recovery process. <u>See</u> JA190 at 1567.

**<u>Response No. 27</u>:** Plaintiffs submit that "several years" is ambiguous, and submit that the cited reference (JA190, at 1567) does not support the assertion. Plaintiffs submit that a competent and cooperative Forest Service could in 1990-92 have permitted a vat cyanide gold recovery mill circuit in less than two years from the time Liberty would have filed a plan of operations, or a supplement to an existing plan of operations, seeking Forest Service approval to build and operate it on national forest system lands.

28. In an April 12, 1990 letter, the District Ranger reminded Mr. Aloisi that he agreed to provide "a written proposal describing the specific plans that you have for your new recovery process . . . ." JA69. The District Ranger reiterated that "due to the change of your proposal complexity and lack of available information, it was agreed that the [Environmental Assessment] scheduled for completion in April, will not be completed until mid-summer." Id.

**Response No. 28:** Plaintiffs concur that DPF No. 28 fairly describes the letter JA69.

29. The District Ranger again wrote to Liberty Mining on August 27, 1990, stating, "it is apparent that there is a high likelihood that preparation of an Environmental Impact Statement (EIS) will be required for your proposed cyanide leaching process . . . [requiring] probably two years, for the process to be completed." JA82 at 777; see also JSOF, ¶ 51. The District Ranger asked that Liberty inform him of its decision about using a milling process which would require an EIS (i.e., a cyanide process) as soon as Liberty finalized its decision, to minimize any delay. See JA82 at 778.

**Response No. 29:** (a) Plaintiffs concur DPF No. 29 is an accurate, partial quotation of JA82. (b) Plaintiffs regard the Forest Service's use of the word "proposed" in the letter as misleading, as Liberty never submitted a plan of operations to the Forest Service that proposed installation and operation of a cyanide milling circuit in Eddy Gulch.

(c) Plaintiffs accepted the representation in JA82 that it would take the Forest Service "probably two years" to permit a cyanide mill circuit. As JA190 at 1567 states, Plaintiffs had more than two years worth of apex and dump ore they intended to process through the gravity separation, or gravity – flotation mill that would be operated before Liberty would be approved to add a cyanide vat circuit to the mill facility, so the addition of such a circuit to Liberty's operation occurring plus-three years after Forest Service approval of a mining plan involving standard scale production and gravity-flotation milling operations fit Liberty's long-term plans. However, these long-term plans were all subordinate and background to getting word on the owl, namely, how the designation of the owl as a threatened species would prevent, constrain or otherwise alter any plans Liberty might otherwise have.

30. On September 18, 1990, Liberty informed the Forest Service that the "milling process will be determined in the next two years as exploring progresses. No cyanide milling is included in the current plan." JA84 (emphasis added); see also JSOF, ¶ 53.

**Response No. 30:** Plaintiffs concur with this statement.

31. In November 1990, the District Ranger informed Liberty that the Forest Service could not process Liberty's proposals without additional information:

> In order to formulate your proposals into a Plan of Operations we need a specific schedule for completion of phases of development of your operation from exploration to full operation, and we need your specific measures that you plan to use to reclaim the disturbed areas of your operation and a time table for the completion of the reclamation.

JA88 at 823. As the District Ranger further observed:

> It is our understanding that at this time there can be no further activity that would constitute a taking of spotted owl habitat within [a Habitat Conservation Area].
>
> ***
>
> Until you can provide us with a detailed Plan of Operations, as described previously, we will not be able to answer to what extent your planned activities would be constrained, nor will [we] be able to complete an environmental analysis.

Id. at 824.

**Response No. 31:** Plaintiffs concur these quotations are accurate.

32. District Ranger Lee wrote to Mr. Aloisi on December 7, 1990, regarding Liberty Mining's alternative proposal to mine in some existing underground tunnels, further away from "the known owl activity center." JA90 at 828. While District Ranger Lee predicted that Mr. Aloisi's alternative proposal "could probably occur," he stated that the Forest Service "would need to know more about [Liberty Mining's] proposal in detail before an accurate response could be made." Id.

