**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| ALFRED ALOISI, et al., Plaintiffs, v. THE UNITED STATES, Defendant. | No. 95-650L<br>Judge Lawrence S. Margolis |

**DEFENDANT'S OPPOSITION TO**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

RONALD J. TENPAS
Assistant Attorney General
Environment & Natural Resources Division

BRUCE K. TRAUBEN
Trial Attorney
Natural Resources Section
Environment & Natural Resources Division
U.S. Department of Justice
601 D Street, NW
Washington, D.C. 20004
(202) 305-0238 (phone)/(202) 305-0506 (fax)

WILLIAM J. SHAPIRO
Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Div.
501 I Street, Suite 9-700
Sacramento, CA 95814-2322

OF COUNSEL:
ROSE MIKSOVSKY
U.S. Department of Agriculture
Office of General Counsel
33 New Montgomery St., 17th Fl.
San Francisco, CA 94105-3170

Dated: March 5, 2008

**TABLE OF CONTENTS**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I. Plaintiffs' Takings Claim Is Not Ripe . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

A. Plaintiffs Did Not Submit a Meaningful Proposal for Mine Production Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

B. Plaintiffs' Claims Are Not Ripened By the Principle of "Extraordinary Delay" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II. Plaintiffs Failed to Demonstrate the Existence of a Compensable Property Interest in the Unpatented Mining Claims and Patented Mountain Laurel Mine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

A. Plaintiffs' Takings Claim Related to the Unpatented Mining Claims Requires Plaintiffs to Demonstrate a Discovery of a Valuable Mineral Deposit . . . . . . . . . . . . . . . . . . . . . . . . . 9

B. Plaintiffs' Novel Argument That Their Compensable Property Interest Arises from a "Statutory Right" Is Not Supported by Long-Established Law and Must Be Rejected . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

1. Plaintiffs' Argument that the Discovery Requirement Is Irrelevant Merely Because They Bring a Temporary, Rather than a Permanent, Takings Claim Must Be Rejected . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

2. Plaintiffs' Argument that Their Property Right is Established by Federal Regulation Must Be Rejected . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

3. Plaintiffs' Argument that Their Property Right is Established by the Forest Service Manual Must Be Rejected . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

4. Plaintiffs' Argument About a "Statutory Right" Demonstrates Why the Court Lacks Jurisdiction Over Plaintiffs' Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

III. Plaintiffs Fail to Show That The Penn Central Factors For A Regulatory Taking Are Met . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

A. Plaintiffs Fail to Show Extraordinary Delay and Fail to Meet Their Burden of Showing Bad Faith by Clear and Convincing Evidence . . . . . 22

1. Plaintiffs' Taking Claim Is Grounded Upon the False Premise that the Fish and Wildlife Service's July 23, 1990 Biological Opinion Would Allow Liberty Mining's Plans of Operations to Go Forward . . . . . 24

2. Forest Service Personnel Met with Mr. Aloisi to Discuss the Biological Opinion and Its Mitigation Requirements . . . . . 26

3. The Alleged Delay Was Not Extraordinary . . . . . 27

4. Plaintiffs Fail to Show Bad Faith . . . . . 33

B. Plaintiffs Fail to Show the Economic Impact of the Alleged Delay . . . . . 36

C. Plaintiffs Fail to Show the Interruption of Reasonable Investment-Backed Expectations Caused by the Alleged Delay . . . . . 40

CONCLUSION . . . . . 43

## TABLE OF AUTHORITIES

### CASES

Almota Farmers Elevator & Warehouse Co. v. United States,
409 U.S. 470 (1973) . . . . . . . . . . 8

Am. Pelagic Fishing Co. v. United States,
379 F.3d 1363 (Fed. Cir. 2004) . . . . . . . . . . 17

Am-Pro Protective Agency, Inc. v. United States,
281 F.3d 1234 (Fed. Cir. 2002) . . . . . . . . . . 31, 34

Appolo Fuels, Inc. v. United States,
318 F.3d 1338 (Fed. Cir. 2004) . . . . . . . . . . 3

Atlas Corp. v. United States,
895 F.2d 745 (Fed. Cir. 1990) . . . . . . . . . . 12

Bass Enters. Prod. Co. v. United States,
381 F.3d 1360 (Fed. Cir. 2004) . . . . . . . . . . 21, 22, 23, 27, 28, 29, 30, 33, 36

Bass Enters. Prod. Co. v. United States,
54 Fed. Cl. 400 (2002) . . . . . . . . . . 43

Bayshore Res. Co. v. United States,
2 Cl. Ct. 625 (1983) . . . . . . . . . . 11

Benson Mining & Smelting Co. v. Alta Mining & Smelting Co.,
145 U.S. 428 (1892) . . . . . . . . . . 9

Best v. Humboldt Placer Mining Co.,
371 U.S. 334 (1963) . . . . . . . . . . 9

Boise Cascade Corp. v. United States,
296 F.3d 1339 (Fed. Cir. 2002) . . . . . . . . . . 3, 6, 7

Bush v. United States,
58 Fed. Cl. 123 (2003) . . . . . . . . . . 11

Cal. Coastal Comm’n v. Granite Rock,
480 U.S. 572 (1987) . . . . . . . . . . 3, 39

Cameron v. United States,
252 U.S. 450 (1920) . . . . . . . . . . 9, 12

Castle v. Womble,
19 Pub. Lands Dec. 455 (1895) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

CCA Assoc. v. United States,
75 Fed. Cl. 170 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 35

Chrisman v. Miller,
197 U.S. 313 (1905) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Clouser v. Espy,
42 F.3d 1522 (9th Cir. 1994), cert. denied, 515 U.S. 1141 (1995) . . . . . . . . . . . . . . . . . . 4

Cottrell v. United States,
42 Fed. Cl. 144 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Crocker v. United States,
125 F.3d 1475 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Davis v. Nelson,
329 F.2d 840 (9th Cir. 1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Deltona Corp. v. United States,
657 F.2d 1184 (Ct. Cl. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Fla. Rock Indus. v. United States,
45 Fed. Cl. 21 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 40

Freese v. United States,
221 Ct. Cl. 963 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Freese v. United States,
6 Cl. Ct. 1 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Good v. United States,
189 F.3d 1355 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Great Basin Mine Watch,
146 I.B.L.A. 248 (Nov. 9, 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Hafen v. United States,
30 Fed. Cl. 470 (1994), aff'd, 47 F.3d 1183 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . 11

Holden v. United States,
38 Fed. Cl. 732 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

In Re S. Utah Wilderness Alliance,
125 I.B.L.A. 175 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Lara v. Sec'y of Interior,
820 F.2d 1535 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Loveladies Harbor, Inc. v. United States,
28 F.3d 1171 (Fed. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 40

MacDonald, Sommer & Frates v. Yolo County,
477 U.S. 340 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Martinez v. United States,
333 F.3d 1295 (Fed. Cir. 2003), cert. denied, 540 U.S. 1177 (2004) . . . . . . . . . . . . . . . 20

Mineral Policy Center v. Norton,
292 F.Supp.2d 30 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 11

Morris v. United States,
392 F.3d 1372 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Mulkern v. Hammitt,
326 F.2d 896 (9th Cir. 1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Palazzolo v. Rhode Island,
533 U.S. 606 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Patton v. United States,
64 Fed. Cl. 768 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Penn Central Transp. Co. v. New York City,
438 U.S. 104 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21, 35, 38, 40

Reynolds v. Army & Air Force Exch. Serv.,
846 F.2d 746 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Rith Energy, Inc. v. United States,
270 F.3d 1347 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 38

Ronald A. Pene,
147 I.B.L.A. 153 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Ruckelshaus v. Monsanto,
467 U.S. 968 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Seiber v. United States,
364 F.3d 1356 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Skaw v. United States,
13 Cl. Ct. 7 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Stone Forest Indus., Inc. v. United States,
973 F.2d 1548 (Fed. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Sw. Center for Biological Diversity v. USFS,
100 F.3d 1443 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Swanson v. Babbitt,
3 F.3d 1348 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Tabb Lakes, Ltd. v. United States,
10 F.3d 796 (Fed. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 33

Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,
216 F.3d 764 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Tenn. Valley Auth., v. Hill,
437 U.S. 153 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

United States v. Bagwell,
961 F.2d 1450 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

United States v. Coleman,
390 U.S. 599 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

United States v. Mobley,
45 F.Supp. 407 (S. D. Cal. 1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

United States v. Riverside Bayview Homes, Inc.,
474 U.S. 121 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

United States v. Weiss,
642 F.2d 296 (9th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Western Radio Servs. Co., Inc. v. Espy,
79 F.3d 896 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City,
473 U.S. 172 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Wyatt v. United States,
271 F.3d 1090 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 28, 33, 40

**STATUTES**

16 U.S.C. § 470 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

30 U.S.C. §§ 21-54 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 18

30 U.S.C. § 28 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

30 U.S.C. § 612 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

33 U.S.C. § 1151 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**REGULATIONS**

36 C.F.R. Part 228 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

36 C.F.R. § 228 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

36 C.F.R. § 228.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

36 C.F.R. § 228.4(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

36 C.F.R. § 228.4(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

36 C.F.R. § 228.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

36 C.F.R. § 228.5(a)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

36 C.F.R § 228.8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

36 C.F.R. §§ 228.8(a)-(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

36 C.F.R. § 228.8(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

36 C.F.R. § 228.8(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

36 C.F.R. Part 252 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

36 C.F.R. § 800.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

36 C.F.R. § 800.1(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

39 Fed. Reg. 31317 (Aug. 28, 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**OTHER AUTHORITIES**

Lawrence G. McBride, Inverse Condemnation Issues in Revising the Mining Law, 38 Rocky Mtn. Min. L. Inst. § 7.02[7][e] (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Michael Graf, Application of Takings Law to Regulation of Unpatented Mining Claims, 24 Ecology L.Q. 57 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

## LIST OF EXHIBITS

| Exhibit No. | Exhibit Description |
|---|---|
| 1 | Lawrence G. McBride, Inverse Condemnation issues in Revising the Mining Law, 38 Rocky Mtn. Min. L. Inst. § 7.02[7][e] (1992) |
| 2 | Thomas Ferrero, excerpts of Jan. 13, 1998 and Nov. 1, 2007 Deposition Transcripts |
| 3 | Kathleen Granillo, excerpts of Oct. 2, 1997 Deposition Transcript |
| 4 | Marc Williams, excerpts of Oct. 11, 1997 Deposition Transcript |
| 5 | Plaintiffs' Answers to Defendant's Second Set of Interrogatories and Requests for Production of Documents, Sept. 24, 2007, excerpts |
| 6 | Quarterly Joint Status Reports, dated Jan. 3, 2006, March 31, 2006, July 5, 2006, and Sept. 29, 2006 |

## INTRODUCTION

Plaintiffs fail to meet their burden of proof to with respect to every element courts consider when determining whether the government is liable for a taking. Accordingly, their motion for summary judgment should be denied.

As a preliminary matter, Plaintiffs fail to show that their takings claim is ripe for review. Plaintiffs bear the burden of proof of showing that their claim is ripe, but they make no attempt to do so. As Defendant discusses below, and in Defendant's Memorandum in Support of Its Motion to Dismiss or, Alternatively, for Summary Judgment ("Def.'s Mem."), Plaintiffs' takings claim is not ripe because they never submitted a proposed plan of operations for the production phase of mining that the Forest Service could consider. Accordingly, Plaintiffs' takings claim is not ripe for review and should be dismissed.

Plaintiffs also fail to show the most basic elements for a takings claim. First, Plaintiffs must show that they had a compensable property interest in the mining claims at issue as of the date of the alleged taking, July 23, 1990. However, they fail to present any evidence that shows that they had a property interest in the patented Mountain Laurel Mine as of that date. Indeed, the evidence they point to supports the government's position that they did not have a property interest in the Mountain Laurel Mine until March 1991, well after the alleged date of taking.

