# EXHIBIT 1

# Chapter 7
# INVERSE CONDEMNATION ISSUES IN REVISING THE MINING LAW

Lawrence G. McBride

Freedman, Levy, Kroll & Simonds
Washington, D.C.

## Synopsis

§ 7.01 **Introduction**

§ 7.02 **Surveying the Developing Law of Inverse Condemnation**

[1] **Background Case Law**

[2] **The Absence of Bright-Line Rules**

[3] **The Three Inquiries**

[4] **The Nature of the Government Action (Inquiry One)**

[a] **Approximating the Effect of Direct Condemnation**

[b] **The "Nuisance" or Noxious Use Defense**

[5] **Economic Impact of the Government Action (Inquiry Two)**

[a] **Loss of All Viable Economic Use**

[b] **Mere Diminution of Value Cases**

[6] **Interference with Reasonable Investment-Backed Expectations (Inquiry Three)**

[7] **Recent Minerals Case Law**

[a] ***United Nuclear, Inc. v. United States***

[b] *Whitney Benefits, Inc. v. United States*

[c] *Rybachek v. United States*

[d] *Florida Rock Industries, Inc. v. United States*

[e] Conclusions from the Cases

§ 7.03 Rights Under the General Mining Law

[1] Pre-discovery Rights

[2] Claims Validated by Discovery

[a] Ownership Interest in the Minerals

[b] The Right to Mine

[c] The Right to Patent

§ 7.04 The General Mining Law Repeal/Reform Bills

[1] Rights Under a New Claim

[2] "Conversion" of Existing Claims

[a] The Constitutionality of Forfeiture Provisions

[b] Absence of any Savings Clause

[3] New Restrictions on the Right to Mine

[a] Right to Say No for Land Management Reasons

[b] Applying *Whitney* and *United Nuclear*

[4] Loss of the Right to Patent

§ 7.05 Issues in Litigating an Inverse Condemnation Claim

[1] A Legislative or an Executive Taking Action?

[2] Ripeness and Premature Suit versus Statute of Limitations

[3] Claims Court or District Court?

[4] Assignment of Claims Prohibition

[5] Traps for the Wary

§ 7.06 Conclusion

## § 7.01 Introduction

This paper examines the developing case law defining the nature of an inverse condemnation claim — the cause of action to recover the fair market value of property condemned by governmental regulatory action. Next, it explores several cases applying this precedent in the context of mining rights and mining properties. It then describes more specifically the nature of the rights asserted by claimants under the General Mining Law.[1] Finally, it examines the rights held by a new or "converting" claimant under the primary bills to change the General Mining Law, and evaluates the types of claims that such legislation would spawn under the inverse condemnation precedent.

## § 7.02 Surveying the Developing Law of Inverse Condemnation

### [1] Background Case Law

Inverse condemnation law has grown out of the prescription in the Fifth Amendment, "nor shall private property be taken for public use, without just compensation."[1.1] Not only does direct condemnation take property, so also does government legislative and regulatory action not directed at substituting a specific public use on specific private property. The case law, of which *First English Evangelical Lutheran Church v. County of Los Angeles*[2] is a recent example containing a detailed discussion, is clear that inverse condemnation can occur either by legislative action or by executive regulatory action under legislative authority, and can occur without governmental intrusion onto the property or physical dispossession of the owner.

### [2] The Absence of Bright-Line Rules

Beyond establishing that inverse condemnation can occur in the context of diverse governmental actions, the United States Supreme Court has resisted "bright-line" rules about when in fact inverse condemnation has actually taken place. The only constant in the cases is the reiteration that such an adjudica-

[1] General Mining Law of 1872, 30 U.S.C. §§ 22 *et seq.* (1988) (General Mining Law).

[1.1] U.S. Const. amend. V.

[2] 482 U.S. 304, 316-17 (1987).

tion is heavily fact-dependent.[3] Instead, the Court has at different times and with different emphases disclosed three "inquiries" to be made or "factors" to be considered in this fact-dependent adjudication. This fundamental looseness in the jurisprudence is important — there are cases that do not appear to undertake all three inquiries, and those where a taking has been found although not all three inquiries militate toward a taking conclusion.[4] Careful analyses have concluded that the case law discloses inverse condemnation standards different from the "three inquiry" formulation.[5]

### [3] The Three Inquiries

Even with these qualifications, however, this paper focuses on the three inquiries because they are quite uniformly employed in the jurisprudence of the Claims Court and the U.S. Court of Appeals for the Federal Circuit. This is where the Tucker Act[6] claims on which this paper focuses would be litigated. The three inquiries are:

1) the nature of the government action;
2) the economic impact of the government action on the property; and
3) interference with reasonable investment-backed expectations.[7]

### [4] The Nature of the Government Action (Inquiry One)

#### [a] Approximating the Effect of Direct Condemnation

The focus of the first inquiry is the extent to which the nature of the governmental action approximates direct condemnation. Is the property appropriated for public use? Is there physical interference with or intrusion onto the property? Lack of governmental intrusion onto the property does not

[3]Connolly v. Pension Benefit Guaranty Corp., 475 U.S. 211, 224-25 (1986).

[4]*E.g.*, Agins v. City of Tiburon, 447 U.S. 255, 260 (1980).

[5]*E.g.*, Jan G. Laitos, "Regulation of Natural Resources Use and Development in Light of the 'New' Takings Clause," 34 *Rocky Mt. Min. L. Inst.* 1-1, § 1.07[2] (1988).

[6]28 U.S.C. §§ 1491 *et seq.* (1988).

[7]*E.g.*, Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 495 (1987).

foreclose the claim; rather, proof of physical intrusion may assure the claim's success.[8]

### [b] The "Nuisance" or Noxious Use Defense

The more important aspect of inquiry into this subject is the defense to a taking claim the government asserts when it characterizes the governmental action as regulating between conflicting land uses, or regulating a harmful or noxious use, rather than initiating a "public use" of the property. "As against reasonable state regulation, no one has a legally protected right to use property in a manner that is injurious to the safety of the general public."[9] The leading case, or original case on which this argument has turned, is *Mugler v. Kansas*,[10] the unsuccessful challenge to a statute that prohibited the use of a distillery for the manufacture of intoxicating beverages.

This "nuisance" defense has returned to the fore because of its use by the Supreme Court of South Carolina in upholding the state's new construction ban on the Atlantic barrier beach property at issue in *Lucas v. South Carolina Coastal Council*.[11] The South Carolina Supreme Court legitimized the authority to bar construction through the legislative finding that it "is necessary to prevent a great public harm" — the erosion and destruction of the beach/dune area and the "nuisance" or hazard that would be caused if a storm destroyed the house-that-couldn't-be-built and the debris damaged other landward buildings or property. The state supreme court's decision and Lucas' petition for certiorari galvanized the property rights bar, and at least two important amicus briefs offered the U. S. Supreme Court the opportunity to clarify, limit, or destroy the nuisance, or noxious use, defense. First, the United States' amicus would limit the defense to those exercises of property rights constituting nuisance to other property owners at common law. This formulation expressed the principle that no one

---

[8] *See* Hendler v. United States, 952 F.2d 1364 (Fed. Cir. 1991).

