# EXHIBIT 2

**In The Matter Of:**

*Alfred Aloisi, et al. v.*
*The United States*

---

*Thomas Paul Ferrero*
*Vol. 1, January 13, 1998*

---

*Bean & Associates, Inc.*
*Professional Court Reporting Service*
*500 Marquette, N.W., Suite 280, Albuquerque, NM 87102*
*119 East Marcy, Suite 110, Santa Fe, New Mexico 87501*

*(800) 669-9492 or (505) 843-9494*

*Original File fe011398.v1, 71 Pages*
*Min-U-Script® File ID: 2141535658*

**Word Index included with this Min-U-Script®**

IN THE UNITED STATES
COURT OF FEDERAL CLAIMS

ALFRED ALOISI, CANDIS ALOISI,
DONALD W. GOODMAN, ENERGEL, INC.,
DYNATECH CORPORATION,
JAMES KENDLE, and
LIBERTY MINING, INC.,
Plaintiffs,
vs. No. 95-650L
THE UNITED STATES,
Defendant.

DEPOSITION OF THOMAS PAUL FERRERO
January 13, 1998
8:30 a.m.
625 Silver Avenue, Southwest
Albuquerque, New Mexico 87102

PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE, this deposition was:

TAKEN BY: MS. SUSAN V. COOK
ATTORNEY FOR THE DEFENDANT

REPORTED BY: Melissa Correa, RPR, NM CCR #279
Bean & Associates, Inc.
Professional Court Reporting Service
500 Marquette, Northwest, Suite 280
Albuquerque, New Mexico 87102

5414-9 MEL



APPEARANCES

For the Plaintiffs:
FREEDMAN, LEVY, KROLL & SIMONDS
Attorneys at Law
1050 Connecticut Avenue, Northwest, Suite 825
Washington, D.C. 20036
BY: MR. LAWRENCE G. MCBRIDE

For the Defendant:
MS. SUSAN V. COOK
Attorney at Law
United States Department of Justice
Environment & Natural Resources Division
601 Pennsylvania Avenue, Northwest, Room 837
Washington, D.C. 20004

Also Present: Mr. Alfred Louis Aloisi

INDEX PAGE

THOMAS PAUL FERRERO
Examination by Ms. Cook 3
Examination by Mr. McBride 61
REPORTER'S CERTIFICATE 67
WITNESS SIGNATURE/CORRECTION PAGE 69



**THOMAS PAUL FERRERO,**
after having been first duly sworn under oath, was questioned and testified as follows:

**EXAMINATION**
**BY MS. COOK:**

**Q:** Can you give us your full name for the record, please?
**A:** Thomas Paul Ferrero.
**Q:** How are you employed?
**A:** I'm a consulting geologist, self-employed.
**Q:** How long have you been doing that?
**A:** Since 1983.
**Q:** What did you do before that?
**A:** I was a geologist working for mining companies and engineering companies.
**Q:** I believe we have a copy of your resume, A-41. Have you looked at this resume recently, or would you like to take a look at it?
**A:** I might as well look at it. It changes every once in a while.
**MS. COOK:** Are you pulling him a copy?
**MR. MCBRIDE:** Yes, I am.
**Q:** What I'd like you to do is take a look at it and make sure all the information is still current.
**A:** This is an old one. I'm certified as an engineering

Page 40

Q: Why would you use a grid as opposed to just picking up –

A: One of the reasons you use a grid is because you don't know which way the veins are going. You don't know how the values are distributed, so you lay out a grid and it gives you survey control, and that gives you – the idea is to make the grid tight enough that if there's something in there – space in close enough. If there's something in there, you're going to pick it up. But generally, grid sampling on a two-dimensional grid because you're not seeing very much and you try to find it.

The other thing, you do a series of channels on set spacing, like underground. You know you have a vein along a tunnel and you'll cut a sample every 5 feet and you'll take the average of those samples in order to get an average grade for that particular section.

Q: Now, this .08 that we were speaking about a moment ago was estimated, then, looking at both New Cinch and your own results?

A: Yes.

Q: But it's not a mathematical calculation?

