# EXHIBIT 4

UNITED STATES COURT OF FEDERAL CLAIMS

ALFRED ALOISI, et al.,
Plaintiffs,
vs. NO. 95-650L
THE UNITED STATES,
Defendant.
/

DEPOSITION OF
MARC ROSS WILLIAMS

FRIDAY, OCTOBER 11, 1996

Computer-Aided Transcription

Reported by
JOYCE A. FINK
CSR 1225
RPR 4605



APPEARANCES:

For Plaintiffs:
FREEDMAN, LEVY, KROLL & SIMONDS
Attorneys at Law
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
BY: LAWRENCE G. MCBRIDE
Attorney at Law

For Defendant:
UNITED STATES DEPARTMENT OF JUSTICE
ENVIRONMENT & NATURAL RESOURCES DIVISION
601 Pennsylvania Avenue, N.W.
Eighth Floor - Rm. 837
Washington, D.C. 20044
BY: SUSAN V. COOK
Attorney at Law

ALSO PRESENT:
Alfred Aloisi

DEPOSITION OF MARC ROSS WILLIAMS, taken on behalf of the Plaintiff, at the offices of Klamath National Forest Headquarters, 1312 Fairlane Road, Yreka, California, on the 11th day of October, 1996, commencing at the hour of 9:36 a.m., before JOYCE A. FINK, CSR License No. 1225.



INDEX


| EXAMINATION BY: | PAGE |
|---|---|
| MR. McBRIDE | 64 4 |
| MS. COOK | 60 |


EXHIBITS
NONE MARKED



MARC ROSS WILLIAMS,
being first duly sworn, testified as follows:

EXAMINATION
BY MR. McBRIDE:
Q. Mr. Williams, will you please state your full name for the record?
A. Marc Ross Williams.
Q. And your job title or responsibility for the Forest Service?
A. District wildlife staff.
Q. Your district is?
A. Salmon River.
Q. In the course of my questioning, I may ask questions which appear to ask you to tell me what the law is, or what rules are, regulations are. As your counsel and I have discussed with the other witnesses, I'm not asking for legal conclusions here; I'm asking for what your understanding is of what the requirements are that apply to you and the Forest Service as you carry out your responsibilities.
A. Uh-huh.
Q. Could you describe for me your history of employment with the Forest Service, where you've been and what your responsibilities have been?



A. Okay. I started with the Forest Service in 1970 -- no, that's wrong -- 1967 as a temporary employee on the Umpqua National Forest, and had various duties there that temporary employees have working on plantation surveys, all sorts of different things, fire duties, et cetera. I went back to the same place in 1970, the Umpqua National Forest, Tiller Ranger District, T-I-L-L-E-R. Worked in the range program in the wildlife program there for the district biologist, and also did fire duties and other things that temporary employees are expected to do. And then I did not come back to the Forest Service until 1976; that was to the Winema National Forest in Chiloquin.
Q. Marc, can you spell some of these names as you go?
A. Sure; which one would you like? Winema is W-I-N-E-M-A, and Chiloquin is C-H-I-L-O-Q-U-I-N.
Q. And Umpqua?
A. U-M-P-Q-U-A. Umpqua Milk.
Q. We're up to the late '70s now.
A. '76, I came to the Winema and I worked as a range conservationist and later as the district wildlife biologist, and then in 1980, I came to the Salmon River District here on the Klamath where I've primarily worked as the district wildlife



biologist. There was a two-year period where I was in charge of the timber program, timber harvest program.
Q. What years would those have been, if you can recall?
A. Late '80s, early '90s, maybe. I'm not sure exactly.
Then, as a staff officer, I've had -- it might have been later -- it had to be later than the early '90s. I don't remember exactly. Must have been that '92, '93, somewhere in there.
Q. You then moved back from running the timber program to wildlife biologist position?
A. Yeah. Actually, I was doing both at the time. I had a larger staff at that particular time. The district was consolidating people, people were leaving, they were not being replaced. So during that two-year period, I was just required to have that program as well as the wildlife program.
Q. And are you still in the Salmon River Ranger District?
A. Yeah.
Q. And your responsibilities there are?
A. Primarily the wildlife and botany programs.
Q. How large a staff do you have?
A. Well, it varies from year to year, depending on

Page 13

Q. Did you ever prepare a biological evaluation on silviculture?
A. We did that as part of a programmatic that was done -- I think it was about June of this year that we did a programmatic biological evaluation that went in with a number of timber sales.
Q. But, at this time, you're not sure whether this is reference to that document or whether that document came up later?
A. That document came up later.
MS. COOK: Let him finish his question all the way, because you start to answer --.
(Discussion held off the record.)
Q. BY MR. MCBRIDE: Still looking at document 52, Mr. Williams, did you make any representations about when biological evaluation might be done or completed?
A. It says in here, quote, "by spring," which it was.
Q. When was it completed?
A. The forest did a programmatic which went in June of '90.
Q. Could I ask you to look at document 66, please?
A. 66?
Q. Yes.

