# EXHIBIT 5

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| ALFRED ALOISI, et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | No. 95-650L |
| THE UNITED STATES, | ) | Judge Lawrence S. Margolis |
| Defendant. | ) | |

**PLAINTIFFS' ANSWERS TO DEFENDANT'S SECOND SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS**

Pursuant to Rules 26, 33, 34 and 36 of the Rules of the United States Court of Federal Claims, Plaintiffs hereby respond to Defendant's Second Set of Interrogatories and Requests for Production of Documents (Defendant's "Second Set of Discovery") as follows:

**GENERAL OBJECTIONS AND OBJECTIONS TO DEFINITIONS**

1. Plaintiffs object to Defendant's Second Set of Discovery to the extent that it seeks irrelevant information and/or documents.

2. Plaintiffs object to Defendant's Second Set of Discovery to the extent it seeks information and/or documents that are protected by attorney-client privilege, work product doctrine, or any other applicable protection against disclosure.

3. Plaintiffs object to Defendant's Second Set of Discovery to the extent that it is overly broad, vague and ambiguous, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

4. Plaintiffs object to overly broad and unduly burdensome definitions of terms, including pronouns, plural/singular, and entities/persons.

5. Plaintiffs object to the instructions relating to the identification of documents on the basis that, as to produced documents, it is unduly burdensome, as the information is as readily available to defendant as to plaintiffs.

6. Plaintiffs object to the instructions and questions asking for descriptions of oral communications, as documented oral communications may be gleaned from any record of oral communications as readily by defendant as by plaintiffs.

7. Plaintiffs object to Defendant's requests to state all facts about contacts, communications and events pertaining to a response to an interrogatory because it is overly broad and burdensome; Plaintiffs identify and describe sufficient facts to support their substantive responses to Defendant's interrogatories as is practicable.

8. Plaintiffs' general objections and objections to definitions and instructions are incorporated into each and every response herein, regardless of whether specific objections are asserted in response to a particular discovery request.

**ANSWERS TO INTERROGATORIES**

INTERROGATORY NO. 1: For each and every mining claim that Plaintiffs contend was temporarily taken please identify:

a. the date upon which Defendant allegedly first temporarily took each mining claim (the "date of taking")

b. the date upon which the alleged temporary taking ceased;

c. any interim or intervening time period within the range of dates identified in response to 1.a. and 1.b. during which Plaintiffs contend there was no taking;

d. each and every mineral deposit or resource site within each mining claim that Plaintiffs contend was temporarily taken; and

e. those mining claims and mineral deposits or resources with respect to which Plaintiffs intend to offer proof of a temporary taking at trial.

**ANSWER No. 1**: Plaintiffs respond that Defendant's (Second) Interrogatory No. 1(a)

appears to seek a legal conclusion rather than factual information. To the extent this Interrogatory constitutes a contention interrogatory seeking explication of Plaintiffs' claims in the action, plaintiffs respond as follows.

First, with respect to each lettered paragraph answer to this (Second) Interrogatory No. 1, Plaintiffs do not contend solely that unpatented mining claims were temporarily taken, but also contend that specific property constituting patented, fully private land was also temporarily taken, chiefly the Mt. Laurel parcel (U. S. Mineral Survey No. 3161, Lot 45A), by virtue of Defendant's letter order of January 4, 1990 (FS # 50) ("the Stop Work Order"), which stated, "I must inform you that all activities, including activities on private land accessed through National Forest must stop immediately."

Second, as a legal proposition, defendant has to acknowledge what its obligations to plaintiffs were on July 23, 1990. On that date, the Forest Service no longer had any basis under the Endangered Species Act: (i) not to rescind the Stop Work Order (as to the previously-approved elements of plaintiffs' mining plan of operations); and (ii) not to immediately process the balance of the All Phase Plan of mining operations, as required by its mining plan rules, 36 CFR 228.5(a), and as it formally represented to plaintiffs in its November 1989 plan approval letter, "The [balance of your proposed activities not approved here] will be included in a master Plan of Operation Two with an Environmental Analysis completed in the Spring of 1990 as we agreed at our meeting." (FS # 46.). Until this legal obligation is acknowledged or resolved, there is uncertainty as to the exact dates of the temporary taking, thus:

a. Plaintiffs claim that Defendant temporarily took plaintiffs' rights on each mining claim, and on the private parcel identified herein (and in the Complaint), and the period of the compensable temporary taking commenced, either: (1) on July 23, 1990 (when the U. S. Fish

and Wildlife Service tendered its biological opinion to the U. S. Forest Service that the 38-acre projected area of surface disturbance for the plaintiffs' All Phase Plan of operations for the Liberty Mine would not jeopardize the northern spotted owl); or (2) on the date shortly after July 23, 1990, when in the normal course of business the U. S. Forest Service would have notified plaintiffs of its receipt of that biological opinion and taken the necessary administrative action to authorize plaintiffs to return to work under the approved portions of their All Phase Plan of mining operations. (The "All Phase Plan" is described more specifically in Answer No. 3 below.) Plaintiffs wrote defendant on September 24, 1998, regarding this dating of the temporary taking period (the USFS used other pages of this letter as an exhibit to its March 1, 2007, Motions in the administrative contest). We asked in 1998 that defendant provide plaintiffs with information so that the parties could consider stipulating to these dates:

> Assume the Forest Service had notified plaintiffs of the July 23, 1990, biological opinion on July 23, or on the same date it began taking action on the timber sales "cleared" by the same opinion. Without rereading Marc Williams's deposition, I believe that was actually July 23. How long would it have taken the Forest Service to rescind or undo its "stop order" of January 4, 1990 (Doc. FS #50), as to all previously approved activities (Phase I and those parts of Phase II approved in 1989)? In other words, how long would it have been before plaintiffs could have gone back to work both on the five claims the agency representatives have been sampling, and on the approved Mt. Laurel property apex cut?
>
> ..................
>
> The same exercise pertains to February 1994 when the second Fish and Wildlife Service clearance was rendered. It was only with the February 1994 second clearance that beneficial use of the property for mining was restored to the status quo as of July 23, 1990, that is, with no Endangered Species Act objection to the resumption of operations previously ordered to a halt ....

Plaintiffs submit that the dates the parties might establish using this principle would shortly follow the dates of the Fish and Wildlife Service letters, but the dates cannot be set without fixing the Forest Service's obligations and process (see 36 CFR 228.5(a)) in light of the complete clearance of the entire all-phases plan of operations under the Endangered Species Act

in both letters.

b. Plaintiffs claim that Defendant's temporary taking of plaintiffs' rights on each mining claim, and on the private parcel identified herein (and in the Complaint), and the period of the compensable temporary ended, either: (1) on February 8, 1994 (this is when the U. S. Fish and Wildlife Service tendered its second biological opinion (FS # 184) to the U. S. Forest Service that the 38-acre projected area of surface disturbance for the all-phase plan of operations of the Liberty Mine would not jeopardize the northern spotted owl, in a consultation treated by the U. S. Fish and Wildlife Service as an "informal consultation" not required by section 7 of the Endangered Species Act, in light of the fact that the projected area of surface disturbance and the operations described in mining plan of operations undergoing informal consultation were the for all purposes the same as those evaluated in the July 23, 1990, no-jeopardy opinion); or (2) on the date shortly after February 8, 1994, when in the normal course of business the U. S. Forest Service would have taken the related administrative actions: (i) of authorizing plaintiffs to return to work under the previously-approved portions of their all-phases mining plan of operations; and (ii) of recommencing processing the balance of the All Phases Plan of mining operations under 36 CFR 226.5(a), consistent with the Forest Service's representation to plaintiffs in FS # 46 (plaintiffs refer here to the unanswered 1998 correspondence regarding temporary taking dates set out in Answer 1.a. above); or (3) based on the Forest Service's failure ever to take further action with respect to plaintiffs' mining plan of operations after its receipt of the February 8, 1994, second biological opinion, some much later date.

c. There was no period of time between the earliest date provided in Answer 1.a. (July 23, 1990), and the latest date provided in Answer 1.b. above (in 1994 or thereafter) when defendant, by virtue of its failure to implement its obligations consistent with the 1990 no-

jeopardy opinion, did not wholly prevent plaintiffs from engaging in beneficial use of the property for mining purposes, and did not wholly prevent plaintiffs from working and mining under the previously-approved mining plan of operations.

d. Every "mineral deposit or resource site within each mining claim," and on the private Mt. Laurel parcel, was wholly subject to the temporary taking, and plaintiffs were denied beneficial use for mining purposes of any and all of them. More specifically, the mineral deposits of economic value and present interest to plaintiffs in 1989 through 1995 were those treated as ore blocks in "The Liberty – Eddy Gulch Gold Mines, A Discussion of Grade, Tonnage, Recovery, Economic Calculations and Other Topics and Issues Related to the Liberty vs. USFS Litigation," September 2007 (A-150), and on the nine Spreadsheets that are described in the September 2007 Ferrero Analysis (A-151), and the three sets of maps showing the location and values of these ore blocks (A-152, A-153 and A-154), all of which A-150 through A-154 taken together constitute plaintiffs' working analysis of the design and profitability of their Eddy Gulch mining operation (together, "the September 2007 Ferrero Analysis").

Plaintiffs are not familiar with defendant's phrase "resource sites," but answer that it was not just the mineral deposits on the mining claims (and on and accessed through the private Mt. Laurel parcel) that were temporarily taken for this entire period. It was also the use and enjoyment of all of the same ground for related mine development purposes, transportation of employees, equipment and ore, construction and operation of mining support facilities including stockpiles, mill and related facilities, and as locations for disposal of mine and mill wastes. These lawful mining uses of the mining claims and the private Mt. Laurel parcel render these lands "resource sites" – and beneficial use for mining purposes of the entirety of this ground, including as "resource sites" as so understood, was prohibited to plaintiffs through the entire

period described in paragraphs 1.a. and 1.b. of this Answer.

e. The "mining claims and mineral deposits or resources with respect to which Plaintiffs intend to offer proof of a temporary taking at trial" are identified as follows.

