**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| ALFRED ALOISI, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | No. 95-650L |
| | ) | |
| v. | ) | Judge Lawrence S. Margolis |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DECLARATION OF JAMES W. DEMAAGD**

1. I am a geologist and Certified Mineral Examiner with the US Forest Service Pacific Southwest Region (Region 5).

2. I graduated from California State University at Chico with a Bachelor's of Science in Geology in 1993, and have been employed with the US Forest Service since April of 1993.

3. I became a certified United States Forest Service Mineral Examiner in November of 1999, and I was certified as a Mineral Examiner by the Bureau of Land Management in September 2000. I have worked on over 48 projects, in which I have evaluated or examined mining projects throughout California and Oregon, for placer gold, lode gold, nephrite, jade, opal, and pumice.

4. I am familiar with the takings claim Plaintiffs are pursuing in this matter.

5. I also am familiar with the mining claims, which are the subject of Plaintiffs' takings claim (the "Liberty Mining Claims") and the documents relating to those mining claims, including the documents submitted to the Court in the Joint

Appendix, and the exhibits submitted by the Plaintiffs in support of their motion for summary judgment, among others.

6. I have been personally involved in this matter since 1998, in the capacity of a Mineral Examiner for the US Forest Service, and base this declaration upon my personal knowledge of the Liberty Mining Claims and documents relating to those mining claims, my review of other relevant documents, my education and my professional experience.

7. I have visited the mining claims at issue on numerous occasions since 1998. I was present onsite when the Forest Service collected samples at the contested mining claims in 1998, 2004, and 2007. I also observed sampling conducted by Plaintiffs in 2004. And, I personally was involved in collecting the Forest Service's samples of Plaintiffs' 2004 bulk samples for verification purposes.

8. Attached hereto as Attachment No. 1 is a true and correct copy of Giles, D.L., 1998, Project Report, Metallurgical Due Diligence, Klamath Area, etc, Liberty Mining Group, Eddy Gulch Area, Siskiyou County, CA., including Facsimile attachment from Knelson Concentrators.

9. Attached hereto as Attachment No. 2 is a true and correct copy of excerpts from MSRDI, 1998, Final Report: Gravity Concentration Tests on Eddy Gulch Sampling Program, pp. 1, 14.

10. Attached hereto as Attachment No. 3 is a true and correct copy of an excerpt from Sannes, D.L., 1977, Report of Activities for the Property of New Cinch Uranium, LTD (N.P.L.), Siskiyou County, California, U.S.A., pp. 1-4.

11. Attached hereto as Attachment No. 4 is a true and correct copy of an excerpt from

Ferrero, T.F., 1986, Summary of Conclusions, Spring – 1986 Exploration Data, Eddy Gulch Properties, Mega Gold Resources, LTD., p. 1.

12. In 1999, I co-authored with John Gutierrez (a former Forest Service Certified Mineral Examiner) a Forest Service Mineral Examination Report of the Liberty Mining Claims. The purpose of this report was to determine whether certain of the unpatented mining claims at issue in this litigation are valid under the mining law. The unpatented mining claims that we examined are the Sunrise and Six O'Clock lode claims, and the Yankee, Sunset, Compressor, and East Fork placer claims. See Attachment No. 5, which is a true and correct copy of excerpts from Gutierrez, J., and DeMaagd, J.W., 1999, United States Department of Agriculture, Mineral Report: Mineral Examination of the Eddy Gulch Group of Gold Properties, Klamath National Forest, Siskiyou County, California ("Mineral Examination Report"). These mining claims include within their boundaries all or part of the following potential gold resources, the Klamath Apex (Sunrise), Incline Ridge, or apex, and Six O'Clock underground (Six O'Clock), Blacksmith, Klamath and Yankee Dumps (Sunset and Yankee) and Union Dumps (Compressor and East Fork). See Pls.' Ex. PE-15 at 211-15.

13. In the Mineral Examination Report, I (and Mr. Gutierrez) conclude that the mining claims examined were not valid for lack of a discovery of a valuable mineral deposit as of 1999, the date of the report, and as of any point during the alleged taking period – 1990 to 1994. See Attachment No. 5 at 50.

