# ATTACHMENT 5

United Sates Department of Agriculture
Mineral Report

Mineral Examination of the
Eddy Gulch Group of Gold Properties
Klamath National Forest
Siskiyou County, California

July 30, 1999

UNITED STATES
DEPARTMENT OF AGRICULTURE

# MINERAL REPORT

# MINERAL EXAMINATION OF THE EDDY GULCH GROUP OF GOLD PROPERTIES KLAMATH NATIONAL FOREST SISKIYOU COUNTY, CALIFORNIA

**Lands Involved**

**Mount Diablo Meridian**
**T.39 N., R. 11 W.,**
**Section 9 - Portion**
**Section 10 - Portion**
**containing approximately 532.65 acres (215.56 hectares)**

**Prepared By:**

**John Gutierrez**
**Certified Mineral Examiner**
**Southwestern Region 3**

**James W. DeMaagd**
**Mineral Examiner**
**Shasta-Trinity National Forest**

**July 30, 1999**

UNITED STATES
DEPARTMENT OF AGRICULTURE
FOREST SERVICE

MINERAL REPORT

# MINERAL EXAMINATION OF THE EDDY GULCH GROUP OF GOLD PROPERTIES
KLAMATH NATIONAL FOREST
SISKIYOU COUNTY, CALIFORNIA

LANDS INVOLVED

Mount Diablo Meridian
T. 39 N., R. 11 W.,
Section 9 -Portion;
Section 10 -Portion;

containing approximately 532.65 acres (215.56 hectares)

Prepared by

John Gutierrez
Certified Mineral Examiner #17
Southwestern Region 3

James W. DeMaagd
Mineral Examiner
Shasta-Trinity National Forest

July 30, 1999

Technical Review

Hilton Cass
Certified Review Mineral Examiner #15
Regional Mining Engineer

August 11, 1999
Date

BUREAU OF LAND MANAGEMENT CERTIFIED Terry S. Maley REVIEW 002 MINERAL EXAMINER DEPARTMENT OF THE INTERIOR

Terry S. Maley
Certified Review Mineral Examiner
Bureau of Land Management

Date

# TABLE OF CONTENTS


| | Page |
|---|---|
| INTRODUCTION | 1 |
| LANDS INVOLVED | 2 |
| PHYSIOGRAPHY | 3 |
| GEOLOGIC SETTING | 4 |
| Regional | 4 |
| Site Geology | 5 |
| Mineral Deposits | 6 |
| PRODUCTION HISTORY | 7 |
| EXPLORATION WORK | 9 |
| MINING CLAIM DEVELOPMENT WORK | 11 |
| PROPOSED PLANS OF OPERATIONS | 13 |
| FIELD EXAMINATION | 16 |
| Posting / Acreage | 17 |
| Sample Procedures | 18 |
| Sample Processing | 24 |
| SAMPLE ANALYSIS | 25 |
| Environmental Testing | 27 |
| Claimant's Test Results on Flotation | 29 |
| MINERAL RESOURCE ESTIMATES | 30 |
| Surface Veins | 30 |
| Underground Veins | 33 |
| Mine Waste Dumps | 34 |
| CLAIMANT'S RESOURCE ESTIMATES | 37 |
| ECONOMIC ANALYSIS | 38 |
| Comingled Mine/Mill Operation Evaluation | 39 |
| Profit v. Loss Analysis | 41 |
| Individual Claim Evaluation | 43 |
| Profit v. Loss Analysis | 44 |
| SUMMARY, CONCLUSIONS, RECOMMENDATIONS | 46 |
| REFERENCES | |
| APPENDICES: A thru D | |
| ATTACHMENTS | |
| E - Mountain States Research & Development, Inc, Final Report | |
| F - Adventurine Engineering's Capital & Cost Estimate & Economic Evaluation for Liberty Mines, Inc. | |

# MINERAL REPORT
## Sunrise and Six O'Clock Lode Mining Claims and the Yankee, Sunset, Compressor and East Fork Placer Mining Claims Liberty Mining District, Siskiyou County, California

---

## INTRODUCTION

The purpose of this report is to convey the results of a field oriented mineral examination and analysis of the subject group of lode and placer gold mining claims situated within the Klamath National Forest, Siskiyou County, California. The report addresses the validity of certain unpatented mining claims and should not be used for purposes other than that for which it was prepared.

This investigation was conducted at the request of the Regional Forester, Pacific Southwest Region 5, in response to a lawsuit filed by some of the mining claimants against the United States (*Alfred Aloisi, et al. v. United States, U.S. Court of Federal Claims 95-650-L*). Plaintiffs allege that their property interests in the subject unpatented mining claims have been temporarily taken without just compensation, in violation of the Fifth Amendment. In order for an individual to establish a compensable property interest in a mining claim, there must be a determination by the U.S. Department of Interior of the validity of that claim. If it is determined that there has been no discovery, the claims are found invalid. *Skaw v. United States, 13 Cl. Ct. 7, 28 (1987), aff'd mem., 847 F 2d 842 (Fed Cir.), cert. denied, 488 U.S. 854 (1988).*

### Background

Claimant Fred Aloisi has conducted sporadic exploration activities on the subject mining claims since the mid-1980's. From 1989 through 1992, Aloisi submitted several supplemental plans of operations to the Klamath National Forest for exploratory activities, sampling and road construction. The Forest Service was unable to complete its evaluation of all aspects of the plans because of consultation requirements under the Endangered Species Act and the lack of critical information from the claimant. The subject mining claims are within the critical habitat of the protected Northern Spotted Owl. Plaintiffs of the lawsuit allege that the Forest Service interfered with their property rights under the Mining Law of 1872 through the failure to promptly approve all phases of the

proposed operations from July 23, 1990 through February 8, 1994. This mineral report considers the question of validity between July 23, 1990 and February 8, 1994, for the purpose of identifying whether any property interest that may have existed in the subject mining claims between those key dates. This report also addresses the validity of the mining claims as of the time of their location in 1985 and as of the time of the mineral examination in 1998.

Record Data

The unpatented mining claims for this report are the Sunrise and the Six O'Clock lode mining claims , the Sunset placer mining claim, and the Compressor, East Fork, and Yankee association placer mining claims . The claimant, Fred Aloisi, located the Sunrise, Six O'Clock and Sunset claims on April 21, 1985. The remaining association placer claims were located by Fred Aloisi and members of his family and the Pincombe and Kendle families on June 10, 1985. The claims have been properly recorded with the Siskiyou County Recorder . Table A of ***Appendix A*** displays the record information for the subject claims. Annual assessment work or payment of rental fees in lieu of assessment work has been timely submitted to the Bureau of Land Management (BLM) since the date of recordation. ***Appendix A***, Table B displays this data.

The Department of Justice notified the claimant about the need for a validity examination in April of 1998. In June 1998, Mr. Aloisi was asked for information regarding the other claimants-of-record for the association placer mining claims. No further information was forthcoming from the claimant. Claimant Fred Aloisi has asserted that he has sole control and ownership of the mining claims. Efforts to verify his contention have been unsuccessful and certified letters to the other claimants-of-record have been returned unanswered. ***Appendix A*** *(3)*

A letter dated September 24, 1998, from Fred Aloisi's counsel, Mr. Larry McBride, assures that all ownership has been consolidated in Fred Aloisi's name, although no documentation has been provided to date. ***Appendix A*** *(4)*

## LANDS INVOLVED

Description and Status

Both the lode and placer unpatented mining claims are located within the headwaters of Eddy Gulch, a tributary of the North Fork Salmon River, in Township 39 North, Range 11 West, Sections 9 &10, Mount Diablo Meridian,

Siskiyou County, California. They form a part of what has become known as the Liberty or Eddy Gulch Group of properties located in the Liberty Mining District. BLM master title plats indicate the lands are not subject to any form of withdrawal and are therefore open to entry and location under the Mining Law. Surface management is by the USDA Forest Service.

The descriptions of the unpatented mining claims in this report are based on the legal descriptions and mapping for the claimant by geologist Tom Ferrero. It is not known how Mr. Ferrero, a registered surveyor, established the location of the Compressor, East Fork and Yankee placer mining claims. Currently, these mining claims are described by legal subdivision. The township where the Liberty mining claims are found has not been legally surveyed by the Bureau of Land Management. Therefore, it is possible that the exact location of the Liberty mining claims may have to be determined at a later date.

## PHYSIOGRAPHY

The claims lie in the west-central portion of the Klamath Mountains in the extreme northwestern portion of California approximately 68 air kilometers (42 miles) southwest of the town of Yreka, California. The lands are located within the Salmon River Ranger District, Klamath National Forest. The location of the subject mining claims is shown on the Eddy Gulch claims location map.

The claims lie on steep hillslopes. Elevations vary from a maximum elevation of 4,800' (1,463 m) along the southwest corner of the Yankee PMC to a minimum elevation of 3,200' (975 m) along the northwest corner of the Compressor PMC. Mean annual precipitation is 127 centimeters (50 inches), including some snow in the winter months (USDI, 1975).

### Ground Cover / Surface Values / Land Use

Vegetation in the area consists of mixed conifers and hardwoods with locally dense undergrowth. Over much of the claim area, a dense cover of fallen trees and thick underbrush makes accessibility difficult. Areas barren of ground cover consist of dump material from historic mining as recent as the mid 1930's. Land uses in the general area consist of recreation, small scale mining and logging. The waterways throughout the area are utilized for fishing and dispersed recreation.


Eddie Gulch
Private Lands
Compressor
Placer
Compressor
Six O'Clock
Lode
Gulch
Sunset
Placer
Sunrise
Lode
Yankee
Placer
East Fork
Placer
1320 0 1320 2640 Feet
Yreka
Eddy Gulch Mines
Area
Redding
Sacramento
Eddy Gulch Mines
Unpatented Sunrise and Six O'Clock
Lode Claims
Unpatented Compressor, Sunset,
East Fork and Yankee
Placer Mining Claims
Forest Service Road
Private Land
Salmon River Ranger District
Klamath National Forest
Scale: 1" = 1/4 mile (1320 feet)
Contour interval: 80 feet
hwhitman rev. 2/18/1999

### Access and Power

Year-round access to the claims from Yreka, California, is along State Highway 3 south for 24 kilometers (15 miles) to Fort Jones, California. From Ft Jones, it is 19 kilometers (12 miles) to Etna. The community of Sawyers Bar is 32 kilometers (20 miles) from Etna along Road 1C01. The subject mining claims are 5 kilometers (3 miles) south of Sawyer's Bar up Forest Road 39N27, which is an improved dirt road. Turning off the Forest Road, the claim road is a narrow unsurfaced road maintained only by the claimant. The claimant has built a system of roads beginning at the Rollins millsite and across the claim group. Portions are very steep and the surface is extremely loose with low water crossings. The spur road leading to the Six O'Clock claim on Incline Ridge is very narrow with tight turns. Numerous creek crossings are also encountered on the road. The narrow, unimproved road system is currently suitable for one-way traffic and susceptible to frequent washouts. Within the claim block area, considerable upgrading of the road will be required for suitable heavy truck traffic use.

Commercial electrical power is not available at the site.

## GEOLOGIC SETTING

### Regional Geology

The geology of the Liberty Mining District is documented by numerous authors. It is thought by many to be very similar to the Calaveras, Mariposa and other formations that make up the Sierra Mother lode belt. The area is located in the Western Paleozoic and Triassic belt of the Klamath Mountains Geologic Province. The Klamath Mountains province is composed of a series of north-south trending lithotectonic belts, or thrust plates which decrease in age from east to west. The rock types associated with the province represent island-arc volcanics, oceanic crust and marine sediments. As portions of the Pacific Plate were subducted eastward under the North American Plate in the Devonian to Middle Jurassic (408-185 Ma.), rocks accreted onto the North American Plate forming the Klamath Mountains Province (Irwin, 1981). The province is distinguished by a series of arcuate, eastward dipping belts separated by bands of ultramafic rocks and thrust faults.

The Eastern Klamath belt is the oldest and most eastern subprovince of the

Klamath Mountains province. Adjacent to this along the west is the Central Metamorphic belt. West of this is the Western Paleozoic and Triassic belt, which is subdivided into the North Fork Terrane, Hayfork Terrane and the Rattlesnake Creek Terrane (from east to west). The subject mining claim parcels can be found in the North Fork Terrane. The Western Jurassic belt is the youngest and furthest west subprovince of the Klamath Mountains province (Irwin, 1981).

The Western Paleozoic and Triassic belt is the most extensive subunit in the Klamath Mountains province. It constitutes a broad, continuous, north-south trending belt throughout the entire length of the province (Holtz, 1971). It includes abundant fine-grained clastic sediments, rhythmically bedded chert, mafic volcanic rocks, and scattered lenticular bodies of crystalline limestone or marble. Rocks throughout much of the belt have been regionally metamorphosed altering the original mafic volcanic rocks to greenstones, development of cleavages in argillaceous rocks, and recrystallization of limestone to marble (Holtz, 1971).

Site Geology

The geology of the Sunrise and Six O'Clock lode claims was noted by the authors on a topographic map of the area. Within the boundaries of the Sunrise claim, interbedded metasediments of schist, slate and chert are found in the road cut above the mine road. These metasediments host the so-called apex vein, a white to milky white hard quartz vein. It is appears that the hard ridge running the length of the claim contains the apex vein, although actual vein exposure seen in the field totalled only about 122 meters (400'). Along strike, the quartz vein or zone varies in thickness and displays a distinct layering and brecciation. The layering effect of quartz has often been reported in the District and suggests episodic mineralizing phases as movement occurred along the fissure zone. ***Appendix C,*** *Figure 1* displays this quartz layering phenomenon.

