**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| ALFRED ALOISI, et al., Plaintiffs, | ) | No. 95-650L |
| v. | ) | Judge Lawrence S. Margolis |
| THE UNITED STATES, Defendant. | ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFFS'**
**PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Defendant, the United States, hereby responds to Plaintiffs' Proposed Findings of Uncontroverted Fact ("PFUF"), pursuant to Rule 56(h)(2). For the Court's convenience, the paragraph numbers used herein match the numbering scheme in the PFUF.

1. Undisputed, but the proposed finding is not material to the issues addressed in the parties' cross motions for summary judgment.

2. Undisputed, but the proposed finding is not material to the issues addressed in the parties' cross motions for summary judgment.

3. Undisputed, but the proposed finding is not material to the issues addressed in the parties' cross motions for summary judgment.

4. Disputed. There is no documentary support for this statement. Plaintiffs rely upon Mr. Aloisi's affidavit (PE-1) at paragraphs 7-9. In paragraph 7 of his Affidavit, Mr. Aloisi cites JA-18 in support of his statement, "[w]ith my colleagues at the time, we entered into a lease purchase agreement on the Eddy Gulch properties, which was accomplished through a sublease with Pincombe (JA-18)." JA-18, however, contains quit claim deeds but no lease-purchase agreement, and there are no documents relating to the patented private parcels in JA-18. Mr.

Aloisi cites no support for his statement in paragraph 8 of his affidavit. Mr. Aloisi again relies upon JA-18 – the only document cited in paragraph 9 of his affidavit – as support for his statement regarding an "arrangement with the Patterson estate . . . that we would pay $50,000 for the two patented parcels - Mineral Lot 45A (the Mountain Laurel Mine) and Mineral Lot 45B (the Mountain Laurel or Gold Ball Millsite, or Rollin site)." As noted above, no where does JA-18 deal with the patented parcels and certainly does not reflect any agreement or arrangement for payments for those parcels. In paragraph 9 of his affidavit, Mr. Aloisi also states that "it was a matter of honor that I completed the purchase under the terms previously contracted with Mr. Patterson, through Pincombe and Mara Ventures," but no contract is cited in the record, and Defendant is not aware of the referenced contract being produced. The record shows that Mr. Aloisi did not acquire Mineral Lots A and B until March 22, 1991. See JA115 at 1117-18.

5. Disputed. This statement relies upon some of the same evidence they cite in support of paragraph four and, as it offered no support for paragraph four, it also offers no support for this statement. Other than Mr. Aloisi's affidavit, they cite JA-18 (which Mr. Aloisi also cites in paragraph 9 of his affidavit) as support, but no where in JA-18 is any consideration shown for the purchase of the mining claims or private parcels. This statement, therefore, is without foundation.

6. Disputed. Plaintiffs do not cite to any lease-purchase agreement in the record and JA-18 offers no support, as discussed above. This statement repeats the unsupported statement in paragraph four, and is not cured, here.

7. Undisputed.

8. Disputed. Plaintiffs' citation (JA-35) is to a hand-drawn map, and does not support the

proffered statement.

9. Disputed. Mr. Aloisi's affidavit (PE-1) references a "handshake" agreement, which cannot be verified. In addition, this statement appears to contain inadmissible hearsay as to what Mr. Goodman believed or intended. These statements also cannot be verified because Mr. Goodman is deceased. Plaintiffs cite no documents reflecting Mr. Goodman's intentions and state of mind. JA-19, which Plaintiffs also cite in support of this statement, appears to be a stock redemption agreement, and does not appear to support the proffered statement.

10. Disputed. Mr. Aloisi's affidavit (PE-1) offers no written document in support of this statement. In addition, this statement appears to contain inadmissible hearsay as to what Mr. Goodman believed or intended. These statements also cannot be verified because Mr. Goodman is deceased.

11. Disputed. This statement cites Mr. Aloisi's affidavit (PE-1), which in turn relies upon JA-18, a collection of deeds. These deeds suggest only (1) that Jefferson State Exploration and Development Company quit claimed to Fred Aloisi, Kendle Trucking, Inc., and Mara Ventures, Inc. certain claims in November 1998 (JA-18 at 338); (2) that Jefferson State Exploration and Development Co. quit claimed to Stephen Bennett and Fred Aloisi certain claims in March 1986 (JA-19 at 347-52).

