No. 95-650L
(Judge Margolis)

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

ALFRED ALOISI, et al.,

Plaintiffs,

v.

UNITED STATES OF AMERICA,

Defendant.

---

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT (AND REPLY TO DEFENDANT'S OPPOSITION BRIEF)**

---

Lawrence G. McBride
FOLEY & LARDNER LLP
3000 K St., N. W., Suite 500
Washington, D.C. 20007-5143
Telephone: (202) 672-5300
Facsimile: (202) 672-5399

Dated: March 21, 2008

*Attorney for Plaintiffs*

# TABLE OF CONTENTS

**Page**


I. SUMMARY OF PLAINTIFFS' REPLY ..... 1

II. ARGUMENT. ..... 1

A. Plaintiffs' Rights under the Mining Law. ..... 1

1. The case for and against discovery ..... 1

2. Property rights in an unpatented mining claim, irrespective of discovery ..... 6

B. Defendant's arguments about "implementation" of the biological opinion. ..... 8

1. Defendant's Misuse of the Granillo Transcript ..... 8

2. The Second Blessing Declaration, and the Evening Star Timber Sale ..... 9

3. What "mitigation requirements," or "mandatory conditions"? ..... 13

C. Extraordinary Delay, Temporary Takings, and the *Penn Central* Factors. ..... 16

1. Ripeness and finality ..... 16

2. APA remedies? ..... 16

3. Non-existent standards of proof ..... 18

4. Submitting a "meaningful application." ..... 18

5. Reasonable Investment-backed Expectations ..... 19

6. Economic Impact of the Temporary Taking ..... 19

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Am-Pro Protective Agency, Inc. v. United States*,
281 F.3d 1234 (Fed. Cir. 2002)....................18

*Bass Enterprises Prod. Co v. United States*,
54 Fed. Cl. 400 (Fed. Cl. 2002)....................19

*Boise Cascade v. United States*,
296 F.3d 1339 (Fed. Cir. 2002)....................16, 18

*Brace v. United States*,
72 Fed. Cl. 337 (2006)....................19

*CCA Associates v. United States*,
75 Fed. Cl. 170 (2007)....................19

*Chrisman v. Miller*,
197 U.S. 313 (1905)....................3, 6

*First English Evangelical Lutheran Church v. Los Angeles County*,
482 U.S. 304 (1987).................... 6-7

*Greenbrier v. United States*,
40 Fed. Cl. 689 (1998)....................18

*MacDonald, Sommer & Frates v. Yolo County*,
477 U.S. 340....................18

*United States v. Coleman*,
390 U.S. 599 (1968)....................3, 6

*United States v. Weiss*,
642 F.2d 296 (9th Cir. 1981)....................7

*Walcek v. United States*,
49 Fed. Cl. 248 (2001)....................19

**FEDERAL STATUTES**

5 U.S.C. § 706(1)....................17

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ALFRED ALOISI, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 95-650L |
| | ) | |
| UNITED STATES OF AMERICA, | ) | Hon. Lawrence S. Margolis |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT (AND REPLY TO DEFENDANT'S OPPOSITION BRIEF)**

## I. SUMMARY OF PLAINTIFFS' REPLY.

Plaintiffs submit reply argument and evidence on three broad subjects: A) Plaintiffs' demonstration of its compensable property right; B) the facts demolishing Defendant's claim that it supposedly "implemented" the 1990 Biological Opinion (its basis for claiming there was no unwarranted or extraordinary delay here); and C) how Plaintiffs satisfy the ripeness doctrine and the Penn Central factors on this record. Plaintiffs submit that Defendant's Opposition filing, including its exhibits, do not defeat the granting of Plaintiffs' summary judgment motion.

## II. ARGUMENT.

### A. Plaintiffs' Rights under the Mining Law.

1. The case for and against discovery. In their opening brief Plaintiffs set out, in summary judgment form, the viability of the mining operation Defendant's actionable conduct aborted, and the "validity" of the unpatented mining claims on which the operations began and were to be conducted. This proof came chiefly through the Affidavit of Thomas P. Ferrero, Plaintiffs' Exhibit ("PE-") 2, but also through voluminous supporting documentation: sampling and assaying (e.g., JA-189, JA-192 and JA-193); metallurgy (e.g., JA-192, JA-193 and PE-18); and the assembly of those data for each target mineral deposit that established revenues and

mining costs for each target mineral deposit, as well as the hauling and milling / processing costs to realize the tested gold recoveries, all to a calculation of net profit or loss (e.g., JA-190 and JA-191 (spreadsheets 1-9) and PE-2), resulting in a profit for each scenario studied.

Defendant's Opposition Brief ("DOB") [1] demands proof of mining claim validity in this case for Plaintiffs to establish the property right predicate to a Tucker Act inverse condemnation claim. Plaintiffs, consistent with Mining Law standards, have made the required showing.

Defendant's response is to complain this proof is speculation, DOB 7, but without explaining how this proof is any more speculative, or less reliable, than the proof of the validity of any mining claim, especially in the recurring circumstance where proof is sought while mining is not occurring. The administrative mineral contest Defendant pursued for seven years would have proceeded on proof comparable to that now before the Court. The Forest Service would have relied, as it has now done here, on its 1999 Mineral Report, parts of which are now Defendant's Opposition Exhibit ("DOEx.") 12, and DOEx. 9.

In its Opening Brief, Defendant made no showing that the Plaintiffs' property was not a unified group of valid unpatented mining claims, containing also an anchor piece of private ground providing access to ore targets underlying a number of the adjacent lode claims. Defendant has now made its summary judgment case (so acknowledged, DOB at 2 n. 1), that the unpatented mining claims do not contain a "discovery" of a valuable mineral deposit under the

[1] Plaintiffs are replying to a "response" brief under RCFC Rule 5.2(b)(2). A quarter of the argument in Defendant's Opposition Brief is on its pages 31-41. The Court need not review or consider any of the arguments there, as Defendant's Opposition was filed in violation of RCFC Rule 5.2(b)(2). That Rule fixes a 30-page limit for "reply briefs or memoranda … where a response to a motion is included," "[e]xcept by leave of the court on motion." Plaintiffs were not served with any such motion, and filed a 30-page Response consistent with the Rule. Should Defendant ignore the Reply page limit of Rule 5.2(b)(2), Plaintiffs reserve the right to move to strike both filings, or to be allowed to submit additional argument of the same size as Defendant's violation of the Rule. It is potentially prejudicial for Plaintiffs to be bound by the Rule's page limit while the government ignores it.

"prudent person/marketability" tests grounded in Castle v. Womble, 19 Land Dec. 455, 457 (1895), Chrisman v. Miller, 197 U.S. 313, 322 (1905), and United States v. Coleman, 390 U.S. 599 (1968). This showing consists of the Declaration of James DeMaagd (DOEx. 7), and his selected exhibits, including sections of the Forest Service's 1999 Mineral Report (DOEx. 12 and DOEx. 9). That Mineral Report was designed, in ways discussed further below, only to show a "prima facie" case of claim invalidity, the low burden the government bears in a contest, but which is inapplicable to their summary judgment burden here.

To respond to Defendant's showings and opinions in the DeMaagd Declaration and its exhibits, Plaintiffs submit the Second Affidavit of Thomas P. Ferrero, PE-27. This Affidavit shows specific miscalculations and erroneous assumptions displayed in the DeMaagd Declaration or argued in Defendant's Opposition, that misread and misunderstand Plaintiffs' demonstration of claim validity. The Second Ferrero Affidavit undoes that misinformation and undermines Defendant's criticisms of Plaintiffs' summary judgment case, and helps render the offered portions of the 1999 Mineral Report useless to show the invalidity of the claims.

The detail and cogency of the Second Ferrero Affidavit's correction of Mr. DeMaagd's criticisms establishes that Mr. DeMaagd has only a limited understanding of what Mr. Ferrero undertook and presented, through the maps, spreadsheets and narrative making up Plaintiffs' showing of claim validity (and project viability). Mr. DeMaagd stumbles over such basics as the fact that the gold recovery rate for underground ore here is different from the gold recovery rate for apex and dump surface deposits (PE-27 ¶¶ 7-12, and 33; DOEx. 7 ¶¶ 21-24, and 26), why that is true, and its significance in this property evaluation.

Further, Plaintiffs respond to Mr. DeMaagd's objection that Mr. Ferrero failed to include in his evaluation a series of samples the Forest Service took and had assayed. The Second

Ferrero Affidavit (PE-27 ¶¶ 18-19) explains why they were excluded – they were taken from only the upper half of the Klamath apex vein, and Mr. Ferrero did not deem the results representative of the full width of that vein given Liberty Mining intended to mine the full width of the vein. Mr. DeMaagd, however, does not propose any alternative definition or professional opinion on what constitutes a representative sample of this vein, or generally.

The basis for Mr. DeMaagd's concern about Mr. Ferrero's rejection of the Forest Service samples is revealed in the remarkable assertion that the Forest Service in its evaluation here, and generally, uses every sample that it takes, excluding none. DOEx. 7 ¶ 38, and see PE-27 ¶ 21. This admits that the agency exercises no judgment whether one or all of its samples is representative or not, and why, and whether they have been properly assayed or not, and why. The Forest Service will use its own samples no matter how useless or flawed they may be.

The Second Ferrero Affidavit discloses the remarkable obverse of Mr. DeMaagd's assertion – the Forest Service's Mineral Report used <u>no other sample results</u> in evaluating the claims. In the contest proceeding, before the Mineral Report was completed, Mr. Ferrero provided the Forest Service all the reports, assays, metallurgy, production histories, and maps Liberty had, including JA-14, JA-50, JA-52, JA-183, JA-63, and JA-68 (see PE-27, ¶ 15). Some historical and regional geological information was used in the background of the Mineral Report, but <u>no</u> sampling or testing data other than the Forest Service's own 1998 sampling and testing was used to evaluate the entire property. Mr. DeMaagd did not even include results from Liberty's 2004 samples, even though they were taken under Forest Service observation in the contest proceeding (after Interior Department mediation necessary to get Forest Service approval to conduct the sampling). However one assesses the quantity or import of the Forest Service's 1998 samples, they are a very small fraction of the body of data pertaining to the gold deposits of

Eddy Gulch. The Forest Service has never explained (in its Mineral Report or now) why all of the other data pertaining to the gold deposits of Eddy Gulch are irrelevant and wholly to be disregarded. The agency's unexplained and arbitrary standard – to use all of its own samples, no matter how unreliable, and use none of anyone else's samples, no matter how reliable – impeaches its approach in this Court.

There is only one conclusion fairly drawn – if the Forest Service had to consider the vast majority of all information pertaining to the Eddy Gulch gold deposits that was not used in the Mineral Report, the information contradicts and undermines the conclusion sought by the agency. The exclamation point on this statement is provided in Paragraph 29 of the Second Ferrero Affidavit by a Forest Service contractor, who essentially apologized to Mr. Ferrero because his contribution to the Mineral Report, the mining cost work-up, had to analyze absurd and inappropriate mining scenarios the Forest Service directed him to use.

Regarding claim validity and project viability, the Court has Defendant's "proof" on the one hand – a fragmentary Mineral Report and a Declaration failing to explain that Report but instead sniping at Plaintiffs' showing, which snipings the Second Ferrero Affidavit shows to be a cascade of misunderstandings, errors or misinformation. The Court has Plaintiffs' showing on the other – the First Ferrero Affidavit (PE-2) and its supporting documentation (including JA-188 through JA-193, and PE-18), with the amassed data, experience on the property, analysis, displayed assumptions, and calculations (displaying a profitable operation under each of several scenarios), along with the Second Ferrero Affidavit refuting Mr. DeMaagd's criticisms of that showing. Defendant has not presented a credible case that the mining claims are invalid, and this Court can find that Plaintiffs have met their burden of proof and shown the mining claims to be valid on this summary judgment record.

2. Property rights in an unpatented mining claim, irrespective of discovery. Defendant submits that Plaintiffs' alternative argument (Part V.A.(3.) of Plaintiffs' Opening Brief, Dkt. No. 118-31 to 118-36) "ignores over 100 years of precedent and may be rejected out of hand." DOB 2. The Supreme Court did not cleanly confirm that the Fifth Amendment's Just Compensation Clause applied to temporary as well as permanent takings of private property for public use until 1987, in First English Evangelical Lutheran Church v. Los Angeles County, 482 U.S. 304 (1987). The first "over 80" years of Defendant's "over 100 years of precedent" cannot be directly applicable, because the cause of action at issue in this case did not clearly exist.

The 20 years of precedent since 1987 are also not controlling. Defendant in two briefs has not cited any case evaluating a temporary taking – the cause of action ratified by First English in 1987 – in the Mining Law context presented by this case. Defendant has not yet acknowledged or discussed First English. In the context of actionable interference with a mining claimants' rights on "open ground" (land that remains open to the operation of the Mining Law), Plaintiffs' argument in their opening brief (at 24-29, Dkt. No. 118-31 to 118-36) is not controlled by the cases Defendant has cited. Every case reciting that a holder of unpatented mining claims litigating a takings claim must demonstrate the validity of the mining claims[2] to have a compensable property interest deals with land that has been withdrawn from or permanently closed to the operation of the Mining Law by legislative or executive action (the latter including where the land management or other permitting agency has effectively withdrawn the land by prohibiting mining under its permit mandates).

[2] By this Plaintiffs mean that they are supported by a "discovery" under the prudent person/marketability tests of Castle v. Womble, 19 Land Dec. 455, 457 (1895), Chrisman v. Miller, 197 U.S. 313, 322 (1905), and United States v. Coleman, 390 U.S. 599 (1968), with the claimant having a "reasonable prospect of success, in developing a valuable mine."

No case involves governmental interference with the exercise of the rights of the holder of mining claims on open ground, under the circumstances that are actionable under the temporary takings case law that has developed under and since First English – extraordinary and unwarranted delay interfering with the exercise of the claimant's Mining Law rights, all out of proportion to time and issues needed for permitting the lawful property use, and infused with evidence of bad faith in manipulation or mishandling of the permit process.

In its argument that without proof of a "discovery" on its claims, Plaintiffs have nothing, Defendant (DOB at 10) relies on statements made in Chapter 7 of the 1992 Rocky Mountain Mineral Law Institute's proceedings, "Inverse Condemnation Issues in Revising the Mining Law." However, Chapter 7 of the 1992 Rocky Mountain Mineral Law Institute is like the group of cases Defendant has cited, authority that speaks only to withdrawn lands, and to permanent takings, rather than to temporary takings on "open ground." Chapter 7 is squarely within the body of authority characterized in Plaintiffs' Opening Brief (Dkt. No. 118, at 31-36 of 47), discussing permanent takings where, by formal action or legislated prohibition against mining, the federal land is no longer subject to the operation of the Mining Law. Plaintiffs do not argue that body of law is wrong, rather that it is not controlling and should not be applied. [3]

Defendant misunderstands plaintiffs' position and attacks its own straw horse when it argues that Plaintiffs' "Property Right is [not] Established by Federal Regulation [nor] Established by the Forest Service Manual." DOB at ii, and 18-19. Plaintiffs do not argue that

[3] Plaintiffs appreciate that Defendant regards a published article by their counsel as authoritative in its analysis of these issues arising under the Mining Law, and that Defendant does not dispute a fundamental premise of Chapter 7 regarding mining on open ground – "the plan of operations rules make clear that the Forest Service does not ultimately have the authority to say no to the plan of an operator who does seek approval." DOEx 1, at 15, citing one of the first cases interpreting what is now 36 CFR Subpart 228, United States v. Weiss, 642 F.2d 296, 299 (9th Cir. 1981). See DOEx. 1, at 14-18.

their property right is created by the Part 228 regulations and the Forest Service's 228 Manual. Plaintiffs argue that the Forest Service designed the regulations and manual to recognize and be consistent with the property rights that Congress, exercising its Property Clause authority in the Mining Law, grants to claim holders when they stake, maintain and develop their claims consistent with the Mining Law. And, in recognizing those rights, neither rules nor manual in their design and operation distinguish between mining claims on which a "discovery" is established and mining claims on which no "discovery" is established. In recognition of claimants' rights created under federal law by their claim location and development work on open ground (federal land open to the operation of the Mining Law), the rules and manual contain the same deadlines for the agency to respond to plans, and the same limitations on the right of Forest Service officials to disapprove of mining operations irrespective of "discovery" or "lack of discovery" on the claim.

**B. Defendant's arguments about "implementation" of the biological opinion.**

1. Defendant's Misuse of the Granillo Transcript. Defendant makes extraordinarily misleading and unsupported use of the 1997 deposition testimony of Kathleen Granillo. This is apparently the government's best "evidence" that any Forest Service employee ever told Liberty there was a July 1990 Biological Opinion prior to the District Ranger's letter in March 1992.

The first misuse is the unsupported claim that "Aloisi and Liberty Mining were made aware of mitigation requirements imposed by the Biological Opinion." DOB at 25. The Granillo testimony does not support that claim. Defendant's first citation contains no content regarding the meeting; Ms. Granillo simply says she met Mr. Aloisi at a meeting "probably a few months after [the July 1990 Biological Opinion] came out. I don't recall when." DOEx. 3, at 24-25, Tr. at 25:5-7. Defendant's next citation is to her testimony about that meeting. This wildlife biologist remembers that the featured discussion was about the Arch Study and

environmental assessment issues. Id., Tr. at 34:22 to 35:2. She also testified, "I know we talked about what was going on with the opinion." Tr. at 35:4-5.[4] "[W]hat was going on" is not making Liberty "aware of mitigation requirements." Ms. Granillo does not make any assertion about the content of any communication, and does not testify that Liberty was made "aware of any mitigation requirements."

This meeting in the Klamath National Forest Supervisor's Office was not otherwise documented in the record in any way. This transcript does not support Defendant's claims on page 25 of its Response. This is Defendant's strongest "evidence" that Liberty knew about the July 1990 biological opinion before March 1992, but it supports no such conclusion. There is no disputed issue of fact here; Mr. Aloisi's Affidavit (PE-1, ¶¶ 31, 36) stands.[5]

2. The Second Blessing Declaration, and the Evening Star Timber Sale. During discovery, Plaintiffs sought documentation on Klamath National Forest's 1990 projects affected by the designation of the northern spotted owl as threatened in June 1990, and how the agency proceeded upon receipt of the July 1990 biological opinions on Klamath National Forest

[4] Ms. Granillo's testimony does disclose a significant Forest Service disconnect. Assume this meeting occurred in the fall of 1990. At that time, an August letter (JA-82) was the most recent correspondence from the Forest Service to Liberty. JA-82 does not disclose to Liberty the existence of the one-month old July 1990 Biological Opinion. Instead it says the Forest Service is still awaiting "a determination … from the Fish and Wildlife Service" regarding "findings on the affect [sic] of the … Owl on your operations." JA-82, at 777. In deposition Ms. Granillo had no idea what FWS determination this letter was referring to Tr. at 36:22 to 37:10, and acknowledged never having seen "document 71" (JA-82). Tr. at 35:17 to 36:15. The record discloses no other role for the FWS than formal section 7 consultations. Either the District Office lied that it was awaiting an FWS determination, or it incompetently "forgot" it had just received the July 1990 Biological Opinion, which District Biologist Williams called "landmark."

[5] It is inconceivable in light of Mr. Aloisi's Affidavit (PE-1, ¶ 32-36), that the Forest Service would have disclosed the existence of the July 1990 FWS biological opinion determining that the Liberty plan of operations would not cause jeopardy to the owl, and that Mr. Aloisi would have left that meeting without a copy of it in his hand. Events would have proceeded entirely differently than they did.

silviculture projects (included the Liberty Mining plan of operations). In response, on December 3, 2007, Defendant stated to Plaintiffs,

> The Forest Service does not have data on when the sales that went forward were approved, whether or not any mitigation measures were implemented with respect to the Northern Spotted Owl, whether and, if so, when any applicants were contacted subsequent to the July 23, 1990 opinion, or regarding the surface area in acres disturbed by the timber sale or removal.[6] See Declaration [dated November 29, 2007] of Dan Blessing.

We now receive a second "Declaration of Dan Blessing," bearing no reference to his first Declaration. The second Blessing Declaration discloses that he found certain information on the Evening Star timber sale in Eddy Gulch, one part of which surrounded an active owl nest and another part of which overlaps Liberty's property. DRExs. 13-16. This new information on the Evening Star timber sale area is fragmentary and unclear at best. The location of the Evening Star sale area, in relationship to Liberty Mining's property, is not disclosed by anything in Defendant's Opposition, but is found in JA-66, at 598. What the second Blessing Declaration does disclose, however, supports Plaintiffs' Motion in three respects.

First, it further supports the only conclusion to be drawn from the record – the Forest Service implemented the July 1990 biological opinions for its silviculture projects, except with respect to the Liberty Mining project. The record is clear here that the Forest Service treated the Liberty Mining plan of operations as a silviculture project. Given the analysis of the Liberty Mining project in the June 1990 Biological Evaluation (JA-76, at 750) and based on the only explanation Defendant offers (DOB 24, citing sketchy Granillo testimony), the Forest Service did so because the impacts of a mining plan of operations relevant to owl conservation are the

---

[6] This discovery Response repudiates Defendant's unsupported assertion (DOB 26) that "the delay experienced by Liberty Mining was similar to what others working in the area experienced." Those records do not exist.

same impacts a timber sale has, namely the acreage and pattern of timber cutting, and proximity of noise and activity to the nest site or pair activity center. Id.; JA-118, at 1147; JA-141, at 1248-49. The second Blessing Declaration simply corroborates the conclusion FWS's biological opinions of July 1990 (JA-80) were implemented for timber sales, but never for the Liberty Mining plan of operations.

Second, this supplemental "evidence" demonstrates that the key consideration in implementing the FWS's no-jeopardy opinions was avoiding timber harvest within the 0.5 mile radius of a nest or owl pair activity center. Plaintiffs submit they never proposed any "timber harvest" within the 0.5 radius of the KL-1034 owl pair nest site. This position is confirmed by the District Biologist.[7] Defendant's aerial photo at DOEx. 16, lacks any identification of the Liberty area, but JA-118, at 1146, shows the Liberty area wholly outside the 0.7 mile circle.

Liberty's proposed apex cut and related tree-cutting at the extreme west end of its claim group touched and possibly slightly crossed the 0.7 mile radius of the "KL-1034" nest site, but never crossed into the 0.5 mile circle. Those and other operations were mitigated out of Liberty's plan in mid-1989 based on informal on-site discussions with District Biologist Williams, and thereafter nothing in Liberty's all-phase plan (October 1989 / April 1992) was within the 0.7 mile radius. This 1989 mitigation is described by Aloisi (PE-1, ¶s 20-21) and Ferrero (PE-2, ¶ 20), and is consistent with the description given in 1996 by District Biologist Williams regarding keeping Liberty's operations outside the 0.7 mile radius by moving a "mill site" (actually a pond) from "Yankee Flat" (Williams, DOEx. 4, Tr. at 63) or "Live Yankee flat"

[7] Plaintiffs acknowledge they submitted JSOF-44 (Dkt. 112 at 14). Plaintiffs' Response No. 49 to Defendant's Proposed Finding of Uncontroverted Fact No. 49 (Dkt. No. 128, at 20-22), explains why JSOF-44 is wrong. District Biologist Mark Williams' 1996 deposition testimony confirms this – "I believe Fred [Aloisi] asked or I may have volunteered that there is a limited operating period for activities within half a mile and that it would not affect his operation because everything was further than a half a mile." DOEx. 4, Tr. 66:17-21.

(Aloisi, PE-1, ¶ 20; Ferrero, PE-2, ¶ 20). This mitigation occurred with changes in Liberty's October 1989 supplemental all-phase plan that was partially approved in November 1989.[8] See also confirmation in the Forest Service's JA-141, at 1248, which appears to use and rely on the map and data in JA-118, "The mine … removes approximately 3 acres of suitable habitat within the outer zone (.7-1.3 miles)."

Third, the second Blessing Declaration, in its paragraph 7, suggests that "Stand No. 132" of the Evening Star timber sale was not clear-cut, but was cut using "single tree selection cutting."[9] DOEx. 14, at 3. Defendant's Opposition suggests justification for indefinite periods of delay by noting that the Evening Star timber sale was still being worked on in 1993.[10] DOB 30-31. However, the Forest Service cannot say what if anything Mr. Blessing describes would

---

[8] Defendant's Opposition uses this testimony of Mr. Williams in trying to find someone who might have discussed the 1990 biological opinion with Liberty. DOB at 25. Both cited sections of Williams' testimony, however, are dated by the record of the plans and the Aloisi and Ferrero Affidavits as having occurred in 1989, not 1990, when Liberty voluntarily mitigated its plan of operations. Mr. Williams and Mr. Aloisi did have a conversation in late 1990, after the 1990 biological opinion was out, but it was not the conversation in the two cited deposition sections regarding the 1989 plan of operations mitigation. The 1990 Williams-Aloisi conversation is reflected in JA-90, the peculiar letter in which the District Ranger directed Mr. Aloisi to stop talking to Mr. Williams or any biologist. JA-90, at 829. Mr. Aloisi did not learn of the July 1990 biological opinion in that conversation with Mr. Williams. He certainly did not learn of it in the JA-90 letter, which throws a bank of fog around the status of the owl and the Liberty plan of operations. While plaintiffs cannot prove it, it appears Mr. Lee ordered Mr. Aloisi not to talk to biologists because Liberty might learn about the opinion if continued to do so.

