IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ALFRED ALOISI, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 95-650L |
| | ) | |
| UNITED STATES OF AMERICA, | ) | Hon. Lawrence S. Margolis |
| | ) | |
| Defendant. | ) | |
| | ) | |

**Second Affidavit of Thomas P. Ferrero**

1. I am the same Thomas P. Ferrero who prepared and executed an affidavit for use in the captioned case on January 29, 2008. I am aware that my January 29, 2008 affidavit was lodged as Plaintiffs' Exhibit ("PE-") 2, Dkt. No. 118-3 (45 pages), on February 6, 2008 in this case. For purposes of this second affidavit, I incorporate by reference and acknowledge the content of my January 29 Affidavit. Specifically, the recitals of my background and professional licenses in paragraph 1 of my January 29 Affidavit remains true and accurate.

2. I have examined the Declaration of James W. DeMaagd, dated March 5, 2008 and lodged as Exhibit 7 to Defendant's Opposition to Plaintiffs' Motion for Summary Judgment in the captioned case, filed March 5, 2008. I have found in the DeMaagd Declaration numerous inaccuracies, misreadings of the record, erroneous assumptions and misrepresentations pertaining to so many portions of the record in this case that they cannot go unanswered. This Second Affidavit addresses those issues.

3. In paragraphs 17 and 18 of his Declaration, Mr. Demaagd's remarks show he did not take the time to really understand the table of production history from the mines on Liberty Mining's property from my 1985 report. Joint Appendix ("JA")-6. He cites what he believes are contradictory and "double-counted" production numbers in the table, specifically

the pre-1887 $161,920 figure and 1863-1886 $600,000 figure regarding production from the Mt. Laurel Mine. However, the $161,920 from the Mt. Laurel Mine, as well as the $79,000 and $30,000 from the Union Mine were not included in the all-mines production total at the bottom of the chart because these three numbers are included in the larger subtotal numbers ($600,000 for the Mt. Laurel Mine and $300,000 for the Union Mine) directly under them. The all-mine total of $1,681,549 does not include those three numbers, and so there is no contradiction. Simple addition shows this to be true. I generated the average recovered grade of 0.565 oz/ton using only the five reported production numbers that included both dollar and tonnage values. The numbers for production from the Union and Klamath Mines that he claims are improperly double-counted are from completely different operators at completely different times. There is no overlap. This is clear from the production years listed – one figure is production from a period in the 19th century and the other from a period in the 20th. The JA-6 report is a summary of 36 pages of notes I made compiling all geologic, grade, recovery and production data compiled from numerous government and private sources. It was a best effort from available data completed in 1984 before I had any connection with the plaintiffs and claim-holders of the property at all.

4. In his paragraph 19, Mr. DeMaagd cites what he believes are errors in the base production data presented in the JA-6 production chart. He concludes that I relied on the 1932 Elmendorf report (PE-4) for this production data. He further states that the Elmendorf report did not correctly cite the California State Mineralogist's Report data, and so I repeated those errors. This is completely wrong. The Klamath Mine $59,000 (actually reported as $59,400), $418,549 (I did not include the cited "$25,000 in specimens") and $30,000, the Union Mine $79,000, and the Mt. Laurel $600,000 production numbers are all taken directly from the 1925 California State Mineralogist's Report (PE-28).

5. Neither informally nor in deposition has Mr. DeMaagd or any representative of the government ever asked me about the table or my sources, yet Mr. DeMaagd feels free to make the erroneous assumption about my work that I relied upon Elmendorf's report in this regard. DeMaagd's assertion that Elmendorf's data are "not correctly" cited is wrong. The quote from the 1925 California State Mineralogist's Report in Elmendorf's report is verbatim, except for two numbers: an elevation of 3510 instead of 3810; and an *understated* production tonnage of 8300 instead of 8800. My production table cites the correct 8800 ton figure *from the California State Mineralogist's Report* (PE- 28), so I obviously did not rely on the Elmendorf report. None of DeMaagd's attacks on my production history table are accurate

6. In paragraph 20 of his Declaration, Mr. DeMaagd shows that his "personal knowledge of the Six O'clock claim" is lacking. The Mt. Laurel workings were stoped up under the Six O'clock claim, and that stoping was stopped in mid-production by a lawsuit filed in about 1935 by the Six O'clock's owner, Wike. Wike's daughter, Ruth Markon (from whom Aloisi leased the Anna Johnson group of claims), told us that her father discovered the trespass when he started feeling blast vibrations coming up to the ground surface of his claim. The down-dip extension of the Six O'clock ore body merges with the Mountain Laurel workings, on the Reverse Dip Vein, which yielded much of the ore from the Mt. Laurel Mine (see JA-187, which maps the stopes reaching across the claim line in under the Six O-clock claim). The average assays from the latest workings in 1932, reported in the Elmendorf report (PE-4), along with vein widths, sample descriptions and assay lab reports, were much higher than the average 0.565 oz/ton recovered gold value I applied from the production records. This is yet another detail in my valuation where I chose the more conservative number. The Six O'clock ore body is defined down-dip by the mapped productive workings and the high assays reported by Elmendorf, and at the top by one high-

grade and other substantial drill intersections (the drilling reports were supplied to the Forest Service in 1998). There is more than enough data to project probable ore reserves under the Six O'clock claim. All of this information is in my 1985 report (JA-6) and again in my 2007 data (JA-189 through JA-193).

