*Ferrero Geologic*
*760 Oak Street, Ashland, Oregon 97520*
*ph 541-488-2452 FAX 541-488-6473*
*Email: fgeo@97520.net*

# Response to USFS 07/99 Mineral Report and 12/06 Request for Documents and Interrogatories

## Regarding the Eddy Gulch Gold Mining Claims (Liberty Mining, Inc.)

**Thomas Ferrero, C.E.G., OR/CA**

**WORKING DRAFT**
**01/07**

Accompanying this text is a document set that responds to the USFS 12/06 request for documents and provides the data on which this text is based.

## Part 1: Rebuttal to *Summary, Conclusions, Recommendations*, USDA Mineral Report, Mineral Examination of the Eddy Gulch Group of Gold Properties, Klamath National Forest, Siskiyou County, California, Gutierrez and DeMaagd, 07/30/99.

Note: USFS Report text shown below as excerpts in small, plain font. Ferrero rebuttal text shown in this font.

SUMMARY, CONCLUSIONS, RECOMMENDATIONS

The Liberty Mining District has a long history of gold production. Much of it came from the Eddy Gulch area; including the subject claims. Earlier investigators praise the development potential of the surface apex lodes, mine dumps, the multiple vein fissure systems and the high potential for underground down-dip lodes. The well-documented chronology of prospecting, sampling and sporadic mining activities continued for more than 140 years in the area of the claims.

At least since 1975, the veins and mine dumps have been explored by exploration companies who promptly lost interest once drilling and sampling results were analyzed. This long period of non-production is evidence that the veins and mine dump deposits are not feasible to develop. Furthermore, the extensive underground workings in the area attests that underground deposits have been exploited.

The brief characterization of the history of the Eddy Gulch Group in the two paragraphs above is woefully inadequate and misleading in that it trivializes the property. There is a more complete history of the property in the body of the

Report, but it includes some erroneous information, and still fails to tell the story. History is more than a series of facts. The following is the history of the property with some "flesh on the bones."

Incomplete records from the Klamath, Union and Mountain Laurel Mines cite production of about 75,000 ounces of gold from 1863 to 1886, and about 25,000 ounces from 1886 to 1932, from ore averaging 0.382 to 0.890 ounce of gold per ton. There is no doubt that there was substantially greater production than that based on the incompleteness of the records.

Prior to the 1930s, the properties were owned and operated as separate mines, at times in litigation against each other, due to the fact that the continuous vein hosting structure crosses numerous claim boundaries. The broken and adverse property positions prevented systematic exploration. The attached documents eg_0107_11_Klamath Patent Mineral Survey Map [reverse black and white], eg_0107_12_Klamath Patent Vicinity Claim Survey Map and eg_0107_13_Klamath Patent Status Archive Document (Tabs 11, 12 and 13) show that the Klamath Mine was surveyed for patent in 1901, but the issuance of the patent was held up until 1935 due to legal issues regarding claim overlaps. In 1935 when the General Land Office acted on the case, the owners were no longer around to receive the notification, and the case was closed on the basis of "laches." Documents eg_0107_03_Plan_Sampling Results and Mining and eg_0107_06_Eddy Gulch Claims Topo and 1985 Control Survey Point Plot (Tabs 3 and 6) show the location of the Klamath claims (Ada, Flora Blanche and Ohio) that were in the 1901-1935 patent application. They clearly cover the same apex that the Liberty claims hold. Note the where the apex crosses the claim boundaries, and the neighbor claims tight against the claims shown on document eg_0107_12_Klamath Patent Vicinity Claim Survey Map (Tab 12). Therein lies the probable crux of the adverse claims asserted against the patent application. It is a significant fact that the property was headed for patent subject only to the resolution of the adverse claims of operators of adjoining mines. The near-patenting of these claims was never mentioned, much less investigated and analyzed, in the Report.

In the 1930s, the properties were consolidated and explored by geologists who, as the Report states, "praise[d] the development potential of the surface apex lodes, mine dumps, the multiple vein fissure systems and the high potential for underground down-dip lodes." These geologists concluded that the mineral hosting structure is a regional scale fissure with continuity across the entire district, and to great depth, and that there was no evidence suggesting that the pattern of substantial ore bodies at 500 to 1000 foot spacing exposed along the

apex by mining operations would not continue with depth and on strike across the entire property.

The geologic character of the deposit had been established by the existing exposures in the mines along the apex. The ore reserve is composed of the down dip ore bodies distributed throughout the structure, as defined by the discovery consisting of the existing mines. The property has the characteristics typical of Mother Lode deposits, which were mined a mile deep in many cases.

It was clear then to the owners and exploration geologists that development of the property would have to evolve from mining ore bodies exposed along the surface apex ("glorified pocket hunting" according to one geologist, Mr. Elmendorf) to systematic down dip development via long cross-cuts and drifts. This would involve substantial development costs. The ability to raise the substantial capital necessary to develop the property was hampered by the depression, World War II, and the post war continuation of the $35 gold price.

After the gold price was freed in the 1970s, the property became economically viable again. In 1975, New Cinch Mining leased the property from the owner (Patterson) who had consolidated the property back in the 1930s. Their geologist, David Sannes, completed some geologic mapping, surveying and sampling of dumps, geochemical sampling and drilling, in an attempt to test the viability of the dumps and apex reserves, and find the underground vein target(s) closest to surface. They realized that the best way to raise capital to develop the property was to begin initial production on the easiest and cheapest reserves to mine, thereby seeding the process of generating interest and investment. The dumps and apexes, and even the first underground target under the Six O'clock Claim – which is actually an extension of the Mountain Laurel workings kept from production by claim boundary litigation – were not the ultimate development goals. They were to be the "seed" production leading to capitalization of the big target – the unexposed, down dip underground reserves.

New Cinch fell on hard times due to what I understand to be some sort of salting scam in New Mexico. They were delisted from the Vancouver Stock Exchange and went bankrupt. This stopped their era of development at the Eddy Gulch property cold.

The Patterson lease was picked up by Fred Aloisi, et al shortly thereafter. From 1984 to 1986, working for Mega Gold, Inc., who leased the property from Aloisi, et al, I picked up where Sannes left off. I drilled holes along side

of his drill holes to check on his results, in case some of the alleged New Cinch "hanky panky" that occurred in New Mexico was occurring in Eddy Gulch. The drilling data was proven to be accurate. The Klamath dumps had been surveyed and sampled by Sannes, and resampled by us, yielding above cut-off grade for surface mining. Apex sampling along the Klamath cut, documented in the record (see my Summary of Data letter to Gutierrez, 02/12/99, and including the assay results at Tabs 14, 15, and 16 in the current document production) yielded gold values above cut-off grade for surface mining.

Mega Gold dropped the lease shortly after that. They did not drop it because the property was no good. They thought it had huge potential just as I did. Their problems were typical of small Canadian mining companies. They needed a property that would generate investor "exitement" immediately by producing high-grade drill intersections or the like. They had not raised any capital to speak of, and so could not sustain the kind of effort that would be necessary to develop the Eddy Gulch Group.

At about that time, I left Mega and became an independent consultant. Aloisi, et al hired me to continue at Eddy Gulch. We submitted the plans of operations in 1988, etc. We were in the process of developing access to other apex sites and dumps under our approved plan of operations when we were shut down by the USFS for various reasons, with the shutdown extending without justification for years after the Forest Service received clearance that the Aloisi / Liberty mining plan would not harm the spotted owl.

The property has not been idle because it lacks merit, as intimated by the Report. It has been idle for the very clear reasons cited above. It took me about fours years of absorbing the geology of the Eddy Gulch Mines and the broader Liberty District before I really understood the scale of what was there. I doubted the 1930s reports at first, as have the USFS personnel, but I learned through sustained investigation that Jones, Elmendorf, et al had it right.

It is understandable that the Report missed the point, given the purpose of the mineral examination in defending against litigation over the improper shutdown of the approved operation, and given the brief time the mineral examiners spent on the property. However, to characterize it as having a lack of mineral continuity or as being "non-mineral in character," is presumptuous as best. The examiners are coming to conclusions that are advantageous to their employers without adequate preparation, and without any intention of making an unbiased evaluation. They have insufficient interest or time/attention invested to gain the understanding that the scale of exposed

mineralization and reserves on the property are much greater than some outcrop and pocket, but, as described above, is tied in to the historic mines and the down dip extension of the structure.

