**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| ALFRED ALOISI, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | No. 95-650L |
| | ) | |
| v. | ) | Judge Lawrence S. Margolis |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT'S REPLY IN SUPPORT OF ITS**
**<u>MOTION TO DISMISS OR, ALTERNATIVELY, FOR SUMMARY JUDGMENT</u>**

RONALD J. TENPAS
Assistant Attorney General
Environment & Natural Resources Division

BRUCE K. TRAUBEN
Trial Attorney
Natural Resources Section
Environment & Natural Resources Division
U.S. Department of Justice
601 D Street, NW
Washington, D.C. 20004
(202) 305-0238 (phone)/(202) 305-0506 (fax)

WILLIAM J. SHAPIRO
Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Div.
501 I Street, Suite 9-700
Sacramento, CA 95814-2322

<u>OF COUNSEL</u>:
ROSE MIKSOVSKY
U.S. Department of Agriculture
Office of General Counsel
33 New Montgomery St., 17th Fl.
San Francisco, CA 94105-3170

Date: March 21, 2008

# TABLE OF CONTENTS

I. INTRODUCTION . . . . . 1

II. ARGUMENT . . . . . 3

A. Any Temporary Regulatory Takings Claim Asserted by Plaintiffs Is Not Ripe . . . 4

1. Plaintiffs' Argument Misapprehends the Relevant Legal Principles . . . . . . 4

2. Plaintiffs Concede that They Failed to Submit a Proposal for Mine Production Activities, and Plaintiffs' Arguments Related to Ripeness Must be Rejected . . . . . 5

3. There Also Was No Extraordinary Delay or Bad Faith . . . . . 8

B. Plaintiffs Failed to Meet Their Burden of Showing a Temporary Regulatory Taking Under Penn Central . . . . . 10

1. Plaintiffs Failed to Show Economic Harm . . . . . 10

2. Plaintiffs' Investment-Backed Expectations Argument Misses the Mark . . . . . 12

3. The "Character" Prong of the Penn Central Test Favors Dismissal . . . . . 13

C. Plaintiffs Fail to Meet Their Burden of Showing that Their Claim Is Not Grounded in Tort and Is within this Court's Jurisdiction . . . . . 13

D. Plaintiffs Failed to Show They Had a Cognizable Property Interest in Mineral Lots 45A and 45B at the Time of the Alleged Taking . . . . . 17

III. CONCLUSION . . . . . 19

## TABLE OF AUTHORITIES

### CASES

Am-Pro Protective Agency, Inc. v. United States,
281 F.3d 1234, 1238-40 (Fed. Cir. 2002) . . . . . . . . . . 10

Bass Enters. Prod. Co. v. United States,
54 Fed. Cl. 400 (2002) . . . . . . . . . . 11

Boise Cascade Corp. v. United States,
296 F.3d 1339 (Fed. Cir. 2002) . . . . . . . . . . 6, 9

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) . . . . . . . . . . 3

Clouser v. Espy,
42 F.3d 1522 (9th Cir. 1994) . . . . . . . . . . 5

Cottrell v. United States,
42 Fed. Cl. 144 (1998) . . . . . . . . . . 16

Freese v. United States,
6 Cl. Ct. 1 (1984) . . . . . . . . . . 5

Hansen v. United States,
65 Fed. Cl. 76 (2005) . . . . . . . . . . 13, 14, 16

Hayward v. United States,
30 Ct. Cl. 219 (1895) . . . . . . . . . . 15

In re Chicago, Milwaukee, St. Paul and Pac. R.R. Co.,
799 F.2d 317 (7th Cir. 1986),
cert. denied, 481 U.S. 1068 (1987) . . . . . . . . . . 15

Lowe v. United States,
76 Fed. Cl. 262 (2007) . . . . . . . . . . 15, 16

McNeil v. City of Montague,
124 Cal. App. 2d 326 (1954) . . . . . . . . . . 15

Morris v. United States,
392 F.3d 1372 (Fed. Cir. 2004) . . . . . . . . . . 4

National Data Corp. v. United States,
50 Fed. Cl. 24, 28 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Patton v. United States,
64 Fed. Cl. 768 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Penn Central Transp. Co. v. New York City,
438 U.S. 104 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 10-13

Reynolds v. Army & Air Force Exch. Serv.,
846 F.2d 746 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Rith Energy, Inc. v. United States,
270 F.3d 1347 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Seiber v. United States,
364 F.3d 1356 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Tabb Lakes, Ltd. v. United States,
10 F.3d 796 (Fed. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10

Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,
535 U.S. 302 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 16

Thune v. United States,
41 Fed. Cl. 49 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13-16

United States v. Vogler,
859 F.2d 638 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Walcek v. United States,
44 Fed. Cl. 462 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Whitney Benefits, Inc. v. United States,
18 Cl. Ct. 294 (Ct. Cl. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Williamson County Reg'l Planning Comm'n v. Hamilton Bank,
473 U.S. 172, 186 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Wyatt v. United States,
271 F.3d 1090 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 18

Yuba Natural Resources, Inc. v. United States,
904 F.2d 1577 (Fed. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**STATUTES**

