IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ALFRED ALOISI, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 95-650L |
| | ) | |
| UNITED STATES OF AMERICA, | ) | Hon. Lawrence S. Margolis |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFFS' SUPPLEMENTAL BRIEF**
**IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Plaintiffs submit this supplemental brief consistent with this Court's Order of February 28, 2008 (Dkt. No. 126) as revised May 20, 2008, which in turn arose out of Defendant's Motions to Compel the appearance at deposition of Plaintiffs Energel Inc., Dynatech Corporation and James Kendle.

1. From Plaintiffs' perspective, these depositions added little relevant to the issues briefed and documented in the summary judgment briefing, namely, whether the Government is or is not liable to Plaintiffs for the temporary taking of their mining property (both the unpatented mining claims and the patented private parcels) by denying all beneficial use of the property. The depositions produced testimony illuminating aspects of the written record regarding the financing and accounting of the investment that the late Plaintiff Donald W. Goodman made in the mining property. The testimony and deposition exhibits focused on the deponents' knowledge of Plaintiff Goodman's transfers of money and some equipment from the blasting businesses he operated in the New York City area to the accounts of Liberty Mining and Energel in Oregon and California, from which Plaintiff Aloisi (assisted in the 1989-1991 period by Plaintiff James Kendle) ran the mining operation, paying wages, equipment, fuel and other

costs. At the same time, due to the passage of time and unfamiliarity with nearly twenty-year-old documents, the depositions produced some testimony that may also confuse the written record regarding the sources and uses of the money that went into Plaintiffs' attempts to develop the Liberty mining operations.

None of this testimony, however, alters the broad picture, and the salient details, of the already-briefed saga of Defendant's 1990 Stop Work Order and the Forest Service's four-year, bad faith failure to address and resolve the northern spotted owl's effects (as the record shows, ultimately, lack of effects) on the Liberty mining operations that Defendant barred, without basis.

In sum, these final depositions confirmed the uncontroverted Affidavit of Plaintiff Alfred L. Aloisi of January 28, 2008 (Plaintiffs' Exhibit ("PE")-1, ¶s 13-16, Dkt. No. 118-2) that he and the late Plaintiff Donald W. Goodman ("Plaintiff Goodman") agreed to own Liberty Mining 50-50 (see JA-19, at 353[1]) through their agreed-upon contributions to Liberty: Aloisi contributing the control and ownership of the real property (the unpatented mining claims and two private parcels in Eddy Gulch); and Plaintiff Goodman contributing the operating funds to pay mine operating expenses. Although the details may be incomplete, and the transfers of money from and to the various entities and individuals involved cannot be fully re-created, Aloisi's and Plaintiff Goodman's agreement is what happened. These depositions confirmed that Plaintiff Goodman's transfers, from the family of businesses he owned and controlled but chiefly from Dynatech, provided a major share of the funding when moved into Liberty Mining's and Energel's Oregon and California bank accounts. These depositions supported the conclusion that it was out of these accounts that Plaintiffs Aloisi and Kendle paid their own salaries, paid wages

[1] Finkelstein Deposition Exhibit 2 (Bates # FINKLE000400, attached here as PE-37) is Liberty Mining's subchapter S tax election (IRS Form 2553), filed in early 1989 at the time Liberty Mining shortly after it was organized (see JA-19), showing and confirming the 50-50 stock ownership of Liberty, divided between Aloisi and Goodman.

for others Liberty employed at the Eddy Gulch operation, made payments to suppliers of equipment, fuel and other mine services, including professional assistance such as Engineering Geologist Thomas Ferrero (see PE-2 and PE-27) provided regarding plans of operations and Forest Service permitting during the period represented by these accounting records.

2. (a) Plaintiffs' designated Rule 30(b)(6) witness for Plaintiff Energel Inc. ("Energel") was Myron Finkelstein.[2] In Energel's most recent Annual Franchise Tax Report for 2003, filed with the State of Delaware in 2004, Mr. Finkelstein was identified as Energel's Corporate Secretary. Dkt. No. 114-5 (filed Jan. 11, 2008). When the Plaintiff Goodman was running his blasting business in the New York City area, Mr. Finkelstein was Plaintiff Goodman's accountant and tax preparer. Affidavit of Myron Finkelstein dated January 11, 2008, Dkt No. 114-2, ¶s 3-4. Upon Plaintiff Goodman's death, Mr. Finkelstein was the administrator of Plaintiff Goodman's estate. PE-34, at 9:11-10:14.

