IN THE
UNITED STATES COURT
OF FEDERAL CLAIMS

COPY

ALFRED ALOISI et al., )
Plaintiffs, )
v. )
UNITED STATES OF AMERICA, )
Defendant. )

DEPOSITION
OF
MYRON FINKELSTEIN

T R A N S C R I P T of the stenographic notes of JANE MESSINEO, a Certified Shorthand Reporter and Notary Public of the State of New Jersey, taken at the offices of VERITEXT, NEW JERSEY, 25B Vreeland Road, Suite 301, Florham Park, New Jersey, on Thursday, April 24, 2008, commencing at 2:15 p.m.

do specific kinds of accounting. Do you want the detail behind it to make it easier for you?

Q Briefly.

A Okay. I promise. The clients that I handle in most instances are small companies. They may have an office manager or have their own accounting system. I assist in putting together financial documents and I do corporate tax returns. Corporate also means LLCs these days, entity returns for lack of a better word, and in a lot of instances, I do the personal returns of the principals that are involved.

Q Was there a time when you began working for Don Goodman Enterprises or Don Goodman?

A The year would be, I believe, 1973.

Q Were you employed directly by Mr. Goodman or one of his entities?

A No. I was a partner in a CPA firm at the time and he employed that CPA firm.

Q What firm?

A Finkelstein Amsterdam & Company.

Q And for how many years after that did Finkelstein Amsterdam & Company do accounting work for Mr. Goodman or one of his entities?

A Ten years.

Q After 1983 did you continue to do accounting work for Mr. Goodman or one of his companies?

A Yes. The entities that I worked for changed, but I still continued to work.

Q Where were you employed at that time?

A In '84 to '86 I was employed Marvin J. Amsterdam, CPA. 1986 through 1990 I was employed by R-O-C-H-E, Roche, Miseo & Co. 1991 until now I have been employed by Maste Consulting Group, Inc.

Q Did there come a time when your work for Mr. Goodman or one of his entities ceased?

A Actually, it didn't cease until he died. That was in 2005.

Q Did you do any work for his estate?

A I was actually the executor of the estate, but at the time of his death in June of 2005, most of the assets had been dissipated. The only, in quote, passing on to his three children who were his beneficiaries, was insurance policy that it was handled outside the estate. I just did the paperwork and they received one-third each of the policy.

Q Was the estate probated?

A No.

Q Has it been wound up?

A Well, nothing was ever probated. The only thing we had was a contingent asset, as far as I am concerned, which was this case. No way to put a number on it in any way, shape or form.

Q Have your duties as an executor of plaintiff Goodman's estate ceased?

A For practical purposes, the answer is yes. Should anything happen here, the answer is no. I guess I would still be the executor.

Q When you say, if anything should happen here, you mean if --

A If there's an award. If all of a sudden an asset comes into his estate. The answer is I would be the executor to handle that asset, yes.

Q Are you familiar with the various entities that Mr. Goodman had?

A Yes.

Q We learned earlier today that Don Goodman Enterprises was a management company. Is that how you would describe it?

A Yes. Exactly.

Q Did Mr. Goodman have a holding company for his various business entities?

A No. Each was handled separately.

Q So in addition to Energel, what entities

were involved with Liberty Mining?

A I would say -- can I ask a question of your --

Q Sure.

A Of your questioning? When you say it that way, would you mean where sources of funds went to that entity, so to speak? Would that be what you are referring to?

Q Ask it again. I'm sorry.

A Okay. You asked who was involved with Liberty Mining. Would extending money for the mining operation be considered being involved with Liberty Mining?

Q Absolutely. Yes.

A I'm sorry.

Q That's fine.

A Dynatech Corp., Don Goodman Enterprises, Inc., Capricorn, Inc. Those are the three major companies that Donald W. Goodman had, where sources of funds would come from.

Q Did Blastech provide any funds?

