IN THE
UNITED STATES COURT
OF FEDERAL CLAIMS

COPY

ALFRED ALOISI et al., )
)
Plaintiffs, )
)
v. )
)
UNITED STATES OF AMERICA, )
)
Defendant. )

DEPOSITION OF DONALD CARL GOODMAN

T R A N S C R I P T of the stenographic notes of JANE MESSINEO, a Certified Shorthand Reporter and Notary Public of the State of New Jersey, taken at the offices of VERITEXT, NEW JERSEY, 25B Vreeland Road, Suite 301, Florham Park, New Jersey, on Thursday, April 24, 2008, commencing at 9:48 a.m.

Q Did you own stock in Dynatech at any time?

A No.

Q What is the relationship between Dynatech and Don Goodman Enterprises?

A Don Goodman Enterprises is like a management company set up. So Dynatech is one business of my late father, and so Don Goodman Enterprise could, therefore, receive a fee to manage Dynatech, just like it could manage any other businesses that my dad did. So it's a business in itself, overseeing different entities.

Q Did Don Goodman Enterprises own stock in Dynatech?

A No. I don't believe.

Q Did Dynatech have any employees?

A Dynatech?

Q Correct.

A Yes. Absolutely.

Q Do you know how many at various times?

A Probably something like seven to ten, something like that.

Q Were you ever an employee?

A Of Dynatech?

Q Correct.

A I don't recall specifically, but that was not my main employment. I may have received, done some work where they actually paid me from there at some point, but I don't have any real specific -- it's not how I made my living.

Q Why don't we go back, actually, and get a little background. We were talking about your employment. Let me get some of your education and employment history. Did you attend college?

A Yes.

Q Where?

A University of Vermont.

Q Graduated?

A 1982.

Q What was your major?

A Bachelor of Science in business administration.

Q Did you attend any graduate school?

A No.

Q Then after graduating from the University of Vermont, did you enter the business world?

A I -- within a very short time period ended up coming to work for my father in some of his business ventures.

Q So when you say you went to work for your father, would that have been, then -- you would have been employed by Don Goodman Enterprises?

A No. I wasn't employed by Don Goodman Enterprises. He had some other businesses, so I am not sure exactly which ones I worked for. He had a music company so I may have had my paycheck from them.

I don't remember exactly who was exactly employing me. I worked for Capricorn which is his New Jersey operations. Eventually, he started working for Blastech which is another New Jersey blasting company. Dynatech was his New York -- Blastech, B-L-A-S-T-E-C-H.

Q And Dynatech was a blasting company?

A Yeah. They are all drill and blasting companies.

Q What does that mean when you say it's a blasting company?

A It's drill and blasting companies.

Q What does that mean?

A That means whether it's for mining, for stone aggregates or for property development for construction of industrial complexes or residential, you know, any kind of building, you have to -- you

can't move the ground without loosening the rock if rock interferes with the construction. So you drill holes and blast with explosives and then they can construct, or in the mines case, they crush and make different dimensions of stone, from dust to very large for the purpose of asphalt or concrete or road materials. Aggregate stone materials. It's a big industry.

Q Do any of the companies that you mentioned, Capricorn, Dynatech or Blastech, have a production facility?

A I don't know.

Q Did they actually make the aggregate?

A No. We did the drilling and blasting as subcontractors. Someone else built the home. Someone else poured foundations for properties like this. We did properties like this we are in right now. In the mine, the quarry themselves, get a contract with us to do the drilling and blasting. They crush the material and they may or may not just sell concrete or asphalt or whatever. Some of them, some companies install their own asphalt and contract in-house. They are all different.

Q So if I understand correctly, the companies, the blasting companies that you are

talking about, then, function as subcontractors?

A Correct.

Q Did the companies own their own equipment?

A Yes. We owned equipment. And if there was a need for some temporarily more, you would rent it.

Q Did they also have long-term leases on some of the equipment?

A I'm sure that is very likely. I don't recall specifically, but most leases are with the intent of being a -- hopefully, purchasing, if the need be. You generally lease to purchase.

Q You mentioned Capricorn, Blastech and Dynatech. Were there any other companies -- what was the name of the music company?

