IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ALFRED ALOISI, et al,
Plaintiffs,
vs. NO. 95-650L
THE UNITED STATES, Judge Lawrence S. Margolis
Defendant.

DEPOSITION OF JAMES KENDLE

Taken on Behalf of the Defendant
Monday, April 28, 2008

Page 42

Feel free to just go ahead and yank those off and not make them part of the exhibit so it will save us from copy costs.
Thank you.
Q BY MR. TRAUBEN: If you take a look there on the second page on the top card, D-11, card number D-11, there's a list of claims down the middle of the page, or middle of the card.
Do you see where I'm looking?
**A Yes.**
Q There's a list there. There's the Lost Dutch Boy, and then there's Lost Dutch Boy number 1 through -- here is number -- Lost Dutch Boy number 12 is the last one on this card. And actually, if you continue on to the next card, there's Lost Dutch Boy number 13.
And there's some other claims here, as well. There's the Bonanza King, Bonanza Queen, Strode East, Strode West.
Do you see where I'm looking?
**A Yes.**
Q Are all these claims that you and Fred staked together in Klamath, to your recollection, or only some of them?
**A Only some of them.**

Page 43

Q Okay. And the Lost Dutch Boys we've talked about, are there any others on this list that you and Fred claim together?
**A Yes, the Bonanza King and the Bonanza Queen.**
Q Are those located in Eddy Gulch?
**A No, they are not.**
Q Oh, okay. So of all these mining claims, which ones are in Eddy Gulch?
**A The Lost Dutch Boys.**
Q And if you --
MR. MCBRIDE: Can I clarify? Are you asking him on this page, or on the entire exhibit?
MR. TRAUBEN: No, just this page.
MR. MCBRIDE: Okay.
MR. TRAUBEN: Yeah, just talking about page D-11 right now.
MR. MCBRIDE: Thank you.
MR. TRAUBEN: And actually E-11, because there's a Lost Dutch Boy on E-11.
Q BY MR. TRAUBEN: Now, if you flip several pages in, there's the Forest Service 91. Do you see that page?
**A Not yet.**
Q The top of the card reads D-17.

Page 44

**A Yes.**
MR. PARKER: We have it.
MR. TRAUBEN: Okay.
Q BY MR. TRAUBEN: And this shows your name as, among others, as a record claim holder of the Buckeye placer claim. Do you see that?
**A Yes.**
Q And John Kendle, is that your father?
**A Yes, it is.**
Q And also listed is Robert Pincombe?
**A Yes.**
Q And Lambert Aloisi, Senior, and then Lambert Aloisi, Junior.
Who is Lambert Aloisi, Senior?
**A That's Fred's father.**
Q Does he also go by Larry Aloisi?
**A Yes.**
Q Do you know? "Yes"?
**A Yes.**
Q And who is Lambert, Junior?
**A Fred's younger brother.**
Q Okay. So do you know what your percentage of the claim was to the Buckeye placer?
**A Yes, I was one of the association members.**
Q Does each member have an equal share, or do

Page 45

they have different shares?
**A I believe they have an equal share.**
Q And was the Buckeye one of the former Lost Dutch Boys?
**A The Buckeye is a placer claim.**
Q Uh-huh. The Lost Dutch Boys were load claims?
**A I don't recall.**
**(Mr. Parker leaves the conference room.)**
**BY MR. TRAUBEN:**
Q Then reading down, you had an ownership interest in the Yankee placer? Looks like the same list of association members as for the Buckeye; correct?
**A Yes.**
Q Okay. And you also have an ownership interest reflected here in the East Fort placer?
**A Yes.**
Q And in the Compressor placer?
**A Yes.**
Q And then if you look down below by this card on E-17, it appears you have an ownership interest in the Stevens placer; correct?
**A Yes, it is.**
Q And are there any other -- other than the placer claims that we looked at, are there any

