# EXHIBIT B

IN THE
UNITED STATES COURT
OF FEDERAL CLAIMS

ALFRED ALOISI et al., )
)
Plaintiffs, )
) DEPOSITION
v. ) OF
) MYRON FINKELSTEIN
UNITED STATES OF AMERICA, )
)
Defendant. )
)
______________________________)

T R A N S C R I P T of the stenographic notes of JANE MESSINEO, a Certified Shorthand Reporter and Notary Public of the State of New Jersey, taken at the offices of VERITEXT, NEW JERSEY, 25B Vreeland Road, Suite 301, Florham Park, New Jersey, on Thursday, April 24, 2008, commencing at 2:15 p.m.

A P P E A R A N C E S:

FOLEY & LARDNER, LLP
Washington Harbour
3000 K Street, N.W., Suite 500
Washington, D.C. 20007-5101
BY: LAWRENCE G. McBRIDE, ESQ.
(202) 295-4017
lmcbride@foley.com
For the Plaintiffs

U.S. DEPARTMENT OF JUSTICE
601 D Street, N.W.
Washington, D.C. 20004
P.O. Box 663
BY: BRUCE K. TRAUBEN, ESQ.
(202) 305-0238
bruce.trauben@usdoj.gov
For the Defendants



I N D E X

| WITNESS | PAGE |
| --- | --- |
| MYRON FINKELSTEIN | |
| Direct Examination by Mr. Trauben | 5 |

E X H I B I T S

| EXHIBIT | DESCRIPTION | MARKED |
| --- | --- | --- |
| Energel Exhibit 1 | Copy of Revised Notice of Deposition of Energel, Inc. | 12 |
| Energel Exhibit 2 | Copy of 2553 form, Bates-stamped FINKLE 000401 and 400 | 28 |
| Energel Exhibit 3 | Document from the Siskiyou County assessor, Bates-stamped FINKLE 000431 through 432 | 33 |
| Energel Exhibit 4 | Copy of deed, Bates-stamped FINKLE 000280 through 282 | 36 |
| Energel Exhibit 5 | Copy of checks No. 1120662 with attachment, Bates-stamped FINKLE 000266 through 271 | 38 |
| Energel Exhibit 6 | Copy of notice of default and election to sell under deed of trust, Bates-stamped FINKLE 000816 through 817 | 43 |
| Energel Exhibit 7 | Copy of letter dated 1/29/92, to Donald W. Goodman from Veronica, with attachment, Bates stamped FINKLE 000429 and 430 | 47 |
| Energel Exhibit 8 | Copy of letter on letterhead of Don Goodman Enterprises, Inc. to David Davies, Bates-stamped FINKLE 000769 through 771 | 50 |
| Energel Exhibit 9 | Copy of handwritten notes, Bates-stamped PLTF 002339 through | 64 |



| | | |
| --- | --- | --- |
| Energel Exhibit 10 | Copy of Energel, Incorporated balance sheet January 31, 1990, Bates-stamped PLTF 002323 through 2338 | 70 |



Myron Finkelstein, 9 Ronarm Drive, Mountain Lakes, New Jersey, sworn.
DIRECT EXAMINATION BY MR. TRAUBEN:
Q Can you please state your name for the record?
A Myron Finkelstein.
Q Mr. Finkelstein, I'm Bruce Trauben. I represent the United States in a case of Aloisi et al. versus United States. I have questions for you today for your deposition and hopefully you can provide some answers.
A I will try.
Q You understand that you are here today as a representative of Energel?
A Yes.
Q Let me go over basically some of the rules of the deposition.
A Okay.
Q First, for me to ask questions and for you to provide answers and not ask questions of me. But if you do have any questions about the procedure or if you don't understand my question, please ask and I will try and clarify as best I can.
A Okay.
Q It works best if we speak one at a time.

