# EXHIBIT D

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ALFRED ALOISI, et al,
Plaintiffs,
vs. NO. 95-650L
THE UNITED STATES, Judge Lawrence S. Margolis
Defendant.

DEPOSITION OF JAMES KENDLE

Taken on Behalf of the Defendant
Monday, April 28, 2008

BE IT REMEMBERED THAT, the deposition of JAMES KENDLE was taken before Charlotte A. Powers, Certified Shorthand Reporter and Registered Merit Reporter, on Monday, April 28, 2008, commencing at the hour of 9:42 a.m., the proceedings being reported in the offices of BEOVICH WALTER & FRIEND, 1001 SW 5th, Suite 1200, Portland, Oregon.

APPEARANCES

STEVEN PARKER, ATTORNEY AT LAW
By Mr. Steven Parker
1400 SW Montgomery Street
Portland, Oregon 97201
and
FOLEY & LARDNER, LLP
By Mr. Lawrence McBride (via telephone)
3000 K Street, NW, Suite 500
Washington, DC 20007
Appearing on behalf of Plaintiffs

U.S. DEPARTMENT OF JUSTICE
By Mr. Bruce K. Trauben (via telephone)
PO Box 663
Washington, D.C. 20044
Appearing on behalf of Defendant

* * * * *



EXAMINATION INDEX


| | Page |
|---|---|
| Examination by Mr. Trauben................... | 4 |
| Examination by Mr. McBride................... | 175 |
| Further Examination by Mr. Trauben........... | 184 |


EXHIBIT LIST


| | | Page |
|---|---|---|
| 1 | Agreement, dated 17th day of December, 1984 | 37 |
| 2 | Listing with BLM of mining claims | 41 |
| 3 | Fax, dated 3/31/89 | 56 |
| 4 | Loggers and Contractors Supply, Inc., invoices | 78 |
| 5 | Professional Register System | 78 |
| 6 | Letter from the Department of the Treasury, dated 1/1/90 | 94 |




* * * * *

JAMES KENDLE,

was thereupon produced as a witness on behalf of the Defendant and, after having been duly sworn on oath, was examined and testified as follows:

EXAMINATION

BY MR. TRAUBEN:

Q Mr. Kendle, my name is Bruce Trauben. I represent the defendant, the United States, in the case of Aloisi versus The United States. And before we begin, I just want to go over a few basic ground rules for the deposition. And one of them -- you might already know this -- is that only -- because we're on the telephone -- some of us are on the telephone -- only one person can speak at a time; otherwise, we get cut out. So if you don't mind, try to be patient, let me get my question out before answering; and likewise, when you're speaking, giving your response, I'll try not to jump in and start asking additional questions until you're finished.

Also, because we have a reporter who is



taking down everything that we say, you need to give a verbal response; in other words, nods of the head, things like that, don't translate well onto the transcript. So -- and also, I can't see you. So that won't work. You'll have to give a verbal response to my -- to my questions. Similarly, things like grunts, you know, uh-huh, that kind of stuff doesn't go well on the transcript. And, you know, if you could respond with a "yes" or "no" answer, that -- that's ideal.

Sometimes my questions will not be clear and you'll want me to rephrase. Don't hesitate to ask me to clarify my questions. And if I ask a question and you begin to respond, I'll assume that you understood it and were able to give a response to the question asked.

And if at any time you need to take a break, just say so. Usually it seems that we go about an hour, maybe an hour and a half, and take a short break. It's hard to go much longer than that without a break. So there will be breaks throughout the day.

Do you have any questions before we begin?

A No, sir.

Q Do you have a current fixed address?
A 5310 Highway 66, number 22, in Ashland, Oregon.
Q Is there a zip code?
A 97520.
Q Thank you.
Before we get into some of the details of the -- of the case, I want to just get some background about you.
Can you tell us, did you graduate high school?
A Yes, I did.
Q And about when?
A 1972.
Q Did you attend college?
A Yes, I did.
Q Where at?
A Southern Oregon University.
Q Did you graduate?
A No, I did not.
Q How many years did you attend?
A Four-and-a-half years.
Q What was your major?
A Science and mathematics.
Q Did you work at any time between high school and college; did you work full time anywhere?



