# EXHIBIT E

**In The Matter Of:**

*Alfred Aloisi, et al. v.*
*The United States*

---

*Alfred Louis Aloisi*
*Vol. 1, January 12, 1998*

---

*Bean & Associates, Inc.*
*Professional Court Reporting Service*
*500 Marquette, N.W., Suite 280, Albuquerque, NM 87102*
*119 East Marcy, Suite 110, Santa Fe, New Mexico 87501*

*(800) 669-9492 or (505) 843-9494*

*Original File al011298.v1, 153 Pages*
*Min-U-Script® File ID: 0077805365*

**Word Index included with this Min-U-Script®**

IN THE UNITED STATES
COURT OF FEDERAL CLAIMS

ALFRED ALOISI, CANDIS ALOISI,
DONALD W. GOODMAN, ENERGEL, INC.,
DYNATECH CORPORATION,
JAMES KENDLE, and
LIBERTY MINING, INC.,
Plaintiffs,
vs. No. 95-650L
THE UNITED STATES,
Defendant.

DEPOSITION OF ALFRED LOUIS ALOISI
January 12, 1998
9:10 a.m.
625 Silver Avenue, Southwest
Albuquerque, New Mexico 87102

PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE, this deposition was:

TAKEN BY: MS. SUSAN V. COOK
ATTORNEY FOR THE DEFENDANT

REPORTED BY: Melissa Correa, RPR, NM CCR #279
Bean & Associates, Inc.
Professional Court Reporting Service
500 Marquette, Northwest, Suite 280
Albuquerque, New Mexico 87102

5414-2 MEL



APPEARANCES

For the Plaintiffs:
FREEDMAN, LEVY, KROLL & SIMONDS
Attorneys at Law
1050 Connecticut Avenue, Northwest, Suite 825
Washington, D.C. 20036
BY: MR. LAWRENCE G. MCBRIDE

For the Defendant:
MS. SUSAN V. COOK
Attorney at Law
United States Department of Justice
Environment & Natural Resources Division
601 Pennsylvania Avenue, Northwest, Room 837
Washington, D.C. 20004

Also Present: Tom Ferrero
Hilton K. Cass

INDEX PAGE


| | |
|---|---|
| ALFRED LOUIS ALOISI | |
| Examination by Ms. Cook | 3 |
| REPORTER'S CERTIFICATE | 148 |
| WITNESS SIGNATURE/CORRECTION PAGE | 150 |


EXHIBITS MARKED OR FORMALLY IDENTIFIED

| | |
|---|---|
| 1 Map | 3 |
| 2 Map | 55 |
| 3 Map | 79 |

ALL EXHIBITS RETAINED BY COUNSEL



(Exhibit 1 marked for identification.)

ALFRED LOUIS ALOISI,

after having been first duly sworn under oath, was questioned and testified as follows:

EXAMINATION
BY MS. COOK:

**Q:** Can you give us your full name, please, for the record?
**A:** Alfred Louis Aloisi.
**Q:** Where do you reside?
**A:** I reside here in Albuquerque on Tramway Terrace Court.
**Q:** How long have you resided in Albuquerque?
**A:** Six months.
**Q:** Before that, where did you live?
**A:** 1412 Iron Street, Truth or Consequences, New Mexico.
**Q:** How long have you lived in New Mexico?
**A:** Three years.
**Q:** Before that, where did you live?
**A:** I lived in Sawyers Bar, California, Rollin site, mill site.
**Q:** How long did you live there?
**A:** Over the years, five or six years, and I alternated between a residence we had, an apartment, in Ashland, Oregon, at 885 Clay Street.

some financial problems. The man's name was Robert Dorn. The firm name was Panagold. He had borrowed some money from – I believe it was Signal Insurance Company of England who received their funds through the Hong Kong Shanghai Bank. And he had problems with them, extraneous from our situation. And subsequently we shut down the Double Eagle operation.

We then went back in, myself and a man by the name of Jim Kendle, reclaiming it and cleaning it up in 1983, '84. We reopened it in 1986. I contracted with a man by the name of Steve Bennett. Subsequent to that, a person that worked for us in 1982 by the name of Dick Watts became involved, and also became involved with Mr. Bennett in some other ventures. He got himself into some problems, drug related, in Sacramento, and the mine closed down in 1987, if I'm not mistaken. We formed a company named Jefferson State Exploration and Development, which was our operating company, which we dissolved in November of 1988. And the following year, we formed Liberty Mining.

