IN THE
UNITED STATES COURT
OF FEDERAL CLAIMS

ALFRED ALOISI et al., )
Plaintiffs, )
v. ) DEPOSITION OF DONALD CARL GOODMAN
UNITED STATES OF AMERICA, )
Defendant. )

Condensed Copy

T R A N S C R I P T of the stenographic notes of JANE MESSINEO, a Certified Shorthand Reporter and Notary Public of the State of New Jersey, taken at the offices of VERITEXT, NEW JERSEY, 25B Vreeland Road, Suite 301, Florham Park, New Jersey, on Thursday, April 24, 2008, commencing at 9:48 a.m.

would understand. He was a smart guy. And in that industry, it was his whole life so --
Q Did you have any discussions with your father regarding this litigation?
A I am unclear. You mean specific, the litigation --
Q What brings us here today, yes.
A Just the suit about being stopped and why and why there's a litigation? Did we have discussions of that?
Q Well, first, we can lay the foundation whether or not you ever discussed the litigation. Then we can get into some details.
A No. We discussed the litigation a lot, although he preferred just to run a business. It's not something, you know, that was -- he would rather just do his job, not be doing litigation. He's not a litigious-type person. He would rather not go the litigation route, ever. He would rather just work.
MR. McBRIDE: Excuse me. Can we clarify, are you talking about the period after the filing of the lawsuit in September 1995 or the circumstances that gave rise to the lawsuit in '88 through '94? Because I am not sure which he was answering as to.



MR. TRAUBEN: Okay.
Q Well, before this lawsuit was filed in 1995, did you have discussions with your father about potentially bringing the lawsuit?
A Yes. I would say I did. The best I recall, I would say yes.
Q And what did you discuss?
A It was more, I would say it's more a discussion about that they can't move forward and that we are stopped, and of course a lawsuit is one thing you can do. But like I said, he didn't want to go a litigious route. He would rather just work.
So -- but I knew that he was stopped and the money was trapped and we weren't going to generate income. I knew all of that, absolutely, firsthand from him and I knew how it affected me. Running the companies. Because I pretty much did his operations on the East Coast. And they were very big and very real.
Q How many years prior to bringing suit did you discuss the potential for litigation?
A Again, I mean, we discussed it. I'm sure that was like something you could do, but it was more important just to work. He's just not looking to sue. He's looking to work. And you know, if a



suit is the only way to, you know, if that's the road you have to go because you are so injured, the injury was huge, that -- I mean, I have a job now. So injury to me is very real for me and my children and my family. So we are still living it out today.
Q And you understand that Dynatech is one of the plaintiffs in this case?
A Yes.
Q And that your father also is one of the plaintiffs?
A Yes.
Q Was. What is the status of your father's estate?
A When he passed, he passed really with nothing. He became ill and -- I mean, pending, except for this --
Q Has it been wound up?
A I wasn't the trustee. I am not -- or executor, whatever that is. Myron executived him so there was nothing to disburse. There was just nothing there. There was no value you can give to these things because they don't have a value. You can't say, oh, my claim to the mine is this and then pay for something because it's not real until it's received. So.



Q Do you know whether your father's estate was probated?
A I don't think it was probated. I don't know about that. I don't understand that.
Q Who would know about that?
A Probably his executor knows, which I believe to be Myron Finkelstein. So you can ask him.
Q Who is Kim Bebe?
A That's his daughter, my sister.
Q Does she have any role in the companies?
A She -- because of family businesses and giving positions of officers, in the legal concept of having corporations, she was an officer, very likely, in his companies or in one of them or any of them.
Q Does she have any involvement in any -- well, let me first ask -- strike that.
Let me first ask, of your father's entities, are any still in existence as ongoing businesses within the family?
A No. I mean, I would say no. They are all dormant. I mean, corporations don't die, but they don't -- if they produce -- if they are not operating, they are dormant.
Q Were any of them formally dissolved?
A I don't know what that means. If you

don't have a contract and income, they just cease to operate. I don't really understand how you formally dissolve. I don't know what you mean by that.

Q Okay.

A I really don't know the definition of that.

MR. McBRIDE: That's fine.

Q Any other siblings?

A Yes.

Q Who would that be?

A He has another daughter, Jody Stephenson that lives in Vermont. And we have a deceased, Susan Goodman, sister, 1995 I think she deceased. Young.

Q Any of your other siblings work for any of the companies?

A No. They didn't. Not on the payroll.

Q Do you know when Dynatech was formed?

A Not exactly. I'd imagine it's in the '80s sometime. I know that it was a preexisting corporation to Dynatech and then it became Dynatech. That, I know.

