# In the United States Court of Federal Claims

```
* * * * * * * * * * * * * * * * * * * * * * * * * * * *
                                         *
ALFRED ALOISI, et al.,                   *
                                         *
                     Plaintiffs,         *
                                         *
        v.                               *
                                         *
                                         *
UNITED STATES OF AMERICA,                *
                                         *
                     Defendant.          *
                                         *
* * * * * * * * * * * * * * * * * * * * * * * * * * * *
```

No. 95-650L
(Filed: December 19, 2008)

Temporary taking; mining permit;
ripeness; extraordinary delay; bad
faith.

*Lawrence G. McBride*, Foley & Lardner LLP, Washington, D.C., for plaintiffs.

*Bruce K. Trauben*, Trial Attorney, Natural Resources Section, Environment and Natural
Resources Division, with whom were *William J. Shapiro*, Trial Attorney, Environment and
Natural Resources Division and *Ronald J. Tenpas*, Assistant Attorney General, United States
Department of Justice, Washington, D.C., for defendant. *Rose Miksovsky*, U.S. Department of
Agriculture, San Francisco, CA, of counsel.

## OPINION

MARGOLIS, *Senior Judge*.

This matter comes before the Court on plaintiffs' motion for summary judgment and
defendant's motion to dismiss, or alternatively, cross-motion for summary judgment, both filed
February 6, 2008.  Plaintiffs, Alfred Aloisi, Candis Aloisi, Donald W. Goodman, Energel Inc.,
Dynatech Corp., James Kendle, and Liberty Mining, Inc., ("plaintiffs") claim that the United
States ("defendant") temporarily deprived  plaintiffs of a property interest without just
compensation.  Defendant claims that this Court does not have jurisdiction over plaintiffs'
takings claim, or alternatively, that summary judgment is appropriate.  Oral argument on the
cross-motions was held on June 25, 2008.  After carefully reviewing the briefs and hearing oral
argument on this matter, the Court concludes that plaintiffs' claim is not ripe for adjudication.
Defendant's motion to dismiss, or alternatively, cross-motion for summary judgment is
**GRANTED**.  Plaintiffs' motion for summary judgment is **DENIED**.

# FACTUAL BACKGROUND

## 1.   Background

This case concerns the federal regulatory scheme, 36 C.F.R. § 228 et seq., whereby the U.S. Department of Agriculture, Forest Service ("Forest Service") regulates the use of the surface of National Forest System lands in connection with operations authorized by the United States mining laws, in order to minimize adverse environmental impacts. The mining laws, 30 U.S.C. § 22 et seq., confer a statutory right to enter upon the public lands to search for minerals, and plaintiffs claim property rights thereunder. The Forest Service works in conjunction with the U.S. Fish and Wildlife Service ("FWS"), which is responsible for administering section 7 of the Endangered Species Act of 1973, 16 U.S.C. § 1531 et seq. ("ESA"), regarding the protection of endangered or threatened species of fish, wildlife, or plants and the habitat of such species. 50 C.F.R. § 402.01(b). Plaintiffs allege that the United States, acting through the Forest Service and the FWS, temporarily deprived them of a property interest and seek $22.5 million in just compensation. Specifically, plaintiffs claim that the Forest Service and the FWS failed to inform plaintiffs of a July 23, 1990 "no jeopardy" biological opinion until March 1992, in violation of federal regulations. Plaintiffs also claim that the Forest Service wrongfully initiated a biological consultation proceeding with the FWS regarding the potential effects of plaintiffs mining operations on the northern spotted owl in April 1992 and delayed in completing that consultation until February 1994, thereby depriving plaintiffs of their rights of use and enjoyment of their property during that period.

## 2.   Plaintiffs' 1989 Proposed Plans of Operations

### A.   June 6, 1989 Proposed Plan of Operations

In March 1989, plaintiffs Alfred Aloisi, Donald W. Goodman and James Kendle organized Liberty Mining, Inc., an Oregon corporation ("Liberty"). In April 1989, Liberty submitted a draft plan of operations for mining on federal land in the Klamath National Forest ("KNF"), located in California, to the District Ranger.[1] The Forest Service reviewed Liberty's proposal and in an internal memorandum, a Forest Service biologist concluded that the proposal would have a negative impact on spotted owl in the area and suggested changes to reduce such effects.

On May 2, 1989, Liberty submitted a formal two-phase proposed plan of operations to the Forest Service. Phase I of the proposed plan primarily dealt with taking bulk samples and testing the samples to determine what amount of gold, if any, could be mined. Alternatively, the plan

---

[1]KNF is under the jurisdiction of the Forest Service and is supervised by the Forest Supervisor in Yreka, California, and during the relevant time period, the Regional Forester in San Francisco, California; the specific area of land involved in this case is further supervised by the Salmon River Ranger District ("the District Ranger").

contemplated taking bulk samples at other apex veins in nearby mining lands in the event that the spotted owl prevented some of the Phase I plans from being implemented.  Liberty also proposed a Phase II operation that included building a road, logging, and cutting apex corridors, if the Phase I testing was successful.