**Response No. 32:** Plaintiffs concur DPF No. 32 fairly describes the content of JA90.

33. On or about March 11, 1991, Plaintiffs submitted a document titled an "Application for Renewal of Existing Plan of Operations with Modifications." See JA94; see also JSOF, ¶ 59. Liberty again informed the Forest Service in its March 1991 proposal that it intended to "[c]onstruct jig and flotation circuit mill at Usher Flat (no cyanide)." JA94 at 906 (emphasis added). However, Liberty describes the March 11, 1991 document as an "outline plan." JA94 at 906. The March 1991 document contains promises of future details to be forthcoming. See, e.g., JA94 at 905-06, ¶¶ 5, 6, 8 & 10. The Forest Service took no action on Liberty's March 11, 1991 submission.

**Response No. 33:** (a) Plaintiffs concur in the first three sentences of DPF No. 33 fairly characterize contents of JA94.

(b) Plaintiffs dispute the fourth sentence, which states that JA94 "promises" anything. The cited paragraphs state that further information on the subjects will be provided in connection with agency approval of the specific activities.

(c) Regarding the fifth sentence of JA94, Plaintiffs concur that the Forest Service never responded to Liberty's requests for modification of the prior approved plans, and concur that the Forest Service never responded in writing to the approval renewal request contained in the first sentence of JA94. The Forest Service's failure ever to respond to this modification request mooted any offer by Liberty to supply further information in support of the modifications. Finally, Plaintiffs dispute that the Forest Service took no action of any kind on the approval renewal request. Plaintiffs incorporate by reference their Response No. 18(b) above, and state that the District Mineral Officer orally partially granted the approval renewal request by authorizing certain work otherwise prohibited by the Stop Work Order. JSOF-60 and PPF No. 55.

34. Liberty Mining's June 1989 plan of operations, as supplemented, terminated on March 31, 1991, according to the terms of the November 27, 1990 extension. See JA88 at 822.

**Response No. 34:** DPF No. 34 is not a statement of fact but a conclusion of law. Plaintiffs incorporate by reference here their Response No. 18(a) above.

35. On May 9, 1991, Tom Ferrero, the author of Liberty's operating plans (see, e.g., JA36, JA40, JA94), met with District Ranger Lee to discuss Liberty's potential operations. See JA99; see also Nov. 1, 2007 Ferrero Tr. at 62:11-13 (Ex. A). During that meeting Mr. Ferrero again raised the possibility of using a cyanide system to recover gold. Nov. 1, 2007 Ferrero Tr. at 66:3-7 (discussing JA99) (Ex. A). As Mr. Ferrero explained at his deposition, "[s]ometimes we think we're going to use cyanide, sometimes we don't. But that was because we were in the process of testing the efficiency of it and weighing the regulatory problems." Nov. 1, 2007 Ferrero Tr. at 67:22-68:16 (Ex. A).

**Response No. 35:** Plaintiffs concur that DPF No. 35 as a fair, partial description of the May 9, 1991 meeting. Plaintiffs submit that this same meeting is further described in Plaintiffs'

Exhibit PE-2 in Support of their Motion for Summary Judgment, ¶ 39 (Dkt. No. 118-3, p. 20 of 45).

36. In a March 10, 1992 letter summarizing the outcome of a February 11, 1992 meeting with Mr. Aloisi and others, the District Ranger reiterated his November 1990 request for information:

> In order to formulate your proposals into a plan of operations, you have agreed to provide a specific schedule for completion of phases of development of your operation from exploration to full operation. We will also need for you to include your specific measures that you plan to use to reclaim the disturbed areas of your operation and a time table for the completion of the reclamation.

JA111 at 1084. Liberty Mining had failed to submit a detailed plan of operations by March 10, 1992. Id. at 1083.