Further, to show that they had a compensable property interest in the unpatented mining claims, Plaintiffs must show that they had made a discovery of valuable mineral deposits as of the date of taking. Plaintiffs attempt to show that their mining claims were valid by relying upon documents that plaintiffs' expert, Mr. Ferrero, recently created based upon assumptions and speculation that find no support in the record. Mr. Ferrero's speculative conclusions are not supported by the documents in the

record, are without merit, and should be given little weight.[1] At the least, genuine issues of material fact regarding the validity of the Plaintiffs' unpatented mining claims prevent the Court from granting Plaintiffs' motion for summary judgment.

Plaintiffs assert a novel argument that they still had a compensable property interest in the unpatented mining claims, because they assert only a temporary taking of mining claims that are located in open lands. Plaintiffs' argument, however, ignores over 100 years of precedent and may be rejected out of hand.

The inability to establish a compensable property interest warrants rejection of Plaintiffs' motion and dismissal of Plaintiffs' complaint. However, even assuming that they could demonstrate a compensable property interest, Plaintiffs fail to show any of the elements necessary to establish a temporary taking. They fail to show extraordinary delay, bad faith, economic impact or any interference with reasonable investment-backed expectations. Rather, all of the elements courts consider to determine whether a temporary taking occurred support the government's cross motion for dismissal.

**ARGUMENT**

**I. Plaintiffs' Takings Claim Is Not Ripe**

As a preliminary matter, Plaintiffs bear the burden of showing by a preponderance of the evidence that the Court has jurisdiction over its takings claim. See Patton v. United States, 64 Fed. Cl. 768, 773 (2005) (quoting Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988)). Plaintiffs, however, fail to address in their motion papers whether their takings claim is

[1] Mr. Ferrero's opinions have not been tested by discovery, as expert discovery has been deferred until after motions practice. Arguably, Plaintiffs' motion is premature because it relies heavily upon Mr. Ferrero's untested opinions. Nevertheless, Defendant believes that the Court should consider the merits of Plaintiffs' motion for summary judgment, and deny it.

ripe for adjudication and, therefore, within the Court's subject matter jurisdiction. See Morris v. United States, 392 F.3d 1372, 1375 (Fed. Cir. 2004). Because Plaintiffs fail to meet their burden of showing that their takings claim is ripe for review, their motion for summary judgment must be denied, and this action should be dismissed as Defendant shows in its motion to dismiss. See Def.'s Mem. at 22-27.

### A. Plaintiffs Did Not Submit a Meaningful Proposal for Mine Production Activities

Even if Plaintiffs had a compensable property interest in these unpatented and patented mining claims, Plaintiffs' takings claim is not ripe for review. A regulatory takings claim is not ripe until the agency charged with implementing the regulation has reached a final decision to restrict some aspect of ownership. See Palazzolo v. Rhode Island, 533 U.S. 606, 620 (2001); MacDonald, Sommer & Frates v. Yolo County, 477 U.S. 340, 349-51 (1986). A takings claim is ripe, therefore, only after a claimant has submitted a meaningful permit application and the agency has reached a final decision on that application. See Boise Cascade Corp. v. United States, 296 F.3d 1339, 1351-52 (Fed. Cir. 2002). The Court lacks jurisdiction over unripe claims. See Morris, 392 F.3d at 1375. Plaintiffs' failure to submit a meaningful application for mining these claims means Plaintiffs' takings claims are not ripe and, therefore, must be dismissed.

A claimants' mining rights may be limited by a variety of federal, state, and local regulations. See Cal. Coastal Comm'n v. Granite Rock, 480 U.S. 572, 584 (1987) (mining activities are subject to regulation to protect the environment); see also Rith Energy, Inc. v. United States, 270 F.3d 1347, 1351 (Fed. Cir. 2001) (mining is highly regulated); Appolo Fuels, Inc. v. United States, 318 F.3d 1338, 1349 (Fed. Cir. 2004) (same). In the present case, one of the most important preexisting limitations is the Forest Service's duty to manage National Forest System lands in order to protect surface resources from unreasonable and undue degradation. The Forest

Service accomplishes this goal by imposing terms and conditions on an operator's conduct of mining activities in national forests. See 30 U.S.C. § 612; Clouser v. Espy, 42 F.3d 1522, 1531 (9th Cir. 1994), cert. denied, 515 U.S. 1141 (1995).

As part of this regulatory authority, the Forest Service requires potential miners to submit for approval operating plans for their proposed operations. See id. at 1530 (citing cases); see also Freese v. United States, 6 Cl. Ct. 1, 11 (1984) ("With regard to unpatented claims, therefore, the Government retains the right to regulate disturbance of surface resources, as well as the right to permit uses of the surface area of the claim for purposes other than mining."). Forest Service regulations provide that "a notice of intent to operate is required from any person proposing to conduct operations which might cause disturbance of surface resources." 36 C.F.R. § 228.4(a). "If the District Ranger determines that the proposed operations are likely to cause a 'significant disturbance of surface resources,' the operator must file a proposed plan of operations." Clouser, 42 F.3d at 1532 (citing 36 C.F.R. § 228.4(a)). A claimant has no right to have a specific project approved by governmental authorities. See Great Basin Mine Watch, 146 I.B.L.A. 248, 256 (Nov. 9, 1998) (holding that "the mere filing of a plan of operations by a holder of a mining claim invests no rights in the claimant to have any plan of operations approved"); see also Mineral Policy Center v. Norton, 292 F.Supp.2d 30, 35 (D.D.C. 2003) (BLM may deny a mining permit because of the area's environmental sensitivity).

In addition to the need for an approved plan of operations, a proposed mining plan must be evaluated under the National Historic Preservation Act, 16 U.S.C. § 470, et al. ("NHPA"), which requires Federal agencies to take into account the "effect of their undertakings on historic properties and afford the [Advisory Council on Historic Preservation] a reasonable opportunity to comment on

such undertakings." 36 C.F.R. § 800.1(a).[2] In addition, depending on the nature of activity proposed, a proposal must comply with (1) Federal and State water quality standards, including the Federal Water Pollution Control Act, see 33 U.S.C. § 1151, et seq.; (2) Federal and State standards for the disposal and treatment of solid wastes, see 36 C.F.R. §§ 228.8(a)-(c); (3) the Endangered Species Act, see 36 C.F.R. §§ 228.8(d)-(e); (4) the National Environmental Protection Act; and (5) county and state regulations. See 36 C.F.R. § 228.8.

Before and during the alleged temporary takings period, Plaintiffs proposed to the Forest Service only non-income producing preliminary activities (such as road-building and sampling activities), and conceptual outlines of production activities, not actual production activities themselves.[3] Morever, Plaintiffs' intended plans frequently changed. [4] And, the parties agree that the Forest Service asked for additional information related to Plaintiffs' plans during the alleged

---

[2] The NHPA contemplates a coordinated effort among the relevant federal agency (in this case, the Forest Service) the Advisory Council on Historic Preservation, the State Historic Preservation Officer ("SHPO"), and the public. See 36 C.F.R. § 800.1.

[3] See JSOF ¶¶ 19, 20 (Phase II activities in May 2, 1989 were described as being dependent on the outcome of "test results from Phase I and NEPA"); JA36 at 449 (Plaintiffs' September 1989 Plan, describing production activities as contingent on positive results from earlier phases); PE-2 at ¶ 16 (Mr. Ferrero stating that the Forest Service could only evaluate the "early plan segments of Plaintiffs' September 1989 Plan); JA40 at 465 (Plaintiffs' October 1989 Supplemental Plan, explaining that details of future production activities "will depend on many factors, and cannot be accurately projected at this time"); JA84 (Plaintiffs' statement that "milling process will be determined in the next two years as exploring progresses"); JA94 at 906 (Plaintiffs' March 1991 "outline plan," describing that details of a variety of issues "will be forthcoming"); JA114 at 1108 (Plaintiffs' April 1992 Plan, lacking details of production activities because those activities would depend on the results of future exploratory work).

[4] See, e.g., JA65 at 594 (Plaintiffs' March 16, 1990 proposal for cyanide vat recovery); JA84 (Plaintiffs' September 1990 elimination of cyanide milling); Nov. 1, 2007 Ferrero Tr. at 66:3-7 (Mr. Ferrero's confirmation that Plaintiffs raised the possibility of using cyanide in a May 9, 1991 meeting with the Forest Service) (attached hereto as Ex. 2).

takings period, but that Plaintiffs did not, or could not, provide the requested information.[5]

Plaintiffs, therefore, never submitted a fully-formed plan for mining production activities. Thus, the Forest Service did not, and could not, reach a final decision on any proposals for actual gold production. Plaintiffs' takings claim, therefore, is not ripe for review and must be dismissed for lack of jurisdiction.

**B. Plaintiffs' Claims Are Not Ripened By the Principle of "Extraordinary Delay"**

Although Plaintiffs do not discuss the question of ripeness in their opening brief, Plaintiffs cite Boise Cascade for the proposition that "extraordinary delay in permit processing or bad faith on the part of the agency can give rise to a ripe takings claim notwithstanding the failure to deny the permit." See Pls.' Mem. at 15 (citing Boise Cascade, 296 F.3d at 1347 n.6). Plaintiffs do not argue, however, that their takings claim is ripe due to extraordinary delay. That argument should be rejected, nevertheless, because the concept that extraordinary delay might ripen a takings claim is irrelevant here. Extraordinary delay might ripen a regulatory takings claim when an applicant has submitted a meaningful permit application and the agency takes an extraordinarily-long amount of time reviewing that application. The principle prevents the agency from unnecessarily dragging out its review of an application (during which time the applicant is restricted from using his property) by allowing a claimant to bring a takings claim after the delay becomes extraordinarily

---

[5] See JA38 at 458 (October 1989 letter from Forest Service requesting a "firm plan"); JA69 (April 1990 letter from Forest Service repeating verbal request for a "written proposal describing the specific plans"); JA82 at 778 (August 1990 letter from Forest Service requesting information about milling process); JA88 (November 1990 letter from Forest Service stating "[a]t this time we do not have a complete proposed Plan of Operations to encompass these [operational phase] activities"); JA90 (December 1990 letter from Forest Service stating "we would need to know more about your proposal in detail before an accurate resopnse could be made"); JA108 (August 1991 letter from Forest Service requesting information); JA111 (March 1992 letter from Forest Service requesting information); JA137 (November 1992 letter from Forest Service requesting additional information); JA142 (December 1992 letter from Forest Service repeating request for additional information)

long. In such a situation, it is clear what activities the applicant intends to undertake; the agency has had a meaningful opportunity to evaluate that proposal; and it is possible to evaluate the economic impact on the applicant caused by the unreasonably-long delay. The principle clearly does not obviate the claimant's need to submit a meaningful application, since the length of an agency's review can never become extraordinary if there is no meaningful application for the agency to review. See Boise Cascade, 296 F.3d at 1351-52 (citing numerous cases so holding).[6]

**II. Plaintiffs Failed to Demonstrate the Existence of a Compensable Property Interest in the Unpatented Mining Claims and Patented Mountain Laurel Mine**

Recognizing their burden to show that they have a compensable property interest (see Pls.' Mem. at 13), Plaintiffs argue that their "core" mining claims were validated by a discovery under the Mining Law.[7] See Pls.' Mem. at 19-24. According to Plaintiffs, Messrs. Aloisi and Goodman "determined that the dump and apex deposits they had identified on the property contained '$40/ton material.'" Pls.' Mem. at 20. In addition to the opinions of Mr. Aloisi and the hearsay opinion of Mr. Goodman (who is now deceased), Plaintiffs also rely upon the opinions of Mr. Ferrero in support of their argument that their mining claims are valid. As Defendant discusses below, however, Plaintiff Aloisi's opinions are wholly unsupported, and Mr. Ferrero's opinions are based upon speculation and are not support by the facts. Indeed, Mr. Ferrero ignores his own prior, contemporaneous conclusions to reach the conclusions he now asserts. Moreover, Defendant's expert Mineral Examiner, James W.