[9] Allied-General Nuclear Services v. United States, 839 F.2d 1572, 1576 (Fed. Cir. 1988).

[10] 123 U.S. 623 (1887).

[11] 404 S.E.2d 895, 898 (S.C. 1991), *rev'd*, 112 S. Ct. 2886 (1992) (a 6 to 2 decision involving one concurrence in the judgement, two separate dissents, and a "statement" by Justice Souter).

has a property right to use his or her property in a manner that harms, i.e., at common law causes nuisance to, others. Second, the American Mining Congress, joined by other natural resource industry associations, argued that the nuisance defense is simply wrong, and *Mugler* should either be overruled, distinguished, or left as a derelict.[12]

The Supreme Court's decision in *Lucas*, reversing the state supreme court decision, adopts these arguments substantially, and may well have rendered the first inquiry irrelevant to regulatory takings cases. As will be developed below, the noxious use issue is used by the Supreme Court in *Lucas* not in analyzing the nature of the governmental action but in analyzing the nature of the property right, the value or exercise of which has been diminished or constrained.

### [5] Economic Impact of the Government Action (Inquiry Two)

#### [a] Loss of All Viable Economic Use

The second judicial inquiry has been the factual one into the economic impact of the government action. The Supreme Court has recited in *Keystone*, for example, that a regulatory taking occurs when the governmental action deprives the owner of all economically viable use of the property, *or* when the regulation does not substantially advance legitimate state interests.[13] It is this recital that appeared to create an alternative-inquiry formula for takings,[14] and that the majority cites in *Lucas*,[14.1] although the South Carolina Supreme Court specifically found that in the *Keystone* opinion the U.S. Supreme Court majority rejected the idea that loss of all use or value alone was sufficient to prove a taking.[15]

---

[12] Reserved.

[13] *Keystone*, 480 U.S. 470, 486 (1987).

[14] *See* Agins v. City of Tiburon, 447 U.S. 255 (1980), as analyzed in Laitos, *supra* note 5.

[14.1] *Lucas*, 112 S. Ct. at 2894 n.7.

[15] *Lucas*, 404 S.E.2d at 900. Both of the dissents in the U.S. Supreme Court decision press the same view. *Lucas*, 112 S. Ct. 2886 (dissent of J. Blackmun at 2894 n.7; dissent of J. Stevens at 2895 n.8).

The *Lucas* decision states, "we have found categorical treatment appropriate . . . where regulation denies all economically beneficial or productive use of land."[15.1] The opinion construes, clarifies, and harmonizes the case law around this principle.

**[b] Mere Diminution of Value Cases**

The factual defense within this second or, post-*Lucas*, central inquiry is that a "mere diminution" of value shows that a taking did not occur. It is in part on this principle that zoning laws, allowing some economic use(s) but denying the highest or more valuable uses, are grounded.[16] There is no "bright-line" test establishing where the extent of diminution ceases being "mere" diminution (a value reduction not requiring compensation) and where it crosses over to unacceptable, compensable loss of all viable economic use.[16.1]

In making this inquiry into partial or total loss, the underlying legal facts are found in the nature of the property right(s) at issue. One must examine the relevant property law to characterize and define those rights properly. The legal facts are usually found in state law, such as the subsidence right estate in *Keystone* and in *Pennsylvania Coal Co. v. Mahon*.[17] But they may be found as well directly and solely in federal law. In *Clawson v. United States*,[18] the Claims Court examined an inverse condemnation challenge by the holder of unpatented mining claims to a federal statutory dredge-mining prohibition. The Claims Court looked directly at the General Mining Law for definition of the unique species of property at issue.

---

[15.1] *Lucas*, 112 S. Ct. at 2893, defining categorical treatment as finding "regulatory action . . . compensable without case-specific inquiry into the public interest advanced in support of the restraint." *Id.*

[16] Village of Euclid v. Ambler Realty Co., 272 U.S. 365 (1926).

[16.1] Diminution of value issues are being tested in the context of CWA § 404 permit denials in: Loveladies Harbor, Inc. v. United States, 21 Cl. Ct. 153 (1990), appeal pending; and Formanek v. United States, No. 764-86L, 1992 U.S. Cl. Ct. LEXIS 217 (May 14, 1992).

[17] 260 U.S. 393, 414 (1922). *Accord* Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1001 (1984) (Missouri trade secrets law).

[18] 24 Cl. Ct. 366 (1991).

### [6] Interference with Reasonable Investment-Backed Expectations (Inquiry Three)

The third judicial inquiry has been whether the prohibition or restriction interferes with reasonable investment-backed expectations. The classic situation is where the purchase and investment immediately precede the newly-imposed regulatory prohibition. *Lucas* presents these facts: most of the dune-shore lots were built up; Lucas bought one of the remaining unbuilt lots; South Carolina then passed its statute authorizing the defendant Council to deny building permits on the dune-shore area.

The relevance of this inquiry after *Lucas* is unclear. Clearly Lucas "passed" this test; investment-backed expectations were not at issue factually. But the majority opinion's only reference to the inquiry is in the course of supporting its disposition of the noxious use issue — an owner with "reasonable expectations" of the prohibited use has solid evidence that the use was lawful and within the bundle of common law rights held in the property.[19] There is no reference to the "investment-backed" aspect of this inquiry at all in *Lucas*.

If this inquiry remains relevant, it will be raised by the governmental assertion that "fallow" or unexercised property rights may be put under prohibition without takings liability. As an example, one of the Department of the Interior's (Interior) proposed regulatory definitions of valid existing rights[20] for purposes of exception from the coal mining prohibitions in section 522(e) of the Surface Mining Control and Reclamation Act (SMCRA)[21] would require the coal owner to have made good faith efforts to obtain the relevant mining permits at the time the statutory prohibition was enacted.[22] One can understand the government's not wanting to reward with compensation an

---

[19] *Lucas*, 112 S. Ct. at 2894 n.7.

[20] *See* Stephen P. Ruffatto & Carolyn S. Ostby, "Cohabitation of Wilderness and Mining: Can this Marriage be Saved?" 38 *Rocky Mt. Min. L. Inst.* 11-1, § 11.02 (1992) where this phrase is treated in detail.

[21] 30 U.S.C. § 1272(e) (1988). *See* Proposed Rules for 30 C.F.R. pts. 740, 761, & 772 at 56 Fed. Reg. 33,152, 33,153 (July 18, 1991).