A: No. It's an estimate. I mean, an estimate is also a mathematical calculation, but it's not a calculation that was based on weighted average of a set grid sampling program, if that's what you're getting at.

Page 41

Q: I understand.

A: One thing about geology – and it applies to mining geology as well as any other geology – it's an interpretive science. There's a lot of interpretation of data.

Q: Now, you also mention later on, "a substantial" – near the bottom of the page – "A substantial portion of the $32 per ton of ore would go to exploration, feasibility analysis, stripping, mining, hauling, milling, and other operational costs." What did you mean by substantial?

A: I said substantial because I knew that it would be a fair portion, but I didn't know what it was because I hadn't – I'm not a mining engineer. I don't have the costs of all of those items at my fingertips. I can make a rough estimate – you know, in the industry, you can make a rough estimate. You can say, well, it costs about 250 bucks a foot to drive a tunnel. That's one of the things that was kind of an industry standard in those days.

But those things really don't mean anything because those costs vary greatly upon whether you're on hard ground or dicey ground or easy ground, whatever, who's doing the work, whether you're going to go diesel or track. There's all these different factors. So when you do a real cost analysis, you go through and you itemize and you know all the blue book prices for things. I'm trying to make a rough estimate, but I don't want to overestimate my case. I don't want to say that I know

Page 42

what all those costs are. I have to point out that they have to consider the fact that they're not going to get all that money. It's going to cost them to get it, and that that's part of the determination.

Q: Now, I noticed you used $400 per ounce for the price of gold. Was that selected to represent the spot price at that particular point in time, or what?

A: If I used it, then that's what it would be. That's the way I normally – I will present either the spot price at the time, or I will reduce it.

Q: Why would you reduce it?

A: You know, it's like a fudge factor. It's contingency. If the gold price drops a little bit, it just gives you some room for error. If I said $400, I would guess – I don't know this for a fact, but knowing my habits, I would guess it was around $420 back then, but I don't know that for a fact. It may have been right at $400. I don't know.

Q: Does the miner necessarily get 100 percent of the current spot price when he sells the gold?

A: I don't believe so, but I don't know that part of the game. I don't sell gold. I think it depends upon the fineness of the gold and what it's going to take for the buyer to extract – you know, separate out the silver and the copper and whatever else you have in the gold.

I worked at a gold mine in the Mojave Desert, and we

Page 43

transported our finished product, our gold, to a refiner. You asked me about that term. That was the refiner, and the light goes on. And they paid based on how difficult it was, what it was going to cost them to turn it into gold, pure gold, or as close as they could get it. So I'm sure there's a reduction there, depending upon our product.

Q: Do you recall what the percentage was that they paid you?

A: No. I wasn't involved in that. I just went along and delivered it.

Q: Okay. Could we look at A-17, which is the Preliminary Feasibility Study by Watts, Griffiths & McQuat?

A: Got it.

Q: Do you know anything about how this report happened to be written?

A: I know some of it. The geologist was Hugh Clayton, if I'm not mistaken. Let me make sure I have the right guy here. Did he have a certificate page in here? Yeah. Hugh Clayton.

MR. MCBRIDE: Page 26?

THE WITNESS: Yeah.

A: And the geologist Hugh Clayton came out representing Watts, Griffith & McQuat. They had an arrangement with Mr. Aloisi. I assume it was a lease. And he was there in the same way that I would go out for other people to assess the

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ALFRED ALOISI, et al., )
)
Plaintiffs, )
)
vs. ) No. 95-650L
)
UNITED STATES OF AMERICA, )
)
Defendants. )
)

DEPOSITION OF THOMAS FERRERO

Thursday, November 1, 2007
9:18 a.m.