Page 14

A. Yes. Okay.
Q. We have numbered the pages. If I could direct your attention to pages 28 and following, maybe just 28 and 29?
A. Okay.
Q. Is this the biological evaluation that you said was later completed in the spring?
A. Yes.
Q. Was there any other material or work-up which, in your mind, constitutes -- also constitutes part of the biological evaluation, or is this it?
A. Well, it's this entire document, not just this one page.
Q. Well, these pages are the pages dealing with the Salmon River Ranger District, so I'm asking about the Salmon River Ranger District.
A. These are the projects -- project descriptions for Salmon River, but those two pages by themselves do not constitute a biological evaluation.
Q. Could you explain what else is excluded and what else constitutes a biological evaluation along with project descriptions?
A. It gives description of the effects of that project on listed species, and it suggests mitigations.
Q. Document 66 was a biological evaluation for the

Page 15

Klamath National Forest as a whole?
A. Yes.
Q. Did you prepare the project descriptions on pages 28 and 29 of this document 66?
A. Only on 29 concerning Liberty Mine.
Q. Okay. Someone else on staff prepared the other ones?
A. I could have. I'm not positive.
Q. There are other Salmon River Ranger District proposed actions elsewhere in the document. I'm not trying to trap you into saying that's all you did when you did other things, but you had a role in preparing this biological evaluation on behalf of the district?
A. Yes.
Q. Okay. Were you the head of the team or the task force, or whatever, that produced the Salmon River Ranger District's product for this programmatic?
A. It was probably the timber management officer at the time.
Q. Rather than --
A. Rather than me. It was probably the timber manager's office --
Q. Who would have headed that?
A. I don't remember who that person was at the

Page 16

time.
Q. You participated in that group?
A. Yes, I had a key role in that group to make sure the descriptions were adequate, and also to talk about the effects.
Q. From what sources, if you recall, did you pull the information that is the project description on page 29 of Liberty?
A. I don't remember specifically. I can only assume I got them from a plan of operations because of the way there are numbers here, so I must have come up with a number somewhere.
Q. That's the type of research or --
A. Yeah.
Q. -- information collection you would engage in?
A. (Witness nodding head up and down.)
Q. Okay. Do you have any recollection of specifically which plans of operations you went to in order to get this information?
A. No.
Q. More than one?
A. I don't know.
MS. COOK: Keep your voice up.
THE WITNESS: I don't know.
MS. COOK: I need to be able to hear you.
THE WITNESS: I think I'm speaking up, but I

Page 17

guess I'm not.
(Discussion held off the record.)
Q. BY MR. MCBRIDE: Were you aware, when you were writing this description, that there was both an approved plan of operations and a pending plan of operations for Eddy Gulch Liberty Mine activities at that time?
A. I doubt it.
Q. So this description was not designed in any way to distinguish between already approved and proposed activities?
A. I don't know.
Q. I'll ask the question a little differently.
A. Yeah.
Q. You were covering activities that were to happen in the future, proposed activities in this description?
A. I'm not sure I understand what you're saying.
Q. Are there any already permitted, already underway activities in this biological evaluation as a whole?
A. No. Because these were supposedly all planned activities.
Q. After this June 18th consultation request went to the Fish & Wildlife Service, did you notify Mr. Aloisi that the Liberty Mine had been put into the

Page 18

package and sent to the Fish & Wildlife Service?
A. I did not personally, no.
Q. Did you know if anyone else did?
A. No.
Q. Did you have any discussions with anybody about the fact that you were including a mining operation in with what was generally a timber sale consultation?
A. Yes.
Q. And with whom did you have those discussions?
A. A person that wrote the final forest level biological evaluation, who is Steve Anderson, the person who signed the document.
Q. Do you recall those discussions? Did he have questions about doing so?
A. I don't really recall specific discussions.
Q. But you both agreed that it was appropriate to do so?
A. Yes. We were trying to get the project through. Sure. It was a mechanism to do it at the time. It was affecting habitat and we needed to get on with it, and this was our opportunity to do so.
Q. In the context of the development of the northern spotted owl issue, was this the first time the Klamath National Forest had done a programmatic evaluation?

Page 19

A. Yes.
MS. COOK: Just for the record, although the document makes that clear, there were two of these done; one for planned sales, and one for --
THE WITNESS: Sold sales.
MS. COOK: -- one for sold sales, which are sales that are ongoing.
MR. MCBRIDE: But both of those packages were sent under the same cover for consultation for the Fish & Wildlife Service?
MS. COOK: That's correct; however, I don't think the one for the sold sales is in the exhibit book.
THE WITNESS: Right.
MS. COOK: This is only the one for planned sales.
MR. ALOISI: You mean previously sold?
THE WITNESS: Previously sold sales, the ones that were already active. We had to characterize them in a package.
MR. ALOISI: It's like a previously-approved plan or previously-approved sale.
MS. COOK: I can get you the other one, if you want it.
MR. MCBRIDE: I was listening to the intercom, I'm sorry, which was getting my attention.

Page 20

Q. Could you look at document 69, please? Are you familiar with the document?
A. Yes, I am.
Q. Is this the Fish & Wildlife Service's biological opinion in response to your June 18th, consultation letter?
A. Yes, it is.
Q. Could I direct your attention to the second paragraph of the cover letter?
A. Okay.
Q. Near the -- well, it's the last sentence of the paragraph. Refers to augmenting documents and updates.
A. Uh-huh.
Q. Do you know if -- did you -- were you involved in providing any augmenting documents or updates to the Fish & Wildlife Service during this consultation?
A. I honestly don't remember.
Q. Do you recall having telephone conversations with the Fish & Wildlife Service during the consultation?
A. No.
Q. I could be even more specific and say: Were there any conversations about the consultation as pertained to the Liberty Mine proposal?