(1) With respect to "resource sites" (as plaintiffs understand defendant's choice of phrase, and consistent with plaintiffs' response in paragraph d. of this answer above), the resource sites include the private Mt. Laurel parcel, Usher Flat, and all roads in Eddy Gulch referred to in plaintiffs' mining plan of operations, including those roads built, re-graded or improved under plaintiffs' and their predecessors' plans of operations in 1988 and 1989 through the January 4, 1990, Stop Work Order (FS # 50).

(2) With respect to the "mineral deposits," these are mapped and identified in the September 2007 Ferrero Analysis (narrative A-150, spreadsheets A-151, and maps A-152, A-153 and A-154) and the materials produced here or previously on which they are based.

(3) Assuming defendant seeks the identification of those mining claims and private property parcels that contain mineral deposits identified in subparagraph (e)(2) of this Answer: the Sunrise, Dariel, Sunset, Yankee and Raindrop mining claims with respect to the mineral deposits mapped and evaluated in the Klamath Mine section of the property; the East Fork, Compressor, Union Extension and Big Fish claims with respect to the Union dump deposit; and the Six O'clock, Compressor, Stevens and Anna Johnson claims with respect to the Mt. Laurel / Anna Johnson deposits, and the Mt. Laurel private parcel (which contains mineral deposits included in the Mt. Laurel / Anna Johnson deposits analyzed in the September 2007 Ferrero Analysis, although it is not a "mining claim.").

In this subparagraph, plaintiffs have simply listed the claims within the boundaries of which the mineral deposits, identified as of economic value and present interest to plaintiffs in

1989-1990 in the materials referred to in subparagraph (2) above, are situated, or on which is found the apex or outcrop of the deposit. Whether a specific dump is "held" under the General Mining Laws (30 U.S.C. 22 et seq.) by the placer claim or the lode claim it is on, or by which of two lode claims, when the boundaries of two claims embrace the one deposit, is immaterial for purposes of this case, as was made clear by the Administrative Law Judge's Order of May 2, 2007, in the contest proceeding denying the Forest Service's motion to declare certain claims null and void because of the overlap in their boundaries.

---

INTERROGATORY NO. 2: For each and every alleged mineral deposit or resource identified in response to Interrogatory 1.d., please provide the following information:

a. the date on which each alleged mineral deposit or resource was located or exposed (if a lode claim);

b. the identity of the person who located or exposed each alleged mineral deposit or resource;

c. the estimated quantity in tons of ore of each mineral deposit or resource, including the data upon which each estimated quantity is based;

d. the dimensions of each mineral deposit or resource, including the data upon which the dimensions are based;

e. the gold content per ton of ore, including the data upon which the estimated gold content is based; and

f. please provide a map depicting as precisely as possible the location of each alleged gold deposit or resource identified in response to Interrogatory No. 1.e.

**ANSWER No. 2**: a. The exposure of the lode deposits on the relevant lode mining claims pre-dates plaintiffs' involvement in Eddy Gulch, and involves miners and mining operations from at least 1863 on (A-2), and known to plaintiffs only by historic claim and mining records pertaining to operations in the Liberty Mining District in the Nineteenth Century. The mineral deposits within the boundaries of the extant lode claims in Eddy Gulch were located in

1985, when the extant claims were staked and recorded. The actual staking of the claims, including the surveying of their corners, boundaries and discovery points, completion of the location notices, and recordation was undertaken by Alfred Aloisi and Thomas Ferrero. Defendant has the location notices containing these discovery points, as the Forest Service used them as exhibits in its March 1, 2007, Motion in the contest proceeding for which this case was stayed – a Motion seeking an agency order that a number of the mining claims in this case null and void for various reasons, which Motion was denied by the Administrative Law Judge.

As to the basis of plaintiffs' knowledge of the mineral deposits of economic value and present interest to plaintiffs in 1989-1990, and included in the September 2007 Ferrero Analysis, plaintiffs respond more specifically:

(1) The apex or outcrop of the Klamath Vein on the Sunrise lode claim was physically exposed at the area known as the "Klamath Cut" by the owners of prior claims covering the same ground as the extant claims in this case, The Klamath Cut was physically exposed for a substantial length along the vein at the time the Sunrise lode claim was located. The dumps on the Sunrise lode claim were created by prior operators of the Klamath Mine during its periods of operation, including the main periods of operation, from 1863-1881 and 1900-1906 (as described by the California State Mineralogist and reported by Elmendorf (A-2)), and at additional times. The existence of the Klamath Vein, the outcrop of which we treat here, was known, and exploited underground down-dip of this outcrop, in every period when the Klamath Mine operated. Additional extensions of the exposure of this same Klamath Vein to the west (on to the Dariel claim (the site of plaintiffs' sample KL-7) and to the east to the site of plaintiffs' sample KL-22 were made by plaintiffs in the approved 1989 operations stopped by the January 4, 1990, Stop Work Order (FS # 150). The additional extension of the exposure of this same Klamath

Vein to the east and south, farther on to the east side of the ridge on the Sunrise claim (to plaintiffs' sample site KL-21), was made by plaintiffs in the 2004 sampling operations conducted within the administrative contest proceeding for which this case was stayed at that time.

(2) The vein on the Six O'clock lode claim was physically exposed by New Cinch in its drilling of core holes in 1975-1976 (A-81(g)). These vein intersections were duplicated by Mega Gold in its drilling of core holes in 1986 (A-14, and A-67, Plates 3, 4 and 5). This vein does not outcrop on the surface of the Six O'clock claim (rather, another intersecting vein does), so this vein appears (and appeared in 1989-90) to constitute a so-called "blind lead." But its existence was projected in the 1970s by New Cinch, from their understanding of the ore body mined from the underground workings accessed through portals and tunnels on the private Mt. Laurel parcel. The core holes in 1975-76 and reverse circulation holes in 1986 exposed the vein, and confirmed the geological inference of the drillers.

b. (1) The answers to paragraph 2.a. identified the person or persons involved in the exposure and location of the lode claims.

(2) With respect to the placer deposits – the mine dumps from prior mining operations – plaintiffs respond that these deposits were <u>exposed</u> when dumped by the operators of the prior mines on the claims. Those operators are not known to plaintiffs, nor are the specific dates when the dumping occurred over the life of the prior mining operations on this same ground. These dumps were abandoned, and the claims then-extant when the dumps were deposited were lost, prior to plaintiffs' location of the now-extant claims involved in this case. These placer deposits were <u>located</u> in 1985 with the staking and recordation of the mining claims listed in the Complaint in this case. Defendant has the location notices and related recordation documents under which the placer deposits were located and are held by plaintiffs, as noted in paragraph

2.a. of this Answer.

c. The estimated quantity in tons of each mineral deposit of economic value and present interest to plaintiffs, in 1989-1990 and thereafter, is set out in Spreadsheet 4 (in A-151) as part of the September 2007 Ferrero Analysis.

d. The dimensions of each mineral deposit are derived from cross-sections of nearly all of the dumps, and from cross-sections of the apex deposits, made by Mr. Ferrero. The field notes for these cross-sections are A-148. The cross-sections and measurements are A-85 and A-86. The dimensions were converted to tons using these ratios: 16 cubic feet per ton for dump ore; 14 cubic feet per ton for apex ore; and 12 cubic feet per ton for underground ore.

e. The gold content per ton of ore is set out in Spreadsheets within the September 2007 Ferrero Analysis, chiefly Spreadsheets 1, 3 and 4 (A-151). The data on which the gold content is based have been previously provided to defendant in the A-series of documents. The maps (A-152 through A-154) that are part of the September 2007 Ferrero Analysis identify and locate all samples of the gold deposits by the date and source of the sampling data. The All-Sample Map (A-117(f) through A-177(l)) identifies and locates all samples of the gold deposits known to plaintiffs by the date and source of the sampling plan. Using "CAD" programs on the "dwg" and "dcd" files provided, or viewing the "pdf" files, one can identify, and examine individually, each set of samples by date and sampler, and the deposits sampled. There should be no sampling data on these maps for which plaintiffs' sampling data has not already been provided to defendant in the A-list documents.

f. The maps that are part of the September 2007 Ferrero Analysis depict each gold deposit of economic value and present interest to plaintiffs in 1989-1990. Using "CAD" programs on the scaleable data in the electronic files provided to defendant in July 2007 and

here, defendant should be able to "zoom in" on each deposit included in the September 2007 Ferrero analysis (A-151, Spreadsheets 1, 3 and 4, and all the accompanying maps A-152, A-153 and A-154).

---

INTERROGATORY NO. 3: Please identify each and every federal, state, county and/or local permit, license or approval Plaintiffs obtained with respect to the mining claims that Plaintiffs contend were temporarily taken, including but not limited to the date of the permit or license, the issuing agency, the mining claim to which the permit or license pertains, and the precise activity authorized.

**ANSWER No. 3**: The Forest Service in June 1989 had approved plaintiffs' June 1989 plan of operations (A-22 and A-24.) The Forest Service on August 11, 1989, approved plaintiffs' July 27 additions to the June plan (A-139 and A-140). The Forest Service on November 27, 1989 (A-142 and FS # 46), approved all of phase 1 and identified portions of phase 2 of plaintiffs' September 28, 1989, mining plan of operations (A-25, and FS # 31), as supplemented by plaintiffs October 25, 1989, mining plan of operations (A-141). (This September 28 mining plan of operations, as supplemented on October 25, together, is called the "All Phase Plan of mining operations."). The mining activities authorized by those approvals did not require other state, federal and local permits, because those activities were being conducted largely on federal lands, as to which the Forest Service exercised exclusive permitting control over some activities (to the exclusion of local agencies), and lead agency control over the other activities.