14. I have read and reviewed Mr. Thomas Ferrero's Affidavit, dated January 29, 2008, and I have reviewed Mr. Ferrero's deposition transcript from November 1,

2007, in which he discussed the spreadsheets and maps presented at JA-189, JA-191, JA-192, and JA-193, among other documents.

15. Based upon my personal knowledge of the mining claims, my knowledge of the documents relating to the mining claims, and Mr. Ferrero's Affidavit and deposition transcript, it is my opinion that Mr. Ferrero's Affidavit contains important factual errors and omissions. The bases for my opinion are set out in more detail in the following paragraphs.

16. At paragraph 49 of his affidavit, Mr. Ferrero includes estimates of gold values that Plaintiffs believe they could have extracted from the May underground along with other sources. The May underground gold resource is part of the patented Mt. Laurel mine. See JA35 (map). Based upon my knowledge of the available data, to estimate the amount of gold available in the May underground, it appears that Mr. Ferrero is relying only upon historical gold production records, rather than actual sampling data. Further, it appears that Mr. Ferrero's opinion is based largely on JA-6, a 1985 compilation by Mr. Ferrero of historical gold production reports. JA-6, however, contains some significant errors with respect to the reported historical gold production that may have been carried over into Mr. Ferrero's estimates of available resources.

17. For example, with respect to the Mt. Laurel mine, Mr. Ferrero lists in JA-6 gold production in terms of dollars as:

    a. pre 1887 producing $161,920, and

    b. 1863-1886 producing $600,000.

See JA-6 at 145.

18. These two numbers contradict each other as the value for 1863 through 1886 ($600,000) should be a portion of the pre 1887 ($161,920) value, and not larger. In addition, Mr. Ferrero appears to double-count the Mt. Laurel production data by including them in the numbers for the Union and Klamath mines. See JA-6 at 145 (adding $154,000 to Union mines and also noting that the "majority of production" from Klamath "came from the Mountain Laurel Mine").

19. Mr. Ferrero reportedly utilizes data from California State Minerologist's Reports to construct his chart found in JA-6 at 145, however, I have reviewed all of the pertinent State Minerologist's Reports and was not able to corroborate the data Mr. Ferrero presents in his chart. Rather, I conclude that Mr. Ferrero relies upon a 1932 report by Elmendorf, who did not correctly cite the data found in the State Minerologist's Reports. Mr. Elmendorf's 1932 errors are repeated by Mr. Ferrero in his 1985 report found at JA-6. Consequently, Mr. Ferrero apparently relies upon erroneous historical production records to support his conclusion that the May underground still is capable of producing significant amounts of gold. See Ferrero Affidavit, ¶¶ 49, 50 (noting that the data presented in paragraph 49 were excerpted from his report at JA-190); see also JA-190 at 1561 (Mr. Ferrero explains his reliance upon historical reports, including data from Elmendorf 1932, among others); and see JA-6 at 145. I conclude therefore that Mr. Ferrero's profit estimates presented in paragraph 49 of his affidavit are based in part upon erroneous historical production records, and are not reliable.

20. Mr. Ferrero also provides an estimate of the value of gold that could be extracted from the Six O'Clock underground along with other mining claims at paragraph

49 of his Affidavit but, based upon my personal knowledge of the Six O'Clock claim, there are no underground workings – no adits or shafts – that would provide access for sampling. Based upon my knowledge of the available documents and data relating to this mining claim, only one hole was drilled on the Six O'Clock claim that yielded any gold values (that hole was drilled in 1976 by David Sannes) (see Attachment No. 3). According to Sannes, multiple attempts were made to verify that value, but none of the subsequent drill holes were able to repeat that single high-value intersect. In my opinion, one sample, which has not been shown to be repeatable, is insufficient to estimate the value of gold available on the Six O'Clock claim. Accordingly, Mr. Ferrero's conclusions in paragraph 49 of his affidavit based on estimated gold values for the Six O'Clock claim are not supported by sufficient data.

21. In paragraphs 56, 66 and 69 of his affidavit, Mr. Ferrero projects 90% recovery of gold from the underground ore processed through a gravity-flotation-cyanide leach system, which is carried through his economic calculation spreadsheets. I conclude that a 90% recovery rate is not supported by available data, as discussed in the following paragraphs.