Paralleling the quartz veins, highly argillized diorite dikes or sills were noted by the mineral examiners. This is a common occurrence in the District and can be indicative of mineralization along this contact. Freshly broken rock faces displays the typical rusty weathered color of sulphide mineral oxidation and remnant mineral casts. No visible gold was observed.

The Sunrise apex vein follows the trace or path of a major thrust fault known to run through the claim area. This shearing action has resulted in the crushed quartz, silicified schist, felsite and inclusions of the country rock found in the vein.

Compass bearings taken along the vein structure by the authors displayed a northeast trend with an almost flat to shallow angle of 15-30 degrees dip to the southeast. Earlier investigators noted the presence of north striking vertical faulting cross-cutting the flatter apex vein. Cooksley (1995) reports that this displacement does not greatly affect the occurrence of mineralization.

The Six O'Clock lode claim lies on steep ridges to the northeast of the Sunrise claim. The surface of the claim, though difficult to assess, is composed of carbonaceous schists and bedded cherts. On the north end of the claim, porphyry dike rocks are found on the surface. The trace of Stevens Fault which runs NW-SE through the claim was not seen in the field by the authors, although its presence can be discerned by topography. To the northeast of the fault, lie a mixture of the bedded cherts, carbonaceous and pelitic schists wedges, probably resulting from movement along the fault. The near-surface vein ("reverse dipping vein") referred to by Ferrero was not evident in the field. However, backhoe trenching by the Forest Service mineral examiners revealed swarms of quartz veinlets intruding the host rock. ***Appendix C*** *(1)* contains geologic maps and cross-sections of the Sunrise and Six O'Clock claims, illustrating the site geology.

Mineral Deposits

Mineral deposits within the Liberty Mining District are found within an extensive fissure zone in Mesozoic and Paleozoic host rocks. Gold mineralization occurs along thrust related stress fissures paralleling the thrust zone. Earlier investigators found evidence of upward migrating mineralized hydrothermal fluids penetrated into the thrust fissure zone. In the fractured zone, the less resistant schist and slate horizons form the loci of the most extensive fissures. Fluid emplacement took place mostly along the contact with siliceous schist or bedded chert. Area faulting and folding later trapped the mineralized fluids. As noted in the field, altered dike rocks (porphyry) occur adjacent or paralleling the quartz veins. Mineral occurrences are known to be lenticular in shape, occur in shoots and rake northerly. The fissure quartz veins in the District extend from four to six feet in thickness, with reports of veins up to 9.8 meters (32') in underground mines. The main structure has been described as containing two or three veins, commonly separated by gouge and porphyry. The vein(s) exposed on the surface of the Sunrise lode appears in places to be a siliceous "zone" rather than a distinct vein separated by gouge. The historical records report that gold occurs mostly as "free gold" with the rest (1-2%) occurring in disseminated sulfides, particularly arsenopyrite. In places, gold mineralization penetrates the altered porphyry host rock.

The claimant has stated that the discovery location on each of his placer claims is the pile of loose dump materials lying within each claim. The material found within the Sunset, Yankee, Compressor and East Fork PMCs are mostly discarded waste rock from mining. While the claimant assumes the mine dump materials have come from adjacent underground openings, there is no evidence to prove that all or a portion came from one source. It is possible that mixing of dump materials from outside sources might have taken place.

Take for example, the Blacksmith tunnel mine dump. Both the authors and Tom Ferrero noted that mine dump materials appeared to be mixed with roadfill materials. Historic miners were not adversed to mixing of their ores to "sweeten" mill runs. Materials from nearby sources outside the subject claim could have been transported to the mine dump sites as part of a milling effort. The point being, that the gold values found in the Klamath dump and others, could be a product of multiple sources. *U.S. v. Parker* addressed the issue of mineral values found in a sample taken from a pile of material on a mine dump. Without knowing the origin of where the material came from, the material in the dump was not deemed probative of the existence of a valuable mineral deposit. This logic was again considered in *U.S. v. Mavros,* when the Board explained why samples from a mine dump cannot be used to support a discovery. In addition, there appears to be no authority to locate waste rock dumps under the mining law.

## PRODUCTION HISTORY

The Liberty Mining District is well-documented as a historic lode gold producing district within the Klamath Mountains, Siskiyou County, California. Although various commodities have been mined from the area, the District is mostly known for it's gold mines. Although significant gold production from the District has been documented in many historical reports, these records are not adequate to identify the extent or location of any production from the subject mining claims. Other than occasional exploration, active mine production in the District stopped after World War II. The following is a description of known past producing mines in the area. Values reported are for gold.

The Liberty Mining District was first mined in the 1850's. Alluvial placer mining around the North Fork of the Salmon River started a long history of mining beginning in the mid-1800's with the mining of rich gold placers near Sawyers Bar. Following alluvial mining, quartz vein source rocks upstream became the

focus of further underground exploitation. Initially, numerous arrastras, small stamp and amalgamation mills were used to recover the gold. As some of the mines expanded in depth and production, larger equipment was brought in using flotation recovery methods. Based upon historical records, the total district area production from underground mines was about 81,000 oz. Placer gold production is noted as 150,000 oz produced from earlier placer workings (Ferrero, 1985).

From 1865 to 1910, lode mines were extremely productive in the District. During this period, the Black Bear Mine, Klamath and Mountain Laurel Mines became the greatest lode gold producers in the Liberty District. The Black Bear Mine group, located in section 13, T. 39 N., R. 12 W., produced $3.1 million (Clark, 1970). The mine utilized six levels with two shafts, a 45 meter (150') ore chute, crosscuts, drifts, and stopes. About 1370 meters (4500') of vein was mined (Brown, 1915). Both the hanging wall and foot wall are slate.

The Klamath Group of mines had a reported production of $600,000 of gold from 1865-1910. (Clark,1970). The host rock of the gold mineralization was a black, slaty schist carrying a pronounced post-mineral gouge. Two or three overlapping quarts veins had a width ranging from 0.6 to 7 meters (2 to 24'). Although the veins looked "good", reportedly, much of it was selectively by-passed because of its low grade. (Root, 1925) In 1925, the ore remaining at the Klamath Mine was low-grade.

The Mountain Laurel Quartz Mine, on a patented claim, is directly west of the subject Six O'Clock claim and is known to have produced $600,000 through the life of the mine up until 1925 (Root, 1925). The mine worked in a black, slaty graphic schist which, according to Root, carries most of the gold ores in the District. The mine had six levels, but only three were significant. The May adit was worked for over 828 meters (925') and was not a producer. The Mi adit, 18 meters (60') above the May adit, reportedly contained a one to two meter (3 to 6') wide vein structure from which good grade ore was found. The MJ adit was the site of a small chamber of high grade ore (60 tons worth $ 7,000). A total of 2300 tons was stoped from the MJ adit level.

California Consolidated Mine is located in Section 16 and 17, T 39 N, R 11 W, in the Liberty District. The mine had a 30 meter (100 foot) ore chute in a slate hanging and footwall carrying a fissure vein (Brown, 1915). Over 305 meters (1,000') had been driven on the vein on two levels with raises, stopes, winzes and crosscuts. The Stevens Tunnel, located 213 meters (700 feet) northwest of

the subject Six O'Clock claim, was part of the former California Consolidated Mine. Clark (1970) notes the mine produced $473,000 during its active mine life from the late 1860's to 1910.

Another significant producer was the Union Mine, also known as the Central or Evening Star Mine. This mine was extensively stoped. Root reports a production of $79,000 from the processing of 7,000 tons of ore prior to 1925. Common with many of the mines in the area, the hanging wall is a black, slaty, graphitic schist. The footwall consists of a light-colored dike rock. Failed attempts were made to connect the Union with the northward extension of the Klamath vein on the west. Earlier reports (Elmendorf, 1932) refer to the area's vein systems being exploited as "pocket hunting", meaning a vein with sporadic occurrences of gold, often concentrated in distinct pods or pockets. This fact, coupled with the crowded conditions of the mine locations, led to numerous lawsuits between mine owners, Locally, the most famous lawsuit involved the Union #8 ore shoot between the Mountain Laurel and Union mine owners, which virtually stopped all mining for 30 years before it was resolved.

## EXPLORATION WORK

### Previous Investigators

Numerous investigators have examined the mine dumps and vein structures in this area. Consequently, there are numerous historical records and drilling, assay and metallurgical data available for the mines and mineral occurrences in the Liberty Mining District.

In 1975-76, New Cinch Uranium, Ltd., drilled 5 holes exploring the Union vein and other ore shoots. Gold mineralization was reportedly intersected by one drill hole, but the overall results were very limited due to poor core recovery. No important gold bearing zones were found. Their overall assessment of the properties held that further exploration was needed due to the erratic nature of gold mineralization. New Cinch also sampled and tested mine dump known as the Klamath Dump, which is on the current Sunset and Yankee placer mining claims. Samples were assayed, and some samples were subjected to cyanide heap leaching to test gold recovery by that method. Leaching of the material was proven unsuccessful. The investigator estimated the Klamath Dump tonnages, using a range of tonnage factors, to be from 35,000 to 46,000+ tons averaging 0.1 oz/ton gold. (Sannes, 1977)

In 1986, Mega Gold conducted reverse circulation drilling based upon recommendations from consulting geologist Robert Gordon. Mr. Gordon opined that a large, disseminated gold deposit was unlikely, but that commercial mineralization would probably be similar to the District's past--gold in shoots and pockets in quartz veins and within fractured zones. Mega drilling found gold in limited zones around and including quartz fissure veins in carbonaceous horizons. (Gordon, 1986) Three of the drill holes are on the subject Six O'Clock mining claim.

Tom Ferrero, consulting geologist, was involved in mapping, sampling and drilling of the subject properties during and following Mega Gold's exploration. Ferrero concluded that the surface assay work and drilling on the Incline Ridge, which is the location of the Six O'Clock claim, did not identify a bulk mineable deposit. His opinion was that underground, narrow vein gold deposits looked more favorable for further exploration to obtain additional data to project grade and tonnage. Ferrero opined that the so-called "surface apex veins" could be mined profitably if stripping ratios, ore grade and milling characteristics were favorable. Finally, Mr. Ferrero recommended bulk sampling and mill testing of the mine dumps . (Ferrero, 1986)

In March of 1988, Consulting Geologists and Engineers, Watts, Griffis and McOuat (WGM), conducted a preliminary feasibility study for Valley View Gold Mines, Ltd. of the Liberty Mining District, including the subject mining claims. Hugh Clayton, consulting geologist for WGM, reviewed the existing literature, examined the mine dumps and veins and presented his recommendations in a written report to Valley View Gold Mines, Ltd. Clayton developed reserve calculations of the Klamath dumps based on Sannes earlier estimates. Clayton's final recommendations emphasized the need for more metallurgical testing to determine the optimum treatment plan for the dump materials. He recommended additional sampling and measurement of existing reserves, along with a waste and tailings dump assessment. (Clayton, 1988)

In 1990, Mountain States Research & Development, International, Inc., (MSRDI) conducted metallurgical testing of samples provided by Fred Aloisi. Mr. Don Moore of Argonaut Mill Supply of Tucson, Arizona, submitted the samples to MSRDI as part of his investigation into the potential for recovering gold from the deposits controlled by Liberty Mining by a gravity and flotation circuit. Details about the source and nature of the samples are not known. MSRDI obtained poor flotation results. Tests showed that a simple flotation circuit does not provide a high gold recovery. (MSRDI, 1990) . Mr. Moore subsequently questioned Fred

Aloisi as to whether the samples were representative of the ore. He recommended a concentrated effort to channel sample the apex vein material. (Don Moore, 1990).

In 1993, Cooksley Geophysics, Inc., reviewed the existing reports and assay data for the mineral deposits of the Liberty Mine area for Liberty Consolidated Mines, Inc., (LCM). LCM was interested in re-opening old workings and establishing an optimum metallurgical recovery process (Cooksley, 1995). Their project development plans called for reopening the mines as an underground operation. Major emphasis of the LCM study was on underground development and evaluating the Union and Mountain Laurel underground reserves. The Cooksley report recommended further exploration of the underground reserves.

## MINING CLAIM DEVELOPMENT WORK

### Sunrise LMC

The *Sunrise* lode claim lies in the western part of the Liberty mine claim block and runs east to west along its long axis. This claim has the most surface disturbance consisting of an access road that runs the length of the claim from east to west. Extensive excavations on the south side of the road exposes the claimant's discovery point--a wide quartz structure that has been sampled in several places and noted by painted sample sites.

The access road widens towards the center of the claim for approximately 48 meters (160'). This widened area represents the most extensive development work within the claim, which the claimant refers to as the Klamath apex pit. The material found in the road prism was reportedly excavated from the vein by Liberty Mining and is referred to in this report as the apex road stockpile. In places along the vein above the Klamath apex pit, timbers or stulls, poke through the ground surface, confirming that earlier underground work extended to the surface. Nearby, there is what appears to be a collapsed shaft above the cutbank into the vein. On the southwest end of the claim, a small, untimbered adit enters below the apex vein, exposing a siliceous shear zone. Tom Ferrero referred to the adit as an exploratory tunnel at the time of the field examination.

### Six O'Clock LMC

The *Six O'Clock* lode claim lies in the eastern part of the Liberty Mine claim block trending northeasterly on its long axis. This claim is accessed by a very steep

and narrow road which intersects other roads within its boundaries. Three drill hole locations (DH 86-1,2 & 6) are collared in the far east corner of the claim. Additional drill hole sites are said to be present from drilling in 1975; however, their locations are uncertain. The only sign of surface development work are small ground excavations on the western end of the claim, including an area of shallow depression near the intersection of the access road. Tom Ferrero has said this depression was the site of a bulk sample taken in 1990.