12. Disputed. The documents upon which this statement is based (JA-6, JA-7 though JA-9, and JA-12 though JA-14) suggest only that work was done on these mines by others, not Mr. Aloisi or his colleagues. There is no evidence Plaintiffs conducted "years of work acquiring the rights" and the rights referenced are not defined.

13. Disputed. The documents upon which this statement is based show that the intent of the

proposed work was to establish a road network and begin exploration. Those preliminary activities were not already "in hand," as this paragraph suggests. The documents cited by Plaintiffs support this:

a. JA20 at 389, states the "objective of the 1989 operations" included "Explore and sample the vein apexes," and specific activities would include, "the construction of approximately 2000' of new low standard road. . . ."

b. JA25 at 417 (the Forest Service's Decision Notice) states that "No vegetation will be cut and no road construction is planned."

c. JA26 at 421 (Plaintiffs' June 6, 1989 Plan of Operations) states the objectives of the plan are to "[d]etermine whether gold can be recovered . . . " and to "[e]xplore and sample the vein apexes."

d. JA31 at 439 states that Plaintiffs were proposing to modify the plan to "[b]uild approximately 1000' feet of road on an old road route . . ." and to "[i]mprove the entire road route . . ."

e. In JA36 at 446, Plaintiffs proposed as objectives of their proposed plan "to determine whether there are reserves of gold bearing rock of sufficient quality and quantity to warrant mine development, and <u>if so</u>, proceed with mining."

f. In JA36 at 446, Plaintiffs proposed to grade a "secondary road system," and proposed "new road construction. . . ." JA36 at 447. In addition, Plaintiffs' consultant, Mr. Ferrero, describes this September 28, 1989 proposed plan of operations was submitted "not for immediate approval of the later phases of the plan, which were a year away or more best case. . . ." PE-2, ¶ 16. Additionally,

Plaintiffs submitted a revised proposed plan of operations, JA40, proposing to clear trees, set up equipment and run mill tests. JA40 at 464-65. In addition, JA43 makes clear that without an Environmental Assessment the Forest Service could not approve Plaintiffs' proposed "Plan of Operations that will cover your entire operation from your present work through reclamation of the area." JA43 at 468.

14. Disputed. As discussed above in response to Paragraph 13, Liberty had no plans for starting production.

15. Undisputed.

16. Disputed. Plaintiffs cite no contemporaneous document that supports this statement. Plaintiffs cite to Mr. Aloisi's affidavit at paragraph 16, but this statement is not supported by any citation to documents in the record. Also, Mr. Aloisi's affidavit contains hearsay evidence as to what Mr. Goodman believed. Mr. Ferrero's affidavit also does not support this statement as the cited paragraphs, 14, 63 and 67 do not mention this figure or cite any documents in support of it.

17. Disputed. Plaintiffs have already conceded that "[t]he activities authorized in the November 1989 approval did not include any activities that could generate income from sale of production from the Liberty Property." Compl., ¶ 23.

18. Undisputed, but the proposed finding is not material to the issues addressed in the parties' cross motions for summary judgment.

19. Disputed. Plaintiffs' statement is misleading as it suggests that Liberty had fully-formed plan of operations in 1989 that would have culminated in the production of gold. As noted above, Mr. Ferrero states in his affidavit that Plaintiffs' proposed plan for "all phases" submitted

on September 28, 1989 (JA36) was submitted "not for immediate approval of the later phases of the plan, which were a year away or more best case. . . ." PE-2, ¶ 16. The proffered statement, then, is not based on fact but, rather, on speculation. See also Declaration of James W. DeMaagd ("DeMaagd Decl."), ¶¶ 16-42, which is being filed contemporaneously herewith.

20. Disputed. Plaintiffs' statement is misleading as it suggests that Liberty had fully-formed plan of operations in 1989 that would have culminated in the production of gold. In addition, the United States disputes Mr. Ferrero's speculative opinions about hypothetical mining operations. See DeMaagd Decl., ¶¶ 16-37.

21. Disputed. Plaintiffs offer no definition of the term "property position," and none is apparent. To the extent this statement is intended by Plaintiffs to demonstrate a property interest, the United States disagrees with this statement. As discussed in more detail in the United States' papers, Plaintiffs lacked a property interest in the unpatented mining claims at all relevant times. See also DeMaagd Decl., ¶¶ 38-42 (opining that certain of the mining claims are invalid).