[9] Liberty's operation never involved any "clear-cutting" on the scale of a real timber sale (its harvest impact was small relative to the average timber sale, as JA-76, at 750 displays. Also, by the time Liberty was stopped it had already completed a significant share of its timber "harvest," including most of the access and haul road construction and improvement, the additional clearing of the historically clear Usher Flat mill site, and the initial clearing of several important apex mining areas. In that work, Liberty only cut trees the Forest Service had marked to cut.

[10] The new Blessing production does not give the duration of the Evening Star harvest. As it was a "sold" sale (JA-77, at 754), it also predated 1990, and could have had a 5-year harvest schedule independent of the owl. It is undisputed on this record that there was timber harvest in the Evening Star sale area in the second half of 1990 while Liberty was neither advised of nor provided the Biological Opinion.

have applied to Liberty because it never happened – the very steps undertaken with respect to the Evening Star timber sale were never undertaken with Liberty Mining's October 1989 all-phase plan of operations.

3. What "mitigation requirements," or "mandatory conditions"? Defendant's argument declares as fact an assumption not demonstrated – that Liberty was "aware of mitigation requirements imposed by the Biological Opinion." DOB at 25, and throughout. The record, however, starting with Mr. Aloisi's Affidavit (PE-1, ¶¶ 32-60), contradicts this assertion that Liberty was ever provided "mitigation requirements" any time after the July 1990 Biological Opinion. On her 1991 site visit, Ms. Granillo did not have, provide or implement any "mitigation requirements." Without the July 1990 Opinion in hand, Liberty through this whole stall period was given no idea whether its operation would or would not cause jeopardy to the owl, and whether it would have to modify its plans to address standards or biological opinion conditions no one provided to it.

More importantly, Defendant has never identified any mitigation requirements required for Liberty Mining's October 1989/April 1992 all-phase plan of operations to protect the owl since July 1990. In March 1992, the District Ranger told Liberty the FWS concluded that Liberty's "project could proceed as submitted." JA-111, at 1084. What mitigation requirements? Was this, too, a false representation from the agency? There is no document from the Forest Service to Liberty identifying any mitigation requirements, or requiring any revisions to the October 1989/April 1992 all-phase plan of operations for owl protection. The three agency Owl Clearances of the plan identified in the February 1994 second biological opinion identify no mitigation requirements. JA-163, at 1342. The most detailed analysis in the record of Liberty's plan under any owl protection standards (JA-141, at 1248-49) concludes:

> Spotted owls must be considered when developing the [mining] plan [of] operations, just as all other resources are, but nothing in the [Interagency Scientific Committee conservation] strategy precludes operation of otherwise legitimate and sensitively planned mining activities.
>
> We also considered that the proposed activity affects a very small portion of the HCA and further, apparently does not result in a "taking" with regard to affected owl territories.

Id. at 1249. What mitigation requirements are there in these four Owl Clearances? What mitigation requirements was Liberty supposedly aware of, not having the 1990 biological opinion until the second half of 1992, and never seeing the JA-141 memorandum clearing its plan of operations for processing on its merits until discovery in this case. Defendant's representation Liberty was aware of requirements that do not appear to exist is unsupported and empty.

Plaintiffs' recounting of the Forest Service's actionable handling of Liberty's situation from July 1990 on (in the ripeness, unreasonable delay and related portions of Plaintiffs' briefing), demonstrates the Forest Service never engaged Liberty to disclose what the requirements were, and what if any alterations to the plan of operations might be required. No one in the agency took this responsibility. No one even provided Liberty the biological opinion until the second half of 1992. Aloisi Affidavit PE-1, ¶¶ 32, 36, 47, 55; JA-127. The Forest Service made no determination until 1992 of any kind to apply any owl protection standards to Liberty's October 1989 / April 1992 all-phase plan of operations. The only people in the Forest Service who acted were those who wrote the four Owl Clearances, unknown to Liberty until 1994 or in discovery in this case. The only thing Liberty was ever advised was the March 1992 representation – "the [Liberty Mining] project could proceed as submitted." JA-111; JA-163; and JA-141, at 1248-49.

Defendant waves the "mandatory terms and conditions" in the July 1990 biological opinion at the Court and Plaintiffs (DOB 23-25), suggesting they had draconian impact on the possibility of mining. This argument is remarkable five ways. First, beyond not providing the biological opinion for more than two years, there is no evidence any official ever told Liberty what those mandatory conditions were – not Granillo, not Lee, not Williams, certainly not the Mineral Officers, no one. Beyond the violation of FWS rules regarding applicants, this reeks of bad faith. Second, "[c]hief among these mandatory conditions was" the 0.5 mile radius activity prohition. DOB 24. District Biologist Williams (quoted in note 7 above) knew that Liberty either never had this problem or solved it in 1989, before the stall.

Third, even if a mandatory condition were applicable, would it affect the entire operation? Liberty had already mitigated voluntarily. No official ever engaged Liberty to discuss whether the "mandatory conditions" did or did not require any alteration in Liberty's all-phase plan of operations, as the second Blessing Declaration makes it clear the agency undertook with its timber sales. If the agency, left to itself, fails to act on a matter indefinitely, call it incompetence. But if the agency, regularly pressed by the applicant, fails indefinitely to act on a matter where agency rules specify response times, that is bad faith.

Fourth, every official who did evaluate Liberty's all-phase plan of operations against the "mandatory conditions" said one thing – go ahead and process the plan of operations. This is true of all four Owl Clearances (the three disclosed in the second biological opinion, JA-163, at 1342, and JA-141, at 1248-49). The District Ranger could not have been clearer in March 1992, "the Fish and Wildlife Service determined that the project could proceed as submitted." In other words, your plan causes no jeopardy and the mandatory terms and conditions do not require changes to your plan. Remarkably, Defendant now claims, "Plaintiffs' reliance upon District

Ranger Lee's statement … is misplaced." What is Defendant now claiming about the District Ranger? That he was misinformed then? That he was misleading Plaintiffs? If this statement was false when made in 1992 the Forest Service reeked even worse of bad faith. If this statement was true when made then the Opposition Brief is spraying smokescreens this Court can ignore.

Fifth, the government defends by maintaining two inconsistent positions. To downplay its incompetence or bad faith, or both, in not providing the applicant the biological opinion on its project, Defendant argues that it simply did not matter that Liberty was not provided the 1990 Biological Opinion (DOB 22-23). But, then warning us Ranger Lee's "proceed as submitted" representation could not be relied on, Defendant intones, "The Biological Opinion is the best document to discern what the Fish and Wildlife Service determined." DOB 23. If this document is the clearest and strongest statement of the requirements for protection of the owl, it is indefensible for Defendant to say it was immaterial that they never provided it to Liberty as required by law.

**C. Extraordinary Delay, Temporary Takings, and the *Penn Central* Factors.**

1. Ripeness and finality. The law is undisputed that a takings claim may ripen, irrespective of finality, upon demonstration of extraordinary delay in the permitting process by the federal agency. Boise Cascade v. United States, 296 F.3d 1339, 1347 n.6 (Fed. Cir. 2002), citing Wyatt v. United States, 271 F.3d 1090, 1097-98 (Fed. Cir. 2001). The facts here define extraordinary, unreasonable and unwarranted delay, with episode after episode displaying bad faith in the agency's actual failure to implement its obligations, while hiding from Liberty the state of the facts and proclaiming it was working on it. This claim is ripe under the law.

2. APA remedies? Defendant asserts the wrongs that occurred in this case were remediable under the Administrative Procedure Act, and are therefore outside this Court's

jurisdiction. DOB 19-20. But Plaintiffs cannot be required to file a district court action to compel "agency action unlawfully withheld or unreasonably delayed" (5 U.S.C. § 706(1)) when the violation is being hidden from them, as was the case with the violation of the FWS's rule commanding prompt provision of a biological opinion to the "applicant." The very hiding of the existence of the opinion nullifies the remedy, and shows, instead, how this is a bad faith, extraordinary delay case. The same defect applies to the "second half" of the temporary taking here. As the unnecessary second consultation[11] dragged on, the four Owl Clearances for Liberty's plan of operations were kept unknown to Liberty until three of them were identified in the February 1994 second biological opinion, JA-163, at 1342, while the fourth (JA-144) appeared in discovery.

"[A]n uncompensated taking and an unlawful government action constitute 'two separate wrongs [that] give rise to two separate causes of action,' and ... a property owner is free either to sue in district court for asserted improprieties committed in the course of the challenged action or to sue for an uncompensated taking in the Court of Federal Claims."..Rith Energy, Inc. v. U.S. 247 F.3d 1355, 1365 (Fed. Cir. 2001), quoting Del-Rio Drilling Programs, Inc. v. United States, 146 F.3d 1358, 1364 (Fed.Cir.1998). A plaintiff is not required to first litigate (and lose) in district court, nor is a plaintiff required to use the APA proceeding to establish the scope of the

[11] Liberty was never provided the May 2002 memorandum with its materially misleading description why consultation was being reinitiatied. JA-118, at 1145 – "This mine was previously covered in the Biological Opinion rendered on July 23, 1990, and given approval to begin operations." Nor did the Forest Service share with Liberty anything from which Liberty could have learned then that the Forest Service failed to prepare a biological evaluation or biological assessment before or in connection with reinitiating the consultation. On the contrary, the Forest Service, like the authorities in Kafka's Castle, made the "APA route" through administrative appeal a futile, Kafkaesque venture – first with a "moot" appeal and then a decision the mooted appeal allowed that should not have been allowed. See PE-1, Aloisi Affidavit, at ¶s 54-59.

property right that was allegedly taken, before pursuing a takings action in the Court of Federal Claims. Rith, 247 F.3d at 265.

3. Non-existent standards of proof. Defendant tries to "raise the bar" against a temporary taking claim by demanding that Plaintiffs show "malice" (DOB 31-32), and show bad faith by "clear and convincing evidence" (DOB 21-22, 31). These standards are inapposite to the case at hand, as Plaintiffs are engaged in an action for temporary takings, not a contract dispute or claim of fraudulent or criminal wrongdoing by specific agency officials. Defendants cite to Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1238-40 (Fed. Cir. 2002), which is clearly distinguishable as it involved a "situation where a government official was allegedly engaged in fraud or in some other quasi-criminal wrongdoing." *See* 281 F.3d at 1239 (contract action involving allegation by plaintiff that it executed a contract release while under duress by the Government).

4. Submitting a "meaningful application." Defendant erroneously cites Boise Cascade v. United States, 296 F.3d 1339, 1351-1352 (Fed. Cir. 2002), to assert that extraordinary delay cannot exist without submission of a "meaningful" permit application. Defendant provides no authority defining what constitutes a meaningful application. Plaintiffs' all-phase plan of operations was certainly meaningful enough to owl purposes, both for consultation with the FWS, and for the committee and task force reviews that gave the four Owl Clearances.

Moreover, whether a plaintiff has submitted a meaningful application arises in futility situations, not extraordinary delay cases, and does not govern ripeness here. See, e.g., MacDonald, Sommer & Frates v. Yolo County, 477 U.S. 340, 353 n.8 (at least one application must be submitted before the futility exception applies); Greenbrier v. United States, 40 Fed. Cl. 689, 702 n.12 (1998).

5. Reasonable Investment-backed Expectations. Defendant asserts that Plaintiffs could only have unreasonable "unilateral expectations" in light of owl concerns and other regulatory requirements in existence as they invested in the mine. DOB 38-40. Walcek v. United States, 49 Fed. Cl. 248, 269 (2001), says that plaintiffs should be cognizant of applicable rules, but holds that Penn Central analysis "does not require a property owner to be clairvoyant." Cases such as Walcek and Brace v. United States, 72 Fed. Cl. 337, 354-55 (2006), which found reasonable investment-backed expectations even in circumstances of substantial regulatory flux when the property was acquired, provide ample room for Plaintiffs to qualify with reasonable investment-backed expectations.

Plaintiffs addressed the changing regulatory issue, the owl, as soon as it was identified, and voluntarily mitigated all identified impacts. Aloisi Affidavit PE-1, ¶¶ 19-20; Ferrero Affidavit PE-2, ¶¶ 20-21; compare pre- and post-mitigation plans at JA-36 and JA-40/JA-141. Here, in fact, when the "changing" requirements were finally applied, the project was cleared in the very shape that it took after Plaintiffs' initial voluntary mitigation. This is the definition of reasonable expectations. What one cannot plan for is years of incompetence or bad faith, and one cannot plan for years in which the agency hides the supposedly-changed relevant requirements from the applicant after it has made its investment.

6. Economic Impact of the Temporary Taking. Plaintiffs' arguments in their opening brief, relying on CCA Associates v. United States, 75 Fed. Cl. 170, 197-98 (2007), and Bass Enterprises Prod. Co v. United States, 54 Fed. Cl. 400, 404 (Fed. Cl. 2002), stand unrefuted. Defendant does not discuss Bass Enterprises, and its holding, clearly applicable in the temporary taking context, that the cash flow method of property valuation is used with mineral properties, applying an interest factor to the lost cash flow. As to the cash flow in question,

Plaintiffs refer back to Part A. of this Reply, inviting comparison of Mr. Ferrero's evaluation of the property with Mr. DeMaagd's evaluation using only the few Forest Service samples.

In conclusion, Plaintiffs submit that this record establishes: their compensable property rights; the Defendant's extraordinary delay, on unwarranted and baseless grounds, through conduct suffused with bad faith; and Plaintiffs' satisfaction of the three Penn Central factors (the extraordinary bad faith nature of the government action, the economic impact on Plaintiffs, and Plaintiffs' reasonable, investment-backed expectations in developing a mine).

Plaintiffs request that their motion be granted and Defendant be found liable for a temporary taking of their property through the July 1990 through February 1994 period at issue here. The northern spotted owl did not abort Plaintiffs' mining operation; Liberty's plan was compatible with all known owl protection requirements. It was the Forest Service's baseless and unwarranted mishandling of the matter, with the extraordinary delays and bad faith demonstrated here, that prohibited beneficial economic use and development of their mining property over that period.

Dated: March 21, 2008

Respectfully submitted,

s/ Lawrence G. McBride
Lawrence G. McBride
FOLEY & LARDNER LLP
3000 K St., N. W., Suite 500
Washington, D.C. 20007-5143
Telephone: (202) 672-5300
Facsimile: (202) 672-5399

Attorney for Plaintiffs

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ALFRED ALOISI, et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 95-650L |
| UNITED STATES OF AMERICA, | ) | Hon. Lawrence S. Margolis |
| Defendant. | ) | |

**Second Affidavit of Thomas P. Ferrero**

1. I am the same Thomas P. Ferrero who prepared and executed an affidavit for use in the captioned case on January 29, 2008. I am aware that my January 29, 2008 affidavit was lodged as Plaintiffs' Exhibit ("PE-") 2, Dkt. No. 118-3 (45 pages), on February 6, 2008 in this case. For purposes of this second affidavit, I incorporate by reference and acknowledge the content of my January 29 Affidavit. Specifically, the recitals of my background and professional licenses in paragraph 1 of my January 29 Affidavit remains true and accurate.

2. I have examined the Declaration of James W. DeMaagd, dated March 5, 2008 and lodged as Exhibit 7 to Defendant's Opposition to Plaintiffs' Motion for Summary Judgment in the captioned case, filed March 5, 2008. I have found in the DeMaagd Declaration numerous inaccuracies, misreadings of the record, erroneous assumptions and misrepresentations pertaining to so many portions of the record in this case that they cannot go unanswered. This Second Affidavit addresses those issues.

3. In paragraphs 17 and 18 of his Declaration, Mr. Demaagd's remarks show he did not take the time to really understand the table of production history from the mines on Liberty Mining's property from my 1985 report. Joint Appendix ("JA")-6. He cites what he believes are contradictory and "double-counted" production numbers in the table, specifically

the pre-1887 $161,920 figure and 1863-1886 $600,000 figure regarding production from the Mt. Laurel Mine. However, the $161,920 from the Mt. Laurel Mine, as well as the $79,000 and $30,000 from the Union Mine were not included in the all-mines production total at the bottom of the chart because these three numbers are included in the larger subtotal numbers ($600,000 for the Mt. Laurel Mine and $300,000 for the Union Mine) directly under them. The all-mine total of $1,681,549 does not include those three numbers, and so there is no contradiction. Simple addition shows this to be true. I generated the average recovered grade of 0.565 oz/ton using only the five reported production numbers that included both dollar and tonnage values. The numbers for production from the Union and Klamath Mines that he claims are improperly double-counted are from completely different operators at completely different times. There is no overlap. This is clear from the production years listed – one figure is production from a period in the 19th century and the other from a period in the 20th. The JA-6 report is a summary of 36 pages of notes I made compiling all geologic, grade, recovery and production data compiled from numerous government and private sources. It was a best effort from available data completed in 1984 before I had any connection with the plaintiffs and claim-holders of the property at all.

4. In his paragraph 19, Mr. DeMaagd cites what he believes are errors in the base production data presented in the JA-6 production chart. He concludes that I relied on the 1932 Elmendorf report (PE-4) for this production data. He further states that the Elmendorf report did not correctly cite the California State Mineralogist's Report data, and so I repeated those errors. This is completely wrong. The Klamath Mine $59,000 (actually reported as $59,400), $418,549 (I did not include the cited "$25,000 in specimens") and $30,000, the Union Mine $79,000, and the Mt. Laurel $600,000 production numbers are all taken directly from the 1925 California State Mineralogist's Report (PE-28).

5. Neither informally nor in deposition has Mr. DeMaagd or any representative of the government ever asked me about the table or my sources, yet Mr. DeMaagd feels free to make the erroneous assumption about my work that I relied upon Elmendorf's report in this regard. DeMaagd's assertion that Elmendorf's data are "not correctly" cited is wrong. The quote from the 1925 California State Mineralogist's Report in Elmendorf's report is verbatim, except for two numbers: an elevation of 3510 instead of 3810; and an *understated* production tonnage of 8300 instead of 8800. My production table cites the correct 8800 ton figure *from the California State Mineralogist's Report* (PE- 28), so I obviously did not rely on the Elmendorf report. None of DeMaagd's attacks on my production history table are accurate

6. In paragraph 20 of his Declaration, Mr. DeMaagd shows that his "personal knowledge of the Six O'clock claim" is lacking. The Mt. Laurel workings were stoped up under the Six O'clock claim, and that stoping was stopped in mid-production by a lawsuit filed in about 1935 by the Six O'clock's owner, Wike. Wike's daughter, Ruth Markon (from whom Aloisi leased the Anna Johnson group of claims), told us that her father discovered the trespass when he started feeling blast vibrations coming up to the ground surface of his claim. The down-dip extension of the Six O'clock ore body merges with the Mountain Laurel workings, on the Reverse Dip Vein, which yielded much of the ore from the Mt. Laurel Mine (see JA-187, which maps the stopes reaching across the claim line in under the Six O-clock claim). The average assays from the latest workings in 1932, reported in the Elmendorf report (PE-4), along with vein widths, sample descriptions and assay lab reports, were much higher than the average 0.565 oz/ton recovered gold value I applied from the production records. This is yet another detail in my valuation where I chose the more conservative number. The Six O'clock ore body is defined down-dip by the mapped productive workings and the high assays reported by Elmendorf, and at the top by one high-

grade and other substantial drill intersections (the drilling reports were supplied to the Forest Service in 1998). There is more than enough data to project probable ore reserves under the Six O'clock claim. All of this information is in my 1985 report (JA-6) and again in my 2007 data (JA-189 through JA-193).

7. In paragraph 21 of his Declaration, Mr. DeMaagd criticizes my use of a 90% gold recovery factor in the JA-189 through JA-193 calculations. I applied the 90% recovery data only to underground ore (JA-191, at 1569 (Sheet 1)). The California State Mineralogist's Report of 1925 (PE-15) recites that the Klamath Mine stamp mill production averaged $12/ton with loss of $1.00 free and $0.80 in cons not saved, which adds up to 85% recovery. Saving cons, which Liberty most definitely would have done, increases recovery to 91.7%. Usher, 1957 (PE-29) who milled ore from the Serpa and Usher Mines during the 1930s, which produced ore typical of the ore throughout Eddy Gulch from a close parallel structure adjacent to the Union Mine, cites 90% recovery without fail, up to 94%, with gravity flotation. C. Jones in 1932 (PE-3) cites only 1.5 to 2% of the gold as not free. A metallurgical test was completed on a composite sample from the underground workings by McLelland Labs for Liberty Consolidated Mines, Inc. in the 1990s (JA-176). The testing showed 93.4% recovery from a gravity-flotation circuit, as per the mill that the Forest Service approved for the LCM operation (JA-176). The 90% recovery number for underground ore is well supported by data.

8. If the miners of the 1800s and early 1900s could get 90% + recovery from stamp mills, and later operations and tests yielded 93 to 94% with gravity flotation (see the Usher and LCM data above), Liberty could get 90% recovery from the centrifugal concentrators on site then (this includes using the crusher Liberty also had on site. The use of this equipment is accounted for in the full mill operating costs included in the cost spreadsheet (JA-191, at 1577, Sheet 9). My evaluation applies the 90% gold recovery to high-grade, underground

ore, not to the low-grade dump or apex ore. With underground ore there are no oxidation problems, and the background fine gold that is difficult to recover makes up a small fraction of the values. This is the same ore character that made it so easy for the pre-World War II miners. There is ample data to support 90% recovery from underground ore crushed and run through the centrifuges. Note that we planned to save the tails and re-run them (mixed with other primary ore as grade control) through the later flotation mill to get the last 3 to 4%.

9. Enhanced gravity separation systems using centrifugal concentrators have been demonstrated to be very effective systems for gold recovery. This is not some untested method. It was reported to me by the on-site operators at the E T Placer Pit that when the centrifuge tests were run on Eddy Gulch ore (which I understood to be dump and apex material) they continuously panned the tails and found them completely stripped of free gold. The centrifuges were working quite well. Liberty recorded the testing operation on video tape showing the gold produced, which was produced to the government as plaintiffs' A-73.

10. In paragraph 25 of his declaration DeMaagd cites the poor Knelson Bowl recovery as the basis for his rejection of my 90% recovery rate from underground ore. In 2007 I supplied to the government a complete metallurgical evaluation of the ore that includes an analysis of why the Knelson Bowl is a completely ineffective system for recovery of Eddy Gulch ore (PE-18). This has to do with the sliming of finely ground carbonaceous material. I saw it in action when we completed our gravity mill test at Don Moore's facility, in 2006. Despite a substantial amount of coarse free gold trapped in the ball mill in the circuit assembled by Mr. Moore for that test, the Knelson Bowl in his circuit yielded very little gold. The total recovery was a fraction of what could be realistically expected given the pre-test assay and metallurgical test results on the same samples, and from other previous gravity testing (JA-191). The Knelson Bowl just does not work with this

ore. The ore must be coarse ground, gravity milled, then pulverized finer for flotation milling.

11. Mr. DeMaagd, in his paragraphs 25 and 26, mixes underground apples and surface deposit oranges. He cites Giles' (Plaintiffs' A-134 filed as Defendant's Opposition Ex. 8) and the Forest Service's Knelson Bowl tests completed in 1998 (FS-190). These tests were run on low-grade dump and apex ore, which would never yield 90% to gravity separation. I used far lower recovery numbers for these surface ores in the calculations in JA-191. The 90% recovery only applies to underground ore. The only thing "skewed" here is DeMaagd's complete misinterpretation of my data and analysis.

12. In his paragraph 27, DeMaagd says "Ferrero's analysis ignores some key evidence…Sannes…in 1975 and 1976 took thirty-four channel samples from the Mountain Laurel underground workings and drilled above these workings to intersect the vein, but could confirm a grade of only 0.072 oz. gold per ton of ore…underground and 0.357 opt gold from 'a very promising intersection' in the one drill hole that was discounted because it could not be duplicated." First of all, every sample from Sannes report was included in my analysis. However, because he only got an average grade of 0.072 from old workings is immaterial. Miners generally do not leave high-grade ore behind as examples of their production for future samplers. Liberty has never planned to mine the pillars and other bypassed workings in the Mt. Laurel or any of the other mines. Sannes' drilling program employed the use of A-size core drilling equipment (core about 1 inch in diameter), which got very poor core recovery in the geologic conditions of Eddy Gulch, which are not conducive to good core recovery with A-core. The fact that he got any values was a miracle. Note that DeMaagd's quotation regarding the drill hole ends after "very promising intersection." This is because the following phrase, "in the one drill hole that was discounted" are DeMaagd's words, not Sannes' or mine. Getting a high-grade intersection

containing visible gold, which is what Sannes described of that promising intersection, and then following up with a reverse circulation hole adjacent to the that first hole (Liberty 1986), and getting some gold, but at a lower concentration, does not discount the first intersection.