7. In paragraph 21 of his Declaration, Mr. DeMaagd criticizes my use of a 90% gold recovery factor in the JA-189 through JA-193 calculations. I applied the 90% recovery data only to underground ore (JA-191, at 1569 (Sheet 1)). The California State Mineralogist's Report of 1925 (PE-15) recites that the Klamath Mine stamp mill production averaged $12/ton with loss of $1.00 free and $0.80 in cons not saved, which adds up to 85% recovery. Saving cons, which Liberty most definitely would have done, increases recovery to 91.7%. Usher, 1957 (PE-29) who milled ore from the Serpa and Usher Mines during the 1930s, which produced ore typical of the ore throughout Eddy Gulch from a close parallel structure adjacent to the Union Mine, cites 90% recovery without fail, up to 94%, with gravity flotation. C. Jones in 1932 (PE-3) cites only 1.5 to 2% of the gold as not free. A metallurgical test was completed on a composite sample from the underground workings by McLelland Labs for Liberty Consolidated Mines, Inc. in the 1990s (JA-176). The testing showed 93.4% recovery from a gravity-flotation circuit, as per the mill that the Forest Service approved for the LCM operation (JA-176). The 90% recovery number for underground ore is well supported by data.

8. If the miners of the 1800s and early 1900s could get 90% + recovery from stamp mills, and later operations and tests yielded 93 to 94% with gravity flotation (see the Usher and LCM data above), Liberty could get 90% recovery from the centrifugal concentrators on site then (this includes using the crusher Liberty also had on site. The use of this equipment is accounted for in the full mill operating costs included in the cost spreadsheet (JA-191, at 1577, Sheet 9). My evaluation applies the 90% gold recovery to high-grade, underground

ore, not to the low-grade dump or apex ore. With underground ore there are no oxidation problems, and the background fine gold that is difficult to recover makes up a small fraction of the values. This is the same ore character that made it so easy for the pre-World War II miners. There is ample data to support 90% recovery from underground ore crushed and run through the centrifuges. Note that we planned to save the tails and re-run them (mixed with other primary ore as grade control) through the later flotation mill to get the last 3 to 4%.

9. Enhanced gravity separation systems using centrifugal concentrators have been demonstrated to be very effective systems for gold recovery. This is not some untested method. It was reported to me by the on-site operators at the E T Placer Pit that when the centrifuge tests were run on Eddy Gulch ore (which I understood to be dump and apex material) they continuously panned the tails and found them completely stripped of free gold. The centrifuges were working quite well. Liberty recorded the testing operation on video tape showing the gold produced, which was produced to the government as plaintiffs' A-73.

10. In paragraph 25 of his declaration DeMaagd cites the poor Knelson Bowl recovery as the basis for his rejection of my 90% recovery rate from underground ore. In 2007 I supplied to the government a complete metallurgical evaluation of the ore that includes an analysis of why the Knelson Bowl is a completely ineffective system for recovery of Eddy Gulch ore (PE-18). This has to do with the sliming of finely ground carbonaceous material. I saw it in action when we completed our gravity mill test at Don Moore's facility, in 2006. Despite a substantial amount of coarse free gold trapped in the ball mill in the circuit assembled by Mr. Moore for that test, the Knelson Bowl in his circuit yielded very little gold. The total recovery was a fraction of what could be realistically expected given the pre-test assay and metallurgical test results on the same samples, and from other previous gravity testing (JA-191). The Knelson Bowl just does not work with this

ore. The ore must be coarse ground, gravity milled, then pulverized finer for flotation milling.

11. Mr. DeMaagd, in his paragraphs 25 and 26, mixes underground apples and surface deposit oranges. He cites Giles' (Plaintiffs' A-134 filed as Defendant's Opposition Ex. 8) and the Forest Service's Knelson Bowl tests completed in 1998 (FS-190). These tests were run on low-grade dump and apex ore, which would never yield 90% to gravity separation. I used far lower recovery numbers for these surface ores in the calculations in JA-191. The 90% recovery only applies to underground ore. The only thing "skewed" here is DeMaagd's complete misinterpretation of my data and analysis.