Only from an understanding of the scale of the Eddy Gulch mineralization can an appreciation be gained of the continuity and the significance of the dump and apex reserves. Those reserves constituted the first phases of our plans of operations, which also included the underground developments as later phases. They formed a logical continuum of development in the real world of financing a mining operation.

Early investigators struggled with perfecting the metallurgical recovery of the Eddy Gulch ores. Even though occasional good test recoveries exist, the record documents the difficulties encountered over a long period of time with finding a consistently acceptable milling process. The fact that easily accessible mine dumps and surface veins remain intact for years within the subject claims vouches for the lack of an optimum treatment plan for the ores.

Forest Service records well illustrate, from June 1989 thru April 1992 and the present, the claimant's continued exploration of his mining claims and the pursuit of a viable milling process. However, the records also demonstrate that the exploration on the claims is not complete. It is quite clear that claimant Aloisi has still not determined a viable mill recovery process for his claim materials as of the date of the mineral examination. He continues to test various milling scenarios, as evidence by recent testing by Don Moore in early 1999. Not having a mill recovery process determined, the claimant cannot know if his proposed mining operation is a viable (profitable) one.

The statement that early investigators "struggled with perfecting the metallurgical recovery of the Eddy Gulch ores" is completely unsupported. The production from the 1860s to 1930s was predominantly milled by gravity separation methods (mostly stamp mills) yielding 85% recovery. In the later years of that period, ball mills replaced stamps and flotation cells were added, increasing recoveries to 90% to 94%.

Metallurgical testing since the 1930s was concentrated on dump material and more recently on apex material. Gold bearing rock in the Liberty District with less than about 0.10 opt gold is composed of fine gold that is largely not recoverable by standard gravity separation methods. At about 0.10 opt and above, the percentage of relatively coarse, gravity separable gold increases as grade increases. Consequently, when running ore in the 0.08 to 0.20 opt range, like the dump and apex material, recovery is lower than that reported from the high grade ore mined from the underground workings during the 1860s through 1930s. Test recoveries were above, although not far above, the margins of economic viability in the early 1990s when the gold price averaged about $380/ounce. The following table shows the relationship of grade, milling method and recovery.

| | *Recovery* | | |
|---|---|---|---|
| Ore Grade (opt) | Gravity | Gravity/Flotation | Gravity/Flotation/Leach |
| Low Grade | 27% | 43% | 70% |
| High Grade | 80% | 90%+ | 95%+? |

The goal of the metallurgical testing by New Cinch, Mega and Aloisi, et al was to figure out how to balance milling rate, recovery and cost in handling low-grade ore to the best advantage. We developed two milling scenarios for the dump and apex ore. One involved high tonnage per hour rate, low cost and lower recovery, using equipment already owned by Aloisi, et al. The other involved lower tonnage per hour rate, higher cost and higher recovery.

The former milling scenario was the triple deck screen/centrifugal concentrator. Preliminary testing indicated sufficient recovery of coarse gold and concentrates to offset the low operating cost per ton. We found that standard gravity milling of the lower grade ore yielded recoveries of about 27%. It was our belief that we could do better with the enhanced gravity of the centrifugal concentrators. Testing was done when I was not present, and it was not well documented, but substantial gold was produced from a test run. It was enough to convince Aloisi, et al to proceed.

Back in 1988 we concluded that we had about "$40 dollar rock" (gross), and that we could excavate with dozers and scrapers and haul the dump and apex material to Rollin or Usher Flat for gravity-flotation-cyanide milling, and pipe the tails to the ET Pit staging area where settling ponds were already in place, for far less than that, constituting "a reasonable expectation of profit". One of Aloisi's partners, Mr. Goodman, made his living quarrying construction materials and blasting for construction projects in the 1980s and '90s, and so he well knew the costs involved in moving rock. The attached spreadsheets show that 2004-6 Liberty pretest /mill testing results confirmed a $6.50 or better profit per ton at $380 gold from the mining activities that were part of the plan of operations approved back in 1989.

The USFS metallurgical testing results supported our contention that their sampling was less than representative. Both apex and dump milling calculated head grades were consistently higher than assay grades. The disparity was most pronounced in the Six O'clock samples which yielded "none detected" results to assays, but from the same samples yielded an average of 0.043 opt with a

high of 0.184 opt mill head grade, and average recovery of 64.5%. Rejecting the two lowest results (as per selective mining) leaves a milling calculated head grade average of 0.070 opt, with recovery of 82.5%. The consistent and in many cases extreme increase in ore grade values as sample size increased from assay (500 grams) size to mill test size (12.5 lbs +/-) is compelling evidence that bulk sampling/mill testing as we proposed would have yielded higher grade and recovery values than are suggested by assays and tests from tiny grab samples.

In the body of the mineral report the authors state,

"Ferrero claims that a recovery of 90% can be achieved from the underground ore on the Six O'clock claim. It is unclear how and on what data Mr. Ferrero bases this recovery estimate."

Data supporting the 90% figure are included in the 1925 California State Mineralogist's Report, Elmendorf in 1932, Usher in 1957, Moore in 1990 and Liberty Consolidated in 1994.

The USFS refused to apply either method as part of the mineral exam. Instead they used a Gold Saver/Knelson Bowl combination, which offers neither the enhanced gravity of the centrifugal concentrators or the sophisticated chemistry of the Moore system. This is why we went along with the USFS plan only with clear statements that we did not believe that the sampling of such small samples, in that way, would be representative.

There is no doubt that gold mineralization is found within the boundaries of the subject lode and placer claims. The current mineral examination sampling program has verified this fact. However, the Liberty mining claims still remain mineralized prospects which warrant further exploration before development and mining can take place. The mere presence of gold mineralization within each claim is not sufficient to define a mining claim as valid under the law. To be valid, a mining claim must contain a discovery of a valuable mineral deposit that is subject to location under the Mining Law. The definition of a "valuable mineral deposit" has been derived from case law decisions over the years and has evolved to be a two-fold test for a mineral discovery; one complimentary of the other. The "Prudent Man Rule", was first described in *Castle v. Womble, 19 LD 455 (1894)*,

> ".....where minerals have been found and the evidence is such a character that a person of ordinary prudence would be justified in the further expenditure of his labor and means, with a reasonable prospect of success, in developing a valuable mine..."

Following this test, a "marketability" test was approved by the Supreme Court in *U.S. v. Coleman, 390 US 602 (1968)*. Essentially, this test pointed out that the profitability of the mining operation must be applied to the prudent man test. In other words, the mine owner must demonstrate, taking into account all costs of development, that a reasonable probability exists for making a profit.

Applying the erroneous USFS historical and metallurgical assumptions rebutted above, and taking a view of the data that reduces both the grade and volume of

ore, one can erroneously conclude that there is not a valid discovery on the Eddy Gulch claims. However, in view of the facts, many of which were completely ignored by the examiners in the Report, there is no doubt that we have a discovery as defined by the law – ***a reasonable prospect of success in developing a valuable mine***.

Our claims are across the apex of the second most productive structure in the entire Klamath Mountains Geologic Province, which geologically is the northern extension of the famed Mother Lode Gold belt. These claims encompass the second and third greatest producing gold mines in that district. The geologic structure that hosts the mineralized veins is a major thrust fault that is shown on every geologic map of the vicinity, including the Sawyer's Bar Quadrangle, Klamath Mountains and State of California geologic maps. Only major structures are of a scale significant enough to show up on a map showing the entire state of California.

The document produced at Tab 10 of the January 2007 production, captioned "Liberty District Geology Elder and Ernst," provides an overview of the immensity of the mineralized structure that apexes on the Liberty claims. Mr. Elder, a USFS Geologist, concluded that the down dip extension of the hosting Soap Creek Ridge Thrust reaches under Mount Shasta!

The claims have historically produced during times when the economics were advantageous to mining, as is the case for all mines. It is common for very successful, long time producing mines to go through periods of inactivity due to changing market and economic conditions. The fact that no mining has taken place since the 1930s is well explained above. The lack of production does not posit lack of validity.

I helped Aloisi et al. restake and survey the claims in 1984, when the gold price was up, and Aloisi et al. have maintained them ever since. The properties remained developable through the late 1970s, 1980s and into the 1990s. The Forest Service's unjustified multi-year prevention of operations, and the resulting litigation, along with the dip in gold prices, discouraged development for a period. Today, however, there is significant interest in developing these claims with the gold price hovering around $630 per ounce. The unreasonable delay forced by the USFS bankrupted the owners in the early 1990's and prevented production during that earlier period of optimal gold prices and production opportunity.