16 U.S.C. § 1531 . . . . . . . . . . 4

30 U.S.C. § 612(b) . . . . . . . . . . 5

**REGULATIONS**

36 C.F.R. § 228.1 . . . . . . . . . . 4

36 C.F.R. § 228.4 . . . . . . . . . . 5

36 C.F.R. § 228.4(d) . . . . . . . . . . 7

36 C.F.R. §§ 228.5 . . . . . . . . . . 5

36 C.F.R. § 228.8 . . . . . . . . . . 5, 6

**TREATISES**

2 Richard R. Powell, Powell on Real Property,
§ 16.02[4] (Michael A. Wolf, ed., 2001) . . . . . . . . . . 18

**DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS OR, ALTERNATIVELY, FOR SUMMARY JUDGMENT**

Defendant, the United States, hereby replies to Plaintiffs' Response to Defendant's Motion to Dismiss, or Alternatively, for Summary Judgment ("Pls.' Resp."), as follows:

## I. INTRODUCTION

Plaintiffs' temporary regulatory takings claim is not ripe. Mining operations in national forests are governed by a variety of environmental regulations, including a requirement that prospective operators submit a detailed proposed plan of operations before initiating any ground-disturbing mining activities. Plaintiffs concede that they failed to submit a sufficiently detailed plan for mining production, despite repeated requests for additional information from the Forest Service. Based on well-settled, binding legal precedent, Plaintiffs' regulatory takings claim is not ripe and this Court should dismiss this claim for lack of jurisdiction. See § II.A, infra.

Plaintiffs' contention that their claim is ripe due to an alleged delayed receipt of a Biological Opinion, issued by the Fish and Wildlife Service ("FWS") pursuant to the Endangered Species Act ("ESA"), should be rejected. The FWS's issuance of the Biological Opinion is not the same as the Forest Service's approval of a proposed plan of operation. The fact that the FWS issued a Biological Opinion does relieve Plaintiffs from the requirement to have submitted a sufficient plan of proposed operations to ripen their regulatory takings claim. Consequently, Plaintiffs' discussion of the alleged delay associated with the Biological Opinion is irrelevant to the ripeness issue raised here. As discussed below, Plaintiffs' argument conflicts with legal precedent on ripeness, is offered with no legal citation or analysis, and should be rejected. See id.

Equally unconvincing is Plaintiffs' suggestion that their claim had ripened by extraordinary delay. Extraordinary delay is relevant to the ripeness inquiry only when the agency unreasonably delays its review of a permit application. However, Plaintiffs concede that they failed to submit a

sufficient proposed plan of mining operations for the Forest Service to review. In addition, extraordinary delay does not mean that a delay of any length ripens into a taking – the principle applies only when the delay in processing a proposal is unreasonably long in light of the complexity of the regulatory scheme at issue. Even if the alleged delay were attributable to the government according to Plaintiffs' theory of the case, it was not unreasonably long considering the government's efforts to protect the northern spotted owl. Moreover, Plaintiffs contributed to the alleged delay by failing to provide information repeatedly requested by the Forest Service. Plaintiffs' claim, therefore, did not ripen by any extraordinary delay. See § II.A.3, infra.

Additionally, courts rarely will find a taking based on extraordinary delay without a showing of bad faith. To show bad faith, Plaintiffs must come forward with clear and convincing evidence to overcome the strong presumption that government officials exercise their duties in good faith. This standard requires a showing of specific intent to injure the plaintiff. The Plaintiffs, however, have failed to show any evidence of bad faith. Accordingly, there was no bad faith on the part of the government or extraordinary delay in the permitting process that ripened any takings claim. See § II.A.3., infra.

Alternatively, even if Plaintiffs' claim was ripe, Plaintiffs fail to satisfy any of the Penn Central factors. See Penn Central Transp. Co. v. New York City, 438 U.S. 104, 124 (1978). First, Plaintiffs failed to show any economic harm resulting from that alleged temporary taking. Defendant has shown how Plaintiffs' damages claim is based on conjecture and speculation. Additionally, as a matter of law, they were not deprived of all economic use of the property at issue because they rented their mining claims during the alleged takings period. Second, Plaintiffs cannot show interference with any reasonable investment-backed expectations, because the complicated regulatory scheme governing mining in national forests pre-existed Plaintiffs' property interest. Third, the

character of the government action prong favors the United States. Accordingly, Plaintiffs do not meet any Penn Central factor, and summary judgment should be granted to Defendant. See § II.B, infra.

In addition, Plaintiffs fail to meet their burden of showing that their claim is not grounded in tort. As discussed below, the gravamen of Plaintiffs' claim is that employees of the United States failed to take certain actions or otherwise acted improperly. Plaintiffs cannot challenge those actions here in the guise of a takings claim. See § II.C., infra.

Finally, even if Plaintiffs' claim was ripe, Plaintiffs did not have a compensable property interest in either the Mountain Laurel mine (Mineral Lot 45A) or the Rollin Mill Site (Mineral Lot 45B) at the time of the alleged taking at the time of the alleged taking. Defendant, therefore, is entitled to partial summary judgment with respect to these parcels. See § II.D, infra.