Energel was a company Plaintiff Goodman had formed in 1987, but which he then used in his investment in the Eddy Gulch mining operation. See PE-37 (Bates # FINKLE000401). One specific use of Energel by Aloisi and Goodman in the Liberty Mine operations was that Energel was the entity to which Plaintiff Aloisi transferred the two patented, private parcels (the Mountain Laurel Mine and the Rollin Mill Site, Mineral Lots 45A and 45B), in the 1991 transaction by which Ruth Patterson (A. R. Patterson's widow and heir) was paid the balance due under the lease-purchase agreement Aloisi and others held from Patterson, Aloisi then granted title forward to Energel (Energel Deposition Exhibit 4, Bates # FINKLE000280), and then Energel in turn mortgaged the properties to secure loans of $250,000 to meet mine expenses. See JA-115, at 1117-1118; PE-34, at 32:23-33:5.

[2] Excerpts from Mr. Finkelstein's deposition transcript are referenced here as PE-34, cited by transcript page and line numbers.

(b) Plaintiffs' designated Rule 30(b)(6) witness for Plaintiff Dynatech Corporation ("Dynatech") was Donald C. Goodman,[3] the son of the late Plaintiff Donald W. Goodman. Donald C. Goodman helped his father run the family blasting business, which his father ran through control of the stock, and the operations of his several entities, among them Dynatech Corporation (his New York operating blasting business), Capricorn Corporation (his New Jersey operating blasting business), and Don Goodman Enterprises. PE-34, at 10:15-11:20, and 51:9-24; PE-35, at 10:4-15:16. Donald C. Goodman worked for his father on the various quarrying and blasting jobs (construction site, foundation and highway blasting) contracted by the various entities. See PE-35, at 12:9-13 (working for Capricorn); at 16:18-17:2 (working for various entities until he took over Blastech), and at 10:16-11:4 (Dynatech had 7-10 employees). Among other things Donald C. Goodman observed in this day-to-day working relationship with his father in this family business was, during the period from 1989 until some point in the early 1990s, the diversion of income from Dynatech and other entities his father controlled for the investment in the Liberty Mine project. PE-35, at 37:1-38:12; at 40:7-41:22; and at 69:8-72:6.

(c) Plaintiff James Kendle[4] was a friend, colleague and associate in the mining business of Plaintiff Alfred Aloisi's in several ventures beginning in the early 1980s in southern Oregon and northern California. Aloisi and Kendle worked together in staking some mining claims, and investigating various mining properties. Eventually they worked together in Eddy Gulch, and Mr. Kendle held an undivided interest in the association placer claims that were part of the property position in Eddy Gulch. PE-36, at 43:21-47:16; JA-18. Plaintiff Kendle participated in

[3] Excerpts from Mr. Donald C. Goodman's deposition transcript are referenced here as PE-35, cited by transcript page and line numbers.

[4] Excerpts from Mr. Kendle's deposition transcript are referenced here as PE-36, cited by transcript page and line numbers.

managing Liberty's operation on the ground (PE-36, at 63:13-22) beginning in 1989 (PE-36, at 66:6-17). He described himself as "the operations coordinator," "responsible for … fuel on the mine, equipment maintenance, coordinating mechanics." PE-36, at 63:16-20.

Mr. Kendle identified the various pieces of mine equipment on Dynatech's April 1991 list of financed Liberty Mine equipment (JA-98, at 913), as having been at the mine and used in the operation under way at the time of the Forest Service's January 1990 Stop Work Order (JA-50). PE-36, at 176:9-180:18.

Mr. Kendle left Eddy Gulch and his connection to Liberty Mining in about May 1991. He testified (PE-36, at 101:4-102:9, quoting from 102:3-4):

> My guts were in a knot from trying to make a living, and the operation had ended. And I had to make a decision to go back to work and make a living. And it was very traumatic for me.

3. Much of the testimony Defendant adduced in these three depositions dealt with where the money put into the mining operation in Eddy Gulch came from, and more particularly, where the money Plaintiff Goodman put into the mining operation came from. Much questioning pertained to how this investment was accounted for, and where it went. Plaintiff Goodman ran the group of businesses of which he was the sole or controlling owner as a family business, as both Mr. Finkelstein and Donald C. Goodman attest. Dkt. No. 114-2, ¶ 6; PE-35, at 34:20-36:20, and at 69-72. Neither Plaintiff Goodman, nor his bookkeeper, nor his accountant Mr. Finkelstein created formal loan documentation when Plaintiff Goodman transferred money he controlled, for example income received by Dynatech for New York blasting work, to Plaintiffs Aloisi and Kendle in Oregon or California for deposit to a Liberty Mining or Energel account in a California or Oregon bank. Among the Goodman-controlled companies, as Mr. Finkelstein testified, the Dynatech account would reflect a "due from gold mine" amount, without greater

formality. PE-34, at 11:17-12:22.