A It's possible the answer is yes. There's a proverbial we. We wound that company down to zero. It was then turned over to Donald C. Goodman, that's his son. And I have a tough time

remembering whether funds were advanced prior to us winding it down or after Donald C. took over, but I know some money would have gone from Blastech, also.

Q If money went from Energel to Liberty Mining, was that considered on the books a loan to Liberty?

A Let me tell you how we handled it. The -- we maintained an account, an accounting if you will, of money advanced to what I call -- you call it Liberty, I call it the mining operation. That's the way I referred to it at the time.

We would set up, yeah, I guess the answer is yes, on the books we had due from gold mine operation. That's the way it was handled on the books. Of all the companies.

Q So when you say due from, then you mean D-U-E F-R-O-M?

A Yes.

Q So it was treated as a loan?

A Yes.

Q Were there any loan documents?

A No.

(Copy of Revised Notice of Deposition of Energel, Inc., marked Energel Exhibit 1 for identification.)

A It hurt when I saw it came in in November because I think we got rid of everything, a realistic guess would be June or July of that year.

Q Was the government's subpoena, the notice -- first notice to you that this litigation was still ongoing?

A Yes, it was.

Q Prior to that time, had you ever been contacted by anyone to produce records relating to this litigation?

A I don't think so, no.

Q Mr. Goodman didn't request that you provide any documents for the litigation?

A The only thing I remember doing, we had put together -- we, me, I, use that word to make it easier on everybody. I'm sorry. I had put together summaries of the monies expended by, in quote, all the entities, his entities, the companies I have mentioned to you, and himself.

It was up about 2.3 million dollars. That was done several years before. It probably was done when the case was more -- I don't know if the word is more active or not, probably relate back even into the '90s that that took place. I did that, but I was not asked to produce documents. So the answer

would be an officer along with his oldest child, Kim Bebe.

Q Is that the same Kim you referred to earlier in your deposition? You may recall you made reference to a Kim.

A I think I mentioned the three children. The answer would be yes, it's the only Kim I could be referring to here today.

Q Is her last name B-E-B-E?

A Yes, it is.

Q Before you and Kim became officers of Energel, were the officers Don Goodman and Fred Aloisi?

A I would say yes.

Q Did you have any involvement in the -- in any loans from either David Davies or National Heritage Life Insurance Company to Energel?

A I know of them, but I was not directly a participant, if you mean it that way.

Q Were you involved in any of the transfer of funds?

A No.

Q Do you know how much money Energel borrowed from those two entities combined, David Davies and National Heritage Life?

A I can give you a guess. I don't think you want that so I am going to say I'd rather say I don't know the specific amount.

Q Well, I can tell you who we have had deposition testimony --

A Okay.

Q -- that combined, approximately $250,000?

A I was going to be close.

Q Based on that representation, in fact, I'll tell you that approximately $150,000 were borrowed from David Davies and a hundred thousand, roughly, I think it was a little more, from National Heritage Life Insurance Company. Does that sound familiar to you?

A Yes. The National Heritage Life was a company that I believe the elder Aloisi was involved in. And so he may have assisted in that loan coming to place. I believe Davies was also an officer of the company. You are saying -- it's striking me you are saying that Davies personally loaned the money. I don't remember if it was specifically -- to me it was all from the same company so I don't know that one. I didn't know he loaned it himself.

Q Do you know how the funds were spent by

Energel or disbursed?

A Well, I know that it wouldn't have been for any of the notes or any of the equipment. It may have, therefore, just been to keep the company going forward, operationally I am talking about.

Q Do you know whether Energel owns any property in Northern California associated with the Liberty Mining operations?

A To my knowledge they have mining interests, is what they own. When you say property, meaning real estate?

Q Yes.

A I don't think they own real estate, no.

(Document from the Siskiyou County assessor, Bates-stamped FINKLE 000431 through 432, marked Energel Exhibit 3 for identification.)