A He owned a booking agency in the '80s which we sold out.

Q Is that different from the music company or is that the same?

A No. That's a music industry thing, booking agency. So it was with musicians. He had a record label, I think they call them. Those are all early to mid-'80s, I would say.

Q Do you recall the name of any of those

entities?

A Talent Consultants International, TCI, probably Inc., or something. It still operates today, that business with separate ownership. We sold out. The record label, TVI International or TVI Record and Film Works, maybe. It's hard to remember, something like that. It's a long time ago.

Q Were there any other entities?

A He had a lot of entities. The Phoenix Sales Company would be purchasing for the explosives for all the various blasting companies because that's how the agency of the government wanted it at one point. And then later they might want to break it down. But that's what that company did, purchased explosives, they are licensed to distribute amongst Dynatech, Capricorn and blasting, for example.

Q Was Energel one of your father's companies?

A Yes.

Q Were you involved with Energel?

A Not hands on.

Q Do you know whether your father formed any companies specifically to deal with the -- with any gold mines?

A Yes.

Q Which are those?
A I believe that Energel might not have initially been formed for that, but I think that that became party to gold mining, and I know he had a Liberty Mines or Liberty Mining, something like that.
Q You mention that you went to work for your father. About what year was that?
A I had a hard time trying to figure that out. I think it might have been around '84, '85.
Q After graduating, the two years before you went to work for your father, what did you do?
A I worked in the restaurant industry.
Q How long did you remain employed with your father?
A That's not a clear question.
MR. McBRIDE: If you need to explain your answer, go ahead and develop it.
A Well, I started working for all his whole, you know, the whole empire because he had so many companies. So I was in his employment until I became -- I could -- I became employed specifically paid from Blastech starting probably, you know, in the late '80s. So I was employed by Blastech, but he owned Blastech so I was employed by him then. Eventually I came to own a hundred percent of the

stock of Blastech so then I became self-employed you could say, so.

Q Did you purchase Blastech, then?

A Yes. Well, it became -- it was kind of in a dormancy stage of work and then with no real equipment. And then I bought new equipment and under that, with that ownership of that name, that ownership became mine, and then I went out and started purchasing equipment for myself.

Q About when did you take over ownership of Blastech?

A It was around -- the ownership might have occurred around '93, '94. The first job was either late '94 or '95 was the beginning of it functioning.

Q The first job, do you mean under contract?

A Right, real.

Q Are you still working with Blastech today?

A No. Blastech went dormant in about 2003, I think.

Q Then how were you employed?

A Then after that?

Q Correct.

A What?

Q Was there -- were there corporate formalities established or were they not -- were corporate formalities not adhered to?

A No. That question -- I don't -- maybe corporate formality by me is an incorrect use of terms, but I'm just saying it's a management company. So Blastech could pay, give, $5,000 a month because, you know, because Don Goodman Enterprises is managing that. You know. You could -- so is that a holding company? What is that when you do that?

Q Did Don Goodman Enterprises, then, own the stock of Dynatech or did your father individually own the stock of Dynatech?

A His stocks are probably owned individually, I would think. I don't think the overall thing -- it's just a management -- like if you were a consultant you could charge fees to be a consultant.

Q So Don Goodman, your father, owned stock in Dynatech.

A He owned Dynatech.

Q He owned it. Did anyone else own shares in Dynatech?

A No. Not to my knowledge.

Q Don Goodman Enterprises was the management company that managed Dynatech, among other entities.

A Amongst, yeah.

Q Now, were the assets of individual corporations that were managed by Don Goodman Enterprises kept separate from assets of the other entities managed by Don Goodman Enterprises?

A I don't think to -- utilization of the assets were kept separate. The ownership would have to be, because whoever owns it owns it, ultimately, from a title standpoint; right. But the utilization was absolutely shared amongst everybody.

Q So then, if Blastech owned equipment, that Blastech equipment could be used by Dynatech.

A And it was, yes.

Q Okay. And Dynatech, then, would not have to make a payment to Blastech for the use of that equipment.

A They didn't have to, no.

Q And they did not?