others that you had an ownership interest in?
A **I'm not sure at this time.**
Q Okay. Going back to the second page when we were talking about the Lost Dutch Boys, it appears from this record, anyway, that Christina Aloisi and Fred Aloisi were the claimants on record. Was it your understanding that at sometime you also were a record claim holder on the Lost Dutch Boys?
A **Yes.**
Q Do you ever -- do you recall ever seeing a card similar to this one where your name appears as the claimant?
A **Not at the moment, no, I don't.**
Q Not with respect to these mining claims?
MR. MCBRIDE: Can the record show that I don't believe the alpha for K is disclosed in this exhibit, though, so we can't check that. In other words, the cards that would list K, Kendle, or others, are not part of this exhibit.
MR. TRAUBEN: Well --
MR. MCBRIDE: This is an alpha card, is it not?
MR. TRAUBEN: By claim holder -- I'm not



sure. That's -- that's post. I don't know the answer to that.
MR. MCBRIDE: I'm also not sure about your statement that Christina Aloisi has an interest, according to D-11, in anything other than the Littrel number 2.
MR. TRAUBEN: Thank you for clarifying.
MR. MCBRIDE: At least on page D-11.
That was Mr. McBride, for the record.
MR. TRAUBEN: Okay. So it could just be that our -- this exhibit is incomplete and that's why Mr. Kendle's name is not showing up. Thank you for clarifying, Mr. McBride.
MR. MCBRIDE: You're welcome.
MR. TRAUBEN: Was that marked as Exhibit 2?
THE COURT REPORTER: Yes.
MR. TRAUBEN: Okay. Thank you.
(Mr. Parker returns to conference room.)
BY MR. TRAUBEN:
Q Do you know how long any relationship, business relationship, lasted with Mara Ventures?
A **I don't recall that date.**
Q Do you know whether any relationship with Mara Ventures continued after Liberty Mining was



formed?
A **I don't know the answer to that.**
Q Did you -- were you -- right.
Did there come a time when you met a man by the name of Don Goodman?
A **Yes, sir.**
Q Donald Goodman?
A **Yes, that's correct.**
Q Did you meet Mr. Goodman in person?
A **Yes.**
Q About when?
A **Late 1988 or early 1989.**
Q What was going on at that time with you and Fred with respect to any mining claims in the Klamath National Forest? What was the status of your efforts with respect to mining in the Klamath?
A **I'm sorry. I don't understand what you -- what you mean.**
Q Okay. Well, we've already seen that you and Fred staked some mining claims in the Klamath National Forest in 1984, and then we saw some placer claims that were dated 1985 on Exhibit 2. What were you and Fred doing with respect to those claims between 1985 and until



you met Don Goodman in late '88 or 1989?
A **We were continuing development of those properties.**
Q And how were you doing that?
A **Various ore sampling, other exploration and development activities.**
Q What does that mean, "exploration and development"? What were the "exploration" activities?
A **Geological mapping under the direction of Mr. Ferrero.**
Q At this time, were you and Fred using your own money to do this work?
A **We always used our own money, when we had it.**
Q Well, in this time frame, from around 1985 to 1988, were you and Fred primarily relying on your own money?
A **I don't exactly recall the specifics of the arrangements.**
Q Did Kendle Trucking invest at this time in the -- in any of the mining operations that you and Fred were conducting in '85 to '88?
A **That's true. And also before then.**
Q Is that considered a loan from Kendle Trucking?
A **Yes.**

Page 62

**things of that nature.**
Q Who was the accountant at that time?
A **His first name was Clay, and his business was Valley Accounting in Central Point, Oregon. And I do not recall his last name.**
Q What city was it in?
A **Central Point, Oregon.**
Q Oh, that's the name of the city?
A **Yes.**
Q Okay. Do you have any knowledge whether or not that accounting firm is still in existence?
A **I don't know the answer to that.**
Q Did Clay at Valley Accounting, was he the accountant for the company until you left in May '99, or through that time period?
A **I believe so.**
MR. MCBRIDE: If the record says May '99, that wasn't his prior testimony.
MR. TRAUBEN: You're right. '91, I meant to say.
THE WITNESS: Oh, I don't know the answer to that.
MR. TRAUBEN: Okay. And I'm not sure you testified yet that you left in May '91, but it was sometime in '91. Okay.