Although sometimes it will be clear to you where I'm going with a question, and you'll want to jump in with an answer before I finish, for the court reporter, we need to speak one at a time.
A Okay.
Q I will try to let you complete your answer before I begin my next question. Sometimes I am guilty of not doing that, but I will try.
Also, because we have a court reporter, you need to verbalize your responses. You can't just nod or shake your head, but you need to give an oral response.
If you need a break at any time, just say so and we can take a break.
Anything before we begin, any questions?
A No. Let's go.
Q Okay. I want to get a little background information. Did you graduate from college?
A Yes, I did.
Q Where did you go?
A I went to City College of New York, Baruch College was the actual division I went to. When I graduated, it was called Baruch College.
Q Did you have graduate school after that?
A No, I did not.



Q What was your degree?
A BBA in public accounting.
Q Are you a CPA?
A No.
Q Were you ever a CPA?
A Yes.
Q When were you a CPA?
A 1965 to 1983.
Q Even though no longer a CPA after 1983, did you work in accounting?
A I've never not worked in accounting. The answer is yes.
Q Have you worked for various firms as an accountant?
A Yes.
Q Are you currently employed?
A Yes.
Q Where at?
A Maste, M-A-S-T-E, Consulting Group, Inc.
Q What do you do for them?
A I am an accountant.
Q So I understand, are you an accountant for Maste or are you doing forensic accounting for clients?
A Maste Consulting Group has clients -- I



do specific kinds of accounting. Do you want the detail behind it to make it easier for you?
Q Briefly.
A Okay. I promise. The clients that I handle in most instances are small companies. They may have an office manager or have their own accounting system. I assist in putting together financial documents and I do corporate tax returns. Corporate also means LLCs these days, entity returns for lack of a better word, and in a lot of instances, I do the personal returns of the principals that are involved.
Q Was there a time when you began working for Don Goodman Enterprises or Don Goodman?
A The year would be, I believe, 1973.
Q Were you employed directly by Mr. Goodman or one of his entities?
A No. I was a partner in a CPA firm at the time and he employed that CPA firm.
Q What firm?
A Finkelstein Amsterdam & Company.
Q And for how many years after that did Finkelstein Amsterdam & Company do accounting work for Mr. Goodman or one of his entities?
A Ten years.



Q After 1983 did you continue to do accounting work for Mr. Goodman or one of his companies?
A Yes. The entities that I worked for changed, but I still continued to work.
Q Where were you employed at that time?
A In '84 to '86 I was employed Marvin J. Amsterdam, CPA. 1986 through 1990 I was employed by R-O-C-H-E, Roche, Miseo & Co. 1991 until now I have been employed by Maste Consulting Group, Inc.
Q Did there come a time when your work for Mr. Goodman or one of his entities ceased?
A Actually, it didn't cease until he died. That was in 2005.
Q Did you do any work for his estate?
A I was actually the executor of the estate, but at the time of his death in June of 2005, most of the assets had been dissipated. The only, in quote, passing on to his three children who were his beneficiaries, was insurance policy that it was handled outside the estate. I just did the paperwork and they received one-third each of the policy.
Q Was the estate probated?
A No.
Q Has it been wound up?

Page 22

sense that we filed returns. It was a while from the time -- we, that's the proverbial we, meaning the company, was paying lease payments to people as an annual thing that had to be done to maintain the status of all the leases. And that was being done. So the answer is no, they were not dormant. They became dormant after Don became sick.
Q I know you said that he passed away in June of 2005. When did his illness become so severe that he was unable to continue working?
A He was a diabetic and, unfortunately, it got very severe and they had to amputate a leg. This was sometime in late 2003. He then had to go to facilities like homes to be taken care of.
I would say, so he spent the last 18 months or so of his life in that condition and, therefore, he was not functioning -- I shouldn't say he wasn't functioning. He spoke to his son still, but that really didn't relate to these companies. It related to the son's blast -- I think he tried to help his son's continuing business. But this company became dormant after he passed. But up until that point we were okay.
Q Do you know what became of the company's records?