A Yes, I did.
Q Where did you work?
A I worked for my father's log truck business.
Q Would that be Kendle Trucking?
A That's correct.
Q What years did you attend college?
A From 1972 until 1977.
Q Did you continue working for Kendle Trucking after college?
A Yes, I did.
Q How long did you work there?
A Approximately three years.
Q Until about 1980?
A Yes.
Q What kinds of assignments were you working on at Kendle Trucking?
A I was a logging truck driver and also a logging truck mechanic.
Q After your work at Kendle Trucking in 1980, where did you go?
A I went into business for myself.
Q What type of business?
A Buying and selling timber.
Q What was the name of the company?
A James Kendle.



Q Were you incorporated or something like that?
A No.
Q How long did you do that?
A Approximately two years.
Q Until sometime in 1982?
A That's correct.
Q And then what did you do for employment?
A I actually became involved with Mr. Aloisi in the mining endeavor.
Q In which year?
A I met Fred in 1982, and I started in business with him in 1983.
Q How did you meet Mr. Aloisi?
A We met in Lamaze natural childbirth class.
Q Where were you at that time?
A Ashland, Oregon.
Q Then, to set the parameters, when did your affiliation with Mr. Aloisi cease?
A Approximately 1991, I believe.
Q Just to get an idea what you've been doing since 1991, did you have subsequent full-time employment?
A Yes, I did.
Q And can you just tell us briefly what you did after working with Mr. Aloisi?



A I was employed by my father's trucking company.
Q About what years?
A Until 1992.
Q And then where did you go?
A I was off work after an accident for a period of time, and then I returned to my father's business.
Q Was this in around 1993?
A That's correct.
Q How long did you stay there?
A Two more years.
Q So about 1995?
A Yes.
Q And then did you go to a specific company after that?
A No, I didn't. I returned to school.
Q Where at?
A Portland Community College.
Q Did you earn a degree there?
A No, I did not.
Q What were you majoring in?
A I was in -- enrolled in a legal secretary and the legal assistant program.
Q What years did you attend the community college?

Page 50

Q Did you and Fred obtain loans from any others?
A It seems to me that we did. I don't recall any specifics, however.
Q In that time frame, 1985 to 1988, before Don Goodman got involved, had you and Fred, or Fred, done any kind of an analysis on how much money it would take to develop these mining claims?
A I believe that there are documents that indicate that.
Q You did undertake that analysis, then?
A I believe so.
Q Do you remember approximately how much money it would have taken to develop the mining claims?
A I don't understand your question.
Q Well, did you come up with an estimated dollar amount that was needed to develop the mining claims into a producing-gold mine operation?
A I don't recall any specific number.
Q Okay. Then, if you could look at the next document, I think, that should be on the top of the stack. If you set the other ones aside, we'll work down. The top. There should be a single page.
MR. PARKER: Single-page document?

Page 51

MR. TRAUBEN: This is a fax from around 1989, actually.
MR. PARKER: Do you have an FS number or a Bates stamp there?
MR. TRAUBEN: Do you see it? I'm not sure you found it yet.
MR. PARKER: Can you reference it by Bates stamp, please?
MR. TRAUBEN: Yes. It's Finkle, F-I-N-K-L-E, 000392.
THE WITNESS: Yeah.
MR. PARKER: Because it's not in the same order.
MR. TRAUBEN: I'm sorry.
MR. PARKER: That's okay. Hang on a second. Just give us a second. Let me --
MR. TRAUBEN: We'll probably take a short break soon, too. Should we do it while you're looking for the document? Why don't we take a short break.
MR. PARKER: That's fair.
MR. TRAUBEN: Okay. We'll go off the record now and reconvene in about five minutes. Don't hang up.
MR. PARKER: Okay. We're off the record.

Page 52

(Deposition in recess at 11:07 a.m. - 11:15 a.m.)
THE WITNESS: Excuse me. Mr. Trauben?
MR. TRAUBEN: Sure.
THE WITNESS: I'm feeling much better now. And I was thinking about a couple of things in the restroom. And I'm --
MR. TRAUBEN: Could we go on?
MR. MCBRIDE: Should we go back on the record? Are we back on the record?
MR. TRAUBEN: Yes, we are on the record. Okay. Go ahead.
THE WITNESS: Yes, I misspoke. I actually did see the complaint.
MR. TRAUBEN: Oh, okay.
Q BY MR. TRAUBEN: About what time?
MR. MCBRIDE: That's getting into that same issue, again, of privilege, but I think he answered -- he answered something about he wasn't sure he'd seen it before. But that's -- that's what he's correcting. I hope that's what he's correcting.
MR. PARKER: Is that what you're correcting?
THE WITNESS: Yes, yes, that's -- yes.
Q BY MR. TRAUBEN: Well, had you seen the complaint