I became involved with a man by the name of Donald Goodman who has been a very good partner to me. He was in the – we call him the master blaster. He quarries 5 million tons of rock a year. That's his trade. He's been doing it for 40 years. And he and I decided that we would make the mine a success together with in-house financing, which is what we proceeded to do until we were stopped in January of 1990.



Q: Okay. Let me stop you here, because I need to ask you some questions.
A: Okay.
Q: What year did you form Liberty Mine?
A: 1989.
Q: Was Liberty Mine the full name or –
A: Liberty Mining, Inc.
Q: So it was actually a corporation?
A: Yes.
Q: Who did you form it with?
A: Donald Goodman.
Q: Anyone else?
A: I don't know if Kendle had a stock position or not. I know it may have been – may or may not have been an involvement with Kendle Trucking. I'm not sure on the corporate structure on that point.
Q: And Liberty Mining, Inc., was formed to do what?
A: Liberty Mining, Inc., was the operations company on the property. We had another company that was going to act as a holding company for our various properties by the name of Energel, Inc., which was an existing Delaware corporation of Mr. Goodman's.
Q: What's a holding company?
A: We would put the mines into this company as a holding company.



Q: Into the name of this company?
A: Yes. We only got so far with that. I put the Rollin and the Mountain Laurel into that company. We also put a property by the name of the Big Cliff in there and used Liberty as an operations company for permitting exploration, that type of thing.
Q: What were the properties encompassed within Liberty Mine, Inc.? The Eddy Gulch group of claims? One was, right?
A: Well, we operated the Eddy Gulch group of claims through –
Q: The Rollin?
A: Yes, which is part of it, through Liberty Mining.
Q: Correct. And the Rollin?
A: Yes.
Q: And the Mountain Laurel?
A: Yes.
Q: Anything else?
A: No. I don't think we submitted any other plans, other than the Eddy Gulch property as Liberty, other plans of ops.
Q: Why did you want to use Energel, Inc., as a holding company?
A: This was Mr. Goodman's idea. He was providing the funding, and it was for that reason that we did it.
Q: How much funding did he provide?



A: To date or at that time?
Q: To date.
A: I believe in excess of $2 million. His accountant Miron Finkelstein is working those numbers up for you.
Q: In 1989, did he put money into the operation?
A: Absolutely.
Q: And how much did he put in?
A: I don't know exactly offhand.
Q: Do you have any figures for any of the particular years?
A: We have our bank records.
Q: I'm sorry?
A: We have our bank records, and he had his bank records.
Q: Do you have knowledge sitting here today as to – like, if I said, "In 1990, how much did he put in, 1991"?
A: The latest number that I had seen was $2,147,000, to date.
Q: But year by year, you don't have a breakdown?
A: No, I don't, offhand.
Q: But your accountant is working on that?
A: Yes. His accountant.
Q: His accountant?
A: Yes.
Q: For purposes of this litigation?

Page 32

A: Correct. Our investment-backed expectations.
Q: Where did Mr. Goodman get this money?
A: Where did he get it?
Q: Where did he get it?
A: You have to ask him. I don't know.
Q: You don't have any idea?
A: Well, I have some ideas, but I'd be speculating.
Q: Did he ever tell you where he got the money?
A: No. He did put the money through two of his corporations named Dynatech and Capricorn. I can say that with a degree of certainty, and I believe he earned it. He quarries 5 million tons of rock a year. He makes 10 cents a ton, net, so he has a cash flow, approximately, of half a million per year, and he's been doing this for 40 years.
Q: Where is his mine?
A: He had a quarry in Nyack, New York, and another in New Jersey, but I'm not sure of the exact location.
Q: What is Dynatech?
A: Dynatech and Capricorn are corporations owned and controlled, I believe, by Mr. Goodman.
Q: Do you know anything else about what Dynatech is?
A: No.
Q: Do you know anything else about what Capricorn is?
A: No.
Q: Now, you said the money was funded through these

Page 33

corporations. What do you mean by that?
A: They provided the financing to Liberty and Energel through Dynatech and Capricorn. For example –
Q: Wait. Okay. "They" is who?
A: Dynatech, Capricorn.
Q: Dynatech provided the funding through Dynatech?
A: No. Dynatech and Capricorn provided certain funding instruments to Liberty and Energel. For example, the equipment that was purchased was done with Dynatech and Capricorn as guarantors, to the best of my recollection.
Q: "Provided certain funding instruments." What funding instruments? What do you mean by "funding instruments"?
A: They did leasing, lease purchasing with Middle States Financial. Bob Ellsman, I think, was the man's name. On-site heavy equipment –
Q: For example, let me just pick something. You need a bulldozer. They would go buy you a bulldozer?
A: Correct, or lease one. But I wouldn't use a bulldozer, because that isn't a correct example. We have a bulldozer, but it was something that Mr. Goodman already owned. I'm talking about scrapers.
Q: Okay. Let's say it's a scraper. Doesn't matter what it is. It could be an orange. Let's say it's a scraper. They're going to go out and buy or lease the scraper for you.