Q Do you know the name of the entity that preexisted Dynatech?

A I only know it from reviewing the documents, but I knew of it, but I couldn't recall



it. But then I saw the documents so I suspect I reviewed them even quickly to be something like Voltaire or something like that. I don't remember. But I wouldn't have ever recalled it without having seen it in documents.

Q What documents are you referring to?

A Just documents I was provided to look at for deposition.

Q Were they corporate documents, of that nature? Can you give a little more information about the documents? How would you categorize them?

A It looked like corporate documents you had that just showed the company going from one name to the other and the ownership of stock going from one situation to another.

Q Dynatech is a Delaware corporation or New Jersey?

A I am not sure of the answer to that. I would think it's a New Jersey one, but I am not positive. I really don't know.

Q So who owns the stock or owned the stock in Dynatech?

A The deceased, Donald W. owned the stock. Now the estate owns it. Whatever that may be, I guess.



Q Where were its offices located?

A His main operating, you know, his main address for his corporate offices was 6 Horizon Road, Fort Lee, New Jersey. It's suite 2307, 07024. That's the zip.

Q There is no connection between -- with that address any longer?

A That was really his primary residence, too, one of the things of operating a small business and having it be profitable is low overhead so he didn't maintain a, you know, an industrial office or a commercial office space. It's not necessary to do in a drilling and blasting company. So. It's his primary residence and his business.

Q Where was the equipment stored?

A Equipment went from contract to contract or stayed in the areas, quarries. We did a lot of quarries. I mean, as many as six or seven or eight different mines at a time so the equipment could go from quarry to quarry or was housed somewhere temporarily, but we didn't have properties at that point.

Q At what point did Dynatech acquire any property?

A I don't think it did. I don't think



Dynatech acquired property on the East Coast. Whether they bought property, I don't know the details of, anywhere else. None that I am aware of.

Q Did Dynatech have any ownership interest in the mining claims at issue in this case?

A I would say Dynatech and anything associated, I think Mr. Goodman, you know, it's nice to break out the corporations, but Mr. Goodman, my father invested in these things and had, absolutely had claims on the whole thing. That's the whole point.

Q I'm specifically speaking of the entity Dynatech, apart from any individual. Did the entity Dynatech have a property interest in Liberty, in the mining claims that are at issue in this case?

A I'm pretty certain the answer would be yes the way you said it. Because it bought a significant amount of equipment to mine in California. So therefore, that's property interest. Equipment is property.

Q Let's figure this out.

A All right.

Q Dynatech owned equipment that it -- did Dynatech lease that equipment to Liberty Mining?

A Did it lease it to Liberty Mining?

34

A What?
Q Was there -- were there corporate formalities established or were they not -- were corporate formalities not adhered to?
A No. That question -- I don't -- maybe corporate formality by me is an incorrect use of terms, but I'm just saying it's a management company. So Blastech could pay, give, $5,000 a month because, you know, because Don Goodman Enterprises is managing that. You know. You could -- so is that a holding company? What is that when you do that?
Q Did Don Goodman Enterprises, then, own the stock of Dynatech or did your father individually own the stock of Dynatech?
A His stocks are probably owned individually, I would think. I don't think the overall thing -- it's just a management -- like if you were a consultant you could charge fees to be a consultant.
Q So Don Goodman, your father, owned stock in Dynatech.
A He owned Dynatech.
Q He owned it. Did anyone else own shares in Dynatech?
A No. Not to my knowledge.

35

Q Don Goodman Enterprises was the management company that managed Dynatech, among other entities.
A Amongst, yeah.
Q Now, were the assets of individual corporations that were managed by Don Goodman Enterprises kept separate from assets of the other entities managed by Don Goodman Enterprises?
A I don't think to -- utilization of the assets were kept separate. The ownership would have to be, because whoever owns it owns it, ultimately, from a title standpoint; right. But the utilization was absolutely shared amongst everybody.
Q So then, if Blastech owned equipment, that Blastech equipment could be used by Dynatech.
A And it was, yes.
Q Okay. And Dynatech, then, would not have to make a payment to Blastech for the use of that equipment.
A They didn't have to, no.
Q And they did not?
A And they did not. And that's very damaging. It can be -- after the fact, that may not be so good. For Blastech, but yeah, we commingled our utilization of the assets because it's a family

36

empire, you know what I mean? He's built all these different things. There's a reason for separate corporations, because like I said, New Jersey or New York, for example, where you are working. So.
Q Now, we are talking about equipment assets. What about financial assets? Was there a commingling of finances?
A There was a commingling of the labor, certainly. We helped each other. It's all one company in the end. The title and the billings and the revenue might get spread around according to where the work is, but everything is commingled in that respect. As far as you have to pay all the bills for all the companies. So you have all the revenue and all the bills.
Q Now, were there separate accounts for Dynatech?
A Yes.
Q We are talking about bank accounts.
A Right. Yes.
Q Do you know whether those assets were transferred to other entities as the need arose?
A I don't understand.
Q Any cash held by Dynatech -- let me rephrase.