In response to Liberty's May 2, 1989 proposal, the Forest Service issued a Decision Notice & Finding of No Significant Impact for Phase I on May 25, 1989.  Liberty and the Forest Service executed the proposed plan on June 6, 1989 ("June 6, 1989 proposed plan of operations").  The proposed plan, by its own terms, expired on July 31, 1989.  On July 10, 1989, the Forest Service informed Liberty that an environmental assessment and analyses for Liberty's Phase II operations would not be complete until December 31, 1989 at the earliest, due to the Forest Service's heavy workload.  Joint Appendix ("J.A.") 30.  The Forest Service advised Liberty that if that timing did not meet its needs, Liberty could obtain a third-party contractor to conduct field work and provide documentation specifically addressing cultural resource issues and northern spotted owl habitat areas.  Id.

In late July 1989, Liberty submitted a proposal to the Forest Service proposing additions to the approved Phase I plan of operations.  The District Ranger approved the proposed additions with certain stipulations by letter dated August 11, 1989.

### B.    September 28, 1989 Plan of Operations

On September 28, 1989, Liberty submitted a long-range proposed plan of operations that included four phases of operations ("September 28, 1989 plan of operations").  J.A. 36 at 449.  That plan was incomplete, however, because Liberty had not finished preliminary feasability studies, and it was never approved as proposed.

### C.    October 25, 1989 Supplemental Plan of Operations

The Forest Service, by letter dated October 24, 1989, requested a firm plan from Liberty; specifically, the Forest Service requested Liberty to submit a plan depicting what mining areas were going to be developed during the next six and twelve-month time periods. In response to the Forest Service's October 24, 1989 letter, Liberty submitted a supplemental plan of operations on October 25, 1989 ("October 25, 1989 supplemental plan of operations") outlining Liberty's operations through October 1990.  After Liberty submitted the October 25, 1989 supplemental plan of operations, Aloisi met with representatives of the Forest Service.  At that November 1, 1989 meeting, the Forest Service stated that it still needed Liberty's complete plan of operations to meet the mining laws.

On November 27, 1989, the District Ranger approved, in part, the supplemental Phase I work in Liberty's October 25, 1989 supplemental plan of operations; certain portions of the plan were not approved because the Forest Service understood that those portions would be included in a second plan of operations that would be submitted after an environmental analysis was

completed.  The District Ranger also noted that Liberty's archeological reports for the proposed mining site had been sent to the California State Historic Preservation Officer, in compliance with the National Historic Preservation Act, 16 U.S.C. § 470 et seq. ("NHPA") but that no reply had been received.  J.A. 46 at 475.  At the time the report was submitted to the State Historic Preservation Officer, cultural and archeological studies had only been done for certain portions of the proposed plan.  Id.  Additionally, the termination date of the June 6, 1989 proposed plan of operations, which was updated by the October 25, 1989 supplemental plan of operations, was adjusted to July 31, 1990.

**3.    Forest Service's January 1990 Stop Work Order**

On December 15, 1989, the California State Historic Preservation Officer responded to the District Ranger's submission of Liberty's archeological report.  The State Historic Preservation Officer informed the Forest Service that unless the entire scope of Liberty's project was reviewed, there could be no determination of the impact of Liberty's operations on the land and whether the operations were in compliance with the NHPA.  J.A. 47 at 498.  In response to the State Historic Preservation Officer's letter, the Forest Service ordered Liberty to stop all mining operations, including any activities on private lands accessible through National Forest property, on January 4, 1990.  Liberty complied with this stop work order and ceased all work approved by the Forest Service.

On February 15, 1990, a Forest Service biologist informed Aloisi that the rules regarding the northern spotted owl were still in flux and that the FWS was the ultimate authority regarding northern spotted owl regulations. In March 1990, Liberty obtained bids for a cultural and archeological resource study to satisfy the State Historic Preservation Officer's December 1989 position on NHPA compliance.  Joint Statement of Material Facts Not in Dispute ("JSMF") ¶ 41.  However, Liberty decided to delay an expanded cultural and archeological resource study until the rules regarding the northern spotted owl were clarified because the rules could potentially change the area where the study would be performed.  See Pls.' Mot. for Summ. J. at 4.

**4.    FWS July 23, 1990 Biological Opinion**

In June 1990, the FWS formally listed the northern spotted owl as a threatened species under the ESA.  Determination of Threatened Status for the Northern Spotted Owl, 55 Fed. Reg. 26114 (June 26, 1990).  Prior to the issuance of that rule, all projects inside KNF that could potentially be affected by listing the northern spotted owl as a threatened species underwent a Programmatic Biological Evaluation.  Liberty's proposed mining project was included in that evaluation among some 45 projects. Liberty was the only mining project; the others were timber projects.  On June 27, 1990, the Regional Forester transmitted the June 1990 Evaluation to the FWS and requested a biological consultation in accordance with the ESA.  JSMF ¶ 46.  In response, the FWS issued a biological opinion on July 23, 1990 ("July 23, 1990 biological opinion") concluding that Liberty's proposed activities, as described in the Forest Service's June 1990 Evaluation, were "not likely to jeopardize the continued existence of the northern spotted

owl." J.A. 80 at 761.  Plaintiffs claim that they did not have knowledge of that FWS "no jeopardy" opinion until March 10, 1992 when the District Ranger informed Liberty of its existence in a letter.

**5.**      **1990-1991 Plan of Operations**

Throughout 1990 and 1991, Liberty's plan of operations was modified and revised.  On March 16, 1990, Aloisi informed the Forest Service that Liberty intended to use a cyanide recovery process to extract gold during Liberty's mining operations.  JSMF ¶ 40.  Use of a cyanide "leaching" process had not been included in any prior submissions to the Forest Service, and Aloisi noted that this was a "new issue" that would need to be addressed.  J.A. 65 at 594.  The Forest Service informed Aloisi that "significantly more information" was needed and that an environmental assessment would be set back until the summer of 1990.  Id.