**Response No. 36:** (a) Plaintiffs concur that the March 10, 1992 letter contains the quoted paragraph. Plaintiffs dispute that the March 10, 1992 letter is "reiterating" anything from 1990. The letter does not say so, and District Ranger Lee has never so testified. The context of the letter contradicts any inference it is related to any November 1990 request, as it refers (on p. 1084) to proposals and supplements many of which post-date November 1990.

(b) Plaintiffs concur that Liberty failed to submit a detailed plan of operations by March 10, 1992, but submitted its plan of operations on April 1, 1992. JA114. Plaintiffs also submit that between his February 11, 1992 meeting with the District Ranger and March 10, 1992, Plaintiff Aloisi had investigated whether there was a biological opinion pertaining to his 1989 plans of operations, and District Ranger Lee had admitted there was one, but did not provide it or disclose that it had been rendered in July 1990, more than 19 months before. PPF Nos. 67-69.

37. On April 1, 1992, Liberty Mining submitted a new Plan of Operations (the "April 1992 Plan"). See JA114 at 1106.

**Response No. 37:** As described in JSOF-74, Liberty submitted its April 1, 1992 Plan of Operations. Plaintiffs dispute it was a "new" plan; it restated the 1989 plan the first phases of which were approved in November 1989 (and modified in November 1990 in the Forest Service

approval letter JA88) embracing the areas of surface disturbance that had been determined in the July 1990 Biological Opinion not to cause jeopardy to the owl.

38. Like its predecessors, the scope of Liberty's April 1992 Plan was contingent upon the outcome of its explorations. See, e.g., JA114 at 1106 ("The objectives of the proposed developments are to determine whether there are reserves of gold bearing [sic] rock of sufficient quality and quantity to warrant mine development . . .").

**Response No. 38:** (a) Plaintiffs dispute that processing 10,000 tons of assayed ore deposit through a gravity concentrator, as the Forest Service approved in November 1989, is "explorations." Plaintiffs submit that all mine development is contingent on the preceding development work. Optimizing mill recovery of gold over multiple runs is not "explorations." Plaintiffs submit that characterizations of mineral activities in terms of "explorations" or not is irrelevant under the regulations of the Forest Service governing plans of operations. See Forest Service Manual, Ex. PE-10 to Plaintiffs' Motion for Summary Judgment (Dkt. No. 118-11, filed February 6, 2008).

(b) Plaintiffs concur the quotation placed in parentheses in DPF No. 38 is correct, except for the erroneous inclusion of "[sic]" in the quotation.

39. In a letter dated November 10, 1992, the District Ranger requested additional, detailed information before he could approve Liberty's "overall plan as submitted." JA137 at 1223-24; see also JSOF, ¶ 85.

**Response No. 39:** Plaintiffs concur DPF No. 39 describes JA137, and JSOF-85 also refers to JA137 and information the District Ranger stated in JA137 that he needed before approval of the overall plan.

40. In a letter to Mr. Aloisi dated December 21, 1992, the Forest Service repeated its request for information identified in the November 10, 1992 letter, listing the "very minimum . . . information . . . required to restart the preparation of the [Environmental Assessment]." JA142; see also JSOF, ¶ 92.

**Response No 40:** Plaintiffs concur that DPF No. 40 describes the contents of JA142.

41. Liberty Mining never submitted the information necessary to complete the requisite Environmental Assessment. See Oct. 29, 2007 Buchter Tr. at 75:4-77:21 (Ex. B).

**Response No. 41:** With the possibility it would ever operate receding into the future, with the Forest Supervisor having mooted Liberty's appeal of the reinitiation of consultation on the owl on the April 1, 1992 plan of operations, with no schedule for the completion of the reinitiated consultation, with the agency taking the position that the same plan partially approved in 1989 was a new plan, having learned that the same agency officials processing this "new" plan of operations had hidden the existence of the July 1990 biological opinion from him for over a year and a half, and then withheld the opinion itself from him months more so that he had to seek a copy of it from the FWS, Liberty did not submit the information demanded by the Forest Service.