---

[6] In addition, it is clear that had Plaintiffs submitted a fully-formed plan of operations, it is very possible that some activities would have been permitted. See JA90 at 828 (December 1990 letter from the Forest Service to Plaintiffs stating that a proposal for underground mining "could probably occur," but that "we would need to know more about your proposal in detail before an accurate response could be made"). Because Plaintiffs never submitted such a proposal, it is impossible to know how far the agency's regulations reached in order to evaluate a Fifth Amendment claim.

[7] Plaintiffs do not define which mining claims they consider to be "core," but presumably they comprise a subset of their mining claims. Accordingly, Plaintiffs' argument on the validity of their mining claims apparently applies only to certain, unspecified mining claims.

DeMaagd, identifies in his declaration (filed herewith) significant inconsistent statements and assumptions made by Mr. Ferrero in his affidavit, as discussed below. Plaintiffs, therefore, fail to show a valid discovery of a valuable mineral deposit, and their motion for summary judgment should be denied.

Plaintiffs' novel argument that they had a compensable property interest in the mining claims regardless of whether they had made a valid discovery of any valuable mineral deposit is without merit, and should be rejected, as discussed below. See Pls.' Mem. at 24-29.

Finally, Plaintiffs argue that they had a compensable property interest in the patented Mountain Laurel Mine, contending that it was held under a "lease-purchase agreement by Aloisi and his associates from the estate of Patterson" (Pls.' Mem. at 17), but they fail to provide a copy of the lease-purchase agreement. The only documents that Plaintiffs point to in support of their contention that they had a property interest in the Mountain Laurel Mine at the time of the alleged taking – the Notice of Trustee's Sale, dated April 7, 1992, and attached Grant Deed dated March 22, 1991 – support Defendant's argument that Mr. Aloisi did not acquire an interest in the Mountain Laurel Mine until 1991, after the alleged taking occurred.[8] See Pls.' Mem. at 17 (citing JA115 at 1117).

**A. Plaintiffs' Takings Claim Related to the Unpatented Mining Claims Requires Plaintiffs to Demonstrate a Discovery of a Valuable Mineral Deposit**

"It is axiomatic that only persons with a valid property interest at the time of the taking are entitled to compensation." Wyatt v. United States, 271 F.3d 1090, 1096 (Fed. Cir. 2001) (quoting Almota Farmers Elevator & Warehouse Co. v. United States, 409 U.S. 470, 473-74 (1973)). In the

---

[8] Because Defendant shows in its opening brief in support of its motion to dismiss that Plaintiffs did not have a property interest in either the Mountain Laurel Mine or the Rollins Mill Site (Mineral Lots 45A and 45B, respectively) at the time of the alleged taking, Defendant does not argue the issue further in this brief but refers the Court to Defendant's opening brief in support of its motion to dismiss. See Def.'s Mem. at 32.

instant case, the majority of Plaintiffs' allegations relate to unpatented mining claims.[9] See Compl. ¶¶ 9-12 (identifying various unpatented mining claims). As discussed below, Plaintiffs fail to show that they had a compensable property interest in the unpatented mining claims at the time of the alleged taking. The Court therefore must deny Plaintiffs' motion for summary judgment.

The General Mining Law of 1872, 30 U.S.C. §§ 21-54 ("Mining Law"), provides citizens the right "to explore, discover, and extract valuable minerals from the public domain and to obtain title to lands containing such discoveries." Although an unpatented mining claim may be a property interest subject to the just compensation clause of the Fifth Amendment, it is well-settled that an individual does not obtain a private property interest in an unpatented mining claim unless and until he makes a "valuable discovery," physically marks the location of his discovery, and properly records the claim. See Cameron v. United States, 252 U.S. 450, 456 (1920) ("To make the claim valid, or to invest the locator with a right to the possession, it was essential that the land be mineral in character and that there be an adequate mineral discovery within the limits of the claim as located"); Best v. Humboldt Placer Mining Co., 371 U.S. 334, 336 (1963).

The discovery requirement is a fundamental principle of mining law, and has been well-settled since before enactment of the Mining Law itself. As the Ninth Circuit stated,

[9] In contrast, a patented mine is private property. An individual who possesses a valid mining claim may obtain a patent and "thereby purchas[e] from the Federal Government the land and minerals and obtain[] ultimate title to them." Swanson v. Babbitt, 3 F.3d 1348, 1350 (9th Cir. 1993). A patent provides the individual with fee simple title in the land. See Benson Mining & Smelting Co. v. Alta Mining & Smelting Co., 145 U.S. 428, 430 (1892). A patent will not be issued, however, until the claim is determined to be valid – i.e., a mineral examiner determines that a discovery of a valuable mineral deposit has been made. The mineral examiner must collect and analyze samples, estimate the value of the mineral deposit and the cost of extracting, processing and marketing the minerals, including the costs of complying with any environmental and reclamation laws. See id. at 506-07. Only upon completion of the mineral report confirming the existence of a valuable mineral deposit may a patent issue. There is only one patented mine at issue in this case – the Mountain Laurel Mine – which Mr. Aloisi acquired in March 1991, after the alleged taking occurred. See Def.'s Mem. at 32.

> [f]rom earliest times in the history of mining, the courts have uniformly held that a discovery of valuable mineral must coincide with compliance with the legal requirements for locating a claim before valid ownership of the property has been established. Whenever such coincidence does occur, the locator has acquired a vested property right enforceable and defendable against the United States as well as third persons.

Davis v. Nelson, 329 F.2d 840, 845 (9th Cir. 1964) (emphasis added) (stating further that the discovery requirement is the "sine qua non of an entry to initiate vested rights against the United States"); accord Lara v. Sec'y of Interior, 820 F.2d 1535, 1537 (9th Cir. 1987) ("A mining claimant has the right to possession of a claim only if he has made a mineral discovery on the claim."); In Re S. Utah Wilderness Alliance, 125 I.B.L.A. 175, 194 (1993) ("It is well settled that the mere location of a mining claim, unsupported by the discovery of a valuable mineral deposit, affords the claimant no rights as against the government.").[10]

Without a valid discovery, a plaintiff lacks a property right upon which to base a takings claim. See United States v. Bagwell, 961 F.2d 1450, 1456 (9th Cir. 1992) (agreeing that the uncompensated taking of a valid unpatented mining claim would violate the Constitution, but holding that "the Fifth Amendment does not require compensation to be paid for divestment of an invalid mining claim"); Holden v. United States, 38 Fed. Cl. 732, 735 (1997) (citing cases and stating that "[t]o have a compensable interest in unpatented mining claims sufficient to bring a takings action in this Court, there must have been a determination as to the validity of those mining claims"); Skaw v. United States, 13 Cl. Ct. 7, 28 (1987) ("Until there has been a determination that there has been a valuable discovery,

---

[10] See also Lawrence G. McBride, Inverse Condemnation Issues in Revising the Mining Law, 38 Rocky Mtn. Min. L. Inst. § 7.02[7][e] at 7-12 (1992) (Plaintiffs' counsel acknowledging that "[t]he holder of a claim located under the General Mining Law that is not supported by a discovery does not, under current case law, have a compensable property interest"). Tellingly, the same article includes a description of Plaintiffs' current argument – that a compensable right does not require a valuable discovery – as part of a proposed bill that was never enacted. See id. § 7.04[1]. A courtesy copy of Mr. McBride's article is attached hereto as Ex. 1.

the locator has only a gratuity from the United States."), aff'd, 847 F.2d 842 (Fed. Cir. 1987), cert. denied, 488 U.S. 854 (1988); see also Mineral Policy Center, 292 F.Supp.2d at 47-48 (stating that a claimant "has no property rights against the United States" before perfecting a valid mining claim); Bush v. United States, 58 Fed. Cl. 123, 125 (2003) (stating that a claimant may establish a property interest in an unpatented mining claim, only if there has been an administrative determination that the mining claim is valid).[11/]

Plaintiffs' takings claim must be dismissed, therefore, unless Plaintiffs demonstrate that their unpatented mining claims were valid at the time of the alleged taking – that is, that they had made a discovery of a valuable mineral deposit. A "discovery" is defined as having occurred in circumstances:

> Where minerals have been found, and the evidence is of such a character that a person of ordinary prudence would be justified in the further expenditure of his labor and means, with a reasonable prospect of success, in developing a valuable mine. . . .

Chrisman v. Miller, 197 U.S. 313, 322 (1905) (citing Castle v. Womble, 19 Pub. Lands Dec. 455, 457 (1895)) (internal quotation marks omitted). Pursuant to Supreme Court precedent, a discovery is determined by the prudent man test as refined by the marketability test, meaning that a discovery is valid only when (1) a prudent man would be justified in further expenditure of his labor and means and (2) the mineral deposit can be extracted, removed, and marketed at a profit. See United States v. Coleman, 390 U.S. 599, 602 (1968). "Mere outcroppings, whether appearing on the surface or in shallow works near the surface, do not satisfy the quantum of discovery." United States v. Mobley, 45 F.Supp. 407, 409 (S. D. Cal. 1942) (citing cases).

It is important to recognize that the discovery obligation is an ongoing requirement. Because

---

[11/] Hence, where the Interior Board of Land Appeals (IBLA) has made an administrative decision that a mining claim is invalid and that decision is upheld by any subsequent challenge, a claimant's takings claim is foreclosed. See Hafen v. United States, 30 Fed. Cl. 470, 473 (1994) (rejecting takings claim), aff'd, 47 F.3d 1183 (Fed. Cir. 1995); Bayshore Res. Co. v. United States, 2 Cl. Ct. 625, 628 (1983) (same); Freese v. United States, 221 Ct. Cl. 963 (1979) (same).

"discovery" turns, in part, on profitability, a valid claim may become invalid if the cost-benefits balance of a mining operation tips away from marketability. See Coleman, 390 U.S. at 600; Cameron, 252 U.S. at 460; Mulkern v. Hammitt, 326 F.2d 896, 897-98 (9th Cir. 1964). "This means that a once-valid, unpatented mining claim may be extinguished as a property interest whenever an increase in operating costs or decrease in the mineral's market price reduces the mining operation below the level of profitability." Michael Graf, Application of Takings Law to the Regulation of Unpatented Mining Claims, 24 Ecology L.Q. 57, 114 (1997); see also Atlas Corp. v. United States, 895 F.2d 745, 757-58 (Fed. Cir. 1990) (affirming dismissal of takings claim where reclamation requirements were imposed on the project even if the costs of such reclamation requirements rendered the mining project uneconomical).

In the instant case, Plaintiffs allege that their takings claim accrued on July 23, 1990 (the date upon which the FWS issued its Biological Opinion and, Plaintiffs allege, the Forest Service failed to inform them of that fact), and ended in February 1994 (when the FWS completed the second Biological Opinion). Plaintiffs fail to show a discovery of a valuable mineral deposit with respect to any unpatented mining claim as of the alleged date of taking. In fact, Plaintiffs' allegation – that the Forest Service prevented them from undertaking certain preliminary activities, including road-clearing and exploration (see Compl., ¶ 23) – is inherently inconsistent with their argument that they had made a discovery of valuable mineral resources. Plaintiffs designed these preliminary activities to investigate the existence and extent of valuable mineral ore, and determine whether mining might be profitable in the future. See JA26 at 421 (June 1989 plan of operations stating that Phase II operations "will depend on such things as the test results from Phase I and NEPA"); see also JA36 at 449 (September 1989 proposed plan of operations stating that activities beyond road improvements and preliminary sampling would be "[c]ontingent on positive results" and that the "description of the overall exploratory and

mining plan presented in this letter is incomplete due to the fact that preliminary feasibility studies have not been completed"); JA40 at 465 (October 1989 proposed plan of operations stating that details about mining activities "will depend on many factors, and cannot be accurately projected at this time"). Because Plaintiffs had not undertaken the preliminary exploratory work necessary to make a valuable mineral discovery, however, Plaintiffs cannot show that they made a discovery of a valuable mineral deposit by July 23, 1990 (or at any other point during the alleged temporary takings period).