[22] Or at a later time when the statutory prohibition became applicable to that coal, such as by a change in the status of the federally-owned surface over the private coal.

owner that had shown no effort to undertake a newly prohibited use. But in some cases this appears really to be a diminution of value assertion — the owner likely had some other continuing use of the land notwithstanding the new prohibition. In the case of reserved or severed mineral rights, however, if the new prohibition denies all economically viable use, the property rights are equally "lost" whether there was a recent attempt to exercise them or not. The absence of recent development efforts may be relevant to valuation, but not to whether the governmental imposition caused a taking. This brief excursion away from reporting into analysis shows how unsettled and uncertain the courts are regarding the significance and relative importance of these three judicial inquiries.[23]

### [7] Recent Minerals Case Law

Although the three inquiries are in major ways still unexplained and unrationalized by the case law, there are at least four highly instructive applications of these inquiries or factors in specific cases involving mineral properties and mining rights.

#### [a] United Nuclear, Inc. v. United States[24]

*United Nuclear* involved Interior's refusal to approve the lessee's mining plan on an Indian uranium lease. Absent this approval the lessee had no chance to be producing prior to and at the end of the primary term of the lease, so the lease expired. The Federal Circuit found (two to one) that the United States took United Nuclear's lease by its regulatory (in)action, and the case has been remanded for the damages trial. The court's opinion engaged in each of the three inquiries. On the first, the court of appeals found that the nature of the government action was to assist the Tribe in its goal of re-leasing the tract with an attendant new bonus payment. This was not clearly for a "public use," but it was certainly not regulation of a nuisance. The Federal Circuit overruled the Claims Court's finding that there were environmental (drinking water supply and worker influx) reasons for the failure to approve. On the

[23] Reserved.

[24] 17 Cl. Ct. 768 (1989), *rev'd & remanded*, 912 F.2d 1432 (Fed. Cir. 1990).

second inquiry, the court found that the property was wholly taken; there was no residual value. On the third inquiry, the court noted that the lessee had spent over $5 million to prove up the uranium deposit on the lease, and about $300,000 in payments under the lease. This investment and the expectation of profits in mining the discovered uranium were destroyed by the action. The second and third (if not all three) inquiries militated toward liability, and no "defenses" applied. The court therefore found inverse condemnation.

### [b] Whitney Benefits, Inc. v. United States[25]

In *Whitney Benefits*, the Federal Circuit affirmed the Claims Court's finding of governmental liability. The case involved private coal land, subject to a private coal lease, that was subject to the alluvial valley floor mining prohibition in section 510(b)(5) of SMCRA.[26] Regarding the nature of the government action, the court found that the statutory provision itself was a legislative taking, because of legislative history that Congress understood it was prohibiting mining on that very property. In the second inquiry, the court found the prohibition left the property with little residual value. In the third inquiry, it found that over $2 million had been spent toward development, including half a million on advance royalties to maintain the lease.[27] These investments supported the conclusion that there were reasonable investment-based expectations of development absent the statutory prohibition.

### [c] Rybachek v. United States[28]

In *Rybachek*, the plaintiffs assert that the conditions the Environmental Protection Agency imposed on the Clean Water

[25] 926 F.2d 1169 (Fed. Cir.), *cert. denied*, 112 S. Ct. 406 (1991), *aff'g* 18 Cl. Ct. 394 (1989).

[26] 30 U.S.C. § 1260(b)(5) (1988).

[27] Both the coal owner-lessor and coal lessee are plaintiffs, and payments under that lease demonstrate investment-backed expectations. New Federal Circuit caselaw and government questions about the petitioners' relationship, however, have led to a federal motion for relief from judgment under 28 U.S.C. § 2515, now pending, on grounds including the pendency of a concurrent action for relief in district court and assignment of the claim against the United States. *See* 28 U.S.C. § 1500 and 31 U.S.C. § 3727 (1988).

[28] 23 Cl. Ct. 222 (1991).

Act discharge permit for their placer operations[29] have taken their Alaskan placer gold property, which consisted of both patented and unpatented mining claims. The plaintiffs argue that operating in compliance with the effluent standards and management practices conditions can only be done at a loss. Liability has not been determined, but the Claims Court denied the government's motion to dismiss for failure to state a claim, and the case will proceed to trial. Note that the plaintiffs have possession and use of their property, even for mining purposes, but allege they are operating at a loss and that their property has no other economic use. One way to read the ruling is that a taking may still be found when only the second and third inquiries militate in favor of compensation of the plaintiffs.

### [d] Florida Rock Industries, Inc. v. United States[30]

In *Florida Rock*, the Corps of Engineers denied a Clean Water Act section 404 permit as contrary to the public interest. This was found to have taken the limestone-bearing wetland parcel the company had applied to "dredge." In making these findings, the Claims Court found that the proposed rock mining has never been considered a nuisance, and that the legitimacy of the Corps' goal to preserve the wetland from development does not defeat the inverse condemnation consequence of permit rejection.[31] Regarding the second inquiry, the Claims Court found a nominal post-prohibition value for "future recreational/water management" purposes. To find that the reduction in value from $10,500 per acre to $500 per acre supported the taking conclusion, the court turned to the third inquiry, relying on the fact that the property had been bought at the prior value solely for the now impossible purpose of limestone mining.[32]

---

[29] Plaintiffs had earlier lost a challenge to the validity and propriety of the EPA's Clean Water Act placer mining rules themselves. Rybachek v. E.P.A., 904 F.2d 1276 (9th Cir. 1990).

[30] 21 Cl. Ct. 161 (1990), *on remand from* 791 F.2d 893 (Fed. Cir. 1986).

[31] 21 Cl. Ct. at 167-68.

[32] *Id.* at 174-75.

### [e] Conclusions from the Cases

From these cases some observations flow. Regarding the first inquiry, note that the clearly environmental nature of the prohibition in *Whitney* and *Florida Rock*, and of the regulation in *Rybachek*, did not defeat liability. On the second inquiry, *United Nuclear* especially endorses working from the nature of the mineral rights held (in that case a mineral lease). On the third inquiry, both exploration and permitting expenditures clearly carry weight in determining the owner's reasonable expectations, and in *Florida Rock* the acquisition cost was highly relevant.

## § 7.03 Rights Under the General Mining Law

### [1] Pre-discovery Rights

The holder of a claim located under the General Mining Law that is not supported by a discovery does not, under current case law, have a compensable property interest. In *Best v. Humboldt Placer Mining Co.*[33] the government initiated a condemnation action to clear title to and secure possession of the land for its dam project, but in the complaint reserved the right to initiate an administrative contest against the mining claims of record on federal lands in the project area. The claimants' attempt to have claim validity determined in court, under what they described as less onerous procedures and substantive standards, failed when their motion to enjoin the initiation of administrative contests was denied. Upon winning the contests, the claims were administratively declared null and void and no compensation was owed.

This interpretation of *Best* was confirmed in the Claims Court in a Tucker Act (inverse condemnation) suit in *Skaw v. United States*.[34] As an element of proving his inverse condemnation claim (arising out of a federal statutory dredge mining prohibition for certain riverbeds and banks in Idaho), Skaw had to prove the validity of his claims. Failing that proof, through what was essentially a judicial validity con-

[33] 371 U.S. 334 (1963).