Reported By: CRAIG W. WOOD, RPR, CSR No. 9789

APPEARANCES

For the Plaintiffs:
FOLEY & LARDNER
Washington Harbour
3000 K Street, N.W., Suite 500
Washington, DC 20007-5101
(202) 295-4017
BY: LAWRENCE G. McBRIDE

For the Defendant:
DEPARTMENT OF JUSTICE
Environmental & Natural Resources Division
601 D Street, N.W.
Washington, DC 20004
(202) 305-0238
BY: BRUCE K. TRAUBEN

Also Present:

Fred Aloisi

---oOo---



INDEX


| EXAMINATION BY: | Page |
|---|---|
| Mr. Trauben | 4 |


EXHIBITS

NO DOCUMENTS WERE MARKED AS EXHIBITS

---oOo---



BE IT REMEMBERED that on Thursday, November 1, 2007, commencing at the hour of 9:18 a.m., of said day, at the offices of Klamath National Forest, 1312 Fairlane Road, Yreka, California, before me, Craig W. Wood, a Certified Shorthand Reporter in and for the State of California, there personally appeared

THOMAS FERRERO,

who, being first duly sworn by me to tell the truth, was examined and testified as follows:

---oOo---

EXAMINATION

BY MR. TRAUBEN:

Q. Please state your full name for the record.
A. Thomas Paul Ferrero.
Q. Mr. Ferrero, my name is Bruce Trauben, I represent the United States, the defendant in this action of Aloisi, et al, versus the United States.
And I understand you've been deposed in this action previously?
A. Yes.
Q. So I'm going to forego the normal preliminaries of explaining the rules of a deposition. I will remind you, though, that if you need to take a break for any reason, just say so and we'll take a break.



A. Okay.
Q. Can we start off by having you take a look at Plaintiff's Exhibit A-171.
A. (Reviewing document.) Okay.
Q. What is Exhibit A-171?
A. It's the cert field notes of a survey of the Klamath Blacksmith Tunnel by H. Behrens, done in 1936.
Q. And what is this -- what do these notes show?
A. They show the bearings and distances from point to point, mapping the course of the Blacksmith Tunnel and some of the side workings off of it.
Q. And based on these notes, is it possible to locate the tunnel in the field? On the ground?
A. Based on these notes?
Q. Yes.
A. No.
Q. And the last page, is that a summary of the notes that you created?
A. This is my plotting of the data in the notes.
Q. And the different -- I'll describe it for the record, there appear to be five depictions surrounding a line that was like three parallel lines which are running northeast to southwest.
A. Uh-huh.
Q. Does this -- your graphical representation show

Page 30

A. Boy, at that time I believe they were down in the ET, but I'm not 100 percent sure at this point.
Q. Do you know whose centrifuges they were?
A. Liberty's.
Q. Liberty was leasing them. Do you know?
A. I think Liberty bought them. But I really don't know for sure. They were originally part of the ET Placer operation.
Q. What's the capacity of the centrifuge?
A. I think they're 1,000 tons a day, but I don't really recall for sure at this point. It depends upon -- the capacity of the system depends upon the type of material you're running and how close of a cut you're trying to make out the product end.
Q. Do you know whether the centrifuges that were being tested proved to be adequate?
A. Yes.
Q. And when was that shown?
A. The exact date, I don't recall.
Q. Was it in 1989?
A. I believe it was in 1989, but I'm not even sure of that.
Q. What factor makes them adequate? How is it that some centrifuges may be inadequate versus an adequate centrifuge?

Page 31

A. If you get gold out of the bottom end, then it's adequate, basically.
Q. Is it based on the percentage of the recovery?
A. If the -- if the test is done that way, if you weigh it going in and weigh your midlings and you weigh your tails, if you do it in that kind of detail, then you can generate those kind of numbers.
Q. Was that done in this case?
A. I don't think so. The question of adequacy in this case was would the centrifuges catch the coarse gold that was in the low grade deposits, which it did do.
Q. Not the fine gold?
A. Not the fine gold.
Q. Between the fine gold and the coarse gold, was the greater percentage of the gold in fines?
MR. McBRIDE: This is in the area we're -- we're presumably getting into opinion. But that's quite all right and he'll proceed as it's this kind of deposition.
THE WITNESS: The answer to that is it varies because the higher the grade of the material, the higher the percentage of coarse gold. So if you're running material that's going 800ths of an ounce, there's a little bit of coarse, but not very much.