Page 21

A. In the time frame immediately after or during this period, between June and July, I don't remember of any, no.
Q. When did you learn of the existence of this biological opinion; immediately, shortly thereafter, not for a long time?
A. Shortly thereafter.
Q. Would it have been your responsibility, then, to notify timber contractors or other staff that they could go forward with processing or issuing authorizations, now that this was back?
A. It would have been my responsibility to talk to other staff officers, yes.
Q. Okay.
A. This was -- I want to add that this was a watermark -- what's the word I want?
Q. Watershed?
A. Water -- thank you. This was a watershed. When this came back, it was general knowledge. Everyone was anticipating this.
Q. How would a document like this be distributed in the ranger district office. Would everyone have gotten a copy?
A. I don't know in this particular case, but usually the staff that is particularly involved would get a copy, the district ranger would probably

Page 22

get a copy. And then I would have distributed it to timber staff, et cetera.
Q. The copy that's been put in the record indicates a fax slug line to Klamath National Forest. I assume it would have been faxed shortly thereafter to the Salmon River Ranger District. Do you recall getting it on the 26th or as soon as the forest had it?
A. Probably a day or two later,.
Q. Did you take any action with respect to the Liberty project after you received this and read it?
A. I did not personally contact Mr. Aloisi, no.
Q. Did you ask anyone else to do so?
A. I don't remember if I did. I don't remember at this particular time if I did.
Q. But you were aware when you received this -- I'll ask it differently. Excuse me.
When you received this, did you look to see if all of the project's proposed actions that you'd done a biological evaluation for were covered by this opinion?
A. Yes.
Q. So you knew, at the time you received this, that Liberty Mine was covered by this opinion?
A. Yes.

Page 23

Q. Could I direct your attention to page 6 of the opinion?
A. Uh-huh.
Q. I take it that the column RD, down in that column, the SA items are your district's actions?
A. Yes.
Q. Am I understanding it correctly that there are four of those actions involving HCA C-10?
A. Yes.
Q. And is that the HCA which is involved with the Liberty project?
A. Yes, it is.
Q. Now, the fact that all ten -- or all four of the C-10 projects were reported back in this, "Not likely to jeopardize biological opinion," that means that taken all together, all four of them would not be likely to jeopardize?
A. Yes.
Q. It is cumulative analysis which stacks up all impacts of all four?
A. On that particular HCA, yes.
Q. Okay. And how large -- do you know how large HCA C-10 was?
A. It's about 60,000 acres.
Q. Is it the same size as SOHA 24 to which we referred before?

Page 24

A. No.
Q. What was the difference between the two units?
A. HCA C-10 is a collection of SOHA's, probably about twenty of them.
Q. So it's a much larger area?
A. Much larger area.
Q. Does the transition from SOHA's to HCA's contain a listing of the owl as a threatened species?
A. In some regards, yes.
Q. There are other regards? Could you explain how, then, else the transition occurred?
A. Well, during the period that the owl is being considered for listing, a team of scientists headed by Jack Ward Thomas, came out with a scientific strategy for the conservation of the spotted owl, and it's called the Interscientific Committee, and they came out with a document, very large document, several hundred pages, in 1990, that, to that date, was the best knowledge and the best strategy for managing the spotted owl. And while the owl was listed, the Forest Service adopted that strategy for their management of the spotted owl.
Q. When was that owl adoption done?
A. It was in 1990 -- it was right around the same time frame.

Page 25

Q. So this biological opinion is consistent with the standards of the management of the owl for a threatened species, not just for a candidate species?
A. The two aren't necessarily connected, no. They were just two events that were occurring during the same time frame.
Q. Was the changing from SOHA's to HCA's tied to the Jack Ward Thomas scientific record?
A. HCA's were a key element of the strategy he helped to author.
Q. And what were the -- sort of the standards for tree age and the growth and the like for habitat conservation area for declaring or designating an area where it had to do with owl proximity nesting and habitation sites, or does it have to do with both?
A. It has to do with both. The HCA's were based on where the owls were and the quality and quantity of habitat in that area.
Q. And quality and quantity of habitat, what were the standards that were relevant or sought?
A. Well, in quality, I guess we could say these would be older, mature and old growth stands. A certain amount of deadwood would be present in the stands; snags, down logs, larger trees, closed

Page 26

canopies.
Q. Was there also sort of an age range zone for nesting sites and the like?
A. I'm not quite sure what you're getting at. Do you want to rephrase that?
Q. Was there a standard in the program for a protective area around nest sites? Was that not part of habitat conservation area treatment?
A. Yes. Yes. There were. There was definitely a disturbance issue around nesting areas where -- to limit the type of noise disturbance within -- originally, it was a half a mile, and then later it changed to a quarter of a mile. But, originally, it was a half a mile.
You know, within the HCA's themselves, timber harvest was not allowed after the sales were done. The purpose was to maintain that habitat through time, so after the -- these associated sales on the original 1990 BO went through, then we were no longer planning timber harvest in those sales, in that HCA.
Q. In any HCA?
A. In any HCA.
Q. Back to page 6 of the biological opinion. Do you know what then happened with respect to the three timber sales that were also in HCA C-10?