With respect to the mining activities described in the balance of phase 2 and in phase 3 of the All-phase Plan of mining operations: (1) Plaintiffs were working with Siskiyou County regarding any land use permit that might be required for those activities, as the County was the lead agency with respect to California state agency approvals for activities on private lands, including any "SMARA" or Water Resources Control Board approvals (e.g., A-42); (2) Plaintiffs

were conducting MSHA compliance training of their employees in 1989 in preparation for filing notice with MSHA when they commenced the reconditioning of the tunnels on the Mt. Laurel private parcel and on other lode claims to initiate underground mining operations; and (3) Plaintiffs had designed their mill to operate as a closed circulation system, thus requiring no water discharge permit for its operation (see A-42).

The Forest Service never undertook any effort after January 4, 1990, to re-authorize the mining operations it had previously-approved. (The Forest Service did not acknowledge to plaintiffs until early 1992 that it had received the biological opinion clearing the operations, and when it did so it did not disclose that the opinion was more than a year and a half old, until plaintiffs demanded a copy of it. At that point, the Forest Service demanded that plaintiffs re-submit their 1989 All Phase Plan of mining operations, and it commenced a new and unnecessary consultation with the U. S. Fish and Wildlife Service on the re-submitted plan – plaintiffs do not consider these to have been efforts to re-authorize the mining operations, rather, they only served to avoid efforts toward re-authorizing the mining operations previously approved.) Moreover, the Forest Service took no steps toward processing the balance of phase 2 and phase 3 of the All Phase Plan of mining operations. In light of the Forest Service's total shutdown of beneficial mining use of their property, plaintiffs did not spend their limited resources to acquire any other permits that may have been required for the mining operations described in the balance of phase 2 and phase 3 of their All Phase Plan of mining operations.

---

INTERROGATORY NO. 4: Please identify each and every sale by Plaintiffs of gold or gold-bearing ore that was extracted from the mining claims that Plaintiffs contend were temporarily taken, and for each transaction include:

a. the mining claim and mineral deposit or resource from which the gold or gold-bearing ore was extracted;

b. the quantity of gold or gold-bearing ore sold;

c. the gold content of the material sold;

d. the price received per unit of gold or gold-bearing ore sold (specifying the unit weight of the material sold, i.e., whether by the ounce, pound, or ton);

e. to whom the gold or gold-bearing ore was sold; and

f. the date of each transaction.

**ANSWER No. 4**: (a. through f.) Plaintiffs did not sell any gold from the claims (or from the Mt. Laurel private parcel). The Forest Service's January 1990 Stop Work Order stopped "all activities" as plaintiffs were engaged in severing ore from the apex mining sites, and just after plaintiffs had begun to haul this ore down from the Klamath Mine to Usher Flat, awaiting only delivery and erection of the balance of the mill equipment that was available from Don Moore per the price quotation that the plaintiffs had receive in early 1990 (A-33). Erection of the mill to process the ore already mined and being mined, and being hauled to the mill staging area, with sale of mill product gold, was exactly what the approved phases of the All Phase Plan called for, and what the baseless actions of the Forest Service after July 23, 1990, prevented from occurring. The actions of the Forest Service prevented plaintiffs from realizing any gold production and sale, or taking any further action toward gold production and sale, for the full period of the temporary taking in this case.

---

INTERROGATORY NO. 5: For each mining claim that Plaintiffs allege was temporarily taken by Defendant, please identify the owner or owners as of the date upon which Plaintiffs contend that the mining claim was first temporarily taken (the "date of taking").

**ANSWER No. 5**: (1) With respect to all of the lode mining claims (with the exception of those held and leased by Melvin Usher – the Boot Jack, the Security and the Ida May), and with respect to the Sunset placer claim, the answer is provided in plaintiffs Answer of

September 2002 to Interrogatory No. 5 in the Administrative Contest, and documented there. (2) With respect to the association placer claims, the answer is provided in plaintiffs Answer of September 2002 to Interrogatory No. 8 in the Administrative Contest, and documented there.

---

INTERROGATORY NO. 6: Please describe any and all efforts by Plaintiffs to sell, lease, license, or otherwise gain economic value of any kind from each mining claim allegedly temporarily taken by Defendant, including, but not limited to, the dates (or range of dates) of the actions taken, whether any offers were extended to Plaintiffs to buy, lease, or license any mining claims, and whether any offers were accepted or rejected.

**ANSWER No. 6**: (1) Fred Aloisi entered into a "Lease Agreement" with WAZCO, Inc., on or about April 1, 1993, under which WAZCO promised to make a "minimum production payment" of $500 per month for the first two years of the Lease to Aloisi (the "WAZCO Lease Agreement (FS # 142). The Forest Service never approved any mining operations by WAZCO, nor any mining plan of operations submitted by WAZCO. To plaintiffs' knowledge WAZCO never sought Forest Service approval to conduct any mining operation on the leased property, nor did WAZCO even provide notice to the Forest Service under 36 CFR 228.4 that it intended to conduct any surface disturbing activities below the level of casual use of the surface that requires no Forest Service plan of operations.

In late March 1994 plaintiffs notified WAZCO it was in breach of this Lease Agreement. A-161. One of the stated breaches by lessee was that WAZCO had assigned the WAZCO Lease Agreement to Liberty Consolidated Mines, Inc. ("LCM"), a corporation organized by a number of the principals of WAZCO, without seeking or securing lessor's approval as required under the Lease (A-161, listing WAZCO's defaults). In response to that notice, the principals of WAZCO and LCM (again, many of them the same) and plaintiffs negotiated a revised, renovated lease agreement.

(2) Out of the breach notice regarding the WAZCO lease, Fred Aloisi and Don Goodman

entered into a Lease and Option Agreement (FS # 147) with LCM (the "LOA"). This LOA was executed by the parties in December 1994, but with a stated effective date of November 1, 1993. LCM promised to pay plaintiffs a "minimum production payment" of $2,500 per month through September 1, 1994, and $2,715 monthly thereafter, with $500 of that monthly payment being made directly to Melvin Usher under the terms of a lease between Usher and Aloisi of Usher's three mining claims in Eddy Gulch – the Boot Jack, Security, and Ida May claims – that were also subject to the LOA.

On or about December 6, 1994 (well after the Fish and Wildlife Service had provided its second and unnecessary biological opinion advising the Forest Service that the 38-acre surface disturbance footprint Eddy Gulch mining operation would not jeopardize the spotted owl), LCM filed a mining plan of operations with the Forest Service under 36 CFR 228.5 to conduct underground mining operations, using existing underground workings on the property after re-conditioning, and involving construction of a mill on the property at Usher Flat. (See A-147, and Forest Service "LCM" indexed files produced to plaintiffs in 1997-1999.) The Forest Service approved the LCM mining plan of operations on or about August 5, 1996. As plaintiffs understand, LCM executed the conditions of the August 5, 1996, Forest Service approval, but never posted the bond required as a condition of the Forest Service's plan approval. LCM never conducted any of the mining operations on the property, other than clearing Usher Flat (its approved mill location) and pouring a concrete foundation slab there, on which portions of the mill could be erected. On or about July 28, 1999, plaintiffs notified LCM it was in breach of its lease terms, and demanded cure of the defaults (A-155). On or about September 9, 1999, plaintiffs notified LCM that the Lease and Option Agreement was terminated (A-156).

(3) One Giles Florence visited Eddy Gulch in 1998, unexpected by Mr. Aloisi. Based on

their conversation, Mr. Aloisi indicated he was not interested in leasing or selling the property to Florence. Thereafter, perhaps a year later, represented by one Michael Johnson, Don Chisholm and Giles Florence negotiated with plaintiffs for a lease-purchase agreement of the property. On or about February 22, 2000, Fred Aloisi and Don Goodman offered to Don Chisholm and Giles Florence a Lease-Purchase Agreement under terms set out in a February 22, 2000, Letter Agreement (A-157), which attached the offered draft Lease-Purchase Agreement, also dated February 22, 2000 (A-158). The Letter Agreement (A-157) obligated Chisholm and Florence to conduct $20,000 worth of sampling they had said they wanted to do before having to commit to and execute the offered Lease-Purchase Agreement. Chisholm and Florence never executed the Letter Agreement, and never undertook the sampling they said they wanted to conduct. On or about April 3, 2000 (A-159), Aloisi and Goodman revoked their offer to enter into a Lease-Purchase Agreement under the terms of the February 22 draft.

(4) At various times post-dating the temporary taking in this case, third parties have expressed interest in the property, and plaintiffs have dealt with these third parties. One third party that did express enough interest to visit the property, take some samples, and make maps of the property, was the same Michael Johnson who had earlier played a role in connecting Don Chisholm and Giles Florence with plaintiffs in connection with Answer (3) above. Michael Johnson, as a principal of Barramundi Gold, never made any offer to lease or buy the property. The Michael Johnson/Barramundi sampling and information provided to plaintiffs has been produced as A-135. In addition, Michael Johnson prepared a computerized rendering of maps of underground workings which was provided to plaintiffs in electronic form (A-117(a), A-117(b) and A-117(c)). Mr. Ferrero has incorporated these Barramundi computer data into the base map computer files from which he created the mapping within the September 2007 Ferrero Analysis.