22. First, Mr. Ferrero does not cite a source for the 90% average recovery rate, and none is apparent.

23. Additionally, at paragraph 70 of his affidavit, Mr. Ferrero refers to Spreadsheet 09 of JA-191 for economic calculations of profitability using only centrifuges, to which he assigns a 90% recovery rate. Based upon my personal knowledge of the

documents relating to the mining claims at issue, there is no information in the record that documents a 90% recovery rate for centrifugal concentrators.

24. During his November 1, 2007 deposition, Mr. Ferrero acknowledged that he was not aware of any data recorded for Liberty's centrifuges when they were run for the ET Placer operation, and that he was not sure of the source of the material run through the centrifuges. See Nov. 1, 2007 Ferrero Tr. at 31-32 (attached at Ex. 2 to Defendant's March 5, 2008 brief in opposition to Plaintiffs' motion for summary judgment).

25. Mr. Ferrero's 90% recovery rate figure is also incorrect because Mr. Ferrero does not account for inconsistent evidence. For example, Knelsen Concentrators, a manufacturer of centrifugal concentrators for mineral production, tested two samples collected by Liberty's consultant David Giles in 1998, and reported very poor concentration, expressed as recovery rates of only 4.0% and 5.2% (Attachment No. 1).

26. The concentration rates estimated by Knelsen Concentrators was somewhat lower than the tests performed on samples collected by the Forest Service in 1998. As shown in Attachment No. 2, Mountain States RDI, using a Knelsen Concentrator in addition to a standard trommel, reported an average recovery rate of 15% for vein material and 28% for dump material. I conclude therefore that there is no support for Mr. Ferrero's use of a 90% recovery rate from centrifugal concentrators, and that his use of such a high recovery rate artificially skews his economic results toward higher values.

27. Mr. Ferrero's analysis ignores some key evidence that does not support his projections of grade and tonnage. For example, David Sannes, who investigated these mines for New Cinch Uranium in 1975 and 1976, took thirty-four channel samples from the Mountain Laurel underground workings and drilled above these workings to intersect the vein, but could confirm a grade of only 0.072 oz. gold per ton of ore ("opt gold") underground and 0.357 opt gold from a "very promising intersection" in the one drill hole that was discounted because it could not be duplicated (Attachment No. 3). However, it appears to me that Mr. Ferrero ignores these data and uses, without support, a value of 0.628 opt, which is more than eight times Sannes' value of 0.072 opt. Compare Attachment No. 3 at 3 with JA-191 at 1577 ("Avg. Grade" for "May Tunnel Und. (Mt. L.- Un.)").

28. Drilling by Mega Gold in 1986 under the direction of Tom Ferrero exposed some intersects above the Mountain Laurel Mine ranging from 0.27 to 0.42 opt gold, but Mr. Ferrero concluded that "Data so far is inadequate to project grade or tonnage." (Attachment No. 4).

29. I am not aware of any other researcher attaining the values of opt gold that Mr. Ferrero uses in his calculations. For example, Hugh Clayton, after reviewing the historic reports and the results of drilling and sampling by New Cinch, reported in 1988 that "rough calculations" resulted in 400,000 tons of material of 0.083 opt gold that would not be economic as underground ore. See JA-12 at 237. When preparing the Forest Service's mineral examination, I and John Gutierrez used an average grade of 0.03 opt gold for the Six O'clock underground targets in the

1999 mineral report, which is based on Mr. Ferrero's 1986 drill hole data (see Attachment No. 5 at 34).

30. Consequently, Mr. Ferrero's calculations for the underground resources are not supported by reliable data on the values of ore grade and recovery rates.

31. As with his conclusions about the lode resources, the evidence also does not support Mr. Ferrero's estimates of average grade of gold in the dump material. Mr. Ferrero uses 0.10 opt and 0.05 opt recovery rates as hypothetical "cut-off grades" in order to reach certain opinions about "[t]wo scenarios that are unlikely, but provide numbers for deriving likely scenario numbers." See PE-2, ¶ 49 (emphasis added).