Yankee PMC

This association placer mining claim overlies the Sunrise lode claim. Mr. Aloisi reported that the claim was located to appropriate the various mine dumps in the area. The Yankee mine waste dump (approximately 1.3 acres) and the southern one-third (0.5 acres) portion of the Klamath mine waste dump are within this claim. There is no evidence of development work related to any of the mine waste dumps other than mine roads and trails that criss-cross portions of the dumps in places. An abandoned trail leads to the site of the Yankee mine waste dump. The southern 1/3 of the Klamath mine waste dump is situated in the east-central portion of the Yankee association placer claim. This end of the claim is readily accessible by a maintained mine road.

Sunset PMC

The *Sunset* placer mining claim, consisting of 20 acres, has been located over the Sunrise lode claim. This claim takes in all of the Blacksmith mine waste dump (0.5 acres) which adjoins the north end of Klamath mine waste dump. The Sunset PMC also covers the northern two-thirds portion of the Klamath mine waste dump (1.0 acre). Both waste dumps are in the eastern portion of the claim, along the access mine road. According to the claimant, rock material from the Klamath apex vein has been incorporated into the road prism on the Sunrise LMC. For the purposes of this report, this material is considered a development of the Sunset placer and is called the apex vein road stockpile.

Compressor PMC

The *Compressor* association placer claim was located to appropriate the mine waste dump of the abandoned Union Mine. The Union dump is the only known mine waste dump on this claim and is partially on the adjoining East Fork placer claim. The Union mine waste dump within the Compressor claim, covers

approximately 0.10 acre. The placer claim is extensively developed by local mine roads.

East Fork PMC

Development on the *East Fork* association placer claim is limited to the southern tip of the Union mine waste dump and several hundred feet of mine access road.

## PROPOSED PLANS OF OPERATIONS

The current claimant and operator, Mr. Fred Aloisi, has occupied and worked the subject mining claims since the mid-1980s. He has acquired existing patented and unpatented mining claims in the Eddy Gulch area and located additional mining claims. Doing business as Liberty Mining, he secured financing, acquired various mining and milling equipment and established a headquarters for his operations at the patented Rollins Millsite. The Rollins millsite is about one mile north of the Sunrise lode mining claim. To date, Liberty Mining accomplished the construction of the current road system, the excavation on the Sunrise lode mining claim, bulk sampling on the Six O'Clock lode mining claim and some test milling of materials from the Sunrise claim with a portable gravity concentration plant.

Liberty Mining submitted several plans of operation to the Klamath National Forest for the exploration and development of the Eddy Gulch mining claims including the mining claims of this report. In June, 1989, Fred Aloisi submitted a plan of operations for Liberty Mining that called for the repair of existing access roads and bulk sampling and testing of materials from the "Klamath dump", the "Klamath Pit", the "Incline Ridge Pit" and others. "Klamath dumps" refers to the mine dumps on the Sunset and Yankee placer mining claims which are denoted in this report at the Klamath and the Blacksmith dumps. The "Klamath Pit" is on the Sunrise lode mining claim consisting of the roadside disturbance. The "Incline Ridge pit" is the shallow exploration pits on the Six O'Clock lode mining claim. The proposed plan called for the mined material to be tested through centrifugal concentrators at the ET placer mine, which is patented land within a mile of the mining claims. This plan was supplemented on July 25, 1989, with additions for more road construction and haulage of dump material to the ET placer.

The most comprehensive Plan of Operations was submitted on September 28, 1989, by Tom Ferrero for Liberty Mining. Styled as the "all phases" plan by Ferrero, it described a four-phased development work schedule. The stated

objective was to determine whether there were gold reserves of sufficient quality and quantity to warrant mine development and, if so, proceed with production. Phase 1 included the work in progress under the approved June, 1989, plan. Phase 2, was "contingent on positive results from Phase 1" and included more road construction, bulk sampling, testing mill, and underground exploration, to be completed during Spring and Summer of 1990. Phase 3, "contingent of positive results from Phase 2". called for production from underground mining and surface mining as well as milling, in late 1990 or early 1991. Phase 4 was identified as reclamation at an unspecified time. Tom Ferrero submitted a supplemental Plan of Operations on October 25, 1990. This supplemental plan listed the road construction, clearing, excavation and test milling which were expected to occur over the following year. The Forest Service approved the Fall and Winter activities of the Supplemental Plan on November 27, 1989.

On March 11, 1991, Ferrero applied for a renewal of the Plan of Operations, with modifications, for Liberty Mining. The modifications included drilling four to seven holes on and in the vicinity of the Six O'Clock lode mining claim. Liberty Mining submitted a plan of operations on April 1, 1992, that outlined a 10-year proposal for road construction, ground clearance for surface mining pits and a millsite, installation of a portable mill, drilling, underground mining and excavation of the dumps and pits on the apex veins. That plan did not provide enough information for the Forest Service to complete a review, and no additional information as requested has been received.

The following section contain the details of the mining and milling operations that were proposed by Liberty Mining through the Plans of Operations received by the Forest Service. ***Appendix B*** contains copies of these Plans of Operations.

<u>Mining</u> Liberty Mining's plans called for the development of the Sunrise and Six O'Clock lode claims as surface mines with maximum backwall heights of 52 meters (170 feet) and 1:1 backslopes. The approximate length of each pit as proposed was 366 meters (1200') and 183 meters (600'), respectively. The vein material from the lode claims would be blasted or dug and loaded into two Terex scrapers with a 950 Caterpillar front-end loader. The Terex scrapers would transport the mined material to Usher Flat for processing. The proposed mining rate has been variable, but has ranged from 350-1000 tons per day. The mine dumps would be excavated utilizing a 950 Caterpillar front-end loader and loaded into the Terex scrapers for transportation to the Usher Flat processing site.

Although requirements limiting pit wall heights were abolished in California in 1986, there is still a requirement for mine operators to have on-site equipment for cleaning and maintaining the integrity of the pit wall. Based on the claimant's pit development plans, it is possible that pit wall heights will exceed 30.5 meters (100') in some areas and could require a slope stability analysis according to SMARA (Surface Mining and Reclamation Act) regulations of the State of California (Article 9, 3704(f).

Milling According to Mr. Aloisi, most of the gold occurs as "free" nuggets and flakes and are thus easily recovered with inexpensive gravity separation techniques. Liberty mining has proposed to co-mingle the mined material from the veins and dumps and feed them through a Cedarapids Pitmaster primary crusher, then onto a triple deck screen to obtain a product of 1/8 inch or less diameter. This product would then be taken to the nearby ET placer claim for processing through the two (2) Tri-R centrifugal concentrators. The oversized material would be stockpiled at Usher Flat for later processing with an alternate method of concentration, to be determined. The centrifugal concentration method involves feeding fine-grained material and abundant water through a rapidly spinning inclined tube that is lined with riffles and ridges.This process uses gravity concentration coupled with centrifugal force to produce a heavy minerals concentrate. Concentrates from the processing would be sold to a buyer at the nearest point of sale. The water for milling would be drawn from the existing ponds at the Rollin millsite. Outflow would be channeled through the existing settling ponds at the E.T. placer claim. However, the existing settling ponds are practically filled with sediment and overgrown with vegetation.

In recent correspondence from the claimant, he is now considering other options for milling of his ores, which may include a flotation and cyanidation process system. The details of this kind of recovery system have not been developed yet, but is reportedly under investigation.

Reclamation will require erosion control devices, reshaping, coverage by a suitable topsoil material and revegetation according to an agreed upon plan. No reclamation plan has been developed; however, Tom Ferrero provided further details of the possible reclamation and tailings disposal procedures associated with the proposed gravity recovery mill. ***Appendix D,*** *(5)* According to this scenario, tailings from the operation will be slurried through a piping system or hauled by truck down to the ET settling ponds. As necessary, the ponds would be bailed and the material stockpiled nearby in a berm-contained area that would allow drainage through a sediment trap. From here, material would be moved to

the bottom of the ET pit. At regular intervals, the boulder/gravel/sand native stream sediments, now deposited on the canyon walls, would be utilized to cap the mill tailings within the pit. The final capping layer, a stream sediment mixture with mostly large boulder, would then be placed over the tailings. This method would strive to avoid introducing tailings or native fine sediments into the stream, while at the same time reclaiming the former canyon and pit. Tailings would also be disposed of as necessary in road beds, road prisms, as fill material and later for reclamation purposes. This reclamation scenario has not been submitted for review by any federal, state, or local agency and approval is only hypothetical.

The foregoing mining, milling and reclamation scenarios offered by Liberty Mining are purely conceptual and depend entirely on whether or not the company is able to discover an ore-grade deposit as stipulated in the exploration phase of its proposed plan of operation. Therefore, if a discovery could be made, the size, location and type of mining or milling operations would depend directly on the size, location and character of the deposit.

## FIELD EXAMINATION

The authors conducted a field examination of the subject mining claim area beginning July 27-29, 1998. During the course of the field work, other qualified Forest Service mineral examiners were involved in mapping and sampling due to the large number and weight of the samples.

Tom Ferrero was designated by Fred Aloisi as the field representative for the examination. Also present as a representative of Mr. Aloisi was Mr. David Giles, a consulting geologist. The authors relied heavily upon Tom Ferrero for field orientation and identification of claim corners and workings. Mr. Ferrero identified the discovery points for collecting samples from each mining claim. Mr. Ferrero also provided information on geology, past sampling and assays, and maps. He and Mr. Aloisi provided information and details regarding Liberty Mining's past and proposed mining and milling processes.

The field examination also involved recording information on and photographing the mining and milling equipment that is stored at the Rollins millsite. The sampling procedures and scenarios that were agreed upon prior to the field examination, are shown in ***Appendix D*** (1, 2 & 3).

The original purpose of the field examination was to investigate the economic viability of producing gold from veins and dumps that had been proposed for

mining in the plans of operations from 1989 through 1992. The Yankee mine waste dump within the Yankee PMC was included in the field examination at the request of Mr. Aloisis in June 1998. Mr. Aloisi asserted that the alleged discovery of valuable mineralization for the Yankee PMC is the Yankee mine waste dump.

The Six O'Clock underground mining proposal was not originally part of the field examination because underground mining of the vein on this claim was not specified in any plan of operations. After conclusion of the field examination, the Forest Service received a proposed mining scenario by Mr. Ferrero which included an underground operation on the Six O'Clock LMC. Details about mine reserves, mine and mill costs, projected recovery rates, etc were received on February 12, 1998 for an underground mining operation. Mr. Ferrero has asserted that the entire apex vein and the exploration drill holes are the discovery on this claim. In addition, following the field examination, the claimant completely changed his mill recovery scheme that he had previously stipulated to in documents to the Forest Service. Claimant Aloisi now dismisses a centrifuge recovery mill in favor of a gravity / flotation / cyanidation system.

Posting & Acreage

The NE claim corner posts for the Sunrise lode claim and the Sunset placer claim were located on the ground by a team of Forest Service mineral examiners on June 9, 1998. On that date, the author Jim DeMaagd, mineral examiner Hilton Cass and geologist Jerry Olson visited the claim area to familiarize themselves with the present-day improvements and exposures on the ground. Accompanying them were Fred Aloisi and Tom Ferrero, as well as Harry Frey, Lands Officer and Howard Whitman, surveyor, from the Klamath National Forest. Forest Service surveyor Howard Whitman set location points with a Global Positioning System (GPS) device in order for the examiners to pin point on the ground features such as claim corner monuments, mine dumps and sample points. On July 21 and 22, 1998, DeMaagd and Cass visited the mining claims site again to map the perimeter dimensions of the Klamath and Union dumps and tie the dumps to the GPS points earlier set by Mr. Whitman. Mapping the mine dumps consisted of measuring the distance with a 61 meter (200 foot) tape, hip chain and a Brunton compass. Bearings and distances were logged and plotted to determine locations and dimension of the area concerned. Depths of the mine dumps were left to be determined later during actual sampling.

The monument for the corner of the Sunrise lode mining claim was reconstructed in the field by Tom Ferrero on July 27. The monument for this corner had been

disturbed by work on the adjoining Dariel mining claim. On August 11, 1998, the authors and mineral examiner Rich Teixeira, located the corner monuments for the Six O'Clock lode mining claim.

The Yankee, Compressor and East Fork association placer claims are located by legal subdivision and do not have their corners monumented in the field. On June 9, 1999, Tom Ferrero pointed out a post below the Union dump which he said corresponded to the common claim boundary line between the Compressor and East Fork placer claims. The position of this boundary line between the claims was established on the ground by Cass and DeMaagd using tape and compass survey methods.

Sampling Procedures

On June 16, 1998, the author Jim DeMaagd and mineral examiners Hilton Cass and Richard Teixeira met with claimant Fred Aloisi and Tom Ferrero to discuss the sampling of the claims. It was agreed that all samples were to be taken from surface outcrops and mine waste dumps. Sampling sites were identified on the Sunrise lode mining claim and some additional lode mining claims that were subsequently deleted from the investigation. Sample sites for the Six O'Clock lode mining claim were determined in the field during the examination of July 27-29. On July 14, 1998, Hilton Cass wrote Tom Ferrero outlining the agreed upon procedures to be followed for sampling Liberty's claims ***Appendix D*** *(2&3).*

It was agreed that Mr. Ferrero was to be present during the sampling to point out the discovery points within each claim. There was general agreement regarding how samples were to be taken, how much sample, etc., recognizing that field conditions or unforeseen circumstances could vary procedures.