22. Disputed. Plaintiffs offer no definition of the term "property position," and none is apparent. To the extent this statement is intended by Plaintiffs to demonstrate a property interest, the United States disagrees with this statement. As discussed in more detail in the United States' papers, Plaintiffs lacked a property interest in the unpatented mining claims at all relevant times. See also DeMaagd Decl., ¶¶ 38-42.

23. Disputed. Plaintiffs offer no definition of the term "property position," and none is apparent. To the extent this statement is intended by Plaintiffs to demonstrate a property interest in the patented mining claims at the time of taking, the United States disagrees with this

statement. See JA115 at 1117-18 (showing Plaintiffs acquired an interest in the patented mining claims no earlier than March 1991, well after the alleged accrual of Plaintiffs' claim).

24. Disputed. Plaintiffs offer no definition of the term "property position," and none is apparent. To the extent this statement is intended by Plaintiffs to demonstrate a property interest, the United States disagrees with this statement. As discussed in more detail in the United States' papers, Plaintiffs lacked a property interest in the unpatented mining claims at all relevant times. See also DeMaagd Decl., ¶¶ 38-42.

25. Undisputed, although the proposed plan was limited to unprofitable, preliminary activities. The terms and limitations on the approved plan are contained in the plans themselves. See JA-26 (June 1989 plan); JA-45 (November 27, 1989 letter); JA-40 (October 1989 plan).

26. Undisputed, although the proposed plan was limited to unprofitable, preliminary activities. The terms and limitations on the approved plan are contained in the plans themselves. See JA-26 (June 1989 plan); JA-45 (November 27, 1989 letter); JA-40 (October 1989 plan).

27. Disputed. Plaintiffs offer no written evidence, other than their self-serving affidavits, to support the statement that they expended "in excess of $800,000 to acquire or equip for use in Eddy Gulch."

28. Disputed. Mr. Aloisi's affidavit at paragraphs 15 and 17 does not support the proffered statement, including the statement that Liberty exposed "additional lengths of the apex ore" or that ore was excavated and hauled to Liberty's approved mill location.

29. Disputed. JA35 is a map, and does not support Plaintiffs' statement. In addition, JA56 suggests Plaintiffs had not modified its proposed mining operations. See JA56 at 530 (suggesting two miles of apex on the Eddy Gulch properties were available for mining). In

addition, the United States disagrees with Plaintiffs' characterization that any modified plan amounted to, or was accepted as, "mitigation."

30. Disputed. Plaintiffs' assertion that its proposals constituted "impact mitigation" is a legal assertion, not supported by the cited evidence.

31. Disputed. Plaintiffs offer no support for this statement, and none is apparent. As discussed in response to paragraphs 29 and 30, the United States disagrees with Plaintiffs' characterization that any modified plan amounted to, or was accepted as, "mitigation."

32. Disputed. Plaintiffs' assertion that its proposals constituted "impact mitigation" is a legal assertion, not supported by the cited evidence. The cited plans do not mention, discuss, or reference "mitigation."

33. Disputed. Plaintiffs offer no support for the statement that Liberty worked on this site "continuously until early January 1990," and provides no evidence of what work was actually accomplished during that time period. In addition, this statement appears to contradict Plaintiffs' assertion in Paragraph 34 that Liberty only "completed one month of the approved work" by January 1990.

34. Disputed. Plaintiffs offer no support for the proffered statement. In addition, this assertion (that "Liberty had only completed one month of the approved work") appears to contradict Plaintiffs' assertion in Paragraph 33 that Liberty worked "continuously until early January 1990."

35. Undisputed.

36. Disputed. The cited document does not support this statement, and none is apparent. Plaintiffs' assumption that the Forest Service projected how long it would take Liberty to

complete certain work is not supported by the mere fact of the termination date.