13. In my metallurgical analysis (PE-18), as well as in Don Moore's reports for Liberty and in the government's own mineral report (FS-190, although Defendant's Opposition Ex. 9 omits these pages of FS-190), the nuggety character of Eddy Gulch ore is well documented. In nuggety deposits, samples taken side by side, especially small ones like ½ gallon channels or A-core intersection, routinely yield highly variable assays. DeMaagd is trying to make something here out of nothing. Drilling data must be interpreted based on the spacing of the intersections, the core recoveries, the nature of the ore, etc. A few random drill holes do not confirm or deny the existence of ore bodies, but scattered "promising" intersections are excellent indicators of ore reserves. Sannes did not have close enough hole spacing to make an interpretation of exact grade and tonnage. But as the old geologists' axiom goes, "You drill for structure, you drift for values." Sannes recommended to his company that it would be prudent to drive a tunnel in from the north to intersect the reverse dip vein area that is the same target as our Six O'clock ore body (A-134, now Def. Opp. Ex. 8). DeMaagd says nothing about that recommendation. The same evidence that led Sannes to that conclusion persuaded me – excellent drill results considering poor drilling conditions, a productive mine stoped up from below, that was stopped by legal action from the owner of the very claim we are evaluating, and stopped thereafter by World War II, with records of high-grade assays from those workings, and with classic structural geologic elements associated with productive ore bodies through the district. Those geologic elements include a large overhanging block of cherty rock, a crossing fault, and the presence of gold. The 0.628 oz/ton that DeMaagd denounces is the average assay of ore that would yield the 0.565 recovery calculated from the production history (JA-6), at the 90% recovery rate.

Once again, this number is lower than the assays from the workings down dip (PE-4). What is more compelling data, a few samples from old dead workings and two A-core drill intersections, or records of the production from thousands of tons of ore? No evidence was ignored here. All was considered. Mr. DeMaagd cherry-picks data that fits his cause, and his "analysis" ignores the rest of the body of evidence that must be considered.

14. In DeMaagd's paragraph 28 he cites Liberty's 1986 drilling program, quoting my statement at that time "Data so far is inadequate to project grade or tonnage." The two Liberty 1986 vein intersections in the Reverse Dip Vein under the Six O'clock Claim cited by DeMaagd in his paragraph 28 yielded assays of 0.27 and 0.42 opt. As I stated above, scattered drill holes alone do not allow for accurate projection of grade and tonnage. However, these intersections, just under $^1/_3$ and ½ of and ounce of gold per ton, are excellent indicators of ore reserves. At the time I wrote the words quoted above, in 1986, I was still in the beginning phases of my evaluating the Eddy Gulch Mines. The first plans of operations were in 1988 and 1989. I had not completed my work and so was not ready "to project grade or tonnage." That quote has absolutely no bearing on what I believed in 1989, 2007 or today, because at all of those later dates I had more data and had taken the time to evaluate and interpret it, leading to a deeper understanding of the property. Obviously DeMaagd has not. It is comical the way DeMaagd and his partner in the mineral exam, Gutierrez, have continually, throughout the documents that they have prepared and that have been entered into the record of this case, especially their mineral report (FS-190), on the one hand rejected nearly everything I have written or said, but then on the other hand, seized on specific words of mine, out of context, and presented them as rock solid facts, as in the above example. This is just "cherry picking," not analysis of the facts.

15. In his paragraph 29, DeMaagd misuses Hugh Clayton's results. JA-12 and JA-13. Clayton was referring to dump and apex material, not underground ore. He did not apply

a cut-off grade for selective mining, reducing volumes accordingly, which I have in the JA-188 through JA-193 evaluation. Note that none of the "other researchers" had the volume of data that I have to work with, including much greater survey and volume data (PE-31, volume cross-sections, and A-148, produced to Defendant, the dozens of pages of field notes from which the volume cross-sections are derived. None of the other researchers, all of whose work I have studied, had the in-depth analyses of assay and recovery data, based on testing before they worked on the property and after, that I have had (see JA-189 through 193, and the stack of reports Liberty had produced as A-118 through A-138, which includes JA-14, JA-50, JA-52, JA-183, JA-63 and JA-68). DeMaagd and his boss on the mineral examination, Gutierrez, averaged misplaced surface samples with uninterpreted and therefore useless drilling data to generate a very low "average grade" of Six O'clock ore for their purpose of creating an unprofitable block of "ore" on the Six O'clock claim. As I described in my rebuttal to the mineral exam (A-84, now PE-30, p. 14-17), their report applied their 0.03 opt average assay value to the high-cost mining of underground reserves, yielding a huge loss sufficient to nullify any profit from mining any other deposit in the Eddy Gulch group of mines. This gave them the negative economics they needed, in their mind, to "conclude" that every claim Liberty proposed to mine was invalid for lack of discovery. But, in the real world, no one is going to mine thousands of tons of below cut-off grade ore; their hypothetical operation was wholly imprudent, and not what Liberty would have done with its data in hand. You can't have it both ways. Either the grade of the underground ore (by itself, without surface samples averaged in) is higher as I claim, and the mining would have occurred, or the grade is low as they say and the mining would not occur. Their manipulation of their surface samples from the Six O'clock claim as the basis for negative economics for their ill-conceived underground operation is indefensible.

16. Paragraphs 4 through 15 above all repudiate Mr. DeMaagd's attack on my calculations for the underground resources evaluated in JA-188 through JA-191, and show they ***are*** supported by reliable data.

17. The maps and my spreadsheets referred to by DeMaagd in his paragraphs 31-34 (JA-189 through JA-193) are accompanied by narratives that provide explanations for all assumptions and calculations employed – see A-84 (PE-29), A-114 (PE-30), and JA-190. This is an incredibly complex body of data, some of which is applicable to economic calculations and some of which is not. For instance, as I explained in my narratives (A-84 (PE-29) and JA-190), all of the Forest Service's 1998 apex samples were cut from only the upper half of the width of the vein. I witnessed this, and Liberty complained then to the Forest Service that they were only sampling a fraction of the vein, and that the results would be useless or subject to qualification. There is no fair way to use these samples in an economic calculation (unless you only intend to mine the upper half of the vein). Any analysis of these samples has to either assume there is no gold in the lower half of the vein or apply some arbitrary value, neither of which is a reliable way to determine the value of the vein to be mined. I could have assumed the value of the lower, unsampled half of the vein would have the same gold content as the upper, sampled half. This would have improved the results, as their results from the upper half of the vein were in some respects favorable. However, I did not do that because it would not be a defensible projection of sample values.

18. I did reject, and refuse to use in my evaluation in JA-188 through JA-191, some data due to anomalous assay values. I rejected the Forest Service assays of the Klamath Ridge splits from Liberty's 2004 pre-test sampling because, as I explained in detail in my narrative (JA-190, at 1584), it was obvious to me that there was a problem with the testing methodology. It is simply not credible that Liberty got consistently high assays from the same samples that they got nothing from, unless there was a problem in their handling of this

refractory ore. Again, you can fail to capture and assay gold present in a sample, for various reasons including the nature of refractory ore, but you cannot capture and assay gold not present in a sample. When these Forest Service results were shared with Liberty, I knew that this would be a big red flag the Forest Service would wave and wave, but science and statistical reality demanded that those sample results had to be rejected as anomalous. The metallurgical and statistical reasons why the low assays were wrong and the higher ones representative, is explained in the metallurgical and economic calculations narratives in detail (PE-18 and JA-190, at 1548-1553).

19. Mr. DeMaagd should be mystified why the Forest Service splits yielded anomalous assay results. Instead, in his paragraphs 32 and 33 he is mystified by the "unlikely" vs. "likely" scenarios in my economic calculation narrative and spreadsheets. These scenarios are about adjusting grades, up here and down there, to reflect what I concluded, after these decades of study of the geology, sampling and metallurgical testing results for this property, are more realistic grade and recovery values interpreted from the whole data set. The net effect of these adjustments is that the "likely" scenario calculates substantially ***lower*** profit numbers than the "unlikely" scenario. This again was not an exercise in cherry-picking the favorable; it was an exercise in conservative interpretation based on an intimate understanding of the data set after weeks spent of analyzing the data and crunching the numbers. No logical evaluation of a mineral property simply throws every piece of the data in and calculates the average. I do not know why the framing of scenarios is a problem for DeMaagd, unless it is because doing this would require him to abandon cherry-picking data favorable to Defendant, and to explain his reasons for including or excluded samples and evidence, as I had done here.

20. I considered every single bit of data we had available, from 1800s production records to 2006 milling data, including the California State Mineralogist's reports, private

reports, Liberty data, Liberty Consolidated Mines data, Forest Service data, etc. What got excluded from the analysis was only that which could not be included because of some serious flaw, like the Forest Service's results from its splits of the 2004 Liberty sampling cited above. I labored over the myriad data for hundreds of hours to make something definitive out of it. It is not simple and easy to absorb with a cursory reading. It takes many hours of study to grasp the flow of the data, the analysis and calculations. It took nearly a day of my deposition to get Mr. Trauben up to speed on the calculations, and we had already had an afternoon-long, off-the-record voluntary session arranged by counsel before the deposition, during which government representatives freely questioned me on the evaluation in JA-188 through JA-191. Mr. DeMaagd did participate in that informal session, but he did not attend my October 2007 deposition. DeMaagd says it is not possible to analyze my data in any meaningful way. This is not a criticism of the data or the analysis and conclusions. It may just be an admission that he could not grasp it given the time and effort he was willing to apply.

21. The process of taking hours, days or weeks to laboriously pour through a stack of data generated at a mining property over many years by various miners, geologists, metallurgists, etc., is standard procedure for a geologist evaluating a new property. DeMaagd and Gutierrez have from the beginning of their activities in this case refused to undertake that work. This may come from their training as "mineral examiners," because the Forest Service process, as described in their training manuals, is about exclusion of data. They only consider the data that *they* generate as "admissible." Note DeMaagd's paragraph 38, which characterizes their use of all of *their* samples, as though that is somehow more inclusive than my considering every bit of defensible data available. However, this is not a mineral examination, and so their exclusionary method has to be evaluated straight up as to its objectivity and competence as a method of evaluating a mineral property.

22. Mr.DeMaagd's stated inability to digest and respond substantively to Liberty's data, which he has had since September 2007, is reminiscent of what happened with the mineral examination of Liberty's claims in 1997. Liberty provided all of its data, again, the body of assays and analyses largely in the set of A-81a through A-81s (using the document production numbers in the case), and summarized for them in A-91 (some of which are now found as JA-6 through JA-9, JA-14 through JA-16, PE-2, PE-3, PE-6, PE-15 and PE-17) to the mineral examiners, DeMaagd and Gutierrez. The Mineral Report used none of it, and analyzed a proposed mining operation based solely on the presumed economics of mining the few areas in which they took their inadequate set of samples in 1998. It is easy to dismiss a complex body of data with a few offhand, out of context comments. DeMaagd and Gutierrez' analyses and reports have not gone beyond cherry-picking.

23. The only "analysis" the DeMaagd Declaration offers, in paragraph 38, is citations to the Forest Service's Mineral Report, which he describes and defends in paragraphs 39 through 42 of his Declaration. Liberty has already provided its analysis of the peculiar assumptions and biases, including use solely of the limited samples the Forest Service took in 1998, and unexplained rejection of all non-Forest Service data. The economic calculation narrative (JA-190) and rebuttal narrative (PE-30), describes the most egregious of the manipulations in that report. The apex sampling was inadequate (1/2 the vein) (see JA-190, at 1547), the apex volumes were calculated based on absurd assumptions about mining (see PE-30, at p. 17), the economic calculations were driven into deep red by implementing the absurd assumption that Liberty would underground mine 0.03 opt ore on the Six O'clock claim (PE-30, at p. 16); and the Klamath apex deposit was halved in quantity by a clever but baseless pit design that proposed leaving half of the exposed ore in the pit floor un-mined (PE-33). This last trick in designing a losing mine is displayed in Plaintiffs' Deposition Exhibit 1 used in the deposition of Hilton Cass (PE-33), where the Forest Service refused to

include the vein ore in triangle A-B-D in its evaluation, including only the vein ore in the overlying triangle A-B-C, even though that ore is mineable without any additional cost with no further overburden to remove, and no prudent miner would leave it in the ground.

24. In paragraph 32 of his Declaration, Mr. DeMaagd says that I do not explain assumptions underlying my "likely" scenarios, like cost factors. On the contrary, all of the cost factors are tabulated on the spreadsheets, including the identification of "Stebbins" – the Forest Service's contractor in the Mineral Report – as the source of mining cost estimates I used. It takes some close study to follow the flow of these cost factors, but it is all there. Once again, if it was too much for him, we offered further cooperation after the October informal session, but the only follow-up was my deposition later in October. The capital, operating and reclamation costs are directly listed and labeled. The refining costs due to the small relative volume of concentrates is included in the operating costs, but not listed as a separate entry. Also, at the time in question, concentrates were being bought off west coast docks by the Japanese at better rates than could be gained by shipping to smelters.

25. The DeMaagd Declaration cites Sannes and Clayton's lower average dump and apex grades in paragraphs 35 and 36. This ignores my application of cut-off grades and selective mining, which neither Sannes nor Clayton applied. The cut-off grades that I used in my calculation scenarios reflect what any prudent miner does when he has a large volume of material, some of which contains below profitable gold content. It is called grade control through selective mining. I have done this in the real world, at producing mines, one in 1987 that involved apex mining similar to Liberty's operation in Eddy Gulch. It works. All you need is an assay lab on site supplemented by copious panning, and an intimate knowledge of the ore, which grows more definitive with time until you can pretty much "eyeball assay" the material. You simply mine only that material that is of high enough grade (above "cut-off grade") to assure you a profit, leaving the below cut-off grade material in place. My

economic calculations include the ore volume reductions inherent in this method. It is quite easy to do with surface deposits like dumps and apexes. This is "Mining 101."

26. Mr. DeMaagd's refusal to acknowledge the use of cut-off grades in mining here is flatly inconsistent with the Forest Service's periodic demand, during their mineral evaluation, to know what Liberty's cutoff grade was going to be. We responded to this demand by reminding the Forest Service that the whole point of the bulk sampling operation they approved but did not allow to proceed was to determine mill efficiencies, and upon optimizing the milling set-up, determine the working cut-off grade. Mr. DeMaagd's stated confusion about mining with a cutoff grade suggests the Forest Service wants to avoid any calculation by which it might disclose favorable or even profitable alternatives to the scenario it presented in its Mineral Report, where it is easier to show unprofitability by refusing to establish and apply a cutoff grade.

27. In paragraph 27, Mr. DeMaagd accuses me of biasing samples by selective application of data. My material here explains what was excluded – bad, incomplete or unrepresentative data – and why it was not included. I scrupulously created a series of documents laying out and defending my analysis and calculations. Mr. DeMaagd amazingly displays pride that the Forest Service includes "all the available data ***from the samples it collects***," (paragraph 38), without justifying his rejection of each study or report other than their own. The non-Forest Service data is the overwhelming bulk of the relevant information; his Declaration essentially admits that the government has refused to consider any of it. Theirs is the valuation that lacks credibility, not mine.

28. Given DeMaagd's baseless and direct attack on my credibility (accusing me of biasing my analysis), I have to present two pieces of testimony. First, the hallmark of my career of more than 25 years is that I tell it like it is – I tell my clients that "The ground speaks through me." I do not "gild the lily," shade or dissemble in any way in my

profession. Everyone who I have consulted for knows this. The environmentalists and developers in my primary work area, southern Oregon, find me somewhat of an enigma because I don't adhere to either group's agenda. That is because I do not let any bias skew my work product. Sometimes my data and conclusions happen to support an environmental agenda, and at other times developers' plans, but neither agenda drives the analysis. In 1983, I gave up a stock option worth over $250,000, and left a company that was rising fast and making everyone involved rich, rather than lie about ***one assay*** at the request of an officer of the company.

29. Second, after the Forest Service finished its sampling in 1998, they brought their economic mining consultant (Mr. Stebbins, whose mining cost figures I used in my evaluation in JA-191) to Eddy Gulch to see the property he was working on. Late in the day, he motioned me aside, away from the Forest Service people there, and told me that he thought our property had great potential, but that he would not be able to express it in his report because of the outrageous assumptions the Forest Service was forcing him to include in his mine cost calculations. The absurd assumptions applied in the mineral report economic calculations (described above and treated in detail in PE-30) are the result of the pressure exerted on Stebbins by the Forest Service, including the underground mining of tens of thousands of tons of 0.03 oz/ton "ore," which of course resulted in costs exceeding the revenues that could be projected from mining the limited areas the Forest Service sampled, in their limited way (see PE-30).

30. The big picture here is that the USFS is relying on a Mineral Report that is based on very limited data and indefensible assumptions, against our data which is inclusive of all defensible data available and documented regarding the property. Yes Liberty's data involves some geologic inference and interpretation, but that is identified when it is applied. There is no attempt on Liberty's or my part to limit or twist the data. The Forest Service on

the other hand has consistently tried to limit data from being admitted into the case. They ignored the historical sampling data in their Mineral Report. In DeMaagd's Declaration he ignores our 2004 rebuttal sampling, and tries to attack my analysis of the whole data set citing errors that don't exist and making arguments that show a complete lack of understanding of the data.

31. *Here I close my response to Mr. Demaagd's declaration and continue with a response to Defendant's Opposition Brief, Document 129, at 17 and 23 through 26.* Defendant's Opposition Brief, Document 129, at 17 and 23 through 26 cherry picks a number of quotes from my reports from 1985 to 1990 in order to claim that Liberty had not made a discovery of a valuable mineral deposit at the relevant times in 1989 and forward. They cite my use of phrases including in 1985, "economic feasibility of mining…would depend upon many factors yet to be determined" (JA-6), in 1986, "data is spotty", "field mapping and sampling will define more targets", "samples on Incline Ridge...not profitably surface mineable", data on vein deposits inadequate "to project grade or tonnage" (JA-7 and JA-8), and in 1990, "drilling and dump testing so far suggest that there may be surface mineable gold ore reserves", "much systematic exploration work must be completed in order to determine the distribution of gold in the apexes [and] potential gold recovery from ore." (JA-56) The 1985 and 1986 quotes are irrelevant because I was new to the property, unfamiliar with much of the record, and still evaluating the property for Mega, long before Liberty eventually submitted its plan of operation in 1989. However, these quotes are taken completely out of context in a way that completely misrepresents what the documents they are gleaned from actually say. The documents are ongoing progress reports to Mega that include many more positive comments about the property. The document from which the 1990 quotes were extracted was a draft (JA-56) of the article about the Liberty Mining District that was published in the June 1990 issue of California Geology Magazine (JA-75 –

unreadable copy), but written in February of 1990. Both of these quotes were purposely couched in very understated terms at the insistence of the editors. They did not want me "promoting the mine" in their academic publication. The first of these quotes was grounded in my belief that there are surface mineable deposits on the property based on geologic evaluation and inference, but that drilling and testing so far, which tended to support that conclusion, was not adequate to define proven ore reserves. The burden of proof for discovery is not proven reserves. It is the reasonable prospect of success in developing a valuable mine, which we had. The second quote simply says that more work is necessary to work out the details of how the gold is distributed in the apexes and how much recovery we can expect from milling the ore. We clearly stated in our plans of operations that our 1989 proposed pilot production was to better define milling methodologies, as well as generate a modest profit for the purpose of attracting investor interest and paying for further development.

32. Nowhere in the documents from which they cherry-pick do I express the belief that there has not been a discovery of a valuable mineral deposit on the property. I would never have recommended a plan of operations that called for milling ten thousand tons of ore (JA-40, at 464, description; JA-45, at 472, approval) if I did not believe there had been a valuable discovery. I find it interesting that the government seeks to prove the lack of a discovery by quoting me. I was there. I remember what I believed then, and I believed that Liberty had valid discoveries across the property. The reason the government is using this inverted approach to proving a negative is that they have no reliable data of their own to offer. The 1998 Forest Service Mineral Report (FS-190), with its deliberate exclusion of nearly all available and relevant data, is indefensible, and all they have.

33. Defendant's brief (at 24) assails the 90% recovery factor I used for underground ore in the 2007 spreadsheets (JA-191). As Mr. DeMaagd did, the brief confuses surface

apples with underground oranges. All of the recovery numbers cited on page 24 are from tests of low-grade dump and apex ore. The government goes on cite the 78% recovery from cyanide milling, and then draws its usual argument about our never being able to get a cyanide mill approved. All of these government citations are completely immaterial to the discussion of underground reserves, which do not require cyanide milling, and for which we have substantial, reliable production history data to draw on to show that 90% recovery, using gravity separation without cyanide, is a conservative estimate, as cited elsewhere in this affidavit.

34. On pages 24 and 25 the government's brief assails the "forty-dollar rock" that Mr. Goodman and Liberty saw as compelling enough to "go minin'" (PE-2). The government cites my brief summary calculation in March of 1990 (JA-61), from which they pluck the number $25.60 per ton and compare it to the "forty-dollar rock" quote, claiming the $40 dollar number was unfounded. First of all, the $40 dollar rock was a gross value for dump and apex material only, meaning that costs and recovery loss was not included. Don Goodman, who had been moving $4/ton rock for a living for many years, believed that Liberty could make a clear profit from $40/ton material. These are the very terms he used. The $26.50 number cited by the government is not a gross number. It is a recovered number, after calculating in a loss of 20%. Also, the assumptions behind the "forty dollar rock" gross value included a cut-off grade of 0.10 opt and a $400 gold price. I applied the same cut-off grade to a $380 gold price in the new spreadsheets (JA-191) for dump and apex material. The assumptions behind the March 1990 $26.50 value included a grade of 0.08 opt described in the calculation as a "conservative estimate", applied to a $400 gold price. This computes out to "thirty-two dollar rock" with the removal of the loss factor.

35. The difference in the two numbers is a very conservative grade assumption for convincing investors or other outsiders that we could mine profitably based on the assay

records we had at the time ($26.50), and a practical evaluation of what we could ***reasonably expect*** for grade using selective mining ("forty dollar rock") – two completely different approaches. There is no contradiction here once the numbers are viewed in context. This is what I am compelled over and over again to point out about the government's "technical case" in responding to their declaration and brief. What numbers do they propose, and how do they defend theirs? Beyond a Mineral Report that excludes nearly all data, they only cherry pick Liberty's data out of context, in an attempt undermine our detailed evaluation of all of the available data.

36. Defendant's brief (at p. 25) assails the 80% recovery number used in the March 1990 calculation (JA-61). We are dealing here with another apples and oranges problem. The mining and milling costs cited in that calculation refer to the 300-ton per day gravity flotation mill Don Moore had a month before recommended and priced for delivery, not the centrifuges already on-site at the E T Placer that were involved in the "forty dollar rock" concept. I reject the March 1990 calculation now because it is far too simplistic and it applies factors that were not borne out by later metallurgical and economic analysis. But that number is not the one in question here. I do not hold that up as the standard of proof for Liberty's discovery or potential profit amounts. My more recent spreadsheets, in all of their complexity, provide that. However, I do still support the "forty dollar rock" concept because it applies appropriate profitable cut-off grade and selective mining principles, consistent with my recent spreadsheets.

37. On page 25 the brief has another strange attack on the viability of the Liberty project – because we did not have proven underground ore reserves, there was no discovery on those claims. The apex deposits are lode deposits, they are the apex of the lode. The apex deposits validate a lode claim. So do placer deposits (the dumps) on a lode claim, as any miner who works claims knows that a lode claim embraces all deposits within its boundaries,

while a placer claim excepts known lodes. Any lode claim containing ore of any kind (underground, apex or dump) that is part of the viable mining project would validate that claim.

38. The brief attacks me for describing, in various plan documents and renewals, surveys and continued exploration and mill testing in 1991, after they had shut us down in 1989 before we could complete those activities and our pilot production. Exploration and testing do not posit lack of discovery. Exploration and testing are an ongoing process throughout the development of a mining property. The following line is really preposterous. "Similarly, Plaintiffs' April 1992 Plan also noted the lack of any drilling results or any information about the existence or extent of underground ore." The statement is simply false. JA-114 does not "note the lack of any drilling results," it is silent on the subject. This silence is unremarkable – no plan of operations, including those the Forest Service approved, ever contained any information about gold content, mineral values, reserves, or metallurgy. We did proposed additional drilling, and underground developments including one rehabilitated and extended tunnel and two or three new tunnels. Do they think we were proposing to tunnel to surface ore? In 1992, Liberty had all of the 1975, 1976 and 1986 drilling data (JA-9), some of it quite compelling, with gold bearing intersections in the Six O'clock (Reverse Dip) and Union vein underground targets. So why would we have said we had no drilling data. The answer is we didn't say that because it was not true. The brief wholly misrepresents the 1992 plan of operations document.

39. The brief (on page 26) assails the "new spreadsheets" and related maps (JA-189 through JA-193). This exercise seeks to deny that the 2007 documents recreate data available to Liberty contemporaneous with the taking period, including maps provided that show the data available from 1932 to 1990 (JA-192). But what difference does it make anyway. However much gold was there and however much of it could be recovered by

whatever process is the same in 1985, 1990 or 2007. The location of the deposits was obvious, especially as to the dumps and apex, and all additional sampling and testing would simply confirm and expand understanding of the quality and quantity of the already-exposed and identified mineral deposits. Since we were prevented from mining, the only progress that could be made was sampling, testing and developing our understanding of the quantity and quality of the already exposed deposits. This does not change the underlying reality of what was in the ground during the taking period. This issue was an obsession of the Forest Service during the contest, as they felt no further data could be collected about an already exposed and targeted ore body. What the analysis in my new spreadsheets and maps applies to the data is a better understanding of ore grade distribution and optimal gold recovery from that ore that we would have realized with our proposed test milling in 1990, had Liberty not been shut down.