12. In his paragraph 27, DeMaagd says "Ferrero's analysis ignores some key evidence…Sannes…in 1975 and 1976 took thirty-four channel samples from the Mountain Laurel underground workings and drilled above these workings to intersect the vein, but could confirm a grade of only 0.072 oz. gold per ton of ore…underground and 0.357 opt gold from 'a very promising intersection' in the one drill hole that was discounted because it could not be duplicated." First of all, every sample from Sannes report was included in my analysis. However, because he only got an average grade of 0.072 from old workings is immaterial. Miners generally do not leave high-grade ore behind as examples of their production for future samplers. Liberty has never planned to mine the pillars and other bypassed workings in the Mt. Laurel or any of the other mines. Sannes' drilling program employed the use of A-size core drilling equipment (core about 1 inch in diameter), which got very poor core recovery in the geologic conditions of Eddy Gulch, which are not conducive to good core recovery with A-core. The fact that he got any values was a miracle. Note that DeMaagd's quotation regarding the drill hole ends after "very promising intersection." This is because the following phrase, "in the one drill hole that was discounted" are DeMaagd's words, not Sannes' or mine. Getting a high-grade intersection

containing visible gold, which is what Sannes described of that promising intersection, and then following up with a reverse circulation hole adjacent to the that first hole (Liberty 1986), and getting some gold, but at a lower concentration, does not discount the first intersection.

13. In my metallurgical analysis (PE-18), as well as in Don Moore's reports for Liberty and in the government's own mineral report (FS-190, although Defendant's Opposition Ex. 9 omits these pages of FS-190), the nuggety character of Eddy Gulch ore is well documented. In nuggety deposits, samples taken side by side, especially small ones like ½ gallon channels or A-core intersection, routinely yield highly variable assays. DeMaagd is trying to make something here out of nothing. Drilling data must be interpreted based on the spacing of the intersections, the core recoveries, the nature of the ore, etc. A few random drill holes do not confirm or deny the existence of ore bodies, but scattered "promising" intersections are excellent indicators of ore reserves. Sannes did not have close enough hole spacing to make an interpretation of exact grade and tonnage. But as the old geologists' axiom goes, "You drill for structure, you drift for values." Sannes recommended to his company that it would be prudent to drive a tunnel in from the north to intersect the reverse dip vein area that is the same target as our Six O'clock ore body (A-134, now Def. Opp. Ex. 8). DeMaagd says nothing about that recommendation. The same evidence that led Sannes to that conclusion persuaded me – excellent drill results considering poor drilling conditions, a productive mine stoped up from below, that was stopped by legal action from the owner of the very claim we are evaluating, and stopped thereafter by World War II, with records of high-grade assays from those workings, and with classic structural geologic elements associated with productive ore bodies through the district. Those geologic elements include a large overhanging block of cherty rock, a crossing fault, and the presence of gold. The 0.628 oz/ton that DeMaagd denounces is the average assay of ore that would yield the 0.565 recovery calculated from the production history (JA-6), at the 90% recovery rate.

Once again, this number is lower than the assays from the workings down dip (PE-4). What is more compelling data, a few samples from old dead workings and two A-core drill intersections, or records of the production from thousands of tons of ore? No evidence was ignored here. All was considered. Mr. DeMaagd cherry-picks data that fits his cause, and his "analysis" ignores the rest of the body of evidence that must be considered.

14. In DeMaagd's paragraph 28 he cites Liberty's 1986 drilling program, quoting my statement at that time "Data so far is inadequate to project grade or tonnage." The two Liberty 1986 vein intersections in the Reverse Dip Vein under the Six O'clock Claim cited by DeMaagd in his paragraph 28 yielded assays of 0.27 and 0.42 opt. As I stated above, scattered drill holes alone do not allow for accurate projection of grade and tonnage. However, these intersections, just under $^1/_3$ and ½ of and ounce of gold per ton, are excellent indicators of ore reserves. At the time I wrote the words quoted above, in 1986, I was still in the beginning phases of my evaluating the Eddy Gulch Mines. The first plans of operations were in 1988 and 1989. I had not completed my work and so was not ready "to project grade or tonnage." That quote has absolutely no bearing on what I believed in 1989, 2007 or today, because at all of those later dates I had more data and had taken the time to evaluate and interpret it, leading to a deeper understanding of the property. Obviously DeMaagd has not. It is comical the way DeMaagd and his partner in the mineral exam, Gutierrez, have continually, throughout the documents that they have prepared and that have been entered into the record of this case, especially their mineral report (FS-190), on the one hand rejected nearly everything I have written or said, but then on the other hand, seized on specific words of mine, out of context, and presented them as rock solid facts, as in the above example. This is just "cherry picking," not analysis of the facts.