The Report admits, as it had to, that there is gold in the dump and apex material. The Report concludes that the absence of economic ore, and their hypothetical mining costs, led to the Report's conclusion of lack of discovery. The data, fairly analyzed, demonstrate that the claimants can recover economically viable gold quantities from the low-grade dump and apex material, even at the ore grades substantiated by USFS sampling, and definitely at the ore grades and with the additional volumes of ore confirmed by the Contestees' additional sampling of previously exposed deposits.

By his own repeated admissions, the claimant has not passed the "prudent man test" of discovery first laid down in *Castle v. Womble in 1894*. This test, which has been approved by the U.S. Supreme Court in many cases, was applied by the Board in *U.S. v. Arbo*, *70 IBLA* 244 (1983)--a case similar to the present one.

Following exploration drilling in 1986, Ferrero writes that "Data so far is inadequate to project grade or tonnage". In September 28, 1989, the claimant submitted a plan of operations whose objective was to determine if "reserves of gold bearing rock of sufficient quality and quantity" occurred. On March 11, 1991, the claimant proposed exploration drilling on the claims and work to develop a suitable mill process. On April 1,1992, the claimant still continued to explore his mining claims. He noted in a letter to the District Ranger, the continuing "objectives of exploration are to determine whether there are reserves of gold bearing rocks of sufficient quality and quantity to warrant mine development, and if so, proceed with mining". Three years had past since these exploration objectives were first noted in 1989 by the claimant:

On February 12, 1999, Mr. Ferrero wrote mineral examiner John Gutierrez stating that Liberty Mining had not completed exploration of the apex vein on the Six O'Clock lode claim. In the same letter, Ferrero described the Union mine dumps as "potential ore reserves". With regards to such statements, the courts have found that if the deposit requires additional exploration to delineate the ore reserves and determine grade or quality before development may be confidently . started, a discovery has not been made.

Because the claimant's proposed Plans of Operations submitted over many years are replete with statements that he plans to conduct exploration operations with the objective of making a discovery, he has neither a valid claim nor a right to assert that his property interests in the claims have been taken without just compensation. As the Supreme Court has consistently ruled, if a claimant has no discovery, he has no valid rights nor property interests.

The examiners have no credibility employing this kind of argument. In their analysis of the geology and mineralization, they ignore or dismiss the data we supplied about the history of production from the district, and the reasons why production ceased, and the fact that production had begun again in the late 1980's when their agency's actions stopped it. After ignoring my explanations of the data, they suddenly take as gospel every statement that has the word "exploration" in it, believing as they do that any geologist who utters the word "exploration" is admitting the invalidity of a mining claim.

As stated above, I had to go through a long process of learning about the property. I am very conservative about mining properties, always "from

Missouri" when it comes to evaluating one. I used to jokingly refer to the mining geology part of my consulting business as "Mine Killers" because I told virtually every client that their properties did not have reasonable potential. The Eddy Gulch property is one of only three of the numerous gold and other mines that I have evaluated, that I concluded could and should be developed. Because it took me years to evolve a cohesive understanding of and unqualified belief in the property does not undo any actual facts of discovery and reasonable prospect of success. The gold does not grow in the ground as the realizations form in my brain. The gold is either there or not, and I and anyone else have to come to understand the geology, the mineral values and the best approach to mining what is there.

As the facts about grade, recovery, etc. accumulated, I still used terms like "exploration" and "potential" because I was still in the process of proving reserves. I am disciplined not to characterize anything as certain unless it is, to protect my clients, investors and myself. Here the Report tries to use my words characterizing the property in terms related to the standard mine evaluation criteria of inferred, probable and proven reserves, out of context, applying them to the issues of a validity test.

In any mining operation exploration is an ongoing process. The margins of the developed deposit or undeveloped areas of the claims are normally undergoing exploration concurrently with mining. Continuous exploration is an integral part of the ongoing development of operating mines. To be in the process of additional exploration of a property does negate the existence of a valid discovery or productive mine elsewhere on the property.

I will use the terminology of uncertainty until I have proven reserves, because I am a responsible professional. However, the standard of "proof" for a validity test is not proven reserves. It is, again, ***a reasonable prospect of success in developing a valuable mine.*** At the time that I wrote all of the words that the authors pin so much significance on, I believed that the property did have a reasonable prospect of success and reasonable probability of making a profit. The report erroneously construes the meaning of my words. The only purpose of twisting the meaning of my words seems to be to take their favorite short-cut ("they said the word 'exploration' – we've got 'em") to a pre-determined conclusion.

The Forest Service sampling program of the mine dumps included careful examination of the waste rock piles. Through discussions with the claimant and his representative, it is clear that the dumps have never been explored and sampled according to industry standards in sufficient detail

to qualify these materials as reserves (Ore Reserves Working Party, SME, 1991). Furthermore, the claimants have not physically exposed the deposits through trenching or drilling on a closely spaced grid to establish a discovery. A discovery under the mining law requires both physical exposure and the existence of reserves as defined by the Society of Mining Engineers, *supra* and *Vanderbilt Gold, 126 IBLA 72 (1993).* The claimants have satisfied neither requirement.

The dumps were sampled by numerous geologists for numerous clients from the 1970s to the 1990s, including Sannes, Redmond, Patterson, Clayton and others, as well as the USFS. Sampling ranged from grabs to truck loads to deep channels down the full length of the face of the dumps, to the 50-pound grabs by the USFS. The assays very consistently ran in the range of 0.08 to 0.12 opt. The USFS samples averaged 0.13 opt. The extreme fluctuations in recovery numbers from metallurgical testing of dump material have been explained by metallurgists for Aloisi, et al and the USFS as related to the nugget effect and to re-absorption of gold in leach tests. However, as described above in detail, we established 28%+ recovery from gravity methodology and 50%+ from gravity/flotation/leach methodology. It is a mystery to me how the authors can justify their contention that the dumps have not been sampled adequately, despite the wealth of sampling and metallurgical data.

The authors make an issue of the fact that I relied upon Sannes' volume measurements of the dumps. Why this is an issue is beyond me. Sannes' drawings and calculations are part of the data. Based on how they were completed and documented, there was no reason to doubt them. Since that time I have surveyed the dumps in detail and found that Sannes substantially underestimated the volume of the dumps. It appears that the examiners were incapable of making any sound estimate of the volume of the dumps. Or, maybe they were afraid to include the large volumes of above cut-off grade material that they would then have to include in their evaluation.

The much lower Klamath Dump volume reported by the USFS in the mineral report was due to their simply not including major portions of the dumps. It is not surprising that their dump surveys were inaccurate. On the first day of sampling dumps, I pointed out where the Yankee Dump was located just down slope and two or three hundred feet north of where we were standing. The mineral examiners worked their way down to the dump. They were standing directly on the broad flat top of the dump that narrowed to the notch driven into the mountain side at the portal, and opposite, the arcuate, uniform slope of the face of the dump extending down slope. I could see them and hear them milling around down there, assuming that they were setting up to begin sampling when I heard one of them call up to me, "Where's the dump?"

Note on the map (Tab 19 in Contestees' January 2007 production) showing the location of USFS samples that some of their Yankee and Blacksmith "dump samples" missed the target dumps. The maps in the Report are so inaccurate that they prevent accurately plotting the sample locations in relation to the dumps and the existing roads.

The authors, in an attempt to dismiss the dump reserves, stretch credibility. In the body of their report they say…

"By their very nature, mine waste dumps are inherently discontinuous, segregated and commonly layered because of random placement of materials. Since there is a total absence of geological continuity in the waste rock dumps, sampling limitations (near-surface sample sites, limited penetration, limited number of samples, etc.) severely restrict any zone of influence or any predictable value to any other part of the dump. There is no conceivable way to determine the source of any part of Liberty waste dumps. It is entirely possible that material from outside sources could have contributed to the mine waste dumps present today."

The statement that "there is a total absence of geological continuity in the waste rock dumps" is based on what data? They did nothing to establish continuity or non-continuity. And if the statement is referring to all dumps, and is true, then no so-called "industry standard" sampling methodology would mean anything. And how is it that "geologic inference" is not adequate for us to establish validity, as stated in the Report, yet is used by the examiners in the above statement to support their efforts to establish non-validity.