## II. ARGUMENT

Defendant's motion to dismiss put this Court's subject matter jurisdiction into question. Accordingly, "[o]nce the court's subject matter jurisdiction is put into question, it is 'incumbent upon [the plaintiff] to come forward with evidence establishing the court's jurisdiction. [The plaintiff] bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence.'" Patton v. United States, 64 Fed. Cl. 768, 773 (2005) (quoting Reynolds v. Army and Air Force Exchange Serv., 846 F.2d 746, 748 (Fed. Cir. 1988)) (alterations as in original). The Plaintiffs, however, have failed to come forward with evidence showing that this Court has jurisdiction and this action must be dismissed.

Additionally, Plaintiffs have failed to meet their burden of showing genuine issues of material fact that would defeat Defendant's motion for summary judgment. See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). Accordingly, if the Court finds that it has jurisdiction over this action, it still

should grant Defendant's alternative motion for summary judgment and dismiss this case.

**A. Any Temporary Regulatory Takings Claim Asserted by Plaintiffs Is Not Ripe**

**1. Plaintiffs' Argument Misapprehends the Relevant Legal Principles**

Defendant has shown that the Court should dismiss Plaintiffs' complaint for lack of jurisdiction because any temporary regulatory takings claim asserted by Plaintiffs is not ripe. See Def.'s Mem. at 22-27. "The general rule is that a claim for a regulatory taking 'is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue.'" Morris v. United States, 392 F.3d 1372, 1376 (Fed. Cir. 2004) (quoting Williamson County Reg'l Planning Comm'n v. Hamilton Bank, 473 U.S. 172, 186 (1985). When "an agency provides procedures for obtaining a final decision, a takings claim is unlikely to be ripe until the property owner complies with those procedures." Morris, 392 F.3d at 1376. Plaintiffs have not met their burden of proof to show that their takings claim is ripe for judicial review.

Plaintiffs misapprehend the very nature of the ripeness inquiry by erroneously equating the FWS's issuance of the Biological Opinion pursuant to the Endangered Species Act, 16 U.S.C. § 1531 et seq. ("ESA"), with the requirement that an operator submit a proposed plan of operations pursuant to Forest Service regulations, 36 C.F.R. § 228.1 et seq. Plaintiffs contend, for example, that the "permit here was clearance of mining the Eddy Gulch property with respect to its impacts on the owl." Pls.' Resp. at 5; see also id. at 2 ("Owl clearance is the regulatory hurdle, the permit, at issue here."). Plaintiffs' position is illogical – compliance with the ESA is only one element of the regulatory regime governing proposed mining operations in national forests. See Def.'s Opp. Pls.' Mot. Summ. J. at 4-5 ("Def.'s Resp.") (discussing various state, local, and federal requirements before mining operations can be initiated); see also, e.g., 36 C.F.R. § 228.8 (listing requirements for environmental

protection, among which "Fisheries and Wildlife Habitat" is but one of several categories to be considered).

Moreover, an operator has no right to conduct mining operations in a national forest unless and until the Forest Service approves a proposed plan of operations. See, e.g., 30 U.S.C. § 612(b); 36 C.F.R. §§ 228.4-228.5; Clouser v. Espy, 42 F.3d 1522, 1531 (9th Cir. 1994) (upholding Forest Service's authority to regulate access to mining claims located within national forest lands), cert. denied, 515 U.S. 1141 (1995). The FWS's issuance of a biological opinion pursuant to the ESA does not vitiate the requirement that miners who intend to operate in a National Forest must obtain an approved plan of operations. Any regulatory takings claim asserting an unconstitutional interference with mining operations would not ripen until after the Forest Service reaches a final decision on a proposed plan of operations. See United States v. Vogler, 859 F.2d 638, 642 (9th Cir. 1988) (takings claim not ripe because plaintiff "never attempted to apply for a permit and he never submitted a mining plan"); Freese v. United States, 6 Cl. Ct. 1, 15 (1984) (denying takings claim where plaintiff failed to furnish information needed to evaluate proposed plan of operation).

As discussed below, Plaintiffs' failure to submit a proposal for mine production activities renders any regulatory takings claim unripe.

#### 2. Plaintiffs Concede that They Failed to Submit a Proposal for Mine Production Activities, and Plaintiffs' Arguments Related to Ripeness Must be Rejected

Plaintiffs concede that they did not submit a proposal for mine production activities: "[T]he plan of operations for full-scale mining operations was never completed to the level of detail that might have satisfied the Forest Service. . . ." Pls.' Resp. at 6 (attempting to justify "Liberty's failure to submit detailed mining plans"). There is no dispute, then, that Plaintiffs' proposed plans lacked sufficient detail for the Forest Service to review and approve. Moreover, Plaintiffs do not dispute that

the Forest Service informed Plaintiffs, on numerous occasions, that Plaintiffs' various plans lacked the information required to enable agency review. See Def.'s Resp. at 5-6.[1]

Having conceded that there is no final agency decision regarding the application of the regulations to the property at issue, Plaintiffs nevertheless urge that their regulatory takings claim is ripe. See Pls.' Resp. at 5-11. Plaintiffs suggest that their claim is ripened by "extraordinary delay." See id. at 5 (citing Boise Cascade for the principle that "extraordinary delay in permit processing or bad faith on the part of the agency can give rise to a ripe takings claim notwithstanding the failure to deny the permit"); see Boise Cascade Corp. v. United States, 296 F.3d 1339, 1347 (Fed. Cir. 2002). Extraordinary delay can be relevant to the ripeness inquiry when an agency takes an extraordinarily long time to review a permit application. See, id., at 1347 n.6. Here, however, Plaintiffs concede that they did not submit a mining production plan with sufficient detail for the Forest Service to review. Moreover, as discussed further below, there was no extraordinary delay in this case. Because Plaintiffs admit that they did not provide sufficient detail for the agency to act, they can hardly complain of the agency's failure to do so. See also Def.'s Resp. at 6-7.