Aloisi (and Mr. Kendle) opened and used bank accounts both in Liberty Mining's and Energel's names in California and Oregon, apart from Plaintiff Goodman's New Jersey bank accounts for the entities under his control. In the Energel deposition, Mr. Finkelstein was shown Energel accounting ledgers from the 1990-1991 period (Finkelstein Deposition Exhibits 9 and 10; Plaintiffs' Document Production Nos. A-167 and A-166, respectively). He testified that he did not see those daily Eddy Gulch operations ledgers, which were maintained and used in Oregon and California. Rather, he recalled an Oregon accountant who provided Plaintiff Goodman annual or summary Energel and/or Liberty accounting information so that Mr. Finkelstein, back in New Jersey, could do the accounting for Plaintiff Goodman's businesses as a whole (chiefly Dynatech, Capricorn, and Don Goodman Enterprises). PE-34, at 79:9-81:8. When one combines this operational trust and family business informality with incomplete records and the impossible task of the witnesses remembering accounting details from nearly twenty years ago, the accounting and financial record, and the accounting-related deposition testimony, are not complete and clear. They do confirm, however, the testimony and documentation supporting the fact that a repeated, ongoing flow of money was moving from Plaintiff Goodman's businesses to Energel and Liberty Mining to finance the operation of the Mine, from salaries to equipment.

4. The accounting details, however, are largely irrelevant to the question whether the Government is or is not liable to the Plaintiffs for what the Forest Service did, and did not do, over the 1990-1994 period in preventing beneficial use by the Plaintiffs of the mining property in Eddy Gulch.

These depositions did adduce testimony further supporting the existing record

establishing Plaintiffs' reasonable investment-backed expectations in development of the Liberty Mine property. Together the testimony of Dynatech's Mr. Goodman and Energel's Mr. Finkelstein confirmed that Plaintiff Goodman ran his several businesses in a unified way, using income from one to fund an investment or project or pay bills in another. Because they were businesses he controlled, investments in the form of equipment purchased or transferred from one of those businesses, or cash transfers from Dynatech or any other Goodman entity to Energel's account in Oregon, or to Liberty Mining's account, were all part of Plaintiff Goodman's unified investment in the development of the mine in Eddy Gulch that the Forest Service baselessly prevented from operating.

Mr. Finkelstein testified that, by his accounting on behalf of Plaintiff Goodman and his enterprises from which equipment or funds were transferred, Plaintiff Goodman invested about $2.3 million in the mine. PE-34, at 24:16-21. This testimony was not specifically limited to the immediate period from 1989 when Liberty Mining was formed (JA-19; PE-37) through mid-1991. However, mid-1991 is roughly when Plaintiff Goodman ceased making payments from his family businesses to the Energel and Liberty mine accounts. From early 1989 through the January 1990 Stop Work Order, and through the time of the July 1990 undisclosed biological opinion, Plaintiff Goodman was making his reasonable investment in Liberty Mining, and Liberty's development of the mine in Eddy Gulch.

Plaintiff Goodman's investments through transferred funds and equipment had been turned on the ground, by Plaintiffs Aloisi and Kendle and the geological and mining plan documentation of Affiant Ferrero, into the reasonable investment-backed expectations of a company initiating mine production, and into the reasonable prospect of success in developing a valuable mine, as both factual and legal propositions. Defendant has put forward no evidence,

nor did it adduce any in these final depositions, that the equipment suite assembled by Plaintiffs (see PE-20, Plaintiffs' September 2007 Response to Defendant's Interrogatory No. 10; see also JA-89) was not appropriate for and not capable of the approved initial mining operations Defendant never let resume. Likewise, Defendant learned nothing suggesting that the scale and nature of the investment Plaintiffs made was in any way inappropriate to the scale and nature of the mining operation described in the approved and pending phases of Liberty's mining plan of operations.

By mid-1991, however, the initial and hoped-for continuous return on that reasonable investment in opening the mine was on indefinite, unexplained and uncertain hold. At this point, the prospects that Liberty Mining would soon be generating modest initial revenues from gold recovery – both from gravity separation of surface-mined dump and apex material in existing equipment and from setting up and running bulk sample material in their test-scale gravity separation – were fading. And they were fading because of the absence of any information from the Forest Service about when any owl issue would be addressed, then the answers would be communicated, and when Liberty would be able to make any adjustment to its plans and proceed.

As Plaintiffs' prior briefing and factual submissions established (see PE-1, at ¶s 14-17, and Affidavit of Thomas P. Ferrero dated Jan. 29, 2008, PE-2, at ¶s 15-25), Liberty had a reasonable, prudent scaled plan: (a) to initiate production using existing gravity separation equipment; (b) to move to bulk milling with an added flotation circuit at Usher Flat; (c) then to convert to full-scale operation using the test-proven optimal gold recovery circuit with gold production from the easily and cheaply-mined surface deposits; and (d) finally to re-open and develop several available underground target ore bodies, including those accessed through the

May Tunnel on the private Mountain Laurel Mine parcel, where underground mining had been stopped by litigation between the owners of two mines (both of whose properties were now under Liberty's unified control) over ownership of the ore body one was mining.