Q You have been handed what the reporter just marked as Exhibit 3 to your deposition. For the record, it's a form filed with the Siskiyou County assessor. It's been Bates-numbered FINKLE 000431, 432.

It reflects, if I can state for the record, a transfer of lots 45 A and 45 B from Alfred Aloisi to Energel, Inc.

Does this help refresh your recollection

Bates-stamped FINKLE 000769 through 771, marked Energel Exhibit 8 for identification.)

Q You have been handed what the reporter just marked as Exhibit 8 to your deposition. It's a letter dated February 24, 1992 from Don Goodman to David Davies. I believe, even though it's identified as David Davis, the correct addressee is Davies.

A I believe you are right, yes.

Q Do you recognize Don Goodman's signature on that page?

A That is his signature, yes.

Q Prior to today, had you seen this letter?

A I'm sure I had at some point.

Q Do you recognize the letterhead, Don Goodman Enterprises?

A That was his entity. As I said to you before, he had two operational companies. Now, the operations that he was in was blasting contractor. Dynatech was a blasting contractor in the State of New York. Capricorn was a blasting contractor in the State of New Jersey. That was their differences and why he had two companies instead of one. Unions and all the rest of that.

This was his company, if you will, that

another question --

THE WITNESS: Oh, okay. Okay.

Q I'll have to hire an expert to -- you are actually giving, I realize we are getting a little bit beyond the scope of the deposition today by getting into some of these things because we are taking advantage of your expert opinions.

A I don't mind. I'll try.

Q And understanding. You mentioned previously that there was an accounting firm in Oregon that was doing some of the books. At the time when you were keeping records for Energel and other entities that Mr. Goodman owned, did you have contact, then, on any regular basis with the accountant in Oregon?

A Once a year. Basically, I believe it was individual, but I don't know if it was a firm or not, no particular person. Once a year he would do the -- send me, I guess, best way to put it, a K-1 for the company out there in Oregon, which would be a culmination of the activities, income less expenses. I needed that to prepare Mr. Goodman's tax return.

I, in turn, did the reverse, would send to them the K-1 for Mr. Aloisi for the operations that I was controlling. I would send him the same

thing. So my contact with him was just to coordinate the two. That's all. I don't remember his name.

Q Would you in the course of business copy the principals, Mr. Aloisi or Mr. Goodman, when you sent those forms?

A Actually, they were sent to me -- they were sent to Mr. Aloisi who turned it over to the accountant. For practical purposes, I sent it to the accountant and the reverse was true, too. In other words, the K-1 belongs to the principal because it's part of their return. They turn it over to the accountant. So it's not cc'd in that sense, but it should be known that it was sent to the accountant, yes, because we do talk about it.

Q How long did that practice continue with that accountant?

A For a few years. In the '90s. I don't know if it made it into the mid-'90s or not, but it was definitely -- wouldn't have been '89. '90 through '93, '94, in that time frame.

Q Did that -- you are suggesting that practice changed, then, at some point in the mid-'90s?

A Well, if the operations basically did not generate income or expenses because there was no

money available, there would be nothing to file K-1 wise. A return could be filed, but the K-1 that I'm referring to is, earlier today I mentioned when we looked at that form 2553, that was filed to see to it that the company became a subchapter S. And that meant that the individual owners of the company would put on to their personal tax returns the income or loss for the entity.

So all -- best way to put it? If there was no K-1 or if a return was filed, it became dormant or had zeros on the return, meaning there was no income, no expenses. Still, some tax law that says you are supposed to write off income against expenses, that would have stopped. It stopped for me probably in the mid-'50s --

MR. McBRIDE: Mid-'50s?

THE WITNESS: '90s. That was pretty bad, wasn't it?

MR. McBRIDE: We are tired. It's afternoon.

A I guess I am. Sorry about that.

When Don had to go into the Chapter 11 for his entities, things quieted down for what he could do as far as advancing funds, and that would have been '92 to '97. There may have been some