A And they did not. And that's very damaging. It can be -- after the fact, that may not be so good. For Blastech, but yeah, we commingled our utilization of the assets because it's a family

empire, you know what I mean? He's built all these different things. There's a reason for separate corporations, because like I said, New Jersey or New York, for example, where you are working. So.

Q Now, we are talking about equipment assets. What about financial assets? Was there a commingling of finances?

A There was a commingling of the labor, certainly. We helped each other. It's all one company in the end. The title and the billings and the revenue might get spread around according to where the work is, but everything is commingled in that respect. As far as you have to pay all the bills for all the companies. So you have all the revenue and all the bills.

Q Now, were there separate accounts for Dynatech?

A Yes.

Q We are talking about bank accounts.

A Right. Yes.

Q Do you know whether those assets were transferred to other entities as the need arose?

A I don't understand.

Q Any cash held by Dynatech -- let me rephrase.

Was any cash held by Dynatech transferred to other entities as needs arose?

A Certainly to California, the cash was transferred.

Q When you said to California, what do you mean?

A I am meaning to the Liberty Mining and Energel and anything associated with mining.

Q So when assets would be transferred from Dynatech to Liberty Mining, for an example, was there any document formalizing that transfer of cash?

A I would have suspected that there was ledgers of all the transactions. However, I didn't -- I don't possess them.

Q Did you see in your review of the documents any ledgers specifically for Dynatech?

A Not ledgers in a book. I didn't see those in bookkeeping format, although I was very aware of the dollars that was invested in that direction, and I did find documents in there that would back up what I had always believed was the investment -- investments that were made there.

Q So if or when Dynatech transferred cash to Liberty Mining, was there any type of a loan agreement between the entities that called for the

transfer of cash?

A I don't think there's anything formal like that. I think Liberty Mining had expenses and it required revenue which they couldn't self-generate. So therefore, someone had to pay it in order to continue to move in the direction of running a real business.

Q Was Dynatech -- when Dynatech transferred cash to Liberty Mining, you --

A Well, I wouldn't say transfer cash, but when they provided revenue to them, you can call it cash, whatever. I guess it's transfer cash.

MR. McBRIDE: Checks, not equal to cash.

A We didn't have cash.

Q But it had -- it had a bank account. It had money --

A Money. I don't call it cash.

Q Okay.

MR. McBRIDE: It wasn't hundred dollar bills.

A No. I am not in that business.

MR. McBRIDE: That's the confusion that's happening here. You said documents and he's thinking of the universe of possible documents. Loan agreement was a more specific line of questioning

that got solid answers.

Q I am referring to cash transactions as opposed to loans of equipment. So we talked earlier a little bit about Dynatech would provide equipment to Liberty Mining or to other entities.

A Okay.

Q Correct? That's fair?

A Yeah.

Q And now I am asking about other assets that Dynatech may have shared with other entities that your father was involved with.

A I know without any doubt that an operation and any mining operation is a lot more than equipment that has to be paid. There's tremendous overheads, insurances, payrolls, licensing fees, legal fees, and I have no doubts whatsoever that it approached close to 3 million dollars going from Mr. Goodman, the late Mr. Goodman's various business entities to the Liberty Mining, Energel, Aloisi Investment. I have no doubts whatsoever it approached the 3-million-dollar mark.

Q That wasn't my question.

A Okay.

MR. TRAUBEN: Can you read back my question, please?

(Record read.)

A Can you give me a time period?

Q Okay. In the time period of the late 1980s, let's say, from about 1989 to 1990, let's just focus on that year or two --

A Okay.

Q -- at that time are you aware of any transfers of revenue from Dynatech to Liberty Mining?

A During that time I would say definitely was transferring during that time, to Liberty Mining, absolutely. His other entities, like you just asked previously, meaning unrelated to that mining operations out in California, I would say he wasn't investing in anything, but that, aside of keeping the money in his own blasting companies that he kept it in them.

Q Do you know how on the books that transfer of revenue from Dynatech to Liberty Mining would be documented?

A I don't know the tax terminology for something like that, but it's probably capital investments of some type. If it was for the equipment payment, it would be capital investment for equipment, you know, for hard equipment. Otherwise, it would be for payroll or permits or licensing or

fees or acquisitions.