Page 63

Q BY MR. TRAUBEN: Okay. Are there other accounting firms involved, to your knowledge, that come to your recollection?
A **No, there aren't.**
Q Did you have any dealings with Myron Finkelstein?
A **No.**
Q Do you know who he is?
A **No, I don't. That name is not familiar to me.**
Q Okay. Did you have to, at any time, tend receipts, invoices or other accounting records back east for Mr. Goodman's accountant?
A **I don't recall that. It -- it's possible, but I don't remember.**
Q You said that you were also the operations coordinator. What kinds of things did you do as the operations coordinator?
A **I was responsible for making sure that we had fuel on the mine, equipment maintenance, coordinating mechanics, if we needed them.**
Q Did you also deal with government personnel?
A **Not so much at that time. In the earlier years, I had contact. But mainly Tom Ferrero was in charge of that. However, I did attend numerous meetings, and I was privy to all of --**

Page 64

**all of the information.**
Q Okay. So in this -- the mining claims -- do you know what mining claims are involved in this lawsuit? Do you have some general idea?
A **Yes.**
Q And generally, we're talking about mining claims that are located within Eddy Gulch, which is near Sawyer's Bar, California; correct?
A **Yes.**
Q Just so we're all on the same page. And you're familiar with that area. You said you'd been going -- been to the area in the early 1980s, at least?
A **Yes.**
Q And were you aware that the Northern Spotted Owl was becoming an issue, as far as its survival and whether or not it would be listed as an endangered species?
A **Coming from a logging family, I was very aware of that matter.**
Q Because there are also owls present in Oregon; correct?
A **Well, it's pronounced Oregon, but, yes, you're correct.**

Page 65

Q Did you know that there was Spotted Owls within the Klamath National Forest?
A **Well, I've never personally seen one.**
Q Did you have an understanding that there's spotted owls in the Klamath National Forest?
A **Well, I heard that rumor.**
Q And about when did you hear that?
A **Late '80s.**
Q Had you heard that in the earlier '80s?
A **No.**
Q Did your family's operation have to stop temporarily for anytime while -- because of the Spotted Owl?
MR. PARKER: Are you asking about Kendle Trucking?
MR. TRAUBEN: Right.
Q BY MR. TRAUBEN: You said you were from a logging family and you're familiar with the issue. So I'm just wondering whether in that family history their operations were stopped at any time because of the Spotted Owl?
A **Well, actually, the entire Pacific Northwest has been affected. In my family, my father transformed the business from logging trucks to long-haul highway freight-moving operations.**

Page 66

Q And that was a result of the Spotted Owl stopping logging?
**A Yes.**
Q About when did that happen?
**A Well, the transition started in the late '80s.**
Q And the reason why I ask is, late '80s, let's say 1988, did you and Fred have concerns then about the Spotted Owl in the Klamath National Forest?
**A Well, I was not involved in the properties during 1988.**
Q That's because of the broken leg, or some other factor?
**A No, I was -- I had a broken leg that year.**
Q That pretty much took you out of commission for the entire year?
**A Yes.**
Q Maybe even before that in 1987 before you broke your leg, did you and Fred have any discussions about potential effects of the Spotted Owl on your plans to mine gold in the Klamath National Forest?
**A No, not that I recall.**
Q And then when you came back from the broken leg, back to work in the Klamath, did you have

Page 67

discussions then with Fred about potential effects on your plans to mine gold in the Klamath?
**A Well, when we learned about the issue from the Forest Service, there were discussions pertaining to that matter.**
Q And when did those discussions take place?
**A Well, usually during dinner.**
Q And what year; what time frame?
**A Oh. 1989 and thereafter.**
Q And in your discussions with Fred in 1989, did you discuss the potential that the Spotted Owl may stop or delay your plans to mine gold in the Klamath?
**A Could you repeat that, please?**
Q Yes. Did you and Fred discuss that the presence of the Spotted Owl may stop or delay your plans to mine gold in the Klamath?
**A I don't recall our conversation going along those lines because there was never any issue that -- that dictated a stopping of our work.**
Q Did you -- was there a time that you became aware that your mining claims were in an area that the Forest Service identified as a Spotted Owl habitat area?