Page 23

A No. We had records for all the entities.
Q When you say we, who is that?
A Me, the company that I am with. Records were passed from each entity I was with until the next, so I had Redwells for lack of a better word, and so Maste Consulting had many Redwells on the different companies including Energel.
He passed and we put everything into storage. Frankly, I heard nothing from anybody and I didn't even know if this case was still alive, and so we disposed of the files, unfortunately, about six or eight months before I found out the case was still alive.
Q So how long after Mr. Goodman had passed away were the files disposed of?
A Couple of years. I would say two years plus some months.
Q Approximately sometime in 2007?
A Latter part, yes.
Q Do you recall receiving a subpoena from the government in this case in November of 2007?
A Yes.
Q So had the documents been destroyed by that time?

Page 24

A It hurt when I saw it came in in November because I think we got rid of everything, a realistic guess would be June or July of that year.
Q Was the government's subpoena, the notice -- first notice to you that this litigation was still ongoing?
A Yes, it was.
Q Prior to that time, had you ever been contacted by anyone to produce records relating to this litigation?
A I don't think so, no.
Q Mr. Goodman didn't request that you provide any documents for the litigation?
A The only thing I remember doing, we had put together -- we, me, I, use that word to make it easier on everybody. I'm sorry. I had put together summaries of the monies expended by, in quote, all the entities, his entities, the companies I have mentioned to you, and himself.
It was up about 2.3 million dollars. That was done several years before. It probably was done when the case was more -- I don't know if the word is more active or not, probably relate back even into the '90s that that took place. I did that, but I was not asked to produce documents. So the answer

Page 25

is no to the original question.
Q Do you know what became of your summary?
A Same place everything else went. It was gone. I did not know it was still needed. I had hoped, in fact, that it had been turned over to Larry here, Mr. McBride, but apparently it was not.
Q Did you have any discussions within the context of Energel or any of the related entities as to the risk associated with investing in gold mines?
A I am not sure I understand that question.
Q Did you ever have a discussion with Mr. Goodman about the risk involved in investing with gold mines? Or in gold mines?
A Oh, over the years, yes. Of course. We discussed it as an investment, what it was. Because he kept spending more and more money over a period of time. He was very comfortable that it was a solid investment because there was gold there. That's what he said to me. Therefore, once we start mining, we'll be in fairly good shape.
Q Were you involved in any analysis of the costs or potential gains from any of the gold mining operations?
A The only thing that came back to me,

because at one point in the '90s, there was work done by a third party whose name escapes me right now. It was done more or less to see at what point it was practical to mine, to do the mining. That was because Don had wanted them to be doing some mining just to bring in enough cash to keep paying the expenses. And I think -- I remember in the back of my mind, this comes to be that as long as the price of gold exceeded $275, it was a very prudent investment, that mining.
Q You personally did not undertake any analysis?
A No. I did not do that. No. Honestly, I did not.
Q Are you familiar with any investment by Mr. Goodman in the Double Eagle Mine?
A Double Eagle?
Q Correct.
A No, I am not.
Q You did produce some documents to us pursuant to our subpoena, and I found among the documents some of Larry or Lambert Aloisi's personal documents. Do you know why those would have found their way into company records?
A Well, really, what I did there, to



assist in giving you what we had, we -- we. I am going to add a person's name here. When I say we, I asked for assistance from Nancy Pinkham. She had been the bookkeeper for Donald W. Goodman for a period of time. Her mother previously had been the bookkeeper. Then she became the bookkeeper. And I asked if she had any files on the gold mine.
I then put the two together, so to speak. Honestly, I did not really, being it said gold mine, I just turned it over to you. I didn't want to take anything out. Turned over all we had. So I can't answer your question.
Q So you don't have any personal recollection of serving as a repository for Mr. or Dr. Aloisi's documents?
A No. Not at all.
Q When Energel was formed, were the only two shareholders Alfred Aloisi and Don Goodman? Donald W. Goodman?
A I believe that's the answer, yes.
Q At some point did Fred relinquish his shares to Mr. Goodman?
A I see you have a 2553 there which is the subchapter S election. That election also shows the percentages that each owned. Should show that on



there.
(Copy of 2553 form, Bates-stamped FINKLE 000401 and 400, marked Energel Exhibit 2 for identification.)
A I asked for this for a reason. This is a form that's filed with the federal government when you want to take a corporation and request that it be subchapter S, which means that instead of the corporation paying taxes on the income or losses, the individuals do.
This looks like the original, dated back in early '89 and Fred was a 50 percent partner. I am trying to think in my mind, I thought he was for quite a while. And you have asked the question did he relinquish shares. And I am trying to remember whether Don became a hundred percent or not, which is what you are really asking. I don't know. I don't know. He may have. I know he did not fund anything in his company so it's possible. I don't remember specifically myself.
Q If you look at the second page of Exhibit 2 to your deposition, there's a form for Liberty Mining.
A Yes.
Q Did you prepare this form?