Page 53

before it was filed in 1995?
MR. MCBRIDE: I'll make that same objection that we've been discussing, Bruce, with respect to this record, which you've asked me to look into.
MR. TRAUBEN: And you're instructing him not to answer?
MR. MCBRIDE: As to when, yes.
Q BY MR. TRAUBEN: Let me ask, Mr. Kendle, then, do you recall how it came into your possession, the copy of the complaint, whether it was provided by counsel or someone else?
A It was by counsel.
Q Was it by counsel that -- one of the counsel that is representing you today?
A That's correct.
Q Looking now at the single-page document that is Bates number Finkle 000392, that's a fax, and it looks like it's a page of a fax. And the reason why I wanted you to look at this is that there's an estimate here in the middle of the page, maybe one-third of the way up from the bottom. There's a note that says "scale-up requirements estimated at 6 MM," which I understand to be 6 million.

But let me ask you whether that figure refreshes your recollection of any estimates that you and Fred had conducted of the amount of money that you needed to get into production.
A Well, Mr. Trauben, I'm trying to be forthright and honest in my answers, and, of course, this has been many years ago. And when I turn the page upside down, it says "Haber." And I specifically remember a gentleman named Norm Haber. And I have seen this, and the answer is yes. And a lot of your questions I'm just trying to get up to speed so that I can answer you.
Q Okay. That's fine.
A Okay.
MR. MCBRIDE: Mr. Trauben, is that going to be made Exhibit 3, or we don't need to, or what?
MR. TRAUBEN: Well, not -- not yet.
Q BY MR. TRAUBEN: Do you recall -- Mr. Kendle, do you recall seeing this document before?
A Yes, I do.
Q And what were the circumstances that you've seen this before?



A Well, that's the hard part. I just don't remember. I'm trying to recall if Norm Haber wasn't -- was in Salt Lake City. That -- that may be a correct recollection. I believe we were doing research on what it would take to be in production.
Q Had any of that kind of analysis been done before this time? The date on this fax is from 1989.
A Well, I would answer yes to that. It's some like -- somewhat like due diligence. You try and get many opinions on the same question and do your research so that you can make an informed decision.
Q So previously, during the time frame of 1985 to 1988, did you and Fred estimate that it would take several millions of dollars to get into production?
A That -- that would be correct, yes.
Q So when you saw this estimate from Mr. Haber on just the scale-up requirements, was that consistent with your prior understanding of the kind of money it would require?
A In a general sense, I would say that's true.
Q Okay.



MR. TRAUBEN: Why don't we go ahead and have this marked as Exhibit 3. You can hand it to the reporter.
THE WITNESS: Okay.
Q BY MR. TRAUBEN: And just for your knowledge, the reporter will collect the exhibits today and she'll make them part of the transcript, so just be sure you don't walk out with any.
A Okay.
Q That does happen from time to time.
(Deposition Exhibit 3 marked for identification.)
BY MR. TRAUBEN:
Q Around this time in the timeframe '85 to '88, or towards the latter part of that time frame, were you and Fred looking for investors?
A Yes.
Q Did you find any investors?
A I believe we did.
Q And who would that be?
A When Mr. Goodman came into the picture.
Q Was he introduced to you by Fred's father, Larry Aloisi?
A Yes. That's correct.
Q So was there any kind of understanding when Mr. Goodman invested; was he buying into the



mining claims, or was he more or less just loaning you and Fred the money?
A I would say that he was buying in. Perhaps loaning, also.
Q Okay. So were you involved in any discussions with Fred and Mr. Goodman on how you would go about this operation; in other words, what companies you might need to form, transfer ownership interest in any of the money claims, things like that?
A Well, yes, I was. I'd like to make a note here that in 1988, I had a broken leg from a logging accident. So when I was coming back in to the situation, I was on the periphery, but aware of those kind of discussions. So the answer would be yes.
Q And what was decided?
A Well, I can't speak to that because those were not my personal decisions.
Q Okay. Was Liberty Mining formed then as a result of -- well, is that your understanding, then, that Liberty Mining was formed at that time?
A Yes, it was. Mr. Goodman was a blaster from back east, and understood the quarrying and

rock business. So he really took an interest in this property.
Q Do you know whether any ownership interest of yours or Fred's was transferred to Mr. Goodman around this time?
A You know, I don't recall specifically. But I would say yes.
Q Did he become -- do you know whether he would have been -- well, strike that.
So was his ownership interest through the company, through Liberty Mining?
MR. MCBRIDE: If you know.
THE WITNESS: I don't know the answer to that.
MR. TRAUBEN: Okay.
Q BY MR. TRAUBEN: Do you have an ownership interest in Liberty Mining; by that I mean, do you own any shares in the company?
MR. PARKER: We just had a beep here. Was that --
MR. MCBRIDE: I believe that was another call coming to me, which I will ignore. This is Larry. My apologies.
THE WITNESS: Could you repeat the question, please?