Page 34

A: Uh-huh.
Q: How are they going to pay for it?
A: That would be Mr. Goodman's – he could answer that for you better than I.
Q: Did Dynatech or Capricorn themselves provide any money?
A: Once again, I have to answer the question the same way. You'll have to ask Mr. Goodman that question.
Could I take a break for a minute?
(A short recess was taken.)
MR. MCBRIDE: On the record.
Q: I'm going to back up for a minute because I have some questions. You mentioned a lease purchase for $640,000. That covered which property or properties?
A: The Eddy Gulch group of properties on pages 4 and 5, and I would like to make a correction. When we named those properties earlier, I included the Union Addition as being part of the original group. It was an additional claim that we added to the original group, as were the others that we specified. Did you want me to give you the names of those claims again, Ms. Cook?
Q: No. That was the Buckeye through Stevens?
A: Those were the Associated Placer claims.
Q: And Union Addition is a lode?
A: Yes.

Page 35

Q: And that was the new lode as well as Ohio 84?
A: Correct.
Q: I got it.
A: Yes, you did.
Q: Good.
A: Good memory.
Q: Now, the $640,000 covered –
A: The Dariel, Sunrise, Sunset, Raindrop, Union, Union Extension, Big Fish, Banner, Buster, 6 O'clock, Specimen, Blue Bell, Mountain Laurel, and Rollin Mill Site.
Q: And what year was that price agreed to?
A: 1980.
Q: Did you ultimately exercise your right to purchase the property?
A: No. As I explained earlier, Mr. Patterson – I believe it was '83 – filed with the County the annual assessment work but failed to file with the BLM due to an illness resulting in his demise.
Q: And so they were lost?
A: They were lost. I went back to the estate, and I also went to Ruth Markon and entered into a new agreement where I would pay each of them $50,000 for them to sign off. And also it was a matter of good faith. And those funds were provided then, and they did sign off. And Mr. Pincomb also received $50,000, I might add.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ALFRED ALOISI, et al., )
)
Plaintiffs, )
)
vs. ) No. 95-650L
)
UNITED STATES OF AMERICA, )
)
Defendants. )
)

DEPOSITION OF ALFRED ALOISI

Wednesday, October 31, 2007
9:20 a.m.

Reported By: CRAIG W. WOOD, RPR, CSR No. 9789

APPEARANCES

For the Plaintiffs:
FOLEY & LARDNER
Washington Harbour
3000 K Street, N.W., Suite 500
Washington, DC 20007-5101
(202) 295-4017
BY: LAWRENCE G. McBRIDE

For the Defendant:
DEPARTMENT OF JUSTICE
Environmental & Natural Resources Division
601 D Street, N.W.
Washington, DC 20004
(202) 305-0238
BY: BRUCE K. Trauben

Also Present: Thomas Ferrero
Hilton Cass

---oOo---



INDEX


| EXAMINATION BY: | Page |
|---|---|
| Mr. Trauben | 4 |


EXHIBITS


| FOR THE DEFENDANT'S: | | |
|---|---|---|
| 1 | Quitclaim Deed | 29 |
| 2 | Tax Assessor Cards | 47 |
| 3 | Document | 129 |
| 4 | Letter | 131 |


---oOo---



BE IT REMEMBERED that on Wednesday, October 31, 2007, commencing at the hour of 9:20 a.m., of said day, at the offices of Klamath National Forest, 1312 Fairlane Road, Yreka, California, before me, Craig W. Wood, a Certified Shorthand Reporter in and for the State of California, there personally appeared

ALFRED L. ALOISI,

who, being first duly sworn by me to tell the truth, was examined and testified as follows:

---oOo---

EXAMINATION

BY MR. TRAUBEN:

Q. Will you please state your name for the record.
A. Alfred L. Aloisi.
Q. And you go by Fred?
A. Yes, I do.
Q. As you know, my name is Bruce Trauben. I represent the United States, the defendant in this action.
A. Yes, Bruce, I've made your acquaintance.
Q. I'll have some questions for you today. And just as an overview of what we're going to do today, I'm going to ask you some general questions about the -- who the plaintiffs are and the status of the plaintiffs.