37

Was any cash held by Dynatech transferred to other entities as needs arose?
A Certainly to California, the cash was transferred.
Q When you said to California, what do you mean?
A I am meaning to the Liberty Mining and Energel and anything associated with mining.
Q So when assets would be transferred from Dynatech to Liberty Mining, for an example, was there any document formalizing that transfer of cash?
A I would have suspected that there was ledgers of all the transactions. However, I didn't -- I don't possess them.
Q Did you see in your review of the documents any ledgers specifically for Dynatech?
A Not ledgers in a book. I didn't see those in bookkeeping format, although I was very aware of the dollars that was invested in that direction, and I did find documents in there that would back up what I had always believed was the investment -- investments that were made there.
Q So if or when Dynatech transferred cash to Liberty Mining, was there any type of a loan agreement between the entities that called for the

transfer of cash?
A I don't think there's anything formal like that. I think Liberty Mining had expenses and it required revenue which they couldn't self-generate. So therefore, someone had to pay it in order to continue to move in the direction of running a real business.
Q Was Dynatech -- when Dynatech transferred cash to Liberty Mining, you --
A Well, I wouldn't say transfer cash, but when they provided revenue to them, you can call it cash, whatever. I guess it's transfer cash.
MR. McBRIDE: Checks, not equal to cash.
A We didn't have cash.
Q But it had -- it had a bank account. It had money --
A Money. I don't call it cash.
Q Okay.
MR. McBRIDE: It wasn't hundred dollar bills.
A No. I am not in that business.
MR. McBRIDE: That's the confusion that's happening here. You said documents and he's thinking of the universe of possible documents. Loan agreement was a more specific line of questioning



that got solid answers.
Q I am referring to cash transactions as opposed to loans of equipment. So we talked earlier a little bit about Dynatech would provide equipment to Liberty Mining or to other entities.
A Okay.
Q Correct? That's fair?
A Yeah.
Q And now I am asking about other assets that Dynatech may have shared with other entities that your father was involved with.
A I know without any doubt that an operation and any mining operation is a lot more than equipment that has to be paid. There's tremendous overheads, insurances, payrolls, licensing fees, legal fees, and I have no doubts whatsoever that it approached close to 3 million dollars going from Mr. Goodman, the late Mr. Goodman's various business entities to the Liberty Mining, Energel, Aloisi Investment. I have no doubts whatsoever it approached the 3-million-dollar mark.
Q That wasn't my question.
A Okay.
MR. TRAUBEN: Can you read back my question, please?



(Record read.)
A Can you give me a time period?
Q Okay. In the time period of the late 1980s, let's say, from about 1989 to 1990, let's just focus on that year or two --
A Okay.
Q -- at that time are you aware of any transfers of revenue from Dynatech to Liberty Mining?
A During that time I would say definitely was transferring during that time, to Liberty Mining, absolutely. His other entities, like you just asked previously, meaning unrelated to that mining operations out in California, I would say he wasn't investing in anything, but that, aside of keeping the money in his own blasting companies that he kept it in them.
Q Do you know how on the books that transfer of revenue from Dynatech to Liberty Mining would be documented?
A I don't know the tax terminology for something like that, but it's probably capital investments of some type. If it was for the equipment payment, it would be capital investment for equipment, you know, for hard equipment. Otherwise, it would be for payroll or permits or licensing or



fees or acquisitions.
I don't know how they individually did it. Depends. I'm sure each of the checks kind of had a goal where it was going, to operate business or run anything, even without the revenue you still have to -- before you collect the money, you got to spend the money. So.
Q You mentioned a 3-million-dollar investment.
A I know it's between 2 and 3 so it's probably somewhere around two and a half million dollars. That's what I was always told. That's what I always understood it to be.
Q Told by whom?
A By my father in those conversations. Those conversations were very common.
Q I'm sorry. It was common --
A Conversation between us. It's a big drain on a family business, that kind of money.
Q Now --
A Ties my hands a lot. It tied my hands a lot.
Q Does that money, 2 to 3 million dollars that you mentioned, does that include any of the litigation costs involved in this case?