On July 10, 1990, the Forest Service required Liberty to submit an amendment to the October 25, 1989 supplemental plan of operations because Liberty had proposed work that was not included in the original plan, including use of timber cut from road right-of-ways in the development of mine tunnels.  J.A. 78 at 757.  The Forest Service requested Liberty to specifically address where tunnels would be placed, when the tunnel work would be scheduled, and how much timber Liberty intended to use.  Id.

The Forest Service, by letter dated August 27, 1990, approved a request from Liberty to extend the June 6, 1989 proposed plan of operations termination date to December 31, 1990, subject to certain conditions and stipulations.  J.A. 82 at 777.  In that letter, the District Ranger also informed Liberty that an Environmental Impact Statement ("EIS") would likely be required for Liberty to use the cyanide leaching process.  Id.  The District Ranger estimated that an EIS would take two years but noted that Liberty's decision regarding the use of a cyanide leaching process would dictate when an environmental assessment would proceed.  Id.

By letter dated September 18, 1990, Liberty requested an extension of the October 25, 1989 supplemental plan of operations and sought approval for activities that were not included in the original October 25, 1989 supplemental plan of operations.  Liberty also noted that cyanide leaching was not included in the plan and that the process to extract gold would be "determined in the next two years."  J.A. 84.

The District Ranger approved Liberty's September 18, 1990 extension request, setting the new expiration date for March 31, 1991, and approved the activities that were not included in the original October 25, 1989 supplemental plan of operations.  J.A. 88 at 822.  The District Ranger also noted that Liberty had included proposals for the operational phase of the mining operations in the September 28, 1989 plan of operations and October 25, 1989 supplemental plan of operations, but that the Forest Service did not have a "complete proposed Plan of Operations" encompassing the operational phase of Liberty's operations.  Id. at 823.  In the same letter, the District Ranger said that there could be no further activity on the land that would constitute a

taking of the spotted owl habitat in a habitat conservation area ("HCA"), and that absent a detailed plan of operations, the Forest Service would not be able to determine the extent to which Liberty's operations would be constrained or when an EIS could be completed.  Id. at 824.

On March 11, 1991, Liberty submitted an "Application for renewal of existing Plan of Operations with modifications" to the District Ranger; there is no evidence that the request was ever approved.  J.A. 94 at 905.  Later in March, the District Ranger orally authorized Liberty to move and deck logs, pill road construction slash, repair damage from road construction to the Klamath mine site, and hand clear a 14-by-14 foot swath to the Anna Johnson mine.

In May 1991, the Interagency Northern Spotted Owl Conservation Group ("INSOCG"), a group created to develop a conservation strategy for the northern spotted owl, responded to the Forest Service's questions about implementing a conservation strategy to deal with mining operations.  J.A. 102 at 1013.  The INSOCG concluded that specific guidelines for dealing with mining operations were not appropriate and that conservation strategies for mining operations should be handled on a case-by-case basis as part of a biological evaluation process.  Id.

On July 12, 1991, the District Ranger's Mineral Officer visited the Liberty mining site and ordered a halt to the activities previously authorized in March 1991.  The District Ranger followed up with a letter to Liberty dated August 5, 1991 that prohibited "any further clearing within the HCA until [the District Ranger] receive[s] guidelines concerning the development of mineral resources within HCAs."  J.A. 108 at 1064.  Moreover, the District Ranger informed Liberty that the District Ranger believed that Liberty would be submitting another proposed plan of operations within 10 days.  After two attempts were made in August 1991, the District Ranger's letter was returned to sender on September 13, 1991.  J.A. 109.  Liberty did not submit its next plan of operations until April 1, 1992.

## 6.      Determination of Critical Habitat for the Northern Spotted Owl

On January 8, 1992, the FWS issued a rule which identified specific areas as critical habitat areas for the northern spotted owl, including an area where Liberty was operating.  Determination of Critical Habitat for the Northern Spotted Owl, 57 Fed. Reg. 1796 (Jan. 15, 1992). The FWS ruling did not apply to "presently existing projects and all proposed projects where all Federal, State, and local permitting processes had been completed and final approvals and permits issued as of the date of the final rule . . ."  Id. at 1808.  Plaintiffs allege that if Liberty's March 1991 renewal request had been granted, Liberty would have been exempt from this rule.  Pls.' Mot. for Summ. J. at 8.

## 7.      April 1, 1992 Plan of Operations

On March 10, 1992, the District Ranger recounted, by letter, a meeting that took place between Liberty representatives and the Forest Service on February 11, 1992.  J.A. 111 at 1083.  The District Ranger reminded Liberty that Liberty had no active plan of operations and that the

prior plan of operations terminated on March 31, 1991.  Id.  The District Ranger also informed Liberty that the FWS determined that Liberty's September 28, 1989 plan of operations did not threaten the northern spotted owl and could proceed as described.  Id. at 1084.  Despite the FWS's prior approval, the District Ranger and Liberty both agreed that Liberty would submit a new final proposal instead of the Forest Service attempting to reconstruct Liberty's proposal history, amendments, and approvals previously submitted by Liberty.  Id.  The District Ranger noted that the new proposal would be the plan of operations proposal and that it would supersede all previous plans and proposals.  Id.  The District Ranger pointed out that any change in the new proposal compared to Liberty's previous proposals would require a new biological evaluation and consultation with the FWS.  Id.  Moreover, the District Ranger noted that the new plan would be the basis for final approval of Liberty's operations and for preparation of any needed environmental documents.  Id.  On April 1, 1992, Liberty submitted a plan of operations ("April 1, 1992 plan of operations") pursuant to the February 11, 1992 meeting and the District Ranger's March 10, 1992 letter.  J.A. 114 at 1106.