42. Liberty Mining began to negotiate leasing its mining claims to a company called WAZCO, during the Fall 1992. See Oct. 31, 2007 Aloisi Tr. at 133:12-23 (Ex. C).

**Response No. 42:** Plaintiffs concur with DPF No. 42.

43. A lease with WAZCO was executed on or about April 25, 1993, with an effective date of April 1, 1993. See JSOF, ¶ 97.

**Response No. 43:** Plaintiffs refer to JSOF-97.

### F. The Northern Spotted Owl Is Listed as a Threatened Species Under the Endangered Species Act, Spurring the Forest Service to Seek a Programmatic Biologic Opinion from the Fish and Wildlife Service

44. By 1984, the northern spotted owl was considered a sensitive species by the Forest Service, triggering efforts by the Forest Service to protect the owl and preserve its habitat. See JSOF, ¶¶ 6, 7, 10, & 13. The listing of the northern spotted owl under the Endangered Species Act began in 1987, and was the subject of legal action. See JSOF, ¶¶ 9, 11, 14, 15, & 23.

**Response No. 44:** Plaintiffs refer to JSOFs-9, 11, 14, 15 and 23.

45. On June 18, 1990, anticipating that the spotted owl soon would be listed as an endangered or threatened species under the ESA, the Forest Service transmitted a Programmatic Biological Evaluation to the Fish and Wildlife Service as part of the required ESA consultation process. See JA76. Although the Forest Service's Programmatic Biological

Evaluation focused almost entirely on proposed timber sales in Klamath National Forest, it also included a paragraph addressing Plaintiffs' proposed mining activities. See JA76 at 747. The Forest Service submitted the Programmatic Biological Evaluation to FWS "to expedite the formal consultation process." JA76 at 719.

**Response No. 45:** Plaintiffs refer to PPF Nos. 40 and 41. Plaintiffs dispute the implication of the phrasing of DPF No. 45 that the Biological Evaluation's "paragraph" on Liberty's plan was any less information than the Forest Service provided the FWS for every timber sale or other project in the formal consultation.

46. On June 26, 1990, the Fish and Wildlife Service published the formal listing of the northern spotted owl as a threatened species under the ESA. See JSOF, ¶45.

**Response No. 46:** Plaintiffs refer to JSOF-45.

47. FWS issued a Biological Opinion on July 23, 1990, addressing the "effects of timber harvest and associated activities on the threatened northern spotted owl (Strix occidentalis caurina)." JA80 at 760. While the focus of the Biological Opinion letter was on timber sales, Liberty Mine was included in the opinion. See id. at 761; see also JSOF, ¶ 50. The Biological Opinion contains mandatory requirements for the incidental take of spotted owls pursuant to the Endangered Species Act. See JA80 at 769-771.

**Response No. 47:** Plaintiffs concur with DPF No. 47.

48. FWS authorized "incidental take" of spotted owls "in the form of harassment . . . in compliance with the provisions of the reasonable and prudent measures and terms and conditions of this Incidental Take Statement." JA80 at 770. The reasonable and prudent measures instructed the Forest Service to "[m]aintain essential habitat within close proximity of spotted owl nest sites and activity centers . . . in proposed [Habitat Conservation Areas (HCAs)]." Id. Mandatory terms and conditions were established by FWS to implement the reasonable and prudent measures. Id. at 770-71. To minimize impacts in HCAs where the project cannot be moved (such as a mining claim), FWS recommended "avoid[ing] road construction in HCAs." JA80 at 772.

**Response No. 48:** Plaintiffs concur with DPF No. 48, although the ellipses and selectivity of the quotations may misrepresent the contents of the whole, and the document best speaks for itself.

49. Liberty Mining's claims are located in a category 1 HCA, and it proposed activities within 0.5 mile of a known pair of spotted owls. See JSOF ¶¶ 43, 44; see also JA80 at 765-766.