Documents generated during the late 1980s and early 1990s show that Plaintiffs had not made a discovery of a valuable mineral deposit before the alleged taking. In a 1985 report on these claims, for example, Mr. Ferrero stated that “[t]he economic feasibility of mining . . . would depend upon many factors yet to be determined, such as tonnage, grade, milling factors, gold price, and others.” JA6 at 157. In his 1986 report, Mr. Ferrero reported that the “data is spotty,” and that additional “field mapping and sampling will define more targets.” JA7 at 184. After conducting further studies in spring of 1986, Mr. Ferrero concluded that mining certain claims would be unprofitable and that the data was insufficient to reach any conclusion with respect to others. See, e.g., JA8 at 185 (“surface samples on Incline Ridge do not support the theory of a possibly profitably [sic] surface mineable, disseminated gold deposit . . .” and the data gathered on vein deposits was inadequate “to project grade or tonnage”); id. at 186 (“A great deal of work would be required in order to determine whether the projected reserves could be profitably mineable, since essential factors such as stripping ratios, reserve volume, ore grade, haul distances, milling methods, and milling recovery have not yet been adequately studied.”). In a February 23, 1990 report, Mr. Ferrero stated that “drilling and dump testing so far suggest that there may be surface mineable gold ore reserves along the vein apex corridors,” but “[m]uch systematic exploration work must be completed in order to determine the distribution of gold in the apexes, potential gold recovery from ore, environmental and archeological factors, etc.” JA56

at 530 (emphasis added). Significantly, Mr. Ferrero's February 23, 1990 report issued after District Ranger Lee ordered Liberty Mining to stop work on January 4, 1990, because of concerns about disturbing archaeological resources (see JA51), and just months before the alleged taking occurred.

Moreover, Mr. Ferrero's opinion that Plaintiffs would achieve a 90% gold recovery rate (see Affidavit of Thomas P. Ferrero, filed Feb. 6, 2006 ("Ferrero Aff."), ¶¶ 56, 66, and 69) is inconsistent with the contemporaneous reports. Plaintiffs' February 12, 1990, assay report showed rates of only 29-39% gold recovery for flotation testing, and a higher rate of recovery, 80%, using cyanide leaching. See JA53 at 510. Those results were similar to a second February 1990 report (see JA183), and a report prepared in March 1990 (see JA63). The February 28, 1990 report shows recovery rates between 29.7% and 48.2% using flotation methods, and approximately 78% recovery using a cyanide process. See JA183 at 1516 (note range of gold recovery rates under the column heading, "Au Recovery %"). The March 21, 1990 report shows only a 30-50% gold recovery rate using flotation and suggests further testing using cyanide. See JA63 at 588. Plaintiffs, however, had not sought a permit for cyanide leaching (and never have), and there is no evidence that such a permit would ever be granted by the Forest Service or allowed under existing federal, state, or local laws. Plaintiffs' use of such a high recovery rate simply is not supported by the evidence. See , DeMaagd Decl., ¶¶ 21-26. Plaintiffs offer no explanation how the recovery rates they were attaining at the time of the alleged taking – a 30-50% gold recovery rate – could translate into a profitable enterprise during any point during the takings period.

Rather than addressing this contemporaneous evidence, Plaintiffs rely upon Mr. Aloisi's and Mr. Ferrero's affidavits, in which both witnesses state without citing any support that by 1989, Plaintiffs had "determined that the dump and apex deposits they had identified on the property contained '$40/ton material.'" Pls.' Mem. at 20 (citing PE-1 at ¶ 16; PE-2 at ¶ 14). Plaintiffs cite no

evidence (other than their self-serving statements) to support this figure, such as sampling results, testing methods, or even the price of gold. Plaintiffs do not explain how or when the $40 per ton figure was calculated and do not offer any contemporaneous writing to document that anyone associated with Plaintiffs reached that $40/ton conclusion in 1989. Nor do they indicate whether this alleged value remained applicable as of the alleged date of taking.

This newly-disclosed $40/ton conclusion is also at odds with Mr. Ferrero's March 1990 calculations, in which he concluded that the "high potential apex" ore would result in no more than "$25.60 per ton of ore value." JA61 at 577.[12/] Even that figure is grossly inflated, though, as it is based upon an 80% recovery rate (which Plaintiffs' own data (JA60) suggests would only be possible by cyanide leaching). See JA61 at 577.[13/]

In addition to their unfounded $40/ton conclusion, Plaintiffs also suggest that they knew far more about the subsurface minerals during the takings period than the written record indicates. In March 1991, for example, Plaintiffs submitted an "outline plan," which noted the need for "detailed site surveys" and that their milling plans depended upon "exploration and continued mill testing results." JA94 at 905-06. Similarly, Plaintiffs' April 1992 Plan also noted the lack of any drilling results or any information about the existence or extent of underground ore. See JA114 at 1106. Even

---

[12/] Plaintiffs' $25.60 per ton figure was for the "high potential apex ore," not the Klamath dumps, which would have a lower per ton figure. JA61 at 577. According to own Plaintiffs' sampling, Plaintiffs might only be able to recover as little as 0.001 ounce of gold per ton of ore for the Klamath dumps, rather than the 0.08 ounce of gold per ton figure Ferrero used. See JA61 at 586.

[13/] Plaintiffs' $25.60 per ton figure was also based on a $400 per ounce price for gold, which was approximately the price for gold in early 1990. See also Jan. 13, 1998 Ferrero Tr. at 42:20-24 (Mr. Ferrero stating that a miner likely would not recover 100% of the spot price when he sells the gold). During the takings period, the price fluctuated as high as $423 per ounce (February 1990) to as low as $327 per ounce (March 1993). Gold currently sells for more than $920 per ounce. Gold prices are posted by Kitco Bullion Dealers at <http://www.kitco.com/charts/ /historicalgold.html> ( last visited March 5, 2008). BLM generally uses a six-year average pricing method to determine the mineral commodity price for use on any specific marketability date. See 65 Fed. Reg. 41724, 41725 (July 6, 2000) (discussing mineral commodity pricing).

if Plaintiffs hoped that their exploratory work would eventually be profitable, the record is clear that Plaintiffs had not made a valid discovery at any point during the alleged temporary takings period.

Plaintiffs now look to several new spreadsheets and documents generated by Mr. Ferrero to support their allegation that their unpatented mining claims were valid during the alleged taking period. Plaintiffs suggest, without offering any support, that this new data simply "recreates in detail the background sampling and metallurgical data available to Liberty when it determined to begin mining operations." Pls.' Mem. at 21. Plaintiffs' suggestion is not borne out by the facts. Rather than correlating with the contemporaneous documents, the new data actually conflicts with the information known prior to and during the takings period. For example, although Plaintiffs sampling data from 1990 showed 30-50% gold recovery rates, Mr. Ferrero now applies "a 90 percent average recovery to underground ore," a figure he characterizes as "conservative." PE-2 at 63, ¶ 56. Similarly, to bolster Plaintiffs' estimation of the quantity of gold in underground resources, Mr. Ferrero now relies upon historic production records that averaged 0.565 ounces of gold per ton of ore (opt). See Ferrero Aff., ¶ 56. Mr. Ferrero, however, ignores his prior warning that those historic "production records are far from complete." JA-6 at 146. Indeed, as the Forest Service's Mineral Examiner, Mr. DeMaagd makes clear in his declaration, some of the historical data that Mr. Ferrero relies upon is erroneous. See DeMaagd Decl., ¶¶ 16-19.

Plaintiffs' assertion that their unpatented mining claims were valid as of the date of taking in 1990, therefore, is not supported by any reliable evidence. See DeMaagd Decl., ¶¶ 16-37. Accordingly, Plaintiffs have failed to show that their mining claims were valid, and that they had a compensable property interest in the mining claims at issue as of the date of the alleged taking. Indeed, the Forest Service's Mineral Examiners found that the mining claims examined were not valid as of the date of taking. See id., ¶¶ 38-42. Because Plaintiffs failed to show that they had a compensable property

interest, Plaintiffs' motion for summary judgment should be denied.

### B. Plaintiffs' Novel Argument That Their Compensable Property Interest Arises from a "Statutory Right" Is Not Supported by Long-Established Law and Must Be Rejected

Despite more than a century of legal precedent to the contrary, Plaintiffs contend that the question of claim validity is immaterial. See Pls.' Mem. at 24-29 (claiming that Plaintiffs had a property right in the unpatented mining claims "whether the claims were valid or not"). Plaintiffs' position lacks any basis in existing law.

#### 1. Plaintiffs' Argument that the Discovery Requirement Is Irrelevant Merely Because They Bring a Temporary, Rather than a Permanent, Takings Claim Must Be Rejected

Plaintiffs first argue that discovery is irrelevant to their claims because they raise a temporary takings claim related to "open" public domain lands, rather than a permanent takings claim related to lands that are closed, or withdrawn, from the operation of the Mining Law. See Pls.' Mem. at 24. Whether a claimant pursues a permanent or a temporary takings claim is irrelevant to whether a claimant has a compensable property interest. See Am. Pelagic Fishing Co. v. United States, 379 F.3d 1363, 1371 n.11, 1372 (Fed. Cir. 2004) (stating that "[t]emporary takings are not different in kind from permanent takings," and requiring the court to determine "whether the claimant has established a property interest for purposes of the Fifth Amendment" as a separate, preliminary question before determining whether the government action amounted to a taking of that property interest). Similarly, nothing about the fundamental legal principles of discovery turns on the current status of the lands, and Plaintiffs offer no basis for such an argument. The fact that the United States has not withdrawn these lands from operation of the Mining Law means only that the lands are still available to new potential mining activities – that fact, however, has no bearing on Plaintiffs' obligation to demonstrate that they have a compensable property interest in this takings claim.

**2. Plaintiffs' Argument that Their Property Right is Established by Federal Regulation Must Be Rejected**

Plaintiffs next argue that their takings claim is premised on a "statutory right," which Plaintiffs contend is created by federal regulation (apparently separate and apart from the Mining Law itself), and is "not dependent on claim validity." See Pls.' Mem. at 26. Plaintiffs' novel theory finds no support in the case law, and is directly contradicted by more than 130 years of precedent interpreting the 1872 Act. Simply stated, a "mining claimant's rights as against the United States are acquired only under the General Mining Law, 30 U.S.C. § 21 (1994), and unless and until the claimant meets the requirements under those laws, no rights can be asserted against the United States." Ronald A. Pene, 147 I.B.L.A. 153, 157 (1999) (emphasis added).