[34] 13 Cl. Ct. 7 (1987), *aff'd*, 847 F.2d 842 (Fed. Cir.), *cert. denied*, 488 U.S. 854 (1988).

test hearing, Skaw had invalid claims and no claim for inverse condemnation.

### [2] Claims Validated by Discovery

#### [a] Ownership Interest in the Minerals

In contrast to a claim not supported by discovery, a claim supported by discovery is "property in the highest sense of that term."[35] The conjunction of location and discovery does vest rights in the claimant against the United States. The exclusive right of possession of the land for mining purposes is secured against all others,[36] and there is an ownership interest in the mineral resource.[37] This ownership interest is subject to maintenance obligations: chiefly the annual assessment work[38] and annual filing[39] requirements, and the risk of loss if the validity of the claims is not maintained. This ownership interest, as reward for discovery, is not by law subject to any royalty interest, or rental or other payment obligation to the United States while the claim remains unpatented.[40]

#### [b] The Right to Mine

The second right inherent in a claim validated by discovery is the right to mine the discovered resource. This is expressed in the statute[41] and reflected in the mine permitting regulations and programs of both agencies, the Forest Service and the Bureau of Land Management (BLM). The Forest Service regulations clearly do not reserve the right to say no, for land man-

---

[35] Belk v. Meagher, 104 U.S. 279, 283 (1881).

[36] 30 U.S.C. § 26 (1988).

[37] *E.g.*, St. Louis Mining & Milling Co. v. Montana Mining Co., 171 U.S. 650, 655 (1898) ("the area becomes segregated from the public domain and the property of the locator"), cited in *Skaw*, 13 Cl. Ct. at 29.

[38] 30 U.S.C. § 28 (1988). *See* Wilbur v. United States *ex rel.* Krushnic, 280 U.S. 306 (1930).

[39] Sec. 314 of the Federal Land Policy and Management Act of 1976 (FLPMA), 43 U.S.C. § 1744 (1988).

[40] *E.g.*, Locke v. United States, 471 U.S. 84, 105 (1985) ("the property right here is the right to a flow of income from production of the claim"). *See also* Freese v. United States, 639 F.2d 754 (Ct. Cl. 1981), discussed in § 7.04[4] *infra*.

[41] 30 U.S.C. § 22 (1988) ("valuable mineral deposits in [unwithdrawn public domain] lands . . . shall be free and open . . . to exploration . . . and occupation"); 30 U.S.C. § 26 (1988) ("exclusive right of possession and enjoyment [of surface and minerals]").

agement or discretionary reasons, to a plan of operations that meets the regulatory requirements for completion, disclosure, impact analysis, and mitigation.[42] Even the cases upholding the Forest Service right to enjoin operators who refuse to comply with the plan of operations rules make clear that the Forest Service does not ultimately have the authority to say no to the plan of an operator who does seek approval.[43] Rather the Forest Service operates under a regulatory land management standard that "operations shall be conducted so as, where feasible, to minimize adverse environmental impacts. . . ."[44] As was evident in *United States v. Richardson*,[45] the Forest Service can enjoin, or prevent through temporary plan disapproval, inappropriate methods of operation that cause more damage or impact than is reasonably necessary for the type of mining activity, but the exercise of rights must be allowed.

The BLM rules closely parallel those of the Forest Service in these respects, reserving no ultimate or discretionary right to disapprove operations that will be conducted in conformity with the operative land management standard.[46] The operative management standard is that the Secretary of the Interior (Secretary) prevent "unnecessary and undue degradation of the public lands."[47] What is key in this formulation is the implicit recognition that there can be "due and necessary" degradation of lands by mining (as well as any other lawful use[48] of public lands), and that the Secretary authorizes such degradation by issuing licenses, permits, and leases for lawful uses of multiple use land.

In the hardrock mining context, the Secretary authorizes the possibility of such degradation by managing the lands as open and unwithdrawn public domain lands, on which prospectors, by self-initiation, location, and discovery acquire this

[42] 36 C.F.R. § 228.5 (1991).

[43] United States v. Weiss, 642 F.2d 296, 299 (9th Cir. 1981).

[44] 36 C.F.R. § 228.8 (1991).

[45] 599 F.2d 290 (9th Cir. 1979), *cert. denied*, 444 U.S. 1014 (1980).

[46] 43 C.F.R. §§ 3809.1-6 & 3809.2-2 (1991).

[47] Sec. 302(b) of FLPMA, 43 U.S.C. § 1732(b) (1988).

[48] The term "principal or major uses" is defined in § 103(l) of FLPMA, 43 U.S.C. § 1702(l) (1988).

set of rights. The relationship of this land management situation to the status of the land as withdrawn or unwithdrawn (i.e., subject to the operation of the general mining laws) is made clear for BLM lands in land use planning provisions of FLPMA: "The Secretary may issue management decisions to implement land use plans . . . in accordance with the following: . . . (3) . . . public lands shall be removed from or restored to the operation of the [general mining laws] . . . only by withdrawal action pursuant to section 204. . . ."[49]

In effect the Forest Service operates under the same regime, although this is because the Forest Service's planning mandates do not mention minerals expressly.[50] The operative land management standard, as discussed above, is to "where feasible, minimize adverse environmental impacts,"[51] and the Department of Agriculture lacks any authority to withdraw land. The open status of Forest Service-managed public domain land can be changed only by withdrawal action by the Secretary *of the Interior* under section 204 of FLPMA.[52] Taken in conjunction, these authorities add up to a system like that of the BLM, in which the land manager mitigates and regulates but does not ultimately have the authority to prohibit the exercise of the right to mine for reasons grounded in his discretion as a land manager.

These principles are at work in the BLM field instructions on the issue of "the right to say no." The BLM Instruction Memorandum (IM) on this issue[53] using a question and answer format, says:

> 29. Under what conditions should the BLM approve a plan of operations?

---

[49]Sec. 202(e) of FLPMA, 43 U.S.C. § 1712(e) (1988).

[50]National Forest Management Act and Forest and Rangeland Renewable Resources Planning Act, 16 U.S.C. §§ 1601-1614 (1988), and Multiple-Use Sustained-Yield Act, 16 U.S.C. §§ 528-531 (1988).

[51]36 C.F.R. § 228.8 (1991).

[52]43 U.S.C. § 1714 (1988), which applies to "Federal lands," not just BLM-administered "public lands."

[53]"BLM IM No. 90-632, Questions and Answers Concerning Resource Management Planning and Environmental Review Requirements in the Locatable Minerals Program," Attachment 1-12, Question 29 (Sept. 25, 1990).

> The BLM should approve a plan of operation if it will *not*:
>
> a. Cause "unnecessary or undue degradation."[53.1]
>
> b. Conflict with or violate substantive environmental laws (e.g. Clean Air Act, Clean Water Act, Endangered Species Act, Solid Waste Management Act) and executive actions.[53.2]
>
> . . .
>
> Where conflicts exist the BLM will modify the plan to eliminate the conflict and require the operator to accept the modifications as a condition of approval.