Page 32

A smaller percentage if you're running material that's going 1200ths or 1300ths of an ounce, you'll have a higher percentage of coarse gold.
Q. Is the material being tested in 1989 in these centrifuges from dumps or from apex?
A. I don't recall now. I think it was both, but I don't know for sure.
Q. Do you recall the results of tests done on dump material with respect to whether the dump material, for example, from the Klamath dump, whether that had a majority of the gold in fines rather than coarse gold? Do you understand my question?
A. No.
Q. Okay. Was the Klamath dump material tested for percentage gold?
A. Yeah. Numerous times by many different people.
Q. And was the gold at the Klamath dump considered to be coarse or fine?
A. It was a mixture. What I determined from the many samples that had been done by others and also by us was that there was generally a background fine gold of somewhere around 8 to 900ths. It varies, but that's kind of an average. And most of the gold that was -- the gold that was between that grade and higher, like if you had a 1200ths, you'd have about 400ths that would be

Page 33

coarse gold as a rule of thumb. That's what the data suggested. And is carried through every test we've ever made.
Q. Just for the record, so it's clear because we're not identifying any unit, it's my understanding that the units are ounces per ton. Is that correct?
A. Yes.
Q. Sometimes abbreviated OPT?
A. Yes.
Q. So the centrifuges that were being tested in 1989 were not intended to recover fine gold?
A. No, they were not. There's a -- you know, sort of a definition question in terms of what you call fine and what you call coarse. Coarse -- the fine gold that I'm talking about that we weren't trying to get was very, very fine gold.
Those centrifuges can catch some fairly fine materials. But we're talking about microscopic gold we weren't trying to get, which is in the background I was talking about.
Q. Can you take a look at page 4 in A-22. There's a note in the middle of the page. Is that your handwriting towards the bottom?
A. Yes.
Q. It says, "called MG." Is "MG" Mark Gavard?

Page 66

Q. Or at any point?
A. No.
Q. So, to your knowledge, then, did you discuss with Mr. Lee and Mr. Buchter the potential use of the cyanide leaching operation in the Eddy Gulch mines?
A. I must have. It's listed here in my list of topics.
Q. Was this -- to your knowledge, is this the first time use of cyanide came up in discussions regarding --
A. No. I think it was in plans that led up to this, in the plans of operations.
Q. To use cyanide?
A. Yes.
Q. In what?
A. I'd have to dig. You want me to look?
Q. Well, actually, let's take a look.
A. I have them all in sequence right here.
Q. Yeah. Give me just one second.
A. We may not have included it in the plans. I know we were working on the testing for it long before that. Let me look.
Q. Let's go back a couple months in time and look at Plaintiff's A-144.
MR. McBRIDE: Show marked as the same as Forest

Page 67

Service 76. But, yes, he has it now.
BY MR. TRAUBEN: Okay. Thank you.
Q. Is document A-144 a memorandum that you wrote to the Forest Service dated March 11th, 1991?
A. Yes.
Q. And that's your signature on the second page?
A. Yes.
Q. And this was -- this memo that you sent to the Forest Service was just a couple months before the meeting in May '91, obviously?
A. Yes.
Q. Okay. Can you take a look at the second page, item ten.
A. Yes.
Q. Number ten. It says there in parentheses "no cyanide"?
A. Correct.
Q. Were you informing the Forest Service that there were no plans to use cyanide in Liberty Mines' operations at that point?
A. At that time.
Q. And between March '91 and May '91, was there a decision made at some time during that period to use cyanide in the Liberty Mine operations?
A. No. This was something that I did on my own to

Page 68

show the possibilities of where it might go. We hadn't decided at that point exactly what we were going -- whether we were going to include a cyanide circuit.
We had been advised that it was going to be difficult to get a cyanide circuit. But I also knew from my own experience that I had worked at operating cyanide mines and that it certainly wasn't impossible. But I was sort of waiting for the process that was going on within the company to fall out.
Each time we made these plans, they were basically yearly intervals because we were on this one year renewal process. And they vary. Sometimes we think we're going to use cyanide, sometimes we don't. But that was because we were in the process of testing the efficiency of it and weighing the regulatory problems.
Q. Okay. Just so everybody is clear on the record and everything, the cyanide circuit that you're referring to is not the heap leach method?
A. Absolutely not. No.
Q. Okay.
A. No. It's a carbon and pulp vat leach, which takes place in a big tank and you build big concrete containments that hold more material than the tank holds. So even if the tank dissolves or it all empties