Page 27

A. If my memory serves me right, both High Winds and Highview were dropped, eventually, for various reasons.
Q. What does "dropped" mean?
A. They weren't followed up on; they were not sold or harvested.
Q. Okay.
A. Then Crawford Heli sale. It was modified significantly and then finally sold. What eventually happened was that none of these sales were allowed to occur within the HCA. The first two, High Winds and Highview, were entirely within the HCA, and so they were eventually dropped. And the last one --
Q. Crawford Heli?
A. Crawford Heli. Part of the sale was outside the HCA and that was allowed to go on.
Q. Is Crawford Heli a sale which was related to, or contained parts of what was known as the Evening Star sale, or was that a separate sale?
A. They are separate sales.
Q. Was Evening Star part of the already sold consultation and biological opinion?
A. Yes, it was.
Q. So there was another set of already sold sales in the C-10 HCA that were already in that separate

Page 28

consultation, or in the other part of this same consultation?
A. Yes. At least three that I can think of.
MS. COOK: Off the record.
(Discussion held off the record.)
Q. BY MR. MCBRIDE: You're familiar with the regulations for consultations in the Fish & Wildlife Service portion of the CFR; you've worked with them?
A. Somewhat.
Q. Are you familiar with the term, "applicant" which is in those rules?
A. I believe so, yes.
Q. And was it your understanding, at this time, that with respect to the Liberty project, the proponents of the project were applicants within the meaning of those rules?
A. Yes.
Q. Document 71, please take your time. If you would like to skim it.
My focus is going to be on the paragraph numbered 1.
A. Uh-huh. All right.
Q. Did you write this letter?
A. No.
Q. And did you write paragraph 1 of it pertaining

Page 29

to HCA's and Fish & Wildlife Service?
MS. COOK: Objection. Asked and answered. He said he didn't write the letter. How could he have written any part in it?
MR. MCBRIDE: I'm not sure that was asked and answered.
Q. Did you write the entire letter?
A. No.
Q. Did you write paragraph 1 of the letter?
A. No.
Q. Do you know who would have?
A. No. I assume Earl Griffith wrote it.
Q. Would Earl Griffith have consulted with you on the substance of a paragraph like paragraph 1 in a letter like this, as a general matter?
A. Not necessarily.
Q. How would he, then, know what the status of Fish & Wildlife consultation was?
A. We may have had previous conversations about it. I'm sure we did.
Q. Do you have any understanding of what the reference is about the Fish & Wildlife report that would be available September 1st? The second sentence of paragraph 1.
A. No. I don't know what he's referring to by the report.

Page 30

Q. And then the last sentence of paragraph 1?
A. Yes.
Q. I don't know if this brings back the recollection, but is that a reference to the change in plans that you discussed with Mr. Aloisi back in April of 1989?
MS. COOK: Objection, calls for speculation. You can answer.
THE WITNESS: I don't know when it was, but Fred and I did have a conversation about part of his proposal which, I believe, is being referred to here in talking about the mill site at Yankee Flat being within a certain distance of the activity center of this owl's home range. That distance is .7 miles, and there is a -- there was a requirement in the biological opinion not to reduce habitat below 500 acres within that .7 miles. If Mr. Aloisi was to go forward with constructing the mill site at Yankee Flat, it would have removed some habitat. For this particular home range, it was below 500 acres already, and I remember having a conversation with him and suggesting to him that it would probably be more appropriate to not remove additional habitat within .7 miles.
Q. Did he agree with you?
A. Yes.

Q. So this biological opinion is consistent with the standards of the management of the owl for a threatened species, not just for a candidate species?
A. The two aren't necessarily connected, no. They were just two events that were occurring during the same time frame.
Q. Was the changing from SOHA's to HCA's tied to the Jack Ward Thomas scientific record?
A. HCA's were a key element of the strategy he helped to author.
Q. And what were the -- sort of the standards for tree age and the growth and the like for habitat conservation area for declaring or designating an area where it had to do with owl proximity nesting and habitation sites, or does it have to do with both?
A. It has to do with both. The HCA's were based on where the owls were and the quality and quantity of habitat in that area.
Q. And quality and quantity of habitat, what were the standards that were relevant or sought?
A. Well, in quality, I guess we could say these would be older, mature and old growth stands. A certain amount of deadwood would be present in the stands; snags, down logs, larger trees, closed



canopies.
Q. Was there also sort of an age range zone for nesting sites and the like?
A. I'm not quite sure what you're getting at. Do you want to rephrase that?
Q. Was there a standard in the program for a protective area around nest sites? Was that not part of habitat conservation area treatment?
A. Yes. Yes. There were. There was definitely a disturbance issue around nesting areas where -- to limit the type of noise disturbance within -- originally, it was a half a mile, and then later it changed to a quarter of a mile. But, originally, it was a half a mile.
You know, within the HCA's themselves, timber harvest was not allowed after the sales were done. The purpose was to maintain that habitat through time, so after the -- these associated sales on the original 1990 BO went through, then we were no longer planning timber harvest in those sales, in that HCA.
Q. In any HCA?
A. In any HCA.
Q. Back to page 6 of the biological opinion. Do you know what then happened with respect to the three timber sales that were also in HCA C-10?