---

INTERROGATORY NO. 7: With respect to each and every lease or license relating to any of the mining claims at issue, please provide the following the information:

a. the circumstances surrounding initiation of any negotiations leading to the execution of each lease or license, including the identity of the individuals who participated in any communication regarding leasing or licensing any mining claim at issue;

b. the date upon which the initial contact between any party, or representative of a party, to the leases or licenses was made;

c. the time period during which each lease was in effect (if the effective period of any lease or license is disputed by the parties to the lease, provide the dates each party to the lease or license contends that the lease was in effect);

d. the amount and date of each payment received pursuant to each lease or license, including in your response the identity of the lease under which the payment was received, from whom it was received, the date of receipt, and the amount received;

e. the total amount in rent or consideration received under each lease or license;

f. whether any lessee developed to production a mine on any leased or licensed mining claim;

g. the amount of gold, or gold-bearing ore, produced from each leased or licensed mining claim; and

h. the quantum of any and all payments received as a production or royalty payment (such as was contemplated in Article 6 found in both FS Document Nos. 142 and 147) under each lease or license.

**ANSWER No. 7**: This Answer employs the same numbering as Answer No. 6, to identify the agreement or offer with respect to which the Answer pertains.

a. (1) By 1991, plaintiffs had been allowed to do no more of the work the Forest Service approved in November 1989 than they had completed by January 4, 1990. Per the sequence of events in the approved phases of the All Phase Plan, the test mill could have been erected, and operating under Forest Service approval, in 1990. Per the plan, income from gold production would have begun to be available to fund succeeding stages in mine development.

As it was, not only had plaintiffs not been allowed back to work, but the Forest Service had lifted not a finger to process the rest of the All Phase Plan of Mining Operations, notwithstanding their representation in November 1989 (FS # 46) to complete environmental analysis on the balance of the All Phase Plan in the Spring of 1990. Plaintiffs mortgaged the Rollin and Mt. Laurel private parcels, and used the loan proceeds to pay expenses, including servicing the equipment payment expenses. The lender - mortgagee on the Mt. Laurel parcel was one David Davies, a business associate of Aloisi's father, who learned of this property and became interested in that loan opportunity at that time.

The Forest Service in early 1992 finally acknowledged its receipt of the July 1990 biological opinion, but then the Forest Service's insisted that plaintiffs' April 1, 1992, version of its All Phase Plan was a new plan, not simply a demanded re-statement of the several submissions that constituted the 1989 All Phase Plan. Plaintiffs, unable to pay on the Mt. Laurel loan note, defaulted, and Davies foreclosed (A-162).

Davies had a business associate in Northern California, in mining, named Mark Gavard, also known to Mr. Aloisi. From Aloisi's perspective Gavard had coveted the Eddy Gulch property for years. When Davies advised Gavard that he was foreclosing on the Mt. Laurel loan (A-162 pertains to this foreclosure sale), Gavard and Davies made some arrangement for Gavard (through WAZCO) to lease, buy or otherwise control the Mt. Laurel property, which they saw as the crucial property for purposes of controlling long-term underground development of the Eddy Gulch property. WAZCO/Gavard approached Aloisi to lease or purchase all the mining claims. From this position, forced on plaintiffs by the Forest Service on the one side and Davies and WAZCO (Gavard) on the other, plaintiffs worked out the 1993 WAZCO Lease Agreement.

(2) The principals of WAZCO were also the principals of LCM, although LCM had new,

additional principals in addition. Plaintiffs understood LCM's motivation to negotiate a successor lease, when lessor notified WAZCO of its default under the WAZCO lease (A-161), to be as follows – LCM had taken an assignment of the WAZCO lease, without notifying lessor or securing lessor's approval, and was either then selling, or intending to sell, stock in LCM, whose primary asset was the assigned WAZCO lease of the Eddy Gulch property. This, plaintiffs understood, was the reason why LCM wanted the LCM LOA, though executed in December 1994, to be effective a year prior, November 1, 1993, and supersede the WAZCO Lease Agreement for that period – a period from in which LCM may have been selling stock on a company whose primary asset was a Lease at risk of termination for breach.

b. (1) Plaintiffs cannot re-create when WAZCO contacted plaintiffs, although it was shortly after Davies initiated foreclosure action on plaintiffs' default on the mortgage of the Mt. Laurel private parcel. (2) Contact between the principals of LCM and plaintiffs was periodic and continual from and through the execution of the WAZCO lease. After the six-month time period provided in Exhibit B of the WAZCO lease for WAZCO to "initiate a mining plan" had passed without WAZCO doing so, plaintiffs were in regular contact with WAZCO about WAZCO's breach of this material contract obligation.

c (1) The WAZCO Lease Agreement was in effect from on or about April 1, 1993, and was superseded on November 1, 1993, per the terms of the LCM LOA. (2) The LCM LOA was executed by the parties in December 1994, and declared that it was effective November 1, 1993. It was terminated on or about September 9, 1999 (A-156).

Plaintiffs are aware of no disputes over these dates. (1) To the extent WAZCO disputed whether its lease was in default due to its breach of the lease terms, that dispute was mooted by the execution of the LCM lease. (2) The termination of the LCM LOA has, to plaintiffs'

knowledge, never been disputed in any way or in any forum.

d. (1) Aloisi believes that he received monthly "minimum production payments" of $500 for 20 months under the WAZCO lease, for April 1993 through November 1994. (2) Under the LCM LOA, LCM made the monthly "minimum production payments" through June 1999. LCM's failure to make the July 1999 monthly payment was one of the breaches on the basis of which the LCM LOA was terminated.

e. Under the WAZCO lease, per lease provisions described in paragraph 7.d., $10,000. Under the LCM LOA, $500 of each monthly payment went not to Aloisi and Goodman, but directly to Melvin Usher to service his lease to Aloisi of three claims Lessor subleased to LCM in the LCM LOA. With the LCM LOA effective November 1, 1993, the 10 months at the $2,500 monthly payment rate had already passed when the LCM LOA was executed. In each of those 10 months, LCM owed an additional net to plaintiffs of $1,500, and LCM owed an additional net sum of $1,715 for the months from September through November 1994. In connection with executing the LCM LOA, LCM made a payment, with other adjustments, of about $17,000 to plaintiffs. After the execution of the LCM LOA through June 1999 when it stopped paying, LCM paid about $93,000 under the LCM LOA.

f. This question was answered in Answer 6, paragraphs (1) and (2) above.

g. Plaintiffs have reason to believe that WAZCO or LCM, or both, removed stockpiled ore from various locations on the property during the period of their Lease Agreement or LOA and had the ore milled at the Bowerman Mill, located outside of Eddy Gulch. Plaintiffs' belief is grounded in the fact that ore mined by plaintiffs from the Klamath Cut, and hauled to Usher Flat in 1989 before the Forest Service shut down the mining operation, was no longer there at some point during these leases, and likewise, ore stockpiled by prior owners of the Mt.

Laurel private parcel near the mouth of the M J Tunnel on that parcel was also removed from the property during this period.

Plaintiffs are aware of no other motive for any lessee to remove this volume of ore from the property other than to have it milled and sell the gold. However, neither lessee ever reported any production of gold to plaintiffs under either lease, and neither lessee ever paid any royalty, as required under either lease, on the production and sale of any gold from those ore piles.

h. Plaintiffs received no "production or royalty payment" under either the WAZCO Lease or the LCM LOA.

---

INTERROGATORY NO. 8: Please describe in detail all investment amounts or costs incurred and/or paid by Plaintiffs with respect to each mining claim at issue that Plaintiffs contend were lost or diminished in value by the alleged temporary taking, including:

a. the amount incurred;

b. whether the incurred amount was paid;

c. the purpose of the cost incurred;

d. the date the cost was incurred; and

e. an explanation as to how, and in what amount, each investment or cost incurred was lost or diminished in value as a result of the alleged temporary taking.

**ANSWER No. 8**:

(1) Plaintiffs detail their investment in equipment to conduct the mining and milling operations in their Answer to Interrogatory No. 10, and as reflected in the expenditures itemized in ledgers and accounting information in A-164 through A-168.

(2) Plaintiffs invested in labor in their 1988 and 1989 operations, as detailed in the produced ledgers and accounting information A-164 through A-168.

(3) Plaintiffs paid Robert Pincombe and his Mara Ventures entity, and through him the

estate of Alex Patterson (who originally held, and leased to Pincombe, both the two private parcels and the bulk of the prior set of claims on the property in the early 1980s, but whose failure to make annual filings with the Bureau of Land Management led to the location of the current set of claims) $50,000 for the two private parcels within the property (the Mt. Laurel and Rollin parcels, Mineral Survey No. 3161, Lots 45A and 45B, respectively). This $50,000 also acquired Mara Ventures' interest in the claims owned by Ruth Markon in Eddy Gulch (the Anna Johnson group at the extreme east of the property). A-163 documents this transaction. Payment on this agreed purchase price was completed in 1991 in "back-to-back" transactions where all obligations to Pincombe / Mara Ventures were fully satisfied, and the private parcels were then titled in Liberty Mining, Inc. and Energel, Inc., and then used as collateral for secured loans to Liberty and Energel. Also, plaintiffs paid Melvin Usher $14,000 under their lease of his three lode claims that included the area at Usher Flat. (That 1990 Usher lease, and its 1994 amendment, are Exhibits B-1 and B-2 to the LCM LOA.) As to the Usher lease and claims, plaintiffs defaulted on payments under the Usher lease, and lost it when LCM ceased making its lease payments.

INTERROGATORY NO. 9: Please identify any and all stockpile(s) of ore on each mining claim that Plaintiffs contend has been staged for milling and production of a product intended for sale, including the precise location of the stockpile, the source of the ore stockpiled, the quantity of ore stockpiled, the date upon which the ore was stockpiled, and the gold content of the stockpiled ore.