32. Mr. Ferrero also states an opinion about "[t]wo likely scenarios." See PE-2, ¶ 49. Mr. Ferrero does not explain the assumptions underlying this opinion (such as expected recovery rates, capital and operating costs, smelter costs to refine the concentrates, or reclamation costs). Although Mr. Ferrero apparently believes that these numbers can be derived from his analysis of "[t]wo scenarios that are unlikely," he offers no explanation for that derivation. PE-2, ¶ 49.

33. Mr. Ferrero states that the assumed grades used to support his "[t]wo scenarios that are unlikely," were derived from the tables presented in JA-189, JA-191, JA-192, and JA-193. See PE-2, ¶ 50. JA-189 is a series of maps, apparently showing results of certain sampling information; JA-191 is a series of spreadsheets, apparently showing Mr. Ferrero's analysis of selected data; JA-192 and JA-193 are a series of maps, apparently showing certain sampling locations.

34. JA-189, JA-191, JA-192, and JA-193 show a wide range of alleged recovery rates based on certain sampling data. Mr. Ferrero does not identify which values he used to reach the conclusions stated in his declaration. In other words, it is not possible to analyze Mr. Ferrero's opinions in any meaningful way because he does not explain or support his calculations. For example, Mr. Ferrero arbitrarily uses a cut-off grade of 0.10 opt gold for the dumps, however, others report lower values for the same resources as discussed below.

35. David Sannes (1977) reports an average grade of 0.041 opt gold based on 17 samples (Attachment No. 3 at 12).

36. Hugh Clayton (1988), in JA-12 at 235, calculated a weighted average grade for the waste dumps of 0.086 opt.

37. Mr. Ferrero's calculations at paragraph 49 of his affidavit cannot be substantiated based on the few sources cited, the information presented in JA-189, JA-191, JA-192 and JA-193, or the other known sampling data. Additionally, based upon my review of Mr. Ferrero's November 1, 2007 deposition, Mr. Ferrero selectively uses some data while rejecting other data with which he disagreed. For example, Mr. Ferrero rejected the government's lower values for ore grade from split samples, while including higher values obtained by Plaintiffs on the same samples. See Nov. 1, 2007 Ferrero Tr. at 124:2-128:6 (attached at Ex. 2 to Defendant's March 5, 2008 brief in opposition to Plaintiffs' motion for summary judgment). Such systematic rejection of selected data would most likely yield biased results.

38. In contrast, for the Forest Service's mineral examination, the government is required to include all of the available data from the samples it collects. Using all of the government's data, I conclude that the contested mining claims are invalid as of the date of taking (1990) and at any point during the alleged taking period (1990-1994), and would not yield any profit. See Attachment No. 5 at 38-46.

39. The Forest Service's mineral examination detailed four scenarios, used to examine a "hypothetical mining and milling operation for the subject mining claims." Attachment No. 5 at 39. Based on an analysis of each scenario, the Forest Service concluded that operating costs ranged from $21.18 to $32.03 per ton in 1985, and $28.91 to $43.09 per ton in 1998. See Attachment No. 5 at 41.

40. Based on estimated grades, recovery rates and historic gold prices, the Forest Service determined that mining operations would be unprofitable for each of the four hypothetical mining scenarios. See Attachment No. 5 at 42. As the Forest Service's mineral examination makes clear, at best, mining operations (without even considering capital costs) would lose $18.59 per ton during 1990 to 1994. See Attachment No. 5 at 42. Even if one considers the mining claims individually, mining operations would not be profitable. See Attachment No. 5 at 44-46.

41. As detailed in the Forest Service's mineral examination, it is my opinion that mining operations would be unprofitable during the alleged takings period, 1990 to 1994. Consequently, in my opinion, "the minerals within the subject mining claims are not capable of being mined, extracted and marketed at a profit, as of the time of the Forest Service mineral examination, the dates of location of the

claims, and the dates of the alleged takings, July 23, 1990 through February 8, 1994." Attachment No. 5 at 50.

42. I and Mr. Gutierrez took samples from each of the various waste dumps, including the Blacksmith, Klamath, Yankee, and Union Dumps. As discussed above, and in more detail in Attachment No. 5, it is my opinion that Plaintiffs have not made a discovery of valuable mineral resources at these dumps, so the placer claims in which they are located are not valid.

I certify, under penalty of perjury, that the above statement is true and correct. Executed on this 5th day of March, 2008.

James W. DeMaagd, CME