The authors sampled each of the lode claims (Sunrise and Six O'Clock) as well as each placer claim (Sunset, Compressor, East Fork and Yankee). Forest Service mineral examiners who participated included Hilton Cass, Rich Teixeira and Mike Dunn. Mr. Ferrero and/or Mr. Giles were present during the collection of most of the samples and were advised of the procedures to be used and given the opportunity for input.

It was previously agreed to use a mechanized backhoe to obtain as many channel samples as possible. The Klamath National Forest contracted with a local operator for the backhoe services on July 27 and 28. However, equipment breakdowns and the unexpected delays involved in opening access to the Six

O'Clock mining claim severely hampered the use of the backhoe. Consequently, the backhoe was used for preparing as many sample sites as was possible. With the exception of the "grab" samples, all samples were channel cut by hand after first scraping "clean" the sample face to expose fresh material. When possible, and/or for safety purposes, the backhoe was used to clean the channel sample face. All channel cut samples were captured using either a bucket, sample can or by catching the material on a tarp. We attempted to obtain a 5 gallon sample for each 1.5 meter (5') length of channel sample. Samples were weighed in the field with a hand-held scale, double-bagged, marked, and photographed. The site locations were noted on a map. The few grab samples obtained were to verify the presence of mineralization or continuity of structure. The maps in ***Appendix C,*** *(2)* display the location of the sample sites within the lode and placer claims.

The mine dumps were the only materials identified for sampling on the placer claims. Tom Ferrero pointed out each discovery location on the claims. The mine dump samples were taken by backhoe excavation or hand-dug when conditions disallowed backhoe access. Most of the sample sites beyond the northern end of the Klamath mine waste dump (identified as the Blacksmith dump in this report) were inaccessible by the backhoe because of the heavy overgrowth of vegetation and blown-down trees. Mechanical problems with the backhoe also limited the number of sample sites that could be dug with the backhoe. We attempted to reach native soil at each sample site. When possible, two (2) five gallon bucketfuls of sample from each sample site was a minimum goal. The procedures for handling and recording the mine dump samples were the same as for the lode samples. However, the claimant was advised when circumstances required sampling procedures different from pre-examination agreements. ***Appendix D*** *(4)*

During the sampling , individual samples remained in the custody of the authors. The samples were placed in a locked Forest Service truck after collection and were transported each day to a storage facility in Yreka, California, where they were kept in a locked storage unit. On September 8, 1998, the authors transported the samples to the Mountain States Research & Development laboratory in Vail, Arizona, in a locked van. Secure custody was maintained during the trip until samples were turned over to Dr. Roshan Bhappu, President of Mountain States Research & Development, International (MSRDI) for processing and analysis. The author John Gutierrez took custody of the sample pulps from the laboratory after the analyses were completed and transferred them to a temporary locked storage facility in Tucson, Arizona, and

later to a Forest Service evidence storage facility at Tonto Basin, Arizona. The remaining umpire samples continue to be secured by MSRDI in Tucson, Arizona. ***Appendix C,*** *(4)* is a chart that summarizes the data concerning each sample. Refer to ***Appendix C*** *(3)* for photographs of both lode and placer claim sample sites.

Sunrise LMC Sampling

Tom Ferrero directed the mineral examiners to the discovery point on this claim, which is a milky, white quartz vein. The apex vein extends through the long axis of the claim, adjacent and directly south of the existing mine road. The physical exposure of the vein along strike is about 122 m (400'), although a strong, continuing structure is indicated beneath the shallow ground cover.

The basic trend of the apex vein structure is northeasterly, dipping 15-20 degrees southeast. Typically, the surface vein consists of a 3 to 4.6 meter (10-15') siliceous zone, commonly capped by quartz breccia. The banded structure is separated by gouge layers. Due to shearing action, the crushed zone makes distinct mineralogical identification difficult. Removal of the surface quartz reveals that oxidation has penetrated at least 1-2 feet into the vein. The claimant has indicated he will remove and process the entire vein exposed in the road cut. Tom Ferrero and/or David Giles, were present during the sampling of the apex vein.

A total of 12 channel samples were obtained from the Sunrise apex vein perpendicular to strike and identified as samples KV-1 through KV-11 and KV-15. Samples KV-1 thru KV-6 and KV-8 were taken perpendicular to a highly sheared, buff to red-brown zone of silicified schist, capped by white quartz. By prior agreement, the authors directed the backhoe to dig vertically alongside the apex vein in three areas in order to verify the width of the vein near surface. At sample sites KV-7 and KV-9, which were approximately 21.3 m (70') apart, the width of the surface apex vein measured 6.4 m (21') and 7.38 m (24.2'), respectively. Approximately five hundred feet to the northeast along strike (KV-15), the surface vein was excavated down 3.7 m (12'), before it became impossible for the backhoe to excavate further. It was readily apparent the vein in this area continued downward. Sample materials from KV-7, KV-9 and KV-15 were divided into upper and lower sections of the vein in order to detect vertical changes in values which could relate to oxidation, lithology changes, etc.

KV-7 and 7a are from one channel cut in a distinctive, highly-indurated blue-white quartz reef displaying hematitic stained fractures and vugs. Chloritic schist can be seen localized along fractures and shatter planes. The KV-9 and 9a channel samples are from the same blue-white quartz reef which appeared to become more intensely iron-stained with depth. The KV-10 channel sample cut 3 meters (10') of highly oxidized siliceous gouge material containing dark to black carbonaceous schist and iron-stained vugs. KV-11 is from the blue-white quartz reef, containing a less intense degree of oxidation with depth. KV-15 exposed a highly sheared zone with alternating layers of fresh and oxidized quartz.

Sample KV-12 was obtained from the adjacent Dariel claim. Samples KV-13 and KV-14 were obtained from the road prism which is called the apex road stockpile in this report.

Six O'Clock LMC Sampling

No apparent structure or vein trace is exposed on the surface of this claim. White quartz float rock is scattered alongside the mine road running through this claim. Tom Ferrero directed the backhoe to excavate trenches where he believed the main gold-bearing vein (which he calls the "reverse dipping vein") to be exposed at the surface. The excavated trenches displayed a distinct schistose zone where shearing and recrystallization of siliceous rocks is evident.

The authors and mineral examiner Rich Teixiera obtained five samples from this claim. These consisted of four channel samples identified as the Six O'Clock #1, #2, #3, and #5, from the excavated trenches within the claim. A single grab sample (Six O'Clock #4) was taken from loose material adjacent to a trench. All sample materials are similar in color (tan-brown) and texture. The veining and and siliceous strings of quartz contain dark blebs of iron oxide or carbonaceous (schist) material. Quartz veining contacts darker porphyry sill rocks in the Six O'Clock #1 sample site. The channel sample took in a portion of the porphyry sill rock in the event that any gold mineralization could have penetrated the porphyry. The Six O'Clock #2 sample is from a highly sheared metasediment zone containing quartz and chert veinlets. The Six O'Clock #3 sample is from an exposure that shows swarms of quartz veinlets in a carbonaceous schist bedrock. Sample Six O'Clock #5 is from material similar to that exposed at the Six O'Clock #3 site.

Sunset PMC Sampling

Generally speaking, all of the Liberty mine waste dumps were formed of rock material that had been blasted, mucked out and randomly dumped over edge of the hillside. This haphazardly disposal of rock material would cause the mine dump pile to be erratic, segregated and classified into discontinuous layers.The authors observed such conditions with all of the Liberty mine waste dumps.

The Sunset placer mining claim includes approximately the northern two-thirds of the Klamath mine dump and all of the Blacksmith mine dump. The plan view map of the Klamath dump in ***Appendix C*** *(6)* illustrates the division of the Klamath mine dump between the Sunset PMC and the Yankee PMC. For the purposes of this report, the apex road stockpile material is considered to be part of this claim. Eleven samples (KD 1,2 & 4, BS-1 thru 6 and KV-13 & 14) were obtained by both backhoe and hand methods. A measured channel sample was cut from top to bottom in each excavated hole or on the sloping dump face from the Blacksmith and Klamath mine waste dumps. Because of the nature of mine dump construction, these samples were cut vertically across all stratified layers in order to obtain a representative sample of the material sampled. Samples taken from the apex road stockpile were obtained using the backhoe bucket to channel or slot the side of the excavated hole. The bucket was used to obtain the samples because of safety reasons.

The native ground surface was not reached in any sample pit. Both the Klamath and Blacksmith dump materials are predominantly gray to black fine-grained and sandy materials, containing angular rock fragments from 2.5 to 5 centimeters (1-2") in diameter. Many of the rock fragments show quartz veinlets and stringers and some sulfide mineralization. The material sampled for the Blacksmith #2 sample shows an abrupt change in color to tan-buff, which could be contamination with road surface materials. The sample, taken from the apex road stockpile (KV- 13 , KV-14), consists of a brown silt and sand mixture with abundant angular stones and boulders, many containing quartz.

Yankee PMC Sampling

This claim includes the Yankee mine waste dump in the northwest quarter of the claim and the southern one-third of the Klamath mine waste dump in the east central part of the claim. The portion of the Klamath mine dump which lies within the Yankee PMC is shown in the plan view map in ***Appendix C*** *(6).* A total of twelve (12) samples were obtained from the Yankee PMC: YD1a thru YD1c were

obtained from the main pile of material on the Yankee dump. Samples YD 1d-1 and YD1d-2 were taken from a small, separate pile away from the main Yankee dump. Whether this pile is from the same origin as the larger dump is uncertain, but it is included by the authors with the Yankee PMC samples. Samples KD-3, KD-5 through KD-8 were obtained from the Klamath mine waste dump. All but samples KD-6 and KD-7 were taken by hand excavations. All samples were obtained from measured channel cuts that ran the vertical length of the holes from top to bottom in order to obtain a representation of the various layers of materials encountered in the holes. Native soil was not reached in any of the sample pits. The sampled materials from both areas are gray to sooty black, silty sand containing angular rock fragments.

Compressor PMC Sampling

The discovery location identified by Mr. Aloisi and Mr. Ferrero for this claim was the Union mine waste dump, which lies partially along the southern boundary of the claim. Two samples were obtained from this claim, one (Union #3) using a backhoe and the other (Union #2) by hand methods after the backhoe developed mechanical problems. The two backhoe-excavated samples were taken vertically down the faces of the holes from measured channel cuts. Another sample, Union A, was a grab sample taken from a small pile of rock outside of the Union Mine portal. Materials from the samples were mainly gray to black, carbonaceous silty sand. A distinct layering or stratification became evident with depth of the excavation as did ferruginous staining between layers. Larger angular quartz rocks in a brown sandy matrix increase with depth. The Union #2 sample exposed native soil at about four feet depth.

East Fork PMC Sampling

Mr. Aloisi and Mr. Ferrero identified the Union dump as discovery point for this claim. The southern end of the Union dump extends onto the claim. The plan view map of the Union mine dump shown in ***Appendix C*** *(6),* illustrates how the common boundary line between the East Fork PMC and Compressor PMC divides the dump. Sample Union #1 is from the Union dump at the boundary between the East Fork and Compressor claims. This sample was taken with the use of a backhoe to excavate the trench. A 12 foot sample was taken from a channel cut down the face of the hole to obtain a representation of the layered dump materials. The description of the material exposed and sampled mine dump is the same as above for the Union #2 and Union #3 samples.

Sample Processing

At an meeting on June 16, 1998, with Mr. Aloisi and Tom Ferrero, the author Jim DeMaagd and mineral examiners Hilton Cass and Rich Teixiera discussed the methodology that would be used to process the samples to be taken from the mining claims. Mr. Aloisi emphasized the need to utilize gravity concentration, and to duplicate the centrifugal concentration methodology that he had planned to use to process the mined materials at the time of his earlier plans of operations. He believed that a centrifugal concentrator could be located through the manufacturer of his equipment, Tri-R Engineering. Although Mr. Aloisi was offered the opportunity to set up his equipment for the processing, he declined, saying it was too expensive and time consuming to set up and operate. He declined a similar request by the authors on July 27, 1998.

Author Jim DeMaagd unsuccessfully attempted to locate Tri-R Engineering, but the company is no longer in business. No analytical laboratory that was contacted had that equipment, either. The authors offered an alternative processing method to use a Goldsaver gravity separation unit with the addition of a Knudson or Knelson bowl concentrator to increase the recovery of any fine gold particles. This equipment is widely available and is typically used to evaluate the recovery of gold from placer materials by simple gravity concentration methods. Mr. Aloisi, in consultation with his consulting geologist David Giles, agreed that the Goldsaver plus Knelson concentrator combination, would best replicate the Tri-R centrifuge's capability.

It was mutually agreed to have the samples processed by Mountain States Research & Development International. When contacted about the availability of Goldsaver equipment, MSRDI reported **it** possessed a similar gold recovery unit called the Generic Gold Trommel. Coupled with a Knelson bowl, MSRDI's professional opinion was that it would "not adversely effect the overall gold recovery". ***Appendix C*** *(9)* Hence, author John Gutierrez, as the lead mineral examiner, made the decision to proceed with testing and analysis using this equipment.

At the claimant's request, a strict sample preparatory routine was performed regarding sample handling and screening. The special handling of the samples was made part of MSRDI's analytical procedures. MSRDI crushed and screened the samples to a maximum diameter of 1/8 inch in order to duplicate the method of ore preparation proposed by Liberty Mining. The prepared samples were then split in equal parts. One split of the samples was provided to Mr. Aloisi. Don

Moore, a Tucson-area metallurgical consultant who has worked in the past for Mr. Aloisi, observed the processing of samples for a short period of time at the request of the claimant and picked up the claimant's sample splits prepared by MSRDI.