37. Disputed, to the extent that Plaintiffs intend to suggest that they had submitted a fully-formed plan before June 23, 1989. On June 6, 1989, the Forest Service approved certain Phase I operations, specifically noting that "Phase II of the operations will depend on such things as the test results from Phase I and NEPA. Additional activities will be covered under an amendment or new plan." JA26 at 421. On June 23, 1989, the Fish and Wildlife published its proposed rule to list the northern spotted owl as a threatened species under the ESA. JSOF, ¶ 23. Plaintiffs did not submit an amendment or new plan intended to cover Phase II operations between June 6 and June 23, 1989. Hence, before the owl was listed, the proposed plan only included certain unprofitable, preliminary activities.

38. Disputed. Plaintiffs offer no support for this statement, which appears to be a legal principle in part. Plaintiffs' statement that the ESA was "likely to apply to the approval of the un-approved balance of Liberty's all-phase plan of operations," is so vague that it is not possible to formulate a complete response. To the extent Plaintiffs offer this statement as evidence that they had submitted a fully-formed proposed plan, that assertion is not supported by the record. See, e.g., JA26 at 421 (June 6, 1989 approval of Phase I operations, noting: "Phase II of the operations will depend on such things as the test results from Phase I and NEPA. Additional activities will be covered under an amendment or new plan.").

39. Disputed in part. The United States agrees that the Forest Service issued a "Notice of Intent to Prepare an Environmental Assessment" in March 1990. See JA-48. Plaintiffs' statement that issuance of this notice is a "key step" is too vague to formulate a complete response, and is, in any event, not supported by any evidence.

40. Disputed in part. The United States agrees that the Forest Service prepared a biological evaluation, which was transmitted to the FWS in compliance with the ESA. See JA-76. Plaintiffs' statement that "[a]bsent such coordination and completion of consultation, the Forest Service's 1990 timber harvests and sales in all forests in the owl's range were at risk of having to stop," is offered without any supporting evidence, and is too vague to formulate a complete response.

41. Undisputed.

42. Undisputed.

43. Disputed. The cited plans do not use the term "mitigation" and Plaintiffs' characterization of "pre-mitigation" is not supported by any evidence.

44. Undisputed, but the proposed finding is not material to the issues addressed in the parties' cross motions for summary judgment.

45. Undisputed, but the proposed finding is not material to the issues addressed in the parties' cross motions for summary judgment.

46. Disputed. Wildlife Biologist Kathleen Granillo participated in a meeting with Liberty Mining in the Forest Supervisor's office just months after the Biological Opinion was issued, during which the opinion was discussed. See Granillo Tr. at 24:24-25:7, 33:8-35:16 (attached as Ex. 3 to Def.'s Opp. Pls.' Mot. Summ. J.). Additionally, Ms. Granillo later visited Liberty Mining's claims in Eddy Gulch during the summer of 1991, specifically to implement the Biological Opinion by identifying ways to potentially mitigate the effects of the mining project on suitable owl habitat. See id. at 25:8-27-17. Ms. Granillo met Mr. Aloisi during that site visit and "talked about what the opinion called for in terms of what [the Forest Service] had to do

with planned sales and trying to get out of suitable habitat." Id. at 25:17-24, 28:21-29:7. Similarly, Wildlife Biologist Marc Williams also recalled discussing certain mitigation measures required by the Biological Opinion with Mr. Aloisi. See Williams Tr. at 30:3-31:19, 62:12-64:6 attached as Ex. 4 to Def.'s Opp. Pls.' Mot. Summ. J.). Even if Plaintiffs did not receive a physical copy of the Biological Opinion, then, the evidence discussed above in response to paragraph 46 contradicts this statement.

47. Disputed. As discussed above in response to paragraph 46, it is the position of the United States that Plaintiffs were aware, or should have been aware, of the requirements of the Biological Opinion during this time period.

48. Disputed. As discussed above in response to paragraph 46, it is the position of the United States that Plaintiffs were aware, or should have been aware, of the requirements of the Biological Opinion during this time period.

49. Disputed. The document upon which Plaintiffs' statement rests states that "194 acres will be lost as suitable habitat within the CHU although 134 of these acres will remain available as dispersal habitat." JA157 at 1298. In addition, "60 acres [of the 194 acre total] are outside the home range of owl #1034." Id.

50. Undisputed, to the extent this statement is intended to mean that the January 1990 Stop Work Order prevented Liberty from engaging in the preliminary unprofitable activities that had been earlier approved. See JA26 (noting that only Phase I activities were proposed and approved).