40. Next, the brief attacks my use of production history (from the table in JA-6) to project average grade and recovery from underground reserves. They quote me as saying "production records are far from complete." This is true, but so what? Does the government assert that all the rest of the unrecorded production was unprofitable? The large tonnage and representative distribution of mined reserves reported, with dollar and tonnage figures, means that the resulting average grade number is statistically valid, certainly much more valid than the grade numbers generated from limited and flawed sampling, and applied to ridiculous mining scenarios in the Mineral Report (FS-190).

Respectfully,

T. Ferreira 03/21/08

Signature Date

# CALIFORNIA JURAT WITH AFFIANT STATEMENT

☒ See Attached Document (Notary to cross out lines 1–6 below)
☐ See Statement Below (Lines 1–5 to be completed only by document signer[s], *not* Notary)

1 
2 
3 
4 
5 
6 

Signature of Document Signer No. 1

Signature of Document Signer No. 2 (if any)

State of California

County of Placer

Subscribed and sworn to (or affirmed) before me on this 21st (Date) day of March (Month), 2008 (Year), by

(1) Thomas P. Ferrero (Name of Signer),

proved to me on the basis of satisfactory evidence be the person who appeared before me (.) ~~(,)~~

~~(and~~

(2) N/A (Name of Signer),

proved to me on the basis of satisfactory evidence be the person who appeared before me.)

Signature Janna Fiori (Signature of Notary Public)

JANNA FIORI
Commission # 1698491
Notary Public - California
Sacramento County
My Comm. Expires Oct 10, 2010

Place Notary Seal Above

## OPTIONAL

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Further Description of Any Attached Document**

Title or Type of Document: Second Affidavit of Thomas P. Ferrero

Document Date: 3/21/08 Number of Pages: 24

Signer(s) Other Than Named Above: None

RIGHT THUMBPRINT OF SIGNER #1
Top of thumb here

RIGHT THUMBPRINT OF SIGNER #2
Top of thumb here

©2007 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org Item #5910 Reorder: Call Toll-Free 1-800-876-6827

CALIFORNIA STATE MINING BUREAU.

EXECUTIVE AND TECHNICAL STAFF

LLOYD L. ROOT
*State Mineralogist*

WALTER W. BRADLEY
*Deputy State Mineralogist*

MINING DIVISION

C. A. LOGAN, District Mining Engineer - - - - - - - Sacramento
C. McK. LAIZURE, District Mining Engineer - - - - - - San Francisco
W. BURLING TUCKER, District Mining Engineer - - - - - Los Angeles
FRANK SANBORN, Mineral Technologist - - - - - - - San Francisco
W. F. DIETRICH, Ceramic Engineer - - - - - - - - San Francisco

DEPARTMENT OF PETROLEUM AND GAS

R. D. BUSH, State Oil and Gas Supervisor - - - - - - San Francisco


NOTE.—A detailed report of the activities of the Department of Petroleum and Gas is issued monthly by the State Mining Bureau, entitled 'Summary of Operations, California Oil Fields.'


CALIFORNIA STATE MINING BUREAU
FERRY BUILDING, SAN FRANCISCO

LLOYD L. ROOT — State Mineralogist

Vol. 21 — OCTOBER, 1925 — No. 4


CHAPTER OF

cop 5

# REPORT XXI OF THE STATE MINERALOGIST

COVERING

# MINING IN CALIFORNIA

AND THE

# ACTIVITIES OF THE STATE MINING BUREAU

1430


CALIFORNIA STATE PRINTING OFFICE
JOHN E. KING, State Printer
SACRAMENTO, 1925

*Kangaroo Mine.* A pocket mine, in Sec. 29, T. 40 N., R. 7 W., nine miles southeast of Callahan.

Bibl: Cal. State Min. Bur. R. XIV, p. 836.

*Katie May Mine.* In Greenhorn district, Sec. 24, T. 45 N., R. 8 W., and contains 20 acres. Was worked by an adit and 80-foot shaft, and ore was stoped four feet wide, 60 feet long and 50 feet high. It was sufficiently high grade to haul many miles to a custom mill.

Bibl: Cal. State Min. Bur. R. XIII, p. 409; XIV, p. 836.

*Keynote Group.* Owners, C. E. Weston, Yreka, Charles G. Peterson, 1825 Oak Street, San Francisco, and Charles Magill, c/o Land Department, Southern Pacific Co., San Francisco.

This comprises six unpatented claims in Sec. 30, T. 34 N., R. 6 W., Fools Paradise district, six miles north of Yreka near Shasta River. Gold bearing quartz was discovered by Horace Howe in 1922 and the claims were leased to W. E. Anderson. Soon afterwards 75 tons of ore was mined and hauled to Yreka where it was crushed in a custom mill and according to a report by Magill, yielded $22.50 a ton in free gold. This ore came from a length of 40 feet and depth of 40 feet on the vein. The vein has been developed for a length of 600 feet by a series of short adits and open cuts. The maximum depth prospected is 175 feet below the apex on the hillside. The workings so far have been in the surface oxidized zone, and show an igneous dike on one wall. No work is being done at present.

*King Solomon Mine.* Owner, Edgar H. Cottrell, Westerly, R. I. Mineral Survey 4532 in Secs. 13 and 14, T. 38 N., R. 12 W., at head of Mathews Creek, three miles due northwest of Cecilville at an elevation of 3500 feet. This property was a good producer previous to 1914 but has been idle lately. A shallow orebody was mined and milled in an eight-stamp mill.

Bibl: Cal. State Min. Bur. R. XIV, p. 836.

*Kinkaid Prospect.* Owner, John Kinkaid, Sawyers Bar. One unpatented quartz location on Jackass Gulch, five miles by trail from the mouth of the gulch and seven miles north of Sawyers Bar. This is equipped with a small Ellis Chili mill. Kinkaid also has two unpatented quartz locations four miles by steep trail from Sawyers Bar at the head of Jessops Gulch. So far only surface prospecting has been done on a disseminated deposit at the latter place and there is no equipment. In years past some gold pockets containing pieces worth as much as $50 each have been mined in a small serpentine area at the head of Jessops Gulch.

*Klamath Group.* Owner, A. J. Ball, Rollin P. O. Contains four quartz locations named Mabel, Protection, Arctic and Zero, being relocations of Ada, Flora Blanch, Ohio and Buckeye claims, respectively, of the old Klamath Mine, a former producer, situated on ridge at the head of Eddys Gulch, elevation 4240 to 4800 feet, and 1½ miles southwest of Rollin P. O. by road.

The main vein on this group and that on the adjoining Central and Mountain Laurel mines on the north no doubt are on the same fissure,



although between the Klamath and Central there has been a narrowing of the fissure where no ore has been found for some distance, as shown in the Central workings.

The black slaty schist or 'slate' as it is called locally, is the most important formation in the district, carrying practically all the payable veins. The Klamath vein strikes between north and northeast and dips from 5° to 45° southeast, at an angle to the schistosity of the enclosing schist. In both walls close to the vein, occur bunches and lenses of light colored porphyritic intrusive rock, usually entirely altered in place, and locally called 'cab.' The strongest veins in this district have pronounced post-mineral gouges, as noted in the Central, Ida May, and other workings. There are said to be two or three overlapping strata of quartz separated by horses, in some of the old Klamath workings. The width of vein and of ore varies from two feet to 24 feet, and in places selective mining has been done, leaving bodies of good looking but probably low-grade quartz.

The Ada and Flora Blanch claims were first operated in 1863–65 by the Union Mining Company which had an eight-stamp mill and is said to have produced $59,400. Between 1870 and 1881 the Klamath Mining Company mined and milled 33,680 tons, which yielded $418,549 and specimens worth $25,000. In 1883, $30,000 was produced. These figures were largely substantiated by C. W. Raymond who made numerous assays and measurements of old stopes in 1906.

Later records are less exact, as this mine and the Mountain Laurel were subsequently operated jointly by several companies, and ores from both were milled in the same 20-stamp mill at Rollin. The old mill handled only about 20 tons in 24 hours. The Gold Ball Consolidated Mining Company between 1887–95, the Yreka Mining and Milling Company about 1900–06, and the California Consolidated Mining Company up to 1910, all operated the two groups but worked principally in the Mountain Laurel. Yreka M. & M. Co. mined and milled 23,300 tons which yielded $184,000 from the two groups in five years up to 1906, according to Raymond.

There remains in the Klamath Mine according to A. J. Ball, considerable low grade ore. The stoped width of ore varied from two feet to six feet as a rule, and value per ton ranged from $5 to $12 but must have averaged nearer $12 a ton if production figures are correct. The average tailing loss was estimated at one dollar in free gold and eighty cents per ton on account of not saving concentrate. The mine was worked by a great number of adits, and stopes varied in length from 50 to 400 feet on the strike. In later years a tramway was built from the mine to the mill, but all equipment is at present in a state of decay.

*Lanky Bob Mine.* Owner, Denny Bar Company, Etna. On East Fork of Whites Gulch, five miles by road and trail from Sawyers Bar.

This was formerly a producer, but has been idle for several years. Its output was possibly $50,000. Under lease and option in 1925 to Thomas Salisbury. There is an old mill on the claims.

*Little Bonsa Mine.* Owner, C. W. Gordon, Yreka. Thirty acres in Sec. 9, T. 45 N., R. 7 W., four miles northwest of Yreka, at an elevation of 3600 feet. This is a pocket mine, with one vein striking east

and another northeast. Production to 1920 was about $8,000, which was taken out by the owner, working alone.

*Livingstone and Everton Pocket Mine.* Owner, T. E. Ahlstrom, Ashland, Oregon. In Happy Camp district.

*Lucky Strike Mine* (see *Osgood Mine*).

*Malloy Quartz Mine* (*Oregonian Group*). Owner, Dan Malloy, Sawyers Bar. Includes Snowbird, Gold Bug and other claims on the south side of Tanners Peak, at head of Rattlesnake Gulch at an elevation of 5000 feet and 3½ miles by road and trail from Sawyers Bar.

A vein six inches and upward in width occurs in granite, and has been prospected and mined in a small way, with considerable production of gold, for the past 40 years. Malloy works alone most of the time, and makes an occasional crushing of ore in the 3-stamp mill, which is operated by a gasoline engine. The mine is opened by adits.

Bibl: Cal. State Min. Bur. R. XII, p. 289; XIII, p. 419; XIV, p. 838.

*McClaughry Group.* In Sec. 8, T. 45 N., R. 8 W., in Humbug district.

Bibl: Cal. State Min. Bur. R. XIV, p. 837.

*McKeen Mine* (see *Oro Grande*).

*McKenzie Mine.* Owner, W. H. Herndon, Gottville. It is on Lum Grey Creek, 5½ miles by road and trail from Gottville. There is a 2-stamp mill on the property. It was active in the summer of 1925.

*Mosher & Lowell* are working a quartz claim on Horse Creek one-fourth mile from Barnum Bros. They have been developing the claim for two years and have a 10-stamp Straub mill.

*Wm. Might* has a group of claims on Indian Creek near Classic Hill Mine, where he has been prospecting for several years. He has no equipment except hand tools.

*Monarch Quartz Mine.* Owner, L. W. Godfrey, Sawyers Bar. This comprises four claims on Methodist Creek, seven miles above the mouth.

A quartz vein, stated to be up to 10 feet in width but of pockety character, has been developed by a series of short adit levels, raises and stopes, the longest adits being 200 and 300 feet in length. There is a 2-stamp mill on the property which is operated by water power and the total production of the property is said to have been about $12,000.

*Morrison and Carlock Mine* (formerly *Little Queen*). Owner, Reichman Mercantile Company, Fort Jones. It is in Quartz Valley district, four miles northwest of Greenview, at an elevation of 2800 feet, and contains 60 acres of patented land.

This was the best quartz producer of the district but has been idle since 1907. It is credited with a production of about $500,000. Previous to 1900 the ore was worked in an arrastra but later a 10-stamp mill was built and the mine was developed by a shaft to a vertical depth of 400 feet, with eight levels, the longest drift reported 1200 feet southwesterly. There was also an old adit 1500 feet long.

The mine was under lease and option in 1925 and was being unwatered in the autumn. L. C. Monahan, superintendent. The equipment



includes an old steam hoist, 10-stamp mill, electric power, dwellings and assay office.

Bibl: Cal. State Min. Bur. R. XIII, p. 413; XIV, p. 837.

*Mountain Laurel Quartz Mine* lies at the head of the left fork of Eddys Gulch, five miles by road south of Sawyers Bar at an elevation of 3600 to 4000 feet. It was one of the producing quartz mines of the district for many years, but has been idle since the last work was done by F. A. Gowing in 1922.

The vein, which strikes north to N. 40° E. and dips 5° to 60° SE., occurs in the black, slaty graphitic schists which carry most of the gold ores of this district. It has been prospected and exploited by a series of six adit levels. The principal production in later years was by the Yreka Mining and Milling Company up to 1906, and by the California Consolidated between 1906 and 1910.

The May adit at 3810 feet elevation was run 535 feet southeast, then drifted 130 feet southwest and 280 feet northeast, but was not productive of ore. The Mi adit, 60 feet above and 280 feet east of May adit, cut the ledge 200 feet from the portal and followed it 140 feet northeast and 250 feet southwest. Ore of good grade, from three feet to six feet wide, was stoped on the southwest nearly to the surface. Mj adit, elevation 3870 feet, is 520 feet southeast of the north end of Mountain Laurel claim and 400 feet east of the west side line. It cut the vein 270 feet from the portal, and a small chamber of high grade ore found near here is said to have yielded 60 tons of ore worth $7,000. In all about 2300 tons was stoped from this level. About 590 feet from the portal a winze was sunk 180 feet to Stevens tunnel level, and levels called 90, 100 and 150 levels were run northeast under the Wisconsin Claim. On the 100 level, 8800 tons of ore averaging 5¼ feet in width and $18.40 per ton is reported to have been mined. The ledge generally has a flat dip and the 100 level was only 42 feet vertically below the adit. The Stevens tunnel was a long lower level from which a great deal of work was done. Due to the long time since this mine was discovered, the various companies concerned, the loss of records, and the fact that the mine was worked at times in conjunction with the nearby Klamath, using the same mill, it is impossible to accurately determine its output, but it probably produced over $600,000 from ore averaging $8.50 or better a ton. The California Consolidated Mining Company is said to have produced $90,000 between 1906 and 1910.

The Mountain Laurel unpatented ground has been relocated, in part by A. J. Ball of Rollin, who holds four claims, formerly known as the Liberty, Wisconsin, Illinois and Golden Eagle, and in part by William Wike of Sawyers Bar. Only assessment work has been done the past few years. There is an old 20-stamp mill, fitted for operation by water power, on patented ground at Rollin.

*Mountain Lily Quartz Mine.* Owner, G. A. Conzetti, of Cecilville. Property comprises seven claims, a six-stamp mill and arrastra. The principal vein has been traced 6000 feet and prospected to a depth of 150 feet. Idle.

Bibl: Cal. State Min. Bur. R. XVII, p. 534.

*Uncle Sam Consolidated Quartz Mine.* Owner, Sheffield Estate, address Ed. Sheffield, Greenview. Sixty acres, patented, on divide between headwaters of Counts Gulch and Whites Gulch, elevation 5000 feet, and seven miles by road and trail from Sawyers Bar. This was one of the older quartz mines, located in 1873 and for many years a satisfactory producer, though idle in recent years.

The mine was opened by a series of crosscut adits from 120 feet to 550 feet long, with drifts on the vein for a maximum length of 420 feet. The vein strikes N. 20° E. and dips 45° to 60° SE., and is reported to have averaged 3½ feet in width between 'porphyry' hanging wall and 'slate' footwall. Early reports state the ore yielded $18 to $20 a ton in free gold down to the 500-foot level (364 feet deep), where the percentage of sulphides was three per cent to five per cent. Ore was crushed in an 8-stamp mill, operated by water power only during a short season in spring, due to small supply of water at this elevation.

*Union Mine* (formerly *Central* or *Evening Star*). Owner, Rollin Mining Company. Address Ben Daggett, or Leslie Daggett, Black Bear. Comprises two quartz locations one mile south of Rollin and between Klamath and Mountain Laurel Mines, at an elevation of 3900 feet. Lease and option to purchase held by Albert Ford, 10 Clifton avenue, San Jose, and C. H. Walters, 465 Marshall street, San Jose.

This mine was a producer years ago, having a record of $79,000 production from 7000 tons of ore. The surface of claims is a steep slope facing north near the head of Eddys Gulch, and the claims are separated on the north from the Mountain Laurel and on the south from the Klamath Mine by gullies which probably mark the courses of faults. It seems nearly certain that all three mines are on segments of the same fissure, or closely parallel fissures.

The outcrop of the Central vein, striking nearly north, was worked for a length of 600 feet. Crosscut adits were run later, the principal one cutting the vein 160 feet from the portal on Union Claim. A drift south from here for 250 feet on vein is still accessible for 175 feet. It gave backs of 80 feet on the vein, which has been stoped out nearly to surface except for one block about 90 feet long. The vein here dips 18° to 24° E. and is two feet to six feet or more in width. The hanging wall is black slaty schist, containing considerable graphite, and frequently much twisted and broken. The footwall is a decomposed, light-colored dike rock, common in the mines of the district. On the south side above drift, the hanging wall portion of vein, which is two to three feet wide, and separated from footwall portion by gouge, has been stoped. There remains on footwall an equal or greater width of vein containing quartz and brecciated fragments of slate. The vein has also been underhand stoped for about 70 feet on strike and 40 feet on dip. In the north drift which is 70 feet long, the vein is broken and narrow at the face. The dip of vein on this side suddenly steepens and it was followed down 25 feet or more by a winze, now full of water but said to show 11 inches of good ore.

Southward beyond the stoped ground a drift said to be 1100 feet long was run in search of the northward extension of the Klamath ore shoot, but this was not found. This is in the Union Extension claim. Near the north end line of Union claim a winze 20 feet long shows a vein 1½ feet wide composed of quartz and 'slate' ribbon rock. Near this end also a crosscut was run 500 feet east but failed to develop ore.



It appears from observations of the steep topography, and the underground geologic conditions, that the developed portions of this and nearby veins in the same formation may be sections which have been bent over nearly flat and perhaps broken away from the remaining deeper sections of veins that were originally much steeper in dip. Movement of the mountain mass in a northwesterly direction due to gravity, would account for such a result, and the heavy gouges in the several mines would indicate that such movement is continuing.

At one time, 40 years ago, there was a 4-stamp mill on the property but there is no equipment now. The ore in sight is low grade.

*Vesa Creek Pocket Mine.* Owners, Harry, Joseph and E. Davidson. This is on Vesa Creek, a tributary of the Klamath, 12 miles from Yreka. The owners have produced several thousand dollars from it in recent years.

*Victoria Quartz Prospect.* Owner, L. H. Brown, Dunsmuir. This contains 40 acres in Sec. 6, T. 39 N., R. 3 W., 1½ miles east of Mott. There are said to be thirteen veins on the claims, carrying gold, silver and copper. Several hundred feet of prospecting and development work has been done.

Bibl: Cal. State Min. Bur. R. XVII, p. 535.

*Victory Gold Mines Company.* A. M. Buley, president. Office 1104 Pacific Mutual Building, Los Angeles. John Nefroney, general manager. The company claims 11 unpatented quartz locations in sections 16, 17 and 20, T. 40 N., R. 10 W., and also owns the Advance Mine (which see, *ante*), adjacent to South Fork of Russian Creek three miles by road from Finley Camp and 22 miles from Etna Mills by road. The property extends from South Fork of Russian Creek, elevation 3400 feet to top of ridge between the two forks, nearly 2000 feet higher. Gazelle, the nearest railroad point, is 52 miles east.

Geological conditions are similar on these claims as far as opened, to those noted under Advance and Hardscrabble properties. Several belts of black schist, up to 50 feet wide, striking north to N. 20° E. and dipping steeply to the west, cross the property. Three of these noted by the writer carry quartz stringers and narrow veins running mostly parallel to the strike of the schist, and other such belts are reported on the property, but were not visited on account of lack of time. This series of schist belts has been opened at intervals on the Victory, Hardscrabble and Advance claims for nearly a mile along the strike, showing in place on all three properties with a practically identical strike and dip. The numerous dikes interbedded with the schist are prominent and are usually to be seen in the workings on the hanging wall side of those sections stated to carry the best ore. Some of these dikes carry noticeable amounts of pyrite. The black schist is probably derived from an older series of intrusive rock of basic character, with associated beds of limestone, and due to its structural weakness became the locus for shearing movements and for the deposition of quartz, calcite and gold of the ore after or contemporaneous with the injection of the later dikes, which are of several generations. This older schist series has been considered by

PE-28-348

The property was worked for many years by Peterson, and previously by others. Peterson's figures show he mined a total of 120,250 cubic yards by hydraulicking and ground sluicing, recovering $47,300 or a reported average of 39.3 cents a cubic yard. He also produced $9,000 by drift mining, but there is no record of amount of previous output. Joubert has been operating the property two years and reports having handled 27,673 cubic yards during 175 days piping in the season of 1924–25. Reported cost was 12 cents a yard. Yield was good and operation profitable, although the average per yard was less than that reported by Peterson. Four to six men were employed.

Joubert estimates there are 550,000 cubic yards remaining that can be hydraulicked. The basin drained by Eddys Gulch contains only seven to eight square miles and is surrounded on three sides by high mountains. There is a good dam site available on this property, and the utilization of this would permit a longer season, as the water flow now ends suddenly with the disappearance of snow.

The placers of Eddys Gulch were fed from the erosion of the numerous auriferous quartz veins which lie in the basin, among which are the Klamath-Central-Ball vein system, the Ida May, Boss, and other veins. The gold in the placers is often coarse, rough and still attached to quartz. The wide U-shaped gulch and the angular character of the filling give the impression that it is an old glacial trough, although this is not known to have been definitely proved. The placer mines of Eddys Gulch have a reputed output of $3,000,000.

*Long Tom Placer Group.* Owner, Judin Johnson, Sawyers Bar. Contains 15 acres, patented, in NE¼ Sec. 35, T. 40 N., R. 11 W., and seven unpatented placer locations extending along Whites Gulch for 1½ miles, and 3 to 4 miles east of Sawyers Bar by road and trail. Under lease and option to Eric K. Craig, Piedmont, California.

Many auriferous quartz veins have been worked in the mountains surrounding Whites Gulch and the erosion of such veins has fed the placers in the gulch, which are otherwise similar to the deposits in Eddys Gulch. The character of the wash is loose and angular, it contains a great many rocks and it is reported to average 20 feet to 25 feet deep. The exact acreage is unknown as the bed of the creek has been worked and some of the higher ground has been drifted, but there are estimated to be 15 acres of hydraulic ground and tests by Craig indicated a value of 25 cents a cubic yard. There is not much dump, and large rocks must be stacked.

There are two miles of ditch, 1500 feet of 9″ and 11″ pipe and two giants. Johnson claims a supply of 800 inches of water from Whites Gulch, with a fall of 250 feet and a water season of about six months. The claims have recently been fitted up for hydraulicking, and there are two good houses and other buildings.

*Lowden Placer.* Owner, J. F. Lowden, Hamburg Bar. This is a hydraulic mine two miles west of Hamburg Bar on a high bench on the south side of Klamath River. The owner has worked for many years on a limited scale.

*Lowden Placer.* Owner, Ariel Lowden, Seiad P. O. Comprises 393 acres, patented, in Secs. 11, 12 and 14, T. 46 N., R. 12 W., in Seiad



Valley on both sides of Klamath River, 56 miles from Hornbrook by road.

This is one of the larger holdings along the river. It occupies an old back channel of Klamath River and the delta of Seiad Creek, entering from the north. It has been hydraulicked in years past and results were reported good, but it has lain idle for some time. One hydraulic pit on the north side of river shows quite a heavy red soil overburden and it is said bedrock was not reached on account of water and lack of dump. This property has been mentioned as a dredging possibility but no data are available as to the gold content.

*Lucky Bob Drift Mine.* Owner, Joseph Freshour, Gottville. One 20-acre placer claim on north side of Klamath River near Gottville. Has been worked irregularly as a drift mine for many years and has been a small producer.

It was being operated under lease by Joseph Freshour, Jr., and three partners in October, 1925. There is a shaft 60 feet deep with a steam hoist and pump operated by gasoline engine. Pay gravel is breasted about six feet high and good ground runs $5 a cubic yard with best on bedrock, but ground is spotty at most of the mines of this class along this part of the river. Work is going on in a drift 125 feet long, south of shaft.

*Mann and Ross Drift Mine (Reynolds Creek Mine).* Owners, Ed. Mann and Nelson Ross, Orleans P. O. In Sec. 21, T. 12 N., R. 6 E., H. M., on Klamath River 13 miles north of Orleans. It contains five placer claims of which two were bought from Wm. Lord in 1914 and three located by the owners.