15. In his paragraph 29, DeMaagd misuses Hugh Clayton's results. JA-12 and JA-13. Clayton was referring to dump and apex material, not underground ore. He did not apply

a cut-off grade for selective mining, reducing volumes accordingly, which I have in the JA-188 through JA-193 evaluation. Note that none of the "other researchers" had the volume of data that I have to work with, including much greater survey and volume data (PE-31, volume cross-sections, and A-148, produced to Defendant, the dozens of pages of field notes from which the volume cross-sections are derived. None of the other researchers, all of whose work I have studied, had the in-depth analyses of assay and recovery data, based on testing before they worked on the property and after, that I have had (see JA-189 through 193, and the stack of reports Liberty had produced as A-118 through A-138, which includes JA-14, JA-50, JA-52, JA-183, JA-63 and JA-68). DeMaagd and his boss on the mineral examination, Gutierrez, averaged misplaced surface samples with uninterpreted and therefore useless drilling data to generate a very low "average grade" of Six O'clock ore for their purpose of creating an unprofitable block of "ore" on the Six O'clock claim. As I described in my rebuttal to the mineral exam (A-84, now PE-30, p. 14-17), their report applied their 0.03 opt average assay value to the high-cost mining of underground reserves, yielding a huge loss sufficient to nullify any profit from mining any other deposit in the Eddy Gulch group of mines. This gave them the negative economics they needed, in their mind, to "conclude" that every claim Liberty proposed to mine was invalid for lack of discovery. But, in the real world, no one is going to mine thousands of tons of below cut-off grade ore; their hypothetical operation was wholly imprudent, and not what Liberty would have done with its data in hand. You can't have it both ways. Either the grade of the underground ore (by itself, without surface samples averaged in) is higher as I claim, and the mining would have occurred, or the grade is low as they say and the mining would not occur. Their manipulation of their surface samples from the Six O'clock claim as the basis for negative economics for their ill-conceived underground operation is indefensible.

16. Paragraphs 4 through 15 above all repudiate Mr. DeMaagd's attack on my calculations for the underground resources evaluated in JA-188 through JA-191, and show they ***are*** supported by reliable data.

17. The maps and my spreadsheets referred to by DeMaagd in his paragraphs 31-34 (JA-189 through JA-193) are accompanied by narratives that provide explanations for all assumptions and calculations employed – see A-84 (PE-29), A-114 (PE-30), and JA-190. This is an incredibly complex body of data, some of which is applicable to economic calculations and some of which is not. For instance, as I explained in my narratives (A-84 (PE-29) and JA-190), all of the Forest Service's 1998 apex samples were cut from only the upper half of the width of the vein. I witnessed this, and Liberty complained then to the Forest Service that they were only sampling a fraction of the vein, and that the results would be useless or subject to qualification. There is no fair way to use these samples in an economic calculation (unless you only intend to mine the upper half of the vein). Any analysis of these samples has to either assume there is no gold in the lower half of the vein or apply some arbitrary value, neither of which is a reliable way to determine the value of the vein to be mined. I could have assumed the value of the lower, unsampled half of the vein would have the same gold content as the upper, sampled half. This would have improved the results, as their results from the upper half of the vein were in some respects favorable. However, I did not do that because it would not be a defensible projection of sample values.

18. I did reject, and refuse to use in my evaluation in JA-188 through JA-191, some data due to anomalous assay values. I rejected the Forest Service assays of the Klamath Ridge splits from Liberty's 2004 pre-test sampling because, as I explained in detail in my narrative (JA-190, at 1584), it was obvious to me that there was a problem with the testing methodology. It is simply not credible that Liberty got consistently high assays from the same samples that they got nothing from, unless there was a problem in their handling of this

refractory ore. Again, you can fail to capture and assay gold present in a sample, for various reasons including the nature of refractory ore, but you cannot capture and assay gold not present in a sample. When these Forest Service results were shared with Liberty, I knew that this would be a big red flag the Forest Service would wave and wave, but science and statistical reality demanded that those sample results had to be rejected as anomalous. The metallurgical and statistical reasons why the low assays were wrong and the higher ones representative, is explained in the metallurgical and economic calculations narratives in detail (PE-18 and JA-190, at 1548-1553).

19. Mr. DeMaagd should be mystified why the Forest Service splits yielded anomalous assay results. Instead, in his paragraphs 32 and 33 he is mystified by the "unlikely" vs. "likely" scenarios in my economic calculation narrative and spreadsheets. These scenarios are about adjusting grades, up here and down there, to reflect what I concluded, after these decades of study of the geology, sampling and metallurgical testing results for this property, are more realistic grade and recovery values interpreted from the whole data set. The net effect of these adjustments is that the "likely" scenario calculates substantially ***lower*** profit numbers than the "unlikely" scenario. This again was not an exercise in cherry-picking the favorable; it was an exercise in conservative interpretation based on an intimate understanding of the data set after weeks spent of analyzing the data and crunching the numbers. No logical evaluation of a mineral property simply throws every piece of the data in and calculates the average. I do not know why the framing of scenarios is a problem for DeMaagd, unless it is because doing this would require him to abandon cherry-picking data favorable to Defendant, and to explain his reasons for including or excluded samples and evidence, as I had done here.