The fact is that numerous samples have been taken from various locations on dumps at various depths, yielding very consistent values. Also, a small amount of investigation and reasoning leads to the fact that the dumps are located directly in front of portals to historic underground workings, including mostly short cross-cuts to the vein and drifts on the vein. Consequently, the majority of the dump material had to have come from within the low-grade gold mineralized fissure zones hosting the quartz veins (the same zone to be mined via the proposed apex pits). This clearly indicates a high degree of continuity in the dump materials; all the sampling, including the Forest Service's, has yielded closely comparable gold content in the dumps.

The final statement in the quotation is ridiculous. Here we have over 100,000 tons of dump material located directly in front of a series of mine portals, at the highest elevation productive area on the property, on steeply sloping ground. Huge, mature trees are growing out of the dumps. It is absurd, bordering on delusional, to suggest that the dumps are from "outside sources." No mining

operation is going to haul waste rock up hill to dump it on a steep slope at one of the highest road locations in the area, especially during or before the 1930s.

One of the justifications for the USFS contention that the dumps may have been imported was a statement that I made regarding a couple of low-grade assays from the dumps. I mentioned that the USFS had sampled road fill instead of dump material at that location. The questioning of the dumps by the USFS is an attempt to make a case out of their own misconceptions. The location in question was on the upper west margin of the dump which spread out well to the east and down slope of this location. At this point, a sliver of road fill along the outer edge of a narrow mine dump access road merged with the edge of the dump where it thinned out onto a spur ridge. There is absolutely no logical justification for applying that occurrence as the basis for the contention that the dumps are composed of imported road fill or any other imported material

The real story here is not that the dumps are suspect, but that the samplers are. They were unable to recognize the difference between road fill and dump material, and they could not recognize a major dump when they were standing on it, as described above. They demonstrated that they were not equipped to conduct this mineral examination

The authors have tried to evaluate the claimant's mining and milling proposal for the Liberty claims by assigning resource estimates based on very limited information. However, the role of the government mineral examiner is merely to verify the existence of an established, physically exposed discovery. The claimant has the ultimate burden of proof that a discovery exists. *Lara v. Secretary of the Interior*, 820 F.2d 1535, 1542 (9th Cir. 1987)

The "limited information" referred to includes a stack of documents several inches thick, which the Justice Department sent to the mineral examiners in a disorganized and incomplete condition only shortly before the mineral examination occurred. When the authors arrived on the property the first day, in response to nearly every map or other item of significant data that we showed them, they said that they did not have it and asked of we would make them copies. Even with our supplementing of their data, they still refused to acknowledge much of it, and provided the excuse that it was too confusing because it was scattered through so many different reports.

To facilitate their understanding, I submitted to the examiners the 16 page document dated 02/12/99, that summarized and organized all of the significant technical data on the property from the various reports. This is what any competent geologic investigator does at the beginning of a mine evaluation

project. There is nearly always a pile of data from numerous sources that has to be laboriously outlined, summarized, organized and evaluated. The authors did not feel compelled to do that, so I did it for them. In spite of my delivery of the summary to the examiners before they prepared the Report, they still ignored most of our data.

By their very designation, the Liberty Mine vein and mine dump resources do not carry very much confidence with regards to geological inference of gold values beyond the surface exposures. The vein contains sufficient enough oxidation near the surface to raise doubts that gold values will continue throughout the vein structure. The inconsistency of gold values along the strike of the vein further adds to this doubt. Finally, the removal of an unknown quantity of the underground vein raises skepticism as to the quantity available for renewed mining. With regards to geological inference applied to the mine waste dumps, not only was the sample confidence compromised by shallow, surface sampling, but the susceptibility of mine dumps to rapid weathering and oxidation, limits the degree of usefulness of the sample values. Most importantly, the lack of geologic continuity within the mine dumps severely restricts the sample influence to each individual sample (SME, 1991).

Because geological inference is so adversely confined as stated above, the Liberty mining claims cannot support a discovery finding. The court has stated that an inferred reserve whose existence is dependent entirely on geologic inference is not affirmation of finding quantity and quality sufficient to support a discovery. *U.S. v. Feezor, 90 I.D. 262 at 278 (1983).*

The first sentence of the above paragraph does not make any sense at all. How do "by their very designation,...vein and mine dump resources...carry very much confidence with regards to geological inference of gold values beyond the surface exposures"? I think they are trying to say that vein and mine dump deposits do not generally have continuity of gold values with depth. The next sentence suggests that oxidation is a limit to down dip gold values in the apex vein deposit.

Maybe there could be some question about the continuity of gold values to depth beyond the oxide zone if there was any data supporting that possibility. However, there is no such data. Generally, the occurrence of productivity limited to surface oxidized zones occurs in heavy sulfide, epithermal type deposits, which are not the type of occurrence at Eddy Gulch. The Eddy Gulch ore bodies are classic mesothermal, Mother Lode type deposits, as characterized by Jones, Elmendorf, Ferrero and others. As cited above, Mother Lode mines are commonly very deep. But even this attempt to dismiss the geology here is misguided. Depth of deposit, and proof of depth, is not the issue with the mining plan the Forest Service had approved. The issue was and is the dump and apex deposits and the up-dip extension of the Mountain Laurel workings under the Six O'clock claim. Oxidation has no bearing on continuity here.

The examiners did not establish inconsistency of gold values. They only sampled the upper half of the vein width at one location where the apex was exposed on the Sunrise claim. Their only other apex samples were taken from the Six O'clock claim. As it turned out, our rebuttal sampling further defined three substantial areas of valuable mineralization along the uniform vein structure that crosses the Sunrise claim, one in the intrusive rocks under the ridge point, where the USFS wrongly claimed there was no vein because it was supposedly cut off by the intrusion.

The Contestees were stopped by the USFS in the process of improving the road up to the Six O'clock claim to allow access for development. They and I knew that the apex of the Reverse Dip vein that was stoped at depth in the Mountain Laurel Mine, and that yielded significant gold from drill intersections by New Cinch and Mega in the 1970s and 1980s, was somewhere near the Six O'clock ridge top. But the stoppage prevented us from digging and drilling to better expose the surface apex and continue the blocking out of underground reserves

Because the surface apex of the Six O'clock Claim was part of the litigated and halted plan of operations, it was included in the mineral exam. I was asked by the examiners to point out locations where the USFS might take samples, and I told them that I did not know exactly where to dig. It was not clearly established at the time, but I suspected and have fairly well confirmed since then that another vein that we call the upper structure (that runs parallel to the Mountain Laurel vein) apexes there, cutting off the top of the productive reverse dip vein, creating a blind lead (see the document at Tab 23, "Six O'clock Proposed Mine XSec"). Consequently, by apex law, the Reverse Dip vein apex is the upper structure apex. Any surface sampling in that location would be on the upper structure, not the Reverse Dip vein.

Although the USFS assays from the upper structure apex showed "none detected," the metallurgical data showed higher calculated heads and very high gold recovery numbers. This disparity was explained by the USFS metallurgist as the nugget effect, in line with our contentions regarding ore character.

I was not particularly concerned by the apex confusion on the Six O'clock claim because the duplicated drill core vein intersections and the historic Mountain Laurel stopes down dip bracketed the projected ore body on two sides. This clearly established discovery for the claim. Standing on the ridge where the USFS samples were taken, to convince me to go ahead and spot some surface sampling points, one of the examiners, Mr. Gutierrez, told me

that he agreed that the drill holes established discovery on the Six O'clock claim, and so poor surface sampling results would not be an issue. However, he apparently changed his mind. In the Report, he completed his "bait and switch" game – employing an unrealistic evaluation of the drilling data while at the same time ignoring the historic mine workings down dip of the drill intersections to add huge tonnages of no-value rock to the costs of the mining operation "studied" in the Report.

This discussion began with the USFS statement about lack of continuity of gold values on the strike of the vein. Having only sampled one location of exposed veining, as part of a mineral exam that targeted only the claims in litigation, other gold bearing apex outcrops across the property were ignored. The USFS did not generate any data to refute the evidence of continuity of gold values across the Eddy Gulch property provided by other gold bearing exposures, production history and the location of visible old workings and the reported historic mines.

Although we do not claim that every foot of apex strike is ore, we do maintain that there is general continuity of gold values across the length of known productive stopes. The apex targets in the approved mining operation were located above the old stopes. Even within those designated targets, we assumed that there would be some segments of below grade material. That is why we included volume reduction factors in our reserve calculations to account for selective mining of apex material.