Plaintiffs next argue that their failure to submit an adequate mining plan should be excused because "the big issue was the owl during this 1989-90 period, and clarity about the owl's potential impact on any operations had to be acquired before completion of a detailed plans [sic] of operations

---

[1] Although Plaintiffs concede that their mining plans were incomplete, they also state that "Forest Service and the FWS never questioned the adequacy of that same plan information for purposes of the 1990 Section 7 consultation." Pls.' Resp. at 7. Plaintiffs' argument is irrelevant to the ripeness inquiry. As discussed above, the consultation under the ESA was only one part of the analysis necessary to approve Liberty Mining's proposed mining activities. Impacts on cultural resources, water quality, fisheries and wildlife habitat, solid waste management, reclamation and other issues required additional analyses, apart from the ESA consultation proceedings on the northern spotted owl. See Def.'s Resp. at 5-6; see also 36 C.F.R. § 228.8. As the Forest Service repeatedly told Liberty Mining, it could not analyze these issues without a complete plan of proposed operations. See Def.'s Mem. at 10-14.

was appropriate." Pls.' Resp. at 6. But concurrent progress by the Forest Service toward approving Plaintiffs' plan of operations was thwarted by Plaintiffs' inability to provide the information that the Forest Service needed to complete its review. It is undisputed that the Forest Service repeatedly requested additional information, describing with particularity what information it needed, but that Plaintiffs did not respond. See Def.'s Resp. at 6 n.5 (listing several letters requesting additional information); see also Pls.' Resp. to Def.'s PFUF, ¶¶ 28; 29, 31, 33, 36, 39-41. It is also undisputed that had Plaintiffs submitted a sufficient plan of operations, it is likely that some mining activities would have been permitted. See JA90 at 828 (December 1990 letter stating that underground mining "could probably occur" and requesting additional information); see also Pls.' Resp. to Def.'s PFUF, ¶ 32. Plaintiffs' takings claim, therefore, has not ripened because of their own failure to submit a sufficient plan of production operations for the Forest Service to review.

Plaintiffs also contend that the "agency's rules contradict [the government's] plan-approval based ripeness argument," arguing that the government's ripeness argument is somehow inconsistent with Forest Service regulations. Pls.' Resp. at 8-9 (citing 36 C.F.R. § 228.4(d)).[2/] Plaintiffs offer no explanation of the alleged inconsistency, and none is apparent. The cited regulations require a plan of operations to describe a proposed mining plan in detail; if it is not possible to describe an entire proposal, the operator must supplement his proposal as necessary. See 36 C.F.R. § 228.4(d). The existence and application of this provision clearly did not prevent Plaintiffs from submitting a proposed plan, and there is no inconsistency with this regulation and the well-settled legal principles discussed in the government's briefs. Plaintiffs' arguments to the contrary should be rejected.

---

[2/] In connection with the argument, Plaintiffs also argue that the "details of out-year operations [are] unimportant. . . ." Pls.' Resp. at 9. Plaintiffs' personal belief that it was unimportant to submit a meaningful plan for review has no legal relevance.

Lastly, Plaintiffs state that their "claim is ripe as to the approved but stopped work," which included sampling and test milling 10,000 tons of ore. Pls.' Resp. at 7. Plaintiffs thus argue that their claim is ripe with respect to a taking of the 10,000 tons, which they argue would have netted about $88,000. See Pls.' Resp. at 7-8.[3] But this argument is based wholly upon speculation (see note 3, infra), and has no merit. Plaintiffs, thus, have not met their burden of showing that this Court has jurisdiction over any ripe temporary regulatory takings claim.[4]

**3. There Also Was No Extraordinary Delay or Bad Faith**

Even if Plaintiffs had submitted a sufficient plan for mining production for the Forest Service to review, Plaintiffs still fail to show that their claim is ripe because there was no extraordinary delay or bad faith. Plaintiffs assert no new argument to show any extraordinary delay, but merely refer to their opening brief in support of their motion for summary judgment. See Pls.' Resp. at 22 (citing Pls.' Mot. Summ. J. Mem. Supp. ("Pls.' Opening Br.")). Their argument regarding perceived delay

---

[3] Plaintiffs' estimated $88,000 figure, however, is based upon Mr. Ferrero's hypothetical selective mining scenario (see Pls.' Resp. at 8 (citing JA191 at 1577)), and is speculative. For example, Plaintiffs stated in their September 28, 1989 proposed plan (JA36 at 449) that Phase 2 (test milling among other activities) was contingent upon positive results from Phase 1(which included bulk sampling), and Phase 3 (production) was contingent upon positive results from Phase 2. Plaintiffs did not know then, and do not know now, what amount of saleable gold they would have recovered from the bulk samples.