The recent testimony simply confirmed that the investment money that funded Liberty's equipment and ongoing operations expenses, as well as ongoing payments under the lease-purchase agreements by which Aloisi and others held the mining rights to both the unpatented claims and the patented parcels, came from Plaintiff Goodman and his New Jersey and New York blasting businesses, and chiefly from Dynatech's income.

5. In these depositions Defendant also adduced rule 30(b)(6) testimony regarding the real property ownership and interests of Plaintiffs Energel and Dynatech. This testimony may well be relevant at a certain point this case has not reached (a point Defendant's Motion argues the case will never reach), namely, when this Court may find the Government liable to Plaintiffs for a temporary taking under the circumstances here. The property position facts are of only marginal relevance to the issues on summary judgment regarding government liability.

Counsel have discussed a Stipulation regarding the property interests of various of the Plaintiffs, including Dynatech and Energel, during the relevant period fought over in the pending summary judgment motions. Dynatech is not listed as a Plaintiff in the complaint because of the nature of the real property rights it held in the mining claims and private parcels temporarily taken by the Government's action here. Plaintiff Goodman, who owned the stock and controlled the business and finances of Dynatech, used Dynatech's income, credit-worthiness and some of its equipment, to invest in the development of the gold mine in Eddy Gulch. As Dynatech's Rule 30(b)(6) witness (Plaintiff Goodman's son) testified, the absence of any return from the mine to Plaintiff Goodman and his businesses, chiefly Dynatech, helped weaken Dynatech and Plaintiff

Goodman to the point where they filed coordinated Chapter 11 reorganization petitions in 1992. What Dynatech's presence in the Complaint assures Plaintiffs is that Plaintiff Goodman's investment in the Liberty Mining property development, using Dynatech's income and assets, is not hidden or ignored in this Court's evaluation of Plaintiffs' reasonable investment-backed expectations, and in its determination of the government's liability for the temporary taking of all beneficial use of the mining property for the relevant period of prohibition.

It remains clear on this summary judgment record that Plaintiffs' motion is sustained by proper owners of the unpatented mining claims through the entire period at issue, and proper owners of the private parcels as well. Notwithstanding that Energel (and Liberty) lost the Mountain Laurel Mine to the non-party lender-mortgagee who successfully foreclosed, JA-115, at 1116-1120, Plaintiffs either held full title or the right to mine the Mountain Laurel, or both, from the inception of the temporary taking through the effective title transfer via foreclosure. Not all the Plaintiffs may have had property interests, or property interests from the beginning through the end of the temporary taking period at issue in the pending motions. And the Plaintiffs may not constitute 100% of the property ownership over 100% of the period at issue. However, the significance of these periods of ownership, if any, to recovery on the claim at issue, is appropriately deferred until relevant, namely, when this Court may have granted Plaintiffs' motion and have found the Government liable for a temporary taking.

6. Plaintiffs submit that the supplemental material developed in these late depositions requires no substantive rethinking or even recalibration of the premises and claims presented by the parties in their earlier opening, response and reply filings. Nothing in this recent exercise shed any material light on the conduct of the government (the Forest Service, the Fish and Wildlife Service, or any other agency) throughout this period, with respect to its (mis)handling of

the spotted owl and Plaintiffs' plans of operations. Nothing in this recent exercise shed any material light on Plaintiffs' mining plans of operations, or their intentions with respect to the design and conduct of the mining operation in Eddy Gulch that was stopped in January 1990, and then stalled thereafter into 1994.

The conclusions Plaintiffs urged this Court to reach in their March Reply filing remain appropriate and just, and the supplemental depositions have not altered the basis for these conclusions. Plaintiffs submit that this record establishes: their compensable property rights; the Defendant's extraordinary delay, on unwarranted and baseless grounds, through conduct suffused with bad faith; and Plaintiffs' satisfaction of the three Penn Central factors (the extraordinary bad faith nature of the government action, the economic impact on Plaintiffs, and Plaintiffs' reasonable, investment-backed expectations in developing a mine).

Plaintiffs request that their motion be granted and Defendant be found liable for a temporary taking of their property through the July 1990 through February 1994 period at issue here. The northern spotted owl did not abort Plaintiffs' mining operation; Liberty's plan was compatible with all known owl protection requirements. It was the Forest Service's baseless and unwarranted mishandling of the matter, with extraordinary delays and bad faith, that prohibited beneficial economic use and development of their mining property over that period.

Dated: May 28, 2008

Respectfully submitted,

s/ Lawrence G. McBride

Lawrence G. McBride
FOLEY & LARDNER LLP
3000 K St., N. W., Suite 500
Washington, D.C. 20007-5143
Telephone: (202) 672-5300
Facsimile: (202) 672-5399

Attorney for Plaintiffs