I don't know how they individually did it. Depends. I'm sure each of the checks kind of had a goal where it was going, to operate business or run anything, even without the revenue you still have to -- before you collect the money, you got to spend the money. So.

Q You mentioned a 3-million-dollar investment.

A I know it's between 2 and 3 so it's probably somewhere around two and a half million dollars. That's what I was always told. That's what I always understood it to be.

Q Told by whom?

A By my father in those conversations. Those conversations were very common.

Q I'm sorry. It was common --

A Conversation between us. It's a big drain on a family business, that kind of money.

Q Now --

A Ties my hands a lot. It tied my hands a lot.

Q Does that money, 2 to 3 million dollars that you mentioned, does that include any of the litigation costs involved in this case?

that could be used so it's all one and the same. Except for that they are incorporated -- he --

Q Individually, if he had equipment, he ran it through the company. Is that what you are saying?

A That's how you would do it. You don't own it personally.

Q Is it fair to say sitting here today, you could not say which equipment was held by Dynatech and which equipment listed here was owned by Energel? Is that fair that you cannot --

A I can't tell you that.

Q How could we go about figuring that out? If we wanted to? Do you know?

A I would say my position would be that everything is owned by Dynatech because Dynatech provided revenue for every single thing there. Until that is recouped along with, you know, the interest of having that stuff there, until that's satisfied, then above that can be accordingly resolved.

Q Is it your testimony that Energel did not provide any equipment to the mining operation in California?

A No. Energel may have. But it's still Energel's revenue -- Energel's revenue was to come

from gold mining, so --
Q But Dynatech had other operations generating revenue?
A No. I don't understand.
Q Did Dynatech have other operations generating revenue?
A Dynatech generated revenue all the time for itself. They had nothing to do with gold mining. Gold mining didn't generate any revenue. That's the problem.
Q Okay. So -- but as far as you know, Energel was not generating revenue?
A As far as I know. If they entered into anything and got little bits of revenue, it's not running a construction company.
Q So --
A It might be they got something because you asked me about leases or something like that. They might have had a little income come in.
Q But it's your understanding that the equipment that's listed on page 1482 would have been provided by Dynatech as the income generating company, it's the one that had revenue and that would be able to afford equipment. Is that fair to say?
A Well, there's somebody's name here and

they have equipment, so that probably is theirs or they wouldn't have put their name there. But under Liberty Mining drag line, clamshell bucket and giving it a value --

MR. McBRIDE: To be responsive and to make sure we understand, you are focused just on the five lines under Dynatech Energel and Don Goodman on this list, not on anything else?

MR. TRAUBEN: Correct. Thank you.

A What's the question about those?

Q About those, whether it's fair to say that, if I understand your testimony correctly, that because Dynatech was the revenue generating entity that's listed here, that the equipment would have been Dynatech's, more likely than not, of all the three entities, Dynatech, Energel and Don Goodman, that these five items listed beneath those names were provided by Dynatech?

A The revenue generating thing, item here, is Don Goodman. Dynatech is owned and Energel is owned by Don Goodman and Dynatech has the revenue from the Dynatech Corporation, is revenue to Don Goodman. So yes, Dynatech made that contribution along from Dynatech and all his other operations. So -- I mean, Dynatech gave enough money that you

could say that money was applied to this.

Q When you say --

A Revenue generating name there between Dynatech, Energel and Don Goodman is always Don Goodman. He's the person. He owns the other two. All three of them own that in that respect. Whether the titles to these things are -- if you go buy an air compressor for $1500, there's not going to be a title. You have it insured and hope it doesn't get stolen, because if someone steals it, it's theirs. Possession is ownership.

I still didn't answer?

Q It may be the best I am going to get.

A That is all you are getting out of me.

Q Do you know the fate of any of the equipment listed on page 1482?

A No. I don't have any idea of it.

Q Is it -- has Dynatech made any claim or asserted any request to be compensated for any of this equipment?

A To?

Q To whomever it believes it was sold to or --

A I would say in the form of this litigation we are here about, that would be its only