Page 68

**A Yes.**
Q Otherwise known as -- I'm sorry. I was going to add for the record that it's otherwise known as a SOHA, S-O-H-A.
**A Yes.**
Q And your answer is "yes"?
**A Yes, it is.**
Q Thank you. When did you learn that mining claims were in a SOHA?
**A Oh, that would be late '80s, I believe.**
Q 1989?
**A Perhaps, yes.**
Q And did that not -- did that fact raise any concerns on your operations, that your operations may be stopped or delayed because it's in the SOHA?
**A Not at that time, no.**
Q At what time did it become a concern, to your recollection?
**A Well, as time went on, it became more and more of an issue. We were unable to get a definitive answer on what effect the Spotted Owl would have on our operations.**
Q Was this still in 1989, you're talking about?
**A Well, I don't recall the exact date. I would

Page 69

say it's more of an evolution over the next few years.**
Q Were there any particular individuals at the Forest Service with whom you had some contact that you recall, that you can identify?
**A Are you asking me to name names?**
Q Yes.
**A Well, yeah, I pretty much knew all the players: Mike Lee, Harry Frey, Al Buchter.**
Q Did you know Kathy Milne?
**A I did not know her.**
Q MaryAnn Garringer?
**A I met her briefly, but did not know her.**
Q Did you know Earl Griffith?
**A Yes.**
Q Among the individuals you just identified, is there any of them that you had more frequent contact with than others that come to mind, especially with respect to the gold mine claims in Eddy Gulch?
**A Yes. Harry Frey was the mineral officer, and then Al Buchter took his place later on. And after that, Harry Frey stepped back into the picture. Al Buchter had left the area for a while, but then he returned.**

Page 98

Q Okay. Is it your understanding that by January of 1990, Liberty Mining was operating in the red?
A **If it was, I wasn't aware of it.**
Q You were not?
A **I don't -- I don't know how the accounting was handled. I'm not an accountant.**
Q Okay. But in your function as administrative assistant, do you help pull the numbers together then, but you weren't keeping tabs of the results?
A **I'm sorry. I don't understand your question.**
Q Well, I'm just -- I -- I guess I was hoping that you might know the answers because of your role as an administrative assistant within the company. But then if I understand what you're saying now, you really weren't involved in the tabulations, but you provided the raw numbers to the accountant who then did the calculations.
A **That's fair to say.**
Q All right. Thank you.
Did Liberty Mining sell any timber?
A **I don't know whether they purchased it or sold it. I don't know the details on that**

Page 99

**transaction.**
Q Okay.
A **I know there was some timber cut when we expanded the roads on the mine.**
Q But you don't know whether it was sold, or what happened to it?
A **No, I'm not clear on that issue.**
Q Okay. And did you have any responsibilities or -- maybe not responsibilities -- but any role in writing checks from any Energel account?
A **I believe I did.**
Q Did you also keep records of those checks written on Energel's account?
A **We should have -- there should have been a ledger in the checkbook.**
Q Okay. If you look in the stack of loose documents, there should be something that's handwritten, and it has plaintiff 2339 through 2345.
MR. MCBRIDE: This is Mr. McBride. That's A167, if you want to use it that way.
MR. TRAUBEN: Okay. So for the record, we'll just refer to it as A167. We won't enter it as an exhibit.