A I may have. I think I did not. I believe there was an accountant in California. It says Oregon, who prepared it.
Q Did you do any work for Liberty Mining?
A No.
Q Didn't keep any Liberty Mining books?
A That, I did not. I saw records, but that was records passed to me by an accountant. The more I think about it, I think it was a he, from Medford, Oregon.
Q Do you know the individual's name?
A No, I don't. So we prepared this, we meaning myself.
Q When you say this, you are referring to page 1?
A Excuse me. I am fairly certain that the 2553 form for Energel was prepared here, and it was signed by Donald Goodman here and then mailed out to them to then forward. An accountant in Medford, Oregon prepared the Liberty Mining and then forwarded it.
The dating is close because it had to be done, you have 75 days from the beginning of the year to become a subchapter S. That's the statutes. It had been that way forever. So let's see. It had to

Mr. Goodman about using funds from another entity of his to cover the amount due?
A Oh, we always did. That's basically how we paid things.
Q But specifically with respect to this debt, did Mr. Goodman make the decision, to your knowledge, to not -- pay off the amount loaned?
A If the amount was 6,000 and change, he would have probably made the attempt through another company to pay it. I can't -- I don't know if this was paid or if this was removed. I keep having this 150 stick in my mind. That's what Davies wanted, 150 -- I mean, that's what he was entitled to, I should say, not that he wanted.
We had situations. The way things worked back around '91, which is the time of this, the chances are it would not be paid directly by Dynatech, nor paid directly by Capricorn. The third company that he had which is the overview company, like a management company, was Don Goodman Enterprises, Inc. So if it were to be paid, it would have been paid through there.
Q So is it your understanding that the loan accelerated then and the full amount was due?
A At some point in time the full amount



became due. That I'm certain of. You are showing me here '91 and I thought it was a little bit later than that, to tell you the truth. That's why the confusion to me is if it was later than that, if he made the installment payments or not.
Actually, the installments were less. 6,875 was not the installment. I think, looking at this as I glanced, I think it's 1,375 a month. So that would make this a five-month delinquency, just looking at it here. So I don't know at what point the acceleration would have taken place for the 150. I just don't remember.
Q Okay. That's fine.
(Copy of letter dated 1/29/92, to Donald W. Goodman from Veronica, with attachment, Bates stamped FINKLE 000429 and 430, marked Energel Exhibit 7 for identification.)
Q Mr. Finkelstein, you have been handed what the reporter has marked as Exhibit 7 to your deposition.
A Yes.
Q First page is a letter dated January 29, 1992 from Consolidated Credit Bureau. The second page is a letter dated February 4, 1992 from Donald Goodman to Consolidated Credit Bureau.



First, turning to the second page from Donald Goodman, do you recognize the signature?
A That's Donald's signature, yes.
Q Have you seen this document before?
A I'd have to say yes, I have seen the document before.
Q And this was among the files that you produced in response to the government subpoena?
A Seeing the letter here this way, the answer would be yes.
Q Second paragraph, second sentence, and I will quote for the record, it says, "For the past 6 to 12 months, they have been, for all intents and purposes, closed down while the investors are trying to find additional capital to continue mining operations."
Do you see where I am reading?
A I see the paragraph, yes.
Q Did you have any discussions with Mr. Goodman about the search for investors during this time period?
A No. I don't remember investors. I do remember looking for credit source, but not for investors, no.
Q Do you have any reason to question the