Q BY MR. TRAUBEN: Did you own any shares in Liberty Mining?
A I don't recall specifically.
Q Were you an officer in Liberty Mining?
A Yes.
Q What office do you hold?
A Secretary.
Q How long did you hold that position?
A Until now.
Q As far as you know, always have been secretary in Liberty?
A As far as I know.
Q From the time it was formed, in other words.
A Yes.
Q There's the next document -- or near the top somewhere, there should be an Election by a Small Business Corporation. So, form 2553. And it has Finkle Bates -- Bates numbers Finkle 000399 through 401.
MR. PARKER: The witness has it.
Q BY MR. TRAUBEN: Have you seen this document before?
A Yes, I have.
Q When did you see it before?
A I don't know the exact date. A long time ago,



though.
Q Would it have been around the time that was dated in March 1989?
A Yes.
Q Were you involved in filing this document?
A I may have been.
Q If you look at the first page, it reflects that Alfred Aloisi has 100 shares and that Donald Goodman has 100 shares. And this is referring to Liberty Mining, Inc.
Is that your understanding that only Alfred Aloisi and Donald Goodman own shares in Liberty Mining?
A That's what --
Q That's --
A -- it appears to be.
Q I'm sorry. I interrupted you. That's what it appears?
A Yes.
Q Okay. It says it was signed by Alfred Aloisi, president. Do you know what -- who else may have held a position in the company as an officer?
A Well, obviously, Mr. Goodman.
Q Do you know what his title was?



A No, I don't.
Q If you look at the last page, there is another company, another form 2553, for a company named Energel?
A Yes.
Q Did you have any position within Energel?
A No.
Q Are you familiar with a company named Dynatech?
A Yes, I am.
Q Did you have any position in Dynatech?
A No, I did not.
Q Did you own any shares in Energel?
A No.
Q Did you own any shares in Dynatech?
A No, I didn't.
Q So what was your responsibility as secretary in the company? Maybe it wasn't as secretary. But what role did you begin to play within Liberty Mining?
A I would have been a -- an administrative assistant and also an operations coordinator.
Q As an administrative assistant, what did you do?
A Answered the phone, did -- took care of banking activities, took receipts to the accountant,

things of that nature.
Q Who was the accountant at that time?
A His first name was Clay, and his business was Valley Accounting in Central Point, Oregon. And I do not recall his last name.
Q What city was it in?
A Central Point, Oregon.
Q Oh, that's the name of the city?
A Yes.
Q Okay. Do you have any knowledge whether or not that accounting firm is still in existence?
A I don't know the answer to that.
Q Did Clay at Valley Accounting, was he the accountant for the company until you left in May '99, or through that time period?
A I believe so.
MR. MCBRIDE: If the record says May '99, that wasn't his prior testimony.
MR. TRAUBEN: You're right. '91, I meant to say.
THE WITNESS: Oh, I don't know the answer to that.
MR. TRAUBEN: Okay. And I'm not sure you testified yet that you left in May '91, but it was sometime in '91. Okay.



Q BY MR. TRAUBEN: Okay. Are there other accounting firms involved, to your knowledge, that come to your recollection?
A No, there aren't.
Q Did you have any dealings with Myron Finkelstein?
A No.
Q Do you know who he is?
A No, I don't. That name is not familiar to me.
Q Okay. Did you have to, at any time, tend receipts, invoices or other accounting records back east for Mr. Goodman's accountant?
A I don't recall that. It -- it's possible, but I don't remember.
Q You said that you were also the operations coordinator. What kinds of things did you do as the operations coordinator?
A I was responsible for making sure that we had fuel on the mine, equipment maintenance, coordinating mechanics, if we needed them.
Q Did you also deal with government personnel?
A Not so much at that time. In the earlier years, I had contact. But mainly Tom Ferrero was in charge of that. However, I did attend numerous meetings, and I was privy to all of --



all of the information.
Q Okay. So in this -- the mining claims -- do you know what mining claims are involved in this lawsuit? Do you have some general idea?
A Yes.
Q And generally, we're talking about mining claims that are located within Eddy Gulch, which is near Sawyer's Bar, California; correct?
A Yes.
Q Just so we're all on the same page. And you're familiar with that area. You said you'd been going -- been to the area in the early 1980s, at least?
A Yes.
Q And were you aware that the Northern Spotted Owl was becoming an issue, as far as its survival and whether or not it would be listed as an endangered species?
A Coming from a logging family, I was very aware of that matter.
Q Because there are also owls present in Oregon; correct?
A Well, it's pronounced Oregon, but, yes, you're correct.