We'll go into the property interest of the plaintiffs. The knowledge of the owl. We'll talk about the various components that go into a takings case. So just to give you an overview of what we'll be discussing.
A. Thank you.
Q. And, also, we'll get into your prior deposition. I have some follow-up questions and some discovery responses.
A. Very well.
Q. I understand from discussions with your attorney, Mr. McBride, that Mr. Goodman has passed away.
A. Yes, he has.
Q. And do you know when?
A. Approximately three, four years ago. And I'm not certain of the exact date.
Q. When did you learn of his passing?
A. I would say three years ago.
Q. Do you know, was it sudden, his death?
A. No. It was -- I believe his health deteriorated over a considerable period of time. Don was diabetic and he had other problems, as well.
Q. Do you know whether his estate is still in probate?
A. I do not know.
Q. Do you know who is representing his estate?

A. Yes. To myself personally.
Q. What piece of equipment?
A. The Joy 180 power compressor at the very bottom.
Q. And were you and yourself leasing it to --
A. I vended it in.
Q. Let me finish my question. We're talking at the same time.
Were you leasing the air compressor to Dynatech?
A. Same answer. I vended it in.
Q. And what does that mean?
A. I put it in for our considerations.
Q. That's part of your contribution to the operation?
A. Yes.
Q. So your capital contribution?
A. I think you might call it that.
Q. And when I asked you whether this would appear on the books of Liberty Mining, Inc., for the record to be clear, you can answer that in the -- as a designee for Liberty Mining. Correct?
It's your -- it's your answer as the designee for Liberty Mining, it would not appear in the Liberty Mining books?



A. I don't believe so.
Q. Have you ever seen any financial records from Dynatech?
A. Yes.
Q. Do you still have any financial records in your possession?
A. I think we have some 1970 -- 1980 financial statements from Dynatech prior to our entering into any agreements with Mr. Goodman that would predate that.
Q. Okay. Any subsequent to 1985? Any --
A. I think it was about '87 or '86, Mr. Trauben, that that -- that financial statement that I referred to, I think that was the year that's on it. Very sketchy, though. I mean, it's --
Q. But that was -- that would predate any investment by Dynatech into the Liberty Mining operation?
A. Yes, sir.
Q. Can you take a look at A-168, please.
A. Yes, sir.
Q. Can you state for the record what A-168 is?
A. It appears to be the professional check register for Liberty Mining from August -- April of '89 to August of '89.
Q. Is this the only handwritten register that



Liberty Mining, Inc. has?
A. It's the only one I have at this time. I provided.
Q. There were others?
A. No. This is the only one that I have.
Q. Currently. Were there others generated?
A. I would believe so. Yes. I think this is all that we have left of those documents, though.
Q. When was Liberty Mining formed?
A. I believe it was -- about 1990. '89, '90, somewhere in there. We have Articles of Incorporation here. If I could look at them, I could let you know.
Q. Okay. But just because this begins with April '89, it was sometime before April '89?
A. I would think so. Yes.
Q. And this is the company's register?
A. Yes, sir.
Q. Okay. Do you recognize any of the handwriting in the register?
A. I do. I certainly do.
Q. And is that -- any of that your handwriting?
A. It is not.
Q. Whose handwriting is that?
A. Jim Kendle's. Oh, there is one piece here. On



line -- check number 1006, Economy Plywood, that kind of looks like my handwriting. Maybe not. Guess not.
Q. Between the two of you --
A. Oh, and the top one here to Alfred Aloisi for $20 is my handwriting.
Q. -- between the two of you, you and Mr. Kendle, was Mr. Kendle more responsible for keeping the books?
A. Correct.
Q. Do you know whether these --
A. Excuse me one second.
Q. Sure.
A. I'm not sure if it was exactly at this same time, but approximately at this same time, we hired an accountant here in Medford by the name of Clay Vanderbrick, I think it was, that was doing our books and issuing checks to our crew. And I believe that would supplement this. It might have been shortly after these, might have been the next --
Q. That's what I was going to get to. Can you take a look at A-164. You can leave the handwritten one available.
A. Okay.
Q. Was the document plaintiffs produced at A-164 prepared by the accounting firm that you hired?
A. I believe so.