In May 1992, the District Ranger and the KNF Supervisor each requested that the Forest Service reinitiate a biological consultation with the FWS regarding the potential effects of Liberty's April 1, 1992 plan of operations on the northern spotted owl.  On May 28, 1992, the Forest Service informed Liberty by letter that it intended to reinitiate consultation with the FWS. In that letter, the District Ranger noted that Liberty's April 1, 1992 plan was "very similar" to Liberty's 1989 proposal; but, even with the minor changes, the Forest Service stated that a new biological opinion and reinitiated consultation with the FWS were required.  J.A. 120 at 1159. The Forest Service believed that the changed conditions between 1989 and 1992, including the northern spotted owl being listed as an endangered species and the creation of critical habitat areas, warranted such consultation.  Id.  The Forest Service also recommended that a field survey be conducted with at least six attempts to verify the location of spotted owls near Liberty's area of operations and estimated that the survey would be completed by June 1993.  Id.

Liberty submitted a "Notice of Appeal" on July 9, 1992, appealing the District Ranger's decision to reinitiate consultation with the FWS.  Despite the pending appeal, the Regional Forester, pursuant to the ESA, formally requested another biological consultation with the FWS regarding Liberty's April 1, 1992 plan of operations.  After multiple discussions between the Forest Service and the FWS regarding whether a second consultation was necessary, on October 5, 1992, the FWS provided the Forest Service a draft letter stating that "reinitiation of formal consultation is not required at this time."  J.A. 133 at 1216.  However, the representatives of the Forest Service met with representatives of the FWS on October 8, 1992, and decided that reinitiation was necessary to determine the effects of Liberty's April 1, 1992 plan of operations on the northern spotted owl; Liberty had not received a final permit exempting the project as of January 15, 1992, and therefore, a second consultation was needed to assess Liberty's proposed operations and the operations' impact on the northern spotted owl.  The October 8, 1992 decision rendered the October 5, 1992 draft letter moot.  Due to the District Ranger's reinitiation, the Forest Supervisor dismissed Liberty's appeal regarding the reinitiated consultation on October 23, 1992.

After Liberty's appeal was denied by the Forest Supervisor, Liberty filed an appeal with the Regional Forester.  On January 22, 1993, the Deputy Regional Forester affirmed the Forest Supervisor's dismissal of Liberty's appeal noting that the Forest Service was still in the process of evaluating the environmental effect of Liberty's April 1, 1992 plan of operations and that no final decision had been made.  The Deputy Regional Forester concluded that without a final decision from the Forest Service on the April 1, 1992 plan of operations, Liberty's appeal was premature.

Prior to the resolution of Liberty's appeal to the Deputy Regional Forester, the FWS notified the Regional Forester, by letter dated November 24, 1992, that it needed additional information from Liberty regarding the April 1, 1992 plan of operations before it could issue a biological opinion.  The District Ranger requested the information required by the FWS from Liberty on December 4, 1992, and again on December 21, 1992.  Representatives from Liberty and the Forest Service corresponded by letter and met twice in early 1993 in an effort to compile the requested information, and on April 2, 1993, the Forest Service provided the FWS with the information requested in the November 24, 1992 letter. That letter served as the Forest Service's biological evaluation of Liberty's proposed activities as submitted in the April 1, 1992 plan of operations.  The Forest Service ultimately concluded that Liberty's proposed activities "may affect, but is not likely to adversely affect the northern spotted owl or it's [sic] critical habitat area."  J.A. 157 at 1302.

On April 25, 1993, Liberty leased all Liberty's mining claims in Eddy Gulch to WAZCO, Inc. ("WAZCO").  On January 11, 1994 WAZCO, under the name Liberty Consolidated Mines, Inc., submitted a notice of intent to operate, identifying activities planned for the following 90 days.  The District Ranger, on February 4, 1994, approved WAZCO's 90-day proposed activities.

On February 8, 1994, the FWS responded to the formal consultation initiated by the Forest Service after Liberty's submission of the April 1, 1992 plan of operations.  The FWS concurred with the Forest Service's determination that Liberty's April 1, 1992 plan of operations would not adversely affect the northern spotted owl or adversely modify the spotted owl's critical habitat area so long as the Forest Service's recommended mitigation measures were followed.

Ultimately, the Forest Service approved WAZCO's complete plan of operations subject to terms and conditions and WAZCO posting a land reclamation bond.  Despite the Forest Service's approval, WAZCO never posted the required bond, and WAZCO never conducted any mining operations.  On September 27, 1995, plaintiffs filed a complaint against the United States in this Court.