**<u>Response No. 49</u>:** (a) Plaintiffs deny and dispute that Liberty ever proposed any activities within 0.5 mile of the nearest owl pair. Plaintiffs hereby withdraw their concurrence in JSOF-44, as upon further analysis of maps and documents of record Plaintiffs find JSOF-44 erroneous as a matter of fact.

(b) Plaintiffs acknowledge that the charts in the June 1990 Biological Evaluation (JA-76, at 732), and the July 1990 Biological Opinion (JA-80, at 765-766), say Liberty did propose activities within the 0.5 mile redius. We believe those writings to be erroneous as a matter of fact.

(c) Using the Forest Service map of the 0.7 and 1.3 mile radius circles (JA-118, at 1146), Plaintiffs submit that since October 1989 (with the submission of JA-40, the first plan reflecting the mitigation and owl avoidance agreed upon between Aloisi and Mark Williams) they have never proposed any activity within the 0.7 radius circle. The Klamath Mine area, and part of Usher Flat, are within the 1.3 mile radius line. The September 1989 all-phase plan (JA-36) proposed activities on or possibly just inside the 0.7 mile radius. These were mitigated out in the October all-phase plan, and have never been part of any subsequent Liberty plan, including the April 1, 1992, restated plan of operations (JA-114).

(d) Plaintiffs describe the mitigation process and substance in the Aloisi Affidavit at ¶¶ 12 and 20, and in the Ferrero Affidavit at ¶¶ 20-22 (Dkt. Nos. 118-2 and 118-3, respectively, filed February 6, 2008), and in PPF No. 29 (Dkt. No. 119, filed February 6, 2008).

(e) Plaintiffs also object to the phrasing of DPF No. 49, as the regulatory guidance draws the circles from an owl pair's nest or activity center, not wherever a pair of owls flies together. Thus, upon re-examination of JA-76, which is cited as authority for JSOF-44, none of the reports

in JA-76 from areas proximate to Liberty's claims pertained to the owls on their nest or activity center. JA-76 is not authority for JSOF-44.

**G. The Forest Service Tries To Implement the Biological Opinion**

50. Within a few months after the Biological Opinion issued, on October 24, 1990, the Regional Forester followed the Fish and Wildlife Service's recommendation and adopted the ISC's Conservation Strategy for the spotted owl. See JSOF, ¶ 54; see also JA86. The Conservation Strategy called for the cessation of logging in HCAs. See JSOF, ¶ 43; see also JA71 at 652. The Regional Forester directed the Forest Supervisors, including the Supervisor of the Klamath National Forest, to comply with the mandatory terms and conditions of the Biological Opinion, and to "document steps taken to implement the Conservation Recommendations." See JSOF, ¶ 54; see also JA86.

**Response No. 50:** (a) Plaintiffs concur that the Regional Forester acted on October 24, 1980, over four months (if that is a "few") after the July 1990 biological opinion. Plaintiffs have no basis to know if the Regional Forester followed a FWS recommendation or not in doing so.

(b) Plaintiffs have never seen any memorandum or other document that "document[s] steps taken to implement the Conservation Recommendations" as described in DPF No. 50 with respect to any Liberty plan of mining operations. Likewise, Plaintiffs have never seen any memorandum or other document that "document[s] compliance with the mandatory terms and conditions of the [July 1990 Biological] Opinion[]" as described in JSOF-54, with respect to any Liberty plan of mining operations.

51. In April 1991, the Regional Forester released spotted owl survey protocol for FY1991 to the Forest Supervisors. See JSOF, ¶ 61.

**Response No. 51:** Plaintiffs concur with DPF No. 51.

52. In May 1991, the Regional Office circulated additional guidance on interpreting and implementing the Conservation Strategy. See JSOF, ¶ 63.

**Response No. 51:** Plaintiffs refer to JSOF-63, which more accurately and in more detail describes the May 1991 document.

53. Additional guidance was issued in July 1991 describing the responsibilities of a Regional Technical Review Team established to review proposed actions for compliance

with the Conservation Strategy. See JSOF, ¶ 65. The July 1991 guidance also set out procedures for evaluating a project area with respect to northern spotted owl populations and habitat. See JSOF, ¶ 65, see also JA107 at 1038-43.