Plaintiffs' assertion that the various federal regulations and the federal register entry cited in their brief "implement th[e] principle" that an individual can somehow obtain a compensable property right in an invalid mining claim is incorrect. Plaintiffs' argument in this regard appears to be focused primarily on 39 Fed. Reg. 31317, col. 1 (Aug. 28, 1974), which discusses enactment of the Forest Service's regulations of surface uses under the Mining Law (36 C.F.R. Part 252, redesignated as 36 C.F.R. Part 228, Subpart A). However, that regulation defined the plan of operations requirement for mining activities within national forests; it did not purport to change Supreme Court precedent regarding the nature of compensable property interests (which, as discussed above, requires a discovery of a valuable mineral deposit before a compensable property interest arises). It is inconceivable that those same regulations sub silentio amend the discovery requirement, a basic tenant of mining law. See United States v. Weiss, 642 F.2d 296, 298 (9th Cir. 1981) (discussing the Forest Service regulations). Regulations contained in 36 C.F.R. § 228, Subpart A are designed to "minimize adverse environmental impacts on the surface resources of the national forests." Id. at 298. The cited regulations are silent as to the requirements established by the Mining Law, and do not purport to create

new compensable property rights.

### 3. Plaintiffs' Argument that Their Property Right is Established by the Forest Service Manual Must Be Rejected

Plaintiffs' suggestion that their property interest arises from the Forest Service Manual ("FSM"), see Pls.' Mem. at 28 (citing the FSM §§ 2817.23, 2818.3), is plainly without merit. The Forest Service Manual is merely a set of procedures for the conduct of Forest Service activities and does not have the independent force and effect of law. See Stone Forest Indus., Inc. v. United States, 973 F.2d 1548, 1551 (Fed. Cir. 1992) (FSM is "a general guide for use by Forest Service employees . . . [but] does not have the force and effect of law"); Western Radio Servs. Co., Inc. v. Espy, 79 F.3d 896, 901 (9th Cir. 1996) ("We hold that the [FSM] and [the FSM Handbook] do not have the independent force and effect of law."); Sw. Center for Biological Diversity v. USFS, 100 F.3d 1443, 1450 (9th Cir. 1996) (same). The FSM could not, and plainly does not purport to, create any compensable property right that could support a claim under the Fifth Amendment.

### 4. Plaintiffs' Arguments About a "Statutory Right" Demonstrates Why the Court Lacks Jurisdiction Over Plaintiffs' Claims

Plaintiffs' argument that their claim is based on some sort of "statutory right" provides an independent basis for rejecting Plaintiffs' takings claim. According to Plaintiffs, because their takings claim is based on a "statutory right," their takings claim "involves defendant's denial of this statutory right by unreasonable and improper actions." Pls.' Mem. at 25. The gravamen of Plaintiffs' takings claim, then, is that the United States violated the Fifth Amendment because the Forest Service allegedly violated its own regulations. E.g., Pls.' Mem. at 26 (alleging violation of the timing requirement set forth in 36 C.F.R. § 228.5); Pls.' Mem. at 27 (alleging the Forest Service's improper "demand" that Liberty submit a proposed plan of operation, allegedly in violation of 36 C.F.R. § 228.4(d)).

Plaintiffs' takings claim, therefore, is nothing more than an improper collateral attack on the

agency's regulatory action. The Court lacks jurisdiction over such claims. Tabb Lakes, Ltd. v. United States, 10 F.3d 796, 802-03 (Fed. Cir. 1993) (stating that takings claimants must concede the propriety of the governmental interference with their alleged property interests). If Plaintiffs disagree with the agency's actions, their remedy is through an administrative appeal or, perhaps, by raising a claim under the Federal Tort Claims Act or the Administrative Procedures Act. It is clear, however, that Plaintiffs cannot pursue these allegations in this forum. See Cottrell v. United States, 42 Fed. Cl. 144, 149 (1998) ("Even where the claim is framed under non-tort law, the court lacks jurisdiction if the essence of the claim lies in tort."); see also Martinez v. United States, 333 F.3d 1295, 1313 (Fed. Cir. 2003) (stating that "the Court of Federal Claims lacks APA jurisdiction"), cert. denied, 540 U.S. 1177 (2004); Crocker v. United States, 125 F.3d 1475, 1476 (Fed. Cir. 1997) (stating that the Court of Federal Claims "lacks the general federal question jurisdiction of the district courts, which would allow it to review the agency's actions and to grant relief pursuant to the [APA]").[14/]

**III. Plaintiffs Fail to Show That the Penn Central Factors for a Regulatory Taking Are Met**

Assuming that Plaintiffs can show both a compensable property interest and a ripe claim, there is no dispute that Plaintiffs must show that the three Penn Central factors are satisfied to establish a temporary regulatory taking. See Pls.' Mem. at 14. The three Penn Central factors are (1) the character

---

[14/] The Forest Service did not violate these provisions, in any event. For example, 36 C.F.R. § 228.5, which sets forth a time requirement for responding to a plan of operation, does not override the Forest Service's other requirements and obligations under other statutes, which must be fulfilled before the Forest Service can authorize a plan of operations. See 36 C.F.R. § 228.5(a)(5). Regarding Plaintiffs' argument with respect to 36 C.F.R. § 228.4(d), it is clear that imposition of a requirement to engage in a permitting process cannot effect a taking. See United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 127 (1985) (The mere requirement that "a person obtain a permit before engaging in a certain use of his or her property does not itself 'take' the property in any sense: after all, the very existence of a permit system implies that permission may be granted"); Bass Enters. Prod. Co. v. United States, 381 F.3d 1360, 1366 (Fed. Cir. 2004) ("The requirement that a property owner obtain a permit to undertake a particular use of his land . . . does not in and of itself constitute a compensable taking.").

of the governmental action; (2) the economic impact of the action on the claimant; and (3) the extent to which the action interfered with the claimant's reasonable investment-backed expectations. Penn Central Transp. Co. v. New York City, 438 U.S. 104, 124 (1978).

### A. Plaintiffs Fail to Show Extraordinary Delay and Fail to Meet Their Burden of Showing Bad Faith by Clear and Convincing Evidence

Under Penn Central, the Court must consider the "character of the governmental action" allegedly giving rise to the regulatory taking. See Penn Central, 438 U.S. at 124. In an attempt to satisfy this element of a taking, Plaintiffs argue that the delay they complain of was extraordinary and that the government acted in bad faith.[15] See Pls.' Mem. at 29-34. Trying to show extraordinary delay, Plaintiffs contend that both the Forest Service and Fish and Wildlife Service "ignored the requirements of their own regulations" by failing to provide a copy of the July 23, 1990 Biological Opinion to Plaintiffs "until 25 months after the fact. . . ." Pls.' Mem. at 30-31. Plaintiffs further contend that the delay was extraordinary because, they argue, the Forest Service again violated governing procedures when it reinitiated consultation with the Fish and Wildlife Service on the northern spotted owl in 1992. See id. at 31-32. Finally, they argue that the delay was extraordinary because the Forest Service discriminated against Liberty Mining by allowing the "Evening Star Timber Sale" to go forward within "the same spotted owl habitat area . . . in Eddy Gulch as the Liberty plan of operations." Pls.' Mem. at 33.

Plaintiffs argue that the government acted in bad faith because of the same acts they contend resulted in extraordinary delay. See Pls.' Mem. at 33-34. According to Plaintiffs, the "Forest Service's

[15] Whether there were extraordinary delay should be considered as a threshold issue, before considering the character of the government action. See Bass Enters., 381 F.3d at 1366-69 (considering whether there were extraordinary delay apart from the analysis of the character of the government's action). The discussion on the alleged delay is included in this section to parallel Plaintiffs' arguments, for the Court's convenience.

conduct was extraordinary and unwarranted, and laced with bad faith, in the delay it created and enforced." Id. at 34. They contend that the Forest Service hid the July 23, 1990 date of the Biological Opinion from them, violated its own regulations, and compounded the delay by initiating a second ESA consultation on the spotted owl with the Fish and Wildlife Service. Id. According to Plaintiffs, the Forest Service repeatedly abused its processes to stall action on Liberty's plans of operations – "the essence of unreasonable, unwarranted, extraordinary and bad faith delay" they contend. Id.

Plaintiffs' arguments, however, are unsupported by both the facts and law. First, Plaintiffs' entire takings case is based upon the false premise that the Fish and Wildlife Service's July 23, 1990 Biological Opinion gave a green light to Liberty Mining's plans of operations, which it did not do. Second, the evidence shows that requirements of the Biological Opinion were discussed with Liberty Mining soon after it was issued in July 1990, and again in 1991. That Plaintiffs may not have received a copy of the document until March 10, 1992, as they claim, is irrelevant. Third, the delay they complain of was not extraordinary as it was not disproportionate to the delay in the permitting process from which it arises – the standard Plaintiffs recognize for determining whether there was extraordinary delay. See Pls.' Mem. at 15-16 (citing Bass Enters., 381 F.3d at 1366-67). Contrary to Plaintiffs' assertion, the Evening Star Timber Sale was not permitted to go forward without mitigation; rather it took over three years to work out mitigation measures, as discussed below. Fourth, there is a strong presumption that government officials acted in good faith, requiring Plaintiffs to show bad faith by clear and convincing evidence, which they fail to do. Indeed, the facts show that the Forest Service was acting in good faith and was trying to expedite the approval process for Liberty Mining. As discussed below, Plaintiffs cannot satisfy even these basic elements for a temporary regulatory taking.

**1. Plaintiffs' Taking Claim Is Grounded Upon the False Premise that the Fish and Wildlife Service's July 23, 1990 Biological Opinion Would Allow Liberty Mining's Plans of Operations to Go Forward**

Plaintiffs contend that "[o]n July 23, 1990, the FWS 'determined that the project [Liberty's September 28, 1989 all-phase plan of operations] could proceed as submitted.'" Pls.' Mem. at 29 (citing JA111 at 1084 (March 10, 1992 Letter from Michael P. Lee, District Ranger, to Fred Aloisi, Liberty Mining, documenting a meeting held February 11, 1992)).[16] Plaintiffs speculate that, because in their view FWS cleared their plan of operations to "proceed as submitted," they would have completed the required archaeological study and proceeded with their plan without further interruption. See Pls.' Mem. at 31. But Plaintiffs' reliance upon District Ranger Lee's statement made 20 months after the Biological Opinion issued, in a letter summarizing the events of a meeting, is misplaced. Indeed, the point of the paragraph in which the quoted statement appears is to put Plaintiffs on notice that a second consultation with FWS may be necessary. The Biological Opinion is the best document to discern what the Fish and Wildlife Service determined. See JA80. Tellingly, throughout their brief, Plaintiffs disregard the language of the Biological Opinion, which contains mandatory terms and conditions – which they do not dispute (see JSOF, ¶ 50) – and instead rely upon a statement made by the District Ranger in his March 10, 1992 letter.

The Biological Opinion plainly contains mandatory terms and conditions. See JA80 at 770-71; see also Def.'s Proposed Findings of Uncontroverted Fact, ¶ 48. FWS authorized "incidental take" only "in compliance with the provisions of the reasonable and prudent measures and terms and

[16] According to Plaintiffs, because District Ranger Lee's March 10, 1992 letter does not mention the date of the Biological Opinion, he therefore was hiding the date of the opinion from them. See Ferrero Aff., ¶ 42; see also Pls.' Mem. at 30. Plaintiffs cite no document supporting their contention that the Forest Service hid the date of the Biological Opinion. See Pls.' Mem. at 30. In their Memorandum, Plaintiffs cite JA127, but this document is Mr. Lee's August 24, 1992 cover letter forwarding the Biological Opinion to Liberty Mining's attorney, Mr. Weller, and provides no support. Plaintiffs also cite JA128, which is an August 28, 1992 note from Mr. Aloisi to the Forest Service reiterating his request for the "1990 Biological Opinion," after Mr. Lee already had forwarded it. Thus, Plaintiffs' conclusion that the Forest Service was hiding the date of the Biological Opinion is not supported by any credible evidence.

conditions of [the Biological Opinion's] Incidental Take Statement." JA80 at 770. The reasonable and prudent measures instructed the Forest Service to "[m]aintain essential habitat within close proximity of spotted owl nest sites and activity centers . . . in proposed [Habitat Conservation Areas (HCAs)]." Id. Mandatory terms and conditions were established by FWS to implement the reasonable and prudent measures. Id. at 770-71. Chief among these mandatory terms and conditions was the elimination or relocation of planned timber harvest activities within a 0.5 mile radius of spotted owl nest sites. Id. at 770; see also JSOF, ¶ 50. Liberty's plans included building a network of roads and other activities within the proximity to a pair of spotted owls. See JSOF, ¶ 44 (citing JA72 and JA76 at 747, 750-52). Indeed, Liberty intended to use some of the cut timber in its mining operations. See JSOF, ¶ 49.