The first of these reasons stands in the context of BLM's definition of unnecessary and undue degradation in the hardrock management rules.[54] The definition provides that technically competent engineering practices and appropriate facilities design in light of the ore, the processes and the location, result in necessary degradation, which is to be allowed. The section 302(b) standard carries this important ramification for miners. Other land management concerns — esthetics, desires to devote the land to another use, conflicting resources (not protected by any police power, EPA-style law of general applicability) — are not a basis for saying no to necessary and due impacts of mining on these lands open to the operation of the mining law.[55]

The second of the reasons the IM asserts for BLM not to approve a plan is if the plan would violate an EPA-style environmental law of general applicability. Obviously, plans of operations are designed and submitted to show compliance with such laws. Equally, agency action on the plan of operations assumes that the designed compliance will occur, either because

[53.1] *See* § 302(b) of FLPMA and 43 C.F.R. 3809.1-6(a) (1991).

[53.2] *See* 43 C.F.R. § 3809.2-2 (1991).

[54] 43 C.F.R. § 3809.0-5(l) (1991).

[55] If this is not clear from the meaning and history of the statutory phrase itself, it is confirmed by the directive in § 701(h) of FLPMA that "[a]ll actions by the Secretary . . . under this Act shall be subject to valid existing rights." 90 Stat. 2786, 43 U.S.C. § 1701 note. *See* Ruffatto & Ostby, *supra* note 20, § 11.02 for an explanation of that term's protection of property rights.

the permits from the other agencies are in hand when BLM acts, or because they are not yet required (e.g., National Pollution Discharge Elimination System permits for later facilities) but the plan of operations provides that they will be obtained when required.

If the cost of compliance with these requirements dissuades the operator from proceeding with development, this might demonstrate, from the agency's perspective, that the claims were not valid. This is based on the agency view that the costs of compliance with applicable environmental law are factored into the determination of discovery.[56] If the rest of the claims are invalid, under *Skaw* and *Best* they are not compensable property interests. It could be argued that this is true even if the reason the claims are invalid is that regulatory action has rendered mining prohibitively expensive (i.e., regulation effectively prohibits mining). This argument may well be joined in the further proceedings in *Rybachek*, where plaintiffs assert that it was the EPA Clean Water Act rules that rendered mining unprofitable, with respect to the Rybacheks' unpatented claims. Against this argument, note that in *Skaw* and *Clawson* the Claims Court determined the validity of the claims *without* reference to the statutory mining prohibition giving rise to the possible taking. Had the mining claims been valid absent the prohibitions, the Claims Court would have undertaken the three inquiries to determine taking liability.

When one compares these two stated grounds for disapproving a plan of operations, note that neither contains any authority for disapproval based on discretionary land management reasons. A land manager's judgment that "due degradation" (the unavoidable impacts of a plan that is designed to comply with all relevant, generally-applicable air and water quality laws) is unacceptable cannot under current law result in disapproval of the plan. As long as the land was not withdrawn when discovery occurred, the valid claim carries the right to mine.

---

[56] United States v. Pittsburgh Pacific Co., 30 IBLA 388, 84 I.D. 282, GFS(MIN) 30(1977), *reviewed on other issues sub nom.* South Dakota v. Andrus, 614 F.2d 1190 (8th Cir.), *cert. denied*, 449 U.S. 822 (1980).

#### [c] The Right to Patent

The third right inherent in a valid claim is that of patent.[57] This is the right, on application and after a non-discretionary adjudication of entitlement,[58] to receive from the United States its quitclaim deed in recognition of compliance with the provisions of the mining law.

The nature of the right was treated in *Freese v. United States*,[59] in which the Claims Court held that Freese suffered no compensable inverse condemnation when Congress prohibited further issuance of mineral patents for lands in the Sawtooth National Recreation Area in Idaho. Freese's claims were valid, per Forest Service determination, but he had not applied for patent prior to Congress' legislative prohibition on doing so. The *Freese* case has been criticized by the mining bar, in part for its failure to treat expressly certain apparently inconsistent case law on the rights inherent in a valid claim: "The claim was thenceforth their property. They needed only a patent of the United States to render their title perfect, and that they could obtain at any time upon proof of what they had done. . . . Until the patent issued the government held the title in trust for the locators. . . ."[60]

## § 7.04 The General Mining Law Repeal/Reform Bills

### [1] Rights Under a New Claim

The following analysis discusses the "Bumpers Bill" (S. 433) and the "Rahall Bill" (H.R. 918), the former as introduced in the 102d Congress, and the latter as reported by the House Interior Committee, in relation to potential inverse condemnation claims.[61] First, both bills establish a claim location system in which the locators' rights are not dependent on discovery. At the same time the bills make it clear that the rights inher-

---

[57] 30 U.S.C. §§ 29 & 35 (1988).

[58] *See* Marathon Oil Co. v. Lujan, 751 F. Supp. 1454 (D. Colo. 1990), *aff'd in part, rev'd in part*, 937 F.2d 498 (10th Cir. 1991).

[59] 639 F.2d 754 (Ct. Cl. 1981).

[60] Noyes v. Mantle, 127 U.S. 348, 351 (1888).

[61] S. 433 and H.R. 918, 102d Cong., 1st Sess. (1991). The Rahall Bill was reported by the House Interior and Insular Affairs Comm. on June 24, 1992. H.R. Rep. No. 711, pt. I, 102d Cong., 1st Sess. (1992) [hereinafter Reform Bills].

ent in a location, while more secure vis-a-vis other locators during exploration, are not more secure vis-a-vis the United States. Both bills clearly subordinate the locators' rights to the land managers' authority under titles of the bills that change in major ways the standards under which operations may be approved.[62] The design of the bills makes it clear that exercises of authority to disapprove operations will not be in derogation of the rights of locators of "new" claims under either bill.

### [2] "Conversion" of Existing Claims

Second, both Reform Bills require the "conversion" of existing claims into claims under the new provisions of the bills.[63] This conversion will extinguish those rights inherent in an existing claim but not provided for in "new" claims. The central three rights — right to mine, right to patent, and ownership of the mineral — are all affected by conversion, and each will be examined in turn. Failure to convert an existing claim during the period provided renders the existing claim void, apparently by operation of law, at that moment. While the law abhors a forfeiture, the mining bar knows it does not abhor all forfeitures.

#### [a] The Constitutionality of Forfeiture Provisions

In *Locke v. United States*,[64] the Supreme Court upheld the constitutionality of the "conclusive abandonment" law applicable upon failure to file either initial recordation of a claim or one's annual claim filing under section 314.[65] In upholding section 314, the Supreme Court cited and applied *Texaco, Inc. v. Short*,[66] which itself upheld the Indiana statute escheating severed mineral interests that either were not being exercised or were not re-recorded during a statutory grace period. *Locke* may be heavily relied upon by those seeking to restrict or eliminate rights held by claimants under existing law, because of its language: "This power to qualify existing property rights is particularly broad with respect to the 'character' of the proper-

[62] S. 433, § 102(d); H.R. 918, § 102(b).