Page 69

out, it's all contained. And the tailings are washed and the cyanide is recirculated into the system. So it's a closed system.
Q. A closed system.
And a heap leach system is an open system where cyanide solution is leached through a pile of ore to extract gold out in the environment?
A. Well, a properly designed heap leach system is also a closed system. They haven't all worked that way.
But because the piles are set on a liner, a heavy liner, and the pregnant solution, which is the cyanide solution, after it circulates through the pile and collects under the pile and then is transported to the pipes at the low end, it never makes contact with the actual earth, it's separated by a liner. The problems that have occurred in some heap leach operations is where the liners have failed. Generally.
Q. So some containment systems that you -- I think you said, the system that you were contemplating, that would have required some containment system?
A. Absolutely.
Q. Had there been engineering designs for a containment system?
A. We never got to that point.
Q. Take a look at the next page. Looks like the

Page 122

of --
A. That's a sum. That's the weighted average of all of those different numbers above it for the east dumps, Klamath Dumps East.
Q. So the "KD-All," the "94" in bold would be the sum of KDE-All and then the -- then what?
A. Yankee Dump, YD US, KD West Liberty 07 and Yankee Dump -- well, Yankee Dump plus KDW are those two. So what the KD-All is a sum of KDE-All and YD plus KDW.
Q. I'm still --
A. Got that?
Q. No.
A. Getting late.
Q. So now on the "0.096" in the bold, is that the average of all the unweighted -- all the samples?
A. No. It's a weighted average of all the samples. Whether I used them or not. This is just -- this just about grade of everything.
Q. I'm not -- I'm not sure how you got to the 0.096. Is that from dividing 9.005 at the bottom of the SA x opt, dividing that by 94?
A. Yes.
Q. And that yields 0.096?
A. I guess. That's what it looks like.
Q. That's how you got there?

Page 123

A. (Nods head up and down.) It's a spreadsheet program and it depends upon how far you carry out the decimals as to what number you end up with.
Q. Well, isn't there -- I'm confused now. The -- let's see, the 9.005, that would be the sum of the 7.631 and the 1.374. Is that correct?
A. Yes.
Q. Okay. So you don't add the entire column to get to the nine, you're just adding from the KDE-All and the YD and KDW?
A. Right.
Q. Okay. You see the source of confusion? Because normally when you see -- I'm not arguing or anything like that, but I'll just explain to you so you understand as we're going forward, that I would have assumed that you would have summed the entire column to get to the bottom of nine. And that's not what you're doing.
A. No. I'm doing little subtotals as I work my way down. And it's -- the bottom number is the sum of the subtotals.
But I didn't do something like make them italic or bold to show that they were sub titles. And so therein lies the confusion.
Q. Thank you.

Page 124

A. I'll remember that next time.
Q. Okay. So, now, let's see what's going on with the Klamath Apex. What numbers then were totaled to get to the KA-All full W-US 04(05) at the bottom line?
A. That's minus, KA-All full -- full width. That's what that means.
That means only the samples that were cut the full width of the vein. There were a number of samples through the years cut by all the different people. I don't know if you noticed when we were talking about Giles and Halbe, in my letter I talk about how he cut a narrow swath parallel to the vein so it wasn't representative of the full width of the vein. That's an example of one that I didn't include in my calculations because it didn't relate, it wasn't representative.
And so -- right. The All full Width (average 20.5 feet), that number.
Q. Yes.
A. That includes the government samples that were -- the government splits, the assays of the government splits from our samples in 2004. That's what that number includes.
The number below it, which is a number I'm using, I eliminated those government splits.
Q. And why did you do that?