A. If my memory serves me right, both High Winds and Highview were dropped, eventually, for various reasons.
Q. What does "dropped" mean?
A. They weren't followed up on; they were not sold or harvested.
Q. Okay.
A. Then Crawford Heli sale. It was modified significantly and then finally sold. What eventually happened was that none of these sales were allowed to occur within the HCA. The first two, High Winds and Highview, were entirely within the HCA, and so they were eventually dropped. And the last one --
Q. Crawford Heli?
A. Crawford Heli. Part of the sale was outside the HCA and that was allowed to go on.
Q. Is Crawford Heli a sale which was related to, or contained parts of what was known as the Evening Star sale, or was that a separate sale?
A. They are separate sales.
Q. Was Evening Star part of the already sold consultation and biological opinion?
A. Yes, it was.
Q. So there was another set of already sold sales in the C-10 HCA that were already in that separate



consultation, or in the other part of this same consultation?
A. Yes. At least three that I can think of.
MS. COOK: Off the record.
(Discussion held off the record.)
Q. BY MR. McBRIDE: You're familiar with the regulations for consultations in the Fish & Wildlife Service portion of the CFR; you've worked with them?
A. Somewhat.
Q. Are you familiar with the term, "applicant" which is in those rules?
A. I believe so, yes.
Q. And was it your understanding, at this time, that with respect to the Liberty project, the proponents of the project were applicants within the meaning of those rules?
A. Yes.
Q. Document 71, please take your time. If you would like to skim it.
My focus is going to be on the paragraph numbered 1.
A. Uh-huh. All right.
Q. Did you write this letter?
A. No.
Q. And did you write paragraph 1 of it pertaining



to HCA's and Fish & Wildlife Service?
MS. COOK: Objection. Asked and answered. He said he didn't write the letter. How could he have written any part in it?
MR. McBRIDE: I'm not sure that was asked and answered.
Q. Did you write the entire letter?
A. No.
Q. Did you write paragraph 1 of the letter?
A. No.
Q. Do you know who would have?
A. No. I assume Earl Griffith wrote it.
Q. Would Earl Griffith have consulted with you on the substance of a paragraph like paragraph 1 in a letter like this, as a general matter?
A. Not necessarily.
Q. How would he, then, know what the status of Fish & Wildlife consultation was?
A. We may have had previous conversations about it. I'm sure we did.
Q. Do you have any understanding of what the reference is about the Fish & Wildlife report that would be available September 1st? The second sentence of paragraph 1.
A. No. I don't know what he's referring to by the report.



Q. And then the last sentence of paragraph 1?
A. Yes.
Q. I don't know if this brings back the recollection, but is that a reference to the change in plans that you discussed with Mr. Aloisi back in April of 1989?
MS. COOK: Objection, calls for speculation. You can answer.
THE WITNESS: I don't know when it was, but Fred and I did have a conversation about part of his proposal which, I believe, is being referred to here in talking about the mill site at Yankee Flat being within a certain distance of the activity center of this owl's home range. That distance is .7 miles, and there is a -- there was a requirement in the biological opinion not to reduce habitat below 500 acres within that .7 miles. If Mr. Aloisi was to go forward with constructing the mill site at Yankee Flat, it would have removed some habitat. For this particular home range, it was below 500 acres already, and I remember having a conversation with him and suggesting to him that it would probably be more appropriate to not remove additional habitat within .7 miles.
Q. Did he agree with you?
A. Yes.

Page 31

Q. If I can take you back to document 15. Is that a memorialization of that conversation?
A. Document 15 is the wildlife input to the Liberty Mine EA?
Q. Yes.
A. No, I don't think this had anything to do with it.
Q. Okay. The conversation you're referring to happened at a different time, you think?
A. Yes. I believe it was -- it seems to me that it would have to be after the biological opinion in July.
Q. Okay.
A. Because that was the -- the concern would have been over reducing habitat further within .7 miles, and until that biological opinion came out with those terms and conditions, that would not have been a concern of mine. I would have not known to have been concerned about that.
Q. Could I ask you to look at document 74, please.
A. Any particular part you want me to look at?
Q. Yes, the bottom of page 2.
A. (Witness complying.)
Q. Did you write the paragraphs at the bottom of page 2 and the top of page 3?

Page 32

A. I don't believe so.
Q. Do you recall discussing them with anyone who might have been drafting that letter?
A. Not -- I don't recall discussing this specifically to draft this letter, but there were conversations prior to drafting this letter regarding these issues.
Q. Fine. Is the reference to the wildlife biologist -- you take that to be you?
A. Yes.
Q. Could you describe the consultation with the Fish & Wildlife Service that's referred to there? Is that the same thing as the June 1990 consultation, or were there additional and separate consultations with the Fish & Wildlife Service?
A. Not at that time. That was later.
Q. There were not separate ones?
A. Correct.
Q. In those consultations, was it clear to you that the people who were asking you and with whom you were discussing it, understood that there was a response of biological opinion that responded to the Fish & Wildlife Service?
A. Yes.
Q. They understood the biological opinion had been returned by the Fish & Wildlife Service?