**<u>ANSWER No. 9</u>**: (1) Plaintiffs understand the word "stockpile" does not define the placer (mine dump) deposits as ore "stockpiles" for purposes of this answer. Nonetheless, plaintiffs note that the dump deposits of economic value and present interest to plaintiffs in 1989-1990 are effectively "stockpiled" for milling and production of gold for sale. There is no cost of "mining" such as scraping, blasting or overburden removal, involved in realizing their value. The only cost is loading and hauling any dump deposit to the mill location, just like any

mined apex ore stockpiled a haul distance from the mill.

(2) In 1989 during their approved operations, and prior to the January 4, 1990, Stop Work Order, plaintiffs began hauling ore from the Klamath Cut to Usher Flat, where it was stockpiled for milling. Plaintiffs do not contend there is any millable stockpile at Usher Flat now. During the life of the WAZCO Lease Agreement or LCM LOA, the lessee removed or wasted this ore. The lessee either hauled it to the Bowerman mill (but never reported production or paid royalty to plaintiffs), or wasted it in the course of blading the Usher Flat site and pouring the concrete mill foundation slab, or both.

(3) There are three stockpiles of apex ore from the Klamath Vein on the Sunrise lode claim: the first on the Dariel claim at the west end of the exposure of the Vein, at plaintiffs' KL-7 sample location; the second at the Klamath Cut near sample KL-1, and the third at the ridge pit near KL-6. This ore was mined and stockpiled in 1989 under plaintiffs' approved mining plan of operations prior to the Forest Service's Stop Work Order. The volumes of these stockpiles are specifically measured in the mapping in A-85 and A-86. The tonnage of these stockpiles is included in the economic evaluation with the additional not-yet-severed (excavated and piled) apex ore at the same locations. The unified tonnage and values of the mined (stockpiled) and un-mined apex ore at each of these sites are included in the September 2007 Ferrero Analysis (A-150), and on its Spreadsheets 4-9 (A-151).

INTERROGATORY NO. 10: Please identify:

a. any and all mining, milling and processing equipment that was in place and available for Plaintiffs' use upon the date of inception of the alleged temporary taking, including but not limited to any crushing, milling, screening, concentrating, and/or other ore processing equipment;

b. for each piece of equipment identified in response to 10.a., please state:

i. its precise location as of the date of taking;

ii. when each piece of equipment was purchased and/or leased;

iii. the name of the purchaser and/or lessee of the equipment;

iv. the seller or lessor of the equipment;

v. when each piece of equipment was transported to a milling site for processing ore extracted from the mining claims allegedly taken;

vi. the location of the milling site;

vii. whether the equipment was new or previously used when purchased or leased;

viii. any repairs or refurbishing necessary to make the equipment operational;

ix. the cost of each piece of equipment purchased or the rent paid under any lease;

x. the cost of transporting and setting in place the equipment;

xi. the cost of any repairs needed to make the equipment operational; and

xii. whether and, if so, when, any tests on the complete milling process were performed using the equipment identified in your response to 10.a.

**ANSWER No. 10**: To create a matrix responding discretely to each of twelve subparts of a subsection of one interrogatory would be unnecessarily burdensome and unnecessarily lengthen this Response. Plaintiffs respond to the substance of Defendant's request, individual piece of equipment by individual piece of equipment. As to Interrogatory 10.b.xii., plaintiffs did not erect the milling equipment – the Forest Service baselessly prohibited them from doing so. As the Forest Service prohibited the erection of the milling equipment, the Forest Service prohibited its being tested.

Some of the mining equipment on-site in 1990 was filmed in 1990 (A-73, voice on tape generally Don Moore; filmed at Rollin). This film does not show the gravity separation milling equipment then at the ET Placer Pit. The milling equipment not described below as having been

purchased by plaintiffs is described in document A-33, Don Moore's pricing sheet in early 1990 for the balance of the milling equipment.

1. (a) Two Tri-R Concentrators, (b) Cedar Rapids 5 by 15 Triple Deck Screen, (c) a 60 KW generator, and (d) 2 20-foot flatbed trailers – all purchased for $69,000 from BenCo (Steve Bennett, a principal with Aloisi in Jefferson State) in 1988; originally acquired by Jefferson State in 1986 and used in the ET Placer operation; this suit of equipment remained at the ET Placer site until 1992, when the Forest Service demanded its removal, at which point this equipment was moved to Rollin, where it is today; it was operational in 1989-1990 at the ET Placer site.

2. (a) one Bico pulverizer; (b) one Braun jaw crusher – bench scale (1/2 ton per hour) assaying equipment – purchased new for the operation in 1988-1989 for $6,000; on Rollin in 1989; still at Rollin.

3. Underground operations equipment suite: (a) Manchi Motor for underground "train," and battery and battery charger for the Manchi Motor; (b) five ore cars; (c) one underground mine flatcar; (d) 260 KW generator; and (e) Eimco 12B mucker – acquired in 1988-1989 used for $20,000 in exchange for forgiveness of debt owed Aloisi by Norman Haber; on the property in 1989; sold (except for the generator) to WAZCO (Gavard) in 1993, and removed from the property by LCM during its LOA, or upon termination of its LOA; generator sold for $13,000 to an equipment outfit in Portland, Oregon, by Jim Kendle in 1991.

4. Caterpillar D8H-46A, serial number 27123 – provided used by Don Goodman, direct costs to plaintiffs included $10,000 to truck to California and $20,000 in improvements (installation of parallel rippers and "U" blade from Steve Wilson Equipment); in use on-site in 1989 as primary apex ore excavation equipment; sold to Bob Johnson in 1998 or 1999 for $22,000; price new then approximately $250,000.

5. Caterpillar 950 rubber-tired loader – purchased used for $45,000 from an equipment supplier in Portland, Oregon; on-site and used in 1989 operations; sold for $17,000 to Bob Johnson in 1999 or 2000.

6. Two Terex T24 scrapers – purchased used for $65,000 from the same Portland equipment supplier; on-site and used in 1989 operations; sold for $7,500 (one operational, the other not at time of sale) to Jenner Ranch in 1998.

7. Caterpillar 977 tracked loader – acquired used by delivery from Don Goodman; $12,000 in refurbishing in 1989 by Steve Wilson (Medford), installing winch and forks; used in operations in 1989; returned to Wilson in 1991 for servicing, kept by Wilson for non-payment of servicing / repair charges.

8. Longyear 44 wire-line core drill and 1000 feet of steel core pipe, and accessories – cost $150,000 new in 1988; used in 1988-1989; when mounted on Mack Truck, used to drill sample hole at Union Mine underground target; seen in A-73 video cassette recording; was equipment in place for use in planned 1990 drilling in Mt. Laurel / Anna Johnson area, drilling work for which the Forest Service gave interim authorization in 1991 to plaintiffs to improve the road to the drill site, but never approved the actual drilling under interim authorization in 1991, as an exception to the Stop Work Order; sold for $65,000 of which only 16,000 was received in 1999-2000; traced to an equipment yard in the Sierra foothills later, and acquired by Andrew Edwards (Britannia Construction) of Ashland, Oregon, and used, mounted on a surplused Army truck, in plaintiffs' sampling plan test drilling in 2004, which penetrated underground mine voids in the Klamath Mine down-dip of the Klamath apex ore deposits here; now in Andrew Edwards' yard in Ashland, Oregon.

9. Forty foot truck and trailer – acquired for $7,500 used in 1988-89; used to haul

plaintiffs' cyanide vats from the Pima Mine to Don Moore's in Tucson, Arizona, awaiting shipment to the mine site; truck and trailer stored in Ashland and lost for rental.

10. Underground long-hole drill and drill steel (for underground drill core sampling), slusher and Detroit 250 (cfm) compressor – acquired for $3,000 from Ed Rutter in Winston, New Mexico in 1988; the compressor and slusher were both used in 1989 operations, with the slusher used to load ore from apex cuts; the compressor remains at Rollin (not in working condition); the slusher was sold to Mark Gavard during the WAZCO Lease Agreement, and removed from the property during the LCM LOA's life, or at its termination; the underground drill and drill steel is in storage in New Mexico.

11. Eight steel, brick-lined vats for cyanide leaching – purchased used for $12,000 ($1,500 each) from Don Moore, who had acquired surplus equipment at the Pima Mine southwest of Tucson, Arizona; 4 remain at Don Moore's; the other 4 were loaned to Norman Haber, thereafter lost by or stolen from Haber from an equipment yard of his, which loss constituted part of the debt from Haber to Aloisi referred to in Answer No. 10(3).

12. Six Denver flotation cells – used, worth $8,000, exchanged to Aloisi by Norman Haber in forgiveness of Haber debt to Aloisi, intended for Eddy Gulch as part of flotation circuit, exchanged to Don Moore in exchange for metallurgical testing and other services to Liberty Mining.

13. Two hoppers – bought used for $1,000 each from Benco (Steve Bennett), out of the dissolution of the Jefferson State operation; used in the ET Placer operation, moved to Rollin in 1989 and ready for use in mill set-up; they remain at Rollin.

14. Two grizzlies – bought used for $1,000 each from Benco (Steve Bennett), out of the dissolution of the Jefferson State operation; used in the ET Placer operation, moved to Rollin in

1989 and ready for use in mill set-up; they remain at Rollin.

15. Cedar Rapids Pitmaster and two conveyor belts, with portable screen and crusher jaws and rolls (mill pre-crush in advance of ball mill, 25 ton/hour capacity) – purchased for $26,000 used from Don Swanson; moved on-site in 1989 for mill set-up; still at Rollin.