Forty-eight samples weighing 40-75 pounds each were assayed and then subjected to gravity concentration tests using the Generic Gold Trommel and Knelson bowl. Concentrates produced from the testing were assayed to determine the recovery of gold. Average bulk density was also determined for both vein and dump materials to obtain a "tonnage factor" or weight of a volume of material in cubic feet per ton. Bulk density is the weight of material divided by its material volume less the volume of its open pores.

Cyanide soluble gold assays were performed to determine the amount of gold recoverable by direct cyanidation. Amalgamation tests were also conducted in order to determine the amount of free gold present in the ores. Amalgamation is a common process used to recover precious metal particles due to their affinity for mercury.

MSRDI ran tests to determine the physical and chemical characteristics of the gold-bearing material found in the samples. LOI (Loss on Ignition) tests confirmed the carbonaceous nature of the vein and dump samples that could cause "preg robbing". Carbon-In-Pulp (CIP) tests were done to determine if the cyanide gold content would increase in the presence of activated carbon. Finally, calcination tests were run on both dump and vein samples from the Eddy Gulch claims. This was done to evaluate any change in gold recovery rates, if the carbonaceous mine ores were roasted prior to cyanidation treatment.

## SAMPLE ANALYSIS

On November 30, 1998, MSRDI, completed its final report on the Eddy Gulch mining claim samples (***Attachment E***). The report includes fire assay and gravity concentration results for each sample.

Fire assay results of the samples taken from the Sunrise lode claim range from 0.043 to 0.265 oz/ton gold. The Six O'Clock lode claim showed no detectable gold. The Union dump samples ranged from 0.027 to 0.054 oz/ton gold. Samples from the Yankee mine dump ranged from 0.12 to 0.302 oz/ton gold. Two samples, YD1-1d and YD1-2d showed 2 to 3 times more gold value than other Yankee mine dump samples. The Klamath mine waste dump samples

values ranged from 0.053 to 0.44 oz/ton. Samples KD-1 and KD-2 indicated gold values 3 to 8 times the average dump value from this mine dump. The Blacksmith mine dump samples ranged from 0.027 to 0.159 oz/ton gold, with the latter value (BS-1) being 3 times the average value of the other dump samples.

Historically, area mine dumps assays range from 0.005 to 0.10 oz/ton. Although the claimant has never presented the Forest Service with any substantial assay results from the mine dumps, Sannes (1977) estimated the Klamath mine dumps to be 0.086 oz/ton gold. WGM (1988) found somewhat similar results and reported 0.10 oz/ton gold for the Klamath mine waste dump.

The anomalous values found in the five samples noted above, are significantly higher than found by both Sannes and WGM. It is possible the elevated values are attributed to what is called the "nugget effect". That is, small, random particles ("nuggets") of the precious metal can erroneously inflate assay results. The higher values from these individual samples are more than likely due the erratic gold distribution known to occur in this area. Since they do occur in randomly placed mine waste rock with no geological continuity, the sample influence is limited to the individual sample volume.

On June 24, 1999, MSRDI's reanalysis of the samples confirmed the assay values of the initial results. At the same time, MSRDI discovered that the bulk density values it had previously reported were in error. The new values are 13.7 cu ft per ton for the vein materials and 17.8 cu ft for the mine waste materials. For purposes of this report these values were rounded up to the next whole number.

Spot testing of a limited number of samples for silver averaged approximately 0.04 ounces per ton, which is a very minor amount and not of economic significance.

The gravity concentration tests using the Generic Gold Trommel and Knelson Bowl showed that the weighted average recovery from the vein material was 15% and the weighted average recovery from the mine dumps was 28%. Due to the poor showing of gold recovery using gravitational methods, MSRDI conducted the amalgamation tests to determine the nature of the gold mineralization contained in the mine rock from the subject claims. Tests on randomly selected samples of the vein and dump materials showed recovery of gold ranging from 0.18% to 19.76 % recovery. MSRDI determined that the gold values in the Eddy Gulch vein and dump samples "are not occurring as free gold and that simple

gravity concentration methods will not be effective in recovering the major portion of the contained gold values." Further, they concluded that gold recovered in the gravity tests was a gold product combined with other high specific gravity gangue materials.

The cyanide soluble gold assays showed that only 3.7 to 28.1% of the gold in the dump samples could be recovered by cyanide leaching, and 17.1 to 73.07% of the gold in the vein samples could be recovered by cyanide leaching. The carbon-in-pulp (CIP) tests showed that cyanide recovery process using activated charcoal could increase the recovery 4-10% for the vein material and as much as 37% for the dump material. MSRDI recommended CIP treatment to be included in any processing of these ores.

The calcination tests returned mixed results, since the vein material did not respond well to roasting. A single sample from the Klamath dump showed an increase in recovery to 59% of the gold content. It is MSRDI opinion that " These results clearly indicate that the unrecoverable gold values in these samples are most probably contained as finely disseminated gold (micron-sized) in the gangue (quartz) matrix which are not liberated even after calcination."

Concluding, MSRDI notes that the samples contain refractory gold with values that range from an average of 0.07 (vein) to 0.10 (dump) oz/ton. The average "recovery of gold from the vein as well as mine dump samples....will be comparatively low and may average about 15% for vein samples and about 28% from the mine dump materials". MSRDI recommends that concentrates be treated by cyanidation (CIP) and/or roasting to increase the recovery rate from "80 to 90 percent". The additional treatment, however, will require "stringent and relatively expensive processing methods" resulting in increase capital and operating costs.

Environmental Testing

The Liberty mine ores are know to contain a small amount of sulfide minerals in the form of arsenopyrite. Arsenic is considered a hazardous substance, as set forth in 40 CFR 302.4. Under CERCLA (Comprehensive Environmental Response, Compensation, and Liability Act), the law holds those who generated the waste potentially liable for cleanup costs (present & future) should a release of a hazardous waste, such as arsenic, occur into the environment. A release is broadly described to include any spilling, leaking, pumping, pouring, emitting,

emptying, discharging, injecting, escaping, leaching, dumping or disposing into the environnment.

Composite concentrate samples of both the Liberty mine waste dumps and vein materials were submitted for environmental testing. The sulfide component in arsenopyrite was evaluated for its potential to produce an acid mine drainage problem. Acid Base Accounting (ABA) testing indicates that mine materials have a basic potential and are not likely to produce an acid drainage problem. Liberty mine samples were also subjected to EPA Method 1312, TLCP, (Toxicity Characteristic Leaching Procedure) analysis to determine the presence of leachable metals. TLCP results indicates that the samples meet the Federal criteria for leachable metals. ***Appendix C*** *(8)*

The State of California has stricter requirements regarding the potential release of hazardous substances. The Waste Extraction Test (WET) analysis was developed to measure the amount of waste constituents that may be leached from waste materials. In general, a solid waste is hazardous if the WET extract concentration of any constituent equals or exceeds its Soluble Threshold Limit Concentration (STLC), or other criteria as defined in the California Health and Safety Code. Liberty mine samples were submitted to a State-certified laboratory for arsenic analysis according TTLC (Total Threshold Limit Concentration) and STLC (Soluble Threshold Limit Concentration) criteria. Samples from individual mining sites, K.D. (Klamath dump), B.S. (Blacksmith dump), Y.D. (Yankee dump), K.V. (Klamath vein) and Union (Union dump), all reported very high arsenic values under TTLC criteria. Being that the material is non-acid generating, STLC analysis with a deionized water extractant found very low arsenic values, ranging from non-detectable to 0.84 mg/l. ***Appendix C*** *(8)*

STLC analysis found the arsenic-containing material from the Liberty claims to be nonsoluble in rainwater. Disposal of Liberty's processed materials will not require transportation to a hazardous waste disposal site. Although the mine waste materials are not considered a hazardous waste, they still constitute a hazardous substance. According to the California Regional Water Quality Board, the material's exposure route to human health is through inhalation of airborne particulate matter and physical contact if left uncovered. Disposal of the Liberty mill tailings will require impoundment away from any live stream or area subject to erosion. The processed waste materials need to be encapsulated with a suitable, engineered top cover, followed by soil cover and revegetation. A suitable alternative could be encapsulation in a cement monolith and burial.

The conventional impoundment facility for the gravity/flotation/cyanidation plant designed by Aventurine Engineering should suffice with modifications to include a top cover. The cost of the liner will add several thousands of dollars to Aventurine's estimate for constructing the impoundment facility.

Claimant's Tests Results on Flotation

Don Moore submitted a Progress report No. 1, dated January 16, 1999, regarding metallurgical testing of the sample splits he obtained from MSRDI. ***Appendix C*** *(10)* Mr. Moore investigated whether a gold recovery process could be developed, using a combination of gravity, flotation, and cyanide leaching methods. However, these test results were based on a limited range and number of samples. Only ten samples were tested, and three of these samples were run twice as splits from the sample original samples (KV-1, KV-2 and KV-5). It is not known how the samples were selected from the 48 samples available to Mr. Aloisi.

Gold recoveries averaged approximately 38% on samples tested. Mr. Moore recommended continued process development tests from "fresh ore samples from drill core samples or underground samples". Although the sample selection may not be representative of the entire range of material, given the broad range of recovery values obtained (10.39% to 73.97%), for this report, Moore's findings are used to estimate the possible recovery of gold using that methodology.

Mr. Moore submitted a Progress Report No. 2 dated February 21, 1999, which discusses the results of further lab testing of three samples (KV-1, KV-5, and YD1a). This testing involved methods to bypass the gravity and flotation stages to determine if straight cyanide leaching would provide recovery of gold similar to the combination gravity/flotation/cyanide leaching system tried previously. As part of continuing pilot studies, Moore suggests that a flotation /cyanide leaching process is the best process for the ore sampled. ***Appendix C,*** *(11)*

It should be noted that the relationship between consultant Don Moore, Tom Ferrero and Mr. Aloisi is significant to the Government's acceptance of any metallurgical tests conducted by Mr. Moore. Mr. Moore is the lab owner and under contract with Mr. Aloisi. It is not known upon what basis samples were selected by the claimant for laboratory testing. There was no chain of custody established for the samples by the claimant; therefore, the opportunity existed for manipulating the integrity of the samples.

## MINERAL RESOURCE ESTIMATES

Using maps and data submitted by the claimant, MSRDI's gold assay data, and independent measurements, observation and analyses, the authors have estimated the tonnage and grade of the mineralized material found within the subject lode and placer claims. The materials are separated into three categories: surface veins, underground veins, and mine waste dumps.

### Surface Veins

The Sunrise lode claim resources were calculated on the basis of our observations of the vein at the surface, distances between sample points, assays and geologic inference. These resources should be categorized as "inferred resources" which means that estimates are based on geological evidence and assumed continuity.

Sample distribution on the apex vein involved several channel samples taken at unequal intervals where the vein is exposed along the mine road. Some of the samples represent greater lengths of the vein structure than others. Customarily, the interval of influence (half the distance to each neighboring sample site), must be weighted (multiplied) by the width of the sample (normal to the vein). Individual samples or sample groupings were used to determine area of influence. Five distinct assay blocks were established in order to determine an average grade for the vein. Within each block, samples were corrected for width and interval of influence to establish an average assay for that block, based on individual assay results from MSRDI. ***Appendix C,*** *(2)* illustrates the location of the blocks beginning at survey point 0+00 thru 13+32 on the Sunrise mine road.

In documents submitted to the Forest Service, Mr. Ferrero noted the Sunrise vein has a thickness of 10.7 m (35'), although he has never submitted data to support this fact. The claimant also assumes the vein continues in its down dip direction carrying the same thickness hundreds of feet. However, previous exploration drilling does not confirm the vein to be consistent with this width. Core drill intersections from exploration drilling are generally less than 6.1 m (20') thickness for the veins in the entire mine area. The range of vein width at the surface observed during the mineral examination was from 2 meters (6.5') to 7.4 meters (24.2'). Geologic inference that an even wider vein exists at depth is only speculative.

The claimant's mining plan calls for nearly horizontal excavations into the hillside until establishing a 1:1 backwall slope with the countryrock. According to drawings submitted by Mr. Ferrero, the claimant projects a downdip extension of the vein from 19.8 m (65') to more than 30.5 m (100'). However, Ferrero has described 1.8-2.4 meters (6-8') wide stopes having been developed 15 to 122 meters (50-400') along the strike of the vein directly under the area being proposed for mining. Stulls and mine timbers observed at the surface of the apex vein raise reasonable doubt that a significant downdip vein extension is possible because their presence are an indication that previous mining has removed the subsurface vein material. The claimant's projected down dip extension of the vein lacks any factual evidence demonstrating its continuity.

With respect to the gold values found in the apex vein, extending mineral values along strike and downdip by geologic inference is further restricted. *U.S. v. Feezor* gave the circumstances under which geological inference can be used to show continuity of values beyond the physical exposure of the vein. Accordingly, values have to be shown to be high and relatively consistent. In the case of the Sunrise apex vein, sampling has shown that values are not consistent nor high. Gold values in the apex vein vary considerably, ranging from 0.021 oz/ton gold (KV-3) to 0.16 oz/ton gold (KV-15). Therefore, it would only be appropriate to extend the gold values found in the apex vein only a few tens of feet both along the vein strike and downdip extension, rather than the lengths envisioned by the claimant. For the purposes of this report, gold values extend along strike of the Sunrise lode vein to the boundaries of each determined assay block. Downdip, the weighted average assay value for the sampled vein was used.