51. Undisputed.

52. Disputed in part. The United States does not dispute that Liberty did not complete the

Archaeological Study. However, as discussed above in response to paragraph 46, it is the position of the United States that Plaintiffs were aware, or should have been aware, of the requirements of the Biological Opinion during this time period.

53. Undisputed, but this statement is not relevant to any issues raised in the parties' cross motions.

54. Undisputed, but this statement is not relevant to any issues raised in the parties' cross motions.

55. Undisputed, but this statement is not relevant to any issues raised in the parties' cross motions.

56. Disputed. The Forest Service permitted Liberty to engage in some development work on these mining claims. See JA166.

57. Undisputed, but this statement is not relevant to any issues raised in the parties' cross motions.

58. Undisputed, but this statement is not relevant to any issues raised in the parties' cross motions.

59. Undisputed, but this statement is not relevant to any issues raised in the parties' cross motions.

60. Undisputed, but this statement is not relevant to any issues raised in the parties' cross motions.

61. Undisputed, but this statement is not relevant to any issues raised in the parties' cross motions.

62. Undisputed, but this statement is not relevant to any issues raised in the parties' cross

motions.

63. Undisputed, but this statement is not relevant to any issues raised in the parties' cross motions.

64. Undisputed, but this statement is not relevant to any issues raised in the parties' cross motions.

65. Undisputed, but this statement is not relevant to any issues raised in the parties' cross motions.

66. Disputed. As discussed above in response to paragraph 46, it is the position of the United States that Plaintiffs were aware, or should have been aware, of the requirements set forth in the Biological Opinion before the January 1992 meeting. See also JA88 at 823-24 (November 27, 1990 letter from Forest Service to Mr. Aloisi discussing constrains resulting from the consultation).

67. Disputed. The Forest Service requested that Liberty submit a new plan to clear up confusion about what the proposed plan caused by Liberty's earlier submissions. Liberty agreed to submit a new plan. See Pls.' JSOF ¶ 68.

68. Undisputed.

69. Disputed. Plaintiffs' characterization of a "stall" is offered without support.

70. Undisputed, but the Forest Service had no cause to tell Liberty the date of the Biological Opinion, and the proposed finding is not material to the issues addressed in the parties' cross motions for summary judgment.

71. Disputed. During this period relevant to this paragraph, the Forest Service was attempting to implement the terms of the Biological Opinion to protect the northern spotted owl

and its habitat. See Granillo Tr. at 25:8-27-17 (attached at Ex. 3 to Def.'s Opp. Pls.' Mot. Summ. J.); see also JSOF ¶ 56 (citing JA89 at 826) (KNF Wildlife Biologist, Karen Raftery, sought guidance in December 1990, on implementing the Biological Opinion with respect to Liberty Mining). Owl surveys conducted by the Forest Service in June 1991, and again in April through June 1992, confirmed the presence of a reproducing pair of spotted owls in Eddy Gulch. See JSOF, ¶¶ 64, 79. Several layers of review and approval were required within the Forest Service, in addition to the ESA consultation with the U.S. Fish and Wildlife Service. The Regional Technical Review Team reviewed and approved Liberty Mining's proposed plan of operations in June 1992. See JA163 at 1342. The Northern Spotted Owl Steering Committee and Oversight Team reviewed and approved Liberty's project in August 1992, and released its report in December 1992. See JA141 at 1242, 1248-49; see also JA163 at 1342. The Oversight Team noted, however, that Liberty Mining's proposed activities must be reviewed by the Interagency Technical Review Team ("ITRT"). See JA141 at 1249. The ITRT completed its review and approval process in January 1993. See JA163 at 1342.

72. Undisputed.

73. Undisputed.

74. Disputed. Liberty was well aware of the re-consultation, and Plaintiffs' allegation of a "cover up" is not supported by any evidence. See, e.g., JA120 (May 28, 1992 letter discussing reinitiation); JA124 (August 7, 1992) (letter requesting reconsultation).

75. Undisputed.

76. Undisputed, although the statement is misleading because Plaintiffs ignore the fact that the Forest Service requested, on numerous occasions, information required by the FWS in order

to evaluate Plaintiffs' proposal. See JSOF, ¶¶ 89, 91, 95, 96; JA138 at 1225; JA140.