This deposit is a type of which there are many examples between Orleans and Happy Camp. The ground drifted is the first bench, about 20 feet above the Klamath. The bedrock is slate close to the river, but serpentine farther back. The gravel is loose, heavy wash of slate, granodiorite and amphibolite. There is a heavy overburden of slide material. The owners attempted at first to work by hydraulicking, but the canyon sides are steep and serpentine naturally prone to slide, so that the overlying country rock slid into the workings to such an extent that they could make no headway. A little hydraulicking, for one or two months in winter, has been done and drifting paid fairly well. Some platinum has been produced. Water is obtained from Reynolds Creek through a short pipe line.

*Maplesden Mine.* On north side of Klamath River, three miles west of Hamburg Bar. Most of it has been worked out and it is idle.

*Mary Alma Claim.* Owner, Carl T. Frey, Seiad. One hydraulic claim in Sec. 10, T. 46 N., R. 12 W., near Seiad, on Klamath River.

This is a low bar which was worked to water level by Chinese in early days.

*Masonic Bar Claims.* Owner, Walter M. Creed, Seiad P. O. Contain 28 acres patented and 80 acres unpatented in Sec. 4, T. 46 N., R. 12 W., 2½ miles west of Seiad on south side of Klamath River. The patented land is valuable for farming and has not been prospected for mining recently, but is too low for hydraulicking. It was partly worked in early days.

Copy

Sawyers Bar, Calif
April 23, 1957

To whom it may concern:

This is a brief report of the Serpa, and Usher Quartz Mines, located in the head of Eddie's Gulch about 4½ miles from Sawyers Bar, P.O.

Each group of mines contain 3 claims, however, in the case of the Usher mine two claims overlap almost half a claim width for the entire length of the claims.

It is my belief that the Serpa mine consists of 3 full claims.

Before going further I want to make it plain that the writer is not a Mining Engineer, but a person who has spent 20 years mining and milling in this immediate vicinity thereby having had considerable experience with the ores of the different mines of this locale.

Something to bear in mind is that none of these mines have been in production since the war. This is partly due to the fact that the Mill owned by the company which leased the mill to the writer, sold all of their equipment leaving us without any means of milling our ores. There is no other mill in serviceable condition, nor hasn't been since.

The above mentioned quartz

mill was made up of the following, 1 50-ton Marcey Ball-mill, 1 Dorr rake type classifier, 2 Gipsoto impact amalgamators of 25 tons each, 1 home made conditioner, 1 bank of six flotation cells with reagent feeders and bins to hold concentrates as recovered. Jaw-crusher 20X20.

Power was furnished by Diesel-Electric plant except, in Winter when water was plentiful when the Hydro-Electric plant was cut in and quite a bit of milling was done by water-Power each Winter.

We found that with careful operation we could make 90 plus, recovery almost without fail and we made many recoveries above 94%. Ore in this locale run 80% free and 20% bas as an average.

We now have on the ground, one 2, and one 5 stamp mills which could be used as re-reduction to speed up recovery of Ball-Mill by enlarging the out-put.

I hope the above will help anyone who is interested in these mines to get a fairly clear picture their past and present Potentials and actual operations.

Next I will set forth a brief description of each mine as I know them from having worked in them and milled the ore that came out of them.

Sincerely Yours
John W. Usher
Rtd. Quartz Mill Oper.

*Ferrero Geologic*
*760 Oak Street, Ashland, Oregon 97520*
*ph 541-488-2452 FAX 541-488-6473*
*Email: fgeo@97520.net*

**Response to USFS 07/99 Mineral Report and 12/06 Request for Documents and Interrogatories**

**Regarding the Eddy Gulch Gold Mining Claims (Liberty Mining, Inc.)**

**Thomas Ferrero, C.E.G., OR/CA**

**WORKING DRAFT**
**01/07**

Accompanying this text is a document set that responds to the USFS 12/06 request for documents and provides the data on which this text is based.

**Part 1: Rebuttal to *Summary, Conclusions, Recommendations*, USDA Mineral Report, Mineral Examination of the Eddy Gulch Group of Gold Properties, Klamath National Forest, Siskiyou County, California, Gutierrez and DeMaagd, 07/30/99.**

Note: USFS Report text shown below as excerpts in small, plain font. Ferrero rebuttal text shown in this font.

SUMMARY, CONCLUSIONS, RECOMMENDATIONS

The Liberty Mining District has a long history of gold production. Much of it came from the Eddy Gulch area; including the subject claims. Earlier investigators praise the development potential of the surface apex lodes, mine dumps, the multiple vein fissure systems and the high potential for underground down-dip lodes. The well-documented chronology of prospecting, sampling and sporadic mining activities continued for more than 140 years in the area of the claims.

At least since 1975, the veins and mine dumps have been explored by exploration companies who promptly lost interest once drilling and sampling results were analyzed. This long period of non-production is evidence that the veins and mine dump deposits are not feasible to develop. Furthermore, the extensive underground workings in the area attests that underground deposits have been exploited.

The brief characterization of the history of the Eddy Gulch Group in the two paragraphs above is woefully inadequate and misleading in that it trivializes the property. There is a more complete history of the property in the body of the

Report, but it includes some erroneous information, and still fails to tell the story. History is more than a series of facts. The following is the history of the property with some "flesh on the bones."

Incomplete records from the Klamath, Union and Mountain Laurel Mines cite production of about 75,000 ounces of gold from 1863 to 1886, and about 25,000 ounces from 1886 to 1932, from ore averaging 0.382 to 0.890 ounce of gold per ton. There is no doubt that there was substantially greater production than that based on the incompleteness of the records.

Prior to the 1930s, the properties were owned and operated as separate mines, at times in litigation against each other, due to the fact that the continuous vein hosting structure crosses numerous claim boundaries. The broken and adverse property positions prevented systematic exploration. The attached documents eg_0107_11_Klamath Patent Mineral Survey Map [reverse black and white], eg_0107_12_Klamath Patent Vicinity Claim Survey Map and eg_0107_13_Klamath Patent Status Archive Document (Tabs 11, 12 and 13) show that the Klamath Mine was surveyed for patent in 1901, but the issuance of the patent was held up until 1935 due to legal issues regarding claim overlaps. In 1935 when the General Land Office acted on the case, the owners were no longer around to receive the notification, and the case was closed on the basis of "laches." Documents eg_0107_03_Plan_Sampling Results and Mining and eg_0107_06_Eddy Gulch Claims Topo and 1985 Control Survey Point Plot (Tabs 3 and 6) show the location of the Klamath claims (Ada, Flora Blanche and Ohio) that were in the 1901-1935 patent application. They clearly cover the same apex that the Liberty claims hold. Note the where the apex crosses the claim boundaries, and the neighbor claims tight against the claims shown on document eg_0107_12_Klamath Patent Vicinity Claim Survey Map (Tab 12). Therein lies the probable crux of the adverse claims asserted against the patent application. It is a significant fact that the property was headed for patent subject only to the resolution of the adverse claims of operators of adjoining mines. The near-patenting of these claims was never mentioned, much less investigated and analyzed, in the Report.

In the 1930s, the properties were consolidated and explored by geologists who, as the Report states, "praise[d] the development potential of the surface apex lodes, mine dumps, the multiple vein fissure systems and the high potential for underground down-dip lodes." These geologists concluded that the mineral hosting structure is a regional scale fissure with continuity across the entire district, and to great depth, and that there was no evidence suggesting that the pattern of substantial ore bodies at 500 to 1000 foot spacing exposed along the

apex by mining operations would not continue with depth and on strike across the entire property.

The geologic character of the deposit had been established by the existing exposures in the mines along the apex. The ore reserve is composed of the down dip ore bodies distributed throughout the structure, as defined by the discovery consisting of the existing mines. The property has the characteristics typical of Mother Lode deposits, which were mined a mile deep in many cases.

It was clear then to the owners and exploration geologists that development of the property would have to evolve from mining ore bodies exposed along the surface apex ("glorified pocket hunting" according to one geologist, Mr. Elmendorf) to systematic down dip development via long cross-cuts and drifts. This would involve substantial development costs. The ability to raise the substantial capital necessary to develop the property was hampered by the depression, World War II, and the post war continuation of the $35 gold price.

After the gold price was freed in the 1970s, the property became economically viable again. In 1975, New Cinch Mining leased the property from the owner (Patterson) who had consolidated the property back in the 1930s. Their geologist, David Sannes, completed some geologic mapping, surveying and sampling of dumps, geochemical sampling and drilling, in an attempt to test the viability of the dumps and apex reserves, and find the underground vein target(s) closest to surface. They realized that the best way to raise capital to develop the property was to begin initial production on the easiest and cheapest reserves to mine, thereby seeding the process of generating interest and investment. The dumps and apexes, and even the first underground target under the Six O'clock Claim – which is actually an extension of the Mountain Laurel workings kept from production by claim boundary litigation – were not the ultimate development goals. They were to be the "seed" production leading to capitalization of the big target – the unexposed, down dip underground reserves.

New Cinch fell on hard times due to what I understand to be some sort of salting scam in New Mexico. They were delisted from the Vancouver Stock Exchange and went bankrupt. This stopped their era of development at the Eddy Gulch property cold.

The Patterson lease was picked up by Fred Aloisi, et al shortly thereafter. From 1984 to 1986, working for Mega Gold, Inc., who leased the property from Aloisi, et al, I picked up where Sannes left off. I drilled holes along side

of his drill holes to check on his results, in case some of the alleged New Cinch "hanky panky" that occurred in New Mexico was occurring in Eddy Gulch. The drilling data was proven to be accurate. The Klamath dumps had been surveyed and sampled by Sannes, and resampled by us, yielding above cut-off grade for surface mining. Apex sampling along the Klamath cut, documented in the record (see my Summary of Data letter to Gutierrez, 02/12/99, and including the assay results at Tabs 14, 15, and 16 in the current document production) yielded gold values above cut-off grade for surface mining.

Mega Gold dropped the lease shortly after that. They did not drop it because the property was no good. They thought it had huge potential just as I did. Their problems were typical of small Canadian mining companies. They needed a property that would generate investor "exitement" immediately by producing high-grade drill intersections or the like. They had not raised any capital to speak of, and so could not sustain the kind of effort that would be necessary to develop the Eddy Gulch Group.

At about that time, I left Mega and became an independent consultant. Aloisi, et al hired me to continue at Eddy Gulch. We submitted the plans of operations in 1988, etc. We were in the process of developing access to other apex sites and dumps under our approved plan of operations when we were shut down by the USFS for various reasons, with the shutdown extending without justification for years after the Forest Service received clearance that the Aloisi / Liberty mining plan would not harm the spotted owl.

The property has not been idle because it lacks merit, as intimated by the Report. It has been idle for the very clear reasons cited above. It took me about fours years of absorbing the geology of the Eddy Gulch Mines and the broader Liberty District before I really understood the scale of what was there. I doubted the 1930s reports at first, as have the USFS personnel, but I learned through sustained investigation that Jones, Elmendorf, et al had it right.

It is understandable that the Report missed the point, given the purpose of the mineral examination in defending against litigation over the improper shutdown of the approved operation, and given the brief time the mineral examiners spent on the property. However, to characterize it as having a lack of mineral continuity or as being "non-mineral in character," is presumptuous as best. The examiners are coming to conclusions that are advantageous to their employers without adequate preparation, and without any intention of making an unbiased evaluation. They have insufficient interest or time/attention invested to gain the understanding that the scale of exposed

mineralization and reserves on the property are much greater than some outcrop and pocket, but, as described above, is tied in to the historic mines and the down dip extension of the structure.

Only from an understanding of the scale of the Eddy Gulch mineralization can an appreciation be gained of the continuity and the significance of the dump and apex reserves. Those reserves constituted the first phases of our plans of operations, which also included the underground developments as later phases. They formed a logical continuum of development in the real world of financing a mining operation.

Early investigators struggled with perfecting the metallurgical recovery of the Eddy Gulch ores. Even though occasional good test recoveries exist, the record documents the difficulties encountered over a long period of time with finding a consistently acceptable milling process. The fact that easily accessible mine dumps and surface veins remain intact for years within the subject claims vouches for the lack of an optimum treatment plan for the ores.

Forest Service records well illustrate, from June 1989 thru April 1992 and the present, the claimant's continued exploration of his mining claims and the pursuit of a viable milling process. However, the records also demonstrate that the exploration on the claims is not complete. It is quite clear that claimant Aloisi has still not determined a viable mill recovery process for his claim materials as of the date of the mineral examination. He continues to test various milling scenarios, as evidence by recent testing by Don Moore in early 1999. Not having a mill recovery process determined, the claimant cannot know if his proposed mining operation is a viable (profitable) one.

The statement that early investigators "struggled with perfecting the metallurgical recovery of the Eddy Gulch ores" is completely unsupported. The production from the 1860s to 1930s was predominantly milled by gravity separation methods (mostly stamp mills) yielding 85% recovery. In the later years of that period, ball mills replaced stamps and flotation cells were added, increasing recoveries to 90% to 94%.

Metallurgical testing since the 1930s was concentrated on dump material and more recently on apex material. Gold bearing rock in the Liberty District with less than about 0.10 opt gold is composed of fine gold that is largely not recoverable by standard gravity separation methods. At about 0.10 opt and above, the percentage of relatively coarse, gravity separable gold increases as grade increases. Consequently, when running ore in the 0.08 to 0.20 opt range, like the dump and apex material, recovery is lower than that reported from the high grade ore mined from the underground workings during the 1860s through 1930s. Test recoveries were above, although not far above, the margins of economic viability in the early 1990s when the gold price averaged about $380/ounce. The following table shows the relationship of grade, milling method and recovery.

| | *Recovery* | | |
|---|---|---|---|
| Ore Grade (opt) | Gravity | Gravity/Flotation | Gravity/Flotation/Leach |
| Low Grade | 27% | 43% | 70% |
| High Grade | 80% | 90%+ | 95%+? |

The goal of the metallurgical testing by New Cinch, Mega and Aloisi, et al was to figure out how to balance milling rate, recovery and cost in handling low-grade ore to the best advantage. We developed two milling scenarios for the dump and apex ore. One involved high tonnage per hour rate, low cost and lower recovery, using equipment already owned by Aloisi, et al. The other involved lower tonnage per hour rate, higher cost and higher recovery.

The former milling scenario was the triple deck screen/centrifugal concentrator. Preliminary testing indicated sufficient recovery of coarse gold and concentrates to offset the low operating cost per ton. We found that standard gravity milling of the lower grade ore yielded recoveries of about 27%. It was our belief that we could do better with the enhanced gravity of the centrifugal concentrators. Testing was done when I was not present, and it was not well documented, but substantial gold was produced from a test run. It was enough to convince Aloisi, et al to proceed.

Back in 1988 we concluded that we had about "$40 dollar rock" (gross), and that we could excavate with dozers and scrapers and haul the dump and apex material to Rollin or Usher Flat for gravity-flotation-cyanide milling, and pipe the tails to the ET Pit staging area where settling ponds were already in place, for far less than that, constituting "a reasonable expectation of profit". One of Aloisi's partners, Mr. Goodman, made his living quarrying construction materials and blasting for construction projects in the 1980s and '90s, and so he well knew the costs involved in moving rock. The attached spreadsheets show that 2004-6 Liberty pretest /mill testing results confirmed a $6.50 or better profit per ton at $380 gold from the mining activities that were part of the plan of operations approved back in 1989.

The USFS metallurgical testing results supported our contention that their sampling was less than representative. Both apex and dump milling calculated head grades were consistently higher than assay grades. The disparity was most pronounced in the Six O'clock samples which yielded "none detected" results to assays, but from the same samples yielded an average of 0.043 opt with a

high of 0.184 opt mill head grade, and average recovery of 64.5%. Rejecting the two lowest results (as per selective mining) leaves a milling calculated head grade average of 0.070 opt, with recovery of 82.5%. The consistent and in many cases extreme increase in ore grade values as sample size increased from assay (500 grams) size to mill test size (12.5 lbs +/-) is compelling evidence that bulk sampling/mill testing as we proposed would have yielded higher grade and recovery values than are suggested by assays and tests from tiny grab samples.

In the body of the mineral report the authors state,

"Ferrero claims that a recovery of 90% can be achieved from the underground ore on the Six O'clock claim. It is unclear how and on what data Mr. Ferrero bases this recovery estimate."

Data supporting the 90% figure are included in the 1925 California State Mineralogist's Report, Elmendorf in 1932, Usher in 1957, Moore in 1990 and Liberty Consolidated in 1994.

The USFS refused to apply either method as part of the mineral exam. Instead they used a Gold Saver/Knelson Bowl combination, which offers neither the enhanced gravity of the centrifugal concentrators or the sophisticated chemistry of the Moore system. This is why we went along with the USFS plan only with clear statements that we did not believe that the sampling of such small samples, in that way, would be representative.

There is no doubt that gold mineralization is found within the boundaries of the subject lode and placer claims. The current mineral examination sampling program has verified this fact. However, the Liberty mining claims still remain mineralized prospects which warrant further exploration before development and mining can take place. The mere presence of gold mineralization within each claim is not sufficient to define a mining claim as valid under the law. To be valid, a mining claim must contain a discovery of a valuable mineral deposit that is subject to location under the Mining Law. The definition of a "valuable mineral deposit" has been derived from case law decisions over the years and has evolved to be a two-fold test for a mineral discovery; one complimentary of the other. The "Prudent Man Rule", was first described in *Castle v. Womble, 19 LD 455 (1894)*,

> ".....where minerals have been found and the evidence is such a character that a person of ordinary prudence would be justified in the further expenditure of his labor and means, with a reasonable prospect of success, in developing a valuable mine..."

Following this test, a "marketability" test was approved by the Supreme Court in *U.S. v. Coleman, 390 US 602 (1968)*. Essentially, this test pointed out that the profitability of the mining operation must be applied to the prudent man test. In other words, the mine owner must demonstrate, taking into account all costs of development, that a reasonable probability exists for making a profit.

Applying the erroneous USFS historical and metallurgical assumptions rebutted above, and taking a view of the data that reduces both the grade and volume of

ore, one can erroneously conclude that there is not a valid discovery on the Eddy Gulch claims. However, in view of the facts, many of which were completely ignored by the examiners in the Report, there is no doubt that we have a discovery as defined by the law – ***a reasonable prospect of success in developing a valuable mine***.

Our claims are across the apex of the second most productive structure in the entire Klamath Mountains Geologic Province, which geologically is the northern extension of the famed Mother Lode Gold belt. These claims encompass the second and third greatest producing gold mines in that district. The geologic structure that hosts the mineralized veins is a major thrust fault that is shown on every geologic map of the vicinity, including the Sawyer's Bar Quadrangle, Klamath Mountains and State of California geologic maps. Only major structures are of a scale significant enough to show up on a map showing the entire state of California.

The document produced at Tab 10 of the January 2007 production, captioned "Liberty District Geology Elder and Ernst," provides an overview of the immensity of the mineralized structure that apexes on the Liberty claims. Mr. Elder, a USFS Geologist, concluded that the down dip extension of the hosting Soap Creek Ridge Thrust reaches under Mount Shasta!

The claims have historically produced during times when the economics were advantageous to mining, as is the case for all mines. It is common for very successful, long time producing mines to go through periods of inactivity due to changing market and economic conditions. The fact that no mining has taken place since the 1930s is well explained above. The lack of production does not posit lack of validity.

I helped Aloisi et al. restake and survey the claims in 1984, when the gold price was up, and Aloisi et al. have maintained them ever since. The properties remained developable through the late 1970s, 1980s and into the 1990s. The Forest Service's unjustified multi-year prevention of operations, and the resulting litigation, along with the dip in gold prices, discouraged development for a period. Today, however, there is significant interest in developing these claims with the gold price hovering around $630 per ounce. The unreasonable delay forced by the USFS bankrupted the owners in the early 1990's and prevented production during that earlier period of optimal gold prices and production opportunity.

The Report admits, as it had to, that there is gold in the dump and apex material. The Report concludes that the absence of economic ore, and their hypothetical mining costs, led to the Report's conclusion of lack of discovery. The data, fairly analyzed, demonstrate that the claimants can recover economically viable gold quantities from the low-grade dump and apex material, even at the ore grades substantiated by USFS sampling, and definitely at the ore grades and with the additional volumes of ore confirmed by the Contestees' additional sampling of previously exposed deposits.

By his own repeated admissions, the claimant has not passed the "prudent man test" of discovery first laid down in *Castle v. Womble in 1894*. This test, which has been approved by the U.S. Supreme Court in many cases, was applied by the Board in *U.S. v. Arbo*, *70 IBLA* 244 (1983)--a case similar to the present one.

Following exploration drilling in 1986, Ferrero writes that "Data so far is inadequate to project grade or tonnage". In September 28, 1989, the claimant submitted a plan of operations whose objective was to determine if "reserves of gold bearing rock of sufficient quality and quantity" occurred. On March 11, 1991, the claimant proposed exploration drilling on the claims and work to develop a suitable mill process. On April 1,1992, the claimant still continued to explore his mining claims. He noted in a letter to the District Ranger, the continuing "objectives of exploration are to determine whether there are reserves of gold bearing rocks of sufficient quality and quantity to warrant mine development, and if so, proceed with mining". Three years had past since these exploration objectives were first noted in 1989 by the claimant:

On February 12, 1999, Mr. Ferrero wrote mineral examiner John Gutierrez stating that Liberty Mining had not completed exploration of the apex vein on the Six O'Clock lode claim. In the same letter, Ferrero described the Union mine dumps as "potential ore reserves". With regards to such statements, the courts have found that if the deposit requires additional exploration to delineate the ore reserves and determine grade or quality before development may be confidently . started, a discovery has not been made.

Because the claimant's proposed Plans of Operations submitted over many years are replete with statements that he plans to conduct exploration operations with the objective of making a discovery, he has neither a valid claim nor a right to assert that his property interests in the claims have been taken without just compensation. As the Supreme Court has consistently ruled, if a claimant has no discovery, he has no valid rights nor property interests.

The examiners have no credibility employing this kind of argument. In their analysis of the geology and mineralization, they ignore or dismiss the data we supplied about the history of production from the district, and the reasons why production ceased, and the fact that production had begun again in the late 1980's when their agency's actions stopped it. After ignoring my explanations of the data, they suddenly take as gospel every statement that has the word "exploration" in it, believing as they do that any geologist who utters the word "exploration" is admitting the invalidity of a mining claim.

As stated above, I had to go through a long process of learning about the property. I am very conservative about mining properties, always "from

Missouri" when it comes to evaluating one. I used to jokingly refer to the mining geology part of my consulting business as "Mine Killers" because I told virtually every client that their properties did not have reasonable potential. The Eddy Gulch property is one of only three of the numerous gold and other mines that I have evaluated, that I concluded could and should be developed. Because it took me years to evolve a cohesive understanding of and unqualified belief in the property does not undo any actual facts of discovery and reasonable prospect of success. The gold does not grow in the ground as the realizations form in my brain. The gold is either there or not, and I and anyone else have to come to understand the geology, the mineral values and the best approach to mining what is there.

As the facts about grade, recovery, etc. accumulated, I still used terms like "exploration" and "potential" because I was still in the process of proving reserves. I am disciplined not to characterize anything as certain unless it is, to protect my clients, investors and myself. Here the Report tries to use my words characterizing the property in terms related to the standard mine evaluation criteria of inferred, probable and proven reserves, out of context, applying them to the issues of a validity test.

In any mining operation exploration is an ongoing process. The margins of the developed deposit or undeveloped areas of the claims are normally undergoing exploration concurrently with mining. Continuous exploration is an integral part of the ongoing development of operating mines. To be in the process of additional exploration of a property does negate the existence of a valid discovery or productive mine elsewhere on the property.

I will use the terminology of uncertainty until I have proven reserves, because I am a responsible professional. However, the standard of "proof" for a validity test is not proven reserves. It is, again, ***a reasonable prospect of success in developing a valuable mine.*** At the time that I wrote all of the words that the authors pin so much significance on, I believed that the property did have a reasonable prospect of success and reasonable probability of making a profit. The report erroneously construes the meaning of my words. The only purpose of twisting the meaning of my words seems to be to take their favorite short-cut ("they said the word 'exploration' – we've got 'em") to a pre-determined conclusion.

The Forest Service sampling program of the mine dumps included careful examination of the waste rock piles. Through discussions with the claimant and his representative, it is clear that the dumps have never been explored and sampled according to industry standards in sufficient detail

to qualify these materials as reserves (Ore Reserves Working Party, SME, 1991). Furthermore, the claimants have not physically exposed the deposits through trenching or drilling on a closely spaced grid to establish a discovery. A discovery under the mining law requires both physical exposure and the existence of reserves as defined by the Society of Mining Engineers, *supra* and *Vanderbilt Gold, 126 IBLA 72 (1993).* The claimants have satisfied neither requirement.

The dumps were sampled by numerous geologists for numerous clients from the 1970s to the 1990s, including Sannes, Redmond, Patterson, Clayton and others, as well as the USFS. Sampling ranged from grabs to truck loads to deep channels down the full length of the face of the dumps, to the 50-pound grabs by the USFS. The assays very consistently ran in the range of 0.08 to 0.12 opt. The USFS samples averaged 0.13 opt. The extreme fluctuations in recovery numbers from metallurgical testing of dump material have been explained by metallurgists for Aloisi, et al and the USFS as related to the nugget effect and to re-absorption of gold in leach tests. However, as described above in detail, we established 28%+ recovery from gravity methodology and 50%+ from gravity/flotation/leach methodology. It is a mystery to me how the authors can justify their contention that the dumps have not been sampled adequately, despite the wealth of sampling and metallurgical data.