20. I considered every single bit of data we had available, from 1800s production records to 2006 milling data, including the California State Mineralogist's reports, private

reports, Liberty data, Liberty Consolidated Mines data, Forest Service data, etc. What got excluded from the analysis was only that which could not be included because of some serious flaw, like the Forest Service's results from its splits of the 2004 Liberty sampling cited above. I labored over the myriad data for hundreds of hours to make something definitive out of it. It is not simple and easy to absorb with a cursory reading. It takes many hours of study to grasp the flow of the data, the analysis and calculations. It took nearly a day of my deposition to get Mr. Trauben up to speed on the calculations, and we had already had an afternoon-long, off-the-record voluntary session arranged by counsel before the deposition, during which government representatives freely questioned me on the evaluation in JA-188 through JA-191. Mr. DeMaagd did participate in that informal session, but he did not attend my October 2007 deposition. DeMaagd says it is not possible to analyze my data in any meaningful way. This is not a criticism of the data or the analysis and conclusions. It may just be an admission that he could not grasp it given the time and effort he was willing to apply.

21. The process of taking hours, days or weeks to laboriously pour through a stack of data generated at a mining property over many years by various miners, geologists, metallurgists, etc., is standard procedure for a geologist evaluating a new property. DeMaagd and Gutierrez have from the beginning of their activities in this case refused to undertake that work. This may come from their training as "mineral examiners," because the Forest Service process, as described in their training manuals, is about exclusion of data. They only consider the data that *they* generate as "admissible." Note DeMaagd's paragraph 38, which characterizes their use of all of *their* samples, as though that is somehow more inclusive than my considering every bit of defensible data available. However, this is not a mineral examination, and so their exclusionary method has to be evaluated straight up as to its objectivity and competence as a method of evaluating a mineral property.

22. Mr.DeMaagd's stated inability to digest and respond substantively to Liberty's data, which he has had since September 2007, is reminiscent of what happened with the mineral examination of Liberty's claims in 1997. Liberty provided all of its data, again, the body of assays and analyses largely in the set of A-81a through A-81s (using the document production numbers in the case), and summarized for them in A-91 (some of which are now found as JA-6 through JA-9, JA-14 through JA-16, PE-2, PE-3, PE-6, PE-15 and PE-17) to the mineral examiners, DeMaagd and Gutierrez. The Mineral Report used none of it, and analyzed a proposed mining operation based solely on the presumed economics of mining the few areas in which they took their inadequate set of samples in 1998. It is easy to dismiss a complex body of data with a few offhand, out of context comments. DeMaagd and Gutierrez' analyses and reports have not gone beyond cherry-picking.

23. The only "analysis" the DeMaagd Declaration offers, in paragraph 38, is citations to the Forest Service's Mineral Report, which he describes and defends in paragraphs 39 through 42 of his Declaration. Liberty has already provided its analysis of the peculiar assumptions and biases, including use solely of the limited samples the Forest Service took in 1998, and unexplained rejection of all non-Forest Service data. The economic calculation narrative (JA-190) and rebuttal narrative (PE-30), describes the most egregious of the manipulations in that report. The apex sampling was inadequate (1/2 the vein) (see JA-190, at 1547), the apex volumes were calculated based on absurd assumptions about mining (see PE-30, at p. 17), the economic calculations were driven into deep red by implementing the absurd assumption that Liberty would underground mine 0.03 opt ore on the Six O'clock claim (PE-30, at p. 16); and the Klamath apex deposit was halved in quantity by a clever but baseless pit design that proposed leaving half of the exposed ore in the pit floor un-mined (PE-33). This last trick in designing a losing mine is displayed in Plaintiffs' Deposition Exhibit 1 used in the deposition of Hilton Cass (PE-33), where the Forest Service refused to

include the vein ore in triangle A-B-D in its evaluation, including only the vein ore in the overlying triangle A-B-C, even though that ore is mineable without any additional cost with no further overburden to remove, and no prudent miner would leave it in the ground.

24. In paragraph 32 of his Declaration, Mr. DeMaagd says that I do not explain assumptions underlying my "likely" scenarios, like cost factors. On the contrary, all of the cost factors are tabulated on the spreadsheets, including the identification of "Stebbins" – the Forest Service's contractor in the Mineral Report – as the source of mining cost estimates I used. It takes some close study to follow the flow of these cost factors, but it is all there. Once again, if it was too much for him, we offered further cooperation after the October informal session, but the only follow-up was my deposition later in October. The capital, operating and reclamation costs are directly listed and labeled. The refining costs due to the small relative volume of concentrates is included in the operating costs, but not listed as a separate entry. Also, at the time in question, concentrates were being bought off west coast docks by the Japanese at better rates than could be gained by shipping to smelters.

25. The DeMaagd Declaration cites Sannes and Clayton's lower average dump and apex grades in paragraphs 35 and 36. This ignores my application of cut-off grades and selective mining, which neither Sannes nor Clayton applied. The cut-off grades that I used in my calculation scenarios reflect what any prudent miner does when he has a large volume of material, some of which contains below profitable gold content. It is called grade control through selective mining. I have done this in the real world, at producing mines, one in 1987 that involved apex mining similar to Liberty's operation in Eddy Gulch. It works. All you need is an assay lab on site supplemented by copious panning, and an intimate knowledge of the ore, which grows more definitive with time until you can pretty much "eyeball assay" the material. You simply mine only that material that is of high enough grade (above "cut-off grade") to assure you a profit, leaving the below cut-off grade material in place. My

economic calculations include the ore volume reductions inherent in this method. It is quite easy to do with surface deposits like dumps and apexes. This is "Mining 101."