Although gold has been found within the subject mining claims, the cost of mining the ore, transporting the ore to staging areas and milling, has been shown to exceed any potential profit. Without even considering the enormous outlay of funds necessary for capital purchases, the claimant's operation is not profitable when developed as an integrated operation. Development of the Liberty mining claims individually is likewise unprofitable, using a variety of mining and milling scenarios. Analysis has shown that although mining the Yankee PMC could have shown a net profit above operating costs in 1985, 1990, 1994 and 1998, when capital costs are added, the claims become unprofitable to mine.

The economic calculations supporting the above statements were based on ludicrous assumptions by the USFS examiners. The Stebbins economic report included USFS dump and underground reserves that yielded below mineable grade assays in their "Resource Site" volumes. This is an obvious ruse meant to dilute the viable reserves established by their own sampling. They go on about industry standards regarding dump sampling and economic factors, but then they do not even hesitate to include the mining of waste rock in their "scenarios." No mining operation mines waste rock. Mining of waste rock is

definitely not an industry standard. So why did they include it? The needed it to establish non-viability of the claims.

Further, on the cross-section drawings of the apex included in the Report that were used to generate reserve volumes, the mine floor is drawn from the base of the outcrop horizontally into the slope, despite the fact that the vein dips into the slope. This substantially reduces the volume of mineable material with absolutely no justification. The mineable material this ploy eliminates underlies no additional overburden - it is exposed in the pit. The flat mine floor portrayal especially odd in that an in-sloped pit is environmentally preferable to a horizontal pit. This is because it contains run-off and channels it along the toe of the well-armored rock slope (less erosion), and facilitates directing it through sediment traps before exiting the pit (less sedimentation of slopes and streams). Once again, the only reason for doing this is to artificially reduce ore volume in order to establish non-validity.

The goal of our rebuttal sampling plan was to further demonstrate continuity of the Klamath apex and economically viable recoveries from dump and apex reserves through flotation-cyanide testing and bulk gravity milling. As the attached spreadsheets and discussion ahead show, we did just that.

Liberty Mining had not proposed to mine the Yankee dump as of the time of their plan of operations from 1989 to 1992. Any potential profitability during that time period is irrelevant to the issue of a regulatory taking of property through denial of approval to operate. Furthermore, the gravity/flotation/cyanidation plant recently proposed by the claimant was never included in the proposed plan of operations.

This statement is erroneous. The Yankee Dumps are part of the dumps at the Klamath Mine that we included in our plans of operations from day one. They were designated as a separate reserve for the purposes of this mineral exam because they were just outside of the Sunset claim, and onto the Yankee association placer claim.

Nor was the cyanidation processing plant included as a part of the stipulations guiding the mineral examination and agreed to by the claimant. The first time the Forest Service became aware of a gravity / flotation / cyanidation proposal, was in a letter from Tom Ferrero on February 2, 1999. This was more than 5 months after the mineral examination had been completed. Therefore, the claimant is precluded from establishing a takings based on gold recovery resulting from a flotation/cyanide processing plant.

First, we did not agree to the stipulations guiding the mineral examination, as cited above. We let the examiners do what they wanted to do with our clearly stated reservations (see my *Response to Mineral Property Evaluation Proposal, Aloisi V. U.S., 03/27/98*, dated 04/13/98).

The flotation circuit was included in the 1989, 1991 and 1992 plans of operations. The cyanide leaching of concentrates was to take place off site, and so was not included in the plans the Forest Service approved. However, the 1990 Moore metallurgical report (A-33 and A-37) described the full gravity/flotation/cyanide leach system, and it was included in the documents submitted to the USFS and court before the mineral examination was ordered. The statement that the first time the USFS became aware of the gravity/flotation/cyanide leach system was in my letter of 02/02/99 is completely erroneous, or else is another example of the government offices failing to share material documents with each other. In either event, the mineral examiners are obligated to examine the feasibility of the most reasonable and appropriate method of mining and processing a mineral deposit.

In consideration of all of the facts gathered, through the authors' field examination and the analysis of the costs of developing a mine on the subject mining claims, it is our conclusion that the minerals within the subject mining claims are not capable of being mined, extracted and marketed at a profit; as of the time of the Forest Service mineral examination, the dates of location of the claims, and the dates of the alleged takings, July 23, 1990 through February 8, 1994. Given the foregoing, we recommend that contest proceedings be initiated against the subject claims.

The conclusion here cannot be justified when considered in light of the numerous facts that were ignored or glossed over by the authors. The clear intent to "prove" non-viability, no matter what, bleeds from the pages of the mineral report. After all, the defendant in the litigation that prompted the mineral examination is the USFS. Given the highest integrity and best intentions of the mineral examiner, the pressure to produce a biased document if the facts are not clearly in the defendant's favor is extreme. No one should be put in that position. The process is unfair to the examiner, and even more so to the contestees.

There is no doubt that the motivations behind some so-called gold mining operations by small companies are suspect, and they may be viewed, at least initially, with some healthy skepticism. Many are stock scams, with no validity at all. This has been true since the days of Agricola. This is why today I make my living primarily as an engineering geologist. I recognize that examiners can approach "gold mines" with a negative attitude, especially in an area populated by some very suspect characters, including pot growers and others who may masquerade as miners to provide cover. However, there is no excuse for a government officer letting personal bias or agency pressures color his or her professional regulatory decisions.

However, the Aloisi, et al operation is different than the typical gold mining fiasco. That is why I maintained my association with it after my nearly total split from the gold mining business. From the start, it was a small operation with two directors, one of whom, Mr. Aloisi, spent years searching and exploring mining properties until he settled on the Eddy Gulch Group. His struggle to consolidate and maintain control of the claims despite a continuous onslaught of claim jumpers and others that coveted the valuable Eddy Gulch properties is a story in itself. His partner, Mr. Goodman, the quarry operator from New Jersey, brought financing and the practical knowledge and experience necessary to operate a mine. Though I was not a financial partner, I became a key member of the team as geologist. The three of us worked to get the operation permitted and into production with the intention of creating a clean, efficient operation. I make my primary living as an engineering geologist, which largely involves assuring responsible land development and environmental protection. Our efforts were in the best tradition of responsible American enterprise and exemplified the intent of the mining laws.

But we were stopped, and the directors were driven into bankruptcy. This was done by a government agency with a vendetta against miners, which hid documents and its mistakes, changed its reasons for acting and failing to act, and otherwise stalled and acted to stop this small and clean mining operation. Then, confronted with having to account for this unjustified and unjustifiable killing of this mining operation, the agency has taken the course of preparing and defending a biased and manipulated Report for the purpose of denying the viability of an approved mining operation.

Vendetta against miners? Strong words, yes, but accurate. I worked for the USFS as a technician level geologist in the mid-1970s, at the national forest that was producing the highest volume of timber in America - not a bastion of environmentalism in those days. Yet, the bias against miners was pervasive and intense. That bias is a tradition in the USFS, despite the kind words for miners included in official pamphlets for public information. When the Klamath National Forest had to address the spotted owl in 1990 and 1991, they received clearance from the Fish and Wildlife Service that the projects they had on the Forest could proceed without jeopardizing the owl. Every timber sale cleared by that FWS opinion proceeded. The Liberty Mine, cleared at the same time in the same FWS opinion, did not. It "fell through the cracks," or "mistakes were made," or it "got overlooked." Our litigation is about accountability for mistakes and indefensible behavior. This critique of Mineral Report is also about accountability, evaluating the examiners' failure to engage in anything close to an objective professional analysis of this property.

The negative attitude of USFS personnel regarding the Liberty operations was exposed when one week prior to the mineral exam, Al Buchter, an officer of the Salmon River Ranger District (our so-called "mineral officer" in fact), told two individuals (Tim Carter and Dan Drake) that they should trespass on the Liberty properties and over-stake our claims. He told them that "there is not a valid claim up there." The fact is that I personally surveyed and supervised staking of the claims in accordance with the mining location laws, as confirmed by the USFS mineral examiners' field checks. Mr. Buchter was characterizing our claims as invalid without any knowledge to back it up. I cannot help but conclude that his intentions were malicious.

**Conclusion**

We have been flabbergasted during this whole side road down which we have been taken in this case – at first called a mineral evaluation and later devolved into a mineral exam. We were assured at the start that the exam had no bearing on claim validity. It was represented to us as just a way to determine the value of the deposits in question to facilitate the lawsuit. Then it mysteriously became a mineral exam, and it was clear to us that the government strategy was to attack our claims and attempt to take away our right to sue in the Court of Federal Claims. It was a calculated "bait and switch" perpetrated by the USFS.