[4] Plaintiffs' argument – that this case is "not about the Forest Service's failure to approve an 'all phase' plan of operations" – provides an alternative basis to reject their takings claim. Pls.' Resp. at 10-11. This argument confirms that Plaintiffs' takings claim has nothing to do with the denial of any proposed plan of operations, and makes clear that Plaintiffs intend to challenge the validity of the agency's actions. See id. at 9 (arguing that agency action was unreasonable, baseless and mistaken). Plaintiffs, however, cite no case law showing how this argument even is relevant to the ripeness doctrine. If Plaintiffs disagreed with the agency's actions, they could have brought an administrative appeal or raised a claim under the Federal Tort Claims Act or the Administrative Procedures Act. This Court lacks jurisdiction over challenges to the agency action, and must assume that the government acted appropriately. See Tabb Lakes, Ltd. v. United States, 10 F.3d 796, 802 (Fed. Cir. 1993) ("Thus, claimant must concede the validity of the government action which is the basis of the taking claim . . . .").

in the handling of the Biological Opinion is irrelevant to whether the Forest Service delayed processing any proposed mining plan. Plaintiffs cannot turn a perceived delay in the context of the ESA into a regulatory takings claim. Plaintiffs' takings claim, therefore, must be dismissed. See Boise Cascade, 296 F.3d at 1349-50 (rejecting plaintiff's regulatory takings claim where plaintiff did "not allege that the [U.S. Fish and Wildlife] Service engaged in extraordinary delay in the processing of its permit").

Defendant shows in its brief in opposition to Plaintiffs' motion for summary judgment that there was no extraordinary delay in this case, because the alleged delay was not disproportionate to the processing time seen for similarly-situated projects in the Klamath National Forest. See Def.'s Resp. at 26-31. Plaintiffs have made no attempt to show otherwise. Moreover, during the period of alleged delay, the Forest Service was actively working out policies and procedures to implement region-wide both the Biological Opinion and the newly adopted Conservation Strategy for the Northern Spotted Owl. See Def.'s Mem. at 16-17, 27-29 (and citations therein). As the Supreme Court observed in Tahoe-Sierra, "the interest in protecting the decisional process [from liability for delay] is even stronger when an agency is developing a regional plan than when it is considering a permit for a single parcel." Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning, 535 U.S. 302, 339 (2002).

Moreover, Plaintiffs do not dispute that they failed "to submit detailed mining plans for the Forest Service to approve," so their own actions caused the delay they complain about. See Pls.' Resp. at 6; see also Def.'s Mem. at 10-14. Because there was no extraordinary delay, Plaintiffs' takings claim is not ripe. See Wyatt v. United States, 271 F.3d 1090, 1099-1100 (Fed. Cir. 2001) (delay of about six years was not extraordinary where caused in large part by plaintiff corporation's failure to respond to requests for information). Accordingly, Plaintiffs have failed to show any

extraordinary delay in the permitting process, and their takings claim must be dismissed.

Additionally, "it is the rare circumstance that [courts] will find a taking based on extraordinary delay without a showing of bad faith." Wyatt, 271 F.3d at 1093 (citing Tabb Lakes, 10 F.3d at 799). To show bad faith, Plaintiffs must come forward with clear and convincing evidence to overcome the strong presumption that government officials exercise their duties in good faith. See Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1238-40 (Fed. Cir. 2002). This standard requires a showing of specific intent to injure the plaintiff, such as by showing actions motivated by malice alone. Id. at 1240. Plaintiffs, however, have failed to show any evidence of bad faith in their opposition brief and in their motion for summary judgment. See Def.'s Resp. at 31-34. Accordingly, there was no bad faith on the part of the government or extraordinary delay in the permitting process that ripened any takings claim.

**B. Plaintiffs Failed To Meet Their Burden of Showing a Temporary Regulatory Taking under Penn Central**

**1. Plaintiffs Failed to Show Economic Harm**

Plaintiffs have not shown economic harm resulting from the alleged temporary taking. While they admit the gold still is in the ground and argue that their damages "are the time value of money based on the delay in its realization by the property owner" (see Pls.' Resp. at 19), they fail to come forward with any evidence of economic harm based upon the time value of money. Plaintiffs point to "the time-value of the deferral for four years of income of the kind analyzed and calculated in JA-191 and explained in the Ferrero Affidavit (PE-2) . . .," but they fail to provide a page citation where such calculations may be found, and Defendant has found none. Significantly, there is no dispute that Plaintiffs have never sold any gold from the mining operation (see Pls.' Ans. Def.'s Second Set Interrogs. at 14 (attached as Ex. 5 to Def.'s Resp.)), so they had no track record upon which to base

any claim for deferred income or cash flow. Accordingly, any such calculations would be based upon conjecture and speculation of the type that courts routinely reject. See Yuba Natural Resources, Inc. v. United States, 904 F.2d 1577, 1583 (Fed. Cir. 1990) ("any attempt to determine how much gold would have been extracted during the taking period, and what its net sales price would have been, would involve the very kind of conjectural and speculative analysis the courts consistently reject..."); see also Seiber v. United States, 364 F.3d 1356, 1371-72 (Fed. Cir. 2004) (dismissing a temporary regulatory takings claim where plaintiffs' proof of economic harm related only to a permanent taking, and therefore failed to show any reduction in the value of the property by the alleged temporary taking).[5]