Page 100

THE WITNESS: And what were those numbers again at the bottom?
MR. TRAUBEN: PLTF002339 --
THE WITNESS: I have --
MR. TRAUBEN: -- through 2345. It's a handwritten document.
THE WITNESS: And that's A166?
MR. TRAUBEN: We'll refer to this as A167. That's not written on the document itself. But we know from the Bates numbers and Mr. McBride's list and my list, as well, that you don't have.
Let me know when you've found it.
THE WITNESS: I have that.
Q BY MR. TRAUBEN: Okay. Do you recognize any of the handwriting on this document?
A **No, I don't.**
Q Do you have any idea who might have prepared it?
A **No, I do not.**
Q Have you ever seen it before?
A **I don't believe so.**
MR. TRAUBEN: Okay. Let's see. Should we take -- do you guys need -- why don't we go off the record for a second.

Page 101

THE WITNESS: Sure, that would be fine.
(Deposition in recess at 12:42 p.m. - 1:03 p.m.)
MR. TRAUBEN: On the record.
Q BY MR. TRAUBEN: Mr. Kendle, do you recall the month that your association with Liberty Mining and Alfred Aloisi ended?
A **No, I do not.**
Q Let me tell you what Fred Aloisi said at his deposition. And I'm looking at the transcript of the deposition of Alfred Aloisi dated Wednesday, October 31, 2007. On page 6, beginning on line 6, I asked: When was the last time you spoke to Mr. Kendle?
Answer: 1991. May the 5th.
And so Mr. Aloisi was able to identify the exact day, May 5, 1991, as the last day that you and he spoke.
Does that refresh your recollection?
A **That sounds accurate.**
Q And what happened that day that that became the last day that you and Fred spoke?
A **I'm sorry. I don't understand your question.**
Q Why did you and Fred no longer speak after that date?
A **I left the operation.**





PE-36-472

Page 102

Q Was there some precipitating event?
A **Well, I would say that I was very stressed out. My guts were in a knot from trying to make a living, and the operation had ended. And I had to make a decision to go back to work and make a living. And it was very traumatic for me.**
Q Did you and Fred have any argument or disagreement at that time?
A **I don't recall.**
Q Were you aware at that time in May 1991 that Liberty Mining, or some of the people involved with Liberty Mining operations, were seeking a loan from an individual named David Davies and his company, National Heritage Life Insurance Company?
A **That name may be familiar, but I don't recall specifically.**
Q Okay. If you could take a look at the document that's Finkle 000319. It's on the Valley of the Rogue Bank letterhead. Dated June 3rd, 1991.
A **Yes, I have that.**
Q Okay. It says that -- in this letter -- an analysis of your account reveals that it has been overdrawn since May 2nd, 1991, which is

Page 103

just a few days prior to your departure.
So my question is whether that's your understanding, that the checking account was overdrawn at the time you were leaving the company?
A **I do not recall that.**
Q Okay. Do you have any reason to dispute what it says here in this letter?
A **No, I don't. I believe it to be just merely a clerical oversight. I wasn't aware of it.**
Q Okay. Did Liberty Mining assume the debts, any debts of Jefferson State?
A **I don't know if they did or not.**
MR. MCBRIDE: I'll -- I think that's -- assumes something not in evidence, that there are debts of Jefferson State.
MR. TRAUBEN: That's why I said "any" debts.
MR. MCBRIDE: There was a question about their contractual relationship.
Q BY MR. TRAUBEN: But your answer is that you're not aware of that or not, correct, whether that occurred or not?
A **My answer is that I don't know.**
Q Okay. We're moving to the bound volumes now.

Page 104

We'll begin with volume 1 and work our way through. We're not going to look at every document. In fact, we've discussed quite a bit already of what I had intended to ask you about these documents, so this should go quicker than it has this morning.
MR. MCBRIDE: Excuse me. This is Mr. McBride. You're going to joint appendix, Volume I?
MR. TRAUBEN: Correct.
MR. MCBRIDE: Thank you.
MR. TRAUBEN: Let me know when you have Volume I handy.
THE WITNESS: Yes, I do.
MR. MCBRIDE: I'm ready, Mr. Trauben. Go ahead.
MR. TRAUBEN: Okay.
Q BY MR. TRAUBEN: If you look at the document that's found at tab JA18. JA18 has a cover letter from Jacobson Jewett and Thierolf?
A **Yes, I have that.**
Q And if you turn to the -- I guess the second sheet. It's the third page. This is double-sided. But it has Bates number JA0338 in the lower right-hand corner. It's a