conclusions Mr. Goodman stated here?
A The conclusions?
Q Well, do you have any information that is contrary to what's stated here in the letter?
A Well, it's a little confusing because Liberty Mining actually was whatever operations were going on. They were the ones spending the money. But I am looking at the dates on this. Unfortunately, right after this, and I don't have it here, is when we had to put -- he and his two companies into Chapter 11. It was around May of 1992.
Q Referring to which companies?
A Dynatech, Capricorn and Donald W. Goodman, all three had to go into Chapter 11, which they did.
Q Donald W. Goodman personally?
A Yes. Personally, yes, yes, yes. So obviously, dollars are very, very tight at that point for him. He responded to this letter personally -- sent him the letter personally. That's why. I look at the first page.
Q It's addressed to Donald W. Goodman and Capricorn.
A Yes. I see that. Liberty Mining at a

different address in Oregon, no longer Medford. These were the times when things were difficult and somewhere about April or May of '92 is when he -- his two main companies went Chapter 11.

Q Did you have any discussions with Mr. Goodman about the funds necessary to develop the mining operations in California?

A You asked earlier if we had a plan or whatever, if I had done anything. And other than knowing what was needed -- I am going to say it in a way that might sound strange. I will say Don's side of the equipment as opposed to Freddie's side of the equipment. Don was in construction so his initial side of the equation was building the road, getting the equipment in there, getting the excavation done to start doing the gold mine.

And frankly, that was done where he just -- the money had to be spent and he spent it, so to speak. I can't tell you specifically the breakdown of the operation itself. I think he may have left that towards Freddie's side, Mr. Aloisi's side. So no, I did not have that discussion where I can be specific about it.

(Copy of letter on letterhead of Don Goodman Enterprises, Inc. to David Davies,



Bates-stamped FINKLE 000769 through 771, marked Energel Exhibit 8 for identification.)

Q You have been handed what the reporter just marked as Exhibit 8 to your deposition. It's a letter dated February 24, 1992 from Don Goodman to David Davies. I believe, even though it's identified as David Davis, the correct addressee is Davies.

A I believe you are right, yes.

Q Do you recognize Don Goodman's signature on that page?

A That is his signature, yes.

Q Prior to today, had you seen this letter?

A I'm sure I had at some point.

Q Do you recognize the letterhead, Don Goodman Enterprises?

A That was his entity. As I said to you before, he had two operational companies. Now, the operations that he was in was blasting contractor. Dynatech was a blasting contractor in the State of New York. Capricorn was a blasting contractor in the State of New Jersey. That was their differences and why he had two companies instead of one. Unions and all the rest of that.

This was his company, if you will, that



while we called it a management company and they paid fees to it for him, this was where he advanced funds out for investments, if you want.

Q Okay. Let me direct your attention to the first page, the second paragraph. The last sentence says, total funding required, 4 million dollars. Do you have any recollection of having a discussion with Mr. Goodman about the need for 4 million dollars investment around this time, 1992?

A I don't believe that I worked those numbers up. To be very truthful with you, but this entity worked up in some fashion between what he was told by Fred or he and Fred worked up, and maybe even another accountant that he would run by me the numbers. But no, I didn't remember this specific amount which is the question you really asked me. So no.

Q Or do you recall having any discussion with Mr. Goodman around this time frame about a need for funds?

A I would have had to. I would have had to.

Q In the first paragraph, second line, Mr. Goodman wrote, "It's just that time is of the essence if I want to slow down Fred from triggering



the lawsuit against the government prior to having at least a tentative agreement with Fred and me."

Do you know what he's referring to there?

A Yes. Here he wanted to make certain that he had in writing with Fred that his equity holdings in the, in quote, gold mine. I don't think he had one.

Q But do you know, is he referring to this present lawsuit that brought us all here today?

A I don't think this was in place at that time, to tell you the truth, but --

Q I would imagine that at this time, maybe it was just anticipated.

A It could be. I'll take a step back.

Fred was very upset because, in quote, the government had stopped him from actually mining the mine. I don't remember the exact dates and so that's why I'm being a little careful here.

If the, in quotes, Spotted Owl situation was precedent to this. Then he was thinking along the lines of a lawsuit. Don is always -- is a businessman, was always thinking of a venture to make money, so that would be what he's referring to. If I'm wrong in dating, I can't answer your question.