Q Did you know that there was Spotted Owls within the Klamath National Forest?
A Well, I've never personally seen one.
Q Did you have an understanding that there's spotted owls in the Klamath National Forest?
A Well, I heard that rumor.
Q And about when did you hear that?
A Late '80s.
Q Had you heard that in the earlier '80s?
A No.
Q Did your family's operation have to stop temporarily for anytime while -- because of the Spotted Owl?
MR. PARKER: Are you asking about Kendle Trucking?
MR. TRAUBEN: Right.
Q BY MR. TRAUBEN: You said you were from a logging family and you're familiar with the issue. So I'm just wondering whether in that family history their operations were stopped at any time because of the Spotted Owl?
A Well, actually, the entire Pacific Northwest has been affected. In my family, my father transformed the business from logging trucks to long-haul highway freight-moving operations.

Q Before Liberty was formed, I think you said that earlier on you had more contact with Forest Service personnel than later. Was it the same group of individuals you were dealing with earlier, in the '85 to '89 time frame?
A Yes.
Q Did you understand my question?
A Could you repeat it, please?
Q Yes. I'm just wondering whether these are the same individuals that you were dealing with before 1989, because I think you testified that you had more contact with Forest Service personnel earlier -- in the earlier years than in the later years. I'm wondering who those individuals were that you were dealing with in the early years?
A For the most part, Mike Lee and Harry Frey.
Q During all this time, was Mike Lee the District Ranger?
A Yes.
Q Did you ever have any dealings with the Forest Supervisor?
A I don't recall that I ever did.
Q If you -- did you attend meetings with the District Ranger then?



A Yes. Sometimes I did.
Q Let's continue with the stack of loose papers. And if you would, if you could pull out a couple documents for me. The first I'd like you to take a look at is an invoice from Loggers and Contractors Supply. And it has the Bates numbers Finkle 000402 through 404. And then there should also be near there in the stack a professional register system that's written on Liberty, a payment record, sort of a ledger sheet of checks written and deposits made. And it's dated -- it says dates from April '89 to August '89. And it says numbers from 1001 to 1299. I assume those are check numbers.
Let me know when you've located those documents.
A Yes, I have that.
Q Okay. If you look at the first page of the Loggers and Contractors Supply --
A Yes.
Q -- invoice has -- I assume that's an invoice. Is that your signature on the bottom of the invoice?
A Yes, it is.



Q And if you go to the third page, is that your signature, dated 4-17-89?
A Yes, it is.
Q Okay. Did you have -- just trying to get a feel for how Liberty conducted business.
Did Liberty have an account with Loggers and Contractors?
A Yes.
Q You would -- you would sign the invoice, or the bill, and they would accumulate a set and then send them to you at some period of time?
A That's correct.
Q And was it a regular basis; once a month, or every two weeks, or did it vary?
A I think it was once a month.
Q In your responsibilities as administrative assistant, did you keep copies of all the invoices that you received from the various contractors and supply companies?
A I believe I did.
Q Were they still there when you left in 1991?
A I believe so.
Q And if you look at the second document, the professional register, do you recognize your handwriting in this document anywhere?



A Yes, I do.
Q Let me rephrase, so you don't have to look at every page.
If you look at the page that's numbered 2348, like the third page in to the document. Let me know when you're there.
A Go ahead.
Q Do you recognize any of the handwriting on that page?
A Yes, I do.
Q And whose is it?
A I think the first line is Fred's handwriting, and thereafter it's mine.
Q Beginning with the entry for check 1002 on 4-12-89 to Tom Ferrero; is that your handwriting?
A That line might be Fred's. I believe my -- my handwriting is on check number 1007 on April 12th on down to check number 1013 on April 12th, also. And then from check number 1017 to the bottom of the page.
My handwriting appears throughout the document.
Q Between you and Fred, between the two of you, which had more responsibilities for keeping the

ledger of checks?
A Well, it was always common property that was always in the pickup. But I wrote most of the checks.
Q Did you also have an accountant at this time?
A Yes, we did.
Q In April '89?
A I believe it was Valley Accounting.
Q Okay. Now, when you wrote the check, you wrote the checks by hand?
A Yes.
Q And was there a stub; when you tore the check out of the book, did it leave a stub where you could make some notes about the purchase of the check?
A I don't remember the style of checkbook. So I tried to make notes in the ledger.
Q Well, one question I have is, is there someplace that you kept a record of the invoices paid so that, you know, like in a ledger sheet or somewhere so that you knew that an invoice from -- that was, like, from Loggers and Contractors, for example, was paid and you don't have to pay it again?
A I believe we had file folders.