## DISCUSSION

The Takings Clause of the Fifth Amendment prohibits the government from taking private property for public use without just compensation.  U.S. CONST. amend. V.  A Fifth Amendment "taking" may occur due to a physical invasion or a government regulation, and the

Supreme Court has recognized that the government may temporarily "take" private property for a finite period of time.  See Wyatt v. United States, 271 F.3d 1090, 1096-97 (2001) (citing Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 533 U.S. 948 (2001)).

1.    **Standard of Review**

Summary judgment is granted when there is a lack of genuine, material, triable facts.  Rules of the Court of Federal Claims ("RCFC") 56(c);  Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986); Palahnuk v. United States, 475 F.3d 1380, 1382 (Fed. Cir. 2007).

RCFC 12(h)(3) instructs that if the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.  Once the court's subject-matter jurisdiction is put into question, the other party must come forward with evidence establishing the court's jurisdiction by a preponderance of the evidence.  Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988); see also McNutt v. General Motors Acceptance Corp. of Indiana, 298 U.S. 178, 182-83 (1936).

2.    **Ripeness**

A court does not have jurisdiction over takings claims that are not ripe. Morris v. United States, 392 F.3d 1372, 1375 (Fed. Cir. 2004).  Defendant argues that plaintiffs have not met their burden of proving that this case is ripe for review.

The Supreme Court has emphasized that a party alleging a regulatory taking must first obtain a final decision from a government agency charged with administering the challenged regulations before a party's claim is ripe for review.  Palazzolo v. Rhode Island, 533 U.S. 606, 618-21 (2001); see also Williamson County Reg'l Planning Comm'n v. Hamilton Bank, 473 U.S. 172, 186-87 (1985) ("[A] claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue.").  Obtaining a final agency decision is necessary to ensure the party has suffered an injury-in-fact.  See Williamson, 473 U.S. at 193 ("[T]he finality requirement is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury.").  Alternatively, a takings claim is ripe for review if either the governmental agency has no discretion to review a contested regulation or submitting further applications for agency review would be a futile exercise because the outcome is obvious.  Palazzolo, 533 U.S. at 620; Cienega Gardens v. United States, 265 F.3d 1237, 1245-46 (Fed. Cir. 2001).

Plaintiffs allege that a taking occurred on July 23, 1990.  On July 23, 1990, the FWS issued a biological opinion concluding that plaintiffs' proposed mining activities were not likely to jeopardize the northern spotted owl.  J.A. 80 at 761.  Plaintiffs believe that because they did not receive a copy of the July 23, 1990 biological opinion, they were deprived of their economic use and enjoyment of their property.

The Forest Service has the ultimate authority to approve or reject proposals to conduct mining operations in national forests.  See 30 U.S.C. § 612(b); 36 C.F.R. §§ 228.4-228.5; Clouser v. Epsy, 42 F.3d 1522, 1531 (9th Cir. 1994) (upholding Forest Service's authority to regulate access to mining claims located within national forest lands).  Therefore, until plaintiffs receive a final decision from the Forest Service, there can be no claim for a taking based on denial of a permit.  See Williamson, 473 U.S. at 186.

The Forest Service reviews proposed mining operations pursuant to various regulations before a final decision is made.  Before proposed mining operations are approved, the proposals are  reviewed under the National Historic Preservation Act, 16 U.S.C. § 470 et seq. ("NHPA"), the Endangered Species Act, 36 C.F.R. §§ 228.8(d)-(e), 16 U.S.C. § 1531 et seq. ("ESA"), and various other federal, state, and local requirements.  The July 23, 1990 biological opinion was only one step in a multi-step review process.  The biological opinion did not, by itself, authorize plaintiffs to begin any mining operations.  Despite the biological opinion's conclusion, plaintiffs were still required to submit a plan of operations and receive approval from the Forest Service under 36 C.F.R. §§ 228.4-228.5.  Furthermore, plaintiffs concede that there was no complete plan of operations submitted to the Forest Service, in spite of numerous requests from the Forest Service for such a plan.  Tr. at 39.

As of July 23, 1990, plaintiffs did not have final approval from the Forest Service to proceed with mining operations.  To the contrary, as of July 23, 1990, the Forest Service was still requesting information from plaintiffs so it could reach a decision on plaintiffs' proposed mining activities.  See J.A. 38 at 458; J.A. 69.  Requests for more detailed information by the Forest Service continued until December 1992.  J.A. 82, 88, 90, 108, 111, 137, 142.  There is no evidence in the record that plaintiffs received final approval from the Forest Service allowing plaintiffs to begin mining operations.

Plaintiffs argue that Palazzolo does not require submission of a "full-detail life of mine plan of operations complete enough for the Forest Service to approve" and note that the ripeness doctrine does not require a landowner to submit applications for their own sake.  Pls.' Resp. to Def.'s Mot. to Dismiss at 5 (citing Palazzolo, 533 U.S. at 622).  Unfortunately, plaintiffs' reliance on Palazzolo is misplaced.  In Palazzolo, the Supreme Court reaffirmed the futility exception to the final decision rule stating:

> "While a land owner must give a land-use authority an opportunity to exercise its discretion, once it becomes clear that the agency lacks the discretion to permit any development, or the permissible uses of the property are known to a reasonable degree of certainty, a takings claim is likely to have ripened."

Palazzolo, 533 U.S. at 620; see also Williamson County Reg'l Planning Comm'n supra.  Following Palazzolo and Williamson, the Federal Circuit noted in Cienega Gardens that "seeking a final decision from the pertinent land use authority is essential to determining the existence and

scope of the taking." Cienega Gardens, 265 F.3d at 1245 (emphasis added).  Therefore, absent a final decision from the Forest Service, plaintiffs' takings claim did not ripen due to a permit denial.