**Response No. 53:** Plaintiffs refer to JSOF-65.

54. KNF Wildlife Biologist Kathleen Milne Granillo visited Liberty Mining's claims in July 1991, to try to implement the Biological Opinion and explore ways to lessen the effect of Liberty's proposed activities on suitable spotted owl habitat. See Granillo Tr. at 25:8-27:17 (Ex. D).

**Response No. 54:** **(a)** Plaintiffs concur that Kathleen Milne Granillo visited Liberty's Mining claims in 1991.

(b) Plaintiffs do not concur that this visit was in July 1991, as Ms. Milne Granillo testified, "I really don't [remember when that was]. I think it was, like, summer of '91." Defs.' Brief, Tr. at 25 (Dkt. 120-6, filed February 6, 2008).

(c) Plaintiffs have no idea what Defendant means with its description of the supposed purpose of her visit, "to try to implement the Biological Opinion and explore ways to lessen the effect of Liberty's proposed activities on suitable spotted owl habitat." Plaintiffs did not see or hear from or of Ms. Milne Granillo for about a year after that visit, and Plaintiffs have never seen or received any communication, written or oral, from Ms. Milne Granillo or referring to Ms. Milne Granillo that pertains to the subject Defendant claims was the purpose of her visit. If any such document exists, Defendant has failed to produce it and is requested to produce it forthwith to Plaintiffs.

### H. The Forest Service Initiated an ESA Consultation with the FWS in 1992 Regarding Liberty Mining's April 1992 Plan

55. In April 1991, FWS proposed designating certain areas as critical habitat for the northern spotted owl. See JSOF, ¶ 61. The list of proposed critical habitat areas was revised on August 13, 1991 to, among other things, include the Eddy Gulch area encompassing Liberty Mining's operations. See JSOF, ¶ 68; see also 56 Fed. Reg. 40002, 40042 (Aug. 13, 1991) (proposing as critical habitat for the northern spotted owl Sections 3, 4, 8, 9 and 10 of Township 39 N., Range 11 W., Mt. Diablo Meridian, among others); JA6 at 142-44 (identifying the Sections, Township and Range of Liberty Mining's claims in Eddy Gulch).

**Response No 55:** Plaintiffs concur that FWS proposed to designate the identified sections of public land as critical habitat for the owl in August 1991, and that the unpatented mining claims and the private parcels involved in this suit are within those identified sections.

56. On January 15, 1992, FWS published its final rule designating as critical habitat the areas identified in its August 13, 1991 revised notice. See JSOF, ¶ 70; see also Final Rule, 57 Fed. Reg. 1796 (Jan. 15, 1992); JA145 at 1264 (Deputy Regional Forester Bosworth noting that the critical habitat areas were based on the HCAs).

**Response No. 56:** Plaintiffs refer to JSOF-70.

57. The designation of critical habitat for the northern spotted owl was to provide "additional protection requirements under section 7 of the [ESA] with regard to activities that are funded, authorized, or carried out by a Federal agency." JA138 at 1226 (quoting Final Rule, 57 Fed. Reg. at 1796) (internal quotation marks omitted).

**Response No. 57:** Plaintiffs refer to the entire preamble of the Federal Register designation notice as the FWS's statement of what the designation "was to provide." Plaintiffs agree the preamble contains the quoted language.

58. Because the area where Liberty Mining's claims were located was designated as critical habitat in January 1992, the Forest Service initiated the ESA consultation process to determine whether Liberty Mining's April 1992 Plan would adversely affect critical habitat of the northern spotted owl. See JA124 at 1177.

**Response No. 58:** (a) Plaintiffs concur that the Forest Service "initiated the ESA consultation process" in May 1992.

(b) Plaintiffs do not concur that the reason stated for reinitiation ("[b]ecause the area where Liberty Mining's claims were located was designated as critical habitat in January 1992") was the only reason. If it were the only reason then the Forest Service should have undertaken standard compliance with the provisions of 50 CFR 402.14 and prepared a biological assessment before reaching the conclusion, "the implementation of the proposed activity may affect the northern spotted owl or adversely affect its habitat," and before reinitiating consultation.