Consistent with the Biological Opinion, the Forest Service adopted the Interagency Scientific Committee's Conservation Strategy for the Northern Spotted Owl ("Conservation Strategy") on October 24, 1990, and directed the Forests to document compliance with the mandatory terms and conditions of the July 23, 1990 Biological Opinion and the steps taken to implement the Conservation Recommendations. See JSOF, ¶ 54; see also JA86. To implement the Conservation Strategy, logging within Habitat Conservation Areas ("HCAs") would have to cease. See JSOF, ¶ 43; see also JA71 at 652. Liberty Mining's claims were within an HCA. See JSOF, ¶ 43. As Wildlife Biologist Kathleen Granillo explained at her deposition, even though "Mr. Aloisi's project is a mining claim . . . it involved . . . removal of timber. . . [so] to implement the [conservation] strategy we would have to say, 'No, you can't do your project.'" Granillo Tr. at 38:12-39:2 (attached hereto as Ex. 3).

Consequently, contrary to Plaintiffs' assertions otherwise, the Biological Opinion did not give Plaintiffs the green light to go forward with their "all phase" plan of operations. Plaintiffs' takings claim is therefore based upon the false premise that had they been timely informed of the Biological Opinion, they would have gone forward with their operations unabated. This alone, warrants denying

Plaintiffs' motion for summary judgment, and granting the government's motion to dismiss.

**2. Forest Service Personnel Met with Mr. Aloisi to Discuss the Biological Opinion and Its Mitigation Requirements**

Plaintiffs' takings claim also is based upon the allegation that they were never informed about the Biological Opinion until Mr. Lee wrote to Liberty on March 10, 1992. See Pls.' Mem. at 29-30. Evidence shows, however, that Mr. Aloisi and Liberty Mining were made aware of mitigation requirements imposed by the Biological Opinion, regardless of whether Liberty Mining was provided a copy of the document itself.

Wildlife Biologist Kathleen Granillo participated in a meeting with Liberty Mining in the Forest Supervisor's office just months after the Biological Opinion was issued, during which the opinion was discussed. See Granillo Tr. at 24:24-25:7, 33:8-35:16.[17] Additionally, Ms. Granillo later visited Liberty Mining's claims in Eddy Gulch during the summer of 1991, specifically to implement the Biological Opinion by identifying ways to potentially mitigate the effects of the mining project on suitable owl habitat. See id. at 25:8-27-17. Ms. Granillo met Mr. Aloisi during that site visit and "talked about what the opinion called for in terms of what [the Forest Service] had to do with planned sales and trying to get out of suitable habitat." Id. at 25:17-24, 28:21-29:7. Similarly, Wildlife Biologist Marc Williams also recalled discussing certain mitigation measures required by the Biological Opinion with Mr. Aloisi. See Williams Tr. at 30:3-31:19, 62:12-64:6.

Accordingly, regardless of whether Liberty Mining was provided a copy of the document, the mitigation measures imposed by the Biological Opinion were discussed with Mr. Aloisi on several occasions. Plaintiffs' takings claim, therefore is based on the false assertion that they were kept in the

[17] Ms. Granillo's reference to "this" at 25:7, and previously in the discussion, refers to the July 23, 1990 Biological Opinion. See Granillo Tr. at 21:18-20.

dark about the Biological Opinion.[18]

### 3. The Alleged Delay Was Not Extraordinary

The alleged delay was not extraordinary, because it was not disproportionate to the delay in the permitting process from which it arises – the standard even Plaintiffs recognize for determining whether there was extraordinary delay. See Pls.' Mem. at 15-16 (citing Bass Enters., 381 F.3d at 1366-67). Assuming that the government caused delay, that delay experienced by Liberty Mining was similar to what others working in the area experienced and, therefore, was not extraordinary or disproportionate. See Bass Enters., 381 F.3d at 1366-67.

As a preliminary matter, the delay that Plaintiffs complain of did not extend "through a period of roughly four years," as they argue. See Pls.' Mem. at 1, 29-32; see also Compl., ¶ 74. Any temporary taking ended no later than April 1, 1993, when the mining claims were leased to WAZCO effective that date. See JSOF, ¶ 97. WAZCO became the operator at that point, as Plaintiffs admit. Id., ¶ 98; see also Affidavit of Alfred L. ALoisi, filed Feb. 6, 2006 ("Aloisi Aff."), ¶ 68. As Mr. Aloisi attests, after leasing the mining claims, "WAZCO was now responsible for maintaining the claims and dealing with the Forest Service with respect to its operating plans." Aloisi Aff., ¶ 68. Mr. Aloisi's statement is consistent with Forest Service minerals regulations, which define "Operations" as "[a]ll functions, work, and activities in connection with prospecting, exploration, development, mining or processing of mineral resources . . . ," and define an "Operator" as "[a] person conducting or proposing to conduct operations." 36 C.F.R. § 228.3. Effective April 1, 1993, WAZCO thus became the operator

---

[18] Plaintiffs also were informed by a letter dated November 27,1990 that a Forest Service Wildlife Biologist had consulted with FWS regarding the northern spotted owl, and that it appears there will be some constraints on Liberty Mining's operations. See JA88 at 823. While the referenced consultation may not be the programmatic consultation initiated in June 1990 (see Williams Tr. at 32:8-18, attached as Ex. 4), it does show that Liberty Mining was aware that the Forest Service had consulted with FWS about the potential effects of Liberty's project on the spotted owl, and that issues remained to be resolved. See JA88 at 823-24.

of the mining claims at issue, and Plaintiffs' proposed operations became moot. The government, therefore, no longer could possibly be preventing Plaintiffs from operating after April 1, 1993, as they allege. Accordingly, the alleged takings period should run from July 23, 1990 to April 1, 1993 – at most a period of about 2-1/2 years – far short of the four years Plaintiffs contend.[19]

Moreover, during the alleged takings period, Plaintiffs were permitted to perform work on their mining claims, as they admit. See Aloisi Aff., ¶¶ 37-40 (attesting that Plaintiffs were allowed to work on the mining claims from March 21, 1991 to July 12, 1991, a period of three months and 23 days). Additionally, when ousting James Kendle from the mining claims in 1994 by issuing a Notice of Labor to Delinquent Co-owner, pursuant to 30 U.S.C. § 28, Plaintiffs Alfred and Candis Aloisi asserted that they had performed work valued at over $74,000 on the mining claims during the 1991, 1992 and 1993 annual assessment reporting periods. See JA166 at 1352-53. That work included sampling, road construction, clearing timber, and stabilizing slopes on the mining claims. Id. at 1353. Accordingly, Plaintiffs were not prevented from performing all manner of work on their mining claims during the alleged takings period as they contend.

Nevertheless, assuming that Plaintiffs were prevented from operating completely for 2-1/2 years because of the spotted owl, that delay was not extraordinary. As the Federal Circuit noted in Bass Enterprises, "'extraordinary delays' typically last for a substantial length of time." Bass Enters., 381 F.3d at 1366 (finding forty-five month delay in making a permitting decision was not a taking) (citing Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172 (1985) (eight year delay not a temporary taking); Wyatt v. United States, 271 F.3d 1090 (Fed. Cir. 2001)

[19] Plaintiffs contend that they first learned about the Biological Opinion by Mr. Lee's March 10, 1992 letter (see Pls.' Mem. at 30), so any takings period triggered by the government's failure to inform them of the Biological Opinion arguably should end by that date – only 20 months from the alleged date of taking. Regardless of how measured, neither time period constitutes extraordinary delay, as discussed above.

(seven year delay not a taking); Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 216 F.3d 764 (9th Cir. 2000) (forty month delay not a taking)). The approximately thirty months of delay at issue here plainly is less than the delay in Bass Enterprises (and the decisions it cites), where no taking had been found after a 45 month delay. But, the length of the delay alone does not completely resolve the issue as the Federal Circuit explained in Bass Enterprises, the court should determine whether "the delay is disproportionate to the regulatory permitting scheme from which it arises." Bass Enters., 381 F.3d at 1366 (citing Wyatt, 271 F.3d at 1098). The delay here is not disproportionate to the regulatory scheme, as discussed below.

During the alleged takings period, the Forest Service was attempting to implement the terms of the Biological Opinion to protect the northern spotted owl and its habitat. See Granillo Tr. at 25:8-27-17; see also JSOF ¶ 56 (citing JA89 at 826) (KNF Wildlife Biologist, Karen Raftery, sought guidance in December 1990, on implementing the Biological Opinion with respect to Liberty Mining). Moreover, FWS urged the Forest Service in the Biological Opinion to adopt the Interagency Scientific Committee's Conservation Strategy for the Northern Spotted Owl (see JA80 at 771), which the Forest Service did in October 1990. See JSOF, ¶ 54. Adopting the Conservation Strategy imposed greater restrictions on the Forest Service with respect to protecting owl habitat. See Granillo Tr. at 38:3-39:14 (explaining how the Conservation Strategy adopted by the Forest Service would not allow logging within Habitat Conservation Areas (HCAs), including clearing trees for mining operations). Additionally, during the alleged takings period the Forest Service was trying to resolve issues on managing the recently-listed spotted owl population and habitat, by issuing and implementing new guidance documents and protocols, as discussed below.

In January 1991, the Regional Forester released to the Forest Supervisors guidance from the Interagency Scientific Committee to help determine "what types of activities should or should not occur

in HCAs." JA92 at 893; see also JSOF, ¶ 58. A few months later, in April 1991, the Regional Forester released new owl survey protocol, which was revised in March 1992. See JSOF, ¶¶ 61, 73. Owl surveys conducted by the Forest Service in June 1991, and again in April through June 1992, confirmed the presence of a reproducing pair of spotted owls in Eddy Gulch. See JSOF, ¶¶ 64, 79.

In July 1991, the Regional Forester released the Regional Guidance for Spotted Owl Habitat Management, which specified the procedures to be followed when evaluating a project with respect to the northern spotted owl, and defined the responsibilities of a Regional Technical Review Team ("RTRT"). See JSOF, ¶ 65 (citing JA107 at 1038-43, 1045). The RTRT later reviewed and approved Liberty Mining's proposed plan of operations in June 1992. See JA163 at 1342.

In December 1991, the Forest Service created the Northern Spotted Owl Steering Committee and Oversight Team ("Oversight Team") to ensure consistent implementation of the ISC's Conservation Strategy within the Forest Service. See JA110. In May 1992, the Regional Forester issued procedural guidance for the Oversight Team. See JSOF, ¶ 75 (citing JA117). The Oversight Team reviewed and approved Liberty's project in August 1992, and released its report in December 1992. See JA141 at 1242, 1248-49; see also JA163 at 1342. The Oversight Team noted, however, that Liberty Mining's proposed activities must be reviewed by the Interagency Technical Review Team ("ITRT"). See JA141 at 1249. The ITRT completed its review and approval process in January 1993.[20/] See JA163 at 1342. Accordingly, there was a plethora of activity occurring during the alleged

[20/] In addition to these team reviews, to comply with the requirements of the ESA, the Forest Service initiated a second consultation with FWS in August 1992. See JSOF, ¶ 82; see also JA124. Three months before submitting the August 1992 request to FWS, the Forest Service informed Liberty Mining of its decision to reinitate consultation (see JSOF, ¶ 78), and Liberty appealed (see JSOF, ¶ 80). Liberty clearly was not kept in the dark about this second consultation as Plaintiffs contend (see Pls.' Mem. at 32). That second consultation was temporarily suspended in November 1992, because FWS needed additional information, which Liberty provided at the end of March 1993, just days before leasing the mining claims to WAZCO. See JSOF, ¶¶ 89, 95, 97.

takings period to assess the potential impact of Liberty Mining's project on the northern spotted owl. As noted above, Liberty Mining leased the mining claims to WAZCO only a few months after these activities were completed, rendering moot further consideration of Liberty Mining's proposed operating plans.