[63] S. 433, § 402(b); H.R. 918, § 404(a).

[64] 471 U.S. 84 (1985).

[65] 43 U.S.C. § 1744(c) (1988). The annual filing is either a copy of the locally-recorded affidavit of assessment work or a notice of intention to hold. 43 U.S.C. § 1744(a) (1988); 43 C.F.R. § 3833.2-2 (1991).

[66] 454 U.S. 516 (1982).

ty rights at issue here. . . . Claimants thus must take their mineral interests with the knowledge that the Government retains substantial regulatory power over those interests."[67]

But this language must be read in light of *Texaco*, on which the *Locke* opinion expressly relies. Both opinions depend on the fact that by reasonable exertions the property owner could have *fully* preserved the property; contrary rulings, the Supreme Court said, would "compensate the owner for the consequences of his own neglect."[68] The Reform Bills cannot be defended this way. The existing claimant either loses all rights (i.e., he does not convert) or he loses many critical ones (if he does convert). By no exertions, reasonable or not, can he preserve his existing rights. *Locke* upholds regulation when "an individual's reasonable, investment-backed expectations can continue to be realized as long as he complies with reasonable . . . restrictions."[69] As is developed below, existing expectations are gone when a claim is converted under the proposed legislation.

### [b] Absence of any Savings Clause

Neither of the Reform Bills provides that the conversion obligation is "subject to valid existing rights."[70] Rather there is no intention to preserve existing property rights.[70.1] Both bills expressly impose the conversion obligation on all existing claims irrespective of its effect on existing rights. In this respect they are unlike prior legislation affecting the scope and application of the General Mining Law.[71]

---

[67] Locke v. United States, 471 U.S. 84, 104, 105 (1985), citing *Best*, 371 U.S. at 335, and Cameron v. United States, 252 U.S. 450, 460 (1920).

[68] *Texaco*, 454 U.S. at 530 (quoted in *Locke*, 471 U.S. at 107).

[69] *Locke*, 471 U.S. at 107.

[70] The meaning and use of this term is developed in Ruffatto & Ostby, *supra* note 20, § 11.02.

[70.1] H.R. 918, § 204(d)(3) exempts properties on which "substantial legal and financial commitments" have been made from certain new prohibitions, but the term is defined in § 101(a)(10) to require capital investment in development. It appears to apply only to existing *mines* that must be re-permitted under the bill.

[71] Compare this to the Mineral Leasing Act of 1920, § 37, 30 U.S.C. § 193 (1988); and to FLPMA, § 701(h), 90 Stat. 2786. FLPMA § 701(h) applies to: withdrawals under FLPMA § 204, 43 U.S.C. § 1714 (1988); management actions including regulations implementing FLPMA § 302(b), 43 U.S.C. § 1732(b) (1988), regarding unnecessary and undue degradation; and land use planning actions under FLPMA § 202, 43 U.S.C. § 1712 (1988).

### [3] New Restrictions on the Right to Mine

#### [a] Right to Say No for Land Management Reasons

The key loss under a converted claim is loss of the right to mine. Under the Reform Bills' plan of operations provisions[72] and their land use planning provisions,[73] the land management agencies would be vested with new authority to disapprove a plan of operations for reasons that would not have been the basis for disapproval under current law.

For instance, the holder of a valid claim group, with a delineated ore body, submits a plan of operations prior to enactment of H.R. 918. During the completion of the environmental impact statement on the plan of operation, the new law becomes effective (per its section 403 effective date and issuance of section 403 rules). Section 405(a)'s transition provision makes section 201(g)(1) applicable to the plan at that moment. Under section 201(g)(1)(D), the Forest Service or BLM land manager can "prohibit . . . proposed mineral activities" because the plan of operations will affect, for example, a riparian area, section 204(e)(1)(D), or an area of critical environmental concern (ACEC), section 204(e)(2)(A),[74] neither of which is (or was at the time of delineation of the ore body) withdrawn from the operation of the General Mining Law. The land manager now has authority to prohibit necessary and due degradation (using the BLM current law phrase) or, it is now "feasible" for the land manager to minimize by prohibition the adverse environmental impacts (using the Forest Service current law phrase).[75]

Exercise of this new land management authority to disapprove a plan of operations on claims validated by discovery at the date of enactment of either of these bills generates an in-

---

[72] S. 433, § 104(a) & (c); H.R. 918, §§ 201(b)(1), (g)(3), & 405(b).

[73] S. 433, §§ 104(c), (e), & 202(e); H.R. 918, §§ 201(b), & 204(c)(3).

[74] The ACEC might have been designated to manage a scenic viewshed, or to manage a locally important (but not threatened or endangered) wildlife population.

[75] If the land manager merely conditions (mitigates) the proposed mineral activities, plan approval will be subject not just to procedural (*i.e.*, NEPA) but also to substantive challenge as arbitrary and capricious for failure to prohibit the proposed activities, under § 202(e) of H.R. 918. After all, project opponents will argue, one of the goals in passing the bill was to vest the land manager with the "right to say no" in situations where he or she did not previously have it.

verse condemnation cause of action. Under the first inquiry, the decision will appear to have the purpose of devoting the land to the public use that motivates the rejection, much as preservation of the wetland had a public interest basis in *Florida Rock*. Certainly at the date the statute was passed the mining right was not a nuisance or noxious use of the public land. Under the second inquiry, it will be clear whether one looks at existing or new law that the claimant's rights are solely rights to mine and to use the land for mineral purposes.[76] There is no residual value in the claims if the plan of operations will not be approved. Under the third inquiry, the claimant will have expended however much (possibly millions) it took to identify and delineate the ore body, to acquire the claims and other property rights (non-federal lands, water rights) predicate to submitting the plan of operations, and to engineer and submit the plan itself. The "reason" for rejection of the plan of operations will not have been formally identified until the plan of operations is under review, so there will have been a reasonable investment-backed expectation of development up until the point when either the agency formally identifies the new basis,[77] or the agency record of decision on the plan of operations proposes rejection for this newly asserted reason.

### [b] Applying Whitney and United Nuclear

The claim property will have no residual value if it cannot be mined, as was true under *United Nuclear* and *Whitney Benefits*. The investment-backed expectations will likely be as substantial, and at least as reasonable, as those that supported the taking holding in *United Nuclear* and *Whitney Benefits*. Under the first inquiry, the government cannot characterize as a nuisance or noxious use what was, immediately prior to the introduction of the new ground for rejection, a lawful and proper use of the public domain that would have been approved under the general mining laws and the land manage-

[76] *E.g.*, United States v. Rizzinelli, 182 F. 675 (D. Idaho 1910); Surface Resources Act of 1955, 30 U.S.C. §§ 611-615 (1988).