Page 125

A. Well, it's described in great detail in the --
Q. Narrative.
A. -- narrative. But basically the results were so anomalously low compared to every other sample that was taken from that area, that I didn't believe them. There was something wrong with the process.
And there's an explanation of why that's a valid assumption having to do with, you know, anomalous samples in the narrative. But basically the bottom line is when you have a series of assays along an apex or from dumps -- from a series of dumps or whatever, it's normal to have ups and downs in the grades. Partly because that's the nature of the deposit and partly because the luck of the draw and where you pick your samples and all that sort of thing.
But when you have a whole block of samples that run high numbers and then another set of analyses of the same samples and they're all dead, that is beyond the bounds of credibility. There's something wrong with the process that created those low assays. Because you can -- you can miss the gold, but you can't put it in during the assay.
Q. How do you know that there's a problem with the low assay and not a problem with the high assay?
A. I just explained that.

Q. Well, no, I -- let's say that a sample was taken, a split is taken by the government, they sample the sample. That's what a split is essentially. And then Liberty Mining processes the remainder of the sample. Liberty Mining's results come out higher consistently than the governments. The government's come out consistently lower.
So how do you know that the government samples are anomalous compared to Liberty Mining's results? Could it not be that Liberty Mining's results are anomalous?
A. In a vacuum you might be able to say that, but statistically it doesn't work because of the basic fact that you can't -- unless you're salting your samples, you can't add gold to the sample, but you can miss gold easily. Especially in refractory ore. And that's the background that adds to this.
The other part is, once again, if it was just individual samples, I wouldn't make that assumption. It's when it's a whole group of samples all strung together that it's suspicious.
But, also, we go to great pains to instruct our assayers on the proper technique for handling this type of material because it's critical because it's refractory ore. It has high carbonaceous content and it



has arsenopyrite, both of which can mess with the chemical balance of an assay.
So -- and we were told that -- in response to one of our questions, that the Forest Service let the assay lab make those determinations. That they were given no instructions. So as a geologist who interprets things and makes a call, I felt that those assays were far too anomalous and there was way too many reasons that I just described to believe them. I thought they were not believable.
Q. When that happens, when you get disparity like that in -- from splits of a sample, wouldn't another reasonable solution be to disregard all the sampling that -- where those splits were so divergent?
A. Not for me because I trust our samples.
I mean, I'm making my call. I mean, if you have a different -- you know, as -- you know, there's a give and take now in this. If you have a different view and can make a different argument, that's fine.
But I honestly wanted this thing to be an interpretive document, as well as a data driven document. I did make interpretations, and I threw away a lot of good assays of ours, too, that would have really jacked up our numbers, but they weren't the full width of the vein or whatever it was. And I only used



what I believed.
And the only thing that I knew was going to be debated was going to be that decision. Because I just threw out that group of those samples by the government. But they just were -- they were incredible to me. They just didn't make any sense.
Q. Let me ask -- hold on a second.
A. And part of this exercise in terms of doing assays and doing metallurgical work, when you're doing this process outside of a contest like this, when you're doing it in industry, your calculations at the end of the process aren't an average of your hits and misses. You're developing a methodology for assaying and extracting the gold. Especially in something like this.
Assays aren't always the problem, but in this case they are. So when you get to the point where you have a process of evaluating the material and milling the material in a certain way, it's the end of that process, it's the results you're getting from that that is the bottom line number that you apply. You don't say, "Oh, well for three years we did this kind of metallurgical test and this kind and this kind and then we ended up with this one. And this worked really well." You're not going to average in the failures. That's not representative of what you're going to be



doing. You're going to be doing the best possible application. And so that's the applicable number.
But even with that, my economic calculations include all of these steps along the way because I'm trying to get as many numbers as possible. So I have a built-in very conservative factor. It's just those samples, they were so gross -- I mean, they were 0 where we had really good numbers all the way across that ridge. It just didn't make any sense.
Q. Now, before you disregarded certain data, like that situation, did you initially include the data in your calculations, see the result and then go back and look what data then could be discarded? Do you understand my question?
A. No. I mean -- well, you can see here, I have a grade calculation that includes those samples. Right here. It's all full width average 20.5 feet. That includes the government samples. It's only the bold entry below where I've eliminated the government samples.
So I've included both calculations in here, but when I applied it to the economic calculations, I used the bold one without the government samples.
Q. And you made that decision before running the economic calculations or did you run the economic