Page 33

MS. COOK: Objection, calls for speculation.
MR. MCBRIDE: That's fine. Withdraw the question.
Q. At the top of page 3, Mr. Williams, is a reference to review at the Washington office level?
A. Uh-huh.
Q. Do you recall ever receiving Washington office level instruction or guidance about mining and owls?
A. No.
Q. Do you recall that you have not, or that you did not receive such guidance?
A. We did not.
Q. Document 75, please.
A. Is there a particular part?
Q. The first two paragraphs.
A. (Witness complying.)
Q. Did you write this letter?
A. Good question. I probably had a pretty strong hand in it, yes, because it was recapping a conversation with Fred.
Q. Do you recall with whom you worked in drafting this letter, if you did not actually draft it yourself?
A. I would say Mike and I worked on it together.
Q. Okay. In the middle of the first paragraph is

Page 34

a sentence, "We have received only sketchy preliminary information to date."
A. Uh-huh.
Q. What is that a reference to? What information is being referred to there?
A. Okay.
MS. COOK: Not if you're speculating what Mike Lee meant, if he added those words; only if you added those words or used those words when you were drafting your part of the letter.
MR. MCBRIDE: That's absolutely appropriate. That's what I'm after.
THE WITNESS: Yes. Okay. What was occurring at the time was that we had received clearance from Fish & Wildlife Service on planned activities. Some of those activities went forward. These were primarily timber sales, as you know. Some of those timber sales had changes proposed in them, and when those changes came about, we, the Forest Service or Salmon River District, anyway, were unclear on what that meant as far as the consultation, because now they were becoming a different project, different proposal.
It's my understanding that the same is also clear for Fred's proposal, at least my understanding of it is; that there were some changes that were

Page 35

occurring, so it put it in the same light as these planned timber projects that we were being told, "Wait a minute, these are being changed. We may need to go back into consultation on these projects."
Q. BY MR. MCBRIDE: Who was saying, "Wait a minute, we may need to go back into consultation"?
A. I don't know specific names.
Q. Is this the forest supervisor's office or the regional office or other people in the district ranger's office?
A. I think it was our interpretation, the forest interpretation of the BO, which says, "If there are changes, you need to consider."
Q. When you say, "The forest," do you mean the Klamath National Forest?
A. Yes. There is a letter -- you should have it. It came -- is it that white one? It was a letter written, I believe, December 3rd or December 4th, by a Forest Service biologist here in the SO here, asking the question.
Q. What is the SO?
A. The supervisor's office here, asking the question, "What do we need to do here because this project is changing?"
Q. Was that a letter written with respect to the

Page 36

timber sales or with respect to Liberty?
A. It was with respect to Liberty.
Q. In the next clause of the same sentence it has a remark about "The Forest Service now to follow the recommendations of" --
A. I'm sorry. Where are --
Q. The same sentence back in document 75, for the second half of the sentence, "sketchy information, primarily, that the Forest Service was now to follow the recommendations of the interagency scientific report." Is the interagency scientific report the same thing as the Jack Ward Thomas study you were talking about?
A. Yes.
Q. And is it your understanding that the July 23rd, 1990 biological opinion was consistent with and based on the Jack Ward Thomas record?
A. No, they are not necessarily related. The biological opinion discusses the effects of those particular projects on the threatened species. The Jack Ward Thomas report, or the conservation strategy for the northern spotted owl is just that, it's a strategy for management. The two were going on at similar times, but they are not necessarily connected.
Q. Turning your attention back to document 69.

elsewhere, because that unit was within a half mile of a known activity center.
Q. You actually have to talk in her direction because it's most important that she hear you as well as me.
A. Okay.
Q. I'm asking you now to look for a moment, and during the break I had you look at them, documents L-5 and L-14, which are different authorizations; one dealing with GWZ, and the other with Liberty Consolidated Mines.
Did you look at those?
A. Yes, I did.
Q. First looking at L-5. Is there any problem with regards to that authorization; in other words, was there consultation needed under the Endangered Species Act before it was issued?
A. No.
Q. Why not?
A. Because there's no vegetative disturbance. That's mainly reopening roads.
Q. Asking you to look now at document L-14. Was there any consultation required prior to the issuance of that authorization?
A. Well, there wasn't, but it's difficult to tell from this particular document because you're



primarily talking about plans and the plans aren't specified. They are just saying what kinds of plans.
Q. Are you otherwise familiar with that particular authorization?
A. Yes. Somewhat. Uh-huh.
MR. MCBRIDE: Speak up, please.
THE WITNESS: Somewhat. Not in detail, but somewhat. There was no consultation done.
Q. BY MS. COOK: Why not?
A. Again, there was no disturbance to vegetation.
Q. Now, earlier when you were talking with counsel, you also discussed the 1990 biological opinion in the context of discussions you had with Mr. Aloisi. Do you recall that discussion?
A. Yes. The discussion today or --
Q. The discussion today?
A. Yes.
Q. Because my next question is, then: Do you recall discussing with Mr. Aloisi the provisions of the 1990 biological opinion?
A. Certain parts of it, yes.
Q. First of all, when do you recall those discussions occurring?
A. I don't have a date. There -- there's probably an exhibit that discusses it, though.