16. Joy 185 (cfm) compressor – cost about $2,000; bought in 1982 by Aloisi and used in the Double Eagle and Jefferson State operations at the ET Placer pit; moved to Rollin in 1989 and used to power drilling and blasting in connection with approved 1989 access road construction and improvement; still being used near Eddy Gulch (at local lumber mill).

17. One pressure washer – bought new for $4,500; used in 1989-1991 road work, sold around 1993.

18. International Shop Truck (one and a half ton) – bought used for $2,500 from Webfoot of Medford in late 1980s; on-site during 1988-1989 operations; in storage in New Mexico now.

19. International flat-bed truck (two and a half ton) – bought used from Webfoot of Medford for $3,500; used on-site during operations; sold during 1990s for $500.

20. Boles Aero 32-foot trailer (for camp use) – bought for used $6,000, moved on-site in 1988-89, and used for employee housing in 1988-89 during operations; in storage in New Mexico.

21. Mack truck (the core drill was mounted on it) – bought used for $4,000 from Kendle Trucking in 1988; available on-site and used in drilling operations then (see Answer No. 10(8).

22. Portable Alaska sawmill – purchased used for $6,800 in 1988; used on-site to mill lumber from trees marked by the Forest Service for cutting in connection with approved 1988-1989 clearing, road construction and improvement; this lumber was used to built various cabins

and other structures at Rollin which were used in the 1989 operations. Salmon Mountain Forestry (Jim Villapiano) milled the cut trees, at a rate of $100 per 1,000 board feet, so in exchange for milling the 68,000 board feet of timber he acquired the sawmill for $6,800; Villapiano removed the sawmill from Eddy Gulch under those terms after completing the lumber milling work.

23. 1989 Ford 4 by 4 (three-quarter ton) pickup truck – purchased new for $25,000; this was the main supervisory work truck on site in 1989; Aloisi acquired and kept it after operations were shut down.

24. Fifth wheel Army "Dolley" (used as portable axles to move portable but unwheeled equipment) – purchased used in Talent, Oregon, for $500 in 1989 and used to move the Pitmaster; still at Rollin.

25. Northwest 41 dragline – bought for $7,500 used from Danny Chancellor for use in the milling circuit to load the Tri-R / Triple-Deck concentrator, and to clean out sedimentation ponds; sold to Christian Hardy in 1992 for $4,000.

26. Welder – bought used for $1,500 from Bill Barton in 1988, used in 1988-1990 for all welding uses; in storage in New Mexico now.

27. Campbell-Houser portable air compressor – bought new for $2,500 in 1989, used in operations; in storage in New Mexico now.

28. Powder magazine – bought used for $3,000 in 1982 for the Double Eagle placer operation; at Rollin during the operation in 1988-1989; sold to LCM during the LOA for $1,000, and removed from the property by LCM either during the LOA or upon its termination.

29. One 2200 Honda generator and one 3500 Honda generator -- $4,000 new, used in 1989 operations, and disposed of after operations ceased.

---

INTERROGATORY NO. 11: Please identify with particularity, by written description and on a map, the discovery point(s) for each mining claim as of the date of the inception of the allege temporary taking.

**ANSWER No. 11**: Plaintiffs object that this Interrogatory is irrelevant to the case. Under the General Mining Laws, whether a claimant holds ground within a claim against other competing claimants, or has a "discovery" that validates the claim for purposes of seeking a patent under the mining law, or constitutes the claim as a "valid existing right" unaffected by a withdrawal of the land – is determined by the state of knowledge, and the exposure of mineralization as a whole at the relevant date for making such a determination. It is not based on or grounded in the "discovery point" employed in the claim location notice and monumented on the ground at that time. In addition, the location of discovery points within a claim is immaterial to the Forest Service's obligation to process mining plans of operations under its surface management regulations at 36 CFR Part 228 – the Forest Service is obligated to process such plans whether claims are properly monumented, whether the claims have discovery points, or whether the claims are supported by discovery of a valuable mineral deposit or not, on "open ground" as Defendant has admitted all the land in all the mining claims in this case is "open ground."

(1) The "discovery point" for each mining claim, in the usual meaning of that phrase under the Mining Law of 1872, is identified on each claim location notice filed in connection with the staking, location and recordation of the mining claim. The map and related descriptions are part of each location made in 1985 by plaintiffs. Defendant has all of these maps and descriptions as evidenced by their use by the Forest Service in its failed March 2007 Motion in the administrative contest seeking an order declaring some of the claims to be null and void.

(2) The "discovery points" for each claim, in the alternative sense of the places on each

claim that contain mineralization of such quantity and quality as would justify a prudent person in the expenditure of his or her labor and means with the reasonable expectation of developing a paying mine, are identified and evaluated in the September 2007 Ferrero Analysis, and the maps that are part of that Analysis, and as described more specifically in Answer No. 1.d., Answer No. 1.e., and Answer No. 2.e. above.

---

INTERROGATORY NO. 12: Please identify each and every ore sample and sample location on each mining claim upon which Plaintiffs will rely upon at trial.

**ANSWER No. 12**: These samples, and their locations, are displayed on the maps that are part of the 2007 Ferrero Analysis.

---

INTERROGATORY NO. 13: Please identify all persons involved in any and all sampling, processing and testing of the alleged gold or gold ore deposits found on Plaintiffs' mining claims, including but not limited to Messrs. McBroom and Quigley.

**ANSWER No. 13**: The persons involved in sampling, processing and testing of the deposits on the property are disclosed in the Ferrero narratives, in the documents produced regarding each sampling, processing and testing exercise, and in the test and assay reports, so far as are known to plaintiffs.

---

INTERROGATORY NO. 14: Please describe where and in what manner any and all sampling of the alleged mineral deposits or resources was conducted, including:

a. the precise location on each mining claim where each sample was collected;

b. the sampling method used to collect each sample;

c. where and how each sample was stored upon collection through testing, specifying:

i. the container if any in which each sample was stored;

ii. whether the container was locked or stored in a locked facility;

d. the chain of custody of each sample; and

e. the equipment used to collect, transport and process the samples collected.

**ANSWER No. 14**:

a. The CAD-file maps (A-152 through A-154) provided here set the location of every sample for which plaintiffs know the location. The third CAD file map (A-154) sets the location of every sample included in the economic evaluation of the September 2007 Ferrero Analysis.

b. each sample provided throughout the A-document series, with respect to each sampling or assaying document there.

c. With respect to the sampling conducted by Thomas Ferrero in Eddy Gulch, in 1985-1986 on behalf of Mega Gold, and thereafter on behalf of plaintiffs and their predecessor business entities: all surface samples were cut by hand using hammer and chisel, bagged in one or two gallon plastic or olefin bags, hauled to Mr. Ferrero's office in Ashland, Oregon by him, boxed at his office and the boxes sent to assay laboratories from the Ashland post office. The reverse circulation drilling samples were collected in trays under a cyclone and splitter, bagged at the drill site in five-gallon olefin bags, hauled in Mr. Ferrero's truck to a prep lab in Wilderville, Oregon, there crushed, pulverized and split into multiple samples bagged in heavy paper geochem bags, and then boxed by Mr. Ferrero and sent from the Ashland post office to the selected laboratories for cross-checking of assays.

With respect to the "pre-test" samples plaintiffs took in 2004 under Forest Service observation and approval, the samples were extracted with an excavator. The excavator samples were spread out on a tarp on level ground and grid-sampled with a shovel into bags. They were bagged in 50-pound olefin bags on site. The Forest Service witnessed all of this. The samples

were hauled at the end of each day and piled at a site at Rollin. After all samples were cut and piled, the bags were loaded on a trailer by Fred Aloisi and Tom Ferrero, and hauled to Don Moore in Tucson, Arizona by Fred Aloisi. The samples were thereafter transported to the Jacobs laboratory for assaying by Don Moore.

With respect to the gravity mill check samples sent to Florin Laboratory in 2007, pulps the mill tests conducted by Don Moore were sent to Mr. Ferrero via a commercial freight common (Yellow Freight Co.). Mr. Ferrero made sample splits from the pulps of the mill samples using a standard sample splitter. The splits were bagged in 1 gallon plastic bags and boxed and shipped to Florin by Mr. Ferrero. The 2007 Florin samples from the Union, Mt. Laurel and the west-side Klamath dumps were taken by Mr. Ferrero by shovel, bagged in 5-gallon cotton bags, and then otherwise handled as described above with respect to the 1985-1989 Ferrero sampling.

---

INTERROGATORY NO. 15: For each mining claim that Plaintiffs identified in response to Interrogatory No. 1.d., what governmental action(s) do you contend caused a temporary taking?

**ANSWER No. 15**: The Answer to Interrogatory No. 15 does not vary by mining claim (nor is it different with respect to the private Mt. Laurel parcel). The same actions applied to the entire property.