Considering all the above reasons limiting the extent and value of the apex vein, the authors have concluded that the dimensions of the apex vein structure assumed by the claimant cannot be substantiated. However, in order to evaluate the claimant's proposal for mining the apex vein, the authors have selected the following parameters: A strike length of 406 m (1332') based on geologic inference from surface exposures; an inferred 7.6 m (25') vein width based upon observations of the vein structure during backhoe excavations, and a downdip vein extension determined by horizontal mining to a 1:1 backwall design.

The Sunrise lode claim material volume and grades were determined utilizing CAD (computer aided design) with a Soft Desk software package. Profiles were developed taking into account the topography of the claim, vein dip, claim boundaries, assay values and using the claimant's backwall design. There exists a total of 1,063,575 cu ft of mineralized rock within the Sunrise apex vein. Mining

will require 5,029,506 cu ft of overburden to be removed--a stripping ratio of almost five to one (4.7:1).

Samples KV-12, 13 & 14 are not included in the grade calculations: KV-12 was taken outside of claim area (Dariel lode claim) and only to confirm continuity of the vein structure. Samples KV-13 & 14 were bulk samples of the apex road stockpile and are considered elsewhere with the mine dump calculations.

Chart A below displays the average weighted grade for the apex vein exposed within the Sunrise claim.

## CHART A

| *Block* | *Station* | *Sample(s)* | *Interval (I)* | *Vein (W)* | *IxW* | *Assay* | *IxWxA* |
|---|---|---|---|---|---|---|---|
| *A* | *End to 4+50* | *KV-11* | *450 ft* | *9.5 ft* | *4275* | *.041* | *175.28* |
| *B* | *4+50 to 6+50* | *KV-1,2,3* | *200 ft* | *6 ft* | *1200* | *.12* | *144* |
| *C* | *6+50 to 8+50* | *KV-4 thru 9* | *200 ft* | *15 ft* | *3000* | *.09* | *270* |
| *D* | *8+50 to 10+50* | *KV-10* | *200 ft* | *12 ft* | *2400* | *.086* | *206.4* |
| *E* | *10+50 to 13+32* | *KV-15* | *282 ft* | *12 ft* | *3384* | *.16* | *541.4* |
| ***TOTALS*** | | | ***1332*** | | ***14,259*** | | ***1,337.1*** |

*Where: Average Grade* $= \frac{\Sigma (I \times W \times A)}{\Sigma (W \times I)}$ *then, 1,337.1 / 14,259 = .09 oz Au / ton*

***Average grade of Klamath apex vein:*** *Takes into account that each channel sample was cut at unequal intervals & represents varying lengths of vein than others. Assuming the vein to be continuous, channel samples are weighted by interval of influence as well as sample width (normal to vein):*

Based on the tonnage factor of 14 cu ft/ton, there may be a total of 75,970 tons of material available for extraction according to the Liberty mining plan of operations for development of this vein. At an average grade of 0.09 oz gold per ton, this could represent a possible total of 6,837 ounces of gold mineral resources found within the Sunrise lode claim. Nevertheless, significant doubt remains regarding existing resources because of early-day mining beneath the Sunrise lode claim.

On the Six O'Clock lode claim, the Liberty Mining plans are to excavate horizontally through the slope, removing mineralized rock, until establishing a pit wall backslope of 1:1. The proposed dimensions of the pit are 183 meters (600') east from the existing surface excavations on the west and approximately 31 meters (100') vertically from the present day surface. However, MSRDI's assay analyses indicated No Values (non-detectable) for the gravity concentrates for all material obtained from the sample sites. The calculated head assays were found to range from .001 to .005 oz/ton gold except for Six O'Clock #3 which has a calculated head assay of .029 oz/ton gold. MSRDI attributes this latter anomalous value to the "nugget effect". This is not unexpected, given the well-known sporadic distribution of gold in ores from the area. The low to non-detectable level of gold found in the surface samples negates any reason to identify surface minable reserves on this claim. This finding is consistent with Ferrero's 1986 conclusions about the Six O'Clock lode (Incline Ridge) claim. He found that surface sampling did not support a surface mineable gold deposit.

Exploration drilling in the past revealed a narrow zone of gold mineralization at about 45.7 meters (150') below the surface along a northwesterly steeply dipping vein. The average grade of this material, as shown in the following section, is estimated to be 0.03 oz. gold per ton.

Underground Veins

Exploration drilling in the past has identified a target for further investigation as an underground resource on the Six O'Clock mining claim. During the 1986 drilling by Mega Gold, three vertical drill holes penetrated gold-bearing material about 31-41 meters (100-150') beneath the Six O'Clock claim surface. ***Appendix C*** *(12)* contains a record of the 1986 drilling data and shows DH 86-1, 2 & 6 cut rock containing sporadic gold mineralization. This drill hole information could not be verified since the drill core was not available for inspection.

Lying on the extreme east edge of the planned surface pit, DH86-2 found 0.02 oz/ton gold from a depth of 38 meters (126') to a depth of 45.7 meters (150') or 7.3 meters (24'). The remaining drill holes DH 86-1 and DH 86-6 lying outside of the proposed surface pit, penetrated mineralized rock averaging .01 oz/ton gold and 0.12 oz/ton gold, respectively. Within the dimensions of the planned pit, DH 86-2 defines a mineralized tabular structure called the "reverse dipping vein" by Ferrero which averages 6.1 meters (20') in width. The true vein width 6 meters (20') was calculated from a drill hole intercept showing an apparent vein width of 7.3 meters (24'), dipping northwesterly at 58 degrees. ***Appendix C*** *(5)* illustrates

an idealized cross-section of DH 86-2 on the Six O'Clock mining claim surface slope.

The data from the three 1986 drill holes are hardly sufficient to define ore reserves upon which to proceed with underground mine development. At best, the drill holes define inferred resources, or those which have very limited measurements or physical evidence. The average grade of the underground veins extrapolated from the drill hole information is as follows:

CHART B

| SAMPLE | WIDTH | ASSAY (Au) | WxA |
|---|---|---|---|
| DH86-1 | 45' | .01 opt | 0.45 |
| DH86-2 | 24' | .02 opt | 0.48 |
| DH86-6 | 9' | .17 opt | 1.53 |
| | 78' | | 2.46 |

Average grade = 2.46 / 78 = **0.03** oz/ton gold

Assuming a vein thickness of 6 meters (20'), a depth of 7.3 meters (24') and inferring the strike of the vein to be 183 meters (600'), there may be approximately 20,571 tons of mineralized rock beneath the Six O'Clock lode claim surface. At an average grade of 0.03 oz/ton gold, this amounts to a possible 617 ounces of contained gold in inferred underground resources.

Mine Waste Dumps

Based on field survey measurements, sample excavations and ground topography, the authors determined the amount of material contained in the mine waste dump. As previously noted, Sannes (1977) estimated between 35,000 and 47,000 tons of material in the Klamath dumps. He used an average depth of 2.3 meters (7.5') and based his figures on estimated tonnage factors ranging from 15 to 20 cu ft per ton. Watts, Griffis and McQuat (1988) estimated 58,000 tons of

materials in the Klamath dump, although their work relied on Sannes' earlier figures. WGM incorporated two (2) cross-sections across the dump and an average depth almost twice that of Sannes or 3.96 meters (13'). They measured the top part of the section, but only approximated the bottom portion of the dump.

Since earlier volume determinations by Sannes (1977) and WGM (1988) used estimated or partial survey measurements, it was important to get an accurate survey of the areal extent of each mine dump. During the course of the mineral examination, each dump perimeter was measured by survey tape. Depths of individual mine dumps were determined from sample excavations and/or ground topography.

The Klamath, Blacksmith and Yankee mine waste dumps are the equivalent of what previous investigators measured as the "Klamath". Together with the Union mine waste dump volumes, the Forest Service mineral examiners found a total of 21,056 tons within these mine waste dumps. While this volume is significantly less than previous investigators, it is based on measurements around the entire perimeter of each mine waste dump. In addition, the tonnage factor used (18 cu ft/ton) was a laboratory determined value, not an estimated figure.

Chart C summarizes our estimates of material volumes contained in the mine waste dumps that have been proposed for mining.

## CHART C

Mine Waste Dumps

| | ***Cu Ft*** | ***Tons*** |
|---|---|---|
| Klamath | 219,846 | 12,214 |
| Blacksmith | 104,621 | 5,812 |
| Yankee | 23,550 | 1,308 |
| Union | 30,996 | 1,722 |
| **Total** | 379,013 | 21,056 |
| Apex road stockpile | 34,350 | 2,454 |

The plan view maps of the mine dumps shown in ***Appendix C*** *(6)* illustrate how claim boundary lines divide some of the mine waste dumps. This division of the dumps influences the total resource volumes within each mining claim affected. The east-west claim line between the Sunset and Yankee placer claims divides the Klamath mine dump. The Sunset PMC contains the upper portion of the Klamath mine dump and all the Blacksmith mine dump materials. For purposes of this report, the 2,454 tons of materials in the apex road stockpile are included with the Sunset PMC. This amounts to approximately 9,956 tons of materials contained in the Sunset PMC.

The southern one-third of the Klamath dump materials and the entire Yankee mine dump (1,308 tons) are within the Yankee PMC. Together, this amounts to 11,832 tons of mine dump waste materials. The East Fork PMC contains 190 tons of mine waste dump materials. There are approximately 1,532 tons of mine waste dump materials within the boundaries of the Compressor PMC.

The claimant alleges 75,410 tons of materials containing 0.17/oz ton gold are contained within the Liberty mine waste dumps. However, in a letter to author John Gutierrez, on February 12, 1999, geologist Ferrero admits not having done an accurate survey of the mining dumps. He notes that he relied upon visual estimation and the earlier work by Sannes and WGM.

By their very nature, mine waste dumps are inherently discontinuous, segregated and commonly layered because of the random placement of materials. Since there is a total absence of geological continuity in the waste rock dumps, sampling limitations (near-surface sample sites, limited penetration, limited number of samples, etc.) severely restrict any zone of influence or any predictive value to any other part of the dump. There is no conceivable way to determine the source of any part of Liberty waste dumps. It is entirely possible that material from outside sources could have contributed to the mine waste dumps present today.

The Forest Service' mine waste dump sampling program objective on the Liberty claims was to determine as much as possible about the character and mineral potential of the waste rock dumps under the contraints of the presampling agreement and the availability of money, equipment and related resources. It must be emphasized that the sampling regime used by the Forest Service does not and cannot establish the quantity of gold in the waste rock nor determine if the materials can be mined at a profit to any degree of accuracy. However, within the limits of the sampling agreement, the results do indicate the presence of gold

mineralization which provides an incentive for further exploration of the mine dumps. Only through a very detailed exploratory program could any degree of confidence be given the mineability of these waste materials. To date, the authors are not aware of any significant exploration and sampling program performed by the claimant on the Liberty mine waste dumps.

Nevertheless, the authors have developed inferred resource estimates solely for the basis of evaluating the profitability of the operation that was envisioned by Aloisi. As noted earlier in this report, several samples were taken from each mine dump. All samples from a single mine waste dump were assayed individually, and then combined to obtain a bulk sample weighted average gold value for that dump. The Klamath, Blacksmith, Yankee and Union mine waste dumps contain a bulk sample weighted average value of 0.12 oz/ton gold, 0.06 oz/ton gold, 0.18 oz/ton gold and 0.03 oz/ton gold, respectively. The apex road stockpile contains a bulk sample weighted average value of 0.04/oz/ton gold. There are a total of 21, 056 tons contained in the mine waste dumps and 2,454 tons of material found in the apex road stockpile. Refer to Tables 1-2, ***Appendix C,*** *(6).*

Again, it must be emphasized that because mine dump materials are characterized by a total lack of geological continuity; they require far greater sampling density and sample size than naturally distributed lode and placer deposits to meet the criteria to be classified as reserves. To properly sample statistically, would amount to making the claimant's discovery at great government expense. Government mineral examiners need only sample existing exposures of mineralized found within a claim in order to make a determination of validity.

Claimant's Resource Estimates

The resource estimates made by the claimant for the subject mining claims have varied over time. Through verbal and later written communications dated February 12, 1999, Tom Ferrero, provided estimates of the minable resources within the mining claims. Mr. Ferrero has estimated that the Sunrise lode claim contains 238,000 tons of ore with an average grade of 0.20 oz/ton gold. The Six O'Clock lode claim surface reserves are said to be 53,300 tons of ore containing 0.20 oz/ton gold. Mr. Ferrero predicts that the Six O'Clock underground reserves contain 82,200 tons of ore with a grade of 0.50 oz/ton gold. The Sunset and Yankee placer claims, consisting of the Klamath and Yankee mine dumps, are reported as having 55,410 tons of ore containing 0.17 oz/ton gold. The East Fork

and Compressor placer claims, containing the Union mine dump, reportedly hold 20,000 tons of material grading 0.17 oz/ton gold.

In addition to these resource volume estimates, Mr. Ferrero alleges that ores from the Sunrise lode, Six O'Clock lode, Sunset, Yankee, East Fork and Compressor placer claims can be milled with a 70% recovery rate. This figure is almost double what the claimant's metallurgist, Don Moore, determined in recent testing. Moore found that with the overall gravity/flotation/leaching process, gold recoveries averaged about 38% on samples obtained from the Liberty claims. Additionally, Ferrero claims that a recovery of 90% can be achieved from the underground ore on the Six O'Clock lode claim. It is unclear how and on what data Mr. Ferrero bases this recovery estimate. Moore's report made no reference to leach recovery tests on underground ore from the Six O'Clock claim. To the contrary, Moore has recommended that fresh ore samples from drill core or underground be tested due to the presence of sulfide oxidation on tested samples. The claimant's mill recovery assumptions appear to be based upon historical records and hypothesis alone, since he offers no factual evidence to substantiate this data.