77. Undisputed.

78. Disputed. Since the very purpose of the appeal was Liberty's challenge to reinitiate consultation, Liberty was obviously aware of the agency's action.

79. Disputed. As discussed above in response to paragraph 46, it is the position of the United States that Plaintiffs were aware, or should have been aware, of the requirements of the Biological Opinion before August 1992.

80. Disputed in part. The United States does not dispute that the FWS wrote a letter, with chronology of certain events, to Mr. Aloisi on October 23, 1992. See JA-136. However, the letter does not say that express "surprise and concern about what had transpired," as Plaintiffs suggest in this paragraph.

81. Disputed. The FWS did not make a formal proposal to reject the Forest Service's request for reinitiation. The FWS drafted a letter concluding that reinitiation was not required, but FWS changed its opinion after obtaining additional information. See JA136.

82. Disputed. Plaintiffs offer no evidence to support their statement that the Forest Service "pressured the FWS" in any way. JA-136 suggests only that the representatives from the FWS and the Forest Service discussed the plan of operations, and both agencies eventually determined that reinitiation was required. In addition, this statement is not material to the issues addressed in the parties' cross motions for summary judgment.

83. Undisputed, although the statement is not material to the issues addressed in the parties' cross motions for summary judgment.

84. Undisputed, although the statement is not material to the issues addressed in the parties'

cross motions for summary judgment.

85. Disputed in part. In the second-level appeal, the Deputy Regional Forester did not "fail[]" to address anything; he reached a decision based on the facts and the procedural posture of the appeal. As demonstrated in his written decision, the Deputy Regional Forester affirmed the Forest Supervisor's dismissal of Liberty's appeal. See JA145. Plaintiffs did not challenge that decision, and cannot do so now, meaning this statement is not material to the issues addressed in the parties' cross motions for summary judgment.

86. Undisputed.

87. Disputed in part. The decision of the Deputy Regional Forester is attached as JA145. The Deputy Regional Forester was not presented with the issues Plaintiffs identify in this paragraph, and Plaintiffs' assignment of wrongdoing is not supported by any evidence.

88. Disputed, in part. Plaintiffs' characterization that it "continued to face a hostile agency" is not supported by any evidence.

89. Undisputed.

90. Undisputed.

91. Undisputed.

92. Disputed. Plaintiffs' statement that the FWS concluded that "reinitiation had not been required" is not supported by the record. Instead, after considering the record before it, the FWS concurred with the Forest Service that "the proposed projects are not likely to adversely affect the northern spotted owl and its critical habitat." JA163 at 1343.

93. Undisputed, although the statement is not material to the issues addressed in the parties' cross motions for summary judgment since Liberty Consolidated Mines, Inc.'s plan was for a

different type of operation (underground, without minimal surface disturbance, in a different area). See JA159 at 1325.

94. Undisputed, although the statement is not material to the issues addressed in the parties' cross motions for summary judgment.

95. Disputed. Plaintiffs cite no evidence in support of this statement.

96. Disputed. The FWS never indicated that the project could "proceed as submitted," as Plaintiffs state in this paragraph. Instead, the Biological Opinion includes mandatory terms and conditions, which would have impacted any mining operations. See JA80 at 770-71.

97. Disputed. Plaintiffs offer no support for the statements contained in this paragraph. In addition, Plaintiffs offer no evidence of "voluntary mitigation." In addition, the Biological Opinion includes mandatory terms and conditions, which would have impacted any mining operations. See JA80 at 770-71.

Respectfully submitted,

RONALD J. TENPAS
Assistant Attorney General
Environment & Natural Resources Division

/s Bruce K. Trauben
BRUCE K. TRAUBEN
Trial Attorney
Natural Resources Section
Environment & Natural Resources Division
U.S. Department of Justice
601 D Street, NW
Washington, D.C. 20004
(202) 305-0238 (phone)
(202) 305-0506 (fax)

WILLIAM J. SHAPIRO
Trial Attorney

U.S. Department of Justice
Environment & Natural Resources Div.
501 I Street, Suite 9-700
Sacramento, CA 95814-2322

OF COUNSEL:
ROSE MIKSOVSKY
U.S. Department of Agriculture
Office of General Counsel
33 New Montgomery St., 17th Fl.
San Francisco, CA 94105-3170

Dated: March 5, 2008