The authors make an issue of the fact that I relied upon Sannes' volume measurements of the dumps. Why this is an issue is beyond me. Sannes' drawings and calculations are part of the data. Based on how they were completed and documented, there was no reason to doubt them. Since that time I have surveyed the dumps in detail and found that Sannes substantially underestimated the volume of the dumps. It appears that the examiners were incapable of making any sound estimate of the volume of the dumps. Or, maybe they were afraid to include the large volumes of above cut-off grade material that they would then have to include in their evaluation.

The much lower Klamath Dump volume reported by the USFS in the mineral report was due to their simply not including major portions of the dumps. It is not surprising that their dump surveys were inaccurate. On the first day of sampling dumps, I pointed out where the Yankee Dump was located just down slope and two or three hundred feet north of where we were standing. The mineral examiners worked their way down to the dump. They were standing directly on the broad flat top of the dump that narrowed to the notch driven into the mountain side at the portal, and opposite, the arcuate, uniform slope of the face of the dump extending down slope. I could see them and hear them milling around down there, assuming that they were setting up to begin sampling when I heard one of them call up to me, "Where's the dump?"

Note on the map (Tab 19 in Contestees' January 2007 production) showing the location of USFS samples that some of their Yankee and Blacksmith "dump samples" missed the target dumps. The maps in the Report are so inaccurate that they prevent accurately plotting the sample locations in relation to the dumps and the existing roads.

The authors, in an attempt to dismiss the dump reserves, stretch credibility. In the body of their report they say…

"By their very nature, mine waste dumps are inherently discontinuous, segregated and commonly layered because of random placement of materials. Since there is a total absence of geological continuity in the waste rock dumps, sampling limitations (near-surface sample sites, limited penetration, limited number of samples, etc.) severely restrict any zone of influence or any predictable value to any other part of the dump. There is no conceivable way to determine the source of any part of Liberty waste dumps. It is entirely possible that material from outside sources could have contributed to the mine waste dumps present today."

The statement that "there is a total absence of geological continuity in the waste rock dumps" is based on what data? They did nothing to establish continuity or non-continuity. And if the statement is referring to all dumps, and is true, then no so-called "industry standard" sampling methodology would mean anything. And how is it that "geologic inference" is not adequate for us to establish validity, as stated in the Report, yet is used by the examiners in the above statement to support their efforts to establish non-validity.

The fact is that numerous samples have been taken from various locations on dumps at various depths, yielding very consistent values. Also, a small amount of investigation and reasoning leads to the fact that the dumps are located directly in front of portals to historic underground workings, including mostly short cross-cuts to the vein and drifts on the vein. Consequently, the majority of the dump material had to have come from within the low-grade gold mineralized fissure zones hosting the quartz veins (the same zone to be mined via the proposed apex pits). This clearly indicates a high degree of continuity in the dump materials; all the sampling, including the Forest Service's, has yielded closely comparable gold content in the dumps.

The final statement in the quotation is ridiculous. Here we have over 100,000 tons of dump material located directly in front of a series of mine portals, at the highest elevation productive area on the property, on steeply sloping ground. Huge, mature trees are growing out of the dumps. It is absurd, bordering on delusional, to suggest that the dumps are from "outside sources." No mining

operation is going to haul waste rock up hill to dump it on a steep slope at one of the highest road locations in the area, especially during or before the 1930s.

One of the justifications for the USFS contention that the dumps may have been imported was a statement that I made regarding a couple of low-grade assays from the dumps. I mentioned that the USFS had sampled road fill instead of dump material at that location. The questioning of the dumps by the USFS is an attempt to make a case out of their own misconceptions. The location in question was on the upper west margin of the dump which spread out well to the east and down slope of this location. At this point, a sliver of road fill along the outer edge of a narrow mine dump access road merged with the edge of the dump where it thinned out onto a spur ridge. There is absolutely no logical justification for applying that occurrence as the basis for the contention that the dumps are composed of imported road fill or any other imported material

The real story here is not that the dumps are suspect, but that the samplers are. They were unable to recognize the difference between road fill and dump material, and they could not recognize a major dump when they were standing on it, as described above. They demonstrated that they were not equipped to conduct this mineral examination

The authors have tried to evaluate the claimant's mining and milling proposal for the Liberty claims by assigning resource estimates based on very limited information. However, the role of the government mineral examiner is merely to verify the existence of an established, physically exposed discovery. The claimant has the ultimate burden of proof that a discovery exists. *Lara v. Secretary of the Interior*, 820 F.2d 1535, 1542 (9th Cir. 1987)

The "limited information" referred to includes a stack of documents several inches thick, which the Justice Department sent to the mineral examiners in a disorganized and incomplete condition only shortly before the mineral examination occurred. When the authors arrived on the property the first day, in response to nearly every map or other item of significant data that we showed them, they said that they did not have it and asked of we would make them copies. Even with our supplementing of their data, they still refused to acknowledge much of it, and provided the excuse that it was too confusing because it was scattered through so many different reports.

To facilitate their understanding, I submitted to the examiners the 16 page document dated 02/12/99, that summarized and organized all of the significant technical data on the property from the various reports. This is what any competent geologic investigator does at the beginning of a mine evaluation

project. There is nearly always a pile of data from numerous sources that has to be laboriously outlined, summarized, organized and evaluated. The authors did not feel compelled to do that, so I did it for them. In spite of my delivery of the summary to the examiners before they prepared the Report, they still ignored most of our data.

By their very designation, the Liberty Mine vein and mine dump resources do not carry very much confidence with regards to geological inference of gold values beyond the surface exposures. The vein contains sufficient enough oxidation near the surface to raise doubts that gold values will continue throughout the vein structure. The inconsistency of gold values along the strike of the vein further adds to this doubt. Finally, the removal of an unknown quantity of the underground vein raises skepticism as to the quantity available for renewed mining. With regards to geological inference applied to the mine waste dumps, not only was the sample confidence compromised by shallow, surface sampling, but the susceptibility of mine dumps to rapid weathering and oxidation, limits the degree of usefulness of the sample values. Most importantly, the lack of geologic continuity within the mine dumps severely restricts the sample influence to each individual sample (SME, 1991).

Because geological inference is so adversely confined as stated above, the Liberty mining claims cannot support a discovery finding. The court has stated that an inferred reserve whose existence is dependent entirely on geologic inference is not affirmation of finding quantity and quality sufficient to support a discovery. *U.S. v. Feezor, 90 I.D. 262 at 278 (1983).*

The first sentence of the above paragraph does not make any sense at all. How do "by their very designation,…vein and mine dump resources…carry very much confidence with regards to geological inference of gold values beyond the surface exposures"? I think they are trying to say that vein and mine dump deposits do not generally have continuity of gold values with depth. The next sentence suggests that oxidation is a limit to down dip gold values in the apex vein deposit.

Maybe there could be some question about the continuity of gold values to depth beyond the oxide zone if there was any data supporting that possibility. However, there is no such data. Generally, the occurrence of productivity limited to surface oxidized zones occurs in heavy sulfide, epithermal type deposits, which are not the type of occurrence at Eddy Gulch. The Eddy Gulch ore bodies are classic mesothermal, Mother Lode type deposits, as characterized by Jones, Elmendorf, Ferrero and others. As cited above, Mother Lode mines are commonly very deep. But even this attempt to dismiss the geology here is misguided. Depth of deposit, and proof of depth, is not the issue with the mining plan the Forest Service had approved. The issue was and is the dump and apex deposits and the up-dip extension of the Mountain Laurel workings under the Six O'clock claim. Oxidation has no bearing on continuity here.

The examiners did not establish inconsistency of gold values. They only sampled the upper half of the vein width at one location where the apex was exposed on the Sunrise claim. Their only other apex samples were taken from the Six O'clock claim. As it turned out, our rebuttal sampling further defined three substantial areas of valuable mineralization along the uniform vein structure that crosses the Sunrise claim, one in the intrusive rocks under the ridge point, where the USFS wrongly claimed there was no vein because it was supposedly cut off by the intrusion.

The Contestees were stopped by the USFS in the process of improving the road up to the Six O'clock claim to allow access for development. They and I knew that the apex of the Reverse Dip vein that was stoped at depth in the Mountain Laurel Mine, and that yielded significant gold from drill intersections by New Cinch and Mega in the 1970s and 1980s, was somewhere near the Six O'clock ridge top. But the stoppage prevented us from digging and drilling to better expose the surface apex and continue the blocking out of underground reserves

Because the surface apex of the Six O'clock Claim was part of the litigated and halted plan of operations, it was included in the mineral exam. I was asked by the examiners to point out locations where the USFS might take samples, and I told them that I did not know exactly where to dig. It was not clearly established at the time, but I suspected and have fairly well confirmed since then that another vein that we call the upper structure (that runs parallel to the Mountain Laurel vein) apexes there, cutting off the top of the productive reverse dip vein, creating a blind lead (see the document at Tab 23, "Six O'clock Proposed Mine XSec"). Consequently, by apex law, the Reverse Dip vein apex is the upper structure apex. Any surface sampling in that location would be on the upper structure, not the Reverse Dip vein.

Although the USFS assays from the upper structure apex showed "none detected," the metallurgical data showed higher calculated heads and very high gold recovery numbers. This disparity was explained by the USFS metallurgist as the nugget effect, in line with our contentions regarding ore character.

I was not particularly concerned by the apex confusion on the Six O'clock claim because the duplicated drill core vein intersections and the historic Mountain Laurel stopes down dip bracketed the projected ore body on two sides. This clearly established discovery for the claim. Standing on the ridge where the USFS samples were taken, to convince me to go ahead and spot some surface sampling points, one of the examiners, Mr. Gutierrez, told me

that he agreed that the drill holes established discovery on the Six O'clock claim, and so poor surface sampling results would not be an issue. However, he apparently changed his mind. In the Report, he completed his "bait and switch" game – employing an unrealistic evaluation of the drilling data while at the same time ignoring the historic mine workings down dip of the drill intersections to add huge tonnages of no-value rock to the costs of the mining operation "studied" in the Report.

This discussion began with the USFS statement about lack of continuity of gold values on the strike of the vein. Having only sampled one location of exposed veining, as part of a mineral exam that targeted only the claims in litigation, other gold bearing apex outcrops across the property were ignored. The USFS did not generate any data to refute the evidence of continuity of gold values across the Eddy Gulch property provided by other gold bearing exposures, production history and the location of visible old workings and the reported historic mines.

Although we do not claim that every foot of apex strike is ore, we do maintain that there is general continuity of gold values across the length of known productive stopes. The apex targets in the approved mining operation were located above the old stopes. Even within those designated targets, we assumed that there would be some segments of below grade material. That is why we included volume reduction factors in our reserve calculations to account for selective mining of apex material.

Although gold has been found within the subject mining claims, the cost of mining the ore, transporting the ore to staging areas and milling, has been shown to exceed any potential profit. Without even considering the enormous outlay of funds necessary for capital purchases, the claimant's operation is not profitable when developed as an integrated operation. Development of the Liberty mining claims individually is likewise unprofitable, using a variety of mining and milling scenarios. Analysis has shown that although mining the Yankee PMC could have shown a net profit above operating costs in 1985, 1990, 1994 and 1998, when capital costs are added, the claims become unprofitable to mine.

The economic calculations supporting the above statements were based on ludicrous assumptions by the USFS examiners. The Stebbins economic report included USFS dump and underground reserves that yielded below mineable grade assays in their "Resource Site" volumes. This is an obvious ruse meant to dilute the viable reserves established by their own sampling. They go on about industry standards regarding dump sampling and economic factors, but then they do not even hesitate to include the mining of waste rock in their "scenarios." No mining operation mines waste rock. Mining of waste rock is

definitely not an industry standard. So why did they include it? The needed it to establish non-viability of the claims.

Further, on the cross-section drawings of the apex included in the Report that were used to generate reserve volumes, the mine floor is drawn from the base of the outcrop horizontally into the slope, despite the fact that the vein dips into the slope. This substantially reduces the volume of mineable material with absolutely no justification. The mineable material this ploy eliminates underlies no additional overburden - it is exposed in the pit. The flat mine floor portrayal especially odd in that an in-sloped pit is environmentally preferable to a horizontal pit. This is because it contains run-off and channels it along the toe of the well-armored rock slope (less erosion), and facilitates directing it through sediment traps before exiting the pit (less sedimentation of slopes and streams). Once again, the only reason for doing this is to artificially reduce ore volume in order to establish non-validity.

The goal of our rebuttal sampling plan was to further demonstrate continuity of the Klamath apex and economically viable recoveries from dump and apex reserves through flotation-cyanide testing and bulk gravity milling. As the attached spreadsheets and discussion ahead show, we did just that.

Liberty Mining had not proposed to mine the Yankee dump as of the time of their plan of operations from 1989 to 1992. Any potential profitability during that time period is irrelevant to the issue of a regulatory taking of property through denial of approval to operate. Furthermore, the gravity/flotation/cyanidation plant recently proposed by the claimant was never included in the proposed plan of operations.

This statement is erroneous. The Yankee Dumps are part of the dumps at the Klamath Mine that we included in our plans of operations from day one. They were designated as a separate reserve for the purposes of this mineral exam because they were just outside of the Sunset claim, and onto the Yankee association placer claim.

Nor was the cyanidation processing plant included as a part of the stipulations guiding the mineral examination and agreed to by the claimant. The first time the Forest Service became aware of a gravity / flotation / cyanidation proposal, was in a letter from Tom Ferrero on February 2, 1999. This was more than 5 months after the mineral examination had been completed. Therefore, the claimant is precluded from establishing a takings based on gold recovery resulting from a flotation/cyanide processing plant.

First, we did not agree to the stipulations guiding the mineral examination, as cited above. We let the examiners do what they wanted to do with our clearly stated reservations (see my *Response to Mineral Property Evaluation Proposal, Aloisi V. U.S., 03/27/98*, dated 04/13/98).

The flotation circuit was included in the 1989, 1991 and 1992 plans of operations. The cyanide leaching of concentrates was to take place off site, and so was not included in the plans the Forest Service approved. However, the 1990 Moore metallurgical report (A-33 and A-37) described the full gravity/flotation/cyanide leach system, and it was included in the documents submitted to the USFS and court before the mineral examination was ordered. The statement that the first time the USFS became aware of the gravity/flotation/cyanide leach system was in my letter of 02/02/99 is completely erroneous, or else is another example of the government offices failing to share material documents with each other. In either event, the mineral examiners are obligated to examine the feasibility of the most reasonable and appropriate method of mining and processing a mineral deposit.

In consideration of all of the facts gathered, through the authors' field examination and the analysis of the costs of developing a mine on the subject mining claims, it is our conclusion that the minerals within the subject mining claims are not capable of being mined, extracted and marketed at a profit; as of the time of the Forest Service mineral examination, the dates of location of the claims, and the dates of the alleged takings, July 23, 1990 through February 8, 1994. Given the foregoing, we recommend that contest proceedings be initiated against the subject claims.

The conclusion here cannot be justified when considered in light of the numerous facts that were ignored or glossed over by the authors. The clear intent to "prove" non-viability, no matter what, bleeds from the pages of the mineral report. After all, the defendant in the litigation that prompted the mineral examination is the USFS. Given the highest integrity and best intentions of the mineral examiner, the pressure to produce a biased document if the facts are not clearly in the defendant's favor is extreme. No one should be put in that position. The process is unfair to the examiner, and even more so to the contestees.

There is no doubt that the motivations behind some so-called gold mining operations by small companies are suspect, and they may be viewed, at least initially, with some healthy skepticism. Many are stock scams, with no validity at all. This has been true since the days of Agricola. This is why today I make my living primarily as an engineering geologist. I recognize that examiners can approach "gold mines" with a negative attitude, especially in an area populated by some very suspect characters, including pot growers and others who may masquerade as miners to provide cover. However, there is no excuse for a government officer letting personal bias or agency pressures color his or her professional regulatory decisions.

However, the Aloisi, et al operation is different than the typical gold mining fiasco. That is why I maintained my association with it after my nearly total split from the gold mining business. From the start, it was a small operation with two directors, one of whom, Mr. Aloisi, spent years searching and exploring mining properties until he settled on the Eddy Gulch Group. His struggle to consolidate and maintain control of the claims despite a continuous onslaught of claim jumpers and others that coveted the valuable Eddy Gulch properties is a story in itself. His partner, Mr. Goodman, the quarry operator from New Jersey, brought financing and the practical knowledge and experience necessary to operate a mine. Though I was not a financial partner, I became a key member of the team as geologist. The three of us worked to get the operation permitted and into production with the intention of creating a clean, efficient operation. I make my primary living as an engineering geologist, which largely involves assuring responsible land development and environmental protection. Our efforts were in the best tradition of responsible American enterprise and exemplified the intent of the mining laws.

But we were stopped, and the directors were driven into bankruptcy. This was done by a government agency with a vendetta against miners, which hid documents and its mistakes, changed its reasons for acting and failing to act, and otherwise stalled and acted to stop this small and clean mining operation. Then, confronted with having to account for this unjustified and unjustifiable killing of this mining operation, the agency has taken the course of preparing and defending a biased and manipulated Report for the purpose of denying the viability of an approved mining operation.

Vendetta against miners? Strong words, yes, but accurate. I worked for the USFS as a technician level geologist in the mid-1970s, at the national forest that was producing the highest volume of timber in America - not a bastion of environmentalism in those days. Yet, the bias against miners was pervasive and intense. That bias is a tradition in the USFS, despite the kind words for miners included in official pamphlets for public information. When the Klamath National Forest had to address the spotted owl in 1990 and 1991, they received clearance from the Fish and Wildlife Service that the projects they had on the Forest could proceed without jeopardizing the owl. Every timber sale cleared by that FWS opinion proceeded. The Liberty Mine, cleared at the same time in the same FWS opinion, did not. It "fell through the cracks," or "mistakes were made," or it "got overlooked." Our litigation is about accountability for mistakes and indefensible behavior. This critique of Mineral Report is also about accountability, evaluating the examiners' failure to engage in anything close to an objective professional analysis of this property.

The negative attitude of USFS personnel regarding the Liberty operations was exposed when one week prior to the mineral exam, Al Buchter, an officer of the Salmon River Ranger District (our so-called "mineral officer" in fact), told two individuals (Tim Carter and Dan Drake) that they should trespass on the Liberty properties and over-stake our claims. He told them that "there is not a valid claim up there." The fact is that I personally surveyed and supervised staking of the claims in accordance with the mining location laws, as confirmed by the USFS mineral examiners' field checks. Mr. Buchter was characterizing our claims as invalid without any knowledge to back it up. I cannot help but conclude that his intentions were malicious.

**Conclusion**

We have been flabbergasted during this whole side road down which we have been taken in this case – at first called a mineral evaluation and later devolved into a mineral exam. We were assured at the start that the exam had no bearing on claim validity. It was represented to us as just a way to determine the value of the deposits in question to facilitate the lawsuit. Then it mysteriously became a mineral exam, and it was clear to us that the government strategy was to attack our claims and attempt to take away our right to sue in the Court of Federal Claims. It was a calculated "bait and switch" perpetrated by the USFS.

Setting aside the obvious legal questions regarding the applicability of the mineral evaluation/validity test, two standards must be satisfied, according to H-3890-1, Handbook for Mineral Examiners (BLM, 3/89). It must be demonstrated that we were "justified in the further expenditure of his [our] labor and means, with a reasonable prospect of success, in developing a valuable mine" (Prudent Man Rule). It also must be demonstrated that "by reason of accessibility, bona fides in development, proximity to market, existence of present demand, and other factors, the deposit is of such value that it can be mined, removed, and disposed of at a profit (Marketability test)."

Existing data clearly demonstrate that the Liberty Mining operation of the Eddy Gulch claims exceeds the standards set forth by the Prudent Man Rule and Marketability Test.

In 1999, Mr. Gutierrez stated that he was only going to consider the data from government sampling and testing, and throughout our battle to get permitted for and completing rebuttal sampling, the USFS continually maintained that all of our data would be "inadmissible", despite the admonition of the

administrative law judge that the contest might have to be dismissed if we were improperly prevented from getting evidence necessary to present our rebuttal case.

The data we have presented to the mineral examiners, before they completed their Report, and since, show that even within the narrowest view of the sampling data, validity has been demonstrated. However, it would be unprofessional to ignore the preponderance of other compelling data. This is especially true because of the very questionable USFS sampling methods. It states in H-3890 that "samples should be representative of the entire mineral deposit…using methods and techniques that are currently recognized as standard practice in the minerals industry." It was my stated opinion before they were taken, and it is now, that the USFS samples were not representative, and do not meet industry standards of practice for ore deposits of this kind.

It also says in H-3890 that "the validity of a mining claim is directly related to the results of the sampling." The "sampling" that must be considered must be all sampling. The view that only government sampling data is applicable to the evaluation is an unacceptable interpretation of USFS obligations in a mineral examination, especially when the agency's own sampling is of questionable value under its own handbook standards. It reeks of bias, and exposes the agency's goal of invalidating the claims, rather than fairly evaluating them, to generate the Report based solely on the agency's inadequate sampling.

It is my unqualified professional opinion that Liberty Mining, armed with the historical and technical data available, supplemented by more recent mapping, drilling, sampling, metallurgical and economic data, have clearly shown ***a reasonable prospect of success and reasonable probability of making a profit***. And based on my personal experience in the matter, I am convinced that the USFS handled the permitting of the Eddy Gulch properties with bias and intent to do harm, and succeeded, costing Aloisi, et al their investment and future profits.

## Part 2: After the Mineral Report, 1999 to 2006

*Liberty Tests of USFS 1998 Sample Splits, Rebuttal Sampling Plan and Permitting*

After receiving the USFS Mineral report, we had our own tests completed on 10 of the sample splits that we had retained. Don Moore ran gravity-flotation-cyanide leach tests on the 10 splits (results presented in Moore's Progress

Report No. 1 dated 01/16/99 and Progress Report No. 2, dated 02/21/99 – both in the record).

In Progress Report No. 1, Moore stated that average calculated head grade of the samples was 0.190 opt Au, ranging from 0.072 to 0.542 opt. Hand gravity concentration recovery was 0.80 to 15.13%, averaging 3.84%, in average 0.66 weight percent cons. Gravity/flotation recovery ranged from 5.31 to 43.21%, averaging 17.92 percent. Gravity/flotation/cyanide leach recovery ranged from 10.39 to 73.97%. The higher head grade samples generally yielded greater flotation recoveries, and initial indications are that cyanide recoveries increase with higher flotation recoveries. This supported my contention that the gold coarsens as the head grade rises above the background 0.10 opt range.

Moore's data from four of the cyanide tested samples indicated higher gold assays for leached tailings than flotation tailings, which should be impossible. It could happen if a coarse grain of gold made it through the sample splitting process to the leach tail assay, missed in each previous step by the assay split – a clear example of the nugget effect Three of them yielded relatively high flotation recoveries, similar to the one sample that yielded 73.97% recovery from combined gravity/flotation/cyanide leach testing. These three anomalous samples were rerun. Measures were taken to control preg robbing. In Progress Report No. 2, Moore reported gravity-flotation recoveries of 9.59 to 43.42%, and gravity-flotation-cyanide leach recoveries of 49.7, 55.6 and 59.3%. This indicated that recoveries could be substantially increased with the gravity-flotation-cyanide leach circuit proposed back in 1990, especially once the circuit chemistry and methodology was fine-tuned.

This set up the conditions for our proposed rebuttal sampling plan. We proposed a series of bulk samples cut along the exposed portions of the Klamath Mine apex west of the Klamath ridge and along a pioneered and reclaimed road along the apex east of the ridge, as well as a group of samples from the Klamath Dumps. We also proposed drilling of the Klamath vein down dip from the apex, under the ridge, and additional drilling of the 6 O-clock underground target. We provided an engineered plan of operations, showing road grading, construction and reclamation, backhoe pits location and reclamation, etc.

The response to our plan by the USFS included real or feigned confusion, unreasonable delay and lame excuses which lasted for four years! Some of the whoppers they came up with included…

1) Since the 1999 Mineral Report concluded that our claims were non-mineral in character, the proposed sampling is "unreasonable." This completely ignored the point that the sampling was supposed to constitute a rebuttal to that report.

2) "Because the environmental impact of our proposed plan was excessive, the proposed sampling is unreasonable." These environmental issues were never defined, despite our written request for details. This despite a clearly stated reclamation plan and agreement to redesign miles of access road as per USFS standards (which actually caused more erosion and sedimentation as I had predicted).

   The road issue was also an exercise in USFS confusion. At our plan of operations informational field meeting with all of the various USFS disciplines attending, one of them (Varga) claimed that USFS rules required our roads to be de-bermed and out-sloped with rolling dips. Another claimed that MSHA safety regulations required in-sloping and berming. As it existed, the road had become armored to the point of nearly zero erosion. Nonetheless, they ended up going with the former, applying major overkill in terms of the frequency of rolling dips, causing nearly the entire road bed to be cut and filled and otherwise scarified, leaving a horribly bumpy road and leading to a significant increase in erosion. Just simply rerouting the drainage in a few isolated locations would have been a much better treatment, with far less environmental impact. I tried to convince them of that, but they would not listen despite the fact that I have been designing drainage and erosion control plans for over 20 years without a failure, in the real world where there is accountability for one's recommendations.