26. Mr. DeMaagd's refusal to acknowledge the use of cut-off grades in mining here is flatly inconsistent with the Forest Service's periodic demand, during their mineral evaluation, to know what Liberty's cutoff grade was going to be. We responded to this demand by reminding the Forest Service that the whole point of the bulk sampling operation they approved but did not allow to proceed was to determine mill efficiencies, and upon optimizing the milling set-up, determine the working cut-off grade. Mr. DeMaagd's stated confusion about mining with a cutoff grade suggests the Forest Service wants to avoid any calculation by which it might disclose favorable or even profitable alternatives to the scenario it presented in its Mineral Report, where it is easier to show unprofitability by refusing to establish and apply a cutoff grade.

27. In paragraph 27, Mr. DeMaagd accuses me of biasing samples by selective application of data. My material here explains what was excluded – bad, incomplete or unrepresentative data – and why it was not included. I scrupulously created a series of documents laying out and defending my analysis and calculations. Mr. DeMaagd amazingly displays pride that the Forest Service includes "all the available data ***from the samples it collects***," (paragraph 38), without justifying his rejection of each study or report other than their own. The non-Forest Service data is the overwhelming bulk of the relevant information; his Declaration essentially admits that the government has refused to consider any of it. Theirs is the valuation that lacks credibility, not mine.

28. Given DeMaagd's baseless and direct attack on my credibility (accusing me of biasing my analysis), I have to present two pieces of testimony. First, the hallmark of my career of more than 25 years is that I tell it like it is – I tell my clients that "The ground speaks through me." I do not "gild the lily," shade or dissemble in any way in my

profession. Everyone who I have consulted for knows this. The environmentalists and developers in my primary work area, southern Oregon, find me somewhat of an enigma because I don't adhere to either group's agenda. That is because I do not let any bias skew my work product. Sometimes my data and conclusions happen to support an environmental agenda, and at other times developers' plans, but neither agenda drives the analysis. In 1983, I gave up a stock option worth over $250,000, and left a company that was rising fast and making everyone involved rich, rather than lie about ***one assay*** at the request of an officer of the company.

29. Second, after the Forest Service finished its sampling in 1998, they brought their economic mining consultant (Mr. Stebbins, whose mining cost figures I used in my evaluation in JA-191) to Eddy Gulch to see the property he was working on. Late in the day, he motioned me aside, away from the Forest Service people there, and told me that he thought our property had great potential, but that he would not be able to express it in his report because of the outrageous assumptions the Forest Service was forcing him to include in his mine cost calculations. The absurd assumptions applied in the mineral report economic calculations (described above and treated in detail in PE-30) are the result of the pressure exerted on Stebbins by the Forest Service, including the underground mining of tens of thousands of tons of 0.03 oz/ton "ore," which of course resulted in costs exceeding the revenues that could be projected from mining the limited areas the Forest Service sampled, in their limited way (see PE-30).

30. The big picture here is that the USFS is relying on a Mineral Report that is based on very limited data and indefensible assumptions, against our data which is inclusive of all defensible data available and documented regarding the property. Yes Liberty's data involves some geologic inference and interpretation, but that is identified when it is applied. There is no attempt on Liberty's or my part to limit or twist the data. The Forest Service on

the other hand has consistently tried to limit data from being admitted into the case. They ignored the historical sampling data in their Mineral Report. In DeMaagd's Declaration he ignores our 2004 rebuttal sampling, and tries to attack my analysis of the whole data set citing errors that don't exist and making arguments that show a complete lack of understanding of the data.

31. *Here I close my response to Mr. Demaagd's declaration and continue with a response to Defendant's Opposition Brief, Document 129, at 17 and 23 through 26.* Defendant's Opposition Brief, Document 129, at 17 and 23 through 26 cherry picks a number of quotes from my reports from 1985 to 1990 in order to claim that Liberty had not made a discovery of a valuable mineral deposit at the relevant times in 1989 and forward. They cite my use of phrases including in 1985, "economic feasibility of mining…would depend upon many factors yet to be determined" (JA-6), in 1986, "data is spotty", "field mapping and sampling will define more targets", "samples on Incline Ridge...not profitably surface mineable", data on vein deposits inadequate "to project grade or tonnage" (JA-7 and JA-8), and in 1990, "drilling and dump testing so far suggest that there may be surface mineable gold ore reserves", "much systematic exploration work must be completed in order to determine the distribution of gold in the apexes [and] potential gold recovery from ore." (JA-56) The 1985 and 1986 quotes are irrelevant because I was new to the property, unfamiliar with much of the record, and still evaluating the property for Mega, long before Liberty eventually submitted its plan of operation in 1989. However, these quotes are taken completely out of context in a way that completely misrepresents what the documents they are gleaned from actually say. The documents are ongoing progress reports to Mega that include many more positive comments about the property. The document from which the 1990 quotes were extracted was a draft (JA-56) of the article about the Liberty Mining District that was published in the June 1990 issue of California Geology Magazine (JA-75 –