Setting aside the obvious legal questions regarding the applicability of the mineral evaluation/validity test, two standards must be satisfied, according to H-3890-1, Handbook for Mineral Examiners (BLM, 3/89). It must be demonstrated that we were "justified in the further expenditure of his [our] labor and means, with a reasonable prospect of success, in developing a valuable mine" (Prudent Man Rule). It also must be demonstrated that "by reason of accessibility, bona fides in development, proximity to market, existence of present demand, and other factors, the deposit is of such value that it can be mined, removed, and disposed of at a profit (Marketability test)."

Existing data clearly demonstrate that the Liberty Mining operation of the Eddy Gulch claims exceeds the standards set forth by the Prudent Man Rule and Marketability Test.

In 1999, Mr. Gutierrez stated that he was only going to consider the data from government sampling and testing, and throughout our battle to get permitted for and completing rebuttal sampling, the USFS continually maintained that all of our data would be "inadmissible", despite the admonition of the

administrative law judge that the contest might have to be dismissed if we were improperly prevented from getting evidence necessary to present our rebuttal case.

The data we have presented to the mineral examiners, before they completed their Report, and since, show that even within the narrowest view of the sampling data, validity has been demonstrated. However, it would be unprofessional to ignore the preponderance of other compelling data. This is especially true because of the very questionable USFS sampling methods. It states in H-3890 that "samples should be representative of the entire mineral deposit…using methods and techniques that are currently recognized as standard practice in the minerals industry." It was my stated opinion before they were taken, and it is now, that the USFS samples were not representative, and do not meet industry standards of practice for ore deposits of this kind.

It also says in H-3890 that "the validity of a mining claim is directly related to the results of the sampling." The "sampling" that must be considered must be all sampling. The view that only government sampling data is applicable to the evaluation is an unacceptable interpretation of USFS obligations in a mineral examination, especially when the agency's own sampling is of questionable value under its own handbook standards. It reeks of bias, and exposes the agency's goal of invalidating the claims, rather than fairly evaluating them, to generate the Report based solely on the agency's inadequate sampling.

It is my unqualified professional opinion that Liberty Mining, armed with the historical and technical data available, supplemented by more recent mapping, drilling, sampling, metallurgical and economic data, have clearly shown ***a reasonable prospect of success and reasonable probability of making a profit***. And based on my personal experience in the matter, I am convinced that the USFS handled the permitting of the Eddy Gulch properties with bias and intent to do harm, and succeeded, costing Aloisi, et al their investment and future profits.

## Part 2: After the Mineral Report, 1999 to 2006

*Liberty Tests of USFS 1998 Sample Splits, Rebuttal Sampling Plan and Permitting*

After receiving the USFS Mineral report, we had our own tests completed on 10 of the sample splits that we had retained. Don Moore ran gravity-flotation-cyanide leach tests on the 10 splits (results presented in Moore's Progress

Report No. 1 dated 01/16/99 and Progress Report No. 2, dated 02/21/99 – both in the record).

In Progress Report No. 1, Moore stated that average calculated head grade of the samples was 0.190 opt Au, ranging from 0.072 to 0.542 opt. Hand gravity concentration recovery was 0.80 to 15.13%, averaging 3.84%, in average 0.66 weight percent cons. Gravity/flotation recovery ranged from 5.31 to 43.21%, averaging 17.92 percent. Gravity/flotation/cyanide leach recovery ranged from 10.39 to 73.97%. The higher head grade samples generally yielded greater flotation recoveries, and initial indications are that cyanide recoveries increase with higher flotation recoveries. This supported my contention that the gold coarsens as the head grade rises above the background 0.10 opt range.

Moore's data from four of the cyanide tested samples indicated higher gold assays for leached tailings than flotation tailings, which should be impossible. It could happen if a coarse grain of gold made it through the sample splitting process to the leach tail assay, missed in each previous step by the assay split – a clear example of the nugget effect Three of them yielded relatively high flotation recoveries, similar to the one sample that yielded 73.97% recovery from combined gravity/flotation/cyanide leach testing. These three anomalous samples were rerun. Measures were taken to control preg robbing. In Progress Report No. 2, Moore reported gravity-flotation recoveries of 9.59 to 43.42%, and gravity-flotation-cyanide leach recoveries of 49.7, 55.6 and 59.3%. This indicated that recoveries could be substantially increased with the gravity-flotation-cyanide leach circuit proposed back in 1990, especially once the circuit chemistry and methodology was fine-tuned.

This set up the conditions for our proposed rebuttal sampling plan. We proposed a series of bulk samples cut along the exposed portions of the Klamath Mine apex west of the Klamath ridge and along a pioneered and reclaimed road along the apex east of the ridge, as well as a group of samples from the Klamath Dumps. We also proposed drilling of the Klamath vein down dip from the apex, under the ridge, and additional drilling of the 6 O-clock underground target. We provided an engineered plan of operations, showing road grading, construction and reclamation, backhoe pits location and reclamation, etc.

The response to our plan by the USFS included real or feigned confusion, unreasonable delay and lame excuses which lasted for four years! Some of the whoppers they came up with included…

1) Since the 1999 Mineral Report concluded that our claims were non-mineral in character, the proposed sampling is "unreasonable." This completely ignored the point that the sampling was supposed to constitute a rebuttal to that report.

2) "Because the environmental impact of our proposed plan was excessive, the proposed sampling is unreasonable." These environmental issues were never defined, despite our written request for details. This despite a clearly stated reclamation plan and agreement to redesign miles of access road as per USFS standards (which actually caused more erosion and sedimentation as I had predicted).

   The road issue was also an exercise in USFS confusion. At our plan of operations informational field meeting with all of the various USFS disciplines attending, one of them (Varga) claimed that USFS rules required our roads to be de-bermed and out-sloped with rolling dips. Another claimed that MSHA safety regulations required in-sloping and berming. As it existed, the road had become armored to the point of nearly zero erosion. Nonetheless, they ended up going with the former, applying major overkill in terms of the frequency of rolling dips, causing nearly the entire road bed to be cut and filled and otherwise scarified, leaving a horribly bumpy road and leading to a significant increase in erosion. Just simply rerouting the drainage in a few isolated locations would have been a much better treatment, with far less environmental impact. I tried to convince them of that, but they would not listen despite the fact that I have been designing drainage and erosion control plans for over 20 years without a failure, in the real world where there is accountability for one's recommendations.

   And how does this environmental concern square with their approval of the 6 O'clock crosscut under a "Categorical Exemption". How are a few backhoe pits excessive and a 300+ foot tunnel and related waste areas not? We believe that they decided that approving the crosscut was a clever way to break us, by allowing us to drive the tunnel at great expense and then delay and refuse to approve our plan to mine the ore. The approval was only for the crosscut through un-mineralized country rock. We decided that the risk of moving ahead with the crosscut without full mining plan approval was too great, and so the crosscut was never driven.

3) In response to our rebuttal sampling plan, we were asked, "What is a backhoe pit?" This after they had dug around 20 of them in 1998. We have to remind the agency that they never refilled (reclaimed) their pits after their 1998 sampling. They remain open still, some of them causing substantial erosion and sedimentation (especially at the Union Dumps). Yet they made a public safety issue out of our rebuttal sampling pits (see item 4 below). Their hypocrisy knows no bounds.

4) "The backhoe pits will be a public safety hazard." This after we clearly stated in our plan that we would fill each pit immediately after removing the sample and moving on to the next. What public? Access to this part of Eddy Gulch is gated by the Forest Service; there is no recreational traffic.

5) "The backhoe pits constitute mining of the deposit." Either this is an admission that we could make a profit even from such a small scale operation, or it is plain silly.

6) "The backhoe pits and east side road may cause landslides." This despite detailed plans and cross-sections provided by a California Certified Engineering Geologist – me.

7) They prevented us from sampling and drilling during the dry season, citing fire danger, then further prevented us from sampling and drilling during the rainy season, citing road bed erosion and sedimentation. This left a very narrow window that lead to additional delays. This despite their admitting to us that drilling and road cut sampling were "notice level" activity, meaning that only a simple notification of intent to do the work was necessary. We had originally submitted our rebuttal sampling plan in the form of a notice, but were formally notified that a plan of operations had to be submitted and approved. At any other location, without the agency goal to prevent us from gathering evidence, this likely would have been notice level work.