Moreover, Plaintiffs do not dispute that they earned rental income on the mining claims during the alleged takings period. See Pls.' Resp. at 16-18. Plaintiffs now argue that the rental income represents a relatively de minimis amount compared to what they could have earned in royalties if their lessee WAZCO had gone into production. Id. at 17-18. But neither WAZCO nor its successor-lessee, Liberty Consolidated Mines, Inc. ("LCM"), ever went into production (see JSOF, ¶¶ 99, 112), so Plaintiffs' comparison of rental income against projected income of the lessees is based wholly

[5] Plaintiffs rely upon Whitney Benefits, Inc. v. United States, 18 Cl. Ct. 294 (Ct. Cl. 1989) in support of their contention that a discounted cash flow analysis should be used to measure damages (see Pls.' Resp. at 19), but that case did not involve a temporary taking and does not apply here. Additionally, in Bass Enterprises, the court compared "the value that has been taken from the property [during the temporary delay] with the value that remains in the property," and found that the plaintiffs incurred merely a 5% diminution in value as a result of the delay, which was insufficient to find a taking. See Bass Enters. Prod. Co. v. United States, 54 Fed. Cl. 400, 404 (2002) (internal quotation marks and citation omitted). Here, Plaintiffs have not shown any loss in value during the period of delay allegedly resulting from the government's failure to notify them about the Biological Opinion.

upon conjecture and speculation.[6] Even if a regulatory action may have caused a "substantial diminution in the value of [plaintiff's]. . .leases, it did not deprive [plaintiff] of its opportunity to make a profit on its leases. . . ." Rith Energy, Inc. v. United States, 270 F.3d 1347, 1352 (Fed. Cir. 2001). Accordingly, Plaintiffs were not deprived "of all or substantially all economically viable use of their property," negating their takings claim. Walcek v. United States, 44 Fed. Cl. 462, 467 (1999). Plaintiffs thus have not shown economic harm resulting from the alleged temporary taking, and the Court should dismiss this action.

**2. Plaintiffs' Investment-Backed Expectations Argument Misses the Mark**

Whether the government's action frustrated a plaintiff's reasonable investment-backed expectations examines whether the regulatory framework in place when the plaintiff invested in the property allegedly taken. Thus, there is no frustration of reasonable investment-backed expectations where an industry has been highly regulated for some time. See, e.g., Rith Energy, 270 F.3d at 1351. Defendant has shown in its opening brief that Plaintiffs' investment-backed expectations were not frustrated in this case because of the regulatory regime in place before Plaintiffs staked their claims in Eddy Gulch in 1985. See Def.'s Mem. at 36-39. Plaintiffs, however, have not come forward with any evidence or argument that refutes Defendant's position. See Pls.' Resp. at 20-28. Instead, Plaintiffs focus their argument on events that occurred during the period from 1989-1992. Id. But these later events have no bearing upon the regulatory regime in place before Plaintiffs made any investment in the mining claims at issue. Plaintiffs, therefore, have failed to show interference with any reasonable investment-backed expectations, and this prong of the Penn Central test supports

[6] Indeed, Plaintiffs rely upon data from lessee-LCM's Plan of Operations (JA-181), which is inadmissible hearsay, opinion testimony of a third party. See Pls.' Resp. at 18 (citing JA-181).

granting summary judgment in favor of the United States.

### 3. The "Character" Prong of the Penn Central Test Favors Dismissal

Finally, Plaintiffs fail to refute Defendant's contention that the delay they allege is attributable to the government, arose from the government's mandate to protect the northern spotted owl. See Pls.' Resp. at 28-30. Indeed, Plaintiffs argue that because several regulatory reviews of the potential impact of Liberty Mining's project on the northern spotted owl concluded that their project could go forward, that those reviews were therefore irrelevant. Id. at 29-30. But that argument puts the cart before the horse, because those reviews could not have reached the conclusion that they did without taking the time necessary to analyze the project. Accordingly, the "character" prong of the Penn Central test shows that, even under Plaintiffs' theory of the case, there was no temporary taking in this case, and summary judgment should be granted to Defendant.

### C. Plaintiffs Failed To Meet Their Burden of Showing that Their Claim Is Not Grounded in Tort and Is within this Court's Jurisdiction

Moreover, other than making a few conclusory statements (see Pls.' Resp. at 11), Plaintiffs failed to come forward with any evidence establishing that this action is not grounded in tort. The Court, therefore, should grant Defendant's motion to dismiss.

Plaintiffs argue that the Court does not lack jurisdiction "merely because an element of [their] claim may be characterized as tortious in nature." Pls.' Resp. at 12. In support of this argument, Plaintiffs rely upon Hansen v. United States, 65 Fed. Cl. 76, 80-81 (2005) (alleging that the government took plaintiff's property by contaminating his groundwater with ethylene dibromide ("EDB")) and Thune v. United States, 41 Fed. Cl. 49 (1998) (alleging that the government took plaintiff's property by allowing fire to escape from a controlled burn). See Pls.' Resp. at 12. Hansen, however, is distinguishable on its facts, and Thune directly supports the government's argument to

dismiss.