Page 105

quitclaim deed.
A **I see it.**
Q Okay. And just for the record, I'll state that this is a quitclaim deed from Jefferson State Exploration and Development Company to Fred Aloisi and Kendle Trucking and Mara Ventures.
So -- and it's reflecting the transfer of interest in a number of mining claims that are listed.
My question to you is, do you know how Jefferson State came to have an interest in these money claims?
A **It would have been through a conveyance of some sort, and I don't recall the details on that transaction.**
Q Do you know who handled the transaction for you; in other words, was there a lawyer involved who handled it for you?
A **I would imagine that it was Jerry Jacobson, but I don't recall.**
MR. MCBRIDE: If I may, he also testified he wasn't there in 1988.
MR. TRAUBEN: I'm sorry?
MR. MCBRIDE: This is a 1988 document. So I'm not sure we've established that he was

Q Are you there?
**A Yes, I am. Go ahead.**
Q Right. There's a listing for Energel, and you see a first listing, Ruth Patterson, mineral lots 45A, 45B, $500.
**A Yes.**
Q Are you aware of any lease agreement with Ruth Patterson for mineral lots 45A and B?
**A I would imagine there is. I can't recall it specifically right at this moment.**
Q Okay. You don't -- you're imagining; you don't know for a fact?
**A No, I didn't say that.**
Q Well, okay. Do you know for a fact that a lease agreement existed, or you're not sure?
**A Well, it appears that it does.**
Q It appears based on this listing, or would it -- what are you basing that statement on?
**A That it appears so because of this listing.**
Q But aside from this listing, do you have any other information suggesting that a lease agreement existed with Ruth Patterson?
**A Not to my knowledge at the present.**
MR. TRAUBEN: Fair enough. That's all the questions I have at this



time. I'm sure Mr. McBride will probably have some questions for you, and Mr. Parker. And if so, I reserve my right to jump back in and question you further.
Thank you for your patience.
THE WITNESS: You're welcome.
MR. MCBRIDE: This is Mr. McBride. Do we need a short break? I don't have many questions, but I can organize them if we need a break. Or I'll just go forward, if we don't.
THE WITNESS: I'd like a five-minute break, if I may.
MR. MCBRIDE: That's fine. We'll take it. Off the record. We'll come back at, I don't know, 25 'til or 20 'til.
MR. TRAUBEN: All right. Thank you. Off the record.
(Deposition in recess at 3:29 p.m. - 3:35 p.m.)
MR. MCBRIDE: Back on the record.

EXAMINATION

BY MR. MCBRIDE:
Q This is Lawrence McBride on behalf of plaintiffs and Mr. Kendle. Thank you, Mr. Kendle, for your patience here. I'll be



short.
If you could put before you what -- Mr. Parker -- what we were talking about during the break there, what's also in JA, the joint appendix, behind tab 98 so you can look at it. Either way, we'll identify it and make sure it's the same or right thing.
MR. PARKER: One moment.
MR. MCBRIDE: For the record, a one-page document that has a Dynatech letterhead, Dynatech Wanaque, or W-A-N-A-Q-U-E, New Jersey. However it's pronounced.
Q BY MR. MCBRIDE: Do you have that?
**A Yes, I have that.**
Q Okay. Can you look down that list of equipment? My question is, I'd like to go down and simply ask if you know whether these pieces of equipment were on-site in Eddy Gulch and used in the Liberty operations.
**A Yes, they --**
Q First -- is the answer yes as to all of them?
**A The diamond core drill was used. That's yes. The 977L was used.**
Q Before you go on from that, is that the same 977L that was in the photograph?