Q But in the file folder, you -- would you stamp an invoice as being -- as having been paid and then file it away?
A I don't remember exactly how we did it, but it was, like, bills paid and bills due, something to that effect.
Q I see. So I was taking Loggers and Contractors as an example. And I was trying to find some notation that, you know, for an example, the first invoice, number 98971 for $275.81, that that was paid and that would be reflected in the checks. But if I understand the way it worked, that's not correct. It would not -- individual invoices would not necessarily show up, if you're paying on account; correct?
A I believe so, yes.
Q Did you have a salary from Liberty Mining?
A Yes.
Q What was the salary?
A I think it was $2,000 a per month, or more. I'm not real sure. It actually may have been more. I just don't recall.
Q Okay. Same for Fred?
A Yes.
Q Did the company sometimes provide money for



personnel expenses, such as groceries, things like that?
A We would stop and purchase groceries on our way down to the mine, yes.
Q Now, were those for your -- for your crew or for you and Fred personally?
A Well, they were for us personally. But if we were working and it was lunch time and somebody didn't have a lunch, we'd certainly feed them.
Q So who -- I'm just wondering whether expenses like that, when you're out working on the mining claims, if that was considered a business expense or a personal expense.
A I don't know the answer to that.
Q Okay. Were you paid every two weeks, or bi-monthly?
A I'd have to look in the ledger to tell you that.
Q Okay. Go ahead. Take a look at page 2351.
MR. PARKER: Can we go off the record for --
Q BY MR. TRAUBEN: And check 1074 on May 11th to you for a thousand dollars.
A Yes, I see that.
Q Okay. And then does that indicate you were



paid twice a month? There should be a second entry; correct? Because if you look on the page, the 2353, just for an example, there is a check number 1106 on May 22nd --
A Yes.
Q -- to you for $500.
A Yes.
Q Was that part of your salary at that point, or --
A It's noted as a draw.
Q I'm sorry. I was speaking over you. It's noted as a what?
A It's noted as a draw.
Q What does that mean, in your terms?
A It means -- it means a draw, an advance.
Q Okay.
MR. PARKER: Can we go off the record just for a moment, please?
MR. TRAUBEN: Sure, we can go off.
(Discussion was had off the record.)
(Mr. Packer leaves the conference room.)
MR. TRAUBEN: Before we go too much further and I forget to do this, can we have these two documents marked as exhibits?
MR. MCBRIDE: Yes, you may.

Needs for the physical mine operation are outlined as follows:

I. Gold Reserve tonnage - 15MM tons at 0.25 - 0.8 oz/ton Probable reserves at 8MM tons.

NOTE: See the independent study report by Watts, Griffith McQuat, a mining engineering firm in Toronto, Canada.

Records indicate that 145,000 tons mined prior to 1940 averaged 0.8 oz.ton.

Mine tailings proven at 200,000 tons of 0.08 oz.ton. 4.5MM ton on apex probably at 0.25 oz./ton and also 2.5MM ton underground at 0.8 oz./ton.

II. Mill capacity required - 500 ton/day initially; scaled up to 2000-5000 ton/day.

NOTE: Hardrock open pit at 2000 ton/day, the mine lifetime is projected to about 20 yrs. At 5000 ton/day, improved economics of scale in mining and milling will

project a 10 yr. lifespan to completion and improved ROI--if reserves are limited to only probable indications.

III. Initial mill cost - $1.5MM plus an additional $0.5MM for infrastructure.

NOTE: Scale up requirements estimated at $6MM.

IV. Mill lead time - 6-10 mos.

V. Milling cost - open pit at $10/ton; underground at $80/ton.

NOTE: see note under I.

VI. Extraction Cost - It is expected that actual extraction costs will not exceed $75/oz.

NOTE: An additional $45/oz. allowance can be conservatively added for unanticipated expenses related to environmental measures resulting from possible changes in regulations or reclamation work.



EXHIBIT 3 Kendle 4/28/08