**3.**     **Extraordinary Delay**

Plaintiffs assert that their takings claim is ripe due to the government's extraordinary delay and bad faith in not notifying the plaintiffs of the July 23, 1990 biological opinion.  The plaintiffs claim that the July 23, 1990 biological opinion was the genesis for the extraordinary delay and constituted a temporary taking that lasted until March 1992.  Plaintiffs additionally claim that the Forest Service's reinitiation of the biological consultation with the FWS regarding the potential effect of the mining operations on the northern spotted owl on April 1, 1992, was the start of a second temporary taking that lasted through February 1994.  Finally, plaintiffs claim that these two events, when taken together, deprived plaintiffs of the use and enjoyment of their property from July 1990 through February 1994.

An extraordinary delay in permit processing by an agency can give rise to a ripe takings claim notwithstanding the failure to deny the permit.  Wyatt v. United States, 271 F.3d 1090, 1098 (Fed. Cir. 2001); see also Boise Cascade Corp. v. United States, 296 F.3d 1339, 1352 (Fed. Cir. 2002) ("[A]bsent denial of a permit, only extraordinary delays in the permitting process ripen into a compensable taking."); Tabb Lakes, Ltd. v. United States, 10 F.3d 796, 803 (Fed. Cir. 1993).  If the court determines that there is an extraordinary delay by the government, the question of temporary regulatory takings liability is then determined using the Supreme Court's three-part analysis in Penn Central Transp. Co. v. City of New York, 438 U.S. 104 (1978). Appolo Fuels, Inc. v. United States, 381 F.3d 1338, 1351 (Fed. Cir. 2004).

In determining if there is a delay sufficient to support a temporary taking, the length of any alleged extraordinary delay must be put into context and examined in relation to the regulatory permitting scheme, the nature of the permitting process, and reasons for the delay. Wyatt, 271 F.3d at 1098.  Delays are inherent in complex regulatory permitting processes.  Id. The nature of the regulatory scheme is especially critical when the permitting process requires detailed technical information necessary to determine the environmental impact of a proposed project.  Id.  When reviewing the length of time alleged to be extraordinary, government agencies dealing with the complex regulatory schemes should be afforded *significant deference* in determining what additional information is required to satisfy statutorily imposed obligations. Id..  We must also recognize that delays may be *attributable to the permit applicant* as well as the government.  Id.  Rarely will there be a takings based on extraordinary delay without a showing of bad faith.  Id. (citing Tabb Lakes, Ltd. v. United States, 10 F.3d 796, 799 (Fed. Cir. 1993)).

A.    **July 1990 Alleged Taking**

Plaintiffs' assertion that the Forest Service's delay in giving the July 23, 1990 biological opinion to plaintiffs amounts to extraordinary delay is without merit.  Examining the evaluation process that the Forest Service used to determine if a proposal should be approved shows that the delay from July 1990 through March 1992 is not extraordinary.

Briefly, the Forest Service evaluates numerous different factors before authorizing a mining permit near an endangered species habitat area.  Proposals are reviewed in accordance with the NHPA, the ESA, and various other federal, state, and local requirements. The various federal, state, and local requirements necessitate a biological opinion, environmental impact study, compliance with the Interagency Scientific Committee's Conservation Strategy for the Northern Spotted Owl ("ISC"), implementation of protocols for the northern spotted owl, and completion of owl surveys.  The Forest Service did not know of the ISC's recommendations regarding a northern spotted owl conservation strategy as applied to mining operations until May 1991, 10 months after the July 23, 1990 biological opinion was issued.  Moreover, the FWS did not designate specific areas as critical habitat areas for the northern spotted owl until January 8, 1992, approximately 18 months after the July 23, 1990 biological opinion was issued.

The regulatory process necessary to approve mining in an environmentally sensitive area shows that a delay of approximately 20 months, from July 1990 to March 1992, does not amount to an extraordinary delay in the context of a complex regulatory scheme, as required by Wyatt.  A 20-month delay when compared to other delays sanctioned by the Supreme Court and Federal Circuit, does not amount to a delay that is substantial enough to be considered extraordinary as a matter of law.  See Williamson, 473 U.S. 172 (1985) (eight-year delay not considered a temporary taking); Bass Enterprises Prod. Co. v. United States, 381 F.3d 1360 (Fed. Cir. 2004) (45-month delay not considered a temporary taking); Wyatt, 271 F.3d 1090 (Fed. Cir. 2001) (finding no extraordinary delay notwithstanding a nearly 10-year permitting process).

As Wyatt noted, the government is given considerable deference in determining what information is necessary to approve a proposed plan of operations, and any delay attributable to the applicant should also be considered when determining if a delay is extraordinary.  Wyatt, 271 F.3d at 1098.  The Forest Service requested additional information from plaintiffs four times from July 1990 to March 1992.  Additionally, as of September 18, 1990, plaintiffs had not decided what milling process would be used to extract minerals, but stated that "in the next two years" the milling process would be decided.  J.A. 84 at 810.  Moreover, plaintiffs contacted the Forest Service and requested a renewal of their submitted plan of operations, with modification, on March 11, 1991, almost eight months after the alleged extraordinary delay began.  J.A. 94 at 905-06.  The March 11, 1991 letter from plaintiffs indicated that further "details [would] be forthcoming."  Id.   The deference afforded the government for requesting information in addition to the plaintiffs' own statements show that there was no extraordinary delay within the context of the regulatory scheme.