59. FWS suspended the consultation pending receipt of additional information from Liberty Mining. See JSOF, ¶¶ 89, 91; see also, JA138 at 1225 (FWS letter providing notice to

the Forest - Service of suspension of consultation and requesting additional information); JA140 (Dec. 4, 1992 Forest Service letter to Mr. Aloisi providing notice of the suspension and forwarding FWS's letter requesting additional information).

**Response No. 59:** Plaintiffs concur that these events happened on these dates, and were effected by the referenced correspondence.

60. Liberty Mining provided the information sought by FWS for the consultation in about March 1993. See JSOF, ¶ 95. That information was forwarded to FWS by District Ranger Lee on April 2, 1993. See JSOF, ¶ 96.

**Response No. 60:** Plaintiffs refer to JSOFs-95-96.

61. Before FWS could complete the consultation on Liberty Mining's April 1992 Plan, Liberty Mining leased its mining claims (including Mountain Laurel mine) to WAZCO on April 25, 1993, effective April 1, 1993. See JSOF, ¶ 97.

**Response No. 61:** Plaintiffs concur with DPF No. 61 except that the inclusion of the Mountain Laurel Mine (Mineral Lot 45A) in the statement is false. The Liberty-WAZCO lease does not include the Mountain Laurel Mine parcel. JSOF-97 is correct, and does not include the Mountain Laurel Mine (Mineral Lot 45A).

62. WAZCO (subsequently operating under the name, Liberty Consolidated Mines, Inc. (LCM)), took over operations relating to the mining claims at issue, and sought Forest Service approval of its proposed plan of operations. See JSOF, ¶¶ 98-100, 103-105, 108-111.

**Response No. 62:** Plaintiffs concur, except with respect to the parenthetical description of the relationship between WAZCO and LCM, which may or may not be true. WAZCO and LCM held the claims under different lease-purchase agreements, one after the other, from Liberty's perspective as lessor.

63. FWS completed its consultation on February 8, 1994, concluding that the proposed project was not likely to adversely affect the northern spotted owl. See JSOF, ¶ 101.

**Response No. 63:** Plaintiffs cannot agree or disagree with this statement, as it has been made indefinite by failing to identify the "proposed project." JSOF-101 identifies the project on which consultation was completed through the February 8, 1994 letter as the project subject to

the formal consultation reinitiated in August 1992. That "proposed project" is Liberty Mining's April 1, 1992, all-phase plan of operations. JA114. If "proposed project" in DPF No. 63 means JA114, then Plaintiffs concur. If "proposed project" in DPF No. 63 means any other project, then Plaintiffs deny DPF 63 as false.

64. Although LCM ultimately was approved to operate on August 5, 1996 (three years after taking possession of Liberty Mining's claims), on condition that it post a reclamation bond (JSOF, ¶ 111), LCM never did so (JSOF, ¶ 112), and allowed its lease on the mining claims to lapse in 1999 (JSOF, ¶ 113).

**Response No. 64:** Plaintiffs refer to Ex. PE-16, the August 5, 1996 Forest Service plan approval document (Dkt. 118-17, filed February 6, 2008). Plaintiffs do not concur that August 5, 1996, was three years after LCM took possession of Liberty Mining's claims. Plaintiffs submit that LCM ceased making rental payments to Liberty in 1999, and Liberty terminated LCM's lease for breach in 1999.

Dated: March 6, 2008

Respectfully submitted,

s/ Lawrence G. McBride

Lawrence G. McBride
FOLEY & LARDNER LLP
3000 K St., N. W., Suite 500
Washington, D.C. 20007-5143
Telephone: (202) 672-5300
Facsimile: (202) 672-5399

*Attorney for Plaintiffs*