Moreover, it took more than three years to work out mitigation measures for the Evening Star Timber Sale, which included a unit of timber (Unit 3) within 0.5 mile of owl nest site KL1034 – the same nest site affecting Liberty's proposed project. See Pls.' Mem. at 11; see also JA66 at 597; JA157 at 1298; and see Declaration of Dan S. Blessing (filed herewith, with Exs. 1-3) ("Blessing Decl."). In March 1990, the Forest Service announced that it intended to perform an environmental analysis of the Evening Star project, which "was sold and awarded in August 1981."[21/] JA66 at 597. In September 1992, over two years after announcing its intent to undertake an environmental analysis, the Forest Service documented its decision to delete Unit 3 from the Evening Star Timber Sale. See Blessing Decl., ¶ 8 & Ex. 1. As of April 1993, the Forest Service still was negotiating mitigation measures with the purchaser of the Evening Star Timber Sale. See JA157 at 1298. Subsequently, the Forest Service exchanged with the purchaser timber located beyond the 0.5 mile radius of owl nest site KL1034, which the purchaser selectively harvested in September 1993 – more than three years after the Forest Service initiated its environmental analysis in March 1990.[22/] See Blessing Decl. at ¶¶ 5-8, Exs. 2 & 3. The Evening Star timber sale thus did not go forward unabated, as Plaintiffs suggest. See Pls.'

---

[21/] Because the Evening Star Timber Sale contract was awarded in 1981, it was allowed to go forward with logging in areas beyond 0.5 mile of an owl nest, under the Standards and Guidelines of the ISC Conservation Strategy. See JA71 at 678. The Conservation Strategy required sales within the 0.5 mile range of a known owl pair to be modified (see id.), which is what occurred with respect to the Evening Star Timber Sale, as discussed herein.

[22/] Plaintiffs contend (see Pls.' Mem. at 11) that 189 acres were harvested in conjunction with the Evening Star Timber Sale, but they fail to cite any supporting evidence. The map at JA66, on its face, does not depict an area to be harvested as Plaintiffs suggest. See JA66 at 597-98.

Mem. at 33. To the contrary, it took over 36 months to resolve mitigation measures to protect the owls at KL1034 for the Evening Star Timber Sale.

With respect to mining operations, it took the lessees of the mining claims at issue, WAZCO and its successor, Liberty Consolidated Mines ("LCM"), over two years to obtain Forest Service approval of its mining operations. WAZCO took over operations at Plaintiffs' mining claims on April 1, 1993, and operating as LCM submitted a plan of operations on June 5, 1994. See JSOF, ¶¶ 97, 98, 103. LCM's operating plans were approved twenty-six months later on August 5, 1996. See JSOF, ¶ 111. Accordingly, whether measured against the 36 months it took to mitigate the Evening Star project, or the 26 months it took to approve LCM's operating plan, the approximate thirty-month delay at issue here was not extraordinary. Consequently, Plaintiffs' motion for summary judgment should be denied, and the government's dispositive motion should be granted.

#### 4. Plaintiffs Fail to Show Bad Faith

Rarely will a court find extraordinary delay in the absence of bad faith by the Government. Bass Enters., 318 F.3d at 1366. Plaintiffs must present clear and convincing evidence of bad faith by government officials to overcome the strong presumption that government officials exercise their duties in good faith. See Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1238-40 (Fed. Cir. 2002) (the Federal Circuit is "loath" to find bad faith by government officials absent "well-nigh irrefragable proof," which requires clear and convincing evidence) (internal quotation marks and citations omitted). This standard of "irrefragable proof has been equated with evidence of some specific intent to injure the plaintiff . . . [such as] actions which are motivated alone by malice." Id. at 1240 (internal quotation marks and citations omitted).

Here, Plaintiffs fall far short of presenting any evidence of bad faith – arguing that the "entire District Ranger's office had neither the courtesy, curiosity or competence to know that Liberty's plan

was in the June 1990 consultation and had come back clean to be implemented 'as submitted.'" Pls.' Mem. at 34. But a lack of "courtesy, curiosity or competence," even if true (which it is not), does not show malice toward Plaintiffs. Plaintiffs further argue that the Forest Service acted " worse than willful ignorance" by allowing "timber harvesting . . . in the same owl nesting area," and by "continued hiding of the date of the [biological] opinion." But these arguments are not supported by the facts, as discussed at length above. First, timber harvesting was not permitted in the owl nesting area – the Evening Star Timber Sale was modified, as a mitigation measure, by deleting the unit of timber located within 0.5 mile of the nest site. See JA66 at 597; JA157 at 1298; Blessing Decl., ¶ 8, Exs. 1-3; Williams Tr. at 60:14-61:2. Second, there is no evidence that the Forest Service hid the date of the Biological Opinion – a contention apparently based solely upon the fact that Mr. Lee did not mention the date of the Biological Opinion in his March 10, 1992 letter to Liberty Mining. See note 16, supra; see also Ferrero Aff., ¶ 42; JA111 at 1084; Pls.' Mem. at 30. Finally, as discussed above, Liberty's plan did not come back "clean to be implemented 'as submitted.'" Other than conclusory statements, Plaintiffs present no evidence that overcomes the strong presumption of good faith by government officials and meets their high burden of showing bad faith by clear and convincing evidence.

Indeed, the evidence shows just the opposite – that the Forest Service acted in good faith and was attempting to help Liberty Mining get its project approved. Wildlife Biologist Marc Williams testified at his deposition that Liberty Mining's proposed project was included in the June 18, 1990 programmatic consultation with FWS because the Forest Service was "trying to get the project through . . . [the programmatic consultation] was a mechanism to do it at the same time . . . this was our opportunity to do so." Williams Tr. at 17:3-19:1 (discussing the Programmatic Biological Evaluation, which is in the Joint Appendix at JA76).

Other evidence of good faith exists. For example, Minerals Officer Harry Frey, "[stuck] his

neck out" and allowed Liberty Mining to proceed with work in March 1991, while still awaiting a decision on the owl. Aloisi Aff., ¶ 37. Additionally, even though Liberty Mining's plan of operations expired in March 1991, Wildlife Biologist Kathleen Granillo visited Liberty Mining's site in July 1991, to try to implement the Biological Opinion. See Def.'s Mem., § I.B.5. And, by a letter dated October 23, 1992, District Ranger Lee informed Liberty Mining's attorney, Mr. Weller, that Mr. Lee intended "to approve operations for Liberty Mine as swiftly as possible within the procedural limits." JA135. Furthermore, on March 8, 1993, the Regional Office of the Forest Service met with FWS and identified the Liberty Mine proposal "as the number 1 priority for which consultation needs to be completed." JA153.

None of the cases cited by Plaintiffs support their argument on bad faith and extraordinary delay. See Pls.' Mem. at 34. In Wyatt, the Federal Circuit found a seven year delay (1984-1990) was not extraordinary in light of the complex regulatory process for approving mining operations and plaintiff's failure to timely provide sufficient information needed to evaluate the environmental impact of the proposed project. Wyatt, 271 F.3d at 1097-99. The 2-1/2 year delay at issue here similarly does not amount to a taking considering the regulatory review process described above. In Tabb Lakes, the Federal Circuit held that the issuance of a cease and desist order by the U.S. Army Corps of Engineers, requiring plaintiff to stop filling wetlands and seek a permit, was not a taking. Tabb Lakes, 10 F.3d at 800-02. The plaintiff in Tabb Lakes also argued that its property was taken by unreasonable delay in the permitting process but, other than pointing to the cease and desist order which the Federal Circuit held did not trigger a taking, failed to identify "a later date or event as marking the start of a taking." Id. at 803. Tabb Lakes, therefore, offers no support for the Plaintiffs' arguments, here.

Finally, in Bass Enterprises, the Federal Circuit found that a forty-five month delay did not amount to a taking considering the complexity of the regulatory process, and the importance of that

process to promote public safety, health and welfare. See Bass Enters., 381 F.3d at 1365-70. Here, as discussed above, the approximate thirty month delay that may have occurred resulted from the Forest Service's complex review process to protect the northern spotted owl – a threatened species under the Endangered Species Act (see JSOF, ¶ 45). According to the Supreme Court, "the plain language of the [Endangered Species] Act, buttressed by its legislative history, shows clearly that Congress viewed the value of endangered species as 'incalculable.'" Tenn. Valley Auth. v. Hill, 437 U.S. 153, 187 (1978). Accordingly, Bass Enterprises provides no support for Plaintiffs' extraordinary delay and bad faith arguments but, instead, supports the Defendant's position that no taking occurred.

In light of the evidence of good faith presented above, the strong presumption that government officials perform their duties in good faith, and Plaintiffs' failure to present any evidence of malice or intent to injure (see Am-Pro Protective Agency, 281 F.3d at 1240), Plaintiffs' motion for summary judgment should be denied and, because there is no genuine dispute as to any material fact relating to extraordinary delay and bad faith, Defendant's cross motion should be granted.

**B. Plaintiffs Fail to Show the Economic Impact of the Alleged Delay**

Plaintiffs' economic impact argument appears to be that because they could not produce gold for sale during the alleged temporary takings period (and continuing until August 1996, when the Forest Service approved the lessee's, LCM's, plan of operations). See Pls.' Mem. at 35. According to Plaintiffs, an owner's loss for a temporary taking is found in the lost profit and income from the property. See id. (citing CCA Assoc. v. United States, 75 Fed. Cl. 170, 197 (2007)). Plaintiffs' argument, however, is woefully inadequate as they don't even attempt to satisfy the legal criteria they contend applies – lost profit and income. Instead, Plaintiffs merely argue, apparently, that because they could not produce gold for sale during the alleged takings period (and several years beyond), they therefore suffered sufficient economic impact warranting the finding of a taking. This argument,

without more, does not satisfy the Penn Central test for an economic impact. Additionally, as Defendant shows below, CCA Associates does not stand for the proposition of law for which Plaintiffs cite it, and it is distinguishable on its facts. Additionally, Plaintiffs' economic impact argument is not supported by the facts of this case. Accordingly, Plaintiffs fail to show any economic impact caused by the alleged delay, and their motion for summary judgment should be denied.

First, as CCA Associates recognizes, the economic impact analysis of the Penn Central test requires an analysis of "the severity of the economic impact of the regulatory action on the property owner." CCA Assoc., 75 Fed. Cl. at 195 (citing Penn Central, 438 U.S. at 124) (emphasis added). Even Plaintiffs recognize that the economic impact analysis requires them to show "whether the government action causes a significant economic impact on the property . . ." Pls.' Mem. at 35 (emphasis added). But, Plaintiffs merely argue that there was an economic impact because they could not produce gold during the temporary takings period, without making any attempt to show the significance or severity of that economic impact. See Pls.' Mem. at 35. Because Plaintiffs fail to show the severity of the alleged economic impact, the Court should deny Plaintiffs' motion for summary judgment.