[77] For any other purpose (except the purpose of regulating hardrock mining under either of the Reform Bills), any land use planning decision to protect another resource value would be made "subject to valid existing rights" under § 701(h) of FLPMA. Under §§ 201(g)(1) & 204(c)(3) of H.R. 918, however, one hypothesizes a situation where the relevant BLM or Forest Service land use plan has not even been amended yet.

ment standard (BLM or Forest Service) applicable to that mining. This inquiry is closely analogous to the *Florida Rock* facts that the Claims Court found supported inverse condemnation. This conclusion is underscored by the fact that the authority to disapprove a plan of operations (prohibit mineral activities) may or may not be exercised in a given situation, depending on the land manager's findings.

Using the precedent of *United Nuclear*, *Whitney Benefits*, and *Florida Rock*, any claimant with a right to mine at the date of enactment of one of the Reform Bills, or even after enactment but prior to claim conversion,[78] has a viable inverse condemnation claim if the plan of operations for that claim group is to be rejected for a reason newly minted under the new authority to say no. Each such prospective mine, of course, is a fact situation with great potential fair market value — the measure of liability. Claims with delineated ore bodies that are undergoing mine design, or initial submission of the plan of operations, are valid claims in effect as the mining law changes. And the greater the land managers' exercise of the new authority to establish grounds for disapproval (i.e.,developing the resource conflicts with newly "unacceptable" impacts that were formerly necessary and due degradation on land open to the mining law), the more situations will present inverse condemnation claims.

### [4] Loss of the Right to Patent

The second major cutoff of an existing right in the Reform Bills is the absence of patenting provisions for new and converted claims, and the termination (upon enactment) of the right to apply for patent to an existing claim. The inverse condemnation claim here essentially requires the relitigation of *Freese* in the Claims Court. Although the "old" Court of Claims was transformed into the Claims Court (trial level) and part of the jurisdiction of the new Federal Circuit (appellate level) in 1982,[79] Court of Claims precedent is followed not only by the

[78] The suit may survive conversion on the theory that the statute compels involuntary conversion and it is in the conversion (taken together with subsequent plan of operations disapproval) that the taking occurred.

[79] Title I of the Federal Courts Improvement Act of 1982, Pub. L. No. 97-164, 96 Stat. 25, 37-41 (codified in scattered titles of U.S.C.).

Claims Court but also by the Federal Circuit. Thus petitioners in the Claims Court must be prepared to take the case to the level of petitioning for a writ of certiorari, unless they can persuade these courts to re-examine this precedent either in light of new takings law, or in light of different arguments under the General Mining Law than those rejected in *Freese*, or both.

On the merits, the two chief holdings of *Freese* must be challenged. First, the case characterizes the patent right as a peripheral or ancillary right of the holder of a valid unpatented claim, reaching the conclusion that the fundamental rights of a claimant were preserved by the Sawtooth National Recreation Area Act.[80] The Court of Claims treated this entirely in the context of defining the rights at issue in the case, but in light of more recent cases the focus might become a governmental "mere diminution in value" defense.

Second, the Court of Claims relied on public land case law saying that the right to a public land patent vests only on payment of the purchase price. The key mining case cited in *Freese* determined that, *after application for patent*, a claim was not subject to adverse relocation for failure to do assessment work.[81] This is correct but not the situation at hand. The challenge must rely on cases like *Noyes v. Mantle*,[82] in which the Supreme Court used the previously quoted trust language even though no patent had been sought for the claim protected by the opinion.

## § 7.05 Issues in Litigating an Inverse Condemnation Claim

There are four specific aspects of litigating an inverse condemnation case in the Claims Court that require description before one can fully appreciate the "trap for the wary"[83] that is

---

[80] 16 U.S.C. §§ 460aa to 460aa-14 (1988). *See Freese*, 639 F.2d at 758 ("[Plaintiff's] rights of use, enjoyment and disposition in his unpatented mining claims remain undiminished").

[81] *E.g.*, Benson Mining & Smelting Co. v. Alta Mining & Smelting Co., 145 U.S. 428, 430-31 (1892).

[82] 127 U.S. 348, 351 (1888), quoted *supra* § 7.03[2][c] (lode claim protected from subsequent placer location).

[83] Section 314 of FLPMA, 43 U.S.C. § 1744 (1988), was described by Justice Stevens in his dissent in *Locke* as a "trap for the unwary." 471 U.S. 84, 123 (1985).

created by the conversion systems of the Reform Bills when they are laid upon the jurisprudence of the Claims Court.

### [1] A Legislative or an Executive Taking Action?

First, one must try to determine whether the taking one asserts was a legislative taking or a regulatory taking. Did the enactment of the law take the property, or did the taking occur only upon the implementation of the law through some later permitting action of the agency? The Supreme Court has held that the steep slope and similar mining prohibitions in SMCRA were not legislative takings, and that a facial attack on the statute would not lie.[84] Yet in *Whitney Benefits* the Claims Court and Federal Circuit both found that the taking caused by the alluvial valley floor mining prohibition of SMCRA[85] occurred at the date of enactment, not at the later date(s) when the regulatory authority disapproved a mining permit application for some of the coal.[86]

### [2] Ripeness and Premature Suit versus Statute of Limitations

The difficulty discussed above is closely related to the next aspect of litigating an inverse condemnation suit — the question of ripeness and the risk of premature suit. An inverse condemnation action in the Claims Court is subject to a six-year statute of limitations.[87] If one waits until the agency rejects a plan of operations, and that does not occur until six and a half years after the legislation is enacted or after claim conversion, one risks being dismissed under the statute of limitations if the taking is later found to have occurred at the earlier date(s).[88] The Federal Circuit had the same initial problem with the Whitney Benefits action. The plaintiffs filed suit within six years of the passage of SMCRA, but the government persuaded the Claims Court to dismiss the action be-

[84] Virginia Surface Mining & Reclamation Ass'n v. Hodel, 452 U.S. 264 (1981).

[85] Sec. 510(b)(5) of SMCRA, 30 U.S.C. § 1260(b)(5) (1988).

[86] 926 F.2d at 1172-74.

[87] 28 U.S.C. § 2501 (1988).

[88] *See* Shiny Rock Mining Corp. v. Hodel, 906 F.2d 1362, 1364-65 (9th Cir. 1990) (case dismissed under parallel statute of limitations, 28 U.S.C. § 2401(a) (1988), over plaintiff's objection that it was not adversely affected by the agency action until more than six years after the action occurred).

cause the plaintiffs had not yet been denied the right to mine administratively, and any taking could not be legislative. The court of appeals reinstated the suit, leaving open whether any taking would be found to be legislative or administrative.[89]

### [3] Claims Court or District Court?

The third aspect to be considered when litigating inverse condemnation actions is that case law has clarified the relative jurisdiction of the Claims Court and the district courts. The old practice of suing in district court for declaratory (and permanent injunctive) relief that the statute is unconstitutional (and unenforceable) has given way. Instead one is now litigating legislative construction to determine whether Congress intended to take or not, or authorized the agency to take or not. As the Supreme Court reiterated in the so-called "Rails to Trails" case, *Preseault v. ICC*,[90] Congress rarely if ever acts "unconstitutionally" in the inverse condemnation context. The Tucker Act is always there as the constitutional backstop, providing compensation if the intended congressional action inversely condemns property. The first question is whether Congress has *withdrawn* Tucker Act jurisdiction. If it has not, then a district court "takings" action is premature until after the Tucker Act remedy of compensation is employed.[91] The parties must choose courts and elect remedies. They will have to litigate twice if the attempt to invalidate the regulatory action, that is, attacking disapproval of the plan of operations (as arbitrary and capricious or inconsistent with statutory authority) in district court fails (as occurred in *Rybachek* and *Florida Rock*). The second suit, after resolution of the first,[92] will be brought in the Claims Court.