Q. The exhibits that you discussed with counsel?
A. I believe so. Yeah. I believe we talked about that before. Yeah.
Q. What do you recall discussing with him; that is, with Mr. Aloisi?
A. Oh. Okay. There were two areas of discussion; one was that part of the operation was within .7 miles of the activity center and that it would be beneficial to the owl and to his operation if we could eliminate disturbance -- excuse me, not disturbance -- but vegetative removal within that distance, and that was the Yankee Flat, I believe it's called, mill site. And then there was some other road work that was in that area and some pits, and Fred was very agreeable to dropping that. And then the second point was the limited operating period. I believe Fred asked or I may have volunteered that there is a limited operating period for activities within a half a mile and that it would not affect his operation because everything was further than a half a mile.
Q. But he asked about it?
A. We had discussed it. I don't know who brought it up. He either asked about it or I offered it and then we discussed it. I'm not sure which way it went.



Q. And that was the limitation during the owl breeding season?
A. Yes.
Q. Of February 1 to July 1, that you discussed during your direct examination with counsel?
A. Yes.
Q. Do you recall whether or not Mr. Aloisi asked you about the biological opinion; in other words, the document, itself, as opposed to your discussion with him about the provisions that you've just described?
A. No. I can't say that I do.
Q. If he'd asked you for a copy of it, would you have furnished it to him?
A. Sure.
MS. COOK: I have no further questions.

FURTHER EXAMINATION
BY MR. MCBRIDE:
Q. Mr. Williams, were you consulted or did you participate in making a determination that no consultation was needed in connection with, I think it was L-5, authorization?
A. I believe -- L-5? Yes, I believe so.
Q. What about the need for operating period restrictions, independent vegetative disturbance



issue?
A. We -- yeah, we discussed it. It would have been at the same time. But there was no need for it because, at this point, we were talking about within a quarter of a mile and the operation is much further than that from known owl centers.
Q. Are there any adolescent birds in the part of the Eddy Gulch area that is treated in that authorization, L-5?
A. There could be. It's possible, sure.
Q. Would those result in any vegetative disturbance restrictions or operating period restrictions if there were?
A. If young were found within a quarter mile, there would be a restriction until August 1st -- a noise restriction until August 1st.
Q. Were you involved in making the determination no consultation was required in connection with the authorization in document L-5?
A. I believe so.
MS. COOK: Did you mean L-14?
THE WITNESS: L-14.
MS. COOK: That was what he and I just -- or did I have the wrong number?
THE WITNESS: It's L-14.
Q. BY MR. MCBRIDE: In connection with L-14?



A. Yeah. Al would have discussed that with me as he does with any mining operation.
Q. Al who?
A. Al Buchter.
Q. What was your determination regarding operating period limitations there?
A. That it was not appropriate.
Q. Why not?
A. Because our known survey information did not show any activity in that area by owls, and again I stress "known." We do not routinely survey every year for all the owls on the district.
MR. MCBRIDE: If we could go off the record for a second. I think I need to find an exhibit.
MS. COOK: Sure.
(Discussion held off the record.)
Q. BY MR. MCBRIDE: Document 75, Mr. Williams? You have Forest Service 75?
A. December 7, 1990?
Q. Yes.
A. Okay.
Q. This letter, I believe you testified, you had a hand in preparing?
A. Right.
Q. In this letter, did Mr. Lee tell Mr. Aloisi to stop calling you?

Q. If I can take you back to document 15. Is that a memorialization of that conversation?
A. Document 15 is the wildlife input to the Liberty Mine EA?
Q. Yes.
A. No, I don't think this had anything to do with it.
Q. Okay. The conversation you're referring to happened at a different time, you think?
A. Yes. I believe it was -- it seems to me that it would have to be after the biological opinion in July.
Q. Okay.
A. Because that was the -- the concern would have been over reducing habitat further within .7 miles, and until that biological opinion came out with those terms and conditions, that would not have been a concern of mine. I would have not known to have been concerned about that.
Q. Could I ask you to look at document 74, please.
A. Any particular part you want me to look at?
Q. Yes, the bottom of page 2.
A. (Witness complying.)
Q. Did you write the paragraphs at the bottom of page 2 and the top of page 3?



A. I don't believe so.
Q. Do you recall discussing them with anyone who might have been drafting that letter?
A. Not -- I don't recall discussing this specifically to draft this letter, but there were conversations prior to drafting this letter regarding these issues.
Q. Fine. Is the reference to the wildlife biologist -- you take that to be you?
A. Yes.
Q. Could you describe the consultation with the Fish & Wildlife Service that's referred to there? Is that the same thing as the June 1990 consultation, or were there additional and separate consultations with the Fish & Wildlife Service?
A. Not at that time. That was later.
Q. There were not separate ones?
A. Correct.
Q. In those consultations, was it clear to you that the people who were asking you and with whom you were discussing it, understood that there was a response of biological opinion that responded to the Fish & Wildlife Service?
A. Yes.
Q. They understood the biological opinion had been returned by the Fish & Wildlife Service?