The Forest Service's entire course of conduct following its receipt of the July 23, 1990, biological opinion, all of which actions unnecessarily created, continued and extended the temporary taking without reasonable basis or purpose in the administration of applicable law and policy, and the salient features of which baseless and purposeless delaying conduct were:

(1) promptly taking administrative action with respect to every suspended timber sale, and proposed timber sale cleared by the July 23 Opinion, but not taking any action in connection

with the Liberty Mine plan of operations, also cleared by the July 23 Opinion;

(2) failing to comply with its obligation to notify the outside party of the results of the its consultation with the Fish and Wildlife Service, as required by FWS rule and policy (a wrong for which plaintiffs had no remedy, as the Forest Service's conduct left plaintiffs not knowing they had been mistreated);

(3) upon realizing, at any of various times after July 23, 1990 and throughout 1991 into early 1992, that the July 23 Opinion did clear the Liberty Mine plan of operations, choosing not to notify the plaintiffs immediately of that fact;

(4) upon finally notifying plaintiffs in early 1992 that the Fish and Wildlife Service had cleared the Liberty Plan, deliberately failing to notify the plaintiffs that the clearance occurred in July 1990, over a year and a half before;

(5) demanding in the Spring of 1992 that plaintiffs submit a new plan of operations as a pre-condition of the Forest Service's taking any further administrative action consistent with the July 1990 Biological Opinion, with the apparent intention of "starting over," and thereby trying to sweep the prior year and three-quarters of bungling under the administrative rug;

(6) treating plaintiffs' April 1992 resubmission of its 1989 All Phase Plan of mining operations (submitted in response to the Forest Service demand) as a new plan, not as the same 1989 All Phase Plan, and reinitiating section 7 consultation with the Fish and Wildlife Service on this "new" action (which the Fish and Wildlife Service eventually said was not different and did not require a second consultation); and

(7) dismissing plaintiffs' administrative appeal of the decision to treat the April 1992 as a "new" action starting from scratch, on the basis of the false statement in the decision that plaintiffs had completed the mining operations authorized by the 1989 plan approval.

---

INTERROGATORY NO. 16: If Plaintiffs contend that the U.S. Forest Service approved a plan of operations authorizing Plaintiffs to extract, mill and sell gold obtained from anything other than a test milling operation, please identify the communication or document(s) which Plaintiffs contend granted that authority.

**ANSWER No. 16**: (1) Plaintiffs do not contend that the November 1989 Forest Service approval letter authorized anything more than it authorizes – it speaks for itself, together with plaintiffs' All Phase Plan of mining operation, in describing what plaintiffs sough to do and what the Forest Service authorized.

(2) Aloisi and others had conducted placer mining operations in Eddy Gulch, downstream (north) of the claims and property in this case, in the early 1980s under the name Double Eagle, and in the mid to late 1980s under the name Jefferson State Exploration and Development. In the latter period, the placer mining site was called the "ET Placer Pit." Aloisi and his colleagues in the Jefferson State /later period operated the ET Placer Pit with centrifuges (gravity separators), a jig and other gravity separation mill equipment. All of this equipment was available for and useable in the gravity separation (first-step, or front-end) circuit of their planned and approved test milling facility. A-150, at 19-22; regarding equipment, see Answer No. 10(1), 10(13), 10(14), 10(16), 10(25), and 10(28). In addition, the ET Placer pit and operations site were bonded in 1989, in compliance with conditions in the Forest Service's periodic approvals of those placer operations. In fact, at various times in 1988-1990 when the Forest Service was cooperating with Aloisi in developing the mine on the claims and property in this case, the Forest Service suggested that it would be beneficial and appropriate to use the ET Placer pit itself as the location for disposing of mill tailings from the mining operations at issue in this case.

Given the potential integration of the use of the two mining areas in Eddy Gulch in the

Forest Service's view, plaintiffs considered the ET Placer site as a logical alternative location for their milling operations, or mill tailings disposal, had any delay occurred in construction of any gravity / flotation mill circuit, or any gravity / flotation / cyanide mill circuit at Rollin or Usher Flat. Further, as described by Mr. Ferrero in A-150 (at 19-21), and 1989 plan documents referred to there (A-22, A-24, A-139 and A-140), plaintiffs could have processed some of the ore they were approved to mine in November 1989 through that centrifuge (gravity separation only) equipment.

(3) The Forest Service representing in writing to plaintiffs that it intended to act to approve phases 3 and 4 of the 1989 All Phase Plan of mining operations, completing the environmental analysis in Spring 1990 (FS # 46). Plaintiffs also know that, from the moment of the January 4, 1990, Stop Work Order, the Forest Service unilaterally ceased all such administrative processing of the unapproved balance of the all-phase 1989 plan of operations, and the Forest Service was regarded as the lead agency with primary and initial responsibility to act, by all other permitting entities with any role in the approval of activities covered by phases 3 and 4 of the 1989 All Phase Plan of mining operations.

---

INTERROGATORY NO. 17: For each mineral deposit or resource allegedly found on each mining claim at issue, please state the gold recovery rate that Plaintiffs contend they attained, or were attainable, with the milling and processing equipment identified in response to Interrogatory No. 10.a.?

**ANSWER No. 17**: The September 2007 Ferrero Analysis employs weighted average gold recovery rates based on actual test results from the samples employed in the analysis, as displayed on its Spreadsheets 3 and 4 (A-151). These actual test results are applied through the economic spreadsheets in A-151. Ultimately, the weighted average recovery for apex deposits is 66%, the weighted average recovery for the dump deposits is 77%, and the weighted average

recovery for the underground deposits is 90%.

There is no single "gold recovery rate" with respect to the gold deposits in Eddy Gulch. There are two distinct components to the gold mineralization. First, there is a background fraction less than 0.08 oz per ton of pickled, complexed fine gold, largely recoverable by flotation milling of the gold ore, and more fully recovered by a mill circuit employing flotation followed by cyanide leaching. Second, there is a free-milling gold fraction found largely in samples assaying above 0.08 oz/ton, which is largely recoverable by gravity separation. It was the latter ore which was mined underground in the historic mining operations that created the dumps on the property. This principle is applied on Spreadsheet 9 (A-151), which analyzes plaintiffs' expectation that, had they chosen to employ an initial milling step of gravity separation using the crusher and centrifuges on-site in the ET Placer operation area, they would have recovered 90% of the gold content above 0.08 oz per ton from higher grade ore they would select to process in such an initial gravity separation sequence.

---

INTERROGATORY NO. 18: For each mineral deposit or resource allegedly found on each mining claim at issue, please describe the milling and gold recovery process that Plaintiffs used, or intended to use, to attain the gold recovery rates identified in response to Interrogatory No. 17.

**ANSWER No. 18**: This Interrogatory is answered directly by the narrative explanation in the September 2007 Ferrero Analysis (A-150, and A-151, Spreadsheets 3 through 9). As that narrative explains, plaintiffs had not committed themselves to whether they would seek to add a cyanide circuit behind the flotation circuit they contemplated, nor had they committed themselves to running underground or high-grade ore through a flotation circuit. The Forest Service's unjustified prohibition of their operations prevented them from erecting the mill and determining, by running ore and, based on the results of actual test operations, then adjusting or

modifying the mill circuit to implement the system or systems that optimized recovery. The 66% recovery from apex ore and the 77% recovery from dump ore described in Answer No. 17 above is based on employing a gravity / flotation / cyanide mill circuit. The 90% recovery from underground ore is based on employing gravity separation and perhaps a flotation circuit following gravity separation, but without a following cyanide circuit.

## ANSWERS TO REQUESTS FOR PRODUCTION OF DOCUMENTS

REQUEST NO. 1: Please produce any and all documents relating to or reflecting the $1,750,000 in costs allegedly incurred by Plaintiffs as set out in paragraph 24 of the Complaint.

**ANSWER No. 1**: Plaintiffs produce here documents A-164 through A-168, pertaining to and constituting part of their accounting for their expenses in operating on the property in 1989-1991. Plaintiffs also produce here A-163 and refer to the agreements and equipment purchases identified in the Answers to Interrogatories 8 and 10, among others.

---

REQUEST NO. 2: Please produce any and all documents regarding or reflecting any and all costs allegedly incurred by Plaintiffs in any way regarding the mining claims allegedly temporarily taken by Defendant, that were incurred in addition to the alleged costs identified in paragraph 24 of the Complaint.

**ANSWER No. 2**: There is no discrete, separate class of documents to produce in response to this Request.

---

REQUEST NO. 3: Please produce any and all documents reflecting or relating to any chemical or physical tests conducted on any ore samples collected from the alleged gold deposits on Plaintiffs' mining claims which Plaintiff contends were temporarily taken by Defendant, including but not limited to assays and/or metallurgical tests conducted by or on behalf of Plaintiffs at any time.

**ANSWER No. 3**: There are no additional documents to be provided here – the responsive documents have already been produced.

---

REQUEST NO. 4: Please produce any and all field and laboratory notes relating to all survey and sampling work conducted by or on behalf of Plaintiffs at the mining claims which Plaintiffs allege were temporarily taken by Defendant.

**ANSWER No. 4**: There are no additional documents except for the Ferrero field notes provided here as A-160, which are relevant to Answers to several of the Interrogatories.

---

REQUEST NO. 5: Please produce all documents obtained by Plaintiffs, their agents or representatives that relate to or reflect the history of the mining district in which the mining claims are located, including but not limited to any and all historical records of the gold content of the ore, that have not previously been produced.

**ANSWER No. 5**: Plaintiffs object to this Request as overly broad and burdensome. Plaintiffs have researched Eddy Gulch and its history over many decades. They have poured over archives, court files, maps and library materials. Material portions of this research have been compiled and produced to Defendant; its substance was largely ignored in the Forest Service's 1999 Mineral Report. If there is any document referred to in any of the several dozen "A-list" produced documents that Defendant seeks to review and cannot find on its own, contact me and we will see if it remains available to plaintiffs. If there is any class of information that Defendant (and its experts, consultants or agents) feels is missing or incomplete in the historical record, ask us and we will discuss what additional material there may be beyond what we have produced or referred to in our production.

---

REQUEST NO. 6: Please produce any and all data relating to or reflecting the dimensions and quantity estimates of any gold deposit or resource in each mining claim that Plaintiffs allege was temporarily taken by Defendant.

**ANSWER No. 6**: These documents have already been produced; A-160 pages (additional Ferrero field notes) are supplied here, to the extent A-160 may be deemed responsive

to this Request.