## ECONOMIC EVALUATION

Liberty Mining has proposed in the past through its mining plans of operations to develop the subject mining claims as an integrated mining and milling operation. The claimant Mr. Aloisi has alleged that mined together, the placer and lode claims contain a sufficient quantity and tenor of precious metals to be extracted profitably using his overall mining plan of operation. Group development of the claims appears to be a reasonable approach since all of the mining claims are either contiguous or close in proximity. The proposed operation is based on the commingling of mine-run materials from each claim.

As described previously in this report, the proposed mining operation involved open pit mining of the shallow resources of vein material on the Sunrise and Six O'Clock lode mining claims and extraction of the mine dump materials at the Klamath and Union mine dumps. Mining of the Yankee dump and the underground vein material on the Six O'Clock lode mining claim were added during the time of this examination at the request of the claimant.

Mr. Tom Ferrero has estimated mining costs for the surface pits and dumps to be around $8 per ton, and about $100 per ton for the underground work. There are no milling cost estimates for a gravity recovery system alone as proposed by

the claimant. The milling costs are based upon estimates provided by Mr. Don Moore for a 300 ton per day plant involving a gravity/flotation and cyanidation recovery system. Milling costs are estimated to be around $20 per ton, and reclamation and waste handling costs are said to be $2 per ton for the dump material and $4 per ton for the vein material. Capital costs for the mill are estimated to range from $500,000 to $1,000,000. Moore also estimated the costs to operate the same mill in 1990 to be $15.54 per ton, with a capital cost of $355,960. The costs to amortize, or pay back the capital costs are not included in the estimates.

Should Liberty Mining site an ore processing plant, utilizing a gravity flotation and cyanide system in California, there would be a high cost associated with permitting the plant and its associated tailings containment facility. While cyanide plants are permitted in California, the cost of permitting in terms of time can be prohibitive. Neither the claimant nor Liberty Mining has submitted a Plan of Operations to the Forest Service nor any other regulatory agency for operating an ore processing plant that utilizes flotation and cyanide chemical processes. Before Mr. Aloisi were to proceed with his plans, he would have to apply and receive approval from the Forest Service. At a minimum, he would need approval from the Regional Water Control Board and Siskiyou County. The time and cost associated with these reviews and approvals can be substantial.

Forest Service mineral economist, Richard Marshall has evaluated mine permit processing times for eighty-eight (88) mines on both private and federal lands (personal communications). The study includes both federal and state permit requirements for several western states and takes into account surface and underground mines with ancillary mill facilities, including cyanidation plants. Mr. Marshall has determined the mean number of months necessary to permit a mine in California took an average of 12.6 months from 1981 to 1985. During 1986-1990, the mean number of months was 11 and after 1991, the time required to permit a mine jumped to 24.1 months.

Mine/Mill Cost Estimates

For the purposes of this mineral examination, the Forest Service contracted with Aventurine Mine Cost Engineering, to prepare capital and operating costs estimates for a hypothetical mining and milling operation for the subject mining claims. Aventurine considered four different scenarios : 1) mining using Liberty Mining's equipment and methods, and a gravity concentration system; 2) mining using Liberty Mining's equipment and methods, and a combination gravity

flotation/cyanidation recovery system; 3) mining using alternative equipment, and a gravity concentration system; and 4) mining using alternative equipment and a combination gravity/flotation/cyanidation recovery system. The reason for including mining and milling scenarios that involves alternative equipment is to consider the influence of more efficient methods and equipment on the total mining operation. Aventurine was also asked to develop the estimates based on costs for the years 1985, 1990, 1994, and 1998. Aventurine transmitted its final report to the Forest Service on July 26, 1999 (***Attachment F***).

The Aventurine report outlines the costs for the development, mining, mineral processing, tailings disposal and reclamation of the subject unpatented mining claims. The report incorporates the authors' estimates of ore grade and tonnage found within the unpatented mining claims. Aventurine used the gold recovery estimates from the results of the MSRDI tests of gravity concentration that were run on the samples from the claims. The gold recovery rate estimated by Don Moore for the gravity/flotation/cyanidation system is used. The report also incorporates information from the mining and milling plans of Liberty Mining as received by the Forest Service over the past several years.

The alternate mining method selected by Aventurine for its analysis involves utilizing smaller and more flexible scoop trams. Scoop trams are narrow self-loading mining equipment. While initially more costly in terms of operating costs, the operator should save money in the final analysis with lower development and equipment purchase costs.

Aventurine's cost estimates are based upon an integrated mining and milling operation with commingled ore materials from all of the unpatented mining claims. Aventurine's cost estimation includes capital and operating costs for a mine and mill operation on the subject claims. Capital costs include preproduction stripping, road construction, site preparation of all facilities, mine and mill equipment purchase, equipment salvage, reclamation, management, permitting, administration and working capital. A 10% contingency cost has been added to the total to account for any unforeseen costs. Operating costs include the wages and salaries, supplies, repairs and fuel necessary to pay for day-to-day costs.

The first scenario evaluated by Aventurine involves the original mining and milling proposal proposal by Liberty Mining with the addition of a 150 ton per day underground operation using shrinkage stope mining. The operation is a 350 ton per day surface mining and underground stoping operation with a crushing,

screening and gravity separation mill utilizing centrifugal concentrators to produce a heavy mineral concentrate. Aventurine used a mill recovery rate of 17.6%, obtained from the weighted average recovery for the mine dumps and the veins. Total operating costs for this scenario ranged from $21.18 per ton in 1985 to $28.91 per ton in 1998.

The second scenario Aventurine evaluated consisted of a 350 ton per day operation involving the open pit mining operations and an underground mining operation (shrinkage stopes) with gold concentrates produced by a gravity / flotation / cyanidation mill facility. The 38% gold recovery rate that is used is from the recent metallurgical tests by Don Moore. Total operating costs ranged from $30.99 per ton in 1985 to $41.68 per ton in 1998.

The third scenario evaluated involved the alternate mining method for the surface mines, as described above, and underground mining of the Six O'Clock claim. The claimant's original gravity recovery mill was incorporated into the cost analysis. The total operating costs ranged from $22.18 per ton in 1985 to $30.26 per ton in 1998.

The final design scenario involved the alternate mining method, underground mining of the Six O'Clock claim, and a gravity/flotation/cyanidation mill. The total operating costs ranged from $32.03 per ton in 1985 to $43.09 per ton in 1998.

Profit v. Loss Analysis

**Tables 1-4,** ***Appendix C*** *(7)* illustrate how the value of each ton of commingled resources from the claims compares with overall total cost of mining the claims, as estimated by Aventurine for an integrated mining and milling operation. The value per ton displayed does not include deductions that would occur for smelting and refining. A weighted average value of 0.080 oz per ton gold is used for the commingled materials from the surface mines, underground mine, and mine dumps. The average gold price for the years of 1985, 1990, 1994 and 1998 are $315, $385, $385 and $295, respectively. The following equation yields the value of each ton of ore:

0.080 oz/ton (grade) x Av gold price (year) x % recovery (mill type)

The resultant value per ton is then compared to the total cost of mining, milling and other miscellaneous costs such as administration, legal, permitting, etc., displayed in the Total Costs column. The Profit or Loss Column shows the

difference between the value of a ton of ore and the total cost of producing that ton of ore. Negative values in this column represent a loss.

**Table 1** displays data for Aventurine's first design scenario which incorporates the claimant's surface mine proposal and gravity mill with the addition of an underground shrinkage stope operation. The gold recovery data developed by MSRDI and incorporated by Aventurine (17.6%) was used. For the years of 1985, 1990, 1994 and 1998, the value of a ton of ore from an integrated operation is $4.44, $5.42, $5.42 and $4.15, respectively. However, after considering the projected mining and milling operating costs, there is a loss shown for every year, ranging from - $16.74 per ton in 1985 to - $24.76 per ton in 1998. During the critical years of 1990 and 1994, there is a projected loss of - $18.59 per ton and - $20.61 per ton, respectively.

**Table 2**, includes the operating costs for the second scenario, which is for surface mines, an underground mine and a gravity / flotation / cyanidation mill. A gold recovery rate of 38% is used based on Don Moore's recovery data. The estimated value per ton increases from the first scenario due to the higher recovery rate. However, this type of operation is unprofitable in all years of concern, as follows: - $21.45 per ton (1985); - $23.39 per ton (1990); - $25.99 per ton (1994) and - $32.74 per ton (1998).

**Table 3** considers the third scenario, which is Liberty Mining's surface and underground mining proposal and the original proposal to use a gravity recovery mill. However, Aventurine's proposed alternate surface mining methods (scoop trams) are incorporated into overall operating costs. The proposed operation would be unprofitable in all years of operation, ranging from a $17.75 per ton loss in 1985 to a loss of $26.11 per ton in 1998. During the critical years of 1990 and 1994, the loss per ton would be - $19.74 and - $21.85, respectively.

**Table 4** considers the fourth operating scenario, which is open pit surface mines, an underground mine operation, and a gravity/flotation/cyanidation recovery mill. Aventurine's proposed alternate mining equipment and methods are incorporated into the operating costs. There is no profit realized for any of the years. The loss per ton would be - $22.48 in 1985, - $24.57 in 1990, - $27.28 in 1999, and - $34.15 in 1998.

It is important to note that the costs per ton described in the above paragraphs are for operating costs only and do not include capital costs. Capital costs for such items as preproduction stripping, road construction, equipment purchase,

reclamation, and administration must be repaid through any profits that may be realized from an operation. These costs are amortized over time and are dependent upon the loan discount rate. Amortization provides an operator with a gradual retirement of debt for monies invested by payment of a part of the principal, usually with periodic interest payments. In mining, amortization insures that the face value of capital invested will be redeemed. Aventurine estimated the capital costs for the first scenario, which is Liberty Mining's original proposal. Total capital costs range from $2.4 million to $3.2 million from 1985 to 1998. When the capital costs are added to the total operating costs for each scenario described above, the potential loss is dramatically increased. For example, in the claimant's original proposal, the capital costs increase the total costs as follows: In 1985 the increase in cost per ton is $19.87; for 1990 , the cost increase per ton is $22.69; for 1994, the cost increase per ton $24.44; and for 1998, the cost increase is $26.77 per ton.

Aventurine also prepared a Discounted Cash Flow analysis (DCF) for each scenario it evaluated. The purpose of a DCF analysis is to show the net present value of an investment, assuming a competitive rate of return for the invested capital. For all scenarios, a negative net present value is shown for all years of operation. This means that the integrated mining and operation proposed by Liberty Mining could not return the capital investment required to operate. Details are contained in the Aventurine report.

Individual Claim Evaluation

Aventurine's analysis of the unpatented mining claims evaluated mining and milling the claim block as a whole. However, in order to be valid, each claim in a claim group must have a discovery within its boundaries. Therefore, the profit from mining each claim must exceed the cost of development.

The authors have also used the cost estimates developed by Aventurine to consider the potential profit or loss from mining and milling the materials on each mining claim individually. Aventurine prepared separate operating cost estimates for each deposit, as identified by the authors, such as the Klamath dumps, Sunrise apex vein, and Six O'Clock underground vein. Therefore, it is possible to analyze the potential operating profit or loss for each deposit and also each claim on which the deposit occurs. Each claim must also bear a proportionate share of the development and capital costs attributable to the overall mining operation. The following analysis looks at each claim individually as to whether a profit can

be made from that claim based solely upon the mineral resources within its boundaries.

Profit v. Loss Analysis

***Tables 5, 6, and 7 Appendix C*** *(7)* present our analysis of the potential profit or loss based on operating costs alone. Table 5 uses a gold recovery rate of 17.6% by a gravity concentration system for both the vein and mine waste dump materials. Table 6 uses an approximately 38% gold recovery rate for a combination gravity /flotation/cyanidation recovery system for both the vein and mine waste dump materials. Table 7 uses a gold recovery rate of 15% for the vein materials and 28% for the dump materials, as was determined by MSRDI's tests of the samples using a gravity concentration system. The value per ton of material is determined by the equation:

Grade x % recovery x gold price

Sunrise LMC

This analysis considered the costs for mining and milling the apex vein deposit only. Evaluation of this claim indicates that there is a loss for each year ranging from - $5.21 per ton in 1985 to - $9.05 per ton in 1998 using the gravity concentration system for the commingled ores (Table 5). During the critical years of 1990 and 1994, a loss is shown for the Sunrise lode claim ranging from - $5.40 per ton in 1990 to $6.25 per ton in 1994. For the combination gravity / flotation cyanidation system (Table 6), this claim shows a loss per ton for each year ranging from - $9.27 in 1985 to - $16.43 in 1998. For 1990 and 1994, the loss per ton is - $9.42 and $10.85, respectively. For the 15% recovery that could be expected from milling the vein materials alone (Table 7), the loss per ton ranges from - $5.44 in 1985 to - $9.12 in 1998. The expected loss for 1990 is - $5.74 per ton; for 1994 the loss is - $6.58 per ton.

Six O'Clock LMC (underground)

This analysis is based solely on an underground stope mining operation. An underground operation on this claim shows a loss for each of the years considered. For gravity milling using the 17.6 % recovery rate, the loss is from - $73.81 per ton to - $102.37 per ton. For milling with the gravity / flotation / cyanidation system, the loss ranges from - $81.85 per ton in 1985 to - $113.57

per ton in 1998. The loss per ton for the lower (15%) recovery expected from milling the vein materials alone through a gravity recovery system is from - $74.11 to - $102.75.