   And how does this environmental concern square with their approval of the 6 O'clock crosscut under a "Categorical Exemption". How are a few backhoe pits excessive and a 300+ foot tunnel and related waste areas not? We believe that they decided that approving the crosscut was a clever way to break us, by allowing us to drive the tunnel at great expense and then delay and refuse to approve our plan to mine the ore. The approval was only for the crosscut through un-mineralized country rock. We decided that the risk of moving ahead with the crosscut without full mining plan approval was too great, and so the crosscut was never driven.

3) In response to our rebuttal sampling plan, we were asked, "What is a backhoe pit?" This after they had dug around 20 of them in 1998. We have to remind the agency that they never refilled (reclaimed) their pits after their 1998 sampling. They remain open still, some of them causing substantial erosion and sedimentation (especially at the Union Dumps). Yet they made a public safety issue out of our rebuttal sampling pits (see item 4 below). Their hypocrisy knows no bounds.

4) "The backhoe pits will be a public safety hazard." This after we clearly stated in our plan that we would fill each pit immediately after removing the sample and moving on to the next. What public? Access to this part of Eddy Gulch is gated by the Forest Service; there is no recreational traffic.

5) "The backhoe pits constitute mining of the deposit." Either this is an admission that we could make a profit even from such a small scale operation, or it is plain silly.

6) "The backhoe pits and east side road may cause landslides." This despite detailed plans and cross-sections provided by a California Certified Engineering Geologist – me.

7) They prevented us from sampling and drilling during the dry season, citing fire danger, then further prevented us from sampling and drilling during the rainy season, citing road bed erosion and sedimentation. This left a very narrow window that lead to additional delays. This despite their admitting to us that drilling and road cut sampling were "notice level" activity, meaning that only a simple notification of intent to do the work was necessary. We had originally submitted our rebuttal sampling plan in the form of a notice, but were formally notified that a plan of operations had to be submitted and approved. At any other location, without the agency goal to prevent us from gathering evidence, this likely would have been notice level work.

Despite all of this, and with the help of a mediator supplied by the Interior Department (mediation which the USFS cut off after the mediator was forced to slog through all of the preceding "obstacles" to approving our operation, and the agency agreed to process the plan of operations), we managed to complete most of our rebuttal sampling after the four year agency delay.

The rebuttal sampling, as proposed, involved taking two separate samples from each pit. One was a bulk channel sample with a volume of 4 to 5 yards, cut across the apex with equal volume per foot of channel, as per standard channel sampling protocol. The other would be a smaller, "pre-test" channel sample scraped from the pit-exposed apex surface, as per channel sampling protocol. This sample was dumped out onto a tarp and grid sampled with shovels into approximately 50 pound bags for shipping to the lab. The USFS took a few shovels from the bulk sample buckets and took parallel pre-test samples.

We stockpiled the bulk samples on the private Rollin mill site for milling at a later date. The pre-test samples were sent to Don Moore in Tucson, where they underwent gravity-flotation-cyanide leach tests as described in Don Moore's report titled *Metallurgical Testing of Liberty Mine Gold Ores*, dated January 2005 (copy supplied to the USFS).

*Rebuttal Sampling Results - Pretests – 2004*

The documents produced to the Forest Service in January 2007, captioned "**eg_0107_03**_Plan_Sampling Results and Mining," "**eg_0107_04**_Cross-Sections_Dumps and Apex Volumes," and "**eg_0107_05**_04-06 Sample Data & Econ Spreadsheets" present the mapping, and results and evaluation of the 2004 Liberty rebuttal sampling of the Klamath apex and dumps. The three documents are self-explanatory; however, I offer the following supplementary comments and explanations.

The sample map (eg_0107_3) was created on a CAD program with data from numerous surveys completed from 1985 to 2005. Documents eg_0107_06, 07 and 08 (Tabs 6, 7 and 8 in the January 2007 document production) show the extent and density of survey control points. The red points shown on 06 and 08 constitute a 1985 cadastral survey I completed with a theodolite and EDM, based on one corner of the Mt. Laurel patent located by bearing trees, and a north star shot for azimuth control. This survey was the control for resetting the numerous Liberty claim corners. The other surveys shown on document 08, scattered across the Klamath Mine, and using some of the 1985 points as control, were compass, clinometer and tape surveys. I worked my way through college working as a survey crew chief for an engineering company, completing numerous cadastral surveys and construction staking projects, and so my surveys are accurate.

Surveys became an issue when the USFS Mineral Report contained maps that did not approximate reality, and rendered all the USFS cross-sections and

volume calculations unreliable. After I informed the mineral examiners that their maps were way off, they continually requested my survey data. Here they are. I have spent many hours in the field and office creating these maps and cross-sections; they are accurate, and infinitely more accurate than the GPS exercise resulting in the maps in the Report.

I bring this up to drive home the point that the mineral examiners have presented their mineral report as though it was a definitive document. In reality it was based on very weak engineering data, whereas our evaluation is based on sound engineering.

Document eg_0107_03 and sheet 2 of document eg_0107_05 (Tab 3 and Tab 5, Sheet 2) show how I grouped the sample testing results into three areas of selective mining along the Klamath apex. I reduced the volume mined in two of these areas by the ratio of below and above cut-off grade samples within that area. On the map, the samples plotted as green rectangles are below cut-off grade, and the ones plotted as green rectangles filled with red are above cutoff grade. The green sample numbers correspond to the sample numbers on the spreadsheets (Tab 5). The red values are the recovered grade (opt)/width of sample.

The black lines on the map are the location of the document eg_0107_04 (Tab 4) cross-sections. The cross-sections were generated from the survey data discussed above. The widths of the veins shown on the apex cross-sections are based on sample widths in that area. The depth of mining chosen is in the general vicinity where the stripping ratio appears to make further mining a break even or loss proposition. This I based on calculations of larger mining areas as indicated by the dashed lines around each of the three mining areas on the map (Tab 3). There may be some line between the solid lines around the chosen hatched areas and dashed extended boundaries at each area, where mining would continue to be profitable. But for this exercise, I am using the hatched areas.

Sheet two of document eg_0107_05 (Tab 5), aside from presenting the breakdown of sample groups and calculation of recovered grades, etc., shows two graphs that illustrate the impact of the nugget effect on the sampling results. In "pockety" or "nuggety" deposits, averages of sample testing results will always fall short of being representative of the whole mass. The only truly representative sampling in deposits like these is mining. This is a fact that every industry-experienced mining geologist that has encountered this type of deposit knows. Document eg_0107_20_ Nugget Effect Sampling Block

Diagram (Tab 20) presents a simplified visual expression of this phenomenon, showing the relative sizes of the different sample splits.

Shortly after we received the pre-test results, I wrote the following preliminary evaluation.

"It seems clear to me that what we have here is a series of tests on small volumes of material in which the background, fairly well-distributed, fine gold is well-represented, but in which the nuggety, coarse, free gold is barely present is at all. This is evidenced by the extremely low gravity and float recoveries, yet pretty good (but below projected) cyanide recoveries. It is further supported by my statistical analysis of the results (graphs on sheet 2 of the spreadsheets)."

"Running the ground material through the enhanced gravity centrifuge system as planned should pick-up the nuggety material. All we really need to bulk run for is the coarse that is too poorly distributed to show up in the small pre-tests."

"The production records on the Klamath indicate better than 0.5 opt average recoveries at widths from 6 to 22 feet. At our average 20 foot width we should be averaging about 0.075 to 0.1 opt recovery, but are getting only 0.55 opt from the apex and 0.49 opt from the dumps (before throwing out lower grade results- selective mining). The missing factor is the coarse gold."

"Moore is gravity testing only 1,000 grams and leach testing only 500 grams of material, which is about 2.5 and 1.25 pounds, or 1/1,000th and 1/2000 of a ton. It would be a miracle if that size test picked up a representative distribution of coarse gold in any samples. The assays are even smaller cuts and so the same applies."

"Based on numerous ore tests in the records, we have maintained all along that the lower 0.10 opt +/- is the average assay of the dump and apex background fine ore. The pre-tests show recoveries of that material ranging from 40 to 60 percent - yielding about 0.05 opt. The remaining portion of the above projected 0.075 to 0.1 opt recovery minimum is composed of poorly distributed coarse, free gold, nearly 100% of which can be recovered - based on production records indicating gravity mill recoveries in the 90s. Of that, the 10% +/- loss is the 0.1+/- opt background. The 90% recovery is the 0.5+/- opt, from 0.55 opt +/- opt ore. Our head grades should be about 1/4 of the

underground head grades, considering the high grade streak mined out and the wider cut we are taking."

"The Quigley and McBroom 20 ton bulk gravity test of dump ore yielded 0.051 opt free, or 27% recovery from head grade 0.287 opt material. Assuming a conservative lower head grade closer to 0.125+/-, we could expect at least an additional 12% recovery, which would drive our percentage up to about 60% overall, yielding about 0.075 average opt recovered. This is about a 50% increase in overall average recovery, inclusive of all tonnages - no selective mining - and so much more volume."

"The pre-tests were essential. They established a higher recovery and greater width, extent and volume of the reserves. They made it so that we do not have to run the bulks through float and cyanide. This will cut the cost of running bulks drastically."

"The bulks will complete our tests - the pre-tests only represent one phase of testing. We just need to be methodical and patient."

"It is turning out that the deposit is proving to be very similar in terms of recoverable grade and tonnage to my original estimates back in the 80s. We had it right then, we just did not set out to prove it to someone else, least of all the enemy. We had 'a reasonable expectation of profit' and were goin' minin'."

*Gravity Milling of Bulk Samples - 2006*

Sheet 03 of Document eg_0107_05 (Tab 5) presents a summary of the sample characteristics and results from gravity milling of selected bulk samples in 2006. The data is generally self-explanatory. Don Moore's report titled *Liberty Mine Gravity Concentration of Dump and Apex Ore Samples* and dated October-November, 2006, provides a detailed description of the mill circuit and methodology of head and tail sampling and analysis. Important numbers include the bottom line $2.43 per ton recovered, the anomalously low heads and tailings grade values compared to the corresponding pre-test results per sample, and the fact that two-thirds of the gold never got past the ball mill. The latter partially explains the former as regards the heads, since the head samples were collected at the outflow of the ball mill, before entering the return screw feed and Knelson Concentrator.

I added the $2.43 recovery from the 2006 gravity milling onto the pre-test results for a number of reasons. The mill that was used was strictly a gravity

mill. It was not capable of collecting the background fine gold that comprised virtually 100% of the pre-test recoveries. The conclusion that the pre-test recoveries were composed only of very fine background gold is based on the very small size of the pre-test samples analyzed, the dropping of gravity testing after the first 3 or 4 samples, and the fact that cyanide leaching does not break down coarse gold. The conclusion that the gold recovered in the gravity mill was very coarse, and so a separate gold fraction from the pre-test gold, is based on the fact that a majority of it never got out of the ball mill.

*Anomalous Calculated Head/Assay Head Values*

The other factor contributing to the low 2006 head assays is related to carbonaceous and oxide chemistry fouling assays under certain conditions. Sheet 04 of the spreadsheets (Tab 5) presents data sets that illustrate what I have identified as a pattern in the anomalous head assay problem. I have heard from assayers for years that carbonaceous and/or oxidized material can play havoc with assays. Fine gold in carbonaceous material is said to "go up the flue" when fire assayed. Don Moore cited oxidation as a problem in one of his Liberty Ore reports.

There seems to be a strong relationship between flotation of carbonaceous material and better fire assays. The post ball mill heads and tails from the 2006 milling yielded much lower assays than the pre-tests on the same material. I believe that the fine, wet grinding and drying of the gold in with the carbonaceous material enhances the assay gold loss problem, but that after the material has passed through a flotation circuit, the problem is greatly reduced.

Sheet 04 (of Tab 5) shows that for the USFS 1999 gravity tests, the average value of the assayed head (AH) was 18% lower than for the calculated head (CH). For the Moore gravity-flotation-cyanide tests on 10 of the USFS 98 samples, the average AH was 33% lower than the CH. For these same 10 samples, the USFS results came out with average AH 13% higher than the CH, and so the net change is even greater. For the recent 2006 bulk milling, the average CH and AH were nearly equal, but the AH was about 70% less than the pre-test CH.

Where the AH and CH are the same or close to the same, the material has not been run through a flotation circuit, and the assays are lower than actual gold content. Where the material has passed through a flotation circuit, the calculated head spikes because the assayed splits have been "scrubbed" and assays reflect more accurate gold values.

I believe that some of our ore grade numbers are skewed negatively by this phenomenon, and so my grade estimates are more than likely lower than probable gravity-flotation-cyanide-milling recoveries.

*Six O'Clock Underground, Union Dumps and Yankee Dumps*

Sheet 6 of the spreadsheets (at Tab 5) presents the data supporting the addition of the Six O'Clock underground and the Union Dumps, despite poor USFS sample testing results in 1998. In the rebuttal to the mineral report above, I discussed how we were stopped in 1990 as we were setting up to drill and open up our Six O'clock underground reserves, and how the Report manipulated this situation by first dismissing our drilling and historical mining data that bracketed the reserves on two sides, and then illogically adding in the cost of underground mining of material that the examiners' surface sample assays identified as well below any cut-off grade. Sheet 6 of document eg_0107_05 (at Tab 5) and the attached documents eg_0107_22_Six O'clock Proposed Underground Mine Map (Tab 22), eg_0107_23_Six O'clock Proposed Underground Mine XSec (Tab 23) and eg_0107_24_Six O'clock - Mt. Laurel UG Map (Tab 24) – clearly show the Six O'Clock reserves to be at least probable, and nearly proven, and that Liberty was "justified in the further expenditure of [its] labor and means, with a reasonable prospect of success, in developing a valuable mine" (Prudent Man Rule), with respect to this resource, and "by reason of accessibility, bona fides in development, proximity to market, existence of present demand, and other factors, the deposit is of such value that it can be mined, removed, and disposed of at a profit" (Marketability test).

The mineral examiners would not sample the Union Dumps where we asked them to, because there was quartz showing on the top of the dump in those locations. They purposely tried to avoid what appeared even to them to be ore material. They reduced the representative quality of the sampling by trying to avoid decent looking material. This was a problem in more than one location. It was our understanding that the mineral examination protocol involves the examiners sampling where the claimants specifically identify so-called "discovery points." But, the mineral examiners were on a mission to prove us invalid. They were not there to complete an unbiased mineral exam. There is even an entry in the field notes provided to us by mineral examiner Jim DeMaagd, saying that Hilton Cass, a regional USFS minerals official, wanted to pick the sample spots, followed by exclamation marks.

Although I have included the Yankee Dump as part of the Klamath Dumps in Scenario B, it is added as an extra reserve in scenario A. The Yankee Dump data is important beyond its value as a single deposit, because it is representative of numerous small dumps, and portions of larger dumps scattered across the Liberty Claims (on the Anna Johnson and Union claims, on the private Mt. Laurel mine parcel, and other un-sampled Klamath Dumps, etc.). We call these "sweetener" deposits, as many have yielded specimens of visible gold and showed substantial gold when sampled and panned. However, none of them have been included in the sampling, but are important for supplementing ore volume and grade control.

Because of the nature of the mineralization on the property, with its pockety and nuggety character, and carbonaceous gangue, no random sampling program will generate values as high as the actual mined values. This is a well known principle in the mining industry. Many of the huge heap leach operations that revitalized the gold mining industry in the '70s and '80s would never have been developed without an understanding of this principle of sampling in non-homogenous material. Also, our rebuttal sampling program was designed ultimately to run about 150 tons of material to more closely approximate mining results. We only were able to run about 20 tons from a poorly distributed set of samples. And the test milling circuits were borderline at best. Small bottle flotation and leach tests, and a patched together, leaky gravity mill like the one Don Moore was able to assemble on short notice for this specific project, cannot approximate the efficiency of a full scale mill with a circuit that has been fine tuned by trial and error and mechanical and chemical adjustments as necessary. We believe that the grade and tonnage numbers resulting from the testing are significantly suppressed by these factors. However, for the sake of this mineral examination exercise, we have calculated our economic model with the numbers as generated, despite their suppression.

I expect that the examiners will criticize this selective mining plan, claiming that it is not realistic or "industry standards" or something like that. This from examiners who refused to evaluate the property without including the underground mining and milling of tens of thousands of tons of what they claimed was below cutoff grade rock. In fact, selective mining by grade control is common industry standard practice. In the past, I was part of the supervisory team at a mine that operated in that way. It works quite well. Between panning and assaying, and close monitoring of milling, any deposit can be selectively mined. The apex material grade varies in definable zones and the dumps are built out in discreet layers that can be visually separated and mined or not mined depending on pan and assay tests. In 1990, Liberty had a fully functional assay lab specifically set up for grade control in the milling operation, as well as for assays in support of grade testing of other exposed deposits, and exploration of other mineralized areas for future consideration.

Another important factor is what I call the "Cadillac" factor. Liberty's mining operation under way, and its milling operation setup just beginning in 1989-1990 was going to be a very modest operation with a small team at work,

including the owners. Equipment would be bought used (including the mill). There would be no extraneous costs for a lot of employees, layers of administration and brand, spankin' new equipment. The operation would be more like a "Ford Fiesta" than a "Cadillac." Models build in "fluff" for these factors, and it is a favorite tactic of mineral examiners to build in a load of what their manuals say are "typical" costs in industry that would only be "typical" in "Cadillac" operations. These high costs are inapplicable to an operation like Liberty's, and tend to overwhelm an appropriate economic analysis by overloading it with unrealistic costs.

Years ago, I was involve in a case where two miners were suction dredging for jewelry grade nuggets on weekends, and were doing quite well selling them for substantially above spot gold price. The mineral report prepared to get them out of a USFS recreation corridor added in employee wages and calculated values at spot gold price, as though they were selling concentrates instead of jewels. To make matters worse, the mineral examiners refused to sample from the 20-foot deep channel where the nuggets were being dredged, citing safety issues, and took their samples from the high gravels along the edge of the river, where there was far less gold. Suppressing values with poor sampling and overstating costs seems to be the current standard policy for USFS mineral exams, especially when there is a motive to generate the so-called "prima facie case" of claim invalidity.

The point here is that the economic models presented in this text and associated documents err on the side of very conservative valuation, and a selective mining operation with a well tuned mill would produce higher values than presented here, more in line with our original estimates of ore grades made back in the late '80s. The profit margin numbers in this economic evaluation and the adaptations of the evaluations by the other three presented here should be considered to be low estimates.

Respectfully,




Klamath Road
Old Mine Waste Haul Roads
Klamath Dump - North 200 ft.
20,594 T (5/8 cut)
2636 sf
Later Dump Access Road
32,950 T (1/1 cut)
Klamath Road
Proposed Klamath Ridge Pit
33,795 T (3/4 cut)
Existing Ridge Cut
40,500 T
1,258 sf
73 ft.
1 to 1
1,502 sf
45,060 T
Klamath Vein
17.3 ft.
100 ft.
Klamath Mine Road and
Existing Ore Stockpile
254 ft. on contour
868 sf
14,367 T
Old Klamath Road Bed
Old Road To Dumps
OB = 418 ft. on contour
Ore = 390 ft. on contour, 3/4 cut
Klamath Dump - South 300 ft,
57,609 T (5/8 cut)
Old Klamath Road
Old Mine Waste Haul Road
New Klamath Road
4916 sf
92,175 T (1/1 cut)
Later Dump Access Road
Klamath Road
Assume Dump Material at 16 cf/T
Assume Apex Material at 13 cf/T
Klamath Ridge
Proposed Klamath Cut Pit
22,500 T (1/1 cut)
Existing Klamath Cut
74 ft.
0.5 to 1
New Klamath Mine Road and
Existing Ore Stockpile
885 sf
22,125 T
335 ft. on contour
647 sf
13,547 T
900 sf
22,500 T
Klamath Vein
21 ft.
Old Klamath Road
50 ft.
325 ft on strike, 1/1 cut
Yankee Dump
5,547 T (5/8 cut)
Old Klamath Road
Adit
3550 sf
Draw Channel
8,875 T (1/1 cut)
80 feet normal to section; in draw so 1/2 xs area)
Dump A
3,894 T (5/8 cut)
Adit
1424 sf
Old Klamath Road
6,230 T (1/1 cut)
70 ft. normal to section
Cross-Sections, Klamath Apex and Dumps, T. Ferrero, 01/07
100 feet
Proposed Dariel Pit
20,382 T (3/5 cut)
Existing Dariel Cut
74 ft.
1 to 1
583 sf
20,629 T
Existing Dariel Ore Stockpile
Landing
32,969 T
960 sf
215 ft. on contour
273 sf
3,668 T
Klamath Vein
23 ft.
50 ft.
460 ft. on strike, 3/5 cut
Dump A
Adit
Old Klamath Road
Klamath Road
Dump C
11,452 T (5/8 cut)
(Assume same volume for Dump D)
2443 sf
Old Dump Road
18,323 T (1/1 cut)
120 feet normal to section
Dump B
2100 T (5/8 cut)
3,360 T (1/1 cut)
1075 sf
Draw Channel
50 feet long normal to section
Document EG_0107_04

PE-31-385

A-148 (continued)

*"Outdoor writing products for outdoor writing people."*

RECYCLABLE

"Rite in the Rain" – A unique All-Weather Writing paper created to shed water and enhance the written image. It is widely used throughout the world for recording critical field data in all kinds of weather.

Available in a variety of standard and custom printed case-bound field books, loose leaf, spiral and stapled notebooks, multi-copy sets and copier paper.

For best results, use a pencil or an all-weather pen.

a product of
J. L. DARLING CORPORATION
Tacoma, WA 98424-1017 USA
(253) 922-5000 • Fax (253) 922-5300
www.RiteintheRain.com

6 32281 35111 5

"Rite in the Rain"®

ALL-WEATHER WRITING PAPER

# FIELD

All-Weather Notebook
No. 351

| |
|---|
| Field Notes + Record |
| |
| 10/03/03 to 11/16/03 |
| |

4 5/8" x 7" - 48 Numbered Pages

T.P.F.

Book # 140

17



Eddy Gulch Sunrise
10/15/03

16

20

Eddy Gulch - Klamath 10/19/03

Control Survey

Start - LS Bluff N9601.11/E7849.58

Shot to MM 78 = N57°25'44"E

Set compass to that -

reset decl. to 16.8°

Use Black white stripe + Ante Flags

Nos 901, 902, .... 9XX

| | | HD | VD | | el |
|---|---|---|---|---|---|
| 904B | 68'/+18° | 64.7 | +21.0 | 310° | 149.7 |
| 904 | | | | | 128.7 |
| 906 LO | 71.2/-7° | 70.7 | -8.7 | 175° | 143.5 |
| 905 RK | 76.1/+18° | 72.4 | +23.5 | 202° | 152.2 |
| 904 BF | 67.1/+5.5° | 66.8 | +6.4 | 188° | 128.7 |
| 903 BF | 43.5/+17° | 41.6 | +12.7 | 188° | 122.3 |
| 902 BP | 87.9/-12° | 86.0 | -18.3 | 97° | 109.6 |
| 901 RK | 77.8/+21° | 72.6 | +27.9 | 162° | 127.9 |
| LS Bluff | | | | | 100 |

21



22

| | SD/VA | HD | VD | AZ | El |
|---|---|---|---|---|---|
| 914 (Baby Fir) | 62.9 / -13° | 61.3 | -14.1 | 347° | 89.7 |
| 913 Rock | 59.7 / -10° | 58.8 | -10.4 | 10° | 103.8 |
| 912 | | | | | 114.2 |
| 912A Portal | 215' / +12° | 210.3 | +44.7 | 230° | 158.9 |
| 912 (Baby Fir) | 62.6 / -19° | 59.2 | -20.4 | 100° | 114.2 |
| 911 (5in fir baby) | 97.8 / -10.5° | 96.2 | -17.8 | 147° | 134.6 |
| 910 (Small Tan Oak) | 85.4 / +5° | 85.1 | +7.4 | 189° | 152.4 |
| 909 (Stob on 24" fir) | 58.8 / +14.5° | 56.9 | +14.7 | 206° | 145.0 |
| 908 (4" fir) | 65.5 / -7° | 65.0 | -8.0 | 175° | 130.3 |
| 907 (Stick) | 50' / -6° | 49.7 | -5.2 | 175° | 138.3 |
| 906 (NO) | | | | | 143.5 |

23



(AS)
86.6/-5.0
-30°, 100'
Uniform (Hummock) slope
E ⟵
145.0
909
→ W
4/0
145
4/0
162.5
SB
35'
+30°
30.3/+17.5
slope
63'
+27°
ERF (ae)
Con 11 Rd
56.1/+28.6
191.1

Not slope
152.4
910
78'
+26
SB
4'/0
Tr
4/0
34'
+25.5
ER
(Con 11 Rd)
→ W
70.1/+34.2
186.6
186.6
30.7/+14.6
172.1
surface (road)
100/+22°
W
134.6
911
201.2
92.7/+37.5
114.2 Road Bed
114.2 slope
97.2
21' + 22°
slope to E
over entire curve in road
912
8'/0
ER 8/0
21'
+17°
slope (Actual)
20/-5.8
→ E
84.7
RB
89.7
RB
90.7
RC
99.1
162.8
NST
15'/0
914
6'
+10°
BC
16'
+36
TC
+3/0 to 910
15/0
E ⟵→ W 59/+1.0
129/+94
97.3
+58.5
(62.7)



x
97.3
3°C
x
97.3
(on 3°)
$\frac{97.3}{x} = \frac{1}{\tan 3°} \cdot 97.3$
$x = \tan 3° \cdot 97.3$


27
26
Up Apex Cut
ERF
Drilled


29
Yankee Jump Rd
N
800
801
802
803
28

*"Outdoor writing products for outdoor writing people"*

RECYCLABLE

"Rite in the Rain" - A unique All-Weather Writing paper created to shed water and enhance the written image. It is widely used throughout the world for recording critical field data in all kinds of weather.