unreadable copy), but written in February of 1990. Both of these quotes were purposely couched in very understated terms at the insistence of the editors. They did not want me "promoting the mine" in their academic publication. The first of these quotes was grounded in my belief that there are surface mineable deposits on the property based on geologic evaluation and inference, but that drilling and testing so far, which tended to support that conclusion, was not adequate to define proven ore reserves. The burden of proof for discovery is not proven reserves. It is the reasonable prospect of success in developing a valuable mine, which we had. The second quote simply says that more work is necessary to work out the details of how the gold is distributed in the apexes and how much recovery we can expect from milling the ore. We clearly stated in our plans of operations that our 1989 proposed pilot production was to better define milling methodologies, as well as generate a modest profit for the purpose of attracting investor interest and paying for further development.

32. Nowhere in the documents from which they cherry-pick do I express the belief that there has not been a discovery of a valuable mineral deposit on the property. I would never have recommended a plan of operations that called for milling ten thousand tons of ore (JA-40, at 464, description; JA-45, at 472, approval) if I did not believe there had been a valuable discovery. I find it interesting that the government seeks to prove the lack of a discovery by quoting me. I was there. I remember what I believed then, and I believed that Liberty had valid discoveries across the property. The reason the government is using this inverted approach to proving a negative is that they have no reliable data of their own to offer. The 1998 Forest Service Mineral Report (FS-190), with its deliberate exclusion of nearly all available and relevant data, is indefensible, and all they have.

33. Defendant's brief (at 24) assails the 90% recovery factor I used for underground ore in the 2007 spreadsheets (JA-191). As Mr. DeMaagd did, the brief confuses surface

apples with underground oranges. All of the recovery numbers cited on page 24 are from tests of low-grade dump and apex ore. The government goes on cite the 78% recovery from cyanide milling, and then draws its usual argument about our never being able to get a cyanide mill approved. All of these government citations are completely immaterial to the discussion of underground reserves, which do not require cyanide milling, and for which we have substantial, reliable production history data to draw on to show that 90% recovery, using gravity separation without cyanide, is a conservative estimate, as cited elsewhere in this affidavit.

34. On pages 24 and 25 the government's brief assails the "forty-dollar rock" that Mr. Goodman and Liberty saw as compelling enough to "go minin'" (PE-2). The government cites my brief summary calculation in March of 1990 (JA-61), from which they pluck the number $25.60 per ton and compare it to the "forty-dollar rock" quote, claiming the $40 dollar number was unfounded. First of all, the $40 dollar rock was a gross value for dump and apex material only, meaning that costs and recovery loss was not included. Don Goodman, who had been moving $4/ton rock for a living for many years, believed that Liberty could make a clear profit from $40/ton material. These are the very terms he used. The $26.50 number cited by the government is not a gross number. It is a recovered number, after calculating in a loss of 20%. Also, the assumptions behind the "forty dollar rock" gross value included a cut-off grade of 0.10 opt and a $400 gold price. I applied the same cut-off grade to a $380 gold price in the new spreadsheets (JA-191) for dump and apex material. The assumptions behind the March 1990 $26.50 value included a grade of 0.08 opt described in the calculation as a "conservative estimate", applied to a $400 gold price. This computes out to "thirty-two dollar rock" with the removal of the loss factor.

35. The difference in the two numbers is a very conservative grade assumption for convincing investors or other outsiders that we could mine profitably based on the assay

records we had at the time ($26.50), and a practical evaluation of what we could ***reasonably expect*** for grade using selective mining ("forty dollar rock") – two completely different approaches. There is no contradiction here once the numbers are viewed in context. This is what I am compelled over and over again to point out about the government's "technical case" in responding to their declaration and brief. What numbers do they propose, and how do they defend theirs? Beyond a Mineral Report that excludes nearly all data, they only cherry pick Liberty's data out of context, in an attempt undermine our detailed evaluation of all of the available data.

36. Defendant's brief (at p. 25) assails the 80% recovery number used in the March 1990 calculation (JA-61). We are dealing here with another apples and oranges problem. The mining and milling costs cited in that calculation refer to the 300-ton per day gravity flotation mill Don Moore had a month before recommended and priced for delivery, not the centrifuges already on-site at the E T Placer that were involved in the "forty dollar rock" concept. I reject the March 1990 calculation now because it is far too simplistic and it applies factors that were not borne out by later metallurgical and economic analysis. But that number is not the one in question here. I do not hold that up as the standard of proof for Liberty's discovery or potential profit amounts. My more recent spreadsheets, in all of their complexity, provide that. However, I do still support the "forty dollar rock" concept because it applies appropriate profitable cut-off grade and selective mining principles, consistent with my recent spreadsheets.