Despite all of this, and with the help of a mediator supplied by the Interior Department (mediation which the USFS cut off after the mediator was forced to slog through all of the preceding "obstacles" to approving our operation, and the agency agreed to process the plan of operations), we managed to complete most of our rebuttal sampling after the four year agency delay.

The rebuttal sampling, as proposed, involved taking two separate samples from each pit. One was a bulk channel sample with a volume of 4 to 5 yards, cut across the apex with equal volume per foot of channel, as per standard channel sampling protocol. The other would be a smaller, "pre-test" channel sample scraped from the pit-exposed apex surface, as per channel sampling protocol. This sample was dumped out onto a tarp and grid sampled with shovels into approximately 50 pound bags for shipping to the lab. The USFS took a few shovels from the bulk sample buckets and took parallel pre-test samples.

We stockpiled the bulk samples on the private Rollin mill site for milling at a later date. The pre-test samples were sent to Don Moore in Tucson, where they underwent gravity-flotation-cyanide leach tests as described in Don Moore's report titled *Metallurgical Testing of Liberty Mine Gold Ores*, dated January 2005 (copy supplied to the USFS).

*Rebuttal Sampling Results - Pretests – 2004*

The documents produced to the Forest Service in January 2007, captioned "**eg_0107_03**_Plan_Sampling Results and Mining," "**eg_0107_04**_Cross-Sections_Dumps and Apex Volumes," and "**eg_0107_05**_04-06 Sample Data & Econ Spreadsheets" present the mapping, and results and evaluation of the 2004 Liberty rebuttal sampling of the Klamath apex and dumps. The three documents are self-explanatory; however, I offer the following supplementary comments and explanations.

The sample map (eg_0107_3) was created on a CAD program with data from numerous surveys completed from 1985 to 2005. Documents eg_0107_06, 07 and 08 (Tabs 6, 7 and 8 in the January 2007 document production) show the extent and density of survey control points. The red points shown on 06 and 08 constitute a 1985 cadastral survey I completed with a theodolite and EDM, based on one corner of the Mt. Laurel patent located by bearing trees, and a north star shot for azimuth control. This survey was the control for resetting the numerous Liberty claim corners. The other surveys shown on document 08, scattered across the Klamath Mine, and using some of the 1985 points as control, were compass, clinometer and tape surveys. I worked my way through college working as a survey crew chief for an engineering company, completing numerous cadastral surveys and construction staking projects, and so my surveys are accurate.

Surveys became an issue when the USFS Mineral Report contained maps that did not approximate reality, and rendered all the USFS cross-sections and

volume calculations unreliable. After I informed the mineral examiners that their maps were way off, they continually requested my survey data. Here they are. I have spent many hours in the field and office creating these maps and cross-sections; they are accurate, and infinitely more accurate than the GPS exercise resulting in the maps in the Report.

I bring this up to drive home the point that the mineral examiners have presented their mineral report as though it was a definitive document. In reality it was based on very weak engineering data, whereas our evaluation is based on sound engineering.

Document eg_0107_03 and sheet 2 of document eg_0107_05 (Tab 3 and Tab 5, Sheet 2) show how I grouped the sample testing results into three areas of selective mining along the Klamath apex. I reduced the volume mined in two of these areas by the ratio of below and above cut-off grade samples within that area. On the map, the samples plotted as green rectangles are below cut-off grade, and the ones plotted as green rectangles filled with red are above cutoff grade. The green sample numbers correspond to the sample numbers on the spreadsheets (Tab 5). The red values are the recovered grade (opt)/width of sample.

The black lines on the map are the location of the document eg_0107_04 (Tab 4) cross-sections. The cross-sections were generated from the survey data discussed above. The widths of the veins shown on the apex cross-sections are based on sample widths in that area. The depth of mining chosen is in the general vicinity where the stripping ratio appears to make further mining a break even or loss proposition. This I based on calculations of larger mining areas as indicated by the dashed lines around each of the three mining areas on the map (Tab 3). There may be some line between the solid lines around the chosen hatched areas and dashed extended boundaries at each area, where mining would continue to be profitable. But for this exercise, I am using the hatched areas.

Sheet two of document eg_0107_05 (Tab 5), aside from presenting the breakdown of sample groups and calculation of recovered grades, etc., shows two graphs that illustrate the impact of the nugget effect on the sampling results. In "pockety" or "nuggety" deposits, averages of sample testing results will always fall short of being representative of the whole mass. The only truly representative sampling in deposits like these is mining. This is a fact that every industry-experienced mining geologist that has encountered this type of deposit knows. Document eg_0107_20_ Nugget Effect Sampling Block

Diagram (Tab 20) presents a simplified visual expression of this phenomenon, showing the relative sizes of the different sample splits.

Shortly after we received the pre-test results, I wrote the following preliminary evaluation.

"It seems clear to me that what we have here is a series of tests on small volumes of material in which the background, fairly well-distributed, fine gold is well-represented, but in which the nuggety, coarse, free gold is barely present is at all. This is evidenced by the extremely low gravity and float recoveries, yet pretty good (but below projected) cyanide recoveries. It is further supported by my statistical analysis of the results (graphs on sheet 2 of the spreadsheets)."

"Running the ground material through the enhanced gravity centrifuge system as planned should pick-up the nuggety material. All we really need to bulk run for is the coarse that is too poorly distributed to show up in the small pre-tests."

"The production records on the Klamath indicate better than 0.5 opt average recoveries at widths from 6 to 22 feet. At our average 20 foot width we should be averaging about 0.075 to 0.1 opt recovery, but are getting only 0.55 opt from the apex and 0.49 opt from the dumps (before throwing out lower grade results- selective mining). The missing factor is the coarse gold."

"Moore is gravity testing only 1,000 grams and leach testing only 500 grams of material, which is about 2.5 and 1.25 pounds, or 1/1,000th and 1/2000 of a ton. It would be a miracle if that size test picked up a representative distribution of coarse gold in any samples. The assays are even smaller cuts and so the same applies."

"Based on numerous ore tests in the records, we have maintained all along that the lower 0.10 opt +/- is the average assay of the dump and apex background fine ore. The pre-tests show recoveries of that material ranging from 40 to 60 percent - yielding about 0.05 opt. The remaining portion of the above projected 0.075 to 0.1 opt recovery minimum is composed of poorly distributed coarse, free gold, nearly 100% of which can be recovered - based on production records indicating gravity mill recoveries in the 90s. Of that, the 10% +/- loss is the 0.1+/- opt background. The 90% recovery is the 0.5+/- opt, from 0.55 opt +/- opt ore. Our head grades should be about 1/4 of the



PE-30-378

underground head grades, considering the high grade streak mined out and the wider cut we are taking."

"The Quigley and McBroom 20 ton bulk gravity test of dump ore yielded 0.051 opt free, or 27% recovery from head grade 0.287 opt material. Assuming a conservative lower head grade closer to 0.125+/-, we could expect at least an additional 12% recovery, which would drive our percentage up to about 60% overall, yielding about 0.075 average opt recovered. This is about a 50% increase in overall average recovery, inclusive of all tonnages - no selective mining - and so much more volume."

"The pre-tests were essential. They established a higher recovery and greater width, extent and volume of the reserves. They made it so that we do not have to run the bulks through float and cyanide. This will cut the cost of running bulks drastically."

"The bulks will complete our tests - the pre-tests only represent one phase of testing. We just need to be methodical and patient."

"It is turning out that the deposit is proving to be very similar in terms of recoverable grade and tonnage to my original estimates back in the 80s. We had it right then, we just did not set out to prove it to someone else, least of all the enemy. We had 'a reasonable expectation of profit' and were goin' minin'."

*Gravity Milling of Bulk Samples - 2006*

Sheet 03 of Document eg_0107_05 (Tab 5) presents a summary of the sample characteristics and results from gravity milling of selected bulk samples in 2006. The data is generally self-explanatory. Don Moore's report titled *Liberty Mine Gravity Concentration of Dump and Apex Ore Samples* and dated October-November, 2006, provides a detailed description of the mill circuit and methodology of head and tail sampling and analysis. Important numbers include the bottom line $2.43 per ton recovered, the anomalously low heads and tailings grade values compared to the corresponding pre-test results per sample, and the fact that two-thirds of the gold never got past the ball mill. The latter partially explains the former as regards the heads, since the head samples were collected at the outflow of the ball mill, before entering the return screw feed and Knelson Concentrator.