In Hansen, as noted above, the plaintiff alleged that the government took his property by contaminating his groundwater with EDB. Hansen, 65 Fed. Cl. at 81. Plaintiff's water wells were contaminated with EDB that was released into the groundwater by Forest Service employees who "reportedly buried several cans of EDB in the mid-1970's at the Nemo Work Center . . . adjacent to plaintiff's property." Id. As early as 1974, EDB was suspected of causing cancer in animals. Id. at 84. The court thus found sufficient evidence in the record indicating "that the EDB contamination on the [plaintiff's] ranch constitutes a permanent and substantial invasion that was the direct, natural, or probable consequence of intentional and authorized government actions. Id. at 120 (emphasis added). In contrast, Plaintiffs' here do not allege, and have not shown, that their claim arises from any intentional and authorized government action. Indeed, they allege that the government failed to notify them of the existence of the Biological Opinion "until March 1992 . . . in violation of federal regulations governing defendant's conduct." Compl., ¶ 65. Plaintiffs' claim is thus grounded upon the allegation that the government failed to take action in violation of a duty to act. Accordingly, Hansen is distinguishable on its facts, and provides no support for Plaintiffs' takings argument.

Plaintiffs' reliance upon Thune similarly is misplaced, as that case supports the government's argument that Plaintiffs' claim is grounded in tort and, therefore, is beyond this Court's jurisdiction. In Thune, the plaintiff alleged that the government took his property by allowing a fire to escape from what was intended to be a controlled burn set by the government. See Thune, 41 Fed. Cl. at 50. The government moved to dismiss for lack of subject matter jurisdiction, arguing that "the destruction of plaintiff's property was not a direct consequence of any authorized government act and, therefore, no intent to take can be inferred." Id. at 52. The court found the government's "reasoning [to be] well

founded," noting that the "plaintiff alleges that the destruction occurred because the USFS 'failed to maintain and control the Dry Cottonwood fire' and because the USFS was 'negligent.'" Id. (emphasis added). The Thune court concluded that such allegations of damages resulting from the government's faulty implementation of an authorized project sound in tort, and do not give rise to a taking. Id. (citing Hayward v. United States, 30 Ct. Cl. 219, 221 (1895) (alleged faulty construction of a dam sounds in tort); In re Chicago, Milwaukee, St. Paul and Pac. R.R. Co., 799 F.2d 317, 326 (7th Cir. 1986) (alleged foul-up may be a tort but not a taking), cert. denied, 481 U.S. 1068 (1987); McNeil v. City of Montague, 124 Cal. App. 2d 326 (1954) (city's failure to prevent a controlled burn from escaping does not give rise to a taking under California State Constitution)). Similarly, Plaintiffs' allegation here that the Forest Service failed to timely inform them of the Biological Opinion, if anything, alleges a tort over which this Court lacks subject matter jurisdiction.

Plaintiffs' criticism of Lowe falls short. See Pls.' Resp. at 12 (discussing Lowe v. United States, 76 Fed. Cl. 262 (2007)). Defendant cites Lowe for the proposition that "[u]nauthorized actions by federal officials . . . are torts." See Def.'s Mem. at 29 (quoting Lowe, 76 Fed. Cl. at 267). Plaintiffs criticize Lowe because the plaintiff in that case alleged "negligence per se, wanton negligence, and suppression of evidence." Pls.' Resp. at 12. Plaintiffs fail to note, however, that the plaintiff in Lowe also alleged violations of his Fifth Amendment rights by alleged omissions and "a general failure of duty on the part of the federal government . . . ." Lowe, 76 Fed. Cl. at 264. The court in Lowe found that the plaintiff's claim of omission, among numerous other claims, fell within the United States District Courts' exclusive jurisdiction over civil actions sounding in tort against the federal government. Id., at 265. Consequently, the Lowe court held that it lacked jurisdiction over any takings claim asserted under the Just Compensation Clause of the Fifth Amendment, arising from

alleged "[u]nauthorized actions by federal officials . . .[which] are torts, and must be pursued in the United States District Courts." Id. at 267. Similarly, Plaintiffs' takings claim here arises from the alleged failure of the Forest Service to inform Plaintiffs of the Biological Opinion, in violation of federal regulations. See Compl., ¶¶ 65, 66. As in Lowe, this Court does not have jurisdiction over Plaintiffs' takings claim.[7]

Plaintiffs also argue that Lowe and Cottrell are inapposite because they do not contain "elements of the regulatory prohibition of the use of property." Pls.' Resp. at 12. This argument, however, impliedly mischaracterizes Plaintiffs' claim as one grounded upon a regulatory prohibition on the use of their property. To the contrary, Plaintiffs' claim is based upon the alleged failure of the government to inform them about the Biological Opinion in violation of federal regulations. See Compl., ¶ 65. Additionally, takings law does not cut so fine as Plaintiffs suggest but, rather, distinguishes physical takings from regulatory takings. See Tahoe-Sierra, 535 U.S. at 323 ("it is in appropriate to treat cases involving physical takings as controlling precedents for the evaluation of a claim that there has been a 'regulatory taking,' and vice versa"). Indeed, the cases Plaintiffs rely upon, Hansen and Thune, are physical takings cases and do not in any way support Plaintiffs' argument, as discussed above.