**A Yes, it is.**
Q Okay. Continue.
**A The screening plant was there. The Cedar Rapid, the 5 by 16 by 3 deck screen is actually a Cedar Rapids shaker. That was used.**
**The centrifuges, I believe, were there.**
**The Pierce --**
Q Do you know where they were?
**A Excuse me.**
Q Excuse the interruption. But on the centrifuges, do you know where they were?
**A Down at the ET placers, I believe.**
Q Okay. Continue, please.
**A The Pierce trailer was there.**
Q That's the trailer that -- I'm sorry. Excuse me for interrupting again. We're not -- our timing isn't good yet.
Is that the same trailer that is in the photographs, or is that a different trailer?
**A That's a different trailer in the photographs.**
Q Okay. Continue.
**A The International Truck was what we used to put the core drill on -- oh, no. The International Truck, that was actually a tool truck and a crew truck. The fork and the winch and the**

Page 178

**valves all went on the 977, the Caterpillar 950**
**wheel loader --**
Q Excuse me. Excuse me, again. When you say the "977," you're referring to the same crawler loader that was in the photograph?
A **That's correct.**
Q Okay.
A **All of these pieces of equipment were used on-site.**
Q When it says "2 TS-24 scrapers" --
A **Yes, they were there --**
Q -- is that --
A **-- the --**
Q -- is one of those scrapers what's shown in the photograph on the highway?
A **Yes. That's correct.**
Q And what are those used for on-site?
A **Those were used to haul dump material.**
Q Do you know where each of these pieces of equipment came from, where it was bought or -- or acquired?
A **I'm not sure if those were purchased in Oregon or California. I believe Oregon.**
Q Okay. And they were all -- were you involved in bringing them to the site?

Page 179

MR. TRAUBEN: Object. It's vague as to what equipment you're referring to. All the equipment listed, or some of them?
MR. MCBRIDE: Well, that's what I'm starting with.
Q BY MR. MCBRIDE: Yeah. The equipment on JA98 that we've just been through.
A **I hired Interstate Heavy Hauling to transport both of the Terex 24B scrapers.**
Q Do you recall when that was?
A **Approximately 1990.**
Q Okay. Were they used in operations before the Stop Work Order was issued?
A **Yes, I believe so.**
Q Using the Stop Work Order of January 1990, I think that's JA50, but I may be wrong, 51 --
MR. PARKER: I'll get it.
BY MR. MCBRIDE:
Q -- as a reference that Mr. Trauben asked you about, was all this equipment in use before the Stop Work Order was issued?
A **Yes, it was.**
Q When you arranged for the transportation of the scrapers, was that something you arranged using money in the checking accounts that have been

Page 180

discussed today?
A **I don't recall specifically, but I believe so.**
Q Okay. The money that was spent out of those checking accounts, what sources do you know that it came from?
A **I know that some was from Don Goodman Enterprises, and I believe some was from Energel.**
Q Any other sources?
A **Dynatech.**
Q Any -- any outside of those three; any further sources?
A **As far as funding for Liberty?**
Q And for this equipment.
A **Yes. Kendle Trucking.**
Q Can we go back to the photographs at this point, now, please.
A **Okay.**
Q On the photograph, there's a page of photographs. The upper one is you and your parents, you've testified, at the Anna Johnson, and then there is a horizontal one, slash burning?
A **Yes.**
Q That picture of the slash burning, can you

Page 181

identify the other people who are in that picture?
A **The gentleman on the left is Jim Villaponto.**
Q And what was his role in the operation, or when was he there?
A **His company, Salmon River Forestry, conducted the slashing and brush-piling operations.**
Q Thank you. And then anyone else you can identify?
A **I can identify myself with my back to the camera.**
Q All right.
A **The other person walking toward the camera, I can't identify.**
Q Is that Oswaldo?
A **No. Oswaldo is actually in the pictures where there's snow on the trailer.**
Q Okay. We're working with this set that's right here.
Let me ask you about -- where is that other photograph? Okay.
When you -- did this -- did this equipment just sit there, or did it ever operate?
A **No, it operated.**
Q And when it wasn't operating, how many -- what