Because of the detailed information required to approve mining operations and the complexity of the regulations associated with approving mining permits on land near endangered species, the delay here is attributable to the nature of the regulatory scheme and the actions of the plaintiffs. These circumstances show that there was no extraordinary delay in the context of the complex regulatory scheme.

**B.       April 1992 Alleged Taking**

There was no extraordinary delay associated with plaintiffs' alleged April 1992 taking. The Forest Service's March 10, 1992 letter placed plaintiffs on notice that a new biological opinion would be needed if plaintiffs' proposed mining activities changed. J.A. 111 at 1084. Plaintiffs were then notified on May 28, 1992 that because the April 1, 1992 plan of operations was different than prior operation proposals, that the change in proposals combined with the changed conditions in KNF required a reinitiation of a biological consultation with the FWS. J.A. 120. In July 1992, plaintiffs filed a "Notice of Appeal" appealing the District Ranger's decision to reinitiate consultation with the FWS; this appeal was ultimately dismissed. J.A. 121. In October 1992, after multiple discussions regarding whether a second consultation would be required, the Forest Service and the FWS concluded that a reinitiated consultation was necessary. J.A. 136. The District Ranger wrote plaintiffs on December 4 and December 21, 1992 asking plaintiffs for information necessary to complete the FWS's consultation and issue a biological opinion. J.A. 140, 142. The District Ranger was unable to reply to the FWS's request for additional information until April 2, 1993, because plaintiffs had not provided the District Ranger with the information requested in December 1992. J.A. 157 at 1297. The District Ranger, in the April 2, 1993 letter, advised the FWS that the Forest Service's position was that plaintiffs' proposed operations were not likely to adversely affect the northern spotted owl or its critical habitat. Id. at 1302. The FWS completed the environmental evaluation of plaintiffs' April 1, 1992 plan of operations on February 8, 1994, and came to the same conclusion as the Forest Service. J.A. 163.

Under these facts, the delay from April 1, 1992 to February 8, 1994 is not substantial enough to be considered an extraordinary delay. The delay from April 1992 to December 1992 was attributable to discussions between the Forest Service and the FWS regarding whether a second consultation was necessary and plaintiffs' appeal. Further, the delay from December 1992 to April 1993 was a result of the plaintiffs' own delay. Under Wyatt, the permit applicant's own delay, in addition to the regulatory scheme, must be considered when determining if a delay is so extraordinary that it ripens plaintiffs' claim. In this case, plaintiffs' delay in providing the District Ranger with required information until April 1993, contributed to the overall delay. Once the FWS was provided with all the necessary information, it was able to issue a biological opinion in a reasonable amount of time, approximately 10 months (April 2, 1993 to February 8, 1994).

C.     **July 1990 to February 1994 Alleged Taking**

Plaintiffs additionally allege that the Forest Service's failure to notify plaintiffs of the July 23, 1990 biological opinion, reinitiation of a biological consultation with the FWS regarding the April 1, 1992 plan of operations and delay in completion of the consultation separately, *and when taken together*, deprived plaintiffs of use and enjoyment of their property from July 23, 1990 to February 4, 1994.  Pls.' Compl. ¶ 74 (emphasis added).  Even if the two separately alleged takings periods are considered together, the approximately 43-month delay is not sufficient to find an extraordinary delay.  As previously noted, the Supreme Court and Federal Circuit have upheld delays of much longer periods of time.  See Williamson, 473 U.S. 172 (1985) (eight-year delay not considered a temporary taking); Bass Enterprises Prod. Co. v. United States, 381 F.3d 1360 (Fed. Cir. 2004) (45-month delay not considered a temporary taking); Wyatt, 271 F.3d 1090 (Fed. Cir. 2001) (finding no extraordinary delay notwithstanding a nearly 10-year permitting process).  Furthermore, the complexity of the regulations that the Forest Service was implementing and the plaintiffs' own delay in providing the Forest Service with the necessary information caused the 43-month delay.  Under these facts and for the reasons previously discussed in more detail relating to each time period individually, the Forest Service's delay was reasonable.

**4.     Bad Faith**

Plaintiffs allege that the Forest Service's delay, when considered in conjunction with its alleged bad faith, is sufficient to ripen a takings claim.  Rarely will there be a takings based on extraordinary delay without a showing of bad faith.  Wyatt, 271 F.3d at 1098 (citing Tabb Lakes, Ltd. v. United States, 10 F.3d 796, 799 (Fed. Cir. 1993)).  Furthermore, there is a high burden of proof placed on the plaintiffs to overcome the well-established rule that government officials are presumed to act in good faith.  Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1239 (Fed. Cir. 2002).  The plaintiffs must present clear and convincing evidence to overcome the presumption that the government acted in good faith.  Id.

Plaintiffs cite three different circumstances in support of their claim that the government acted in bad faith.  First, plaintiffs claim that the government failed to notify plaintiffs of the July 23, 1990 biological opinion.  Second, plaintiffs claim the government acted in bad faith when the Forest Service reinitiated consultation with the FWS in 1992.  Lastly, plaintiffs assert that allowing timber sale operations to proceed on land that was affected by the same pair of northern spotted owls as plaintiffs' mining activities constituted bad faith by the government.  The plaintiffs claim that the government's actions from July 1990 through February 1994 amounted to an abuse of process evidencing the government's bad faith.