CCA Associates did not hold that the economic impact of a temporary taking is measured by "the lost profit and income from the property," as Plaintiffs argue.[23/] See Pls.' Mem. at 35. To determine economic impact, the court looked to "the diminution in return on equity" to the plaintiff "by dividing the maximum HUD-allowed annual dividend . . . by the aggregate equity in the property" at the time of the alleged taking. CCA Associates 75 Fed. Cl. at 198. The court then compared the return on equity with the delay against an estimated return had there been no delay, to find as estimated

---

[23/] Defendant notes that the United States appealed from this decision to the Federal Circuit, which currently is pending before the Federal Circuit as CCA Assoc. v. United States, No. 2007-5094.

economic impact of 81.25%. Id. at 198. Plaintiffs here make no attempt to undertake the analysis performed by the court in CCA Associates and, therefore, fail to show any economic impact from the alleged delay, even assuming CCA Associates applies.

CCA Associates, however, is inapposite because the property at issue in that case was already generating income when the alleged taking occurred. See CCA Associates, 75 Fed. Cl. at 196 ("the alleged taking involves lost streams of income at an operating property . . . ."). As the court explained, "for a temporary taking of an operating property, the Supreme Court looked to returns over the period of the taking . . . ." Id. at 196-97. Accordingly, CCA Associates does not apply here where, as Plaintiffs admit, Liberty Mining never generated any income from their mining claims. See Plaintiffs' Answers to Defendant's Second Set of Interrogatories at 14 ("Plaintiffs did not sell any gold from the claims (or the Mt. Laurel private parcel).") (attached hereto as Ex. 5).

Moreover, Plaintiffs' economic impact argument is based upon the erroneous statement that "[i]n 1989, the Forest Service authorized Liberty to begin mining the property, and Liberty did so." Pls.' Mem. at 35. As Defendant makes clear in its opening brief in support of its motion to dismiss, in 1989, Plaintiffs were authorized to undertake exploration and development activities, and at no time were they authorized to enter into the production phase of mining. See Def.'s Mem. at 4-8. Plaintiffs cite no evidence in support of their statement that they were authorized to begin mining, as none exists. Plaintiffs speculate that "the milling of bulk samples authorized in the November 1989 approval (JA-40, at 464 and JA-88, at 822) would have initiated production and generated some gold to sell."[24/] Pls.' Mem. at 35.

The letter approving Liberty Mining's October 25, 1989 proposed modifications to its plan of

---

[24/] Plaintiffs' citation to JA88 appears to be in error as District Ranger Lee approved portions of the October 25, 1989 supplemental plan in his November 27, 1989 letter (JA45), rather than in his November 27, 1990 letter (JA88), which Plaintiffs cite.

operations was issued on November 27, 1989. See JA45. In that letter, District Ranger Lee made clear that the "activities labeled Spring/Summer/Fall, 1990 which would be part of Phase Two of the development of [Liberty's] mine . . . are not approved at this time because they will be included in a master Plan of Operation Number Two . . . ." JA45 at 472 (emphasis added). Included among the activities proposed for the "Spring/Summer/Fall, 1990" was "Milling of apex and dump material." JA40 at 465. Accordingly, the District Ranger expressly did not authorize Liberty Mining to enter into the production phase as Plaintiffs contend. Only "test milling" was authorized. See JA40 at 465; JA45 at 472. The results of the test milling were uncertain, as Liberty Mining itself noted when proposing activities for the "Spring/Summer/Fall, 1990" including, "Upgrading of gravity separation mill or installation of floatation mill at Usher Flat as determined by Winter mill testing results." JA40 at 465 (emphasis added). Liberty thus did not know in 1989 what results it would obtain from the test milling, and contemplated that another mill system may need to be installed. Plaintiffs' contention, therefore, that Liberty was authorized to begin mining and milling, and would have generated gold for sale is not supported by the facts and is based upon nothing more than rank speculation.[25]

Because "the existence of economic injury is indispensable to demonstrating a regulatory

---

[25] Plaintiffs' optimistic scenario presented in their brief also is not supported by subsequent events. For example, Plaintiffs reported to the Court in January 2006 that during the preceding quarter they "were unable to recondition the milling equipment on site, in advance of the onset of the wet season, to conduct the milling of bulk samples from the claims." See Jan. 3, 2006 Quarterly Joint Status Report, ¶ 3. Poor weather conditions, Plaintiffs reported, "could affect access to the site and the integrity of the milling, as well as resulting in additional labor and operation costs." Id. The test milling also was not completed during the next quarter as Plaintiffs reported to the Court in March 2006 that weather conditions prevented them from testing the milling equipment. See Mar. 31, 2006 Quarterly Joint Status Report, ¶ 3. By July, 2006, Plaintiffs had yet to conduct the test milling, and still were "working on site to conduct this test milling during the summer season." See July 5, 2006 Quarterly Joint Status Report, ¶ 4. Plaintiffs apparently then abandoned the idea of conducting their own test milling, and decided to send their bulk samples to a facility in Arizona for test milling. See Sept. 29, 2006 Quarterly Joint Status Report, ¶ 4. For the convenience of the Court, the cited Quarterly Joint Status Reports are attached hereto as Ex. 6.

taking," Seiber v. United States, 364 F.3d 1356, 1370 (Fed. Cir. 2004), and because Plaintiffs fail to show any economic impact arising from the alleged delay, their motion for summary judgment should be denied. As the court in Seiber noted, the Federal Circuit " has repeatedly made clear that the failure to provide evidence to support the existence of economic injury is fatal to a takings claim." Id. at 1371.

### C. Plaintiffs Fail to Show the Interruption of Reasonable Investment-Backed Expectations Caused by the Alleged Delay

The third prong of the Penn Central test "looks to whether or not the regulation of plaintiff's property interfered with plaintiff's 'distinct investment-backed expectations.'" Fla. Rock Indus. v. United States, 45 Fed. Cl. 21, 38 (1999) (quoting Penn Central, 438 U.S. at 124). "Plaintiff must show that the regulation of its property frustrated reasonable expectations . . . if it is to show a taking." Id. However, a "reasonable investment-backed expectation must be more than a unilateral expectation or an abstract need." Id. (citing Ruckelshaus v. Monsanto, 467 U.S. 968, 1004-06 (1984) (internal quotation marks omitted). Here, Plaintiffs' merely present their unilateral expectations and fail to show that their expectations were reasonable in light of the pre-existing concerns regarding the northern spotted owl, and the pre-existing regulatory requirements. The cases Plaintiffs rely upon do not support their arguments, nor do the facts.

First, reasonable investment-backed expectations usually will be found to be lacking where the industry at issue has been highly regulated for some time. See, e.g., Rith Energy, 270 F.3d at 1351 ("A party in Rith's position necessarily understands that it can expect the regulatory regime to impose some restraints on its right to mine coal under a coal lease."); Deltona Corp. v. United States, 657 F.2d 1184, 1193 (Ct. Cl. 1981) (claimant "must have been aware that the standards and conditions governing the issuance of permits could change"); Good v. United States, 189 F.3d 1355, 1363 (Fed. Cir. 1999) (claimant lacked reasonable investment-backed expectation to be free from development restrictions under post-acquisition statutory regime where such restrictions were foreseeable based on the pre-

acquisition regulatory regime). To show governmental interference with their reasonable investment-backed expectations, Plaintiffs therefore must show that they "bought their property in reliance upon a state of affairs that did not include the challenged regulatory regime." Loveladies Harbor, Inc. v. United States, 28 F.3d 1171, 1177 (Fed. Cir. 1994) (citations omitted).

Mining within national forests had been regulated for years before Plaintiffs acquired any interest in these mining claims. Among those preexisting regulations are comprehensive procedural regimes regulating the protection of wildlife, including spotted owls and their habitat. See JSOF, ¶¶ 6, 7; see also 36 C.F.R. § 228.8(e) (2007); Cal. Coastal Comm'n, 480 U.S. at 599 ("Congress has entrusted the task of balancing mineral development and environmental protection in the national forests to the Department of Agriculture, and its delegate the Forest Service").

In 1984, before Plaintiffs staked their mining claims (see JSOF, ¶ 8), the Forest Service had identified the northern spotted owl as a sensitive species requiring, within KNF, a "core area of old-growth timber stands surrounding a nest site, with an additional 700 acres of these stands in one to four parcels within a 1.5 mile radius of the core area," known as a Spotted Owl Habitat Area ("SOHA"). JSOF, ¶ 6. Morever, Forest Service regulations had long required mining operators to "take all practicable measures to maintain and protect fisheries and wildlife habitat which may be affected by the operations." 36 C.F.R. § 228.8(e) (2007) (emphasis added). When Plaintiffs staked out a mining claim within KNF, they knew, or should have known, that any mining proposal would be closely examined under existing environmental statutes.

Indeed, Aloisi attests in his affidavit that he had been working in Eddy Gulch since 1980 and, although he fails to specify the time period, admits that he was aware of spotted owl habitat areas or SOHAs. See Aloisi Aff., ¶¶ 1, 18. Indeed, as early as 1981, the Forest Service was taking steps to protect the northern spotted owl within KNF, for example, by deleting from the Evening Star Timber

Sale "four units for [the] protection spotted owl habitat." See Blessing Aff., Ex. 1. Plaintiffs therefore knew or should have known that their mining operation might be modified or delayed due to the presence of spotted owls.

In their brief, Plaintiffs merely present evidence of their unilateral expectations, arguing that they assembled an experienced team of people (see Pls.' Mem. at 36-37) and that money was invested into the project (see id. at 38-39). Plaintiffs, however, fail to show that they invested in these mining claims in reliance upon a state of regulatory affairs that did not include protecting the northern spotted owl. See Loveladies Harbor, 28 F.3d at 1177. The cases they cite offer no support.

Plaintiffs cite Bass Enterprises, for the proposition that "[r]easonable investment-backed expectations exist where the plaintiffs' proposed use of the property was feasible and appropriate, and they could reasonably anticipate the mines would be productive." Pls.' Mem. at 36 (citing Bass Enters. Prod. Co. v. United States, 54 Fed. Cl. 400, 403 (2002)). Bass Enterprises, however, offers no support because the legislation at issue in that case was not enacted until forty years after the plaintiff acquired an interest in the mineral rights. See Bass Enters., 54 Fed. Cl. at 401. This is not the situation here, where the Plaintiffs did not stake their mining claims until after protections for the spotted owl already were in place. Bass Enterprises, therefore, does not support Plaintiffs' argument.

Similarly, Fla. Rock offers no support because the plaintiff in that case bought a 1,560 acre parcel to mine limestone in September 1972, before "Congress passed, and the President signed into law, the Clean Water Act Amendments of 1972 (the Clean Water Act or CWA)." Id. at 25. And Wyatt lends no support because, in that case, the court found no extraordinary delay and, therefore, did not need to consider whether any of the Penn Central factors were met. See Wyatt, 271 F.3d at 1097-1100.

Accordingly, Plaintiffs fail to show any governmental interference with reasonable investment-backed expectations and their motion for summary judgment should be denied.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for summary judgment and grant the government's cross motion to dismiss.

Respectfully submitted,

RONALD J. TENPAS
Assistant Attorney General
Environment & Natural Resources Division

/s/ Bruce K. Trauben
BRUCE K. TRAUBEN
Trial Attorney
Natural Resources Section
Environment & Natural Resources Division
U.S. Department of Justice
601 D Street, NW
Washington, D.C. 20004
(202) 305-0238 (phone)
(202) 305-0506 (fax)

WILLIAM J. SHAPIRO
Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Div.
501 I Street, Suite 9-700
Sacramento, CA 95814-2322

OF COUNSEL:
ROSE MIKSOVSKY
U.S. Department of Agriculture
Office of General Counsel
33 New Montgomery St., 17th Fl.
San Francisco, CA 94105-3170

Dated: March 5, 2008