---

[89] Whitney Benefits, Inc. v. United States, 752 F.2d 1554 (Fed. Cir. 1985).

[90] 494 U.S. 1 (1990).

[91] *Id.* at 12, 14.

[92] 28 U.S.C. § 1500 (1988) renders the Claims Court case subject to dismissal if there is district court litigation of the "claim" pending at the same time. UNR Ind., Inc. v. United States, 962 F.2d 1013 (Fed. Cir. 1992). The Federal Circuit concluded as well that a declaratory judgement action in district court and a monetary damages case in the Claims Court are the same "claim" for 28 U.S.C. § 1500 purposes. This construction of the word "claim," which seems both needless and dysfunctional when applied to this problem, is found in the Federal Circuit's reversal of Casman v. United States, 135 Ct. Cl. 647 (1956) and Boston Five Cents Savings Bank v. United States,

### [4] Assignment of Claims Prohibition

The fourth aspect to consider is that the Claims Court carries with it the prohibition on the assignment of claims against the United States.[93] Once the taking occurs, the property "belongs" to the United States, and the claim for financial compensation cannot be assigned. Given the uncertainties about whether a statutory restriction causes a taking upon enactment or only later upon its application to the specific mining claims, this prohibition, which the United States may assert as a bar to compensation to anyone but the owner at the time of taking,[94] must be observed.

### [5] Traps for the Wary

The overlay of either of these bills on this jurisprudence creates a legal obstacle course of remarkable complexity. This is apparent if one examines what happens when the hypothetical plan of operation meets section 201(g)(1) of H.R. 918 (as discussed in § 7.04[3][a], *supra*).

Prior to enactment of H.R. 918, the mining company has a discovery on an unpatented claim block. The bill is enacted while the mining company develops a plan of operations under the current BLM rules.[95] Upon enactment the mining company has lost the right to patent, and the six-year statute of limitations begins to run on the "Son of *Freese*" claim.[96] The plan of operations is submitted after enactment but prior to the bill's effective date. The BLM undertakes to comply with NEPA and otherwise processes the plan of operations. One hundred and eighty days after enactment, BLM rules under section 403 are issued, and per section 101(a)(4) the bill is now effective. If the plan of operations did not already satisfy the

---

864 F.2d 137 (Fed. Cir. 1988) (*see UNR*, 962 F.2d at 1022 n.3). *UNR* is the basis for federal motions for dismissal or for relief from judgement, respectively, in *Loveladies Harbor*, 21 Cl. Ct. 153 (1990) and *Whitney Benefits*, 926 F.2d 1169 (Fed. Cir. 1991) (*see* discussion at *supra* § 7.02[7][b]).

[93] 31 U.S.C. § 3727 (1988) (formerly 31 U.S.C. § 203); Cooper v. United States, 8 Cl. Ct. 253 (1985).

[94] *Cooper*, 8 Cl. Ct. at 254, citing United States v. Dow, 357 U.S. 17 (1958).

[95] 43 C.F.R. § 3809.1-5 (1991).

[96] This claim appears ripe upon enactment, as there is no administrative remedy or disapproval to be sought. This would be a "legislative taking" claim.

requirements of BLM rules implementing section 201(c) (reclamation), it must be revised and reprocessed.

Assume processing of the plan of operations is completed about a year after the section 403 rules are issued, so the conversion period under section 404 is already a year open. The BLM disapproves the plan of operations ("prohibits the proposed mineral activities") under section 201(b)(5) of H.R. 918. The grounds for disapproval, protection of a riparian area and an ACEC under sections 201(b)(5)(A) and (C), were not bases on which the plan of operations could have been disapproved prior to enactment of H.R. 918.

The mining company may challenge disapproval in the district court, seeking a reversal that would allow mining.[97] While the case proceeds, however, it may be an exclusive remedy that forecloses Claims Court relief.[98] While the challenge to disapproval of the plan of operations is wending its way through the district court to the court of appeals, the three-year conversion period under section 404(b)(2) is drawing to a close. If one simply fails to convert, the government will defend against any action on the basis that the claims are void, and under *Locke* constitutionally so. On the other hand, if the disapproval of the plan of operations inversely condemned the right to mine that exists under current law, the taking has already occurred and there is nothing to convert.

Assume the mining company sticks with its desire to mine and with its district court action to reverse the rejection. It must then convert its claims under section 404(b)(2) before the three years expire. Under H.R. 918 a converted claim is equivalent in "rights" to a new claim, i.e., it is fully subject to the land manager's rights to say no to mining under Title II. By converting, does a claimant voluntarily waive the right to mine inherent in the pre-conversion claims? Conversion is not

---

[97] Query: must one pursue this judicial remedy to have a ripe inverse condemnation action in the Claims Court? *Florida Rock*, 21 Cl. Ct. at 164, suggests not.

[98] 28 U.S.C. § 1500 (1988). *See supra* note 92 and accompanying text. Further, the district court action cannot viably attack the land manager's constitutional *authority* to disapprove the plan. Under *Preseault* analysis (see *supra* § 7.05[3]), H.R. 918 clearly does not *withdraw* the Tucker Act remedy, and any disapproval of operations that would constitute inverse condemnation is compensable in the Claims Court.

voluntary, and by its statutory terms rights inherent in current-law claims are shorn away when it happens.

When, then, did inverse condemnation occur: upon passage of the bill (or the "effective date" when section 404(b)(1) became applicable to existing claims); upon agency disapproval of the plan of operations; upon district court affirmance of that rejection; or upon conversion of the claims subject to the plan of operations?

## § 7.06 Conclusion

This maze would be created by bills that are supposed to promote mineral exploration and development. Title II of the bills promises a transition alive with the possibility of inverse condemnation claims arising out of every attempt to develop claims valid at the time of enactment. It also promises a transition alive with sorting out the procedural morass just described in brief, and alive with all kinds of activity other than secure investment in mine exploration and development. To the extent the new "right to say no" is exercised against developing claims valid when new legislation is enacted — for new "resource-conflict" reasons at the discretion of the land manager — the United States is, under the developing case law, at substantial risk of paying those claimowners the fair market value of the claims that cannot be developed. And even if the new "right to say no" may not be exercised in a given case, its open-ended existence in the law — without protection of "valid existing rights" and without clear, prospective indication where and under what circumstances it would be exercised in advance of exploration and mine design expenditures — will chill if not kill the risk-taking that is the basis of the hardrock minerals industry on public lands.