MS. COOK: Objection, calls for speculation.
MR. MCBRIDE: That's fine. Withdraw the question.
Q. At the top of page 3, Mr. Williams, is a reference to review at the Washington office level?
A. Uh-huh.
Q. Do you recall ever receiving Washington office level instruction or guidance about mining and owls?
A. No.
Q. Do you recall that you have not, or that you did not receive such guidance?
A. We did not.
Q. Document 75, please.
A. Is there a particular part?
Q. The first two paragraphs.
A. (Witness complying.)
Q. Did you write this letter?
A. Good question. I probably had a pretty strong hand in it, yes, because it was recapping a conversation with Fred.
Q. Do you recall with whom you worked in drafting this letter, if you did not actually draft it yourself?
A. I would say Mike and I worked on it together.
Q. Okay. In the middle of the first paragraph is



a sentence, "We have received only sketchy preliminary information to date."
A. Uh-huh.
Q. What is that a reference to? What information is being referred to there?
A. Okay.
MS. COOK: Not if you're speculating what Mike Lee meant, if he added those words; only if you added those words or used those words when you were drafting your part of the letter.
MR. MCBRIDE: That's absolutely appropriate. That's what I'm after.
THE WITNESS: Yes. Okay. What was occurring at the time was that we had received clearance from Fish & Wildlife Service on planned activities. Some of those activities went forward. These were primarily timber sales, as you know. Some of those timber sales had changes proposed in them, and when those changes came about, we, the Forest Service or Salmon River District, anyway, were unclear on what that meant as far as the consultation, because now they were becoming a different project, different proposal.
It's my understanding that the same is also clear for Fred's proposal, at least my understanding of it is; that there were some changes that were



occurring, so it put it in the same light as these planned timber projects that we were being told, "Wait a minute, these are being changed. We may need to go back into consultation on these projects."
Q. BY MR. MCBRIDE: Who was saying, "Wait a minute, we may need to go back into consultation"?
A. I don't know specific names.
Q. Is this the forest supervisor's office or the regional office or other people in the district ranger's office?
A. I think it was our interpretation, the forest interpretation of the BO, which says, "If there are changes, you need to consider."
Q. When you say, "The forest," do you mean the Klamath National Forest?
A. Yes. There is a letter -- you should have it. It came -- is it that white one? It was a letter written, I believe, December 3rd or December 4th, by a Forest Service biologist here in the SO here, asking the question.
Q. What is the SO?
A. The supervisor's office here, asking the question, "What do we need to do here because this project is changing?"
Q. Was that a letter written with respect to the



timber sales or with respect to Liberty?
A. It was with respect to Liberty.
Q. In the next clause of the same sentence it has a remark about "The Forest Service now to follow the recommendations of" --
A. I'm sorry. Where are --
Q. The same sentence back in document 75, for the second half of the sentence, "sketchy information, primarily, that the Forest Service was now to follow the recommendations of the interagency scientific report." Is the interagency scientific report the same thing as the Jack Ward Thomas study you were talking about?
A. Yes.
Q. And is it your understanding that the July 23rd, 1990 biological opinion was consistent with and based on the Jack Ward Thomas record?
A. No, they are not necessarily related. The biological opinion discusses the effects of those particular projects on the threatened species. The Jack Ward Thomas report, or the conservation strategy for the northern spotted owl is just that, it's a strategy for management. The two were going on at similar times, but they are not necessarily connected.
Q. Turning your attention back to document 69.

A. Stop calling me?
Q. Yes.
A. It says to "Please address your comments or questions through me."
Q. And how about the second line about having conversations with too many players?
MS. COOK: The document speaks for itself. Do you have a question for him about it, or do you want to argue about it?
Q. BY MR. MCBRIDE: Did you understand that you were not supposed to call him and he was not supposed to call you?
A. No. I was told not to call him because there was too many contacts and it was getting confusing. But, I mean, if Mr. Aloisi called me, if it was pertinent to wildlife issues, then I would discuss it with him. But, for the most part, Mike wanted most of the conversation to go through him.
Q. Do you recall having any conversation after this date with Mr. Aloisi?
A. Well, I would imagine so, but I can't say absolutely. We had a number of meetings.
MR. MCBRIDE: Okay. No further questions.
MS. COOK: I have nothing further. Thank you.
THE WITNESS: You're welcome.



(Deposition concluded at 2:14 p.m.)

PENALTY OF PERJURY

I, the undersigned, hereby certify that I have read the foregoing deposition; that I know the contents thereof, and I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on

MARC ROSS WILLIAMS



CERTIFICATE OF REPORTER

I, JOYCE A. FINK, Certified Shorthand Reporter, State of California, License No. 1225, hereby certify that witness in the foregoing deposition named:

MARC ROSS WILLIAMS

Was duly sworn by me to tell the truth, the whole truth, and nothing but the truth, in the within entitled cause; that said deposition was taken at the time and place therein named;

That the testimony of said witness was reported by me, a Certified Shorthand Reporter and a disinterested person, to the best of my ability, and was thereafter transcribed into typewriting under my direction and supervision using computer assisted transcription;

That deponent was notified of the availability of the deposition for review.

DATE: November 4, 1996

JOYCE A. FINK
Certified Shorthand Reporter 1225