---

REQUEST NO. 7: With respect to each and every gold deposit or resource found on each mining claim that Plaintiffs contend was temporarily taken, please produce any and all documents regarding or relating to the date on which each alleged deposit or resource was located or exposed, the identity of the person who located or exposed each alleged deposit or resource, the estimated quantity in tons of ore of each deposit or resource, the dimensions of each deposit or resource, and the gold content per ton of ore.

**ANSWER No. 7**: These documents have already been provided; see Answer to Interrogatory No. 2 and the September 2007 Ferrero Analysis, A-152, which is specifically a complete mapping of sample locations and data 1932-1990.

---

REQUEST NO. 8: Please produce each and every federal, state, county and/or local permit, license or approval that Plaintiffs obtained with respect to the mining claims that Plaintiffs contend were temporarily taken.

**ANSWER No. 8**: Consistent with plaintiffs' Answer to Interrogatory No. 3, there are no further documents to produce responsive to this Request No. 8.

---

REQUEST NO. 9: Please produce any and all documents regarding or relating to each and every sale by Plaintiffs of gold or gold-bearing ore that was extracted from the mining claims that Plaintiffs contend were temporarily taken.

**ANSWER No. 9**: Consistent with plaintiffs' Answer to Interrogatory No. 4, there are no such documents.

---

REQUEST NO. 10: Please produce any and all documents reflecting, regarding or relating to the ownership of each mining claim at issue as of the date upon which the Defendant allegedly first temporarily took the mining claim.

**ANSWER No. 10**: Consistent with plaintiffs' Answer to Interrogatory No. 5, the documents relevant here were produced to the Forest Service during discovery in the

administrative contest.

---

REQUEST NO. 11: Please produce any and all documents regarding or relating to any effort by Plaintiffs to sell, lease, or otherwise gain economic value of any kind from each mining claim allegedly temporarily taken by Defendant, including but not limited to documents regarding or relating to any offer to purchase or lease any of Plaintiffs' mining claims, and any and all documents regarding or relating to any sale or lease of the mining claims.

**ANSWER No. 11**: Plaintiffs provide here documents A-155 through A-159, and A-161, as further described in the Answer to Interrogatories Nos. 6 and 7.

---

REQUEST NO. 12: Please produce any and all documents regarding or relating to any leases entered into with respect to the mining claims allegedly temporarily taken by Defendant, including all documents relating to or reflecting negotiations leading up to the execution of each lease, the lease itself (if different from FS Document Nos. 142 and 147), the consideration paid for each lease, any minimum production payments, any production or royalty payments, and the termination of each lease.

**ANSWER**: Plaintiffs cannot find any further documents pertaining to payments made. The checks received under the leases were cashed or deposited. No further written documentation of those payments was provided by lessees to lessors under the leases.

Because of the difficulty of communication between Sawyers Bar, California (the nearest post office to Eddy Gulch) and other places, nearly all communications pertaining to leases and lease negotiations were oral or telephonic.

Separately, plaintiffs object that any negotiation documents are, usually by the express terms of the lease or contract itself, specifically deemed superseded and of no effect by the parties themselves, and as a matter of law are not admissible regarding the intentions of the parties in the agreement reached (except as may be allowed by the parol evidence rule, which has no application in this case).

Plaintiffs are unable to locate either a printed or electronic copy of the notice of breach

letter involving the WAZCO Lease, which the letter of April 26, 1994, states was dated March 29, 1994. In any event, the contents of the March 29 letter are in substance restated in the April 26 letter.

---

REQUEST NO. 13: Please produce any and all documents regarding or relating to any and all stockpile(s) of ore that Plaintiffs contend has been extracted and staged for milling and production.

**ANSWER**: There are no additional documents to produce responsive here – the stockpiles are described in the Answer to Interrogatory No. 9.

---

REQUEST NO. 14: Please produce any and all documents regarding or relating to any and all mining, milling and processing equipment that Plaintiffs identified in response to Interrogatory 10, including but not limited to bills of sale, leases, invoices, and shipping documents.

**ANSWER No. 14**: The accounting documents that are A-164 through A-168 are partial documentation of the costs of, and payments for, equipment acquired for and used in the operations.

---

REQUEST NO. 15: Please produce any and all documents regarding or relating to the discovery point(s) for each mining claim.

**ANSWER**: Plaintiffs re-state their objection to Interrogatory No. 11 that this Request is irrelevant. Proceeding to respond to the objectionable (as irrelevant) substance of the Request:

(1) As explained in the Answer to Interrogatory No. 11, defendant has the location notices, and accompanying maps, that identify the "discovery point" for each claim connected with staking, locating, and recording each claim consistent with the Mining Law of 1872. In addition, in 1998, at the request of the mineral examiners, Mr. Ferrero provided them the survey coordinates for each corner of each mining claim in the property. Given that discovery points

are identified on the location notices by course and distance measurements from the lines of the claims, defendant has every means available to the competent to identify the physical location of the discovery points for each claim.

(2) To the extent this request seeks documents pertaining to the identified mineral deposits on each claim that were of economic value and present interest to the plaintiffs in 1989-1990, these have previously been provided in the A-list of produced documents, and are mapped in the September 2007 Ferrero Analysis (A-150, and A-152 through A-154).

---

REQUEST NO. 16: Please produce any and all resumes, curriculum vitae, or other biographical documents regarding or relating to the persons identified in response to Interrogatory No. 13, including but not limited to the resumes of Messrs. McBroom and Quigley.

**ANSWER No. 16**: Plaintiffs have no further responsive documents not already produced in prior production and discovery responses.

---

REQUEST NO. 17: Please produce any and all documents regarding or reflecting sampling of the alleged gold or gold ore, including but not limited to documents that describe or depict where each sample was collected, how each sample was collected, where and how each sample was stored upon collection through testing, the chain of custody of each sample, and the equipment used to collect, transport and process the samples.

**ANSWER No. 17**: Plaintiffs have no further responsive documents not already produced in prior production, or discussed in their Answer to Interrogatory No. 14.

---

REQUEST NO. 18: Please produce any and all documents that relate in any way to the communication(s) or document(s) identified by Plaintiffs in their response to Interrogatory No. 16.

**ANSWER No. 18**: There are no further documents responsive to this Request.

---

REQUEST NO. 19: Please produce any and all documents that Plaintiffs reviewed, consulted or referred to when responding to the Interrogatories propounded herein, whether or

not the document was expressly referenced by Plaintiffs in any of their responses.

**ANSWER No. 19**: This request is overbroad, vague and burdensome. Plaintiffs have produced all available documents material to their Answers. If there is some specific, identifiable topic as to which Defendant believes the case would be furthered by discussing what additional documents may have been looked at in preparing these Answers, ask and we will cooperate in producing any such specific, identifiable documents as are not otherwise protected from production.

---

REQUEST NO. 20: Please produce any and all documents that relate to or reflect the basis or bases for Plaintiffs' temporary takings claims asserted in this action that have not been previously produced.

**ANSWER No. 20**: There are no further documents responsive to this Request of which we are immediate aware. As plaintiffs proceed, plaintiffs are aware of their continuing obligation to supplement if and when additional responsive material of any kind is identified.

---

REQUEST NO. 21: Please produce any and all documents relating to the gold recovery rates that Plaintiffs contend they attained, or were attainable, with the milling and processing equipment identified in response to Interrogatory No. 10.a.

**ANSWER No. 21**: Plaintiffs have produced here their A-150 through A-154, and produced any and all other documents referred to in those documents, and on which that analysis is based, as explained in their Answer to Interrogatory No. 17.

---

REQUEST NO. 22: Please produce any and all documents relating to the milling and gold recovery process that Plaintiffs may identify in response to Interrogatory No. 18.

**ANSWER No. 22**: Plaintiffs have produced here their A-150 through A-154, and produced any and all other documents referred to in those documents, and on which that analysis is based, as explained in their Answer to Interrogatory No. 18.

---

REQUEST NO. 23: Please produce all documents that Plaintiffs may rely upon at trial

**ANSWER No. 23**: Plaintiffs have done so, subject to the objections and qualifications: (1) that expert reports may be completed and discovered when completed at whatever later date is set in pre-trial schedule; (2) that neither party is obligated to have created or shared any demonstrative exhibits they may create and stipulate to use; and (3) that plaintiffs recognize their ongoing obligation to supplement their production should they identify additional responsive documents as they proceed.

---

Dated: September 24, 2007

Respectfully submitted,

Lawrence G McBride

Lawrence G. McBride
FOLEY & LARDNER LLP
3000 K Street, N.W. – Suite 500
Washington, D.C. 20007
Telephone: (202) 672-5300
Facsimile: (202) 672-5399
E-mail: lmcbride@foley.com

RULE 33(B) CERTIFICATION

I hereby certify, pursuant to section 1746 of Title 28 of the United States Code, that the above responses to Defendant's Interrogatories are true and correct to the best of my current knowledge and belief.

Alfred L. Aloisi
P. O. Box 1003
Sawyers Bar, CA 96027

RULE 33(B) CERTIFICATION

I hereby certify, pursuant to section 1746 of Title 28 of the United States Code, that the above responses to Defendant's Interrogatories are true and correct to the best of my current knowledge and belief.

Thomas P. Ferrero
Ferrero Geologic
760 Oak St.
Ashland, OR 97520

**CERTIFICATE OF SERVICE**

I hereby certify that on September 24, 2007, a true and correct copy of the foregoing Plaintiffs' Answers To Defendant's Second Set Of Interrogatories And Requests For Production Of Documents was served by hand-delivery upon the following counsel of record:

Bruce K. Trauben
Trial Attorney
Natural Resources Section
Environmental & Natural Resources Division
U.S. Department of Justice
601 D Street, N.W. – Room 3607
Washington, D.C. 20004

Lawrence G. McBride