Sunset PMC

This analysis is based on the operating costs prepared by Aventurine for the Blacksmith dump, the apex road stockpile, and portions of the Klamath dump. The overall costs per ton that are displayed on Tables 5,6, and 7 were developed by calculating the weighted average of costs for each deposit. The analysis shows that this placer claim would incur a loss ranging from - $2.53 per ton in 1985 to - $6.12 per ton in 1998 for the gravity concentration milling system and the integrated mining operation that commingles the ores. The loss per ton for each of the years using the combination gravity/flotation/cyanidation system range from - $10.64 in 1985 to a loss per ton of - $17.30 in 1998. Using a 28% recovery for gravity concentration of the dumps materials alone, operating costs show a loss per ton ranging from - $4.32 to - $8.04 from 1985 to 1998.

Compressor PMC

This analysis is based on the costs for operating a mine on the Union dump. A loss is shown for this claim for each of the years considered under each mill recovery scenario. Under the most favorable scenario, which assumes a 28% recovery rate using simple gravity concentration, the loss per ton ranges from - $6.06 per ton in 1985 to - $9.40 per ton in 1998.

East Fork PMC

This analysis is based on the operating costs for mining the Union dump. From 1985 through 1998, a loss is shown every year, for each recovery scenario. When evaluating this mining claim, under the most favorable scenario, which assumes a 28% recovery rate using simple gravity concentration, the loss per ton ranges from - $6.06 per ton in 1985 to - $9.40 per ton in 1998.

Yankee PMC

The Yankee association placer claim includes the Yankee dump and the southern portion of the Klamath dump which is divided by a common claim boundary line with the Sunset placer claim. Therefore, the operating costs for each of these deposits is proportionally included.

Mining and milling the material from the Yankee PMC shows a loss for each year under the operating scenarios that involve both gravity concentration and a gravity / flotation / cyanidation system (Tables 5 and 6). The expected loss per ton ranges from - $2.03 per ton to - $5.66 per ton with the gravity concentration system. The loss per ton ranges from - $3.68 per ton to - $10.87 per ton for the combination gravity/flotation/cyanidation system. However, there is a projected profit for all years based solely on operating costs (Table 7). The positive cash flow ranges from a low of $1.73 per ton in 1998 to a high of $ 8.42 per ton 1990. The profit figure represents those monies above and beyond the operational cost of mining and milling the ore from the Yankee PMC. As before, Charts 5-7 do not include capital investment monies necessary to mount a full-scale mine and milling operation. Aventurine Engineering determined capital costs (per ton) for the claimant's original gravity recovery system to range from $2.4 million to $3.2 million. Accordingly, the per ton cost are: $19.87 (1985), $22.69 (1990), $24.44 (1994) and $26.77 (1998). When these capital costs are added to the operating costs for the Yankee PMC (Table 7), there is an aggregate loss per year from 1985 thru 1998 of -$13.72, -$14.27, -$16.86 and -$ 25.04, respectively.

## SUMMARY, CONCLUSIONS , RECOMMENDATIONS

The Liberty Mining District has a long history of gold production. Much of it came from the Eddy Gulch area, including the subject claims. Earlier investigators praise the development potential of the surface apex lodes, mine dumps, the multiple vein fissure systems and the high potential for underground down-dip lodes. The well-documented chronology of prospecting, sampling and sporadic mining activities continued for more than 140 years in the area of the claims.

At least since 1975, the veins and mine dumps have been explored by exploration companies who promptly lost interest once drilling and sampling results were analyzed. This long period of non-production is evidence that the veins and mine dump deposits are not feasible to develop. Furthermore, the extensive underground workings in the area attests that underground deposits have been exploited.

Early investigators struggled with perfecting the metallurgical recovery of the Eddy Gulch ores. Even though occasional good test recoveries exist, the record documents the difficulties encountered over a long period of time with finding a consistently acceptable milling process. The fact that easily accessible mine dumps and surface veins remain intact for years within the subject claims vouches for the lack of an optimum treatment plan for the ores.

Forest Service records well illustrate, from June 1989 thru April 1992 and the present, the claimant's continued exploration of his mining claims and the pursuit of a viable milling process. However, the records also demonstrate that the exploration on the claims is not complete. It is quite clear that claimant Aloisi has still not determined a viable mill recovery process for his claim materials as of the date of the mineral examination. He continues to test various milling scenarios, as evidence by recent testing by Don Moore in early 1999. Not having a mill recovery process determined, the claimant cannot know if his proposed mining operation is a viable (profitable) one.

There is no doubt that gold mineralization is found within the boundaries of the subject lode and placer claims. The current mineral examination sampling program has verified this fact. However, the Liberty mining claims still remain mineralized prospects which warrant further exploration before development and mining can take place. The mere presence of gold mineralization within each claim is not sufficient to define a mining claim as valid under the law. To be valid, a mining claim must contain a discovery of a valuable mineral deposit that is subject to location under the Mining Law. The definition of a "valuable mineral deposit" has been derived from case law decisions over the years and has evolved to be a two-fold test for a mineral discovery; one complimentary of the other. The "Prudent Man Rule", was first described in *Castle v. Womble, 19 LD 455 (1894),*

> ".....where minerals have been found and the evidence is such a character that a person of ordinary prudence would be justified in the further expenditure of his labor and means, with a reasonable prospect of success, in developing a valuable mine...."

Following this test, a "marketability" test was approved by the Supreme Court in *U.S. v. Coleman, 390 US 602 (1968).* Essentially, this test pointed out that the profitability of the mining operation must be applied to the prudent man test. In other words, the mine owner must demonstrate, taking into account all costs of development, that a reasonable probability exists for making a profit.

By his own repeated admissions, the claimant has not passed the "prudent man test" of discovery first laid down in *Castle v. Womble* in 1894. This test, which has been approved by the U.S. Supreme Court in many cases, was applied by the Board in *U.S. v. Arbo, 70 IBLA 244 (1983)*--a case similar to the present one.

Following exploration drilling in 1986, Ferrero writes that "Data so far is inadequate to project grade or tonnage". In September 28, 1989, the claimant submitted a plan of operations whose objective was to determine if "reserves of gold bearing rock of sufficient quality and quantity" occurred. On March 11, 1991, the claimant proposed exploration drilling on the claims and work to develop a suitable mill process. On April 1,1992, the claimant still continued to explore his mining claims. He noted in a letter to the District Ranger, the continuing "objectives of exploration are to determine whether there are reserves of gold bearing rocks of sufficient quality and quantity to warrant mine development, and if so, proceed with mining". Three years had past since these exploration objectives were first noted in 1989 by the claimant.

On February 12, 1999, Mr. Ferrero wrote mineral examiner John Gutierrez stating that Liberty Mining had not completed exploration of the apex vein on the Six O'Clock lode claim. In the same letter, Ferrero described the Union mine dumps as "potential ore reserves". With regards to such statements, the courts have found that if the deposit requires additional exploration to delineate the ore reserves and determine grade or quality before development may be confidently started, a discovery has not been made.

Because the claimant's proposed Plans of Operations submitted over many years are replete with statements that he plans to conduct exploration operations with the objective of making a discovery, he has neither a valid claim nor a right to assert that his property interests in the claims have been taken without just compensation. As the Supreme Court has consistently ruled, if a claimant has no discovery, he has no valid rights nor property interests.

The Forest Service sampling program of the mine dumps included careful examination of the waste rock piles. Through discussions with the claimant and his representative, it is clear that the dumps have never been explored and sampled according to industry standards in sufficient detail to qualify these materials as reserves (Ore Reserves Working Party, SME, 1991). Furthermore, the claimants have not physically exposed the deposits through trenching or drilling on a closely spaced grid to establish a discovery. A discovery under the mining law requires both physical exposure and the existence of reserves as defined by the Society of Mining Engineers, *supra* and *Vanderbilt Gold, 126 IBLA 72 (1993).* The claimants have satisfied neither requirement.

The authors have tried to evaluate the claimant's mining and milling proposal for the Liberty claims by assigning resource estimates based on very limited

information. However, the role of the government mineral examiner is merely to verify the existence of an established, physically exposed discovery. The claimant has the ultimate burden of proof that a discovery exists. *Lara v. Secretary of the Interior,* 820 F.2d 1535, 1542 (9th Cir. 1987)

By their very designation, the Liberty Mine vein and mine dump resources do not carry very much confidence with regards to geological inference of gold values beyond the surface exposures. The vein contains sufficient enough oxidation near the surface to raise doubts that gold values will continue throughout the vein structure. The inconsistency of gold values along the strike of the vein further adds to this doubt. Finally, the removal of an unknown quantity of the underground vein raises skepticism as to the quantity available for renewed mining. With regards to geological inference applied to the mine waste dumps, not only was the sample confidence compromised by shallow, surface sampling, but the susceptibility of mine dumps to rapid weathering and oxidation, limits the degree of usefulness of the sample values. Most importantly, the lack of geologic continuity within the mine dumps severely restricts the sample influence to each individual sample (SME, 1991).

Because geological inference is so adversely confined as stated above, the Liberty mining claims cannot support a discovery finding. The court has stated that an inferred reserve whose existence is dependent entirely on geologic inference is not affirmation of finding quantity and quality sufficient to support a discovery. *U.S. v. Feezor, 90 I.D. 262 at 278 (1983).*

Although gold has been found within the subject mining claims, the cost of mining the ore, transporting the ore to staging areas and milling, has been shown to exceed any potential profit. Without even considering the enormous outlay of funds necessary for capital purchases, the claimant's operation is not profitable when developed as an integrated operation. Development of the Liberty mining claims individually is likewise unprofitable, using a variety of mining and milling scenarios. Analysis has shown that although mining the Yankee PMC could have shown a net profit above operating costs in 1985, 1990, 1994 and 1998, when capital costs are added, the claims become unprofitable to mine.

Liberty Mining had not proposed to mine the Yankee dump as of the time of their plan of operations from 1989 to 1992. Any potential profitability during that time period is irrelevant to the issue of a regulatory taking of property through denial of approval to operate. Furthermore, the gravity/flotation/cyanidation plant recently proposed by the claimant was never included in the proposed plan of operations.

Nor was the cyanidation processing plant included as a part of the stipulations guiding the mineral examination and agreed to by the claimant. The first time the Forest Service became aware of a gravity / flotation / cyanidation proposal, was in a letter from Tom Ferrero on February 2, 1999. This was more than 5 months after the mineral examination had been completed. Therefore, the claimant is precluded from establishing a takings based on gold recovery resulting from a flotation/cyanide processing plant.

In consideration of all of the facts gathered through the authors' field examination and the analysis of the costs of developing a mine on the subject mining claims, it is our conclusion that the minerals within the subject mining claims are not capable of being mined, extracted and marketed at a profit, as of the time of the Forest Service mineral examination, the dates of location of the claims, and the dates of the alleged takings, July 23, 1990 through February 8, 1994. Given the foregoing, we recommend that contest proceedings be initiated against the subject claims.

## REFERENCES

Brown, G.C., 1915, 14th Report of the State Mineralogist: California Division of Mines and Geology, pp. 825-837.

Clark, W.B., 1970, Gold Districts of California: California Division of Mines and Geology Bulletin 193, p. 92

Cooksley, J.W., 1995, Liberty Mine, Sawyers Bar, California, Prepared for Liberty Consolidated Mines, Inc.

Clayton, R.H., 1988, Preliminary Feasibility Study of the Jefferson State Exploration and Development Property, Liberty Mining District California for Valley View Gold Mines, Ltd.

Elmandorf, W.J., 1932, Report on the mining Property of Gold Standard, Inc., Siskiyou County, California.

Ferrero, T., 1985, The Eddy Gulch Group of Gold Mining Properties: A Geologic Report

Ferrero, T., 1986, Unpublished activities report, Eddy Gulch mapping and sampling, 5/12-6/2/86.

Ferrero, T., 1990, The Liberty Gold Mining District, Siskiyou County, California.

Gordon, R.E., 1986, Report on the Eddy Gulch Claims, Liberty Mining District, Siskiyou County, California.

Holtz, P.E., 1971, Geology of Lode Gold Deposits in the Klamath Mountains, California and Oregon: U.S. Geological Survey Bulletin 1290, 91 pp.

Irwin, W.P., 1981, Tectonic Accretion of the Klamath Mountains: in Ernst, W.G., ed., The Geotectonic Development of California, Ruby Volume 1: Prentice Hall, Inc., pp. 29-49

Moore, Don, 1990, Unpublished letters of 3-5-90 and 4-9-90, Mill process testing of Eddy Gulch ores.

Mountain States R&D International, Inc., 1990, Progress Report No. 1, Metallrugical testing of gold ore samples for Argonaut Mill Supply.

Redmonds, R.L., 1988, Field examination report on the Eddy Gulch, Liberty Mining District, Siskiyou County, California.

Root, L.L., 1925, 21st Report of the State Mineralogist: California Division of Mines and Geology, pp. 448-458.

Sannes, D.L., 1977, Report of Activities for the Property of New Cinch Uranium Ltd., (N.P.L.), Siskiyou County, California.

Society of Mining Engineering,1991 Working Party #79, Ore Reserve Definition

United States Department of the Interior, Bureau of Land Management, 1998, Geographic Index and Claim Name Index of Mining Claim Locations, California.

United States Department of the Interior, Geological Survey, 1975, Mean Annual Precipitation in the California Region.