Available in a variety of standard and custom printed case-bound field books, loose leaf, spiral and stapled notebooks, multi-copy sets and copier paper.

"Rite in the Rain" - All-Weather writing papers are also available in a wide selection of rolls and sheets for printing and photocopying.

*a product of*

**J. L. DARLING CORPORATION**
Tacoma, WA 98424-1017 USA
(253) 922-5000 FAX (253) 922-5300
www.riteintherain.com

6 32281 35111 5

Rite in the Rain®
ALL-WEATHER WRITING PAPER

# FIELD

All-Weather Notebook
**No. 351**

Field Notes + Record

9/27-10/12/04

4 5/8" x 7" - 48 Numbered Pages

TPF

Book 145A

Eddy Gulch Rebuttal Sampling

6

Klamath Dump

Baseline / Lateral
Survey




| | | | | | |
|---|---|---|---|---|---|
| 1 | | | | | |
| A | 73′/6° | 72.6 | −7.6 | 124° | |
| B | 101/−7.5° | 100.1 | −13.2 | 114° | |
| 914 | 16/+2° | 16 | +0.6 | 170° | |
| 3 | | | | | |
| 2 | 50/+2 | 100 | +1.8 | 338° | |
| 1 | 100/+2 | 100 | +3.5 | 338° | |

7

110′

1″=40′



9




8

| | | | | |
|---|---|---|---|---|
| 6 | 100/+9.5 | 98.6 | +6.5 | 25° |
| 5 | 100/+2 | 100 | +3.5 | 351° |
| 4 | 20/-10 | 20 | +1.0 | 248° |
| 3 | | | | |

10

Top of Tram ?

10.1 (End of Flow at Jump sample access Rd - see old survey)

| | | | | |
|---|---|---|---|---|
| | 13'/0 | 13 | 0 | 120° |
| 10 | 104'/30° | 90.1 | 52.0 | 105° |
| 9 | 98/-5° | 97.6 | -8.5 | 20° |
| 8 | 59'/-20° | 55.4 | -20.2 | 48° |
| 7 | 23/+9° | 22.7 | +3.6 | 356° |
| 6 | | | | |

11



12

| | | | | |
|---|---|---|---|---|
| NE Cor Sunrise | | | | |
| | 214/-10° | 210.7 | -37.2 | 15° |
| 11 | | | | |
| 14.1 | | | | |
| | 16/-37° | 12.8 | -9.6 | same? |
| 14 | 71'/-18° | 67.5 | -21.9 | 140° |
| 13 (12" Madrone) | | | | |
| | 62/-10° | 61.0 | -10.8 | 150° |
| 12 | | | | |
| | 53/-33° | 44.4 | -28.9 | 88° |
| 10.1 | | | | |

Fir Cedar 11

Cedar Top Tree at Main RC (Next to 24" Fir) Rd cut

| | | | | |
|---|---|---|---|---|
| 11 | | | | |
| | 149'/-32° | 126 | -79.0 | 74° |
| 10.1 | | | | |

13





Samples 01/29/04

K1-1

K1, 1A 1B 1C

Test Pit

(S) Bulk Buckets

25' wide cut

1A + 1B is upper 23'

1C is lower split 2'

1A, B { — no — } soil; Q; C, Q + Rx; Q; CQ

1C { Q

25'

Bulk 4 yds +/-

At 804



K1-2 42' east of 804 & K1 1

K1 2A Upper 21' KL 2B lower 4'

0 — Mostly Q w/ Cab — Rx+ Cav'ts } K1 2A

21' Q 25' carb } K1 2B

} Bulk

Moore's ID

KL 2C Grabs from Bulk Sample

(S) Bulk Buckets

KL-3 09/29/04 Betw 1+2 (KL)

21' each way

Qtz Veb
instead 16'
Open cutbo 5'10
Stope 6' 3
Pillar

} 22'

(5) Bulk Buckets

This is a sheared section
at where a cross-fault



KL-4 (6) Bulk Buckets

All one sample (shovels full from flat loose sample on Tarp).

26' long sample

— 0
Sheared Qtz+Q Vlets
Shells → QV
Cob/Qtz Vlets
26 QV
Black Slate

} KL-4 A,B,C

KL-5

Bulk
5 buckets

Shear 10 Q
QV 12'
Carb
6' QV
2' Slate QV
} 20'

KL-6

Bulk
3 Buckets

0
HW Gouge + Oxides
6'
Qtz reef
13'



Kl-7 (end of Kl Rd at Dorvel Turnaround) - Far end

09/30/04

8' Country Rx w/ Qtz veinlets } Kl 7B
3' Slope + Covered
1' QV
6' Mineralized Rx } Kl 7A + 7C




5 Buckets

KI-8

Just past claim corner in turnaround.

17' Tan Qtz veinlets in slate ?
11' Block carbo flag w/ many Qtz veinlets (veinlets)

28'

Top of stope → Tan } KI 8 C+D } Bulk
Carb } KI 8 A+B } 5 Buckets



KI-9

9' Tan Q } KI 9 E+F } Bulk 24'
Carb 9' QV } KI 9 - C+D } 5 Buckets
Qtz + carb 6' } KI 9 A+B

KI-10

15' HW Rx w QVs } 5 Buckets, Bulk and 10 A+B
9' [illegible] QV carbo slate
Stope

Opened tunnel - 30' in + stops

KI-11

USFS 20.5

1' HW OB
2' QV
Slate w/ Qv lets
1' FW QV

FW3

11 A,B,C / Belt
5 Buckets

Slate at bottom too hard.
Qtz reef in Footwall!?
Couldn't get there.

KI-12

Same as KI-11
22' wide (USFS)

Bulk w 5 but
small ones = 4



KI-13 Indrow keftai
Yankee Ant/ left
in roadcut.

Structure HW & FW there,
but qtz pinched
Lots of veinlets,
one at FW up
to 4"65".
Lots of FeOx
in struct.




13 A,B,C
Blk (5 bucket)

33° Slope above


27
Sample #9
Sample #8
Stopes & Pillars
Turnaround
Road
Portal
Dump
26

KI-14 In drow toward Klamoth Cut

Hit top of stope on drift at bottom, one side

Pillar samplable on one sides

Bulk = 5 buckets




30° slope above



KI-15

21' — cab — Carbon Q veinlets — Hard slate } KI-15 A, B, C + Bulk 5 Buckets

KI-16

2' — Oxidized Carbo Slate
1' — Oxide zone HW
1.5' — QV
Carbo slate w/ Q veinlets
24'
Oxide zone 1' wide FW
Carbo slate
} 16 A, B, C Bulk (5 buckets)

30° slope above

K1-17

1.5' — 0 — QTZ Vein } (Bulk 17B) 17D,E,F 0 to 7'

12' — Cab

1.5' — seam of oxides + Qtz ! } 12.5 to 23

7' — carbo w/ oxides } 17A,B,C (Bulk 17A)

6" — 23 Qtz oxide seam !

6" hard slate

23' wide total

Bulk from same intervals as above

5 buckets each

Note: 17ABC(LM) = K117US
17DEF(LM) = K118US



K1 18

Ridge Point




17' Top
11 Cab
1 vein
7' Top Stope
0' FW QV

Bulk

5 Buckets

30

Survey - Relocated Apex
10/11/04

So 10° dip fits
perfect with
relocation.

▮ = prepared sample point

| | | | | |
|---|---|---|---|---|
| 21.4 | 112/-13° | 109.1 | -25.2 | 137° |
| 21.3 | 93/-5° | 92.6 | -8.1 | 184° |
| 21.2 | 64/-10.5° | 62.9 | -11.7 | 164° |
| 21.1 | 108'/-10° | 106.4 | -18.8 | 175° |
| Su 21 | | | | |

31



KI-19

3/4 yard

Bulk 5 Buckets




Sa KI-19 A,B,C

width of stope is 9'!

Same stope as KI-18

Coming up vein to NW.



KL-20

Belly in Cab




KI-20 ABC

Not sure this is the vein.


37
KL-22
Cob
1' sample
KL-22A, B+C
Bulk
6" Blue Qtz Vein
36
KL-21
Cob
vein Q
Gouge (subs above)

KI-23

cab

QV → 0

Cab w/ Quartz

Hvy Sheared cab - black to green - w/ Drusy qtz veins - broken by movement, lots of manganese oxide,

Sample 0-13'
KI-23A-B+C

– 13

Hard greenish (all) Cab.

Bulk
0-13'

3 bucket
1 block piled
at ⊗

Truck - Flat tire



Piles of Ore Map



40

10/10/4.

Kd24

Klamath Dump
Near Upper Portal - Top of
Big Dump




24 A B+C

Kd25

K1 Dump on frontline Rd
Just below "new road - top
of dump

41

Kd26 (A, B & C Bags)

On dump at USFS prev
sample - in front of
BS Tunnel (mine).




Kd27 (AB+C Bags) (Hauled 26)

On dump as above
other USFS

Same dimensions as 26



Kd 28 ~~Hosted 27~~

End of lower road near
from

Kd 29

Small Portal
one back from end
of lower
dump rd.

Kd 30

At USFS sample
2nd from last out






Kd 31

Same as 30 only
last sample out



44

~~[illegible]~~ Next Page

| | | | | |
|---|---|---|---|---|
| Sa 14 | | | | |
| 704 | 181/+7 | 189 | +2.3 | 95° |
| 704 | 88.2/-14.0 | 85.6 | -21.3 | 46° |
| 703 | | | | |
| Sa #13 | | | | |
| 703 | 26.5/∅ | 26.5 | ∅ | 150° |
| 702 | 100/-8° | 99.0 | -13.9 | 97° |

45



705.3

103' / -36° 83.3 - 60.5 20°

705.2

705.2

38'

~~28'~~ / ~~0~~ 38 ⊘ 350

705.1

17A (1984 Post) 26' / +3 23.0 +13.6 ~~208~~°

705.1 - on Yankee Dump (control)

100' / -16.5 95.9 -28.4 2~~7~~5°

705

Sal 2

44.5' / +3 44.4 +2.3 77°

705

Sal 1

41.5' / +8 41.1 +5.8 160°

705

100' / -9° 98.8 -15.6 10°

704





*"Outdoor writing products for outdoor writing people."*

RECYCLABLE

"Rite in the Rain" - A unique All-Weather Writing paper created to shed water and enhance the written image. It is widely used throughout the world for recording critical field data in all kinds of weather.

Available in a variety of standard and custom printed case-bound field books, loose leaf, spiral and stapled notebooks, multi-copy sets, and copier paper.

For best results, use a pencil or an all-weather pen.

*a product of*

**J. L. DARLING CORPORATION**
Tacoma, WA 98424-1017 USA
(253) 922-5000 • FAX (253) 922-5300
www.RiteintheRain.com

6 32281 35111 5

"Rite in the Rain"®
**ALL-WEATHER WRITING PAPER**

# FIELD

All-Weather Notebook
**No. 351**

Field Notes + Record

10/12/04 to

4 5/8" x 7" - 48 Numbered Pages

TPF
Book 145B
>Eddy Gulch Rebuttal Sampling

2

| | | | | |
|---|---|---|---|---|
| Sa 4 | 86.5/-5 | 86.2 | -7.5 | 85° |
| 706 | | | | |
| Sa 2 | 46/-3 | 459 | -2.4 | 100° |
| 706 | | | | |
| Sa 3 | 32/0 | 32 | 0 | 140° |
| 706 | | | | |
| Sa 1 | 32' +3 | 32.0 | +1.7 | 170° |
| 706 | 100/-5.5° | 995 | -9.6 | 44° |
| 705 | | | | |

3



| | | | | |
|---|---|---|---|---|
| 707.2 | | | | |
| | 23/35° | 18.8 | -13.2 | 358° |
| 707.1 | | | | |
| 707 | 37/-9 | 36.5 | -5.8 | 338° |
| Sa5 | | | | |
| 707 | 32.5/-12 | 31.8 | -6.8 | 100° |
| Sa4 | | | | |
| | 13/+6 | 12.9 | +1.4 | 243° |
| 707 | | | | |
| | 100/-5 | 99.6 | -8.7 | 80° |
| 706 | | | | |





| | | | | |
|---|---|---|---|---|
| 708.4 | | | | |
| 708.2 | 45'/-38° | 35.5 | -27.7 | 20° |
| 708.13 | | | | |
| | 52/21 | 48.5 | -18.6 | 80 |
| 708.2 | | | | |
| | 31.5/-30° | 27.3 | -15.8 | 30° |
| 708.1 | | | | |
| | 69.3/-1.5 | 69.3 | -1.8 | 310° |
| 708 | | | | |
| 9a - No Dump | cut - No Jump in dump | | | |
| | 17'/+14 | 16.5 | +4.1 | 235 |
| 708 | | | | |
| | 100'/-9.5 | 98.6 | -16.5 | 91° |
| 707 | | | | |





9




8

| | | | | |
|---|---|---|---|---|
| 709.3 | | | | |
| 709. | 21/+5 | 20.9 | +1.8 | 143° |
| 709.2 | | | | |
| 709 | 36/+22 | 33.4 | +13.5 | 143° |
| 709.1 | | | | |
| | 75.5/+24 | 69.0 | +30.7 | 143 |
| 709 | | | | |
| | 100/-9 | 98.8 | -15.6 | 54° |
| 708 | | | | |



PE-32-420

Sailib

| | | | | |
|---|---|---|---|---|
| 711 | 48/-3° | 48.0 | -2.5 | 18° |

Base Line out to end of E side red.

| | | | | |
|---|---|---|---|---|
| 715 (21) | 77.7/+1 | 77.7 | +1.4 | 194° |
| 714 | 100/0 | 100 | 0 | 188° |
| 713 | 100/-7° | 99.3 | -12.2 | 153° |
| 712 | 100/-2½ | 99.9 | -4.4 | 90° |
| 711 | 100/+1.5° | 100.0 | +2.6 | 97° |
| 710 | | | | |





14

K1 32 At bottom of ramp w/ D
E side road
(reloc open)
Grey [illegible]
cut + [illegible]
[illegible]

15' wide ramp

0 — cob - green 1'
— av 1"
carbo 3'
— av + cob 2'

carbo + ate 6'

— av 6"
carbo 2'
18 — av 6"
slate/carbo
↓

15

From USDA Mineral Report
July 30, 1999
Appendix C
lettering added

**CROSS SECTION**

**KV-8**

1" = 20'

VEIN THICKNESS: 13'




PLAINTIFF'S
DEPO EXHIBIT
1
ALL-STATE LEGAL SUPPLY CO.

EXHIBIT 1

PLAINTIFF'S EXHIBIT 2
ALL-STATE LEGAL SUPPLY CO.

Fieldnotes re: Sample locations
Sample volumes.

No. 342

6/16/98, Liberty Mine

Jim DeMaagd
Rich Teixeira
Hilton Cass

0615 left SO in Redding

0800 left SO in Yreka

0944 Arr@ Rollins site

Meeting w/Fred Alois and waiting for Tom Ferraro.

Fred said this changed from a property evaluation to a validity exam. They were willing to participate w/ the evaluations but sees no reason for validity.

Suing for a temporary taking, not permanent takings.

They want to be compensated for the ~~[illegible]~~ cash flow they have been prevented from collecting.

Don Moore @ Mountain States built the Flotation mill (Phase III)
712 Marcy Ball Mill

(1)

6/16/98

J. DeMaagd

Phase I & II - 1000 T/d gravity concentrator

Phase III - Use cash flow from I & II to work Nay 5 to Union 8
This material and 1/8 plus from the dumps would be mixed and crushed and run through the mill planned @ Usher Flat.

Bowerman Mill is @ the place up Know Nothing Creek. Fred had stuff stockpiled at Usher and Mtn Laurel that was run through that mill.

D8
950
977
2 scrapers TS24 4x4's

Cedar Rapids 5x15 Tripledeck Screening Plant.

" " Atmaster
Set of Jaws, revolving screen & a set of rolls

(2)

*-Ideas we discuss samples. As these notes were being [illegible] the claims with us showing us areas to sample. Page 12 of the field notes describes what sample volumes will be.

No. 342

6/16/98 T

J. DeMaagd

- 2- Centerfuge (trommels) make 2 revolutions/sec
  runs off of an electric motor
- 60kw generator. for ↑

The Pitmaster runs off of a diesel motor
Approximately 90% of the dump material will pass through the screen.

Giles took 50lb samples last week @ our GPS spots on the Klamath Dump. Shipped them off to Salt Lake City to have them run by centrif. concentration. Alois said this is mimicing his equip. 1/8" minus.

Bought the plant in 1988. It was set up and running @ the ET?

Centrifuge motors — WER INDUSTRIES
Electrostat DC
Model # 327 OF 450011
Serial # 47289-IL
20HP
1750RPM

Ran these centrifuges 36 months

(3)

6/16/98 T

J. DeMaagd

1045 S. Mtg w/ Fred, Tom & us.
Hilton wants to determine sample points.

★★ Fred exposed vein beyond the Kla dump where we were looking for that post by the log deck.

Vein Sample — Hilton says this is on the Daniel. No longer on the involved claims. Fred said it's part of the original plan.

5'25 Talking vein thickness. Varies in thickness. Two qtz veins w/ graphitic schist between. Not totally exposed anywhere (thickness).

Footwall is richer than hanging wall (Fred)
Not true (Tom)

Union -
Union - any reason to sample?
Tom said there's no exposures.

Union Ext - Exposure in Union #9 (Union ext)
Union #8 is below the vein. Caved
Surface between 9 & 8 vein exposed
Banner Claim -
Big Fish Exposure (below Union #7)
road cut w/vein exposure.

(4)

No. 342

6/16/98 T J. DeHaag d

May Tunnel. This is his put property. leases it to Schmittel. Hilton wants to know if this should be used due to the fact it's put. Fred said he was working it in 1990, so he feels it's part of the operation.

DUMPS

2-3 top

Klamath-
Sampled by Hugh Clayton. 2 trenches and 8 grab samples. He got a grade of 0.089.
This is the approved starting point.
Didn't get to the base of the dump. Just sampled the top 2-3'.

Sample the Yankee Flat dump on the west of the Klamath Dump.

UNION
Sample it the same as Klamath w/ sampling above & below the road bisecting it.

(5)

6/16/98 T J. DeHaag

MJ Dump

Stevenson Dump
Hilton says it's out, Fred says no.

For Compressor and East Fork Ass. Placers ~~Fom~~ Fred wants to use Union Dump

1239- Beyond the log deck (west). Fred exposed vein in the road. He wants this sampled

Don Swansen - backhoe service in Callahan.

Partially opened adit along roadcut just before the log deck. Fred called it an exploration tunnel. Doesn't go too far in.

1251- shaft above ~~from~~ the road in the draw. Post on a tree just above it. Fred says it's the centerline of the Dariel Shaft is partially caved. Fred says it connects w/ portal below the road.

(6)

No. 342

6/16/98
T

J. DeMaagd

Hilton says it's SW Corner Sunrise

1308 In the Klamath dump Fred found a chunk of rock [illegible] he thinks has native copper. NO

Hilton would like to take an excavator & scrape a channel and also dig down to the base of the vein.




Claimants prefer Fire assay instead of AA

(7)

6/16/98
T

J. DeMaagd

Fred said Egan & Redmond costed out mining and milling

5 channels at this point.

Back @ Yankee Ass Placer we will pick & shovel 3 TO 4 x 1 bucket (5 gal) samples.

1349- West of the LS Bluff. Cut a channel in road cut

1354 At the west end of the Klamath Dump Above Blacksmith Tunnel

Discussion for the Sunset Placer

5 trenches per level. 3 levels makes 15 trenches. 5 gallon bucket per other or half scoop.

Sections of the dump not reachable w/equipment will be done by hand.

(8)

No. 342

6/16/98 T

J. DeMaagd

This dump material

per Tom centerfuges make 20 lbs of conc's.

The 1000 T/day is 500T Apex & 500T dump.

1432 Blacksmith Tunnel. Location where a tram to Rollins was located. Mined in 1880's. This is on the intermediate road on west end.

Hilton and I went just below the Blacksmith Tree had fallen over and exposed the material. Sluffed (dump) material is 2' max.

1529. @ road cut east of Union #7 on Banner




(5)

6/16/98 T

J. DeMaagd

3 channels @ 10' apart
Called the Big Fish outcrop although it's on the Banner

If Fred exposes the entire vein we may only do 2 channels.

1518- Union #9 portal. On Union Extension

cut a channel in side and maybe one outside the portal.

1603 Union #8. On Union Extention. Tom doesn't recall seeing the vein @ the cross cut. This is the Union Extention Discovery. Vein is subsurface. Best sampling starts @ 170' from the "T".

Approved PO 10/25/89
Mtn Laurel and ~~Apex~~ Klamath?
Union Extention was not part of it.
Dumps were approved everywhere
KLAMATH, MTN LAUREL, UNION

Approved to do the dump here before it was suspended.

No. 342

6/16/98 T

J. DeMaagd

lawsuit price is based on Phase II and the dumps. Apex and dumps.

1636- Little Fish Tunnel. small adit goes about 10' in. Near Union #7. Fred is going to open this up. On intermediate layer.

1640 Union #7. Also called NorCal Tunnel. On the upper vein layer

West Center end of Banner. Post above Little Fish Tunnel.

This makes the Little Fish Tunnel the Discovery for the Big Fish.

They have no interest in sampling the upper vein or Union #7.

1712- Back @ Union #8 Compressor to North East Fork to the south. Dump @ Union #8

1717 Road intersection coming down from #7 8 & #9 is a corner. Marked Union & Union EXT

(11)

No 342

6/16/98 T

J. DeMaagd

1721 Below the Union #8 dump. Post saying Big Fish

1745 @ Rollins

☆ There's 2 x 1 gallon pails w/ material from the Klamath dump. Ore & black fine material.

1800- Left Rolling

1930- Arr in Yreka @ SO

2100 Arr in Redding @ SO

(12)

Rite in the Rain ALL-WEATHER WRITING PAPER J.L. DARLING CORP. TACOMA, WA 98421

No. 352

Jim DeMaung

Liberty Sampling

7/27/98

0830 - @ SD in Redding. Going to Meet up with Hilton Cass, Mike Dunn and John Gutierrez (lead examiner for the project).

0958 - Arr @ Rollins

USFS

ME, HILTON CASS, MIKE DUNN, JOHN GUTIERREZ

1016 - @ the concentrators. Fred said he will not pay to get it running. He said we can take it and do what we want.

Fred says there is a 200 factor with the concentrators. I am not sure what he's talking about.

Fred said recovery was around 95% @ Double Eagle Pit.

He doesn't want to use straight gravity sep w/o classification.

(1)

Rite in the Rain ALL-WEATHER WRITING PAPER J.L. DARLING CORP. TACOMA, WA 98421

No. 352

7/27/98
M

Were going to sell cons to Asarco Don Moore?

ON THE CONCENTRATOR:

TRI-R ENGINEERING
310S INDUSTRIAL DRIVE
YUBA CITY, CA 95991
(916) 671-0822

ON THE TRIPLE DECK

R&R
BACKHOE SERVICE
Gen. Eng. Cont. Lic. #479074
CALLAHAN, CA
467-3569

Back to the concentrators. Fred said it would take his crew one month to set it up. John said to him it's his responsibility to get that running. Fred disagrees. Fred said his placer material runs $60.00/yard. His dump.

(2)

This is where we all finally agreed on using a gold saver w/a Nelson Bowl.

No. 352

7/27/98

Fred uses Dawson Metallurgical out of Idaho

1050 Tom Ferraro and David Giles show up.

Tom said they took some bulk samples which they have not received results from the 6:O'clock.

David said results from the most recent Apex samples will be in Tuesday.

1120 Tom agreed to the Goldsaver w/a Knudson Bowl: Fred just showed up and said he wants to use centrifugal force. He said a Nelson concentrator would work, too.

Fred will not pay for the concentrator to get up to working order.

Processing

(3)

No. 352

7/27/98

1158 @ the western end of the Sunrise.

Tom said the porphyry in the hanging wall may carry gold

Samples -

Apex - Send it in. Crush to 1/4" minus and then split it.

Dump - Screen greater than 1/8". Split 1/8" minus.

Weigh coarse and crush to 1/4" minus. Split this, too.

Run 1/8" minus through Knelson Bowl.

(4)