37. On page 25 the brief has another strange attack on the viability of the Liberty project – because we did not have proven underground ore reserves, there was no discovery on those claims. The apex deposits are lode deposits, they are the apex of the lode. The apex deposits validate a lode claim. So do placer deposits (the dumps) on a lode claim, as any miner who works claims knows that a lode claim embraces all deposits within its boundaries,

while a placer claim excepts known lodes. Any lode claim containing ore of any kind (underground, apex or dump) that is part of the viable mining project would validate that claim.

38. The brief attacks me for describing, in various plan documents and renewals, surveys and continued exploration and mill testing in 1991, after they had shut us down in 1989 before we could complete those activities and our pilot production. Exploration and testing do not posit lack of discovery. Exploration and testing are an ongoing process throughout the development of a mining property. The following line is really preposterous. "Similarly, Plaintiffs' April 1992 Plan also noted the lack of any drilling results or any information about the existence or extent of underground ore." The statement is simply false. JA-114 does not "note the lack of any drilling results," it is silent on the subject. This silence is unremarkable – no plan of operations, including those the Forest Service approved, ever contained any information about gold content, mineral values, reserves, or metallurgy. We did proposed additional drilling, and underground developments including one rehabilitated and extended tunnel and two or three new tunnels. Do they think we were proposing to tunnel to surface ore? In 1992, Liberty had all of the 1975, 1976 and 1986 drilling data (JA-9), some of it quite compelling, with gold bearing intersections in the Six O'clock (Reverse Dip) and Union vein underground targets. So why would we have said we had no drilling data. The answer is we didn't say that because it was not true. The brief wholly misrepresents the 1992 plan of operations document.

39. The brief (on page 26) assails the "new spreadsheets" and related maps (JA-189 through JA-193). This exercise seeks to deny that the 2007 documents recreate data available to Liberty contemporaneous with the taking period, including maps provided that show the data available from 1932 to 1990 (JA-192). But what difference does it make anyway. However much gold was there and however much of it could be recovered by

whatever process is the same in 1985, 1990 or 2007. The location of the deposits was obvious, especially as to the dumps and apex, and all additional sampling and testing would simply confirm and expand understanding of the quality and quantity of the already-exposed and identified mineral deposits. Since we were prevented from mining, the only progress that could be made was sampling, testing and developing our understanding of the quantity and quality of the already exposed deposits. This does not change the underlying reality of what was in the ground during the taking period. This issue was an obsession of the Forest Service during the contest, as they felt no further data could be collected about an already exposed and targeted ore body. What the analysis in my new spreadsheets and maps applies to the data is a better understanding of ore grade distribution and optimal gold recovery from that ore that we would have realized with our proposed test milling in 1990, had Liberty not been shut down.

40. Next, the brief attacks my use of production history (from the table in JA-6) to project average grade and recovery from underground reserves. They quote me as saying "production records are far from complete." This is true, but so what? Does the government assert that all the rest of the unrecorded production was unprofitable? The large tonnage and representative distribution of mined reserves reported, with dollar and tonnage figures, means that the resulting average grade number is statistically valid, certainly much more valid than the grade numbers generated from limited and flawed sampling, and applied to ridiculous mining scenarios in the Mineral Report (FS-190).

Respectfully,

T. Ferrero 03/21/08

Signature Date

# CALIFORNIA JURAT WITH AFFIANT STATEMENT

☒ See Attached Document (Notary to cross out lines 1–6 below)
☐ See Statement Below (Lines 1–5 to be completed only by document signer[s], *not* Notary)

1 ______
2 ______
3 ______
4 ______
5 ______
6 ______

Signature of Document Signer No. 1 | Signature of Document Signer No. 2 (if any)

State of California

County of Placer

Subscribed and sworn to (or affirmed) before me on this 21st day of March, 2008, by

(1) Thomas P. Ferrero,
Name of Signer

proved to me on the basis of satisfactory evidence be the person who appeared before me (.) ~~(~~

~~(and~~

(2) N/A,
Name of Signer

proved to me on the basis of satisfactory evidence be the person who appeared before me.)~~.~~

Signature Janna Fiori
Signature of Notary Public

JANNA FIORI
Commission # 1698491
Notary Public - California
Sacramento County
My Comm. Expires Oct 10, 2010

Place Notary Seal Above

## OPTIONAL

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Further Description of Any Attached Document**

Title or Type of Document: Second Affidavit of Thomas P. Ferrero

Document Date: 3/21/08 Number of Pages: 24

Signer(s) Other Than Named Above: None

RIGHT THUMBPRINT OF SIGNER #1
Top of thumb here



RIGHT THUMBPRINT OF SIGNER #2
Top of thumb here

✓

©2007 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org Item #5910 Reorder: Call Toll-Free 1-800-876-6827