I added the $2.43 recovery from the 2006 gravity milling onto the pre-test results for a number of reasons. The mill that was used was strictly a gravity

mill. It was not capable of collecting the background fine gold that comprised virtually 100% of the pre-test recoveries. The conclusion that the pre-test recoveries were composed only of very fine background gold is based on the very small size of the pre-test samples analyzed, the dropping of gravity testing after the first 3 or 4 samples, and the fact that cyanide leaching does not break down coarse gold. The conclusion that the gold recovered in the gravity mill was very coarse, and so a separate gold fraction from the pre-test gold, is based on the fact that a majority of it never got out of the ball mill.

*Anomalous Calculated Head/Assay Head Values*

The other factor contributing to the low 2006 head assays is related to carbonaceous and oxide chemistry fouling assays under certain conditions. Sheet 04 of the spreadsheets (Tab 5) presents data sets that illustrate what I have identified as a pattern in the anomalous head assay problem. I have heard from assayers for years that carbonaceous and/or oxidized material can play havoc with assays. Fine gold in carbonaceous material is said to "go up the flue" when fire assayed. Don Moore cited oxidation as a problem in one of his Liberty Ore reports.

There seems to be a strong relationship between flotation of carbonaceous material and better fire assays. The post ball mill heads and tails from the 2006 milling yielded much lower assays than the pre-tests on the same material. I believe that the fine, wet grinding and drying of the gold in with the carbonaceous material enhances the assay gold loss problem, but that after the material has passed through a flotation circuit, the problem is greatly reduced.

Sheet 04 (of Tab 5) shows that for the USFS 1999 gravity tests, the average value of the assayed head (AH) was 18% lower than for the calculated head (CH). For the Moore gravity-flotation-cyanide tests on 10 of the USFS 98 samples, the average AH was 33% lower than the CH. For these same 10 samples, the USFS results came out with average AH 13% higher than the CH, and so the net change is even greater. For the recent 2006 bulk milling, the average CH and AH were nearly equal, but the AH was about 70% less than the pre-test CH.

Where the AH and CH are the same or close to the same, the material has not been run through a flotation circuit, and the assays are lower than actual gold content. Where the material has passed through a flotation circuit, the calculated head spikes because the assayed splits have been "scrubbed" and assays reflect more accurate gold values.

I believe that some of our ore grade numbers are skewed negatively by this phenomenon, and so my grade estimates are more than likely lower than probable gravity-flotation-cyanide-milling recoveries.

*Six O'Clock Underground, Union Dumps and Yankee Dumps*

Sheet 6 of the spreadsheets (at Tab 5) presents the data supporting the addition of the Six O'Clock underground and the Union Dumps, despite poor USFS sample testing results in 1998. In the rebuttal to the mineral report above, I discussed how we were stopped in 1990 as we were setting up to drill and open up our Six O'clock underground reserves, and how the Report manipulated this situation by first dismissing our drilling and historical mining data that bracketed the reserves on two sides, and then illogically adding in the cost of underground mining of material that the examiners' surface sample assays identified as well below any cut-off grade. Sheet 6 of document eg_0107_05 (at Tab 5) and the attached documents eg_0107_22_Six O'clock Proposed Underground Mine Map (Tab 22), eg_0107_23_Six O'clock Proposed Underground Mine XSec (Tab 23) and eg_0107_24_Six O'clock - Mt. Laurel UG Map (Tab 24) – clearly show the Six O'Clock reserves to be at least probable, and nearly proven, and that Liberty was "justified in the further expenditure of [its] labor and means, with a reasonable prospect of success, in developing a valuable mine" (Prudent Man Rule), with respect to this resource, and "by reason of accessibility, bona fides in development, proximity to market, existence of present demand, and other factors, the deposit is of such value that it can be mined, removed, and disposed of at a profit" (Marketability test).

The mineral examiners would not sample the Union Dumps where we asked them to, because there was quartz showing on the top of the dump in those locations. They purposely tried to avoid what appeared even to them to be ore material. They reduced the representative quality of the sampling by trying to avoid decent looking material. This was a problem in more than one location. It was our understanding that the mineral examination protocol involves the examiners sampling where the claimants specifically identify so-called "discovery points." But, the mineral examiners were on a mission to prove us invalid. They were not there to complete an unbiased mineral exam. There is even an entry in the field notes provided to us by mineral examiner Jim DeMaagd, saying that Hilton Cass, a regional USFS minerals official, wanted to pick the sample spots, followed by exclamation marks.

Although I have included the Yankee Dump as part of the Klamath Dumps in Scenario B, it is added as an extra reserve in scenario A. The Yankee Dump data is important beyond its value as a single deposit, because it is representative of numerous small dumps, and portions of larger dumps scattered across the Liberty Claims (on the Anna Johnson and Union claims, on the private Mt. Laurel mine parcel, and other un-sampled Klamath Dumps, etc.). We call these "sweetener" deposits, as many have yielded specimens of visible gold and showed substantial gold when sampled and panned. However, none of them have been included in the sampling, but are important for supplementing ore volume and grade control.

Because of the nature of the mineralization on the property, with its pockety and nuggety character, and carbonaceous gangue, no random sampling program will generate values as high as the actual mined values. This is a well known principle in the mining industry. Many of the huge heap leach operations that revitalized the gold mining industry in the '70s and '80s would never have been developed without an understanding of this principle of sampling in non-homogenous material. Also, our rebuttal sampling program was designed ultimately to run about 150 tons of material to more closely approximate mining results. We only were able to run about 20 tons from a poorly distributed set of samples. And the test milling circuits were borderline at best. Small bottle flotation and leach tests, and a patched together, leaky gravity mill like the one Don Moore was able to assemble on short notice for this specific project, cannot approximate the efficiency of a full scale mill with a circuit that has been fine tuned by trial and error and mechanical and chemical adjustments as necessary. We believe that the grade and tonnage numbers resulting from the testing are significantly suppressed by these factors. However, for the sake of this mineral examination exercise, we have calculated our economic model with the numbers as generated, despite their suppression.

I expect that the examiners will criticize this selective mining plan, claiming that it is not realistic or "industry standards" or something like that. This from examiners who refused to evaluate the property without including the underground mining and milling of tens of thousands of tons of what they claimed was below cutoff grade rock. In fact, selective mining by grade control is common industry standard practice. In the past, I was part of the supervisory team at a mine that operated in that way. It works quite well. Between panning and assaying, and close monitoring of milling, any deposit can be selectively mined. The apex material grade varies in definable zones and the dumps are built out in discreet layers that can be visually separated and mined or not mined depending on pan and assay tests. In 1990, Liberty had a fully functional assay lab specifically set up for grade control in the milling operation, as well as for assays in support of grade testing of other exposed deposits, and exploration of other mineralized areas for future consideration.

Another important factor is what I call the "Cadillac" factor. Liberty's mining operation under way, and its milling operation setup just beginning in 1989-1990 was going to be a very modest operation with a small team at work,

including the owners. Equipment would be bought used (including the mill). There would be no extraneous costs for a lot of employees, layers of administration and brand, spankin' new equipment. The operation would be more like a "Ford Fiesta" than a "Cadillac." Models build in "fluff" for these factors, and it is a favorite tactic of mineral examiners to build in a load of what their manuals say are "typical" costs in industry that would only be "typical" in "Cadillac" operations. These high costs are inapplicable to an operation like Liberty's, and tend to overwhelm an appropriate economic analysis by overloading it with unrealistic costs.

Years ago, I was involve in a case where two miners were suction dredging for jewelry grade nuggets on weekends, and were doing quite well selling them for substantially above spot gold price. The mineral report prepared to get them out of a USFS recreation corridor added in employee wages and calculated values at spot gold price, as though they were selling concentrates instead of jewels. To make matters worse, the mineral examiners refused to sample from the 20-foot deep channel where the nuggets were being dredged, citing safety issues, and took their samples from the high gravels along the edge of the river, where there was far less gold. Suppressing values with poor sampling and overstating costs seems to be the current standard policy for USFS mineral exams, especially when there is a motive to generate the so-called "prima facie case" of claim invalidity.

The point here is that the economic models presented in this text and associated documents err on the side of very conservative valuation, and a selective mining operation with a well tuned mill would produce higher values than presented here, more in line with our original estimates of ore grades made back in the late '80s. The profit margin numbers in this economic evaluation and the adaptations of the evaluations by the other three presented here should be considered to be low estimates.

Respectfully,

REGISTERED GEOLOGIST
CERTIFIED ENGINEERING GEOLOGIST
T. Ferrero
THOMAS FERRERO
NO. 1806
STATE OF CALIFORNIA