Defendant has shown that Plaintiffs' takings claim is grounded upon the government's alleged failure to notify them of the Biological Opinion in violation of federal regulations – an unauthorized omission that sounds in tort, over which this Court lacks jurisdiction. Plaintiffs have failed to come

[7] Moreover, Cottrell correctly stands for the proposition for which Defendant cites it – where, as here, the essence of the claim lies in tort regardless of how cloaked, the Court of Federal Claims does not have jurisdiction. See Def.'s Mem. at 30 (quoting Cottrell v. United States, 42 Fed. Cl. 144, 149 (1998)).

forward with any evidence showing otherwise. Accordingly, this Court does not have jurisdiction over Plaintiffs' claim, and it must be dismissed.

**D. Plaintiffs Failed To Show They Had a Cognizable Property Interest in Mineral Lots 45A and 45B at the Time of the Alleged Taking**

After two affidavits by Mr. Aloisi, Plaintiffs still fail to show that any of them had a property interest in either the Mountain Laurel mine (Mineral Lot 45A) or the Rollin Mill Site (Mineral Lot 45B) at the time of the alleged taking in 1990. See Pls.' Resp. at 12-14 (citing Pls.' Exs. 1 and 21).

In his March 3, 2008, Affidavit ("March 3, 2008 Aloisi Aff.") (PE-21), Mr. Aloisi points to a Memorandum of Agreement dated March 18, 1988 to establish the existence of a lease-purchase agreement dated June 1984 relating to the Mountain Laurel and Rollin property, that apparently is now lost. See March 3, 2008 Aloisi Aff., ¶ 6 (citing Mem. Agreement, PE-22). But that Memorandum of Agreement reflects the interests of "Mara Ventures, Inc. in the . . . Agreement . . . with George M. Patterson . . . covering Mineral Lot 45A and Mineral Lot 45B. . . ." Mem. Agreement at PE-22-292. According to the Memorandum of Agreement, Jefferson State Exploration and Development Co. ("Jefferson State") "will acquire all of the interests of Mara Ventures, Inc." in the Lease/Option agreement. Id. (emphasis added). This Memorandum of Agreement therefore does not convey any property interest, but anticipates some future transaction between Jefferson State and Mara Ventures – neither of which is a party to this litigation – and is purely executory. An executory agreement "does not itself transfer a right to possession to the prospective tenant." National Data Corp. v. United States, 50 Fed. Cl. 24, 28 (2001) (quoting 2 Richard R. Powell, Powell on Real Property § 16.02[4] (Michael A. Wolf, ed., 2001)) (internal quotation marks omitted). Accordingly, the Memorandum of Agreement does not show that any of the Plaintiffs acquired any interest in the purported lease-purchase agreement on Mineral Lots 45A and 45B.

Plaintiffs next point to a 1989 ledger sheet that reflects two payments made by Liberty Mining, Inc. to Ruth Patterson in support of their argument that they had a property interest in these lots at the time of alleged taking. See March 3, 2008 Aloisi Aff., ¶ 7; see also Pls.' Resp. at 13. But the annotations of payments in the ledger do not establish either the existence, or terms, of any lease-purchase agreement. Indeed, Mr. Aloisi states that he "felt it was a matter of honor that [he] completed the purchases under the terms previously contracted with Mr. Patterson, through Pincombe and Mara Ventures."[8] March 3, 2008 Aloisi Aff., ¶ 4 (quoting Jan. 28, 2008 Aloisi Aff., ¶ 9) (internal quotation marks omitted) (emphasis added). If anything, Liberty Mining's 1989 ledger sheet reflects the "honor" payments, but it does not reflect the terms of any lease-purchase agreement. Indeed, Plaintiffs admit that they did not complete the purchase of these lots until 1991, after the date of the alleged taking. See Pls.' Resp. at 13; see also March 3, 2008 Aloisi Aff., ¶¶ 10, 11.

Plaintiffs thus failed to come forward with any evidence that shows that they had a property interest in the Mountain Laurel (Mineral Lot 45A) and Rollin Mill Site (Mineral Lot 45B) at the time of taking. Defendant, therefore, is entitled to partial summary judgment with respect to these lots. See Def.'s Mem. at 32 (citing Wyatt, 271 F.3d at 1096).

[8] Referring to the purported June 1, 1984 agreement between Mara Ventures and George M. Patterson identified in the executory Memorandum of Agreement. See March 3, 2008 Aloisi Aff., ¶¶ 5, 6.

## III. CONCLUSION

For the foregoing reasons and the reasons stated in its opening brief, the United States respectfully requests that the Court grant its motion to dismiss. Alternatively, Defendant requests that the Court grant its motion for summary judgment.

Respectfully submitted,

RONALD J. TENPAS
Assistant Attorney General
Environment & Natural Resources Division

/s/ Bruce K. Trauben
BRUCE K. TRAUBEN
Trial Attorney
Natural Resources Section
Environment & Natural Resources Division
U.S. Department of Justice
601 D Street, NW
Washington, D.C. 20004
(202) 305-0238 (phone)
(202) 305-0506 (fax)

WILLIAM J. SHAPIRO
Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Div.
501 I Street, Suite 9-700
Sacramento, CA 95814-2322

OF COUNSEL:
ROSE MIKSOVSKY
U.S. Department of Agriculture
Office of General Counsel
33 New Montgomery St., 17th Fl.
San Francisco, CA 94105-3170

Date: March 21, 2008