The facts demonstrate that the plaintiffs have not overcome the strong presumption that the government acted in good faith.  From July 1990 to March 1992, the plaintiffs asked for, and received, several time extensions to complete activities that were approved by the Forest Service. Aside from receiving time extensions, the plaintiffs and the Forest Service were in regular

contact regarding plaintiffs' proposed plan of operations.  Also during this time period, plaintiffs were still determining if cyanide should be used in the milling process.  The frequent communications between the parties, in addition to plaintiffs' own inability to settle on a precise milling process, is evidence that the government did not act in bad faith.  Moreover, during oral argument plaintiffs made telling admissions that the government did not act in bad faith in 1990. Plaintiffs indicated that the July 23, 1990 biological opinion was not provided to plaintiffs because "it fell through the cracks."  Tr. at 5.  Also, plaintiffs described the Forest Service's failure to give plaintiffs a copy of the July 23, 1990 biological opinion as a "mistake."  Tr. at 6-7.

The Forest Service's reinitiation of a consultation with the FWS was not done in bad faith.  Plaintiffs were put on notice in March 1992 that another consultation with the FWS might be necessary if plaintiffs' new proposed plan of operations was sufficiently different from plaintiffs' plan as submitted in 1989.  The circumstances had changed sufficiently enough after the issuance of the July 23, 1990 biological opinion that the Forest Service determined another consultation with the FWS was necessary.  After the July 23, 1990 biological opinion was issued, the northern spotted owl was listed as an endangered species, HCAs were established, the Forest Service implemented a conservation strategy to protect the northern spotted owl, and plaintiffs' proposed operations were further crystalized.  Plaintiffs have not provided sufficient evidence to overcome the presumption that the Forest Service acted in good faith when it reinitiated a biological consultation with the FWS based on those changed circumstances.

Like the other two bad faith examples cited by the plaintiffs, the fact that the government allowed timber sale operations on adjacent land also does not indicate bad faith by the government.  The timber sale was much further along in the permitting process than Liberty.  The timber sale contract was awarded in 1981; but, by March 1990, the timber sale was just entering the biological assessment phase of the permitting process.  J.A. 66 at 597.  In March 1990, the Forest Service initiated an environmental analysis on the timber sale's proposed activities as well as Liberty's proposed activities.  Id.  The July 23, 1990 biological opinion concluded that the timber sale could go forward provided mitigation measures were followed.  However, despite the July 23, 1990 biological opinion, as of April 1993, the Forest Service was still negotiating the mitigation measures associated with the timber sale.  J.A. 157 at 1298; Tr. at 49-50.  There were three timber sale operations near the area where Liberty was operating and by April 1993, only one of the three had finished operations.  Id.  There is no evidence the government acted in bad faith towards the plaintiffs by allowing the timber sales to move forward.  Complaining that other operations, which were further along in the permitting process, were allowed to move forward after the July 23, 1990 biological opinion was issued is insufficient evidence to overcome the presumption that the government acted in good faith.

Plaintiffs make general allegations that the government engaged in an abuse of process throughout its relationship with the plaintiffs.  Plaintiffs cite violations of Forest Service and

FWS regulations as evidence of an abuse of process, including 36 C.F.R. §§ 228.4-228.5[2] and 50 C.F.R. § 402.14.[3]  Despite plaintiffs' allegations of an abuse of process, there is no evidence of bad faith associated with the government's alleged violation of Forest Service and FWS regulations.  Failing to supply plaintiffs with the July 23, 1990 biological opinion in a timely manner and taking time to complete the reinitiated biological consultation with the FWS is insufficient evidence to overcome the presumption that the government acted in good faith.  Violation of a regulation is not <u>per se</u> evidence of bad faith sufficient to overcome the presumption of good faith.  The plaintiffs have not provided clear and convincing evidence to overcome the presumption that the government acted in good faith.

## CONCLUSION

For these reasons, the Court finds that the plaintiffs failed to establish the requisite showing of extraordinary delay and bad faith by defendant to ripen a temporary takings claim.  Defendant's motion to dismiss, or alternatively, cross-motion for summary judgment is **GRANTED**.  Plaintiffs' motion for summary judgment is **DENIED**.  The clerk will enter judgment for the defendant and dismiss this case.  Each party shall bear its own costs.

s/Lawrence S. Margolis
LAWRENCE S. MARGOLIS
Senior Judge, U.S. Court of Federal Claims

December 19, 2008

---

[2]36 C.F.R. § 228.4 provides specific guidelines, applicable to both the person proposing to conduct mining operations and the Forest Service, on submission and review of a plan of operations.  36 C.F.R. § 228.5 requires the Forest Service to respond to any plan of operations within 30 days of its filing by: 1) approving the plan; 2) notifying the operator that the proposed operations do not require an operating plan; 3) notifying the operator of changes deemed necessary to meet the purpose of the regulations; 4) notifying the operator that the plan is being reviewed, but that more time, not to exceed an additional 60 days is necessary; or 5) notifying the operator that the plan cannot be approved until a formal environmental impact statement has been prepared.

[3]50 C.F.R. § 402.14(e) provides that the FWS shall deliver a biological opinion to an applicant within 45 days of the conclusion of a formal consultation.